UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re:

JPA NO. 111 CO., LTD. and
JPA NO. 49 CO., LTD.,

Debtors.[1]

Chapter 11

Case No.: 21-12075 (___)

(Joint Administration Pending)

---

### DECLARATION OF TEIJI ISHIKAWA PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Teiji Ishikawa, being duly sworn, hereby depose and state as follows:

1.      I am the President and Chief Executive Officer of JP Lease Products & Services Co. Ltd. ("JPL"), the direct parent company and owner of 100% of the equity interests in the debtors and debtors in possession (the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases").  I also serve as the Representative Director for each of the Debtors.

2.      I have more than 36 years of experience in the aircraft leasing and financing industry.  I have served in my current position with JPL since August 2011.  I also currently serve as a Director of Japan Investment Adviser Co., Ltd. ("JIA") (since 2014), the direct parent company of JPL;  a Director of Vallair Capital SAS (since 2015), an aircraft leasing, teardown, trading, and MRO (maintenance, repair, and overhaul) company based in France;  and a Director of JLPS Ireland Limited (since 2017), a wholly owned subsidiary of JPL and sister company of the Debtors.  Prior to my time at JPL, I established Aviation Plus and served as its Chief Executive Officer from 2010 to 2011.

---

[1]     The Debtors in these Chapter 11 cases are:  JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd.  The Debtors' corporate address is:  Kasumigaseki Common Gate West Tower, 3-2-1 Kasumigaseki, Chiyoda-Ku, Tokyo 100-0013.

Prior to that time, I seconded at Sanwa Business Credit (currently Mitsubishi HC Capital Inc.) from 1999 to 2008.  I began my career in 1985 at The Sanwa Bank, Limited, which was acquired by MUFG Bank, Ltd. in 2002.

3.      I submit this declaration (the "Declaration") pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules"):  (a) in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");  (b) to explain to the United States Bankruptcy Court for the Southern District of New York (the "Court") and other interested parties the circumstances that led the Debtors to seek relief under chapter 11;  and (c) in support of the motions and applications for relief filed substantially concurrently herewith and discussed herein (collectively, the "First Day Pleadings").

4.      Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of the Debtors' business operations, my review of relevant documents, information provided to me, and/or my opinion based upon my experience, knowledge, and information concerning the Debtors.  Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change.

5.      I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

6.      This Declaration is divided into four parts.  Part I of this Declaration provides an overview of the Debtors' business and operations, including their corporate and capital structure.  Part II described the circumstances that led to the commencement of these Chapter 11 Cases and the Debtors' restructuring plans.  Part III

2

sets forth the relevant facts in support of each of the Debtor's First Day Pleadings.
Part IV provides the information required by Local Bankruptcy Rule 1007-2.

7.      As described in detail below, the Debtors were forced to file these
Chapter 11 Cases because their senior mortgage holder, FitzWalter Capital Partners
(Financial Trading) Limited ("FitzWalter"), is engaging in an out-of-sight foreclosure of
the Debtors' assets with the singular goal of cashing out their claims without concern
for junior creditors, the TK Investors (defined below), or the equity holder.  The Debtors
believe there is sufficient value to provide a return to all creditors and a distribution to
the TK Investors if the Debtors' assets—state-of-the-art, next-generation, wide body
A350 aircraft—are sold pursuant to an organized and transparent process before this
Court.  I understand that this Court frequently sees mortgage holders engage in similar
inappropriate behavior and requires the parties to conduct a controlled and transparent
sales process, often resulting in improved outcomes for all stakeholders.  Achieving a
value-maximizing outcome is the purpose of these Chapter 11 Cases.  The Debtors
believe that there is no other alternative to ensure a fair, open sales process for the
benefit of *all* creditors, the TK Investors, and the equity holder.

8.      Due to the emergency nature of these filings precipitated by
FitzWalter's conduct, the Debtors have made a good-faith effort to provide accurate and
current information, but reserve the right to amend or supplement this Declaration
and/or the petitions if new information comes to light or corrections or clarifications
need to be made.

