**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| JPA NO. 111 CO., LTD., and | : | |
| JPA NO. 49 CO., LTD., | : | Case No. 21-12075 (DSJ) |
| | : | Case No. 21-12076 (DSJ) |
| Debtors.[1] | : | |
| | : | |
| | : | |

## MOTION OF FITZWALTER CAPITAL PARTNERS (FINANCIAL TRADING) LIMITED TO DISMISS OR ABSTAIN FROM HEARING THESE CHAPTER 11 CASES

---

[1]  The Debtors in these Chapter 11 cases are: JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd.  The Debtors' corporate address is:  Kasumigaseki Common Gate West Tower, 3-2-1 Kasumigaseki, Chiyoda-Ku, Tokyo 100-0013.

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION.................................................................................................. 1

II. FACTUAL BACKGROUND ................................................................................. 2

    A.  The Debtors Finance The Acquisition Of The Aircraft.......................................... 4

    B.  The Debtors Lease Each Aircraft To Affiliates, Which In Turn Lease The
        Aicraft To Vietnam Airlines ............................................................................ 7

    C.  FWCP Purchases Interests In The Senior Facilities And Becomes Security
        Agent ............................................................................................................. 9

    D.  FWCP Begins Sale Process For The Lease Assets And Debtors Respond
        By Initiating These Chapter 11 Cases ................................................................ 9

III. ARGUMENT ...................................................................................................... 13

    A.  The Debtors Are Not Eligible For Bankruptcy Protection ................................. 13

    B.  The "Cause" Standard Under Bankruptcy Code Section 1112........................... 14

    C.  Dismissal Is Warranted As The Debtors Clearly Filed For Chapter 11
        Protection In Bad Faith.................................................................................. 15

        1.  The Debtors Filed With Subjective Bad Faith. ...................................... 16

            (a)  The Debtors Essentially Each Have Only One Asset.................. 16

            (b)  This Is Essentially A Two-Party Dispute And There Are
                    Virtually No Unsecured Creditors .............................................. 16

            (c)  The Debtors Filed To Frustrate The Legitimate Efforts Of
                    Their Secured Creditors To Foreclose On The Aircraft ............. 19

            (d)  The Debtors Have No Cash Flows And Cannot Provide
                    Adequate Protection To Secured Creditors Absent A
                    Fatally Flawed Sale Process That Cannot Occur If These
                    Cases Are Dismissed ................................................................ 20

            (e)  The Debtors Have No Employees............................................... 24

            (f)  The Bankruptcy Code Is Not A Proper Scheme For These
                    Debtors .................................................................................... 24

        2.  The Filing Is Objectively Futile, As The Debtors Have No
            Prospect Of Reorganiation And Do Not Seek A Discharge................... 25

    D.  The Court Should Not Convert This Case To A Chapter 7 Case Under
        1112(b)........................................................................................................ 27

    E.  The Court Should Abstain From Hearing This Case Under Section 305 Of
        The Bankruptcy Code.................................................................................... 28

CONCLUSION ......................................................................................................... 30

i

TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222 (2d Cir. 1991) ............................................. 25

*In re Compania de Alimentos Fargo, S.A.*, 376 B.R. 427 (Bankr. S.D.N.Y. 2007) .................... 29

*In re C-TC 9th Ave. Partnership*, 113 F.3d 1304 (2d Cir. 1997) ........................................ *passim*

*In re Downey Fin. Corp.*, 428 B.R. 595 (Bankr. D. Del. 2010) .......................................... 21, 22

*In re E. 81st, LLC*, No. 13-13685(SMB), 2014 WL 4548551 (Bankr. S.D.N.Y. Mar. 17,
      2014) ...................................................................................................................... 26

*In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293 (Bankr. D. Del. 2011) .................... 21

*In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309 (Bankr. S.D.N.Y. 2001) ................................... 14

*In re Loco Realty Corp.*, No. 09-11785 (AJG), 2009 WL 2883050 (Bankr. S.D.N.Y.
      June 25, 2009) ..................................................................................................... *passim*

*In re MF Glob. Holdings Ltd.*, 515 B.R. 193 (Bankr. S.D.N.Y. 2014) ...................................... 21

*In re Michael S. Starbuck, Inc.*, 14 B.R. 134 (Bankr. S.D.N.Y. 1981) ...................................... 29

*In re Monitor Single Lift I, Ltd.*, 381 B.R. 455 (Bankr. S.D.N.Y. 2008) ................................... 30

*In re Murray*, 543 B.R. 484 (Bankr. S.D.N.Y. 2016), *aff'd*, 565 B.R. 527 (S.D.N.Y.
      2017), *aff'd*, 900 F.3d 53 (2d Cir. 2018) ....................................................... 15, 18

*In re Navient Sols., LLC*, 625 B.R. 801 (Bankr. S.D.N.Y. 2021) .............................................. 28

*In re Nesenkeag, Inc.*, 131 B.R. 246 (Bankr. D.N.H. 1991) ..................................................... 14

*In re Newbury Operating LLC*, No. 20-12976-JLG, 2021 WL 1157977 (Bankr. S.D.N.Y.
      Mar. 25, 2021) ...................................................................................................... 30

*In re On the Ocean, Inc.*, No. 16-16204-BKC-RBR, 2016 WL 8539791 (Bankr. S.D. Fla.
      June 6, 2016) ......................................................................................................... 24

*Pleasant Pointe Apartments, Ltd. v. Kentucky Hous. Corp.*, 139 B.R. 828 (W.D. Ky.
      1992) ..................................................................................................................... 16

*In re Reyes*, No. 14-13233, 2015 WL 4624156 (Bankr. S.D.N.Y. Aug. 4, 2015) ............... 14, 15

*In re Schur Mgmt. Co., Ltd.*, 323 B.R. 123 (Bankr. S.D.N.Y. 2005) ................................... 14, 26

*In re Selectron Mgmt. Corp.*, 2010 WL 3811863 (Bankr. E.D.N.Y. Sept. 27, 2010) ................ 28

*In re Syndicom Corp.*, 268 B.R. 26 (Bankr. S.D.N.Y. 2001) .................................................... 14

*Taberna Preferred Funding IV, Ltd. v. Opportunities II Ltd. (In re Taberna Preferred Funding IV, Ltd.)*, 594 B.R. 576 (Bankr. S.D.N.Y. 2018) ............................................. *passim*

*Travelers Ins. Co. v. 633 Third Assocs.*, No. 91 CIV. 5735 (CSH), 1991 WL 236842, at *2 (S.D.N.Y. Oct. 31, 1991) ........................................................................................... 20

*Y.J. Sons & Co., Inc. v. Anemone, Inc. (In re Y.J. Sons & Co., Inc.)*, 212 B.R. 793 (D.N.J. 1997) .......................................................................................................... 19,

*In re Yukos Oil Co.*, 321 B.R. 396 (Bankr. S.D. Tex. 2005) .................................................... 29

## Statutory Authorities

11 U.S.C. § 101(31) ............................................................................................................... 15

11 U.S.C. § 109 ...................................................................................................................... 13

11 U.S.C. § 305 ............................................................................................... 1, 11, 23, 24, 25

11 U.S.C. § 1112 ............................................................................................................ *passim*

FitzWalter Capital Partners (Financial Trading) Limited ("**FWCP**"), the holder of the largest amount of secured claims against each of the Debtors and the security agent for virtually all creditors, respectfully submit this Motion pursuant to 11 U.S.C. §§ 109, 1112, and 305 to dismiss or abstain from the Chapter 11 bankruptcy cases of JPA No. 111 Co., Ltd. ("**Japan Debtor One**") and JPA No. 49 Co., Ltd. ("**Japan Debtor Two**") and, with Japan Debtor One, collectively, the "**Debtors,**" and their cases, the "**Chapter 11 Cases**").

## I.   INTRODUCTION

These cases must be dismissed.   The Debtors do not qualify for bankruptcy protection. Moreover, there is no bankruptcy purpose being served, and each Debtor commenced its case at the direction of its parent, JP Lease Products & Services Co. Ltd. ("**JPL**"), to stave off enforcement of remedies being exercised by FWCP—including against assets that are not estate property—as Security Agent (defined below) for all of the Debtors' non-insider creditors, in accordance with the Proceeds Agreements (defined below) and other documents that bind every secured creditor and the only unsecured creditor of any material amount, JPL.

