UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>JPA No. 111 Co., LTD., and<br>JPA No. 49 Co., LTD.,<br><br>　　　　　Debtors.[1] | Chapter 11<br><br>Case No. 21–12075 (DSJ)<br>Case No. 21–12076 (DSJ) |

**DECLARATION OF ANDREW GRAY IN SUPPORT OF
CREDITOR FITZWALTER CAPITAL PARTNERS (FINANCIAL TRADING)
LIMITED'S MOTION TO DISMISS OR ABSTAIN FROM HEARING THESE
CHAPTER 11 CASES**

I, Andrew Gray, being duly sworn, hereby declare as follows:

1. I am a Partner at FitzWalter Capital, a global private investment fund with offices in New York, London and Hamburg. From 2010 to 2020, I was a Managing Director at Macquarie's CAF Principal Finance business based in London. Prior to joining the Principal Finance business, I was an analyst at J.P. Morgan's Investment Banking business in Sydney, Australia. I have experience in investing across a broad spectrum of sectors and asset classes, including corporate businesses, infrastructure, real estate, renewables and aviation.

2. I am a Director of FitzWalter Capital Partners (Financial Trading) Limited ("**FWCP**"), an interested party in the above–entitled action. I am authorized to submit this declaration ("**Declaration**") on behalf of FWCP and if called and sworn as a witness, I could and would testify competently to the information submitted herein.

3. I am a Director of FWCP which has made a number of investments in aircraft financings. In this role, I gained personal knowledge of the transactions related to aircraft at issue in this bankruptcy.

---

[1] The Debtors in these Chapter 11 cases are: JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd. The Debtors' corporate address is: Kasumigaseki Common Gate West Tower, 3–2–1 Kasumigaseki, Chiyoda–Ku, Tokyo 100–0013.

1

4. I submit this Declaration in support of FWCP's Motion to Dismiss or Abstain From Hearing These Chapter 11 Cases ("**Motion**").

5. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of the underlying events, my review of relevant documents, information provided to me, and/or my opinion based upon my experience, knowledge, and information concerning this matter. Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change.

**A.** *The Debtors Were Formed To Acquire And Lease Airplanes*

6. FWCP is a private limited company incorporated in England and Wales that specializes in investment management. FWCP is a secured creditor of JPA No. 111 Co., Ltd. ("**Japan Debtor One**") and JPA No. 49 Co., Ltd. ("**Japan Debtor Two**"). As described in greater detail below, FWCP is the Debtors' largest creditor and holds the substantial majority of the Debtors' outstanding obligations.

7. The Debtors are special purpose vehicles formed under the laws of Japan. The Debtors are each the direct, wholly owned subsidiaries of JP Lease Products & Services Co., Ltd. ("**JPL**"). In turn, JPL is the direct, wholly owned subsidiary of Japan Investment Adviser Co., Ltd. ("**JIA**").

8. The Debtors were formed for the express purpose of acquiring two Airbus A350 airplanes (collectively, "**Aircraft**"), which they leased to an intermediate lessor who, in turn, leased the aircraft to Vietnam Airlines JSC ("**Vietnam Airlines**"), the party that operated the Aircraft. The first Airbus A350 is designated "**MSN 173 Aircraft**" and was acquired by Japan Debtor Two in 2017 ("**173 Transaction**"). The second Airbus A350 is designated "**MSN 067 Aircraft**" and was acquired by Japan Debtor One in 2018 ("**067 Transaction**").[2] The transactions are substantially similar in terms and structure.

---

[2] "MSN" is an acronym for "Manufacturer's Serial Number."

2

9. By design, the Debtors do not have any employees or operations. Pursuant to a suite of agreements, the Debtors' operations are managed either directly by JPL or by third parties hired by JPL.

10. True and correct copies of Japan Debtor Two's management and service agreement with JPL and JPL's management and service agreement with a third party are attached hereto as Exhibits 1 and 2 respectively.

11. True and correct copies of Japan Debtor One's management and service agreement with JPL and JPL's management and service agreement with a third party are attached hereto as Exhibits 3 and 4 respectively.

### B. *Japan Debtor Two Acquires And Leases The MSN 173 Aircraft In 2017*

12. Through the 173 Transaction, various lenders provided Japan Debtor Two with funding so that Japan Debtor Two could acquire the MSN 173 Aircraft.

13. Crédit Agricole Corporate & Investment Bank ("**CACIB**") acted as Mandated Lead Arranger, Senior Agent, Junior Agent, Security Agent, and Account Bank (as those terms are defined in the 173 Transaction documents) for the lenders (as applicable) involved in the 173 Transaction.

