# EXHIBIT 14

**C L I F F O R D**

**C H A N C E**

CLIFFORD CHANCE PTE LTD

**EXECUTION VERSION**

**DATED** _____ 6 November _____ **2018**

## JPA NO. 111 CO., LTD.
AS BORROWER

### THE INTERMEDIATE LESSOR
BY ACCESSION

### CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK
AS MANDATED LEAD ARRANGER

### THE KOREA DEVELOPMENT BANK
AS ARRANGER

### CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK
AS SENIOR AGENT

### CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK
AS JUNIOR AGENT

### CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK
AS SECURITY AGENT

### CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK
AS HEDGING COUNTERPARTY

### THE FINANCIAL INSTITUTIONS NAMED HEREIN
AS LENDERS

### CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK
AS ACCOUNT BANK

### JP LEASE PRODUCTS & SERVICES CO., LTD.
AS BORROWER PARENT

---

### PROCEEDS AGREEMENT
IN RESPECT OF THE FINANCING OF
ONE (1) AIRBUS A350-900 AIRCRAFT
WITH MANUFACTURER'S SERIAL NUMBER 67

---

# CONTENTS

Clause                                                                                      Page

1.    Definitions and Interpretation .......................................................................... 2
2.    Ranking and Priority ......................................................................................... 2
3.    Non-Petitioning ................................................................................................ 3
4.    Turnover of Receipts ......................................................................................... 3
5.    Notice of Loan Relevant Event ........................................................................ 4
6.    Disposals by Security Agent ............................................................................ 4
7.    Release of Security ........................................................................................... 5
8.    Application of Proceeds .................................................................................... 5
9.    Enforcement Of Security ................................................................................ 10
10.   Borrower Parent Undertakings ...................................................................... 11
11.   Intermediate Lessor ........................................................................................ 13
12.   Cape Town Convention ................................................................................... 25
13.   Mitigation ....................................................................................................... 26
14.   Change of Party .............................................................................................. 27
15.   Information ...................................................................................................... 30
16.   Notices ............................................................................................................ 31
17.   Preservation .................................................................................................... 33
18.   Counterparts .................................................................................................... 33
19.   Confidentiality ................................................................................................ 33
20.   Governing Law ............................................................................................... 36
21.   Enforcement .................................................................................................... 36
22.   Limitation on Recourse ................................................................................... 37
23.   Contractual recognition of Bail-in ................................................................. 39
24.   Parallel debt (Covenant to pay the Security Agent) ...................................... 40
25.   Benefit of Sanctions Restrictions ................................................................... 40
26.   Hedging ........................................................................................................... 41
Schedule 1 Form of Proceeds Agreement Accession Undertaking ......................... 44
Schedule 2 The Finance Parties ............................................................................... 47
Schedule 3 Form of Agent Transfer Certificate ...................................................... 73
Schedule 4 Appendix A - Master Definitions Schedule .......................................... 75

**THIS PROCEEDS AGREEMENT** is dated ___6 November___ 2018 (this "**Agreement**") and made by way of a deed between:

(1)     **JPA NO. 111 CO., LTD.**, a limited liability company (*kabushiki kaisha*) duly formed and incorporated under the laws of Japan, with its registered office at 3-2-1, Kasumigaseki, Chiyoda-ku, Tokyo 100-0013, Japan (the "**Borrower**");

(2)     **CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**, in its capacity as mandated lead arranger of the Senior Loan and the Junior Loan (the "**Mandated Lead Arranger**");

(3)     **THE KOREA DEVELOPMENT BANK**, in its capacity as arranger of the Senior Loan (the "**Arranger**");

(4)     **CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**, in its capacity as facility agent for the Senior Lenders (the "**Senior Agent**");

(5)     **CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**, in its capacity as facility agent for the Junior Lenders (the "**Junior Agent**");

(6)     **CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**, in its capacity as security agent and trustee for and on behalf of itself, the Senior Agent, the Junior Agent, the Hedging Counterparty and the Lenders for the purposes only of holding certain security under the Transaction Documents (the "**Security Agent**");

(7)     **CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**, in its capacity as hedging counterparty (the "**Hedging Counterparty**");

(8)     **THE FINANCIAL INSTITUTIONS** listed on the signature pages as original senior lenders (the "**Original Senior Lenders**");

(9)     **THE FINANCIAL INSTITUTIONS** listed on the signature pages as original junior lenders (the "**Original Junior Lenders**");

(10)    **CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**, in its capacity as account bank (the "**Account Bank**"); and

(11)    **JP LEASE PRODUCTS & SERVICES CO**., **LTD**., a limited liability company (*kabushiki kaisha*) duly formed and incorporated under the laws of Japan, with its registered office at 3-2-1, Kasumigaseki, Chiyoda-ku, Tokyo 100-0013, Japan (the "**Borrower Parent**").

**INTRODUCTION**:

(A)     The Borrower has agreed to acquire the Aircraft and will lease the Aircraft to the Intermediate Lessor pursuant to the Head Lease Agreement. The Intermediate Lessor will lease the Aircraft to the Lessee pursuant to the Lease Agreement.

(B)     The Borrower has entered into, or will enter into, as the context may require, the Senior Facility Agreement with the Senior Finance Parties to, *inter alia*, finance a portion of the Purchase Price payable for the Aircraft.

(C)     The Borrower has entered into, or will enter into, as the context may require, the Junior Facility Agreement with the Junior Finance Parties to, *inter alia*, finance a portion of the Purchase Price payable for the Aircraft.

(D)     The Borrower has entered into, or will enter into, as the context may require, the Hedging Agreement with the Hedging Counterparty to hedge interest rate exposure in respect of the Senior Loan.

(E)     The Intermediate Lessor shall accede to this Deed on or about the date of the Utilisation Date and shall thereupon be bound by this Deed in accordance with its terms. Until such time, all references to the Intermediate Lessor shall be disregarded.

(F)     As security for the obligations of the Obligors to the Finance Parties under the Transaction Documents, the Borrower, the Intermediate Lessor and the Borrower Parent have entered into, or will on or after the date of this Agreement enter into, the Security Documents to which they are respectively a party in favour of the Security Agent.

**NOW IT IS AGREED** as follows:

1.      **DEFINITIONS AND INTERPRETATION**

1.1     **Definitions**

1.1.1   Unless the context otherwise requires, capitalised terms and expressions used herein and not otherwise defined shall have the respective meanings ascribed thereto in Part A of Appendix A (*Master Definitions Schedule*) listed in Schedule 4 to this Agreement.

1.1.2   The rules of interpretation set out in Part B of Appendix A (*Master Definitions Schedule*) listed in Schedule 4 to this Agreement shall apply to this Agreement.

1.2     **Third Party Rights**

1.2.1   Unless expressly provided to the contrary in this Agreement, a person who is not a Party has no right under the Third Parties Act to enforce or to enjoy the benefit of any term of this Agreement.

1.2.2   Each Finance Party may enforce or enjoy the benefit of any term of this Agreement expressed in its favour.

1.2.3   Notwithstanding any term of this Agreement, the consent of any person who is not a Party is not required to rescind or vary this Agreement at any time.

2.      **RANKING AND PRIORITY**

Each of the Parties agrees that the Collateral granted by the Obligors to the Finance Parties shall be applied in the manner and order of priorities set out in this Agreement.

3.      **NON-PETITIONING**

3.1    **The Borrower Parent hereby agrees in favour of each of the Finance Parties that until the Secured Obligations Discharge Date it shall not:**

3.1.1    sue and shall procure that none of its Affiliates will sue the Borrower or the Intermediate Lessor for or in respect of the recovery of any moneys (whether principal, interest or otherwise) now or hereafter owing to it;

3.1.2    claim (and shall procure that none of its Affiliates will claim) any set-off or counterclaim (save pursuant to any express contractual agreement in this respect) against the Borrower or the Intermediate Lessor in respect of any liability on the part of the Borrower or the Intermediate Lessor owed to it; and

3.1.3    (and shall procure that its Affiliates will not) file or join in any petition to commence any winding-up proceedings by or against the Borrower or the Intermediate Lessor or any other action or proceedings for the winding-up, dissolution, administration or examinership of the Borrower or the Intermediate Lessor or take, or acquiesce in, any other action which might reasonably be expected to lead to the bankruptcy or insolvency of the Borrower or the Intermediate Lessor, save as required by applicable law or with the consent of the Security Agent.

3.2    **The Intermediate Lessor hereby agrees in favour of each of the Finance Parties that until the Secured Obligations Discharge Date it shall not:**

3.2.1    sue and shall procure that none of its Affiliates will sue the Borrower for or in respect of the recovery of any moneys (whether principal, interest or otherwise) now or hereafter owing to it;

3.2.2    claim (and shall procure that none of its Affiliates will claim) any set-off or counterclaim (save pursuant to any express contractual agreement in this respect) against the Borrower in respect of any liability on the part of the Borrower owed to it; and

3.2.3    (and shall procure that its Affiliates will not) file or join in any petition to commence any winding-up proceedings by or against the Borrower or any other action or proceedings for the winding-up, dissolution, administration or examinership of the Borrower or take, or acquiesce in, any other action which might reasonably be expected to lead to the bankruptcy or insolvency of the Borrower, save as required by applicable law or with the consent of the Security Agent.

4.      **TURNOVER OF RECEIPTS**

4.1    **Turnover by the Parties**

Subject to Clause 4.2 (*Permitted assurance and receipts*), if at any time prior to the Secured Obligations Discharge Date any Party to this Agreement receives or recovers any sum which, under the terms of any of the Transaction Documents, should have been paid to the Security Agent (including in the case of the Borrower Parent or the Intermediate Lessor any amount received from the Borrower other than in accordance

with Clause 8 (*Application of Proceeds*)) such Party shall hold that amount on trust for the Security Agent and promptly pay that amount to the Security Agent or, if this trust cannot be given effect to, such Party will promptly pay an amount equal to that receipt or recovery to the Security Agent for application in accordance with the terms of this Agreement.

4.2     **Permitted assurance and receipts**

Nothing in this Agreement shall restrict the ability of any Party to:

4.2.1     arrange with any person any assurance against loss in respect of, or reduction of its credit exposure to, any Obligor or the Lessee (including assurance by way of credit based derivative, insurance policy or sub-participation); or

4.2.2     to receive or recover any sum in respect of its Secured Obligations as a result of any assignment or transfer permitted by Clause 14 (*Change of Party*) of this Agreement,

and that party shall not be obliged to account to any other Party for any sum received by it as a result of that action.

5.     **NOTICE OF LOAN RELEVANT EVENT**

When any Party becomes aware of a Loan Relevant Event it shall as soon as reasonably practicable thereafter, give written notice thereof to the Senior Agent or the Junior Agent (as applicable) and the Security Agent (each a "**Notice of Default**"). Such Notice of Default shall cease to be in effect once the subject Loan Relevant Event has been cured or waived.

6.     **DISPOSALS BY SECURITY AGENT**

If any assets forming part of the Collateral are sold or otherwise disposed of pursuant to the Transaction Documents by (or on behalf of) the Security Agent, or by an Obligor at the request of the Security Agent, either as a result of the enforcement of any of the Collateral or if that disposal is permitted under the Transaction Documents:

6.1.1     the Security Agent shall, subject to Clause 7 (*Release of Security*), be authorised (at the cost of the Borrower) to release those assets from the Collateral and is authorised to execute, on behalf of and without the need for any further authority from any Party, any release of the Collateral or any other claim over those assets and to issue any certificates of non-crystallisation that may, in the absolute discretion of the Security Agent, be considered necessary or desirable;

6.1.2     if the asset which is disposed of consists of all of the Intermediate Lessor Shares, the Security Agent is authorised (at the cost of the Borrower) to, and may execute on behalf of each Finance Party and each Obligor, as appropriate, a release of the Intermediate Lessor from all liabilities it may have to any Finance Party or any other Obligor, both actual and contingent (including any liability to any other Obligor by way of guarantee, contribution, subrogation or indemnity) and a release of any Collateral granted by the Intermediate Lessor, over any of its assets under any of the Security Documents; and

6.1.3    the Finance Parties and the Obligors shall execute any releases or other documents that the Security Agent may consider to be necessary to give effect to those releases,

**provided that** the proceeds of that sale or disposal are applied in accordance with Clause 8.3 (*Order of Application*) of this Agreement.

## 7.    RELEASE OF SECURITY

### 7.1    Release of Collateral

Upon the full, final and indefeasible payment and discharge in full of all amounts of the Secured Obligations, the Collateral shall be released and discharged from the Security Interests constituted by the Security Documents and, as applicable, reassigned by the Security Agent to the Obligor, and the Security Agent (at the cost of the Borrower) will execute such agreements, give such notices and do such other things as are necessary or as the Borrower or any other Obligor may reasonably request to give effect to such release, discharge and reassignment.

### 7.2    Counsel's advice

No Finance Party shall be required to release any part of the Collateral if the Security Agent has been advised by appropriate and reputable legal counsel that, by reason of the application of any bankruptcy, insolvency or other applicable laws affecting creditors' rights and the discharge of obligations, the Security Agent will or will become likely to be obliged to pay to or account to any Obligor or any liquidator or trustee in bankruptcy of any Obligor any amount corresponding to all or any part of the amount paid in or towards such discharge.

## 8.    APPLICATION OF PROCEEDS

### 8.1    No Enforcement Event

8.1.1    While no Enforcement Event is continuing, the Borrower shall pay all amounts payable by it to the Finance Parties pursuant to the Transaction Documents to the Borrower Account in accordance with Clause 8.13 (*Payment Directions*).

8.1.2    At the times referred to in Clause 8.3 (*Order of Application*) the Account Bank shall promptly distribute amounts received by it which are payable to the Finance Parties and the Borrower pursuant to the Transaction Documents in the order of priority set out in Clause 8.3 (*Order of Application*).

### 8.2    Post-Enforcement Event, Final Disposition Proceeds and Event of Loss Proceeds

Subject to the payment of any claim ranking in priority as a matter of law, all amounts payable by the Borrower to the Finance Parties pursuant to the Transaction Documents while an Enforcement Event is continuing and the proceeds of enforcement of the Collateral constituted by the Security Documents or any Event of Loss Proceeds and Final Disposition Proceeds shall be paid to the Security Agent to such account as the Security Agent specifies in writing to the Borrower, and the Security Agent shall hold such amounts, together with any amounts received or recovered by the Security Agent from time to time in connection with the realisation or enforcement of all or any part of

the Collateral, on trust and apply them to the extent permitted by applicable law, in the order of priority set out in Clause 8.3 (*Order of Application*).

## 8.3    Order of Application

The amounts referred to in Clauses 8.1 (*No Enforcement Event*) and 8.2 (*Post-Enforcement Event, Final Disposition Proceeds and Event of Loss Proceeds*) shall be applied in the following order of priority:

8.3.1    **firstly**, on each Repayment Date and on the date on which any other amount may be due and payable pursuant to the Senior Facility Agreement or any other Transaction Document (other than the Junior Facility Agreement or the Hedging Agreement), in payment to the Senior Agent and the Security Agent in discharging Expenses (including Remarketing and Recovery Expenses) and other amounts (other than principal and interest under the Senior Facility Agreement) owing by any Obligor to the Senior Agent, the Security Agent, the Account Bank, any Receiver or any Delegate under the Transaction Documents;

8.3.2    **secondly**, on each Repayment Date and on the date on which any other amount may be due and payable pursuant to the Senior Facility Agreement on a *pari passu* basis in payment to:

(a)    the Hedging Counterparty in or towards the discharge of any scheduled payments (including default interest) due and payable by the Borrower to the Hedging Counterparty pursuant to the Hedging Agreement; and

(b)    the Senior Lenders for application in or towards the discharge of the Borrower's liabilities in respect of interest due and payable (including default interest) under the Senior Facility Agreement;

8.3.3    **thirdly**, on each Repayment Date on a *pari passu* basis to:

(a)    the Senior Lenders for application in or towards the discharge of the Borrower's liabilities in respect of principal due and payable under the Senior Facility Agreement; and

(b)    the Hedging Counterparty in or towards the discharge of any Swap Termination Amount due and payable by the Borrower to the Hedging Counterparty pursuant to the Hedging Agreement;

8.3.4    **fourthly**, on each Repayment Date on a *pari passu* basis to:

(a)    the Senior Lenders for application in or towards discharge of any Obligor's other liabilities due and payable to the Senior Lenders under any of the Transaction Documents but not otherwised discharged under Clauses 8.3.2 and 8.3.3; and

(b)    the Hedging Counterparty in or towards the discharge of any payments due and payable by the Borrower to the Hedging Counterparty pursuant to the Hedging Agreement to the extent not otherwise discharged under Clauses 8.3.2 and 8.3.3;

8.3.5    **fifthly**, on each Repayment Date and on the date on which any other amount may be due and payable pursuant to the Junior Facility Agreement or any other Transaction Document, in payment to the Junior Agent in discharging Expenses (including Remarketing and Recovery Expenses) and other amounts (other than principal and interest under the Junior Facility Agreement) owing by any Obligor to the Junior Agent under the Transaction Documents;

8.3.6    **sixthly**, on each Repayment Date prior to the Junior Secured Obligations Discharge Date and on the date on which any other amount may be due and payable pursuant to the Junior Facility Agreement on a *pari passu* basis in payment to the Junior Lenders for application in or towards the discharge of the Borrower's liabilities in respect of interest due and payable (including default interest) under the Junior Facility Agreement;

8.3.7    **seventhly**, on each Repayment Date prior to the Junior Secured Obligations Discharge Date on a *pari passu* basis to the Junior Lenders for application in or towards the discharge of the Borrower's liabilities in respect of principal due and payable under the Junior Facility Agreement;

8.3.8    **eighthly**, on each Repayment Date prior to the Junior Secured Obligations Discharge Date on a *pari passu* basis to the Junior Lenders for application in or towards discharge of the any Obligor's other liabilities due and payable to the Junior Lenders under any of the Transaction Documents but not otherwise discharged under Clauses 8.3.6 and 8.3.7;

8.3.9    **ninthly**, on each Repayment Date, US$12,000 (or such higher amount as may be agreed by the Security Agent) to the Borrower (or to the Borrower's order) for application in or towards amounts then due and payable in respect of certain servicing and management fees; and

8.3.10    **lastly**, on the Final Repayment Date, subject to Clause 8.11 (*Retention of surplus*), any surplus in payment to the Borrower (or to the Borrower's order) to such account as the Borrower may notify the Account Bank,

**provided that** this paragraph is subject to Clause 8.11 (*Retention of surplus*) and shall not apply while a Loan Event of Default or an Enforcement Event is continuing.

8.4    **Investment of proceeds**

The Security Agent may (for so long as a Loan Relevant Event is continuing) hold all or part of any proceeds otherwise to be applied in accordance with Clause 8.3 (*Order of Application*) in an interest bearing suspense or impersonal account(s) in the name of the Security Agent with such financial institution and for so long as the Security Agent shall think fit (the interest being credited to the relevant account) pending the application from time to time of those monies in accordance with the provisions of this Clause 8 (*Application of Proceeds*).

8.5    **Currency conversion**

8.5.1    For the purpose of, or pending the discharge of, any of the Secured Obligations the Security Agent may convert any moneys received or recovered by the

Security Agent from one currency to the currency in which the Secured Obligations are due with respect to the amount received, at the spot rate at which the Security Agent is able to purchase the currency in which the Secured Obligations are due with the amount received.

8.5.2    The obligations of any Obligor to pay in the due currency shall only be satisfied to the extent of the amount of the due currency purchased after deducting the costs of conversion.

## 8.6    Permitted deductions

The Security Agent shall be entitled (a) to set aside by way of reserve, amounts required to meet and (b) to make and pay, any deductions and withholdings (on account of Taxes) which it is or is likely to be required by any applicable law to make from any distribution or payment made by it under this Agreement, and to pay all Taxes which may be assessed against it in respect of any of the Collateral, or as a consequence of performing its duties, or by virtue of its capacity as Security Agent under any of the Transaction Documents or otherwise (other than in connection with its remuneration for performing its duties under the Transaction Documents and other than Taxes for which the Borrower has no liability to indemnify any Finance Party by virtue of sub-clause 13.2.2 of the Senior Facility Agreement or the Junior Facility Agreement, as applicable).

## 8.7    Good discharge

8.7.1    Any payment to be made in respect of the Secured Obligations by the Security Agent may be made to the Senior Agent or the Junior Agent (as the case may be) on behalf of the relevant Lenders and any payment made in that way shall be a good discharge, to the extent of that payment, by the Security Agent.

8.7.2    The Security Agent is under no obligation to make payment to either the Senior Agent or the Junior Agent in the same currency as that in which any Unpaid Sum is denominated, **provided that** if an Unpaid Sum is recovered by the Security Agent (whether from the Borrower or otherwise) in the currency in which it is denominated, the Borrower shall not be liable for any Losses incurred by any Finance Party on account of the fact that the Security Agent makes payment to the Senior Agent or the Junior Agent (as applicable) in a different currency.

## 8.8    Excepted Payments

Any Excepted Payments or other moneys received by the Security Agent which are identifiable as amounts properly due by way of an indemnity payment to any person pursuant to any of the Transaction Documents shall be promptly applied by the Security Agent in payment to such person.

## 8.9    Partial Payments

If, in relation to the application of any amounts pursuant to any sub-clause of Clause 8.3 (*Order of Application*) the amount available is insufficient to satisfy and discharge all of the amounts due and payable as referred to in such sub-clause, the application

shall be made *pari passu* and *pro-rata* as between the amounts expressed to be due and payable as referred to in such sub-clause (or in such other manner as the Parties entitled to the amounts referred to in such sub-clause may agree in writing).

## 8.10 Insurance Proceeds

8.10.1 All insurance proceeds received by the Security Agent in respect of an Event of Loss shall be applied in accordance with Clause 8.3 (*Order of Application*).

8.10.2 If any party receives insurance proceeds (other than, in respect of Obligors, Excepted Payments and, in respect of Finance Parties, proceeds of public and third party liability insurances) other than following an Event of Loss, such proceeds shall be paid to the Security Agent for application in accordance with Clause 8.3 (*Order of Application*).

## 8.11 Retention of surplus

Notwithstanding Clause 8.3 (*Order of Application*),

8.11.1 if a Default has occurred and is continuing the Account Bank shall be entitled to retain any such remaining amounts, which but for this Clause would be paid to the Borrower or to its order, until the earlier of such Default having been cured and all amounts owing to the Finance Parties under the Transaction Documents having been paid in full; and

8.11.2 if all amounts owing to the Finance Parties under the Transaction Documents have been paid in full but the Account Bank or any other Finance Party has been advised by reputable legal counsel that, by reason of the application of any bankruptcy, insolvency or other applicable laws affecting creditors' rights and the discharge of obligations, the Account Bank or any other Finance Party will or will become likely to be obliged to repay monies recovered by it under the Transaction Documents, the Account Bank shall be entitled to retain any such remaining amounts, which but for this Clause would be paid to the Borrower or to its order, until it is satisfied that the Finance Parties have no liability to repay monies recovered by them under the Transaction Documents.

## 8.12 Return Compensation

8.12.1 The Borrower and the Intermediate Lessor shall procure that any cash Return Compensation paid by the Lessee in accordance with the Lease Agreement shall be credited to the Borrower Account.

8.12.2 The Borrower and the Intermediate Lessor shall not, without the prior written consent of the Security Agent (which will be granted if the Security Agent determines in its sole discretion and in good faith that such request from the Lessee is in accordance with the terms of the Lease Agreement), grant any consents to the Lessee to carry out any maintenance work in respect of the Aircraft. The Borrower and the Intermediate Lessor shall promptly provide the relevant information and any other supporting documentation as may be reasonably requested by the Security Agent in order to determine the scope of such maintenance work.

8.13   **Payment Directions**

8.13.1   The Intermediate Lessor agrees and shall procure that all amounts (other than Excepted Payments) payable by the Lessee to the Intermediate Lessor under the Lease Agreement shall be paid when due into the Intermediate Lessor Account for application by the Account Bank in accordance with this Clause 8 (and may be retained by the Account Bank in the Borrower Account pending such application).

8.13.2   The Borrower agrees and shall procure that all amounts (other than Excepted Payments) payable by the Intermediate Lessor to the Borrower under the Head Lease Agreement shall be paid when due into the Borrower Account for application by the Account Bank in accordance with this Clause 8 (and may be retained by the Account Bank in the Borrower Account pending such application).

8.14   **Hedge Break Amounts in respect of voluntary part prepayments**

Notwithstanding Clause 8.3 (*Order of Application*), if there is a voluntary prepayment on a Repayment Date in accordance with Clause 8.2 of the Facility Agreement and a Hedge Break Amount is then payable by the Borrower to the Hedge Counterparty, then the Account Bank shall promptly distribute an amount equal to the Hedge Break Amount to the Hedge Counterparty, provided, however, that no Enforcement Event is continuing and full payment has been made to the Borrower Account in respect of such Hedge Break Amount.

9.   **ENFORCEMENT OF SECURITY**

9.1   **Agent's directions**

The Security Agent will enforce the Collateral and undertake Enforcement Action (or refrain from doing so) as directed by the Instructing Party. At all times after the request to commence enforcement has been issued and subject to the terms of this Agreement, the Security Agent will act on the directions of the Instructing Party who shall be entitled to give directions and do any other things in relation to the enforcement of the Collateral (including in connection with but not limited to, the disposal, collection or realisation of assets subject to the Collateral) that it considers appropriate including (without limitation) determining the timing and manner of any Enforcement Action against any particular person or asset.

9.2   **Obligors' waiver**

To the extent permitted under applicable law and subject to Clause 8 (*Application of Proceeds*) and this Clause 9 (*Enforcement of Security*), each Obligor waives all rights it may otherwise have to require that the Collateral be enforced in any particular order or manner or at any particular time or that any sum received or recovered from any person, or by virtue of the enforcement of any of the Collateral or of any other security interest, which is capable of being applied in or towards discharge of any of the Secured Obligations is so applied, always without prejudice to the provisions of the Transaction Documents.

9.3     **Enforcement of Obligations**

Each Obligor agrees with the Finance Parties that it will, if reasonably requested by the Security Agent and as soon as reasonably practicable following such request, take all such actions (at its sole cost and expense) as are necessary and available to it pursuant to the provisions of the Transaction Documents and law, to allow the Security Agent to (a) after the occurrence of an Enforcement Event, enforce the payment and other obligations of any Obligor under the Transaction Documents, (b) after the occurrence of an Enforcement Event, take any Enforcement Action or (c) perfect the Security Interests granted to the Security Agent pursuant to the Security Documents or to ensure the validity, enforceability or priority of the Transaction Documents.

10.     **BORROWER PARENT UNDERTAKINGS**

10.1    **No Additional Security**

Until the Secured Obligations Discharge Date has occurred (unless the Security Agent otherwise agrees):

10.1.1   the Borrower Parent will not accept any Security Interest or guarantee from the Borrower or the Intermediate Lessor and neither the Intermediate Lessor nor the Borrower will grant any other Security Interest over the Collateral (except as contemplated by the Security Documents);

10.1.2   if the Borrower Parent receives at any time any payment or distribution (in cash or otherwise and including by way of set-off) from the Borrower under the terms of the Transaction Documents otherwise than in accordance with this Agreement it will forthwith pay or transfer the same to the Security Agent for application by the Security Agent in accordance with the Transaction Documents and pending such payment or transfer, it will hold such payment on trust for the Security Agent provided however that this Clause 10.1.2 shall not apply to any payments made to the Borrower Parent to the extent such payments are made from amounts the Borrower is entitled to retain in accordance with Clause 8.3 (*Order of Application*); and

10.1.3   neither the Borrower nor the Intermediate Lessor shall enter into any transaction with the Borrower Parent or with any other person in consideration of the Borrower Parent agreeing not to exercise or enforce any of its rights to the Collateral until the Secured Obligations Discharge Date.

10.2    **Service Agreement and Lease Management Agreement**

10.2.1   The Borrower Parent shall manage, or procure that the Servicer manages, the leasing of the Aircraft under the Lease Agreement during the Security Period. For the avoidance of doubt, neither the Borrower Parent nor the Servicer shall have any right to terminate the leasing of the Aircraft pursuant to the Lease Agreement (other than in circumstances where the Borrower is permitted to terminate the leasing of the Aircraft in accordance with the terms of the Senior Facility Agreement or the Junior Facility Agreement, as applicable) and the Borrower Parent shall not, and shall procure that the Servicer shall not, do anything which would be contrary to the obligations of the Borrower under the

Senior Facility Agreement or the Junior Facility Agreement, as applicable, and of the Borrower Parent hereunder including, without limitation, the Borrower shall not make any payment (and shall ensure that neither the Borrower Parent nor the Servicer is entitled to receive any payment from the Borrower) in priority to any payment due under the Transaction Documents to the Finance Parties and shall not, and shall ensure that the Servicer shall not, claim or petition against the Borrower or any of its assets for any amounts owing to it during the Security Period.

