UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>JPA NO. 111 CO., LTD. and<br>JPA NO. 49 CO., LTD.,<br><br>Debtors.[1] | Chapter 11<br><br>Case No.: 21-12075 (DSJ)<br><br>(Jointly Administered) |

**DECLARATION OF HEINRICH LOECHTEKEN
IN SUPPORT OF DEBTORS' APPLICATION FOR ENTRY OF
ORDERS: (I)(A) APPROVING BIDDING PROCEDURES RELATING
TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS;
(B) ESTABLISHING STALKING HORSE BIDDERS AND BID
PROTECTIONS; (C) APPROVING PROCEDURES OF THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES; (D) AUTHORIZING ENFORCEMENT ACTIONS;
(E) SCHEDULING AN AUCTION AND A SALE HEARING; AND
(F) APPROVING THE FORM AND MANNER OF NOTICE THEREOF;
AND (II)(A) APPROVING THE SALE OF THE PURCHASED ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS,
AND ENCUMBRANCES; AND (B) GRANTING RELATED RELIEF**

I, Heinrich Loechteken, being duly sworn, hereby depose and state:

1. I am the CEO of JLPS Ireland Limited ("JLPSI"), a wholly owned subsidiary of JP Lease Products & Services Co. Ltd. ("JPL"). JLPSI is responsible for aircraft trading and management for the JPL group, including the Debtors (as defined below). JPL is the parent company of JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd, the debtors and debtors in possession (the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"). JLPSI currently manages 33 aircraft and has further contracts / Letters of Intent ("LOIs") for an additional 18 aircraft. Through JLPSI's management

---

[1] The Debtors in these Chapter 11 cases are: JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd. The Debtors' corporate address is: Kasumigaseki Common Gate West Tower, 3-2-1 Kasumigaseki, Chiyoda-Ku, Tokyo 100-0013.

role, I am generally familiar with the day-to-day operations of the Debtors and their affairs, books, and records.

2. JLPSI's management team has an average of 30 years aviation experience gained in financial institutions and aircraft lessors, including AerCap, ILFC, GECAS, Avolon, DAE Capital, ACG, MCAP and Deutsche Bank. JLPSI has relationships with over 270 airlines in 88 countries worldwide and with the majority of the top 50 lessors (as per Airfinance Journal June 2020).

3. I make this Declaration in support of the *Debtors' Application for Entry of Orders: (I)(A) Approving Bidding Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (B) Establishing Stalking Horse Bidders and Bid Protections; (C) Approving Procedures of the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Authorizing Enforcement Actions; (E) Scheduling an Auction and a Sale Hearing; and (F) Approving the Form and Manner of Notice Thereof; and (II)(A) Approving the Sale of the Purchased Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances; and (B) Granting Related Relief* [Docket No. 21], which was filed on December 31, 2021 (the "Motion").[2]

4. Except where specifically noted, the statements in this Declaration are based on my personal knowledge, belief, or opinion; information that I have received from the Debtors' advisors and professionals; or from the records maintained in the ordinary course of business of the Debtors and/or their affiliates.

5. I am not being compensated for providing this Declaration or testimony. If I were called upon to testify, I could and would testify competently to the

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

facts set forth herein.  I am authorized to submit this Declaration on behalf of the Debtors.

I. **Professional Background and Qualifications**

6.      I have held various executive positions in the fields of aviation and corporate finance over the last thirty years.  After working at Deutsche Bank for six years, I served as Chief Credit Officer of DaimlerChrysler Financial and Chief Financial Officer of DaimlerChrysler Capital for six years.  During my time at DaimlerChrysler Capital the company acquired a 900+ general aviation aircraft portfolio from the Raytheon Company. I also spent six years as Chief Financial Officer and Chief Investment Officer of AerCap, where I was responsible for all sales and purchases of aircraft, investment in aircraft, joint ventures and securitization, accounting, finance and treasury, and risk management.  In 2010, I joined International Lease Finance Corporation (ILFC) as Chief Investment Officer and was responsible for ILFC's portfolio strategy, for aircraft investment, and for purchase and sale activites.  From 2014 to 2017, I served as an executive advisor to Mitsubishi Group Companies, MCAP and Vermillion, and I have been involved in the purchase and sale activities as well as the investment acitivties of their various aircraft leasing portfolio companies.

