**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| JPA NO. 111 CO., LTD., and | : | Case No. 21–12075 (DSJ) |
| JPA NO. 49 CO., LTD., | : | |
| | : | (Jointly Administered) |
| Debtors[1]. | : | |
| | : | |

**PRELIMINARY OBJECTION OF FITZWALTER CAPITAL PARTNERS (FINANCIAL TRADING) LIMITED TO DEBTORS' APPLICATION FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES RELATING TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) ESTABLISHING STALKING HORSE BIDDERS AND BID PROTECTIONS; (C) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) AUTHORIZING ENFORCEMENT ACTIONS; (E) SCHEDULING AN AUCTION AND SALE HEARING; AND (F) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (II)(A) APPROVING THE SALE OF THE PURCHASED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES; AND (B) <u>GRANTING RELATED RELIEF</u>**

---

[1]    The Debtors in these Chapter 11 cases are:  JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd. The Debtors' corporate address is:  Kasumigaseki Common Gate West Tower, 3–2–1 Kasumigaseki, Chiyoda–Ku, Tokyo 100–0013.

# TABLE OF CONTENTS

**Page**

SUMMARY OF OBJECTION..................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 6

    A.    The Commencement Of These Cases................................................. 6

    B.    Misrepresentations, Omissions, And Overreach In Debtors' "First Day" Declaration........................................................................................ 6

    C.    The Debtors' Schedules And Statements Of Financial Affairs............ 8

    D.    The Debtors' Bid Procedures Motion................................................. 9

    E.    The Debtors Seek To Sell Assets They Do Not Own. ...................... 11

    F.    The Staking-Horse Bid Is Insufficient And The Break-Up Fee Is Improper. ...... 14

    G.    The Debtors Refuse To Provide Information In Response To Properly Served Discovery..................................................................... 15

OBJECTION............................................................................................................ 18

I.    THE DEBTORS SEEK TO SELL THE LEASE ASSETS, WHICH DO NOT CONSTITUTE PROPERTY OF THE ESTATE. .......................................... 18

    A.    The Lease Assets Cannot, As A Matter Of Law, Be Sold By The Debtors Because They Do Not Own Them.................................... 18

    B.    The Debtors' Conditioning The Bid Procedures On The Sale Of The Lease Assets Requires Rejection Of Debtors' Scheme........................ 21

II.    THE DEBTORS' "ALL OR NOTHING" BIDDING APPROACH IS IMPROPER. ..................................................................................................... 25

III.    THE BREAK–UP FEE IS AN UNPRECEDENTED, IMPROPER LIQUIDATED DAMAGES PROVISION AND SHOULD NOT BE APPROVED. ............................. 26

IV.    THE DEBTORS' RESTRICTIONS ON CREDIT BIDDING ARE INAPPROPRIATE. ....................................................................................... 27

V.    THE BID PROCEDURES MOTION SHOULD BE DENIED (OR DEFERRED) UNTIL AFTER RESOLUTION OF THE MOTION TO DISMISS. ............................. 29

CONCLUSION........................................................................................................ 30

## TABLE OF AUTHORITIES

### Cases

*ASSF IV AIV B Holdings III, L.P. v. Empire Generating Co., LLC*
   (*In re Empire Generating Co., LLC*), No. 19–CV–5721 (CS), 2020 WL 1330285
   (S.D.N.Y. Mar. 23, 2020) ................................................................................................ 27

*Butner v. United States*,
   440 U.S. 48 (1979) .......................................................................................... 18, 21, 22, 24

*First Fid. Bank, N.A. v. Jason Realty, L.P. (In re Jason Realty, L.P.)*,
   59 F.3d 423 (3d Cir. 1995) ............................................................................................. 24

*In re Aéropostale, Inc.*,
   555 B.R. 369 (Bankr. S.D.N.Y. 2016) ........................................................................... 27

*In re Am. W. Airlines, Inc.*,
   166 B.R. 908 (Bankr. D. Ariz. 1994) ............................................................................. 26

*In re Hupp Indus., Inc.*,
   140 B.R. 191 (Bankr. N.D. Ohio 1992) ......................................................................... 26

*In re Loco Realty Corp.*,
   2009 WL 2883050 (Bankr. S.D.N.Y. June 25, 2009) ............................................... 21, 23

*In re S.N.A. Nut Co.*,
   186 B.R. 98 (Bankr. N.D. Ill. 1995) .............................................................................. 26

*In re Town Center Flats, LLC*,
   855 F.3d 721 (2017) ....................................................................................................... 23

*Gey Assocs. Gen. P'ship v. 310 Assocs., L.P. (In re 310 Assocs.)*,
   No. 02 Civ. 0710, 2002 WL 31426344 (S.D.N.Y. Oct. 29, 2002), *aff'd* 346 F.3d 31
   (2d Cir. 2003) ................................................................................................................. 26

*Lewis v. Manufacturers Nat. Bank of Detroit*,
   364 U.S. 603 (1961) ....................................................................................................... 25

*Nobelman v. Am. Sav. Bank*,
   508 U.S. 324 (1993) ....................................................................................................... 24

*Reverend C.T. Walker Hous. Dev. Fund Corp. v. City of New York*,
   586 B.R. 534 (E.D.N.Y. 2018) ................................................................................. 18, 23

*Soho 25 Retail, LLC v. Bank of Am.*
  *(In re Soho 25 Retail, LLC)*, Nos. 10–15114 (SHL), 11–1286 (SHL), 2011 WL
  1333084 (Bankr. S.D.N.Y. Mar. 31, 2011) ......................................................................... 24

*Sovereign Bank v. Schwab*,
  414 F.3d 450 (3d Cir. 2005) ................................................................................................ 24

## Statutory Authorities

11 U.S.C. § 363 ................................................................................................. 4, 5, 18, 23, 27

11 U.S.C. § 541(a) ................................................................................................. 4, 18, 22, 23

11 U.S.C. § 1322 ................................................................................................................ 24

## Rules and Regulations

Fed. R. Civ. P. 44.1 ............................................................................................................ 19

FitzWalter Capital Partners (Financial Trading) ("**FWCP**") Limited respectfully submits this Objection to the *Debtors' Application For Entry Of Orders (I)(A) Approving Bidding Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (B) Establishing Stalking Horse Bidders and Bid Protections; (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Authorizing Enforcement Actions; (E) Scheduling an Auction and Sale Hearing; and (F) Approving the Form and Manner of Notice Thereof; and (II)(A) Approving the Sale of the Purchased Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances; and (B) Granting Related Relief* (the "**Bid Procedures Motion**") [Dkt. No. 21], filed by JPA No. 111 Co., Ltd. ("**Japan Debtor One**") and JPA No. 49 Co., Ltd. ("**Japan Debtor Two** and, with Japan Debtor One, the "**Debtors**").[2]

## SUMMARY OF OBJECTION

The paramount question here is whether Debtors can invoke Bankruptcy Code section 363 and the jurisdiction of this Court to frustrate the undisputed rights of their creditors through a jerry-rigged process that requires the Court to authorize the sale of property that no Debtor's estate owns, and in blatant disregard of a contracted-for arrangement that already binds 99.99% of the Debtors' stakeholders.  The obvious answer is that this Court should deny the Debtors' improper effort.

The Debtors commenced these cases on December 17, 2021, in a misguided and inappropriate attempt to use the United States Bankruptcy Code and the imposition of the automatic stay to interfere with a pre-petition sale of  Lease Assets[3] that they do not own.  The Debtors are nothing more than single-purpose entities, with no employees, no operations, and

---

[2]    All terms not otherwise defined herein have the same meanings ascribed to them in the Bid Procedures Motion.

[3]    The Lease Assets ("**Lease Assets**") consist of, *inter alia*, any and all rights, including claims, arising under the Subleases and the Head Leases.

effectively no creditors who are not already subject to the Proceeds Agreements. The Debtors also have no property located in the United States, which even they concede in their *Schedules of Assets and Liabilities* filed on December 31, 2021 (Dkt No. 19 in Case No. 21–12075; Dkt. No. 6 in Case No. 21–21076) (the "**Schedules**"). Each Debtor owns a single aircraft, which has never flown to or from the United States. The retainers provided to their proposed counsel (which still has not filed an employment application), were provided to the Debtors by their parent company, JP Lease Products & Services Co., Ltd. ("**JPL**").

Each Debtor effectively has no unsecured creditors; the only unsecured creditor of any size[4] is JPL (which also employs Teiji Ishikawa, who resides in Japan and is the only fiduciary for both Debtors). This simple structure is by design; each Debtor covenanted not to incur any third-party debt.

The Debtors admit that the sole source of revenue to service their debt was indirect payment from Vietnam Airlines ("VNA") under Subleases that terminated pre-petition. However, before the Subleases were terminated, the Debtors had absolutely assigned all rights to those lease payments (as part of all Lease Assets) to the Security Agent, relinquishing all right, title and interest in those payments. In any event, VNA ceased making regular lease payments in early 2021 and is in arrears for tens of millions of dollars owed under the terminated Subleases though it continues to fly the aircraft in foreign jurisdictions. VNA's continued use of the aircraft for dozens of flights since the contracts were terminated continues to reduce the value of the aircraft collateral.

---

[4] According to their Schedules, the Debtors purportedly owe approximately $47,000 to a law firm in Japan.

