UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | : |
| | :    Chapter 11 |
| JPA NO. 111 CO., LTD., and | : |
| JPA NO. 49 CO., LTD., | :    Case No. 21–12075 (DSJ) |
| | : |
|             Debtors.[1] | :    (Jointly Administered) |
| | : |
| | : |

**REPLY OF FITZWALTER CAPITAL PARTNERS (FINANCIAL TRADING) LIMITED TO PLEADINGS FILED IN SUPPORT OF DEBTORS' OBJECTION TO MOTION DISMISS OR ABSTAIN FROM HEARING THESE CHAPTER 11 CASE**

FitzWalter Capital Partners (Financial Trading) Limited ("**FWCP**"), respectfully submits this Reply in support of its motion to dismiss (Dkt. No. 22) (the "**Motion**")[2] and in response to: Sumitomo Mitsui Trust Bank's ("**SMTB**") Statement Regarding The Bidding Procedures Motion and The Dismissal Motion (Dkt. No. 51) ("**SMTB's Objection**"); Mizuho Leasing Co. Ltd.'s ("**Mizuho**") Objection to the Motion (Dkt No. 54) ("**Mizuho's Objection**"); and JP Lease Product & Services Co.'s ("**JPL**") Response Objecting to the Motion to Dismiss and Supporting the Motion to Approve Bidding Procedures (Dkt No. 55) ("**JPL's Objection**," collectively the "**Objections**").[3] For the foregoing reasons, this Court should grant the Motion to dismiss these Chapter 11 proceedings.

---

[1] The Debtors in these Chapter 11 cases are: JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd. The Debtors' corporate address is: Kasumigaseki Common Gate West Tower, 3–2–1 Kasumigaseki, Chiyoda–Ku, Tokyo 100–0013.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion or the Declaration of Andrew Gray in Support of the Motion (Dkt. No. 23) (the "**Gray Declaration**"), as applicable.

[3] FWCP separately submits a reply to the Debtors' Objection to the Motion (Dkt. No. 53).

**INTRODUCTION**

This Court should respect the contractual terms that the parties negotiated for in good-faith and voluntarily assumed by entering into the Proceeds Agreement. It should not entertain the unsubstantiated claims or a conclusory, factual narrative that is unsupported by any declaration or other evidence. These baseless attacks seek to obscure the fact that the Objections fail to address the *C-TC*[4] factors or the dispositive, gating issues that are before this Court.

There is no dispute that the parties who filed the Objections are bound by complex transaction documents that were designed to address the Debtors' current default and that provide for an orderly sale of assets and distribution of proceeds. All parties agreed that bankruptcy was not the proper forum to resolve a party's default and the transaction documents specifically make JPL's support of this bankruptcy proceeding an explicit breach of its contractual duties. *See* Gray Decl. Exs. 7, 14 (Proceeds Agreements) § 3.1.3.

Allowing these bankruptcy proceedings to continue risks creating a dangerous precedent that would disturb the reasonable expectations of the sophisticated parties that sustain the aircraft financing industry, while perversely encouraging future parties to abuse the bankruptcy code whenever they become dissatisfied with their contractual commitments. The Bankruptcy Code does not countenance equitable relief for parties that regret their bargains; it protects parties that have a good-faith desire to restructure their operations. Because good-faith is absent in this case and for the reasons below, this Court should dismiss these Chapter 11 proceedings.

*First*, the Objections lack any evidentiary support for the factual assertions made therein and this Court's analysis should not be informed by these unsubstantiated arguments.

---

[4] *See In re C-TC 9th Ave. Partnership*, 113 F.3d 1304 (2d Cir. 1997).

***Second***, JPL, SMTB and Mizuho—like the Debtors—are bound by the Proceeds Agreement. Their conclusory allegation that a bankruptcy sale would generate more value than FWCP's sale is not a legitimate basis to pursue liquidation through bankruptcy. There is no dispute that FWCP's sale was consistent with the terms of the transaction documents. The desire to alter the terms and rights granted pursuant to the Proceeds Agreement is not a legitimate basis to invoke this Court's jurisdiction.

***Third***, the Objections largely concede FWCP's argument that the *C-TC* factors are satisfied. Nevertheless, they claim that FWCP has no right to complain about the Debtors' proposed sale because they claim the sale will result in full payment of the secured debt obligations. The assertion that the offer to pay the outstanding principal, interest, and expenses is sufficient to pay "the full amount that any secured creditor is entitled to receive" is simply not true. JPL's Obj. 6.

