**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: : | |
| : | Chapter 11 |
| JPA NO. 111 CO., LTD., and : | |
| JPA NO. 49 CO., LTD., : | Case No. 21–12075 (DSJ) |
| : | Case No. 21–12076 (DSJ) |
| Debtors.[1] : | |
| : | |
| : | |

**FITZWALTER CAPITAL (TRADING PARTNER) LIMITED'S RESPONSE TO THE DEBTORS' STATEMENT RESPONDING TO THIS COURT'S INQUIRIES**

FitzWalter Capital (Trading Partner) Limited ("**FWCP**") submits this response to JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd.'s (the "**Debtors**") Statement (Dkt. No. 90) ("**Statement**") that was filed on January 28, 2022.

At the January 26, 2022 Hearing, the Court inquired, among other things, as to whether the Debtors had procured the Stalking Horse Bidders' commitment to satisfy all of the Debtors' Secured Obligations under the Transaction Documents.[2] The Debtors' Statement confirms the answer is "*no*."[3] Rather, the Debtors concede that they have merely obtained an agreement to pay certain, select secured claims. In bankruptcy, of course, "property interests are created and defined by [otherwise applicable, here, English] law [and u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an

---

[1] The Debtors in these Chapter 11 cases are: JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd. The Debtors' corporate address is: Kasumigaseki Common Gate West Tower, 3–2–1 Kasumigaseki, Chiyoda–Ku, Tokyo 100–0013.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion, the Declaration of Andrew Gray in Support of the Motion (Dkt. No. 23) (the "**Gray Declaration**"), or the Transaction Documents as applicable.

[3] Debtors specifically admit that the Purchase Price will not cover certain Secured Obligations. *See* Statement ¶ 3. FitzWalter will not here respond to Debtors' attempt to disparage and minimize those claims, except to reserve all of its rights and state that its claims are each lawful and valid under the documents negotiated and agreed to by the Debtors. And indeed each of these claims have been confirmed to "fall within the definition of Secured Obligations" by Mr. Shah. Dkt. No. 79-2 ¶ 42. Additionally, the Statement contains no indication that the Purchase Price will include swap breakage costs that are indisputably Secured Obligations. *Id.*

1

interested party is involved in a bankruptcy proceeding," *see Americredit Financial Services, Inc. v. Tompkins*, 604 F.3d 753, 757 (2d Cir. 2010) (*citing Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443 (2007) ("[W]e generally presume that claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed.")), and not left to the discretion of the Debtors and their self-interested purchaser.

The Court also questioned whether the Debtors were seeking Court approval to sell assets that were not property of their estates and/or whether the Stalking Horse Purchaser was willing to transact merely to the extent of the Debtors' assets—whatever those rights and entitlements may be. The Debtors' Statement ignores the Court's inquiry altogether, likely because each expert on foreign law testified that the Debtors did not have title to the Lease Assets they are seeking to sell. This non-answer strongly suggests that the answer to this question is also "***no.***" It is now clear that the Debtors—pursuant to JPL's directives—seek to unilaterally rewrite the Transaction Documents and redefine the terms therein, in order to sell property they do not own, excuse JPL of its contractual obligations, and siphon money out of the waterfall scheme that binds all parties in interest. For these reasons, as well as for all of the reasons advanced at the Hearing, FitzWalter's motion to dismiss these Chapter 11 Cases should be granted.

*First,* the Statement makes clear the Debtors have no intention of pursuing full satisfaction of the Secured Obligations, as defined by the Transaction Documents. The Debtors' ubiquitous and misleading claims of full satisfaction are false, should be afforded zero weight in counterbalancing the presence of numerous *C-TC* factors in this case,[4] and indeed provide further evidence that these Chapter 11 Cases are improper. From the inception of these proceedings, the Debtors have consistently represented to this Court that their good faith could not seriously be

---

[4] *See generally* In re *C–TC 9th Ave. Partnership*, 113 F.3d 1304 (2d Cir. 1997).

questioned because the proposed sale provides full repayment of the Secured Obligations,[5] but the Statement removes any doubt about the veracity of this claim. At best, the proposed sale will provide for only *partial* satisfaction of the Secured Obligations, which not only undermines the Debtors' argument that the filing was "a good faith effort to protect the interest of all parties consistent with the aims of the Bankruptcy Code" (Obj. ¶ 21), but will also be insufficient to trigger any "equity of redemption" the Debtors may have. The Debtors sole defense to the *C-TC* factors—the "full repayment" trump card—can no longer be maintained.

