TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Frank A. Oswald
Kyle J. Ortiz
Minta J. Nester
Bryan M. Kotliar
Jared C. Borriello

*Counsel to the Debtors*
*and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>JPA NO. 111 CO., LTD. and<br>JPA NO. 49 CO., LTD.,<br><br>          Debtors.[1] | Chapter 11<br><br>Case No.:  21-12075 (DSJ)<br><br>(Jointly Administered) |
| JPA NO. 111 CO., LTD. and<br>JPA NO. 49 CO., LTD.,<br><br>          Plaintiffs,<br>v.<br><br>FITZWALTER CAPITAL PARTNERS<br>(FINANCIAL TRADING) LIMITED,<br><br>          Defendant. | Adv. Pro. No. 22-_____ (DSJ) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF,
RECOVERY OF DAMAGES, AND RELATED RELIEF**

---

[1]    The Debtors in these Chapter 11 cases are:  JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd.  The Debtors' corporate address is:  Kasumigaseki Common Gate West Tower, 3-2-1 Kasumigaseki, Chiyoda-Ku, Tokyo 100-0013.

JPA No. 111 Co., Ltd. (the "MSN 067 Owner"), and JPA No. 49 Co., Ltd.
(the "MSN 173 Owner", and together with MSN 067 Owner, the "Debtors" or
the "Plaintiffs"), as debtors and debtors in possession in the above-captioned chapter 11
cases (the "Chapter 11 Cases"), by and through their attorneys, bring this complaint
(this "Complaint") against FitzWalter Capital Partners (Financial Trading) Limited
("FitzWalter" or the "Defendant"), and allege and state as follows:

### SUMMARY OF ACTION[2]

1.      As this Court is aware, the Debtors commenced these Chapter 11 Cases to
prevent a secretive, "expedited, value-destroying, likely self-serving" enforcement sale[3]
that the Defendant implemented without providing *any* notice to the Debtors.  This
value-destructive enforcement sale was thwarted—by chance—when the JPA Parties
(defined below) discovered (through their own due diligence) the Defendant's
imminent enforcement sale of the Lease Assets (detached from the Aircraft).  The
Defendant's scheme prompted the filing of these Chapter 11 Cases.  Such clandestine
enforcement sale efforts were not only secretive and harmful, but they violated both the
contracts and laws governing the conduct of such enforcement actions.

2.      If the Defendant had complied with applicable law and contractual
obligations, the Debtors would not have needed to commence these Chapter 11 Cases
and would have paid off the secured obligations through a legally compliant, value-
maximizing sale process.  Unfortunately, the Defendant's self-serving prepetition
conduct has continued post-petition, necessitating this adversary proceeding.

---

[2]    Capitalized terms used herein have the meanings ascribed to such terms in the General Allegations
Section below.  References to "Docket No. __" refer to documents filed on the main docket for the
jointly administered Chapter 11 Cases under case number 21-12075 (DSJ).

[3]    *See Memorandum Decision and Order Resolving Motion to Dismiss*, entered on February 1, 2022 [Docket
No. 97] (the "Memorandum Decision").

3.      Rather than allowing the Defendant's inequitable conduct to harm all stakeholders, the Debtors commenced the Chapter 11 Cases and immediately undertook a strategy that this Court credited as being a "reliable way to maximize recoveries for all parties in interest."[4]  Within a week of filing, the Debtors, JP Lease, as their Manager and the Manager's agents (collectively, the "JPA Parties") had negotiated and executed a binding term sheet that guaranteed the *imminent payment in full* to all creditors, including all obligations owed to the Defendant.[5]  Shortly after issuing its Memorandum Decision, the Court approved the Bidding Procedures Order and the related Bidding Procedures, pursuant to which the Debtors are conducting a sale process (collectively, the "Sale Process") that is fair, value-maximizing, and compliant with all applicable laws.

4.      The Debtors have commenced this adversary proceeding, pursuant to Bankruptcy Rule 7001, to obtain, among other things, relief from the Court to prohibit the Defendant from commencing or continuing any actions against the Debtors or the Non-Debtor Affiliates.[6]  Such actions by the Defendant are a transparent attempt to control property of the estate by undermining the Sale Process to continue its loan-to-own strategy by artificially inflating the purported amount of "Secured Obligations" to improperly drive up the purchase price in an attempt to dissuade bidders and interfere

---

[4]    *Id.* at 18.

[5]    The term "Non-Debtor Affiliates" refers collectively to the JP Lease, the Intermediate Lessors, the Debtors' other affiliates, and their respective directors, officers, and employees.

[6]    Substantially contemporaneously with the filing of this Complaint, the Debtors are also filing a motion (the "Stay Motion") for entry of an order (the "Proposed Stay Order"), which requests the relief sought in the First, Second, and Third Claims for Relief herein and an opening brief setting forth the bases for the Proposed Stay Order (the "Opening Brief").  In support of the Stay Motion and Opening Brief, the Debtors are submitting (i) the *Declaration of Heinrich Loechteken in Support of Debtors' Motion for an Order (I) Extending and Enforcing the Automatic Stay, Granting Injunctive Relief, and (II) Granting Related Relief;* and (ii) the *Declaration of Jared C. Borriello in Support of Debtors' Motion in Support of Debtors' Motion for an Order (I) Extending and Enforcing the Automatic Stay, Granting Injunctive Relief, and (II) Granting Related Relief.*

with the Debtors' use of their property.[7]  The Defendant's actions are intended to deter the Stalking Horse Bidders and to chill bidding more generally, such that the ultimate result of the Sale Process is that the Defendant walks away with the assets.  Collectively, these efforts by the Defendant also seek to hinder the Debtors' efforts to treat all stakeholders fairly and pay all creditors in full (based upon contractual entitlements).  In fact, the Defendant's actions amount to a campaign of harassment and the assertion of improper claims under which they are seeking to chill the bidding on, and the value of, the Debtors' assets.  In sum, the Debtors seek to safeguard and avoid irreparable harm to the Debtors' estates by enforcing and extending the automatic stay so as to achieve a fair and successful value-maximizing outcome for all stakeholders.

5.      This adversary proceeding also seeks (i) recovery of money damages, in amounts to be determined at trial at a later date, for certain of the Defendant's pre- and post-petition actions, (ii) to surcharge the Defendant's collateral pursuant to section 506(c) of the Bankruptcy Code, (iii) equitable subordination of the Defendant's liens and/or claims under section 510(c) of the Bankruptcy Code, and (iv) declaratory relief relating to and/or disallowance or, in the alternative, estimation of the Defendant's claim.

## THE PARTIES

6.      The Debtors are the Plaintiffs in this Adversary Proceeding.  Each Debtor is a company organized under the laws of Japan.  The Debtors are wholly owned subsidiaries of JP Lease Products & Services Co. Ltd. ("JP Lease").

---

[7]     To the extent that the Court believes that such Secured Obligations must be determined prior to the Sale Hearing, the Debtors submit that the Court has authority under section 502(c) of the Bankruptcy Code to estimate such claims.

7.       The Defendant is a private limited company incorporated in England and Wales and the current majority Senior Lender under each of the Senior Facilities and is acting, as of December 2, 2021, as the Security Agent and Senior Agent under the Debt Facilities.[8]

## JURISDICTION AND VENUE

8.       This adversary proceeding arises in and relates to the Debtors' Chapter 11 Cases pending before this Court under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

9.       The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  The adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (G) and (O).

10.       Venue is proper pursuant to 28 U.S.C. § 1409.

11.       The statutory predicates for the relief requested herein are sections 105, 362, 363, 502(c), 506(b), 506(c), and 510(c) of the Bankruptcy Code, and Rules 7001(7), 7001(8) 7001(9), and 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND AND FACTS

### I.       THE CHAPTER 11 CASES

12.       On December 17, 2021 (the "Petition Date"), the Debtors each filed voluntary petitions in this Court commencing the Chapter 11 Cases.  The Debtors are authorized to continue to operate their businesses and manage their property as debtors and debtors in possession.  These Chapter 11 Cases are jointly administered for

---

[8]    *See Declaration of Andrew Gray in Support of Creditor FitzWalter Capital Partners (Financial Trading) Limited's Motion to Dismiss or Abstain from Hearing These Chapter 11 Cases*, filed on January 2, 2022 [Docket No. 23] (the "Gray Decl."), ¶ 6.  Upon information and belief, the Defendant has offices in the United States.

procedural purposes only.

13.     No trustee, examiner, or statutory committee of creditors has been

appointed in these Chapter 11 Cases.

## II.     THE UNDERLYING TRANSACTIONS

### A.     <u>The Debtors Acquire the Aircraft</u>

14.     The Debtors are sister-affiliated companies wholly owned by JP Lease that

were each formed for the purpose of acquiring and leasing an Airbus A350-941 aircraft.

