Sidney P. Levinson
Isabella M. Cusano
**DEBEVOISE & PLIMPTON LLP**
919 Third Avenue
New York, New York 10022
Telephone:     (212) 909-6000
Facsimile:     (212) 909-6836

*Counsel for JLPS Leasing Uranus Limited and*
*JLPS Leasing Draco Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re | Chapter 11 |
| JPA NO. 111 CO., LTD., and JPA NO. 49 CO., LTD., | Case No. 21-12075 (DSJ) |
|  | (Jointly Administered) |
| Debtors.[1] |  |

**DECLARATION OF SIDNEY P. LEVINSON IN SUPPORT OF OBJECTION AND RESERVATION OF RIGHTS OF JLPS LEASING URANUS LIMITED AND JLPS LEASING DRACO LIMITED TO PROPOSED SALE OF PURCHASED ASSETS**

I, Sidney P. Levinson, an attorney duly admitted to practice in the Southern District of New York, declare under penalty of perjury and pursuant to 28 U.S.C. § 1746:

1.    I submit this declaration in support of the *Objection and Reservation of Rights of JLPS Leasing Uranus Limited And JLPS Leasing Draco Limited to Proposed Sale of Purchased Assets* in the above captioned cases (the "Objection"), and state that true and correct copies of the following documents are attached as exhibits hereto: [2]

---

[1]    The Debtors in these Chapter 11 Cases are: JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd.  The Debtors' corporate address is: Kasumigaseki Common Gate West Tower, 3-2-1 Kasumigaseki, Chiyoda-Ku, Tokyo 100-0013.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Objection.

2.      Attached as <u>Exhibit 1</u> is a letter, dated as of February 3, 2022, from McCann Fitzgerald to Simmons & Simmons regarding "[y]our client: Fitzwalter Capital Partners (Financial Trading) Limited Airbus A350 Aircraft with Manufacturer's Serial Number 173."

3.      Attached as <u>Exhibit 2</u> is a letter, dated as of February 3, 2022, from McCann Fitzgerald to Simmons & Simmons regarding "[y]our client: Fitzwalter Capital Partners (Financial Trading) Limited Airbus A350 Aircraft with Manufacturer's Serial Number 67."

4.      Attached as <u>Exhibit 3</u> is a Share Charge, dated as of December 29, 2017, between JLPS Holding Ireland Limited and Credit Agricole Corporate and Investment Bank.

5.      Attached as <u>Exhibit 4</u> is a Share Charge, dated as of November 21, 2017, between JLPS Holding Ireland Limited and Credit Agricole Corporate and Investment Bank.

6.      Attached as <u>Exhibit 5</u> is a Director's Letter of Resignation of Niall McNamara, dated as of January 24, 2022, in respect of JLPS Leasing Uranus Limited.

7.      Attached as <u>Exhibit 6</u> is a Director's Letter of Resignation of Niall McNamara, dated as of January 24, 2022, in respect of JLPS Leasing Draco Limited.

8.      Attached as <u>Exhibit 7</u> is a Director's Letter of Resignation of Teiji Ishikawa, dated as of January 24, 2022, in respect of JLPS Leasing Uranus Limited.

9.      Attached as <u>Exhibit 8</u> is a Director's Letter of Resignation of Teiji Ishikawa, dated as of January 24, 2022, in respect of JLPS Leasing Draco Limited.

10.     Attached as <u>Exhibit 9</u> is a notice of appointment of Derek O'Reilly as director of JLPS Leasing Uranus Limited.

11.     Attached as <u>Exhibit 10</u> is a notice of appointment of Derek O'Reilly as director of JLPS Leasing Draco Limited.

12.      Attached as <u>Exhibit 11</u> is a Director's Letter of Resignation of Thomas Francis Dowling, dated as of January 30, 2022, in respect of JLPS Leasing Uranus Limited.

13.      Attached as <u>Exhibit 12</u> is a Director's Letter of Resignation of Thomas Francis Dowling, dated as of January 30, 2022, in respect of JLPS Leasing Draco Limited.

14.      Attached as <u>Exhibit 13</u> is a notice, dated as of February 9, 2022, confirming Derek O'Reilly as director of JLPS Leasing Uranus Limited.

15.      Attached as <u>Exhibit 14</u> is a notice, dated as of February 9, 2022, confirming Derek O'Reilly as director of JLPS Leasing Draco Limited.

16.      Attached as <u>Exhibit 15</u> is a stock transfer form, dated as of February 9, 2022, of JLPS Leasing Uranus Limited.

17.      Attached as <u>Exhibit 16</u> is a stock transfer form, dated as of February 9, 2022, of JLPS Leasing Draco Limited.

18.      Attached as <u>Exhibit 17</u> is the Airframe Warranties Agreement in Respect of One A350-941 Aircraft Bearing Manufacturer's Serial Number 0173, dated as of December 29, 2017, issued by Airbus S.A.S. in favor of JLPS Uranus and Vietnam Airlines.

19.      Attached as <u>Exhibit 18</u> is the Initial Notice, dated as of September 28, 2017, regarding the Airframe Warranties Agreement.

20.      Attached as <u>Exhibit 19</u> is the Engine Warranty Agreement, dated as of December 29, 2017, between Rolls-Royce Plc and JLPS Leasing Uranus Limited.

21.      Attached as <u>Exhibit 20</u> is the Claim Form relating to the legal proceedings brought by FitzWalter Capital Partners (Financial Trading) Limited against, among others, JLPS Leasing Uranus Limited and JLPS Leasing Draco Limited.

22.     Attached as <u>Exhibit 21</u> is the Particulars of Claim relating to the legal proceedings brought by FitzWalter Capital Partners (Financial Trading) Limited against, among others, JLPS Leasing Uranus Limited and JLPS Leasing Draco Limited.


Dated:  February 17, 2022                 */s/ Sidney P. Levinson*

      New York, New York          Sidney P. Levinson
                                      **DEBEVOISE & PLIMPTON LLP**
                                      919 Third Avenue
                                      New York, New York 10022
                                      Telephone:    (212) 909-6000
                                      Facsimile:    (212) 909-6836
                                      Email:        slevinson@debevoise.com

                                      *Counsel for JLPS Leasing Uranus Limited*
                                      *and JLPS Leasing Draco Limited*

**<u>Exhibit 1</u>**

McCann FitzGerald LLP
Riverside One
Sir John Rogerson's Quay
Dublin 2
D02 X576

Tel: +353-1-829 0000
Email: inquiries@mccannfitzgerald.com
Dx 31 Dublin
www.mccannfitzgerald.com

# McCANN FITZGERALD

| OUR REF | YOUR REF | DATE |
|---|---|---|
| LMS\44474312.3 | Your ref: DR/119935-0003/RAST/ANDB | 3 February 2022 |

Simmons & Simmons
Waterways House
Grand Canal Quay
Dublin 2

Andrea.Brennan@simmons-simmons.com.
Conor.Ward@simmons-simmons.com

**Your client: Fitzwalter Capital Partners (Financial Trading) Limited**          By email
**Airbus A350 Aircraft with Manufacturer's Serial Number 173**

Dear Sirs

We act for JLPS Leasing Uranus Limited (formerly known as PAAL Uranus Company Limited) ("**Uranus**" or the "**Intermediate Lessor**").

Terms used herein shall, unless otherwise stated, have the same meaning as set out in the correspondence issued to our clients by or on behalf of Fitzwalter Capital Partners (Financial Trading) Limited ("**Fitzwalter**"). This letter deals only with the Irish law points raised in your letter of 24 January 2022.

As a preliminary matter, it is worth outlining the position the Intermediate Lessor holds within the corporate structure which was set up to acquire an Airbus A350 aircraft.

1.    **Acquisition of the Aircraft**

1.1    JPA No. 49 Co. Ltd ("**JPA**") is a special purpose investment vehicle formed under the laws of Japan and created to acquire and lease an Airbus A350 aircraft bearing manufacturer's serial number 173 (the "**Aircraft**").

1.2    The acquisition of the Aircraft was part funded by senior and junior debt advanced under facilities in respect of which Credit Agricole Corporate & Investment Bank ("**CACIB**") acted,

Barry Devereux (Managing Partner), Catherine Deane (Chair), Terence McCrann, Roderick Bourke, Niall Powderly, Kevin Kelly, Hilary Marren, Eamonn O'Hanrahan, Helen Kilroy, Judith Lawless, James Murphy, David Lydon, David Byers, Colm Fanning, Paul Lavery, Alan Fuller, Michelle Doyle, Hugh Beattie, Fergus Gillen, Valerie Lawlor, Mark White, Rosaleen Byrne, Eamon de Valera, Joe Fay, Ben Gaffikin, Donal O Raghallaigh, Karyn Harty, Philip Andrews, Barrett Chapman, Mary Brassil, Audrey Byrne, Shane Fahy, Georgina O'Riordan, Adrian Farrell, Michael Murphy, Aidan Lawlor, Darragh Murphy, Brian Quigley, Conor O'Dwyer, Stephen FitzSimons, David Hurley, Philip Murphy, Fiona O'Beirne, Garreth O'Brien, Gary McSharry, Alan Heuston, Josh Hogan, Richard Leonard, Rory O'Malley, Lisa Smyth, Brendan Slattery, Tom Dane, Catherine Derrig, Megan Hooper, Shane Sweeney, Adam Finlay, Iain Ferguson, Jennifer Halpin, Stuart McCarron, Stephen Proctor, Michael Coonan, Stephen Holst, Emily Mac Nicholas, Brendan Murphy, Shane O'Brien, Éamon Ó Cuív, Eleanor Cunningham, Gill Lohan, Ciara Ryan, Niall Best, Richard Gill, Douglas McMahon, Laura Treacy, Laura Deignan, Stephen Fuller, Niall McDowell, John Neeson, David O'Dea, Orlaith Sheehy.
**Consultants**: Catherine Austin, Deirdre Barnicle, Seán Barton, Ambrose Loughlin, Eleanor MacDonagh (FCA), Lonan McDowell, Anna Moran, Peter Osborne, Tony Spratt (ACA).
DUBLIN • BRUSSELS • LONDON • NEW YORK

amongst other capacities, as security agent. The acquisition was also part funded by equity investment.

1.3    JPA leased the Aircraft to the Intermediate Lessor, which in turn sub-leased the aircraft to Vietnam Airlines JSC ("**Vietnam Airlines**").

1.4    The Intermediate Lessor was incorporated in Ireland for the sole purpose of entering into:

   (a)    the Head Lease Agreement dated 29 December 2017 with JPA (the "**Head Lease**"); and

   (b)    the Aircraft Lease Agreement 1 August 2017 with Vietnam Airlines (the "**Sub Lease**").

1.5    It was a requirement of the debt financing that the Intermediate Lessor would enter into a Security Assignment in favour of JPA pursuant to which the Intermediate Lessor would assign by way of security, amongst other things, its rights under the Sub Lease as security for its obligations to JPA under the Head Lease (the "**Sub Lease Security Assignment**").

1.6    It was a requirement of the debt financing that JPA would grant (a) an Aircraft Mortgage to the lenders in respect of the Aircraft and (b) a Head Lease Security Assignment to the lenders in respect of its rights under the Transaction Documents, including the Sub Lease Security Assignment, which have been referred to in correspondence as the **Lease Assets.** We understand that any claim that lies against Vietnam Airlines for non-payment of amounts due by it under the Sub Lease, fall within the Lease Assets.

2.    **Fitzwalter Position**

2.1    We note that arising from a series of steps taken on 1 and 2 December 2022:

   (a)    CACIB notified JPA that it had terminated the Head Lease and Sub Lease; and

   (b)    Fitzwalter purported to succeed CACIB as Security Agent and as lender, in each case, under the Transaction Documents.

3.    **Chapter 11 Proceedings**

3.1    We are instructed that having acquired the debt on 1 December 2021, Fitzwalter pursued a sale process in respect of the Lease Assets and, on 10 December 2021, it appointed Airborne to manage that sale. The bid deadline for the Lease Assets was fixed for 4pm on Friday, 17 December 2021, with a requirement that the purchaser fund the purchase price by midnight on Friday, 17 December with closing to occur on Monday, 20 December. Fitzwalter has acknowledged that it was intended that one of its affiliates would purchase the Lease Assets pursuant to this enforcement sale.

3.2    We understand that Fitzwalter intended to pursue a separate enforcement sale strategy of the Aircraft at an undetermined date in the future.

3.3    On the morning of 17 December 2021, JPA filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code (the "**Chapter 11 Filing**"). The Chapter 11 Filing has brought

**McCann FitzGerald**

into effect an automatic stay which means that no enforcement action against JPA is permitted nor can any party either commence or continue proceedings against it.

3.4    As part of the Chapter 11 Filing, JPA indicated its intention to conduct a sale process under section 363 of the United States Bankruptcy Code.

3.5    On 2 January 2022, Fitzwalter filed a Motion to Dismiss JPA's bankruptcy petition.  By decision of the US Bankruptcy Court made on 2 February 2022, that Motion was denied (the "**Denial Ruling**").  Consequently, JPA remains subject to the Chapter 11 Process.

4.    **The Stalking Horse Bid**

4.1    JPA signed a term sheet with a Stalking Horse bidder on 24 December 2021 for the purchase and sale of substantially all of JPA's assets, including the Aircraft and the Lease Assets.

4.2    We are instructed that the Stalking Horse Bid has set a floor for the sale of the Aircraft and the Lease Assets at a level which will result in the satisfaction of all of the secured creditors allowed claims in full, including post-petition interest, and a surplus of circa. $5m dollars for equity holders.

4.3    At page 18 of the Denial Ruling, the judge made the following finding of fact: "*I further credit Mr. Loechtekens's terstimony and JPA's contention that, in his and JPA's judgment, this strategy is the most reliable way to maximise recoveries for all parties in interest, and that, by contrast, Fitzwalter's approach appears likely to realise a lower total recovery, and to come at the expense of other secured creditors and other parties in interest.*"

5.    **The Bill of Sale**

5.1    In order to facilitate the consensual enforcement of JPA's rights under the Sub Lease Security Assignment and by extension, the successful conclusion of the Stalking Horse Bid (which as set out in paragraph 4.3 above, has since been endorsed by the US Court as offering a better outcome for all stakeholders than the Fitzwalter strategy) the Intermediate Lessor executed a Bill of Sale in favour of JPA in respect of such right, title and interest as it holds in, *inter alia,* the Lease Assets on 21 January 2022.

5.2    At the time of executing the Bill of Sale, the Lease Assets were subject to the terms of the Sub Lease Security Assignment in favour of JPA.

6.    **Current status of the Intermediate Lessor**

6.1    As at the date of this letter, the Intermediate Lessor has no assets and no liabilities.

6.2    Fitzwalter took a series of steps on 24 and 30 January 2022, pursuant to which it has purported to enforce a Share Charge from JLPS Holding (Ireland) Limited granted to the Security Agent, to remove Niall McNamara, Teiji Ishiikawa and Frank Dowling from the board of the Intermediate Lessor and to appoint Derek O'Reilly as the sole director.

6.3    It is not understood why Fitzwalter has purportedly taken such enforcement steps against what is now a shell company.  However, if additional steps are taken, our client fully reserves its position in relation to the purported capacity in respect of which Fitzwalter has sought to

**McCann FitzGerald**

take those steps, namely as Mortgagee in Possession, in circumstances where the assets are
subject to a charge, not a mortgage.

7.     **Correspondence received on behalf of Fitzwalter**

       *Directors' Duties*

7.1    In light of the steps taken by Fitzwalter to date as set out above, it seems clear that Fitzwalter,
       as lender, does not in fact want JPA to repay it. Rather, its objective is to gain control of the
       Aircraft and Lease Assets. In this regard, there is a certain irony to Fitzwalter making
       allegations against the directors suggesting that they did not act honestly and responsibly in
       their decision to execute the Bill of Sale.

7.2    Suffice it to say that the directors are well aware of the duties which apply to solvent
       companies in this jurisdiction as set out in section 228 of the Companies Act, 2014. It is
       abundantly clear that the pursuit of a strategy which the US Bankruptcy Court has
       acknowledged will deliver a better outcome for all stakeholders, including equity holders, is
       entirely consistent with those obligations.

7.3    The Intermediate Lessor received rent from Vietnam Airlines and passed it on to JPA. The
       overlapping nature of the obligations contained within the lease documents and the finance
       documents make it impossible for the directors of the Intermediate Lessor not to give due
       consideration to the overall strategy to maximise realisable value for the Aircraft and the
       Lease Assets. In accordance with well-established principles of corporate benefit, the
       directors were perfectly justified in exercising their judgment, with the benefit of advice, in
       favour of executing the Bill of Sale to achieve an outcome which can very obviously deliver a
       better financial return for the stakeholders of this Aircraft and offers some return to the equity
       holders, whose interests the directors of a solvent company must equally consider.

7.4    For the avoidance of doubt, the description of the execution of the Bill of Sale as amounting
       to a "*transfer of assets from the Intermediate Lessor (to which it does not have legal title) to a connected
       party at an undervalue and for no cash consideration*" is a blatant misrepresentation of the position
       as set out above. It takes no account of the existence of the Sub Lease Security Assignment.
       For the avoidance of doubt, we wholly reject any suggestion that the execution of the Bill of
       Sale has any impact whatsoever on the limited liability protections which apply under the
       Transaction Documents.

7.5    If the transaction, in respect of which the Bill of Sale forms a part, completes, your client (as
       lender), will be repaid its allowed claims in full. It is therefore difficult to understand the tone
       of your letter to directors who have taken steps to act honestly and responsibly in supporting
       a strategy that can deliver such an outcome.

Yours faithfully

*M'Cann FitzGerald LLP*

**McCann FitzGerald LLP**

**Exhibit 2**

**McCann FitzGerald LLP**

Riverside One
Sir John Rogerson's Quay
Dublin 2
D02 X576

Tel: +353-1-829 0000
Email: inquiries@mccannfitzgerald.com
Dx 31 Dublin
*www.mccannfitzgerald.com*

# McCANN FITZGERALD

| OUR REF | YOUR REF | DATE |
|---|---|---|
| LMS\44415182.4 | Your ref: DR/119935-0003/RAST/ANDB | 3 February 2022 |

Simmons & Simmons
Waterways House
Grand Canal Quay
Dublin 2

Andrea.Brennan@simmons-simmons.com.
Conor.Ward@simmons-simmons.com

**Your client: Fitzwalter Capital Partners (Financial Trading) Limited**      By email
**Airbus A350 Aircraft with Manufacturer's Serial Number 67**

Dear Sirs

We act for JLPS Leasing Draco Limited (formerly known as DAE Leasing (Ireland) 12 Limited) ("**Draco**" or the "**Intermediate Lessor**").

Terms used herein shall, unless otherwise stated, have the same meaning as set out in the correspondence issued to our clients by or on behalf of Fitzwalter Capital Partners (Financial Trading) Limited ("**Fitzwalter**"). This letter deals only with the Irish law points raised in your letter of 24 January 2022.

As a preliminary matter, it is worth outlining the position the Intermediate Lessor holds within the corporate structure which was set up to acquire an Airbus A350 aircraft.

1.     **Acquisition of the Aircraft**

1.1    JPA No. 11 Co. Ltd ("**JPA**") is a special purpose investment vehicle formed under the laws of Japan and created to acquire and lease an Airbus A350 aircraft bearing manufacturer's serial number 67 (the "**Aircraft**").

1.2    The acquisition of the Aircraft was part funded by senior and junior debt advanced under facilities in respect of which Credit Agricole Corporate & Investment Bank ("**CACIB**") acted, amongst other capacities, as security agent. The acquisition was also part funded by equity investment.

Barry Devereux (Managing Partner), Catherine Deane (Chair), Terence McCrann, Roderick Bourke, Niall Powderly, Kevin Kelly, Hilary Marren, Eamonn O'Hanrahan, Helen Kilroy, Judith Lawless, James Murphy, David Lydon, David Byers, Colm Fanning, Paul Lavery, Alan Fuller, Michelle Doyle, Hugh Beattie, Fergus Gillen, Valerie Lawlor, Mark White, Rosaleen Byrne, Eamon de Valera, Joe Fay, Ben Gaffikin, Donal O Raghallaigh, Karyn Harty, Philip Andrews, Barrett Chapman, Mary Brassil, Audrey Byrne, Shane Fahy, Georgina O'Riordan, Adrian Farrell, Michael Murphy, Aidan Lawlor, Darragh Murphy, Brian Quigley, Conor O'Dwyer, Stephen FitzSimons, David Hurley, Philip Murphy, Fiona O'Beirne, Garreth O'Brien, Gary McSharry, Alan Heuston, Josh Hogan, Richard Leonard, Rory O'Malley, Lisa Smyth, Brendan Slattery, Tom Dane, Catherine Derrig, Megan Hooper, Shane Sweeney, Adam Finlay, Iain Ferguson, Jennifer Halpin, Stuart McCarron, Stephen Proctor, Michael Coonan, Stephen Holst, Emily Mac Nicholas, Brendan Murphy, Shane O'Brien, Éamon Ó Cuív, Eleanor Cunningham, Gill Lohan, Ciara Ryan, Niall Best, Richard Gill, Douglas McMahon, Laura Treacy, Laura Deignan, Stephen Fuller, Niall McDowell, John Neeson, David O'Dea, Orlaith Sheehy.
**Consultants**: Catherine Austin, Deirdre Barnicle, Seán Barton, Ambrose Loughlin, Eleanor MacDonagh (FCA), Lonan McDowell, Anna Moran, Peter Osborne, Tony Spratt (ACA).

DUBLIN • BRUSSELS • LONDON • NEW YORK

**McCann FitzGerald**

1.3     JPA leased the Aircraft to the Intermediate Lessor, which in turn sub-leased the aircraft to Vietnam Airlines JSC ("**Vietnam Airlines**").

1.4     The Intermediate Lessor was incorporated in Ireland for the sole purpose of entering into:

   (a)     the Head Lease Agreement dated 19 November 2018 with JPA (the "**Head Lease**"); and

   (b)     the Aircraft Lease Agreement 4 December 2016 with Vietnam Airlines (the "**Sub Lease**").

1.5     It was a requirement of the debt financing that the Intermediate Lessor would enter into a Security Assignment in favour of JPA pursuant to which the Intermediate Lessor would assign by way of security, amongst other things, its rights under the Sub Lease as security for its obligations to JPA under the Head Lease (the "**Sub Lease Security Assignment**").

1.6     It was a requirement of the debt financing that JPA would grant (a) an Aircraft Mortgage to the lenders in respect of the Aircraft and (b) a Head Lease Security Assignment to the lenders in respect of its rights under the Transaction Documents, including the Sub Lease Security Assignment, which have been referred to in correspondence as the **Lease Assets.** We understand that any claim that lies against Vietnam Airlines for non-payment of amounts due by it under the Sub Lease, fall within the Lease Assets.

2.     **Fitzwalter Position**

2.1     We note that arising from a series of steps taken on 1 and 2 December 2022:

   (a)     CACIB notified JPA that it had terminated the Head Lease and Sub Lease; and

   (b)     Fitzwalter purported to succeed CACIB as Security Agent and as lender, in each case, under the Transaction Documents.

3.     **Chapter 11 Proceedings**

3.1     We are instructed that having acquired the debt on 1 December 2021, Fitzwalter pursued a sale process in respect of the Lease Assets and, on 10 December 2021, it appointed Airborne to manage that sale.  The bid deadline for the Lease Assets was fixed for 4pm on Friday, 17 December 2021, with a requirement that the purchaser fund the purchase price by midnight on Friday, 17 December with closing to occur on Monday, 20 December.  Fitzwalter has acknowledged that it was intended that one of its affiliates would purchase the Lease Assets pursuant to this enforcement sale.

3.2     We understand that Fitzwalter intended to pursue a separate enforcement sale strategy of the Aircraft at an undetermined date in the future.

3.3     On the morning of 17 December 2021, JPA filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code (the "**Chapter 11 Filing**").  The Chapter 11 Filing has brought into effect an automatic stay which means that no enforcement action against JPA is permitted nor can any party either commence or continue proceedings against it.

McCANN FITZGERALD

3.4    As part of the Chapter 11 Filing, JPA indicated its intention to conduct a sale process under section 363 of the United States Bankruptcy Code.

3.5    On 2 January 2022, Fitzwalter filed a Motion to Dismiss JPA's bankruptcy petition. By decision of the US Bankruptcy Court made on 2 February 2022, that Motion was denied (the "**Denial Ruling**"). Consequently, JPA remains subject to the Chapter 11 Process.

4.     **The Stalking Horse Bid**

4.1    JPA signed a term sheet with a Stalking Horse bidder on 24 December 2021 for the purchase and sale of substantially all of JPA's assets, including the Aircraft and the Lease Assets.

4.2    We are instructed that the Stalking Horse Bid has set a floor for the sale of the Aircraft and the Lease Assets at a level which will result in the satisfaction of all of the secured creditors allowed claims in full, including post-petition interest, and a surplus of circa. $5m dollars for equity holders.

4.3    At page 18 of the Denial Ruling, the judge made the following finding of fact: "*I further credit Mr. Loechtekens's testimony and JPA's contention that, in his and JPA's judgment, this strategy is the most reliable way to maximise recoveries for all parties in interest, and that, by contrast, Fitzwalter's approach appears likely to realise a lower total recovery, and to come at the expense of other secured creditors and other parties in interest.*"

5.     **The Bill of Sale**

5.1    In order to facilitate the consensual enforcement of JPA's rights under the Sub Lease Security Assignment and by extension, the successful conclusion of the Stalking Horse Bid (which as set out in paragraph 4.3 above, has since been endorsed by the US Court as offering a better outcome for all stakeholders than the Fitzwalter strategy) the Intermediate Lessor executed a Bill of Sale in favour of JPA in respect of such right, title and interest as it holds in, *inter alia*, the Lease Assets on 21 January 2022.

5.2    At the time of executing the Bill of Sale, the Lease Assets were subject to the terms of the Sub Lease Security Assignment in favour of JPA.

6.     **Current status of the Intermediate Lessor**

6.1    As at the date of this letter, the Intermediate Lessor has no assets and no liabilities.

6.2    Fitzwalter took a series of steps on 24 and 30 January 2022, pursuant to which it has purported to enforce a Share Charge from JLPS Holding (Ireland) Limited granted to the Security Agent, to remove Niall McNamara, Teiji Ishiikawa and Frank Dowling from the board of the Intermediate Lessor and to appoint Derek O'Reilly as the sole director.

6.3    It is not understood why Fitzwalter has purportedly taken such enforcement steps against what is now a shell company. However, if additional steps are taken, our client fully reserves its position in relation to the purported capacity in respect of which Fitzwalter has sought to take those steps, namely as Mortgagee in Possession, in circumstances where the assets are subject to a charge, not a mortgage.

**MᶜCANN FITZGERALD**

7.    **Correspondence received on behalf of Fitzwalter**

*Directors' Duties*

7.1    In light of the steps taken by Fitzwalter to date as set out above, it seems clear that Fitzwalter, as lender, does not in fact want JPA to repay it. Rather, its objective is to gain control of the Aircraft and Lease Assets. In this regard, there is a certain irony to Fitzwalter making allegations against the directors suggesting that they did not act honestly and responsibly in their decision to execute the Bill of Sale.

7.2    Suffice it to say that the directors are well aware of the duties which apply to solvent companies in this jurisdiction as set out in section 228 of the Companies Act, 2014. It is abundantly clear that the pursuit of a strategy which the US Bankruptcy Court has acknowledged will deliver a better outcome for all stakeholders, including equity holders, is entirely consistent with those obligations.

7.3    The Intermediate Lessor received rent from Vietnam Airlines and passed it on to JPA. The overlapping nature of the obligations contained within the lease documents and the finance documents make it impossible for the directors of the Intermediate Lessor not to give due consideration to the overall strategy to maximise realisable value for the Aircraft and the Lease Assets. In accordance with well-established principles of corporate benefit, the directors were perfectly justified in exercising their judgment, with the benefit of advice, in favour of executing the Bill of Sale to achieve an outcome which can very obviously deliver a better financial return for the stakeholders of this Aircraft and offers some return to the equity holders, whose interests the directors of a solvent company must equally consider.

7.4    For the avoidance of doubt, the description of the execution of the Bill of Sale as amounting to a "*transfer of assets from the Intermediate Lessor (to which it does not have legal title) to a connected party at an undervalue and for no cash consideration*" is a blatant misrepresentation of the position as set out above. It takes no account of the existence of the Sub Lease Security Assignment. For the avoidance of doubt, we wholly reject any suggestion that the execution of the Bill of Sale has any impact whatsoever on the limited liability protections which apply under the Transaction Documents.

7.5    If the transaction, in respect of which the Bill of Sale forms a part, completes, your client (as lender), will be repaid its allowed claims in full. It is therefore difficult to understand the tone of your letter to directors who have taken steps to act honestly and responsibly in supporting a strategy that can deliver such an outcome.

Yours faithfully

*M'Cann FitzGerald LLP*

**McCann FitzGerald LLP**

**<u>Exhibit 3</u>**

EXECUTION VERSION

DATED _29th_ DECEMBER 2017

## JLPS HOLDING IRELAND LIMITED
### (as Chargor)

-and-

## CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK
### (as Security Agent)

---

**SHARE CHARGE**

---

 **Flynn O'Driscoll**
Business Lawyers

No. 1 Grant's Row, Lower Mount Street
Dublin, D02 HX96
Ireland

Tel: 353 1 6424220
Email: info@fod.ie

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | INTERPRETATION | 2 |
| 2. | PAYMENT PROVISIONS | 6 |
| 3. | CHARGING PROVISIONS | 7 |
| 4. | CONTINUING SECURITY | 7 |
| 5. | REPRESENTATIONS AND WARRANTIES | 9 |
| 6. | UNDERTAKINGS | 11 |
| 7. | FINANCIAL COLLATERAL DIRECTIVE | 15 |
| 8. | ENFORCEMENT OF SECURITY | 15 |
| 9. | RECEIVERS | 17 |
| 10. | APPLICATION OF PROCEEDS | 18 |
| 11. | CONSOLIDATION OF ACCOUNTS AND SET-OFF | 18 |
| 12. | FURTHER ASSURANCES | 18 |
| 13. | POWER OF ATTORNEY | 19 |
| 14. | COSTS AND EXPENSES | 19 |
| 15. | CURRENCY CONVERSION AND INDEMNITY | 20 |
| 16. | MISCELLANEOUS PROVISIONS | 20 |
| 17. | RIGHTS AND REMEDIES | 21 |
| 18. | ASSIGNMENT | 22 |
| 19. | NOTICES | 22 |
| 20. | COUNTERPARTS | 23 |
| 21. | RELEASE OF SECURITY | 23 |
| 22. | GOVERNING LAW | 24 |
| 23. | ENFORCEMENT | 24 |
| 24. | CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999 | 24 |
| SCHEDULE 1 | | 26 |
| SCHEDULE 2 | | 29 |
| CHARGED ASSETS | | 29 |
| SCHEDULE 3 | | 30 |
| SCHEDULE 4 | | 32 |

**THIS DEED** is dated ___29ᵗʰ___ December 2017

**BETWEEN:**

(1)      **JLPS HOLDING IRELAND LIMITED**, a limited company with company registration number 612691 and registered offices at 29 Main Street, Cashel, Co. Tipperary (the "**Chargor**"); and

(2)      **CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK** in its capacity as security agent and trustee for and on behalf of itself, the Senior Agent, the Junior Agent, the Hedging Counterparty and the Lenders for the purposes only of holding certain security under the Transaction Documents (together with its successors and assigns the "**Security Agent**").

**RECITALS**

A.      The Chargor is the legal and beneficial owner of the Shares (as defined below). As at the date of this Charge, the Shares represent 100% of the issued share capital in the Company.

B.      By way of the Proceeds Agreement (as is further defined below), the Chargor has agreed to charge the Shares in favour of the Security Agent.

C.      It has been agreed that the Chargor will enter into this Deed in order to secure, inter alia, the Secured Obligations.