## I.    THE DEBTORS' BUSINESS AND OPERATIONS

### A.    The Chapter 11 Filing

9.      On the date hereof (the "Petition Date"), each of the Debtors filed
voluntary petitions under chapter 11 of the Bankruptcy Code.  The Debtors continue to

manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

**B.       The Debtors' Corporate Organization**

10.       The Debtors are special purpose vehicles formed under the laws of Japan. The Debtors are each direct, wholly owned subsidiaries of JPL, which is a direct wholly owned subsidiary of JIA.[2] JPL offers financial services based on a financial scheme combining the borrowings from financial institutions and funds to manage valuable assets including aircraft, ships, containers for maritime transportation, and solar power generation equipment. JIA, in turn, creates and sells unique financial instruments to investors that consist of small and medium enterprises in Japan through a network of financial institutions, including banks and securities companies, and tax and accounting firms.

11.       The Debtors are sister companies that were each formed for the purpose of acquiring and leasing an Airbus A350 aircraft, as described in greater detail below. The Debtors have no employees. The Debtors are managed by myself as sole director or indirectly through non-employed individuals who are employees of non-debtor affiliates who act under my direction.

**C.       Overview of the Debtors' Business, Operations, and Capital Structure**

(1)       The Debtors' Operations

12.       Debtor JPA No. 111 Co., Ltd. (the "MSN 067 Owner") was formed in December 2017 for the purpose of acquiring an Airbus A350-941 aircraft bearing manufacturer serial number ("MSN") 067 (including its airframe, engines, parts, and

---

[2]       A corporate organization chart is attached hereto as **Exhibit A**.

applicable documentation, "MSN 067"), and Debtor JPA No. 49 Co., Ltd. (the "MSN 173 Owner") was formed in August 2017 for the purpose of acquiring an Airbus A350-941 aircraft bearing MSN 173 (including its airframe, engines, parts, and applicable documentation, "MSN 173" and, together with MSN 067, the "Aircraft").  Upon the closing of the Aircraft Financings (as defined below), each of the Debtors acquired title to its respective aircraft.  The Aircraft are next-generation, fuel efficient, composite wide body aircraft in high demand, and each retails for over $150 million.  The acquisition price for the Aircraft was funded by (a) debt financing and (b) equity financing under arrangements known as Tokumei kumiai ("TK"), a form of silent partnership.  Under this structure, the TK investors (the "TK Investors") are expected to be later repaid from the proceeds of a sale of the Aircraft after payment in full of the Debtors' loan obligations.

| **MSN 067** | **MSN 173** |
|:---:|:---:|
|  |  |

13.     MSN 067 Owner leases MSN 067 to JLPS Leasing Draco Limited f/k/a DAE Leasing (Ireland) 12 Limited ("JLPS Draco") pursuant to an aircraft lease agreement, dated November 19, 2018 (the "MSN 067 Head Lease"), and MSN 173 Owner leases MSN 173 to JLPS Leasing Uranus Limited f/k/a PAAL Uranus Company

Limited ("JLPS Uranus" and, together with JLPS Draco, the "JLPS Lessors")[3] pursuant

to an aircraft lease agreement, dated December 29, 2017 (the "MSN 173 Head Lease"

and, together with the MSN 067 Lease, the "Head Leases").

       14.    Each of the JLPS Lessors, in turn, leases its respective Aircraft to

Vietnam Airlines JSC ("Vietnam Airlines") pursuant to aircraft operating subleases

(together, the "Subleases").[4]  The lease payments by Vietnam Airlines on account of the

Subleases are used by the Debtors to repay the outstanding debt under the Aircraft

Financings described below.  The Debtors' sole source of revenue is the foregoing lease

payments, which are paid by Vietnam Airlines into bank accounts owned by the non-

Debtor JLPS Lessors and then transferred to bank accounts owned by the Debtors.

These accounts owned by the Debtors are pledged as security under the Aircraft

Financings, and historically CACIB, as Security Agent and account bank, swept the cash

monthly to pay the loan obligations under the Aircraft Financings.[5]

       15.    Substantially all of the expenses associated with operating the

Aircraft are paid by the sublessee, Vietnam Airlines.  Vietnam Airlines is currently

operating both planes as part of its active fleet.  For instance, MSN 173 is currently

regularly serving a Hanoi-Brussels route.  The Debtors are engaged in discussions with

Vietnam Airlines regarding a long-term restructuring of the Head Leases and Subleases

---

[3]    The JLPS Lessors are indirect, wholly owned subsidiaries of JPL.