Every relevant factor identified by the Second Circuit in *In re C-TC 9th Ave. Partnership*, 113 F.3d 1304 (2d Cir. 1997) applies here:

- Each Debtor is a single purpose vehicle owning a single asset:  an Airbus A350 aircraft to be leased out to third parties;

- Each Debtor has *de minimis* unsecured creditors, the largest of which is their parent company, JPL;

- The Debtors' secured creditors had commenced enforcement proceedings against assets that are not estate property, and the Debtors filed these cases to seek to stay such proceedings;

- These cases amount to nothing more than a two-party dispute between the Debtors and their secured creditors;

- The Debtors have no cash flow and cannot provide adequate protection to secured creditors; and

1

- The Debtors have no employees.

The Debtors will no doubt argue that these cases should not be dismissed because they are seeking to sell their purported assets that will pay in full all claims, per a motion that they filed on December 31, 2021. Dkt No. 21. While, as discussed below, the proposed sale itself suffers from a fatal flaw, the Debtors' "ends justify the means" theory must fail. A company cannot improperly commence a bankruptcy case to take advantage of the tools of the Bankruptcy Code, even if use of those tools might be laudable.

Indeed, the reasons these cases should be dismissed are analogous to the reasons cited by the court in *Taberna Preferred Funding IV, Ltd. v. Opportunities II Ltd. (In re Taberna Preferred Funding IV, Ltd.)*, 594 B.R. 576 (Bankr. S.D.N.Y. 2018). While that case was an involuntary petition filed against two structured finance vehicles known as collateral debt obligations, the court dismissed the case as a bad faith filing under section 1112. Like the facts here, in *Taberna*, the party seeking bankruptcy relief hoped to use bankruptcy to sell assets in connection with what was in effect a two-party dispute but without complying with contractual restrictions negotiated by the secured parties. Also like the facts here, the debtor had no employees or operations, and the debtor and all of its creditors had agreed in advance to allocation of value under an indenture. This Court should follow *Taberna* and dismiss.

## II.    FACTUAL BACKGROUND

In December of 2017, Japan Debtor One was formed and in November of 2018, it acquired the Airbus A350 aircraft referred to as MSN 067. In August of 2017, Japan Debtor Two was formed and, in December of 2017, it acquired the Airbus A350 aircraft referred to as MSN 173 (together with MSN 067, the "**Aircraft**"). *See* Declaration of Teiji Ishikawa Pursuant to Local

Bankruptcy Rule 1007-2 and In Support of the Debtors' Chapter 11 Petitions and First Day Pleadings (Dkt. No. 3) ("**First Day Declaration**")[2] ¶¶ 12, 21-22.

The Debtors each are passive special purpose investment vehicles formed under the laws of Japan created for the express and sole purpose acquiring and leasing Airbus 350 aircraft. They never have, and still do not, conduct any operations. Indeed, by virtue of the transactions to which they are parties, the Debtors cannot incur any trade debt or engage in any business other than each passively owning a single aircraft. Not surprisingly, neither Debtor has ever had or has today any employees. *See id.* ¶¶ 10-11.

Instead, the Debtors' operations are managed either directly by JPL,[3] or by third parties hired by JPL. *Id.* ¶¶ 11, 16 ("Pursuant to a management and servicing agreements [sic] with JPL (the '**Management Agreement**'), JPL has agreed to engage and pay these third parties on behalf of the Debtors, and the Debtors subsequently pay JPL for its management services and reimburse JPL for amounts paid on its behalf by JPL under the terms of the Management Agreement."). JPL engages and pays third parties to service, market, and maintain the Aircraft on an ad hoc basis. Gray Decl. Exs. 2, 4 (Servicing Agreements). Each Debtor, in turn, pays JPL fees for these services. Gray Decl. Exs. 1, 3 (Lease Management Agreements).

The Debtors are not corporate entities formed under any United States law. They have no assets or offices in the United States, and neither Aircraft has ever touched down in the United States. Instead, the Debtors are "located" in Japan, albeit only on paper. They have no independent

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the First Day Declaration or the Declaration of Andrew Gray filed concurrently herewith (the "**Gray Declaration**"), as applicable.

[3] JPL is also formed under the laws of Japan. *Id.* Ex. A.

offices anywhere in the world; rather, JPL maintains an office in Tokyo, Japan, and conducts all business matters for the Debtors.  *See* First Day Decl. ¶ 10, n.2 & Ex. 2.

Consistent with their formation and purpose, and as confirmed by the Debtors' first day papers, the only significant creditors of the Debtors are their secured lenders, for whom FWCP is the Security Agent and authorized representative, and JPL as the largest unsecured creditor.  First Day Decl. ¶ 18 & Exs. C, D; Gray Decl. ¶ 6.

### A.      The Debtors Finance The Acquisition Of The Aircraft

The acquisition of the Aircraft was funded by both senior and junior debt financings,[4] each through Crédit Agricole Corporate & Investment Bank ("**CACIB**"),[5] who acted as Mandated Lead Arranger, Senior Agent, Junior Agent, Security Agent, and Account Bank for the Junior and Senior Lenders (as applicable), as well as contributions from equity owners.  First Day Decl. ¶¶ 20-22; Gray Decl. Exs. 5, 6, 12, 13  (067 and 173 Senior and Junior Facility Agreements).

Specifically, on December 22, 2017, Japan Debtor Two entered into the Senior 173 Facility Agreement which provided for a senior loan up to $111,000,000 and the Junior 173 Facility Agreement which provided for a junior loan up to $7,300,000.  Gray Decl. Exs. 5, 6 (173 Senior and Junior Facility Agreements).  On November 6, 2018, Japan Debtor One entered into the Senior 067 Facility Agreement which provided for a senior loan up to $100,000,000 and the Junior 067 Facility Agreement which provided for a junior loan up to $15,000,000.  Gray Decl. Exs. 12, 13 (067 Senior and Junior Facility Agreements).

As of October 4, 2021, for Japan Debtor One, the outstanding balance of the Senior 067 Loans was approximately $90,032,662, and the outstanding balance of the Junior 067 Loans was

---

[4]  The Senior and Junior Facility Agreements for the Debtors are attached to the Gray Declaration as Exs. 5, 6, 12, 13.

[5]  CACIB is a bank headquartered in Paris, France and formed under the laws of France.

approximately $8,958,681. First Day Decl. ¶ 20. For Japan Debtor Two, the outstanding balance of the Senior 173 Loans was approximately $89,811,133, and the outstanding balance of the Junior 173 Loans was approximately $6,771,235. *Id.* ¶ 21.

In connection with the debt financings, the Debtors entered into proceeds agreements (the "**Proceeds Agreements**"),[6] by and among the Debtors, their Intermediate Lessors, JPL, CACIB, and the Lenders. *Id.* ¶ 22. The Proceeds Agreements binds JPL and every secured creditor of the Debtors—there is no known secured creditor of either Debtor that is not a party to the Proceeds Agreements.

Section 8.3 of both of the Proceeds Agreements contains a payment waterfall for distribution of all proceeds received by the Debtors, either pre- or post-default, to the Senior and Junior Lenders. *See* Gray Decl. Ex. 7 § 8.3 ("The amounts referred to in Clause 8.1 (No Enforcement Event) and Clause 8.2 (Post-Enforcement Event, Final Disposition Proceeds and Event of Loss Proceeds) shall be applied in the following order of priority. . . . "); Gray Decl. Ex. 14 § 8.3 (same). The waterfall provides that proceeds be allocated to the Senior Loans ahead of the Junior Loans, and provides for allocation to the Debtors at the bottom of the waterfall, after allocation on both the Senior and Junior Lenders have been satisfied. *Id.* This waterfall not only acts as a subordination agreement, it also provides a comprehensive scheme to allocate the value of each Debtor to all of such Debtor's creditors. Indeed, section 2 of each Proceeds Agreement states: "[e]ach of the Parties agrees that the Collateral granted by the Obligors to the Finance Parties shall be applied in the manner and order of priorities set out in this Agreement." The term "Parties" as used in the Proceeds Agreements means every creditor of each of the Debtors.

---

[6] The Proceeds Agreements are attached to the Gray Declaration as Exs. 7, 14.