14. On December 22, 2017, Japan Debtor Two entered into the Senior 173 Facility Agreement and pursuant thereto received a senior loan up to $111,000,000.

15. A true copy of the Senior 173 Facility Agreement is attached hereto as Exhibit 5.

16. In exchange for the senior loan, Japan Debtor Two committed itself to repaying the loan in quarterly installments pursuant to a fixed schedule. Additionally, Japan Debtor Two committed itself to leasing the MSN 173 Aircraft to an intermediate lessor ("**173 Head Lease**") that would in turn lease the MSN 173 Aircraft to a lessee that would operate the aircraft ("**173 Sublease**").

17. Concurrently, on December 22, 2017, Japan Debtor Two, entered into the Junior 173 Facility Agreement which provided for a junior loan up to $7,300,000.

18. A true copy of the Junior 173 Facility Agreement is attached hereto as Exhibit 6.

19. In exchange for the junior loan, Japan Debtor Two committed itself to repaying the loan in quarterly instalments pursuant to a fixed schedule.

20. All secured and unsecured creditors to the 173 Transaction have either executed an agreement regarding the distribution of proceeds ("**173 Proceeds Agreement**"), or acceded to it terms at a later date, as FWCP did.

21. A true copy of the 173 Proceeds Agreement is attached hereto as Exhibit 7. True and correct copies of FWCP's accession undertakings for the 173 Proceeds Agreement are attached as Exhibit 8.

22. The 173 Proceeds Agreement sets out a waterfall providing the order of payment priority for the lenders under the Senior 173 Facility Agreement and the Junior 173 Facility Agreement, among others. *See* Ex. 7 (173 Proceeds Agreement) § 2 ("Each of the Parties agrees that the Collateral granted by the Obligors to the Finance Parties shall be applied in the manner and order of priorities set out in this Agreement."). The 173 Proceeds Agreement binds JPL and every secured creditor of Japan Debtor Two under the 173 Transaction. There is no known secured creditor of either Debtor claiming a debt based on the 173 Transaction that is not a party to the 173 Proceeds Agreement. This waterfall provision not only acts as a subordination agreement; it also provides a comprehensive scheme to allocate the value of Japan Debtor Two to all of its secured creditors.

23. Pursuant to the 173 Proceeds Agreement, JPL—the Debtors' parent—agreed with Japan Debtor Two's intermediate lessor, JLPS Leasing Uranus Limited f/k/a PAAL Uranus Company Limited ("**173 Intermediate Lessor**"), to abstain from suing to recover any moneys owed until the secured obligations of the senior and junior lenders were discharged. *See* Ex. 7 (173 Proceeds Agreement) § 3.1.1 ("The Borrower Parent hereby agrees in favour of each of the Finance Parties that until the Secured Obligations Discharge Date it shall not: . . . sue the Borrower or the Intermediate Lessor for or in respect of the recovery of any moneys. . . . "); Ex. 7 (173 Proceeds Agreement) § 3.2.1 ("The Intermediate Lessor hereby agrees in favour of each of the Finance Parties that until the Secured Obligations Discharge Date it shall not: . . . sue the Borrower

4

for or in respect of the recovery of any moneys. . . . "). Similarly, by entering into the 173 Proceeds Agreements, JPL and 173 Intermediate Lessor agreed to abstain from filing, joining, or otherwise supporting a bankruptcy filing. Ex. 7 (173 Proceeds Agreement) §§ 3.1.3, 3.2.3.

24. Vietnam Airlines was the designated lessee ("**173 Lessee**") pursuant to the 173 Proceeds Agreement.

25. On December 29, 2017, 173 Intermediate Lessor assigned "absolutely by way of security with full title guarantee . . . all of its right, title, and interest, present and future" arising from the 173 Transaction to Japan Debtor Two.

26. A true copy of the 173 Intermediate Lessor Security Assignment Agreement is attached hereto as Exhibit 9.

27. On December 29, 2017, Japan Debtor Two assigned "absolutely by way of security with full title" its interests arising from the 173 Transaction to CACIB, then serving as Security Agent pursuant to a security assignment agreement ("**173 Security Assignment Agreement**").

28. A true copy of the 173 Security Assignment Agreement is attached hereto as Exhibit 10.

29. On December 29, 2017, Japan Debtor Two executed a mortgage ("**173 Mortgage Agreement**"), conveying to CACIB a security interest in the MSN 173 Aircraft to ensure full and punctual payments to Japan Debtor Two's senior and junior secured creditors as provided for in the 173 Proceeds Agreement. The 173 Mortgage Agreement is governed by New York law.