10.2.2   If the Borrower Parent breaches its obligations under the Lease Management Agreement or if the Servicer breaches its obligations under the Service Agreement and, if such breach is capable of remedy, the Borrower Parent or, as applicable, the Servicer does not remedy such breach upon the earlier of (i) it becoming aware of the breach and (ii) the Borrower, the Senior Agent or the Junior Agent giving notice of the breach to it, then the Borrower Parent and the Borrower shall, if requested by the Security Agent (acting on the instructions of the Instructing Party), terminate the Lease Management Agreement and the Borrower shall appoint a new lease manager acceptable to the Security Agent (acting on the instructions of the Instructing Party) on terms acceptable to the Security Agent (acting on the instructions of the Instructing Party) and upon such appointment, the Borrower Parent shall ensure that the Servicer no longer manages the leasing of the Aircraft. Upon such new lease manager being appointed, all references to (i) the "Lease Manager" in the Transaction Documents shall be construed as references to such new lease manger and (ii) the "Lease Management Agreement" shall be construed as references to such new lease management agreement.

10.2.3   The Borrower Parent hereby unconditionally and irrevocably agrees with the Finances Parties that the it shall not, during the Security Period:

(a)   sue and shall procure that none of its Affiliates will sue the Borrower or the Intermediate Lessor for or in respect of the recovery of any monies (whether principal, interest or otherwise) now or hereafter owing to it;

(b)   claim (and shall procure that none of its Affiliates will claim) any set-off or counterclaim (save pursuant to any express contractual agreement in this respect) against the Borrower or the Intermediate Lessor in respect of any liability on the part of the Borrower or the Intermediate Lessor owed to it; and

(c)   (and shall procure that its Affiliates will not) file or join in any petition to commence any winding-up proceedings by or against the Borrower or the Intermediate Lessor or any other action or proceedings for the winding-up, dissolution, administration or examinership of the Borrower or the Intermediate Lessor or take, or acquiesce in, any other action which might reasonably be expected to lead to the bankruptcy or insolvency of the Borrower or the Intermediate Lessor, save as required by applicable law or with the consent of the Security Agent.

10.3   **Financial statements**

The Borrower Parent shall supply to the Senior Agent in sufficient copies for all the Senior Lenders and to the Junior Agent in sufficient copies for all the Junior Lenders as soon as they are available and, in any event, within one hundred and eighty (180) days after the end of each financial year of the Borrower Parent, copies of its unaudited financial statements for such financial year.

10.4   **Requirements as to financial statements**

10.4.1   Each set of financial statements delivered by the Borrower Parent pursuant to Clause 10.3 (*Financial statements*) shall be certified by a director or other authorised officer of the Borrower Parent as fairly representing its financial condition as at the date at which those financial statements were drawn up.

10.4.2   The Borrower Parent shall procure that each set of financial statements delivered pursuant to Clause 10.3 (*Financial statements*) is prepared in accordance with Japanese Generally Accepted Accounting Principles.

11.   **INTERMEDIATE LESSOR**

11.1   **Intermediate Lessor's Representations**

The Intermediate Lessor makes, subject to any express legal qualification referred to in a Legal Opinion, the representations and warranties set out in this Clause 11.1 to each Finance Party on the date of this Agreement and on the date of each Utilisation.

11.1.1   *Status*

(a)   It is a limited liability company, duly incorporated under the laws of Ireland.

(b)   It has the power to own its assets and carry on its business as it is being conducted.

11.1.2   *Binding obligations*

The obligations expressed to be assumed by it in each Transaction Document to which it is a party are legal, valid, binding and enforceable obligations except as enforceability may be limited by bankruptcy, insolvency, reorganisation, examinership or other similar laws affecting the rights of creditors generally and by general principles of equity.

11.1.3   *Non-conflict with other obligations*

The entry into and performance by it of, and the transactions contemplated by, the Transaction Documents to which it is party do not and will not conflict with:

(a)   any law or regulation applicable to it;

(b)   its constitutional documents; or

(c)    any agreement or instrument binding upon it or any of its assets.

**11.1.4    *Power and authority***

It has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, the Transaction Documents to which it is a party and the transactions contemplated by those Transaction Documents.

**11.1.5    *Validity and admissibility in evidence***

All Authorisations required:

(a)    to enable it lawfully to enter into, exercise its rights and comply with its obligations in the Transaction Documents to which it is a party; and

(b)    to make the Transaction Documents to which it is a party admissible in evidence in Ireland and England; and

(c)    to enable it to create the Security Interests to be created by it pursuant to any Security Document to which it is a party and to ensure that such Security Interests have the priority and ranking they are expected to have,

have or will be been obtained or effected and are in full force and effect.

**11.1.6    *Governing law and enforcement***

(a)    the choices of the governing laws of the Transaction Documents to which it is party will be recognised and enforced in Ireland; and

(b)    any judgment obtained in England in relation to any such Transaction Document will be recognised and enforced in Ireland.

**11.1.7    *Insolvency***

No:

(a)    corporate action, legal proceeding or other procedure or step described in clause 20.6 (*Insolvency proceedings*) of the Senior Facility Agreement or the Junior Facility Agreement; or

(b)    creditors' process described in clause 20.7 (*Creditors' process*) of Senior Facility Agreement or the Junior Facility Agreement,

has to the knowledge, information and belief of the Intermediate Lessor been taken or threatened in relation to the Borrower and to the knowledge of the Borrower none of the circumstances in clause 20.5 (*Insolvency*) of the Senior Facility Agreement or the Junior Facility Agreement applies to the Intermediate Lessor.

11.1.8  ***No filing or stamp Taxes***

Except as specified in the Legal Opinions, under the laws of Ireland it is not necessary that the Transaction Documents to which it is party be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration or similar tax be paid on or in relation to the Transaction Documents to which it is party or the transactions contemplated by the Transaction Documents to which it is party.

11.1.9  ***No Event of Default***

So far as it is aware no Lease Event of Default has occurred or is continuing or might reasonably be expected to result from it entering into this Agreement.

11.1.10  ***Pari passu ranking***

Its payment obligations under the Transaction Documents to which it is a party rank at least *pari passu* with the claims of all its other unsecured and unsubordinated creditors, except for obligations mandatorily preferred by law applying to companies generally.

11.1.11  ***No proceedings pending or threatened***

No litigation, arbitration or administrative proceedings of or before any court, arbitral body or agency have (to the best of its knowledge and belief) been started or threatened against it.

11.1.12  ***Taxation***

(a)    It has duly and punctually paid and discharged all Taxes imposed upon it or its assets within the time period allowed without incurring penalties (except to the extent that (i) payment is being contested in good faith, (ii) it has maintained adequate reserves for those Taxes and (iii) payment can be lawfully withheld).

(b)    It is not materially overdue in the filing of any Tax returns.

(c)    No claims are being or are reasonably likely to be asserted against it with respect to Taxes.

11.1.13  ***Security***

(a)    Save as specifically mentioned in the Legal Opinions, the terms of the Security Documents, the rights of the Lessee under the Lease Agreement, the Security Interests to be created by the Intermediate Lessor pursuant to the Security Documents will (when created) constitute first priority Security Interests in favour of the Security Agent or (as the case may be) the Finance Parties against all persons (including, without limitation, a liquidator, receiver, administrator, examiner, administrative receiver, trustee or similar officer of, or any creditor of, the Intermediate Lessor or any other person claiming through, under or in place of the

Intermediate Lessor) over the property mortgaged, charged or otherwise encumbered thereunder.

(b)   Subject to the rights of the Lessee under the Lease Agreement or the terms of any other document or agreement comprised in the Collateral, there are no restrictions on the Intermediate Lessor's ability to assign all or any of its right, title and interest in the Collateral pursuant to the Security Documents.

11.1.14   *No Security Interests*

Save for the Security Interests created pursuant to the Transaction Documents, subject to the rights of (and any encumbrance indemnified for by) the Lessee under the Lease Agreement, it has not created any Security Interest over any of its present or future revenues, undertakings or assets and it is not aware of the existence of any such Security Interest.

11.1.15   *Tax Residency*

The Intermediate Lessor is resident in Ireland for tax purposes.

11.1.16   *No Employees*

The Intermediate Lessor has no employees.

11.1.17   *Subsidiaries*

The Intermediate Lessor has no subsidiaries.

11.1.18   **Shares**

All beneficial and legal title to the outstanding shares in the capital of the Intermediate Lessor is held by the Borrower Parent subject to the Intermediate Lessor Share Pledge.

11.1.19   *No other agreements or business*

From the date of its incorporation, it has not entered into any contract or agreement with any person and has not otherwise created or incurred any liability to any person other than pursuant to and as permitted by (or incidental to) the Transaction Documents.

11.1.20   *Good title to assets*

It has good, valid and marketable title to, or valid leases or licences of, and all appropriate Authorisations to use, the assets necessary to carry on its business as presently conducted.

11.1.21   *Applicable Sanctions*

The Borrower is neither aware, nor ought reasonably to be aware, and no director, officer, agent, employee or affiliate of the Borrower is aware or ought

reasonably to be aware, that it is currently a target of any economic sanctions administered by the U.S. Department of State, the U.S. Department of Commerce, the U.S. Department of Treasury or any other U.S. government entity, the United Nations, the United Kingdom, the European Union or any of its member states (a "**Sanctions Target**").

11.1.22 *No UK establishments*

It has not registered one or more "establishments" (as that term is defined in Part 1 of The Overseas Companies Regulations 2009) with the Registrar of Companies of England and Wales or, if it has so registered, it has provided to the Security Agent sufficient details to enable an accurate search against it to be undertaken by the Security Agent (or legal counsel on its behalf) at the companies registry of England and Wales.

11.1.23 *No Damage to Aircraft*

As far as the Intermediate Lessor is aware, no Event of Loss or any event that would constitute an Event of Loss has occurred and is continuing.

## 11.2    Intermediate Lessor's Obligations

11.2.1    For the purposes of ensuring and preserving the validity and continuity of security rights under the Security Documents to be granted by the Intermediate Lessor:

(a)    the Intermediate Lessor hereby irrevocably and unconditionally undertakes to pay, subject always to the operation of any limited recourse provisions therein or applicable thereto, to the Security Agent all amounts whatsoever, without any limitation, owing by the Intermediate Lessor to the Borrower whether actually or contingently under and in accordance with the terms of the Transaction Documents upon such amounts becoming due and payable (such obligation and undertaking being hereinafter referred to in this Clause 11.2 (*Intermediate Lessor's Obligations*) as the "**Intermediate Lessor Obligations**");

(b)    each of the Intermediate Lessor and the Security Agent acknowledges that the Intermediate Lessor Obligations are obligations and liabilities of the Intermediate Lessor to the Security Agent under this Agreement, separate and independent from, and without prejudice to, the identical obligations which the Intermediate Lessor has to the Borrower under the Transaction Documents, provided that the total amount due and payable under or in respect of the Intermediate Lessor Obligations shall be decreased to the extent that the Intermediate Lessor pays any amounts to the Borrower under and in the manner required under the Transaction Documents and vice versa; and

(c)    nothing in this Agreement shall in any way negate or affect the obligations which the Intermediate Lessor may have under or in respect of the Transaction Documents.

11.3    **Intermediate Lessor's Undertakings**

The undertakings in this Clause 11.3 (*Intermediate Lessor's Undertakings*) remain in force at all times during the Security Period.

11.3.1  *Authorisations*

The Intermediate Lessor shall promptly:

(a)     obtain, comply with and do all that is necessary to maintain in full force and effect; and

(b)     supply certified copies to the Security Agent on reasonable request of the Security Agent of,

any Authorisation required under any law or regulation of the United Kingdom or Ireland to enable it to perform its obligations under the Transaction Documents and to ensure the legality, validity, enforceability or admissibility in evidence in the United Kingdom or Ireland of any Transaction Document.

11.3.2  *Compliance with laws*

The Intermediate Lessor shall comply in all respects with all laws to which it is or will be subject, if failure so to comply would materially impair its ability to perform its obligations under the Transaction Documents.

11.3.3  *Pari passu ranking*

The Intermediate Lessor must ensure that its payment obligations under the Transaction Documents at all times rank at least *pari passu* with all its other present and future unsecured payment obligations, except for obligations mandatorily preferred by law applying to companies generally.

11.3.4  *Negative pledge*

(a)     The Intermediate Lessor shall not create or expressly consent to the creation of any Security Interest over the Aircraft or any of the Collateral other than the Security Interests created pursuant to or as permitted by the Security Documents and Permitted Security Interests unless it has obtained the prior written consent of the Security Agent.

(b)     The Intermediate Lessor shall not without the prior written consent of the Security Agent:

(i)      sell, transfer, assign its rights in respect of or otherwise dispose of any of the Collateral other than pursuant to the Security Documents; or

(ii)     enter into any arrangement under which money in or the benefit of a bank or other account which constitutes Collateral may be applied, set-off or made subject to a combination of accounts or

enter into any other preferential arrangement having a similar effect.

### 11.3.5   *Applicable Sanctions*

The Intermediate Lessor shall not:

(a)   use the proceeds of either Loan (or consent or knowingly condone the indirect use by another person of the proceeds of either Loan) or lease or permit the Aircraft to be operated for any purpose which would violate economic sanctions or trade regulations of the European Union or the United States of America, or the United Nations, or any Anti-Bribery Law; or

(b)   lend, invest, contribute or otherwise knowingly make available the proceeds of either Loan or knowingly enter into any arrangement to make the use and possession of the Aircraft available to, or for the benefit of, any then-current Sanctions Target (as defined in sub-clause 11.1.21 (*Applicable Sanctions*)).

### 11.3.6   *Taxation*

The Intermediate Lessor shall duly and punctually pay and discharge all Taxes imposed upon it, the Aircraft or its assets for which it is directly responsible within the time period allowed without incurring penalties (save to the extent that (a) payment is being contested in good faith, adequate reserves are being maintained for those Taxes and payment can be lawfully withheld or (b) the same is indemnified by the Lessee, and it has not been put in funds in respect thereof).

### 11.3.7   *Ownership*

The Intermediate Lessor shall continue to be 100% owned directly or indirectly by the Borrower Parent unless the Senior Agent's prior written consent has been obtained with respect to a change of ownership of the Intermediate Lessor.

### 11.3.8   *No other business*

The Intermediate Lessor shall not transact or carry on any business other than as required or permitted by (or incidental to), or incur any liability other than pursuant to or as permitted by (or incidental to) the Transaction Documents or otherwise voluntarily assume any liability, whether actual or contingent, in respect of any obligation of any person.

### 11.3.9   *Merger*

The Intermediate Lessor shall not enter into any amalgamation, demerger, merger or corporate reconstruction.

11.3.10    ***Dividends and Shares***

The Intermediate Lessor shall not: (a) pay, make or declare any dividend, charge, fee or other distribution (or interest on any unpaid dividend, charge, fee or other distribution) (whether in cash or in kind) on or in respect of the Intermediate Lessor Shares (or any class of the Intermediate Lessor Shares) in respect of any financial year; (b) repay or distribute any dividend or premium reserve; (c) pay any management advisory or other fee to or to the order of the Intermediate Lessor Parent; or (d) issue any Intermediate Lessor Shares. For the avoidance of doubt, the Intermediate Lessor shall be permitted to pay management, advisory or other fee to or to the order of the Borrower Parent, in each case from the amounts paid to the Intermediate Lessor in accordance with Clause 8.3 (*Order of application*).

11.3.11    ***No employees***

The Intermediate Lessor shall not have any employees.

11.3.12    ***No Affiliates***

The Intermediate Lessor shall not have any Subsidiary.

11.3.13    ***Further assurance***

(a)    The Intermediate Lessor shall, as soon as reasonably practicable following request, execute, acknowledge, deliver, file and register all such additional agreements, instruments, certificates, documents and assurances and perform such other acts or things as the Security Agent shall reasonably request to (a) following an Event of Default, Acceleration Event or Change in Law effectuate the purposes of this Agreement and each of the other Transaction Documents or the transactions hereby or thereby contemplated or to protect the rights of the Finance Parties hereunder or thereunder, (b) following an Event of Default, Acceleration Event or Change in Law perfect the Security Interests created or intended to be created under or evidenced by the Security Documents (which may include the execution of a mortgage, charge, assignment or other Security Interests over all or any of the assets which following the occurrence of an Enforcement Event are, or are intended to be, the subject of the Security Documents) or by law; and (c) to facilitate the realisation of the assets which are, or are intended to be, the subject of the Security Documents.

(b)    If in the State of Registration (or, if different, the respective jurisdiction of incorporation and/or principal place of business of the Intermediate Lessor, the Lessee or the Intermediate Lessor) there shall be, or be brought into force, any legislative or other provisions giving effect to the Cape Town Convention or otherwise relating to the recognition of rights in aircraft, the Intermediate Lessor shall, if requested by any Finance Party, at the Intermediate Lessor's expense perform, or procure the performance of, all such acts as may be necessary to perfect

recognition of the Security Agent's title and interest in the Aircraft in accordance with such legislative or other provisions.

11.3.14  *Amendments*

The Intermediate Lessor shall not, without the prior written consent of the Security Agent:

(a)  cancel or terminate any Transaction Document or consent to or accept any cancellation or termination thereof (save as permitted in Clause 11.3.19 (*Termination of Leasing*) of the Senior Facility Agreement or the Junior Facility Agreement); or

(b)  amend, vary, modify, supplement, restate, novate, waive or replace or agree to any amendment, variation, modification, supplement, restatement, novation, waiver or replacement of any Transaction Document or the obligations of any person thereunder; or

(c)  grant any consent, waiver or approval under any Insurances; or

(d)  make any material amendments to its constitutional documents; or

(e)  knowingly do anything, and shall not knowingly take any action, which has or is reasonably likely to have the effect of prejudicing the first priority Security Interests created in favour of the Security Agent against all persons (including, without limitation, a liquidator, receiver, administrator, examiner, administrative receiver, trustee or similar officer of, or any creditor of, the Intermediate Lessor or any other person claiming through, under or in place of the Intermediate Lessor) over any of the Collateral.

Without limiting the generality of the foregoing, the Intermediate Lessor shall not, without the prior written consent of the Security Agent, take any action to revoke the IDERA or remove any designation in favour of the Security Agent in respect of the IDERA.

11.3.15  *Tax Residency*

The Intermediate Lessor shall remain resident in Ireland for tax purposes.

11.3.16  *Account*

The Intermediate Lessor shall not open or maintain any bank account without the prior written consent of the Security Agent.

11.3.17  *Notification of Events etc*

The Intermediate Lessor shall, as soon as it becomes aware of the same, given written notice to the Security Agent of the occurrence of any Event of Default, Loan Relevant Event or any Event of Loss with respect to the Aircraft (or any event or circumstance which with the giving of notice or lapse of time or the

making of any relevant determination or any combination of the foregoing, would constitute an Event of Loss with respect to the Aircraft).

### 11.3.18 *Actions Under Transaction Documents*

(a)   The Intermediate Lessor shall not without the prior written consent of the Security Agent (not to be unreasonably withheld, delayed or conditioned) exercise any right, power, authority or discretion vested in it pursuant to the Head Lease Agreement or the Lease Agreement, as applicable, if as a consequence thereof the rights and interests of the Finance Parties pursuant to the Transaction Documents could reasonably be expected to be materially prejudiced.

(b)   If the Intermediate Lessor is approached by any other Party to participate in discussions regarding the Transaction Documents (including any proposed waiver or restructuring in respect thereof) if a Relevant Event has occurred and is continuing and if the proposals made are in relation to a waiver or restructuring and are sufficiently definitive so as to make an amendment to the terms of the Transaction Documents reasonably likely, it shall promptly inform the Security Agent of such request and to the extent possible allow the Security Agent (and its advisers) to attend and participate in any discussion with the other Party and/or its advisers in respect thereof.

(c)   The Intermediate Lessor shall supply to the Security Agent a copy of each material document, notice or any correspondence it receives from the Lessee under or in connection with the Lease Agreement.

### 11.3.19 *Termination of Leasing*

(a)   The Intermediate Lessor shall, if so requested by the Security Agent in writing upon the instructions of the Instructing Party following the occurrence of a Lease Event of Default or a Head Lease Event of Default which is continuing, promptly give notice or procure that notice is given to the Lessee of termination of the leasing of the Aircraft under the Lease Agreement unless the Intermediate Lessor has been advised by appropriate legal counsel that to do so is likely to be contrary to applicable law binding on it.

(b)   Save as provided in sub-clause (c) below, the Intermediate Lessor shall not terminate the leasing of the Aircraft under the Lease Agreement without the prior written consent of the Security Agent (not to be unreasonably withheld).

(c)   If while a Lease Event of Default is continuing the Intermediate Lessor wishes to terminate the leasing of the Aircraft under the Lease Agreement (the "**Termination**"), the Intermediate Lessor shall give a written notice to the Security Agent to that effect. The Security Agent shall, as soon as is reasonably practicable, inform the Intermediate Lessor whether or not it consents to the Termination.

(d)     At any time prior to the Secured Obligations Discharge Date, the Intermediate Lessor shall not enter into any other lease in relation to the Aircraft without the prior written consent of the Security Agent. The Security Agent shall consider in good faith and act reasonably in evaluating any such proposal from the Intermediate Lessor but its approval shall in all events be subject to the Finance Parties obtaining all necessary credit and internal approvals required in connection with any such lease, and such approvals shall be subject to such additional conditions as may be stipulated at the relevant time.

### 11.3.20  *Relevant Events*

The Intermediate Lessor shall, and shall procure that the Intermediate Lessor shall, at any time after the occurrence of a Relevant Event which is continuing, from time to time take such action, make such requests or demands and give such notices and certificates (including, without limitation, any lawful demand for payment under the Lease Agreement or any other Transaction Document) as the Security Agent may reasonably request and the Intermediate Lessor shall not take any steps (other than to terminate the leasing of the Aircraft under the Lease Agreement in accordance with Clause 11.3.19 (*Termination of Leasing*) or as otherwise expressly permitted under the Transaction Documents) to enforce or exercise, and shall take such reasonable steps as the Security Agent may direct to enforce or exercise, any rights, remedies, powers and privileges under the Lease Agreement in respect of the Collateral.

### 11.3.21  *State of Registration*

(a)     The Intermediate Lessor shall not change or agree to a change in the registration of the Aircraft from the State of Registration without the prior written consent of the Security Agent (such consent not to be unreasonably conditioned, withheld or delayed).

(b)     Without prejudice to sub-clause (a) above, if by reason of a sub-lease or otherwise, there occurs a change in the State of Registration, the Intermediate Lessor shall, upon the written request of the Security Agent or the Security Agent, at its own cost and expense, carry out such acts or things and execute such documentation as the Security Agent and/or the Security Agent may reasonably require in connection with the preservation and/or enforcement of any of the rights of the Finance Parties under the Transaction Documents (including but not limited to the execution and registration of an aircraft mortgage in the new state of registration of the Aircraft), having regard to the position as at the Utilisation Date.

### 11.3.22  *Insurances*

The Intermediate Lessor shall (at no cost to the Finance Parties) effect and maintain the Insurances or, as applicable, procure that the Insurances are maintained in respect of the Aircraft in accordance with the requirements of the Lease Agreement with the Finance Parties named as additional insureds to the extent of their interests and the Security Agent named as sole loss payee.

### 11.3.23 *Anti-Social Forces, Relationship and Conduct*

(a)     The Intermediate Lessor shall ensure that no Obligor shall (x) have any relationship with any Anti-Social Forces or any person under the control of any Anti-Social Forces, (y) have any Anti-Social Relationship or (z) engage in any Anti-Social Conduct, whether directly or indirectly through a third party.

(b)     The Intermediate Lessor shall promptly provide to the Security Agent such documents or information pertaining to it and within its possession (including, without limitation, registered or principal office, residential address, formal name, birth date) as the Security Agent shall reasonably request for the purposes of screening to identify Anti-Social Conduct, Anti-Social Forces and Anti-Social Relationship by the Security Agent.

(c)     The Intermediate Lessor shall not engage, directly or indirectly, in (i) any demand or claim under the threat of violence; (ii) any unreasonable demand or claim under the threat of actions that are not legally permissible; (iii) any blackmail or assault, physically or verbally; (iv) any obstructive activities, including, but not limited to, disseminating information or fraudulent activities for the purpose of falsely harming a Lender's creditworthiness or impeding a Lender's business; or (v) other actions similar or analogous to any of the foregoing.

(d)     Upon receiving information which provides to a reasonable certainty that a violation of this Clause 11.3.23 has occurred, the Intermediate Lessor shall immediately advise the Security Agent of the occurrence and take all actions reasonably necessary to mitigate, correct and report such occurrence, under law or otherwise (such steps may include termination or severance of the individual(s) involved).

### 11.3.24 *Inspections*

(a)     Subject to Lessee's willingness to co-operate under the Lease Agreement and the Lessee's quiet enjoyment rights, the Security Agent (or its representatives) may, at any time, on reasonable written notice and in such a way as to minimise disturbance to the Lessee's operations, inspect the Aircraft and the Manuals and Technical Records to ascertain the condition of the Aircraft and satisfy itself that the Aircraft is being properly repaired and maintained in accordance with the Lease Agreement. Subject to Lessee's willingness to co-operate under the Lease Agreement and the Lessee's quiet enjoyment rights, the Intermediate Lessor shall procure that the Lessee grants the Security Agent (or its representatives) access to the Aircraft and the Technical Records to conduct such inspections. Unless a Lease Event of Default is then continuing, the Security Agent (or its representatives) shall conduct no more than one inspection in any calendar year. Subject the provisions of the Lease Agreement, the Security Agent (or its representatives) may inspect the Aircraft at any time a Lease Event of Default is continuing.

(b)     The Intermediate Lessor must procure the rectification of any deficiencies (ordinary wear and tear excepted) found during any inspection.

(c)     The Security Agent has no duty or liability to make any inspection nor any liability arising from any such inspection of the Aircraft or its Technical Records.

(d)     Any Aircraft inspection undertaken by the Security Agent (or its authorised representative) will be at the reasonable cost of the Intermediate Lessor. The Intermediate Lessor shall also meet the cost of one desk top appraisal of the Aircraft per year.

## 12.    CAPE TOWN CONVENTION

### 12.1   Registrations to be made in the International Registry

12.1.1   The Parties agree that the following interests in respect of the Airframe and each Engine shall be registered with the International Registry and shall have the following order of priority (with the first listed having the highest priority under the Cape Town Convention and subsequent interests having decreasing priority), and notwithstanding any variation from this order of priority which may appear according to the time of registration of such interest in the records of the International Registry:

(a)     the International Interest with respect to the Airframe and the Engines under the New York Mortgage with the Security Agent as creditor and the Borrower as debtor;

(b)     the International Interests with respect to the Airframe and the Engines under the Vietnamese Mortgage, with the Security Agent as creditor and the Borrower as debtor;

(c)     the International Interest with respect to the Aircraft under the Head Lease Agreement with the Borrower as creditor and the Intermediate Lessor as debtor;

(d)     the assignment of International Interest with respect to the Aircraft under the Borrower Security Assignment with the Security Agent as assignee and the Borrower as assignor;

(e)     the International Interest with respect to the Aircraft under the Lease Agreement with the Intermediate Lessor as creditor and the Lessee as debtor;

(f)     the assignment of International Interest with respect to the Aircraft under the Intermediate Lessor Assignment with the Borrower as assignee and the Intermediate Lessor as assignor; and

(g)     the International Interests with respect to the Airframe and the Engines under the Contract of Sale (as defined in the Cape Town Convention) created by the Bill of Sale.

12.1.2   Each Party:

(a)   authorises and consents to the registration with the International Registry of the foregoing interests; and

(b)   agrees to co-operate and to take such actions, insofar as any such consent, co-operation or action of such party is required, as are necessary to timely effect the registration of the interests set forth above with the International Registry.