7.      I have been a director of several AerCap and ILFC subisidiaries.  I was the Chairman of the Board of Directors of AerVenture, a joint venture between AerCap and a Kuwaiti investor, for 3 years.  AerVenture over time took delivery of 70 new Airbus A320CEO family aircraft.

8.      During my time at DaimlerChrysler Capital I was responsible for the sale of about $5 billion in various financial assets including, commercial real estale loans, blue and brown water commercial marine loans, pleasure marine loans, helicopter operating and finance leases, general aviation loans and leases, private jet

3

loans and leases, commercial aircraft assets with leases attached.  In my combined ten year role as Chief Investment Officer and Chief Financial Officer of AerCap and Chief Investment Officer of ILFC, I managed teams that purchased aircraft from Original Equipment Manufacturers ("OEMs"), airlines, and leasing companies.  During that timeframe I also managed teams that sold aircraft to airlines, leasing companies, and financial investors.  During the aforementioned timeframe, the total volume of purchase (orders from OEMs, Sale and Leasebacks and purchases from leasing companies and investors) and sale of aircraft that I was directly responsible for exceeds $25 billion.  Both AerCap and ILFC ordered large quantities of aircraft from the OEMs during my tenure – namely 70 A320 family aircraft plus 30 A330 family aircraft at AerCap and 200 A320NEO family aircraft plus 100 Embraer E2 aircraft at ILFC.  Under my direction, AerCap and ILFC regularly purchased aircraft via sale and leaseback transactions from airlines.  Both companies also purchased aircraft on lease from other leasing companies and engaged in active selling of aircraft to leasing companies and financial investors.  For example, between 2006 and 2008 alone, my team at AerCap purchased 139 aircraft and sold 110 aircraft.  ILFC purchased its aircraft mainly through forward order contracts with the OEM.  During my time as Chief Investment Officer of ILFC I oversaw the sale of 200 aircraft.

        9.     I was also responsible for the sale of debis AirFinance to Cerberus Capital in 2005 and the subsequent IPO of AerCap (ex debis AirFinance) in a deal valued at $2.8 billion, the acquisition of AeroTurbine in 2006 in a deal valued at $0.3 billion, the sale of a 50% equity interest in AerCap Partners 1 Holding Limited in 2006 in a deal valued at $0.7 billion, and the acquisition of AeroTurbine into ILFC in 2011 in a deal valued at $0.2 billion.  As part of the ILFC management team I participated in the sale of ILFC in a deal valued at $28.1 billion.

10. During my time at JPL, JPL has purchased 10 A350s and has sold 9 A350s. In my role at JLPSI, I was responsible for and directly involved in the purchase of 4 A350s and the sale of 3 A350s.

**II.    Sales & Marketing Efforts**

11. On December 17, 2021 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases. The Debtors are pursuing an orderly marketing and auction process for the sale of the Debtors' 100% ownership interest in the Purchased Assets.

12. Under the proposed Bidding Procedures, the Debtors and their advisors will market the Purchased Assets. Such marketing involves the Debtors, their advisors, JPL, and JLPSI and includes (a) contacting a broad range of both strategic and financial investors that may have an interest in bidding for the Purchased Assets, (b) providing access to confidential electronic data room with information on the Purchased Assets, to all potential bidders, and (c) providing other relevant information and marketing materials to potential bidders. In this way, the Debtors intend to maximize the number of participants who may participate as bidders at the Auction and thereby maximize the value to be achieved from the Sale and Auction.

13. Our typical process for selling an A350 begins with contacting all (non airline) managers of modern widebody aircraft and other managers with assets under management in excess of $1 billion to gauge their interest in acquiring these assets. We would normally allow three to four weeks for these managers to provide an initial bid, but we can truncate this to two weeks in the current market because there is a lack of aircraft being offered at the moment. We would expect to receive up to ten offers for these aircraft in the current environment. This is less than might be expected in a normal market due to (i) the lack of other aircraft being offered with these aircraft

5

for diversification; (ii) slightly reduced financing capacity in the market; and (iii) less investor appetite for widebody aircraft due to the COVID-19 pandemic.

15. 14. The Debtors and their advisors are committed to working with potential bidders to provide access to confidential information on the Purchased Assets and to facilitate any meetings or other due diligence that potential bidders may require to understand and evaluate the Purchased Assets.