FWCP informed the Debtors and this Court at the "first day" hearing that FWCP would be moving to dismiss these cases under Bankruptcy Code section 1112 as commenced in bad faith. FWCP did so by motion filed on January 2, 2022 (the "**Motion to Dismiss**") (Dkt No. 22). The Motion to Dismiss not only seeks dismissal for cause under section 1112; it seeks dismissal, because the Debtors do not qualify for protection under the Bankruptcy Code, as neither Debtor has any property located in the United States, and neither Debtor otherwise satisfies the requirements of Bankruptcy Code section 109(a).[5]

Despite these facts, on December 31, 2021, the Debtors filed the Bid Procedures Motion. While it is far from clear whether the proposed sale could actually occur—among other defects, the Debtors have not provided a copy of any asset purchase agreement and have pointedly refused to produce requested discovery or make Mr. Ishikawa available for deposition—the purpose of the proposed sale is clear. The Debtors, under the control of JPL, have negotiated a sale that, if consummated, would give $5 million to JPL. Rather than notice the Bid Procedures Motion for hearing on or after January 26, 2022— after this Court determines whether the Debtors can even invoke any provisions of the Bankruptcy Code that would govern their Bid Procedures Motion and could affect the rights of creditors—the Debtors sought to have their motion heard on January 20, 2022, a transparent attempt to undercut FWCP and obtain a ruling that they can could use to try to

---

[5]   FWCP realized that neither Debtor satisfied section 109 after each of the Debtors filed their Schedules and *Statements of Financial Affairs* (Dkt No. 20 in Case No. 21–12075; Dkt. No. 7 in Case No. 21–21076) (the "**Statements**"), on December 31, 2021 none of which disclose any property located in the United States. Further the Statements revealed that the Debtors' parent company, JPL, had directly funded the Debtors' proposed counsel's retainers, which was not disclosed by Mr. Ishikawa in his "first day" declaration. *See* Declaration of Teiji Ishikawa Pursuant to Local Bankruptcy Rule 1007–2 and In Support of the Debtors' Chapter 11 Petitions and First Day Pleadings (Dkt. No. 3) ("**First Day Declaration**").

defeat the Motion to Dismiss.[6]  Only after FWCP raised this concern did the Debtors relent and agree that the Bid Procedures Motion could be heard on the same day as the Motion to Dismiss.

This Court should deny the Bid Procedures Motion for five independent, dispositive reasons:[7]

**First**, as a fundamental threshold issue, because these cases were commenced in bad faith and without either Debtor satisfying section 109, this Court should deny the Bid Procedures Motion (or defer ruling until after the Motion to Dismiss has been decided).  It makes no sense to consider the Bid Procedures Motion when any ruling would, at best, be advisory and, at worst, may improperly cause the Debtors to become liable for over $8.3 million in liquidated damages.

**Second**, the Debtors expressly seek an order from this Court permitting them to sell property that they do not own.  The Debtors ask this Court to bless selling Lease Assets that are **not** property of the estate of either Debtor.  The Lease Assets consist of, *inter alia*, any and all rights, including claims against VNA, arising under the Subleases and the Head Leases.  But the Debtors have nothing to sell because under English law–which governs the Lease Assets–each Debtor absolutely assigned all rights, title, and interest in and to the Lease Assets to the Security Agent.  Attached as Exhibit 1 to the Declaration of Benjamin I. Finestone submitted herewith (the "**Finestone Declaration**") is an opinion of an expert on English law, Akhil Shah Q.C. (the "**Shah Opinion**"),[8] that explains the effect of an assignment under settled English law (i.e., it transfers

---

[6]  *See Notice of Hearing on Bid Procedures Motion* (Dkt. No. 21–6).  The Debtors gave FWCP no forewarning of their intent to notice the Bid Procedures Motion for hearing on January 20, 2022 and did so with full knowledge that the Motion to Dismiss was scheduled for January 26, 2022.

[7]  This Objection addresses the threshold issues concerning the Bid Procedures Motion.  FWCP reserves any and all rights to further object as necessary, including arguments concerning good faith.

[8]  Mr. Shah is available to testify at the January 20 hearing.

legal title), and that English law makes clear that the Lease Assets belong to the Security Agent, not either Debtor. Because the proposed bid procedures are conditioned on this Court's approval of the Debtors selling assets that they do not own, the proposed bid procedures are improper under 11 U.S.C. §§ 363(b)(1), 541(a) and should be rejected.

*Third*, the proposed bid procedures require that any competing bid must be "all or nothing." That is, the bids must include the entirety of the two aircraft and the Lease Assets (that are not part of Debtors' estates), even though these cases have not been substantively consolidated and each Debtor has its own capital structure. *See* Bid Proc. Mot. Ex. 1 (Bid Procedures) § VII.B(ii) ("Each Bid submitted must purchase all of the Purchased Assets and must specify the purchase price. . . ."). If the Debtors were truly interested in maximizing value, they would not mandate that the bids be "all or nothing."

*Fourth*, the proposed Break–Up Fee is actually a disguised liquidated damages clause that finds no support in the case law and cannot be paid if triggered in certain circumstances. Specifically, the Debtors have agreed to pay over $8.3 million to the Stalking Horse Bidders even if there is never a consummated overbid—*e.g.*, the Break–Up Fee applies if the Debtors withdraw the Bid Procedures Motion or do not satisfy the deadlines they imposed on themselves. That effectively elevates the Break–Up Fee into a liquidated damages provision, which is improper. Unsurprisingly, none of precedent the Debtors cite in the Bid Procedures Motion authorized such relief. *See* Bid Proc. Mot. ¶ 56.

*Fifth*, the Debtors' attempt to limit the rights of the Security Agent to credit bid violates Bankruptcy Code section 363(k).

The Debtors no doubt will argue that FWCP should sit on the sidelines as they proceed with their proposed sale as it will purportedly result in full payment for all lenders, including

FWCP.  Whether in fact that is true is not only speculative; it requires that this Court ignore the Bankruptcy Code.  The value that can purportedly be achieved in a proposed sale of a debtor's property combined with property the debtor does not own is an inappropriate basis to seek this Court's approval and an improper invocation of the Bankruptcy Code.  The ends cannot and do not justify the means.

## FACTUAL BACKGROUND

FWCP incorporates by reference the factual background set forth in the Motion to Dismiss, and the Declaration of Andrew Gray in Support of Motion to Dismiss (Dkt. No. 23) (the "**Gray Declaration**"), and highlights the following facts specific to the Bid Procedures Motion.

### A.    The Commencement Of These Cases.

Each Debtor commenced its case on December 17, 2021, in an admitted and concerted effort to interfere with the Security Agent's auction of the Lease Assets, which are not assets of either Debtors' estate.  The auction of the Security Agent's Lease Assets was to be completed on December 17, 2021.  *See* First Day Decl. ¶ 31.  The Debtors each listed only one unsecured creditor on their petitions—JPL, their parent company, which they claimed was owed approximately $1.46 million.[9]  JPL is located in Tokyo, Japan; the Debtors do not have any employees; and each Debtor only has a single representative director, Teiji Ishikawa, who is the President and CEO of JPL and apparently resides in Tokyo, Japan.  *See id.* ¶ 11.

### B.    Misrepresentations, Omissions, And Overreach In Debtors' "First Day" Declaration.

Mr. Ishikawa submitted the First Day Declaration which states, among other things, that the Debtors' significant assets were the two aircraft, the Lease Assets, $150,000 in cash, and the

---

[9]    Both voluntary petitions show this amount.  *See* Dkt. No. 1 in Case No. 21–12075 at 9; Dkt. No. 1 in Case No. 21–12076 at 9.

Debtors' respective interests in retainers provided to their proposed bankruptcy counsel. First Day Decl. ¶ 17. These statements, and many others, were misleading at best.

Contrary to Mr. Ishikawa's sworn statements, (1) JPL—not the Debtors—directly funded that retainer and the Debtors have no interest in the cash, *see* Statements ¶ 11; and (2) the Debtors do not own the Lease Assets, rather they are property of the Security Agent, *see* Shah Op. ¶¶ 21–25. In addition, Mr. Ishikawa conveniently omitted that JPL, the entity he serves as CEO of and the only entity that can act on behalf of the Debtors, contractually obligated itself not to cause either Japan Debtor One or Japan Debtor Two to seek insolvency protections in any jurisdiction. *See, e.g.*, Gray Decl. Ex. 7 (173 Proceeds Agreement) § 3.1.3 (providing that JPL agrees "it shall not . . . file or join in any" bankruptcy petition for the Debtors). By signing the petitions and by funding the retainers, JPL breached this contractual obligation.[10] The factual misrepresentations and omissions in Mr. Ishikawa's declaration likely explains Debtors' refusal to produce Mr. Ishikawa—or any other witness—for deposition. *See* FWCP's Counsel's Let'r to Chambers 2–3, Jan. 13, 2022, Dkt. No. 49. The only substantive motion the Debtors filed was a "comfort order" motion that requested unprecedented relief—extending the automatic stay protections to benefit non–debtors and property that did not belong to the Debtors. When FWCP objected—noting that none of the cases Debtors cited supported its requested relief—and this Court expressed its concerns, the Debtors relented and conceded that it would not seek to extend the automatic stay in this fashion. In retrospect, given the relief sought here—*i.e.*, the ability to sell assets they do not own and protect the interests of their non–Debtor partners—the Debtors' attempt to surreptitiously extend the reach of the stay beyond reason is not surprising.

---

[10]   FWCP reserves any and all rights against JPL and any person who aided and abetted JPL's breach, and will be taking appropriate actions in the proper forum.

At the "first day" hearing on December 20, 2021, FWCP made clear that it would be filing a motion to dismiss.  *See, e.g.*, Dec. 20, 2021 Hr'g Tr. 16:4–7.  But at that hearing, based on the misleading representations made in the First Day Declaration, FWCP's counsel did not know that the Debtors had no interest in the retainers provided to proposed counsel.  Had counsel known, counsel would have alerted the Court to this threshold section 109 issue.