Pursuant to the Transaction Documents, the Secured Obligations cover a wide range of obligations that extend far beyond principal, interest, and expenses, and include liabilities stemming from the breach of the Transaction Documents. *See* Gray Decl. Exs. 7, 14 (Proceeds Agreements) at Appendix A. Here, JPL and its non-Debtor subsidiaries (the "**JPL Parties**") have engaged in a concerted course of action to breach the Transaction Documents, slander, and defame FWCP. This conduct has and continues to cause FWCP significant damages that are recoverable as Secured Obligations. Because of the significant harm caused by the JPL Parties and the corresponding increase in the amount of Secured Obligations, the proposed transaction is not sufficient to pay "the full amount that any secured creditor is entitled to receive." JPL's Obj. ¶ 7.

Even this claim were true, accepting the argument that a contract can be disregarded for bankruptcy proceedings whenever a party to the contract deems that bankruptcy provides for a

3

marginally better outcome for some of the parties to a contract will frustrate the reasonable expectations of the sophisticated parties that sustain the airplane financing industry. It will also encourage improper filings, such as the one *sub judice*. For these reasons, this Court should dismiss these Chapter 11 cases or, alternatively, abstain from hearing them.

## ARGUMENT

### A. The Parties Are Bound By The Proceeds Agreements And Should Not Be Allowed To Use Bankruptcy To Renegotiate The Terms Of These Agreements.

Like the Debtors and FWCP, JPL, SMTB, and Mizuho are all parties that are bound by the terms of the Proceeds Agreements. Gray Decl. Exs. 7, 14 (Proceeds Agreements) 1. The Proceeds Agreements sets out "the manner and order of priorities" for distribution of proceeds arising from the transaction documents. *Id*. § 2. The Proceeds Agreements provide that "[t]he Security Agent will enforce the Collateral and undertake Enforcement Action (or refrain from doing so as directed by the Instructing Party)." *Id*. § 9.1. The Instructing Party is defined as the Majority Senior Secured Parties—*i.e.* FWCP. *Id*. at 90. The Proceeds Agreements empower the Instructing Party—FWCP—to direct the Security Agent "and do any other things in relation to the enforcement of the Collateral . . . that is considers appropriate including (without limitation) determining the timing and manner of any Enforcement Action against any particular person or asset." *Id*. § 9.1.

By its plain terms, the Proceeds Agreements gives the Security Agent and the Majority Senior Secured Parties wide discretion to initiate and pursue enforcement actions. While the Debtors and the Objections cast FWCP's enforcement efforts in a negative light, no party has argued or demonstrated that the prepetition sale was inconsistent with the terms of the transaction documents. On December 2, 2021, when FWCP became Security Agent, the Debtors and VNA had been in default on their obligations for almost a year. *See* Gray Decl. ¶¶ 68, 76.. During this

4

time, VNA continued to operate the aircraft and depreciate the value of those assets. *Id.* ¶¶ 74–75. Given the ongoing breaches and the termination notices issued on December 1, 2021, FWCP retained Airborne Capital Limited, a well-known aircraft asset manager to conduct a sale of the lease-related rights. *Id.* ¶¶ 80–83. The unfounded attack on FWCP is baseless as there is no debate that there was an ongoing default, a sale was needed to monetize the security for the benefit of the secured creditors and that process was both reasonable and authorized under the plain meaning of the transaction documents. *See* id. Exs. 7, 14 (Proceeds Agreements) §§ 2, 9.1, 9.2.

Moreover, by entering into the Proceeds Agreements, JPL, SMTB and Mizuho expressly waived any right to demand that the Security Agent take enforcement actions in any particular time, place, or manner. *See id.* § 9.2. While the Objections do not acknowledge that the Proceeds Agreements provided for an orderly distribution scheme and empowered FWCP to determine when, where, and how to take enforcement actions, the foregoing provisions reveal that the Objections complain about the bargain that was entered into more than two years before these cases were initiated. While the Objections—and the Debtors—spend considerable effort attempting to attack FWCP's prepetition sale, no party has shown how FWCP's enforcement efforts were inconsistent with its powers, duties, and rights under the Proceeds Agreements.

The simple truth is that FWCP's sale was consistent with its rights under the transaction documents and that the Objections essentially complain about the bargain their negotiated for. But the bankruptcy code is not a haven for parties that are dissatisfied with their bargains and should not provide refuge to parties, like JPL, that have no regard for their contractual obligations.

B.    **The Parties Have No Submitted Any Evidence In Support Of Their Position.**

The Objections' complaints concerning FWCP's prepetition sale are nothing more than conclusory rhetoric that should be ignored by this Court. The Objections are not supported by any

declarations, documents, or other evidence. They make the unsupported allegations that FWCP's prepetition sale would not have maximized value for JPL and the junior lenders, *see, e.g.*, JPL's Obj. 6, but do not submit any evidence to support this contention, or any of their other allegations.