The Proceeds Agreements provide that the Collateral shall not be released until there is "full, final and indefeasible payment and discharge in full of all amounts of the Secured Obligations." Gray Decl. Ex. 7, 14 (Proceeds Agreements) § 7.1. The Proceeds Agreements define "Secured Obligations" as:

> [A]ny and all moneys, liabilities and obligations (whether actual or contingent, whether now existing or hereafter arising, whether or not for the payment of money and including, without limitation, any obligation or liability to pay damages) from time to time owing to any of the Finance Parties by any Obligor pursuant to any Transaction Document, notwithstanding that the recourse of the Finance Parties against any person may be limited in recourse.

*Id.* Appendix A (Master Definitions Schedule) 99. "Obligors" is defined to include "collectively, the Borrower, the Intermediate Lessor, the Intermediate Lessor Parent and the Borrower Parent (each an '**Obligor**')." *Id.* at 97. Under the plain language of the Proceeds Agreement, the Secured Obligations include any and all liabilities *any* Obligor—including JPL—owed to *any* Finance

---

[5] *See, e.g.*, Obj. ¶ 6 ("So long as FitzWalter is paid in full, there can be no legitimate objection to these proceedings."). The Debtors have repeated this statement on at least *twenty* separate instances in their pleadings, as a multipurpose response to all of FWCP's concerns. *See* Obj. ¶¶ 4, 6, 19, 26, 32, 37, 34, 56, 62, 63, 64, 65; Dkt. No. 68 ("**Reply**") ¶¶ 2, 3, 5, 7, 24, 37, 39. This "win–win" outcome is the Debtors' only excuse for why the Court should not apply the *C–TC* factors and dismiss these cases: "So long as FitzWalter is paid in full, there can be no legitimate objection to these proceedings." Obj. ¶ 2. Absent this defense, the Debtors lack a basis in fact or law to oppose dismissal or abstention.

3

Party—including FWCP. Notwithstanding the clear language in the Transaction Documents, the Debtors represent that the proposed sale will provide for the payment of *only* "all outstanding principal of and accrued interest on the Senior Loans and the Junior Loans together with all fees, costs or charges allowed by the Bankruptcy Code." Statement ¶ 3. Not only does the Statement explicitly exclude the unliquidated secured amounts owed to FWCP as a result of breaches of the Proceeds Agreements,[6] the Statement blatantly omits the Swap Terminations amounts, totaling more than $12.3 million, owed to the Hedging Counterparty, which is a Senior Finance Party and which amounts the Debtors have already admitted are outstanding. *See* Bid Proc. Mot. ¶¶ 15–16. Thus, the contention that the proposed sale will provide for full satisfaction of "all of the allowed secured claims owed by the Debtors to the Senior Finance Parties and the Junior Finance Parties under the applicable transaction documents" is facially ridiculous.[7] The claim only makes sense if the Debtors are allowed to unilaterally rewrite the Transaction Documents to wipeout Secured Obligations the Stalking Horse Bidders, and JPL, are unwilling to accept.

*Second*, the Statement completely ignores the Court's request to confirm that the Stalking Horse Bidders would commit to the sale even if the Debtors cannot sell the Lease Assets. In their Objection, the Debtors denied that FWCP holds title to the Lease Assets, arguing that the proposed the proposed sale would "satisfy—in full—the allowed secured claims encumbering the Lease Assets, such that the reversionary interest is realized and the entirety of the Lease Assets can be administered by the Bankruptcy Court, including through a section 363 sale free and clear of all encumbrances." Obj. ¶ 53. This point was developed through expert testimony offered by both parties on the effects of the Deeds of Security. The experts agreed that regardless of the

---

[6] *See* Gray Supp. Decl. Ex. 6 (UCC Response) at Appendices 1 & 2.

[7] At a minimum, there will be no distributions to Junior Finance Parties pending adjudication of the claims raised by FWCP.