The Debtors have no employees.  The Debtors are managed by their directors or

indirectly through non-employed individuals who are employees of JP Lease and other

affiliates, including certain of the Non-Debtor Affiliates, who act as agents of the

Debtors under the direction of the directors.

15.     Debtor MSN 067 Owner was formed in December 2017 for the purpose of

acquiring an Airbus A350-941 aircraft bearing manufacturer serial number ("<u>MSN</u>") 067

(including its airframe, engines, parts, and applicable documentation, "<u>MSN 067

Aircraft</u>"), and Debtor MSN 173 Owner was formed in August 2017 for the purpose of

acquiring an Airbus A350-941 aircraft bearing MSN 173 (including its airframe, engines,

parts, and applicable documentation, "<u>MSN 173 Aircraft</u>" and, together with MSN 067

Aircraft, the "<u>Aircraft</u>").  Upon the closing of the financing related to each Aircraft

(the "<u>Aircraft Financings</u>"), each of the Debtors acquired title to its respective Aircraft.

16.     The Aircraft are next-generation, fuel efficient, composite wide body

A350-941 aircraft in high demand, and each retail for over $150 million.  The acquisition

price for the Aircraft was funded by (a) debt financing and (b) equity financing under

arrangements known as Tokumei kumiai ("<u>TK</u>"), a form of silent partnership.  Under

this structure, the investors (the "<u>TK Investors</u>") are expected to be later repaid from the

proceeds of a sale of the Aircraft after payment in full of the Debtors' loan obligations.

**B.     Head Leases and Subleases for the Aircraft;
        Operations and Management of the Debtors**

17.     In connection with the Transaction Documents (as defined below), the Debtors entered into head lease and subleasing arrangements for each Aircraft. Specifically:  (a) the MSN 067 Owner leased the MSN 067 Aircraft to Leasing Draco Limited f/k/a DAE Leasing (Ireland) 12 Limited ("JLPS Draco") pursuant to an aircraft lease agreement, dated November 19, 2018 (the "MSN 067 Head Lease"); and (b) the MSN 173 Owner leased the MSN 173 Aircraft to JLPS Leasing Uranus Limited f/k/a PAAL Uranus Company Limited ("JLPS Uranus" and, together with JLPS Draco, the "Intermediate Lessors")[9] pursuant to an aircraft lease agreement, dated December 29, 2017 (the "MSN 173 Head Lease" and, together with the MSN 067 Head Lease, the "Head Leases").

18.     Each of the Intermediate Lessors, in turn, leased its respective Aircraft to Vietnam Airlines JSV ("Vietnam Airlines"), as sub-lessee, pursuant to a sublease (each, a "Sublease" and collectively, the "Subleases").  The lease payments by Vietnam Airlines on account of the Subleases were used to make lease payments to the Debtors under the Head Leases and by the Debtors to repay the outstanding debt under the Aircraft Financings (as defined below).  The Debtors' sole source of revenue is the foregoing lease payments, which were paid by Vietnam Airlines into bank accounts owned by the Intermediate Lessors and then transferred to bank accounts owned by the Debtors.[10]  These accounts owned by the Debtors are pledged as security under the Aircraft Financings.  Historically, and until the Defendant's recent substitution, CACIB,

---

[9]     The Intermediate Lessors also are indirect, wholly owned subsidiaries of JP Lease.

[10]    Prior to the Petition Date and the Defendant's auction, the Debtors were engaged in discussions with Vietnam Airlines regarding a long-term restructuring of the Head Leases and Subleases pursuant to lease amendments.

as Security Agent (each as defined below) and account bank, swept the cash in these bank accounts monthly to pay the loan obligations under the Aircraft Financings.

19.    Substantially all of the expenses associated with operating the Aircraft are paid by Vietnam Airlines.  Vietnam Airlines is currently operating both Aircraft as part of its active fleet.

20.    The Debtors also utilize JP Lease to engage third parties to provide services related to their ownership of the Aircraft.  Pursuant to management and servicing agreements with JP Lease (the "Management Agreements"), JP Lease has agreed to engage and pay these third parties on behalf of the Debtors, and the Debtors subsequently pay JP Lease for its management services and reimburse JP Lease for amounts paid on the Debtors' behalf under the Management Agreements.  To fund these expenses in the ordinary course, the Debtors historically used a portion of the lease payments received from Vietnam Airlines.  In addition, the Debtors are required to reimburse and indemnify JP Lease and its agents under the Management Agreements for certain costs and claims asserted against such parties (the "JP Lease Indemnification Obligations").

      **C.**     **Secured Senior and Junior Financing Used
           to Finance Acquisition of the Aircraft**

21.    To finance the acquisition of the Aircraft, each of the Debtors entered into a series of financing, security, and proceeds agreements with various lenders, agents, and other parties specific to each Aircraft (together, for each Aircraft, the "Transaction Documents").

22.    In connection with the suite of security and collateral assignments and related rights set forth in the Transaction Documents, for each Aircraft, the applicable Debtor and affiliated parties entered into, *inter alia*, (a) a proceeds agreement (as defined

below), (b) senior and junior loan agreements, (c) a Head Lease, (d) a Sublease with Vietnam Airlines, as sublessee, (e) collateral assignments by the Intermediate Lessor, as assignor, of its rights under the Sublease, to the respective Debtor relating to its Aircraft, as assignee (the "Intermediate Assignments"), (f) further collateral assignments from each Debtor, as assignor, to the Security Agent (as defined below), as collateral assignee, and (g) various aircraft mortgages from each Debtor, as mortgagor, to the Security Agent, as mortgagee, to secure the secured obligations owed to the Security Agent and the Lenders (each as defined below). Under the Transaction Documents for each Aircraft, the rent paid by Vietnam Airlines was intended to fully cover all obligations owed by the applicable Debtor to the Lenders under the debt facility secured by such Aircraft and the applicable Head Lease and Sublease.

23.     Specifically, pursuant to the Transaction Documents with respect to the MSN 067 Aircraft, on November 6, 2018, MSN 067 Owner, as borrower, entered into that certain senior facility agreement (the "Senior 067 Facility") which provided for a total committed senior loan up to $100,000,000 (the "Senior 067 Loans"), and that certain junior facility agreement (the "Junior 067 Facility") which provided for a total committed junior loan up to $15,000,000 (the "Junior 067 Loans"). As of October 4, 2021, the outstanding balance of the Senior 067 Loans was approximately $90,032,662, and the outstanding balance of the Junior 067 Loans was approximately $8,958,681.

24.     Also, pursuant to the Transaction Documents with respect to MSN 173 Aircraft, on December 22, 2017, MSN 173 Owner, as borrower, entered into that certain senior facility agreement (the "Senior 173 Facility" and, together with the Senior 067

Facility, the "Senior Facilities"),[11] which provided for a total committed senior loan up to $111,000,000 (the "Senior 173 Loans" and, together with the Senior 067 Loans, the "Senior Loans"), and that certain junior facility agreement (the "Junior 173 Facility" and, together with the Junior 067 Facility, the "Junior Facilities" [12] and, together with the Senior Facilities, the "Debt Facilities"), which provided for a total committed junior loan up to $7,300,000 (the "Junior 173 Loans" and, together with the Junior 067 Loans, the "Junior Loans" and, together with the Senior Loans, the "Loans").  As of October 4, 2021, the outstanding balance of the Senior 173 Loans was approximately $89,811,133, and the outstanding balance of the Junior 173 Loans was approximately $6,771,235.[13]

25.    Under the Transaction Documents applicable to the secured debt facility for each Aircraft, Credit Agricole Corporate & Investment Bank ("CACIB") served as both the original senior and junior facilities agents, as well as the security agent (in such capacities, the "Security Agent"), on behalf of the various financial institutions that serve as lenders under each respective facility (the "Lenders").

### D.    The Debtors Grant Security Interests Over Aircraft and Leasehold Rights

26.    In connection with the suite of security and collateral assignments set forth in the Transaction Documents, for each Aircraft, the applicable Debtor entered into a proceeds agreement with various other parties (each, a "Proceeds Agreement"), which incorporated additional aspects of the financing and lease structure, pursuant to which such Debtor is required to lease its Aircraft to the applicable Intermediate Lessor

---

[11]    The Debtors understand that the Defendant has acquired substantial majorities of each of the Senior Facilities.

[12]    The Debtors understand that 100% of the Junior Facilities are held by Mizuho Leasing Company, Limited.

[13]    Prior to the Petition Date, the Loans were fully drawn, and were to be repaid pursuant to a fixed repayment schedule.

under the Head Lease, and such Intermediate Lessor is in turn required to sublease the

Aircraft to Vietnam Airlines under the applicable Sublease.