1.      **INTERPRETATION**

1.1.   **Definitions**

        In this Deed, the following terms shall, unless the context otherwise requires, have the following meanings:

| | |
|---|---|
| **"Act"** | means the Land and Conveyancing Law Reform Act 2009. |
| **"Aircraft"** | means the Airbus A350-941 aircraft bearing manufacturer's serial number 173 as more particularly described in the Lease Agreement relating thereto, including the Airframe, Engines and all Parts and, where the context so requires, the aircraft documents and technical records. |
| **"Charged Assets"** | means (a) the shares specified in Schedule 2; (b) all other shares in the capital of the Company which the Chargor may now or hereafter hold or beneficially own and (c) all present and future Related Rights. |
| **"Companies Act"** | means the Companies Act 2014. |
| **"Company"** | means PAAL Uranus Company Limited a limited liability company incorporated in Ireland with registered number 598249 and having its registered office at 2 Grand Canal Square, Grand Canal Harbour, Dublin 2 to be changed on closing to 29 Main Street, Cashel, Co. Tipperary E25 RF76. |

| | |
|---|---|
| **"Delegate"** | means any person appointed by the Security Agent or any Receiver appointed pursuant to the provisions of clause 13.2 (*Delegation*). |
| **"Disposal"** | means (a) any sale, transfer, mortgage, assignment, grant of an option over, charge, pledge, loan or other disposal of Charged Assets, or an agreement to do any of the foregoing; and/or (b) entering into any transaction (including a derivative transaction) having an economic effect similar to any of the types of disposal described in sub-paragraph (a) above; and **dispose** and shall be construed accordingly. |
| **"Dispute"** | means any suit, action, proceedings and/or any dispute or difference which may arise out of or in connection with or which may relate in any way to this Deed (including but not limited to any suit, action, proceedings, dispute or difference relating to the formation, interpretation or performance of this Deed) or any dispute arising out of any non-contractual obligations of any nature (including those to which Regulation (EC) No. 864/2007 applies) arising between the parties or any of them. |
| **"Enforcement Event"** | has the meaning ascribed to it in the Proceeds Agreement. |
| **"Examiner"** | means an examiner appointed under Section 509 of the Companies Act. |
| **"Facility Agreement"** | means either or both, as the context requires, of: the Senior Facility Agreement; and/or the Junior Facility Agreement. |
| **"Junior Facility Agreement"** | means the facility agreement entered into or to be entered into, as the context may require, between inter alia the Junior Lenders, the Junior Agent, the Security Agent and the Borrower in respect of the Aircraft. |
| **"Proceedings"** | means suits, actions or proceedings arising out of or in connection with or relating in any way to this Deed or any dispute arising out of any non-contractual obligations of any nature (including those to which Regulation (EC) No. 864/2007 applies) arising between the parties or any of them (including but not limited to any suits, actions or proceedings relating to the formation, interpretation or performance of this Deed). |
| **"Proceeds Agreement"** | means the proceeds agreement entered into, or to be entered into, as the context may require, between, amongst others, the Borrower and the Finance Parties. |
| **"Receiver"** | means any receiver and/or receiver and manager appointed by the Security Agent (whether pursuant to this Deed or otherwise) in respect of the Chargor or over all or any part of the Charged Assets. |
| **"Related Rights"** | mean, in relation to the Charged Assets (a) all dividends, distributions, interest and other income paid or payable on the relevant Shares or any asset referred to in (b); (b) all rights, |

3

monies, benefits property or other claims accruing or offered at any time in relation to the Charged Assets whether by way of conversion, redemption, substitution, exchange, bonus or preference, under option rights or otherwise; (c) all rights and claims relating to any Charged Assets which are deposited with, or registered in the name of, any depositary, custodian, nominee, clearing house or system, investment manager, Security Agent or other similar person or their nominee, in each case whether or not on a fungible basis (including rights against any such person); and (d) all other rights and claims attaching or relating to any Charged Assets and all cash or other securities or investments in the future deriving from the Charged Assets or such rights and claims.

| | |
|---|---|
| **"Relevant Documents"** | means any Transaction Document (as such term is defined in the Proceeds Agreement). |
| **"Secured Obligations"** | means any and all moneys, liabilities and obligations (whether actual or contingent, whether now existing or hereafter arising, whether or not for the payment of money and including, without limitation, any obligation or liability to pay damages) from time to time owing to any of the Finance Parties by any Obligor pursuant to any Transaction Document, notwithstanding that the recourse of the Finance Parties against any person may be limited in recourse. |
| **"Secured Obligations Discharge Date"** | means the date on which the Security Interests constituted by the Security Documents are required to be released, discharged and/or re-assigned pursuant to Clause 7 (Release of Security) of the Proceeds Agreement |
| **"Security Period"** | means the period commencing on the first Utilisation Date and expiring on the Secured Obligations Discharge Date. |
| **"Security"** | means the security constituted or intended to be constituted by this Deed. |
| **"Senior Facility Agreement"** | means the facility agreement entered into or to be entered into, as the context may require, between inter alia the Senior Lenders, the Senior Agent, the Security Agent and the Borrower in respect of the Aircraft |
| **"Shares"** | means all of the Chargor's present and future shares in the Company and all other shares, stocks, bonds, bearer instruments, options and securities and share warrants in the Company from time to time legally or beneficially owned by the Chargor or in respect of which it may now or hereafter have any rights, including those shares in the Company specified in the Schedule 2 (and including those shares held in an uncertificated form whether in the name of the Chargor or any agent, nominee or trustee for and on behalf of the Chargor). |

1.2.   **Construction**

4

1.2.1.    Unless the context otherwise requires or this Deed provides otherwise, a term which is defined in the Proceeds Agreement (including by reference to any other document) shall have the same meaning (or be subject to the same construction) in this Deed. If there is any conflict or inconsistency between the terms of this Deed and the Proceeds Agreement then the terms of the Proceeds Agreement shall prevail to the extent of such conflict or inconsistency.

1.2.2.    Unless otherwise provided, any reference to a section, clause, sub-clause, paragraph or schedule is a reference to a section, clause, sub-clause, paragraph or schedule (as the case may be) of this Deed.

1.2.3.    Headings and the contents page are inserted for ease of reference only and do not affect the construction of this Deed.

1.2.4.    A document is in the agreed form if it is in the form of a draft agreed between or on behalf of the parties hereto on or before the date hereof.

1.2.5.    Unless the context otherwise requires, any reference in this Deed to:

(1)    a word or phrase the definition of which is contained or referred to in section 2 of the Companies Act shall have the meaning thereby given to it;

(2)    any provision of law is a reference to that provision as amended, substituted, extended or re-enacted and includes any subordinate legislation;

(3)    any Irish legal term, concept, legislation or regulation (including those for any action, remedy, method of judicial proceeding, document, statute, court official, governmental authority or agency) or any accounting term or concept, in respect of any jurisdiction other than Ireland will be construed as references to the term, concept, legislation or regulation which most nearly corresponds to it in that jurisdiction;

(4)    the singular includes the plural and vice versa and any gender includes the other gender;

(5)    a reference to time is a reference to Irish time;

(6)    a person includes that person's successors, personal representatives, permitted assignees and/or transferees, substitutes, executors, administrators, successors in title (as the case may be) whether direct or indirect or any person with whom they may from time to time merge or amalgamate;

(7)    this Deed or any other agreement or instrument is a reference to this Deed, or such other agreement or instrument as amended, restated, extended, varied, novated, substituted, replaced or supplemented in any manner from time to time, however fundamentally and which may include, without limitation, an increase in facilities, an increase in any interest rate applicable to facilities provided, an increase in the Secured Obligations and/or any rescheduling of indebtedness;

5

(8)   a person includes any person, firm, partnership, company, corporation, association, trust, investment fund, government, state or agency (whether or not having a separate legal personality) or two or more of the foregoing but references to individuals are deemed to be references to natural persons only;

(9)   any phase introduced by the terms including or includes or in particular or any similar expression is to be construed as illustrative without limitation;

(10)   costs, charges or expenses include any value added tax or similar tax charged or chargeable in respect of such cost, charges or expenses;

(11)   a regulation includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(12)   assets includes present and future properties, revenues and rights of every description;

(13)   an authorisation means an authorisation, consent, approval, licence, resolution, filing or registration;

(14)   a party or the parties is a reference to a party or the parties to this Deed; and

(15)   in this Deed, an Enforcement Event is continuing where such Enforcement Event has not been remedied within any stated grace or remedy period applicable to it or otherwise waived in writing by the relevant Security Agent.

## 2.   PAYMENT PROVISIONS

### 2.1.   Covenant to Pay

The Chargor hereby irrevocably and unconditionally covenants to, on demand by the Security Agent, pay, perform and discharge all the Secured Obligations when due and acknowledges to the Security Agent that the amount secured by this Deed and in respect of which this Deed and the Security hereby created is enforceable is the full amount of the Secured Obligations.

### 2.2.   Payment Free of Deduction

Subject to Clause 13 of the Facility Agreement, all payments to be made under this Deed by the Chargor shall be made free and clear of and without deduction for or on account of any set-off or counterclaim or any present or future Taxes, levies, imposts, charges, deductions or withholdings of any nature whatsoever.  If the Chargor shall be compelled by law to make any deduction or withholding from any payment to the Security Agent , the amount of the payment due from the Chargor shall be increased to the extent necessary to ensure that, after the making of such deduction or withholding, the Security Agent  receives and retains (free from any liability in respect of such deduction or withholding) a net sum equal to the sum which it would have received and so retained had no such deduction or withholding been made or required to be made.

6

2.3.    **Evidence and Calculation**

Any certificate or determination by the Security Agent of a rate or amount under this Deed is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

3.    **CHARGING PROVISIONS**

3.1.    **Fixed Charge**

The Chargor, as beneficial owner for the purpose of securing the payment and discharge in full of the Secured Obligations hereby absolutely, irrevocably and unconditionally **CHARGES** as a first fixed charge in favour of the Security Agent as a continuing security, all of its rights, title, benefit and interest whatsoever, present and future, actual and contingent, in and to the Charged Assets together with all Related Rights, but so that the Security Agent shall not in any circumstances incur any liability whatsoever in respect of such charge, subject to clause 13.3.

3.2.    The Chargor hereby covenants and undertakes to immediately deliver to the Security Agent, on the date of execution of this Deed, or if later, on the date of acquisition by the Chargor of any Charged Assets:

3.2.1.    an undated stock transfer form (executed in blank by or on behalf of the Chargor and/or its nominees) in respect of such Charged Assets as set out in Schedule 3 to this Deed;

3.2.2.    all share certificates, warrants and other documents of title representing such Charged Assets (including in the case of any Charged Assets which are not in the sole name of the Chargor, a declaration of trust in respect of the interest of the Chargor in such Charged Assets executed by each nominee);

3.2.3.    a certified copy of the up to date register of members of the Company;

3.2.4.    executed but undated letters of resignation and dated letters of authority from each of the directors, alternate directors and secretary of the Company in the forms set out in Schedule 4 to this Deed; and

3.2.5.    such other documents as are necessary or advisable or the Security Agent may from time to time reasonably require for the purpose of giving the Security Agent a valid first fixed charge over and for perfecting its title to the Charged Assets or for vesting or enabling it to vest title to the Charged Assets in the Security Agent or its nominee(s) to the intent that the Security Agent may, at any time after this Charge has become enforceable, without notice present for registration any transfer of the Charged Assets to itself or its nominee for the purpose of protecting or perfecting its security over the Charged Assets and may, upon or at any time after this Charge has become enforceable, without notice present for registration any transfer of the Charged Assets to any purchaser.

4.    **CONTINUING SECURITY**

4.1.    **Continuing Security**

This Deed and the security hereby created shall be a continuing security and, in particular (but without limitation), shall not be, nor be considered as, impaired, satisfied or discharged by any

intermediate discharge or payment on account of any liabilities or any settlement of accounts between the Chargor (or any other person) and the Security Agent or the other Secured Parties (or any of them, if any) or any other act, event or matter whatsoever, except only the execution by the Security Agent of an absolute and unconditional release of the security created by this Deed to the Chargor, and this Deed shall extend to cover any sum or sums of money or other liability and obligations which shall for the time being constitute the balance of the Secured Obligations until all the Secured Obligations have been paid and discharged in full and this Deed has been released in accordance with clause 21.1 (*Release of Security*).

4.2.   **Additional Security**

This Deed is in addition to, without prejudice to, and shall not merge with, any other right, remedy, guarantee or Security Interest which the Security Agent may at any time hold for any of the Secured Obligations.

4.3.   **Right to Enforce**

This Deed may be enforced against the Chargor without the Security Agent first having recourse to any other right, remedy, guarantee or Security Interest held by or available to it, irrespective of any law or any provision of this Deed to the contrary.

4.4.   **Waiver of Defences**

The obligations of the Chargor under this Deed and the Security shall not be affected by any act, omission, matter or thing which, but for this provision, might operate to impair, affect or discharge such obligations, in whole or in part, including without limitation, and whether or not known to or discoverable by the Chargor, the Security Agent or any other person:

4.4.1.   any time, indulgence or waiver granted to or composition with any person whatsoever;

4.4.2.   the taking, variation, compromise, renewal or release of or refusal or neglect to perfect or enforce any rights, remedies or securities against or granted by any person whatsoever;

4.4.3.   any legal limitation, disability, incapacity or other circumstances relating to any such party or any other person;

4.4.4.   any amendment, novation, supplement, variation, restatement, replacement of or extension (in each case however fundamental and of whatsoever nature and whether or not more onerous) of any term of this Deed or any other Transaction Document or any increase in the Secured Obligations to the intent that this Deed shall apply to such term as varied or in respect of the extended due date or such increase;

4.4.5.   any judgment obtained against the Chargor;

4.4.6.   the dissolution, liquidation, examinership, amalgamation, reconstruction or reorganisation of the Chargor, the Company or any other person; or

4.4.7.   any irregularity, unenforceability, invalidity or frustration of any obligations of any person whatsoever under any agreement or any other document or security, or any present or future law or order of any government or authority purporting to produce

8

or otherwise effect any such obligations, to the intent that this Deed shall remain in full force and be construed accordingly as if there were no such irregularity, unenforceability, invalidity, frustration, law or order.

4.5. **No Competition**

4.5.1. Until the Secured Obligations have been unconditionally and irrevocably satisfied and discharged in full to the satisfaction of the Security Agent, the Chargor shall not by virtue of any payment made hereunder on account of the Secured Obligations or by virtue of any enforcement by the Security Agent of its rights under this Deed or the Security:

(1) exercise any rights of subrogation in relation to any rights, security or moneys held or received or receivable by the Security Agent or any person;

(2) exercise any right of contribution or indemnity from any co-surety liable in respect of such moneys and liabilities under any other guarantee, security or agreement;

(3) exercise any right of set-off or counterclaim against the Company or any co-surety;

(4) receive, claim or have the benefit of any payment, distribution, security or indemnity from the Company or any such co-surety; or

(5) claim, rank, prove or vote as a creditor of the Company or any such co-surety in competition with the Security Agent.

4.5.2. The Chargor will hold in trust for and forthwith pay or transfer to the Security Agent any payment or distribution or benefit of security received by it contrary to the above. If the Chargor exercises any right of set-off contrary to the above, it will forthwith pay an amount equal to the amount set-off to the Security Agent.

5. **REPRESENTATIONS AND WARRANTIES**

5.1. The Chargor represents and warrants to the Security Agent on the date hereof that, and on any date on which the Chargor acquires an asset falling within the scope of the definition of "Charged Assets":

5.1.1. it is duly incorporated and validly existing under the laws of its place of incorporation and is a separate legal entity capable of suing and being sued;

5.1.2. it has the power to own its properties and assets and to carry on its business as currently conducted.

5.1.3. it has the necessary power and authority, and all necessary corporate and other action has been taken, to enable it to execute, deliver and perform the obligations undertaken by it under this Deed and the Transaction Documents to which it is party;

5.1.4. the obligations under this Deed are legally and validly binding on it and are enforceable in accordance with the terms of this Deed;

9

5.1.5.    all authorisations, approvals or other action by, and notice to or filing with, any governmental or regulatory authority or regulatory body as required for the entry into and performance of this Deed, have been obtained and are in full force and effect;

5.1.6.    the execution of this Deed, the creation of the Security or the performance by the Chargor of its obligations hereunder will not contravene its constitutional documents, any applicable law or regulation or any agreement to which the Chargor is a party or which is binding on the Chargor or the Charged Assets;

5.1.7.    on the date of execution of this Deed and on each date hereafter until the Security is released by the Security Agent, the Charged Assets are free from any mortgage, charge or any other Security Interest (save for Permitted Security Interests and those created pursuant to this Deed) and constitutes a first priority Security Interest over the Charged Assets enforceable against the Chargor or the Chargor's creditors;

5.1.8.    its obligations under this Deed rank and will rank at least pari passu with the claims of all of its other unsecured and unsubordinated creditors, except for obligations mandatorily preferred by law applying to companies generally;

5.1.9.    it is able to pay its debts within the meaning of Section 570 of the Companies Act or any analogous legislation at the time of entering into this Deed and remains able to pay its debts and did not become unable to pay its debts as a consequence of entering into this Deed;

5.1.10.    it has not taken any corporate action nor have any other steps been taken or legal proceedings been instituted or (to the best of its knowledge and belief having made all reasonable enquiries) threatened against it for its winding up or re-organisation or to appoint an examiner or receiver or any such analogous steps in relation to it or any of its assets;

5.1.11.    there is no litigation, arbitration, insolvency or other proceeding taking place, pending, or, to the best of its knowledge and belief, threatened against it or any of its assets;

5.1.12.    the Charged Assets are duly authorised, validly issued and fully paid and constitute all of the issued share capital of the Company;

5.1.13.    it is the sole legal and beneficial owner of the Charged Assets and all Related Rights (save for any Charged Assets that are specified in Schedule 2 to this Deed as being held by a nominee on its behalf) and that the Charged Assets listed in Schedule 2 constitute the entire share capital owned by the Chargor in the relevant company as at the date of this Deed;

5.1.14.    the constitutional documents of the Company do not and could not restrict or inhibit any transfer of the Charged Assets on creation or enforcement of the Security and the directors of the Company cannot refuse to register any transfer of the Charged Assets to the Security Agent or any nominee of the Security Agent and all rights of pre-emption are waived;

10

5.1.15.    there are no agreements in place which provide for the issue or allotment of, or grant to any person the right to call for the issue or allotment of, any share or loan capital of the Company (including any option or right of pre-emption or conversion); and

5.1.16.    no calls have been made in respect of the Charged Assets and remain unpaid and no calls can be made in respect of such Charged Assets in the future.

## 6.    UNDERTAKINGS

6.1.    **Negative Pledge**

6.1.1.    The Chargor will not do or agree to do any of the following without the prior written consent of the Security Agent:

(1)    create or permit to subsist any Security Interest on any of the Charged Assets; or

(2)    sell, transfer, lend or otherwise dispose of all or any part of its interest in the Charged Assets.

6.1.2.    The foregoing provisions of this clause 6.1 (*Negative Pledge*) shall not be construed as limiting any powers exercisable by any Receiver appointed by the Security Agent  under or pursuant to this Deed.

6.2.    **Charged Assets Generally**

The Chargor covenants and undertakes to the Security Agent that at all times during the continuance of the Security Period that the Chargor will:

6.2.1.    **General compliance**

(1)    conduct and carry on its business in a proper and efficient manner and procure that no substantial change is made to the general nature of the business of the Chargor from that carried on at the date of this Deed;

(2)    comply with and observe all of the terms, conditions and obligations in relation to the Charged Assets under any present or future law, regulation, license or consent and to comply with all covenants and obligations affecting any of the Charged Assets;

(3)    comply and observe all terms and conditions of the Transaction Documents to which it is a party and of all other contracts, agreements and security to which it is a party relating to the Charged Assets;

(4)    not do or cause or permit to be done anything with may in any way depreciate, jeopardise or otherwise prejudice the value (whether monetary or otherwise) or marketability of the Charged Assets (or any of them);

(5)    not take any action which would cause any of the representations made in clause 5 (*Representations and Warranties*) to be untrue or incorrect in any respect during the Security Period;

11

(6) not take any corporate action or other steps or legal proceedings for the winding up or re-organisation of the Company or to appoint an examiner or receiver or any such analogous steps in relation to the Company in any jurisdiction;

(7) not take any action in relation to the Charged Assets or this Deed under the provisions of Section 94 of the Act (*Court order for sale*).

6.2.2.    **Information**

(1) at the cost of the Chargor, provide the Security Agent with such information relating to the business of the Chargor and the Charged Assets as the Security Agent may reasonably request from time to time; and

(2) notify the Security Agent within 10 Business Days of receipt of every material notice, order or proposal given or made in relation to the Charged Assets and comply with such notice, order or proposal as the Security Agent may reasonably require or approve.

6.2.3.    **Pay outgoings**

pay all Taxes, assessments, impositions and outgoings whatsoever, whether governmental or otherwise as may be imposed upon or payable in respect of the Charged Assets as and when they shall become payable and produce the receipt for such payments as the Security Agent may reasonably request from time to time;

6.2.4.    **Notice**

promptly notify the Security Agent in writing on becoming aware of the occurrence or potential occurrence of an Enforcement Event.

6.2.5.    **Undertakings in relation to the Charged Assets**

(1) The Chargor hereby covenants and undertakes to the Security Agent that, for the duration of the Security Period there shall be:

(i) no increase or reduction in the authorised or issued share capital of the Company;

(ii) no variation of the rights attaching to or conferred by the Charged Assets or any part of it;

(iii) no exercise, renunciation or assignment by the Chargor of any right to subscribe for any shares or securities;

(iv) no redemption, reconstruction, amalgamation, sale or other Disposal of the Charged Assets (including the exchange, conversion or reissue of any shares or securities as a consequence thereof);

(v) no appointment of any further director or officers of the Company; and

(vi) no alteration to the constitutive documents of the Company,

12

in each case, without the prior consent in writing of the Security Agent (such consent not to be unreasonably withheld, delayed or conditioned).

(2)  The Chargor hereby covenants and undertakes to the Security Agent that, for the duration of the Security Period, if any Charged Assets are in, or are converted into, uncertificated form, the Chargor shall promptly notify the Security Agent and:

(i)  act on any instructions given by the Security Agent and give such directions as the Security Agent may require in order to protect and preserve the Security Agent 's Security;

(ii)  transfer those Charged Assets to an escrow account in respect of which it has named as escrow agent the Security Agent or any nominee or agent of the Security Agent notified to the Chargor or any other person approved in writing by the Security Agent;

(3)  The Chargor hereby covenants and undertakes to the Security Agent that, for the duration of the Security Period, the Chargor shall provide the Security Agent , as soon as practicable upon receipt, with copies of all notices and information received by it from any other party in relation to the Charged Assets.

### 6.2.6.  Voting rights and dividends

(1)  Prior to the occurrence of an Enforcement Event, the Chargor shall:

(i)  be entitled to receive and retain all dividends, distributions and other monies derived from the Charged Assets;

(ii)  exercise all voting rights and other rights and powers attaching to the Charged Assets, subject to clause 6.2.5 (Undertakings) above;

PROVIDED THAT the Chargor's rights and powers relating to the Charged Assets (or any part thereof) shall not be exercised in any manner which would result in any variation of the rights attaching to or conferred by the Charged Assets (or any part thereof) or which in the opinion of the Security Agent is inconsistent with, or prejudicial to, its interest in the security over the Charged Assets (or any part thereof) or which would result in the Security Agent incurring any cost, expense or liability.

(2)  Upon the occurrence of an Enforcement Event, the Security Agent may, at its discretion, (in the name of the Chargor or otherwise and without any further consent or authority from the Chargor):

(i)  transfer the Charged Assets into the name of the Security Agent or such nominees(s) of the Security Agent as it shall require;

(ii)  exercise (or refrain from exercising) all voting and other rights and powers attaching to the Charged Assets in such a manner as the Security Agent deems appropriate;

(iii)    apply all dividends, interest and other monies derived from the Charged Assets as though they were proceeds of sale under this Deed;

(iv)    complete the Director's/Secretary's Letter of Resignation as set out in Schedule 4 and present same to the Company;

(v)    exercise (or refrain from exercising) the powers and rights conferred on or exercisable by the legal or beneficial owner of the Charged Assets including the right, in relation to any company whose shares or other securities are included in the Charged Assets, to concur or participate in:

(a)    the reconstruction, amalgamation, sale or other disposal of such company or any of its assets or undertaking (including the exchange, conversion or reissue of any shares or securities as a consequence thereof);

(b)    the release, modification or variation of any rights or liabilities attaching to such shares or securities; and

(c)    the exercise, renunciation or assignment of any right to subscribe for any shares or securities,

in each case, in the manner and on the terms the Security Agent thinks fit, and the proceeds of any such action shall form part of the Charged Assets.

(3)    The Chargor shall, if requested by the Security Agent after the occurrence of an Enforcement Event, instruct any clearance system to transfer any Charged Assets held by it for or on behalf of the Chargor to an account of the Security Agent or its nominee with that clearance system or otherwise as the Security Agent may direct.

(4)    For the avoidance of doubt, the Security Agent is not obliged to:

(a)    perform or fulfil any obligation of the Chargor;

(b)    make any payment;

(c)    make any enquiry as to the nature or sufficiency of any payment received by it or the Chargor; or

(d)    present or file any claim or take any other action to collect or enforce the payment of any amount,

in respect of the Charged Assets.

6.2.7.    **Payment of calls**

The Chargor shall pay when due all calls, instalments or other payments and shall discharge all other obligations, which may become due in respect of any of the Charged Assets.

6.2.8.  **Liability of the Security Agent**

Neither the Security Agent nor any Receiver shall have any duty to ensure that any dividends, distributions or other monies receivable in respect of the Charged Assets are duly and punctually paid, received or collected as and when the same become due and payable or to ensure that the correct amounts (if any) are paid or received on or in respect of such Charged Assets or to ensure the taking up of any (or any offer of any) stocks, shares, rights, moneys or other property paid, distributed, accruing or offered at any time by way of redemption, bonus, rights, preference, or otherwise on or in respect of, any of the Charged Assets except in the case of fraud, gross negligence or wilful default upon part of the Security Agent or any Receiver.

7.  **FINANCIAL COLLATERAL DIRECTIVE**

To the extent that any of the Charged Assets and Related Rights constitute "financial collateral" and this Deed and the obligations of the Chargor and the Security Agent hereunder constitute a "security financial collateral arrangement" (in each case as defined in, and for the purposes of, the European Communities (Financial Collateral Arrangements) Regulations 2010 as amended by the European Communities (Financial Collateral Arrangements) (Amendment) (No. 2) Regulations 2011 (the **Regulations)** the Security Agent shall, at any time after the occurrence of an Enforcement Event, have the right to appropriate all or any part of such financial collateral in or towards discharge of the Secured Obligations.

For this purpose, the parties agree that the value of such financial collateral so appropriated shall be the market price of the Charged Assets determined by the Security Agent by such process as the Security Agent may select including independent valuation. The Parties further agree that the method of valuation provided for in this Deed shall constitute a commercially reasonable method of valuation for the purposes of the Regulations.

8.  **ENFORCEMENT OF SECURITY**

8.1.  **When Enforceable**

8.1.1.  The Security shall become enforceable immediately upon the occurrence of an Enforcement Event and the Secured Obligations will be deemed to have become due and payable.

8.1.2.  After the Security has become enforceable, the Security Agent may in its absolute discretion enforce all or any part of the Security and take any action in respect of the Security in such a manner as it sees fit.

8.2.  **Statutory Powers**

8.2.1.  At any time after the Security constituted by this Deed has become enforceable (in accordance with this clause 8 (*Enforcement of Security*)) :

(1)  the statutory power of sale conferred by section 100 (*Power of sale*) of the Act free from restrictions contained in section 100(1), (2), (3) and (4) and without the requirement to serve notice (as specified in the final proviso to section 100(1)); and

(2)  the incidental powers of sale conferred by section 102 (*Incidental powers*),

will immediately arise and be exercisable by the Security Agent and/or any Receiver. The provisions of section 96(1)(c) of the Act shall not apply to this Deed.

8.2.2.    The Security Agent and any Receiver is entitled to all the rights, powers, privileges and immunities conferred by the Act.

8.2.3.    All of the powers, authorities and discretions which are conferred by this Deed upon a Receiver (either expressly or impliedly) may be exercised after the security constituted by this Deed become enforceable by the Security Agent in relation to all or any part of the Charged Assets  both before and after the appointment of a Receiver.

## 8.3.    Mortgagee in Possession

8.3.1.    In addition to the statutory powers incidental to the estate or interest of mortgagees contained in the Act as more particularly detailed in clause 8.2 (*Statutory powers*) and at any time after the Security has become enforceable, the Security Agent may, without further notice or demand and without the need to obtain the consent of the Security Agent  or obtain an order for possession under section 97 (*Taking possession*) of the Act, enter into possession of the Charged Assets together with all Related Rights.

8.3.2.    Neither the Security Agent  nor any Receiver will be obliged to take any steps to sell or lease the Charged Assets  (or any part thereof) and the provisions of section 99 (*Mortgagee in possession*) and section 101 *(Applications under sections 97 and 100)* of the Act shall not apply to this Deed.

## 8.4.    No Liability

8.4.1.    Save as provided for in section 103 (*Obligations on selling*) of the Act, neither the Security Agent nor any Receiver will be liable for any loss or damages which arises out of the exercise or the attempted or purported exercise of, or the failure to exercise any of, its or his respective powers (unless such loss or damage is caused by its or his gross negligence, fraud or wilful misconduct) in relation to all or any part of the Charged Assets.

8.4.2.    Without prejudice to the generality of clause 8.4.1 above, neither the Security Agent nor any Receiver will be liable to account as mortgagee in possession in respect of the Charged Assets or any part thereof nor be liable for any loss on realisation or in connection with the Charged Assets or for any default or omission for which a mortgagee in possession might be liable.

## 8.5.    Protection of Third Parties

8.5.1.    No person (including a purchaser) dealing with the Security Agent or a Receiver or its or his agents will be concerned to enquire:

(1)    whether the Secured Obligations have become payable;

(2)    whether any power which the Security Agent or a Receiver is purporting to exercise has become exercisable;

(3)    whether any of the Secured Obligations remain outstanding under the Transaction Documents (or any of them); or

(4)    how any money paid to the Security Agent or a Receiver is to be applied;

and all protections to purchasers contained in sections 105(1),106 and 108(5) of the Act shall apply to all persons (including a purchaser) dealing with the Security Agent  or any Receiver in like manner as if the statutory powers of sale and appointing a receiver had not been varied or extended by this Deed.

8.5.2.    No purchaser from the Security Agent or any Receiver, delegate or sub-delegate shall be entitled to rely on Section 105(2) of the Act which is disapplied by this Deed.

## 9.    RECEIVERS

### 9.1.    Appointment of a Receiver

9.1.1.    At any time after the Chargor so requests or the Security becomes enforceable, the Security Agent  may, without the need for the occurrence of any of the events specified in paragraphs (a) to (c) of section 108(1) (*Appointment of a receiver*) of the Act, appoint under seal or under the hand of a duly authorised officer of the Security Agent , any person or persons considered by it to be competent to be a receiver or a receiver and manager (hereinafter called a **Receiver** which expression will, where the context so admits, include the plural and any substituted receiver or receiver and manager) of all or any part of the Charged Assets  and such persons shall be deemed to be in the same position as a Receiver duly appointed by a mortgagee under the Act.

9.1.2.    If at any time there is more than one Receiver of all or part of the Charged Assets, each such Receiver may, unless otherwise stated in any appointment document) exercise all of the powers conferred on a Receiver under this Deed individually and to the exclusion of each other Receiver.

9.1.3.    All of the powers, authorities and discretions which are conferred by this Deed, either expressly or impliedly, upon any Receiver may be exercised by the Security Agent after the Security becomes enforceable in relation to all or part of the Charged Assets without first appointing a Receiver or notwithstanding the appointment of a Receiver of the Charged Assets, or any part thereof.

### 9.2.    Receiver as Agent

Any Receiver so appointed shall be the agent of the Chargor and the Chargor will be solely responsible for his remuneration, acts, defaults, omissions and losses and for all costs, expenses, liabilities incurred by him.  The Security Agent shall not incur any liability by reason of the appointment of a Receiver or for any other reason.

### 9.3.    Remuneration

A Receiver shall be entitled to remuneration for his services at a rate to be fixed by the Security Agent (but without being limited to a maximum rate of commission as prescribed in sub-section 108(7) (*Appointment of a Receiver*) of the Act and the Security Agent may direct payment

thereof out of the Charged Assets but the Chargor alone will be liable for payment of such remuneration.

9.4.    **Removal of a Receiver**

The Security Agent may in writing remove any Receiver so appointed and appoint another person or person as Receiver either in place of a Receiver whose appointment has been terminated or in addition to any Receiver already appointed.

9.5.    **Powers of a Receiver**

A Receiver so appointed will have and be entitled to exercise, in addition to all powers conferred by the Act (except where expressly disapplied in this Deed) and pursuant to section 108(3) of the Act, each of the additional powers, rights and obligations as set forth in Schedule 1.

10.    **APPLICATION OF PROCEEDS**

Any monies received by the Security Agent and/or any Receiver after the Security has become enforceable shall be applied by the Security Agent in accordance with the Proceeds Agreement.

11.    **CONSOLIDATION OF ACCOUNTS AND SET-OFF**

11.1.    **Consolidation**

The Chargor agrees that the Security Agent may at any time without notice and notwithstanding any settlement of account or other matter whatsoever, combine or consolidate all or any of the Chargor's existing accounts wheresoever located (including accounts in the name of the Chargor jointly with others) whether such accounts are current, deposit, loan or of any other nature whatsoever, whether they are subject to notice or not and in any currency.

11.2.    **Set-Off**

The Security Agent may set off any matured obligation due from the Chargor against any matured obligation owed by the Security Agent to the Chargor, regardless of the place of payment or currency of either obligation. If the obligations are in different currencies, the Security Agent may convert either obligation at a market rate of exchange in its usual course of business for the purpose of set off.

12.    **FURTHER ASSURANCES**

12.1.    The Chargor shall, at its own expense, take whatever action as may be reasonably required by the Security Agent:

12.1.1.    to perfect or protect the Security intended to be created by this Deed; and

12.1.2.    to facilitate the realisation of the Charged Assets or the exercise of any right, power or discretion exercisable by the Security Agent or any such Receiver in respect of the Charged Assets,

including the execution, acknowledgement or delivery of any agreement, transfer, mortgage, charge or assignment, notice, or the making of a registration, in each case as the Security Agent may direct.

## 13.    POWER OF ATTORNEY

### 13.1.    Power of Attorney

13.1.1.    The Chargor, by way of security, hereby irrevocably appoints the Security Agent, each Receiver and any of their Delegates, jointly and also severally, to be its attorney:

    (1)    to take any action which the Chargor is obliged to take under this Deed, including under clause 12 (*Further Assurances*); and

    (2)    to do all such acts or things as may be required by the Security Agent or any Receiver under this Deed in exercise of any of their powers.

13.1.2.    The Chargor ratifies and confirms all things done by any attorney appointed under this clause in the exercise or purported exercise of all or any of such attorney's powers save for those acts, things or omissions done by way of fraud, wilful misconduct or gross negligence.