[4]    In connection with the Transaction Documentation (as defined below), as security for their
obligations owed to the Debtors under the Head Leases, the JPL Lessors assigned their rights in the
Subleases to the Debtors.

[5]    The Debtors are in the process of opening new accounts that comply with section 345 of the
Bankruptcy Code and may file cash management and/or cash collateral motions.

pursuant to lease amendments that the parties plan to execute as early as the end of December 2021.[6]

16.     The Debtors also utilize JPL to engage third parties to provide services related to their ownership of the aircraft.  Pursuant to a management and servicing agreements with JPL (the "Management Agreement"), JPL has agreed to engage and pay these third parties on behalf of the Debtors, and the Debtors subsequently pay JPL for its management services and reimburse JPL for amounts paid on its behalf by JPL under the terms of the Management Agreement.  To fund these expenses in the ordinary course, the Debtors use a portion of the rental received by Vietnam Airlines.

17.     As of the Petition Date, the Debtors' significant assets consist of (a) the Aircraft and their interests under the documentation relating to the Secured Financings (including New York law-governed mortgages and security agreements) and lease structures, including and related rights (including claims and causes of action related thereto), (b) approximately $150,000 in cash, and (c) their respective interests ($250,000 for each Debtor) in the retainer account held by the Togut, Segal & Segal LLP (the "Togut Firm") in New York.

18.     Other than claims arising under the Aircraft Financings discussed below, the Debtors do not anticipate any other material claims against the Debtors. FitzWalter is located in London.  Other interested parties are located in Vietnam, Ireland, Japan, the United Kingdom, and other locations around the globe.

---

[6]     The effectiveness of any agreements signed by the Debtors will be subject to Bankruptcy Court approval.

(2)    The Debtors' Capital Structure

19.    To finance their acquisitions of the Aircraft, each of the Debtors entered into a complex set of financing, security, and proceeds agreements with various lenders, agents, and other parties specific to each Aircraft (together, for each Aircraft, the "Transaction Documentation").

20.    Pursuant to the Transaction Documentation with respect to MSN 067, on November 6, 2018, MSN 067 Owner, as borrower, entered into that certain senior facility agreement (the "Senior 067 Facility") which provided for a total committed senior loan up to $100,000,000 (the "Senior 067 Loans"), and that certain junior facility agreement (the "Junior 067 Facility") which provided for a total committed junior loan up to $15,000,000 (the "Junior 067 Loans").  As of October 4, 2021, the outstanding balance of the Senior 067 Loans was approximately $90,032,662, and the outstanding balance of the Junior 067 Loans was approximately $8,958,681.

21.    Pursuant to the Transaction Documentation with respect to MSN 173, on December 22, 2017, MSN 173 Owner, as borrower, entered into that certain senior facility agreement (the "Senior 173 Facility" and, together with the Senior 067 Facility, the "Senior Facilities"),[7] which provided for a total committed senior loan up to $111,000,000 (the "Senior 173 Loans" and, together with the Senior 067 Loans, the "Senior Loans"), and that certain junior facility agreement (the "Junior 173 Facility" and, together with the Junior 067 Facility, the "Junior Facilities"[8] and, together with the Senior Facilities, the "Debt Facilities"), which provided for a total committed junior loan

---

[7]    The Debtors understand that FitzWalter has acquired substantial majorities of each of the Senior Facilities.

[8]    The Debtors understand that 100% of the Junior Facilities is held by Mizuho Leasing Company, Limited.

up to $7,300,000 (the "Junior 173 Loans" and, together with the Junior 067 Loans, the "Junior Loans" and, together with the Senior Loans, the "Loans").  As of October 4, 2021, the outstanding balance of the Senior 173 Loans was approximately $89,811,133, and the outstanding balance of the Junior 173 Loans was approximately $6,771,235.[9]

22.    Under the Transaction Documentation applicable to each Debt Facility, Credit Agricole Corporate & Investment Bank ("CACIB") served as both the Senior and Junior Facilities agents, as well as the security agent (in such capacity, the "Security Agent"), on behalf of the various financial institutions that serve as lenders under each respective facility (the "Lenders").  In connection with the suite of security and collateral assignments set forth in the Transaction Documents, for each Aircraft, the applicable Debtor entered into a proceeds agreement with various other parties (each, a "Proceeds Agreement"), which incorporated additional aspects of the financing and lease structure, pursuant to which such Debtor is required to lease the Aircraft to the applicable JLPS Lessor under the Head Lease, and the JLPS Lessor is in turn required to sublease the Aircraft to Vietnam Airlines under the Sublease.  Under the Transaction Documents, the rent paid by Vietnam Airlines is intended to fully cover all obligations owed by the Debtors to the Lenders under the Debt Facilities.