The Debtors also entered into security agreements granting liens in favor of the Security Agent on the Aircraft (the "**Aircraft Mortgages**").[7] First Day Decl. ¶ 23. The Aircraft Mortgages are governed by New York law, but, as explained above, the Aircraft have never flown to the United States and, but for this single choice of law provision, there is no other connection to the United States applicable to any creditor of the Debtors. The Aircraft do not constitute property interests of either Debtor located in the United States.

The Debtors further entered into assignment agreements (the "**Security Assignment Agreements**"),[8] transferring absolute right, title and ownership to certain rights under various Transaction Documents, including all Aircraft leases, to the Security Agent. *See, e.g.*, Gray Decl. Ex. 10 (173 Security Assignment Agreement) § 3.1 ("The Borrower *assigns and agrees to assign absolutely by way of security with full title guarantee* . . . to the Security Agent . . . as security for the payment and discharge of the Secured Obligations, *all of its right, title and interest*, present and future, in and to the Assigned Property.") (emphasis added). The Security Assignment Agreements are governed by English law. *Id.* § 19. The Security Agent is required to apply the proceeds of any sale or disposal of the Aircraft or the rights obtained under the Security Assignment Agreements in accordance with the waterfall in Section 8.3 of the Proceeds Agreements. *See, e.g., id.* Ex. 7 (Proceeds Agreement) §§ 6, 8.2.

The secured loans to the Debtors were nonrecourse; the Lenders only had the collateral available to satisfy their debts. The fact that the loans were nonrecourse is consistent with the both the Debtors' limited business purpose and the comprehensive allocation and priority architecture of the Aircraft financing documents.

---

[7]   The Aircraft Mortgages are attached to the Gray Declaration as Exs. 11, 18.

[8]   The Security Assignment Agreements are attached to the Gray Declaration as Exs. 10, 17.

**B.    The Debtors Lease Each Aircraft To Affiliates, Which In Turn Lease The Aicraft To Vietnam Airlines**

Each Aircraft was leased to Vietnam Airlines JSC ("**Vietnam Airlines**"), to be used on long-haul flights to and from the Socialist Republic of Vietnam. Vietnam Airlines has never flown the Aircraft to the United States. Until November 4, 2021, Vietnam Airlines was not certified by the Federal Aviation Administration to fly in the United States.[9]

Pursuant to the MSN 067 Head Lease, Japan Debtor One leased the MSN 067 aircraft to JLPS Draco, an affiliate of the Debtors organized under the laws of Ireland, and JLPS Draco subsequently subleased the MSN 067 aircraft to Vietnam Airlines. First Day Decl. ¶¶ 13-14. Pursuant to the MSN 173 Head Lease, Japan Debtor Two leased the MSN 173 aircraft to JLPS Uranus, also an affiliate of the Debtors organized under the laws of Ireland, and JLPS Uranus subsequently subleased the MSN 173 aircraft to Vietnam Airlines. *Id.* The sublease payments made by Vietnam Airlines were the Debtors' only source of revenue. *Id.* ¶ 14. The Debtors used these revenues to repay the Loans, among other things. *Id.*

In early 2020, Vietnam Airlines began signaling that it would not be able to meet its obligations under the Subleases. On January 2021, Vietnam Airlines breached its obligations under the Lease Agreements for both Aircraft. Since then, Vietnam Airlines has made sporadic, partial payments under the Lease Agreements but has not paid off the amounts owed. Specifically, for MSN 67, Vietnam Airlines has paid approximately $5,075,585.57 and owes approximately $10,429,865.50. Regarding MSN 173, Vietnam Airlines has paid approximately $4,545,435.71 and owes approximately $10,695,530.92. *See* Gray Decl. ¶ 72.

---

[9] FWCP understands that starting in November of 2021, Vietnam Airlines began passenger service to cities on the west coast of the United States using Airbus 350 and Boeing 787 Dreamliner aircraft.

In April and May of 2020 and again on October 29, 2020, the Intermediate Lessors and Debtors entered into agreements (the "**Lease Deferral Agreements**") that provided Vietnam Airlines with rent deferrals through December 2020.[10]  The Lease Deferral Agreements were each accompanied by deferral agreements on the Loans (the "**Loan Deferral Agreements**"),[11] whereby CACIB, in its capacity as Agent for the Loans, agreed to defer all payments on the Loans into 2021.  Vietnam Airline's deferral period ended on January 1, 2021, and Vietnam Airlines failed to make full payments owed under the Lease Agreements beginning in 2021.

On December 1, 2021, CACIB, as (then) Security Agent under the Senior Loans, (i) notified the Debtors, JPLS Draco, JPLS Uranus, and Vietnam Airlines that events of default had occurred and were continuing under the Head Leases and the Subleases, (ii) terminated the leasing of the Aircraft under the Head Leases and Subleases; and (c) provided notice confirming the automatic acceleration of the Senior Loans.  Gray Decl. Exs. 31, 32 (Head Lease and Sublease Agreement Termination Notices).  The Debtors did not dispute the lease terminations prior to the Petition Date.

As a result, Vietnam Airlines had no legal right to continue to fly the Aircraft.  Prior to the Petition Date, the Security Agent owns all rights arising under or relating to the Head Leases and the Subleases, including damage claims against Vietnam Airlines (the "**Lease Assets**").  *See id.* Exs. 9, 16 (Intermediate Lessor Security Assignments) § 3.1 (assigning full title in all of JPLS Uranus and JLPS Draco rights under *inter alia*, the Subleases, to the Debtors); *id.* Ex. 10, 17 (Security Assignment Agreements) § 3.1 (assigning full title to the same rights from the Debtors

---

[10]  The Lease Deferral Agreements are attached to the Gray Declaration as Exs. 19, 20.

[11]  The Loan Deferral Agreements are attached to the Gray Declaration as Exs. 22, 24.

to the Security Agent).  Each Debtor only has a contingent revisionary interest in the relevant Lease Assets *after* all secured loans have been paid in full.  *Id.* § 17.

Despite these lease terminations, Vietnam Airlines continues to utilize both planes as part of its active fleet.  First Day Decl. ¶ 15.  Every time Vietnam Airlines flies one of the Aircraft, that Aircraft's value decreases.  *See* Gray Decl. ¶ 75.  The Debtors have not provided their secured lenders adequate protection for the diminution in the value of their Collateral occasioned by Vietnam Airlines' continued use of the Aircraft.

## C.   FWCP Purchases Interests In The Senior Facilities And Becomes Security Agent

FWCP is a company incorporated in England and Wales. Gray Decl. ¶ 6.  On December 1, 2021, FWCP acquired $128,227,903.53 in outstanding obligations issued by the Debtors, made up of $115,778,525.00 in Senior Loans and $12,449,378.53 in a secured claim relating to the termination of certain swap obligations arising in connection with the Transaction Documents. *Id.* ¶ 76.  FWCP is, by far, each Debtor's largest creditor and holds a substantial majority of the Debtors outstanding Senior Loans.  *Id.*.  Additionally, on December 2, 2021, FWCP succeeded CACIB as Security Agent under the Transaction Documents.  *Id.* Exs. 33, 34, 35, 36. (CACIB Notices of Resignation and Appointment).

## D.   FWCP Begins Sale Process For The Lease Assets And Debtors Respond By Initiating These Chapter 11 Cases

On December 10, 2021, FWCP appointed Airborne Capital Limited ("**Airborne**") to conduct a sale of the Lease Assets transferred to the Security Agent under the Security Assignment Agreements. Gray Decl. ¶ 81.  Beginning on December 10, 2021, Airborne advertised the pending sale, via advertisements in the WSJ, Aersyn (a trade website) and Airborne's own website— despite the fact there was no requirement under the operative documents to advertise.  Gray Decl. ¶ 82.  Airborne also offered detailed bidding procedures to any parties who expressed interest in

9

the sale. *Id*. Thus, if there were bidders interested in the Lease Assets, they were free to communicate with Airborne and bid for the assets.

Every step FWCP took was in strict accordance with every Transaction Document to which the Debtors and JPL are parties. *Id*. ¶ 83. The Transaction Documents granted broad powers to the Security Agent to enforce security over this collateral "at the times, in the manner and on the terms it thinks fit."