30. A true copy of the 173 Mortgage Agreement is attached hereto as Exhibit 11.

C. *Japan Debtor One Acquires And Leases The MSN 067 Aircraft In 2018*

31. As with the 173 Transaction, through the 067 Transaction, various lenders provided Japan Debtor One with funding so that Japan Debtor One could acquire the MSN 067 Aircraft.

32. As with the 173 Transaction, CACIB acted as Mandated Lead Arranger, Senior Agent, Junior Agent, Security Agent, and Account Bank (as those terms are defined in the 067 Transaction documents) for the lenders (as applicable) involved in the 067 Transaction.

5

33. On November 6, 2018, Japan Debtor One, entered into the Senior 067 Facility Agreement which provided for a senior loan up to $100,000,000.

34. A true copy of the Senior 067 Facility Agreement is attached hereto as Exhibit 12.

35. In exchange for the senior loan, Japan Debtor One committed itself to repaying the loan in quarterly installments. Additionally, Japan Debtor One committed itself to leasing the MSN 067 Aircraft to an intermediate lessor ("**067 Head Lease**") that would in turn lease the MSN 067 Aircraft to a lessee that would operate the aircraft ("**067 Sublease**").

36. Concurrently, on November 6, 2018, Japan Debtor One, entered into the Junior 067 Facility Agreement which provided for a junior loan up to $15,000,000.

37. A true copy of the Junior 067 Facility Agreement is attached hereto as Exhibit 13.

38. In exchange for the junior loan, Japan Debtor One committed itself to repaying the loan in quarterly installments.

39. All secured and unsecured creditors to the 067 Transaction executed or have since acceded to an agreement regarding the distribution of proceeds ("**067 Proceeds Agreement**") that is substantially identical to the 173 Proceeds Agreement.

40. A true copy of the 067 Proceeds Agreement is attached hereto as Exhibit 14. True and correct copies of FWCP's accession undertakings for the 067 Proceeds Agreement are attached as Exhibit 15.

41. The 067 Proceeds Agreement sets out a waterfall providing the order of payment priority for the lenders under the Senior 067 Facility Agreement and the Junior 067 Facility Agreement, among others. *See* Ex. 14 (067 Proceeds Agreement) § 2 ("Each of the Parties agrees that the Collateral granted by the Obligors to the Finance Parties shall be applied in the manner and order of priorities set out in this Agreement."). The 067 Proceeds Agreement binds JPL and every secured creditor of Japan Debtor One under the 067 Transaction. This waterfall provision not only acts as a subordination agreement; it also provides a comprehensive scheme to allocate the value of Japan Debtor One to all of its secured creditors.

42. Pursuant to the 067 Proceeds Agreement, JPL—the Debtors' parent—agreed with Japan Debtor One's intermediate lessor, JLPS Leasing Draco Limited f/k/a DAE Leasing (Ireland) 12 Limited ("**067 Intermediate Lessor**"), to abstain from suing to recover any moneys owed until the secured obligations of the senior and junior lenders were discharged. *See* Ex. 14 (067 Proceeds Agreement) § 3.1.1 ("The Borrower Parent hereby agrees in favour of each of the Finance Parties that until the Secured Obligations Discharge Date it shall not: . . . sue the Borrower or the Intermediate Lessor for or in respect of the recovery of any moneys. . . . "); Ex. 14 (067 Proceeds Agreement) § 3.2.1 ("The Intermediate Lessor hereby agrees in favour of each of the Finance Parties that until the Secured Obligations Discharge Date it shall not: . . . sue the Borrower for or in respect of the recovery of any moneys. . . . "). Similarly, by entering into the 067 Proceeds Agreements, JPL and the 067 Intermediate Lessor agreed to abstain from filing, joining, or otherwise supporting a bankruptcy filing. Ex. 14 (067 Proceeds Agreement) §§ 3.1.3, 3.2.3.

43. For the 067 Transaction, Vietnam Airlines was the designated lessee ("**067 Lessee**") pursuant to the 067 Proceeds Agreement.

44. On November 21, 2018, 067 Intermediate Lessor assigned "absolutely by way of security with full title guarantee . . . all of its right, title, and interest, present and future" arising from the 067 Transaction to Japan Debtor One.

45. A true copy of the 067 Intermediate Lessor Security Assignment Agreement is attached hereto as Exhibit 16.

46. On November 21, 2018, Japan Debtor One assigned "absolutely by way of security with full title" its interests arising from the 067 Transaction to CACIB, then serving as Security Agent pursuant to a security assignment agreement ("**067 Security Assignment Agreement**").