## 12.2   General Application of Cape Town Convention

Without limiting any other provisions of the Transaction Documents, the Borrower or the Intermediate Lessor:

12.2.1   shall procure that the Contract of Sale (as defined in the Cape Town Convention) created by the Bill of Sale shall be registered at the International Registry as soon as practicable after the Closing Date;

12.2.2   will co-operate in connection with the execution and filing of any applications, registrations, amendments or deregistrations with the International Registry, as requested by the Security Agent from time to time to ensure the validity, enforcement and first priority of the International Interests or such other interest;

12.2.3   shall consent to the registration of International Interests as required by the Security Agent at the International Registry and will not register any conflicting interests (whether or not taking priority over the International Interests) at the International Registry without the prior written consent of Security Agent;

12.2.4   undertakes from time to time to take any actions which the Security Agent requests and has reasonably determined should be taken to ensure that the Cape Town Convention is applicable to the Transaction Documents and that the International Interests or such other interests are fully and effectively registered at the International Registry; and

12.2.5   shall register itself as a transacting user entity with the International Registry and shall not revoke such registration without Security Agent's prior written consent.

## 13.   MITIGATION

If any circumstance contemplated in any of clauses 8.1 (*Illegality*), 8.5.1(d), 8.5.1(e) or 14 (*Increased Costs*) of the Senior Facility Agreement or the Junior Facility Agreement arises or is likely to arise, without in any way limiting, reducing or otherwise qualifying the rights of any Party under any of the clauses referred to above, and provided that no Loan Event of Default has occurred and is continuing, the Party first becoming aware of the existence of such circumstances shall promptly upon becoming aware of such circumstances notify the Senior Agent or the Junior Agent, as applicable, and the Borrower thereof and, in the case of any circumstance of the kind referred to in clause 14 (*Increased Costs*) of the Senior Facility Agreement or the Junior Facility Agreement, with an estimate (if it is reasonably able to prepare such) of the amount which the Borrower may be liable for pursuant to such provisions (provided that no such estimate

shall prejudice any Party's claim under such provisions), and, in consultation with the Senior Agent, the Junior Agent and the Borrower for a minimum period of:

13.1.1   thirty (30) days; or

13.1.2   in respect of sub-clause 8.5.1(e) of the Senior Facility Agreement or the Junior Facility Agreement, as applicable, ten (10) days; or

13.1.3   where the relevant circumstances relate to a proposed Change in Law, if earlier, up to the last date prior to the implementation of such Change in Law;

and to the extent that it can do so lawfully and without prejudice to its own position, any Party affected by such circumstances shall take steps (including in the case of a Lender, a change of location of its Facility Office or the transfer of its rights, benefits and obligations (at no cost to such Lender) to another financial institution acceptable to such Lender (acting reasonably) and willing to participate in the relevant Facility) to mitigate the effects of such circumstances (including by avoiding the effects of such circumstances, avoiding the need for the Borrower to make any payments pursuant to such clauses or reducing the liability of the Borrower pursuant to such clauses), **provided that** such person shall be under no obligation to take any such action if, in the reasonable opinion of such person, to do so is likely to have a material adverse effect upon its business, operations or financial condition.

## 14.   CHANGE OF PARTY

### 14.1   Change of Party

No party may assign any of its rights and benefits or transfer any of its rights, benefits and obligations in respect of this Agreement or the Transaction Documents except as permitted by this Clause 14 (*Change of Party*).

### 14.2   Change of Lender

A Lender may assign any of its rights and benefits or transfer any of its rights, benefits and obligations or sub-participate all or a portion of its interest in respect of any Transaction Documents to which it is a party if that assignment, transfer or sub-participation is in accordance with the terms of the Senior Facility Agreement or the Junior Facility Agreement, as applicable, and any assignee or transferee permitted by this Clause 14.2 has executed and delivered to the Security Agent a Proceeds Agreement Accession Undertaking.

### 14.3   Change of Senior Agent

Any person which becomes the Senior Agent as defined in, and in accordance with, the terms of the Senior Facility Agreement, shall at the same time accede to this Agreement by executing and delivering to the Security Agent a Proceeds Agreement Accession Undertaking.

### 14.4   Change of Junior Agent

Any person which becomes the Junior Agent as defined in, and in accordance with, the terms of the Junior Facility Agreement, shall at the same time accede to this Agreement

by executing and delivering to the Security Agent a Proceeds Agreement Accession Undertaking.

## 14.5 Lender Accession Undertaking

With effect from the date of acceptance by the Security Agent and, if appropriate, the Senior Agent and/or the Junior Agent of a Proceeds Agreement Accession Undertaking (which shall in each case be accepted as soon as reasonably practicable after receipt by it of a duly completed Proceeds Agreement Accession Undertaking) or, if later the date specified in that Proceeds Agreement Accession Undertaking:

14.5.1   any Party ceasing entirely to be a Lender and/or Senior Agent and/or Junior Agent and/or Security Agent and/or Hedging Counterparty shall be discharged from further obligations towards the Security Agent, Senior Agent, Junior Agent and other Parties under this Agreement and their respective rights against one another shall be cancelled (except in each case for those obligations and rights which arose prior to that date); and

14.5.2   as from that date, the replacement or new Lender and/or Senior Agent and/or Junior Agent and/or Security Agent and/or Hedging Counterparty shall assume the same obligations, and become entitled to the same rights, as if it had been an original Party to this Agreement.

## 14.6 Additional Parties

Each of the Parties appoints the Security Agent to receive on its behalf each Proceeds Agreement Accession Undertaking delivered to the Security Agent and to accept and sign it if, in the Security Agent's opinion, it is complete and appears on its face to be authentic and duly executed and until accepted and signed by the Security Agent that document shall not be effective.

## 14.7 Obligors

No Obligor shall be entitled to assign any of its respective rights and benefits or transfer any of its rights, benefits and obligations in respect of this Agreement, other than in connection with a permitted assignment or transfer of rights and/or obligations under the other Transaction Documents to which it is a party.

## 14.8 Junior Lender Buy-Out Right

14.8.1   Any Junior Lender may, by written notice to the Senior Agent (which notice shall, in order to be effective, state that it is irrevocable) elect to purchase (or cause its designee to purchase) all, but not less than all, of the Senior Loan outstanding as at the date specified in such written notice (which shall not be more than five (5) Business Days from the date of such notice) (a "**Junior Buy-Out Notice**") at any time whilst a Loan Event of Default is continuing.

14.8.2   Each Senior Lender agrees to such purchase rights and, by its acceptance thereof, each relevant Senior Lender will, subject to satisfaction of any "know your customer checks" which any such Senior Lender may be required to perform on the relevant Junior Lender or its nominee, upon payment to the Senior Agent (and the Senior Agent shall pay any amounts received under this subclause

14.8.2 to the Senior Lenders) (in immediately available funds) by the relevant Junior Lender of an amount equal to, subject to subclause 14.8.3 in respect of the Hedging Counterparty (i) the aggregate unpaid principal amount of the Senior Loan (ii) accrued and unpaid interest thereon to the date of payment, (iii) Break Costs, if any, incurred by any Senior Lender (iv) all out-of-pocket costs and expenses reasonably incurred by any Senior Lender as a consequence of giving effect to the transfer (for the avoidance of doubt, not including any costs or expenses relating to early repayment or breaking funding or associated arrangements, which shall be fully compensated by payment of Break Costs (if any)), and (v) all other sums then due and payable by any Obligor to any Senior Lender pursuant to the Transaction Documents (other than any prepayment premium or penalty), *less* any Break Gains, forthwith sell, assign, transfer and convey, in accordance with clause 21(*Changes to the Senior Lenders*) of the Senior Facility Agreement to the purchaser thereof (without recourse, representation or warranty of any kind except for its own acts or omissions) all its participations, rights, title and interest in the Senior Loan and the Transaction Documents to which it is a party, whereupon the purchaser shall assume all of the relevant Senior Lenders' obligations under the relevant Transaction Documents arising from and after the time of such sale.

14.8.3 A Junior Lender may only exercise its rights under Clause 14.8.1 if, at the same time (unless the Hedging Counterparty agrees otherwise), it receives a transfer to it (or to its nominee or nominees) of the Hedging Counterparty's rights in each relevant Transaction in accordance with the Hedging Agreement and the requirements set out in Clause 14.9 (*Change of Hedging Counterparty*) (other than any requirement for consent from the Senior Lenders set out therein) and where:

(a) the Hedging Counterparty is paid (in the case of a positive number) or pays to the Junior Lender (in the case of a negative number) an amount equal to the aggregate of:

(i) the Hedge Break Amount in respect of the Transactions under the Hedging Agreement at that time;

(ii) all out-of-pocket costs and expenses reasonably incurred (for the avoidance of doubt not including costs or expenses related to early termination of the Hedging Agreement which shall be fully compensated by payment of the applicable Hedge Break Amount) as a consequence of giving effect to that transfer; and

(iii) all other sums then due and payable by any relevant Obligor to the Hedging Counterparty pursuant to the relevant Transaction Documents; and

(b) the transfer is made without recourse, representation or warranty of any kind by the Hedging Counterparty except for its own acts.

14.8.4 Following the delivery of a Junior Buy-Out Notice by a Junior Lender pursuant to subclause 14.8.1, the Senior Lenders shall refrain from further exercising any rights or remedies under the relevant Transaction Documents until the date of

the scheduled purchase as set out in the Junior Buy-Out Notice. Thereafter the Majority Senior Secured Parties shall be entitled to exercise any rights or remedies under the relevant Transaction Documents if the purchase of the relevant Senior Lenders' participations in the Senior Loan and the transfers of the Hedging Counterparty's rights in each relevant Transaction Document has not been completed by the relevant Junior Lender (or its designee) pursuant to the provisions of this Clause 14.8.

14.8.5   If more than one Junior Lender serves a Junior Buy-Out Notice in respect of the Senior Loan, the first in time shall prevail.

## 14.9   Change of Hedging Counterparty

14.9.1   The Hedging Counterparty may assign or transfer its rights, benefits and obligations under the Hedging Agreement in accordance with Part 5(9) (*Transfer and Security Assignment*) of the Schedule to the Hedging Agreement.

14.9.2   Any person which becomes the Hedging Counterparty shall at the same time accede to this Agreement by executing and delivering to the Security Agent a Proceeds Agreement Accession Undertaking.

## 14.10   No additional obligations

For the avoidance of doubt, no Obligor shall incur any additional obligations, liabilities, Taxes or costs (including legal fees) in relation to Clause 14.8 (*Junior Lender Buy-Out Right*) or 14.9 (*Change of Hedging Counterparty*).

## 15.   INFORMATION

## 15.1   Information and dealing

Each Lender shall provide to the Security Agent from time to time (through the Senior Agent or the Junior Agent, as applicable, if relevant) any information that the Security Agent may reasonably specify as being necessary or desirable to enable the Security Agent to perform its functions as Security Agent. Each Lender shall deal with the Security Agent exclusively through the Senior Agent or the Junior Agent, as applicable, and shall not deal directly with the Security Agent.

## 15.2   Disclosure

Each Obligor consents, until such time as all of the Secured Obligations owed by it to the Lenders have been discharged in full, to the disclosure by any of the Lenders to each other of such information concerning the Obligors as any Lender shall see fit (acting reasonably). The Borrower irrevocably authorises the Lenders to give, divulge and reveal from time to time information and details relating to its account, the Transaction Documents and the Loan to any authorities, each Lender's respective head office, parent company, branches and affiliates and to their respective directors, officers, employees who are involved in the funding and operational arrangement in relation thereto and professional advisers who are bound by professional duties of confidentiality.

16.    **NOTICES**

16.1    **Communications in writing**

Any communication to be made under or in connection with the Transaction Documents shall be made in writing and, unless otherwise stated, may be made by fax, electronic mail or letter.

16.2    **Addresses**

The address, fax number and email address (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the Transaction Documents is:

16.2.1    identified with its name below; or

16.2.2    specified on the Proceeds Agreement Accession Undertaking to which it is a party,

or any substitute details which that Party may notify to the Security Agent (or the Security Agent may notify to the other Parties, if a change is made by the Security Agent) by not less than five (5) Business Days' notice and promptly upon receipt of any notification of any new or changed details, the Security Agent shall notify the other Parties.

16.3    **Delivery**

16.3.1    Any communication or document made or delivered by one person to another under or in connection with the Transaction Documents will only be effective:

(a)    if by way of fax, when received in legible form;

(b)    if by way of letter, when it has been left at the relevant address provided such delivery was by way of an internationally reputable courier company which retains proof of delivery;

(c)    if by way of electronic mail, when sent provided that the message is in legible form and no message is received by the sender indicating that such message has not been received by or delivered to the intended recipient.

16.3.2    Any communication or document to be made or delivered to the Security Agent will be effective only when actually received by the Security Agent and then only if it is expressly marked for the attention of the department or officer identified with the Security Agent's signature below (or any substitute department or officer as the Security Agent shall specify for this purpose).

16.4    **English language**

16.4.1    Any notice given under or in connection with any Transaction Document must be in English.

16.4.2   All other documents provided under or in connection with any Transaction Document must be:

(a)   in English; or

(b)   if not in English, and if so required by the Security Agent, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

## 16.5   Electronic communication

16.5.1   Any communication to be made between any two Parties under or in connection with the Finance Documents may be made by electronic mail or other electronic means (including, without limitation, by way of posting to a secure website) if those two Parties:

(a)   notify each other in writing of their electronic mail address and/or any other information required to enable the transmission of information by that means; and

(b)   notify each other of any change to their address or any other such information supplied by them by not less than five Business Days' notice (and promptly upon receipt of any notification of any new or changed details, the Security Agent shall notify the other Parties).

16.5.2   Any such electronic communication as specified in sub-clause 16.5.1 above to be made between an Obligor and a Finance Party may only be made in that way to the extent that those two Parties agree that, unless and until notified to the contrary, this is to be an accepted form of communication. Each of the Parties hereby confirms that, as of the date hereof, electronic communication is an accepted form of communication.

16.5.3   Any such electronic communication as specified in sub-clause 16.5.1 above made between any two Parties will be effective only when actually received (or made available) in readable form and in the case of any electronic communication made by a Party to the Senior Agent or the Junior Agent, as applicable, only if it is addressed in such a manner as the Senior Agent or the Junior Agent, as applicable, shall specify for this purpose.

16.5.4   Any electronic communication which becomes effective, in accordance with Clause 16.5.3 above, after 5:00 p.m. in the place in which the Party to whom the relevant communication is sent or made available has its address for the purpose of this Agreement shall be deemed only to become effective on the following day.

16.5.5   Any reference in a Transaction Document to a communication being sent or received shall be construed to include that communication being made available in accordance with this Clause 16.5.

17.    **PRESERVATION**

17.1    **Partial invalidity**

If, at any time, any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of that provision under the law of any other jurisdiction will in any way be affected or impaired.

17.2    **Remedies and waivers**

No failure to exercise, nor any delay in exercising, on the part of any Party, any right or remedy under this Agreement shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

17.3    **Priorities not affected**

Except as otherwise provided in this Agreement the priorities referred to in Clause 2 (*Ranking and Priority*) and Clause 8 (*Application of Proceeds*) will:

17.3.1    not be affected by any reduction or increase in the principal amount secured by the Collateral in respect of the Secured Obligations of the Lenders or by any intermediate reduction or increase in or by any variation or satisfaction of, any of the Secured Obligations or any other circumstances;

17.3.2    apply regardless of the order in which or dates upon which the Transaction Documents and this Agreement are executed or registered or notice of them is given to any person; and

17.3.3    secure the Secured Obligations in the order specified, regardless of the date upon which any of the Secured Obligations arise or of any fluctuations in the amount of any of the Secured Obligations outstanding.

18.    **COUNTERPARTS**

This Agreement may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

19.    **CONFIDENTIALITY**

19.1    **Confidentiality**

At all times during the continuance of this Agreement and the other Transaction Documents and after the termination hereof (howsoever caused), each of the parties hereto or any person who becomes a party hereto, whether or not any such party or person ceases to be a party hereto, shall not, without the express prior written consent of the other parties, issue any press release identifying any of the Finance Parties in relation to the transactions evidenced by this Agreement and the other Transaction Documents, or disclose to any other person (other than another party to a Transaction

Document), the Transaction Documents or the business, financial or other covenants and/or information contained in or supplied in connection with this Agreement or any other Transaction Document and the transactions contemplated hereby or thereby or any other agreement entered into after the date hereof by any party hereto or in connection with this Agreement or any other Transaction Document, or release synopses, summaries, explanations, copies or drafts of any such document which disclose or reveal the identity of the parties or the terms thereof (or any of them) provided, that the parties shall be entitled, without any such consent, to disclose (to the extent reasonably required):

19.1.1   in connection with any proceedings arising out of or in connection with this Agreement or any of the other Transaction Documents; or

19.1.2   if required to do so by an order of a court of competent jurisdiction whether in pursuance of any procedure for discovery of documents or otherwise or by an order of any arbitral tribunal; or

19.1.3   pursuant to any law or regulation having the force of law; or

19.1.4   to any fiscal, monetary, tax, regulatory, supervisory, governmental or other competent authority or any stock exchange on which its shares may be listed; or

19.1.5   to the auditors, legal, insurance or other professional advisors or insurers or underwriters of any member of the group of companies of which such party is a member and to any potential assignee or transferee and any member of the group of companies of which such party is a member, provided, that the recipient is obliged to keep the relevant information confidential; or

19.1.6   to any Affiliate or any Investor; or

19.1.7   if required to do so in order to obtain any permits, consents, licences which such Party is required to obtain pursuant to, or for the purposes of the Transaction Documents; or

19.1.8   if any of the same is or shall become publicly known otherwise than as a result of a breach of such Party of this Clause 19; or

19.1.9   in the case of any Obligor, to any actual or potential equity investor in the Borrower or its ultimate holding company **provided that** such equity investor enters into a non-disclosure agreement providing the same level of protection as this Clause 19.1; or

19.1.10  in any manner expressly permitted by any of the Transaction Documents.

## 19.2   Personal Data Protection

19.2.1   If the Borrower provides the Finance Parties with personal data of any individual as required by, pursuant to, or in connection with the Transaction Documents (the "**Relevant Personal Data**"), the Borrower represents and warrants to the Finance Parties that it has, to the extent required by law, (i) notified the relevant individual of the purposes for which data will be

collected, processed, used or disclosed; and (ii) obtained such individual's consent for, and hereby consents on behalf of such individual to, the collection, processing, use and disclosure of his/her personal data by the Finance Parties, in each case, in accordance with or for the purposes financing transactions as contemplated by the Transaction Documents, and confirms that it is authorised by such individual to provide such consent on his/her behalf.

19.2.2 Each Finance Party hereby acknowledges that the Relevant Personal Data is given to the Finance Parties on a strictly confidential basis, and each Finance Party hereby undertakes and confirms to the Borrower that it shall maintain the confidentiality of the Relevant Personal Data or is otherwise bound by requirements of confidentiality in relation to the Relevant Personal Data and no Finance Party or its directors, officers, employees, agents, representatives or other persons shall collect, process, use or disclose the Relevant Personal Data to any person or for any purposes other than in the following cases:

(a) for any purpose in accordance herewith and the transactions contemplated by the Transaction Documents;

(b) in cases in which the disclosure is required or authorized based on the applicable laws and/or regulations such as the Banking Act (Cap. 19) of Singapore;

(c) in cases in which the purpose of such disclosure is clearly in the interests of the Borrower and the relevant individual, and if consent cannot be obtained in a timely way;

(d) in cases in which the disclosure is necessary for any official sanctioned investigation or proceedings;

(e) in cases in which the personal data is disclosed to any officer of a prescribed law enforcement agency, upon production of written authorisation signed by the head or director of that law enforcement agency or a person of a similar rank, certifying that the personal data is necessary for the purposes of the functions or duties of the officer;

(f) in cases in which the disclosure is to a public agency and such disclosure is officially deemed necessary in light of the public interest; and/or

(g) in cases where such disclosure without the Borrower's consent is permitted by the Personal Data Protection Act 2012 of Singapore ("**PDPA**") and by any other Applicable Law including, without limitation, the provisions of the Second, Third and Fourth Schedules of the PDPA which is publicly available at http://statutes.agc.gov.sg.

19.2.3 The Borrower agrees and undertakes to notify the Security Agent promptly upon its becoming aware of the withdrawal by the relevant individual of his/her consent to the collection, processing, use and/or disclosure by any Finance Party of any personal data provided by the Borrower to any Finance Party.

19.2.4   Any consent given pursuant to this agreement in relation to personal data shall, subject to all applicable laws and regulations, survive death, incapacity, bankruptcy or insolvency of any such individual and the termination or expiration of this agreement.

## 20.   GOVERNING LAW

This Agreement and all non-contractual obligations arising from, or connected with it, are governed by English law.

## 21.   ENFORCEMENT

### 21.1   Jurisdiction of English Courts

21.1.1   The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute relating to the existence, validity or termination of this Agreement or the consequences of its nullity or any non-contractual obligations arising out of or in connection with this Agreement) (a "**Dispute**").

21.1.2   Each Party agrees that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

21.1.3   Notwithstanding Clause 21.1.1 above, any Finance Party may take proceedings relating to a Dispute in any other courts with jurisdiction. To the extent allowed by law, the Finance Parties take concurrent proceedings in any number of jurisdictions.

### 21.2   Service of process

21.2.1   Without prejudice to any other mode of service allowed under any relevant law, the Borrower:

(a)   irrevocably appoints Kingsman Services Limited, whose offices are currently located at 12 Retreat Road, Richmond, Surrey, England TW9 1AF (or its replacement principal place of business from time to time) as its agent for service of process in relation to any proceedings before the English courts in connection with any Transaction Document; and

(b)   agrees that failure by a process agent to notify the Borrower of the process will not invalidate the proceedings concerned.

21.2.2   Without prejudice to any other mode of service allowed under any relevant law, the Borrower Parent:

(a)   irrevocably appoints Kingsman Services Limited, whose offices are currently located at 12 Retreat Road, Richmond, Surrey, England TW9 1AF (or its replacement principal place of business from time to time) as its agent for service of process in relation to any proceedings before the English courts in connection with any Transaction Document; and

(b)     agrees that failure by a process agent to notify the Borrower Parent of the process will not invalidate the proceedings concerned.

## 22.    LIMITATION ON RECOURSE

### 22.1   Borrower

The Transaction Documents and all rights, liabilities and obligations of the Parties hereto against the Borrower under the Transaction Documents are subject to clause 6 (*Limitation on Recourse*) of the Senior Facility Agreement and the Junior Facility Agreement, as if the same were set out in full herein.

### 22.2   Intermediate Lessor

22.2.1   Subject to the provisions of sub-clause 22.2.2, the Intermediate Lessor shall not be personally liable for the performance of any obligation or for the payment of any amount under any Transaction Document (including liability for damages) except to the extent the Intermediate Lessor actually receives (and is entitled to retain, free of any obligation to account to the Lessee or any third party) moneys (other than money it is entitled to retain or be paid for its own account in accordance with clause 8 (*Application of Proceeds*) of this Agreement):

(a)     under the Lease Agreement;

(b)     as a consequence of the exercise or enforcement of any right, power or remedy conferred on the Security Agent under any of the Security Documents;

(c)     as a consequence of the exercise or enforcement of any right, power or remedy conferred on the Intermediate Lessor under any Transaction Document, including as a consequence of any default by any party to any Transaction Document, or as a consequence of the termination of any Transaction Document; and

(d)     from any Governmental Entity or any person acting or purporting to act by authority of the same as a result of confiscation, forfeiture, nationalisation, seizure, restraint, detention, appropriation, requisition for title or use or other compulsory acquisition whatsoever of the Aircraft,

**provided always that**, subject to sub-clause 22.2.2 and without prejudice to the terms of the Transaction Documents, the Intermediate Lessor shall have no liability for any Losses incurred by the Finance Parties as a result of any default on the part of any other party to the Transaction Documents.

22.2.2   Notwithstanding the provisions of sub-clause 22.2.1, the Intermediate Lessor shall be fully and personally liable to the fullest extent of its assets to the Finance Parties for any loss sustained or incurred by the Finance Parties or any of them as a consequence of:

(a)     any gross negligence or fraudulent or wilful misconduct of the Intermediate Lessor with respect to the exercise or purported exercise

by the Intermediate Lessor of any of the Intermediate Lessor's powers, rights, remedies, duties, obligations and liabilities under any Transaction Document; or

(b)     a representation or warranty made by the Intermediate Lessor pursuant to sub-clauses 11.1.1 (*Status*), 11.1.14 (*No Security Interests*), 11.1.16 (*No Employees*), 11.1.17 (*Subsidiaries*), 11.1.18 (*Shares*), 11.1.19 (*No other agreements or business*) and 11.1.21 (*Applicable Sanctions*) being untrue or incorrect in any material respect when made; or

(c)     any breach of the undertakings, obligations or liabilities of the Intermediate Lessor set out in sub-clauses 11.3.4 (*Negative pledge*), 11.3.5 (*Applicable Sanctions*) (but only to the extent that the relevant breach arises from the acts, breaches or consents of the Intermediate Lessor), 11.3.6 (*Taxation*), 11.3.8 (*No other business*), 11.3.9 (*Merger*), 11.3.10 (*Dividends and Shares*), 11.3.11 (*No employees*), 11.3.12 (*No Affiliates*), 11.3.13 (*Further assurance*), 11.3.14 (*Amendments*), 11.3.18 (*Actions Under Transaction Documents*), 11.3.19 (*Termination of Leasing*) and 11.3.21 (*State of Registration*); or

(d)     any failure by the Intermediate Lessor to comply with clause 8 (*Quiet Enjoyment*) of the Lease Agreement; or

(e)     any failure of the Intermediate Lessor to satisfy the condition subsequent set forth in paragraph 5 of Part III (*Conditions Subsequent*) of Schedule 2 (*Conditions Precedent*) of the Senior Facility Agreement or the Junior Facility Agreement within the time limit specified therein,

**provided that** in each case the Intermediate Lessor shall not be fully and personally liable hereunder to the extent that the relevant breach or failure is incurred solely as a result of actions of the Finance Parties or as a result of the Intermediate Lessor having been rendered unable to comply with the relevant obligations as a result of the Finance Parties having enforced their rights under the Security Documents (except where such enforcement or such actions are taken following the occurrence of a Loan Event of Default for which the Intermediate Lessor is fully and personally liable, in which case this proviso shall not apply).

22.2.3   The provisions of sub-clause 22.2.1 shall only limit the personal liability of the Intermediate Lessor for the discharge of its monetary and other obligations under the Transaction Documents and shall not:

(a)     limit or restrict in any way the accrual of interest (although the limitations as to the personal liability of the Intermediate Lessor shall apply to such interest);

(b)     derogate from or otherwise limit the right of enforcement, recovery, realisation or application by the Finance Parties in respect of the Collateral under or pursuant to any of the Transaction Documents; or

(c)     affect, limit or restrict in any way the Finance Parties (i) exercising or enforcing their claims or rights under the Transaction Documents on or with respect to the Aircraft or the Collateral or (ii) exercising their claims against the Intermediate Lessor under the Transaction Documents in proceedings for the winding-up, dissolution, liquidation, corporate reorganisation, bankruptcy or any other similar proceedings with respect to the Intermediate Lessor.

22.2.4   Notwithstanding anything provided in this Agreement or any of the other Transaction Documents to which the Intermediate Lessor is a party, the Intermediate Lessor shall have no obligation to take any action requested, directed or required by any Finance Party (a) which would cause the Intermediate Lessor to be in breach of applicable law or of any Transaction Document or (b) where such action involves expenditure and/or the incurring of liability to a third party, unless (in the case of (b)) the Intermediate Lessor is indemnified to its reasonable satisfaction in respect of any such expenditure and/or liability **provided that** the Intermediate Lessor shall take such action and need not be indemnified pursuant to this sub-clause 22.2.4 for (i) any normal overhead costs and expenses incurred by the Intermediate Lessor for any reason; and/or (ii) any action required as a result of the occurrence of any of the events or circumstances described in sub-paragraphs (a) to (e) of sub-clause 22.2.2 (other than in respect of a breach of sub-clause 11.3.10 (*Dividends and Shares*), sub-clause 11.3.13 (*Further assurance*) or which did not result from any other event or circumstance described in sub-paragraphs (a) to (e) of sub-clause 22.2.2 inclusive).

## 23.    CONTRACTUAL RECOGNITION OF BAIL-IN

Notwithstanding any other term of any Transaction Document or any other agreement, arrangement or understanding between the Parties, each Party acknowledges and accepts that any liability of any Party to any other Party under or in connection with any applicable Transaction Documents may be subject to Bail-In Action by the relevant Resolution Authority and acknowledges and accepts to be bound by the effect of:

23.1.1   any Bail-In Action in relation to any such liability, including (without limitation):

(a)     a reduction, in full or in part, in the principal amount, or outstanding amount due (including any accrued but unpaid interest) in respect of any such liability;

(b)     a conversion of all, or part of, any such liability into shares or other instruments of ownership that may be issued to, or conferred on, it; and

(c)     a cancellation of any such liability; and

23.1.2   a variation of any term of any Transaction Document to the extent necessary to give effect to any Bail-In Action in relation to any such liability.