### III. The Term Sheet

15. In connection with the Debtors' sale efforts to date, the Debtors contacted four potentially interested parties. As a result of these discussions, the Debtors received an initial bid for the Purchased Assets from Capitol Reef LLC and Isle Royale LLC (collectively, the "Stalking Horse Bidders"). Following extensive good-faith, arm's-length negotiations among the Debtors, JPL, the Stalking Horse Bidders, and their respective advisors, the parties reached agreement on that certain term sheet, dated December 24, 2021 (the "Term Sheet"), a copy of which is attached to the Motion as **Exhibit B**. Pursuant to the Term Sheet, the Stalking Horse Bidders will serve as the initial "stalking horse" bidder for the Purchased Assets, which will be subject to the Sale Process overseen by the Court pursuant to the proposed Bidding Procedures.

16. I believe that the (i) Term Sheet confers substantial value and benefits on the Debtors' estates, (ii) entry into the Term Sheet, subject to higher or better offers, is a sound exercise of the Debtors' reasonable business judgment, and (iii) filing this Motion with the Term Sheet in hand, subject to the post-petition marketing process described herein, is in the Debtors' best interests to maximize the value of the Purchased Assets by setting an initial price "floor" in the Sale Process and moving that process forward in a timely manner given the pressure being exerted by certain lenders.

17. The Term Sheet provides for total consideration of approximately $207,741,763.53 (the "Base Purchase Price"), equal to: (1) the outstanding principal amount of the Senior Loans and Junior Loans associated with both Aircraft, plus all accrued and unpaid interest, and payment of all other indemnification and other out of pocket-expenses owing to the Senior and Junior Financing Parties (collectively, the "Facility Repayment"); and (2) a cash payment equal to $5,000,000 (the "Cash Component").³ The Facility Repayment funds will be used to satisfy the Debt Facilities in full as of the closing of the proposed sale. The Debtors have requested an accounting from the Secured Creditors and will consult with the Secured Creditors in good faith concerning the outstanding Senior Secured Obligations and Junior Secured Obligations that are expected to be payable on the Closing Date. Any disputes in connection with the Base Purchase Price that the parties are unable to resolve may be resolved by the Court prior to the Sale Hearing. The Debtors will provide Potential Bidders a breakdown of the amounts for each element of the Base Purchase Price at least one week prior to the Bid Deadline.

18. Pursuant to the Motion, the Debtors are requesting approval of a break-up fee of 4% of the total Base Purchase Price, in the event that the Purchased Assets or any part thereof are sold to a party other than the Stalking Horse Bidder (the "Break-Up Fee") and an expense reimbursement not to exceed $1,000,000 (the "Expense Reimbursement" and together with the Break-Up Fee, the "Bid Protections"). The Bid Protections apply to any sale of the Purchased Assets or any part thereof (regardless of

---

³ The Base Purchase Price includes the outstanding balances on the Senior Loans and Junior Loans as of December and October 2021, respectively, but the final number will include additional interest incurred through the Closing Date and certain reasonable fees that may be required under the Security Documents to ensure that the Senior Loans and Junior Loans are fully satisfied.

7

when it may occur, whether or not as part of the Bidding Procedures or these Chapter 11 Cases), or any debtor in possession or other financing.

19.  The Bid Protections have induced the Stalking Horse Bidder to provide a commitment to purchase the Purchased Assets, while providing the Debtors with the potential to obtain even greater benefits for the Debtors' estates through the Auction.  By having an initial bid, the Debtors are able to establish a floor price for the Purchased Assets that other bidders will need to surpass in order participate at the Auction.  Notably, the Term Sheet does not provide for significant due diligence contingencies related to the Stalking Horse Bidders' offer, which will signal additional security and confidence to other prospective buyers who may be interested in submitting a bid.  If the Debtors were to market the assets without the benefit of a Stalking Horse Bid, the Debtors might encounter greater challenges in their pursuit of the highest or otherwise best offer for the Purchased Assets.  Additionally, the Stalking Horse Bid demonstrates to the market that the Debtors will be able to fully satisfy the Senior and Junior Loans and accomplish their objectives for these Chapter 11 Cases.  I believe that the Bid Protections are appropriate in light of the need for reaching agreement with the Stalking Horse Bidder, while another entity is seeking to disrupt these Chapter 11 Cases.

20.  I therefore believe that the Bid Protections are necessary and appropriate and will allow the Debtors to maximize the potential sale value of the Purchased Assets and ultimately provide the Debtors with a successful sale of their most significant assets.