Counsel for FWCP conferred with proposed counsel for the Debtors on a date for the hearing on a motion to dismiss and a briefing schedule.  They agreed on a January 26 hearing date and oppositions due on January 17, 2022.

### C.    The Debtors' Schedules And Statements Of Financial Affairs.

On December 31, 2021, each Debtor filed its respective Schedules and Statements.  In each Statement, it was disclosed that JPL had directly paid Debtors' proposed counsel.  Statements ¶ 11.  As of the date of this Objection, the Debtors' proposed counsel has not filed an application to be employed, nor has either Debtor filed any other employment applications.

Each Debtors' Schedules listed various categories of assets, but neither set of Schedules identified any property located in the United States.  Specifically, no bank account was located in the United States.  *See* Schedules at 11.  The Schedules did not disclose any interest in any retainers provided (which is consistent with JPL paying the retainers directly).  And the Schedules did not disclose any intangible assets, including any rights in contracts.  *See id.* ¶ 59.  In other words, neither Debtor claimed a property interest in any contract, including any New York–law governed mortgage.  Mr. Ishikawa signed the Schedules and the Statements under penalty of perjury.  *Id.* at 22;  Statements at 15.

The Schedules list five secured creditors, including FWCP.  Schedules at 13.  While none of these claims are listed as disputed, they are listed as unliquidated (even though the Schedules each list specific dollar amounts).  *Id*.  This will force each creditor to file proofs of claim if these

cases are not dismissed.  According to the Schedules, each secured creditor is not located in the United States.[11]

The Schedules indicate that Japan Debtor One owed JPL $618,263.88 and Japan Debtor Two owed JPL $843,539.36.  *Id.* at 18.  The Schedules did not list either of JPL's claims as disputed, contingent or unliquidated.  *Id.*  In other words, the Debtors made sure to protect their parent company.

The Schedules revealed one additional unsecured creditor holding a specific dollar amount claim.  *Id.*  Allegedly the Debtors had engaged a law firm and collectively owe it approximately $47,000, though the claim was listed as contingent and unliquidated.  *Id.*  Five other entities were listed on Schedule E/F, each supposedly holding contingent and unliquidated claims with no dollar amounts.  *Id.*  FWCP has no understanding how either Debtor could be liable for any such claims.

Given the fact that the Debtors have virtually no non–insider unsecured creditors, no creditors' committee has been formed for either Debtor.

D.    **The Debtors' Bid Procedures Motion.**

On December 31, 2021, the Debtors filed the Bid Procedures Motion along with attachments, including the Term Sheet (which is dated December 24, 2021).  They scheduled the hearing date for the Bid Procedures Motion as January 20, 2022, with an objection deadline of January 13, 2022, meaning that the Debtors were trying to have the Bid Procedures Motion heard before the Motion to Dismiss, and were providing the minimum amount of time for parties to object.[12]

---

[11]    One Japanese junior secured creditor allegedly has a US–based counsel.  *Id.*  Thus far that counsel has not filed a notice of appearance.

[12]    Given the Term Sheet is dated December 24, 2021 it is not clear why the Debtors waited until December 31, 2021 to file the Bid Procedures Motion.

The Debtors request that this Court approve the Bid Procedures on January 20, 2022. If approved, then the Debtors would begin a marketing process and the deadline to submit bids (other than credit bids) would be February 22, 2022. *See* Bid Proc. Mot. ¶ 23. Secured creditors who wish to utilize credit bids would have to have to complete a request by January 28, 2022. *Id.* According to the Debtors, because of liquidity constraints and the continuing accrual of interest and fees, the Debtors believe the "shortest possible timeline" for an auction is appropriate, as long as it ensures full satisfaction of secured loans. *Id.* ¶ 29. The Debtors also state that "the parties who regularly bid on similar types of Purchased Assets have a general familiarity with such assets and will be able to assess the Purchased Assets and make an informed bid relatively quickly." *Id.* ¶ 48. The Debtors do not disclose in the Bid Procedures Motion, and have not provided any evidence, whether any sales of the aircraft and the Lease Assets outside of bankruptcy would have resulted in less than payment in full.

The two stalking horse bidders are Capital Reef LLC ("**Capital Reef**") and Isle Royale LLC ("**Isle Royale**"). *Id.* ¶ 18. The Bid Procedures Motion states that each bidder is a subsidiary of a global investment firm. *Id.* ¶ 19. But the Bid Procedures Motion does not state how either is capitalized other than to state each is "sufficiently funded to have the financial wherewithal to complete the Sale." *Id.* The motion does not disclose when negotiations with the Proposed Bidders began, who conducted the negotiations,[13] or whether other bidders were contacted.

The Bid Procedures Motion states that as of December 31, the Debtors were in the process of creating and populating a virtual data room and were in the process of preparing a draft

---

[13]   The Bid Procedures Motion refers to "advisors" to the Debtors. *Id.* ¶ 26. Other than the Debtors' proposed counsel (who still have not filed an employment application), FWCP is not aware of any other professional being retained by the Debtors.

confidential information memorandum and teaser for distribution to potential bidders. *See id.* ¶ 27. The Debtors have not shared this information with FWCP.

### E.    The Debtors Seek To Sell Assets They Do Not Own.

The Debtors are no doubt seeking to sell both the aircraft and the Lease Assets (in a single sale). At numerous places they make it clear that they are selling both sets of assets. *See, e.g.*, Term Sheet ¶ 1(a)–(b) (specifically listing among the "Assets to be Purchased and Sold" the rights under the Head Leases and Subleases, "whether or not owned by the Sellers on the date hereof"). But the Bid Procedures Motion does not disclose that the Debtors do not own the Lease Assets which were absolutely assigned, pursuant to English law, to the Security Agent.

Japan Debtor One was formed in December of 2017, and in November of 2018, it acquired the MSN 067 aircraft. *See* First Day Decl. ¶¶ 12, 20. In August of 2017, Japan Debtor Two was formed and, in December of 2017, it acquired the MSN 173 aircraft. *See id.* ¶¶ 12, 21. The Debtors' acquisition of the aircraft was funded through senior and junior debt financings. *Id.* ¶¶ 20–21. As part of these transactions (collectively, the "**Transaction**"), the Debtors entered into security agreements granting liens in favor of the Security Agent on the aircraft. *Id.* ¶ 23.

The Debtors never intended to operate the aircraft. *See id.* ¶ 12. Instead, the Debtors entered into the Head Leases, which leased the MSN 173 and MSN 067 to JLPS Leasing Uranus Limited f/k/a PAAL Uranus Company Limited and JLPS Leasing Draco Limited f/k/a DAE Leasing (Ireland) 12 Limited respectively (the "**Intermediate Lessors**"). *Id.* ¶ 13; *see* Finestone Decl. Exs. 2–3 (Head Leases). In turn, the Intermediate Lessors subleased the aircraft to VNA through the Subleases. First Day Decl. ¶ 14; Finestone Decl. Exs. 4–5 (Subleases). To ensure the Transaction would be adequately funded, each Debtor pledged the aircraft as collateral to the Security Agent for the lenders. First Day Decl. ¶ 23. Additionally, the Debtors conveyed the entirety of their interests in the Head Leases and the Subleases (together, the "**Leases**")—along

11

with all of Intermediate Lessors' interests in Subleases, which the Debtors had acquired—to the Security Agent more than two years before the Debtors filed for bankruptcy. *See* First Day Decl. ¶ 23; Gray Decl. ¶¶ 25–27, 44–46.

As set forth more fully in the Shah Opinion, by no later than November 21, 2018, the Debtors lacked any property interest in the Lease Assets pursuant to valid, absolute assignments of their interests to the Security Agent, (at that time CACIB). These conveyances were effectuated through two separate, albeit identical transactions.

- *First*, on December 29, 2017, the 173 Intermediate Lessor—PAAL Uranus Company Limited—assigned to Japan Debtor Two "all of its right, title and interest, present and future, in and to the Assigned Property." Gray Decl. Ex. 9 (173 Intermediate Lessor Security Assignment Agreement) § 3.1. "Assigned Property" is defined as "(a) the Lease Agreement Property, (b) the Intermediate Lessor Insurance Property, (c) the Requisition Proceeds Property, (d) the Final Disposition Proceeds Property, relating to the Aircraft [MSN 173]. . . ." *Id.* § 1; and

- *Second*, also on December 29, 2017, Japan Debtor Two "assign[ed] and agree[d] to assign absolutely by way of security with full title guarantee (subject to any Permitted Security Interest) to the Security Agent . . . all of its right, title and interest, present and future, in and to the Assigned Property." Gray Decl. Ex. 10 (173 Security Assignment Agreement) § 3.1. "Assigned Property" is defined as "(a) the Head Lease Agreement Property, (b) the Aircraft Purchase Agreement Property, (c) the Borrower Insurance Property, (d) the Requisition Proceeds Property, (e) the Final Disposition Proceeds Property, (f) the Lease Management Agreement Property, (g) the Hedging Agreement Property and (h) the Intermediate Lessor Assignment Property relating to the Aircraft [MSN 173]. . . ." *Id.* § 1.1.

The effect of this transaction is that Japan Debtor Two assigned all property interests it possessed in the Lease Assets, including rights arising under the Leases, to CACIB (in its capacity as Security Agent), effective as of December 29, 2017. *See* Shah Op. ¶¶ 37–67, 76–83.

An identical transaction occurred with respect to Japan Debtor One's interests in the Lease Assets concerning the aircraft MSN 067.