As a matter of law, the parties cannot petition this Court for relief absent a reliable evidentiary record that supports their desired relief. The absence of a scintilla of supporting evidence shows that the Objections were not intended to engage with the dispositive issues raised by the Motion. Instead, the purpose of the Objections—and the conclusory allegations contained therein—is to distract from the dispositive, gating issues that are before this Court: whether the Debtors have demonstrated their eligibility to pursue bankruptcy and whether cause exists to dismiss these Chapter 11 cases. The Court should disregard any and all "facts" referenced in the Objections as they are conclusory and unsupported by any evidence.

C.    **The *C-TC* Factors Are Satisfied And Weigh In Favor Of Dismissal.**

The Objections did not contest that the *C-TC* factors should inform this Court's analysis of whether cause exists to dismiss these Chapter 11 cases. As explained in the Motion, courts considering dismissal under section 1112 look to whether there is a reasonable likelihood of successful reorganization and whether the petition was filed in bad faith. Mot. 4 (quoting *In re Reyes*, No. 14-13233 (SMB), 2015 WL 4624156, at *4 (Bankr. S.D.N.Y. Aug. 4, 2015)). In considering bad faith, courts within the Second Circuit consider whether:

> (1) the debtor has only one asset;
> (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;
> (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;
> (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;
> (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

6

> (6) the debtor has little or no cash flow;
> (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and
> (8) the debtor has no employees.

*C-TC*, 113 F.3d at 1311. While no single factor is dispositive, *id.*, FWCP notes that the Objections concede that most of the *C-TC* factors are satisfied on the current record. And the Objections do not challenge FWCP's contention that once the good faith of a debtor is called into question, the burden shifts to the debtor to demonstrate that the petition was filed in good faith. Mot. 14–15 (quoting *In re Syndicom Corp.*, 268 B.R. 26 (Bankr. S.D.N.Y. 2001)). The only factors that the Objections address is whether this is a two-party dispute and whether the proposed sale, if consummated, would satisfy the secured obligations. On both points, the Objections are wrong.

The Objections misunderstand when a bankruptcy case is essentially a two-party dispute. For example, JPL denies this is a two-party dispute, reasoning that it is "the party-in-interest that holds the fulcrum rights . . . who will only receive recoveries if the Chapter 11 Cases are maintained." JPL's Obj. 4. While JPL and FWCP have divergent interests, there is no suggestion that JPL (the Debtors' parent and 100% equity holder) has interests that diverge from the Debtors' interests. And—like the Debtors—JPL fully support selling the assets through bankruptcy. *Id.* 7. As to SMTB and Mizuho, these parties are bound by the Proceeds Agreements and therefore have no legitimate interests that diverge from FWCP's, who serves as their Security Agent. Therefore, this effectively a two party dispute between the parties to the Proceeds Agreements that wish to enjoy the benefit of their bargain, on the one hand, and the parties to the Proceeds Agreements that wish to use bankruptcy proceedings to escape the burden of their bargain, on the other hand.

**D.   The Stalking Horse Bid Is Not Sufficient To Satisfy All Secured Obligations.**

The Objections hinge on the conclusory, and incorrect, claim that the Stalking Horse Bid is sufficient to satisfy all of the secured obligations. In fact, SMTB's Objection specifically states

7

that "SMTB has no objection . . . provided that the MSN 173 Senior Secured Obligations will be paid in full at closing . . . ." SMTB's Obj. 3. But the current Stalking Horse Bid does not meet this condition. Pursuant to the Proceeds Agreements:

> "Secured Obligations" means any and all moneys, liabilities and obligations (whether actual or contingent, whether now existing or hereafter arising, whether or not for the payment of money and including, without limitation, any obligation or liability to pay damages) from time to time owing to any of the Finance Parties by any Obligor pursuant to any Transaction Document, notwithstanding that the recourse of the Finance Parties against any person may be limited in recourse.

Gray Decl. Exs. 7, 14 (Proceeds Agreements) at Appendix A. Thus the "Secured Obligations" are much broader than the principle, interest, and expense covered by the Stalking Horse Bid. *See* Bid. Proc. Mot. Ex. B (Stalking Horse Term Sheet) § 3(c); *see also id*. at Appendix A 101 (defining "Senior Finance Party" as "any or all as the context requires of the Senior Lenders, the Hedging Counterparty, the Senior Agent and the Security Agent.").

The Secured Obligations include significantly more than the amounts owed by the Debtors. The Secured Obligations cover "any and all moneys, liabilities and obligations . . . owing to any of the Finance Parties by and Obligor . . . ." Gray Decl. Exs. 7, 14 (Proceeds Agreements) at Appendix A 101. "Obligors" means, collectively, the Borrower, the Intermediate Lessor, the Intermediate Lessor Parent, and the Borrower Parent." *Id*. at 97. The Obligors include the JPL Parties and, therefore, the Secured Obligations cannot be satisfied and all secured creditors paid in full until all of the Obligors' liabilities and obligations—not just Debtors'—are satisfied.