4

interpretation of the Deeds of Security (either as absolute assignments or charges), the Debtors do not currently have the right to sell the Lease Assets: If interpreted as an absolute assignment the right to enforce and sell the Lease Assets belongs to FWCP, if a charge, the rights still do not belong to the Debtors. And the experts agreed that the Debtors' and/or the Intermediate Lessors' equitable, reversionary interest in the Lease Assets could not be exercised unless and until the Secured Obligations are fully discharged. But there is no longer any question that the proposed sale does not purport to satisfy the Secured Obligations. *See* Statement ¶ 2. Accordingly, because the Debtors cannot satisfy the conditions precedent to exercising their right of redemption, they only possess a "theoretical" interest and therefore have no right to sell interests belonging to FWCP. *See* Reply Ex. A (Tregear Op.) ¶ 60 (describing the Debtors' interest in the Lease Assets as a "theoretical interest only" if the Secured Obligations are not paid in full). The Court specifically requested that the Debtors confirm whether the Stalking Horse Bidders will commit to the sale even if, as the undisputed testimony establishes, the Debtors do not have title to the Lease Assets. The Statement is conspicuously silent on the matter, which strongly suggests that the Stalking Horse Bidders will not consummate the sale unless this Court does that which it cannot do: approves the sale of non-debtor assets. *Reverend C.T. Walker Hous. Dev. Fund Corp. v. City of New York*, 586 B.R. 534, 537 (E.D.N.Y. 2018) ("For the bankruptcy court to order a sale under 11 U.S.C. § 363, the Property must qualify as property of the estate under § 541."); *In re Soho 25 Retail, LLC*, 2011 WL 1333084, at *8 (Bankr. S.D.N.Y. Mar. 31, 2011) ("[I]f a debtor has only an interest in the rents to the extent a mortgage is ever satisfied, the cash flow from the rents is not property of the estate until the mortgage is satisfied. . . . Therefore, until the Mortgage and Note here are satisfied, the rents are not property of the Debtor's estate and cannot be used by the Debtor to fund a plan of reorganization").

5

*Third*, the Statement requests a Break-Up Fee of 3.5%, which is higher than what this Court indicated would be justified. The Debtors also *increased* their requested Expense Reimbursement by 50%, all of which would have to be paid by any overbidder.

The Debtors' basis for ignoring the *CT–C* factors has always been their promise of full satisfaction. That foundation is now in ruins. The Debtors no longer promise full payment—a tacit admission that they filed these cases for improper purposes. The Debtors have not offered adequate protection. They have instead engaged in a misguided attempt to misappropriate funds and value due to FWCP. The Statement shows that Debtors' "ends justify the means" argument is empty rhetoric, and the repeated statements that the Stalking Horse Bid was going to pay everyone in full are, and always have been, illusory. And the Debtors have otherwise ignored the Court's instructions to (i) confirm the Stalking Horse Bidders will accept the deal without the Lease Assets and (ii) reduce the Break-up Fee to 3.0%. The Court should apply the *CT–C* factors and dismiss this matter.

6

DATED:    January 31, 2022                    Respectfully submitted,


                                              By: /s/ Asher Griffin


                                              QUINN EMANUEL URQUHART &
                                              SULLIVAN, LLP

                                              Benjamin I. Finestone
                                              Zachary R. Russell
                                              51 Madison Avenue, 22nd Floor
                                              New York, NY 10010
                                              Telephone: (212) 849–7000
                                              Facsimile: (212) 849–7100
                                              benjaminfinestone@quinnemanuel.com
                                              zacharyrussell@quinnemanuel.com

                                              Justin C. Griffin (admitted *pro hac vice*)
                                              Eric Winston (admitted *pro hac vice*)
                                              865 South Figueroa Street, 10th Floor
                                              Los Angeles, CA 90017
                                              Telephone: (213) 443–3000
                                              Facsimile: (213) 443–3100
                                              justingriffin@quinnemanuel.com
                                              ericwinston@quinnemanuel.com

                                              Asher B. Griffin (admitted *pro hac vice*)
                                              300 West 6th Street, Suite 2010
                                              Austin, TX 78710
                                              Telephone: (737) 667–6100
                                              Facsimile: (737) 667–6110
                                              ashergriffin@quinnemanuel.com
                                              *Counsel to FitzWalter Capital Partners
                                              (Financial Trading) Limited*