27.     To secure its obligations under the Debt Facilities, each Debtor also

entered into separate mortgages and security agreements in favor of the Security Agent,

granting, *inter alia*, (a) a New York law mortgage that grants security interests in the

Aircraft and the related proceeds (each, a "<u>New York Mortgage</u>"); (b) an English law

deed of security assignment that granted security interests under various Transaction

Documents, including the leasehold rights (each, an "<u>English Security Agreement</u>");

and (c) assignments from the Intermediate Lessors to the Debtors.  Some of the

collateral is covered by both the New York Mortgages and the English law Security

Agreements, such as the leasehold rights and claims against, respectively, Vietnam

Airlines and the Intermediate Lessors (collectively, such lease-based claims and rights

are referred to herein as, the "<u>Lease Assets</u>").

### E.     Each of the Aircraft, the Mortgages and the English Security Agreements are Subject to the Cape Town Treaty and U.C.C.

28.     The Cape Town Treaty governs enforcement actions with respect to the

Lease Assets and to the Aircraft.[14]  The Cape Town Treaty applies where both

(a) security interests and leases relate to aircraft of a certain size, which include the

---

[14]   The "Cape Town Treaty" is comprised of, collectively, (a) that certain Convention on International Interests in Mobile Equipment (the "<u>Cape Town Convention</u>"), and (b) that certain Protocol to the Convention on International Interests on Matters Specific to Aircraft Equipment (the "<u>Cape Town Protocol</u>"), each as adopted on November 16, 2001 at a diplomatic conference in Cape Town, South Africa.  Collectively, the Cape Town Protocol and the Cape Town Convention are referred to as the "<u>Cape Town Treaty</u>".  The Cape Town Treaty has been ratified and in effect in each of (w) the United States (as of Mar. 1, 2006), (x) Ireland (as of Mar. 1, 2006), (y) Vietnam (as of Jan. 1, 2015) and (z) the United Kingdom (as of Jan. 11, 2015).  *See* https://www.unidroit.org/instruments/security-interests/aircraft-protocol/status.

Aircraft,[15] and (b) either (i) the subject aircraft is registered in a country that has ratified the Cape Town Treaty[16] or (ii) the debtor (the charger under a security instrument or lessee under a lease) is "situated in" a country that has ratified the Cape Town Treaty at the time the applicable lease or security instrument relating to an aircraft was created.[17]

29.     Here, the Cape Town Treaty applies to the New York Mortgages, the English Security Agreements, the Head Leases and the Subleases because the Aircraft are large commercial aircraft and registered in Vietnam (which ratified the Cape Town Treaty years before the parties entered into the Transaction Documents).[18]

30.     As "international interests," "aircraft objects" and "associated rights" governed by the Cape Town Treaty, any security interest-enforcement action regarding the Aircraft, the Head Leases and/or the Subleases are required to satisfy both (A) the "commercial reasonable manner" requirements of the Cape Town Treaty[19] and (B) the provision of "reasonable prior notice" to each of (i) the Debtors (as debtors under the New York Mortgages), (ii) the Intermediate Lessors (as the debtors under the

---

[15]   The Cape Town Treaty applies to aircraft that can carry at least 8 people. *See* Cape Town Protocol, Art. I(2)(a) & (e).  The Aircraft here satisfy such size requirement because each Aircraft can carry more than 300 people.

[16]   *See* Cape Town Protocol, Art. IV.

[17]   *See* Cape Town Convention, Art, 2, 3, & 4.

[18]   As an additional ground for the mandated application of the Cape Town Treaty, such treaty also governs the Head Leases and the Subleases as the lessees under each of those leases were situated in a country that had ratified the Cape Town Treaty at the time that such documents were executed. *See* Cape Town Convention, Art. 2, 3 & 4.  Each of the Intermediate Lessors are situated in Ireland. Vietnam Airlines, in turn, is situated in Vietnam.  As each of Ireland and Vietnam were subject to the Cape Town Treaty at the time that the Head Leases and Subleases were executed, the Cape Town Treaty also governs Head Leases and the Subleases.

[19]   *See* Cape Town Convention, Art. 8(3) (enforcement action relating to associated rights must be exercised in a commercially reasonable manner in accordance with such Article) & Art. 34 (applying the above-described enforcement requirements of Article 8(3) of the Cape Town Convention to "associated rights", which includes all enforcement against all collaterally assigned rights to payments and claims asserted under the Head Leases and Subleases); Cape Town Protocol, Art. IX(3) (applying "commercially reasonable manner" enforcement requirements for "aircraft objects", such as the Aircraft).

Intermediate Assignments and as the lessees of the Head Leases), and (iii) Vietnam Airlines, as the lessee of the Subleases.[20]  Importantly, these provisions of the Cape Town Treaty may not be waived by the parties.[21]

31.    In addition to being subject to the Cape Town Treaty, both the Aircraft and the claims relating to the Head Leases and Subleases are subject to the New York Mortgages.

32.    Each of the New York Mortgages are governed by New York law.  Section 12(a) of each provides:

> THIS  AGREEMENT  AND  THE  RIGHTS  AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

As such, the New York Mortgages are governed by New York's Uniform Commercial Code ("U.C.C.").

33.    Section 1.1 of each of the New York Mortgages covers (a) the "Aircraft, including the Airframe and the Engines[,]" and (b) all "proceeds of the foregoing, including, without limitation, all proceeds from the sale or other disposition of any of the foregoing and all proceeds from insurances, expropriation, condemnation, confiscation, requisition, indemnity, warranty and other payments with respect to any of the foregoing."

---

[20]    *See* Cape Town Convention, Art. 8(4) (reasonable prior notice must be given by mortgagee/assignee to mortgagor/assignor and to lessee), & Art. 34 (applying the above-described enforcement requirements of Cape Town Treaty to "associated rights", which includes any enforcement of rights and claims for payments under collaterally assigned leases for an Aircraft subject to the Cape Town Treaty); Cape Town Protocol, Art. IX(4) requiring at least ten working days' prior written notice for any enforcement actions against aircraft objects).

[21]    *See* Cape Town Convention, Art. 15 (provisions of Cape Town Protocol Articles 8(3) & (4) cannot be waived by the parties); Cape Town Protocol, Art. IV(3) (provisions of Cape Town Protocol Articles IX(3) & (4) cannot be waived by the parties).

34.    As used in security agreements governed by New York law, "proceeds" is a term of art that is defined in Article 9 of the U.C.C.[22]  As defined by statute, "Proceeds", includes, among other things (in relevant part), the following property:

(A)    whatever is acquired upon the . . . lease . . . or other disposition of collateral;

(B)    whatever is collected on, or distributed on account of, collateral; [and]

(C)    rights arising out of collateral; . . . ."[23]

35.    Both the rents and claims associated with the Head Leases and the Subleases constitute property "acquired upon the lease of the Aircraft collateral" and "rights arising out of collateral," and, therefore, are "proceeds."  As such, the New York Mortgages covers each of the Aircraft, and the rental and other claims arising from the leases of the Aircraft, including the claims against Vietnam Airlines.

36.    Section 6.5 of each of the New York Mortgages also provides that:

This [Mortgage] Agreement shall be controlling for all purposes of New York law and determining the rights of the parties in any proceeding in the courts of New York.

**F.    Advance Notice of Enforcement Sales of Aircraft and/or Lease Assets is Required both under Applicable Law and By Contractual Agreement**

37.    Both the U.C.C. and the Cape Town Treaty set forth requirements to which secured creditors seeking to sell aircraft and their associated rights in enforcement sales must adhere, including that such sales be conducted in a commercially reasonable manner and that specified periods of advance notice be given to interested parties and, with respect to public enforcement sales, to prospective bidders.  With respect to any enforcement sale of the Lease Assets, applicable law

---

[22]    *See* N.Y. U.C.C. § 9-102(64).

[23]    *Id.*

provides that (a) the Security Agent provide requisite periods of advance notice to the Debtors and other interested parties and (b) all aspects of the enforcement sale be conducted in a commercially reasonable manner.

38.    As to advance notice to interested parties, the Cape Town Treaty provides that (a) all aspects of the advance notice of the enforcement sale to interested parties, such as, in our case, the Debtors, the Intermediate Lessors, and Vietnam Airlines, be effected in a commercially reasonable manner and (b) that ten working days advance notice (or a longer period as agreed by the parties) satisfies such requirement for an enforcement sale.  Article IX(4) of the Cape Town Protocol provides that:

> A chargee giving ten or more working days' prior written notice of a proposed sale or lease to interested persons shall be deemed to satisfy the requirement of providing "reasonable prior notice" in Article 8(4) of the [Cape Town] Convention .  The foregoing shall not prevent a chargee and a chargor . . . from agreeing to a longer period of prior notice.[24]

39.    As the Official Commentary further confirms:

> Paragraph 4 crystallises the meaning a  "reasonable prior notice" in Article 8(4) of the [Cape Town] Convention.  There is a safe-haven of ten working days.  Parties may agree to a longer period but not a shorter one, since [Cape Town Protocol] Article IV(3) precludes derogation from [Cape Town Protocol] Article IX(4).[25]

Such requirements applies to both aircraft and aircraft lease assets (*i.e.*, "associated rights" under the Cape Town Treaty).