### 13.2.    Delegation

The Security Agent or any Receiver may delegate by power of attorney or in any other manner, to any person, any right, power or discretion exercisable by it under this Deed upon any terms (including the power to sub-delegate) as it may deem fit but no such delegation shall preclude the subsequent exercise of such power by the Security Agent or any Receiver itself or himself or preclude the Security Agent or the Receiver from making a subsequent delegation thereof to some other person.  Any such delegation may be revoked by the Security Agent or the Receiver at any time.

### 13.3.    Liability

Neither the Security Agent nor any Receiver will be in any way liable or responsible to the Chargor for any loss or liability arising from any act, default, omission or misconduct on the part of any such Delegate except in the case of fraud, gross negligence or wilful default upon its part.

## 14.    COSTS AND EXPENSES

### 14.1.    Transaction Expenses

The Chargor shall promptly on demand reimburse the Security Agent (and every Receiver and Delegate) the amount of all reasonably incurred out-of-pocket costs and expenses (including legal fees) incurred by it in connection with:

14.1.1.    the negotiation, preparation, execution and perfection of this Deed and any documents referred to in this Deed;

14.1.2.    in the exercise of any of the rights, remedies and powers conferred on the Security Agent or, as the case may be, any Receiver or Delegate, by this Charge or in connection with any proceedings instituted by or against the Security Agent in relation to the title to the whole or any part of the Charged Assets; and

14.1.3. a request for a waiver, amendment or consent, the evaluation, negotiation or implementation of that waiver, amendment or consent.

## 14.2. Taxes

Subject to Clause 13 of the Facility Agreement, the Chargor shall promptly pay all stamp, registration and other Taxes to which this Deed or any judgment given in connection with this Deed is or at any time may be subject and shall indemnify the Security Agent against any liabilities, costs, claims and expenses resulting from any failure to pay or delay in paying any such Taxes.

## 14.3. Indemnity

Subject to Clause 13 of the Facility Agreement, the Chargor shall promptly indemnify the Security Agent and every Receiver and Delegate against any cost, loss or expenses (including legal fees) and liabilities (including VAT thereon (if applicable)) reasonably incurred by any of them as a result of:

14.3.1. the taking, holding, protection or enforcement of this Deed and the Security;

14.3.2. anything done in the exercise of any of the rights, powers, discretions and remedies vested in the Security Agent and each Receiver and Delegate by this Deed or by law.

## 15. CURRENCY CONVERSION AND INDEMNITY

## 15.1. Currency Conversion

All monies received or held by the Security Agent or any Receiver under this Deed may be converted from their existing currency into such other currency as the Security Agent or the Receiver reasonably requires to cover the obligations and liabilities comprised in the Secured Obligations in that other currency at the then prevailing spot rate of exchange (as conclusively determined by the Security Agent) for purchasing the currency to be acquired with the existing currency.

## 15.2. Currency Indemnity

No payment to the Security Agent (whether under any judgment or court order or otherwise) will discharge the obligation or liability of the Chargor in respect of which it was made unless and until the Security Agent receives payment in full in the currency in which such obligation or liability was incurred, and to the extent that the amount of any such payment, on actual conversion into such currency, falls short of such obligation or liability expressed in that currency, the Chargor shall indemnify and hold harmless the Security Agent from and against any loss it suffers or incurs as a result of any such shortfall.

## 16. MISCELLANEOUS PROVISIONS

## 16.1. Suspense Account

All monies received, recovered or realised by the Security Agent under this Deed (including the proceeds of any conversion of currency) may, at the discretion of the Security Agent, be credited to any interest-bearing suspense account for so long as the Security Agent may determine (with

interest accruing thereon) without the Security Agent having any obligation to apply the same or any part thereof in or towards the discharge of any of the Secured Obligations.

16.2.   **New Accounts**

If the Security Agent receives, or is deemed to be affected by, notice, whether actual or constructive, of any subsequent Security Interest affecting any Charged Asset and/or the proceeds of sale of any Charged Asset:

16.2.1.   the Security Agent may open a new account for the Chargor; and

16.2.2.   if the Security Agent does not open a new account, it shall nevertheless be treated as if it had done so at the time when it received or was deemed to have received such notice,

and as from that time, all payment made to the Security Agent shall be credited or be treated as having been credited to the new account and will not operate to reduce any amount of the Secured Obligations.

16.3.   **Amendments**

Any provision of this Deed may be amended, supplemented, varied, modified, released or discharged only if the Security Agent and the Chargor so agree in writing.

16.4.   **Unfettered Discretion**

Save as otherwise stated in this Deed, any liability or power which may be exercised or any determination which may be made under this Deed by the Security Agent may be exercised or made in its absolute and unfettered discretion and it shall not be obliged to give reasons therefor.

16.5.   **Severability**

All the terms and provisions of this Deed are distinct and severable, and if any term or provision is held unenforceable, illegal or void in whole or in part (or any of the Security intended to be created by or pursuant to this Deed is ineffective) by any court, regulatory authority or other competent authority it shall to that extent be deemed not to form part of this Deed, and the enforceability, legality and validity of the remainder of this Deed will not be affected.

**17.   RIGHTS AND REMEDIES**

17.1.   **Waiver and Forbearance**

17.1.1.   No failure or delay by the Security Agent or any Receiver to exercise any right or remedy under this Deed shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise, or the exercise of any other right or remedy.  A waiver or consent by the Security Agent under this Deed will be effective only if given in writing and then only in the instance and for the purpose for which it is given.

17.1.2.   The rights of the Security Agent or any Receiver under this Deed will not be prejudiced or restricted by any indulgence or forbearance extended to the Chargor

or other parties including a release of any person or persons (whether or not a party hereto and whether or not such person or persons are jointly and/or severally liable with the Chargor) in respect of the Secured Obligations or of any other security without prejudice either to the Security or to the liability of the Chargor for the Secured Obligations.

17.2.   **Remedies Cumulative**

The rights and remedies of the Security Agent and any Receiver under this Deed are cumulative and not exclusive of any rights or remedies provided by law.

17.3.   **Company Intent**

The Chargor expressly confirms that it intends that the Security shall extend from time to time to any (however fundamental) variation, increase, extension or addition of or to any of the Transaction Documents and/or any facility or amount made available or owing under or in connection with any of the Transaction Documents for the purposes of or in connection with any of the following: acquisitions of any nature; increasing working capital; enabling investor distributions to be made; carrying out restructurings; refinancing existing facilities; refinancing any other indebtedness; making facilities available to new borrowers; any increase in any interest rate; any other variation or extension of the purposes for which any such facility or amount might be available from time to time; and any fees, costs and/or expenses associated with any of the foregoing.

## 18.   ASSIGNMENT

18.1.   The Chargor may not assign or transfer all or any of its rights, benefits or obligations under this Deed.

18.2.   The Security Agent may assign or transfer all or any part of its rights under this Deed to any person in accordance with the terms of the Facility Agreement and the Chargor hereby consents to any such assignment. The Security Agent will be entitled to impart any information concerning the Chargor to any assignee or successor in title.

18.3.   This Deed shall be binding upon and inure to the benefit of each Party and their respective successors and permitted assigns and references in this Deed to any of them shall be construed accordingly.

## 19.   NOTICES

19.1.   **Communications in Writing**

Any notice or other communication to be made under, or in connection with, this Deed shall be in writing, in the English language addressed to the relevant party.

19.2.   **Addresses**

The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with this Deed is:

**The Chargor:**

Address:    29 Main Street,
Cashel,
Co. Tipperary

E-mail:    niall.mcnamara@avcs.ie

Attention:    Directors/ Gary Fitzgerald

Fax No:    +339 5164 5171

**The Security Agent:**
Address:    12 place des Etats-Unis,
CS 70052,
92547 Montrouge Cedex,
France
E-mail:    francois.barbut@ca-cib.com
alexandra.delaune@ca-cib.com
mounia.bekkali@ca-cib.com

Attention:    Structured Finance Agency & Middle Office

Fax No:    +33 1 41 89 85 75

or to such other address or fax number as may be notified to the Security Agent by not less than five Business Days' notice.

19.3. **Delivery**

19.3.1.    Any such notice or other communication made or delivered by one party to another under or in connection with this Deed will only be effective:

(1)   if delivered by hand, on delivery;

(2)   if sent by fax, when received in legible form;

(3)   if by way of electronic email, when actually received in a readable form; or

(4)   if by way of letter, when it has been left at the relevant address or five Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address.

19.3.2.    and, if a particular department or officer is specified as part of its address details provided under clause 19.2 if addressed to that department or officer.

20.    **COUNTERPARTS**

This Deed may be executed in counterparts and each such counterpart taken together shall be deemed to constitute one and the same instrument.

21.    **RELEASE OF SECURITY**

21.1.  **Release of Security**

Subject to and without prejudice to clause 21.2 (*Retention of security*), upon the expiry of the Security Period, the Security Agent shall,  at the request and cost of the Chargor, take whatever action is necessary to release or re-assign and discharge the Charged Assets from the Security.

21.2.  **Retention of Security**

If any payment or discharge of the Secured Obligations is in the reasonable opinion of the Security Agent liable to be voided, set aside or invalidated under any enactment relating to insolvency, liquidation or otherwise (without limitation), the Security Agent may refuse to grant any release of the Security for such further period as the risk of such avoidance or invalidity continues.

21.3.  **Reinstatement**

Where any discharge in respect of the Secured Obligations is made, in whole or in part or any arrangement is made on faith of any payment, security, assurance or otherwise is avoided or must be restored on insolvency, liquidation or otherwise, the liability of the Chargor under this Deed shall continue as if the discharge or arrangement had not occurred.

22.  **GOVERNING LAW**

22.1.  **Governing Law**

This Deed and all non-contractual obligations created by it and arising out of or in connection with it, together with all Disputes, will in all respects be governed by and construed in accordance with the laws of Ireland.

23.  **ENFORCEMENT**

23.1.  **Jurisdiction**

23.1.1.  The Chargor hereby agrees for the exclusive benefit of the Security Agent that any Proceedings brought against the Chargor with respect to this Deed may be brought in the High Court in Ireland or such other competent court of Ireland as the Security Agent may elect, and the Chargor waives any objection to Proceedings in such courts whether on grounds of venue or on the grounds that Proceedings have been brought in any inconvenient forum. The Chargor undertakes to enter an unconditional appearance within 14 days after the completion of any service or process in any Proceedings. The Chargor hereby consents to the service by post of any process issued in connection with this Deed. Nothing in this Deed will affect the right to serve process in any other manner permitted by law.

23.1.2.  Nothing contained in this Deed will limit the right of the Security Agent  to take Proceedings against the Chargor in any other court of competent jurisdiction, nor will the taking of any Proceedings in any one or more jurisdictions preclude the taking by the Security Agent  of Proceedings in any other jurisdiction whether concurrently or not.

24.  **CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999**

Except for any Obligor, a person who is not a party to this Deed shall not have rights, in so far as it may be applicable, under the Contracts (Rights of Third Parties) Act 1999 to directly enforce any of its terms.

**IN WITNESS** whereof this Deed has been duly executed as a deed by the parties to it and delivered on the date set out at the beginning of this Deed.

## SCHEDULE 1

### Powers of a Receiver

1.  *Possession*

    to take immediate possession of, get in and collect the property in respect of which the Receiver is appointed and to make such demands and take such proceedings as may seem expedient for that purpose, and to take possession of the property over which the Receiver is appointed with like rights;

2.  *Realisation*

    to sell, realise or otherwise dispose of the Charged Assets as the Receiver thinks fit;

3.  *Manage*

    to carry on, manage, develop, reconstruct, amalgamate or diversify or concur in carrying on, managing, developing, reconstructing, amalgamating or diversifying any business of the Chargor in any manner the Receiver thinks fit;

4.  *Appoint Advisors*

    to appoint and discharge managers, officers, agents, professional advisers, consultants, servants, workmen, employees and others for the purposes specified in this Schedule upon such terms as to remuneration or otherwise as the Receiver thinks fit and to remove any person so appointed to any such position by the Chargor;

5.  *Borrow Money/Lend Money*

    to raise and borrow money or incur any other liability, either unsecured or on the security of any Charged Assets or otherwise and generally on any terms and for whatever purpose the Receiver thinks fit and to lend money or advance credit to any customer of the Chargor;

6.  *Sell*

    to grant rights, options or easements over, dispose of, convert into money and realise any Charged Assets by public auction or private contract and generally in any manner and on any terms the Receiver thinks fit. The consideration for any such transaction may consist of cash, debentures or other obligations, shares, stock or other valuable consideration and any such consideration may be payable in a lump sum or by instalments spread over any period he or she thinks fit;

7.  *Share Calls*

    where the Chargor is a company, to require the Chargor, or the directors of the Chargor, to make calls conditionally or unconditionally upon the shareholders of the Chargor in respect of any of its uncalled capital and enforce payment of any call so made by action (in the name of the Chargor or the Receiver as the Receiver may think fit) or otherwise;

8.  *Related Rights*

to sell or assign all or any of the Related Rights in respect of which the Receiver is appointed in such manner, and generally on such terms and conditions, as the Receiver thinks fit.

9.      **Voting Rights**

to exercise in respect of any Charged Assets all voting or other powers or rights in such manner as the Receiver thinks fit;

10.     **Compromise**

to settle, adjust, refer to arbitration, allow time for payment, compromise and arrange any claim, contract, account, dispute, question or demand with or by any person who is or claims to be a creditor of the Chargor or relating in any way to any Charged Assets;

11.     **Legal Actions**

to bring, prosecute, enforce, defend and abandon any action, suit or proceedings both in the Receiver's own name and in the name of the Chargor in relation to any Charged Assets which the Receiver thinks fit;

12.     **Receipts**

to give a valid receipt for any money and execute any assurance or thing that may be necessary or desirable for realising any Charged Assets;

13.     **Company Reorganisation**

where the Chargor is a company, to form a subsidiary of the Chargor, arrange for any such subsidiary to trade or cease to trade as the Receiver sees fit, in his or her capacity as shareholder and transfer to that subsidiary any Charged Assets and sell or otherwise dispose of any such subsidiary;

14.     **Delegation**

to delegate the Receiver's powers to a reputable and experienced individual or company;

15.     **Material Contracts**

to enter into, abandon, perform, repudiate, rescind, vary or cancel any material contracts as the Receiver thinks fit;

16.     **Insurances**

to effect with any insurer any policy of insurance either in lieu or satisfaction of, or in addition to, the insurances required to be maintained by the Chargor;

17.     **Taxes**

to make any election for value-added tax purposes that the Receiver thinks fit and to run the tax affairs of the Chargor in any manner that the Receiver thinks fit;

18.     **Settle Accounts**

27

to redeem any prior Security Interest and to settle and pass the accounts to which that Security Interest relates. Any accounts so settled and passed are conclusive and binding on the Chargor, and any money so paid shall be taken to be an expense properly incurred by him or her;

19.   *Protect and Manage*

to effect any repair or insurance and do any other act which the Chargor might do in the ordinary conduct of its business to protect or improve any Charged Assets and to arrange for or provide any service proper for the efficient use or management of the Charged Assets.

20.   *Use The Chargor's Name*

to use the name of the Chargor when exercising any of the rights, powers or discretions conferred on the Receiver;

21.   *Company Seal*

where the Chargor is a company, to use the Chargor's seal;

22.   *Insolvency*

to rank and claim in the bankruptcy, insolvency, sequestration or liquidation of any person indebted to the Chargor and to receive dividends, and to accede to the trust deeds for the creditors of any such person;

23.   *Payments*

to make any payment which is necessary or incidental to the performance of his or her functions;

24.   *Other Rights*

to do all other acts and things which he or she may consider desirable or necessary for realising any Charged Assets or incidental or conducive to any of the rights, powers or discretions conferred on a Receiver;

to exercise in relation to a Charged Assets all the rights, powers and authorities that he or she could exercise if he or she were the absolute beneficial owner of the Charged Assets;

to do all acts and to execute in the name and on behalf of the Chargor any deed, receipt or other document;

to draw, accept, make or endorse any bill of exchange or promissory note in the name of and on behalf of the Chargor.

## SCHEDULE 2

### CHARGED ASSETS

| Issuer (company name and registered number) | Class | Nominal Value | Number Held by Chargor |
|---|---|---|---|
| **PAAL URANUS COMPANY LIMITED**, a company incorporated under the laws of Ireland with company number 598249 | Ordinary Shares | €1.00 (one euro) | 1 (One) |

## SCHEDULE 3

STOCK
TRANSFER
FORM

| (Above this line for Registrars only) | |
|---|---|
| Consideration Money......... | Certificate lodged with the registrar<br><br>(For completion by the  Registrar/Stock Exchange) |
| Full name of Undertaking | |
| Full description of Security. | |
| Number or amount of Shares, Stock or other security and, in figures column only, number and denomination of units, if any. | Words / Figures |
| Name(s) of registered holder(s) should be given in full; the address should be given where there is only one holder. If the transfer is not made by the registered holder(s) insert also name(s) and capacity (e.g. Executors(s)) of the person(s) making the transfer | In the name(s) of |

| | |
|---|---|
| I/We hereby transfer the above security out of the name(s) aforesaid to the person(s) named below (or to the several persons named in parts two of Brokers Transfer Forms relating to the above security:)<br><br>(Delete above words in brackets except for stock exchange transactions)<br><br>Signature(s) of transferor(s)<br><br>1. ...................................................................................<br><br>2. ...................................................................................<br><br>3. ...................................................................................<br><br>4 ...................................................................................<br>Bodies corporate should execute under their common seal. | Stamp of Selling Broker(s) or, for transactions which are not stock exchange transactions, of Agent(s), if any, acting for the Transferor(s).<br><br><br><br>Date  ...... |

| | |
|---|---|
| Full   name(s)   and   full postal          address(es) (including  County  or,  if applicable, Postal District number)  of  the  person(s) to  whom  the  security  is transferred.<br><br>Please state title, if any, or whether Mr., Mrs. Or Miss<br><br>    1.   Please   complete   in type   writing   or   in Block Capitals | |

I/We request that such entries be made in the register as are necessary to give effect to this transfer.

30

| Stamp of Buying Broker(s)  (if any) | Stamp or name and address of person lodging this form  (if other than the Buying Broker(s)) |
|---|---|
|  |  |

(Endorsement for use only in Stock Exchange Transactions)
The security represented by the transfer overleaf has been sold as follows:-

| ........................................ Shares/Stock | ........................................ Shares/Stock |
|---|---|
| ........................................ Shares/Stock | ........................................ Shares/Stock |
| ........................................ Shares/Stock | ........................................ Shares/Stock |
| ........................................ Shares/Stock | ........................................ Shares/Stock |
| ........................................ Shares/Stock | ........................................ Shares/Stock |
| ........................................ Shares/Stock | ........................................ Shares/Stock |
| ........................................ Shares/Stock | ........................................ Shares/Stock |
| ........................................ Shares/Stock | ........................................ Shares/Stock |
| ........................................ Shares/Stock | ........................................ Shares/Stock |
| ........................................ Shares/Stock | ........................................ Shares/Stock |

Balance (if any)due to Selling Broker(s)

Amount of Certificate(s)
Brokers Transfer Forms for above amounts certified

*Stamp of Certifying Stock Exchange*                     *Stamp of Selling Broker(s).*

1.1.1.    FORM OF CERTIFICATE REQUIRED WHERE TRANSFER IS NOT LIABLE TO AD VALOREM STAMP DUTY

I/We hereby certify that the transaction in respect of which this transfer is made, and under which the fixed Duty of ten punts is payable, falls within the following description:-

|     | (a) | Vesting the property in trustees on the appointment of a new Trustee of a pre-existing Trust, or on the retirement of a Trustee. |
|---|---|---|
| (*) | (b) | A transfer, where no beneficial interest of property passes, (i) to a mere nominee of the Transferor, (ii) from a mere nominee of the Transferee, (iii) from one nominee to another nominee of the same beneficial owner. |
| (*) | (c) | A transfer by way of security for a loan; or re-transfer to the original Transferor on repayment of a loan. |
|     | (d) | A transfer to a residuary legatee of Shares, etc., which forms part of the residue divisible under a Will. |
|     | (e) | A transfer to a beneficiary under a Will of a *specific legacy* of Shares, etc. |
|     | (f) | A transfer of Shares, etc., being the property of a person dying intestate, to the person or persons entitled thereto. |
|     | (g) | A transfer to a beneficiary under a settlement on distribution of the trust funds, of Shares, etc., forming the Share, or part of the share of those funds to which the beneficiary is entitled in accordance with the terms of the settlement. |
|     | (h) | A transfer on the occasion of a marriage to trustees of shares, etc., to be held on the terms of a settlement made in consideration of marriage. |
|     | (i) | A transfer by the liquidator of a Company of Shares. Etc., forming part of the assets of the Company, to which the Transferee is entitled in satisfaction or part satisfaction of his rights as a Shareholder of the Company. |

Here set out concise-
ly the facts, explain-
ing the transaction in
cases falling with in
(b) and (c) or in any
case which does not
clearly fall within any
one of the clauses (a)        to...........................................................................................
to (g). Adjudication  Date...................................................20.......................................................
in any case may be
required

............................................                    .........................................
............................................                    .........................................
............................................                    .........................................
                                                            *Signature*...........................
                                                            *Description*...........................

* Note:- The above Certificate must be signed in the case of (b) and (c), either by (1) all the transferors and the transferees, or (2) a member of a Stock Exchange or a Solicitor acting for one or other of the parties, or (3) an accredited representative of a Bank. Where the Bank or its official nominee is a party to the transfer, the Certificate may be to the effect that "the transfer is expected from Section 74 of the Finance (1909-10) Act, 1910". The above Certificate in other cases should be signed by a solicitor or other person (e.g., a Bank acting as Trustee or Executor) having full knowledge of the facts.

## SCHEDULE 4

### Part I

### Director's/Secretary's Letter of Resignation

Date: [●]

The Board of Directors
**PAAL URANUS COMPANY LIMITED** (the **Company**)
29 Main Street,
Cashel,
Co Tipperary,
E25 RF76,
Ireland.

Dear Sirs,

**Resignation of Director/Secretary**

I hereby resign as director/secretary of the Company and confirm that I have no claims against the Company for loss of office, arrears of pay or otherwise howsoever.

This resignation is to be effective as at the date specified above. You are hereby authorised to complete this letter by dating the same at any time after you are notified by Crédit Agricole Corporate and Investment Bank, in its capacity as trustee for and on behalf of itself, the Senior Agent, the Junior Agent, the Hedging Counterparty and the Lenders for the purposes only of holding certain security under the Transaction Documents (the "**Security Agent**") that an Enforcement Event as defined in the share charge dated [•] December 2017 between the Security Agent and JLPS Holding Ireland Limited in respect of shares held in the capital of the Company (the "**Share Charge**") has occurred.

SIGNED AND DELIVERED AS A DEED
BY [NAME OF INDIVIDUAL]
IN THE PRESENCE OF:

                                  _____
                                  DIRECTOR/SECRETARY

SIGNATURE OF WITNESS:

NAME OF WITNESS:

ADDRESS OF WITNESS:

OCCUPATION OF WITNESS:

32

## Part II

### Director's/Secretary's Letter of Authority

**To:**    Crédit Agricole Corporate and Investment Bank, in its capacity as trustee for and on behalf of itself, the Senior Agent, the Junior Agent, the Hedging Counterparty and the Lenders for the purposes only of holding certain security under the Transaction Documents (the "**Security Agent**")

Dear Sirs,

I hereby unconditionally and irrevocably authorise you to date the letter of resignation delivered by me to you under the share charge dated [•] December 2017 between the Security Agent and JLPS Holding Ireland Limited in respect of shares held in the capital of PAAL Uranus Company Limited (the "**Share Charge**") as and when you become entitled to date such letter under the terms of the Share Charge.

SIGNED AND DELIVERED AS A DEED
BY [NAME OF INDIVIDUAL]
IN THE PRESENCE OF:

_____
DIRECTOR/SECRETARY

SIGNATURE OF WITNESS:

NAME OF WITNESS:

ADDRESS OF WITNESS:

OCCUPATION OF WITNESS:

EXECUTION PAGE

SHARE CHARGE

EXECUTED AS A DEED BY
JLPS HOLDING IRELAND LIMITED

acting by: *NIALL MC NAMARA*
in the presence of:

Name of witness:

Signature: *Frank Doul*

Name: FRANK DOULDING

Occupation: DIRECTOR

EXECUTED AS A DEED BY
CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK
(as Security Agent)

acting by:
in the presence of:
Name of witness:

Signature: _____

Name: _____

Occupation: _____

34

## EXECUTION PAGE

## SHARE CHARGE

**EXECUTED AS A DEED BY**
**JLPS HOLDING IRELAND LIMITED**

acting by:
in the presence of:

Name of witness:

Signature:        _____

Name:             _____

Occupation:       _____

**EXECUTED AS A DEED BY**
**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**
**(as Security Agent)**

acting by:
in the presence of:
Name of witness:

Signature:        _____

Name:        Valerie So

Occupation:    Analyst

Bertrand ROVETTO              Cecilia PETEUIL

34

**<u>Exhibit 4</u>**

EXECUTION VERSION

**DATED 21st November 2018**

**JLPS HOLDING IRELAND LIMITED**
**(as Chargor)**

-and-

**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**
**(as Security Agent)**

---

**SHARE CHARGE**

---



**Flynn O'Driscoll**
**Business Lawyers**

No. 1 Grant's Row, Lower Mount Street
Dublin, D02 HX96
Ireland

Tel: 353 1 6424220
Email: info@fod.ie

## TABLE OF CONTENTS

1.  INTERPRETATION ........................................................................................................2
2.  PAYMENT PROVISIONS ..............................................................................................6
3.  CHARGING PROVISIONS .............................................................................................7
4.  CONTINUING SECURITY .............................................................................................7
5.  REPRESENTATIONS AND WARRANTIES ..................................................................9
6.  UNDERTAKINGS .........................................................................................................11
7.  FINANCIAL COLLATERAL DIRECTIVE .....................................................................15
8.  ENFORCEMENT OF SECURITY ................................................................................15
9.  RECEIVERS .................................................................................................................17
10. APPLICATION OF PROCEEDS .................................................................................18
11. CONSOLIDATION OF ACCOUNTS AND SET-OFF ..................................................18
12. FURTHER ASSURANCES ..........................................................................................18
13. POWER OF ATTORNEY..............................................................................................18
14. COSTS AND EXPENSES ............................................................................................19
15. CURRENCY CONVERSION AND INDEMNITY...........................................................20
16. MISCELLANEOUS PROVISIONS ..............................................................................20
17. RIGHTS AND REMEDIES...........................................................................................21
18. ASSIGNMENT .............................................................................................................22
19. NOTICES .....................................................................................................................22
20. COUNTERPARTS .......................................................................................................23
21. RELEASE OF SECURITY...........................................................................................23
22. GOVERNING LAW ......................................................................................................24
23. ENFORCEMENT .........................................................................................................24
SCHEDULE 1 .......................................................................................................................25
SCHEDULE 2 .......................................................................................................................28
SCHEDULE 3 .......................................................................................................................29
SCHEDULE 4 .......................................................................................................................31

1

**THIS DEED** is dated 21 November 2018

**BETWEEN:**

(1)    **JLPS HOLDING IRELAND LIMITED,** a limited company with company registration number 612691 and registered offices at 29 Main Street, Cashel, Co. Tipperary (the "**Chargor**"); and

(2)    **CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK** in its capacity as security agent and trustee for and on behalf of itself, the Senior Agent, the Junior Agent, the Hedging Counterparty and the Lenders for the purposes only of holding certain security under the Transaction Documents (together with its successors and assigns the "**Security Agent**").

**RECITALS**

A.    The Chargor is the legal and beneficial owner of the Shares (as defined below). As at the date of this Charge, the Shares represent 100% of the issued share capital in the Company.

B.    By way of the Proceeds Agreement (as is further defined below), the Chargor has agreed to charge the Shares in favour of the Security Agent.

C.    It has been agreed that the Chargor will enter into this Deed in order to secure, inter alia, the Secured Obligations (as defined below).

**1.    INTERPRETATION**

**1.1.    Definitions**

In this Deed, the following terms shall, unless the context otherwise requires, have the following meanings:

| | |
|---|---|
| "**Act**" | means the Land and Conveyancing Law Reform Act 2009. |
| "**Aircraft**" | means the Airbus A350-900 aircraft bearing manufacturer's serial number 67 as more particularly described in the Lease Agreement relating thereto, including the Airframe, Engines and all Parts and, where the context so requires, the aircraft documents and technical records. |
| "**Charged Assets**" | means (a) the shares specified in Schedule 2; (b) all other shares in the capital of the Company which the Chargor may now or hereafter hold or beneficially own and (c) all present and future Related Rights. |
| "**Companies Act**" | means the Companies Act 2014. |
| "**Company**" | means DAE Leasing (Ireland) 12 Limited, a limited liability company incorporated in Ireland with registered number 592187 and having its registered office at 29 Main Street, Cashel, Co. Tipperary, Ireland. |

2

**"Delegate"**              means any person appointed by the Security Agent or any Receiver appointed pursuant to the provisions of clause 13.2 (*Delegation*).

**"Disposal"**              means (a) any sale, transfer, mortgage, assignment, grant of an option over, charge, pledge, loan or other disposal of Charged Assets, or an agreement to do any of the foregoing; and/or (b) entering into any transaction (including a derivative transaction) having an economic effect similar to any of the types of disposal described in sub-paragraph (a) above; and dispose and shall be construed accordingly.

**"Dispute"**               means any suit, action, proceedings and/or any dispute or difference which may arise out of or in connection with or which may relate in any way to this Deed (including but not limited to any suit, action, proceedings, dispute or difference relating to the formation, interpretation or performance of this Deed) or any dispute arising out of any non-contractual obligations of any nature (including those to which Regulation (EC) No. 864/2007 applies) arising between the parties or any of them.

**"Enforcement Event"**     has the meaning ascribed to it in the Proceeds Agreement.

**"Examiner"**              means an examiner appointed under Section 509 of the Companies Act.

**"Facility Agreement"**    means either or both, as the context requires, of: the Senior Facility Agreement; and/or the Junior Facility Agreement.

**"Junior Facility Agreement"**   means the facility agreement entered into or to be entered into, as the context may require, between inter alia the Junior Lenders, the Junior Agent, the Security Agent and the Borrower in respect of the Aircraft.

**"Proceedings"**           means suits, actions or proceedings arising out of or in connection with or relating in any way to this Deed or any dispute arising out of any non-contractual obligations of any nature (including those to which Regulation (EC) No. 864/2007 applies) arising between the parties or any of them (including but not limited to any suits, actions or proceedings relating to the formation, interpretation or performance of this Deed).

**"Proceeds Agreement"**    means the proceeds agreement entered into, or to be entered into, as the context may require, between, amongst others, the Borrower and the Finance Parties.

**"Receiver"**              means any receiver and/or receiver and manager appointed by the Security Agent (whether pursuant to this Deed or otherwise) in respect of the Chargor or over all or any part of the Charged Assets.

3

| | |
|---|---|
| **"Related Rights"** | mean, in relation to the Charged Assets (a) all dividends, distributions, interest and other income paid or payable on the relevant Shares or any asset referred to in (b); (b) all rights, monies, benefits property or other claims accruing or offered at any time in relation to the Charged Assets whether by way of conversion, redemption, substitution, exchange, bonus or preference, under option rights or otherwise; (c) all rights and claims relating to any Charged Assets which are deposited with, or registered in the name of, any depositary, custodian, nominee, clearing house or system, investment manager, Security Agent or other similar person or their nominee, in each case whether or not on a fungible basis (including rights against any such person); and (d) all other rights and claims attaching or relating to any Charged Assets and all cash or other securities or investments in the future deriving from the Charged Assets or such rights and claims. |
| **"Relevant Documents"** | means any Transaction Document (as such term is defined in the Proceeds Agreement). |
| **"Secured Obligations"** | means any and all moneys, liabilities and obligations (whether actual or contingent, whether now existing or hereafter arising, whether or not for the payment of money and including, without limitation, any obligation or liability to pay damages) from time to time owing to any of the Finance Parties by any Obligor pursuant to any Transaction Document, notwithstanding that the recourse of the Finance Parties against any person may be limited in recourse. |
| **"Secured Obligations Discharge Date"** | means the date on which the Security Interests constituted by the Security Documents are required to be released, discharged and/or re-assigned pursuant to Clause 7 (Release of Security) of the Proceeds Agreement |
| **"Security Period"** | means the period commencing on the first Utilisation Date and expiring on the Secured Obligations Discharge Date. |
| **"Security"** | means the security constituted or intended to be constituted by this Deed. |
| **"Senior Facility Agreement"** | means the facility agreement entered into or to be entered into, as the context may require, between inter alia the Senior Lenders, the Senior Agent, the Security Agent and the Borrower in respect of the Aircraft |
| **"Shares"** | means all of the Chargor's present and future shares in the Company and all other shares, stocks, bonds, bearer instruments, options and securities and share warrants in the Company from time to time legally or beneficially owned by the Chargor or in respect of which it may now or hereafter have any rights, including those shares in the Company specified in the Schedule 2 (and including those shares held in an uncertificated form whether in the name of the Chargor or any agent, nominee |

4

or trustee for and on behalf of the Chargor).

## 1.2. Construction

1.2.1.   Unless the context otherwise requires or this Deed provides otherwise, a term which is defined in the Proceeds Agreement (including by reference to any other document) shall have the same meaning (or be subject to the same construction) in this Deed. If there is any conflict or inconsistency between the terms of this Deed and the Proceeds Agreement then the terms of the Proceeds Agreement shall prevail to the extent of such conflict or inconsistency.

1.2.2.   Unless otherwise provided, any reference to a section, clause, sub-clause, paragraph or schedule is a reference to a section, clause, sub-clause, paragraph or schedule (as the case may be) of this Deed.