23.    To secure its obligations under the Debt Facilities, each Debtor also entered into separate security agreements in favor of the Security Agent, granting a security interest in the applicable Aircraft (each, a "New York Law Mortgage") and a security interest in the Debtors' rights under various Transaction Documents, including the leases (each, a "Security Assignment Agreement").

---

[9]    Prior to the Petition Date, the Loans were fully drawn, and were to be repaid pursuant to a fixed repayment schedule.

24.     The Debtors also have approximately $12.5 million outstanding on account of the purported termination of certain swap obligations arising in connection with the Transaction Documents.  The Debtors understand this position was acquired by FitzWalter.

25.     The Debtors understand that FitzWalter may have asserted defaults under the Head Leases and Subleases and purportedly accelerated the Senior Loans. On December 1, CACIB, as former Security Agent under the Senior Loans, sent the JLPS Lessors and Vietnam Airlines numerous notices with respect to both Aircraft, including (among others):  (a) Lease Agreement and Head Lease Agreement Termination Notices (the "Termination Notices") declaring that "Events of Default" had occurred and were continuing under the Head Leases and the Subleases and terminating all such leases (the "Lease Terminations");  (b) Acceleration/Mandatory Prepayment Notices with respect to both Aircraft (together, the "Acceleration Notices") declaring that "Acceleration Events" had occurred as a result of the Lease Terminations and accordingly, the Senior Loans were immediately due and payable;  and (c) Borrower Consultation Letters declaring that CACIB intended to resign and appoint FitzWalter as successor Security Agent.  On December 2, CACIB sent the Debtors and the JLPS Lessors Notices of Resignation and Appointment, and FitzWalter succeeded CACIB as Security Agent effective immediately.

II.    **EVENTS LEADING TO THESE CHAPTER 11 CASES
       AND THE DEBTORS' RESTRUCTURING GOALS**

A.    **Lease Deferrals and Amendments**

26.     Like many airlines following the worldwide pandemic caused by COVID-19, Vietnam Airlines has experienced ongoing financial challenges since at least

March 2020.  Pre-pandemic, Vietnam Airlines was current on its monthly lease obligations.

27.     On April 29, 2020 and October 29, 2020, the Debtors, the JPL Lessors, and Vietnam Airlines agreed to rent deferrals under the Subleases (the "Initial Rent Deferrals" and "Second Rent Deferrals" respectively, and collectively, the "Rent Deferrals").  The Initial Rent Deferrals (a) reduced the rent payable by Vietnam Airlines during the months of April through September 2020, (b) required Vietnam Airlines to pay the deferred rent in six (6) equal monthly installments commencing in October 2020, and (c) modified the interest rate on the deferred rent payments.  The Second Rent Deferrals terminated the Initial Rent Deferrals, reduced the rent payable by Vietnam Airlines during the months of April through December 2020, and provided that Vietnam Airlines would pay the deferred rent in eighteen (18) equal monthly installments commencing in January 2021.  To account for shortfalls owed under the Aircraft Financings, the predecessor senior secured party, CACIB, drew on a letter of credit in favor of Vietnam Airlines that was pledged to support the Debtors' obligations under the Aircraft Financings.

28.     The Debtors, the JPL Lessors, and Vietnam Airlines are currently in advanced stages of negotiating long-term amendments to the Head Leases and Subleases, which will provide for (a) continued rent payments at a reduced rent that steps up to full rent over time, and (b) an extension of the term, and may be signed as early as the end of December 2021.