Importantly, the sales process for the Lease Assets that Airborne had commenced did not include a sale of the Aircraft. The sale of the Aircraft would involve a separate foreclosure process pursuant to the New York Uniform Commercial Code, which requires the sale be "commercially reasonable." *Id*. ¶ 83 A sale of the Aircraft would necessarily require separate procedures, different timelines and advertisements that would be appropriate for the sale of an airplane (as opposed to the sale of contractual rights). *Id*.

In a clear and desperate attempt to prevent FWCP exercising the parties' agreed upon remedies over the Lease Assets, assets that are not properly part of the Debtors' bankruptcy estates, the Debtors, at the direction of their parent JPL,[12] filed these inappropriate cases (the "**Chapter 11 Cases**") on December 17, 2021. *See* First Day Decl. ¶¶ 9, 37 (alleging that the "Debtors were forced to file these Chapter 11 Cases to stay FitzWalter's improper foreclosure of the Aircraft pursuant to sale procedures. . . .").[13] The Debtors did not seek reorganization in Japan, but instead

---

[12]   JPL's direction to file violated section 3.1.3 of the Proceeds Agreements. *See, e.g.*, Gray Decl. Ex. 7 (173 Proceeds Agreement.) § 3.1.3 (providing that JPL agrees "it shall not . . . file or join in any petition to commence any winding-up proceedings by or against the Borrower or the Intermediate Lessor or any other action or proceedings for the winding-up, dissolution, administration or examinership of the Borrower or the Intermediate Lessor or take, or acquiesce in, any other action which might reasonably be expected to lead to the bankruptcy or insolvency of the Borrower or the Intermediate Lessor, save as required by applicable law or with the consent of the Security Agent.")

[13]   The First Day Declaration mischaracterizes the sales process as seeking the sale of the Aircraft. *Id.* These statements are simply false. As explained above, FWCP has neither foreclosed upon nor sought to

ran to this Court, no doubt in hopes that they could hide behind the automatic stay's worldwide application. They also did not file a chapter 7 case, even though the Debtors have no intention whatsoever to reorganize, and there is in fact no business to reorganize.

In the First Day Declaration, the Debtors state they intend to conduct a sale process under Bankruptcy Code section 363. First Day Decl. ¶ 38. Indeed, even though the Debtors have not filed a motion to provide adequate protection, or filed employment applications, on December 31, they filed a motion to sell **both** their respective Aircraft and the Lease Assets to buyers. According to the sale motion, the buyers propose to pay cash sufficient to pay in full all secured claims plus $5 million, which if approved will go to the pockets of JPL.

Yet nowhere in their papers do they disclose that the Proceeds Agreements already set forth a mechanism to allocate value to all of the Debtors' constituents, and other Transaction Documents that are binding on all secured creditors and JPL already provide the means to liquidate the Debtors' assets. They also do not disclose that the auctions they propose to conduct in this Court are auctions that ***would be conducted outside of bankruptcy*** and nothing prevents their stalking horse bidders (or anyone else) from bidding. Finally, they do not disclose that the sale includes a sale of the Lease Assets, even though the Debtors do not own the Lease Assets as a matter of applicable nonbankruptcy law.

By virtue of commencing these cases, the automatic stay provisions of Bankruptcy Code section 362(a) apply, and FWCP cannot take ordinary course actions to repossess the Aircraft or to seek to prevent Vietnam Airlines from continuing to improperly use (and devalue) the Aircraft. Yet the Debtors are themselves doing nothing to seek to repossess the Aircraft or block Vietnam

---

sell the Aircraft. FWCP, as Security Agent, sought to sell claims it owned outright pursuant to the terms of the Security Assignment Agreements.

Airlines. In this way, the automatic stay has had the perverse effect of letting the Debtors' sole assets continue to decline in value while FWCP, the one party with the means to try to preserve value, has been stayed automatically simply because the Debtors filed these cases.

Consistent with their single-purpose, non-operation status, the Debtors did not start these cases like a typical operating company. The only "first day" motions filed were joint administration, creditor matrix, and an automatic stay "comfort order" motion.[14] They not only did not file any employee benefits motion, tax motion, insurance motion, or even a schedules extension motion,[15] they did not file a motion to seek authority to use cash collateral or propose adequate protection, even though all of their assets are subject to liens. Indeed, the Debtors did not tell FWCP that they would be commencing these Chapter 11 Cases and did not (and still have not) proposed any terms for the use of cash collateral or to provide adequate protection for the use of assets during the cases.

Moreover, in order to ensure that this Court had subject matter jurisdiction, at some point prior to the Petition Date, the Debtors' parent company allegedly provided retainers to their proposed chapter 11 counsel, which were deposited in New York bank accounts, and amount to a fraction of 1% of the total outstanding debt. The Debtors did not in the First Day Declaration identify the source of these payments or if the payments were even made with the Debtors' property.[16] The Debtors also have not filed applications to employ any professionals.

---

[14]  Dkt. Nos. 2, 4, 5. The "comfort order" motion initially sought to extend the automatic stay to nondebtors (presumably to protect JPL) but after FWCP objected, the Debtors voluntarily withdrew that requested relief.

[15]   The Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs on December 31, 2021. Dkt. Nos. 19, 20 ; Case No. 21-12076, Dkt. Nos. 6, 7

[16]   In their Schedules of Assets And Liabilities, the Debtors disclose that JPL paid a $250,000 retainer to each of the Debtor's proposed counsel on December 16, 2021—the day before the Petition Date. In addition to raising the eligibility issue under Bankruptcy Code section 109 (because the Debtors have no

## III.   ARGUMENT

The Court should dismiss these Chapter 11 Cases because the Debtors are not eligible for bankruptcy protection under section 109 of the Bankruptcy Code.  Additionally, the Court should dismiss these cases "for cause" pursuant to Bankruptcy Code section 1112, as the Debtors filed these cases in bad faith.  Finally, the Court should dismiss or abstain from hearing these cases under section 305 of the Bankruptcy Code because it would be in the best interests of the creditors and the estates.

### A.   The Debtors Are Not Eligible For Bankruptcy Protection

The court should dismiss these Chapter 11 Cases because the Debtors are not domiciled in the United States, have no place of business in the United States, and have no property in the United States.  Under section 109 of the Bankruptcy Code, "only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under this title." 11 U.S.C. § 109.  It is undisputed that the Debtors are not domiciled in the United States, do not have a place of business in the United States, and do not conduct business in the United States.  The Debtors have relied on the retainers paid to their proposed bankruptcy counsel to establish eligibility under section 109.  *See* First Day Declaration ¶ 17; *In re Octaviar Admin. Pty. Ltd.*, 511 B.R. 361, 372 (Bankr. S.D.N.Y. 2014).  But the Debtors concede in their own Statements of Financial Affairs that these retainers were not paid by the Debtors, but by the Debtors' parent JPL.  *See* Dkt. No. 20 § 11.1; Case No. 21-12076, Dkt. No. 7 § 11.1.  Thus the Debtors do not have a property interest in the retainers.  And the Debtors do not identify any other property located in the United States in their Schedules of Assets and Liabilities and Statements

---

interest in the retainers provided), this raises significant questions of lack of disinterestedness and conflicts of interests.  *See* Dkt. No. 20 § 11.1; Case No. 21-12076, Dkt. No. 7 § 11.1

of Financial Affairs.  *See* Dkt. Nos. 19, 20 ; Case No. 21-12076, Dkt. Nos. 6, 7.  Indeed none of

the other assets (the Aircraft, cash, or lease-related assets) are located in the United States.  Thus,

under section 109(a), neither is eligible to be a debtor, and the cases should be dismissed.

### B.      The "Cause" Standard Under Bankruptcy Code Section 1112

Section 1112(b) states that "the court shall convert a case . . . or dismiss a case under this

chapter, whichever is in the best interests of creditors and the estate, for cause."  11 U.S.C.

§ 1112(b); *Taberna*, 594 B.R. at 600 (Bankr. S.D.N.Y. 2018) ("Section 1112 authorizes dismissal

of a case for cause when it is in the best interest of the creditors and the estate to do so.").