47. A true copy of the 067 Security Assignment Agreement is attached hereto as Exhibit 17.

48. On November 21, 2018, Japan Debtor One executed a mortgage ("**067 Mortgage Agreement**"), conveying to CACIB a security interest in the MSN 067 Aircraft to ensure full and

7

punctual payments to Japan Debtor One's senior and junior secured creditors as provided for in the 067 Proceeds Agreement. The 067 Mortgage Agreement is governed by New York law.

49. A true copy of the 067 Mortgage Agreement is attached hereto as Exhibit 18.

**D.    *Events Leading To Bankruptcy***

50. In early 2020, Vietnam Airlines began signaling that it would not be able to meet its obligations to the Debtors.

51. On April 29, 2020, 173 Intermediate Lessor and 067 Intermediate Lessor entered into deferral agreements with Vietnam Airlines pursuant to which Vietnam Airline's monthly rental payment obligations were deferred through September 2020.

52. A true copy of the Lease Deferral Agreement between Vietnam Airlines and 173 Intermediate Lessor for MSN 173 is attached hereto as Exhibit 19.

53. A true copy of the Lease Deferral Agreement between Vietnam Airlines and 067 Intermediate Lessor for MSN 067 is attached hereto as Exhibit 20.

54. Similarly, on May 19, 2020, the Debtors entered into (i) deferral agreements with 173 Intermediate Lessor and 067 Intermediate Lessor and (ii) agreements with CACIB pursuant to which the Debtors' payments on the loans were deferred.

55. A true copy of the Head Lease Deferral Agreement between 173 Intermediate Lessor and Japan Debtor Two for MSN 173 is attached hereto as Exhibit 21.

56. A true copy of the Loan Deferral Agreement for MSN 173 is attached hereto as Exhibit 22.

57. A true copy of the Head Lease Deferral Agreement between 067 Intermediate Lessor and Japan Debtor One for MSN 067 is attached hereto as Exhibit 23.

58. A true copy of the Loan Deferral Agreement for MSN 067 is attached hereto as Exhibit 24.

59. On October 29, 2020, Vietnam Airlines was still unable to satisfy its obligations. In response, 173 Intermediate Lessor and 067 Intermediate Lessor again entered into a rent deferral

8

agreement with Vietnam Airlines pursuant to which Vietnam Airline's rental payments for the Aircraft were further deferred through December 2020.

60. A true copy of the Second Lease Deferral Agreement between Vietnam Airlines and 173 Intermediate Lessor for MSN 173 is attached hereto as Exhibit 25.

61. A true copy of the Second Head Lease Deferral Agreement between 173 Intermediate Lessor and Japan Debtor Two for MSN 173 is attached hereto as Exhibit 26.

62. A true copy of the Second Lease Deferral Agreement between Vietnam Airlines and 067 Intermediate Lessor for MSN 067 is attached hereto as Exhibit 27.

63. A true copy of the Second Head Lease Deferral Agreement between 067 Intermediate Lessor and Japan Debtor One for MSN 067 is attached hereto as Exhibit 28.

64. On November 27, 2020, Japan Debtor Two entered into another agreement with CACIB through which Japan Debtor Two's payments on the loans for MSN 173 Aircraft were deferred.

65. A true copy of the Second Loan Deferral Agreement for MSN 173 is attached hereto as Exhibit 29.

66. On December 14, 2020, Japan Debtor One entered into another agreement with CACIB through which Japan Debtor One's payments on the loan for MSN 067 were deferred.

67. A true copy of the Second Loan Deferral Agreement for MSN 067 is attached hereto as Exhibit 30.

68. The deferral period ended on January 1, 2021, and Vietnam Airlines defaulted on its rent obligations in 2021 and remains in default today. While Vietnam Airlines has made sporadic rent payments, these payments do not cover the full amount owed to the Debtors. And the Debtors have not received any payments from Vietnam Airlines since October 26, 2021.

69. On December 1, 2021, CACIB, as (then) Security Agent under the senior loans, (i) notified the Debtors, JPLS Draco (in respect of the MSN 067 Aircraft only), JPLS Uranus (in respect of the MSN 173 Aircraft only), and Vietnam Airlines that events of default had occurred and were continuing under the leases, (ii) terminated the leasing of the Aircraft under the relevant

Head Lease and Sublease; and (iii) provided notice confirming the automatic acceleration of the Debtors' senior secured loans.