24. **PARALLEL DEBT (COVENANT TO PAY THE SECURITY AGENT)**

24.1.1   Notwithstanding any other provision of this Agreement or any other Transaction Document, each Obligor hereby irrevocably and unconditionally undertakes to pay to the Security Agent, as creditor in its own right and not as representative of the other Finance Parties, sums equal to and in the currency of each amount payable by such Obligor to each of the Finance Parties under each of the Transaction Documents as and when that amount falls due for payment under the relevant Transaction Document or would have fallen due but for any discharge resulting from failure of another Finance Party to take appropriate steps, in insolvency proceedings affecting that Obligor, to preserve its entitlement to be paid that amount (the "**Parallel Debt**").

24.1.2   The Security Agent shall have its own independent right to demand payment of the amounts payable by each Obligor under this Clause 24 irrespective of any discharge of such Obligor's obligation to pay those amounts to the other Finance Parties resulting from failure by them to take appropriate steps, in insolvency proceedings affecting that Obligor, to preserve their entitlement to be paid those amounts.

24.1.3   Any amount due and payable by an Obligor to the Security Agent under this Clause 24 shall be decreased to the extent that the other Finance Parties have received (and are able to retain) payment in full of the corresponding amount under the other provisions of the Transaction Documents and any amount due and payable by an Obligor to the other Finance Parties under those provisions shall be decreased to the extent that the Security Agent has received (and is able to retain) payment in full of the corresponding amount under this Clause 24.

24.1.4   The rights of the Finance Parties (other than the Security Agent) to receive payment of amounts payable by each Obligor under the Transaction Documents are several and are separate and independent from, and without prejudice to, the rights of the Security Agent to receive payment under this Clause 24.

25. **BENEFIT OF SANCTIONS RESTRICTIONS**

The Sanctions Provisions shall only apply for the benefit of a Restricted Lender to the extent that the Sanctions Provisions would not result in (a) the violation of, conflict with or liability under EU Regulation (EC) 2271/96 or (b) a violation or conflict with section 7 foreign trade rules ("**AWV**") (Außenwirtschaftsverordnung) (in connection with section 4 paragraph 1a no. 3 foreign trade law ("**AWG**") (Außenwirtschaftsgesetz)) or a similar anti-boycott statute applicable to such Restricted Lender. Solely in the event of or on the basis of any breach of any Sanctions Provisions which do not apply to a Restricted Lender by virtue of the foregoing sentence (but not with respect to any other breaches which do apply to a Restricted Lender), the Parties agree that the Restricted Lender will:

25.1.1   be deemed to vote against taking any action (including pursuant to clause 20.15 (*Acceleration*) of the Senior Facility Agreement or the Junior Facility Agreement, as applicable; and

25.1.2   not be entitled to assert any other right or remedy on the basis of such breach.

26.     **HEDGING**

26.1.1   Subject to this Clause 26, the Hedging Agreement may not be terminated, varied or cancelled by the Borrower without the consent of the Senior Agent (acting on the instructions of the Majority Senior Lenders) and the Hedging Counterparty.

26.1.2   Without prejudice to the operation of the "Automatic Early Termination" provision under Section 6(a) of the Hedging Agreement, the Hedging Counterparty may not close out its Interest Rate Exchange at any time unless:

(a)     there has been a mandatory or voluntary full repayment, prepayment or cancellation of the Senior Loan in accordance with the terms of the Senior Facility Agreement;

(b)     the Borrower has defaulted on a payment due under the Interest Rate Exchange and such default continues for more than five (5) days after the Hedging Counterparty has given notice of such default to the Senior Agent;

(c)     an Illegality Event, a Tax Event, a Tax Event Upon Merger or a Force Majeure Event (each as defined in the Hedging Agreement in respect of the Interest Rate Exchange has occurred and is continuing;

(d)     the Senior Agent has accelerated amounts due under the Senior Facility Agreement pursuant to clause 20.15 (*Acceleration*) of the Senior Facility Agreement or any Security Interest has been enforced under a Security Document;

(e)     as a result of any mandatory or voluntary repayment, prepayment or cancellation under the Senior Facility Agreement, the aggregate notional amount of the Interest Rate Exchange under the Hedging Agreement is greater than the remaining amount outstanding (if any) under the Senior Loan at that time, provided that the remaining amount outstanding under the Senior Loan remains hedged by the Hedging Counterparty under the Interest Rate Exchange after any partial close out; or

(f)     the Senior Loan is not drawn down on the scheduled Utilisation Date and the Senior Loan is not ultimately disbursed to the Borrower in accordance with the terms of the Senior Facility Agreement and the Proceeds Agreement.

26.1.3   The Senior Agent shall notify the Hedging Counterparty promptly upon the delivery of any notice to the Borrower pursuant to clause 20.15 (*Acceleration*) of the Senior Facility Agreement.

26.1.4   If, on close-out of the Interest Rate Exchange, any Hedge Break Amount is payable by the Hedging Counterparty, then an amount equal to the absolute value of those Hedge Break Amounts in the case of a negative number, shall be immediately paid by the Hedging Counterparty to the Security Agent for application in accordance with Clause 8.3 (*Order of Application*), or by the

Borrower to the Hedging Counterparty in the case of a positive number in accordance with Clause 8.3 (*Order of Application*), subject to clause 8.14.

26.1.5    The Hedging Counterparty shall promptly terminate or close out in full or in part (as the case may be) any Interest Rate Exchange under the Hedging Agreement prior to its stated maturity, following the occurrence of any event specified in Clause 26.1.2 and the Senior Agent (acting on the instructions of the Majority Senior Lenders) instructs it to do so or, if instructed by the Security Agent following the occurrence of an Enforcement Event.

26.1.6    The Borrower shall not discharge any of the Hedging Liabilities at any time unless such discharge is expressly permitted under this Clause 26.

26.1.7    The Borrower may discharge a Hedging Liability in accordance with the terms of the Hedging Agreement:

(a)    if such discharge is by way of a scheduled payment arising under the Hedging Agreement prior to close-out;

(b)    to the extent that the Borrower's obligation to discharge such Hedging Liability arises as a result of the operation of any of sections 2(d) (*Deduction or Withholding for Tax*), 8(a) (*Payment in the Contractual Currency*), 8(b) (*Judgments*), 9(h)(i) (*Prior to Early Termination*) and 11 (*Expenses*) of the ISDA Master Agreement;

(c)    if the Interest Rate Exchange is closed out as a result of circumstances specified in Clause 26.1.2; or

(d)    if the Majority Senior Lenders give prior consent to such Hedging Liability being discharged.

26.1.8    Failure by the Borrower to discharge a Hedging Liability owed to the Hedging Counterparty under the Hedging Agreement which results solely from the operation of Clause 26.1.7 above shall, without prejudice to Clause 26.1.9, not result in a default (however described) in respect of the Borrower under the Hedging Agreement.

26.1.9    The Borrower shall continue to be subject to any Hedging Liability (including default interest) under the Hedging Agreement even its discharge is restricted at any time by the terms of this Clause 26.

27.    **Intermediate Lessor**

(a)    The parties acknowledge and agree that upon the occurrence of the relevant Closing (as defined in the Aircraft Purchase Agreement) pursuant to the Aircraft Purchase Agreement, the Intermediate Lessor will request the Security Agent that it be accepted as the Intermediate Lessor under this Deed. The Security Agent shall not accept any such request by the Intermediate Lessor unless and until:

(i)     such acceding Intermediate Lessor has produced such documents as are required by the Security Agent to carry out and be satisfied with all necessary "Know Your Customer" checks; and

(ii)    such acceding Intermediate Lessor has executed and delivered to the Security Agent a Proceeds Agreement Accession Undertaking.

(b)     With effect from the date of acceptance by the Security Agent of a Proceeds Agreement Accession Undertaking (which shall in each case be accepted as soon as reasonably practicable after receipt by it of a duly completed Proceeds Agreement Accession Undertaking), such acceding Intermediate Lessor shall comply with all obligations under this Deed and shall become entitled to the rights provided to a Intermediate Lessor as if it had been an original Party to this Deed.

**This Agreement has been entered into by way of a deed on the date stated at the beginning of this Agreement**.

## SCHEDULE 1
## FORM OF PROCEEDS AGREEMENT ACCESSION UNDERTAKING

To:       [*Insert full name of current Security Agent*], for itself and each of the other Parties to the Proceeds Agreement referred to below.

**THIS UNDERTAKING** is made on [*date*] by [*insert full name of new Lender/Senior Agent / Junior Agent/ Account Bank/Security Agent/Intermediate Lessor*] (the "Acceding [Lender/Senior Agent/Junior Agent/Account Bank/Security Agent/Intermediate Lessor]") in relation to the proceeds agreement dated [•] 2018 between (*inter alios*) Crédit Agricole Corporate and Investment Bank as Senior Agent, Junior Agent and as Security Agent and JPA No. 111 Co., Ltd. as Borrower (the "**Proceeds Agreement**"). Terms defined in the Proceeds Agreement shall bear the same meanings when used in this Undertaking.

In consideration of the Acceding [Lender/Senior Agent/Junior Agent/Security Agent/Account Bank/Intermediate Lessor] being accepted as a [Lender/Senior Agent/Junior Agent/Security Agent/Account Bank/Intermediate Lessor] for the purposes of the Proceeds Agreement, the Acceding [Lender/Senior Agent/Junior Agent/Security Agent/Account Bank/Intermediate Lessor] hereby confirms that, as from [date], it intends to be party to the Proceeds Agreement as a [Lender/Senior Agent/Junior Agent/Security Agent/Account Bank/Intermediate Lessor], undertakes to perform all the obligations expressed in the Proceeds Agreement to be assumed by a [Senior Agent/Junior Agent/Lender/Security Agent/Account Bank/Intermediate Lessor] and agrees that it shall be bound by all the provisions of the Proceeds Agreement, as if it had been an original party to the Proceeds Agreement. The benefit of each Security Document shall be maintained in favour of the Acceding Security Agent.

[We hereby confirm that for the purposes of Clause 16 (*Notices*) of the Proceeds Agreement, our notice details are as follows:

[•]

Fax:            [•]

Attention:     [•]]

This Undertaking shall be governed by and construed in accordance with English law.

**THIS UNDERTAKING** has been entered into on the date stated above.

Acceding [Lender/Senior Agent/Junior Agent/Security Agent/Account Bank]

By:      _____

Address:      _____

Fax:      _____

Accepted by the Security Agent:

[                          ]

By:       _____


Title:    _____


Date: _____            Date: _____


Acceding Intermediate Lessor

SIGNED AND DELIVERED as a Deed
for and on behalf of
DAE LEASING (IRELAND) 12 LIMITED
by its lawfully appointed attorney

_____        _____
in the presence of:-                                                       Attorney


_____
(Witness' Signature)


_____
(Witness' Name)


_____
(Witness' Address)


_____
(Witness' Occupation)

## SCHEDULE 2
## THE FINANCE PARTIES

1.     **Role of the Senior Agent**

1.1    **Appointment of the Senior Agent**

1.1.1   Each of the Senior Lenders appoints the Senior Agent to act as its Agent under and in connection with the Transaction Documents.

1.1.2   Each of the Senior Lenders authorises the Senior Agent to exercise the rights, powers, authorities and discretions specifically given to the Senior Agent under or in connection with the Transaction Documents together with any other incidental rights, powers, authorities and discretions.

1.1.3   No Obligor shall enquire as to or challenge the authority of the Senior Agent to take action under the Transaction Documents provided that this sub-paragraph 1.1.3 shall be without prejudice to any Obligor's right to claim damages and other relief and remedies from the courts against any Person.

1.2    **Duties of the Senior Agent**

1.2.1   The Senior Agent shall promptly forward to a Party the original or a copy of any document which is delivered to the Senior Agent for that Party by any other Party.

1.2.2   Except where a Transaction Document specifically provides otherwise, the Senior Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

1.2.3   If the Senior Agent receives notice from a Party referring to this Agreement, describing a Relevant Event and stating that the circumstance described is a Relevant Event, it shall promptly notify the other Finance Parties.

1.2.4   If the Senior Agent is aware of the non-payment of any principal, interest, or other amount payable to a Finance Party (other than the Senior Agent) under this Agreement it shall promptly notify the other Finance Parties.

1.2.5   The Senior Agent's duties under the Transaction Documents are solely mechanical and administrative in nature.

1.3    **No fiduciary duties**

1.3.1   Except to the extent set out in this Agreement, nothing in this Agreement constitutes the Senior Agent as a trustee or fiduciary of any other person.

1.3.2   The Senior Agent shall not be bound to account to any Senior Lender for any sum or the profit element of any sum received by it for its own account.

1.4     **Business with other involved parties**

1.4.1    The Senior Agent may accept deposits from, lend money to and generally engage in any kind of banking or other business with any Obligor, the Lease Manager and the Lessee.

1.4.2    The Senior Agent may act in such capacity in accordance with the Transaction Documents notwithstanding that it may act in other capacities in connection with the Transaction Documents and notwithstanding that it may have dealings with any Obligor, any other Finance Party, the Lease Manager or the Lessee.

1.5     **Rights and discretions of the Senior Agent**

1.5.1    The Senior Agent may rely on:

(i)     any representation, notice or document believed by it to be genuine, correct and appropriately authorised; and

(ii)    any statement made by a director, authorised signatory or employee of any person regarding any matters which may reasonably be assumed to be within his knowledge or within his power to verify.

1.5.2    The Senior Agent may assume (unless it has received notice to the contrary in its capacity as Agent for the Senior Lenders) that:

(i)     no Relevant Event has occurred (unless it has actual knowledge of a Relevant Event arising by reason of non-payment of a sum due to be paid to the Senior Agent); and

(ii)    any right, power, authority or discretion vested in any Party or the Senior Lenders has not been exercised.

1.5.3    The Senior Agent may engage, pay for and rely on the advice or services of any lawyers, accountants, valuers, appraisers, maintenance providers, surveyors or other experts.

1.5.4    The Senior Agent may act in relation to the Transaction Documents through its personnel and agents.

1.5.5    The Senior Agent may disclose to any other Party any information it reasonably believes it has received as agent under this Agreement, provided that the Senior Agent shall not be obliged to review or check, otherwise represent in any manner, the accuracy, adequacy or completeness of any such information disclosed.

1.5.6    Notwithstanding any other provision of any Transaction Document to the contrary, the Senior Agent is not obliged to do or omit to do anything if it would or might in its reasonable opinion constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

1.6     **Majority Senior Lenders' instructions**

1.6.1     Unless a contrary indication appears in a Transaction Document, the Senior
Agent shall (i) exercise any right, power, authority or discretion vested in it as
Senior Agent in accordance with any instructions given to it by the Majority
Senior Lenders (or, if so instructed by the Majority Senior Lenders, refrain from
exercising any right, power, authority or discretion vested in it as Senior Agent)
and (ii) not be liable for any act (or omission) if it acts (or refrains from taking
any action) in accordance with an instruction of the Majority Senior Lenders.

1.6.2     Unless a contrary indication appears in a Transaction Document, any
instructions given by the Majority Senior Lenders will be binding on all the
Senior Lenders.

1.6.3     The Senior Agent shall be entitled to request instructions, or clarification of any
instruction, from the Majority Senior Lenders (or, if the relevant Transaction
Document stipulates the matter is a decision for any other Senior Lender or
group of Senior Lenders, from that Senior Lender or group of Senior Lenders)
as to whether, and in what manner, it should exercise or refrain from exercising
any right, power, authority or discretion. The Senior Agent may refrain from
acting unless and until it receives any such instructions or clarification that it
has requested.

1.6.4     The Senior Agent may refrain from acting in accordance with the instructions
of the Senior Lenders (or, if appropriate, the Majority Senior Lenders) until it
has received such security as it may require for any Loss (together with any
associated VAT) which it may incur in complying with the instructions.

1.6.5     In the absence of instructions from the Majority Senior Lenders (or, if
appropriate, the Senior Lenders), the Senior Agent may act (or refrain from
taking action) as it considers to be in the best interest of the Senior Lenders,
provided that the Senior Agent shall be exempted from any responsibilities for
other Senior Lender(s) by such act.

1.6.6     The Senior Agent is not authorised to act on behalf of a Senior Lender in any
legal or arbitration proceedings relating to any Transaction Document.

1.7     **Responsibility for documentation**

The Senior Agent:

1.7.1     is not responsible for the adequacy, accuracy and/or completeness of any
information (whether oral or written) supplied by it, the Security Agent, an
Obligor, the Lease Manager or the Lessee or any other person given in or in
connection with any Transaction Document; or

1.7.2     is not responsible for the legality, validity, effectiveness, adequacy or
enforceability of any Transaction Document or any other agreement,
arrangement or document entered into, made or executed in anticipation of or
in connection with any Transaction Document.

1.8     **Exclusion of liability**

1.8.1    Without limiting paragraph 1.8.2 below, the Senior Agent will not be liable for any action taken by it under or in connection with any Transaction Document, unless directly caused by its gross negligence, fraud or wilful misconduct.

1.8.2    No Party (other than the Senior Agent) may take any proceedings against any officer, employee or agent of the Senior Agent in respect of any claim it might have against the Senior Agent or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Transaction Document and any officer, employee or agent of the Senior Agent may rely on this paragraph subject to clause 1.4 (*Third Party Rights*) of the Senior Facility Agreement.

1.8.3    The Senior Agent will not be liable for any delay (or any related consequences) in crediting an account with an amount required under the Transaction Documents to be paid by the Senior Agent if the Senior Agent has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognised clearing or settlement system used by the Senior Agent for that purpose.

1.8.4    Nothing in this Agreement shall oblige the Senior Agent to carry out any "know your customer" or other checks in relation to any person on behalf of any Senior Lender and each Senior Lender confirms to the Senior Agent that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Senior Agent.

1.8.5    The Senior Agent will not be liable for any delay in taking action or failure to take action it would otherwise be authorised or required to take in accordance with the Transaction Documents if such delay or failure is caused by events or circumstances outside of the Senior Agent's control.

1.9     **Senior Lenders' indemnity to the Senior Agent**

Each Senior Lender shall (in proportion to its participation in the Senior Loan or, if the Senior Loan has not then been made, to its share of the Total Commitments) indemnify the Senior Agent, within three (3) Business Days of demand, against any Loss incurred by the Senior Agent (otherwise than by reason of the Senior Agent's gross negligence or wilful misconduct) in acting as Agent under the Transaction Documents (unless the Senior Agent has been reimbursed by the Borrower or any other Obligor pursuant to a Transaction Document).

1.10    **Resignation of the Senior Agent**

1.10.1   The Senior Agent may resign and appoint one of its Affiliates as successor by delivering an Agent Transfer Certificate to the other Finance Parties and the Borrower. Alternatively the Senior Agent may resign by giving notice to the other Finance Parties and the Borrower, in which case the Majority Senior Lenders may appoint a successor Senior Agent by the successor delivering an Agent Transfer Certificate to the other Finance Parties and the Borrower. Unless the successor Senior Agent is an affiliate of the existing Senior Agent, the prior written consent of the Borrower shall be required if the proposed successor

Senior Agent is a competitor of the Borrower Parent in the business of aircraft leasing. In each case, the change of Senior Agent shall be to a reputable, creditworthy entity with relevant agency experience in aircraft financing and leasing transactions effected in accordance with this paragraph 1.10 and be at no cost to the Borrower.

1.10.2   If the Majority Senior Lenders have not appointed a successor Senior Agent in accordance with paragraph 1.10.1 above within thirty (30) days after notice of resignation was given, the Senior Agent may appoint a successor Senior Agent.

1.10.3   The retiring Senior Agent shall make available to the successor Senior Agent such documents and records as the successor Senior Agent may reasonably request for the purposes of performing its functions as Senior Agent under the Transaction Documents.

1.10.4   The Senior Agent's resignation notice shall only take effect upon the appointment of a successor.

1.10.5   Upon the appointment of a successor, the retiring Senior Agent shall be discharged from any further obligation in respect of the Transaction Documents but shall remain entitled to (a) the benefit of this paragraph 1.10 and (b) the benefit of clause 15.4 (*Indemnity to the Senior Agent*) of the Senior Facility Agreement (and any agency fees for the account of the retiring Senior Agent shall cease to accrue from (and shall be payable on) that date). Its successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

1.10.6   A change in the identity of the Senior Agent shall not result in a Borrower having to make any increased payment or perform any increased obligations under the provisions of the Transaction Documents.

1.10.7   Unless expressly agreed to the contrary, an "**Existing Agent**" (as defined in the applicable Agent Transfer Certificate) makes no representation or warranty and assumes no responsibility to a "**New Agent**" (as defined in the applicable Agent Transfer Certificate) for:

(a)   the legality, validity, effectiveness, adequacy or enforceability of the Transaction Documents or any other documents;

(b)   obligations under the Transaction Documents or any other documents; or

(c)   the accuracy of any statements (whether written or oral) made in or in connection with any Transaction Document or any other document,

and any representations or warranties implied by law are excluded.

1.10.8   A "**Change of Agent**" (as defined in the applicable Agent Transfer Certificate) is effected when each of the Existing Agent and the New Agent executes an otherwise duly completed Agent Transfer Certificate and delivers the same to the other Finance Parties and the Borrower whereupon, as of such time:

(a)     the Existing Agent shall be released from further obligations under the Transaction Documents and its rights under the Transaction Documents shall be cancelled (being the "**Discharged Rights and Obligations**");

(b)     the New Agent shall assume obligations and/or acquire rights under the Transaction Documents which differ from the Discharged Rights and Obligations only insofar as the New Agent has assumed and/or acquired the same in place of the Existing Agent;

(c)     the New Agent, the other Finance Parties and the Borrower shall acquire the same rights and assume the same obligations between themselves as they would have acquired and assumed had the New Agent been the Senior Agent as at the date of signing of this Agreement with the rights and/or obligations acquired or assumed by it as a result of the transfer and to that extent the Existing Agent the Finance Parties and the Borrower shall each be released from further obligations to each other under the Transaction Documents;

(d)     the New Agent shall become a Party as the "Senior Agent"; and

(e)     the Borrower shall incur no additional obligations or costs in connection with such transfer.

1.10.9   Contemporaneously with the execution and delivery of any Agent Transfer Certificate, the New Agent shall execute and deliver to the Security Agent and Borrower a Proceeds Agreement Accession Undertaking in accordance with the terms of the Proceeds Agreement.

## 1.11   **FATCA**

1.11.1   The Senior Agent shall resign in accordance with paragraph 1.10 (*Resignation of Senior Agent*) above (and, to the extent applicable, shall use reasonable endeavours to appoint a successor Senior Agent pursuant to paragraph 1.10 (*Resignation of the Senior Agent*) above) if on or after the date which is three months before the earliest FATCA Application Date relating to any payment to the Senior Agent under the Transaction Documents, either:

(a)     the Senior Agent fails to respond to a request under clause 13.8 (*FATCA Information*) of the Senior Facility Agreement and a Senior Lender reasonably believes that the Senior Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date;

(b)     the information supplied by the Senior Agent pursuant to clause 13.8 (*FATCA Information*) of the Senior Facility Agreement indicates that the Senior Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date; or

(c)     the Senior Agent notifies the Borrower and the Senior Lenders that the Senior Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date,

and (in each case) a Senior Lender reasonably believes that a Party will be required to make a FATCA Deduction that would not be required if the Senior Agent were a FATCA Exempt Party, and that Lender, by notice to the Senior Agent, requires it to resign.

## 1.12   Confidentiality

1.12.1   In acting as senior agent for the Senior Lenders, the Senior Agent shall be regarded as acting through its agency division which shall be treated as a separate entity from any other of its divisions or departments.

1.12.2   If information is received by another division or department of the Senior Agent, it may be treated as confidential to that division or department and the Senior Agent shall not be deemed to have notice of it.

## 1.13   Relationship with the Senior Lenders

The Senior Agent may treat each Senior Lender as a Senior Lender entitled to payments under the Senior Facility Agreement and acting through its Facility Office unless it has received not less than five (5) Business Days prior notice from that Senior Lender to the contrary in accordance with the terms of the Senior Facility Agreement.

## 1.14   Credit Appraisal by the Senior Lenders

Without affecting the responsibility of any Obligor for information supplied by it or on its behalf in connection with any Transaction Document, each Senior Lender confirms to the Senior Agent that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Transaction Document including but not limited to:

1.14.1   the financial condition, status and nature of each Obligor, the Lease Manager and the Lessee;

1.14.2   the legality, validity, effectiveness, adequacy or enforceability of any Transaction Document and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document;

1.14.3   whether that Senior Lender has recourse, and the nature and extent of that recourse, against any Party, any Obligor, the Lease Manager or the Lessee or any of their respective assets under or in connection with any Transaction Document, the transactions contemplated by the Transaction Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document; and

1.14.4   the adequacy, accuracy and/or completeness of any information provided by the Senior Agent, any Party, any Obligor, the Lease Manager or the Lessee or by any other person under or in connection with any Transaction Document, the transactions contemplated by the Transaction Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document.

1.15   **Deduction from amounts payable by the Senior Agent**

If any Party owes an amount to the Senior Agent under the Transaction Documents the Senior Agent may, after giving notice to that Party, deduct an amount not exceeding that amount from any payment to that Party which the Senior Agent would otherwise be obliged to make under the Transaction Documents and apply the amount deducted in or towards satisfaction of the amount owed. For the purposes of the Transaction Documents that Party shall be regarded as having received any amount so deducted.

1.16   **Senior Agent's management time**

Any amount payable to the Senior Agent under paragraph 1.9 (*Senior Lenders' indemnity to the Senior Agent*) above and clause 16 (*Costs and Expenses*) of the Senior Facility Agreement shall include the cost of utilising the Senior Agent's management time or other resources, but only to the extent that this applies to enforcement or preservation of security or as part of any restructuring or rescheduling of the Secured Obligations, and will be calculated on the basis of such reasonable daily or hourly rates as the Senior Agent may notify to the relevant Borrower and the relevant Senior Lender, and is in addition to any fee paid or payable to the Senior Agent.

2.   **ROLE OF THE SECURITY AGENT**

2.1   **Appointment of the Security Agent**

2.1.1   Each of the Secured Parties (other than the Security Agent, the Account Bank, any Receiver and any Delegate) appoints the Security Agent to act as its Security Agent under and in connection with the Transaction Documents.

2.1.2   Each of the Secured Parties (other than the Security Agent, the Account Bank, any Receiver and any Delegate) authorises the Security Agent to exercise the rights, powers, authorities and discretions specifically given to the Security Agent under or in connection with the Transaction Documents, together with any other incidental rights, powers, authorities and discretions.

2.1.3   No Obligor shall enquire as to or challenge the authority of the Security Agent to take action under the Transaction Documents, provided that this sub-paragraph 2.1.3 shall be without prejudice to any Obligor's right to claim damages and other relief and remedies from the courts against any Person.

2.2   **Duties of the Security Agent**

2.2.1   The Security Agent shall promptly forward to a Party the original or a copy of any document which is delivered to the Security Agent for that Party by any other Party.

2.2.2   Except where a Transaction Document specifically provides otherwise, the Security Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

2.2.3   If the Security Agent receives notice from a Party referring to this Agreement, the Senior Facility Agreement or the Junior Facility Agreement, describing a

Relevant Event and stating that the circumstance described is a Relevant Event, it shall promptly notify the other Finance Parties.

2.2.4    If the Security Agent is aware of the non-payment of any principal, interest, or other amount payable to a Finance Party (other than the Security Agent) under this Agreement it shall promptly notify the other Finance Parties.

## 2.3    No fiduciary duties

2.3.1    Nothing in this Agreement constitutes the Security Agent as a trustee or fiduciary of any other person.

2.3.2    The Security Agent shall not be bound to account to any Secured Party for any sum or the profit element of any sum received by it for its own account.

## 2.4    Business with other involved parties

2.4.1    The Security Agent may accept deposits from, lend money to and generally engage in any kind of banking or other business with any Obligor, the Lease Manager and the Lessee.

2.4.2    The Security Agent may act in such capacity in accordance with the Transaction Documents notwithstanding that it may act in other capacities in connection with the Transaction Documents and notwithstanding that it may have dealings with any Obligor, any other Finance Party, the Lease Manager or the Lessee.

## 2.5    Rights and discretions of the Security Agent

2.5.1    The Security Agent may rely on:

(i)    any representation, notice or document believed by it to be genuine, correct and appropriately authorised; and

(ii)    any statement made by a director, authorised signatory or employee of any person regarding any matters which may reasonably be assumed to be within his knowledge or within his power to verify.