**IV.  Proposed Bidding Procedures and Timeline**

21.  I have reviewed and am familiar with the Motion and the related Bidding Procedures.  It is my opinion that conducting the Sale Process within the time

period set forth in the Motion and the Bidding Procedures Order is adequate and will provide additional potential bidders with sufficient time and information necessary to formulate a bid. Moreover, I believe that the proposed sale timeline, including the period of over one month from approval of bid procedures to the bid submission deadline, will benefit all parties, as it will provide stability in the near term regarding the go-forward operation and utilization of the Purchased Assets, which will serve to maximize their value to new buyers. Additionally, based on my 20 years of experience marketing aircraft assets similar to the Purchased Assets, I believe the time frame proposed is consistent with the period of time required to maximize value. There is a relatively small pool of buyers who regularly participate in such sales, and we will be able to market the Purchased Assets through the typical channels pursuant to which such buyers would consider these types of assets. Specifically, we would issue an RFP to interested parties with a two week timeframe to review and present bids. We would thereafter create a shortlist of no more than six counterparties to negotiate best and final proposals over a one week period.

      22. Moving forward with the Stalking Horse Bid in accordance with the milestones set forth therein is a necessary step for the Debtors to pursue the Sale Process as it provides sufficient proceeds to effectuate the Facility Repayment. All prospective parties will be encouraged and permitted to submit proposals for a variety of potential transactions, including DIP financings or outright sale of the Purchased Assets in a way that maximizes value.

23. The Debtors propose to conduct the Sale and Auction on the following timeline:

| Key Event | Deadline[4] |
|---|---|
| Deadline for Bidders Who Are Secured Creditors to Complete Request to Utilize Credit Bids at the Auction | January 28, 2022 at 4:00 p.m. (ET) |
| Deadline for Any Objections to Credit Bidding under Bankruptcy Code Section 363(k) (the "Credit Bidding Objection Deadline") | February 4, 2022 at 4 p.m. (ET) |
| Deadline for any Responses in Support of Credit Bidding (the "Credit Bidding Response Deadline") | February 11, 2022 at 4 p.m. (ET) |
| Deadline for any Replies in Further Support of Objections to Credit Bidding (the "Credit Bidding Reply Deadline") | February 14, 2022 at 4 p.m. (ET) |
| Court Hearing Date for Any Credit Bidding Disputes | [**Subject to Court Availability**][February 16, 2022 at __:__ __.m.] |
| Deadline to Submit Bids (the "Bid Deadline") | February 22, 2022 at 10 a.m. (ET) |
| Deadline for Debtors to Notify Bidders of Status as Qualified Bidders (the "Qualified Bid Deadline") | February 22, 2022 at 5:00 p.m. (ET) |
| If No Auction Is to Be Held, Deadline for Debtors to Notice that Stalking Horse Bid (as defined herein) Is Successful Bid | February 22, 2022 at 5:00 p.m. (ET) |
| Auction to be held if the Debtors receive Qualified Bids, to be conducted via Zoom Telephone Conference | February 23, 2022 at 10:00 a.m. (ET) |
| Deadline to File Notice of (i) Identities of Successful Bid and Back-Up Bid and (ii) for seeking authority to sell the Purchased Assets to such Successful Bidder | February 23, 2022 at 6:00 p.m. (ET) |
| Deadline to Object to Successful Bid | February 24, 2022 at 10:00 a.m. (ET) |
| Deadline for Replies in Support of Sale | February 24, 2022 at 6:00 p.m. (ET) |
| Sale Hearing | [**Subject to Court Availability**][February 25, 2022 at [__:_0_.m. (ET) |

---

[4] These dates assume a January 20, 2022 Hearing on the Bidding Procedures and a February 25, 2022 Sale Hearing. Dates to be adjusted if hearings are scheduled for different dates.

10

| Key Event | Deadline[4] |
|---|---|
| Deadline for Closing of Successful Bid | February 28, 2022 at 5:00 p.m. (ET) (or Such Later Date as Agreed by the Debtors and the Successful Bidder) |

24.     Based on my professional experience, I believe that the proposed timeline set forth in the Bidding Procedures is adequate and will allow the Debtors sufficient time to market the Purchased Assets and obtain the highest and best offer.

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:   New York, New York
         January 10, 2022

                                        By: /s/ *Heinrich Loechteken*
                                        Name:  Heinrich Loechteken
                                        Title:    CEO of JLPSI

11