- *First*, on November 21, 2018, the 067 Intermediate Lessor—DAE Leasing (Ireland) 12 Limited—assigned to Japan Debtor One "all of its right, title and interest, present and future, in and to the Assigned Property." Gray Decl. Ex. 16 (067 Intermediate Lessor Security Assignment Agreement) § 3.1. Again, "Assigned Property" is defined as

12

"(a) the Lease Agreement Property, (b) the Intermediate Lessor Insurance Property, (c) the Requisition Proceeds Property, (d) the Final Disposition Proceeds Property, relating to the Aircraft [MSN 067]. . . ." *Id.* § 1.1; and

- *Second*, also on November 21, 2018, Japan Debtor One "assign[ed] and agree[d] to assign absolutely by way of security with full title guarantee (subject to any Permitted Security Interest) to the Security Agent . . . all of its right, title and interest, present and future, in and to the Assigned Property." Gray Decl. Ex. 17 (067 Security Assignment Agreement) § 3.1. "Assigned Property" is defined as "(a) the Head Lease Agreement Property, (b) the Aircraft Purchase Agreement Property, (c) the Borrower Insurance Property, (d) the Requisition Proceeds Property, (e) the Final Disposition Proceeds Property, (f) the Lease Management Agreement Property, (g) the Hedging Agreement Property and (h) the Intermediate Lessor Assignment Property relating to the Aircraft [MSN 067]. . . ." *Id.* § 1.1.

The effect of this transaction is that Japan Debtor One assigned all property interests it had in the Lease Assets, including rights arising under the Head Leases and the Subleases, to CACIB (in its capacity as Security Agent), effective as of November 21, 2018. *See* Shah Op. ¶¶ 68–75, 84–92.

The legal effect of these conveyances is clear. As of December 29, 2017, the Debtors ceased to possess any "***title and interest, present and future***" under the Head Lease and Sublease governing the MSN 173 aircraft. Gray Decl. Ex. 10 § 3.1 (emphasis added). And, as of November 21, 2018, the Debtors ceased to possess any "***title and interest, present and future***" under the Head Lease and Sublease related to the MSN 067 aircraft. Gray Decl. Ex. 17 § 3.1 (emphasis). As a result of these conveyances, the entirety of the Debtors' interests in the Lease Assets passed to the then–Security Agent, CACIB.[14] Shah Op. ¶ 22. On December 2, 2021, FWCP assumed CACIB's role as Security Agent. Gray Decl. ¶ 76. Thus, as of December 2, 2021,

---

[14]   The Debtors have not suggested that these assignments were invalid or failed for any reason. Instead, they conveniently elide the distinction between property that they do own and property that belongs to their creditors.

13

FWCP possessed the entirety of the property interests in the Lease Assets that the Debtors conveyed through the Security Assignment Agreements.

### F.    The Staking-Horse Bid Is Insufficient And The Break-Up Fee Is Improper.

The Bid Procedures Motion states that the total consideration is $207,741,763.53. Bid Proc. Mot. ¶ 20. This amount is supposed to equal the outstanding amounts of the secured loans, plus all accrued but unpaid interest, payment of indemnification and out–of–pocket expenses, and a cash payment of $5 million. *Id.* The Base Purchase Price does not indicate the value to be attributed to the aircraft or the Lease Assets.

If this sale is ultimately consummated, the Debtors seek to have virtually all of the $5 million go to JPL.

The proposed 'Break–Up Fee' is 4% of the Base Purchase Price. *Id.* ¶ 21. That equals $8,309,670.52. While paragraph 21 of the Bid Procedures Motion states that the Break–Up Fee is payable "in the event that the Purchased Assets or any part thereof are sold to a party other than Stalking Horse Bidders," that is not consistent with the Term Sheet. The Term Sheet provides that the Break–Fee Up is payable in circumstances where no one acquires any of the "Purchased Assets." *See* Term Sheet ¶ 9. Specifically, the Break–Up Fee is triggered in any of the following circumstances:

(i)    the consummation of the sale to an alternative bidder that the Bankruptcy Court determined submitted the highest and/or best offer for the Purchased Assets (or any part thereof), **or a similar non–bankruptcy transaction**; the consummation of a debtor–in–possession or other financing sufficient to (y) repay all of the amounts set forth in Sections 3(a) through 3(g) above [*i.e.*, the Base Purchase Price] and (z) pay the Expense Reimbursement and the Break–Up Fee to the Buyer; or

(ii)    the [Debtors] breaching their obligations under the Stalking Horse Purchase Agreement, including, without limitation, (A) by **withdrawing from the transaction** . . . , (B) **by failing to meet their time of the essence obligations herein [*i.e.*, under the Stalking Horse Purchase Agreement**, or (C) by making or allowing unilateral changes being made to the bidding procedures set forth below [*i.e.*, the Bidding Procedures] (or other terms agreed by the Parties as part of the

14

Bidding Procedures Order), except for changes agreed upon in writing by the Buyer (which consent shall not be unreasonably withheld).

*Id.* (emphasis added).  In other words, if this Court approves the Bid Procedures now but these cases are ultimately dismissed, or for whatever reason the Debtors do not or cannot sell all of the assets (including the Lease Assets, which they do not own), the Bidders have a single claim for over $8.3 million against the Debtors.  The Bid Procedures Motion does not disclose how the Debtors could ever pay the Break–Up Fee if there is no overbid.

At paragraph 30 of the Bid Procedures Motion, the Debtors seek authorization to exercise any remedies "to effectuate sales of, enforcement actions on, and/or foreclosure sales on, as applicable, the Debtors' direct and/or beneficial interests in any or all of the Purchased Assets. . . ." Bid Proc. Mot. ¶ 30.  The motion does not explain at all what the Enforcement Actions are or why they are needed, but it does state that any bidder "has disclaimed any enforcement action affecting the Debtors or the Purchased Assets." *Id.* ¶ 32.

Last, the Bid Procedures Motion indicates that the Purchased Assets include all material executory contracts of the Debtors and the Intermediate Lessors (which are not the Debtors'). *Id.* ¶ 33.[15]

### G.    The Debtors Refuse To Provide Information In Response To Properly Served Discovery

The Debtors incorporate the First Day Declaration into the Bid Procedures Motion and make numerous factual assertions, including alleged negotiations with the two stalking horse bidders as well as other bidders. *See, e.g.*, Bid. Proc. Mot. ¶ 18.

---

[15]   It is unclear from the Bid Procedures Motion what Enforcement Actions or material executory contracts Debtors are referring to.  However, to the extent Debtors' are referring to the Lease Assets, the contracts are not Debtors' property and Debtors have no right to take any Enforcement Actions related thereto.  As such, the requested authorization should be denied.

On January 3, 2022, FWCP served document requests on both Debtors, seeking documents relevant to both the Motion to Dismiss and the Bid Procedures Motion. *See* Finestone Decl. Exs. 6–7 (FWCP's First Requests for Production of Documents to the Debtors). FWCP also served a deposition notice for Mr. Ishikawa, to occur on January 11, 2022 and Rule 30(b)(6) depositions for each Debtor, to occur on January 12, 2022. *Id.* Exs. 8–10 (FWCP's Deposition Notices to the Debtors). The timing was dictated by the objection deadline the Debtors imposed and the Debtors' unwillingness to defer a hearing on the Bid Procedures Motion.

On January 7, 2022, the Debtors only produced bank statements and pointedly refused to produce any other documents[16] a position they confirmed in a "meet and confer" conference held on January 10, 2022. *See* FWCP's Counsel's Let'r to Chambers 2, Jan. 13, 2022, Dkt. No. 49. According to the Debtors, every other document is, *ipsit dixit*, irrelevant to the Motion to Dismiss and the Bid Procedures Motion. In other words, the Debtors believe irrelevant, and will not produce, any document controverting (a) any factual issue raised by FWCP in the Motion to Dismiss and (b) any communications with the stalking horse bidders or any other bidders, or creditors, concerning whether a sale in bankruptcy—as opposed to under the terms of the Proceeds Agreement—is necessary and appropriate.

The Debtors also refused to make Mr. Ishikawa available for a deposition, even though he is the sole representative of the Debtors, signed the Schedules and Statements, and submitted the First Day Declaration. Yet the Debtors did not seek a protective order or move quash, so FWCP began the deposition on January 11, 2021, and confirmed Mr. Ishikawa failed to appear. Finestone Decl. Ex. 13 (Certificate of No Appearance for Mr. Ishikawa's Rule 30 Deposition).

---

[16]  *See* Finestone Decl. Exs. 11–12 (Debtors' Responses And Objections to FWCP's First Set of Requests for Documents).

The Debtors also indicated that they would not designate anyone as a corporate representative for either Japan Debtor One or Japan Debtor Two.  *See* Finestone Decl. Ex. 14–15 (Debtors' Responses and Objections to FWCP's Notices of 30(b)(6) Depositions to Japan Debtor One and Japan Debtor Two).

Yet a few days earlier, on January 10, 2022, the Debtors filed the Declaration of Heinrich Loechteken In Support of the Bid Procedures Motion (Dkt. No. 44) ("**Loechteken Declaration**"). According to the Loechteken Declaration, Mr. Loechteken is employed by a subsidiary of JPL located in Ireland that purportedly provides aircraft leasing services.  Loechteken Declaration ¶ 1. But the Loechteken Declaration does not indicate that he or his company actually has any contractual relationship with either Debtor.   The Debtors also have not explained why the declaration was not filed on December 31, with the Bid Procedures Motion.

The Loechteken Declaration acts as a quasi–expert report[17] but also (1) purports to provide facts regarding negotiations with stalking horse bidders and other unnamed bidding candidates that the Debtors allegedly had discussions with after the Petition Date, and (2) purports to describe the planned marketing process.  *See id.* ¶¶ 12–15.  The Debtors have not produced any documents relied on by Mr. Loechteken or any documents evidencing any of the communications described therein.