The Stalking Horse Bid amount is nowhere near sufficient to pay the outstanding Secured Obligations. For example, the Secured Obligations owed by the JPL Parties include, but are not limited to, more than $20 million in unpaid rent amounts owed by the Intermediate Lessors and the potentially significant liability created by the JPL Parties' breaches of the Proceeds Agreements.

8

The JPL Parties have breached their obligations under the Transaction Documents in numerous ways, thereby significantly increasing the amount of the Secured Obligations. These breaches include, but are not limited to:

1. Violating clause 11.3.2 the Proceeds Agreements by "… *engag[ing] in any Anti-Social Conduct, whether directly or indirectly through a third party*." "Anti-Social Conduct" is defined to include actions to "*defame the reputation or interfere with the business of any Finance Party* [including the First Claimant] *by spreading rumour, using fraudulent means or resorting to force*" and "*other actions similar or analogous to any of the foregoing in any jurisdiction. Id.* at Appendix A 77.

2. Violating clause 11.3.2 the Proceeds Agreements by engaging in Anti-Social Conduct in a world-wide effort to defame and slander FWCP and interfere with FWCP's business relationships, including contacting industry participants and threatening to "nail [them] to the mast" if they continue to do business with FWCP, taking concerted efforts to ensure that no one works with FWCP again, and calling FWCP "financial terrorists."

3. Violating clause 3.1.3 of each of the Proceeds Agreements, which requires JPL not, "*take, or acquiesce in, any … action which might reasonably be expected to lead to the bankruptcy or insolvency of the Borrower[s]. . . .*";

4. Violating clause 10.2.3(c) of the Proceeds Agreements, under which JPL will not, "*take, or acquiesce in, any . . . action which might reasonably be expected to lead to the bankruptcy or insolvency of the Borrower[s]...*";

5. Violating clause 1(b) and 1(d) of each of the Borrower Parent Letters, in which JPL agreed to ensure that the Borrowers would "*. . . remain solvent and [would] not be liquidated or dissolved or merged or reorganised in any other matter*" and ensure that the Borrowers would "*duly and punctually perform and comply with [their] obligations*" under the relevant Transaction Documents.

In order to protect its reputational and business interests, FWCP has been forced to initiate several proceedings against the JPL Parties seeking recovery of significant damages. In fact, FWCP filed a formal claim in London today. The total amount of these claims is currently unliquidated, and all recovery that FWCP seeks as a result of the JPL Parties' conduct constitute a Secured Obligation.

The significant amount of the Secured Obligations over and above the principal, interest, and expenses owed by the Debtors negates the Debtors' representations and the assumption in the

9

Objections that the Stalking Horse Bid will result in payment of all secured creditors in full. The current Stalking Horse Bid figure of approximately $207 million is tens of millions of dollars less than the amount that would be necessary to fully pay the Secured Obligations. This is true even before accounting for the additional amount of Secured Obligations stemming from the ongoing litigation concerning the JPL Parties' conduct, an amount which cannot be determined at this time.

## CONCLUSION

By entering into the Proceeds Agreements, JPL, Mizuho and SMTB empowered FWCP, as the Majority Secured Party, to initiate enforcement actions with respect the Aircraft and Lease Assets in its discretion. Thus, while the Objections suggest that bankruptcy presents an optimal outcome for most of the parties to the Proceeds Agreement, this is an inadequate basis for bankruptcy proceedings. Accordingly, this Court should grant the Motion for the aforementioned reasons.

Dated: January 18, 2022

                        Respectfully submitted,

                        /s/ *Benjamin I. Finestone*

                        QUINN EMANUEL URQUHART & SULLIVAN, LLP

                        Benjamin I. Finestone
                        Zachary R. Russell
                        51 Madison Avenue, 22nd Floor
                        New York, NY 10010
                        Telephone: (212) 849-7000
                        Facsimile: (212) 849-7100
                        benjaminfinestone@quinnemanuel.com
                        zacharyrussell@quinnemanuel.com

                        Justin C. Griffin (admitted pro hac vice)
                        Eric Winston (admitted pro hac vice)
                        865 South Figueroa Street, 10th Floor
                        Los Angeles, CA 90017
                        Telephone: (213) 443-3000
                        Facsimile: (213) 443-3100
                        justingriffin@quinnemanuel.com
                        ericwinston@quinnemanuel.com

                        Asher B. Griffin (admitted pro hac vice)
                        300 West 6th Street, Suite 2010
                        Austin, TX 78710
                        Telephone: (737) 667-6100
                        Facsimile: (737) 667-6110
                        ashergriffin@quinnemanuel.com

                        *Counsel to FitzWalter Capital Partners (Financial Trading) Limited*