---

[24]    *See* Cape Town Protocol, Art. IX(4).

[25]    *See* Official Commentary to Convention on International Interests in Mobile Equipment and Protocol Thereto on Matters Specific to Aircraft Equipment (Roy Goode, 4th edition 2019), Comment 5.54 to Article IX of the Cape Town Protocol.

40.     The U.C.C. similarly requires at least ten days advance notice to interested parties.[26]  Similarly, under the New York Mortgages, the Defendant expressly agreed to provide both the Debtors and Vietnam Airlines with at least ten days advance notice before commencing any public or private enforcement sale of the Lease Assets.[27]

41.     The Defendant also breached its obligation under both the Cape Town Treaty and the U.C.C. to provide commercially reasonable advance notice to potential bidders of its proposed public enforcement sale of the Lease Assets.[28]

## III.    EVENTS LEADING TO THESE CHAPTER 11 CASES:  THE DEFENDANT'S LOAN-TO-OWN STRATEGY AND THE DEBTORS' EFFORTS TO PRESERVE VALUE TO ENABLE ALL CREDITORS TO BE REPAID IN FULL

### A.    Covid Pandemic's Material Impact Upon Financing and Lease Transactions

42.     The worldwide pandemic caused by COVID-19 has had a material adverse effect upon many aircraft leasing companies, including the Debtors.

43.     Like many airlines following the pandemic, Vietnam Airlines has experienced ongoing financial challenges since at least March 2020.  Prior to the pandemic, Vietnam Airlines was current on its monthly lease obligations.

44.     On April 29 and October 29, 2020, the Debtors, the Intermediate Lessors, and Vietnam Airlines agreed to rent deferrals under the Subleases (the "Initial Rent Deferrals" and "Second Rent Deferrals" respectively, and collectively, the "Rent Deferrals").  The Initial Rent Deferrals (a) reduced the rent payable by Vietnam Airlines during the months of April through September 2020, (b) required Vietnam Airlines to

---

[26]    *See* Cape Town Protocol, Art. IX(4); Cape Town Convention, Art. 8(4); N.Y. U.C.C. § 9-612(b).

[27]    *See* New York Mortgages, § 6.1(c); *see also supra* at ¶¶ 31-34 (leasehold rights and claims constitute part of "Mortgaged Property" under the New York Law).

[28]    See Cape Town Convention, Art. 8(3) & 34; Cape Town Protocol, Art. IX(3); N.Y. U.C.C. § 9-610(b) ("Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable.").

pay the deferred rent in six (6) equal monthly installments commencing in October

2020, and (c) modified the interest rate on the deferred rent payments.  The Second Rent

Deferrals terminated the Initial Rent Deferrals, reduced the rent payable by Vietnam

Airlines during the months of April through December 2020, and provided that

Vietnam Airlines would pay the deferred rent in eighteen (18) equal monthly

installments commencing in January 2021.  To account for shortfalls owed under the

Aircraft Financings, the predecessor senior secured party, CACIB, drew on a letter of

credit in favor of Vietnam Airlines that was pledged to support the Debtors' obligations

under the Aircraft Financings.

45.     Prior to the Petition Date, the JPA Parties and Vietnam Airlines were in

advanced stages of negotiating long-term restructured leases, which would provide for

(a) continued rent payments at a reduced rent that steps up to full rent over time, and

(b) an extension of the new lease terms.

**B.     The Defendant Acquires Majority of Senior Loans and
        Immediately Commences Loan-to-Own Strategy by
        <u>Launching Secretive Bifurcated Foreclosure Process</u>**

46.     Upon information and belief, on December 1, 2021, the Defendant

purchased Senior Loans and became the majority Lender under each of the Senior

Facilities.[29]

47.     On or around the same date, the Defendant caused the Security Agent to

issue notices of terminations with respect to each of the Head Leases and the

Subleases.[30]

---

[29]   *See* Gray Decl. ¶ 76.

[30]   *See id.*

48.     Upon information and belief, immediately thereafter, on December 1 and December 2, 2021, the Defendant caused CACIB to resign as the Senior Agent and Security Agent and entered into an agreement with CACIB to become the replacement Senior Agent and Security Agent under each of the Debt Facilities.  Under this agreement, the Defendant agreed to accept all obligations of CACIB as the Security Agent under the Transaction Documents.

49.     Immediately after the Debtors learned that the Defendant had appointed itself as the Security Agent, the Debtors contacted the Defendant to discuss the purported appointment.

50.     Rather than discuss its loan acquisition and purported appointment as Security Agent, the Defendant appointed a sales agent, and on December 10, 2021, commenced an expedited, enforcement sale of the Lease Assets—which the Defendant intentionally separated from the Aircraft—to one of its affiliates.

51.     Under the Defendant's unilaterally imposed sale procedures, such enforcement sale:

- was pursued by the Defendant on an expedited basis and was scheduled to select a winning bidder within seven calendar days (from start to finish)—by December 17, 2021;

- was pursuant to a bifurcated enforcement process that separated the Lease Assets away from the Aircraft;

- was pursued by the Defendant despite its failure to provide any notice of such sale to the Debtors, Vietnam Airlines and/or any other interested party;

- failed to comply with the advance notice requirements of the Cape Town Treaty, the U.C.C. or the contractual agreements to which the Defendant was bound; and

- upon information and belief, was conducted with an objective of selling the Lease Assets to an affiliate of the Defendant at a material discount.

Such an enforcement scheme is manifestly unreasonable and contrary to governing

laws and contracts.  Rather than learning of the Defendant's Lease Assets Enforcement

Action from a properly issued notice as required by the governing law and the

contractual obligations binding upon the Defendant, the Debtors learned about such

proposed sale through their own due diligence on December 14, 2021—*three days*

before the successful bidder was to be selected.

52.     The manifest unreasonableness of the Defendant's enforcement sale

procedures is further supported by certain of the additional specific bidding

requirements imposed by the Defendant, which (a) provided that the Defendant, as the

Security Agent, would select the successful bid at 5:00 p.m. (New York time) on Friday

evening, December 17, 2021, and (b) then required that the successful bidder to "fund

the Purchase Price" by "midnight"—seven hours after the Friday evening selection of

the winning bidder.  Requiring full payment of the purchase price banks closed for the

weekend—when wire transfers cannot be made—underscores the Defendant's efforts to

dissuade competitive third-party bids and were, upon information and belief, designed

to ensure that the Defendant's affiliate obtained the Lease Assets at a substantially

depressed price.

53.     Further, the Debtors believe that a sale of the Lease Assets separate and

apart from the Aircraft materially reduces the value each of such Lease Assets as well as

the Aircraft.  The Defendant then intended to sell the Aircraft in a separate enforcement

sale (collectively, the proposed sale of the Lease Assets to an affiliate of the Defendant is

referred to herein as the "<u>Defendant's Lease Assets Enforcement Action</u>"; such

enforcement sale of the Lease Assets when combined with the contemplated separate

foreclosure sale of the Aircraft is referred to herein as the "<u>Defendant's Enforcement</u>

<u>Action</u>").

**D.    The Debtors Commence These Chapter 11 Cases both
(a) to Stop Secretive and Defective Lease Assets
Enforcement Action and (b) to Treat All Creditors Fairly**

54.    Upon learning of the Defendant's Lease Assets Enforcement Action, the Debtors concluded that the Defendant's secretive and truncated enforcement processes would destroy the value of the Debtors' assets and posed a material risk of impairing all of the Debtors' creditors, other than the Defendant, as well as investors.

55.    Accordingly, on December 17, 2021, mere hours before expiration of the bid deadline under the Defendant's Lease Asset Enforcement Action, the Debtors filed petitions commencing these Chapter 11 Cases to preserve the value of their estates for the benefit of all creditors by conducting a transparent marketing and sales process under section 363 of the Bankruptcy Code.

56.    As part of their first day filings, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Enforcing the Protections of Sections 105(a), 362, 365, 525 and 541 of the Bankruptcy Code, Restating Automatic Stay and Ipso Facto Provisions; and (II) Granting Related Relief* [Docket No. 5] (the "First Day Stay Motion").  On December 20, 2021, the Court approved the First Day Stay Motion and entered the *Order (I) Enforcing the Protections of Sections 105(a), 362, 365, 525 and 541 of the Bankruptcy Code, Restating Automatic Stay and Ipso Facto Provisions; and (II) Granting Related Relief* [Docket No. 15] (the "First Day Stay Order").  Among other things, the First Day Stay Order prohibited, consistent with the stay provisions of the Bankruptcy Code that are automatically effective upon filing a petition, all persons from taking any action to obtain possession of property of the Debtors' estates or to exercise control over property of the estates.[31]

---

[31]    *See* First Day Stay Order ¶ 2(a); 11 U.S.C. § 362(a)(3).