1.2.3.   Headings and the contents page are inserted for ease of reference only and do not affect the construction of this Deed.

1.2.4.   A document is in the agreed form if it is in the form of a draft agreed between or on behalf of the parties hereto on or before the date hereof.

1.2.5.   Unless the context otherwise requires, any reference in this Deed to:

(1)   a word or phrase the definition of which is contained or referred to in section 2 of the Companies Act shall have the meaning thereby given to it;

(2)   any provision of law is a reference to that provision as amended, substituted, extended or re-enacted and includes any subordinate legislation;

(3)   any Irish legal term, concept, legislation or regulation (including those for any action, remedy, method of judicial proceeding, document, statute, court official, governmental authority or agency) or any accounting term or concept, in respect of any jurisdiction other than Ireland will be construed as references to the term, concept, legislation or regulation which most nearly corresponds to it in that jurisdiction;

(4)   the singular includes the plural and vice versa and any gender includes the other gender;

(5)   a reference to time is a reference to Irish time;

(6)   a person includes that person's successors, personal representatives, permitted assignees and/or transferees, substitutes, executors, administrators, successors in title (as the case may be) whether direct or indirect or any person with whom they may from time to time merge or amalgamate;

(7)   this Deed or any other agreement or instrument is a reference to this Deed, or such other agreement or instrument as amended, restated, extended, varied, novated, substituted, replaced or supplemented in any manner from time to time, however fundamentally and which may include, without limitation, an increase in facilities, an increase in any interest rate

5

applicable to facilities provided, an increase in the Secured Obligations and/or any rescheduling of indebtedness;

(8) a person includes any person, firm, partnership, company, corporation, association, trust, investment fund, government, state or agency (whether or not having a separate legal personality) or two or more of the foregoing but references to individuals are deemed to be references to natural persons only;

(9) any phase introduced by the terms including or includes or in particular or any similar expression is to be construed as illustrative without limitation;

(10) costs, charges or expenses include any value added tax or similar tax charged or chargeable in respect of such cost, charges or expenses;

(11) a regulation includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(12) assets includes present and future properties, revenues and rights of every description;

(13) an authorisation means an authorisation, consent, approval, licence, resolution, filing or registration;

(14) a party or the parties is a reference to a party or the parties to this Deed; and

(15) in this Deed, an Enforcement Event is continuing where such Enforcement Event has not been remedied within any stated grace or remedy period applicable to it or otherwise waived in writing by the relevant Security Agent.

## 2.    PAYMENT PROVISIONS

### 2.1.    Covenant to Pay

The Chargor hereby irrevocably and unconditionally covenants to, on demand by the Security Agent, pay, perform and discharge all the Secured Obligations when due and acknowledges to the Security Agent that the amount secured by this Deed and in respect of which this Deed and the Security hereby created is enforceable is the full amount of the Secured Obligations.

### 2.2.    Payment Free of Deduction

Subject to Clause 13 of the Facility Agreement, all payments to be made under this Deed by the Chargor shall be made free and clear of and without deduction for or on account of any set-off or counterclaim or any present or future Taxes, levies, imposts, charges, deductions or withholdings of any nature whatsoever.  If the Chargor shall be compelled by law to make any deduction or withholding from any payment to the Security Agent , the amount of the payment due from the Chargor shall be increased to the extent necessary to ensure that, after the making of such deduction or withholding, the Security Agent  receives and retains (free from any liability in respect of such deduction or withholding) a net sum equal to the sum which it

6

would have received and so retained had no such deduction or withholding been made or required to be made.

2.3.   **Evidence and Calculation**

Any certificate or determination by the Security Agent of a rate or amount under this Deed is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

3.   **CHARGING PROVISIONS**

3.1.   **Fixed Charge**

The Chargor, as beneficial owner for the purpose of securing the payment and discharge in full of the Secured Obligations hereby absolutely, irrevocably and unconditionally **CHARGES** as a first fixed charge in favour of the Security Agent as a continuing security, all of its rights, title, benefit and interest whatsoever, present and future, actual and contingent, in and to the Charged Assets together with all Related Rights, but so that the Security Agent shall not in any circumstances incur any liability whatsoever in respect of such charge, subject to clause 13.3.

3.2.   The Chargor hereby covenants and undertakes to immediately deliver to the Security Agent, on the date of execution of this Deed, or if later, on the date of acquisition by the Chargor of any Charged Assets:

3.2.1.   an undated stock transfer form (executed in blank by or on behalf of the Chargor and/or its nominees) in respect of such Charged Assets as set out in Schedule 3 to this Deed;

3.2.2.   all share certificates, warrants and other documents of title representing such Charged Assets (including in the case of any Charged Assets which are not in the sole name of the Chargor, a declaration of trust in respect of the interest of the Chargor in such Charged Assets executed by each nominee);

3.2.3.   a certified copy of the up to date register of members of the Company;

3.2.4.   executed but undated letters of resignation and dated letters of authority from each of the directors, alternate directors and secretary of the Company in the forms set out in Schedule 4 to this Deed; and

3.2.5.   such other documents as are necessary or advisable or the Security Agent may from time to time reasonably require for the purpose of giving the Security Agent a valid first fixed charge over and for perfecting its title to the Charged Assets or for vesting or enabling it to vest title to the Charged Assets in the Security Agent or its nominee(s) to the intent that the Security Agent may, at any time after this Charge has become enforceable, without notice present for registration any transfer of the Charged Assets to itself or its nominee for the purpose of protecting or perfecting its security over the Charged Assets and may, upon or at any time after this Charge has become enforceable, without notice present for registration any transfer of the Charged Assets to any purchaser.

4.   **CONTINUING SECURITY**

4.1.   **Continuing Security**

This Deed and the security hereby created shall be a continuing security and, in particular (but without limitation), shall not be, nor be considered as, impaired, satisfied or discharged by any intermediate discharge or payment on account of any liabilities or any settlement of accounts between the Chargor (or any other person) and the Security Agent or the other Secured Parties (or any of them, if any) or any other act, event or matter whatsoever, except only the execution by the Security Agent of an absolute and unconditional release of the security created by this Deed to the Chargor, and this Deed shall extend to cover any sum or sums of money or other liability and obligations which shall for the time being constitute the balance of the Secured Obligations until all the Secured Obligations have been paid and discharged in full and this Deed has been released in accordance with clause 21.1 (*Release of Security*).

4.2.   **Additional Security**

This Deed is in addition to, without prejudice to, and shall not merge with, any other right, remedy, guarantee or Security Interest which the Security Agent may at any time hold for any of the Secured Obligations.

4.3.   **Right to Enforce**

This Deed may be enforced against the Chargor without the Security Agent first having recourse to any other right, remedy, guarantee or Security Interest held by or available to it, irrespective of any law or any provision of this Deed to the contrary.

4.4.   **Waiver of Defences**

The obligations of the Chargor under this Deed and the Security shall not be affected by any act, omission, matter or thing which, but for this provision, might operate to impair, affect or discharge such obligations, in whole or in part, including without limitation, and whether or not known to or discoverable by the Chargor, the Security Agent or any other person:

4.4.1.   any time, indulgence or waiver granted to or composition with any person whatsoever;

4.4.2.   the taking, variation, compromise, renewal or release of or refusal or neglect to perfect or enforce any rights, remedies or securities against or granted by any person whatsoever;

4.4.3.   any legal limitation, disability, incapacity or other circumstances relating to any such party or any other person;

4.4.4.   any amendment, novation, supplement, variation, restatement, replacement of or extension (in each case however fundamental and of whatsoever nature and whether or not more onerous) of any term of this Deed or any other Transaction Document or any increase in the Secured Obligations to the intent that this Deed shall apply to such term as varied or in respect of the extended due date or such increase;

4.4.5.   any judgment obtained against the Chargor;

4.4.6.   the dissolution, liquidation, examinership, amalgamation, reconstruction or reorganisation of the Chargor, the Company or any other person; or

8

4.4.7.   any irregularity, unenforceability, invalidity or frustration of any obligations of any person whatsoever under any agreement or any other document or security, or any present or future law or order of any government or authority purporting to produce or otherwise effect any such obligations, to the intent that this Deed shall remain in full force and be construed accordingly as if there were no such irregularity, unenforceability, invalidity, frustration, law or order.

4.5.   **No Competition**

4.5.1.   Until the Secured Obligations have been unconditionally and irrevocably satisfied and discharged in full to the satisfaction of the Security Agent, the Chargor shall not by virtue of any payment made hereunder on account of the Secured Obligations or by virtue of any enforcement by the Security Agent of its rights under this Deed or the Security:

(1)   exercise any rights of subrogation in relation to any rights, security or moneys held or received or receivable by the Security Agent  or any person;

(2)   exercise any right of contribution or indemnity from any co-surety liable in respect of such moneys and liabilities under any other guarantee, security or agreement;

(3)   exercise any right of set-off or counterclaim against the Company or any co-surety;

(4)   receive, claim or have the benefit of any payment, distribution, security or indemnity from the Company or any such co-surety; or

(5)   claim, rank, prove or vote as a creditor of the Company or any such co-surety in competition with the Security Agent.

4.5.2.   The Chargor will hold in trust for and forthwith pay or transfer to the Security Agent any payment or distribution or benefit of security received by it contrary to the above.  If the Chargor exercises any right of set-off contrary to the above, it will forthwith pay an amount equal to the amount set-off to the Security Agent.

5.   **REPRESENTATIONS AND WARRANTIES**

5.1.   The Chargor represents and warrants to the Security Agent on the date hereof that, and on any date on which the Chargor acquires an asset falling within the scope of the definition of "Charged Assets":

5.1.1.   it is duly incorporated and validly existing under the laws of its place of incorporation and is a separate legal entity capable of suing and being sued;

5.1.2.   it has the power to own its properties and assets and to carry on its business as currently conducted.

5.1.3.   it has the necessary power and authority, and all necessary corporate and other action has been taken, to enable it to execute, deliver and perform the obligations undertaken by it under this Deed and the Transaction Documents to which it is party;

5.1.4.   the obligations under this Deed are legally and validly binding on it and are enforceable in accordance with the terms of this Deed;

5.1.5.   all authorisations, approvals or other action by, and notice to or filing with, any governmental or regulatory authority or regulatory body as required for the entry into and performance of this Deed, have been obtained and are in full force and effect;

5.1.6.   the execution of this Deed, the creation of the Security or the performance by the Chargor of its obligations hereunder will not contravene its constitutional documents, any applicable law or regulation or any agreement to which the Chargor is a party or which is binding on the Chargor or the Charged Assets;

5.1.7.   on the date of execution of this Deed and on each date hereafter until the Security is released by the Security Agent, the Charged Assets are free from any mortgage, charge or any other Security Interest (save for Permitted Security Interests and those created pursuant to this Deed) and constitutes a first priority Security Interest over the Charged Assets enforceable against the Chargor or the Chargor's creditors;

5.1.8.   its obligations under this Deed rank and will rank at least pari passu with the claims of all of its other unsecured and unsubordinated creditors, except for obligations mandatorily preferred by law applying to companies generally;

5.1.9.   it is able to pay its debts within the meaning of Section 570 of the Companies Act or any analogous legislation at the time of entering into this Deed and remains able to pay its debts and did not become unable to pay its debts as a consequence of entering into this Deed;

5.1.10.  it has not taken any corporate action nor have any other steps been taken or legal proceedings been instituted or (to the best of its knowledge and belief having made all reasonable enquiries) threatened against it for its winding up or re-organisation or to appoint an examiner or receiver or any such analogous steps in relation to it or any of its assets;

5.1.11.  there is no litigation, arbitration, insolvency or other proceeding taking place, pending, or, to the best of its knowledge and belief, threatened against it or any of its assets;

5.1.12.  the Charged Assets are duly authorised, validly issued and fully paid and constitute all of the issued share capital of the Company;

5.1.13.  it is the sole legal and beneficial owner of the Charged Assets and all Related Rights (save for any Charged Assets that are specified in Schedule 2 to this Deed as being held by a nominee on its behalf) and that the Charged Assets listed in Schedule 2 constitute the entire share capital owned by the Chargor in the relevant company as at the date of this Deed;

5.1.14.  the constitutional documents of the Company do not and could not restrict or inhibit any transfer of the Charged Assets on creation or enforcement of the Security and the directors of the Company cannot refuse to register any transfer of the Charged Assets to the Security Agent or any nominee of the Security Agent and all rights of pre-emption are waived;

10

5.1.15.   there are no agreements in place which provide for the issue or allotment of, or grant to any person the right to call for the issue or allotment of, any share or loan capital of the Company (including any option or right of pre-emption or conversion); and

5.1.16.   no calls have been made in respect of the Charged Assets and remain unpaid and no calls can be made in respect of such Charged Assets in the future.

6.   **UNDERTAKINGS**

6.1.   **Negative Pledge**

6.1.1.   The Chargor will not do or agree to do any of the following without the prior written consent of the Security Agent:

(1)   create or permit to subsist any Security Interest on any of the Charged Assets; or

(2)   sell, transfer, lend or otherwise dispose of all or any part of its interest in the Charged Assets.

6.1.2.   The foregoing provisions of this clause 6.1 (*Negative Pledge*) shall not be construed as limiting any powers exercisable by any Receiver appointed by the Security Agent under or pursuant to this Deed.

6.2.   **Charged Assets Generally**

The Chargor covenants and undertakes to the Security Agent that at all times during the continuance of the Security Period that the Chargor will:

6.2.1.   **General compliance**

(1)   conduct and carry on its business in a proper and efficient manner and procure that no substantial change is made to the general nature of the business of the Chargor from that carried on at the date of this Deed;

(2)   comply with and observe all of the terms, conditions and obligations in relation to the Charged Assets under any present or future law, regulation, license or consent and to comply with all covenants and obligations affecting any of the Charged Assets;

(3)   comply and observe all terms and conditions of the Transaction Documents to which it is a party and of all other contracts, agreements and security to which it is a party relating to the Charged Assets;

(4)   not do or cause or permit to be done anything with may in any way depreciate, jeopardise or otherwise prejudice the value (whether monetary or otherwise) or marketability of the Charged Assets (or any of them);

(5)   not take any action which would cause any of the representations made in clause 5 (*Representations and Warranties*) to be untrue or incorrect in any respect during the Security Period;

11

(6) not take any corporate action or other steps or legal proceedings for the winding up or re-organisation of the Company or to appoint an examiner or receiver or any such analogous steps in relation to the Company in any jurisdiction;

(7) not take any action in relation to the Charged Assets or this Deed under the provisions of Section 94 of the Act (*Court order for sale*).

6.2.2. **Information**

(1) at the cost of the Chargor, provide the Security Agent with such information relating to the business of the Chargor and the Charged Assets as the Security Agent may reasonably request from time to time; and

(2) notify the Security Agent within 10 Business Days of receipt of every material notice, order or proposal given or made in relation to the Charged Assets and comply with such notice, order or proposal as the Security Agent may reasonably require or approve.

6.2.3. **Pay outgoings**

pay all Taxes, assessments, impositions and outgoings whatsoever, whether governmental or otherwise as may be imposed upon or payable in respect of the Charged Assets as and when they shall become payable and produce the receipt for such payments as the Security Agent may reasonably request from time to time;

6.2.4. **Notice**

promptly notify the Security Agent in writing on becoming aware of the occurrence or potential occurrence of an Enforcement Event.

6.2.5. **Undertakings in relation to the Charged Assets**

(1) The Chargor hereby covenants and undertakes to the Security Agent that, for the duration of the Security Period there shall be:

(i) no increase or reduction in the authorised or issued share capital of the Company;

(ii) no variation of the rights attaching to or conferred by the Charged Assets or any part of it;

(iii) no exercise, renunciation or assignment by the Chargor of any right to subscribe for any shares or securities;

(iv) no redemption, reconstruction, amalgamation, sale or other Disposal of the Charged Assets (including the exchange, conversion or reissue of any shares or securities as a consequence thereof);

(v) no appointment of any further director or officers of the Company; and

(vi) no alteration to the constitutive documents of the Company,

in each case, without the prior consent in writing of the Security Agent (such consent not to be unreasonably withheld, delayed or conditioned).

(2)   The Chargor hereby covenants and undertakes to the Security Agent that, for the duration of the Security Period, if any Charged Assets are in, or are converted into, uncertificated form, the Chargor shall promptly notify the Security Agent and:

(i)   act on any instructions given by the Security Agent and give such directions as the Security Agent may require in order to protect and preserve the Security Agent 's Security;

(ii)   transfer those Charged Assets to an escrow account in respect of which it has named as escrow agent the Security Agent or any nominee or agent of the Security Agent notified to the Chargor or any other person approved in writing by the Security Agent;

(3)   The Chargor hereby covenants and undertakes to the Security Agent that, for the duration of the Security Period, the Chargor shall provide the Security Agent , as soon as practicable upon receipt, with copies of all notices and information received by it from any other party in relation to the Charged Assets.

6.2.6.   **Voting rights and dividends**

(1)   Prior to the occurrence of an Enforcement Event, the Chargor shall:

(i)   be entitled to receive and retain all dividends, distributions and other monies derived from the Charged Assets;

(ii)   exercise all voting rights and other rights and powers attaching to the Charged Assets, subject to clause 6.2.5 (Undertakings) above;

**PROVIDED THAT** the Chargor's rights and powers relating to the Charged Assets (or any part thereof) shall not be exercised in any manner which would result in any variation of the rights attaching to or conferred by the Charged Assets (or any part thereof) or which in the opinion of the Security Agent is inconsistent with, or prejudicial to, its interest in the security over the Charged Assets (or any part thereof) or which would result in the Security Agent incurring any cost, expense or liability.

(2)   Upon the occurrence of an Enforcement Event, the Security Agent may, at its discretion, (in the name of the Chargor or otherwise and without any further consent or authority from the Chargor):

(i)   transfer the Charged Assets into the name of the Security Agent or such nominees(s) of the Security Agent as it shall require;

(ii)   exercise (or refrain from exercising) all voting and other rights and powers attaching to the Charged Assets in such a manner as the Security Agent deems appropriate;

(iii)   apply all dividends, interest and other monies derived from the Charged Assets as though they were proceeds of sale under this Deed;

(iv)    complete the Director's/Secretary's Letter of Resignation as set out in Schedule 4 and present same to the Company;

(v)    exercise (or refrain from exercising) the powers and rights conferred on or exercisable by the legal or beneficial owner of the Charged Assets including the right, in relation to any company whose shares or other securities are included in the Charged Assets, to concur or participate in:

(a)    the reconstruction, amalgamation, sale or other disposal of such company or any of its assets or undertaking (including the exchange, conversion or reissue of any shares or securities as a consequence thereof);

(b)    the release, modification or variation of any rights or liabilities attaching to such shares or securities; and

(c)    the exercise, renunciation or assignment of any right to subscribe for any shares or securities,

in each case, in the manner and on the terms the Security Agent thinks fit, and the proceeds of any such action shall form part of the Charged Assets.

(3)    The Chargor shall, if requested by the Security Agent after the occurrence of an Enforcement Event, instruct any clearance system to transfer any Charged Assets held by it for or on behalf of the Chargor to an account of the Security Agent or its nominee with that clearance system or otherwise as the Security Agent may direct.

(4)    For the avoidance of doubt, the Security Agent is not obliged to:

(a)    perform or fulfil any obligation of the Chargor;

(b)    make any payment;

(c)    make any enquiry as to the nature or sufficiency of any payment received by it or the Chargor; or

(d)    present or file any claim or take any other action to collect or enforce the payment of any amount,

in respect of the Charged Assets.

### 6.2.7.  Payment of calls

The Chargor shall pay when due all calls, instalments or other payments and shall discharge all other obligations, which may become due in respect of any of the Charged Assets.

### 6.2.8.  Liability of the Security Agent

14

Neither the Security Agent nor any Receiver shall have any duty to ensure that any dividends, distributions or other monies receivable in respect of the Charged Assets are duly and punctually paid, received or collected as and when the same become due and payable or to ensure that the correct amounts (if any) are paid or received on or in respect of such Charged Assets or to ensure the taking up of any (or any offer of any) stocks, shares, rights, moneys or other property paid, distributed, accruing or offered at any time by way of redemption, bonus, rights, preference, or otherwise on or in respect of, any of the Charged Assets except in the case of fraud, gross negligence or wilful default upon part of the Security Agent or any Receiver.

## 7.   FINANCIAL COLLATERAL DIRECTIVE

To the extent that any of the Charged Assets and Related Rights constitute "financial collateral" and this Deed and the obligations of the Chargor and the Security Agent hereunder constitute a "security financial collateral arrangement" (in each case as defined in, and for the purposes of, the European Communities (Financial Collateral Arrangements) Regulations 2010 as amended by the European Communities (Financial Collateral Arrangements) (Amendment) (No. 2) Regulations 2011 (the **Regulations**) the Security Agent shall, at any time after the occurrence of an Enforcement Event, have the right to appropriate all or any part of such financial collateral in or towards discharge of the Secured Obligations.

For this purpose, the parties agree that the value of such financial collateral so appropriated shall be the market price of the Charged Assets determined by the Security Agent by such process as the Security Agent may select including independent valuation. The Parties further agree that the method of valuation provided for in this Deed shall constitute a commercially reasonable method of valuation for the purposes of the Regulations.

## 8.   ENFORCEMENT OF SECURITY

### 8.1.   When Enforceable

8.1.1.   The Security shall become enforceable immediately upon the occurrence of an Enforcement Event and the Secured Obligations will be deemed to have become due and payable.

8.1.2.   After the Security has become enforceable, the Security Agent may in its absolute discretion enforce all or any part of the Security and take any action in respect of the Security in such a manner as it sees fit.

### 8.2.   Statutory Powers

8.2.1.   At any time after the Security constituted by this Deed has become enforceable (in accordance with this clause 8 (*Enforcement of Security*)) :

(1)   the statutory power of sale conferred by section 100 (*Power of sale*) of the Act free from restrictions contained in section 100(1), (2), (3) and (4) and without the requirement to serve notice (as specified in the final proviso to section 100(1)); and

(2)   the incidental powers of sale conferred by section 102 *(Incidental powers)*,

will immediately arise and be exercisable by the Security Agent and/or any Receiver. The provisions of section 96(1)(c) of the Act shall not apply to this Deed.

15

8.2.2.   The Security Agent and any Receiver is entitled to all the rights, powers, privileges and immunities conferred by the Act.

8.2.3.   All of the powers, authorities and discretions which are conferred by this Deed upon a Receiver (either expressly or impliedly) may be exercised after the security constituted by this Deed become enforceable by the Security Agent in relation to all or any part of the Charged Assets  both before and after the appointment of a Receiver.

## 8.3.   Mortgagee in Possession

8.3.1.   In addition to the statutory powers incidental to the estate or interest of mortgagees contained in the Act as more particularly detailed in clause 8.2 (*Statutory powers*) and at any time after the Security has become enforceable, the Security Agent  may, without further notice or demand and without the need to obtain the consent of the Security Agent  or obtain an order for possession under section 97 (*Taking possession*) of the Act, enter into possession of the Charged Assets together with all Related Rights.

8.3.2.   Neither the Security Agent  nor any Receiver will be obliged to take any steps to sell or lease the Charged Assets  (or any part thereof) and the provisions of section 99 (*Mortgagee in possession*) and section 101 (*Applications under sections 97 and 100*) of the Act shall not apply to this Deed.

## 8.4.   No Liability

8.4.1.   Save as provided for in section 103 (*Obligations on selling*) of the Act, neither the Security Agent nor any Receiver will be liable for any loss or damages which arises out of the exercise or the attempted or purported exercise of, or the failure to exercise any of, its or his respective powers (unless such loss or damage is caused by its or his gross negligence, fraud or wilful misconduct) in relation to all or any part of the Charged Assets.

8.4.2.   Without prejudice to the generality of clause 8.4.1 above, neither the Security Agent nor any Receiver will be liable to account as mortgagee in possession in respect of the Charged Assets or any part thereof nor be liable for any loss on realisation or in connection with the Charged Assets or for any default or omission for which a mortgagee in possession might be liable.

## 8.5.   Protection of Third Parties

8.5.1.   No person (including a purchaser) dealing with the Security Agent or a Receiver or its or his agents will be concerned to enquire:

(1)   whether the Secured Obligations have become payable;

(2)   whether any power which the Security Agent or a Receiver is purporting to exercise has become exercisable;

(3)   whether any of the Secured Obligations remain outstanding under the Transaction Documents (or any of them); or

(4)   how any money paid to the Security Agent or a Receiver is to be applied;

16

and all protections to purchasers contained in sections 105(1),106 and 108(5) of the Act shall apply to all persons (including a purchaser) dealing with the Security Agent or any Receiver in like manner as if the statutory powers of sale and appointing a receiver had not been varied or extended by this Deed.

8.5.2.   No purchaser from the Security Agent or any Receiver, delegate or sub-delegate shall be entitled to rely on Section 105(2) of the Act which is disapplied by this Deed.

## 9.    RECEIVERS

### 9.1.   Appointment of a Receiver

9.1.1.   At any time after the Chargor so requests or the Security becomes enforceable, the Security Agent may, without the need for the occurrence of any of the events specified in paragraphs (a) to (c) of section 108(1) (*Appointment of a receiver*) of the Act, appoint under seal or under the hand of a duly authorised officer of the Security Agent , any person or persons considered by it to be competent to be a receiver or a receiver and manager (hereinafter called a **Receiver** which expression will, where the context so admits, include the plural and any substituted receiver or receiver and manager) of all or any part of the Charged Assets and such persons shall be deemed to be in the same position as a Receiver duly appointed by a mortgagee under the Act.

9.1.2.   If at any time there is more than one Receiver of all or part of the Charged Assets, each such Receiver may, unless otherwise stated in any appointment document) exercise all of the powers conferred on a Receiver under this Deed individually and to the exclusion of each other Receiver.

9.1.3.   All of the powers, authorities and discretions which are conferred by this Deed, either expressly or impliedly, upon any Receiver may be exercised by the Security Agent after the Security becomes enforceable in relation to all or part of the Charged Assets without first appointing a Receiver or notwithstanding the appointment of a Receiver of the Charged Assets, or any part thereof.

### 9.2.   Receiver as Agent

Any Receiver so appointed shall be the agent of the Chargor and the Chargor will be solely responsible for his remuneration, acts, defaults, omissions and losses and for all costs, expenses, liabilities incurred by him. The Security Agent shall not incur any liability by reason of the appointment of a Receiver or for any other reason.

### 9.3.   Remuneration

A Receiver shall be entitled to remuneration for his services at a rate to be fixed by the Security Agent (but without being limited to a maximum rate of commission as prescribed in sub-section 108(7) (*Appointment of a Receiver*) of the Act and the Security Agent may direct payment thereof out of the Charged Assets but the Chargor alone will be liable for payment of such remuneration.

### 9.4.   Removal of a Receiver

17

The Security Agent may in writing remove any Receiver so appointed and appoint another person or person as Receiver either in place of a Receiver whose appointment has been terminated or in addition to any Receiver already appointed.

9.5.   **Powers of a Receiver**

A Receiver so appointed will have and be entitled to exercise, in addition to all powers conferred by the Act (except where expressly disapplied in this Deed) and pursuant to section 108(3) of the Act, each of the additional powers, rights and obligations as set forth in Schedule 1.

## 10.   APPLICATION OF PROCEEDS

Any monies received by the Security Agent and/or any Receiver after the Security has become enforceable shall be applied by the Security Agent in accordance with the Proceeds Agreement.

## 11.   CONSOLIDATION OF ACCOUNTS AND SET-OFF

11.1.   **Consolidation**

The Chargor agrees that the Security Agent may at any time without notice and notwithstanding any settlement of account or other matter whatsoever, combine or consolidate all or any of the Chargor's existing accounts wheresoever located (including accounts in the name of the Chargor jointly with others) whether such accounts are current, deposit, loan or of any other nature whatsoever, whether they are subject to notice or not and in any currency.

11.2.   **Set-Off**

The Security Agent may set off any matured obligation due from the Chargor against any matured obligation owed by the Security Agent to the Chargor, regardless of the place of payment or currency of either obligation. If the obligations are in different currencies, the Security Agent may convert either obligation at a market rate of exchange in its usual course of business for the purpose of set off.

## 12.   FURTHER ASSURANCES

12.1.   The Chargor shall, at its own expense, take whatever action as may be reasonably required by the Security Agent:

    12.1.1.   to perfect or protect the Security intended to be created by this Deed; and

    12.1.2.   to facilitate the realisation of the Charged Assets or the exercise of any right, power or discretion exercisable by the Security Agent  or any such Receiver in respect of the Charged Assets,

including the execution, acknowledgement or delivery of any agreement, transfer, mortgage, charge or assignment, notice, or the making of a registration, in each case as the Security Agent may direct.

## 13.   POWER OF ATTORNEY

13.1.   **Power of Attorney**

 13.1.1. The Chargor, by way of security, hereby irrevocably appoints the Security Agent, each Receiver and any of their Delegates, jointly and also severally, to be its attorney:

  (1) to take any action which the Chargor is obliged to take under this Deed, including under clause 12 (*Further Assurances*); and

  (2) to do all such acts or things as may be required by the Security Agent or any Receiver under this Deed in exercise of any of their powers.

 13.1.2. The Chargor ratifies and confirms all things done by any attorney appointed under this clause in the exercise or purported exercise of all or any of such attorney's powers save for those acts, things or omissions done by way of fraud, wilful misconduct or gross negligence.

13.2.   **Delegation**

The Security Agent or any Receiver may delegate by power of attorney or in any other manner, to any person, any right, power or discretion exercisable by it under this Deed upon any terms (including the power to sub-delegate) as it may deem fit but no such delegation shall preclude the subsequent exercise of such power by the Security Agent or any Receiver itself or himself or preclude the Security Agent or the Receiver from making a subsequent delegation thereof to some other person.  Any such delegation may be revoked by the Security Agent or the Receiver at any time.

13.3.   **Liability**

Neither the Security Agent nor any Receiver will be in any way liable or responsible to the Chargor for any loss or liability arising from any act, default, omission or misconduct on the part of any such Delegate except in the case of fraud, gross negligence or wilful default upon its part.

14.   **COSTS AND EXPENSES**

14.1.   **Transaction Expenses**

The Chargor shall promptly on demand reimburse the Security Agent (and every Receiver and Delegate) the amount of all reasonably incurred out-of-pocket costs and expenses (including legal fees) incurred by it in connection with:

 14.1.1. the negotiation, preparation, execution and perfection of this Deed and any documents referred to in this Deed;

 14.1.2. in the exercise of any of the rights, remedies and powers conferred on the Security Agent or, as the case may be, any Receiver or Delegate, by this Charge or in connection with any proceedings instituted by or against the Security Agent in relation to the title to the whole or any part of the Charged Assets; and

 14.1.3. a request for a waiver, amendment or consent, the evaluation, negotiation or implementation of that waiver, amendment or consent.

14.2. **Taxes**

Subject to Clause 13 of the Facility Agreement, the Chargor shall promptly pay all stamp, registration and other Taxes to which this Deed or any judgment given in connection with this Deed is or at any time may be subject and shall indemnify the Security Agent against any liabilities, costs, claims and expenses resulting from any failure to pay or delay in paying any such Taxes.

14.3. **Indemnity**

Subject to Clause 13 of the Facility Agreement, the Chargor shall promptly indemnify the Security Agent and every Receiver and Delegate against any cost, loss or expenses (including legal fees) and liabilities (including VAT thereon (if applicable)) reasonably incurred by any of them as a result of:

14.3.1.   the taking, holding, protection or enforcement of this Deed and the Security;

14.3.2.   anything done in the exercise of any of the rights, powers, discretions and remedies vested in the Security Agent and each Receiver and Delegate by this Deed or by law.

15. **CURRENCY CONVERSION AND INDEMNITY**

15.1. **Currency Conversion**

All monies received or held by the Security Agent or any Receiver under this Deed may be converted from their existing currency into such other currency as the Security Agent or the Receiver reasonably requires to cover the obligations and liabilities comprised in the Secured Obligations in that other currency at the then prevailing spot rate of exchange (as conclusively determined by the Security Agent) for purchasing the currency to be acquired with the existing currency.

15.2. **Currency Indemnity**

No payment to the Security Agent (whether under any judgment or court order or otherwise) will discharge the obligation or liability of the Chargor in respect of which it was made unless and until the Security Agent receives payment in full in the currency in which such obligation or liability was incurred, and to the extent that the amount of any such payment, on actual conversion into such currency, falls short of such obligation or liability expressed in that currency, the Chargor shall indemnify and hold harmless the Security Agent from and against any loss it suffers or incurs as a result of any such shortfall.

16. **MISCELLANEOUS PROVISIONS**

16.1. **Suspense Account**

All monies received, recovered or realised by the Security Agent under this Deed (including the proceeds of any conversion of currency) may, at the discretion of the Security Agent, be credited to any interest-bearing suspense account for so long as the Security Agent may determine (with interest accruing thereon) without the Security Agent having any obligation to apply the same or any part thereof in or towards the discharge of any of the Secured Obligations.

16.2.   **New Accounts**

If the Security Agent receives, or is deemed to be affected by, notice, whether actual or constructive, of any subsequent Security Interest affecting any Charged Asset and/or the proceeds of sale of any Charged Asset:

16.2.1.   the Security Agent may open a new account for the Chargor; and

16.2.2.   if the Security Agent does not open a new account, it shall nevertheless be treated as if it had done so at the time when it received or was deemed to have received such notice,

and as from that time, all payment made to the Security Agent shall be credited or be treated as having been credited to the new account and will not operate to reduce any amount of the Secured Obligations.