29.     On or about December 10, 2021, the Debtors learned for the first time that FitzWalter, which has only acquired its position recently from CACIB, had commenced an aggressive and improper foreclosure and sale process with respect to the Aircraft (the "Foreclosure Sale") that would potentially impair the Junior Facilities

and the Debtors' equity investors and potentially disrupt the long-term lease renegotiations, as well as Vietnam Airlines' ability to continue to operate the Aircraft. The Debtors were provided with no notice whatsoever, and only learned of this process because individuals at JPL had learned that FitzWalter had appointed an enforcement agent and visited the site and found enforcement / sale procedures terms. FitzWalter took all of these actions without notifying the Debtors.

30.     Based on information obtained from this site and a copy of the procedures notice employees of JPL obtained on their own, the Debtors understand that FitzWalter has appointed Airborne Capital Limited ("Airborne"), pursuant to a Remarketing Agreement, dated December 10, 2021, as the remarketing and enforcement agent on behalf of the Security Agent.

31.     Based on the notice obtained, FitzWalter and Airborne are pursuing a hyper-aggressive and wholly inappropriate sale process that does nothing but artificially deflate the value of the Aircraft. The notice, which was just released on December 10, 2021, provides for an extraordinarily truncated sale process for any bidders to seriously consider and diligence a complicated suite of claims and rights to proceeds arising under the Aircraft Financings. Among other things, the sale notice provides for (a) December 10 to commence the sale process and open a data room to potential bidders that execute confidentiality agreements, (b) December 15 at 5:00 p.m. (ET) as the deadline for potential bidders to contact Airborne to receive copies of the sale procedures and execute confidentiality agreements to obtain access to the data room, (c) December 17 at 4:00 p.m. (ET) as the bid deadline, including the deadline to submit a deposit and execute a claims assignment agreement related to the purported sale, (d) December 17 at midnight (ET) as the deadline for the successful bidder to fund the purchase price (at which time wire transfers around the world are closed for the

weekend, thereby rendering satisfaction of this condition impossible to anyone other

than FitzWalter),[10] and (e) December 20 at 12:00 p.m. (ET) as the proposed closing date.

32.     The sale procedures also provide other onerous terms that no

serious bidders will be able to satisfy or clear in connection with submitting a bid.  For

example, among other things, each bid:  (a) must be accompanied by a $500,000 cash

deposit and evidence of unconditional committed financing documented to the

satisfaction of FitzWalter and Airborne;  (b) shall not be conditioned on internal

approval or the outcome or review of due diligence;  (c) waive any remedies and claims

that the bidder may have against FitzWalter or Airborne in connection with the bidding

and sale process;  and (d) must not be subject to any governmental, licensing,

regulatory, or other approvals or consents.  Furthermore, the procedures provide that

the sale shall be on an "as is, where is" basis without any representations or warranties.

33.     The sale procedures appear to be part of a two-step foreclosure

process that further depresses the price of the Aircraft.  Having separated the claims

and proceeds from the Aircraft themselves, FitzWalter is apparently trying to obtain the

Aircraft in a further proceeding where they will be divorced from the revenue-

generating portions and basically become worthless pieces of metal.

34.     This absurd sale timeline does not provide a meaningful

opportunity for a market testing of the assets and obtaining the highest and best price

under the circumstances, let alone any price.  What is apparent is that FitzWalter has

designed these procedures in its sole discretion, without notice or input from the

Debtors—the *owners* of the Aircraft—to discourage any bidders from making any offers

and take the Aircraft for its own purposes.  This is particularly concerning when the

---

[10]   Although the notice states that the funding deadline is on December 17 at midnight, the Debtors
believe it must be December 18, as the bid deadline necessarily must precede the funding deadline.

Debtors understand FitzWalter has only recently acquired its position, likely at a steep

discount to par, and is orchestrating a scheme to obtain the Aircraft for itself on the

cheap[11]—Aircraft that the Debtors believe have sufficient value to effectuate a return to

all creditors, the TK Investors, and potentially equity holders.

35.     Further complicating matters, certain of the pledged engines and

auxiliary power units (APUs) are not currently attached to the planes.  One of the

engines for MSN 067 is in storage at the hangar of Vietnam Airlines in Hanoi, and one

of the engines for MSN 173 is being overhauled in an N3 repair shop located in

Germany, and the Debtors understand that N3 can assert a workman's lien on the

engine and will not return it until repair costs have been paid in full.  In addition, both

auxiliary power units (APUs) are installed on other planes (bearing MSNs 014 and 086)

operated by Vietnam Airlines.  In the normal course of operations, airlines will move

engines and parts between leased aircraft, but typically are required to reattach the

original equipment prior to redelivery at the expiration of a lease or in connection with

a sale of the aircraft.