"Cause . . . may be found based on unenumerated factors, including 'bad faith.'"  *In re Syndicom*

*Corp.*, 268 B.R. 26, 48 (Bankr. S.D.N.Y. 2001) (citing *C-TC*, 113 F.3d at 1313; *see also In re*

*Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 334 (Bankr. S.D.N.Y. 2001) ("Cause, for either dismissal

or relief from the stay, may be found based on unenumerated factors, including 'bad faith[.]'"); *In*

*re Reyes*, No. 14-13233 (SMB), 2015 WL 4624156, at *4 (Bankr. S.D.N.Y. Aug. 4, 2015) (noting

that under § 1112(b), "the court may convert or dismiss a case that was filed in bad faith"); *In re*

*Schur Mgmt. Co., Ltd.*, 323 B.R. 123, 127 (Bankr. S.D.N.Y. 2005) ("It is not contested . . . that

there exists a general good faith requirement under which Chapter 11 petitions can be dismissed

for having been filed in bad faith.").

A finding of bad faith "'does not itself mean bad mind or malicious activity . . . but simply

the causing of a reorganization proceeding to be filed that does not fit within the intended scope

of chapter 11 relief as that chapter [was] enacted by Congress.'"  *Syndicom Corp.*, 268 B.R. at 49

(quoting *In re Nesenkeag, Inc.*, 131 B.R. 246, 247 (Bankr. D.N.H. 1991)).

"The standard in this Circuit is that a bankruptcy petition will be dismissed if both objective

futility of the reorganization process and subjective bad faith in filing the petition are found."

*Reyes*, 2015 WL 4624156, at *4 (internal citation omitted).  "With respect to motions seeking a

14

finding of cause based on bad faith, or a lack of good faith, once the good faith of a debtor is called into question, the burden shifts to the debtor to demonstrate that the petition was filed in good faith." *Syndicom*, 268 B.R. at 57.

Courts within the Second Circuit consider the following factors when determining whether subjective bad faith exists:

> (1) the debtor has only one asset; (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors; (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt; (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action; (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (6) the debtor has little or no cash flow; (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and (8) the debtor has no employees.

*Id.* (citing *C-TC*, 113 F.3d at 1311); *Reyes*, 2015 WL 4624156, at *4; *see also In re Murray*, 543 B.R. 484, 492 (Bankr. S.D.N.Y. 2016), *aff'd*, 565 B.R. 527 (S.D.N.Y. 2017), *aff'd*, 900 F.3d 53 (2d Cir. 2018) (dismissing involuntary petition after consideration of similar factors, including that the case amounted to a "two party dispute;" that there were "no creditors competing with each other;" and that "[t]he debtor [did] not need, or want, a discharge"); *Taberna*, 594 B.R. at 600 (same). Many of these factors apply in this case, each confirming the existence of bad faith.

Moreover, a bankruptcy is not commenced in good faith simply because the stated purpose of the filing is to take advantage of provisions of the Bankruptcy Code that arguably preserve or increase value. *See Taberna*, 594 B.R. at 602.

## C. Dismissal Is Warranted As The Debtors Clearly Filed For Chapter 11 Protection In Bad Faith

The Debtors cannot possibly meet their burden of demonstrating that these Chapter 11 Cases were filed in good faith, as both "subjective bad faith" and "objective futility" are present here.

### 1.     The Debtors Filed With Subjective Bad Faith.

#### (a)     *The Debtors Essentially Each Have Only One Asset*

These are essentially single asset cases.  As explained in the First Day Declaration, "[t]he

Debtors . . . were each formed for the purpose of acquiring and leasing an Airbus A350 aircraft."

First Day Decl. ¶ 11.  Indeed, the Debtors note that that their "substantial assets are located at:

Various international airports or in the air"—clearly referring to the Aircraft—and identify no

other assets aside from "$150,000 in cash" and the retainers paid by JPL to their proposed counsel

to establish this Court's jurisdiction.  *Id.* ¶ 17, Ex. I.

The fact that the Debtors each have essentially only one asset weighs in favor of a finding

of bad faith.  *See C-TC*, 113 F.3d at 1311; *Syndicom*, 268 B.R. at 50; *accord Pleasant Pointe*

*Apartments, Ltd. v. Kentucky Hous. Corp.*, 139 B.R. 828, 832 (W.D. Ky. 1992) ("In Chapter 11

cases, one particular area of concern has been 'single asset hostage' cases, where there is evidence

that the debtor's purpose in filing is not to reorganize, but to hold a single asset hostage.") (quoted

with approval by *C-TC*, 113 F.3d at 1311).

#### (b)     *This Is Essentially A Two-Party Dispute And There Are Virtually No Unsecured Creditors*

This is essentially a two-party dispute between the Debtors and their secured creditors.

FWCP is not only the Debtors' largest secured creditor—it holds a substantial majority of the

outstanding Senior Loans, as well as a claim arising out of certain swap obligations of the Debtors

(Gray Decl. ¶ 73; First Day Decl. ¶¶ 21 n.7 & 24)—but FWCP also serves as Security Agent for

all other secured creditors under both the Senior and Junior Facility Agreements, and is authorized

to enforce its security interests in the Collateral for the benefit of all Lenders.  Gray Decl. ¶¶ 76,

83; *id.* Ex. 10 (Security Assignment Agreement) § 6; *id.* Ex. 17 (Security Assignment Agreement)

§ 10 (providing that "[a]ll moneys received or recovered by the Security Agent . . . shall . . . be applied in accordance with clause 8 (Application of Proceeds) of the Proceeds Agreement.").

The Debtors' other secured creditors—which are secured by the same collateral, but just with different priorities—have agreed by contract that their recoveries, both pre- and post-default, would be paid in accordance with the application of proceeds waterfall contained within the Proceeds Agreements.  *See, e.g.*, Gray Decl. Ex. 7 § 2 ("Each of the Parties agrees that the Collateral granted by the Obligors to the Finance Parties shall be applied in the manner and order of priorities set out in this Agreement."); *id.* § 8.3 (setting forth the order of application of proceeds both before and after an event of default).  These parties do not otherwise have recourse to the Debtors upon a payment default.  *Id.* Ex. 5 (173 Senior Facility Agreement) § 6.1 (providing the Debtors are not personally liable to Senior or Junior creditors for failure meet its payment obligations); *id.* Ex. 6 (173 Junior Facility Agreement) § 6.1.

Thus, none of the secured creditors have legitimate interests in these cases that would compete with, or diverge from, FWCP's interests, and they do not need the protections of the Bankruptcy Code or this Court to assist in maximizing their recoveries.  *See Taberna*, 594 B.R. at 604–05 ("There is, however, no need for bankruptcy protection here since the Taberna Indenture independently establishes the parties' agreements as to liquidation.").

Judge Vyskocil's analysis in *Taberna* is particularly instructive on this point, as the debtors in that case were passive investment vehicles with several classes of secured creditors, similar to the Debtors in this case.  *Id.* at 580.  There, as here, contractual provisions expressly governed the secured creditors' rights upon liquidation, and the court found this weighed in favor of dismissal:

> In contemplation of the possibility that Taberna would lack the funds necessary to pay timely interest or principal, all noteholders . . . expressly agreed to terms for how the indenture trustee will manage the remaining portfolio and how losses will be

17

> distributed among the noteholders. Here, the alleged debtor faces
> no involuntary creditors and the rules for liquidating this single
> purpose, single use entity were set forth by contract.

*Id.* at 605. The same reasoning applies here: the Proceeds Agreements set forth "how losses will

be distributed among the noteholders" and there is therefore no need to resort to the Bankruptcy

Code or this Court to administer the Debtors' assets.

The Debtors' lone unsecured creditor of any size is JPL, which is "the direct parent

company and owner of 100% of the equity interests" in the Debtors—clearly an insider whose

interests align with the Debtors. First Day Decl. ¶ 1; 11 U.S.C. § 101(31) (insider includes "person

in control of the debtor"). And JPL agreed, when entering into the Transaction Documents, that

filing a bankruptcy petition would be inappropriate for these Debtors. *See, e.g.*, Gray Decl. Ex. 7

(173 Proceeds Agreement) § 3.1.3 (providing that JPL agrees "it shall not . . . file or join in any"

bankruptcy petition for the Debtors). In an analogous circumstance in *Taberna*, the court stated

that "in the Court's view it would be an injustice for the Court to find that the Petitioning Creditors,

sophisticated business entities who analyzed and bargained for Taberna's current liquidation

scheme, are prejudiced by the contractual terms and conditions they freely sought out and entered."