70. A true and correct copy of CACIB's Termination Notice of 173 Head Lease and Sublease Agreement is attached hereto as Exhibit 31.

71. A true and correct copy of CACIB's Termination Notice of 067 Head Lease and Sublease is attached hereto as Exhibit 32.

72. As of the last rental due date before the leases were terminated, Vietnam Airlines has paid $5,075,585.57 for leasing the MSN 067 Aircraft with $10,429,865.50 left due. With respect to the MSN 173 Aircraft, Vietnam Airlines has paid $4,545,435.71 with $10,695,530.92 left due.

73. The Debtors also defaulted on their loan payment obligations and remain in default today. As of October 4, 2021, Japan Debtor Two owed an outstanding balance of approximately $89,811,133 under the Senior 173 Facility Agreement and approximately $6,771,235 under the Junior 173 Facility Agreement. As of October 4, 2021, Japan Debtor One owed an outstanding balance of approximately $90,032,662 under the Senior 067 Facility Agreement and approximately $8,958,681 under the Junior 067 Facility Agreement. The Debtors also owe $12,449,378.53 on a senior secured claim relating to the termination of certain swap obligations arising in connection with the Transaction Documents.

74. As a result of CACIB's terminations of the leasing of the Aircraft, Vietnam Airlines has no legal right to possess or operate the Aircraft. Nevertheless, the Debtors and the 173 Intermediate Lessor and 067 Intermediate Lessor have failed to stop Vietnam Airlines from operating the Aircraft, even after the termination of the leases and the bankruptcy filing, and notwithstanding that Vietnam Airlines has not made any lease payments since October 26, 2021. Between the date that Vietnam Airlines' leases were terminated and the filing of these bankruptcy proceedings, Vietnam Airlines has improperly used the Aircraft on sixty–six (66) separate flights—totaling more than 472 flight hours and spanning eight (8) countries across Asia and Western Europe.

75. Each and every flight depletes the value of the Aircraft given their finite useful life, particularly in relation to the consumable components of the engine and airframe. To ensure adequate safety, once an aircraft's engines reach a certain quantum of usage, they must be overhauled to remain compliant, which costs between $8,000,000.00 and $10,000,000.00 per engine depending on the nature of the servicing that is required.

### E. *FWCP Acquires Its Position And Begins Enforcing Its Rights As Security Agent*

76. On December 1, 2021, FWCP acquired $128,227,903.53 in outstanding obligations issued by the Debtors, made up of $115,778,525.00 in senior loans and $12,449,378.53 in a secured claim relating to the termination of certain swap obligations arising in connection with the Transaction Documents. FWCP is, by far, each the Debtor's largest creditor and holds a substantial majority of the Debtors' outstanding senior secured loans. Additionally, on December 2, 2021, FWCP was nominated, appointed and succeeded CACIB as Security Agent in accordance with the terms of the relevant transaction documents and proceeds agreements.

77. A true and correct copy of CACIB's Notice of Resignation for MSN 173 is attached hereto as Exhibit 33.

78. A true and correct copy of CACIB's Notice of Resignation for MSN 067 is attached hereto as Exhibit 34.

79. A true and correct copy of the Notice of FWCP's Appointment as Security Agent for the 173 Transaction is attached hereto as Exhibit 35.

80. A true and correct copy of the Notice of FWCP's Appointment as Security Agent for the 067 Transaction is attached hereto as Exhibit 36.

81. In accordance with its rights as Security Agent, on December 10, 2021, FWCP appointed Airborne Capital Limited ("**Airborne**") to conduct a sale of the lease–related rights transferred to it under the 173 Security Assignment Agreement and 067 Security Assignment Agreement.

82. Beginning on December 10, 2021, Airborne advertised the pending sale, via advertisements in the WSJ, Aersyn (a trade website) and Airborne's own website. Airborne also offered detailed bidding procedures to any parties who expressed interest in the sale.

83. Airborne's conduct was in strict accordance with all the powers enumerated in the transaction documents. As Security Agent, FWCP was granted broad discretion to enforce its security interest in the collateral. Notably, the sales process did not—and could not—include a sale of the Aircraft. The sale of the Aircraft would involve a separate foreclosure process pursuant to the New York Uniform Commercial Code, which requires the sale be "commercially reasonable." A sale of the Aircraft would necessarily require separate procedures, different timelines and advertisements that would be appropriate for the sale of an airplane (as opposed to the sale of contractual rights).

84. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on this <u>3rd</u> day of January 2022, at London, United Kingdom.

*Andrew Gray*
Andrew Gray
Director, FitzWalter Capital Partners (Financial Trading) Limited