2.5.2    The Security Agent may assume (unless it has received notice to the contrary in its capacity as Security Agent) that:

(i)    no Relevant Event has occurred (unless it has actual knowledge of a Relevant Event arising by reason of non-payment of a sum due to be paid to the Security Agent); and

(ii)    any right, power, authority or discretion vested in any Party has not been exercised.

2.5.3    The Security Agent may engage, pay for and rely on the advice or services of any lawyers, accountants, valuers, appraisers, maintenance providers, insurance brokers, surveyors or other experts.

2.5.4   The Security Agent may act in relation to the Transaction Documents through its personnel and agents.

2.5.5   The Security Agent may disclose to any other Party any information it reasonably believes it has received as Security Agent under the Transaction Documents.

2.5.6   Notwithstanding any other provision of any Transaction Document to the contrary, the Security Agent is not obliged to do or omit to do anything if it would or might in its reasonable opinion constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

## 2.6   Instructions

2.6.1   Unless a contrary indication appears in a Transaction Document, the Security Agent shall (i) exercise any right, power, authority or discretion vested in it as Security Agent in accordance with any instructions given to it by the Instructing Party and (ii) not be liable for any act (or omission) if it acts (or refrains from taking any action) in accordance with an instruction of the Instructing Party.

2.6.2   Unless a contrary indication appears in a Transaction Document, any instructions given by the Instructing Party will be binding on all the Finance Parties.

2.6.3   The Security Agent shall be entitled to request instructions, or clarification of any instruction, from the Instructing Party as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion. The Instructing Party may refrain from acting unless and until it receives any such instructions or clarification that it has requested.

2.6.4   The Security Agent may refrain from acting in accordance with the instructions of the Instructing Party until it has received such security as it may require for any Loss (together with any associated VAT) which it may incur in complying with the instructions.

2.6.5   In the absence of instructions from the Instructing Party, the Security Agent may act (or refrain from taking action) as it considers to be in the best interest of the Finance Parties.

2.6.6   The Security Agent is not authorised to act on behalf of a Finance Party (without first obtaining that Finance Party's consent) in any legal or arbitration proceedings relating to any Transaction Document.

## 2.7   Responsibility for documentation

The Security Agent:

2.7.1   is not responsible for the adequacy, accuracy and/or completeness of any information (whether oral or written) supplied by it, the Security Agent, an Obligor, the Lease Manager, the Lessee or any other person given in or in connection with any Transaction Document; or

2.7.2    is not responsible for the legality, validity, effectiveness, adequacy or enforceability of any Transaction Document or any other agreement, arrangement or document entered into, made or executed in anticipation of or in connection with any Transaction Document.

## 2.8    Exclusion of liability

2.8.1    Without limiting paragraph 2.8.2 below, the Security Agent will not be liable for any action taken by it under or in connection with any Transaction Document, unless directly caused by its gross negligence or wilful misconduct.

2.8.2    No Party (other than the Security Agent) may take any proceedings against any officer, employee or Security Agent of the Security Agent in respect of any claim it might have against the Security Agent or in respect of any act or omission of any kind by that officer, employee or Security Agent in relation to any Transaction Document and any officer, employee or Security Agent of the Security Agent may rely on this Clause subject to clause 1.4 (*Third Party Rights*) of the Senior Facility Agreement and the Junior Facility Agreement.

2.8.3    The Security Agent will not be liable for any delay (or any related consequences) in crediting an account with an amount required under the Transaction Documents to be paid by the Security Agent if the Security Agent has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognised clearing or settlement system used by the Security Agent for that purpose.

2.8.4    Nothing in this Agreement shall oblige the Security Agent to carry out any "know your customer" or other checks in relation to any person on behalf of any Lender and each Lender confirms to the Security Agent that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Security Agent.

2.8.5    The Security Agent will not be liable for any delay in taking action or failure to take action it would otherwise be authorised or required to take in accordance with the Transaction Documents if such delay or failure is caused by events or circumstances outside of the Security Agent's control.

## 2.9    No responsibility to exercise voting rights

The Security Agent shall not be liable for failure to exercise any voting rights that it receives pursuant to a Security Interest where not instructed to do so, and it shall not be obliged to do so unless it is indemnified and/or secured and/or prefunded to its satisfaction.

## 2.10    No responsibility to perfect Transaction Security

The Security Agent shall not be liable for any failure to:

2.10.1    require the deposit with it of any deed or document certifying, representing or constituting the title of any Obligor to any of the Collateral;

2.10.2    obtain any licence, consent or other authority for the execution, delivery, legality, validity, enforceability or admissibility in evidence of any of the Transaction Documents or the Security Interests created by the Security Documents;

2.10.3    register, file or record or otherwise protect any of the Security Interests created by the Security Documents (or the priority of any of the Security Interests created by the Security Documents) under any applicable laws in any jurisdiction or to give notice to any person of the execution of any of the Transaction Documents or of the Security Interests created by the Security Documents;

2.10.4    take, or to require any of the Obligors to take, any steps to perfect its title to any of the Collateral or to render the Security Interests created by the Security Documents effective or to secure the creation of any ancillary security interest under the laws of any jurisdiction;

2.10.5    require any further assurances in relation to any of the Security Documents; or

2.10.6    investigate as to the existence, accuracy or sufficiency of any legal opinions, searches, reports, certificates, valuations or investigations given or required to be given in connection with the Collateral or the Security Interests created by the Security Documents.

2.11    **Insurance by Security Agent**

2.11.1    The Security Agent shall not be under any obligation to insure any of the Collateral, to require any other person to maintain any insurance or to verify any obligation to arrange or maintain insurance contained in the Transaction Documents. The Security Agent shall not be responsible for any Loss which may be suffered by any person as a result of the lack of or inadequacy of any insurance.

2.11.2    Where the Security Agent is named on any insurance policy as an insured party, it shall not be responsible for any Loss which may be suffered by reason of, directly or indirectly, its failure to notify the insurers of any material fact relating to the risk assumed by such insurers or any other information of any kind, unless the Senior Agent shall have requested it to do so in writing and the Security Agent shall have failed to do so within fourteen (14) days after receipt of that request.

2.12    **Custodians and nominees**

The Security Agent may appoint and pay any person to act as a custodian or nominee on any terms in relation to any asset comprising the Collateral as the Security Agent may determine, including for the purpose of depositing with a custodian this Agreement or any document relating to the Collateral and the Security Agent shall not be responsible for any loss, liability, expense, demand, cost, claim or proceedings incurred by reason of the misconduct, omission or default on the part of any person appointed by it under any Transaction Document or be bound to supervise the proceedings or acts of any person.

2.13    **Acceptance of title**

The Security Agent is not required to be the registered holder of title to any of the Collateral prior to any Enforcement Action. The Security Agent shall be entitled to accept without enquiry, and shall not be obliged to investigate, any right and title that any of the Obligors may have to any of the Collateral and shall not be liable for or bound to require any Obligor to remedy any defect in its right or title.

2.14    **Lenders' indemnity to the Security Agent**

Each Secured Party (other than the Security Agent, the Senior Agent, the Junior Agent, the Account Bank, any Receiver and any Delegate) shall (in the proportion that the Secured Obligations owed to it bears to the aggregate of the Secured Obligations owed to all the Secured Parties (other than the Security Agent, the Senior Agent, the Junior Agent, the Account Bank, any Receiver and any Delegate) for the time being (or, if the Secured Obligations of each of those Secured Parties is zero, immediately prior to their being reduced to zero)), indemnify the Security Agent, within three (3) Business Days of demand, against any Loss incurred by the Security Agent (otherwise than by reason of the Security Agent's gross negligence or wilful misconduct) in acting as Security Agent under the Transaction Documents (unless the Security Agent has been reimbursed by the Borrower or any other Obligor pursuant to a Transaction Document).

2.15    **Resignation of the Security Agent**

2.15.1    The Security Agent may resign and appoint one of its Affiliates as successor by giving notice to the other Finance Parties and the Borrower.

2.15.2    Alternatively the Security Agent may resign by giving notice to the other Finance Parties and the Borrower, in which case the Instructing Party (after consultation with the Borrower) may appoint a successor Security Agent.

2.15.3    If the Instructing Party has not appointed a successor Security Agent in accordance with paragraph 2.15.2 above within thirty (30) days after notice of resignation was given, the retiring Security Agent may (after consultation with the Borrower) appoint a successor Security Agent.

2.15.4    The retiring Security Agent shall make available to the successor Security Agent such documents and records and provide such assistance as the successor Security Agent may reasonably request for the purposes of performing its functions as Security Agent under the Transaction Documents.

2.15.5    The Security Agent's resignation notice shall only take effect upon the appointment of a successor.

2.15.6    Upon the appointment of a successor, the retiring Security Agent shall be discharged from any further obligation in respect of the Transaction Documents but shall remain entitled to the benefit of this paragraph 2. Its successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

2.15.7    A change in the identity of the Security Agent shall not result in an Obligor or the Lessee having to make any increased payment or perform any increased

obligations or have any reduced rights under the provisions of the Transaction Documents.

2.15.8 Notwithstanding any other provision in this Agreement, on or after the Senior Secured Obligations Discharge Date, Crédit Agricole Corporate and Investment Bank as security agent may, at the Borrower's cost (provided that a written fee estimate is submitted to the Borrower at least ten (10) Business Days in advance), resign as security agent hereunder in accordance with this paragraph 2 and the Junior Lenders must nominate a replacement security agent to become the Security Agent hereunder in accordance with this paragraph 2, provided that if the replacement security agent is an affiliate of Crédit Agricole Corporate and Investment Bank then the Borrower shall incur no costs in relation to these actions.

## 2.16    Relationship with the Lenders

The Security Agent may treat each Lender as a Lender, entitled to payments under the Transaction Documents and acting through its Facility Office unless it has received not less than five (5) Business Days prior notice from that Senior Lender to the contrary in accordance with the terms of the Transaction Documents.

## 2.17    Credit Appraisal by the Lenders

Without affecting the responsibility of any Obligor for information supplied by it or on its behalf in connection with any Transaction Document, each Lender confirms to the Security Agent that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Transaction Document including but not limited to:

2.17.1 the financial condition, status and nature of each Obligor, the Lease Manager and the Lessee;

2.17.2 the legality, validity, effectiveness, adequacy or enforceability of any Transaction Document and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document;

2.17.3 whether that Lender has recourse, and the nature and extent of that recourse, against any Party, any Obligor, the Lease Manager, the Lessee or any of its respective assets under or in connection with any Transaction Document, the transactions contemplated by the Transaction Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document; and

2.17.4 the adequacy, accuracy and/or completeness of any information provided by the Security Agent, any Party, any Obligor, the Lease Manager, the Lessee or by any other person under or in connection with any Transaction Document, the transactions contemplated by the Transaction Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document.

2.18   **Deduction from amounts payable by the Security Agent**

If any Party owes an amount to the Security Agent under the Transaction Documents the Security Agent may, after giving notice to that Party, deduct an amount not exceeding that amount from any payment to that Party which the Security Agent would otherwise be obliged to make under the Transaction Documents and apply the amount deducted in or towards satisfaction of the amount owed. For the purposes of the Transaction Documents that Party shall be regarded as having received any amount so deducted.

2.19   **Security Agent's management time**

Any amount payable to the Security Agent under paragraph 2.14 (*Lenders' indemnity to the Security Agent*) above, clause 16 (*Costs and Expenses*) of the Senior Facility Agreement and clause 16 (*Costs and Expenses*) of the Junior Facility Agreement shall include the cost of utilising the Security Agent's management time or other resources, but only to the extent that this applies to enforcement or preservation of security or as part of any restructuring or rescheduling of the Secured Obligations, and will be calculated on the basis of such reasonable daily or hourly rates as the Security Agent may notify to the Borrower and the relevant Lenders, and is in addition to any fee paid or payable to the Security Agent.

3.   **Role of the Junior Agent**

3.1   **Appointment of the Junior Agent**

3.1.1   Each of the Junior Lenders appoints the Junior Agent to act as its Agent under and in connection with the Transaction Documents.

3.1.2   Each of the Junior Lenders authorises the Junior Agent to exercise the rights, powers, authorities and discretions specifically given to the Junior Agent under or in connection with the Transaction Documents together with any other incidental rights, powers, authorities and discretions.

3.1.3   No Obligor shall enquire as to or challenge the authority of the Junior Agent to take action under the Transaction Documents provided that this sub-paragraph 1.1.3 shall be without prejudice to any Obligor's right to claim damages and other relief and remedies from the courts against any Person.

3.2   **Duties of the Junior Agent**

3.2.1   The Junior Agent shall promptly forward to a Party the original or a copy of any document which is delivered to the Junior Agent for that Party by any other Party.

3.2.2   Except where a Transaction Document specifically provides otherwise, the Junior Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

3.2.3   If the Junior Agent receives notice from a Party referring to this Agreement, describing a Relevant Event and stating that the circumstance described is a Relevant Event, it shall promptly notify the other Finance Parties.

3.2.4    If the Junior Agent is aware of the non-payment of any principal, interest, or other amount payable to a Finance Party (other than the Junior Agent) under this Agreement it shall promptly notify the other Finance Parties.

3.2.5    The Junior Agent's duties under the Transaction Documents are solely mechanical and administrative in nature.

## 3.3    No fiduciary duties

3.3.1    Nothing in this Agreement constitutes the Junior Agent as a trustee or fiduciary of any other person.

3.3.2    The Junior Agent shall not be bound to account to any Junior Lender for any sum or the profit element of any sum received by it for its own account.

## 3.4    Business with other involved parties

3.4.1    The Junior Agent may accept deposits from, lend money to and generally engage in any kind of banking or other business with any Obligor, the Lease Manager and the Lessee.

3.4.2    The Junior Agent may act in such capacity in accordance with the Transaction Documents notwithstanding that it may act in other capacities in connection with the Transaction Documents and notwithstanding that it may have dealings with any Obligor, any other Finance Party, the Lease Manager or the Lessee.

## 3.5    Rights and discretions of the Junior Agent

3.5.1    The Junior Agent may rely on:

(i)    any representation, notice or document believed by it to be genuine, correct and appropriately authorised; and

(ii)    any statement made by a director, authorised signatory or employee of any person regarding any matters which may reasonably be assumed to be within his knowledge or within his power to verify.

3.5.2    The Junior Agent may assume (unless it has received notice to the contrary in its capacity as Agent for the Junior Lenders) that:

(i)    no Relevant Event has occurred (unless it has actual knowledge of a Relevant Event arising by reason of non-payment of a sum due to be paid to the Junior Agent); and

(ii)    any right, power, authority or discretion vested in any Party or the Junior Lenders has not been exercised.

3.5.3    The Junior Agent may engage, pay for and rely on the advice or services of any lawyers, accountants, valuers, appraisers, maintenance providers, surveyors or other experts.

3.5.4    The Junior Agent may act in relation to the Transaction Documents through its personnel and agents.

3.5.5    The Junior Agent may disclose to any other Party any information it reasonably believes it has received as agent under this Agreement, provided that the Junior Agent shall not be obliged to review or check, otherwise represent in any manner, the accuracy, adequacy or completeness of any such information disclosed.

3.5.6    Notwithstanding any other provision of any Transaction Document to the contrary, the Junior Agent is not obliged to do or omit to do anything if it would or might in its reasonable opinion constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

## 3.6    Majority Junior Lenders' instructions

3.6.1    Unless a contrary indication appears in a Transaction Document, the Junior Agent shall (i) exercise any right, power, authority or discretion vested in it as Junior Agent in accordance with any instructions given to it by the Majority Junior Lenders (or, if so instructed by the Majority Junior Lenders, refrain from exercising any right, power, authority or discretion vested in it as Junior Agent) and (ii) not be liable for any act (or omission) if it acts (or refrains from taking any action) in accordance with an instruction of the Majority Junior Lenders.

3.6.2    Unless a contrary indication appears in a Transaction Document, any instructions given by the Majority Junior Lenders will be binding on all the Finance Parties.

3.6.3    The Junior Agent shall be entitled to request instructions, or clarification of any instruction, from the Majority Junior Lenders (or, if the relevant Transaction Document stipulates the matter is a decision for any other Junior Lender or group of Junior Lenders, from that Junior Lender or group of Junior Lenders) as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion. The Junior Agent may refrain from acting unless and until it receives any such instructions or clarification that it has requested.

3.6.4    The Junior Agent may refrain from acting in accordance with the instructions of the Junior Lenders (or, if appropriate, the Majority Junior Lenders) until it has received such security as it may require for any Loss (together with any associated VAT) which it may incur in complying with the instructions.

3.6.5    In the absence of instructions from the Majority Junior Lenders (or, if appropriate, the Junior Lenders), the Junior Agent may act (or refrain from taking action) as it considers to be in the best interest of the Junior Lenders, provided that the Junior Agent shall be exempted from any responsibilities for other Lender(s) by such act.

3.6.6    The Junior Agent is not authorised to act on behalf of a Junior Lender in any legal or arbitration proceedings relating to any Transaction Document.

3.7     **Responsibility for documentation**

The Junior Agent:

3.7.1   is not responsible for the adequacy, accuracy and/or completeness of any information (whether oral or written) supplied by it, the Security Agent, an Obligor, the Lease Manager or the Lessee or any other person given in or in connection with any Transaction Document; or

3.7.2   is not responsible for the legality, validity, effectiveness, adequacy or enforceability of any Transaction Document or any other agreement, arrangement or document entered into, made or executed in anticipation of or in connection with any Transaction Document.

3.8     **Exclusion of liability**

3.8.1   Without limiting paragraph 1.8.2 below, the Junior Agent will not be liable for any action taken by it under or in connection with any Transaction Document, unless directly caused by its gross negligence, fraud or wilful misconduct.

3.8.2   No Party (other than the Junior Agent) may take any proceedings against any officer, employee or agent of the Junior Agent in respect of any claim it might have against the Junior Agent or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Transaction Document and any officer, employee or agent of the Junior Agent may rely on this paragraph subject to clause 1.4 (*Third Party Rights*) of the Junior Facility Agreement.

3.8.3   The Junior Agent will not be liable for any delay (or any related consequences) in crediting an account with an amount required under the Transaction Documents to be paid by the Junior Agent if the Junior Agent has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognised clearing or settlement system used by the Junior Agent for that purpose.

3.8.4   Nothing in this Agreement shall oblige the Junior Agent to carry out any "know your customer" or other checks in relation to any person on behalf of any Junior Lender and each Junior Lender confirms to the Junior Agent that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Junior Agent.

3.8.5   The Junior Agent will not be liable for any delay in taking action or failure to take action it would otherwise be authorised or required to take in accordance with the Transaction Documents if such delay or failure is caused by events or circumstances outside of the Junior Agent's control.

3.9     **Junior Lenders' indemnity to the Junior Agent**

Each Junior Lender shall (in proportion to its participation in the Junior Loan or, if the Junior Loan has not then been made, to its share of the Total Commitments) indemnify the Junior Agent, within three (3) Business Days of demand, against any Loss incurred by the Junior Agent (otherwise than by reason of the Junior Agent's gross negligence or wilful misconduct) in acting as Junior Agent under the Transaction Documents

(unless the Junior Agent has been reimbursed by the Borrower or any other Obligor pursuant to a Transaction Document).

## 3.10   Resignation of the Junior Agent

3.10.1   The Junior Agent may resign and appoint one of its Affiliates as successor by delivering an Agent Transfer Certificate to the other Finance Parties and the Borrower. Alternatively the Junior Agent may resign by giving notice to the other Finance Parties and the Borrower, in which case the Majority Junior Lenders may appoint a successor Junior Agent by the successor delivering an Agent Transfer Certificate to the other Finance Parties and the Borrower. Unless the successor Junior Agent is an affiliate of the existing Junior Agent, the prior written consent of the Borrower shall be required if the proposed successor Junior Agent is a competitor of the Borrower Parent in the business of aircraft leasing. In each case, the change of Junior Agent shall be to a reputable, creditworthy entity with relevant agency experience in aircraft financing and leasing transactions effected in accordance with this paragraph 3.10 and be at no cost to the Borrower.

3.10.2   If the Majority Junior Lenders have not appointed a successor Junior Agent in accordance with paragraph 1.10.1 above within thirty (30) days after notice of resignation was given, the Junior Agent may appoint a successor Junior Agent.

3.10.3   The retiring Junior Agent shall make available to the successor Junior Agent such documents and records as the successor Junior Agent may reasonably request for the purposes of performing its functions as Junior Agent under the Transaction Documents.

3.10.4   The Junior Agent's resignation notice shall only take effect upon the appointment of a successor.

3.10.5   Upon the appointment of a successor, the retiring Agent shall be discharged from any further obligation in respect of the Transaction Documents but shall remain entitled to (a) the benefit of this paragraph 1.10 and (b) the benefit of clause 15.4 (*Indemnity to the Junior Agent*) of the Junior Facility Agreement (and any agency fees for the account of the retiring Junior Agent shall cease to accrue from (and shall be payable on) that date). Its successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if such successor had been an original Party.

3.10.6   A change in the identity of the Junior Agent shall not result in a Borrower having to make any increased payment or perform any increased obligations under the provisions of the Transaction Documents.

3.10.7   Unless expressly agreed to the contrary, an "**Existing Agent**" (as defined in the applicable Agent Transfer Certificate) makes no representation or warranty and assumes no responsibility to a "**New Agent**" (as defined in the applicable Agent Transfer Certificate) for:

(a)   the legality, validity, effectiveness, adequacy or enforceability of the Transaction Documents or any other documents;

(b)     obligations under the Transaction Documents or any other documents; or

(c)     the accuracy of any statements (whether written or oral) made in or in connection with any Transaction Document or any other document,

and any representations or warranties implied by law are excluded.

3.10.8  A "**Change of Agent**" (as defined in the applicable Agent Transfer Certificate) is effected when each of the Existing Agent and the New Agent executes an otherwise duly completed Agent Transfer Certificate and delivers the same to the other Finance Parties and the Borrower whereupon, as of such time:

(a)     the Existing Agent shall be released from further obligations under the Transaction Documents and its rights under the Transaction Documents shall be cancelled (being the "**Discharged Rights and Obligations**");

(b)     the New Agent shall assume obligations and/or acquire rights under the Transaction Documents which differ from the Discharged Rights and Obligations only insofar as the New Agent has assumed and/or acquired the same in place of the Existing Agent;

(c)     the New Agent, the other Finance Parties and the Borrower shall acquire the same rights and assume the same obligations between themselves as they would have acquired and assumed had the New Agent been the Junior Agent as at the date of signing of this Agreement with the rights and/or obligations acquired or assumed by it as a result of the transfer and to that extent the Existing Agent the Finance Parties and the Borrower shall each be released from further obligations to each other under the Transaction Documents;

(d)     the New Agent shall become a Party as the "Junior Agent"; and

(e)     the Borrower shall incur no additional obligations or costs in connection with such transfer.

3.10.9  Contemporaneously with the execution and delivery of any Agent Transfer Certificate, the New Agent shall execute and deliver to the Security Agent and Borrower a Proceeds Agreement Accession Undertaking in accordance with the terms of the Proceeds Agreement.

## 3.11    FATCA

3.11.1  The Junior Agent shall resign in accordance with paragraph 3.10 (*Resignation of the Junior Agent*) above (and, to the extent applicable, shall use reasonable endeavours to appoint a successor Agent pursuant to paragraph 3.10 (*Resignation of the Junior Agent*) above) if on or after the date which is three months before the earliest FATCA Application Date relating to any payment to the Junior Agent under the Transaction Documents, either:

(a)     the Junior Agent fails to respond to a request under clause 13.8 (*FATCA Information*) of the Junior Facility Agreement and a Junior Lender

reasonably believes that the Junior Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date;

(b)     the information supplied by the Junior Agent pursuant to clause 13.8 (*FATCA Information*) of the Junior Facility Agreement indicates that the Junior Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date; or

(c)     the Junior Agent notifies the Borrower and the Junior Lenders that the Junior Agent will not be (or will have ceased to be) a FATCA Exempt Party on or after that FATCA Application Date,

and (in each case) a Junior Lender reasonably believes that a Party will be required to make a FATCA Deduction that would not be required if the Junior Agent were a FATCA Exempt Party, and that Lender, by notice to the Junior Agent, requires it to resign.

## 3.12    Confidentiality

3.12.1   In acting as junior agent for the Junior Lenders, the Junior Agent shall be regarded as acting through its agency division which shall be treated as a separate entity from any other of its divisions or departments.

3.12.2   If information is received by another division or department of the Junior Agent, it may be treated as confidential to that division or department and the Junior Agent shall not be deemed to have notice of it.

## 3.13    Relationship with the Junior Lenders

The Junior Agent may treat each Junior Lender as a Junior Lender entitled to payments under the Junior Facility Agreement and acting through its Facility Office unless it has received not less than five (5) Business Days prior notice from that Junior Lender to the contrary in accordance with the terms of the Junior Facility Agreement.

## 3.14    Credit Appraisal by the Junior Lenders

Without affecting the responsibility of any Obligor for information supplied by it or on its behalf in connection with any Transaction Document, each Junior Lender confirms to the Junior Agent that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Transaction Document including but not limited to:

3.14.1   the financial condition, status and nature of each Obligor, the Lease Manager and the Lessee;

3.14.2   the legality, validity, effectiveness, adequacy or enforceability of any Transaction Document and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document;

3.14.3   whether that Junior Lender has recourse, and the nature and extent of that recourse, against any Party, any Obligor, the Lease Manager or the Lessee or

any of their respective assets under or in connection with any Transaction Document, the transactions contemplated by the Transaction Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document; and

3.14.4    the adequacy, accuracy and/or completeness of any information provided by the Junior Agent, any Party, any Obligor, the Lease Manager or the Lessee or by any other person under or in connection with any Transaction Document, the transactions contemplated by the Transaction Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Transaction Document.

## 3.15    Deduction from amounts payable by the Junior Agent

If any Party owes an amount to the Junior Agent under the Transaction Documents the Junior Agent may, after giving notice to that Party, deduct an amount not exceeding that amount from any payment to that Party which the Junior Agent would otherwise be obliged to make under the Transaction Documents and apply the amount deducted in or towards satisfaction of the amount owed. For the purposes of the Transaction Documents that Party shall be regarded as having received any amount so deducted.

## 3.16    Junior Agent's management time

Any amount payable to the Junior Agent under paragraph 3.9 (*Junior Lenders' indemnity to the Junior Agent*) above and clause 16 (*Costs and Expenses*) of the Junior Facility Agreement shall include the cost of utilising the Junior Agent's management time or other resources, but only to the extent that this applies to enforcement or preservation of security or as part of any restructuring or rescheduling of the Secured Obligations, and will be calculated on the basis of such reasonable daily or hourly rates as that Junior Agent may notify to the Borrower and the relevant Junior Lenders, and is in addition to any fee paid or payable to the Junior Agent.

## 4.    CONDUCT OF BUSINESS BY THE FINANCE PARTIES

No provision of this Agreement will:

4.1.1    interfere with the right of any Finance Party to arrange its affairs (tax or otherwise) in whatever manner it thinks fit;

4.1.2    oblige any Finance Party to investigate or claim any credit, relief, remission or repayment available to it or the extent, order and manner of any claim; or

4.1.3    oblige any Finance Party to disclose any information relating to its affairs (tax or otherwise) or any computations in respect of Tax.

## 5.    SHARING AMONG THE FINANCE PARTIES

## 5.1    Payments to Finance Parties

If a Finance Party (a "**Recovering Finance Party**") receives or recovers any amount from the Borrower other than in accordance with Clause 8 (*Application of Proceeds*) and applies that amount to a payment due under the Transaction Documents then:

5.1.1    the Recovering Finance Party shall, within three (3) Business Days, notify details of the receipt or recovery, to the Security Agent;

5.1.2    the Security Agent shall determine whether the receipt or recovery is in excess of the amount the Recovering Finance Party would have been paid had the receipt or recovery been received or made by the Security Agent and distributed in accordance with Clause 8 (*Application of Proceeds*) without taking account of any Tax which would be imposed on the Security Agent in relation to the receipt, recovery or distribution; and

5.1.3    the Recovering Finance Party shall, within three (3) Business Days of demand by the Security Agent, pay to the Security Agent an amount (the "**Sharing Payment**") equal to such receipt or recovery less any amount which the Security Agent determines may be retained by the Recovering Finance Party as its share of any payment to be made, in accordance with Clause 8 (*Application of Proceeds*).