Given the Debtors' abject failure to comply with the Federal Rules of Civil Procedure, FWCP will be seeking to exclude any documents or testimony the Debtors intend to seek to admit in connection with the Bid Procedures Motion.

---

[17]   It is not clear whether the Debtors are intending to offer Mr. Loechteken's declaration as expert or fact testimony.  FWCP reserves all rights to seek to exclude the Loechteken Declaration.

## OBJECTION

This Court should deny the Bid Procedures Motion.  It is procedurally improper and seeks

unprecedented relief.

## I.   THE DEBTORS SEEK TO SELL THE LEASE ASSETS, WHICH DO NOT CONSTITUTE PROPERTY OF THE ESTATE.

It is axiomatic that a bankruptcy estate can only seek to sell, and a bankruptcy court can

only approve, a sale of property of the estate.  *See, e.g.*, 11 U.S.C. §§ 363(b)(1), 541(a); *Reverend*

*C.T. Walker Hous. Dev. Fund Corp. v. City of New York*, 586 B.R. 534, 537 (E.D.N.Y. 2018) ("For

the bankruptcy court to order a sale under 11 U.S.C. § 363, the Property must qualify as property

of the estate under § 541.").  A person cannot sell property that person does not own, and likewise

cannot ask a bankruptcy court to exercise jurisdiction over such nondebtor property.

Yet that is precisely what the Debtors are seeking to do.  The Bidding Procedures, and

Stalking Horse Bid, require that the Debtors be permitted to sell *both* the aircraft (which the

Debtors do own) *and also* the Lease Assets, which the Debtors do not own.  *See* Bid Proc. Mot.

¶¶ 18, 32; Term Sheet ¶ 1.  The Debtors' effort to use this Court to further its scheme to

misappropriate the Lease Assets should be rejected.  The Lease Assets consist of any rights,

including claims against Vietnam Airlines, arising under the Subleases and the Head Leases, which

clearly belong to FWCP.

### A.   The Lease Assets Cannot, As A Matter Of Law, Be Sold By The Debtors Because They Do Not Own Them.

It is well settled that nonbankruptcy law determines what is a debtor's interest in property

in order to determine what constitutes property of the estate under Bankruptcy Code section 541(a).

*See, e.g.*, *Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and

defined by state law.  Unless some federal interest requires a different result, there is no reason

why such interests should be analyzed differently simply because an interested party is involved

in a bankruptcy proceeding."). Here, the law governing the Debtors' interest in the Lease Assets is English law, as Leases are governed by English law. *See* Finestone Decl. Exs. 2–3 (Head Leases) § 12 ("This Agreement . . . is governed by and shall be construed in accordance with English Law"); Finestone Decl. Exs. 4–5 (Subleases) § 28 ("This Agreement and any non–contractual obligations arising out of or in connection with this Agreement shall be governed by, and interpreted in accordance with, English law"); Gray Decl. Exs. 10, 17 (Security Assignment Agreements) § 19 ("This Agreement and any non–contractual obligation arising out of or in connection with it are governed by English law.").

Each Debtor absolutely assigned all rights, title, and interest in and to the Lease Assets to the Security Agent. Gray Decl. Exs. 10, 17 (Security Assignment Agreements) § 3.1; *see also* Shah Op. §§ D–F.[18] Under English law, the "assignment of a chose in action (a personal right of property which can only be claimed or enforced by action and not by taking physical possession) has four fundamental requirements" all of which are satisfied by the Security Assignment Agreements:

1.   The assignor must express a final and settled intention to transfer the chose to the assignee there and then;
2.   the chose must be owned by the assignor, capable of ascertainment and identified with sufficient certainty to establish what is being assigned; and
3.   the identity of the assignee must be clearly stated; and
4.   the appropriate form and formalities must have been satisfied.

*Id.* ¶ 25. The plain text of section 3.1 of the Security Assignment Agreements clearly establishes the first three elements. *Id.* ¶ 62. And the "appropriate form and formalities" were followed here because (i) the assignments were absolute; (ii) the Security Assignment Agreements were signed

---

[18] For avoidance of doubt, FWCP invokes Rule 44.1 of the Federal Rules of Civil Procedure and will have Mr. Shah, a United Kingdom law expert provide testimony on this issue.

by the Debtors; and (iii) proper notice was given to the Debtors. *Id* ¶ 64. The assignments that the Debtors and the Intermediate Lessors freely entered into long before these bankruptcy proceedings absolutely and unequivocally transferred ownership of the Lease Assets to the Security Agent. *Id.* ¶¶ 21–23. Upon transfer, the Debtors no longer retained any ownership interest in, right to possession of, or right to sell the Lease Assets. *See id.* ¶¶ 30–34. Further, even if the formal requirements were not satisfied, the Security Assignment Agreements still constitute equitable assignments of the Lease Assets because they are in writing and signed. *See id.* ¶¶ 27, 65. Equitable assignment also strips Debtors of any current ownership interest in or ability to sell the Lease Assets. *See id.* ¶ 31.

Debtors may argue that the assignment language in section 3.1 of the Security Assignment Agreements merely creates security interests, or "charges," in the Lease Assets in favor of the Security Agent, but this is clearly not so under English Law, which provides that the court must look at the terms of the document to determine whether the "assignor intended to pass all rights in the chose in action to the assignee (absolute assignment) or only such rights as would provide security for the money payable to the assignee (assignment by way of charge)." *Id.* ¶ 35(1) (citing *Bexhill UK Ltd v Razzaq* [2012] EWCA Civ 1376 at [45]; *Guest on the Law of Assignment, 5th edn.* 2–21).

Here, the terms of the Security Assignment Agreements clearly intend absolute transfers of the Debtors' respective interests in the Lease Assets. *First*, section 3.1 unambiguously states that it is assigning the Assigned Property "***absolutely*** by way of security." Gray Decl. Exs. 10, 17 (Security Assignment Agreements) § 3.1 (emphasis added). *Second,* section 3.2, which uses different language, unambiguously creates a charge on the Lease Assets, but only "to the extent not validly and effectively assigned pursuant to Clause 3.1." *Id.* § 3.2. If the Debtors only intended

section 3.1 to effect an assignment by way of charge, they knew how to do so, and chose instead to "assign absolutely" the Lease Assets. *Id.* § 3.1. *Third,* other sections of the Security Assignment Agreements are consistent with an absolute assignment. For instance, sections 12.1 and 13.9 grant the Security Agent power of attorney and prevent the Borrower from exercising rights under the Lease Assets. *See id.* §§ 12.1, 13.9; Shah Decl. ¶ 56. And section 8 of Schedule 1 to the Security Assignment Agreements provides that the Security Agent, not the Debtors, may choose where all proceeds of the Lease Assets are to be deposited. Gray Decl. Exs. 10, 17 (Security Assignment Agreements) Schedule 1 § 8; Shah Decl. ¶ 55. And, because the nonrecourse nature of the Loans, "an absolute assignment of the Assigned Property makes commercial sense, since it ensures that the Security Agent will at all times have recourse against the Assigned Property." Shah Decl. ¶ 60. *Finally,* the Debtors' purported reversionary interest in the Lease Assets constitute future interests, which does not give rise to present property interests in the Lease Assets. *See id.* ¶ 28 ("[O]nce the chose in action comes into existence in the hands of the assignor, the equitable interest in the chose passes directly into the hands of the assignee.").

Thus, under the controlling English law—which here determines each Debtors' interests (or lack thereof) s*ee Butner*, 440 U.S. at 55—FWCP owns the Lease Assets and is the sole party who can decide what to do with these assets. The Debtors have no legal or equitable interest in the Lease Assets. As such, the Lease Assets are not part of the Debtors' estates and cannot be sold as party of the proposed process.

### B.    The Debtors' Conditioning The Bid Procedures On The Sale Of The Lease Assets Requires Rejection Of Debtors' Scheme.

In a classic "cart before the horse" scheme, the Debtors' request the right to sell the Lease Assets *before* all loans have been paid in full. *See* Bid Proc. Mot. ¶ 20. This request seeks to exacerbate Debtors' improper bankruptcy filing by dragging this Court into the Debtors' efforts to

sell assets they do not own.  It should be denied.  Bankruptcy Judge Gonzalez confronted an analogous circumstance in *In re Loco Realty Corp.*, 2009 WL 2883050 (Bankr. S.D.N.Y. June 25, 2009), and rejected a debtor's request to misappropriate assigned lease assets to fund its plan.

There the debtor owned a 45–unit mixed–use apartment building in New York and borrowed $3 million from a bank secured by a promissory note and a mortgage.  *Id.* at *1.  The mortgage contained a provision assigning all of the debtor's interests in leases of the property to the bank.  *Id.*  When the debtor defaulted, the bank began a foreclosure process which was stayed when the debtor filed a chapter 11 case.  *Id.*  At the beginning of the bankruptcy, the debtor obtained permission from the court to use rents from the leases as cash collateral on an interim basis but no determination was made whether the rents were in fact cash collateral or property of the bank.  *See id.*  The bank then filed a motion to dismiss.  *Id.*  Starting with Bankruptcy Code section 541(a) and *Butner*, the court confronted whether the assignment clause was an absolute assignment or a security interest and determined that under applicable law the rents were the property of the bank.  *See id.* at *4–7.  The court next considered the debtor's revisionary interest (or what the court labeled an accounting) and held that the mere fact the debtor had a revisionary interest *after* the bank was paid did not render the rents themselves property of the estate, stating that "[i]n light of the fact that the Debtor only has an interest in the rents to the extent the mortgage is ever satisfied, the cash flow from the rents itself until the mortgage is satisfied is not property of estate and cannot be used by the Debtor to fund the plan."  *Id.* at *6.