## IV.   THE DEBTORS PROPOSE STALKING HORSE SALE
## THAT WILL REPAY ALL CREDITORS IN FULL

57.   Within a week after the Petition Date, the Debtors successfully negotiated and executed a binding term sheet with stalking horse bidders (the "Stalking Horse Bidders") that contemplated an auction process for obtaining the highest and best value for the Debtors' assets, while establishing a guaranteed floor sales price that will enable the Debtors to satisfy *all* creditors' allowed claims in full.[32]

58.   The Binding Stalking Horse Term Sheet provides for the purchase price of the sum of (a) all of the outstanding obligations under both Senior Facilities, *plus* (b) all of the outstanding obligations under both Junior Facilities, *plus* (c) a $5 million additional cash payment (which well exceeds the amount of all other obligations of the Debtors, including any reasonable estimates of unsecured claims).[33]   Accordingly, with an elastic purchase price to account for valid secured unliquidated amounts in addition to interest, principal, and return to equity, the proposed stalking horse bid is structured to provide for the full payment of all of the legitimate and allowed obligations owed to the Defendant (and all other Lenders and the Security Trustee) under the Debt Facilities.[34]   The Binding Stalking Horse Term Sheet specifically provides that the full

---

[32]   *See Debtors' Application for Entry of Orders: (I) (A) Approving Bidding Procedures Relating to the Sale of Substantially all of the Debtors' Assets; (B) Establishing Stalking Horse Bidders and Bid Protections; (C) Approving Procedures of the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Authorizing Enforcement Actions; (E) Scheduling an Auction and a Sale Hearing; and (F) Approving the Form and Manner of Notice Thereof; and (II) (A) Approving the Sale of the Purchased Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances; and (B) Granting Related Relief*, filed December 31, 2021 [Docket No. 21] (the "Bidding Procedures Motion").

[33]   *See* Bidding Procedures Motion, Ex. 3 (the "Binding Stalking Horse Term Sheet").

[34]   This result is confirmed by the Stalking Horse Purchase Agreements as filed with the Court. *See* Revised Exhibits to Bidding Procedures Motion, Ex. D (the "Stalking Horse Purchase Agreements"), § 3.01.  This payoff was further confirmed at the request of the Court in a further filing by the Debtors on January 28, 2022.  *See Statement Responding to This Court's Inquiries Regarding Debtors' Motion to Approve Bidders Procedures [ECF No. 21]*, filed on January 28, 2022 [Docket No. 90].

satisfaction of the Debt Facilities will occur concurrently with the closing of the sales.[35]

Finally, the Sale Process outlined in the Bidding Procedure Motion provided for the

fully executed bill of sale transferring the Sublease claims and rights to the Debtors,

which bill of sale was irrevocably signed and delivered by the Intermediate Lessors and

delivered to the Debtors.[36]

59.     On February 4, 2022, the Court entered an order approving the Bidding

Procedures Motion [Docket No. 101] (the "Bidding Procedures Order") and establishing

the bidding and auction procedures set forth on Exhibit 1 to the Bidding Procedures

Order (the "Bidding Procedures") pursuant to which the Debtors are conducting a sale

process that is fair and value-maximizing. Pursuant to the Bidding Procedures Order, a

hearing to authorize the Debtors' sale(s) of their assets pursuant to the Sale Process is

currently scheduled for March 14, 2022 at 11:00 a.m. (ET) (the "Sale Hearing").

60.     As of the filing of this Complaint, 23 potential bidders have executed non-

disclosure agreements and are actively engaged with the Debtors and the JPA Parties in

considering submitting bids for the Debtors' assets.

**V.     THE DEFENDANT COMMENCES ONSLAUGHT OF ENFORCEMENT
         ACTIONS AND LITIGATION WORLDWIDE TO FURTHER ITS
         "LOAN-TO-OWN" EFFORTS, DISRUPT THE SALE PROCESS, AND
         DEPRIVE THE DEBTORS OF SUBSTANTIAL SURPLUS VALUE**

61.     Unlike the typical secured party in a chapter 11 proceeding—who is

content with receiving payment in full through an expedited, transparent process that

---

[35]   *See id.*, Ex. D, § 5.

[36]   *See Notice of Filing of Exhibits to the Debtors' Application for Entry of Orders:  (I) (A) Approving Bidding
       Procedures Relating to the Sale of Substantially all of the Debtors' Assets; (B) Establishing Stalking Horse
       Bidders and Bid Protections; (C) Approving Procedures of the Assumption and Assignment of Certain
       Executory Contracts and Unexpired Leases; (D) Authorizing Enforcement Actions; (E) Scheduling an Auction
       and a Sale Hearing; and (F) Approving the Form and Manner of Notice Thereof; and (II) (A) Approving the
       Sale of the Purchased Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances; and
       (B) Granting Related Relief*, filed January 13, 2022 [Docket No. 58] (the "Revised Exhibits to Bidding
       Procedures Motion"), Ex. B.

limits costs and maximizes value—the Defendant has launched a worldwide series of

enforcement actions, threats of litigations, and other efforts to chill bidding and

undermine the Debtors' efforts to accomplish a near-term payoff of the Debt Facilities,

including the amounts owed to the Defendant.  There can be only one reason why the

Defendant has undertaken a strategy contrary to the interest of a typical secured

creditor:  the Defendant is pursuing a loan-to-own strategy at any cost.  The

Defendant's strategy seeks to strip substantial value from the Debtors' estates by

acquiring estate property for its own benefit regardless of the detriment to these estates

and all other parties in interest.

> **A.    The Defendant Commences Near-Daily Barrage of Harassment,
> Suits, and Threats Against the Debtors, the Non-Debtor
> Affiliates, and Their Respective Directors and/or Agents**

62.    One of the first steps taken by the Defendant was to file the *Motion of*

*FitzWalter Capital Partners (Financial Trading) Limited to Dismiss or Abstain From Hearing*

*These Chapter 11 Cases*, dated January 2, 2022 [Docket No. 22] (the "Motion to Dismiss").

The Defendant, however, was not content to limit its actions to this Court or await this

Court's ruling.  Rather, the Defendant doubled down in other jurisdictions – including

Japan, England, and Ireland – through a bombardment of enforcement actions,

litigations, and hostile activities to threaten and harass the Debtors, their management,

and the Non-Debtor Affiliates (collectively, the "FitzWalter Actions").

63.    The most egregious of the FitzWalter Actions include:

   a.    Threats to bring a lawsuit against the Debtors and others in
        England (the "English Suit") without any further or direct notice to
        the Debtors;

   b.    Commencing the English Suit against each of the following Non-
        Debtor Affiliates:  (a) JP Lease, (b) JLPS Ireland Limited ("JLPS
        Ireland"), which is the direct parent of the Intermediate Lessors,
        (c) each of the Intermediate Lessors and (d) Director Heinrich
        Loechteken, who has acted as an agent managing the affairs of the

Debtors and is currently serving as a Representative Director of the Debtors, which the Defendant alleges gives rise to additional Secured Obligations against the Debtors;

c.     Allegations that the Debtors and their affiliates are liable for lost profits that the Defendant would have obtained if the Defendant completed its scheme to sell the Debtors' assets at substantially discounted prices to the Defendant's affiliate at the enforcement sales run by the Defendant;

d.     Sending numerous pre-action letters threatening further lawsuits against the Non-Debtor Affiliates in Japan, England and Ireland;

e.     Enforcement actions against the Intermediate Lessors (who had previously pledged and assigned all of its rights relating to the Lease Assets to the Debtors), including the replacement of directors of those entities and the transfer of the shares thereof to the Defendant;

f.     Demands for the Non-Debtor Affiliates to withdraw the Chapter 11 Cases;

g.     Demands for the Non-Debtor Affiliates to cause the Debtors to turn over property belonging to the Debtors to the Defendant;

h.     Demands for the Non-Debtor Affiliates to assist the Defendant to effect the enforcement sale of the Debtors' assets;

i.     Demands that the Debtors admit, and for the Non-Debtor Affiliates to cause the Debtors to admit, that the Debtors have no property rights or interests in the Lease Assets;

j.     Notifying the Debtors, during the Chapter 11 Cases, of retroactively imposed unreasonable management fees of the Security Agent purportedly totaling millions of dollars *per month*, where such fees formerly charged by CACIB—including following COVID-19—totaled an aggregate amount for both Debtors of $25,000 *per year*;

k.     Threats against all non-affiliated secured creditors for supporting these Chapter 11 Cases and the Debtors' pursuit of a process that will maximize the Debtors' assets, pay all creditors in full and treat all creditors fairly;

l.     Demands for the Debtors and the Non-Debtor Affiliates to recognize and agree to purported Secured Obligations that are well beyond the scope permitted under the Transaction Documents and applicable law—amounting to alleged currently liquidated and unliquidated amounts of approximating $30 million—and

demands that the Debtors' proposed sale cannot take place absent pay off such unsupported amounts;

m.  Using deposition testimony obtained by the Defendant in these Chapter 11 Cases (in connection with discovery taken with respect to the Motion to Dismiss) against the Non-Debtor Affiliates, including one of the Debtors' directors, in furtherance of the English Suit;

n.  Serving overbroad discovery requests against certain Non-Debtor Affiliates in connection with the Sale Process; and

o.  Repeated and publicized efforts to assert that the Sale Process cannot convey the Lease Assets or the other assets being sold free and clear, even though such assets have been conveyed to the Debtors under binding contracts, and such sale is expressly permitted by the Bankruptcy Code and other appliable law.