16.3.   **Amendments**

Any provision of this Deed may be amended, supplemented, varied, modified, released or discharged only if the Security Agent and the Chargor so agree in writing.

16.4.   **Unfettered Discretion**

Save as otherwise stated in this Deed, any liability or power which may be exercised or any determination which may be made under this Deed by the Security Agent may be exercised or made in its absolute and unfettered discretion and it shall not be obliged to give reasons therefor.

16.5.   **Severability**

All the terms and provisions of this Deed are distinct and severable, and if any term or provision is held unenforceable, illegal or void in whole or in part (or any of the Security intended to be created by or pursuant to this Deed is ineffective) by any court, regulatory authority or other competent authority it shall to that extent be deemed not to form part of this Deed, and the enforceability, legality and validity of the remainder of this Deed will not be affected.

17.   **RIGHTS AND REMEDIES**

17.1.   **Waiver and Forbearance**

17.1.1.   No failure or delay by the Security Agent or any Receiver to exercise any right or remedy under this Deed shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise, or the exercise of any other right or remedy.  A waiver or consent by the Security Agent under this Deed will be effective only if given in writing and then only in the instance and for the purpose for which it is given.

17.1.2.   The rights of the Security Agent or any Receiver under this Deed will not be prejudiced or restricted by any indulgence or forbearance extended to the Chargor or other parties including a release of any person or persons (whether or not a party hereto and whether or not such person or persons are jointly and/or severally liable with the Chargor) in respect of the Secured Obligations or of any

other security without prejudice either to the Security or to the liability of the Chargor for the Secured Obligations.

17.2. **Remedies Cumulative**

The rights and remedies of the Security Agent and any Receiver under this Deed are cumulative and not exclusive of any rights or remedies provided by law.

17.3. **Company Intent**

The Chargor expressly confirms that it intends that the Security shall extend from time to time to any (however fundamental) variation, increase, extension or addition of or to any of the Transaction Documents and/or any facility or amount made available or owing under or in connection with any of the Transaction Documents for the purposes of or in connection with any of the following: acquisitions of any nature; increasing working capital; enabling investor distributions to be made; carrying out restructurings; refinancing existing facilities; refinancing any other indebtedness; making facilities available to new borrowers; any increase in any interest rate; any other variation or extension of the purposes for which any such facility or amount might be available from time to time; and any fees, costs and/or expenses associated with any of the foregoing.

18. **ASSIGNMENT**

18.1. The Chargor may not assign or transfer all or any of its rights, benefits or obligations under this Deed.

18.2. The Security Agent may assign or transfer all or any part of its rights under this Deed to any person in accordance with the terms of the Facility Agreement and the Chargor hereby consents to any such assignment. The Security Agent will be entitled to impart any information concerning the Chargor to any assignee or successor in title.

18.3. This Deed shall be binding upon and inure to the benefit of each Party and their respective successors and permitted assigns and references in this Deed to any of them shall be construed accordingly.

19. **NOTICES**

19.1. **Communications in Writing**

Any notice or other communication to be made under, or in connection with, this Deed shall be in writing, in the English language addressed to the relevant party.

19.2. **Addresses**

The address and fax number (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with this Deed is:

**The Chargor:**

Address:        29 Main Street,
                Cashel,
                Co. Tipperary

E-mail:         nmcnamara@dmsgovernance.com
Attention:      Directors/ Gary Fitzgerald
Fax No:         +339 5164 5171


**The Security Agent:**
Address:        12 place des Etats-Unis,
                CS 70052,
                92547 Montrouge Cedex,
                France
E-mail:         francois.barbut@ca-cib.com
                alexandra.delaune@ca-cib.com
                mounia.bekkali@ca-cib.com


Attention:      Structured Finance Agency & Middle Office
Fax No:         +33 1 41 89 85 75
or to such other address or fax number as may be notified to the Security Agent by not less
than five Business Days' notice.

## 19.3.   Delivery

19.3.1.   Any such notice or other communication made or delivered by one party to
another under or in connection with this Deed will only be effective:

(1)   if delivered by hand, on delivery;

(2)   if sent by fax, when received in legible form;

(3)   if by way of electronic email, when actually received in a readable form; or

(4)   if by way of letter, when it has been left at the relevant address or five
Business Days after being deposited in the post postage prepaid in an
envelope addressed to it at that address.

19.3.2.   and, if a particular department or officer is specified as part of its address details
provided under clause 19.2 if addressed to that department or officer.

## 20.   COUNTERPARTS

This Deed may be executed in counterparts and each such counterpart taken together shall
be deemed to constitute one and the same instrument.

## 21.   RELEASE OF SECURITY

## 21.1.   Release of Security

Subject to and without prejudice to clause 21.2 (*Retention of security*), upon the expiry of the
Security Period, the Security Agent shall,   at the request and cost of the Chargor, take
whatever action is necessary to release or re-assign and discharge the Charged Assets from
the Security.

21.2. **Retention of Security**

If any payment or discharge of the Secured Obligations is in the reasonable opinion of the Security Agent liable to be voided, set aside or invalidated under any enactment relating to insolvency, liquidation or otherwise (without limitation), the Security Agent may refuse to grant any release of the Security for such further period as the risk of such avoidance or invalidity continues.

21.3. **Reinstatement**

Where any discharge in respect of the Secured Obligations is made, in whole or in part or any arrangement is made on faith of any payment, security, assurance or otherwise is avoided or must be restored on insolvency, liquidation or otherwise, the liability of the Chargor under this Deed shall continue as if the discharge or arrangement had not occurred.

22. **GOVERNING LAW**

22.1. **Governing Law**

This Deed and all non-contractual obligations created by it and arising out of or in connection with it, together with all Disputes, will in all respects be governed by and construed in accordance with the laws of Ireland.

23. **ENFORCEMENT**

23.1. **Jurisdiction**

23.1.1.   The Chargor hereby agrees for the exclusive benefit of the Security Agent that any Proceedings brought against the Chargor with respect to this Deed may be brought in the High Court in Ireland or such other competent court of Ireland as the Security Agent may elect, and the Chargor waives any objection to Proceedings in such courts whether on grounds of venue or on the grounds that Proceedings have been brought in any inconvenient forum. The Chargor undertakes to enter an unconditional appearance within 14 days after the completion of any service or process in any Proceedings. The Chargor hereby consents to the service by post of any process issued in connection with this Deed. Nothing in this Deed will affect the right to serve process in any other manner permitted by law.

23.1.2.   Nothing contained in this Deed will limit the right of the Security Agent  to take Proceedings against the Chargor in any other court of competent jurisdiction, nor will the taking of any Proceedings in any one or more jurisdictions preclude the taking by the Security Agent  of Proceedings in any other jurisdiction whether concurrently or not.

**IN WITNESS** whereof this Deed has been duly executed as a deed by the parties to it and delivered on the date set out at the beginning of this Deed.

24

## SCHEDULE 1
## Powers of a Receiver

1. **Possession**

   to take immediate possession of, get in and collect the property in respect of which the Receiver is appointed and to make such demands and take such proceedings as may seem expedient for that purpose, and to take possession of the property over which the Receiver is appointed with like rights;

2. **Realisation**

   to sell, realise or otherwise dispose of the Charged Assets as the Receiver thinks fit;

3. **Manage**

   to carry on, manage, develop, reconstruct, amalgamate or diversify or concur in carrying on, managing, developing, reconstructing, amalgamating or diversifying any business of the Chargor in any manner the Receiver thinks fit;

4. **Appoint Advisors**

   to appoint and discharge managers, officers, agents, professional advisers, consultants, servants, workmen, employees and others for the purposes specified in this Schedule upon such terms as to remuneration or otherwise as the Receiver thinks fit and to remove any person so appointed to any such position by the Chargor;

5. **Borrow Money/Lend Money**

   to raise and borrow money or incur any other liability, either unsecured or on the security of any Charged Assets or otherwise and generally on any terms and for whatever purpose the Receiver thinks fit and to lend money or advance credit to any customer of the Chargor;

6. **Sell**

   to grant rights, options or easements over, dispose of, convert into money and realise any Charged Assets by public auction or private contract and generally in any manner and on any terms the Receiver thinks fit. The consideration for any such transaction may consist of cash, debentures or other obligations, shares, stock or other valuable consideration and any such consideration may be payable in a lump sum or by instalments spread over any period he or she thinks fit;

7. **Share Calls**

   where the Chargor is a company, to require the Chargor, or the directors of the Chargor, to make calls conditionally or unconditionally upon the shareholders of the Chargor in respect of any of its uncalled capital and enforce payment of any call so made by action (in the name of the Chargor or the Receiver as the Receiver may think fit) or otherwise;

8. **Related Rights**

to sell or assign all or any of the Related Rights in respect of which the Receiver is appointed in such manner, and generally on such terms and conditions, as the Receiver thinks fit.

9.    *Voting Rights*

to exercise in respect of any Charged Assets all voting or other powers or rights in such manner as the Receiver thinks fit;

10.   *Compromise*

to settle, adjust, refer to arbitration, allow time for payment, compromise and arrange any claim, contract, account, dispute, question or demand with or by any person who is or claims to be a creditor of the Chargor or relating in any way to any Charged Assets;

11.   *Legal Actions*

to bring, prosecute, enforce, defend and abandon any action, suit or proceedings both in the Receiver's own name and in the name of the Chargor in relation to any Charged Assets which the Receiver thinks fit;

12.   *Receipts*

to give a valid receipt for any money and execute any assurance or thing that may be necessary or desirable for realising any Charged Assets;

13.   *Company Reorganisation*

where the Chargor is a company, to form a subsidiary of the Chargor, arrange for any such subsidiary to trade or cease to trade as the Receiver sees fit, in his or her capacity as shareholder and transfer to that subsidiary any Charged Assets and sell or otherwise dispose of any such subsidiary;

14.   *Delegation*

to delegate the Receiver's powers to a reputable and experienced individual or company;

15.   *Material Contracts*

to enter into, abandon, perform, repudiate, rescind, vary or cancel any material contracts as the Receiver thinks fit;

16.   *Insurances*

to effect with any insurer any policy of insurance either in lieu or satisfaction of, or in addition to, the insurances required to be maintained by the Chargor;

17.   *Taxes*

to make any election for value-added tax purposes that the Receiver thinks fit and to run the tax affairs of the Chargor in any manner that the Receiver thinks fit;

18.   *Settle Accounts*

to redeem any prior Security Interest and to settle and pass the accounts to which that Security Interest relates. Any accounts so settled and passed are conclusive and binding on

26

the Chargor, and any money so paid shall be taken to be an expense properly incurred by him or her;

19.   **Protect and Manage**

to effect any repair or insurance and do any other act which the Chargor might do in the ordinary conduct of its business to protect or improve any Charged Assets and to arrange for or provide any service proper for the efficient use or management of the Charged Assets.

20.   **Use The Chargor's Name**

to use the name of the Chargor when exercising any of the rights, powers or discretions conferred on the Receiver;

21.   **Company Seal**

where the Chargor is a company, to use the Chargor's seal;

22.   **Insolvency**

to rank and claim in the bankruptcy, insolvency, sequestration or liquidation of any person indebted to the Chargor and to receive dividends, and to accede to the trust deeds for the creditors of any such person;

23.   **Payments**

to make any payment which is necessary or incidental to the performance of his or her functions;

24.   **Other Rights**

to do all other acts and things which he or she may consider desirable or necessary for realising any Charged Assets or incidental or conducive to any of the rights, powers or discretions conferred on a Receiver;

to exercise in relation to a Charged Assets all the rights, powers and authorities that he or she could exercise if he or she were the absolute beneficial owner of the Charged Assets;

to do all acts and to execute in the name and on behalf of the Chargor any deed, receipt or other document;

to draw, accept, make or endorse any bill of exchange or promissory note in the name of and on behalf of the Chargor.

## SCHEDULE 2

### CHARGED ASSETS

| Issuer (company name and registered number) | Class | Nominal Value | Number Held by Chargor |
|---|---|---|---|
| **DAE LEASING (IRELAND) 12 LIMITED** a company incorporated under the laws of Ireland with company number 592187 | Ordinary Shares | €1.00 (one euro) | 1 (One) |

28

## SCHEDULE 3

**STOCK
TRANSFER
FORM**

| | |
|---|---|
| (Above this line for Registrars only) | |
| | **Certificate lodged with the registrar** |
| **Consideration Money.........** | **(For completion by the  Registrar/Stock Exchange)** |

| | | |
|---|---|---|
| **Full name of Undertaking** | | |
| **Full description of Security.** | | |
| **Number or amount of Shares, Stock or other security and, in figures column only, number and denomination of units, if any.** | **Words** | **Figures** |
| **Name(s) of registered holder(s) should be given in full; the address should be given where there is only one holder. If the transfer is not made by the registered holder(s) insert also name(s) and capacity (e.g. Executors(s)) of the person(s) making the transfer** | **In the name(s) of** | |

| | |
|---|---|
| **I/We hereby transfer the above security out of the name(s) aforesaid to the person(s) named below (or to the several persons named in parts two of Brokers Transfer Forms relating to the above security:)**<br><br>  **(Delete above words in brackets except for stock exchange transactions)**<br><br>    **Signature(s) of transferor(s)**<br><br>**1.** .........................................................................................................<br><br>**2.** .........................................................................................................<br><br>**3.** .........................................................................................................<br><br>**4** .........................................................................................................<br>     **Bodies corporate should execute under their common seal.** | **Stamp of Selling Broker(s) or, for transactions which are not stock exchange transactions, of Agent(s), if any, acting for the Transferor(s).**<br><br><br><br>**Date  ......** |

| | |
|---|---|
| **Full name(s) and full postal address(es) (including County or, if applicable, Postal District number) of the person(s) to whom the security is transferred.**<br><br>**Please state title, if any, or whether Mr., Mrs. Or Miss**<br><br>    1.    Please complete in type writing  or  in  Block Capitals | |

**I/We request that such entries be made in the register as are necessary to give effect to this transfer.**

29

| Stamp of Buying Broker(s)  (if any) | Stamp or name and address of person lodging this form  (if other than the Buying Broker(s)) |
|---|---|
| | |

(Endorsement for use only in Stock Exchange Transactions)
The security represented by the transfer overleaf has been sold as follows:-

…… …… …… …… …… …… …… …. Shares/Stock        …… …… …… …… …… …… … …… …. Shares/Stock
…… …… …… …… …… …… …… …. Shares/Stock        …… …… …… …… …… …… … …… …. Shares/Stock
…… …… …… …… …… …… …… …. Shares/Stock        …… …… …… …… …… …… … …… …. Shares/Stock
…… …… …… …… …… …… …… …. Shares/Stock        …… …… …… …… …… …… … …… …. Shares/Stock
…… …… …… …… …… …… …… …. Shares/Stock        …… …… …… …… …… …… … …… …. Shares/Stock
…… …… …… …… …… …… …… …. Shares/Stock        …… …… …… …… …… …… … …… …. Shares/Stock
…… …… …… …… …… …… …… …. Shares/Stock        …… …… …… …… …… …… … …… …. Shares/Stock
…… …… …… …… …… …… …… …. Shares/Stock        …… …… …… …… …… …… … …… …. Shares/Stock
…… …… …… …… …… …… …… …. Shares/Stock        …… …… …… …… …… …… … …… …. Shares/Stock
…… …… …… …… …… …… …… …. Shares/Stock        …… …… …… …… …… …… … …… …. Shares/Stock

…… …… …… …… …… …… …… …… …… ….

Balance (if any)due to Selling Broker(s)     _____

Amount of Certificate(s)                             _____
Brokers Transfer Forms for above amounts certified
*Stamp of Certifying Stock Exchange*                     *Stamp of Selling Broker(s).*
    **1.1.1.    FORM OF CERTIFICATE REQUIRED WHERE TRANSFER IS NOT LIABLE TO AD VALOREM STAMP DUTY**

I/We hereby certify that the transaction in respect of which this transfer is made, and under which the fixed Duty of ten punts is payable, falls within the following description:-

|   | (a) | Vesting the property in trustees on the appointment of a new Trustee of a pre-existing Trust, or on the retirement of a Trustee. |
|---|---|---|
| (*) | (b) | A transfer, where no beneficial interest of property passes, (i) to a mere nominee of the Transferor, (ii) from a mere nominee of the Transferee, (iii) from one nominee to another nominee of the same beneficial owner. |
| (*) | (c) | A transfer by way of security for a loan; or re-transfer to the original Transferor on repayment of a loan. |
|   | (d) | A transfer to a residuary legatee of Shares, etc., which forms part of the residue divisible under a Will. |
|   | (e) | A transfer to a beneficiary under a Will of a *specific legacy* of Shares, etc. |
|   | (f) | A transfer of Shares, etc., being the property of a person dying intestate, to the person or persons entitled thereto. |
|   | (g) | A transfer to a beneficiary under a settlement on distribution of the trust funds, of Shares, etc., forming the Share, or part of the share of those funds to which the beneficiary is entitled in accordance with the terms of the settlement. |
|   | (h) | A transfer on the occasion of a marriage to trustees of shares, etc., to be held on the terms of a settlement made in consideration of marriage. |
|   | (i) | A transfer by the liquidator of a Company of Shares. Etc., forming part of the assets of the Company, to which the Transferee is entitled in satisfaction or part satisfaction of his rights as a Shareholder of the Company. |

Here set out concise-
ly the facts, explain-
ing the transaction in   …… …… …… …… …… …… …… …… …… …… …… …… …… …… …… …… ……
cases falling with in    …… …… …… …… …… …… …… …… …… …… …… …… …… …… …… …… ……
(b) and (c) or in any    …… …… …… …… …… …… …… …… …… …… …… …… …… …… …… …… ……
case which does not     …… …… …… …… …… …… …… …… …… …… …… …… …… …… …… …… ……
clearly fall within any   …… …… …… …… …… …… …… …… …… …… …… …… …… …… …… …… ……
one of the clauses (a)  to…… …… …… …… …… …… …… …… …… …… …… …… …… …… …… …… ……
to (g). Adjudication    Date…… …… …… …… …… …… …… …… ……20…… …… …… …… …… ……
in any case may be
required

                  …… …… …… …… …… …… …… ….        …… …… …… …… …… …… …… …
                  …… …… …… …… …… …… ….        …… …… …… …… …… …… …… …
                  …… …… …… …… …… …… …        *Signature*…… …… …… …… …… …
                                                    *Description*…… …… …… …… …… ……

* Note:- The above Certificate must be signed in the case of (b) and (c), either by (1) all the transferors and the transferees, or (2) a member of a Stock Exchange or a Solicitor acting for one or other of the parties, or (3) an accredited representative of a Bank. Where the Bank or its official nominee is a party to the transfer, the Certificate may be to the effect that "the transfer is expected from Section 74 of the Finance (1909-10) Act, 1910". The above Certificate in other cases should be signed by a solicitor or other person (e.g., a Bank acting as Trustee or Executor) having full knowledge of the facts.

30

**SCHEDULE 4**
**Part I**
**Dividend Payment Mandate**

To:    The Secretary
       DAE LEASING (IRELAND) 21 LIMITED (the "**Company**")
       29 Main Street,
       Cashel,
       Co. Tipperary,
       E25 RF76
       Ireland

Dated: _____

Dear Sirs,

With effect from the date above and pending receipt by you of instructions from Crédit Agricole Corporate and Investment Bank (together with its successors, assignees and transferees the "**Security Trustee**"), to the contrary we, JLPS Holding Ireland Limited, as Chargor, hereby authorise and direct you to pay any dividends, interest or other monies paid or payable on all of the shares in the Company which are registered in our name, to or to the order of the Security Trustee.

On receipt of this mandate please acknowledge to the Security Trustee that you will act in accordance with the instructions contained herein.  This request is irrevocable.

Signed by:

_____
For and on behalf of
JLPS Holding Ireland Limited

31

**Part II**
**Irrevocable Voting Proxy**

Dated: _____

We, JLPS Holding Ireland Limited (as Chargor), being a member of DAE Leasing (Ireland) 12 Limited (a company registered in Ireland having company number 592187) (the "**Company**") hereby irrevocably appoint, Crédit Agricole Corporate and Investment Bank (together with its successors, assignees and transferees the "**Security Trustee**") as our proxy to vote for us and on our behalf at meetings of the shareholders of the Company, in respect of any existing or future shares in the Company which may have been or may from time to time be issued to us and/or registered in our name.

This proxy is irrevocable by reason of being coupled with the interest of the Security Trustee as chargee of the aforesaid shares in the Company.

The person appointed as proxy is authorised to vote as that person thinks fit.

Signed by:


_____
For and on behalf of
JLPS Holding Ireland Limited

### Part III

### Shareholder's Letter of Authority

**To:**    Crédit Agricole Corporate and Investment Bank, in its capacity as trustee for and on behalf of itself, the Senior Agent, the Junior Agent, the Hedging Counterparty and the Lenders for the purposes only of holding certain security under the Transaction Documents (the "**Security Agent**")

Dear Sirs,

I hereby unconditionally and irrevocably authorise you to date the stock transfer form delivered by me to you under the share charge dated _____ 2018 between the Security Trustee and JLPS Holding Ireland Limited in respect of shares held in the capital of DAE Leasing (Ireland) 12 Limited (the "**Share Charge**") as and when you become entitled to date such letter under the terms of the Share Charge.

**SIGNED AND DELIVERED** as a deed
for and on behalf of **JLPS HOLDING IRELAND LIMITED**
by its lawfully appointed attorney
**[•]**
in the presence of:

_____
Signature
Name: [•]
Title:  Attorney

_____
Witness (Signature)

_____
Print Name

_____
Print Address

_____
Witness Occupation

33

**Part VI**
**Director's/Secretary's Letter of Resignation**

Date: [●]

The Board of Directors

**DAE LEASING (IRELAND) 12 LIMITED** (the **Company**)
29 Main Street,
Cashel,
Co. Tipperary,
E25 RF76
Ireland

Dear Sirs,

**Resignation of Director/Secretary**

I hereby resign as director/secretary of the Company and confirm that I have no claims against the Company for loss of office, arrears of pay or otherwise howsoever.

This resignation is to be effective as at the date specified above. You are hereby authorised to complete this letter by dating the same at any time after you are notified by Crédit Agricole Corporate and Investment Bank, in its capacity as trustee for and on behalf of itself, the Senior Agent, the Junior Agent, the Hedging Counterparty and the Lenders for the purposes only of holding certain security under the Transaction Documents (the "**Security Agent**") that an Enforcement Event as defined in the share charge dated [•] December 2017 between the Security Agent and JLPS Holding Ireland Limited in respect of shares held in the capital of the Company (the "**Share Charge**") has occurred.

SIGNED AND DELIVERED AS A DEED
BY [NAME OF INDIVIDUAL]
IN THE PRESENCE OF:

_____
DIRECTOR/SECRETARY

SIGNATURE OF WITNESS:

NAME OF WITNESS:

ADDRESS OF WITNESS:
OCCUPATION OF WITNESS:

34

**Part V**
**Director's/Secretary's Letter of Authority**

**To:**   Crédit Agricole Corporate and Investment Bank, in its capacity as trustee for and on behalf of itself, the Senior Agent, the Junior Agent, the Hedging Counterparty and the Lenders for the purposes only of holding certain security under the Transaction Documents (the "**Security Agent**")

Dear Sirs,

I hereby unconditionally and irrevocably authorise you to date the letter of resignation delivered by me to you under the share charge dated [•] 2018 between the Security Agent and JLPS Holding Ireland Limited in respect of shares held in the capital of DAE Leasing (Ireland) 21 Limited (the "**Share Charge**") as and when you become entitled to date such letter under the terms of the Share Charge.


SIGNED AND DELIVERED AS A DEED
BY [NAME OF INDIVIDUAL]
IN THE PRESENCE OF:

_____
DIRECTOR/SECRETARY


SIGNATURE OF WITNESS:

NAME OF WITNESS:

ADDRESS OF WITNESS:
OCCUPATION OF WITNESS:

**EXECUTION PAGE**

**SHARE CHARGE**

**EXECUTED AS A DEED BY**
**JLPS HOLDING IRELAND LIMITED**
acting by:
in the presence of:

Name of witness:

Signature:

Name:        CLARKE MC DERMOTT

Occupation:   LAWYER


**EXECUTED AS A DEED BY**
**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**
**(as Security Agent)**

acting by:
in the presence of:
Name of witness:

Signature:        _____

Name:        _____

Occupation:        _____

**EXECUTION PAGE**

**SHARE CHARGE**

**EXECUTED AS A DEED BY**
**JLPS HOLDING IRELAND LIMITED**
acting by:
in the presence of:

Name of witness:

Signature:        _____

Name:             _____

Occupation:       _____


**EXECUTED AS A DEED BY**
**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**
**(as Security Agent)**

acting by:
in the presence of:
Name of witness:

Signature:        _____

Name:             Cecilia PETEUIL
                  _____

Occupation:       VICE PRESIDENT
                  _____

Amaury DE RIVAZ

VICE PRESIDENT

Bertrand ROVETTO

DIRECTOR

**Exhibit 5**

**Director's Letter of Resignation**

Date: 24 January 2022 at 10:02 GMT

The Board of Directors
**PAAL URANUS COMPANY LIMITED** (the **Company**)
29 Main Street,
Cashel,
Co Tipperary,
E25 RF76,
Ireland.

Dear Sirs,

**Resignation of Director**

I hereby resign as director of the Company and confirm that I have no claims against the Company for loss of office, arrears of pay or otherwise howsoever.

This resignation is to be effective as at the date specified above. You are hereby authorised to complete this letter by dating the same at any time after you are notified by Crédit Agricole Corporate and Investment Bank, in its capacity as trustee for and on behalf of itself, the Senior Agent, the Junior Agent, the Hedging Counterparty and the Lenders for the purposes only of holding certain security under the Transaction Documents (the "**Security Agent**") that an Enforcement Event as defined in the share charge dated 29 December 2017 between the Security Agent and JLPS Holding Ireland Limited in respect of shares held in the capital of the Company (the "**Share Charge**") has occurred.

SIGNED AND DELIVERED AS A DEED
BY **NIALL MCNAMARA**
IN THE PRESENCE OF:

_____
DIRECTOR

SIGNATURE OF WITNESS:

NAME OF WITNESS: FRANK DOWLING

ADDRESS OF WITNESS: THE COMMONS, CASHEL, CO. TIPPERARY

OCCUPATION OF WITNESS: DIRECTOR

**Exhibit 6**

**Director's Letter of Resignation**

Date: 24 January 2022 at 10:03 GMT

The Board of Directors
**DAE Leasing (Ireland) 12 Limited** (the **Company**)
29 Main Street,
Cashel,
Co Tipperary,
E25 RF76,
Ireland.

Dear Sirs,

**Resignation of Director**

I hereby resign as director of the Company and confirm that I have no claims against the Company for loss of office, arrears of pay or otherwise howsoever.

This resignation is to be effective as at the date specified above. You are hereby authorised to complete this letter by dating the same at any time after you are notified by Crédit Agricole Corporate and Investment Bank, in its capacity as trustee for and on behalf of itself, the Senior Agent, the Junior Agent, the Hedging Counterparty and the Lenders for the purposes only of holding certain security under the Transaction Documents (the "**Security Agent**") that an Enforcement Event as defined in the share charge dated 21st November 2018 between the Security Agent and JLPS Holding Ireland Limited in respect of shares held in the capital of the Company (the "**Share Charge**") has occurred.

SIGNED AND DELIVERED AS A DEED
BY NIALL MCNAMARA
IN THE PRESENCE OF:

_____
DIRECTOR

SIGNATURE OF WITNESS: Darren Reidy

NAME OF WITNESS: DARREN REIDY

ADDRESS OF WITNESS: Woodlock Grove Dundrum Co. Tipperary

OCCUPATION OF WITNESS: Intern

**Exhibit 7**

### Director's Letter of Resignation

Date: _24 January 2022 at 10:04 GMT_

The Board of Directors
**PAAL URANUS COMPANY LIMITED** (the **Company**)
29 Main Street,
Cashel,
Co Tipperary,
E25 RF76,
Ireland.

Dear Sirs,

**Resignation of Director**

I hereby resign as director of the Company and confirm that I have no claims against the Company for loss of office, arrears of pay or otherwise howsoever.

This resignation is to be effective as at the date specified above. You are hereby authorised to complete this letter by dating the same at any time after you are notified by Crédit Agricole Corporate and Investment Bank, in its capacity as trustee for and on behalf of itself, the Senior Agent, the Junior Agent, the Hedging Counterparty and the Lenders for the purposes only of holding certain security under the Transaction Documents (the "**Security Agent**") that an Enforcement Event as defined in the share charge dated _29_ December 2017 between the Security Agent and JLPS Holding Ireland Limited in respect of shares held in the capital of the Company (the "**Share Charge**") has occurred.

SIGNED AND DELIVERED AS A DEED
BY **TEIJI ISHIKAWA**
IN THE PRESENCE OF:

_____
DIRECTOR

SIGNATURE OF WITNESS:

NAME OF WITNESS:    _TOYOOMI  SHIMAMURA_

ADDRESS OF WITNESS:    _4-6-12 Sengoku, Bunkyo-ku, Tokyo_

OCCUPATION OF WITNESS: _Director, JP Lease Products & Services Co. Ltd._

**Exhibit 8**

**Director's Letter of Resignation**

Date: 24 January 2022 at 10:00 GMT

The Board of Directors
**DAE Leasing (Ireland) 12 Limited** (the **Company**)
29 Main Street,
Cashel,
Co Tipperary,
E25 RF76,
Ireland.

Dear Sirs,

**Resignation of Director**

I hereby resign as director of the Company and confirm that I have no claims against the Company for loss of office, arrears of pay or otherwise howsoever.

This resignation is to be effective as at the date specified above. You are hereby authorised to complete this letter by dating the same at any time after you are notified by Crédit Agricole Corporate and Investment Bank, in its capacity as trustee for and on behalf of itself, the Senior Agent, the Junior Agent, the Hedging Counterparty and the Lenders for the purposes only of holding certain security under the Transaction Documents (the "**Security Agent**") that an Enforcement Event as defined in the share charge dated 21st November 2018 between the Security Agent and JLPS Holding Ireland Limited in respect of shares held in the capital of the Company (the "**Share Charge**") has occurred.

SIGNED AND DELIVERED AS A DEED
BY TEIJI ISHIKAWA
IN THE PRESENCE OF:

_____
DIRECTOR

Teiji Ishikawa

SIGNATURE OF WITNESS: _____

NAME OF WITNESS: TAKESHI SHIRAI

ADDRESS OF WITNESS: Room No 224 4-4-32 Komaba Meguroku Tokyo JAPAN

OCCUPATION OF WITNESS: Senior Director

**Exhibit 9**

Company No. 598249

## THE COMPANIES ACT, 2014

## PRIVATE COMPANY LIMITED BY SHARES

## DETAILS OF DECISION

### of

### SOLE MEMBER

### of

### JLPS LEASING URANUS LIMITED

### ("THE COMPANY")

Without prejudice to the notice and resolution made on 29 January 2022 appointing Derek O'Reilly as director:

Pursuant to Clause 34.1 of the Company's Constitution, we, **FitzWalter Capital Partners (Financial Trading) Limited** being the Sole Member of the Company, hereby give notice that we made the following Decision (being a decision within the meaning of Section 196 of the Companies Act, 2014 that may be taken by the Company in general meeting and that has effect as if agreed by the Company in general meeting) on 9 February 2022:

### <u>Decision</u>

**THAT** Derek O'Reilly, having consented to act, be appointed as a director of the Company with immediate effect.

.....................................................

Signed by __Benjamin Brazil_____, director of
**FitzWalter Capital Partners (Financial Trading) Limited**
(Sole member of the Company following the exercise of its powers as Security Agent for and on behalf of the lenders)

DATED: 9 February 2022

**WRITTEN RESOLUTION OF THE SOLE MEMBER**

**OF**

**JLPS LEASING URANUS LIMITED**

**Company No: 598249**

(the **Company**)

We, the undersigned, being the sole member of the Company for the time being entitled to attend and vote on the resolutions at general meetings of the Company, **HEREBY RESOLVE** to approve of and pass the following resolution as a special resolution of the Company:

"**THAT** Derek O'Reilly, having consented to act, be appointed director of the Company with immediate effect."

**SIGNED** by the following, being the sole member of the Company for the time being entitled to attend and vote on the resolutions at general meetings of the Company (or being a body corporate by its duly authorised representatives).

…………………………………………
Signed by  Benjamin Brazil                      , director of
**FitzWalter Capital Partners (Financial Trading) Limited,**
(Sole member of the Company following the exercise of its powers as Security Agent for and on behalf of the lenders)

Dated: 9 February 2022 at  5:46  pm

**<u>Exhibit 10</u>**

Company No. 592187

## THE COMPANIES ACT, 2014

## PRIVATE COMPANY LIMITED BY SHARES

## DETAILS OF DECISION

### of

## SOLE MEMBER

### of

## JLPS LEASING DRACO LIMITED

## ("THE COMPANY")

Pursuant to Clause 34.1 of the Company's Constitution, we, JLPS Ireland Limited acting through its mortgagee in possession, **FitzWalter Capital Partners (Financial Trading) Limited** (together with the benefit of an irrevocable voting proxy) being the Sole Member of the Company, hereby give notice that we made the following Decision (being a decision within the meaning of Section 196 of the Companies Act, 2014 that may be taken by the Company in general meeting and that has effect as if agreed by the Company in general meeting) on 30 January 2022:

<u>Decision</u>

**THAT** Derek O'Reilly, having consented to act, be appointed as a director of the Company with immediate effect.

………………………………………………..