36.     An orderly marketing and sale process will ensure that the Debtors

obtain the best possible price for the Aircraft and will also allow the Debtors to address

these logistical issues in a manner that mitigates disruption to the Debtors and the

airline.

**B.     The Debtor's Purpose for these Chapter 11 Cases**

37.     The Debtors were forced to file these Chapter 11 Cases to stay

FitzWalter's improper foreclosure of the Aircraft pursuant to sale procedures that are

---

[11]   This is apparently a repeat playbook for FitzWalter, as the Debtors understand that recently
FitzWalter has used similar procedures to orchestrate the foreclosure of seven other aircraft unrelated
to the Debtors.

designed to at best artificially depress the price of the Debtors' only material assets or at worst obtain for FitzWalter the Aircraft and cause harm to the Debtors, their creditors, and Vietnam Airlines.

38.     The Debtors intend to use these Chapter 11 Cases to preserve and maximize the value of their assets for the benefit of all creditors, the TK Investors, and the equity holder, not just FitzWalter through its foreclosure process.  The Debtors own valuable assets that are worth preserving and can be sold for the benefit of their creditors (including the lenders under the Junior Loans), the TK Investors, and the equity holder without disrupting Vietnam Airlines' operation of the Aircraft.  This Court will be best able to provide the Debtors protection while they pursue an orderly sale of the Aircraft and related claims pursuant to a marketing and sale process overseen by this Court (the "Sale Process") designed to maximize value.

39.     The Debtors typically utilize in-house marketing and sales services from its non-debtor affiliates, which it intends to do here to find a bid for the Aircraft that pays all creditors, the TK Investors, and the equity holder in full.  If such a bid is not available, the Debtors intend to engage a third-party sales agent or investment banker to assist with the Debtors' sale efforts.  The Debtors are in discussions with certain parties that have expressed an interest in serving as a stalking horse bidder in connection with the Sale Process.  The Debtors expect to file a motion for bidding and sale procedures in the near term, which will continue to advance the Debtors' sale efforts, and ensure that such process is orderly and maximizes value for all stakeholders.

40.     The Debtors believe that with the benefit of a robust marketing process (with the assistance of a sales agent, if needed), the Debtors will be able to

15

maximize the value of their key assets and make distributions to their creditors,

including all Lenders, the TK Investors, and the equity holder.

## III.   FIRST DAY PLEADINGS

41.     Substantially contemporaneously with the filing of this Declaration,

the Debtors have filed a small number of First Day Pleadings, and, at the "first day"

hearing (the "<u>First Day Hearing</u>") will seek orders granting various forms of relief.  I

have reviewed each of the First Day Pleadings or have otherwise had their contents

explained to me, including the exhibits thereto, and I believe that the relief sought in

each of the First Day Pleadings is important to the Debtors' ability to transition to

chapter 11 with minimum interruption or loss of value.

42.     Because of the Debtors' limited operations historically, the Debtors

have only filed three First Day Pleadings to be heard at the first day hearing, each on a

final basis:  the Joint Administration Motion, the Creditor Matrix Motion, and the Stay

Confirmation Motion (each as defined below).

**A.      Debtors' Motion for an Order Directing
Joint Administration of the Debtors' Chapter 11 Cases
(the "<u>Joint Administration Motion</u>").**

43.     By the Joint Administration Motion, the Debtors request entry of an

order directing the joint administration of the Chapter 11 Cases for procedural purposes

only pursuant to Bankruptcy Rule 1015(b).  Specifically, the Debtors request that the

Court maintain one file and one docket for each of the Chapter 11 Cases under the case

of MSN 067 Owner (*i.e.*, JPA No. 111 Co., Ltd.).

44.     Joint administration of these Chapter 11 Cases will provide

significant administrative convenience without harming the substantive rights of any

party in interest.  Many of the motions, hearings, and orders that will be filed in these

Chapter 11 Cases will almost certainly affect both of the Debtors.  The entry of an order

16

directing joint administration of these Chapter 11 Cases will reduce fees and costs by

avoiding duplicate filings and objections and will allow the U.S. Trustee and all parties

in interest to monitor the Chapter 11 Cases with greater ease and efficiency.