*Taberna*, 594 B.R. at 602. Here, a similar injustice would if the cases were allowed to proceed to

benefit JPL.

In any case, JPL relinquished the right to enforce this claim. Gray Decl. Ex. 7 (173

Proceeds Agreement) § 3.1.1 (JPL "shall not . . . sue . . . the Borrower or the Intermediate Lessor

for or in respect of the recovery of any moneys (whether principal, Interest or otherwise) now or

hereafter owing to it").

"Bankruptcy is a *collective remedy*, with the original purpose—which continues to this

day—to address the needs and concerns of creditors with competing demands to debtors' limited

assets. . . . " *Murray*, 543 B.R. at 494–95. Here, the Debtors and their insider-parent are

18

attempting to use bankruptcy proceedings to resolve a dispute with a single group of secured creditors who do not have any competing demands. This is not a proper use of the Bankruptcy Code and is therefore further indicia of bad faith. *See C-TC*, 113 F.3d at 1311; *Taberna*, 594 B.R. at 604–05.

(c)    *The Debtors Filed To Frustrate The Legitimate Efforts Of Their Secured Creditors To Foreclose On The Aircraft*

The Debtors admit that they sought bankruptcy protection to block FWCP's legitimate efforts to enforce its rights as Senior Lender and Security Agent. *See* First Day Decl. ¶¶ 37–38 (explaining that the Debtors filed the bankruptcy petition simply to "stay" FWCP's "foreclosure" while they "pursue an orderly sale of the Aircraft"). This is an inappropriate use of the Bankruptcy Code and clear indicia of a bad faith filing. *See C-TC*, 113 F.3d at 1312 (noting that "the timing of C–TC's filing evidences an intent to delay and frustrate the legitimate efforts of Norton to enforce its rights"); *Syndicom*, 268 B.R. at 51 (filing was in bad faith where the "timing of the Debtor's filing . . . evidence[d] an intent to delay or frustrate the legitimate efforts of" its secured creditor "to secure possession of the" debtor's sole asset); *Y.J. Sons & Co., Inc. v. Anemone, Inc. (In re Y.J. Sons & Co., Inc.)*, 212 B.R. 793, 803–04 (D.N.J. 1997) (dismissal warranted where debtor filed "simply to secure the sale of the Flower Shop on better terms").

While FWCP has not yet begun the process of foreclosure on the Aircraft,[17] it remains well within FWCP's rights to do so, and this filing is a blatant attempt to prevent FWCP from exercising those rights. Indeed, as a result of the imposition of the automatic stay, FWCP cannot take ordinary course actions to repossess the Aircraft or to seek to prevent Vietnam Airlines from continuing to

---

[17]    The Debtors make much of FWCP's efforts to sell the rights it holds under the Security Assignment Agreements. *See* First Day Decl. ¶¶ 29-34. These rights are not estate property and FWCP's sale process with respect to those claim is irrelevant to these cases. *See* Gray Decl. ¶ 83; Exs. 10, 17 (granting FWCP title to the rights).

19

improperly use (and devalue) the Aircraft.  Since the Debtors are not themselves trying to repossess the Aircraft or seeking to block Vietnam Airlines from flying the Aircraft, the Debtors have perversely converted the automatic stay from a shield that preserves value into a sword that indisputably lowers value.

(d)   *The Debtors Have No Cash Flows And Cannot Provide Adequate Protection To Secured Creditors Absent A Fatally Flawed Sale Process That Cannot Occur If These Cases Are Dismissed*

The Debtors are currently receiving no cash flows, as their only source of revenue, the Subleases to Vietnam Airlines, have been terminated.  First Day Decl. ¶ 14 (explaining that the lease payments made by Vietnam Airlines were the "Debtors' sole source of revenue"); *id.* ¶ 25 .  The Debtors have not received any payments from Vietnam Airlines since October 26, 2021, and Vietnam Airlines' lease payments remain in arrears.  Gray Decl. ¶ 68.  This factor weighs in favor of dismissal.  *See C-TC*, 113 F.3d at 1312; *Syndicom*, 268 B.R. at 51.

Moreover, the Debtors have not attempted to provide (and cannot provide) adequate protection for the use of any cash collateral.

The Debtors have filed a sale motion that they claim will generate value to pay their lenders in full, with an additional $5 million available to pay JPL.  This sale motion will no doubt be their justification for why the cases should not be dismissed.  This is a form of the "ends justifying the means" theory; in effect, the Debtors are asking this Court to ignore that they have not and cannot satisfy the Second Circuit's test for dismissal because, if the cases are not dismissed, they think they have a buyer that will pay creditors in full.  The Court should not put the cart before the horse.  *Cf. Travelers Ins. Co. v. 633 Third Assocs.*, No. 91 CIV. 5735 (CSH), 1991 WL 236842, at *2 (S.D.N.Y. Oct. 31, 1991) ("[Section 1111(b)] was not intended as a device for non-recourse creditors to enhance their position under state law—thereby repudiating their bargain—in advance of any bankruptcy proceeding that may or may not take place.").

20

Moreover, the proposed sale is fatally flawed.  According to the sale motion, each Debtor seeks to sell its Aircraft and the related Lease Assets in a package deal.  But that cannot work as a matter of law:  the Lease Assets did not belong to the Debtors prepetition.  Under United Kingdom law, which is the law governing property interests in the Lease Assets, the Security Agent owns all of the Lease Assets.  *See* Gray Decl. Ex. 10 (173 Security Assignment Agreement) § 3.1 (assigning to the Security Agent full title in all of the Debtors' "right, title and interest, present and future, in and to the Assigned Property"); *id.* Ex. 17 (067 Security Assignment Agreement) § 3.1 (same).  The Debtors only have revisionary interests, after all creditors under the Proceeds Agreement are paid in full.  Since that did not happen as of the Petition Date, the Debtors do not own the Lease Assets and cannot sell the Lease Assets.

The Debtors are improperly attempting to use the Bankruptcy Code to expand their rights to sell the Lease Assets.  *See In re Downey Fin. Corp.*, 428 B.R. 595, 607 (Bankr. D. Del. 2010); ("Section 541(a) is not intended to expand the debtor's rights against others beyond what rights existed at the commencement of the case.) (internal quotation omitted); *cf. In re MF Glob. Holdings Ltd.*, 515 B.R. 193, 203 (Bankr. S.D.N.Y. 2014 ) (noting, in the D&O context, "courts have given effect to priority of payment provisions in authorizing access to policies to advance defense costs to individual insureds.").

Counsel for FWCP has repeatedly sought clarification from the Debtors on their position relating to the Lease Assets.  In a meet-and-confer between the parties on December 20, 2021, counsel for FWCP asked if the Debtors would agree to allow FWCP and Airborne to go forward with the sale of the rights transferred to it pursuant to the Security Assignment Agreements.  Even after the Debtors filed their sale motion, counsel asked for clarification but counsel refused to respond.

Bankruptcy Judge Gonzalez confronted a similar issue in *In re Loco Realty Corp.*, No. 09-11785 (AJG), 2009 WL 2883050, at *4 (Bankr. S.D.N.Y. June 25, 2009). In that case, the court dismissed a petition that was filed in bad faith because the debtor had no prospect of successfully emerging from bankruptcy. *Id.* To determine whether the value of the estate suggested a likelihood of success, the court faced the threshold question of whether the debtors improperly claimed a property interest as part of the estate that it had previously conveyed. *See* at *14 ("The issue here is whether the absolute assignment of rents in the mortgage divested the debtor of all legal and equitable interests in the rents as of the petition date."). The debtor did have a revisionary interest, but all parties acknowledged that a document purporting to effect an absolute assignment had been executed two years before the debtor filed for bankruptcy. *Id.* at *2. The court found that the operative language in the security agreement effected a successful conveyance that pre-dated the debtor's Chapter 11 petition and therefore placed the interest outside the scope of the estate. *See id.* at *18–19. Accordingly, because the debtor had not prospect of reorganization by virtue of the absolute assignment, the court found that the case was filed in bad faith and dismissed it pursuant to § 1112(b). *Id.* at *23; *see also Downey*, 428 B.R. at 607 (holding the interest held by directors and officers in insurance proceeds was not property of the estate notwithstanding debtor's junior interest therein). *In re Loco* is on all fours with this case.