## 5.2    Redistribution of payments

The Security Agent shall treat the Sharing Payment as if it had been paid by the Borrower and distribute it between the Finance Parties (other than the Recovering Finance Party) in accordance with Clause 8 (*Application of Proceeds*).

## 5.3    Recovering Finance Party's rights

5.3.1    On a distribution by the Security Agent under paragraph 5.1 (*Payments to Finance Parties)* of this Schedule 22 (*The Finance Parties*), the Recovering Finance Party will be subrogated to the rights of the Finance Parties which have shared in the redistribution.

5.3.2    If and to the extent that the Recovering Finance Party is not able to rely on its rights under paragraph 5.3.1 above, the Borrower shall be liable to the Recovering Finance Party for a debt equal to the Sharing Payment which is immediately due and payable.

## 5.4    Reversal of redistribution

If any part of the Sharing Payment received or recovered by a Recovering Finance Party becomes repayable and is repaid by that Recovering Finance Party, then:

5.4.1    each Lender which has received a share of the relevant Sharing Payment pursuant to paragraph 5.1 (*Payments to Finance Parties*) of this Schedule 2 (*The Finance Parties*) shall, upon request of the Security Agent, pay to the Security Agent for account of that Recovering Finance Party an amount equal to the appropriate part of its share of the Sharing Payment (together with an amount as is necessary to reimburse that Recovering Finance Party for its proportion of any interest on the Sharing Payment which that Recovering Finance Party is required to pay); and

5.4.2    that Recovering Finance Party's rights of subrogation in respect of any reimbursement shall be cancelled and the Borrower will be liable to the reimbursing Finance Party for the amount so reimbursed.

5.5    **Exceptions**

5.5.1    This paragraph 5 shall not apply to the extent that the Recovering Finance Party would not, after making any payment pursuant to this paragraph, have a valid and enforceable claim against the Borrower.

5.5.2    A Recovering Finance Party is not obliged to share with any other Finance Party any amount which the Recovering Finance Party has received or recovered as a result of taking legal or arbitration proceedings, if:

(a)    it notified that other Finance Party of the legal or arbitration proceedings; and

(b)    that other Finance Party had an opportunity to participate in those legal or arbitration proceedings but did not do so as soon as reasonably practicable having received notice and did not take separate legal or arbitration proceedings.

6.    **FEES**

No Finance Party shall be obliged to disclose to any other Finance Party the contents of any Fee Letter.

7.    **ACCOUNT BANK TERMINATION AND RESIGNATION**

7.1    **Resignation**

The Account Bank may resign its appointment under this Agreement upon not less than 30 days' notice to the Borrower, the Junior Agent and the Senior Agent (with a copy to the Security Agent), **provided that** such resignation shall not take effect until a successor has been duly appointed consistently with paragraph 7.3 (*Successor Account Bank*) or paragraph 7.4 (*Account Bank may appoint Successor*).

7.2    **Termination**

The Security Agent may revoke the appointment of the Account Bank by not less than 30 days' notice to the Account Bank (with a copy to the Borrower, the Senior Agent and the Junior Agent). Such revocation shall not take effect until a successor, previously approved in writing by the Security Agent, has been duly appointed consistently with paragraph 7.3 (*Successor Account Bank*) or paragraph 7.4 (*Account Bank may appoint Successor*).

7.3    **Successor Account Bank**

In the circumstances specified in the preceding provisions of this paragraph 7, the Borrower and the Intermediate Lessor shall (with the prior written approval of the Security Agent) appoint a successor Account Bank which is a reputable and experienced financial institution and forthwith give notice of such appointment to the Security Agent and the Facility Agents, whereupon the successor Account Bank shall, simultaneous with its appointment, execute a Proceeds Agreement Accession Undertaking pursuant to which each of the Parties to this Agreement (other than the Account Bank) and the successor Account Bank shall acquire and became subject to

the same rights and obligations between themselves as if they had entered into an agreement in the form of, and on the same terms as, this Agreement.

## 7.4 Account Bank may appoint Successor

If the Account Bank gives notice of its resignation in accordance with paragraph 7.1 (*Resignation*) and by the tenth day before the expiry of such notice a successor has not been duly appointed in accordance with this paragraph 7.4, the Account Bank may itself, following such consultation with the Security Agent as is practicable in the circumstances and with the prior written approval of the Security Agent:

7.4.1   appoint as its successor any reputable and experienced financial institution; and

7.4.2   give notice of such appointment to the Borrower, the Senior Agent, the Junior Agent and the Security Agent,

whereupon the successor Account Bank shall, simultaneous with its appointment, execute a Proceeds Agreement Accession Undertaking pursuant to which each of the Parties to this Agreement (other than the outgoing Account Bank) and the successor Account Bank shall acquire and became subject to the same rights and obligations between themselves as if they had entered into an agreement in the form of, and on the same terms as, this Agreement.

## 7.5 Merger

7.5.1   *Successor through merger*: Any legal entity into which the Account Bank is merged or converted or any legal entity resulting from any merger or conversion to which the Account Bank is a party shall, to the extent permitted by applicable law, be the successor to the Account Bank without any further formality.

7.5.2   *Rights and obligations upon merger*: In the event of such a merger or conversion the new merged Account Bank successor entity shall execute a Proceeds Agreement Accession Undertaking pursuant to which each of the Parties to this Agreement (other than the Account Bank) and the successor Account Bank shall acquire and became subject to the same rights and obligations between themselves as if they had entered into an agreement in the form of, and on the same terms as, this Agreement.

7.5.3   *Notice of merger*: Notice of any such merger or conversion shall forthwith be given by such successor to the Borrower, the Security Agent, the Senior Agent and the Junior Agent.

## 7.6 Termination upon appointment of replacement account bank

The appointment of the Account Bank shall terminate on the date on which the appointment of the replacement account bank becomes effective in accordance with the provisions of this paragraph 7.

## 7.7 Without prejudice

For the avoidance of doubt the Account Bank shall not be liable to any party if no suitable replacement account bank can be identified which is willing to act as

replacement account bank on the same, or substantially the same, terms as the Account Bank.

**7.8    Continuation of Account Bank**

Until such time as a replacement account bank is appointed in accordance with paragraph 7.3 (*Successor Account Bank*) or paragraph 7.4 (*Account Bank may appoint Successor*) the Account Bank's appointment shall continue unaffected.

**7.9    No Additional Borrower Obligations**

The Borrower shall incur no additional costs or obligations in connection with any resignation or appointment of the Account Bank or otherwise in connection with the provisions of this paragraph 7 (*Account Bank Termination and Registration*).

**8.    ACCOUNT BANK INDEMNITY**

Notwithstanding any other provision of this Agreement, the Borrower shall indemnify the Account Bank against any liability or loss howsoever incurred in connection with the Account Bank's obligation to withhold or deduct an amount of tax, **provided that** the same is not attributable to the breach, wilful misconduct, fraud or gross negligence of the Account Bank. This Paragraph 8 shall survive termination of this Agreement or the resignation or replacement of the Account Bank.

**9.    ACCESS TO ACCOUNT BALANCES**

The Account Bank shall provide access to information as to the balance of the Borrower Account and the Intermediate Lessor Account upon request from the Senior Agent, the Junior Agent or the Security Agent.

## SCHEDULE 3
## FORM OF AGENT TRANSFER CERTIFICATE

To:     [ • ] (the "**Finance Parties**")

        [ • ] (the "**Borrower**")

From:  [*Senior Agent/Junior Agent*] as [Senior Agent/Junior Agent] (the "**Existing Agent**") and [*The New Agent*] (the "**New Agent**")

Dated: [ • ]

**Proceeds Agreement dated [•] 2018 (the "Facility Agreement")**

1.      We refer to the Proceeds Agreement. This is an Agent Transfer Certificate. Terms defined in the Proceeds Agreement have the same meaning in this Agent Transfer Certificate unless given a different meaning in this Agent Transfer Certificate.

2.      We refer to paragraph [1.10 (*Resignation of the Senior Agent*) / 3.10 (*Resignation of the Junior Agent*)] of Schedule 2 (*The Finance Parties*) to the Proceeds Agreement:

        (a)     The Existing Agent and the New Agent agree to the Existing Agent resigning as [Senior Agent/Junior Agent] and to the New Agent being appointed as [Senior Agent/Junior Agent] in accordance with [1.10 (*Resignation of the Senior Agent*) / 3.10 (*Resignation of the Junior Agent*)] of Schedule 2 (*The Finance Parties*) to the Proceeds Agreement (the "**Change of Agent**").

        (b)     The Change of Agent shall take effect on [•].

        (c)     The address, fax number and attention details for notices of the New Agent for the purposes of Clause 16 (*Notices*) of the Proceeds Agreement are:

        [*address, fax, e-mail and attention details*]

3.      The Borrower shall incur no additional obligations or costs in connection with the aforementioned transfer.

4.      This Agent Transfer Certificate may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Agent Transfer Certificate.

5.      The benefit of each Security Document shall be maintained in favour of the New Agent.

This Agent Transfer Certificate and any non-contractual obligations arising from, or connected with it shall be governed by English law.

**[EXISTING AGENT]**                              **[NEW AGENT]**

By:    …………..………………          By:    …………………………………

Title:    …………..………………          Title:    …………………………………

## SCHEDULE 4
## APPENDIX A - MASTER DEFINITIONS SCHEDULE

## APPENDIX A

MASTER DEFINITIONS SCHEDULE
IN RESPECT OF THE FINANCING OF
ONE (1) AIRBUS A350-900 AIRCRAFT WITH
MANUFACTURER'S SERIAL NUMBER 67

## PART A - DEFINITIONS

"**Acceleration Event**" means any event or circumstance specified in clause 8.5 (*Mandatory Prepayment*) of the Senior Facility Agreement or in clause 8.5 (*Mandatory Prepayment*) of the Junior Facility Agreement, as applicable.

"**Account Bank**" means Crédit Agricole Corporate and Investment Bank or its successor account bank appointed in accordance with paragraph 7 of Schedule 2 (*The Finance Parties*).

"**Act**" means the Law of Property Act 1925.

"**Account Pledge**" means the French law account pledge in respect of the Borrower Account and the Security Deposit Account.

"**Affiliate**" means, in relation to any person, any other person which, directly or indirectly, controls or is controlled by or is under common control with such person and for the purposes of this definition, "control" when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise and the terms "**controlling**" and "**controlled**" shall be construed accordingly.

"**Agent Transfer Certificate**" means a certificate in the form set out at Schedule 3 (*Form of Agent Transfer Certificate*).

"**Aggregate Rent**" means the aggregate of all Rental which the Senior Agent forecasts to be payable in accordance with the terms of the Lease Agreement, acting reasonably.

"**Agreed Value**" has the meaning given to such term in the Lease Agreement

"**Aircraft**" means the Airbus A350-900 aircraft bearing manufacturer's serial number 67 as more particularly described in the Lease Agreement relating thereto, including the Airframe, Engines and all Parts and, where the context so requires, the Manuals and Technical Records.

"**Aircraft Proceeds**" means any monies, proceeds, assets, rights or other amounts, property or interests arising from or in connection with any sale, transfer, exchange or other disposition of the Aircraft or title thereto (or any part or interest thereof or therein), whether in accordance with the Transaction Documents or otherwise, or in respect of any conversion or other loss of, or other any interference with, the Aircraft or title thereto (or any part or interest thereof or therein) or any act or omission causing loss or damage to the Aircraft or title thereto (or any part or interest thereof or therein), whether by way of compensation or damages for such conversion, loss, interference, act or omission or otherwise.

"**Aircraft Purchase Agreement**" means the sale and purchase agreement dated 23 May 2018 *inter alios* between AWAS Aviation Trading Designated Activity Company, the sellers listed in Schedule 1 thereto and the Borrower Parent in respect of *inter alia* the Aircraft and the Intermediate Lessor Shares.

"**Aircraft Purchase Agreement Property**" means all of the right, title and interest (present and future, actual and contingent) of the Borrower in, to and under any

representations, warranties and indemnities given to it by the Seller under the Aircraft Purchase Agreement and the Bill of Sale, such rights excluding, for the avoidance of doubt, the right of the Borrower to purchase and take title to the Aircraft and the Intermediate Lessor Shares under the Aircraft Purchase Agreement and the Bill of Sale.

"**Airframe**" means the airframe as more particularly described in the Lease Agreement.

"**Airframe Manufacturer**" means Airbus S.A.S.

"**Airframe Warranties Agreement**" means the airframe warranties agreement in respect of the Aircraft dated 28 December 2016 executed by the Airframe Manufacturer.

"**Anti-Bribery Law**" means the U.S. Foreign Corrupt Practices Act of 1977, the United Kingdom Bribery Act 2010 and any equivalent or similar law enacted in any European Union member state, Singapore or Japan, in each case as amended from time to time, and any applicable law of similar purpose and scope from time to time notified by the Security Agent to the Borrower.

"**Anti-Social Conduct**" means:

(a)    a demand and conduct with force and arms;

(b)    an unreasonable demand and conduct having no legal cause;

(c)    threatening or committing violent behaviour relating to its business transactions;

(d)    an action to defame the reputation or interfere with the business of any Finance Party by spreading rumour, using fraudulent means or resorting to force; or

(e)    other actions similar or analogous to any of the foregoing in any jurisdiction.

"**Anti-Social Forces**" means:

(a)    an organised crime group (*boryokudan*) (as defined in the law relating to Prevention of Unjustifiable Acts by Organized Crime Group Members of Japan (Law No. 77 of 1991, as amended);

(b)    a member of an organised crime group (*boryokudan in*);

(c)    a person who used to be a member of an organised crime group but has only ceased to be a member of an organised crime group for a period of less than 5 years;

(d)    a quasi-member of an organised crime group (*bouryokudan jun-kosei-in*) including individuals who are not members of an organised crime group and who may (x) imply its influence to engage in violent and unlawful activity, or (y) co-operate in the maintenance and operation of an organised crime group;

(e)     a related or associated company of an organised crime group (*bouryokudan kankei kigyo*);

(f)     a corporate racketeer (*sokaiya*) or blackmailer advocating social cause (*shakaiundo tou hyoubou goro*) or a special intelligence organised crime group; or

(g)     a member of any other criminal force similar or analogous to any of the foregoing in any jurisdiction.

"**Anti-Social Relationship**" means in relation to a person:

(a)     an Anti-Social Forces controls its management;

(b)     an Anti-Social Forces is substantively involved in its management;

(c)     it has entered into arrangements with an Anti-Social Forces for the purpose of, or which have the effect of, unfairly benefiting itself or a third party or prejudicing a third party;

(d)     it is involved in the provision of funds or other benefits to an Anti-Social Forces; or

(e)     any of its directors or any other person who is substantively involved in its management has a socially objectionable relationship with an Anti-Social Forces.

"**APU**" has the meaning given to such term in the Lease Agreement.

"**Authorisations**" means each and every approval, waiver, authorisation, consent, licence, certificate or order of, or registration with, or requirement for the giving of prior notice to, or the taking of any action in respect of, the Aviation Authority or any other Government Entity having jurisdiction over any Obligor, the Lessee, the Intermediate Lessor, any Finance Party or the operation of the Aircraft.

"**Available Facility**" means in respect of a Facility at any time, the amount of the Total Commitments in respect of such Facility at such time less the aggregate amount of the Senior Loan or the Junior Loan, as the case may be, advanced under the relevant Facility Agreement at such time.

"**Aviation Authority**" means the civil aviation authority or any Government Entity which under the laws of the State of Registration from time to time has control over civil aviation or the registration, airworthiness or operation of Aircraft in the State of Registration.

"**AWG**" has the meaning given to such term in Clause 25 (*Benefit of Sanctions Restrictions*).

"**AWV**" has the meaning given to such term in Clause 25 (*Benefit of Sanctions Restrictions*).

"**Bail-In Action**" means the exercise of any Write-down and Conversion Powers.

"**Bail-In Legislation**" means, in relation to an EEA Member Country which has implemented, or which at any time implements, Article 55 of Directive 2014/59/EU

establishing a framework for the recovery and resolution of credit institutions and investment firms, the relevant implementing law or regulation as described in the EU Bail-In Legislation Schedule from time to time.

"**Balloon Amount**" means thirteen million, six hundred thousand Dollars $13,600,000.

"**Basel III**" means:

(a)     the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision in December 2010, each as amended, supplemented or restated;

(b)     the rules for global systemically important banks contained in "Global systemically important banks: assessment methodology and the additional loss absorbency requirement – Rules text" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated; and

(c)     any further guidance or standards published by the Basel Committee on Banking Supervision relating to "Basel III".

"**Bill of Sale**" means the bill of sale in respect of the Aircraft executed by the Seller pursuant to the Aircraft Purchase Agreement in respect of the Aircraft (such Bill of Sale to be in a form reasonably acceptable to the Security Agent).

"**Borrower**" means JPA NO. 111 Co., Ltd.

"**Borrower Account**" means the following account of the Borrower:

| | |
|---|---|
| Correspondent Bank Name: | JP Morgan Chase Bank, New-York |
| ABA: | 021000021 |
| SWIFT Code: | CHASUS33XXX |
| Beneficiary Bank: | Credit Agricole CIB, Paris |
| Beneficiary Bank Account Number: | 786419036 |
| Beneficiary Bank SWIFT Code: | BSUIFRPPXXX |
| Beneficiary Account Number: | 00259961455 |
| Beneficiary: | JPA 111 Rent Account |

"**Borrower Insurance Property**" means all of the right, title and interest (present and future, actual and contingent) of the Borrower in and to the Insurances (excluding third party liability insurance and including any Insurance Proceeds) provided that, for the avoidance of doubt, nothing in any Security Document shall constitute an assignment of the policy of insurance.

"**Borrower Parent**" means JP Lease Products & Services Co., Ltd.

"**Borrower Security Assignment**" means the English law deed of security agreement in respect of the Aircraft and the Assigned Property (as defined therein) relating thereto.

"**Break Costs**" means, in respect of a Loan or an Unpaid Sum, the amount (if any) by which:

(a)     the interest (less the Margin) which a Lender should have received for the period from the date of receipt of all or any part of its participation in that Loan or Unpaid Sum to the last day of the current Interest Period in respect of such Loan or Unpaid Sum, had such Loan or Unpaid Sum received been paid on the last day of that Interest Period;

exceeds:

(b)     the amount which that Lender would be able to obtain by placing an amount equal to that Loan or Unpaid Sum received by it on deposit with a leading bank in the Relevant Interbank Market for a period starting on the Business Day following receipt or recovery and ending on the last day of the current Interest Period.

"**Break Gains**" means, in respect of a Loan or an Unpaid Sum, the amount (if any) by which:

(a)     the amount which a Lender obtains by placing an amount equal to the principal amount of its participation in that Loan or Unpaid Sum received by it otherwise than on the day due for payment on deposit with a leading bank in the Relevant Interbank Market for a period starting on the Business Day following receipt or recovery and ending on the last day of the current Interest Period;

exceeds:

(b)     the interest (less the Margin) which that Lender should have received for the period from the date of receipt of all or any part of its participation in that Loan or Unpaid Sum to the last day of the current Interest Period in respect of that Loan or Unpaid Sum, had the Loan or Unpaid Sum received been paid on the last day of that Interest Period.

"**Business Day**" means:

(a)     for the purpose of any payment pursuant to Transaction Documents a day (other than a Saturday or Sunday), on which banks are open for the transaction of domestic and foreign exchange business in Paris, London and New York;

(b)     for the purpose of submission of a Utilisation Request and of determining a Utilisation Date, a day (other than a Saturday or Sunday), on which banks are open for the transaction of domestic and foreign exchange business in Paris, London, Tokyo, Vietnam, Seoul and New York;

(c)     for the purpose of determining LIBOR, the Fixed Rate and determining any other rate of interest, a LIBOR Business Day; and

(d)     for any other purpose, a day (other than a Saturday, Sunday or holiday scheduled by law) on which banks are open for business in Dublin and Tokyo.

"**Cape Town Convention**" means the Convention on International Interests in Mobile Equipment and the Protocol thereto on Matters Specific to Aircraft Equipment signed at Cape Town on 16 November 2001 (using its English language version).

"**Change in Law**" means, in each case after the date of this Agreement, any implementation, introduction, abolition, withdrawal or variation of any applicable law, regulation, published practice or concession or official directive, ruling, request, notice, guideline, statement of policy or practice statement by any central bank, Tax, fiscal, monetary, governmental, local, revenue, international, national, supranational or other competent authority or agency (including, without limitation, any Government Entity) (whether or not having the force of law but in respect of which compliance by banks or other persons in the relevant jurisdiction is generally customary) or any change in any interpretation, or the introduction or making of any new or further interpretation, or any new or different interpretation by any court, tribunal, governmental, local, revenue, international, national, supranational, Tax, fiscal, monetary or other competent authority (including, without limitation, any Government Entity) of any law or compliance with any new or different request or direction (including any request or requirement made or imposed after the date of this Agreement relating to the maintenance of capital) (in either case whether or not having the force of law but in respect of which compliance by banks or other persons in the relevant jurisdiction is generally customary) from any central bank, Tax, fiscal, governmental, local, revenue, international, national, supranational, monetary or other authority (including, without limitation, any Government Entity).

"**Closing Date**" means the date on which the Senior Loan is advanced to the Borrower in accordance with the terms of the Senior Facility Agreement.

"**Code**" means the US Internal Revenue Code of 1986.

"**Collateral**" means all of the property, rights, title, benefits, interests, assets, property, accounts and proceeds which are subject, or expressed or intended to be subject, to the Security Interests created, or expressed or intended to be created, by any Obligor pursuant to the Security Documents provided however that all amounts distributed by the Security Agent to the Borrower pursuant to Clause 8 of the Proceeds Agreement shall cease to be Collateral at the time of such distribution and provided further that no amount of consumption tax refund or return shall constitute Collateral.

"**Collateral Rights**" means all of the rights, powers and remedies of any Finance Party provided by any Security Document or by law in relation to the Collateral.

"**Commitment**" means either or both (as the context requires) of:

(a)      the Senior Commitment; and

(b)      the Junior Commitment,

to the extent not cancelled, reduced or transferred by it under the relevant Facility Agreement.

"**Commitment Termination Date**" means 31 December 2018, or such later date as the Senior Agent (acting on the instructions of all the Senior Lenders), the Junior Agent

(acting on the instructions of all the Junior Lenders) and the Borrower may agree in writing.

"**Default**" means a Head Lease Default, a Lease Default and/or a Loan Default, as the context shall require.

"**Delegate**" means any delegate, agent, attorney or co-agent appointed by the Security Agent pursuant to any Transaction Document.

"**EEA Member Country**" means any member state of the European Union, Iceland, Liechtenstein and Norway.

"**Enforcement Action**" means:

(a)     the taking of any steps to enforce or require the enforcement of any of the Collateral;

(b)     the making of any demand against any Obligor in relation to any indemnity or other assurance against loss in respect any of the Secured Obligations;

(c)     the exercise of any right of set-off against any Obligor in respect of any of the Secured Obligations;

(d)     subject always to clause 6 (*Limitation on Recourse*) of the Senior Facility Agreement and the Junior Facility Agreement, as applicable, the suing for, commencing or joining of any legal or arbitration proceedings against any Obligor to recover or in respect of any of the Secured Obligations;

(e)     the entering into of any composition, assignment or arrangement with any Obligor; or

(f)     subject always to clause 6 (*Limitation on Recourse*) of the Senior Facility Agreement and the Junior Facility Agreement, as applicable, the petitioning, applying or voting for, or the taking of any steps (including the appointment of any liquidator, receiver, administrator or similar officer) in relation to, the winding up, examinership, dissolution, administration or reorganisation of any Obligor or any suspension of payments or moratorium of any indebtedness of any Obligor, or any analogous procedure or step in any jurisdiction.

"**Enforcement Event**" means either:

(a)     an Acceleration Event specified in sub-clause 8.5.1 of the Senior Facility Agreement or the Junior Facility Agreement, as applicable, occurs; or

(b)     a Loan Event of Default has occurred and is continuing.

"**Engine**" has the meaning given to such term in the Lease Agreement.

"**Engine Manufacturer**" means Rolls Royce plc.

"**Engine Warranties Agreement**" means the replacement engine warranty data form to be entered into in respect of the Aircraft between the Engine Manufacturer, the Lessee, the Intermediate Lessor and the Security Trustee.

"**EU Bail-In Legislation Schedule**" means the document described as such and published by the Loan Market Association (or any successor person) from time to time.

"**Event of Default**" means a Head Lease Event of Default, a Lease Event of Default and/or a Loan Event of Default, as the context shall require.

"**Event of Loss**", with respect to the Airframe, has the meaning given to the term "**Total Loss**" in the Lease Agreement and with respect to an Engine, has the meaning given to the term "**Engine Loss**" in the Lease Agreement.

"**Event of Loss Proceeds**" means any and all proceeds, payments and recoveries (including any Insurance proceeds) paid or payable in respect of or on compensation for an Event of Loss.

"**Excepted Payments**" means (i) all public or third party liability insurance and any proceeds thereof payable as a result of claims paid for the benefit of or losses suffered by any Obligor or its officers, directors, Investors, agents, employees and affiliates, (ii) any indemnity or other amount payable in favour of and for the benefit of any Obligor (and not in support of or otherwise relating to any payment obligation of the Borrower under the Senior Facility Agreement or the Junior Facility Agreement) pursuant to any indemnity provision contained in any Transaction Document; (iii) the rights of any Obligor to seek specific performance of payment of any of the foregoing amounts; (iv) all proceeds of and claims for damages in relation to the foregoing and (v) any consumption tax refund or return received by any Obligor.

"**Exemption Certificate**" means a certificate with respect to withholding tax for foreign corporations or non-residents of Japan issued in accordance with paragraph 1 of Article 180 of the Income Tax Law of Japan (Law No. 33 of 1965, as amended) or any amendment thereto or any replacement certificate issued in lieu thereof by the relevant tax authorities in Japan.

"**Existing Lender**" has the meaning given to such term in clause 21.1 (*Assignments and transfers by the Senior Lenders*) of the Senior Facility Agreement or in clause 21.1 (*Assignments and transfers by the Junior Lenders*) of the Junior Facility Agreement, as applicable.

"**Expenses**" means any or all, as the context requires, of:

(a)     the costs and expenses referred to in clause 16 (*Costs and Expenses*) of the Senior Facility Agreement;

(b)     the costs and expenses referred to in clause 16 (*Costs and Expenses*) of the Junior Facility Agreement; and

(c)     in relation to the Security Documents, the costs and expenses referred to therein.

"**Expiry Date**" means the last date listed in column (2) of the Repayment Schedule.

**"Facility"** means either or both, as the context requires, of:

(a)     the term loan facility made available under the Senior Facility Agreement as described in clause 2.1 (*The Facility*) of the Senior Facility Agreement; and/or

(b)     the term loan facility made available under the Junior Facility Agreement as described in clause 2.1 (*The Facility*) of the Junior Facility Agreement.

**"Facility Agreement"** means either or both, as the context requires, of:

(a)     the Senior Facility Agreement; and/or

(b)     the Junior Facility Agreement.

**"Facility Office"** means:

(a)     the office or offices notified by a Senior Lender to the Senior Agent in writing on or before the date it becomes a Senior Lender (or, following that date, by not less than five (5) Business Days' written notice) as the office or offices through which it will perform its obligations under the Senior Facility Agreement; or

(b)     the office or offices notified by a Junior Lender to the Junior Agent in writing on or before the date it becomes a Junior Lender (or, following that date, by not less than five (5) Business Days' written notice) as the office or offices through which it will perform its obligations under the Junior Facility Agreement.

**"FATCA"** means:

(a)     sections 1471 to 1474 of the Code or any associated regulations;

(b)     any treaty, law or regulation of any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of any law or regulation referred to in paragraph (a) above; or

(c)     any agreement pursuant to the implementation of any treaty, law or regulation referred to in paragraphs (a) or (b) above with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction.

**"FATCA Application Date"** means:

(a)     in relation to a "withholdable payment" described in section 1473(1)(A)(i) of the Code (which relates to payments of interest and certain other payments from sources within the US), 1 July 2014;

(b)     in relation to a "withholdable payment" described in section 1473(1)(A)(ii) of the Code (which relates to "gross proceeds" from the disposition of property of a type that can produce interest from sources within the US), 1 January 2019; or

(c)     in relation to a "passthru payment" described in section 1471(d)(7) of the Code not falling within paragraphs (a) or (b) above, 1 January 2019,

or, in each case, such other date from which such payment may become subject to a deduction or withholding required by FATCA as a result of any change in FATCA after the date of this Agreement.

"**FATCA Deduction**" means a deduction or withholding from a payment under a Transaction Document required by FATCA.