The same reasoning applies here.[19]  The Lease Assets are not property of the estate because Debtors assigned away all of their interests.  *See* Shah Op. ¶¶ 21–75 (discussing legal effects of

---

[19]   In *Loco*, Judge Gonzalez, applied New York law to determine whether the disputed asset had been absolutely assigned, and in so doing noted that "New York law is, at best, unclear on the topic of whether an absolute assignment of rent transfers title to the rent upon execution of the

section 3.1 of the Security Assignment Agreements under English Law). Debtors cannot use the Lease Assets, including for a sale that might ultimately pay lenders in full. There is nothing in the Lease Assets for the Debtors to sell. Approving the Bid Procedures Motion, which seeks this Court's permission to allow the Debtors to sell assets they do not own and requires bidders to bid for the Lease Assets and the aircraft in a single package deal, would thus violate core bankruptcy law. 11 U.S.C. §§ 363(b)(1), 541(a); *Reverend C.T.*, 586 B.R. at 538 ("Because the Property was not property of the estate pursuant to § 541, the bankruptcy court properly denied C.T. Walker's motion to sell the Property under § 363."). It also creates confusion and uncertainty; no bidder will ever be able to comply because the Debtors cannot sell the Lease Assets.

Courts across the country have recognized that a debtor's prior, valid assignment of its assets removes those assets from the debtor's estate. Indeed, in cases where courts have found that the pre–petition conveyance effectuated a valid, absolute assignment of the debtor's interest in the disputed assets, courts have consistently and uniformly held that those assets are not part of the debtor's bankruptcy estate as a matter of law. *See, e.g.*, *In re Loco,* 2009 WL 2883050 at *4–7; *Reverend C.T.*, 586 B.R. at 538–39; *In re Town Center Flats, LLC*, 855 F.3d 721, 728 (2017).

For example, in *Town Center Flats*, the Sixth Circuit encountered this precise issue. *See* 855 F.3d at 724. There, the debtor argued that rental income from an investment property was part of the bankruptcy estate, even though the debtor assigned the rental income to a secured creditor in a bona–fide transaction that pre–dated the bankruptcy petition. *Id* at 723. As the transaction documents were subject to Michigan law, the court first considered the threshold question of

---

instrument." 2009 WL 2883050 1724, at *5. In contrast, it is well settled under English law that an absolute assignment is effected as the time of execution, provided that the requirements of section 136 of the Law of Property Act 1925 are satisfied. *See* Shah Op. ¶¶ 25–29 (discussing requirements for a valid, absolute assignment under English law).

whether the debtor had effectively assigned its interest in the rents under Michigan law, and whether the debtor retained any residual interest in the rents. *Id.* at 724–27. Finding that the debtor conveyed its property interest through an absolute assignment that was effective under Michigan law, the Sixth Circuit held that "the assigned rents in this case are not properly included in the [bankruptcy] estate" because the debtor "d[id] not retain ownership of the rents and does not hold residual property rights in those rents. Instead, the rents belong to [the creditor]." *Id.* at 728. So too here.

The Debtors validly and absolutely conveyed all their interests in the Lease Assets to the Security Agent under English Law. *See* Shah Decl. ¶¶ 21–25. This Court should employ the framework that has been used and endorsed by courts across this country to halt the Debtors' misguided efforts to sell assets they do not own. *See, e.g., Soho 25 Retail, LLC v. Bank of Am. (In re Soho 25 Retail, LLC)*, Nos. 10–15114 (SHL), 11–1286 (SHL), 2011 WL 1333084, at \*8 (Bankr. S.D.N.Y. Mar. 31, 2011) (holding that by virtue of a prepetition absolute assignment, contested rents "are not property of the Debtors' estate and cannot be used by the Debtor to fund a plan of reorganization."); *Sovereign Bank v. Schwab*, 414 F.3d 450, 453 (3d Cir. 2005) ("We conclude that the debtor had no interest in the rents when the petition was filed, because (A) the bank took title to the rents pre–petition, and (B) its subsequent appointment as receiver did not affect that title."); *First Fid. Bank, N.A. v. Jason Realty, L.P. (In re Jason Realty, L.P.)*, 59 F.3d 423, 427 (3d Cir. 1995) (holding that property rights that have been validly and absolutely conveyed under New Jersey law before Chapter 11 filings were not part of the bankruptcy estate); *cf. Nobelman v. Am. Sav. Bank*, 508 U.S. 324, 329 (1993) (holding that property rights that were bargained for and validly assigned under Texas law were not subject to modification pursuant to 11 U.S.C. § 1322).

Crediting the Debtors' position—that assets which they conveyed in a bona fide transaction that predated their petitions can be liquidated as part and parcel of a debtor's bankruptcy estate—invites the precise harms that the Supreme Court has repeatedly cautioned against. In *Butner*, the Supreme Court emphasized that bankruptcy courts must determine competing property claims based on the applicable state law in order to "reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving 'a windfall merely by reason of the happenstance of bankruptcy.'" 440 U.S. at 55 (quoting *Lewis v. Manufacturers Nat. Bank of Detroit*, 364 U.S. 603, 608 (1961)). This is the precise mischief the Debtors seek. Even though the Debtors lack a legitimate nexus to this United States and this forum, they have availed themselves of the Bankruptcy Code in hopes of receiving a windfall by selling assets that they do not own. The Debtors conveyed "all of its right, title and interest" interests in the Lease Assets between 2017 and 2018, years before filing bankruptcy. Gray Decl. Exs. 10, 17 (Security Assignment Agreements) § 3.1. In exchange, the Debtors received adequate consideration that they had bargained for. There is no dispute that this transaction effected a valid and absolute assignment of the Debtors' interest under English law. The Debtors should not be invited to abuse the Bankruptcy Code to realize a second profit by selling FWCP's property.

## II.    THE DEBTORS' "ALL OR NOTHING" BIDDING APPROACH IS IMPROPER.

The Debtors have treated these cases as if it is a single estate, not two separate estates with their own capital structures. Consistent with this mindset, the Debtors' Bid Procedures require any qualified bidder to bid for the assets of both Debtors as well as the non–Debtor Lease Assets; a bid is not qualified if submitted for only one Debtor's assets or only the aircraft that each Debtor owns. *See* Bid Proc. Mot. ¶ 32 (describing form and manner of bids).

Yet there has been no substantive consolidation, and the Debtors' hypocrisy is startling given that they negotiated with two bidders—Capital Reef and Isle Royale—to serve as stalking

horse bidders, a tacit recognition that the two Debtors' assets are distinct.    While the Bid
Procedures Motion should be denied under any circumstances, this Court should not force
competing bidders to have to acquire both Debtors' aircraft.

## III.    THE BREAK–UP FEE IS AN UNPRECEDENTED, IMPROPER LIQUIDATED DAMAGES PROVISION AND SHOULD NOT BE APPROVED.

This Court must not approve the proposed Break–Up Fee.  The Debtors have agreed to pay
over $8.3 million to the stalking horse bidders even if there is never a consummated overbid, *e.g.*,
if the Debtors withdraw the Bid Procedures Motion or the Debtors do not satisfy the deadlines they
imposed on themselves.  Bid Proc. Mot. ¶ 32.  This fee is earned even if this Court dismisses these
cases or determines that the Debtors cannot sell the Lease Assets.[20]  *See* Term Sheet ¶ 9.

These conditions effectively elevate a break–up fee into a liquidated damages provision,
which is improper.  *See, e.g.*, *In re Am. W. Airlines, Inc.*, 166 B.R. 908, 912–13 (Bankr. D. Ariz.
1994) ("As liquidated damages, the proposed break–up fee does not meet the standard of section
503 because it is not correlated to any transactional cost or expense incurred by the negotiating
bidder."); *In re S.N.A. Nut Co.*, 186 B.R. 98, 103 (Bankr. N.D. Ill. 1995) ("Liquidated damages
are inappropriate because an enforceable contract for a sale of assets does not exist until court
approval has been obtained."); *In re Hupp Indus., Inc.*, 140 B.R. 191, 196 (Bankr. N.D. Ohio 1992)
("A break–up fee should not be authorized as an administrative expense where it is ill–defined,
not correlated to an actual transactional cost or expense incurred by the negotiating bidder, and
otherwise cannot be addressed under a specific provision of § 503(b).").  A break–up fee is
supposed to reward a stalking horse for its time and expenses that results in others stepping forward
and offering more.  *See Gey Assocs. Gen. P'ship v. 310 Assocs., L.P. (In re 310 Assocs.)*, No. 02

---

[20]    FWCP notes that while 4% is within the range courts have approved, here, that 4% is payable
whether there is a consummated sale or not, which is unprecedented.

Civ. 0710, 2002 WL 31426344, at *2 (S.D.N.Y. Oct. 29, 2002), *aff'd* 346 F.3d 31, 34 (2d Cir.

2003) ("Breakup fees are designed to reward those bidders who function as 'stalking horses,'

allowing the seller to search for higher offers and setting a floor price on the transaction."). But

here the Debtors do the opposite—they bind themselves to paying almost $10 million (that Debtors

do not have and have no means of obtaining) even if there is no resulting benefit.

Not a single precedent the Debtors cite at paragraph 56 of the Bid Procedures Motion

authorized such relief, even though the Debtors represent that "[s]imilar types of bid protections

have been approved by this Court." Bid Proc. Mot. ¶ 56. In each one of the cases cited, the break–

up fee the court approved was triggered only by an overbid resulting in a consummated transaction.