64.  Because the Debtors had already entered into a binding agreement that ensured full repayment of the Secured Obligations (including all legitimate amounts owed to the Defendant) before any of these FitzWalter Actions were commenced, such actions serve no legitimate purpose.  These actions amount to a blatant attempt to control and interfere with the Debtors' property to stall the Sale Process in violation of the automatic stay.

**B.    The Defendant Confirms Its Pursuit of Self-Serving Loan-to-Own Strategy and Launches Collateral Attack on the Sale Process by Asserting Unsupported "Secured Obligations"**

65.  The Defendant admitted that it commenced the enforcement sale of the Debtors' Lease Assets to sell such assets to its affiliate.  These efforts violate the Debtors' property rights, the laws governing enforcement actions involving aircraft and aircraft-lease claims, and related contractual arrangements.

66.  The Cape Town Treaty protects a debtor's interest in property that it collaterally assigned by prohibiting a lender from seeking to attain ownership and

control over an asset that has surplus value.  Specifically, the Cape Town Treaty

provides that:

> The court shall grant an application [for the secured
> creditor/chargee to become vested and retain ownership of
> the collateral] . . . only if the amount of the secured obligations
> to be satisfied by such vesting is commensurate with the value
> of the object after taking account of any payment to be made
> by the chargee to any of the interested persons.[37]

67.    The Official Commentary to such provision confirms that a secured

creditor, such as the Defendant, cannot retain the collateral to satisfy the debt where the

value the secured party would receive from exercising its remedies would amount to a

windfall:

> The effect of [Cape Town Convention Article 9(3)] is that an
> order [to take the collateral in satisfaction of a debt] can be
> made only if, first, the chargee has applied for the remedy
> and, secondly, the court is satisfied that the amount of the
> secured debt is commensurate with the value of the object
> after taking account of any payment to be made by the
> chargee to any of the interested persons, *e.g.*, a higher-ranking
> chargee. . . .   The purpose of this provision is to avoid a
> situation in which, without the consent of the interested
> persons, the chargee obtains a windfall as a result of the
> chargor's default.  Where the value of the object is greatly in
> excess of the debt owed to the chargee the court must refuse
> to make the vesting order. . . .   Moreover, Article 9(3) is a
> mandatory provision which cannot be excluded or varied by
> Agreement (Article 15).[38]

---

[37]    *See* Cape Town Convention, Art. 9(3).

[38]    *See* Official Commentary to Convention on International Interests in Mobile Equipment and Protocol Thereto
on Matters Specific to Aircraft Equipment (Roy Goode, 4th edition 2019), Comment 4.100 to Article 9(3) of the
Cape Town Convention.

68.     This Court has already found that "[the Debtors] plausibly argue[] that [the Defendant] is motivated by an intention to divide estate assets and cause depressed-price sales to be made to FitzWalter affiliates that will reap a windfall."[39]

69.     Here the value of the Debtors' assets greatly exceeds the Secured Obligations.  In fact, the Debtors were able to negotiate, obtain, and execute the Binding Stalking Horse Term Sheet (a) within ten days after learning of the Defendant's Lease Assets Enforcement Action and (b) seven days after the Debtors commenced the Chapter 11 Cases.  Additionally, as of the filing of this Complaint, *twenty-three (23)* potential bidders have executed non-disclosure agreements and are actively considering bids, which further evidences surplus value.

70.     Not satisfied with payment of its outstanding obligations in full in cash as contemplated by the Sale Process, the Defendant continues to pursue its efforts to artificially inflate the "Secured Obligations" (as defined in the Proceeds Agreement) to disrupt the Sale Process, deter the Stalking Horse Bidders and chill other parties from bidding and, in general, to undermine the Sales Process.

71.     Specifically, on January 28, 2022, counsel for the Defendant sent counsel for the Debtors a letter (the "January 28 Letter") asserting additional Secured Obligations which are not part of the usual and customary outstanding principal and interest on the loans and related fees and expenses of the agent that would need to be paid under the documents.  The Defendant followed up the January 28 Letter by filing a statement with the Court with similar assertions and arguments.[40]

---

[39]  *See* Mem. Decision at 19.

[40]  *See* FitzWalter Capital (Trading Partner) Limited's Response to the Debtors' Statement Responding to This Court's Inquiries, filed January 31, 2022 [Docket No. 91] ("Defendant's January 31 Response").

72.     These actions are an unabashed effort to chill bidding by increasing the cost of any purchase.  This not only directly impacts recoveries of equity and the other Lenders, but is also an effort to exercise control over and interfere with the Debtors' use of property of the estate.

**D.     The Defendant Repeatedly Violates Automatic Stay Through Threats and Efforts to Control the Debtors' Property Rights and Interests**

73.     Many of the Defendant's actions and threats violate the automatic stay provided under section 362 of the Bankruptcy Code and the Court's First Day Stay Order, including those detailed below.

*(a)     Threatened Action Against the Debtors in England without Further Notice.*

74.     By letter dated January 11, 2022 (the "Stay Violations Letter"), the Defendant informed JP Lease that its counsel had been instructed to issue a claim against, among others, the Debtors.  The Stay Violations Letter further provides that, absent the receipt of certain confirmations by January 17, 2022, the Defendant's attorneys have been instructed to issue such proceedings without further notice.  The Stay Violations Letter, despite naming the Debtors, was never sent to the Debtors' counsel.

*(b)     Attack on the Debtors' Rights under Binding Stalking Horse Term Sheet and Associated Documents under the Sale Process.*

75.     The Defendant has taken numerous actions designed to undermine the Debtors' ability to conduct the auction, including by attacking the ability of the Debtors to sell their Lease Assets.  The Defendant's repeated and publicized efforts to assert that the Debtors cannot convey the Lease Assets or the other assets under the Sale Process free and clear of liens and their repeated and publicized efforts to improperly inflate the secured obligations owed to the Defendant by around $30 million not only potentially

chills the bidding under the Sale Process, but also violates the Debtors' property rights. These actions seek to deprive the Debtors of property rights under instruments executed by, among others, the Debtors, the Intermediate Lessors and/or the Stalking Horse Bidder—all in express violation of the automatic stay.

### *(c)   Notifying the Debtors of Change in Security Agent's Fees.*

76.     On January 21, 2022, the Defendant, as its own recently self-appointed successor Security Agent, notified the Debtors of a unilaterally imposed and retroactive increase in the amount of the Security Agent's management time fees for each of the Debtors—asserting that such amounts were justified under the Transaction Documents (the "<u>Management Time Notices</u>").

77.     The Management Time Notices purportedly include daily rates for the Defendant's management time, in its capacity as Security Agent, charged to each Debtor of $50,000, $25,000, and $10,000 for each of the Defendant's Co-Founders, Partners, and Non-Partners, respectively.  The Defendant has asserted that such amounts are approximately $2,442,500 incurred between December 2, 2021 and January 21, 2022, and continue to accrue each day thereafter (the "<u>Management Time Fees</u>").

78.     In support of the Management Time Fees, the Management Time Notices cite Section 2.19 of Schedule 2 of the Proceeds Agreement, which reads:

> **Security Agent's management time**.  Any amount payable to the Security Agent under paragraph 2.14 (*Lenders' indemnity to the Security Agent*) above, clause 16 (*Costs and Expenses*) of the Senior Facility Agreement and clause 16 (*Costs and Expenses*) of the Junior Facility Agreement shall include the cost of utilizing the Security Agent's management time or other resources, but only to the extent that this applies to enforcement or preservation of security or as part of any restructuring or rescheduling of the Secured Obligations, and will be calculated on the basis of such reasonable daily or hourly rates as the Security Agent may notify the Borrower and the relevant Lenders, and is in addition to any fee paid or payable to the Security Agent.