Signed by Ben Brazil, director of
**FitzWalter Capital Partners (Financial Trading) Limited**,
In its capacity as Mortgagee in Possession authorised
for and on behalf of **JLPS Ireland Limited** and
with the benefit of an irrevocable voting proxy

DATED: 30 January 2022

**WRITTEN RESOLUTIONS OF THE MEMBER**

**OF**

**JLPS LEASING DRACO LIMITED**

**Company No: 592187**

(the **Company**)

We, the undersigned, being the sole member of the Company for the time being entitled to attend and vote on the resolutions at general meetings of the Company, **HEREBY RESOLVE** to approve of and pass the following resolution as a special resolution of the Company:

> "**THAT** Derek O'Reilly, having consented to act, be appointed director of the Company with immediate effect."

**SIGNED** by the following, being the sole member of the Company for the time being entitled to attend and vote on the resolutions at general meetings of the Company (or being a body corporate by its duly authorised representatives).

………………………………………………
Signed by Ben Brazil, director of
**FitzWalter Capital Partners (Financial Trading) Limited,**
In its capacity as Mortgagee in Possession authorised
for and on behalf of **JLPS Ireland Limited** and
with the benefit of an irrevocable voting proxy

Dated: 30 January 2022 at  1:30  pm

**<u>Exhibit 11</u>**

**Director's Letter of Authority**

**To:**    Crédit Agricole Corporate and Investment Bank, in its capacity as trustee for and on
behalf of itself, the Senior Agent, the Junior Agent, the Hedging Counterparty and the
Lenders for the purposes only of holding certain security under the Transaction
Documents (the "**Security Agent**")

Dear Sirs,

I hereby unconditionally and irrevocably authorise you to date the letter of resignation
delivered by me to you under the share charge dated _24_ December 2017 between the
Security Agent and JLPS Holding Ireland Limited in respect of shares held in the capital of
PAAL Uranus Company Limited (the "**Share Charge**") as and when you become entitled to
date such letter under the terms of the Share Charge.


SIGNED AND DELIVERED AS A DEED
BY **THOMAS FRANCIS DOWLING**
IN THE PRESENCE OF:

DIRECTOR

SIGNATURE OF WITNESS: Faye Dowling

NAME OF WITNESS: FAYE DOWLING

ADDRESS OF WITNESS: The Commons, Cashel, Co. Tipperary

OCCUPATION OF WITNESS: Student

**Director's Letter of Resignation**

Date: 30 January 2022 @ 3.14pm

The Board of Directors
**PAAL URANUS COMPANY LIMITED** (the **Company**)
29 Main Street,
Cashel,
Co Tipperary,
E25 RF76,
Ireland.

Dear Sirs,

**Resignation of Director**

I hereby resign as director of the Company and confirm that I have no claims against the Company for loss of office, arrears of pay or otherwise howsoever.

This resignation is to be effective as at the date specified above. You are hereby authorised to complete this letter by dating the same at any time after you are notified by Crédit Agricole Corporate and Investment Bank, in its capacity as trustee for and on behalf of itself, the Senior Agent, the Junior Agent, the Hedging Counterparty and the Lenders for the purposes only of holding certain security under the Transaction Documents (the "**Security Agent**") that an Enforcement Event as defined in the share charge dated 29 December 2017 between the Security Agent and JLPS Holding Ireland Limited in respect of shares held in the capital of the Company (the "**Share Charge**") has occurred.

SIGNED AND DELIVERED AS A DEED
BY **THOMAS FRANCIS DOWLING**
IN THE PRESENCE OF:

_____
DIRECTOR

SIGNATURE OF WITNESS: _Niall Mc Namara_

NAME OF WITNESS: _NIALL MC NAMARA_

ADDRESS OF WITNESS: _The Lookout, Portroe, Nenagh, Co. Tipperary._

OCCUPATION OF WITNESS: _CHARTERED ACCOUNTANT._

**Exhibit 12**

### Director's Letter of Authority

**To:**    Crédit Agricole Corporate and Investment Bank, in its capacity as trustee for and on
behalf of itself, the Senior Agent, the Junior Agent, the Hedging Counterparty and the
Lenders for the purposes only of holding certain security under the Transaction
Documents (the "**Security Agent**")

Dear Sirs,

I hereby unconditionally and irrevocably authorise you to date the letter of resignation
delivered by me to you under the share charge dated 21ˢᵗ November 2018 between the
Security Agent and JLPS Holding Ireland Limited in respect of shares held in the capital of
DAE Leasing (Ireland) 12 Limited (the "**Share Charge**") as and when you become entitled to
date such letter under the terms of the Share Charge.

SIGNED AND DELIVERED AS A DEED
BY THOMAS FRANCIS DOWLING
IN THE PRESENCE OF:

_____
DIRECTOR

SIGNATURE OF WITNESS: Darren Reidy

NAME OF WITNESS: DARREN REIDY

ADDRESS OF WITNESS: Woodcock Grove Dundrum Co. Tipperary

OCCUPATION OF WITNESS: Intern

**Director's Letter of Resignation**

Date: 30 January 2022 @ 3.15pm

The Board of Directors
**DAE Leasing (Ireland) 12 Limited** (the **Company**)
29 Main Street,
Cashel,
Co Tipperary,
E25 RF76,
Ireland.

Dear Sirs,

**Resignation of Director**

I hereby resign as director of the Company and confirm that I have no claims against the Company for loss of office, arrears of pay or otherwise howsoever.

This resignation is to be effective as at the date specified above.  You are hereby authorised to complete this letter by dating the same at any time after you are notified by Crédit Agricole Corporate and Investment Bank, in its capacity as trustee for and on behalf of itself, the Senior Agent, the Junior Agent, the Hedging Counterparty and the Lenders for the purposes only of holding certain security under the Transaction Documents (the "**Security Agent**") that an Enforcement Event as defined in the share charge dated 21st November 2018 between the Security Agent and JLPS Holding Ireland Limited in respect of shares held in the capital of the Company (the "**Share Charge**") has occurred.


SIGNED AND DELIVERED AS A DEED
BY THOMAS FRANCIS DOWLING
IN THE PRESENCE OF:

**DIRECTOR**

SIGNATURE OF WITNESS: Darren Reidy

NAME OF WITNESS: DARREN REIDY

ADDRESS OF WITNESS: Woodcock Grove Dundrum Co Tipperary

OCCUPATION OF WITNESS: Intern

**Exhibit 13**

Company No. 598249

**THE COMPANIES ACT, 2014**

**PRIVATE COMPANY LIMITED BY SHARES**

**DETAILS OF DECISION**

**of**

**SOLE MEMBER**

**of**

**JLPS LEASING URANUS LIMITED**

**("THE COMPANY")**

Without prejudice to the notice and resolution made on 29 January 2022 appointing Derek O'Reilly as director:

Pursuant to Clause 34.1 of the Company's Constitution, we, **FitzWalter Capital Partners (Financial Trading) Limited** being the Sole Member of the Company, hereby give notice that we made the following Decision (being a decision within the meaning of Section 196 of the Companies Act, 2014 that may be taken by the Company in general meeting and that has effect as if agreed by the Company in general meeting) on 9 February 2022:

<u>**Decision**</u>

**THAT** Derek O'Reilly, having consented to act, be appointed as a director of the Company with immediate effect.

…………………………………………..

Signed by __Benjamin Brazil_____, director of
**FitzWalter Capital Partners (Financial Trading) Limited**
(Sole member of the Company following the exercise of its powers as Security Agent for and on behalf of the lenders)

DATED: 9 February 2022

**WRITTEN RESOLUTION OF THE SOLE MEMBER**

**OF**

**JLPS LEASING URANUS LIMITED**

**Company No: 598249**

(the **Company**)

We, the undersigned, being the sole member of the Company for the time being entitled to attend and vote on the resolutions at general meetings of the Company, **HEREBY RESOLVE** to approve of and pass the following resolution as a special resolution of the Company:

"**THAT** Derek O'Reilly, having consented to act, be appointed director of the Company with immediate effect."

**SIGNED** by the following, being the sole member of the Company for the time being entitled to attend and vote on the resolutions at general meetings of the Company (or being a body corporate by its duly authorised representatives).


…………………………………………
Signed by  Benjamin Brazil_____, director of
**FitzWalter Capital Partners (Financial Trading) Limited,**
(Sole member of the Company following the exercise of its powers as Security Agent for and on behalf of the lenders)

Dated: 9 February 2022 at  5:46  pm

**<u>Exhibit 14</u>**

Company No. 592187

**THE COMPANIES ACT, 2014**

**PRIVATE COMPANY LIMITED BY SHARES**

**DETAILS OF DECISION**

**of**

**SOLE MEMBER**

**of**

**JLPS LEASING DRACO LIMITED**

**("THE COMPANY")**

Without prejudice to the notice and resolution made on 29 January 2022 appointing Derek O'Reilly as director:

Pursuant to Clause 34.1 of the Company's Constitution, we, **FitzWalter Capital Partners (Financial Trading) Limited** being the Sole Member of the Company, hereby give notice that we made the following Decision (being a decision within the meaning of Section 196 of the Companies Act, 2014 that may be taken by the Company in general meeting and that has effect as if agreed by the Company in general meeting) on 9 February 2022:

**<u>Decision</u>**

**THAT** Derek O'Reilly, having consented to act, be appointed as a director of the Company with immediate effect.

*[signature]* …………………………………..

Signed by <u>Benjamin Brazil</u>, director of
**FitzWalter Capital Partners (Financial Trading) Limited**
(Sole member of the Company following the exercise of its powers as Security Agent for and on behalf of the lenders)

DATED: 9 February 2022

**WRITTEN RESOLUTIONS OF THE MEMBER**

**OF**

**JLPS LEASING DRACO LIMITED**

**Company No: 592187**

(the **Company**)

We, the undersigned, being the sole member of the Company for the time being entitled to attend and vote on the resolutions at general meetings of the Company, **HEREBY RESOLVE** to approve of and pass the following resolution as a special resolution of the Company:

"**THAT** Derek O'Reilly, having consented to act, be appointed director of the Company with immediate effect."

**SIGNED** by the following, being the sole member of the Company for the time being entitled to attend and vote on the resolutions at general meetings of the Company (or being a body corporate by its duly authorised representatives).

…………………………………………

Signed by Benjamin Brazil_____, director of
**FitzWalter Capital Partners (Financial Trading) Limited,**
(Sole member of the Company following the exercise of its powers as Security Agent for and on behalf of the lenders)

Dated: 9 February 2022 at  5:45 pm

**Exhibit 15**

STOCK
TRANSFER
FORM

| (Above this line for Registrars only) | |
|---|---|
| **Consideration Money**........€1.00 | **Certificate lodged with the registrar**<br><br>**(For completion by the Registrar/Stock Exchange)** |
| **Full name of Undertaking** | PAAL Uranus Company Limited |
| **Full description of Security.** | Ordinary share of €1.00 each |
| **Number or amount of Shares, Stock or other security and, in figures column only, number and denomination of units, if any.** | **Words**<br>One share of €1.00 each | **Figures**<br>1 unit of €1.00 each |
| **Name(s) of registered holder(s) should be given in full; the address should be given where there is only one holder. If the transfer is not made by the registered holder(s) insert also name(s) and capacity (e.g. Executors(s)) of the person(s) making the transfer** | **In the name(s) of**<br><br>JLPS Holding Ireland Limited<br>29 Main Street<br>Cashel<br>Co. Tipperary<br>Ireland | |

| I/We hereby transfer the above security out of the name(s) aforesaid to the person(s) named below (or to the several persons named in parts two of Brokers Transfer Forms relating to the above security:)<br><br>**(Delete above words in brackets except for stock exchange transactions)**<br><br>Signature(s) of transferor(s)<br><br>1. ........................................<br><br>2. *Niall Mc Namara*<br><br>3. ........................................<br><br>4 ........................................<br>Bodies corporate should execute under their common seal. | Stamp of Selling Broker(s) or, for transactions which are not stock exchange transactions, of Agent(s), if any, acting for the Transferor(s).<br><br><br>Date ..... 9 February 2022 |
|---|---|

| **Full name(s) and full postal address(es) (including County or, if applicable, Postal District number) of the person(s) to whom the security is transferred.**<br><br>**Please state title, if any, or whether Mr., Mrs. Or Miss**<br><br>1.  Please complete in type writing or in Block Capitals | FITZWALTER CAPITAL PARTNERS (FINANCIAL TRADING) LIMITED (AS SECURITY AGENT ACTING ON BEHALF OF MAJORITY SENIOR SECURED PARTIES) 21 BRUTON STREET FIRST FLOOR LONDON W1J 6DQ U.K. |
|---|---|

| I/We request that such entries be made in the register as are necessary to give effect to this transfer. | |
|---|---|
| **Stamp of Buying Broker(s)  (if any)** | **Stamp or name and address of person lodging this form  (if other than the Buying Broker(s))** |

(Endorsement for use only in Stock Exchange Transactions)

The security represented by the transfer overleaf has been sold as follows:-

| .................................... Shares/Stock | .................................... Shares/Stock |
| .................................... Shares/Stock | .................................... Shares/Stock |
| .................................... Shares/Stock | .................................... Shares/Stock |
| .................................... Shares/Stock | .................................... Shares/Stock |
| .................................... Shares/Stock | .................................... Shares/Stock |
| .................................... Shares/Stock | .................................... Shares/Stock |
| .................................... Shares/Stock | .................................... Shares/Stock |
| .................................... Shares/Stock | .................................... Shares/Stock |
| .................................... Shares/Stock | .................................... Shares/Stock |
| .................................... Shares/Stock | .................................... Shares/Stock |

.............................................

Balance (if any)due to Selling Broker(s)     _____

Amount of Certificate(s)                      _____
Brokers Transfer Forms for above amounts certified
*Stamp of Certifying Stock Exchange*          *Stamp of Selling Broker(s).*

1.1.1.   **FORM OF CERTIFICATE REQUIRED WHERE TRANSFER IS NOT LIABLE TO AD VALOREM STAMP DUTY**

I/We hereby certify that the transaction in respect of which this transfer is made, and under which the fixed Duty of ten punts is payable, falls within the following description:-

(a)   Vesting the property in trustees on the appointment of a new Trustee of a pre-existing Trust, or on the retirement of a Trustee.

(*)  (b)   A transfer, where no beneficial interest of property passes, (i) to a mere nominee of the Transferor, (ii) from a mere nominee of the Transferee, (iii) from one nominee to another nominee of the same beneficial owner.

(*)  (c)   A transfer by way of security for a loan; or re-transfer to the original Transferor on repayment of a loan.

(d)   A transfer to a residuary legatee of Shares, etc., which forms part of the residue divisible under a Will.

(e)   A transfer to a beneficiary under a Will of a *specific legacy* of Shares, etc.

(f)   A transfer of Shares, etc., being the property of a person dying intestate, to the person or persons entitled thereto.

(g)   A transfer to a beneficiary under a settlement on distribution of the trust funds, of Shares, etc., forming the Share, or part of the share of those funds to which the beneficiary is entitled in accordance with the terms of the settlement.

(h)   A transfer on the occasion of a marriage to trustees of shares, etc., to be held on the terms of a settlement made in consideration of marriage.

(i)   A transfer by the liquidator of a Company of Shares. Etc., forming part of the assets of the Company, to which the Transferee is entitled in satisfaction or part satisfaction of his rights as a Shareholder of the Company.

Here set out concise-
ly the facts, explain-
ing the transaction in        .................................................................................................................
cases falling with in    .................................................................................................................
(b) and (c) or in any    .................................................................................................................
case which does not      .................................................................................................................
clearly fall within any  .................................................................................................................
one of the clauses (a)   to.................................................................................................................
to (g). Adjudication    Date.................................20.................................................................
in any case may be
required

| .................................... | .................................... |
| .................................... | .................................... |
| .................................... | .................................... |
|                                     | *Signature*............................ |
|                                     | *Description*.......................... |

* Note:- The above Certificate must be signed in the case of (b) and (c), either by (1) all the transferors and the transferees, or (2) a member of a Stock Exchange or a Solicitor acting for one or other of the parties, or (3) an accredited representative of a Bank. Where the Bank or its official nominee is a party to the transfer, the Certificate may be to the effect that "the transfer is expected from Section 74 of the Finance (1909-10) Act, 1910". The above Certificate in other cases should be signed by a solicitor or other person (e.g., a Bank acting as Trustee or Executor) having full knowledge of the facts.

**Exhibit 16**

STOCK
TRANSFER
FORM

| (Above this line for Registrars only) | |
|---|---|
| Consideration Money....€1.00 | **Certificate lodged with the registrar**<br><br>(For completion by the Registrar/Stock Exchange) |

| Full name of Undertaking | DAE Leasing (Ireland) 12 Limited |
|---|---|
| Full description of Security. | Ordinary Shares |

| Number or amount of Shares, Stock or other security and, in figures column only, number and denomination of units, if any. | **Words**<br>One ordinary share of €1.00 each | **Figures**<br>1 Unit of €1.00 |
|---|---|---|

| Name(s) of registered holder(s) should be given in full; the address should be given where there is only one holder. If the transfer is not made by the registered holder(s) insert also name(s) and capacity (e.g. Executors(s)) of the person(s) making the transfer | In the name(s) of<br><br>JLPS Holding Ireland Limited<br>29 Main Street,<br>Cashel,<br>Co. Tipperary,<br>Ireland |
|---|---|

I/We hereby transfer the above security out of the name(s) aforesaid to the person(s) named below (or to the several persons named in parts two of Brokers Transfer Forms relating to the above security:)

**(Delete above words in brackets except for stock exchange transactions)**

Signature(s) of transferor(s)

1. ................................................

2. ................................................

3. ................................................

4. ................................................
Bodies corporate should execute under their common seal.

Stamp of Selling Broker(s) or, for transactions which are not stock exchange transactions, of Agent(s), if any, acting for the Transferor(s).

Date ......

9 February 2022

| Full name(s) and full postal address(es) (including County or, if applicable, Postal District number) of the person(s) to whom the security is transferred.<br><br>Please state title, if any, or whether Mr., Mrs. Or Miss<br><br>1. Please complete in type writing or in Block Capitals | FITZWALTER CAPITAL PARTNERS (FINANCIAL TRADING) LIMITED (AS SECURITY AGENT ACTING ON BEHALF OF MAJORITY SENIOR SECURED PARTIES)<br>21 BRUTON STREET<br>FIRST FLOOR<br>LONDON<br>W1J 6DQ<br>U.K. |
|---|---|

I/We request that such entries be made in the register as are necessary to give effect to this transfer.

| Stamp of Buying Broker(s)  (if any) | Stamp or name and address of person lodging this form  (if other than the Buying Broker(s)) |
|---|---|

(Endorsement for use only in Stock Exchange Transactions)
The security represented by the transfer overleaf has been sold as follows:-

| .................................... Shares/Stock | .................................... Shares/Stock |
|---|---|
| .................................... Shares/Stock | .................................... Shares/Stock |
| .................................... Shares/Stock | .................................... Shares/Stock |
| .................................... Shares/Stock | .................................... Shares/Stock |
| .................................... Shares/Stock | .................................... Shares/Stock |
| .................................... Shares/Stock | .................................... Shares/Stock |
| .................................... Shares/Stock | .................................... Shares/Stock |
| .................................... Shares/Stock | .................................... Shares/Stock |
| .................................... Shares/Stock | .................................... Shares/Stock |
| .................................... Shares/Stock | .................................... Shares/Stock |

Balance (if any)due to Selling Broker(s)    _____

Amount of Certificate(s)    _____

Brokers Transfer Forms for above amounts certified

*Stamp of Certifying Stock Exchange*          *Stamp of Selling Broker(s).*

1.1.1.    **FORM OF CERTIFICATE REQUIRED WHERE TRANSFER IS NOT LIABLE TO AD VALOREM STAMP DUTY**

I/We hereby certify that the transaction in respect of which this transfer is made, and under which the fixed Duty of ten punts is payable, falls within the following description:-

|   |   |   |
|---|---|---|
|   | (a) | Vesting the property in trustees on the appointment of a new Trustee of a pre-existing Trust, or on the retirement of a Trustee. |
| (*) | (b) | A transfer, where no beneficial interest of property passes, (i) to a mere nominee of the Transferor, (ii) from a mere nominee of the Transferee, (iii) from one nominee to another nominee of the same beneficial owner. |
| (*) | (c) | A transfer by way of security for a loan; or re-transfer to the original Transferor on repayment of a loan. |
|   | (d) | A transfer to a residuary legatee of Shares, etc., which forms part of the residue divisible under a Will. |
|   | (e) | A transfer to a beneficiary under a Will of a *specific legacy* of Shares, etc. |
|   | (f) | A transfer of Shares, etc., being the property of a person dying intestate, to the person or persons entitled thereto. |
|   | (g) | A transfer to a beneficiary under a settlement on distribution of the trust funds, of Shares, etc., forming the Share, or part of the share of those funds to which the beneficiary is entitled in accordance with the terms of the settlement. |
|   | (h) | A transfer on the occasion of a marriage to trustees of shares, etc., to be held on the terms of a settlement made in consideration of marriage. |
|   | (i) | A transfer by the liquidator of a Company of Shares. Etc., forming part of the assets of the Company, to which the Transferee is entitled in satisfaction or part satisfaction of his rights as a Shareholder of the Company. |

Here set out concise-
ly the facts, explain-
ing the transaction in
cases falling with in   ...........................................................................................................................
(b) and (c) or in any   ...........................................................................................................................
case which does not   ...........................................................................................................................
clearly fall within any   ...........................................................................................................................
one of the clauses (a)   to............................................................................................................................
to (g). Adjudication  Date...............................................20...........................................................
in any case may be
required

.........................................                    .........................................
.........................................                    .........................................
.........................................                    .........................................
                                                   *Signature*..............................
                                                   *Description*..........................

* Note:- The above Certificate must be signed in the case of (b) and (c), either by (1) all the transferors and the transferees, or (2) a member of a Stock Exchange or a Solicitor acting for one or other of the parties, or (3) an accredited representative of a Bank. Where the Bank or its official nominee is a party to the transfer, the Certificate may be to the effect that "the transfer is expected from Section 74 of the Finance (1909-10) Act, 1910". The above Certificate in other cases should be signed by a solicitor or other person (e.g., a Bank acting as Trustee or Executor) having full knowledge of the facts.

**Exhibit 17**

DATED  $29$   DECEMBER 2017

**AIRBUS S.A.S.**

AS MANUFACTURER

---

AIRFRAME WARRANTIES AGREEMENT
IN RESPECT OF ONE
A350-941 AIRCRAFT BEARING
MANUFACTURER'S SERIAL NUMBER 0173

---

**THIS AIRFRAME WARRANTIES AGREEMENT** (this "**Agreement**") is executed on $\underline{29}$ December 2017 by Airbus S.A.S., *a société par actions simplifiée* duly created and existing under French law, having its registered office at 2, rond-point Emile Dewoitine, 31700 Blagnac, France and includes its successors and assigns (the "**Manufacturer**"), in favour of the Relevant Parties (as defined below) from time to time.

1.    **DEFINITIONS AND INTERPRETATION**

1.1    **Definitions**

Capitalised words and expressions have the meanings set out in Schedule 1 (*Definitions and Interpretation*), except where the context otherwise requires.

1.2    **Interpretation**

Headings are to be ignored in construing this Agreement and, unless the contrary intention is stated, a reference in this Agreement or a Relevant Notice to:

1.2.1    "**Manufacturer**" or any other person includes, without prejudice to the provisions of this Agreement restricting transfer or assignment, any successor and any assignee;

1.2.2    words importing the plural shall include the singular and vice versa;

1.2.3    any document shall include that document as amended, novated, assigned or supplemented;

1.2.4    a Clause or a Schedule is a reference to a clause of, or a schedule to, this Agreement;

1.2.5    any law, or to any specified provision of any law, is a reference to such law or provision as amended, substituted or re-enacted;

1.2.6    a "**person**" includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust or partnership (whether or not having separate legal personality) of two or more of the foregoing; and

1.2.7    "**including**" and similar words and terms shall not be construed as limiting and shall mean "**including without limitation**".

The Schedules form part of this Agreement and shall have effect as if set out in full in the body of this Agreement. Any reference to this Agreement includes the Schedules.

For the purpose of Schedule 2 (*Warranties*) only, the term "Buyer" shall be construed as if it referred to the "Entitled Party" and the term "Seller" shall be construed as if it referred to the "Manufacturer".

2.    **EFFECTIVENESS**

2.1    **Effective Date**

This Agreement takes effect from the date hereof.

2.2    **Amendment**

Save as expressly set out in this Agreement, the prior written consent of the Manufacturer and the Controlling Party shall be required to terminate or vary this Agreement.  Any such termination or variation shall then be binding on the Manufacturer and the Relevant Parties.

3.    **BENEFIT OF WARRANTIES**

3.1    **General**

    3.1.1    Pursuant to the terms of this Agreement, the Manufacturer agrees to make available to the Entitled Party (from time to time) the Warranties. The entitlement of any Entitled Party to make a claim under the Warranties shall be only as specified in this Agreement or as otherwise agreed in accordance with Clause 3.2 (*Relevant Parties*) (and any agreement otherwise between any or all of the Relevant Parties and/or any other person shall have no effect and shall not bind the Manufacturer).

    3.1.2    The terms and conditions of the Warranties shall be binding upon the Entitled Party and shall apply to all claims made in respect of the Warranties (including the release waiver and renunciation in clause 12.5 of the Warranties). Only one Entitled Party shall be entitled to benefit from and to make a claim under the Warranties at any one time.

3.2    **Relevant Parties**

    3.2.1    The Entitled Party on the Delivery Date shall be the Initial Entitled Party. Such person shall remain the Entitled Party unless and until a different Eligible Person is specified as the new Entitled Party in a Replacement Entitled Party Notice delivered in accordance with Clause 4.1.1 (*Termination of Entitled Party's Rights*).

    3.2.2    The Controlling Party on the Delivery Date shall be the Initial Controlling Party. Such person shall remain the Controlling Party unless and until a different Eligible Person is specified as the new Controlling Party in a Replacement Controlling Party Notice delivered in accordance with Clause 4.2.1 (*Termination of Controlling Party's Rights*).

    3.2.3    The Entitled Party and the Controlling Party may (but are not required to) be the same person.

3.3    **Record of Relevant Parties**

The Manufacturer will, as soon as practicable following receipt by it of a Relevant Notice, countersign such Relevant Notice and return it to the Controlling Party.

4.    **TERMINATION OF WARRANTY RIGHTS**

4.1    **Termination of Entitled Party's Rights**

    4.1.1    With immediate and automatic effect at the time of the receipt by the Manufacturer of a Replacement Entitled Party Notice (the "**Relevant Time**"):

        (a)    the Outgoing Entitled Party shall cease to be the Entitled Party;

        (b)    the New Entitled Party shall be the Entitled Party; and

        (c)    save to the extent of any claim or right to claim against the Manufacturer, in each case which prior to the Relevant Time (A) exists and (B) has been notified in writing to the Manufacturer in accordance with this Agreement:

            (i)    all rights of the Outgoing Entitled Party under this Agreement shall terminate; and

            (ii)    the Manufacturer shall have no liability whatsoever to the Outgoing Entitled Party in any respect under this Agreement.

For the avoidance of doubt, the benefit of any other claim or right to claim against the Manufacturer shall accrue to the New Entitled Party.

4.1.2   Without prejudice to Clause 4.1.1 (*Termination of Entitled Party's Rights*), a copy of a Replacement Entitled Party Notice shall be sent by the Controlling Party to the Outgoing Entitled Party for information, but the receipt or non-receipt of such copy by the Outgoing Entitled Party shall not affect the rights or obligations of any person under this Agreement.

4.1.3   For the purposes of this Clause 4.1 (*Termination of Entitled Party's Rights*), the "Outgoing Entitled Party" means the person specified as such in the relevant Replacement Entitled Party Notice (being the person who, immediately prior to service thereof, was the Entitled Party) and the "New Entitled Party" means the person specified as such in the relevant Replacement Entitled Party Notice.

4.2   **Termination of Controlling Party's Rights**

4.2.1   With immediate and automatic effect upon the receipt by the Manufacturer of a Replacement Controlling Party Notice:

(a)   the Outgoing Controlling Party shall cease to be the Controlling Party;

(b)   the New Controlling Party shall be the Controlling Party;

(c)   all rights of the Outgoing Controlling Party under this Agreement shall terminate; and

(d)   the Manufacturer shall have no further liability whatsoever to the Outgoing Controlling Party in any respect under this Agreement.

4.2.2   Without prejudice to Clause 4.2.1 (*Termination of Controlling Party's Rights*), a copy of a Replacement Controlling Party Notice shall be sent by the New Controlling Party to the Entitled Party for information, but the receipt or non-receipt of such copy by the Entitled Party shall not affect the rights or obligations of any person under this Agreement.

4.2.3   For the purposes of this Clause 4.2 (*Termination of Controlling Party's Rights*), the "Outgoing Controlling Party" means the person specified as such in the relevant Replacement Controlling Party Notice (being the person who, immediately prior to service thereof, was the Controlling Party) and the "New Controlling Party" means the person specified as such in the relevant Replacement Controlling Party Notice.

4.3   **Other Warranty Agreements**

This Agreement shall not interfere with or limit the terms of any separate warranty arrangements with respect to the Aircraft that the Manufacturer may, from time to time, have made with any person, provided that nothing in such arrangements shall limit the rights of any Relevant Party in respect of the Warranties unless and to the extent it has expressly agreed the same in writing with the Manufacturer.

4.4   **Lapse of Warranties**

4.4.1   The entitlement of any Relevant Party to enforce the rights under any Warranty shall automatically lapse on the date on which that Warranty expires in accordance with this Agreement.

4.4.2   Following the date on which all Warranties have expired in accordance with this Agreement:

(a)     no change to the identity of the Controlling Party or the Entitled Party may be made hereunder; and

(b)     the Manufacturer shall cease to be under any obligation to maintain the record of the Relevant Parties pursuant to Clause 3.3 (*Record of Relevant Parties*).

5.     **MANUFACTURER LIMIT OF LIABILITY**

By execution of any Relevant Notice, each party thereto agrees that:

5.1     the Manufacturer shall not incur any Liability under this Agreement by reason of the Transaction Documents;

5.2     any performance by the Manufacturer that discharges its obligation in respect of any of the Warranties in favour of any Relevant Party in accordance with this Agreement will satisfy the respective interests of each Relevant Party from time to time, and nothing in this Agreement shall give rise to or impose upon the Manufacturer any several or duplicate liability with respect to such Warranties;

5.3     the Manufacturer shall (i) be entitled to rely conclusively on the information contained in any Relevant Notice, without enquiring as to the accuracy and validity of such Relevant Notice or to the entitlement of the party serving such Relevant Notice to serve it, (ii) have no duty so to enquire and (iii) not be liable for acting in accordance with such Relevant Notice;

5.4     in the event that a Relevant Party commences or has commenced against it any bankruptcy, insolvency, reorganization, receivership, suspension of payments, dissolution, liquidation, assignment for the benefit of creditors, moratorium, or other similar proceeding under debtor relief laws of the United States or any other applicable jurisdiction (**Bankruptcy Proceedings**) or the Manufacturer otherwise believes in good faith that it is or could be the subject of conflicting claims or another dispute hereunder as to the relative rights and interests of the Relevant Parties, the Manufacturer shall have the right to refrain from acting in accordance with any Relevant Notice received after the commencement of such Bankruptcy Proceedings, or conflicting claim or other dispute having arisen, in terms of transferring and providing the benefit of the Warranties to such person as designated by such notice, until any Relevant Party either (a) provides (i) a final order from a court of appropriate jurisdiction (which may be a bankruptcy court) or (ii) an assurance from the administrator, receiver, liquidator, bankruptcy trustee or other applicable insolvency officer, in each case confirming the relative rights of the Relevant Parties in respect of the Warranties, or (b) provides the Manufacturer with an indemnity for all Liabilities (including legal fees and expenses incurred in connection with the enforcement of such indemnity) incurred or suffered by the Manufacturer in relation to such Bankruptcy Proceedings provided that any claim for such indemnity by the Manufacturer shall be substantiated by a certificate of the Manufacturer's Head of Contracts – Customer Services setting out the basis upon which such Liabilities were incurred together with documentary evidence (if any) thereof; and until such time, the Manufacturer shall be permitted to perform hereunder to and on the instruction of the person that is the then Entitled Party designated prior to such Bankruptcy Proceedings, conflicting claim or other dispute having arisen, and the Manufacturer shall have no liability to any other Relevant Party in connection therewith;

5.5     without limiting the foregoing, the Manufacturer may refrain from doing anything and shall not be required to take any action that is contrary to any applicable law or regulation, or otherwise expose the Manufacturer to liability under such applicable law or regulation, and may do anything which is necessary or desirable to comply with any applicable law or regulation; and

5.6     the Manufacturer shall not be deemed to have knowledge of any change in the authority of any Relevant Party to exercise the rights established under this Agreement until the Manufacturer has received written notice thereof in accordance with this Agreement.

6.     **PARTIAL INVALIDITY**

If, at any time, any provision hereof is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions hereof nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall in any way be affected or impaired thereby.

7.     **REMEDIES AND WAIVERS**

No failure by the Manufacturer or any Relevant Party to exercise, nor any delay in exercising, any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise thereof or the exercise of any other right or remedy.

8.     **NOTICES**

8.1     **Form of Communication**

Any notice or other communication given or to be made under this Agreement shall be in writing in the English language and shall be addressed to the recipient as set out below. In the absence of evidence of earlier receipt, any notice or other communication shall be deemed to have been duly given:

8.1.1     if sent by post, five (5) Business Days after posting; and

8.1.2     if sent by fax, when confirmation of its clear transmission has been recorded on the sender's fax machine.

Any notice or other communication delivered to the Manufacturer outside 9am to 5pm (Toulouse time) on a Business Day shall only be deemed effective at 9am (Toulouse time) on the next Business Day.