45.    Accordingly, I believe that the relief requested in the Joint

Administration Motion is in the best interests of the Debtors, their estates, their

creditors, and all other parties in interest, and should be approved.

**B.    Debtors' Motion for Entry of an Order (I) Waiving Certain Creditor List Filing Requirements;  (II) Authorizing the Filing of a Consolidated List of Top 20 Unsecured Creditors;  and (III) Authorizing the Debtors to Establish Procedures for Notifying Parties of the Commencement of These Cases (the "<u>Creditor Matrix Motion</u>").**

46.    By the Creditor Matrix Motion, the Debtors are seeking entry of an

order (i) waiving the requirements applicable to creditor list filing pursuant to

section 521(a)(1) of the Bankruptcy Code, Bankruptcy Rule 1007(d), and Local

Bankruptcy Rule 1007-1 (collectively, the "<u>List Filing Requirements</u>");  (ii) authorizing

the Debtors to file a single, consolidated list of their 20 largest unsecured creditors in

these Chapter 11 Cases (the "<u>Consolidated Top 20 List</u>") rather than a list of each

Debtor's 20 largest unsecured creditors (the "<u>Top 20 List</u>");  and (iii) (A) authorizing the

Debtors to establish certain procedures (the "<u>Procedures</u>") for providing notice to

parties of the commencement of these Chapter 11 Cases and of the meeting of creditors

pursuant to sections 341 and 342(a) of the Bankruptcy Code and (B) approving the form

of notice of commencement (the "<u>Notice of Commencement</u>").

47.    I believe that permitting the Debtors to maintain a single

consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor,

is warranted.  Under the circumstances, reformatting the creditor list, preparing and

filing separate formatted creditor matrices, and otherwise complying with the List

21-12075-dsj    Doc 3    Filed 12/17/21    Entered 12/17/21 07:03:27    Main Document
Pg 18 of 22

Filing Requirements will unnecessarily burden the Debtors without any corresponding benefit to the estates.

        48.      Furthermore, I believe that requiring each of the Debtors to file a Top 20 List would be unduly burdensome, with little, if any, attendant value to the Debtors' estates or the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"). If a creditors' committee is ultimately deemed appropriate, the Consolidated Top 20 List will be sufficient to aid in the U.S. Trustee's appointment of such committee.

        49.      In addition, service of the Notice of Commencement by regular first-class mail and email, where available, will maximize efficiency in administering these Chapter 11 Cases and will ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee. In addition, the Debtors will endeavor to serve the Notice of Commencement by email where possible. I believe the Procedures will ensure that the Debtor's creditors receive prompt notice of the commencement of these Chapter 11 Cases and of the meeting of creditors.

        50.      Accordingly, I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest, and should be approved.

      **C.**      **Debtors' Motion for the Entry of an Order (I) Enforcing the Protections of Sections 105(a), 362, 365, 525, and 541 of the Bankruptcy Code, Restating Automatic Stay and *Ipso Facto* Provisions; and (II) Granting Related Relief (the "Stay Confirmation Motion").**

        51.      The Debtors' business operations are conducted worldwide, with their Aircraft moving through international airways and landing at locations outside of the United States. As a result, the Debtors have foreign creditors and counterparties who may not be well-versed in the restrictions of the Bankruptcy Code. It is my

understanding that many of these creditors do not transact business on a regular basis with companies that have filed for chapter 11, or are unfamiliar with the scope of a debtor-in-possession's authority to conduct its business.  I believe that these creditors may be unfamiliar with the operation of the automatic stay and other provisions of the Bankruptcy Code.  I believe an affirmative court order will make the impact of the automatic stay and its applicability to creditors wherever located clearer to such creditors.

52.      In addition, the Debtors are parties to contracts and possess licenses or other grants from governmental units located throughout the world, both domestically and internationally, that are necessary to the conduct of the Debtors' business.  I believe that certain of these foreign governmental units may not be cognizant of the protections afforded to the Debtors by the Bankruptcy Code, and therefore, may inadvertently contravene its provisions.  I believe an affirmative court order will ensure that governmental units worldwide do not hamper the Debtors' operations in contravention of the protections of the Bankruptcy Code regarding relationships with governmental entities.