Like the *Loco* debtor, the Debtors are necessarily (and improperly) claiming the Lease Assets it assigned years before bankruptcy to be part of their estates. More than two years ago, the Debtors executed the Security Assignment Agreements. Both Agreements state:

> The Borrower assigns and agrees to assign absolutely by way of security with full title guarantee (subject to any Permitted Security Interest) to the Security Agent (as security agent and trustee for the Finance Parties), as security for the payment and discharge of the Secured Obligations, all of its right, title and interest, present and future, in and to the Assigned Property.

Gray Decl. Ex. 10 (173 Security Assignment Agreement) § 3.1; Gray Decl. Ex. 17 (067 Security Assignment Agreement) § 3.1.

As in *In re Loco*, this language demonstrates that the Debtors unambiguously assigns their interests. This conveyance was effective at the time the agreement was executed. *See Loco*, 2009 WL 2883050 at *16. And because this conveyance, like the one in *In re Loco,* was a bona-fide transaction that predated bankruptcy the Debtors cannot claim it as part of the estate. *See id.* at *18. Accordingly, the Debtors' reliance on assets outside the estate evinces their improper motivations and weighs in favor of dismissal. What makes matters worse is that their entire scheme—to sell the Aircraft and the Lease Assets in order to ultimately funnel money to JPL—depends on the Debtors owning the Lease Assets, which they do not.

Putting aside their aspirational desires of what they hope to achieve, in the meantime the Debtors are doing nothing to adequately protect their secured creditors' Collateral. Indeed, they passively watch Vietnam Airlines continue to fly the Aircraft, without legal authority to do so. Between the date of the termination of the leases and the bankruptcy filing, the Debtors stood by and allowed Vietnam Airlines to fly the Aircraft on sixty-six (66) separate flights, more than 472 flight hours, between eight different countries across Asia and Western Europe. *See* Gray Decl. ¶ 74. Each and every flight puts miles, flight hours, and stress on the Aircraft, and increases maintenance requirements, all of which decreases the value of those Aircraft. *Id.* at ¶ 75. The Debtors' conduct—allowing Vietnam Airlines to fly the Aircraft for more than eleven (11) months without making full lease payments and more than sixty (60) times after the leases were terminated—has significantly reduced the value of the Aircraft and impaired the Collateral. The Debtors have not presented any plan to protect the Collateral and are merely using the bankruptcy process to gamble with secured creditors' Collateral. The Debtors' decision to improperly file

23

bankruptcy to block FWCP's efforts to take actions against Vietnam Airlines to prevent continued unlawful and depreciating use of the Aircraft is further evidence of the Debtors' pattern of wasting the Collateral and does not indicate any effort to provide adequate security.

(e)   *The Debtors Have No Employees*

The Debtors have no employees, which further indicates this filing was in bad faith. First Day Decl. ¶ 11; *C-TC*, 113 F.3d at 1312; *Syndicom*, 268 B.R. at 51; *In re On the Ocean, Inc.*, No. 16-16204-BKC-RBR, 2016 WL 8539791, at *3 (Bankr. S.D. Fla. June 6, 2016) (finding the fact that "[t]he Debtor has no employees and uses only 1099 independent contractors, so reorganizing the business to save jobs is not a consideration in this case" indicative of bad faith). The Debtors are single asset special purpose vehicles. As such, these Chapter 11 Cases will not save any jobs or generate any economic activity. The only purpose of the filing is to upset the ability of the secured creditors to exercise their agreed-upon rights in this two-party dispute. These cases were clearly filed with subjective bad intent, given the fact that so many indicia of bad faith are present here.

(f)   *The Bankruptcy Code Is Not A Proper Scheme For These Debtors*

While not an enumerated factor, this Court can examine the Debtors' invocation of this Court's jurisdiction as further illumination of the Debtors' subjective bad faith. Bankruptcy Code section 1112 does not define "cause," and provides a non-exhaustive list of factors. *C-TC*, 113 F.3d at 1311. Similarly, the Second Circuit's identification of factors is not intended to be exclusive. *Id.*

Every factor—including the Debtors' formation and business purpose, financing arrangements and relationships with lenders, management of affairs, and conduct through JPL—points to procedures other than the United States' insolvency laws as the means to allocate value in a collective proceedings. Prepetition, there were no connections with the United States other

24

than a choice of law provision in the Aircraft Mortgages, and no property located in the United States.

FWCP, of course, acknowledges, that foreign entities can seek protection under the Bankruptcy Code, and companies can file chapter 11 with the intent to liquidate their assets through a going concern sale. But when the Debtors' parent company attempts to manufacture jurisdiction by providing bankruptcy counsel retainers in order to commence a case, that is a red flag that there may be a bad faith filing at hand.

2.      **The Filing Is Objectively Futile, As The Debtors Have No Prospect Of Reorganiation And Do Not Seek A Discharge.**

"A petition for Chapter 11 bankruptcy may be deemed frivolous if it is clear that on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings." *In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 227 (2d Cir. 1991). Here, the Debtors have no prospect of reorganization: They are passive investment vehicles and have no business to reorganize. First Day Decl. ¶ 16; s*ee Taberna*, 594 B.R. at 604 ("It is undisputed that Taberna is not an operating business, and there is therefore no rehabilitative objective that can be served by allowing a bankruptcy case to proceed."); *C-TC*, 113 F.3d at 1308 ("The primary purpose of Chapter 11 is to enable businesses to reorganize and emerge from bankruptcy as operating enterprises.").

Additionally, there is no prospect of reorganization here because all of the Debtors' substantial assets are encumbered. First Day Decl. ¶¶ 21–23 (explaining that the Aircraft are pledged as Collateral for the outstanding amounts due and owing under the Senior and Junior Facility Agreements). And the value of the Aircraft—their sole assets—dissipates daily as the Debtors continue to allow Vietnam Airlines to fly the Aircraft free of charge and after the

25

termination of their right to do so under the leases.  *See* First Day Decl. ¶¶ 14, 25; Gray Decl. ¶¶ 74, 75.

Moreover, FWCP would never agree to a plan for reorganization from the Debtors, thus there is no possibility of reorganization because FWCP represents the only substantial creditors in this action.  *See Loco*, 2009 WL 2883050, at *6 (noting the debtor's plan was infeasible where single significant creditor "already stated it would not consent to the plan"); *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 299–300, 302–03 (Bankr. D. Del. 2011) (dismissing case for cause of bad faith and finding no possibility of reorganization without the consent of debtor's only creditor to a plan).

Seemingly in recognition of this reality, the Debtors admit they are not even pursuing a reorganization, they are simply seeking to forestall the secured creditors' efforts to enforce their rights, while pursuing their own efforts to sell the Aircraft in hopes they may provide returns to their equity holder.  *See* First Day Decl. ¶ 38 (explaining that the Debtors' bankruptcy petition was intended to "provide the Debtors protection while they pursue an orderly sale of the Aircraft and related claims. . . ."); Dec. 20, 2021 Hr'g Tr. 9:22-10:3 (explaining that the Debtors filed for bankruptcy so that the Aircraft may be "sold for an amount that potentially satisfies all creditors and provides return to equity.").

This is not a proper use of the Bankruptcy Code.  *Schur Mgmt.*, 323 B.R. at 128 (dismissing where there was no "intent to reorganize" or "reorganizational purpose" to the filing); *Y.J. Sons*, 212 B.R. at 803–04 (dismissal warranted where debtor filed simply to obtain better terms for sale of asset).  Nothing prevents the same assets being marketed, auctioned, and sold outside of bankruptcy.  No secured creditor of the Debtors would be prejudiced, nor would JPL, because that

is the bargain they agreed to in the Proceeds Agreement. And there is no evidence that any value would be lost outside of bankruptcy.

It is readily apparent that these Chapter 11 Cases are objectively futile, and that the Debtors filed these actions in bad faith and without a valid bankruptcy purpose. These cases should be dismissed for cause.