"**FATCA Exempt Party**" means a Party that is entitled to receive payments free from any FATCA Deduction.

"**Fee Letters**" means any letter between any Finance Party, on the one hand, and the Borrower, on the other hand, which is expressed by the terms thereof to be a "**Fee Letter**" for the purposes of the Transaction Documents.

"**Fees**" means any fees payable pursuant to the Fee Letters.

"**Final Disposition**" means, with respect to the Aircraft, either (a) the completion of a sale by the Borrower (or any nominee of the Borrower) or the Security Agent (or any Receiver), against payment in full in cash, of all its right, title and interest in and to the Aircraft or (b) the entering into by the Borrower (or any nominee of the Borrower) or the Security Agent (or any Receiver) of any finance lease (or other arrangement) in respect of the Aircraft pursuant to which, upon payment in full of the amounts provided for therein by the lessee or bailee, the Borrower (or the nominee of the Borrower) or the Security Agent (or any Receiver) shall be obliged to transfer title to the Aircraft to such lessee or bailee (but excluding for the avoidance of doubt any arrangement whereby any lessor has an option to transfer title to such Aircraft but has no obligation to do so).

"**Final Disposition Proceeds**" means the aggregate amount of all consideration received by or on behalf of the Borrower (or any nominee of the Borrower), the Intermediate Lessor or the Security Agent (or any Receiver) as proceeds of any Final Disposition of the Aircraft, including without limitation:

(a)     the amount of any cash received in respect of any Final Disposition of the Aircraft;

(b)     the amount of any proceeds as and when received of any Final Disposition under any finance lease of the Aircraft;

(c)     the amount of any advance payment, deposit or analogous payment paid by a person entering into an arrangement for any Final Disposition of the Aircraft under a contract of offer to purchase or otherwise acquire the Aircraft which has been withdrawn, terminated or cancelled or has lapsed, to the extent that the Borrower (or any nominee of the Borrower), the Intermediate Lessor or the Security Agent is entitled to and does retain any such amount free from any liability to any person to refund the amount thereof or to account to any person in respect thereof; or

(d)     to the extent the same do not constitute Requisition Proceeds, the amount of any damages, compensation or other monetary entitlement which the Borrower or the Intermediate Lessor may at any time receive under any law by reason of the confiscation, conversion, theft or other dispossession of its rights, title and interest in and to the Aircraft.

"**Final Disposition Proceeds Property**" means all of the right, title and interest (present and future, actual and contingent) of the Borrower in and to any Final Disposition Proceeds.

"**Final Repayment Date**" means the last date listed in Schedule 4 (*Repayment Schedule*) of the Senior Facility Agreement.

"**Finance Parties**" means, together, the Lenders, the Security Agent, the Senior Agent, the Junior Agent, the Hedging Counterparty and the Account Bank.

"**Fixed Rate**" means the fixed rate of interest agreed pursuit to clause 9.4 (*Establishment of Fixed Rate*) of the Junior Facility Agreement.

"**Fixed Rate Break Costs**" means, in respect of a Junior Lender, an amount equal to the amount (if any) determined by such Junior Lender which would indemnify such Junior Lender against all Losses (including any Losses incurred as a result of such Junior Lender modifying, varying, amending, extending or terminating all or any part of its fixed rate swap or other hedging arrangements (internal or external) entered into in connection with the provision of the Fixed Rate and entering into any replacement fixed rate swap or other hedging arrangement (internal or external) determined by such Junior Lender as being necessary or appropriate **provided that** such amount will be no greater than an amount equal to the amount which would be the Early Termination Amount (an "**Early Termination Amount**") determined under (and as defined in) the ISDA 2002 Master Agreement (the "**ISDA Agreement**") which would be due from the Junior Lender had the fixed rate swap or other hedging transaction(s) entered into or to be entered into by it in connection with the provision of the Fixed Rate (the "**Relevant Swap**") been entered into by such Junior Lender with a third party counterparty on the basis of the ISDA Agreement and as if such Junior Lender, were the Determining Party (as defined in the ISDA Agreement and notwithstanding that such Junior Lender may be the defaulting party under the Relevant Swap) and the Terminated Transaction (as defined in the ISDA Agreement) were an interest rate swap transaction beginning on the Utilisation Date in respect of the Junior Loan and ending on the date on which the Junior Loan is fully repaid pursuant to the Junior Facility Agreement.

"**Fixed Rate Break Gains**" means, in respect of a Junior Lender, (a) an amount agreed between such Junior Lender and the Borrower or, failing such agreement, (b) an amount equal to the amount (if any) determined by such Junior Lender as its net gains (including any gains incurred as a result of such Junior Lender modifying, varying, amending, extending or terminating all or any part of its fixed rate swap or other hedging arrangements (internal or external) entered into in connection with the provision of the Fixed Rate and entering into any replacement fixed rate swap or other hedging arrangement (internal or external) determined by such Junior Lender as being necessary or appropriate **provided that** such amount will be no greater than an amount equal to the amount which would be the Early Termination Amount determined under (and as defined in) the ISDA Agreement which would be due to such Junior Lender had

the fixed rate swap or other hedging transaction(s) entered into or to be entered into by it in connection with the provision of the Fixed Rate been entered into by such junior Lender with a third party counterparty on the basis of the ISDA Agreement and as if such Junior Lender, were the Determining Party (as defined in the ISDA Agreement and notwithstanding that such Junior Lender may be the defaulting party under the Relevant Swap) and the Terminated Transaction (as defined in the ISDA Agreement) were an interest rate swap transaction beginning on the Utilisation Date in respect of the Junior Loan and ending on the date on which the Junior Loan is fully repaid pursuant to the Junior Facility Agreement.

"**Floating Rate**" means the sum of (i) LIBOR and (ii) the Margin.

"**Forecast Maximum Debt Service**" means, at any time, the amount which the Senior Agent determines, acting reasonably, would be the aggregate of all amounts payable by the Borrower pursuant to the Senior Facility Agreement and the Junior Facility Agreement in the event that the facilities under each such Facility Agreement were to be fully drawn, having regard to the interest rates prevailing at such time.

"**Funding Indemnity Letter**" means the funding indemnity letter to be entered into by the Borrower Parent and addressed to the Senior Agent, the Junior Agent, the Lenders and the Hedging Counterparty on or before the issuance of the Utilisation Request.

"**Government Entity**" means and includes (a) any national government, political sub-division thereof, or local jurisdiction therein, (b) any board, commission, department, division, organ, instrumentality, court or agency of any entity referred to in (a) above, however constituted, and (c) any association, organisation or institution (international or otherwise) of which any entity mentioned in (a) or (b) above is a member or to whose jurisdiction any thereof is subject or in whose activities any thereof is a participant.

"**Head Lease Agreement**" means the aircraft head lease agreement entered into, or to be entered into, as the context may require between the Borrower as head lessor and the Intermediate Lessor as lessee in respect of the Aircraft.

"**Head Lease Agreement Property**" means all of the right, title and interest, present and future, of the Borrower under the Head Lease Agreement, and the Acceptance Certificate (as defined in the Head Lease Agreement) including, without limitation, all of its right, title and interest in and to (a) any amounts payable under the Head Lease Agreement, (b) claims of the Borrower for damages arising out of a breach of or default under the Head Lease Agreement and the Acceptance Certificate (as defined in the Head Lease Agreement), and (c) all the rights of the Borrower to compel performance and otherwise exercise all rights and remedies under the Head Lease Agreement and the Acceptance Certificate (as defined in the Head Lease Agreement), pursuant thereto or in connection therewith including, without limitation, all rights to give and receive notices, reports, requests and consents, to make demands, to exercise discretion and to exercise all options and elections under the Head Lease Agreement and the Acceptance Certificate (as defined in the Head Lease Agreement), pursuant thereto or in connection therewith, in each case other than the Excepted Payments and rights, title, interest and claims in respect thereof. For the avoidance of any doubt, the Head Lease Agreement Property shall not include any policies of insurance (or any proceeds thereunder) in respect of aircraft third party, property damage (other than to the Aircraft), passenger,

baggage, cargo and mail and airline general third party liability, including war liability and products liability.

"**Head Lease Default**" means a Head Lease Event of Default or any event or circumstance which would (with the expiry of a grace period, the giving of notice or the making of a determination) be a Head Lease Event of Default.

"**Head Lease Event of Default**" has the meaning given to the term "Event of Default" in the Head Lease Agreement.

"**Head Lease Relevant Event**" means, in respect of the Aircraft, any Head Lease Default or Head Lease Event of Default.

"**Hedge Break Amount**" means, with respect to any termination or partial termination of a Transaction (whether actual or deemed) and as of any date of determination thereof, an amount (calculated in relation to the Hedging Agreement then in effect as is or would be payable pursuant to Section 6(e) of the Hedging Agreement) in respect of such termination or partial termination of such Transaction only, as if the Borrower was the Affected Party (as defined in the Hedging Agreement).

"**Hedging Agreement**" means together:

(a)     the ISDA Master Agreement entered into or to be entered into between the Borrower and the Hedging Counterparty in connection with this Agreement together with each supplement or annex relating thereto;

(b)     the ISDA schedule to such ISDA Master Agreement; and

(c)     any confirmation entered into in connection therewith,

in each case in the form agreed by the Borrower and the Hedging Counterparty.

"**Hedging Liability**" means the liabilities owed by the Borrower to the Hedging Counterparties under or in connection with the Hedging Agreement.

"**IDERA**" means an irrevocable power of attorney (in the form prescribed by the Aviation Authority) executed or to be executed by the Lessee and countersigned for acknowledgement by the Aviation Authority.

"**Increased Costs**" means:

(a)     a reduction in the rate of return from the Senior Loan or the Junior Loan, as applicable, or on a Finance Party's (or its Affiliate's) overall capital;

(b)     an additional or increased cost which is not otherwise contemplated or provided for under the Transaction Documents and which does not constitute ordinary and usual overhead expenses of the relevant Finance Party; or

(c)     a reduction of any amount due and payable under any Transaction Document,

which is incurred or suffered by a Finance Party or any of its Affiliates to the extent that it is attributable to that Finance Party having entered into its Commitment or funding or performing its obligations under any Transaction Document.

"**Indemnitee**" means each of the Senior Agent, the Junior Agent, the Security Agent, the Hedging Counterparty and the Lenders, each of their respective successors, permitted assigns, permitted transferees, and each of their respective officers, directors, servants, agents and employees.

"**Instructing Party**" means:

(a)     at any time prior to the Senior Secured Obligations Discharge Date, the Majority Senior Secured Parties; and

(b)     at any time after the Senior Secured Obligations Discharge Date but prior to the Junior Secured Obligations Discharge Date, the Majority Junior Lenders.

"**Insurance Proceeds**" means any and all amounts payable in consequence of a claim under any of the Insurances, other than amounts payable in consequence of a claim under the liability insurances.

"**Insurances**" means, any and all contracts or policies of insurance (including reinsurance) to be maintained under the Lease Agreement or the Head Lease Agreement in relation to the Aircraft.

"**Insurer**" means any insurer (or reinsurer) in respect of any of the Insurances.

"**Interest Period**" means:

(a)     in relation to the Senior Loan, each period determined in accordance with clause 10.1 (*Length of Interest Periods*) of the Senior Facility Agreement;

(b)     in relation to the Junior Loan, each period determined in accordance with clause 10.1 (*Length of Interest Periods*) of the Junior Facility Agreement; and

(c)     in relation to an Unpaid Sum, each period determined in accordance with clause 9.4 (*Default Interest*) of the Senior Facility Agreement or the Junior Facility Agreement, as applicable.

"**Interest Rate Exchange**" means the interest rate hedging arrangement entered into pursuant to the Hedging Agreement, the provisions of which provide for the payment on each Repayment Date of (a) LIBOR plus the Margin, calculated on an actual over 360-day basis, from and including each relevant Repayment Date to but excluding the following Repayment Date, in each case, in respect of a notional amount equal to the principal amount of the Facility scheduled to be outstanding on each such Repayment Date (such amount to be paid by the Hedging Counterparty) and (b) the swap rate, calculated on an actual over 360-day basis, from and including each relevant Repayment Date to but excluding the following Repayment Date, in each case in respect of a notional amount equal to the principal amount of the Facility scheduled to be outstanding on each such Repayment Date (such amount to be paid by the Borrower); and, as the context may require, any replacement hedging agreement between the

Borrower and the Hedging Counterparty pursuant to any replacement Hedging Agreement between the Borrower and the Hedging Counterparty.

"**Intermediate Lessor**" means DAE Leasing (Ireland) 12 Limited, a company incorporated under the laws of Ireland with company number 592187 and whose registered office is at 29 Main Street Cashel Co. Tipperary E25 RF76 Ireland.

"**Intermediate Lessor Account**" means the following account of the Intermediate Lessor:

| | |
|---|---|
| Correspondent Bank Name: | JP Morgan Chase Bank, New-York |
| ABA: | 021000021 |
| SWIFT Code: | CHASUS33XXX |
| Beneficiary Bank: | Credit Agricole CIB, Paris |
| Beneficiary Bank Account Number: | 786419036 |
| Beneficiary Bank SWIFT Code: | BSUIFRPPXXX |
| Beneficiary Account Number: | 00259961552 |
| Beneficiary: | Intermediate Lessor MSN67 Rent |

"**Intermediate Lessor Account Pledge**" means the French law account pledge in respect of the Intermediate Lessor Account.

"**Intermediate Lessor Assignment**" means the security assignment entered into or to be entered into, as the context may require, between the Intermediate Lessor as assignor and the Borrower as assignee in respect of the Aircraft.

"**Intermediate Lessor Assignment Property**" means all of the right, title, benefit, claims and interests (present and future, actual and contingent) of the Borrower in, to, under and in respect of the Intermediate Lessor Assignment.

"**Intermediate Lessor Insurance Property**" means all of the right, title and interest (present and future, actual and contingent) of the Intermediate Lessor in and to the Insurances (excluding third party liability insurance and including any Insurance Proceeds) provided that, for the avoidance of doubt, nothing in any Security Document shall constitute an assignment of the policy of insurance.

"**Intermediate Lessor Parent**" means JLPS Holding Ireland Limited.

"**Intermediate Lessor Parent Letter**" means the parent support letter entered into, or to be entered into, as the context may require, between the Borrower Parent and the Security Agent in respect of the Intermediate Lessor's obligations under the Transaction Documents.

"**Intermediate Lessor Security Power of Attorney**" means the irrevocable security power of attorney executed or, as the context may require, to be executed by the Intermediate Lessor in favour of the Security Agent.

"**Intermediate Lessor Share Pledge**" means the deed of pledge of registered shares over the Intermediate Lessor Shares entered into or to be entered into, as the case may be, between the Intermediate Lessor Parent, the Intermediate Lessor and the Security Agent in respect of the Intermediate Lessor Shares.

"**Intermediate Lessor Shares**" means all of the outstanding shares in the capital of the Intermediate Lessor.

"**International Interest**" has the meaning ascribed to such term under the Cape Town Convention.

"**International Registry**" means the registry established pursuant to the Cape Town Convention.

"**Interpolated Screen Rate**" means the rate (rounded upwards to four (4) decimal places) which results from interpolating on a linear basis between:

(a)     the applicable Screen Rate for the longest period (for which that Screen Rate is available) which is less than the Interest Period for the Loan; and

(b)     the applicable Screen Rate for the shortest period (for which that Screen Rate is available) which exceeds the Interest Period of the Loan.

each for dollars and each of which is as at 11:00 a.m. London time on the Quotation Date.

"**Investor**" means any person entering into a Tokumei Kumiai Agreement with, and making a cash contribution to, the Borrower for the purposes of the Transaction Documents and the transactions contemplated thereby, together with any assignee from such person.

"**Junior Agent**" means Crédit Agricole Corporate and Investment Bank or its successor junior agent appointed in accordance with paragraph 3.10 (*Resignation of the Junior Agent*) of Schedule 2 (*The Finance Parties*).

"**Junior Buy-Out Notice**" has the meaning given to that term in Clause 14.8.1 of this Agreement.

"**Junior Commitment**" means:

(a)     in relation to an Original Junior Lender, the amount set out opposite its name under the heading "**Total Commitment**" in schedule 1 (*The Original Junior Lenders*) of the Junior Facility Agreement and the amount of any other Junior Commitment transferred to such Original Junior Lender under the Junior Facility Agreement; and

(b)     in relation to any other Junior Lender, the amount of any Junior Commitment transferred to it under the Junior Facility Agreement,

to the extent not cancelled, reduced or transferred by it under the Junior Facility Agreement.

"**Junior Facility Agreement**" means the facility agreement entered into or to be entered into, as the context may require, between *inter alia* the Junior Lenders, the Junior Agent, the Security Agent and the Borrower in respect of the Aircraft.

"**Junior Finance Party**" means any or all as the context requires, of the Junior Lenders, the Junior Agent and the Security Agent.

"**Junior Lender**" means, in relation to the Junior Facility Agreement:

(a)     any Original Junior Lender; and

(b)     any bank, financial institution, trust, fund or other entity which has become a Party in accordance with clause 21 (*Changes to the Junior Lenders*) of the Junior Facility Agreement,

which in each case has not ceased to be a Party to the Junior Facility Agreement in accordance with the terms of the Junior Facility Agreement.

"**Junior Loan**" means the loan made or to be made under the Junior Facility Agreement or the principal amount outstanding for the time being of that loan.

"**Junior Loan Event of Default**" means any event or circumstance specified as such in clause 20 (*Junior Loan Events of Default*) of the Junior Facility Agreement.

"**Junior Secured Obligations**" means all of the Secured Obligations other than those owing to the Senior Finance Parties.

"**Junior Secured Obligations Discharge Date**" means the date upon which the full, final and indefeasible payment and discharge in full of all amounts of the Junior Secured Obligations then due and payable occurs.

"**Lease Agreement**" means the aircraft lease agreement dated 4 December 2016 in respect of the Aircraft between the Intermediate Lessor as lessor and the Lessee as lessee.

"**Lease Agreement Property**" means all of the right, title and interest, present and future, of the Intermediate Lessor under the Lease Agreement and the other Relevant Documents including, without limitation, all of its right, title and interest in and to (a) the Rental, any Return Compensation, any Insurance Proceeds thereunder, any maintenance reserves, any compensation payments and agreed value and any Security Deposit (b) claims of the Intermediate Lessor for damages arising out of a breach of or default under the Lease Agreement and the other Relevant Documents, and (c) all the rights of the Intermediate Lessor to compel performance and otherwise exercise all rights and remedies under the Lease Agreement and the other Relevant Documents, pursuant thereto or in connection therewith including, without limitation, all rights to give and receive notices, reports, requests and consents, to make demands, to exercise discretion and to exercise all options and elections under the Lease Agreement and the other Relevant Documents, pursuant thereto or in connection therewith, in each case other than the Excepted Payments and rights, title, interest and claims in respect thereof. For the avoidance of any doubt, the Lease Agreement Property shall not include any policies of insurance (or any proceeds thereunder) in respect of aircraft third party, property damage (other than to the Aircraft), passenger, baggage, cargo and mail and airline general third party liability, including war liability and products liability.

"**Lease Default**" means a Lease Event of Default or any event or circumstance which would (with the expiry of a grace period, the giving of notice or the making of a determination) be a Lease Event of Default.

"**Lease Expiry Date**" has the meaning given to the term "Expiry Date" in the Lease Agreement.

"**Lease Event of Default**" has the meaning given to the term "Event of Default" in the Lease Agreement.

"**Lease Management Agreement**" means the Lease Management and Marketing Agreement between the Borrower and the Lease Manager dated on or about the date hereof, in respect of the Aircraft.

"**Lease Manager**" means the Borrower Parent.

"**Lease Relevant Event**" means, in respect of the Aircraft, any Lease Default or Lease Event of Default.

"**Legal Opinions**" means the legal opinions referred to in schedule 2 (*Conditions Precedent*), part II (*Utilisation Specific Conditions Precedent*) of the Senior Facility Agreement or the Junior Facility Agreement.

"**Lender**" means any or all, as the context requires, of:

(a)     the Senior Lenders; and

(b)     the Junior Lenders,

which in each case has not ceased to be a Party to the Senior Facility Agreement or the Junior Facility Agreement, as applicable, in accordance with the terms thereof.

"**Lessee**" means Vietnam Airlines JSC.

"**Lessee Deregistration Power of Attorney**" means the deregistration power of attorney and/or, as applicable, certified designee confirmation letter executed or, as the context may require, to be executed by the Lessee in favour of the Intermediate Lessor or the Security Agent, as the case may be.

"**Letter of Credit**" has the meaning given to that term in the Lease Agreement.

"**LIBOR**" means, in relation to the Loan, the higher of zero and the following rate determined as of 11.00 a.m. (London time) on the Quotation Date (or such earlier time as may be agreed between the Borrower and the Senior Agent or the Junior Agent, as applicable) and for a period equivalent (in the Senior Agent's or the Junior Agent's (as applicable) opinion, without the need for instructions) to the Interest Period of the Loan:

(a)     the applicable Screen Rate; or

(b)     if no Screen Rate is available for the currency or period of the Loan and the Interest Period is longer than the minimum period for which a Screen Rate is available, the Interpolated Screen Rate; or;

(c)    if no Screen Rate is available for the currency or period of the Loan and it is not possible to calculate an Interpolated Screen Rate for the Loan, the arithmetic mean of the rates (rounded upwards to four decimal places) as supplied to the Senior Agent or the Junior Agent, as applicable, at its request quoted by the Reference Banks to leading banks in the London interbank market for the offering of deposits in the currency of the Loan.

"**LIBOR Business Day**" means a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London.

"**Loan**" means either or both, as the context requires, of the Senior Loan and the Junior Loan.

"**Loan Default**" means a Loan Event of Default or any event or circumstance which would (with the expiry of a grace period, the giving of any notice or the making of a determination) be a Loan Event of Default.

"**Loan Event of Default**" means either or both, as the context may require, of:

(a)    a Senior Loan Event of Default; and/or

(b)    a Junior Loan Event of Default.

"**Loan Maximum**" means:

(a)    in relation to the Senior Loan, one hundred million dollars ($100,000,000); and

(b)    in relation to the Junior Loan, fifteen million dollars ($15,000,000).

"**Loan Relevant Event**" means any Loan Default or Loan Event of Default.

"**Losses**" means any losses (including Taxes), costs, charges, documented and properly incurred expenses, interest (including default interest), fees (including, without limitation, legal fees and VAT thereon), payments, demands, liabilities, claims, actions, proceedings, penalties, damages, adverse judgments, orders or other sanctions (and "**Loss**" shall be construed accordingly).

"**MAC**" has the meaning given to such term in sub-clause 4.2.5 of the Senior Facility Agreement.

"**Majority Junior Lenders**" means:

(a)    if no Junior Loan is then outstanding, a Junior Lender or Junior Lenders whose Commitments under the Junior Facility Agreement aggregate more than 66.67% of the Total Commitments under the Junior Facility Agreement (or, if the Total Commitments have been reduced to zero, aggregated more than 66.67% of the Total Commitments immediately prior to the reduction); or

(b)    at any other time, a Junior Lender or Junior Lenders whose participations in the Junior Loan then outstanding aggregate more than 66.67% of the aggregate principal amount of the Junior Loan then outstanding.

**"Majority Senior Lenders"** means:

(a)     if no Senior Loan is then outstanding, a Senior Lender or Senior Lenders whose Commitments under the Senior Facility Agreement aggregate more than 66.67% of the Total Commitments under the Senior Facility Agreement (or, if the Total Commitments have been reduced to zero, aggregated more than 66.67% of the Total Commitments immediately prior to the reduction); or

(b)     at any other time, a Senior Lender or Senior Lenders whose participations in the Senior Loan then outstanding aggregate more than 66.67% of the aggregate principal amount of the Senior Loan then outstanding.

**"Majority Senior Secured Parties"** means:

(a)     prior to the occurrence of a Senior Loan Event of Default which is continuing, the Majority Senior Lenders; and

(b)     at any other time, a Senior Lender and/or the Hedging Counterparty that holds more than 50.1% in value of the aggregate amount of the Senior Finance then outstanding.

**"Manuals and Technical Records"** has the meaning given to the term **"Technical Records"** in the Lease Agreement.

**"Margin"** means in respect of the Senior Loan, two point one zero per cent. (2.10%) per annum.

**"Market Disruption Event"** has the meaning given to such term in sub-clause 11.2.2 of the Senior Facility Agreement, or the Junior Facility Agreement, as applicable.

**"Month"** means a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month, except that:

(a)     if the numerically corresponding day is not a Business Day, that period shall end on the preceding Business Day;

(b)     if there is no numerically corresponding day in the calendar month in which that period is to end, that period shall end on the last Business Day in that calendar month.

The above exceptions will only apply to the last Month of any period.

**"Mortgaged Property"** means all of the present and future right, title and interest of the Borrower in and to the Aircraft and any and all Aircraft Proceeds.

**"New Lender"** has the meaning given to such term in clause 21.1 (*Assignments and transfers by the Senior Lenders*) of the Senior Facility Agreement or clause 21.1 (*Assignments and transfers by the Junior Lenders*) of the Junior Facility Agreement, as applicable.

**"New York Mortgage"** means the New York law aircraft mortgage and security agreement over the Aircraft to be granted by the Borrower on the Utilisation Date.

"**Notice of Default**" has the meaning given to such term in Clause 5 (*Notice of Loan Relevant Event*) of the Proceeds Agreement.

"**Obligors**" means, collectively, the Borrower, the Intermediate Lessor, the Intermediate Lessor Parent and the Borrower Parent (each an "**Obligor**").

"**Parent Letter**" means the parent letter entered into, or to be entered into, as the context may require, between the Borrower Parent and the Security Agent in respect of the Borrower's obligations under the Transaction Documents.

"**Parts**" has the meaning given to such term in the Lease Agreement.

"**Party**" means, in the context of any Transaction Document, the persons who are signatories to such Transaction Document (or who have otherwise become party to such Transaction Document by, succession, transfer, assignment, novation or similar in accordance with such Transaction Document).

"**Permitted Security Interest**" means "Permitted Lien" (as defined in the Lease Agreement), excluding any "Lessor's Security" (as defined in the Lease Agreement).

"**Proceeds Agreement**" means the proceeds agreement entered into, or to be entered into, as the context may require, between, amongst others, the Borrower and the Finance Parties.

"**Proceeds Agreement Accession Undertaking**" means an undertaking substantially in the form of Schedule 1 (*Form of Proceeds Agreement Accession Undertaking*) to this Agreement.

"**Protocol**" means the Protocol to the Cape Town Convention on Matters Specific to Aircraft Equipment signed in November 2001, which is sometimes also referred to as the "Aircraft Equipment Protocol".

"**Purchase Price**" means the amount payable by the Borrower pursuant to the Aircraft Purchase Agreement.

"**Qualifying Lender**" means any bank or other financial institution which is regularly engaged in or established for the purpose of making, purchasing or investing in loan, securities or other financial assets and which (a) is a company incorporated in Japan, or (b) is a company incorporated in a jurisdiction other than Japan which holds a current Exemption Certificate, or (c) is entitled by virtue of any treaty, double tax agreement or other similar provision to payments on the basis that no withholding tax would be due or payable in respect of any such payments made to or for the benefit of it under the Senior Facility Agreement or the Junior Facility Agreement, as applicable.

"**Quotation Date**" means, in relation to any period for which an interest rate is to be determined hereunder, two (2) LIBOR Business Days before the first day of such period, or the date on which quotations would ordinarily be given by prime banks in the London Interbank Market for deposits in the currency in relation to which such rate is to be determined for delivery on the first day of that period **provided that**, if, for any period, quotations would ordinarily be given on more than one date, the Quotation Date for that period shall be the last of those dates.

"**Receiver**" means any receiver appointed under the terms of any Security Document.

"**Reference Banks**" means the principal London offices of any three of ICE Benchmark Administration Limited's (or its successor's) reference panel banks for dollars (as published by ICE Benchmark Administration Limited or its successor) or such other banks as may be appointed by the Senior Agent or the Junior Agent, as applicable, in consultation with the Lenders and the Borrower.

"**Relevant Documents**" has the meaning given to that term in the Lease Agreement.

"**Relevant Event**" means any Loan Relevant Event, Head Lease Relevant Event or Lease Relevant Event.

"**Relevant Interbank Market**" means the London interbank market.