*See* Exhibit A attached hereto, which contains a chart comparing each of the Debtors' cited cases,

along with copies of the cited bid procedures orders and relevant excerpts from the applicable asset

purchase agreements.

## IV.   THE DEBTORS' RESTRICTIONS ON CREDIT BIDDING ARE INAPPROPRIATE.

While this Court need not address the issue if the Motion to Dismiss is granted, the Bid

Procedures Motion also is flawed because it improperly restricts credit bidding rights. Bankruptcy

Code section 363(k) preserves a secured creditor's nonbankruptcy law credit bidding absent a

showing of cause. "At a sale under subsection (b) of this section of property that is subject to a

lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such

claim may bid at such sale, and, if the holder of such claim purchases such property, such holder

may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k); *In re

Aéropostale, Inc.*, 555 B.R. 369, 415 (Bankr. S.D.N.Y. 2016) ("The modification or denial of

credit bid rights should be the extraordinary exception and not the norm."); *ASSF IV AIV B

Holdings III, L.P. v. Empire Generating Co., LLC (In re Empire Generating Co., LLC)*, No. 19–

CV–5721 (CS), 2020 WL 1330285, at *11 (S.D.N.Y. Mar. 23, 2020) ("It is beyond peradventure that a secured creditor is entitled to credit bid its allowed claim") (internal quotation omitted).

The Debtors have not attempted to establish cause for altering the credit bidding rights of any secured creditors of the Debtors in any way, yet the proposed Bid Procedures impose severe restrictions on credit bidding rights.

First, unlike any other bidder, credit bidders must submit a statement by January 28, 2022—well before any other bidder is required to act. *See* Bid Proc. Mot ¶ 32. The statement must contain several administrative actions but also a "cash component" and a deposit. *See id.*

This is in addition to all of the requirements every bidder must provide,[21] including confirmation that the bidder and its affiliates will not take any enforcement action outside of these cases "in respect of any of the Purchased Assets and/or any other assets in which either the Debtors or their affiliates has a property interest." *See id*. This is an extraordinary restriction on the Debtors' secured lenders, who have rights against JPL and the Intermediate Lessors, as well as rights with respect to the Lease Assets. The automatic stay does not apply to any such enforcement actions against nondebtors, and no property of the estate is implicated if FWCP takes action against JPL or the Intermediate Lessors and their property, so there should be no reason that FWCP or any other secured creditor forfeits its right to credit bid simply because they are exercising their rights.

This is an undue burden that is designed to prevent any credit bidding by FWCP. This is improper, and the Debtors do not cite any cases, or provide any evidence, justifying this behavior.[22]

---

[21] According to the Bid Procedures, the Debtors need only consider bids submitted by "Qualified Bidders" and a Qualified Bidder must first be a "Potential Bidder." *Id*. It appears that any credit bidder must also satisfy various conditions to be a "Qualified Bidder." *See id.*

[22] The Bid Procedures are littered with additional questionable provisions that, if a creditors' committee existed, it would object to. For example, the Bid Procedures state that the Debtors can restrict any "competitor" from seeing commercially sensitive information. Bid Proc. Mot. at 8. Yet the Debtors are special–purpose vehicles with no business purpose other than to passively own

## V.    THE BID PROCEDURES MOTION SHOULD BE DENIED (OR DEFERRED) UNTIL AFTER RESOLUTION OF THE MOTION TO DISMISS.

This Court should deny the Bid Procedures Motion (or defer ruling) in light of the Motion to Dismiss.  It makes no sense to consider the Bid Procedures Motion when any ruling would, at best, be advisory and, at worst, may improperly cause the Debtors to become liable for over $8.3 million in liquidated damages.

The impropriety of these bankruptcy is addressed in detail in the Motion to Dismiss.  *See* Mot. to Dismiss §§ III.A, III.C, III.E.  Dismissal is proper because, among other reasons, the Debtors are ineligible under Bankruptcy Code section 109, these cases were commenced in bad faith and must be dismissed for cause, and this Court should abstain under section 305.  These are threshold issues that concern the invocation of this Court's power at the moment the petitions were filed.  The Motion to Dismiss does not concern what might be cause for events occurring during the chapter 11 cases.

Moreover, deferring the Bid Procedures Motion avoids the absurd circumstance where the Debtors become liable for the Break–Up Fee regardless of whether the Motion to Dismiss is granted.  That would be bizarre and detrimental to the Debtors and their secured creditors.

The Debtors have no cause to complain.  They apparently negotiated with Capital Reef and Isle Royale knowing full well that FWCP would be moving to dismiss.  And while the Term Sheet purports to require the hearing on the Bid Procedures Motion to occur at the earliest possible date, the Bidding Procedures are subject to changes agreed to by the stalking horse bidders, who shall not unreasonably withhold consent.  Bid Proc. Mot. ¶ 32.  If Capital Reef and Isle Royale refuse

---

a single aircraft.  Either they have no competitors, or every person on earth interested in their assets, is a competitor.

to consent to the hearing being at least continued until after resolution of the Motion to Dismiss, then that refusal clearly would be unreasonable.

## **CONCLUSION**

Based on the foregoing, FWCP respectfully requests that this Court deny the Bid Procedures Motion.

*Draft 1/12/22*
*Confidential Attorney Work Product*

Dated: January 13, 2021

Respectfully submitted,

/s/ *Benjamin I. Finestone*　　　　　　

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Benjamin I. Finestone
Zachary R. Russell
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849–7000
Facsimile: (212) 849–7100
benjaminfinestone@quinnemanuel.com
zacharyrussell@quinnemanuel.com

Justin C. Griffin (pro hac vice admitted)
Eric Winston (pro hac vice admitted)
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443–3000
Facsimile: (213) 443–3100
justingriffin@quinnemanuel.com
ericwinston@quinnemanuel.com

Asher B. Griffin (pro hac vice admitted)
300 West 6th Street, Suite 2010
Austin, TX 78710
Telephone: (737) 667–6100
Facsimile: (737) 667–6110
ashergriffin@quinnemanuel.com

*Counsel to FitzWalter Capital Partners (Financial
Trading) Limited*

*Draft 1/11/22*
*Confidential Attorney Work Product*

## Exhibit A

Comparison of Break–Up Fee Triggers

| Case | Break Up Fee Triggers | Comparison to Stalking Horse APA |
|------|----------------------|----------------------------------|
| *In re A.B.C. Carpet Co., Inc., et al.*, Case No. 21–11591 (DSJ) (Bankr. S.D.N.Y. Oct. 1, 2021) | 1. The *A.B.C.* Stalking Horse APA is terminated by the Buyer pursuant to Section 10.1(i), which states that the Agreement will terminate automatically "upon Sellers consummating an Alternative Transaction." *See A.B.C.* Stalking Horse APA §§ 10.1(i); 10.2(b).[23] An "Alternative Transaction" is "any transaction or series of transactions, whether a going concern sale, liquidation or otherwise, that involves a sale of all or substantially all of the Business or the Acquired Assets by Sellers to a purchaser or purchasers other than Buyer." *Id.* § 12.1.<br><br>2. The *A.B.C.* Stalking Horse APA is terminated by the Seller pursuant to Section 10.1(j), which allows for termination if the "board of directors of the Seller determines . . . that proceeding with the transactions . . . would be inconsistent with its fiduciary duties" and it is determined that the board of directors . . . utilized Section 10.1(j) with the intention or purpose to circumvent the Break–Up Fee or Expense Reimbursement." *Id.* §§ 10.1(j); 10.2(b). | Does not provide for the payment of the Break–Up Fee upon the occurrence of a withdrawal or failure to achieve milestones, which is specifically provided for here. *See* Term Sheet ¶ 9 (providing for payment of Break–Up Fee if "the Sellers breach[ ] their obligations herein, including, without limitation, (A) by withdrawing from the Transaction (other than being under the circumstances set forth in clauses (i) (other bidder(s) being selected as the highest and/or best bid for all of the Purchased Assets) or (ii) (sufficient refinancing obtained)), (B) by failing to meet their time of the essence obligations herein or (C) by making or allowing unilateral changes being made to the bidding procedures set forth below (or other terms agreed by the Parties as part of the Bidding Procedures Order).)" |
| *In re Fairway Group Holdings Corp.*, Case No. 20–10161 (JLG) (Bankr. S.D.N.Y. Feb. 21, 2020) | 1. A Competing Bid, defined as a "higher or better competing bid[] in respect of all or any part of the Acquired Assets in accordance with the Bidding Procedures Order", is consummated; and | Does not provide for the payment of the Break–Up Fee upon the occurrence of a withdrawal or failure to achieve milestones, which is specifically provided for here. *See* Term Sheet ¶ 9 (providing for payment of Break–Up Fee if "the Sellers breach[ ] their obligations herein, |

---

[23]   The *A.B.C.* Bid Procedures Order (Dkt. No. 120 in Case No. 21–11591 (Bankr. S.D.N.Y.)) and relevant portions of the *A.B.C.* Stalking Horse APA (Dkt. No. 18–2 in Case No. 21–11591 (Bankr. S.D.N.Y.)) are attached to Finestone Declaration as Exhibit 16.