79.     Such increased fees directly contravene the terms of the Transaction

Documents relating to the Security Agent's management fees, which require that such

fees be "reasonable."  Moreover, as successor Security Agent, the Defendant is

prohibited from increasing its management's fees chargeable against the Debtors.

Section 2.15.7 of Schedule 2 of the Proceeds Agreement expressly provides that:

> A change in the identity of the Security Agent shall not result
> in an Obligor or the Lessee having to make any increased
> payment or perform any increased obligations or have any
> reduced rights under the Transaction Documents.

80.     In contrast, the prior Security Agent charged an annual "fee" for acting as

the Security Agent of (a) $10,000 per annum for MSN 067 Owner and (b) $15,000 per

annum for the MSN 173 Owner.  In the almost two years that the Secured Obligations

were in default prior to the Defendant forcing its succession as the Security Agent, the

prior Security Agent never charged any additional amounts for "management time"

pursuant to Section 2.19 of Schedule 2 of the Proceeds Agreement.

81.     In addition, CACIB and the Defendant failed to comply with the terms

and procedures that must be undertaken for the appointment of a successor Security

Agent, rendering its status as Security Agent dubious.[41]

82.     Thus, the Defendant's unilateral efforts to charge exorbitant Security

Agent fees is expressly prohibited by the Transaction Documents and amounts to a

further breach of the automatic stay by the Defendant in seeking to unilaterally alter

such agreements and manufacture claims against the Debtors to the detriment of all

other parties in interest.  By seeking to control and undermine the Sale Process that is

---

[41]  *See, e.g.*, Proceeds Agreement, Sch. 2, § 2.15.2 (the "Instructing Party" must "consult[] with the
Borrower" before the "[appoint]ment of a successor Security Agent").

being implemented under a binding stalking horse term sheet, the Defendant is acting

to control property of the Debtors' estates.

### (d)   The Defendant's Unsupported Increase of Indemnification Obligations.

83.     As described herein, the Defendant has undertaken a worldwide attack on

the Sale Process and the right of the Debtors to repay the Secured Obligations to have

their collateral revested free and clear of liens.  Such extensive efforts, when the

Defendant will be paid in full under the Sale Process, are not reasonable and,

accordingly, cannot be deemed to satisfy the requirements for allowed secured claims

under section 506(b) of the Bankruptcy Code.

84.     Notwithstanding this limitation, the Defendant has claimed that all costs

and expenses associated with these actions, regardless of their merit, are chargeable

against the Debtors' estates.  Such actions by the Defendant amount to a direct and

continuing attack against the assets and property interests of the Debtors' estates and an

attempt to control property of the Debtors' estates and constitutes further breaches of

the automatic stay under section 362(a)(3) of the Bankruptcy Code.

85.     Furthermore, as the Debtors are required to reimburse and indemnify JP

Lease and its agents for performing the management functions of the Debtors under the

Management Agreements, these frivolous and widespread litigation efforts in violation

of the automatic stay are having a doubly negative impact upon the Debtors—just as

the Defendant intended.

### (e)   Tort Claims Against Third Parties That Allegedly Result in Secured Obligations Against the Debtors.

86.     The English Suit asserts, *inter alia*, various tort claims against

Mr. Loechteken, as the Debtors' agent and director, and certain Non-Debtor Affiliates,

including (i) defamation and similar claims for alleging that the Defendant was acting

aggressively and pursuing loan-to-own strategies, and (ii) conspiracy claims for alleged interference with the Defendant's legal and commercial rights under Transaction Documents.  The Defendant alleges that such tort claims give rise to additional Secured Obligations against the Debtors.  Such alleged tort claims, however, do not constitute secured claims under the Transaction Documents.  Accordingly, the assertion of such baseless claims is yet another attempt to undermine the Sale Process by inflating the purported amount of "Secured Obligations" through litigation that violates the automatic stay.

## FIRST CLAIM FOR RELIEF
### (Section 362 Declaratory Relief)

87.    The Debtors repeat and reallege each of the foregoing allegations of this Complaint as though fully set forth herein.

88.    The Debtors seek an order enforcing the automatic stay and declaring void all of the Defendant's actions and suits against the Debtors and the Non-Debtor Affiliates (including the English Suit and lawsuits threatened and brought anywhere outside this Court) under section 362 of the Bankruptcy Code.

89.    The Defendant's actions against the Debtors and the Non-Debtor Affiliates violate the automatic stay under section 362 of the Bankruptcy Code because they, among other things, attempt to (a) recover claims against the Debtors that arose prior to the Petition Date, (b) obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate, and/or (c) collect, assess, or recover a claim against the Debtors that arose prior to the Petition Date.

90.    In addition, the Defendant's actions against the Non-Debtor Affiliates inevitably have an adverse impact on property of the Debtors' estates and/or have immediate adverse economic consequences for the Debtors' estates.

91.     Enforcement of the stay is warranted because the Defendant is materially obstructing the Debtors' efforts to utilize their property to pursue the Chapter 11 Cases for the benefit of all stakeholders.

92.     The Debtors have secured a stalking horse bid that will pay all creditors the full allowed amount of their claims (thereby mooting the FitzWalter Actions) and provide a substantial return to equity.  Additionally, the Debtors have already solicited and received additional third-party interest in the assets to be sold, and there may ultimately be an auction resulting in even greater recoveries by the Debtors' stakeholders.

93.     Despite being assured that its claims will be paid in full, the Defendant is pursuing the FitzWalter Actions against the Debtors and the Non-Debtor Affiliates.  The FitzWalter Actions are compelling the Debtors and others to expend a tremendous amount of time, money, and attention to keep the Defendant from chilling bidding and derailing these cases, which can only work to the detriment of the Debtors' stakeholders.  Indeed, the Defendant appears to be acting with the goal of depleting, if not wiping out entirely, the equity to be derived from the contemplated sale and possibly returns to other secured creditors.

94.     Furthermore, costs and expenses incurred by indemnified parties under the JP Lease Indemnification Obligations will result in additional claims against the Debtors' estates.  Staying the FitzWalter Actions will therefore also keep the Debtors' estates from incurring additional obligations directly resulting from the Defendant's conduct against the Non-Debtor Affiliates.

95.     For these reasons, the Debtors respectfully request a declaratory judgment pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure extending the stay under section 362 of the Bankruptcy Code to the FitzWalter Actions.

## SECOND CLAIM FOR RELIEF
### (Injunctive Relief)

96.     The Debtors repeat and reallege each of the foregoing allegations of this

Complaint as though fully set forth herein.

97.     To the extent that the Court does not order the FitzWalter Actions null

and void as violations of the automatic, the Debtors seek an injunction staying the

FitzWalter Actions (and all actions taken by the Defendant and its agents and

representatives relating to such FitzWalter Actions) under sections 105(a) and 362 of the

Bankruptcy Code until the effective date of a chapter 11 plan, or further order of this

Court.  The FitzWalter Actions and related actions are interfering with the Debtors'

ability to preserve estate property, manage their businesses, and are diminishing the

Debtors' prospects for achieving a value-maximizing outcome for all stakeholders.

98.     As the Debtors' business and affairs are managed by JP Lease under the

Management Agreements, and the FitzWalter Actions constitute a global campaign of

litigation, threats, and harassment waged against JP Lease and its officers, directors,

employees and agents for activities undertaken in the Debtors' management, the

Defendant's actions undermine these Chapter 11 Cases.

99.     If the FitzWalter Actions against the Non-Debtor Affiliates are not

enjoined, the Debtors are likely to suffer irreparable harm, including delay and

disruption that risks the Debtors' abilities to successfully complete the Chapter 11

process.  This harm far outweighs any potential harm to the Defendant caused by the

injunctive relief that the Debtors seek.  The Debtors only ask the Court to enjoin the

FitzWalter Actions until the effective date of the Debtors' plan of reorganization, and

are not seeking a permanent injunction.

100.    Injunctive relief is necessary and proper to allow the Debtors to complete their chapter 11 process without the distractions caused by having to respond to the FitzWalter Actions initiated by the Defendant and without the costs borne by the estate under the JP Lease Indemnification Obligations, and to allow creditors the opportunity to maximize their recovery.

101.    The injunction requested herein will serve the public interest by promoting compliance with Congress's purpose in enacting the automatic stay that facilitates the Debtors' Chapter 11 efforts.

102.    Based on the foregoing, the Debtors seek an injunction under section 105 of the Bankruptcy Code enjoining the continuation of the FitzWalter Actions by the Defendant and its agents and representatives.

## THIRD CLAIM FOR RELIEF
### (Declaratory Judgment that the Defendant Willfully Violated the Automatic Stay and First Day Stay Order)

103.    The Debtors repeat and reallege each of the foregoing allegations as if fully set forth herein.

104.    An actual controversy has arisen and now exists between the Defendant and the Debtors as to whether the Defendant willfully violated the automatic stay contained in section 362 of the Bankruptcy Code and the First Day Stay Order.