8.2     **Relevant Parties' Addresses**

The contact details for any Relevant Party shall be set out in a Relevant Notice or shall be such other address as such Relevant Party may notify to the Manufacturer from time to time in writing.

8.3     **Manufacturer's Address**

The contact details for the Manufacturer are as set out below as at the date of this Agreement:

Address:     Airbus S.A.S.
             2, rond-point Emile Dewoitine
             31700 Blagnac - France

Fax:         +33 (0)5 61 93 46 10
Attention:   Head of Contracts - Customer Services

The Manufacturer may amend the contact details specified above by sending written notice to the Controlling Party.

8.4     **Electronic Mail**

Any notice or other communication given or to be made under this Agreement to the Manufacturer shall also be sent by electronic mail to the following address (provided that the receipt or non-receipt of such electronic mail by the Manufacturer shall not affect the rights or obligations of any person under this Agreement): AWA.notification@airbus.com.

9.    **BENEFIT OF AGREEMENT**

No Relevant Party may assign or otherwise transfer (in whole or in part) any rights that it may have under this Agreement or the Warranties (including any rights to proceeds of any claim in respect of the Warranties) other than pursuant to the delivery of a Relevant Notice to the Manufacturer in strict compliance with the express provisions of this Agreement and any such transfer shall only be effective as to the Manufacturer upon its receipt of the applicable Relevant Notice as provided herein. Any purported assignment or other transfer by a Relevant Party of rights hereunder or the Warranties that does not comply with the requirements of this Agreement shall be null and void and of no force or effect.

10.    **LAW AND JURISDICTION**

10.1    **Governing Law**

This Agreement shall be governed by and construed in accordance with the laws of France.

10.2    **Exclusive Jurisdiction**

10.2.1    The Tribunal de commerce de Paris has exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute regarding the existence, validity or termination of this Agreement or the consequences of its nullity) (a "**Dispute**").

10.2.2    Each of the Manufacturer and (by their signature of Relevant Notice(s)) the Relevant Parties agrees that the French courts are the most appropriate and convenient courts to settle Disputes and accordingly it will not argue to the contrary.

10.3    **Election of Domicile**

Without prejudice to any other mode of service allowed under any relevant law, the Manufacturer hereby elects domicile at its registered office address as provided in Clause 8.3 (*Manufacturer's Address*) for the purpose of serving any judicial or extra-judicial documents in relation to any action or proceedings.

### SCHEDULE 1
### DEFINITIONS AND INTERPRETATION

### PART A - SPECIFIC DEFINITIONS

"**Airframe**" means the A350-941 with manufacturer's serial number 0173 (excluding the Propulsion Systems installed thereon) together with all parts incorporated in, installed on or attached to such airframe on the Delivery Date.

"**Buyer**" means PAAL URANUS COMPANY LIMITED , being the person named as "*Buyer*" in the bill of sale in respect of the Aircraft issued by the Manufacturer on the Delivery Date.

"**Initial Controlling Party**" means PAAL URANUS COMPANY LIMITED.

"**Initial Entitled Party**" means Vietnam Airlines JSC.

### PART B - GENERAL DEFINITIONS

"**Aircraft**" means, collectively, the Airframe and the Propulsion Systems installed thereon.

"**Aircraft Purchase Agreement**" means the purchase agreement pursuant to which, inter alia, the Manufacturer has agreed to sell the Aircraft.

"**Aviation Authorities**" means when used in respect of any jurisdiction the government entity which, under the laws of such jurisdiction, has control over civil aviation or the registration, airworthiness or operation of aircraft in such jurisdiction.

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in Toulouse, France.

"**Buyer Furnished Equipment**" means the items described in the list attached to the BFE bill of sale delivered to the Manufacturer on the Delivery Date.

"**Controlling Party**" means, at any time, the person who is the controlling party for the purposes of this Agreement, being the Initial Controlling Party or the person named as the New Controlling Party in any Replacement Controlling Party Notice delivered to the Manufacturer in accordance with this Agreement.

"**Delivery**" means the transfer of title to the Aircraft by the Manufacturer to the Buyer.

"**Delivery Date**" means the date on which Delivery occurs.

"**Eligible Person**" means:

(i)     in the case of the Entitled Party: the person that has the present right to possession of the Airframe, whether (a) as owner, mortgagee or pledgee or under a lease or other bailment of the Airframe or any analogous instrument or (b) as a duly appointed nominee of any such person;

(ii)    in the case of the Controlling Party: a person that either (a) has the present right to possession of the Airframe whether (x) as owner, mortgagee or pledgee or under a lease or other bailment of the Airframe or any analogous instrument or (y) as a duly appointed nominee of any such person; or (b) may have such right subject only to the enforcement of rights under the Transaction Documents; and

(iii)   in all cases, a person that is neither (a) subject to any sanctions or similar instruments such as would result in the Manufacturer being in breach of any laws or sanctions of the United States of America, France, the European Union or the United Nations by having a legal relationship under this Agreement with such person in respect of the Warranties and the

Airframe nor (b) an aircraft manufacturer or a person owned or controlled by an aircraft manufacturer.

"**Entitled Party**" means, at any time, the person who is entitled at such time to make claims under the Warranties under and in accordance with this Agreement, being the Initial Entitled Party or the person named as the new Entitled Party in any Replacement Entitled Party Notice delivered to the Manufacturer in accordance with this Agreement.

"**Initial Notice**" means a notice signed by the Initial Entitled Party and the Initial Controlling Party in the form of Schedule 3 (*Initial Notice*).

"**Liabilities**" means losses, liabilities, actions, claims, proceedings, penalties, fines, judgments, damages, fees, costs and expenses and "**Liability**" means any such thing.

"**New Controlling Party**" has the meaning given to that term in Clause 4.2.3 (*Termination of Controlling Party's Rights*).

"**New Entitled Party**" has the meaning given to that term in Clause 4.1.3 (*Termination of Entitled Party's Rights*).

"**Outgoing Controlling Party**" has the meaning given to that term in Clause 4.2.3 (*Termination of Controlling Party's Rights*).

"**Outgoing Entitled Party**" has the meaning given to that term in Clause 4.1.3 (*Termination of Entitled Party's Rights*).

"**Propulsion Systems**" means the engines and, if provided by the engine manufacturer, the nacelles and thrust reversers installed on the Aircraft at Delivery.

"**Propulsions Systems Manufacturer**" means the manufacturer of the Propulsion Systems.

"**Relevant Notice**" means an Initial Notice, a Replacement Entitled Party Notice or a Replacement Controlling Party Notice.

"**Relevant Party**" means, at any time, each of the Entitled Party and the Controlling Party at such time.

"**Replacement Controlling Party Notice**" means a notice, executed by the Outgoing Controlling Party and the New Controlling Party named therein, in the form of Schedule 5 (*Replacement Controlling Party Notice*).

"**Replacement Entitled Party Notice**" means a notice, executed by the Controlling Party and the New Entitled Party named therein, in the form of Schedule 4 (*Replacement Entitled Party Notice*).

"**Seller's Representatives**" means a customer support representative of the Manufacturer.

"**Service Bulletin**" means the document used to notify officially an airline of the technical data governing embodiment of modifications (or the accomplishment of inspections to be performed) on in-service aircraft.

"**Service Life Policy**" has the meaning set out in clause 12.2 of Schedule 2 (*Warranties*).

"**Specification**" means the aircraft specification as further detailed in the Technical Data available to the Buyer at Delivery.

"**Technical Data**" means the technical data and software services provided by the Manufacturer to the Buyer in respect of the Aircraft at Delivery.

"**Transaction Documents**" means all documents (excluding this Agreement and any Relevant Notice and the Aircraft Purchase Agreement) entered into between the Relevant Parties and other persons in connection with the acquisition, leasing, bailment and/or financing of the Aircraft.

"**Warranties**" means, insofar as they relate to the Airframe, such warranties, rights and provisions as are set out in Schedule 2 (*Warranties*).

**SCHEDULE 2**
**WARRANTIES**

**SCHEDULE 3**
**INITIAL NOTICE**

To:             **Airbus S.A.S.**
Attention:      Head of Contracts - Customer Services

CC:             PAAL URANUS COMPANY LIMITED
Attention:      Gareth Delany

*[Date of the Agreement]*

**One A350-941 airframe with MSN 0173 (the "Airframe")**

1.      Unless otherwise defined, terms used in this notice bear the same meanings as those set forth in the airframe warranties agreement dated ____December 2017 entered into by Airbus S.A.S. in relation to the Airframe (the "**Airframe Warranties Agreement**").

2.      We hereby give notice that: (a) [•] is the Initial Entitled Party; and (b) [•] is the Initial Controlling Party.

3.      The contact details of the Initial Entitled Party for the purposes of clause 8.2 (*Relevant Parties' Addresses*) of the Airframe Warranties Agreement are as follows:

        [•]

4.      The contact details of the Initial Controlling Party for the purposes of clause 8.2 (*Relevant Parties' Addresses*) of the Airframe Warranties Agreement are as follows:

        [•]

5.      This is the Initial Notice.

6.      By its signature below and in consideration of the Manufacturer making available to it the rights specified under the Airframe Warranties Agreement and for other good and valuable consideration, receipt of which is hereby acknowledged, the Initial Entitled Party hereby: (i) represents and warrants that it is an Eligible Person; and (ii) joins as party to, and agrees to be bound by and perform its obligations under (as, and for so long as it remains, the Entitled Party) the terms and conditions of, the Airframe Warranties Agreement.

7.      By its signature below and in consideration of the Manufacturer making available to it the rights specified under the Airframe Warranties Agreement and for other good and valuable consideration, receipt of which is hereby acknowledged, the Initial Controlling Party hereby: (i) represents and warrants that it is an Eligible Person; and (ii) joins as party to, and agrees to be bound by and perform its obligations under (as, and for so long as it remains, the Controlling Party) the terms and conditions of, the Airframe Warranties Agreement.

8.      This notice shall be governed by and construed in accordance with the laws of France.

**[NAME OF CONTROLLING PARTY]**

By: _____

Title: _____


**[NAME OF ENTITLED PARTY]**

By: _____

Title: _____


Accepted and agreed for and on behalf of:

**AIRBUS S.A.S.**

By: _____

Title: _____

**SCHEDULE 4**
**REPLACEMENT ENTITLED PARTY NOTICE**

To:          **Airbus S.A.S.**
Attention:   Head of Contracts - Customer Services

CC:          **[Outgoing Entitled Party]**
Attention:   [•]

[*Date*]

**One A350-941 airframe with MSN 0173 (the "Airframe")**

1.    Unless otherwise defined, terms used in this notice bear the same meanings as those set forth in the airframe warranties agreement dated ___December  2017 entered into by Airbus S.A.S. in relation to the Airframe (the "**Airframe Warranties Agreement**").

2.    [•] (the "**Controlling Party**") hereby gives notice that, as from today's date: (a) [•] (being the "Outgoing Entitled Party" for the purposes of the Airframe Warranties Agreement) has ceased to be the Entitled Party; and (b) [•] (the "**New Entitled Party**") is the new Entitled Party.

3.    The contact details of the New Entitled Party for the purposes of clause 8.2 (*Relevant Parties' Addresses*) of the Airframe Warranties Agreement are as follows:

      [•]

4.    This is a Replacement Entitled Party Notice.

5.    By its signature below and in consideration of the Manufacturer making available to it the rights specified under the Airframe Warranties Agreement and for other good and valuable consideration, receipt of which is hereby acknowledged, the New Entitled Party hereby: (i) represents and warrants that it is an Eligible Person; and (ii) joins as party to, and agrees to be bound by and perform its obligations under (as, and for so long as it remains, the Entitled Party) the terms and conditions of, the Airframe Warranties Agreement.

6.    This notice shall be governed by and construed in accordance with the laws of France.

**[NAME OF CONTROLLING PARTY]**

By:      _____

Title:   _____


**[NAME OF NEW ENTITLED PARTY]**

By:      _____

Title:   _____


Accepted and agreed for and on behalf of:

**AIRBUS S.A.S.**

By:      _____

Title:   _____

**SCHEDULE 5**
**REPLACEMENT CONTROLLING PARTY NOTICE**

To:          **Airbus S.A.S.**
Attention:   Head of Contracts - Customer Services

CC:          **[Entitled Party]**
Attention:   [•]

                                                                                    [*Date*]

**One A350-941 airframe with MSN 0173 (the "Airframe")**

1.      Unless otherwise defined, terms used in this notice bear the same meanings as those set
        forth in the airframe warranties agreement dated ___December 2017 entered into by Airbus
        S.A.S. in relation to the Airframe (the "**Airframe Warranties Agreement**").

2.      We hereby give notice that, as from today's date: [•] (the "**Outgoing Controlling Party**") has
        ceased to be the Controlling Party; and [•] (the "**New Controlling Party**") is the new
        Controlling Party.

3.      The contact details of the New Controlling Party for the purposes of clause 8.2 (*Relevant
        Parties' Addresses*) of the Airframe Warranties Agreement are as follows:

        [•]

4.      This is a Replacement Controlling Party Notice.

5.      By its signature below and in consideration of the Manufacturer making available to it the
        rights specified under the Airframe Warranties Agreement and for other good and valuable
        consideration, receipt of which is hereby acknowledged, the New Controlling Party hereby: (i)
        represents and warrants that it is an Eligible Person; and (ii) joins as party to, and agrees to
        be bound by and perform its obligations under (as, and for so long as it remains, the
        Controlling Party) the terms and conditions of, the Airframe Warranties Agreement.

6.      This notice shall be governed by and construed in accordance with the laws of France.

**[NAME OF RETIRING CONTROLLING PARTY]**

By: _____

Title: _____


**[NAME OF NEW CONTROLLING PARTY]**

By: _____

Title: _____


Accepted and agreed for and on behalf of:

**AIRBUS S.A.S.**

By: _____

Title: _____

**EXECUTION PAGE (MSN0173)**

**AIRBUS S.A.S.**

By:

Bernard DAUBECH

Head of  Delivery Transactions

Title:         Customer Affairs - AIRBUS

**Exhibit 18**

**INITIAL NOTICE**

To:          **Airbus S.A.S.**
Attention:   Head of Contracts - Customer Services

CC:          PAAL URANUS COMPANY LIMITED
Attention:   Gareth Delany

*29* December 2017

**One A350-941 airframe with MSN 0173 (the "Airframe")**

1.   Unless otherwise defined, terms used in this notice bear the same meanings as those set forth in the airframe warranties agreement dated *29* December 2017 entered into by Airbus S.A.S. in relation to the Airframe (the "**Airframe Warranties Agreement**").

2.   We hereby give notice that: (a) Vietnam Airlines JSC is the Initial Entitled Party; and (b) PAAL URANUS COMPANY LIMITED is the Initial Controlling Party.

3.   The contact details of the Initial Entitled Party for the purposes of clause 8.2 (*Relevant Parties' Addresses*) of the Airframe Warranties Agreement are as follows:

     Address:    Vietnam Airlines JSC

                 200 Nguyen Son, Bo De Ward,

                 Long Bien District, Hanoi City, Vietnam

     Fax:        +84 4 38722254

     Attention:  Director of Technical Department and Director of

                 Supply & Material Management Department

     E-mail:     thangnguyenchien@vietnamairlines.com and

                 hoaitranquoc@vietnamairlines.com

4.   The contact details of the Initial Controlling Party for the purposes of clause 8.2 (*Relevant Parties' Addresses*) of the Airframe Warranties Agreement are as follows:

     Address:    PAAL URANUS COMPANY LIMITED

                 2 Grand Canal Square, Grand Canal Harbour,          Dublin 2, Ireland

     Tel:        ++353 1 224 0443

     Attention:  Mr. Gareth Delany

     E-Mail:     GARETHDELANY@leasing.pingan.com

5.   This is the Initial Notice.

Vietnam Airlines – MSN 0173 – A350-941
Initial Notice to the AWAg

6.    By its signature below and in consideration of the Manufacturer making available to it the rights specified under the Airframe Warranties Agreement and for other good and valuable consideration, receipt of which is hereby acknowledged, the Initial Entitled Party hereby: (i) represents and warrants that it is an Eligible Person; and (ii) joins as party to, and agrees to be bound by and perform its obligations under (as, and for so long as it remains, the Entitled Party) the terms and conditions of, the Airframe Warranties Agreement.

7.    By its signature below and in consideration of the Manufacturer making available to it the rights specified under the Airframe Warranties Agreement and for other good and valuable consideration, receipt of which is hereby acknowledged, the Initial Controlling Party hereby: (i) represents and warrants that it is an Eligible Person; and (ii) joins as party to, and agrees to be bound by and perform its obligations under (as, and for so long as it remains, the Controlling Party) the terms and conditions of, the Airframe Warranties Agreement.

8.    This notice shall be governed by and construed in accordance with the laws of France.

**PAAL URANUS COMPANY LIMITED**

By: _____

Title: ___ Attorney in Fact ___


**VIETNAM AIRLINES JSC**

By: NGUYEN TUAN CUONG

Title: _____

Attorney in Fact

Accepted and agreed for and on behalf of:

**AIRBUS S.A.S.**

By: Bernard DAUBECH

Head of Delivery Transactions

Title: Customer Affairs - AIRBUS

**Exhibit 19**

ENGINE WARRANTY AGREEMENT
WARRANTY DATA FORM

Dated   29 December 2017

| MSN Number: 0173 | DEG Number: 11485 |
|---|---|
| Aircraft Manufacturer: Airbus | Engine: RB211 - Trent XWB-84 Turbofan |
| Aircraft: A350 | ESN Number: 21368 and 21369 |
| Aircraft Registration Mark: VN-A895 | (each an "Engine" and collectively, the "Engines") |

Between the following parties ("together known as the Parties"):

| ROLLS-ROYCE plc a company incorporated in England (company number 1003142), whose registered office is 62 Buckingham Gate, London, SW1E 6AT, England ("Rolls-Royce"); | Vietnam Airlines JSC a company incorporated in Vietnam whose registered office is at 200 Nguyen Son, Bo De Ward, Long Bien District, Hanoi City, Vietnam ("Lessee"), |
|---|---|
| Signed for and on behalf of: ROLLS-ROYCE plc | Signed for and on behalf of: Vietnam Airlines JSC |
| By:  DLWood | By: _____ |
| Printed: D·L·WOOD | Printed: _____ |
| Title: COMMERCIAL MANAGER | Title: _____ |
| PAAL Uranus Company Limited a company incorporated in Ireland whose registered office is at 2 Grand Canal Square, Grand Canal Harbour, Dublin 2, Ireland ("Lessor"); | |
| Signed for and on behalf of: PAAL Uranus Company Limited | |
| By: _____ | |
| Printed: _____ | |
| Title: _____ | |
| **Customer Agreement:** | **Lease Agreement:** |
| Agreement between Vietnam Airlines JSC and Rolls-Royce dated 25 September 2014 DEG, 6821 | Agreement between PAAL Uranus Company Limited and Vietnam Airlines JSC dated 1 August 2017 |
| The following are the notice details for each Party. | |
| Rolls-Royce plc<br>SINB-63<br>PO Box 31<br>Moor Lane<br>Derby<br>England<br>DE24 8BJ<br><br>Contact: Commercial Manager Commercial Operations<br><br>E-mail Address: ewa@rolls-royce.com | For the Lessee:<br><br>200 Nguyen Son, Bo De Ward, Long Bien District, Hanoi City, Vietnam<br><br>Contact: Nguyen Tuan Cuong |

Engine Warranty Agreement

ENGINE  WARRANTY AGREEMENT
WARRANTY DATA FORM

Dated  29 December 2017

| MSN Number: 0173 | DEG Number: 11485 |
|---|---|
| Aircraft Manufacturer: Airbus | Engine: RB211 - Trent XWB-84 Turbofan |
| Aircraft: A350 | ESN Number: 21368 and 21369 |
| Aircraft Registration Mark: VN-A895 | (each an "**Engine**" and collectively, the "**Engines**") |

Between the following parties ("together known as the Parties"):

| ROLLS-ROYCE plc a company incorporated in England (company number 1003142), whose registered office is 62 Buckingham Gate, London, SW1E 6AT, England ("**Rolls-Royce**"); | Vietnam Airlines JSC a company incorporated in Vietnam whose registered office is at 200 Nguyen Son, Bo De Ward, Long Bien District, Hanoi City, Vietnam ("**Lessee**"); |
|---|---|
| Signed for and on behalf of:<br>**ROLLS-ROYCE plc** | Signed for and on behalf of:<br>**Vietnam Airlines JSC** |
| By: _____ | By: _____ |
| Printed: _____ | Printed: NGUYEN TUAN CUONG |
| Title: _____ | Title: Attorney in Fact |
| **PAAL Uranus Company Limited** a company incorporated in Ireland whose registered office is at 2 Grand Canal Square, Grand Canal Harbour, Dublin 2, Ireland ("**Lessor**"); | |
| Signed for and on behalf of:<br>**PAAL Uranus Company Limited** | |
| By: _____ | |
| Printed: _____ | |
| Title: _____ | |
| **Customer Agreement:** | **Lease Agreement:** |
| **Agreement between Vietnam Airlines JSC and Rolls-Royce dated 25 September 2014 DEG, 6821** | **Agreement between PAAL Uranus Company Limited and Vietnam Airlines JSC dated 1 August 2017** |
| The following are the notice details for each Party. | |
| Rolls-Royce plc<br>SINB-63<br>PO Box 31<br>Moor Lane<br>Derby<br>England<br>DE24 8BJ<br><br>Contact:  Commercial Manager Commercial Operations<br><br>E-mail Address: ewa@rolls-royce.com | For the Lessee:<br><br>200 Nguyen Son, Bo De Ward, Long Bien District, Hanoi City, Vietnam<br><br>Contact:  Nguyen Tuan Cuong |

Engine Warranty Agreement

ENGINE WARRANTY AGREEMENT
WARRANTY DATA FORM

Dated __29 December 20__178

| MSN Number: 0173 | DEG Number: 11485 |
|---|---|
| Aircraft Manufacturer: Airbus | Engine: RB211 - Trent XWB-84 Turbofan |
| Aircraft: A350 | ESN Number:  21368 and 21369 |
| Aircraft Registration Mark: VN-A895 | (each an "**Engine**" and collectively, the "**Engines**") |

Between the following parties ("together known as the Parties"):

| | |
|---|---|
| **ROLLS-ROYCE plc** a company incorporated in England (company number 1003142), whose registered office is 62 Buckingham Gate, London, SW1E 6AT, England ("**Rolls-Royce**");<br><br>Signed for and on behalf of:<br>**ROLLS-ROYCE plc**<br><br>By: _____<br><br>Printed: _____<br><br>Title: _____ | **Vietnam Airlines JSC** a company incorporated in Vietnam whose registered office is at 200 Nguyen Son, Bo De Ward, Long Bien District, Hanoi City, Vietnam ("**Lessee**");<br><br>Signed for and on behalf of:<br>**Vietnam Airlines JSC**<br><br>By: _____<br><br>Printed: _____<br><br>Title: _____ |
| **PAAL Uranus Company Limited** a company incorporated in Ireland whose registered office is at 2 Grand Canal Square, Grand Canal Harbour, Dublin 2, Ireland ("**Lessor**");<br><br>Signed for and on behalf of:<br>**PAAL Uranus Company Limited**<br><br>By: _____<br><br>Printed: _____GARETH DELANY_____<br><br>Title: _____DIRECTOR_____ | |
| **Customer Agreement:**<br><br>Agreement between Vietnam Airlines JSC and Rolls-Royce dated 25 September 2014 DEG, 6821 | **Lease Agreement:**<br><br>Agreement between PAAL Uranus Company Limited and Vietnam Airlines JSC dated 1 August 2017 |
| The following are the notice details for each Party. | |
| Rolls-Royce plc<br>SINB-63<br>PO Box 31<br>Moor Lane<br>Derby<br>England<br>DE24 8BJ<br><br>Contact:  Commercial Manager Commercial Operations<br><br>E-mail Address: ewa@rolls-royce.com | For the Lessee:<br><br>200 Nguyen Son, Bo De Ward, Long Bien District, Hanoi City, Vietnam<br><br>Contact:  Nguyen Tuan Cuong |

Engine Warranty Agreement

For the Lessor:

2 Grand Canal Square, Grand Canal Harbour, Dublin 2, Ireland

Contact: Gareth Delany/TIAN Ye/Thomas Bambrick/ZHOU jing/XU Ke/JIANG Pengfei

The Engine Warranty Agreement (pages 4 to 26 inclusive of Schedules) are the terms and conditions applicable to this Engine Warranty Agreement subject to any agreed amendments between the Parties as set out here:

1.  In clause 2.1(a) the words "it is a limited liability corporation" should be replaced with "in the case of the Lessee a joint stock company, in the case of the Lessor a private company limited by shares and in the case of Rolls-Royce a limited liability corporation".

2.  Clause 3.2(e) shall be amended by inserting "(save in respect of (a) any service credits payable or (b) any other valid claim under the Lessee Warranty arising during, or attributable to, the period prior to service of the Trigger Event Notice (each a "Permitted Lessee Claim"))" at the end of the clause.

3.  Clause 3.5(b) shall be amended by inserting the words "equivalent to a claim under the Warranties" after the words "Lessee Warranty", and also inserting ", then save in respect of any Permitted Lessee Claim," after the words "no longer the Operator".

4.  In clause 9.2, the word "Affiliate," is added between the words "employees," and "officers".

5.  In schedule 1, definition of "Operator" should be deleted in its entirety and replaced with the following: ""Operator" means the Party having the right for the time being to immediate possession of the Engines".

6.  On page 18 of the Warranties ("Ultimate Life Warranty"), for point 6 "Specific conditions", the second paragraph shall be amended as follows *"Operator to provide the DACs Data to Rolls-Royce. If the DACs Data is not supplied or in case Customer has supplied the data but the DACs system is not available then the Least Arduous Cycles will be used instead of the Ultimate Flight Cycles when calculating the Allowance Factor in Section 5 above."*

Additional Definitions:

Order of Priority of Notices as referred to in clause 3.4 should be taken in the following order Lessor, Lessee;

Beneficiaries means the Lessor

Lessee Warranty: warranties in respect of the Supplies granted by Rolls-Royce (and/or its Affiliates) to Vietnam Airlines JSC pursuant to the Product Agreement dated 25 September 2014.

---

2

**Background:**

_Type 2 (Sale and Leaseback arrangement (one leasing layer)_

(A)    Lessee has entered into a purchase agreement with the Aircraft Manufacturer, for the purchase of the Aircraft.  The Lessee has agreed to assign to the Lessor its rights to purchase the Aircraft.

(B)    The Lessor has agreed to lease the Aircraft to the Lessee.

(C)    Rolls-Royce has granted certain warranties relating to the Supplies to the Lessee.

(D)    Rolls-Royce has agreed to extend to the Beneficiaries the benefit of the Warranties on the terms set out in this Agreement.

---

Engine Warranty Agreement

**<u>Exhibit 20</u>**

# Claim Form

| In the | High Court of Justice, Queen's Bench Division |
|---|---|
| | Royal Courts of Justice |
| | **Media and Communications List** |

**Fee Account no.**

**Help with Fees - Ref no.** (if applicable)

H W F – ☐☐☐ – ☐☐☐

**You may be able to issue your claim online which may save time and money. Go to www.moneyclaim.gov.uk to find out more.**

| For court use only |
|---|
| Claim no. |
| Issue date |

## Claimant(s) name(s) and address(es) including postcode

FITZWALTER CAPITAL PARTNERS (FINANCIAL TRADING) LIMITED
21 Bruton Street, First Floor, London, W1J 6QD, UK



SEAL

20 Jan 2022

QB-2022-000199

Not for Service
Outside Jurisdiction

## Defendant(s) name and address(es) including postcode

(1) JP LEASE PRODUCTS & SERVICES CO. LTD
C/o Kingsman Services Limited, 12 Times Court, Retreat Road, Richmond, Surrey, England, TW9 1AF

(2) JLPS IRELAND LIMITED (formerly JLPS HOLDING IRELAND LIMITED)
C/o Kingsman Services Limited, 12 Times Court, Retreat Road, Richmond, Surrey, England, TW9 1AF

(3) JLPS LEASING DRACO LIMITED (FORMERLY DAE LEASING (IRELAND) 12 LIMITED)
C/o Kingsman Services Limited, 12 Times Court, Retreat Road, Richmond, Surrey, England, TW9 1AF

(4) JLPS LEASING URANUS LIMITED (FORMERLY PAAL URANUS COMPANY LIMITED)
C/o Kingsman Services Limited, 12 Times Court, Retreat Road, Richmond, Surrey, England, TW9 1AF

(5) HEINRICH LOECHTEKEN
Laan van Koot 25 2244 AT, Wassenaar, ZUID-HOLLAND Netherlands

## Brief details of claim

Please see attached.

## Value

The claimant expects to recover more than £25,000.

You must indicate your preferred County Court Hearing Centre for hearings here *(see notes for guidance)*

**Defendant's name and address for service including postcode**

(1) JP LEASE PRODUCTS & SERVICES CO. LTD
C/o Kingsman Services Limited, 12 Times Court, Retreat Road, Richmond, Surrey, England, TW9 1AF
(2) JLPS IRELAND LIMITED (FORMERLY JLPS HOLDING IRELAND LIMITED) C/o Kingsman Services Limited, 12 Times Court, Retreat Road, Richmond, Surrey, England, TW9 1AF
(3) JLPS DRACO LIMITED (FORMERLY DAE LEASING (IRELAND) 12 LIMITED) C/o Kingsman Services Limited, 12 Times Court, Retreat Road, Richmond, Surrey, England, TW9 1AF
(4) JLPS LEASING URANUS COMPANY LIMITED C/o Kingsman Services Limited, 12 Times Court, Retreat Road, Richmond, Surrey, England, TW9 1AF
(5) HEINRICH LOECHTEKEN  Laan van Koot 25 2244 AT, Wassenaar, ZUID-HOLLAND Netherlands

| | £ |
|---|---|
| Amount claimed | More than £25,000 |
| Court fee | £10,000 |
| Legal representative's costs | |
| **Total amount** | TBC |

For further details of the courts www.gov.uk/find-court-tribunal.
When corresponding with the Court, please address forms or letters to the Manager and always quote the claim number.

© Crown Copyright 2020

| Claim No. | |
|---|---|

Does, or will, your claim include any issues under the Human Rights Act 1998? ☐ Yes  ☒ No

Particulars of Claim to follow

# Statement of Truth

I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

☐ **I believe** that the facts stated in these particulars of claim are true.

☒ **The Claimant** believes that the facts stated these particulars of claim are true. **I am authorised** by the claimant to sign this statement.

**Signature**

☐ Claimant

☐ Litigation friend (where judgment creditor is a child or a patient)

☒ Claimant's legal representative (as defined by CPR 2.3(1))

**Date**

| Day | Month | Year |
|-----|-------|------|
| 20  | 01    | 2022 |

Full name

Paul Baker

Name of claimant's legal representative's firm

Quinn Emanuel Urquhart & Sullivan, LLP

If signing on behalf of firm or company give position or office held

Partner

Claimant's or claimant's legal representative's address to which documents should be sent.

Building and street

90 High Holborn

Second line of address

Town or city

London

County (optional)

Postcode

W  C  1  V  6  L  U

If applicable

Phone number

020 7653 2290

Fax phone number

DX number

Your Ref.

Email

paulbaker@quinnemanuel.com

## BRIEF DETAILS OF CLAIM

1.    The Claimant is an investment management company incorporated in the United Kingdom.

2.    The First Defendant is a financial services firm formed under the laws of Japan and is the parent company of two special purpose investment vehicles (JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd.) formed under the laws of Japan and created for the express and sole purpose of acquiring and leasing Airbus 350 aircraft (together, the "**Borrowers**"). The Second to Fourth Defendants are subsidiaries of the First Defendant. The Fifth Defendant is the Chief Executive Officer ("**CEO**") of the Second Defendant.

3.    The Claimant and the First to Fourth Defendants are, amongst others, parties to various transaction documents (the "**Transaction Documents**") relating to the financing of two Airbus A350 aircraft (with manufacturer's serial numbers 67 and 173) (together, the "**Aircraft**").

4.    The Transaction Documents include:

    (a)    two Proceeds Agreements dated 22 December 2017 and 6 November 2018, the terms of which are mostly identical (the "**Proceeds Agreements**"). The First and Second Defendants are parties to the Proceeds Agreements.  The Third Defendant is a party to the Proceeds Agreement dated 6 November 2018, and the Fourth Defendant is a party to the Proceeds Agreement dated 22 December 2017;

    (b)    two Head Lease Agreements dated 19 November 2018 and 29 December 2017 (each a "**Head Lease**");

    (c)    two Sub-Lease Agreements with Vietnam Airlines JSC (the "**Sub-Lessee**" and the "**Sub-Leases**") dated 4 December 2016 and 1 August 2017; and

    (d)    two Borrower Security Assignments dated 21 November 2018 and 29 December 2017, pursuant to which the Borrowers' rights under, inter alia, the Head Leases and Sub Leases were assigned to the Security Agent.

5.    In December 2021, the Claimant became a party to the Proceeds Agreements when it (a) succeeded Credit Agricole Corporate & Investment Bank as Security Agent under the Transaction Documents pursuant to two Resignation and Appointment Agreements dated 2 December 2021, and (b) became a Lender under those agreements by acquiring approximately US $128 million in outstanding obligations issued by the Borrowers.

6.    The First and Second Defendants also provided separate undertakings to the Claimant (in its capacity as Security Agent) pursuant to (a) two Borrower Parent letters dated 22 December 2017 and 6 November 2018 (the "**Borrower Parent Letters**") as regards the First Defendant, and (b) two Intermediate Lessor Parent Letters dated 22 December 2017 and 6 November 2018 (the "**Intermediate Lessor Parent Letters**") as regards the Second Defendant (collectively, the "**Parent Letters**").