53.      Moreover, the Debtors are currently subject to the Foreclosure Sale that was initiated by FitzWalter.  As detailed above, FitzWalter is seeking to foreclose on the lease claims and all contract rights in the expedited Foreclosure Sale, of which neither the Debtors nor JPL received notice, and expect FitzWalter to move quickly to foreclose on the Aircaft.  FitzWalter is attempting to foreclose on the Debtors assets located outside of the United States to the detriment of the Debtors and their creditors, in contravention of the automatic stay of section 362 of the Bankruptcy Code, which could harm the Debtors' estates.

54.     Accordingly, I believe that the relief requested in the Stay

Confirmation Motion is in the best interests of the Debtors, their estates, their creditors,

and all other parties in interest, and should be approved.

## IV.    ADDITIONAL DISCLOSURES REQUIRED UNDER LOCAL BANKRUPTCY RULE 1007-2

55.     Local Bankruptcy Rule 1007-2 requires that the Debtors provide

certain information, which is set forth below:

- Local Bankruptcy Rule 1007-2(a)(2):  not applicable to these Chapter 11 Cases because such cases were not originally commenced as a chapter 7, chapter 12, or chapter 13 case;

- Local Bankruptcy Rule 1007-2(a)(3):  **Exhibit B** lists the names and addresses of the members of, and attorneys for, any committee organized prior to the Petition Date and a brief description of the circumstances surrounding the formation of the committee and the date of its formation;

- Local Bankruptcy Rule 1007-2(a)(4):  **Exhibit C** lists the following information with respect to each of the holders of the Debtor's twenty (20) largest unsecured claims, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), telephone number, the name(s) of person(s) familiar with the Debtors' accounts, the amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured;[12]

- Local Bankruptcy Rule 1007-2(a)(5):  **Exhibit D** lists the holders of the five largest secured claims against the Debtors;

- Local Bankruptcy Rue 1007-2(a)(6):  **Exhibit E** provides a summary of the unaudited assets and liabilities for the Debtors;

- Local Bankruptcy Rule 1007-2(a)(7):  **Exhibit F** provides the following information:  the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held and the number of record holders thereof;  and the number and classes of shares of stock, debentures, and other securities of

---

[12]   In each case, the claim amounts are estimated and subject to verification.  The Debtors reserve all rights, including to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

the Debtors that are held by the Debtors' directors and officers, and the amounts so held;

- Local Bankruptcy Rule 1007-2(a)(8):  **Exhibit G** provides a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending;

- Local Bankruptcy Rule 1007-2(a)(9):  **Exhibit H** provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their business;

- Local Bankruptcy Rule 1007-2(a)(10):  **Exhibit I** provides the location of the Debtors' substantial assets, and the location of their books and records;

- Local Bankruptcy Rule 1007-2(a)(11):  **Exhibit J** provides a list of actions against the Debtors;

- Local Bankruptcy Rule 1007-2(a)(12):  **Exhibit K** provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience;

- Local Bankruptcy Rule 1007-2(b)(1)–(2):  **Exhibit L** provides the estimated amount to be paid to the Debtors' employees (not including officers, directors, and stockholders), and the estimated amount to be paid to the Debtors' officers, stockholders, directors, and financial and business consultants retained by the Debtors for the thirty (30)-day period following the Petition Date;  and

- Local Bankruptcy Rule 1007-2(b)(3):  **Exhibit M** sets forth, for the thirty (30)-day period following the Petition Date, estimated cash receipts and disbursements, net cash gain or loss, obligations, and receivables expected to accrue but remaining unpaid, other than professional fees, and other information relevant to the foregoing.

56.     Copies of the resolutions authorizing the filing of the Debtors'

chapter 11 petitions are annexed thereto.


[*Remainder of page left blank intentionally; signature page follows*]


21

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: December 17, 2021
Tokyo, Japan


By:   /s/ Teiji Ishikawa
Name:   Teiji Ishikawa
Title:    Director Representative
       JPA No. 111 Co., Ltd.
       JPA No. 49 Co., Ltd.