### D.   The Court Should Not Convert This Case To A Chapter 7 Case Under 1112(b).

These cases should be dismissed and not converted to Chapter 7 cases because dismissal is in "the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1). Simply put, there is no need for the appointment of a chapter 7 trustee in this case. These are single asset cases that amount to nothing more than two-party disputes between the Debtors and their secured creditors, whose recoveries are dictated by contractual provisions wholly enforceable outside of the bankruptcy process. *See supra* Part III.C*; In re E. 81st, LLC*, No. 13-13685 (SMB), 2014 WL 4548551, at *7 (Bankr. S.D.N.Y. Mar. 17, 2014) (holding dismissal, not conversion, appropriate for a "single asset real estate case bearing all of the hallmarks of a two-party dispute between the Debtor and its secured lender"). There are no avenues for a chapter 7 trustee to pursue, such as the avoidance of preferential payments or other transfers, that would increase creditor recoveries or otherwise benefit the estates or their single unsecured creditor. *Id.* ("[T]here are no assets for a chapter 7 trustee to recover for the benefit of the unsecured creditors . . . ."). In fact, the only identified unsecured creditor, JPL, is contractually barred from seeking any recovery from Debtors. *See* Gray Decl. Ex. 7  (173 Proceeds Agreement) § 3.1.1; Gray Decl. Ex. 14 (067 Proceeds Agreement) ) § 3.1.1. And, FWCP does not need the assistance of a chapter 7 trustee to oversee the foreclosure and sale of the Debtors' assets, nor to effectuate the distribution of the sale

proceeds in accordance with the terms of Proceeds Agreements.  Conversion does not serve the interests of the estates or their creditors and these Chapter 11 Cases should be dismissed.

### E.       The Court Should Abstain From Hearing This Case Under Section 305 Of The Bankruptcy Code.

Should the Court decline to dismiss the Chapter 11 cases under section 1112(b), then the Court should dismiss or abstain pursuant to Bankruptcy Code section 305(a)(1), which provides that "[t]he court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if . . . the interests of creditors and the debtor would be better served by such dismissal or suspension."  Courts in this Circuit consider several factors when determining whether to dismiss or abstain under section 305(a)(1):

> (1) the economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought.

*In re Selectron Mgmt. Corp.*, 2010 WL 3811863, at *5 (Bankr. E.D.N.Y. Sept. 27, 2010).  All of the relevant factors weigh in favor of dismissal or abstention.

*First*, the Debtors are structured in a way such "the economy and efficiency of administration" would be best served by dismissing these Chapter 11 Cases because the parties have already "work[ed] out a less expensive out-of-court arrangement which better serves all interests in the case."  *See In re Navient Sols.*, LLC, 625 B.R. 801, 820 (Bankr. S.D.N.Y. 2021) (noting that "factors 1–6" can be "grouped together because these factors touch upon the availability of an alternate forum to efficiently achieve an equitable distribution.").

28

Here, there is "an alternative means of achieving an equitable distribution of assets" to which the parties have all already agreed: the Proceeds Agreements. *Selectron*, 2010 WL 3811863, at \*5; *supra* Part III.C. Thus, "federal proceedings" are not "necessary to reach a just and equitable solution." *See In re Michael S. Starbuck, Inc.*, 14 B.R. 134, 135 (Bankr. S.D.N.Y. 1981) (noting that "[i]n evaluating the best interests of the creditors and the debtor, efficiency and economy of administration are primary considerations" and holding that "[a]llowing this matter to continue as a debtor proceeding under the Bankruptcy Code would result in a terrible waste of time and resources" where another mechanism was already in place to provide for the "efficient and equitable distribution of [the debtors'] assets").

Concerns of economy and efficiency are particularly relevant here, as neither the Debtors nor any of their creditors have any substantial ties to the United States. First Day Decl. ¶ 18.. Bankruptcy courts have found a lack of ties to the United States to be a relevant consideration when deciding whether to abstain or dismiss. *In re Yukos Oil Co.*, 321 B.R. 396, 409 (Bankr. S.D. Tex. 2005) ("[C]onsiderations of comity with respect to dismissal of a voluntary Chapter 11 bankruptcy case . . . must be considered in connection with a determination of whether cause exists for dismissal."); *cf. In re Compania de Alimentos Fargo, S.A.*, 376 B.R. 427, 434 (Bankr. S.D.N.Y. 2007) (dismissing case pursuant to § 305(a)(1) because, *inter alia*, the debtor had limited ties to the United States and had all business operations, customers, and employees in Argentina).

*Second*, "the purpose for which bankruptcy jurisdiction has been sought" weighs in favor of dismissal, as the Debtors are not seeking to reorganize. In fact, as explained above, there is no prospect of reorganization and the Debtors do not have any interest in obtaining a discharge. *See supra* Part III.C.2. Instead, the Debtors have filed this case simply to delay FWCP while they frantically attempt to conduct their own sale process in a last-ditch effort to scrounge up some

value for their equity holder, JPL. *See* Dec. 20, 2021 Hr'g Tr. ("Your Honor, we hope to utilize these cases to effectuate a level set and to provide time to properly market the aircraft and hopefully deliver a return to all interested parties."). This is an inappropriate use of the Bankruptcy Code and should not be countenanced. *Y.J. Sons*, 212 B.R. at 803–04.

*Finally*, these Chapter 11 Cases should be dismissed because the cases are nothing more than a two-party dispute between the Debtors and their only class of significant creditors. *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 464 (Bankr. S.D.N.Y. 2008) (noting dismissal under section 305(a) is proper "where a bankruptcy was filed in response to a two-party dispute between a debtor and a single creditor"); *In re Newbury Operating LLC*, No. 20-12976-JLG, 2021 WL 1157977 (Bankr. S.D.N.Y. Mar. 25, 2021) (dismissing under 305(a) where the case was "essentially a two-party case"). These cases clearly do not belong in Chapter 11, and this Court should dismiss them, or at the very least, abstain from hearing them.

## **CONCLUSION**

For the foregoing reasons, FWCP requests that the Court dismiss this case for cause under Bankruptcy Code sections 1112 and 305, or abstain from hearing this case under Bankruptcy Code section 305.

30

Dated: January 2, 2022

Respectfully submitted,

/s/ *Benjamin I. Finestone*

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Benjamin I. Finestone
Zachary R. Russell
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
benjaminfinestone@quinnemanuel.com
zacharyrussell@quinnemanuel.com

Justin C. Griffin (pro hac vice forthcoming)
Eric Winston (pro hac vice forthcoming)
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
justingriffin@quinnemanuel.com
ericwinston@quinnemanuel.com

Asher B. Griffin (pro hac vice forthcoming)
300 West 6th Street, Suite 2010
Austin, TX 78710
Telephone: (737) 667-6100
Facsimile: (737) 667-6110
ashergriffin@quinnemanuel.com

*Counsel to FitzWalter Capital Partners (Financial
Trading)*

**<u>Exhibit A</u>**
**(Proposed Order)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| JPA NO. 111 CO., LTD., and | : | |
| JPA NO. 49 CO., LTD., | : | Case No. 21-12075 (DSJ) |
| | : | Case No. 21-12076 (DSJ) |
| Debtors. | : | |
| | : | |
| | : | |

**[PROPOSED] ORDER GRANTING MOTION OF FITZWALTER CAPITAL**
**PARTNERS (FINANCIAL TRADING) TO DISMISS OR ABSTAIN FROM HEARING**
**THESE CHAPTER 11 CASES**

Upon consideration of the Motion (the "**Motion**") of FitzWalter Capital Partners (Financial

Trading) ("**FWCP**") for entry of an order (this "**Order**") dismissing or abstaining from hearing

the above-captioned chapter 11 case; and the Court having jurisdiction over this matter pursuant

to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant

to 28 U.S.C. § 157(b)(2), and that the Court may enter a final order consistent with Article III of

the United States Constitution; and the Court having found that the relief requested in the Motion

is in the best interests of the creditors and the estates; and the Court having reviewed the Motion

and determined that the legal and factual bases set forth in the Motion establish just cause for the

relief granted herein; and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      The above-captioned chapter 11 cases are dismissed.

3.      The terms and conditions of this Order shall be immediately effective and

enforceable upon its entry.

4.      This Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the Motion or the implementation, interpretation or enforcement of this Order.

Dated: _____, 2022
New York, New York

_____
THE HONORABLE DANIEL S. JONES
UNITED STATES BANKRUPTCY JUDGE