"**Remarketing and Recovery Expenses**" means all costs and expenses (including properly incurred legal fees and the fees and costs of any remarketing agent, technical or other advisers which the Security Agent may reasonably deem necessary), Losses, liabilities, obligations or fees incurred or suffered by any of the Finance Parties (or any Delegate or Receiver) in relation to the repossession and remarketing of any Aircraft including without limitation repossessing, remarketing, reconfiguring, repainting, insuring, storing, repairing, overhauling, performing maintenance checks on (including, without limitation, a "C" Check or the next sequential higher level check in accordance with the Airframe Manufacturer's maintenance planning document or an engine performance restoration) any Aircraft, any Airframe and/or any Engine or in relation to putting any Aircraft, any Airframe and/or any Engine into a condition required in relation to any proposed sale or lease thereof; together with interest on all amounts referred to above as calculated by the Senior Agent or the Junior Agent, as applicable, from the date such amounts were incurred to the date of payment of such amounts at the rate specified in clause 9.4 (*Default interest*) of the Senior Facility Agreement or in clause 9.4 (*Default interest*) of the Junior Facility Agreement, as applicable (in either case without double counting).

"**Rental**" has the meaning given to such term in the Lease Agreement.

"**Rental Payment Date**" has the meaning given to that term in the Lease Agreement.

"**Rental Period**" has the meaning given to that term in the Lease Agreement.

"**Repayment Dates**" means:

(a)     in respect of the Senior Loan each of the dates set forth in Schedule 4 (*Repayment Schedule*) of the Senior Facility Agreement; and

(b)     in respect of the Junior Loan each of the dates set forth in Schedule 4 (*Repayment Schedule*) of the Junior Facility Agreement.

"**Replacement Controlling Party Notice**" means the replacement controlling party notice executed on or about the date hereof by the Intermediate Lessor and the Security Trustee in respect of the Airframe Warranties Agreement pursuant to which the Security Trustee will become the "Controlling Party" for the purposes of the Airframe Warranties Agreement.

"**Representatives**" means each of the Senior Agent, the Junior Agent and the Security Agent.

"**Requisition Proceeds**" means any monies or other compensation receivable by the Borrower or the Intermediate Lessor from any Government Entity in relation to the Aircraft, the Airframe or any Engine in the event of its requisition for title, confiscation, restraint, detention, forfeiture or compulsory acquisition or seizure or requisition for hire by or under the order of any such government or public or local authority.

"**Requisition Proceeds Property**" means all of the right, title and interest (present and future, actual and contingent) of the Borrower and the Intermediate Lessor in and to any Requisition Proceeds.

"**Resolution Authority**" means any body which has authority to exercise any Write-down and Conversion Powers.

"**Restricted Lender**" means each Lender that is resident in Germany within the meaning of Section 2, Paragraph 15 of the AWG (and is therefore subject to Section 7 of the AWV);

"**Return Compensation**" has the meaning given to such term in the Lease Agreement.

"**Sanctions Provisions**" means:

(a)     Clauses 11.1.21 (*Applicable Sanctions*) and 11.3.5 (*Applicable Sanctions*) of this Agreement;

(b)     Clauses 17.22 (*Applicable Sanctions*) and 19.5 (*Applicable Sanctions*) of the Senior Facility Agreement; and

(c)     Clauses 17.22 (*Applicable Sanctions*) and 19.5 (*Applicable Sanctions*) of the Junior Facility Agreement.

"**Sanctions Target**" means has the meaning given to such term in clause 17.22 (*Applicable Sanctions*) of the Senior Facility Agreement or the Junior Facility Agreement, as applicable.

"**Scheduled Expiry Date**" means the date falling 143 months after the Delivery Date (as defined in the Lease Agreement).

"**Screen Rate**" means the London interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) for dollars and the relevant period displayed on page LIBOR01 of the Reuters screen (or any replacement Reuters page which displays that rate) as at 11:00 a.m. (London time) on the Quotation Date for such period or on the appropriate page of such other information service which publishes that rate from time to time in place of Reuters. If any such page or service ceases to be available, the Senior Agent or the Junior Agent, as applicable, may specify another page or service displaying the relevant rate after consultation with the Borrower.

"**Secured Obligations**" means any and all moneys, liabilities and obligations (whether actual or contingent, whether now existing or hereafter arising, whether or not for the

payment of money and including, without limitation, any obligation or liability to pay damages) from time to time owing to any of the Finance Parties by any Obligor pursuant to any Transaction Document, notwithstanding that the recourse of the Finance Parties against any person may be limited in recourse.

"**Secured Obligations Discharge Date**" means the date on which the Security Interests constituted by the Security Documents are required to be released, discharged and/or re-assigned pursuant to Clause 7 (*Release of Security*) of the Proceeds Agreement.

"**Secured Parties**" means the Senior Finance Parties and the Junior Finance Parties.

"**Security Agent**" means Crédit Agricole Corporate and Investment Bank or its successor security agent appointed in accordance with paragraph 2.15 (*Resignation of the Security Agent*) of Schedule 2 (*The Finance Parties*).

"**Security Deposit**" has the meaning given to that term in the Lease Agreement.

"**Security Deposit Account**" means the following account of the Intermediate Lessor:

| | |
|---|---|
| Correspondent Bank Name: | JP Morgan Chase Bank, New-York |
| ABA: | 021000021 |
| SWIFT Code: | CHASUS33XXX |
| Beneficiary Bank: | Credit Agricole CIB, Paris |
| Beneficiary Bank Account Number: | 786419036 |
| Beneficiary Bank SWIFT Code: | BSUIFRPPXXX |
| Beneficiary Account Number: | 00259961649 |
| Beneficiary: | Intermediate Lessor MSN67 Deposit |

"**Security Documents**" means (i) the New York Mortgage, the Vietnamese Mortgage, the Account Pledge, the Intermediate Lessor Account Pledge, the Borrower Security Assignment, the Intermediate Lessor Assignment, the Intermediate Lessor Share Pledge, the Security Power of Attorney, the Intermediate Lessor Security Power of Attorney, the Parent Letter, the Intermediate Lessor Parent Letter, the Lessee Deregistration Power of Attorney, the Airframe Warranties Agreement, the Replacement Controlling Party Notice and the Engine Warranties Agreement and (ii) any other document, instrument or agreement which is agreed in writing by the Borrower and the Security Agent to be a "Security Document" and (iii) each and every notice, acknowledgement, certificate or document delivered or required to be delivered under any of the foregoing (and "**Security Document**" means any of them).

"**Security Interest**" means any mortgage, charge, pledge, lien, hypothecation, lease, title retention, assignment, trust arrangement, right of possession or detention or security interest of any kind, howsoever created or arising.

"**Security Period**" means the period commencing on the first Utilisation Date and expiring on the Secured Obligations Discharge Date.

"**Security Power of Attorney**" means the irrevocable security power of attorney executed or, as the context may require, to be executed by the Borrower in favour of the Security Agent.

"**Seller**" means MSN 0067 Leasing Limited.

"**Senior Agent**" means Crédit Agricole Corporate and Investment Bank or its successor senior agent appointed in accordance with paragraph 1.10 (*Resignation of the Senior Agent*) of Schedule 2 (*The Finance Parties*).

"**Senior Commitment**" means:

(a)     in relation to an Original Senior Lender, the amount set out opposite its name under the heading "**Total Commitment**" in schedule 1 (*The Original Senior Lenders*) of the Senior Facility Agreement and the amount of any other Senior Commitment transferred to such Original Senior Lender under the Senior Facility Agreement; and

(b)     in relation to any other Senior Lender, the amount of any Senior Commitment transferred to it under the Senior Facility Agreement,

to the extent not cancelled, reduced or transferred by it under the Senior Facility Agreement.

"**Senior Facility Agreement**" means the facility agreement entered into or to be entered into, as the context may require, between *inter alia* the Senior Lenders, the Senior Agent, the Security Agent and the Borrower in respect of the Aircraft.

"**Senior Finance**" means, at any given time, the aggregate of the Senior Loan and the relevant Swap MTM.

"**Senior Finance Party**" means any or all as the context requires, of the Senior Lenders, the Hedging Counterparty, the Senior Agent and the Security Agent.

"**Senior Lender**" means, in relation to the Senior Facility Agreement:

(a)     any Original Senior Lender; and

(b)     any bank, financial institution, trust, fund or other entity which has become a Party in accordance with clause 21 (*Changes to the Senior Lenders*) of the Senior Facility Agreement,

which in each case has not ceased to be a Party to the Senior Facility Agreement in accordance with the terms of the Senior Facility Agreement.

"**Senior Loan**" means the loan made or to be made under the Senior Facility Agreement or the principal amount outstanding for the time being of that loan.

"**Senior Loan Event of Default**" means any event or circumstance specified as such in clause 20 (*Senior Loan Events of Default*) of the Senior Facility Agreement.

"**Senior Secured Obligations**" means all of the Secured Obligations other than those owing to the Junior Finance Parties.

"**Senior Secured Obligations Discharge Date**" means the date upon which the full, final and indefeasible payment and discharge in full of all amounts of the Senior Secured Obligations then due and payable occurs.

"**Service Agreement**" means the lease management agreement between the Lease Manager and the Servicer dated on or about the date hereof, in respect of the Aircraft.

"**Servicer**" means, subject to Clause 10.2 of the Proceeds Agreement, Stratos Aircraft Management Limited.

"**Specified Time**" means a time determined in accordance with schedule 6 (*Timetables*) of the Senior Facility Agreement or the Junior Facility Agreement, as applicable.

"**State of Registration**" means Vietnam.

"**Subsidiary**" means an entity of which a person has direct or indirect control or owns directly or indirectly more than fifty per cent. (50%) of the voting capital or has a similar right of ownership and control.

"**Swap MTM**" means, in relation to the Hedging Agreement and any date, an amount equal to the swap break amount determined in accordance with the terms of the Hedging Agreement and notified to the Senior Agent as if each interest rate swap entered into pursuant to the Hedging Agreement were terminated in full on that date. If the Swap MTM is a negative number, then unless expressly stated otherwise, the Swap MTM shall be deemed to be zero for the purposes of the relevant Transaction Documents.

"**Swap Termination Amount**" means as of any date in respect of the Hedging Counterparty, the amount which would be payable by the Borrower to the Hedging Counterparty on such date if the Hedging Agreement (or the relevant Transactions thereunder) terminated on such date.

"**Taxes**" shall mean any and all present and future sales, use, personal property, customs, value added, turnover, stamp, interest equalisation, income, profits or gains, gross receipts, or other taxes, levies, imposts, duties, fees or withholdings together with any penalties, fines, surcharges or interest thereon imposed, levied, or assessed by, or otherwise payable to, any Government Entity and "**Tax**" and "**Taxation**" shall be construed accordingly.

"**Tax Deduction**" means a deduction or withholding for or on account of Tax from a payment to be made by the Borrower to the Finance Parties (or any of them) under any Transaction Document, other than a FATCA Deduction.

"**Tax Payment**" means either the increase in a payment made by the Borrower to a Finance Party under clause 13.1 (*Tax gross-up*) of the Senior Facility Agreement or the Junior Facility Agreement, as applicable, or a payment under clause 13.2 (*Tax indemnity*) or clause 13.4 (*Value Added Tax*) of the Senior Facility Agreement or the Junior Facility Agreement, as applicable.

"**Third Parties Act**" means the Contracts (Rights of Third Parties) Act 1999.

"**Tokumei Kumiai Agreement**" means any agreement entered into, or to be entered into, between the Borrower, in its capacity as proprietor and manager of the investment made by any Investor (including, without limitation, all letter or other agreements entered into between the Borrower and any Investor in relating to the relevant Tokumei Kumiai Agreement and the transactions contemplated hereby and executed and

delivered contemporaneously therewith) in connection with the purchase, ownership and leasing of the Aircraft by the Borrower pursuant to the Transaction Documents.

"**Total Commitments**" means the aggregate of the Commitments.

"**Transaction**" has the meaning given to such term in the Hedging Agreement.

"**Transaction Documents**" means (i) the Senior Facility Agreement, the Junior Facility Agreement, the Proceeds Agreement, the Security Documents, each Fee Letter, the Funding Indemnity Letter, the Lease Agreement, the Head Lease Agreement, the Aircraft Purchase Agreement, the Bill of Sale, the Service Agreement, the Hedging Agreement and the Lease Management Agreement and (ii) any other document, instrument or agreement which is agreed in writing by the Borrower and the Senior Agent to be a Transaction Document and "**Transaction Document**" means any of them.

"**Transfer Certificate**" means:

(a)     in respect of the Senior Facility Agreement, a certificate substantially in the form set out in part II (*Form of Transfer Certificate*) of schedule 5 (*Changes to the Senior Lenders*) of the Senior Facility Agreement or any other form agreed between the Senior Agent and the Borrower; and

(b)     in respect of the Junior Facility Agreement, a certificate substantially in the form set out in part II (*Form of Transfer Certificate*) of schedule 5 (*Changes to the Junior Lenders*) of the Junior Facility Agreement or any other form agreed between the Junior Agent and the Borrower.

"**Transfer Date**" means, in relation to a transfer, the later of:

(a)     the proposed Transfer Date specified in the Transfer Certificate; and

(b)     the date on which the Senior Agent or the Junior Agent, as applicable, executes the Transfer Certificate.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York, provided that, if by reason of mandatory provisions of applicable law, any or all of the attachment, perfection or priority of the Security Agent's security interest in the New York Mortgage is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term UCC will mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection of priority and for purposes of definitions related to such provisions.

"**Unpaid Sum**" means any sum due and payable to any Finance Party but unpaid by the Borrower under the Transaction Documents.

"**Utilisation**" means a utilisation of either Facility.

"**Utilisation Date**" means the date of a Utilisation, being the date on which the Senior Loan or the Junior Loan (as applicable) is, or is to be, made.

"**Utilisation Request**" means a utilisation request substantially in the form set out in schedule 3 (*Form of Utilisation Request*) of the Senior Facility Agreement or the Junior Facility Agreement, as applicable.

"**VAT**" means any value added Tax, goods and services Tax or similar Tax.

"**Vietnamese Mortgage**" means the Vietnamese law mortgage over the Aircraft to be granted by the Borrower on the Utilisation Date.

"**Write-down and Conversion Powers**" means:

(a)     in relation to any Bail-In Legislation described in the EU Bail-In Legislation Schedule from time to time, the powers described as such in relation to that Bail-In Legislation in the EU Bail-In Legislation Schedule; and

(b)     in relation to any other applicable Bail-In Legislation:

    (i)     any powers under that Bail-In Legislation to cancel, transfer or dilute shares issued by a person that is a bank or investment firm or other financial institution or affiliate of a bank, investment firm or other financial institution, to cancel, reduce, modify or change the form of a liability of such a person or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers; and

    (ii)     any similar or analogous powers under that Bail-In Legislation.

## PART B - INTERPRETATION

1.      Unless a contrary indication appears any reference to:

1.1     the **"Senior Agent"**, the **"Junior Agent"** the **"Borrower"**, the **"Borrower Parent"**, the **"Intermediate Lessor"**, the **"Lessor"**, the **"Lessee"**, any **"Finance Party"**, any **"Lender"**, any **"Obligor"**, the **"Hedging Counterparty"**, the **"Account Bank"**, any **"Party"** or the **"Security Agent"** shall be construed so as to include its successors in title, permitted assigns and permitted transferees;

1.2     **"assets" includes** present and future properties, revenues and rights of every description;

1.3     **"indebtedness"** includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

1.4     a **"Transaction Document"** or **"Security Document"** or any other agreement or instrument is a reference to that Transaction Document, Security Document or other agreement or instrument as amended, supplemented, novated or otherwise modified from time to time;

1.5     a **"person"** includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust or partnership (whether or not having separate legal personality) of two or more of the foregoing;

1.6     a **"law"** or **"regulation"** includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

1.7     a reference to a day or days is a reference to calendar days, unless otherwise specified;

1.8     a provision of law is a reference to that provision as amended or re-enacted;

1.9     a time of day is a reference to London time; and

1.10    a **"class of creditors"** is a reference to a generic class of creditor by type (e.g. secured, unsecured or trade creditors) and not an individual syndicate of lenders.

2.      Section, Clause, Part and Schedule headings contained in any Transaction Document are for ease of reference only.

3.      Words importing the plural shall also include the singular and vice versa.

4.      A Lease Default, a Lease Event of Default, a Head Lease Default, a Head Lease Event of Default, a Loan Default, a Loan Event of Default, an Acceleration Event or an Enforcement Event is **"continuing"** if it has not been remedied or waived.

5.      **"USD"**, **"$"** and **"dollars"** denote lawful currency of the United States of America.

6.      Any other term not expressly defined herein shall have the meaning given to such term in the Lease Agreement.

## EXECUTION PAGE

PROCEEDS AGREEMENT
MSN 67

**The Borrower**

| | |
|---|---|
| **EXECUTED AS A DEED BY** | ) |
| **JPA NO. 111 CO., LTD.** | ) |
| acting by: | ) |
| in the presence of: | ) |

**Kamil Gerard Ahmed**
Attorney-In-Fact
K&L Gates LLP (Singapore)

Name of witness:

Signature:

Name: Jitlada Santorat

Occupation: Business Lady


Address:

Kasumigaseki Common Gate West Tower 34F
3-2-1, Kasumigaseki
Chiyoda-ku
Tokyo 100-0013
Japan

Email: jlps-notices@jlps.co.jp
Fax: +81 3 6206 1395
Attention: Fund Administration

with a copy to:

K&L Gates Gaikokuho Joint Enterprise
Toranomon Hills Mori Tower 28F
1-23-1 Toranomon, Minato-Ku
Tokyo 105-6328
Japan

Attention: Robert E. Melson, Jr. / Takahiro Kawaguchi
Facsimile: +81 3 3597 6421
Email: Robert.Melson@klgates.com/Takahiro.Kawaguchi@klgates.com

with a copy to:

Stratos Aircraft Management Limited
Rineanna House
Shannon
Ireland

Attention:     Gary Fitzgerald / Ana Urien
Email:         gfitzgerald@stratos.aero / aurien@stratos.aero
Fax:           +33 951 645 171

**The Senior Agent**

**EXECUTED** as a **DEED**

by:
**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**
acting by:
in the presence of:

Signature:
Name:
Title:

Address:         12 place des Etats-Unis, CS 70052
                 92547 Montrouge Cedex, France

Fax:             +33 1 41 89 85 75
Attention:       Structured Finance Agency & Middle Office
Email:           francois.barbut@ca-cib.com / melody.lavigne@ca-cib.com /
                 mounia.bekkali@ca-cib.com


**The Original Senior Lenders**

**EXECUTED** as a **DEED**

by:
**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**
acting by:
in the presence of:

Signature:
Name:
Title:

Address:         12 place des Etats-Unis, CS 70052
                 92547 Montrouge Cedex, France

Fax:             +33 1 41 89 85 75
Attention:       Structured Finance Agency & Middle Office
Email:           francois.barbut@ca-cib.com / melody.lavigne@ca-cib.com /
                 mounia.bekkali@ca-cib.com

**The Original Senior Lenders**

EXECUTED as a DEED

by:
**THE KOREA DEVELOPMENT BANK**
acting by:
in the presence of:

**Hanvit Kim**
Manager

Signature:
Name:
Title:  **Kuk Jin Yang**
        **Team Head**

| | |
|---|---|
| Address: | 14 Eunhaeng-ro, Yeoungdeungpo-gu, Seoul 07242, Korea |
| Fax: | +82 2 331 1321 |
| Attention: | Aviation Finance Team |
| Email: | aviation@kdb.co.kr, hanvit_kim@kdb.co.kr, loovelolloo@kdb.co.kr |

**The Original Senior Lenders**

EXECUTED as a DEED

by:
**THE KOREA DEVELOPMENT BANK, TOKYO BRANCH**
acting by:
in the presence of:

Signature:
Name:
Title:

| | |
|---|---|
| Address: | GranTokyo North Tower 36F, 1-9-1, Marunouchi, Chiyoda-ku, Tokyo, 100-6736, Japan |
| Fax: | +81 3 3214 6933 |
| Attention: | Corporate Finance Team |
| Email: | jpark@kdb.co.kr, bch3223@kdb.co.kr, amatsubara@kdb.co.kr, wjjang@kdb.co.kr |

**The Original Senior Lenders**

**EXECUTED** as a **DEED**

by:
**THE KOREA DEVELOPMENT BANK**
acting by:
in the presence of:

Signature:
Name:
Title:

| | |
|---|---|
| Address: | 14 Eunhaeng-ro, Yeoungdeungpo-gu, Seoul 07242, Korea |
| Fax: | +82 2 331 1321 |
| Attention: | Aviation Finance Team |
| Email: | aviation@kdb.co.kr, hanvit_kim@kdb.co.kr, loovelolloo@kdb.co.kr |

**The Original Senior Lenders**

**EXECUTED** as a **DEED**

by:
**THE KOREA DEVELOPMENT BANK, TOKYO BRANCH**
acting by:            L e e J e o n g K w o n
in the presence of:   G E N E R A L   M A N A G E R

Signature:
Name:
Title:        P a r k J i n W o o
              D E P U T Y  G E N E R A L  M A N A G E R

| | |
|---|---|
| Address: | GranTokyo North Tower 36F, 1-9-1, Marunouchi, Chiyoda-ku, Tokyo,    100-6736, Japan |
| Fax: | +81 3 3214 6933 |
| Attention: | Corporate Finance Team |
| Email: | jpark@kdb.co.kr, bch3223@kdb.co.kr, amatsubara@kdb.co.kr, wjjang@kdb.co.kr |

**The Junior Agent**

**EXECUTED** as a **DEED**


by:
**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**
acting by:
in the presence of:


Signature:
Name:
Title:

Bertrand ROVETTO

Amaury DE RIVAZ

Cecilia PETEUIL
VICE PRESIDENT

| | |
|---|---|
| Address: | 12 place des Etats-Unis, CS 70052<br>92547 Montrouge Cedex, France |
| Fax: | +33 1 41 89 85 75 |
| Attention: | Structured Finance Agency & Middle Office |
| Email: | francois.barbut@ca-cib.com / melody.lavigne@ca-cib.com /<br>mounia.bekkali@ca-cib.com |


**The Original Junior Lender**

**EXECUTED** as a **DEED**


by:
**IBJ LEASING CO., LTD.**
acting by:
in the presence of:


Signature:
Name:
Title:

| | |
|---|---|
| Address: | 1-2-6 Toranomon, Minato-ku, Tokyo 105-0001, Japan |
| Fax: | +81-3-5253-6657 |
| Attention: | General Manager / Aviation Business Department |
| Email: | aviation.business@ibjl.co.jp |

**The Junior Agent**

**EXECUTED** as a **DEED**


by:
**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**
acting by:
in the presence of:


Signature:
Name:
Title:


Address:      12 place des Etats-Unis, CS 70052
              92547 Montrouge Cedex, France

Fax:          +33 1 41 89 85 75
Attention:    Structured Finance Agency & Middle Office
Email:        francois.barbut@ca-cib.com / melody.lavigne@ca-cib.com /
              mounia.bekkali@ca-cib.com


**The Original Junior Lender**

**EXECUTED** as a **DEED**

by:
**IBJ LEASING CO., LTD.**
acting by:                Yoshiyasu Mizutomi
in the presence of:       Executive Officer

Signature:
Name:                     Yoshihiko Fujita
Title:                    Joint General Manager

Address:      1-2-6 Toranomon, Minato-ku, Tokyo 105-0001, Japan

Fax:          +81-3-5253-6657
Attention:    General Manager / Aviation Business Department
Email:        aviation.business@ibjl.co.jp


538596-3-7148-v1.0                                    17-40689385

**The Borrower Parent**

| | |
|---|---|
| **EXECUTED AS A DEED BY** | ) |
| **JP LEASE PRODUCTS &** | ) |
| **SERVICES CO., LTD.** | ) |
| acting by: | ) |
| in the presence of: | ) |

**Kamil Gerard Ahmed**
Attorney-In-Fact
K&L Gates LLP (Singapore)

Name of witness:

Signature:

Name:         Jitlada Jumbarat

Occupation:   Business Lady

Address:      JP Lease Products and Services Co., Ltd.
              Kasumigaseki Common Gate West Tower 34F
              3-2-1, Kasumigaseki,
              Chiyoda-ku
              Tokyo 100-0013
              Japan

              Email: jlps-notices@jlps.co.jp
              Fax: +813-6206-1395
              Attention: Fund Administration

              with a copy to:

              K&L Gates Gaikokuho Joint Enterprise
              Toranomon Hills Mori Tower 28F
              1-23-1 Toranomon, Minato-Ku
              Tokyo 105-6328
              Japan

              Attention: Robert E. Melson, Jr. / Takahiro Kawaguchi
              Facsimile: +81 3 3597 6421
              Email: Robert.Melson@klgates.com/Takahiro.Kawaguchi@klgates.com

              with a copy to:

              Stratos Aircraft Management Limited
              Rineanna House
              Shannon
              Ireland

              Attention:   Gary Fitzgerald / Ana Urien
              Email:       gfitzgerald@stratos.aero / aurien@stratos.aero
              Fax:         +33 951 645 171

**The Security Agent**

**EXECUTED** as a **DEED**

by:
**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**
acting by:
in the presence of:

Signature:
Name:
Title:            Cecilia PETEUIL          Bertrand ROVETTO          Amaury DE RIVAZ
          VICE PRESIDENT

Address:      12 place des Etats-Unis, CS 70052
              92547 Montrouge Cedex, France

Fax:          +33 1 41 89 85 75
Attention:    Structured Finance Agency & Middle Office
Email:        francois.barbut@ca-cib.com / melody.lavigne@ca-cib.com /
              mounia.bekkali@ca-cib.com


**The Mandated Lead Arranger**

**EXECUTED** as a **DEED**

by:
**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**
acting by:
in the presence of:

Signature:
Name:
Title:          Cecilia PETEUIL          Bertrand ROVETTO          Amaury DE RIVAZ
          VICE PRESIDENT

Address:      12 place des Etats-Unis, CS 70052
              92547 Montrouge Cedex, France

Email:        hkg-asianaviation@ca-cib.com

**The Hedging Counterparty**

**EXECUTED** as a **DEED**

by:
**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**
acting by:
in the presence of:

Signature:
Name:
Title:                                    *Pierre Lafon*

Amaury DE RIVAZ   Address:       12 place des Etats-Unis, CS 70052
VICE PRESIDENT                   92547 Montrouge Cedex, France

Benjamin LAMBERG
Managing Director

Fax:           +33 1 41 89 39 16
Attention:     IRD Product Documentation
Email:         DMC-DERIVATIVE-DOCUMENTATION@ca-cib.com / hkg-
               asianaviation@ca-cib.com

**The Account Bank**

**EXECUTED** as a **DEED**

by:
**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**
acting by:
in the presence of:

Signature:
Name:
Title:

Address:       12 place des Etats-Unis, CS 70052
               92547 Montrouge Cedex, France

Fax:           +33 1 41 89 85 75
Attention:     Structured Finance Agency & Middle Office
Email:         francois.barbut@ca-cib.com / melody.lavigne@ca-cib.com /
               mounia.bekkali@ca-cib.com

**The Hedging Counterparty**

**EXECUTED** as a **DEED**


by:
**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**
acting by:
in the presence of:


Signature:
Name:
Title:

| | |
|---|---|
| Address: | 12 place des Etats-Unis, CS 70052 |
| | 92547 Montrouge Cedex, France |
| Fax: | +33 1 41 89 39 16 |
| Attention: | IRD Product Documentation |
| Email: | DMC-DERIVATIVE-DOCUMENTATION@ca-cib.com / hkg-asianaviation@ca-cib.com |


**The Account Bank**

**EXECUTED** as a **DEED**


by:
**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**
acting by:
in the presence of:


Signature:
Name:
Title:

Cecilia RETEUIL
VICE PRESIDENT

Bertrand ROVETTO

Amaury DE RIVAZ

| | |
|---|---|
| Address: | 12 place des Etats-Unis, CS 70052 |
| | 92547 Montrouge Cedex, France |
| Fax: | +33 1 41 89 85 75 |
| Attention: | Structured Finance Agency & Middle Office |
| Email: | francois.barbut@ca-cib.com / melody.lavigne@ca-cib.com / mounia.bekkali@ca-cib.com |

**The Arranger**

**EXECUTED** as a **DEED**

by:
**THE KOREA DEVELOPMENT BANK**
acting by:
in the presence of:

Hanvit Kim
Manager

Signature:
Name:
Title:           Kuk Jin Yang
                 Team Head

Address:      14 Eunhaeng-ro, Yeoungdeungpo-gu, Seoul 07242, Korea
Fax:          +82 2 331 1321
Attention:    Aviation Finance Team
Email:        aviation@kdb.co.kr, hanvit_kim@kdb.co.kr, loovelolloo@kdb.co.kr