*Draft 1/11/22*
***Confidential Attorney Work Product***

| Case | Break Up Fee Triggers | Comparison to Stalking Horse APA |
|---|---|---|
| | 2.  The stalking horse bidder is not in material breach of the Fairway Group Stalking Horse APA.<br><br>*See Fairway Group* Stalking Horse APA §§ 5.4(a); 5.4(b).[24] | including, without limitation, (A) by withdrawing from the Transaction (other than being under the circumstances set forth in clauses (i) (other bidder(s) being selected as the highest and/or best bid for all of the Purchased Assets) or (ii) (sufficient refinancing obtained)), (B) by failing to meet their time of the essence obligations herein or (C) by making or allowing unilateral changes being made to the bidding procedures set forth below (or other terms agreed by the Parties as part of the Bidding Procedures Order).)" |
| *In re Hooper Holmes, Inc. d/b/a Provant Health*, Case No. 18–23302 (RDD) (Bankr. S.D.N.Y. Sept. 20, 2018) | 1.  The "Bankruptcy Court . . . enters an order approving an offer to purchase the Transferred Assets submitted by an Alternative Purchaser"; and<br><br>2.  Such "Alternative Purchaser closes on the sale with the Sellers."<br><br>*See Hooper Holmes* Stalking Horse APA § 2.5.[25] | Does not provide for the payment of the Break–Up Fee upon the occurrence of a withdrawal or failure to achieve milestones, which is specifically provided for here.  *See* Term Sheet ¶ 9 (providing for payment of Break–Up Fee if "the Sellers breach[ ] their obligations herein, including, without limitation, (A) by withdrawing from the Transaction (other than being under the circumstances set forth in clauses (i) (other bidder(s) being selected as the highest and/or best bid for all of the Purchased Assets) or (ii) (sufficient refinancing obtained)), (B) by failing to meet their time of the essence obligations herein or (C) by making or allowing unilateral changes being made to the bidding procedures set forth below (or other terms agreed by the Parties as part of the Bidding Procedures Order).)" |
| *In re Nine West Holdings, Inc.*, Case No. 18–10947 (SCC) (Bankr. S.D.N.Y. May 7, 2018) | 1.  The *Nine West* Stalking Horse APA is terminated after the Bid Procedures Hearing Date pursuant to sections 9.1(b) (failure to close by Outside Date); 9.1(d) (breach of any representation, warranty, covenant or | Does not provide for the payment of the Break–Up Fee upon the occurrence of a withdrawal or failure to achieve milestones, which is specifically provided for here.  *See* Term Sheet ¶ 9 (providing for payment of Break–Up Fee if "the Sellers breach[ ] their obligations herein, |

---

[24]    The *Fairway Group* Bid Procedures Order (Dkt. No. 202 in Case No. 20–10161 (Bankr. S.D.N.Y.)) and relevant portions of the *Fairway Group* Stalking Horse APA (Dkt. No. 21, Ex. C, in Case No. 20–10161 (Bankr. S.D.N.Y.)) are attached to Finestone Declaration as Exhibit 17.

[25]    The *Hooper Holmes* Bid Procedures Order (Dkt. No. 119 in Case No. 18–23302 (Bankr. S.D.N.Y.)) and relevant portions of the *Hooper Holmes* Stalking Horse APA (Dkt. No. 119–1 in Case No. 18–23302 (Bankr. S.D.N.Y.)) are attached to Finestone Declaration as Exhibit 18.

*Draft 1/11/22*
***Confidential Attorney Work Product***

| Case | Break Up Fee Triggers | Comparison to Stalking Horse APA |
|---|---|---|
| | agreement made by Seller without cure); 9.1(e) (dismissal or conversion of Ch. 11 case); 9.1(f) & (h) (Alternative Transaction); 9.1(g) (BoD finding of inconsistency with fiduciary duties); 9.1 (i) (government intervention).<br><br>2.  The Sellers enter into or consummate an Alternative Transaction at any time within nine (9) months following such termination, with Alternative Transaction defined to mean "a sale, transfer or other disposition, directly or indirectly, whether by means of an asset sale, merger, sale of stock, amalgamation, reorganization, liquidation or otherwise, of any material portion of the Acquired Business, or 10% or more of the Purchased Assets, in a transaction or a series of transactions with one or more Persons, other than Buyer and/or its Affiliates."<br><br>*See Nine West* Stalking Horse APA §§ 5.1(b); 9.1; 1.1(h).[26] | including, without limitation, (A) by withdrawing from the Transaction (other than being under the circumstances set forth in clauses (i) (other bidder(s) being selected as the highest and/or best bid for all of the Purchased Assets) or (ii) (sufficient refinancing obtained)), (B) by failing to meet their time of the essence obligations herein or (C) by making or allowing unilateral changes being made to the bidding procedures set forth below (or other terms agreed by the Parties as part of the Bidding Procedures Order).)" |
| *In re Avaya, Inc.*, Case No. 17–10089 (SMB) (Bank. S.D.N.Y. Apr. 5, 2017) | 1.  The *Avaya* Stalking Horse APA is terminated pursuant to sections 8.01(b) (sale violates law or Order, or no Closing by End Date (9 months)); 8.01(c) (breach of any representation, warranty, covenant or agreement made by Seller without cure); 8.01(f) (Alternative Transaction or dismissal/conversion, or Court denies approval); 8.01(g) (withdrawal of Bidding Procedures, Purchaser is not Successful Bidder or Backup Bidder, or Sale Order not entered by 120 days | Does not provide for the payment of the Break–Up Fee upon the occurrence of a withdrawal or failure to achieve milestones, which is specifically provided for here.  *See* Term Sheet ¶ 9 (providing for payment of Break–Up Fee if "the Sellers breach[ ] their obligations herein, including, without limitation, (A) by withdrawing from the Transaction (other than being under the circumstances set forth in clauses (i) (other bidder(s) being selected as the highest and/or best bid for all of the Purchased Assets) or (ii) (sufficient refinancing obtained)), (B) by failing to meet their time of the essence |

---

[26]   The *Nine West* Bid Procedures Order (Dkt. No. 223 in Case No. 18–10947 (Bankr. S.D.N.Y.)) and relevant portions of the *Nine West* Stalking Horse APA (Dkt. No. 20, Ex. B, in Case No. 18–10947 (Bankr. S.D.N.Y.)) are attached to Finestone Declaration as Exhibit 19.

*Draft 1/11/22*
*Confidential Attorney Work Product*

| Case | Break Up Fee Triggers | Comparison to Stalking Horse APA |
|------|----------------------|----------------------------------|
|  | from Agreement); 8.01(h) (finding of inconsistency with fiduciary duties); and<br><br>2.  The Sellers consummate an Alternative Transaction within one (1) year of termination.  "Alternative Transaction" is defined broadly as (i) any recapitalization transaction, plan of reorganization, liquidation, or sale, including any such transaction by way of a credit bid or by any creditor of a Debtor, involving (directly or indirectly) all or any material portion of the Transferred Assets, or (ii) any merger, consolidation, share exchange, business combination or similar transaction (directly or indirectly) involving all or any material portion of the Transferred Assets, in each case whether in one transaction or a series of transactions, or (iii) one or more sales, assignments, leases, transfers, or other dispositions of all or any material portion of the Transferred Assets to any Person (or group of Persons), whether in one transaction or a series of transactions.<br><br>*See Avaya* Stalking Horse APA §§ 5.15(a); 8.01; 11.05.[27] | obligations herein or (C) by making or allowing unilateral changes being made to the bidding procedures set forth below (or other terms agreed by the Parties as part of the Bidding Procedures Order).)" |
| *In re Hostess Brands, Inc.*, Case No. 12–22052 (Bankr. S.D.N.Y. 2013) | 1.  The *Hostess Stalking* Horse APA is terminated pursuant to sections 4.4(e) (breach of any representation, warranty, covenant or agreement made by Seller without cure) or 4.4(h) (Competing Transaction); and<br><br>2.  A Competing Transaction is consummated.  "Competing | Does not provide for the payment of the Break–Up Fee upon the occurrence of a withdrawal or failure to achieve milestones, which is specifically provided for here.  *See* Term Sheet ¶ 9 (providing for payment of Break–Up Fee if "the Sellers breach[ ] their obligations herein, including, without limitation, (A) by withdrawing from the Transaction (other than being under the circumstances set forth in clauses (i) (other |

---

[27]  The *Avaya* Bid Procedures Order (Dkt. No. 356 in Case No. 17–10089 (Bankr. S.D.N.Y.)) and relevant portions of the *Avaya* Stalking Horse APA (Dkt. No. 223–1 in Case No. 17–10089 (Bankr. S.D.N.Y.)) are attached to the Finestone Declaration as Exhibit 20.

*Draft 1/11/22*
*Confidential Attorney Work Product*

| Case | Break Up Fee Triggers | Comparison to Stalking Horse APA |
|------|----------------------|----------------------------------|
|  | Transaction" is "any transaction (or series of transactions) involving the direct or indirect sale, transfer or other disposition of all, or a material portion of, the Purchased Assets to a purchaser or purchasers other than Purchaser or effecting any other transaction (including a Chapter 11 plan) the consummation of which would be substantially inconsistent with the transactions herein contemplated" <br><br> *See Hostess* Stalking Horse APA §§ 7.2, 7.1.[28] | bidder(s) being selected as the highest and/or best bid for all of the Purchased Assets) or (ii) (sufficient refinancing obtained)), (B) by failing to meet their time of the essence obligations herein or (C) by making or allowing unilateral changes being made to the bidding procedures set forth below (or other terms agreed by the Parties as part of the Bidding Procedures Order).)" |

---

[28]   The *Hostess* Bid Procedures Order (Dkt. No. 2216 in Case No. 12–22052 (Bankr. S.D.N.Y.)) and relevant portions of the *Hostess* Stalking Horse APA (Dkt. No. 2078, Ex. A, in Case No. 12–22052 (Bankr. S.D.N.Y.)) are attached to Finestone Declaration as Exhibit 21.