105.    Accordingly, the Debtors respectfully request a declaratory judgment finding that the Defendant willfully violated the automatic stay pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.

## FOURTH CLAIM FOR RELIEF
### (Declaratory Judgment with Respect to Incurrence of Security Agent's Costs and other Expenses Claimed by the Defendant)

106.    The Debtors repeat and reallege each of the foregoing allegations of this Complaint as though fully set forth herein.

107.    The Defendant has asserted numerous claims and amounts that it asserts are part of the Secured Obligations which have no basis in fact under the Transaction Documents and applicable law.

108.    Given the pendency of the Sale Process and the Debtors' imminent pay-off of the entirety of the valid Secured Obligations as part of that Sale Process, there exists an actual controversy between the parties, and the Debtors seek a declaration of the rights and other legal relations of the parties under the Transaction Documents pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure. Specifically, in light of the limitations provided by section 506(b) of the Bankruptcy Code and N.Y. U.C.C. § 9-623(b), the Debtors respectfully request an order declaring the reasonable and allowable amount of any fees, costs and charges that are properly included as part of the Defendant's secured claim.

109.    To the extent that the Court determines that it must resolve this issue as part of the Sale Process and prior to the Sale Hearing, the Debtors respectfully request that the Court estimate such claims pursuant to section 502(c) of the Bankruptcy Code.

## FIFTH CLAIM FOR RELIEF
### (Surcharge of Collateral Pursuant to Section 506(c) of the Bankruptcy Code)

110.    The Debtors repeat and reallege each of the foregoing allegations of this Complaint as though fully set forth herein.

111.    The Debtors have expended, are expending, and will continue to expend funds to preserve and dispose of the Aircraft and Lease Assets for the Defendant's direct benefit.

112.    Such expenditures are reasonable and necessary for the preservation and disposition of the Aircraft and the Lease Assets and provide a direct benefit to the Defendant in the recovery that the Defendant will obtain from the Debtors' sale of the

Aircraft and the Lease Assets at an auction being maximized for the Defendant's benefit.

113.    Based on the foregoing, the Debtors respectfully request that this Court authorize the Debtors to surcharge the proceeds from the sale of the Aircraft and Lease Assets payable to the Defendant pursuant to section 506(c) of the Bankruptcy Code.

**SIXTH CLAIM FOR RELIEF**
**(Breach of Contract and Governing Law with**
**Respect to Conduct of Enforcement Actions)**

114.    The Debtors repeat and reallege each of the foregoing allegations of this Complaint as though fully set forth herein.

115.    The New York Mortgages are valid and legally enforceable contracts governed by the U.C.C. and the Cape Town Treaty.

116.    Additionally, the English Security Agreements, the Head Leases and the subleases are all governed by the Cape Town Treaty.

117.    The Debtors have fully performed their applicable obligations under the New York Mortgages, the Head Leases, the Subleases and the English Security Agreements.

118.    The Defendant is the Security Agent under the Transaction Documents and the Debtors' counterparty on the New York Mortgages and the English Security Agreements.

119.    The Defendant breached its obligations under governing law and contracts by initiating a secretive and commercially unreasonable process intended to quickly sell the Lease Assets at a discount to an affiliate without providing the Debtors and other interested parties with the notice required under New York law.  In fact, the procedures unilaterally imposed by the Defendant under the proposed Defendant's Lease Assets Enforcement Action are manifestly unreasonable.

120.     In violation of governing law, the Defendant also failed to provide commercially reasonable notice of the public enforcement sale of the Lease Assets to potential bidders.

121.     Had they been given the notice required, the Debtors would have been able to sell the Aircraft and Lease Assets outside of Chapter 11 and pay off their debts, and would not have been forced to file these Chapter 11 Cases.

122.     As a direct and proximate result of the breaches of the New York Mortgages, the Debtors have suffered substantial damages in an amount to be proven at trial, including compensatory damages for the incurrence of unnecessary fees and expenses resulting from the Chapter 11 process, the provision of bidder protections In connection with the Sale Process and the loss of surplus value to equity.

## SEVENTH CLAIM FOR RELIEF
### (Conversion)

123.     The Debtors repeat and reallege each of the foregoing allegations of this Complaint as though fully set forth herein.

124.     As demonstrated at the Dismissal Hearing, the Debtors have the right to possess and control the Lease Assets and to effect the sale thereof under the binding term sheet executed in connection with the Sale Process.

125.     The Defendant, however, has repeatedly exercised control over the Lease Assets, including with respect to its repeated and continuing claims that it is the sole owner of the Lease Assets.

126.     The Defendant is undertaking activities that violate numerous governing laws and contracts to disenfranchise the Debtors rights to the Lease Assets even though the instruments assigning such property rights held by the Debtors are protected by the

automatic stay. In this regard, applicable law protects the Debtors' rights to their Aircraft and Lease Assets.

127. The Defendant's actions have deprived the Debtors of their property, which actions threaten the ability of the Debtors to complete the sale of the Aircraft and Lease Assets as contemplated under the Sale Process.

128. Based on the foregoing, as a direct and proximate result of the Defendant's conversion of their property rights and interests, the Debtors have suffered damages in an amount to be proven at trial, including compensatory damages.

**EIGHTH CLAIM FOR RELIEF**
**(Equitable Subordination Pursuant to Section 510(c) of the Bankruptcy Code)**

129. The Debtors repeat and reallege each of the foregoing allegations of this Complaint as though fully set forth herein.

130. The Defendant's pursuit of a secretive, self-dealing, and rushed sales process, which contravened the Transaction Documents and governing law, and, as set forth above, is manifestly unreasonable, constitutes inequitable conduct that supports equitable subordination under section 510(c) of the Bankruptcy Code.

131. The Defendant has harmed the Debtors' estates and all of the Debtors' other creditors, and has gained an unfair advantage, by forcing the Debtors into Chapter 11 and thereby eliminating the surplus value that would have been realized by a sale of the Debtors' Aircraft and Lease Assets outside of bankruptcy.

132. Equitable subordination of the Defendant's security interests or claims (or other alternative relief will remedy the Defendant's injuries to the Debtors' stakeholders and will negate the Defendant's unfair advantage.

133. Based on the foregoing, the Debtors request that the Court issue an order under section 510(c) of the Bankruptcy Code that (a) the lien securing the Secured

Obligations currently held by the Security Agent be transferred to the Debtors estates

and (b) that such liens be held by the Debtors' estates for benefit of parties-in-interest in

the following order of priority, with any rights and proceeds derived from such liens

being distributed in accordance with the following order of priority: (i) first for the pro

rata benefit of all Senior Lenders (other than the Defendant) (and without regard to any

sharing requirements that otherwise may accrue for the benefit of the Defendant (in

whatever capacity held by the Defendant), which sharing requirements to the extent

benefitting the Defendant shall likewise be subject to such equitable subordination

decree); (ii) second, for the pro rata benefit of all Junior Lenders (other than, as

applicable, the Defendant) (and without regard to any sharing requirements that

otherwise may accrue for the benefit of the Defendant (in whatever capacity held by the

Defendant), which sharing requirements to the extent benefitting the Defendant shall

likewise be subject to such equitable subordination decree); (iii) third, for the pro rata

benefit of all other creditors (other than, as applicable, the Defendant); (iv) fourth, JP

Lease to the extent of any damages award to the Debtors under this adversary

proceeding; and (v) finally, to the Defendant after all of the foregoing parties and their

respective claims and damage awards have been fully and indefeasibly satisfied.

Alternatively, the Debtors request that this Court fashion alternative relief that properly

compensates the parties injured by the Defendant's inequitable conduct that has caused

substantial injury and damages to all parties in interest (other than the Defendant) in

these Chapter 11 Cases.

134.    The Debtors therefore respectfully request an order subordinating the

Defendant's security interests and/or allowed claims pursuant to section 510(c) of the

Bankruptcy Code as provided above and barring the Defendant from receiving any

distributions from the proceeds of this Adversary Proceeding.

**PRAYER FOR RELIEF**

WHEREFORE, the Debtors respectfully request as follows:

(i)      the grant of relief as set forth in the final paragraph of each of the Claims for Relief; and

(ii)     grant such other and further relief as this Court deems just and proper under the circumstances.

Dated:  February 14, 2022
        New York, New York

JPA NO. 111 CO., LTD. and
JPA NO. 49 CO., LTD.
*Debtors and Debtors in Possession*
By their Counsel
TOGUT, SEGAL & SEGAL LLP
By:

*/s/ Kyle J. Ortiz*
Frank A. Oswald
Kyle J. Ortiz
Minta J. Nester
Bryan M. Kotliar
Jared C. Borriello
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000