7.    On 1 December 2021, following the occurrence of certain events of default under the Transaction Documents, the leasing of each Aircraft was terminated and the Sub-Lessee was required immediately to cease operating the Aircraft.  The Sub-Lessee has continued

to breach its obligations pursuant to each Sub-Lease, including inter alia, by continuing to operate the Aircraft. The Third and Fourth Defendants have not used their reasonable endeavours to procure that the Sub-Lessee complies with its obligations under the relevant Sub-Lease.

8.     On 10 December 2021, the Claimant (in its capacity as Security Agent) appointed Airborne Capital Limited ("**Airborne**") to conduct a sale of its lease-related rights (the "**Sales Process**"). Airborne advertised the pending sale and offered detailed bidding procedures to any parties who expressed interest in the sale.

9.     On 17 December 2021, the Borrowers filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code (the "**Chapter 11 Filing**") with the support and/or acquiescence of the First, Second, Third and Fourth Defendants (for example, statements were filed in support of the Chapter 11 Filing by the CEOs of the First and Second Defendants (the latter being the Fifth Defendant)). The First Defendant also paid money into a retainer account in the United States seemingly for the purpose of allowing the Borrowers to assert that the US Bankruptcy Court has jurisdiction over the bankruptcy. The Chapter 11 Filing purported to include the Claimant's property as part of the Borrowers' bankruptcy estates. The Chapter 11 Filing has also interfered with the Sales Process. It remains unclear when, or if, that process will be able to recommence.

10.    On 20 December 2021, the Fifth Defendant (with the authorisation and/or acquiescence of the First and Second Defendants) described the Claimant as a *"financial terrorist"* during a telephone conversation with the CEO of Airborne, Mr Ramki Sundaram, in connection with the Claimant's business dealings with the First Defendant (the "**Offending Statements**"). These statements are false and defamatory of the Claimant. During the same conversation, the Fifth Defendant also threatened to take (and impliedly that the First and Second Defendants would take) steps to harm the reputation of Airborne and Mr Sundaram if Airborne did not resign immediately from its engagement by the Claimant. The Fifth Defendant had previously made similar threats to Airborne in text messages sent to Cian Dooley (an Executive Director at Airborne) on or around 17 December 2021 stating that, if Airborne did not resign immediately from its engagement by the Claimant, the Fifth Defendant (and impliedly the First and Second Defendants) would take steps to cause reputational harm to Airborne and Mr Dooley. The Fifth Defendant also stated that he would be contacting other prominent participants in the aviation sector (notably, Airbus, Boeing and Aviation Working Group) to ensure that no one in the industry works with the Claimant again (the "**Further Threats**").

11.    The First Defendant breached:

(a)    clause 3.1.3 of each of the Proceeds Agreements, which requires the First Defendant not to, and to procure that its Affiliates (including the Borrowers and the Second to Fourth Defendants) will not, "*file or join in any ... action or proceedings for the winding-up, dissolution, administration or examinership of the Borrower[s] ... or take, or acquiesce in, any other action which might reasonably be expected to lead to the bankruptcy or insolvency of the Borrower[s] ...*";

(b)    clause 10.2.3(c) of each of the Proceeds Agreements, under which the First Defendant has undertaken not to, and to procure that its Affiliates (including the Borrowers and the Second to Fourth Defendants) will not, "*file or join in any ...*

action or proceedings for the winding-up, dissolution, administration or examinership of the Borrower[s] ... or take, or acquiesce in, any other action which might reasonably be expected to lead to the bankruptcy or insolvency of the Borrower[s] ...";

(c)   clause 1(b) of each of the Borrower Parent Letters, under which the First Defendant agreed to ensure that the Borrowers would "...*remain solvent and [would] not be liquidated or dissolved or merged or reorganised in any other matter*"; and

(d)   clause 1(d) of the Borrower Parent Letters, under which the First Defendant agreed to ensure that the Borrowers would "*duly and punctually perform and comply with [their] obligations*" under the relevant Transaction Documents. Whilst the Borrowers are not defendants to this claim, they separately breached their obligations under the Transaction Documents, including (but not limited to) clauses 19.23 and 19.26 of two Senior Facility Agreements dated 22 December 2017 and 6 November 2018.

12.   For the reasons set out in paragraphs 13 to 18 below, the Second Defendant breached clause 1(d) of each of the Intermediate Lessor Parent Letters, under which the Second Defendant agreed to ensure that the Third and Fourth Defendants would "*duly and punctually perform and comply with [their] obligations*" under the relevant Transaction Documents.

13.   The Third Defendant breached clause 3.2.3 of the Proceeds Agreement dated 6 November 2018, which requires the Third Defendant not to, and to procure that its Affiliates (including the Borrowers and the First and Second Defendants) will not, "*file or join in any ... action or proceedings for the winding-up, dissolution, administration or examinership of the Borrower[s] or take, or acquiesce in, any other action which might reasonably be expected to lead to the bankruptcy or insolvency of the Borrower[s] ...*".

14.   The Third Defendant breached clause 3.6 of the Head Lease Agreement dated 19 November 2018, which requires the Third Defendant to "*use its reasonable endeavours to procure that the Sub-Lessee complies with the Sub-Lessee's obligations under the Sub-Lease (including, without limitation as relate to the insurance, operation and maintenance of the Aircraft)*".

15.   By failing to prevent the First and Second Defendants from making the Offending Statements and the Further Threats (via the Fifth Defendant), the Third Defendant breached clause 11.3.23(a) of the Proceeds Agreement dated 6 November 2018, which requires it to ensure that no Obligor (including the First and Second Defendants) shall "... *engage in any Anti-Social Conduct, whether directly or indirectly through a third party*." "Anti-Social Conduct" is defined to include actions to "*defame the reputation or interfere with the business of any Finance Party* [including the Claimant] *by spreading rumour, using fraudulent means or resorting to force*" and "*other actions similar or analogous to any of the foregoing in any jurisdiction*".

16.   The Fourth Defendant breached clause 3.2.3 of the Proceeds Agreement dated 22 December 2017, which requires the Fourth Defendant not to, and to procure that its Affiliates (including the Borrowers and the First and Second Defendants) will not, "*file or join in any ... action or proceedings for the winding-up, dissolution, administration or*

*examinership of the Borrower[s] or take, or acquiesce in, any other action which might reasonably be expected to lead to the bankruptcy or insolvency of the Borrower[s] …".*

17.   The Fourth Defendant breached clause 3.6 of the Head Lease Agreement dated 29 December 2017, which requires the Fourth Defendant to "*use its reasonable endeavours to procure that the Sub-Lessee complies with the Sub-Lessee's obligations under the Sub-Lease (including, without limitation as relate to the insurance, operation and maintenance of the Aircraft)*".

18.   By failing to prevent the First and Second Defendants from making the Offending Statement and the Further Threats (via the Fifth Defendant), the Fourth Defendant breached clause 11.3.23(a) of the Proceeds Agreement dated 22 December 2017, which requires it to ensure that no Obligor (including the First and Second Defendants) shall "… *engage in any Anti-Social Conduct* (as defined in paragraph 15 above)*, whether directly or indirectly through a third party*."

19.   Separately, the First, Second and Fifth Defendants are each liable to the Claimant:

(a)   in defamation having participated in the publication of the Offending Statements, which have caused or are likely to cause serious financial harm to the Claimant;

(b)   in malicious falsehood having participated in the malicious publication of the Offending Statements;

(c)   for having unlawfully interfered with the Claimant's business, including the proper exercise of the Claimant's legal and commercial rights under the Transaction Documents, by breaching the Proceeds Agreements and the Parent Letters and/or participating in the publication of the Offending Statements and the Further Threats; and

(d)   for engaging in a conspiracy aimed at preventing the proper exercise of the Claimant's legal and commercial rights under the Transaction Documents and adversely impacting its business more generally.  Those defendants used unlawful means to achieve their objective (including by breaching the Proceeds Agreements and the Parent Letters and/or participating in the publication of the Offending Statements and the Further Threats) and intended to cause harm to the Claimant.

20.   Accordingly, the Claimant claims:

(a)   damages (including but not limited to losses incurred in connection with the Chapter 11 Filing, the wasted costs of the Sales Process, damage to reputation and other losses arising from interference with the Claimant's business);

(b)   interest;

(c)   costs.

**Exhibit 21**

<u>**IN THE HIGH COURT OF JUSTICE**</u>  **Claim No. QB-2022-000199**

<u>**QUEEN'S BENCH DIVISION**</u>

<u>**MEDIA AND COMMUNICATIONS LIST**</u>

**B E T W E E N :**

**FITZWALTER CAPITAL PARTNERS (FINANCIAL TRADING) LIMITED**

<u>**Claimant**</u>

**- and -**

**(1) JP LEASE PRODUCTS & SERVICES CO., LTD.**

**(2) JLPS IRELAND LIMITED**

**(formerly JLPS Holding Ireland Limited)**

**(3) JLPS LEASING DRACO LIMITED**

**(formerly DAE Leasing (Ireland) 12 Limited)**

**(4) JLPS LEASING URANUS LIMITED**

**(formerly PAAL Uranus Company Limited)**

**(5) HEINRICH LOECHTEKEN**

<u>**Defendants**</u>

—————————————————————————

**PARTICULARS OF CLAIM**

—————————————————————————

## A.    INTRODUCTION

1.    The Claimant is an investment management company incorporated under the laws of England and Wales.

2.    The First Defendant is a financial services firm incorporated under the laws of Japan. The First Defendant is the parent company of two special purpose investment vehicles (JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd.) formed under the laws of Japan and created for the express and sole purpose of acquiring and leasing Airbus 350 aircraft (each a "**Borrower**" and together the "**Borrowers**").

1

3.      The Second to Fourth Defendants are subsidiaries of the First Defendant.

4.      The Fifth Defendant is the Chief Executive Officer ("**CEO**") of the Second Defendant.

## B.      TRANSACTION DOCUMENTS

5.      The Claimant and the First to Fourth Defendants are, amongst others, parties to various transaction documents relating to the financing of two Airbus A350 aircraft (with manufacturer's serial numbers ("**MSN**") 67 and 173) (together, the "**Aircraft**"). The relevant Borrower in relation to MSN 67 is JPA No. 111 Co., Ltd. and the Borrower in relation to MSN 173 is JPA No. 49 Co., Ltd.

6.      The transaction documents include:

    6.1    two Proceeds Agreements dated 22 December 2017 and 6 November 2018, the terms of which are mostly identical (the "**Proceeds Agreements**");

    6.2    two Head Lease Agreements dated 19 November 2018 and 29 December 2017 (each a "**Head Lease**");

    6.3    two Sub-Lease Agreements with Vietnam Airlines JSC (the "**Sub-Lessee**" and the "**Sub-Leases**") dated 4 December 2016 and 1 August 2017; and

    6.4    two Borrower Security Assignments dated 21 November 2018 and 29 December 2017, pursuant to which the Borrowers' rights under, inter alia, the Head Leases and Sub Leases were assigned to the Security Agent.

7.      The Claimant makes the following claims in its capacity as Security Agent under the relevant transaction documents. The Claimant will rely on the transaction documents as necessary at trial for their full terms, true meaning and effect. Without prejudice to that position, the material provisions of the transaction documents relevant to this claim are set out below.

## (1)      Transaction documents relating to MSN 173

8.      Pursuant to the Proceeds Agreement in respect of the financing of one Airbus A350-941 aircraft with MSN 173 dated 22 December 2017 ("**the MSN 173 Proceeds Agreement**"), the First Defendant (as "Borrower Parent") and the Fourth

2

Defendant (as "Intermediate Lessor") (by way of the Proceeds Agreement Accession Undertaking dated 29 December 2017) agreed (amongst others) as follows:

8.1    Clause 3 provided, under the heading "NON-PETITIONING", as follows:

3.1    **The Borrower Parent hereby agrees in favour of each of the Finance Parties that until the Secured Obligations Discharge Date it shall not:**

…

3.1.3    (and shall procure that its Affiliates will not) file or join in any petition to commence any winding-up proceedings by or against the Borrower or the Intermediate Lessor or any other action or proceedings for the winding-up, dissolution, administration or examinership of the Borrower or the Intermediate Lessor or take, or acquiesce in, any other action which might reasonably be expected to lead to the bankruptcy or insolvency of the Borrower or the Intermediate Lessor, save as required by applicable law or with the consent of the Security Agent.

3.2    **The Intermediate Lessor hereby agrees in favour of each of the Finance Parties that until the Secured Obligations Discharge Date it shall not:**

…

3.2.3    (and shall procure that its Affiliates will not) file or join in any petition to commence any winding-up proceedings by or against the Borrower or any other action or proceedings for the winding-up, dissolution, administration or examinership of the Borrower or take, or acquiesce in, any other action which might reasonably be expected to lead to the bankruptcy or insolvency of the Borrower, save as required by applicable law or with the consent of the Security Agent.

8.2    Clause 10 provided, under the heading "BORROWER PARENT UNDERTAKINGS", as follows:

10.2    **Service Agreement and Lease Management Agreement**

…

10.2.3    The Borrower Parent hereby unconditionally and irrevocably agrees with the Finances Parties that the it [*sic*] shall not, during the Security Period:

…

3

(c)      (and shall procure that its Affiliates will not) file or join in any petition to commence any winding-up proceedings by or against the Borrower or the Intermediate Lessor or any other action or proceedings for the winding-up, dissolution, administration or examinership of the Borrower or the Intermediate Lessor or take, or acquiesce in, any other action which might reasonably be expected to lead to the bankruptcy or insolvency of the Borrower or the Intermediate Lessor, save as required by applicable law or with the consent of the Security Agent.

8.3      Clause 11 provided, under the heading "INTERMEDIATE LESSOR", as follows:

11.3.23 *Anti-Social Forces, Relationship and Conduct*

(a)      The Intermediate Lessor shall ensure that no Obligor shall (x) have any relationship with any Anti-Social Forces or any person under the control of any Anti-Social Forces, (y) have any Anti-Social Relationship or (z) engage in any Anti-Social Conduct, whether directly or indirectly through a third party.

(b)      The Intermediate Lessor shall promptly provide to the Security Agent such documents or information pertaining to it and within its possession (including, without limitation, registered or principal office, residential address, formal name, birth date) as the Security Agent shall reasonably request for the purposes of screening to identify Anti-Social Conduct, Anti-Social Forces and Anti-Social Relationship by the Security Agent.

(c)      The Intermediate Lessor shall not engage, directly or indirectly, in (i) any demand or claim under the threat of violence; (ii) any unreasonable demand or claim under the threat of actions that are not legally permissible; (iii) any blackmail or assault, physically or verbally; (iv) any obstructive activities, including, but not limited to, disseminating information or fraudulent activities for the purpose of falsely harming a Lender's creditworthiness or impeding a Lender's business; or (v) other actions similar or analogous to any of the foregoing.

(d)      Upon receiving information which provides to a reasonable certainty that a violation of this Clause 11.3.23 has occurred, the Intermediate Lessor shall immediately advise the Security Agent of the occurrence and take all actions reasonably necessary to mitigate, correct and report such occurrence, under

4

law or otherwise (such steps may include termination or severance of the individual(s) involved).

8.4    Appendix A contained the following definitions:

"**Affiliate**" means, in relation to any person, any other person which, directly or indirectly, controls or is controlled by or is under common control with such person and for the purposes of this definition, "control" when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise and the terms "**controlling**" and "**controlled**" shall be construed accordingly.

…

"**Anti-Social Conduct**" means:

(a)    a demand and conduct with force and arms;

(b)    an unreasonable demand and conduct having no legal cause;

(c)    threatening or committing violent behaviour relating to its business transactions;

(d)    an action to defame the reputation or interfere with the business of any Finance Party by spreading rumour, using fraudulent means or resorting to force; or

(e)    other actions similar or analogous to any of the foregoing in any jurisdiction.

…

"**Finance Parties**" means, together, the Lenders, the Security Agent, the Senior Agent, the Junior Agent, the Mandated Lead Arranger,[1] the Hedging Counterparty and the Account Bank.

…

"**Obligors**" means, collectively, the Borrower, the Intermediate Lessor, the Intermediate Lessor Parent and the Borrower Parent (each an "**Obligor**").

…

"**Secured Obligations Discharge Date**" means the date on which the Security Interests constituted by the Security Documents are required to be released, discharged and/or re-assigned pursuant to Clause 7 (*Release of Security*) of the

---

[1] The MSN 67 Proceeds Agreement, as defined below, does not include reference to the Mandated Lead Arranger.

5

Proceeds Agreement.

…

"**Security Period**" means the period commencing on the first Utilisation Date and expiring on the Secured Obligations Discharge Date.

…

"**Utilisation Date**" means the date of a Utilisation, being the date on which the Senior Loan or the Junior Loan (as applicable) is, or is to be, made.

…

9.   On 22 December 2017, the First Defendant executed a Parent Letter in favour of the Security Agent in respect of the Borrower's obligations ("**the MSN 173 Borrower Parent Letter**") by which it agreed (amongst other things) as follows (references to the "Company" being references to the "Borrower"):

1.   In consideration of the foregoing, the Parent hereby agrees with the Security Agent (acting for and on behalf of the Lenders) that, unless and until the Company shall have performed and discharged in full its obligations to the Transaction Documents to which the Company is a party (the "**Lessor Documents**"):

(a)   except with the prior written consent of the Security Agent, the Parent will continue to control the Company and directly hold the legal and beneficial ownership of the entire issued share capital in the Company;

(b)   the Parent will ensure that the Company will be properly and diligently managed, will remain solvent and will not be liquidated or dissolved or merged or reorganised in any other manner;

…

(d)   the Parent will ensure that the Company shall duly and punctually perform and comply with its obligations, covenants and agreements under the Lessor Documents pursuant to the terms and conditions thereof and contained therein (including, without limitation, the personal liability of the Borrower pursuant to and in accordance with clause 6.2 (*Personal Liability*) of the Senior Facility Agreement) and clause 6.2 (*Personal Liability*) of the Junior Facility Agreement) …

…

**provided that** the Parent shall not be liable or responsible for any breach in respect of paragraph (b) above if such breach is caused solely and directly by any Lease Event of Default or an event which with the lapse of time or giving of notice could become a Lease Event of

6

Default.

2.      In further consideration of the Finance Parties entering into the
Transaction Documents to which they are a party, we hereby undertake
to you that, for so long as the Company shall have any undischarged
obligations to the Finance Parties under the Lessor Documents,
whether jointly or severally incurred: (1) we shall indemnify each of
the Finance Parties and keep them indemnified against any and all
costs, losses and expenses that they may suffer or incur (i) arising out
of the Parent failing to perform its undertakings in this Letter; …

…

5.      This Letter shall be governed by and construed in accordance with the
laws of Japan.

10.    On 22 December 2017, the Second Defendant executed a Parent Letter in favour of
the Security Agent ("**the MSN 173 Intermediate Lessor Parent Letter**") on terms
materially the same as those set out in paragraph 9 above albeit in respect of the
obligations of the Fourth Defendant as "Intermediate Lessor". Therefore,
references to "the Company" in the MSN 173 Intermediate Lessor Parent Letter are
to the Fourth Defendant as Intermediate Lessor.

**(2)      Transaction documents relating to MSN 67**

11.    Pursuant to a Proceeds Agreement in respect of the financing of one Airbus A350-
900 aircraft with MSN 67 dated 6 November 2018 ("**the MSN 67 Proceeds
Agreement**"), the First Defendant (as "Borrower Parent") and the Third Defendant
(as "Intermediate Lessor") (by way of the Proceeds Agreement Accession
Undertaking dated 21 November 2018) agreed (amongst others) materially the
same terms as set out in paragraph 8 above.

12.    On 6 November 2018, the First Defendant executed a Parent Letter in favour of the
Security Agent in respect of the Borrower's Obligations ("**the MSN 67 Borrower
Parent Letter**") on terms materially the same as those set out in paragraph 9 above.

13.    On 6 November 2018, the Second Defendant executed a Parent Letter in favour of
the Security Agent ("**the MSN 67 Intermediate Lessor Parent Letter**") on terms
materially the same as those set out in paragraph 9 above albeit in respect of the
obligations of the Third Defendant as "Intermediate Lessor". Therefore, references
to "the Company" in the MSN 67 Intermediate Lessor Parent Letter are to the Third

7

Defendant as Intermediate Lessor.

**(3)     The Claimant as Lender and Security Agent**

14.     In December 2021, the Claimant became a party to the MSN 173 and MSN 67
Proceeds Agreements when it (a) succeeded Credit Agricole Corporate &
Investment Bank as Security Agent pursuant to two Resignation and Appointment
Agreements dated 2 December 2021, and (b) became a Lender under those
agreements by acquiring approximately US $128 million in outstanding obligations
issued by the Borrowers.

15.     On 1 December 2021, following the occurrence of certain events of default under
the transaction documents, the leasing of each Aircraft was terminated and the Sub-
Lessee was required immediately to cease operating the Aircraft. In this connection,
the Borrowers were in breach of (amongst other obligations) clauses 19.23 and
19.26 of two Senior Facility Agreements dated 22 December 2017 and 6 November
2018 respectively. As a result, the First Defendant is in breach of its obligation
under Clause 1(d) of the Borrower Parent Letters. The Claimant reserves the right
to claim damages for the aforesaid breaches in due course.

16.     The Sub-Lessee has breached its obligations pursuant to each Sub-Lease, including
inter alia, by continuing to operate the Aircraft. Contrary to their obligations under
clause 3.6 of each of the Head Lease Agreements, dated 19 November 2018 and 29
December 2017 the Third and Fourth Defendants have failed to use their reasonable
endeavours to procure that the Sub-Lessee complies with its obligations under the
relevant Sub-Lease. Furthermore, the Second Defendant is in breach of its
obligations under Clause 1(d) of the MSN 67 Intermediate Lessor Parent Letter and
the MSN 173 Intermediate Lessor Parent Letter by failing to ensure that the Third
Defendant and/or Fourth Defendant would duly and punctually perform and
comply with their obligations. The Claimant reserves the right to claim damages
for the aforesaid breaches in due course.

17.     On 10 December 2021, the Claimant (in its capacity as Security Agent) appointed
Airborne Capital Limited ("**Airborne**") to conduct a sale of its lease-related rights
(the "**Sales Process**"). Airborne advertised the pending sale and offered detailed

8

bidding procedures to any parties who expressed interest in the sale. However, for the reasons set out below, the Sales Process has been frustrated by the unlawful actions of the Defendants.

## C. LIABILITY

### (1) Chapter 11 bankruptcy in the United States

(a) <u>Breach of contract: Chapter 11 Filing</u>

18. On 17 December 2021, the Borrowers filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code (the "**Chapter 11 Filing**").

19. As a result of the Chapter 11 Filing, the First Defendant (as Borrower Parent) is breach of its obligations under Clause 3.1.3 and 10.2.3(c) of the Proceeds Agreements (see paragraphs 8.1, 8.2 and 11 above) and Clause 1(b) of the Parent Letters (see paragraphs 9 and 12 above).

PARTICULARS OF BREACH

19.1 The First Defendant failed to procure that the Borrowers (being one of the First Defendant's Affiliates as defined) would not file or join in the Chapter 11 Filing. In this connection, the First Defendant held the entire share capital of the Borrowers and thereby retained control over the Borrowers (and expressly agreed it would continue to do so under Clause 1(a) of the Parent Letters: see paragraphs 9 and 12 above).

19.2 The Chapter 11 Filing was and continues to be supported by a declaration given by Mr Teiji Ishikawa (President and Chief Executive Officer of First Defendant), such that the First Defendant has joined in and/or acquiesced and/or engaged in action which might reasonably be expected to lead to the bankruptcy or insolvency of the Borrowers.

19.3 Mr Ishikawa acts as the Representative Director for each of the Borrowers in the Chapter 11 Filing.

19.4 The First Defendant paid money into a retainer account in the United States seemingly for the sole purpose of allowing the Borrowers to assert that the US Bankruptcy Court has jurisdiction over the bankruptcy.

19.5    The First Defendant also failed to procure that the Second Defendant (being one of the First Defendant's Affiliates as defined) would not file or join in the Chapter 11 Filing. In this connection, the Chapter 11 Filing is supported by a declaration by the Fifth Defendant (as CEO of the Second Defendant).

19.6    Further, as stated in the deposition evidence of the Fifth Defendant taken on 23 January 2022, the decision to make the Chapter 11 Filing was taken by the First Defendant and the Second Defendant.

20.    The Fourth Defendant (as Intermediate Lessor) is in breach of its obligations under Clause 3.2.3 of the MSN 173 Proceeds Agreement (see paragraphs 8.1 and 11 above) by failing to procure that the Borrower and/or the First Defendant and/or the Second Defendant and/or the Third Defendant (each being one of the Fourth Defendant's Affiliates as defined) would not file or join in the Chapter 11 Filing. The Claimant relies on and repeats the matters set out in paragraph 19 above.

21.    The Third Defendant (as Intermediate Lessor) is in breach of its obligations under Clause 3.2.3 of the MSN 67 Proceeds Agreement (see paragraphs 8.1 and 11 above) by failing to procure that the Borrower and/or the First Defendant and/or the Second Defendant and/or the Fourth Defendant (each being one of the Third Defendant's Affiliates as defined) would not file or join in the Chapter 11 Filing. The Claimant relies on and repeats the matters set out in paragraphs 19 and 20 above.

22.    The Second Defendant is in breach of its obligations under Clause 1(d) of the MSN 67 Intermediate Lessor Parent Letter and the MSN 173 Intermediate Lessor Parent Letter (see paragraphs 10 and 13 above) by failing to ensure that the Third Defendant and/or Fourth Defendant would duly and punctually perform and comply with their obligations (as to which the Claimant relies on and repeats paragraphs 20 and 21 above).

(b)    Breach of contract: the Purported Enforcement Sale

23.    On 21 January 2022, the Borrowers filed a Notice of Enforcement Sale and General Conveyance and Bill of Sale, which purported to assign certain property said to be the property of the Third and Fourth Defendants (the "**Purported Enforcement Sale**"). The notice of the Purported Enforcement Sale was signed by Niall McNamara as director of the Third and Fourth Defendants.

10

21-12075-dsj   Doc 119   Filed 02/17/22   Entered 02/17/22 15:51:37   Main Document
Pg 172 of 176

24.     By purporting to assign property as part of the Purported Enforcement Sale, the Fourth Defendant breached clause 11.3.4(b) of the Proceeds Agreement, which provides that the Fourth Defendant "*shall not without the prior written consent of the Security Agent* [i.e. the Claimant]: *[...] (i) sell, transfer, assign its rights in respect of or otherwise dispose of any of the collateral other than pursuant to the Security Documents*", in circumstances where the Fourth Defendant had not in fact obtained such consent from the Claimant, and where the Purported Enforcement Sale was not carried out "pursuant to the Security Documents".

(c)     <u>Inducing or procuring a breach of contract</u>

25.     By reason the matters set out in paragraphs 18 to 24 above, the First Defendant and/or Second Defendant and/or the Fifth Defendant are liable for the tort of inducing or procuring a breach of contract in that the First Defendant, Second Defendant and Fifth Defendant (each and all of them) were aware that the Chapter 11 Filing would constitute a breach of contract as set out above and took active steps to support the Chapter 11 Filing. Indeed, as the Fifth Defendant stated during his deposition evidence of the Fifth Defendant taken on 23 January 2022, "*we perfectly understand that there was a clause in the contract that effectively prohibits us from filing for Chapter 11. So we discussed the consequences of filing for bankruptcy relief with that clause in mind*" ("*we*" meaning, at the least, the First Defendant, Second Defendant and the Fifth Defendant).

(d)     <u>Conspiracy</u>

26.     The Defendants (and each of them) were party to a conspiracy to injure the Claimant by unlawful means. The unlawful means consist of the breaches of contract identified in paragraphs 18 to 24 above. Pending disclosure, the existence of a joint enterprise falls to be inferred from the matters set out in paragraph 19 above. As is evident from the Fifth Defendant's deposition taken on 23 January 2022, the Defendants (and each of them) made and/or supported and/or acquiesced in the Chapter 11 Filing for the sole purpose of frustrating the Sales Process and thereby to interfere with Claimant's contractual rights under the transaction documents.

**(2)     Statements and threats to damage the Claimant's business**

27.     On or around 21 December 2021, the Fifth Defendant described the Claimant as a

11

*"financial terrorist"* during a telephone conversation with the CEO of Airborne, Mr Ramki Sundaram, in connection with the Claimant's business dealings with the First Defendant (the "**Offending Statements**"). These statements are false and defamatory of the Claimant.

28.    During the same conversation, the Fifth Defendant also threatened to take (and impliedly that the First and Second Defendants would take) steps to harm the reputation of Airborne if Airborne did not resign immediately from its engagement by the Claimant. The Fifth Defendant had previously made similar threats to Airborne in a text message sent to Cian Dooley (an Executive Director at Airborne) on or around 19 December 021 stating that, if Airborne did not resign immediately from its engagement by the Claimant, the Fifth Defendant (and impliedly the First and Second Defendants) would take steps to cause reputational harm to Airborne in the view of participants in the aviation sector. The Fifth Defendant also stated that he already spoken to senior management at Airbus and Boeing and the President of the International Society of Transport Aircraft Trading (ISTAT) (the "**Further Threats**").

29.    The Offending Statements and/or the Further Threats were made with the authorisation and/or acquiescence of the First Defendant and/or the Second Defendant and which are thereby to be attributed to the First Defendant and/or the Second Defendant.

(a)    <u>Breach of contract: Anti-Social Conduct</u>

30.    The Offending Statements and/or Further Threats amount to a breach by the Third Defendant (as Intermediate Lessor) and/or the Fourth Defendant (as Intermediate Lessor) of Clause 11.3.23(a) of the MSN 173 Proceeds Agreement and the MSN 67 Proceeds Agreement respectively (see paragraphs 8.3 to 11 above). In particular:

30.1    The Third Defendant and/or the Fourth Defendant failed to ensure that the First Defendant and/or the Second Defendant (both of which fall within the definition of an Obligor) did not engage in any Anti-Social Conduct, whether directly or indirectly through a third party (including via the Fifth Defendant).

30.2    The Offending Statements amounted to Anti-Social Conduct as being (a)

12

conduct having no legal cause and/or (b) an action to defame the reputation or interfere with the business of the Claimant by spreading rumour and/or (c) was a similar or analogous action.

30.3    The Further Threats amounted to Anti-Social Conduct as being (a) an unreasonable demand and conduct having no legal cause and/or (b) was a similar or analogous action.

31.    Furthermore, the Second Defendant is in breach of its obligations under Clause 1(d) of the MSN 67 Intermediate Lessor Parent Letter and the MSN 173 Intermediate Lessor Parent Letter by failing to ensure that the Third Defendant and/or Fourth Defendant would duly and punctually perform and comply with their obligations.

(b)    <u>Conspiracy to injure</u>

32.    The Defendants (and each of them) were party to a conspiracy to injure the Claimant by unlawful means. The unlawful means consist of the breaches of contract identified in paragraph 30 above and/or the defamation pleaded at paragraph 33 below and/or the malicious falsehood pleaded at paragraph 34 below. Pending disclosure, the existence of a joint enterprise falls to be inferred from the common control between the Defendants and the fact that the Offending Statements and the Further Threats were part of a wider campaign of interfering with the Claimant's contractual rights and/or the Claimant's business more generally, which included the Chapter 11 Filing.

(c)    <u>Defamation</u>

33.    The Offending Statements were defamatory. In particular:

33.1    In their natural and ordinary meaning and in context, the words complained of meant and were understood to mean that the Claimant had been and would continue to be engaged in unlawful conduct, alternatively disreputable conduct, alternatively commercially or morally unacceptable conduct, in respect of its business and its dealings with the Defendants.

33.2    The Offending Statements have caused and/or are likely to cause serious financial harm to the Claimant. The serious harm arises from the fact that the Offending Statements were published to significant individuals and/or

13

entities in the aviation sector and who are (collectively and individually) highly influential to the Claimant's prospects of engaging in further business in the aviation finance sector.

(d)    Malicious falsehood

34.    The Defendants are liable for the tort of malicious falsehood by virtue of the following:

34.1    The Offending Statements were false. Claimant is not a "*financial terrorist*" and had not engaged in any of the conduct described in paragraph 33 above.

34.2    The Offending Statements were made maliciously. The Fifth Defendant (and through him the First to Fourth Defendants) intended to damage the reputation of the Claimant and interfere with the exercise of its contractual rights, including the Sales Process.

**D.    LOSS AND DAMAGE**

35.    By reason of the above breaches of duty, the Claimant has suffered loss and damage. The precise extent of that loss and damage is yet to be ascertained and the Claimant reserves the right to further particularise its claim for damages when the position becomes clear.

36.    Without prejudice to the foregoing, the Claimant claims:

36.1    The losses sustained in respect of the Chapter 11 Filing, which will include the legal and management costs of the Chapter 11 Filing, the losses associated with the Claimant's inability to exercise its contractual rights under the transaction documents and/or the wasted costs of the Sales Process and/or the additional costs associated with any further Sales Process.

36.2    The losses sustained as a result of the Offending Statements and/or Further Threats, which will include damages for loss of reputation and/or loss of profits as a result of the interference with the Claimant's business.

37.    Further, the Claimant is entitled to and claims interest pursuant to Section 35A of

14

the Senior Courts Act 1981 for such period and in such amount as the Court thinks fit.

AND the Claimant claims:

(1) Damages

(2) Interest as aforesaid

(3) Costs

**CHRISTOPHER LANGLEY**