**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| JPA NO. 111 CO., LTD., and | : | Case No. 21-12075 (DSJ) |
| JPA NO. 49 CO., LTD., | : |  |
|  | : | (Jointly Administered) |
| Debtors[1]. | : |  |
|  | : |  |

### FITZWALTER CAPITAL PARTNERS (FINANCIAL TRADING) LIMITED'S
### PRELIMINARY OBJECTION TO SALE

---

[1]   The Debtors in these Chapter 11 cases are:  JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd. The Debtors' corporate address is:   Kasumigaseki Common Gate West Tower, 3-2-1 Kasumigaseki, Chiyoda–Ku, Tokyo 100-0013.

# TABLE OF CONTENTS

**Page**

SUMMARY OF OBJECTION ............................................................................. 1

JURISDICTION AND VENUE ......................................................................... 4

FACTUAL BACKGROUND ............................................................................. 4

    A.    Formation Of The Debtors And The Acquisition Of The Aircraft ....................... 4

    B.    The Security Agent's Property Interests ............................................. 7

    C.    Events Leading To This Bankruptcy ............................................... 15

    D.    FWCP's Claims Against The Debtors' Affiliates ................................. 22

OBJECTION ................................................................................................... 25

I.     THE DEBTORS CANNOT SELL ASSETS THEY DO NOT OWN ........................... 26

    A.    The Lease Assets Belong To FWCP And The Debtors Cannot Sell Any Of The Lease Assets Until The Secured Obligations Are Paid In Full. .................. 26

    B.    The VNA Claims Revert To The Intermediate Lessors Upon Satisfaction Of The Secured Obligations ............................................................... 32

    C.    The Debtors Cannot Assume And Assign Contracts To Which They Are Not Party ............................................................................................. 34

II.    THE DEBTORS CANNOT SELL THE COLLATERAL FREE AND CLEAR OF THE SECURITY AGENT'S PROPERTY INTERESTS. .............................................. 35

    A.    The Extent Of The Debtors' Interest In The Lease Assets Must Be Determined By Adversary Proceeding Prior To A 363(f) Sale. ........................ 36

    B.    The Debtors Have Not Established That Any Of The Requirements Of Section 363(f) Apply ....................................................................... 37

    C.    The Debtors May Not Sell The Collateral Free And Clear Of FWCP's Claims For Wrongful Conduct That Occurred Post-Petition .......................... 41

III.   THE DEBTORS CANNOT PAY THE JUNIOR LENDERS DIRECTLY IN VIOLATION OF SECTION 510(A) AND THE PROCEEDS AGREEMENT ............. 42

IV.   THE DEBTORS ARE NOT ENTITLED TO A FINDING OF GOOD FAITH. ........... 43

CONCLUSION ............................................................................................... 44

# TABLE OF AUTHORITIES

**Page**

## Cases

*Barnes v. Barnes (In re Barnes)*,
  615 B.R. 514 (Bankr. D. Conn. 2020) ................................................................. 39

*Butner v. United States*,
  440 U.S. 48 (1979) ..................................................................................... 25, 28

*Czyzewski v. Jevic Holding Corp. (In re Jevic Holding Corp.)*,
  137 S. Ct. 973 (2017) ................................................................................... 41

*Darby v. Zimmerman (In re Popp)*,
  323 B.R. 260 (B.A.P. 9th Cir. 2005) ................................................................. 36

*Dishi & Sons v. Bay Condos LLC*,
  510 B.R. 696 (S.D.N.Y. 2014) .................................................................... 37, 40

*Elliott v. GM LLC (In re Motors Liquidation Co.)*,
  829 F.3d 135 (2d Cir. 2016) ........................................................................... 41

*First Fid. Bank, N.A. v. Jason Realty, L.P. (In re Jason Realty, L.P.)*,
  59 F.3d 423 (3d Cir. 1995) ............................................................................. 29

*In re Amaravathi Ltd. P'ship*,
  416 B.R. 618 (Bankr. S.D. Tex. 2009) ............................................................... 29

*In re Dundee Equity Corp.*,
  No. 89-B-10233, 1992 WL 53743 (Bankr. S.D.N.Y. Mar. 6, 1992) ...................................... 38

*In re Eastman Kodak Co.*,
  No. 12-10202 ALG, 2012 WL 2255719 (Bankr. S.D.N.Y. June 15, 2012) ........................... 35

*In re Flour City Bagels, LLC*,
  557 B.R. 53 (Bankr. W.D.N.Y. 2016) ............................................................ 38, 39

*In re Interiors of Yesterday, LLC*,
  No. 02-30563LMW, 2007 WL 419646 (Bankr. D. Conn. Feb. 2, 2007) ............................... 35

*In re Jaussi*,
  488 B.R. 456 (Bankr. D. Colo. 2013) ................................................................. 37

*In re LATAM Airlines Grp. S.A.*,
  620 B.R. 722 (Bankr. S.D.N.Y. Sept. 10, 2020) ................................................... 41

*In re Loco Realty Corp.*,
  2009 WL 2883050 (Bankr. S.D.N.Y. June 25, 2009) ............................................... 29

*In re Mocco*,
  176 B.R. 335 (Bankr. D.N.J. 1995) ................................................................... 29

*In re Princeton Overlook Joint Venture*,
  143 B.R. 625 (Bankr. D.N.J. 1992) ................................................................. 29

*In re Purdue Pharma, L.P.*,
  2021 WL 5979108 (S.D.N.Y. Dec. 16, 2021), *certificate of appealability granted*,
  2022 WL 121393 (S.D.N.Y. Jan. 7, 2022) ......................................................... 42

*In re Smith*,
  No. BR 13-61627-TMR7, 2014 WL 738784 (Bankr. D. Or. Feb. 26, 2014) ................... 38, 39

*In re Soho 25 Retail, LLC*,
  2011 WL 1333084 (Bankr. S.D.N.Y. Mar. 31, 2011) ............................................ 29

*Maury v. Ventura in Manhattan, Inc.*,
  544 F. Supp. 3d 396 (S.D.N.Y. 2021) ............................................................. 41

*Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*,
  4 F.3d 1095 (2d Cir. 1993) .......................................................................... 34

*Revel AC, Inc. v. IDEA Boardwalk LLC*,
  802 F.3d 558 (3d Cir. 2015) ......................................................................... 39

*Reverend C.T. Walker Hous. Dev. Fund Corp. v. City of New York*,
  586 B.R. 534 (E.D.N.Y. 2018) ...................................................................... 25

*U.S. Bank Nat'l Ass'n v. T.D. Bank, N.A.*,
  569 B.R. 12 (S.D.N.Y. 2017) ........................................................................ 42

### Statutory Authorities

11 U.S.C. § 8.3 .......................................................................................... 4

11 U.S.C. § 105 ......................................................................................... 4

11 U.S.C. § 363 ................................................................................... *passim*

11 U.S.C. § 365 .................................................................................... 33, 34

11 U.S.C. § 510(a) ................................................................................. 3, 41

11 U.S.C. § 541 ............................................................................ 3, 4, 25, 29

28 U.S.C. § 157 ......................................................................................... 4

28 U.S.C. § 1334 ....................................................................................... 4

28 U.S.C. § 1408 ....................................................................................... 4

28 U.S.C. § 1409 ....................................................................................... 4

### Rules and Regulations

Local Rule 1007-2 ...................................................................................... 4

Fed. R. Bankr. P. 7001(2) .................................................................................................. 36

### Additional Authorities

*Collier on Bankruptcy* ¶ (16th ed. 2021)..................................................................... 36

Section 136 of the Law of Property Act 1925 ......................................................... 26

FitzWalter Capital Partners (Financial Trading) Limited ("**FWCP**") respectfully submits this Preliminary Objection ("**Objection**") to the sale of substantially all of the Debtors' assets (the "**Sale**") based upon the terms of the *Stalking Horse Purchase Agreement* (Dkt. No. 58-5) (the "**APA**"), as modified by *Debtors' Statement Responding to This Court's Inquiries Regarding the Debtors' Motion to Approve Bidding Procedures* (Dkt. No. 90) (the "**Debtors' Statement**"), and the general sale terms.[2]

## SUMMARY OF OBJECTION

The Debtors improperly seek to utilize the Bankruptcy Code sections 363(b)(1) and 363(f) to authorize the sale of property, free and clear, that no Debtor's estate owns. In particular, the Debtors seek to sell rights to the Lease Assets that indisputably belong to FWCP. The "**Lease Assets**" consist of, *inter alia*, any and all rights arising under the Subleases (including claims against VNA) and the Head Leases. But the Debtors cannot sell these assets because, as confirmed by the testimony of Akhil Shah, FWCP's English law expert, the Lease Assets were absolutely assigned to the Security Agent. The Debtors' current rights as they relate to the Lease Assets are limited to their "equitable right to redeem," which is substantively meaningless unless and until the Secured Obligations owed to the secured lenders, including FWCP, are paid *in full*.[3] Critically,

---

[2]  Capitalized terms used but not defined in this Objection shall have the same meanings ascribed to them in the *Debtors' Application For Entry Of Orders (I)(A) Approving Bidding Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (B) Establishing Stalking Horse Bidders and Bid Protections; (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Authorizing Enforcement Actions; (E) Scheduling an Auction and Sale Hearing; and (F) Approving the Form and Manner of Notice Thereof; and (II)(A) Approving the Sale of the Purchased Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances; and (B) Granting Related Relief* (the "**Sale Motion**") (Dkt. No. 21) the APA, or FWCP's *Motion to Dismiss or Abstain from Hearing These Chapter 11 Cases* (Dkt. No. 22) (the "**Motion to Dismiss**"), as applicable.

[3]  *See* Transcript of Jan. 26, 2022 Hearing (Dkt. No. 94) ("**Hr'g Tr.**") 111:16-112:10, 185:2-6, 212:23-25.

as the Debtors and the Stalking Horse Bidders have admitted, the Purchase Price set forth in the APA will not be sufficient to pay the Secured Obligations in full.  Debtors' Statement ¶ 3 (Dkt. No. 90).  The Proceeds Agreement could not be more clear:  Secured Obligations includes amounts over and above what the Purchase Price provides for—not just the claims that the Debtors and/or their strategic purchaser deem worthy of payment without due process.  As FWCP has legitimate claims for breach of contract (as this Court has several times acknowledged)[4] committed by the Debtors' parent and affiliates, the Purchase Price must account for these claims if the Secured Obligations are to be satisfied.

Moreover, even if the Purchase Price were sufficient to satisfy all Secured Obligations, this would still be insufficient to vest the Debtors with the right to sell all of the Lease Assets.  Even if the Debtors were able to satisfy the Secured Obligations in full (and they are not even trying to do so), they would not secure ownership of the claims against VNA (the "**VNA Claims**") and other rights arising under the Subleases.  Upon satisfaction of the Secured Obligations, ownership of the those rights, including the VNA Claims, reverts to the Intermediate Lessors (not the Debtors) pursuant to the Intermediate Lessors' equitable right of redemption, and the Debtors would not have the right to sell those claims.[5]

Similarly, assuming *arguendo* that the Court finds that the Debtors' transfer of the Lease Assets to FWCP pursuant to the Security Assignment Agreements amounted to nothing more than the grant of a security interest in the Lease Assets (a notion irreconcilable with governing English law), it necessarily follows that the coterminous assignments from the Intermediate Lessors to the Debtors of the VNA Claims under the Intermediate Lessor Assignment Agreements were also

---

[4]  Hr'g Tr. 45:25-46:3; Dkt. No. 97 at 17–18.

[5]  Hr'g Tr. 195:2-20.

nothing more than security interests granted in favor of the Debtors. Thus, in no circumstance can the Debtors establish that they have the ownership rights over the Lease Assets necessary to effectuate the Sale on the Closing Date under section 363(b)(1).

Additionally, the Debtors cannot sell the Lease Assets, or any of the Collateral, free and clear of all property interests because they have not satisfied the conditions in section 363(f) of the Bankruptcy Code. It is undisputed that FWCP, as Security Agent, has a property interest in the Collateral—both the Lease Assets and the Aircraft. And the Debtors have not shown (and cannot show) that they have met any of the requirements in section 363(f): (i) neither the governing Transaction Documents nor English law allow for the Debtors to sell the Collateral free and clear without providing full payment of the Secured Obligations (which the APA does not provide for); (ii) the Debtors have not obtained the Security Agent's consent; (iii) the Purchase Price does not exceed the value of the Security Agent's interest in the Collateral; (iv) the fact that the Security Agent has a property interest in the Collateral is not the subject of a bona fide dispute; and (v) the Debtors cannot compel the Security Agent to accept a money satisfaction of its interests in the Collateral. *See* 11 U.S.C. § 363(f).

Because the Sale is conditioned of this Court's approval of the Debtors selling assets that they do not own, free and clear of any interest in such property, the Sale is improper under 11 U.S.C. §§ 363(b)(1), 363(f), and 541(a) and should not be approved.

Finally, the provision in the APA that purports to require the Stalking Horse Bidders to pay portions of the Purchase Price directly to Junior Lenders violates the Bankruptcy Code in two respects: (i) it is an improper attempt to circumvent the chapter 11 requirements for confirmation of a plan of reorganization, including section 1129's absolute priority rule; and (ii) it violates section 510(a) of the Bankruptcy Code, in each case, because it is not in strict compliance with the

payment waterfall established by section 8.3 of the Proceeds Agreements or the Bankruptcy Code. Thus, under all circumstances, that provision should be stricken from the APA.

## JURISDICTION AND VENUE

This Court has jurisdiction to consider the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.

The Sale is a core proceeding pursuant to 28 U.S.C. § 157(b).

Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for this Objection are sections 105, 363, and 541 of Bankruptcy Code.

## FACTUAL BACKGROUND

### A.    Formation Of The Debtors And The Acquisition Of The Aircraft

JPA No. 111 Co., Ltd. ("**JPA No. 111**") was formed in December of 2017, and in November of 2018, it acquired the MSN 067 Aircraft. *See Decl. of Teiji Ishikawa Pursuant to Local Bankruptcy Rule 1007-2 and In Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (Dkt. No. 3) ("**First Day Decl.**") ¶¶ 12, 21-22. In August of 2017, JPA No. 49 Co., Ltd. ("**JPA No. 49**") was formed and, in December of 2017, it acquired the MSN 173 Aircraft. *Id.* Each Debtor is wholly owned by JP Lease Products and Services Co., Ltd. ("**JPL**"). *Id.* ¶ 1. JPL appointed Mr. Teiji Ishikawa as the representative director and sole fiduciary for each Debtor. *Id.* Mr. Ishikawa is also the CEO of JPL. *Id.* Neither Debtor has or has ever had any employees. *Id.* ¶¶ 10-11. Nor does either Debtor conduct any business. *Id.* Instead, JPL conducts business on the Debtors' behalf and charges each Debtor a fee for providing such services. *Id.* ¶¶ 11, 16.

The Debtors' acquisition of each Aircraft was funded through senior and junior debt financings. JPA No. 111 entered into senior and junior facility agreements providing for total committed loans up to $100 million and $15 million, respectively. *Decl. of Andrew Gray In Support of FWCP's Mot. to Dismiss or Abstain* (Dkt. 23) ("**Gray Decl.**") Exs. 12 (MSN 067 Senior

Facility Agreement), 13 (MSN 067 Junior Facility Agreement).[6] JPA No. 49 entered into senior and junior facility agreements providing for total committed loans up to $111 million and $7.3 million, respectively. *Id.* Exs. 5 (MSN 173 Senior Facility Agreement), 6 (MSN 173 Junior Facility Agreement).

A suite of documents (the "**Transaction Documents**") govern the acquisition of the Aircraft and set forth the concomitant rights and obligations of the parties to the transactions. The Transaction Documents imposed various conditions precedent to the Debtors' receiving the financing. These conditions include, *inter alia*, that the Debtor would lease the Aircraft to a designated Intermediate Lessor that in turn would sublease the Aircraft to an operating airline. Gray Decl. Exs. 7, 14 (Proceeds Agreements) at 1. Each Debtor entered into a Head Lease agreement with JPLS Uranus or JPLS Draco (together the "**Intermediate Lessors**"). First Day Decl. ¶¶ 13-14; *Decl. of Benjamin I. Finestone* (Dkt. No. 57) ("**Finestone Decl.**") Exs. 2, 3 (Head Leases). JPA No. 49 leased the MSN 173 Aircraft to JLPS Uranus. JPA No. 111 leased the MSN 067 Aircraft to JLPS Draco. In turn, the Intermediate Lessors subleased the Aircraft to VNA through separate Subleases. *See* Finestone Decl. Exs. 4, 5 (Subleases).

Neither Debtor has any contractual privity with VNA under the Subleases. VNA paid amounts due under the Subleases directly to pledged and blocked bank accounts held with the Security Agent (as account bank) in the name of Intermediate Lessors. First Day Decl. ¶ 14; Finestone Decl. Exs. 4, 5 (Subleases) §§ 9, 12. These amounts were automatically required to be applied (pursuant to clause 8.13 of the Proceeds Agreement) in accordance with the 'waterfall' for application of proceeds to the Finance Parties under clause 8 of the Proceeds Agreement. The

---

[6] FWCP hereby incorporates the factual allegations contained within the Gray Declaration and the *Supplemental Declaration of Andrew Gray in Support of the Motion to Dismiss* (Dkt. No. 80) (the "**Supplemental Gray Declaration**"), as though it were submitted in support of this Objection.

payments were therefore not paid by VNA to the Debtors at any point. Since the service of the Enforcement Notices on December 1, 2021, VNA has been, and remains, obliged to pay all amounts directly to the Security Agent. *See* Supp. Gray Decl. Exs. 1, 2 (Enforcement Event Notices); Supp. Gray Decl. Exs. 3, 4 (Notice and Acknowledgements of Security Assignments) § 13. Therefore, there has never been a time when the Debtors have been entitled to receive payments from VNA. Similarly, in the event of a breach by VNA under the Subleases, no Debtor has ever had the right to pursue claims against VNA. Finestone Decl. Exs. 4, 5 (Subleases) § 24.

Additionally, the Transaction Documents prohibit the Debtors and their affiliates from engaging in certain conduct. For instance, the Proceeds Agreements forbid JPL from causing the Debtors to file for bankruptcy, or to join in or support any bankruptcy proceeding unless JPL has obtained the Security Agent's consent to do so. Gray Decl. Exs. 7, 14 (Proceeds Agreements) § 3.1.3 (providing that JPL agrees "it shall not . . . file or join in any petition to commence any winding-up proceedings by or against the Borrower or the Intermediate Lessor or any other action or proceedings for the winding-up, dissolution, administration or examinership of the Borrower or the Intermediate Lessor or take, or acquiesce in, any other action which might reasonably be expected to lead to the bankruptcy or insolvency of the Borrower or the Intermediate Lessor, save as required by applicable law or with the consent of the Security Agent."); Gray Decl. Exs. 7, 14 (Proceeds Agreements) § 10.2.3(c) (providing JPL "shall not . . . (and shall procure that its Affiliates will not) . . . take, or acquiesce in, any other action which might reasonably be expected to lead to the bankruptcy or insolvency of the Borrower or the Intermediate Lessor, save as required by applicable law or with the consent of the Security Agent.").

Section 3.2.3 of the Proceeds Agreements extends the same prohibitions to the Intermediate Lessors. *See id.* § 3.2.3 ("The Intermediate Lessor hereby agrees . . . it shall not . . . (and shall

procure that its Affiliates will not) . . . take, or acquiesce in, any other action which might reasonably be expected to lead to the bankruptcy or insolvency of the Borrower, save as required by applicable law or with the consent of the Security Agent.").

Each of the Borrower Parent Letters require JPL ensure the Debtors remain solvent, avoid reorganization, and "duly and punctually perform and comply with [their] obligations." *See Decl. of Zachary Russell in Support of Obj.* ("**Russell Decl.**") at Exs. 1, 2 (Borrower Parent Letters) ¶¶ 1(b), (d). The Intermediate Lessor Parent Letters require JLPS Holding Ireland Limited ("**JLPSI**"), to ensure the Intermediate Lessors "duly and punctually perform and comply with [their] obligations." *Id.* Exs. 3, 4. (Intermediate Lessor Parent Letters) ¶ 1(d).

The Intermediate Lessors are required by their respective Head Leases to use reasonable endeavors to procure that VNA complies with its obligations under the Subleases. Finestone Decl. Exs. 2, 3 (Head Leases) § 3.6. The Intermediate Lessors are also required to make rent payments during the lease period. *See id.* § 3.1.

Finally, each of the Proceeds Agreements contains a covenant that prohibits the Debtors or any of their affiliates from engaging, directly or indirectly, in Anti-Social conduct, which includes, but is not limited to, "an action to defame the reputation or interfere with the business of any Finance Party by spreading rumour . . . or other actions similar or analogous to any of the foregoing in any jurisdiction." Gray Decl. Exs. 7, 14 (Proceeds Agreements) § 11.3.23.

### B.    The Security Agent's Property Interests

As part of the Transaction, and to secure the financing provided by the Senior and Junior Lenders, on December 29, 2017, JPA No. 49 executed an aircraft mortgage granting a lien on the MSN 173 Aircraft in favor of the Security Agent, through which JPA No. 49 pledged the MSN 173 Aircraft as collateral by granting the a first priority security interest in the Aircraft to the Security Agent for the benefit of the Lenders. Gray Decl. ¶ 29. The MSN 173 Aircraft Mortgage

is governed by New York law. *Id.* It gives the Security Agent broad enforcement powers over the MSN 173 Aircraft in the event of a default, including the authority to effectuate a foreclosure sale of the MSN 173 Aircraft. *Id.* Ex. 11 (MSN 173 Mortgage Agreement) § 6.1. The Security Agent is authorized to exercise enforcement powers in its absolute discretion. *Id.* § 5.3.

Also on December 29, 2017, JLPS Uranus "assign[ed] absolutely by way of security with full title guarantee . . . as security for the payment and discharge of the Secured Obligations, all of its right, title and interest, present and future, in and to the Assigned Property" to JPA No. 49. Gray Decl. Ex. 9 (MSN 173 Intermediate Lessor Security Assignment Agreement) § 3.1. "Assigned Property" is defined to include "(a) the Lease Agreement Property, (b) the Intermediate Lessor Insurance Property, (c) the Requisition Proceeds Property, (d) the Final Disposition Proceeds Property, relating to the [MSN 173] Aircraft . . . ." *Id.* at § 1.1. Each of these terms are defined by the applicable Proceeds Agreement:

a)  "**<u>Lease Agreement Property</u>**" means "all of the right, title and interest, present and future, of the Intermediate Lessor under the Lease Agreement and the other Relevant Documents including, without limitation . . . (b) claims of the Intermediate Lessor for damages arising out of a breach of or default under the Lease Agreement and the other Relevant Documents, and (c) all the rights of the Intermediate Lessor to compel performance and otherwise exercise all rights and remedies under the Lease Agreement and the other Relevant Documents . . . ."

b)  "**<u>Intermediate Lessor Insurance Property</u>**" means "all of the right, title and interest (present and future, actual and contingent) of the Intermediate

Lessor in and to the Insurances (excluding third party liability insurance and including any Insurance Proceeds)  . . . ."

c)    "**Requisition Proceeds Property**" means "all of the right, title and interest (present and future, actual and contingent) of the Borrower and the Intermediate Lessor in and to any Requisition Proceeds."

d)    "**Final Disposition Proceeds Property**" means "all of the right, title and interest (present and future, actual and contingent) of the Borrower in and to any Final Disposition Proceeds."

Gray Decl. Exs. 7, 14 (Proceeds Agreements) at App'x A.  Likewise, on December, 29, 2017, JPA No. 49 "assign[ed] absolutely by way of security with full title guarantee . . . as security for the payment and discharge of the Secured Obligations, all of its right, title and interest, present and future, in and to the Assigned Property" to the Security Agent.   Gray Decl. Ex. 10 (MSN 173 Security Assignment Agreement) § 3.1.  "Assigned Property" is defined to include "(a) the Head Lease Agreement Property, (b) the Aircraft Purchase Agreement Property, (c) the Borrower Insurance Property, (d) the Requisition Proceeds Property, (e) the Final Disposition Proceeds Property, (f) the Lease Management Agreement Property, (g) the Hedging Agreement Property and (h) the Intermediate Lessor Assignment Property relating to the Aircraft  . . . ."  *Id.* § 1.1 Most of these terms are defined by the applicable Proceeds Agreement:

a)    "**Head Lease Agreement Property**" means "all of the right, title and interest, present and future, of the Borrower under the Head Lease Agreement . . . including, without limitation, all of its right, title and interest in and to (a) any amounts payable under the Head Lease Agreement, (b) claims of the Borrower for damages arising out of a breach of or default under the Head Lease Agreement and the Acceptance Certificate (as defined in the Head Lease Agreement), and (c) all the rights of the Borrower to compel performance and otherwise exercise all rights and remedies under the Head Lease Agreement  . . . ."

b)    "**Aircraft Purchase Agreement Property**" means "all of the right, title and interest (present and future, actual and contingent) of the Borrower in, to and under any  representations, warranties and indemnities given to it by the Seller under the Aircraft Purchase Agreement and the Bill of Sale, such rights excluding, for the avoidance of doubt, the right of the Borrower to

purchase and take title to the Aircraft and the Intermediate Lessor Shares under the Aircraft Purchase Agreement and the Bill of Sale."

c)    "**Borrower Insurance Property**" means "all of the right, title and interest (present and future, actual and contingent) of the Borrower in and to the Insurances (excluding third party liability insurance and including any Insurance Proceeds) . . . ."

d)    "**Requisition Proceeds Property**" means "all of the right, title and interest (present and future, actual and contingent) of the Borrower and the Intermediate Lessor in and to any Requisition Proceeds."

e)    "**Final Disposition Proceeds Property**" means "all of the right, title and interest (present and future, actual and contingent) of the Borrower in and to any Final Disposition Proceeds."

f)    "**Lease Agreement Property**" means "all of the right, title and interest, present and future, of the Intermediate Lessor under the Lease Agreement and the other Relevant Documents including . . . (b) claims of the Intermediate Lessor for damages arising out of a breach of or default under the Lease Agreement and the other Relevant Documents, and (c) all the rights of the Intermediate Lessor to compel performance and otherwise exercise all rights and remedies under the Lease Agreement and the other Relevant Documents . . . ."

g)    "**Intermediate Lessor Assignment Property**" means all of the right, title, benefit, claims and interests (present and future, actual and contingent) of the Borrower in, to, under and in respect of the Intermediate Lessor Assignment.

Gray Decl. Exs. 7, 14 (Proceeds Agreements) at App'x A.  The effect of this transaction is that

JPA No. 49 assigned all property interests it possessed in the Lease Assets applicable to MSN 173,

including rights arising under its Head Lease and the applicable Sublease, to CACIB (in its

capacity as Security Agent), effective as of December 29, 2017.

On December 29, 2017, JPA No. 49, JPLS Uranus, VNA, and CACIB executed a Notice

and Acknowledgement of Security Assignments referencing assignments above ("**MSN 173

Notice and Acknowledgement**").  *See* Supp. Gray Decl. Ex. 4.  In the MSN 173 Notice and

Acknowledgement:

**a)**      The parties acknowledged that JPLS Uranus "assigned absolutely by way of security and has charged by way of first to [JPA No. 49] all of its right, title and interest, present and future, actual or contingent and whether contractual, proprietary or of any other kind, in and to the Lessors Assigned Property . . . ."

**b)**      The parties also acknowledged that JPA No. 49 "has assigned absolutely by way of security and has charged by way of first fixed charge to the Security Agent all of its rights, title and interest, present and future, actual or contingent and whether contractual or proprietary or of any other kind, in and to, the Borrower Assigned Property . . . ."

*Id.* Through the Deeds of Security Agreements and the Notice and Acknowledgement, JPA No. 49, JPLS Uranus, VNA, and the Security Agent received notice of and acknowledged the simultaneous chain of absolute assignments giving the Security Agent ownership and full control over all property interests in the Lease Assets.

An identical set of conditions precedents existed, and an identical transaction occurred *mutatis mutandis* with respect to the MSN 067 Aircraft. *See* Gray Decl. ¶¶ 44–49; Ex. 18 (MSN 067 Mortgage Agreement) § 6.1, Ex. 16 (MSN 067 Intermediate Lessor Security Assignment Agreement) § 3.1, Ex. 17 (MSN 067 Security Assignment Agreement), Supp. Gray Decl. Ex. 3 (MSN 067 Notice and Acknowledgement).

Thus, by no later than December 29, 2017 (in the case of JPA No. 49) and November 21, 2018 (in the case of JPA No. 111), pursuant to valid, absolute assignments of their interests to the Security Agent, (at that time CACIB), neither Debtor held any current property interest in the Lease Assets. *See* Gray Decl. Exs. 9, 16 (Intermediate Lessor Security Assignments) § 3.1 (assigning full title in all of JPLS Uranus and JLPS Draco rights under *inter alia*, the Subleases to the Debtors); Gray Decl. Exs. 10, 17 (Security Assignment Agreements) § 3.1 (assigning full title to the same rights from the Debtors to the Security Agent). Based on these conveyances, the entirety of the Debtors' interests in the Lease Assets passed to the Security Agent. The Security Assignment Agreements were entered into on the same date as the Intermediate Lessor Security

11

Assignments, and therefore there was not one single day when either Debtor owned the Subleases or the VNA Claims.

Pursuant to the Transaction Documents, only the Security Agent owns, and has the right to dispose of, any Lease Asset unless and until there has been "full, final and indefeasible payment and discharge in full of all amounts of the Secured Obligations." Gray Decl. Exs. 7, 14 (Proceeds Agreements) § 7.1. The Proceeds Agreements define "**Secured Obligations**" to mean "any and all moneys, liabilities and obligations (whether actual or contingent, whether now existing or hereafter arising, whether or not for the payment of money and including, without limitation, any obligation or liability to pay damages) from time to time owing to any of the Finance Parties by any Obligor pursuant to any Transaction Document." *Id.* at App'x A.

The term "**Obligors**" is defined in the Proceeds Agreement to include not only the Debtors, but also the Borrowers' Parent, JPL, the Intermediate Lessors, and the Intermediate Lessors' Parent, JLPSI. *Id.* The Proceeds Agreements' definition of "**Transaction Documents**" includes the Security Documents, the Proceeds Agreements, the Hedging Agreements, the Subleases, the Head Leases, the Borrower Parent Letters, the Intermediate Lessor Parent Letters, the Security Assignment Agreements, and the Intermediate Lessor Assignment Agreements, the Senior Facility Agreements, and the Junior Facility Agreements. *Id.* And the term "**Finance Parties**" includes FWCP, which is both a Senior Lender and the Security Agent. *Id.*

Once the Secured Obligations are paid in full, subject to an additional protection for the Security Agent under clause 7.2 of the Proceeds Agreement (discussed below), the property transferred to the Security Agent under the Security Assignment Agreements and the Intermediate Lessor Security Assignment Agreements is required to be released and returned to the original owners—the Debtors (in respect of the Aircraft and the Head Lease) or the Intermediate Lessors

(in respect of the Sublease), respectively. *Id.* Exs. 10, 17 (Security Assignment Agreements) § 17 ("Upon the expiry of the Security Period, the Security Agent shall, at the cost of the Borrower, promptly release, discharge and cancel the security and Security Interests constituted by this Agreement and reassign to the Borrower of the Assigned Property assigned to the Security Agent pursuant to this Agreement . . . ."); *id.* Exs. 9, 16 (Intermediate Lessor Security Assignments) ("Upon the expiry of the Security Period, the Borrower shall, at the cost of the Lessor, promptly release, discharge and cancel the security and Security Interests constituted by this Agreement and reassign to the Lessor of the Assigned Property assigned to the Borrower pursuant to this Agreement . . . ."). Additionally, the Security Agent's liens on the Aircraft are to be released only upon full satisfaction of the Secured Obligations. *Id.* Exs. 7, 14 (Proceeds Agreements) § 7.1. Therefore, upon full satisfaction of the Secured Obligations, the VNA Claims revert to the Intermediate Lessors, not the Debtors. Debtors do not have ownership of the VNA Claims now, and will not have ownership of these claims even if the Secured Obligations are satisfied.

Pursuant to the Transaction Documents, the Security Agent enjoys broad enforcement rights over the Lease Assets and Aircraft. Specifically, the Proceeds Agreements, which bind all the parties to both Transactions, empowered the Majority Senior Secured Parties to direct the Security Agent to undertake enforcement actions against the Collateral, including, "but not limited to the disposal, collection, or realization of assets subject to the Collateral." *Id.* Exs. 7, 14 (Proceeds Agreements) § 9.1. The Debtors, Intermediate Lessors, and JPL "waive[d] all rights . . . to require that the Collateral be enforced in any particular order or manner or at any particular time" provided, however, that the proceeds realized be distributed to according to the waterfall distribution scheme in the Proceeds Agreements. *See id.* § 9.2.

13

Additionally, pursuant to the terms of the Notice and Acknowledgements of Security Assignments signed by the Debtors, Intermediate Lessors, and VNA as part of the transactions, once an Enforcement Notice (as that term is defined in the Notice and Acknowledgements of Assignment) is sent by the Security Agent to VNA and the applicable Intermediate Lessor:

a)    All payments payable by VNA under the Subleases, and all money constituting Assigned Property "shall be paid to such account as the Security Agent shall from time to time direct in writing";

b)    VNA "shall perform all of its other obligations under the [Subleases] and the other Relevant Documents in favour of the Security Agent as if the Security Agent were named therein as lessor and [VNA] will comply solely with the Security Agent's instructions in relation to the exercise of any of the [Intermediate] Lessor's rights and will not recognise the exercise by the [Intermediate] Lessor of any of its rights and powers under or in respect of the [Subleases], the other Relevant Documents and the Assigned Property;"

c)    Each Intermediate Lessor "agrees that all payments that may be payable by it to [the Debtors] under the [Head Leases], and all money constituting or forming part of the Assigned Property, shall be paid to such account as the Security Agent shall from time to time direct;" and

d)    Each Intermediate Lessor "shall perform all of its obligations under the [Head Leases] in favour of the Security Agent as if the Security Agent were named therein as lessor and the [Intermediate] Lessor will comply solely with the Security Agent's instructions in relation to the exercise of any of the [Debtors'] rights and will not recognise the exercise by the [Debtors] of any of its rights and power under or in respect of the [Head Leases] and the Assigned Property."

Supp. Gray Decl. Exs. 3, 4 (Notice and Acknowledgements of Security Assignment) § 13. Thus, upon the delivery of an Enforcement Notice, both the Debtors and the Intermediate Lessors relinquished all rights under the Head Leases and the Subleases; the Security Agent is the sole party entitled to receive payments and exercise rights. This is expressly agreed to and constitutes a binding agreement between all four parties, including VNA and the Debtors.

### C.        Events Leading To This Bankruptcy

Beginning in January 2021, VNA breached its obligations under the Lease Agreements for both Aircraft by failing to make rental payments when due.  Gray Decl. ¶ 68.  Since then, VNA has made partial payments under the Lease Agreements but has not paid off amounts owed.  *Id.*

On December 1, 2021, CACIB, as (then) Security Agent (i) notified the Debtors, the Intermediate Lessors, and VNA that events of default had occurred and were continuing under the Head Leases and the Subleases, (ii) terminated the leasing of the Aircraft under the Head Leases and Subleases; and (iii) provided notice confirming the automatic acceleration of the Senior Loans. Gray Decl. ¶ 69, Exs. 31, 32 (Head Lease and Sublease Termination Notices).  The Debtors did not and do not dispute that the Head Leases and Subleases terminated prior to the Petition Date.

On December 1, 2021, CACIB also sent Enforcement Notices to the Debtors, the Intermediate Lessors, and VNA pursuant to the Notice and Acknowledgement of Security Assignments.  *See* Supp. Gray Decl. Exs. 1, 2 (Enforcement Notices).  The Enforcement Notices directed VNA and the Intermediate Lessors to (i) "pay all amounts that may be payable" under the Subleases and Head Leases directly to the Security Agent, and (ii) "perform all obligations" under the Subleases and Head Leases "in favour of the Security Agent as if the Security Agent were named therein as lessor." *Id.* at 3–4.

Also on December 1, 2021, FWCP acquired $128,227,903.53 in outstanding obligations issued by the Debtors, made up of $115,778,525.00 in Senior Loans and $12,449,378.53 in a secured claim relating to the termination of certain swap obligations under the Hedging Agreements which constitute part of the Transaction Documents and part of the Secured Obligations.  Gray Decl. ¶ 76.  FWCP is, by far, each Debtor's largest creditor and holds a substantial majority of the Debtors outstanding Senior Loans.  *Id.*

On December 2, 2021, FWCP assumed CACIB's role as Security Agent. *Id.* Thus, as of December 2, 2021, FWCP possessed all interests in the Lease Assets that the Debtors conveyed via the Security Assignment Agreements, including the right to dispose of such assets.

Consistent with its rights, on December 10, 2021, FWCP, as Security Agent, engaged Airborne Capital ("**Airborne**") to conduct an auction of the Lease Assets, with the auction to close on December 17, 2021 ("**Lease Assets Auction**"). Gray Decl. ¶ 81. Airborne posted notices in the Wall Street Journal, Aersyn (a trade website), and on its own website. *Id.* ¶ 82. The Debtors knew of the auction by no later than December 13, 2021, although they had (in any event) received the Enforcement Notices on December 1, 2021, which gave notice of the event and circumstances which expressly give rise to the power of sale under clause 6.1 of each Security Assignment Agreements. The Security Assignment Agreements provide that the Security Agent's rights (including the power to dispose of or transfer the assigned Lease Assets in its absolute discretion) are immediately enforceable "with or without notice to the Borrower or prior authorisation from any court." Gray Decl. Exs. 10, 17 (Security Assignment Agreements) § 6.1.

On December 17, 2021, the Debtors, at the direction of their parent, JPL, and with the support of JLPSI filed these cases (the "**Chapter 11 Cases**") to prevent FWCP exercising the parties' agreed upon remedies over the Lease Assets, assets that do not belong to the Debtors. First Day Decl. ¶ 37; Hr'g Tr. 155:9–13.

On December 24, 2021, the Debtors and two subsidiaries of Strategic Value Partners, LLC ("**SVP**"), Capital Reef LLC and Isle Royale LLC (together the "**Stalking Horse Bidders**") executed a term sheet pursuant to which the Stalking Horse Bidders committed to purchase, and the Debtors agreed to sell, the Aircraft and all of the Lease Assets (the "**Stalking Horse Bid**"). *See Stalking Horse Term Sheet* (Dkt. 21-3) at 1.

16

On December 31, 2021, the Debtors filed the Sale Motion, seeking approval of the Sale

and bid procedures. The Sale Motion states that the total consideration is $207,741,763.53 (the

"**Purchase Price**"). Sale Mot. ¶ 20. This amount is only to pay the outstanding amounts of the

secured loans, plus all accrued but unpaid interest, payment of indemnification and out-of-pocket

expenses, and a cash payment of $5 million for JPL. *Id.* The Purchase Price does not indicate the

value to be attributed to the aircraft or the Lease Assets, but the Sale Motion indicates that the

Purchased Assets include the Lease Assets and all material executory contracts of the Debtors and

the Intermediate Lessors (which are not Debtor property). *Id.* ¶¶ 32, 33.

On January 2, 2022, FitzWalter objected to the bid procedures proposed in the Sale Motion.

*See Prelim. Obj. to the Sale Mot.* (Dkt. No. 56) (the "**Bid Proc. Obj.**"). Among other reasons for

the relief requested in the Bid Procedures Objection, FWCP asserted that the Debtors were seeking

to sell the Lease Assets, which they did not own. *See* Bid Proc. Obj. § I.

On January 13, 2022, the Debtors filed the APA. The APA contains a Purchase Price that

is not tied to Secured Obligations. Instead, the APA states that the Purchase Price "shall be an

amount in Cash equal to the sum of (a) $2,500,000 (the 'Additional Cash Payment'), plus (b) the

Senior Obligations, plus (c) the Junior Obligations, plus (d) any Cure Costs." APA § 3.01.[7] The

APA also indicates that the Sale is contingent on the sale of the Lease Assets, including the VNA

Claims. *See id.* 2.01(i) (including among the Transferred Assets "all rights under the Contracts set

forth on Schedule 2.01(a)(i) (the 'Transferred Security Documents') and any collateral granted in

favor of the Seller under such Security Documents, including, without limitation, the Assigned

---

[7]    The APA's definition of "**Senior Obligations**" is limited to "Outstanding Senior Principal
Amount, plus the Senior Interest Amount, plus the Senior Out-of-Pocket Amounts." APA at Ex.
A-6. The APA's definition of "**Junior Obligations**" is limited to "Outstanding Junior Principal
Amount, plus the Junior Interest Amount, plus the Junior Out-of-Pocket Amounts." *Id.* at Ex. A-
4.

Property"); 2.01(iii) (including in Transferred Assets "the Aircraft Head Lease, the Aircraft Lease, and Related Aircraft Documents and other Contracts set forth on Schedule 2.01(a)(iii)"). Finally, the APA contemplates direct payments from the Stalking Horse Bidders to the Senior and Junior Lenders, in defiance of the waterfall in the Proceeds Agreement. APA § 3.03(c) ("[T]he Senior Obligations shall be paid directly by the Buyer to the Senior Finance Parties and . . . the Junior Obligations shall be paid directly by the Buyer to the Junior Finance Parties").

The Debtors seek to sell the assets listed in the APA, including the Aircraft and the Lease Assets, "free and clear" of the Security Agent's property interests. Sale Mot. ¶ 32 ("All of the Purchased Assets shall be sold as a single lot (free and clear of all liens, claims and encumbrances) . . . ."); Proposed Sale Order (Dkt. No. 58-4) ¶ K ("Pursuant to the Stalking Horse Purchase Agreement . . . upon Closing, the sale of the Purchased Assets to the Purchasers, including all Purchased Assets that were subject to the Enforcement Actions, shall be free and clear (other than those items expressly permitted to remain under the terms of the Stalking Horse Purchase Agreement) of liens, claims (including any competing claims to legal or beneficial title or adverse ownership claims), defenses and interests . . . .").

Also on January 13, 2022, each Debtor filed a certain *(A) Notice of Enforcement Sale and (B) General Conveyance and Bill of Sale* (Dkt. 58-3) (the "**Bills of Sale**").[8] The Bills of Sale purport to transfer to the Debtors all of the Intermediate Lessors' "right, title and interest, . . . in and to the Assigned Property" including the rights under the Subleases and the VNA Claims. Bills of Sale at 2–3. However, the Bills of Sale were not executed with the consent of the Security Agent, as required by Transaction Documents. *See* Gray Decl. Ex. 7, 14 (Proceeds Agreements)

---

[8] Revised versions of the Bills of Sale were filed on January 21, 2022. *See* Dkt. No. 77.

§ 11.3.4(b). And the effectiveness of the Bills of Sale are conditioned on this Court's approval of the Sale and full satisfaction of the Secured Obligations. *See* Bills of Sale 2.

On January 26, 2022, a hearing was held on FWCP's Motion to Dismiss and the Debtors' proposed bidding procedures. During the hearing, FWCP and the Debtors presented expert testimony regarding the effect of the assignment of the Lease Assets to the Security Agent. According to Mr. Shah (FWCP's expert), the right to enforce rights under the Lease Assets rests solely with FWCP, as Security Agent, "because the effect of the absolute[ ] assignment is all the legal title and all their rights, the proprietary rights, rest with FitzWalter." Hr'g Tr. 111:16-22. Mr. Shah explained that the only interest the Debtors hold in the Lease Assets are the equity of redemption and a concomitant equitable right to redeem the Lease Assets. But the Debtors are unable to exercise these rights until they "pay off the entirety of the secured obligations"; "until that time, all the Debtors can sell is their . . . interest. Effectively whatever their right of redemption is worth." *Id.* at 112:1-10.

Mr. Tregaer (Debtors' expert) provided similar testimony. He stated that the Debtors could not exercise their right of redemption over the Lease Assets until the Secured Obligations are paid in full. *See id.* at 185:2-6 ("[Question]. . . . a party, in this instance, the assignor, who has an equity of redemption only recovers the right to the chose in action upon payment of the secured debt, correct? [Answer] The—correct as far as it goes."). Mr. Tregaer also conceded that the Debtors may not sell the lease assets ***until*** the right of redemption is triggered. *See id.* at 212:23-25 ("If there's been an absolute assignment to the rights, then the Debtor is not a position to give title to those rights to a purchaser.").

And Mr. Tregaer further clarified that, if the Security Assignment Agreements granted a charge on the Lease Assets in favor of the Security Agent, the Debtors still would not have the

right to sell Lease Assets that originally belonged to the Intermediate Lessors—namely the rights under the Subleases and the VNA Claims—because the Intermediate Lessor Security Assignment Agreements, which contain identical conveyance language, would have granted the Debtors a charge in those assets. *See id.* at 195:7-25 ("[Question] . . . So, with regards to one of the central questions you've been asked about whether there is an absolute assignment or a charge, that analysis would apply equally to both deeds of security, the deed of security between the intermediate lessor and the Debtor and the deed of security between the Debtor and the security agent, correct?  [Answer] I agree, that follows. Yes. . . . [Question]. . . . [I]f the Court determines that there's only a charge created, that means that there's only a charge between the intermediate lessor and the Debtor, and a charge between the Debtor and the security agent, correct?  [Answer] Correct."); *id.* at 196:16-21 ("[Question] With regard to the lease assets, if there's only a charge created between the intermediate lessor and the Debtor, the Debtors would not have the current right to sell the lease assets, correct?  [Answer] That's correct.").

At the conclusion of the January 26, 2022 hearing, the Court asked the Debtors to provide written answers to certain questions it had regarding the Sale before it would approve the proposed bidding procedures. The Court appropriately questioned "whether that is actually a viable pathway even if all that the estate possesses is an equity of redemption." *Id.* at 253:3-4.

On January 28, 2022, the Debtors filed the Statement in response to the Court's inquiries. The Debtors confirmed that the Stalking Horse Bidders intended to proceed with the Stalking Horse Bid only if they acquired title the Lease Assets, including the rights under the Subleases and the VNA Claims. *See* Debtors' Statement ¶ 1.  The Debtors also clarified that the Purchase Price would not provide full and final satisfaction of the Secured Obligations. *See id.* ¶ 3 ("For avoidance of doubt, the Purchase Price does not include amounts on account of (a) defamation and

similar claims, whether sounding in contract, tort, or otherwise; (b) trustee and agent fees significantly in excess of amounts normally charged by Credit Agricole Corporate and Investment Bank and other reputable and customary agents and security agents acting in such capacities; (c) duplicative claims; and (d) any claims that do not constitute outstanding principal, accrued interest, or reasonable fees, costs, or charges owed by the Debtors under the applicable transaction documents and allowed by the Bankruptcy Code.").

On February 1, 2022, this Court issued its *Memorandum Decision and Order Denying the Motion to Dismiss* (Dkt. No. 97). The Court did not determine in its ruling whether the Debtors owned the Lease Assets or could sell the Lease Assets. *See id.* at 20 ("The Court declines to find whether an absolute assignment or a mere 'charge' was effected under the governing agreements, because no such finding is necessary to resolve the dispute before the Court.").

On February 4, 2022, a hearing on the proposed bidding procedures was held. During that hearing, counsel to the Stalking Horse Bidders intimated that they intended to proceed with the Sale only if they acquired full title the Lease Assets, including the rights under the Subleases and the VNA Claims. *See* Transcript of Feb. 4, 2022 Hearing (Dkt. No. 103) ("**Feb. 4, 2022 Hr'g Tr.**") 69:6-20 ([MR. GREISSMAN]: . . . [T]here's two principal issues, so we need to be fully transparent. If for some reason your Honor rules that the package of assets that the Debtor has agreed to deliver cannot be delivered—that's the principal issues that FitzWalter has been raising over and over again . . . . [I]f the Debtors can't deliver that through no fault of the Stalking Horse Bidder, in that case, that [break-up] free is earned but not paid . . . ." When pressed on whether the Stalking Horse Bidders would close if the Lease Assets are not expressly identified and conveyance through the sale order, counsel for the Stalking Horse equivocated. *See id.* 70:5-17. At the hearing, the Court approved the proposed bidding procedures including the Stalking Horse

Bidders' Break-up Fee in an amount, equal to 3.5% of the Stalking Horse Bidders' Purchase Price

plus up to $1,500,000 in expense reimbursements to be payable even if the Debtors do not receive

any overbids and the proposed sale to the Stalking Horse Bidders is not consummated (other than

because of a breach by the Stalking Horse Bidders). *Id.* 22:18-23:20.

On February 9, 2022, the Debtors filed the *Notice of Proposed Assumption and Assignment*

*of Certain Executory Contracts in Connection With Proposed Sale* (Dkt. No. 104) (the "**Notice of**

**Assumption**"), with an attached list of contracts the Debtors are seeking to assume and assign to

the Stalking Horse Bidders as part of the Sale. *See* Notice of Assumption at 2 ("The Debtors

hereby provide notice that one or more of the executory contracts or unexpired leases listed on

Exhibit 1 attached hereto may be assumed and assigned in connection with the Stalking Horse

Bidders or such other Successful Bidder (as defined in the Bidding Procedures)."). Among the

contracts listed in the Notice of Assumption are several contracts to which the Debtors are not a

party, including the Airframe Warranties Agreement for the MSN 173 Aircraft, the Airframe

Warranties Agreement for the MSN 067 Aircraft, and the Engine Warranty Agreement for the

MSN 173 Aircraft. *See* Russell Decl. Exs. 5, 6, 7. Further, the Debtors' rights in other contracts

listed in the Notice of Assumption, including the Intermediate Lessor Security Assignment

Agreements, have been absolutely assigned to the Security Agent. *See* Gray Decl. Exs. 10, 17

(Security Assignment Agreements) § 3.1; *see also* Supp. Gray Decl. Exs. 3, 4 (Notice and

Acknowledgements of Security Assignment).

### D.       FWCP's Claims Against The Debtors' Affiliates

In the months leading up to the Petition Date and through the pendency of these Chapter

11 Cases, the Debtors' affiliates have engaged in unlawful conduct, namely breaches of the

Transaction Documents, for which they are liable to FWCP, in its capacity as Security Agent and

Senior Lender. On January 20, 2022, FitzWalter filed suit against JPL, the Intermediate Lessors,

JLPSI, and JLPSI's CEO, Heinrich Loechteken, in the High Court of Justice, Queen's Bench

Division Royal Courts of Justice in London, England (the "**English Proceeding**"). *See* Supp. Gray

Decl. Ex. 5 (English Proceeding Claim Form). The English Proceeding Claim Form details, *inter*

*alia*, the following claims:

- Breach of sections 3.1.3 and 10.2.3(c) of the Proceeds Agreements against JPL for supporting and join in these Chapter 11 Cases;

- Breach of section 3.2.3 of the Proceeds Agreements against the Intermediate Lessors and JLPSI for supporting these Chapter 11 Cases;

- Breach of clause 1(b) of each of the Borrower Parent Letters JPL for failing to ensure the Debtors would remain solvent and not be reorganized;

- Breach of clause 1(d) of each of the Borrower Parent Letters against JPL for failing to ensure the Borrowers would "duly and punctually perform and comply with [their] obligations";

- Breach of clause 1(d) of each of the Intermediate Lessor Parent Letters against JPLSI for failing to ensure the Intermediate Lessors would "duly and punctually perform and comply with [their] obligations";

- Breach of clause 3.6 of the Head Lease Agreements by the Intermediate Lessors, for failure to use reasonable endeavors to procure that VNA compliance with its obligations under the Subleases;

- Breach of clause 11.3.23(a) of the Proceeds Agreements, which requires no Obligor engage in any Anti-Social Conduct, against JPL, JPLSI, and each of the Intermediate Lessors, based on false, defamatory, and damaging statements made about FWCP by Heinrich Loechteken, the CEO of JLPSI to members of the airline financing industry that have had a material impact on FWCP's ability to conduct business; and

- Breach of the Head Leases against each of the Intermediate Lessors for failure to pay rent under the Head Leases.

English Proceeding Claim Form ¶¶ 9-20. These damages are by their very nature open

ended given there was a widespread campaign to defame FWCP and interfere with its business.

As FWCP will establish at the hearing on the Sale Motion, the nature of these breaches of the

transactions documents are egregious and widespread and included targeting specifically

suppliers, industry bodies and other market participants. The defamatory statements and clear breaches of the Proceeds Agreements are apparent from the very nature of the statements including calling FWCP "financial terrorists" and "predatory funds" and utilizing "predatory tactics."

Furthermore, there has been clear interference with FWCP's business. The following instances are just those currently known to FitzWalter, without the benefit of discovery, and the full extent of the breaches and the harm caused will only become apparent at a later stage:

- In conversations with Airborne, FWCP's Marketing Agent, Mr. Loechteken referred to FWCP as a "Financial Terrorist" and made both verbal and written threats (including text messages on or around December 19, 2021) to take steps to cause reputational harm to Airborne if they did not resign immediately from the engagement with FWCP. Mr. Loechteken also stated in this text that they had already spoken to senior management at Airbus and Boeing and the President of the International Society of Transport Aircraft Trading ("**ISTAT**");

- The breaches target one of the two key suppliers in this space, Airbus, with whom FWCP has historically had a constructive relationship, including referring to FWCP as a "predatory fund";

- FWCP's preferred service provider in Ireland declined to work with it as a result of this campaign;

- The Aviation Working Group ("**AWG**") have conducted a campaign to change industry norms, referencing FWCP, which we understand to be directed by "vested interests" consequent on JPL's instigation.

- Statements including "improper," "hyper-aggressive," and "wholly inappropriate" have been reported in at least four global publications, with inevitable and intentional harm to FWCP's reputation.

- FWCP's financing partner, with whom FWCP has partially complete transactions, has today (Feb. 17, 2022) requested a call to discuss the "Japanese lessor situation" which they had seen in the press and wanted to "make sure on FitzWalter's side its not a major issue";

- As further discovery will show, the breaches have had additional adverse effects on third parties' willingness to deal with FWCP, and the value to FWCP's business and standing in the marketplace;

- Finally, costs awarded in the English Proceeding will only be determinable at the end of those proceedings and may include amounts in respect of future elements of

the English Proceeding over the coming years (which are not knowable at all at present).

Each of the claims constitute a Secured Obligation of the Debtors, as they are all contingent liabilities of the Obligors, and FWCP, as Security Agent, cannot release the property interests it holds in the Collateral until these claims are addressed and the amounts owed as damages for each of the above-listed causes of action, together with all fees and costs associated with pursuing these claims, are paid in full. *See* Decl. of Akhil Shah (Dkt. No. 79) Ex. 2 (Shah Reply Op.) ¶¶ 38–46.

On January 21, 2022, FWCP provided to the Debtors a statement pursuant to U.C.C. § 9-210(b) (the "**UCC Statement**"), setting forth the amounts of the Secured Obligations then known to FWCP. *See* Supp. Gray Decl. Ex. 6 (UCC Statement) at App'x 1, 2. According to the UCC Statement, the outstanding Secured Obligations totaled more than $232,707,465.59,[9] on January 21, 2022, *plus* the unliquidated amounts of damages and costs to be assessed in the English Proceeding. *Id.* And the amounts of the legal and professional fees and costs of the Security Agent have increased and will continue to increase as the Debtors continue to pursue the Sale in breach of the express terms of the Transaction Documents.

## **OBJECTION**

This Court should not approve the Sale based on the APA. Pursuant to the terms of the APA, the Debtors are required to sell assets that they do not own, which section 363(b)(1) does not allow. Moreover, the Debtors' attempt to sell the Transferred Assets free and clear of the Security Agent's property interests in the Collateral does not meet the requirements of section 363(f) of the Bankruptcy Code. The APA also seeks to allow the Stalking Horse Bidders to pay

---

[9] $118,488,768.24 in Secured Obligations relating to the MSN 067 Aircraft; $114,218,697.35 in Secured Obligations relating to the MSN 173 Aircraft. These amounts assume a 1:1.36 exchange rate for British Pounds Sterling and a 1:1.14 exchange rate for the Euro.

Junior Lenders directly, in violation of plan confirmation requirements and the Proceeds Agreements' payment waterfall. Finally, the Debtors are not entitled to a finding of good faith.

## I.    THE DEBTORS CANNOT SELL ASSETS THEY DO NOT OWN.

A bankruptcy estate can only seek to sell property of the estate. *See, e.g.*, 11 U.S.C. §§ 363(b)(1), 541(a); *Reverend C.T. Walker Hous. Dev. Fund Corp. v. City of New York*, 586 B.R. 534, 537 (E.D.N.Y. 2018) ("For the bankruptcy court to order a sale under 11 U.S.C. § 363, the Property must qualify as property of the estate under § 541."). A person cannot sell property that person does not own, and a bankruptcy court cannot approve a sale that purports to do so.

Yet that is precisely what the Debtors are seeking to do. The APA requires that the Debtors not only sell the Aircraft (which the Debtors indisputably own), but also (x) to sell the Lease Assets that currently belong to FWCP (including the VNA Claims in which the Intermediate Lessors (not the Debtors) have the ultimate equity of redemption), and (y) assume and assign certain contracts to which the Debtors are not a party. *See* APA § 2.01, Notice of Assumption at Ex. 1; Sale Mot. ¶¶ 18, 32; Stalking Horse Term Sheet ¶ 1. The proposed sale is plainly improper under the clear language of section 363(b)(1) and thus the Sale cannot be approved.

### A.    The Lease Assets Belong To FWCP And The Debtors Cannot Sell Any Of The Lease Assets Until The Secured Obligations Are Paid In Full.

1.    *The Lease Assets Were Absolutely Assigned to FWCP and the Debtors Hold Nothing More Than An Equitable Right to Redemption*.[10]

Nonbankruptcy law determines the extent of a debtor's interest in property under Bankruptcy Code section 541(a). *See Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property

---

[10]    The extent of FWCP and the Debtors' respective rights in the Lease Assets is a question properly determined by adversary proceeding. Thus, FWCP has concurrently filed an adversary complaint seeking a declaration that the Lease Assets were absolutely assigned to the Security Agent and are not estate property.

interests are created and defined by state law.").  Here, the law governing the Debtors' interest in the Lease Assets is English law, as the Head Leases and Subleases are governed by English law. Finestone Decl. Exs. 2, 3 (Head Leases) § 12 ("This Agreement . . . is governed by and shall be construed in accordance with English Law"); Finestone Decl. Exs. 4, 5 (Subleases) § 28 ("This Agreement and any non-contractual obligations arising out of or in connection with this Agreement shall be governed by, and interpreted in accordance with, English law"); Gray Decl. Exs. 10, 17 (Security Assignment Agreements) § 19 ("This Agreement and any non-contractual obligation arising out of or in connection with it are governed by English law.").

As explained by FWCP's expert on English law, each Debtor absolutely assigned all rights, title, and interest in and to the Lease Assets to the Security Agent because the clear language of section 3.1 of the Security Assignment Agreements unambiguously states that it is assigning the Assigned Property "*absolutely* by way of security." Gray Decl. Exs. 10, 17 (Security Assignment Agreements) § 3.1; *see also* Decl. of Akhil Shah (Dkt. No. 79) Ex. 1 (Shah Op.) §§ D–F.[11]

Additionally, other sections of the Security Assignment Agreements, as well as certain other Transaction Documents, evidence a clear intent to effectuate an absolute transfer.  Section

---

[11]  Section 136 of the Law of Property Act 1925 enacted in England describes the rights in relation to a contract right (a chose in action) which constitute property in that contract right under English Law and set forth the following requirements for an absolute assignment, all of which are present here:

> (1) the assignment is of a debt or other legal chose in action;
>
> (2) the assignment is absolute and does not purport to be by way of charge only;
>
> (3) the assignment is in writing under the hand of the assignor; and
>
> (4) the debtor (or trustee or other person from whom the assignor would have been entitled to claim such debt or thing in action) gives express notice in writing of the assignment.

As set forth below, and in the Shah Opinions, it is clear from the terms of the Security Assignment Agreements and the Notice and Acknowledgements of Assignment that all of these rights have been transferred to the Security Agent and are vested in the Security Agent and not the Debtors.

3.2 unambiguously creates a charge on the Lease Assets but only "to the extent not validly and effectively assigned pursuant to Clause 3.1." Gray Decl. Exs. 10, 17 (Security Assignment Agreements) § 3.2; Hr'g Tr. 199:7-16. It would make no sense to include two entirely duplicative provisions back-to-back within the same section of the Security Assignment Agreements. Shah Decl. ¶¶ 51–62. And sections 12.1 and 13.9 grant the Security Agent power of attorney and prevent the Borrower from exercising rights under the Lease Assets, which evidence an intent to assign ownership rights to the Security Agent. *See* Gray Decl. Exs. 10, 17 (Security Assignment Agreements) §§ 12.1, 13.9; Shah Op. ¶ 56.

Section 8 of the Notice and Acknowledgements of Assignments provides that the Security Agent, not the Debtors, may choose where all proceeds of the Lease Assets are to be deposited. Supp. Gray Decl. Exs. 3, 4 (Notice and Acknowledgements of Security Assignment) § 8; Shah Decl. ¶ 55. Further, pursuant to the terms of the Notice and Acknowledgements of Assignments, upon receipt of the Enforcement Notices on December 1, 2022, VNA and the Intermediate Lessors have pledged to refuse to recognize "the exercise by the [Debtors] of any of [their] rights and power under or in respect of the [Head Leases] and the Assigned Property" and to perform all obligations under the Subleases and Head Leases "in favour of the Security Agent as if the Security Agent were named therein as lessor." *Id.* § 13. In any event, the Debtors were never (at any time) entitled to receive payments or exercise rights in respect of the VNA Claims or the Subleases.

Finally, as the experts for both FWCP and the Debtors agree, the Debtors' equitable rights to redeem the Lease Assets are future interests, which does not give rise to present property interests in the Lease Assets. *See* Hr'g Tr. at 112:1-10 (testimony from Mr. Shah explaining the Debtors are unable to exercise their equity of redemption or equitable right to redeem the Lease Assets until they "pay off the entirety of the secured obligations" and that "until that time, all the

Debtors can sell is their . . . interest.  Effectively whatever their right of redemption is worth."); Hr'g Tr. at 185:2-6 ("[Question]. . . . a party, in this instance, the assignor, who has an equity of redemption only recovers the right to the chose in action upon payment of the secured debt, correct?  [Answer] The—correct as far as it goes.").

Debtors may argue that the assignment language in section 3.1 of the Security Assignment Agreements merely creates security interests, or "charges," in the Lease Assets in favor of the Security Agent.  Even if they are correct, the Debtors would not have the right to sell the Lease Assets:  the VNA Claims and rights under the Subleases would belong to the Intermediate Lessors. *See id.* at 195:7-25 ("[Question]. . . . [I]f the Court determines that there's only a charge created, that means that there's only a charge between the intermediate lessor and the Debtor, and a charge between the Debtor and the security agent, correct?  [Answer]. Correct."); *id.* at 196:16-21 ("[Question] With regard to the lease assets, if there's only a charge created between the intermediate lessor and the Debtor, the Debtors would not have the current right to sell the lease assets, correct? [Answer].  That's correct.").

Thus, under the controlling English law—which here determines the extent of the Debtors' interests in the Lease Assets, *see Butner*, 440 U.S. at 55—the Debtors do not have the right to sell the Lease Assets.  The only possible way for the Debtors to obtain the right to sell any of the Lease Assets would be through the exercise of their equitable rights of redemption which will only trigger upon full payment of the Secured Obligations, an event which—as explained below—will not happen if the Sale occurs according to the terms in the APA.[12]

---

[12]    And, as explained in detail below, even if the Secured Obligations are fully satisfied, the Debtors will still not be able to sell all of the Lease Assets because the Intermediate Lessors' equitable rights of redemption will trigger simultaneously with the Debtors' rights to redeem, which will result in the transfer to the Intermediate Lessors all of the rights to the Lease assets

Until full payment of the Secured Obligations, none of the Lease Assets are property of the estate—the Debtors' estates only have a property interest in their equitable right to redeem, and may only sell that equitable right. *See* Hr'g Tr. at 112:1-10 ([MR. SHAH]: "[U]ntil [payment of the Secured Obligations], all the Debtors can sell is their . . . interest. Effectively whatever their right of redemption is worth."); Hr'g Tr. at 212:23-25 ("[MR TREGEAR]: If there's been an absolute assignment to the rights, then the Debtor is not a position to give title to those rights to a purchaser."); *In re Loco Realty Corp.*, 2009 WL 2883050 (Bankr. S.D.N.Y. June 25, 2009); *In re Soho 25 Retail, LLC*, 2011 WL 1333084, at *8 (Bankr. S.D.N.Y. Mar. 31, 2011) ("An absolute assignment of rents prepetition does not necessarily mean that the estate has no interest in the rents for the purposes of Section 541 analysis. . . . However, if a debtor has only an interest in the rents to the extent a mortgage is ever satisfied, the cash flow from the rents is not property of the estate until the mortgage is satisfied."); *First Fid. Bank, N.A. v. Jason Realty, L.P. (In re Jason Realty, L.P.)*, 59 F.3d 423, 427–429 (3d Cir. 1995) (stating "[a] federal court in bankruptcy is not allowed to upend the property law of the state in which it sits, for to do so would encourage forum shopping and allows a party to receive a windfall merely by reason of the happenstance of bankruptcy" and applying the applicable state law to conclude "the district court properly concluded that the rents were assigned to First Fidelity and were not property of the bankruptcy estate.").[13]

---

originally transferred under the Intermediate Lessor Security Assignment Agreements, including rights under the Subleases and the VNA Claims.

[13]    In prior briefing, the Debtors have argued that their equitable right of redemption is sufficient to bring the entirety of the Lease Assets within definition of "property of the estate" and, consequently, the Debtors may sell those assets. *See Debtors' Obj. to Mot. to Dismiss* (Dkt. No. 53) at 22–23. In support of this argument, Debtors rely on two cases, *In re Mocco*, 176 B.R. 335 (Bankr. D.N.J. 1995) & *In re Princeton Overlook Joint Venture*, 143 B.R. 625, 633 (Bankr. D.N.J. 1992), that were overruled by the Third Circuit's holding in *In re Jason*, and one additional case, *In re Amaravathi Ltd. P'ship*, 416 B.R. 618, 634 (Bankr. S.D. Tex. 2009), that is wholly inapposite as it concerns post-petition proceeds of estate property, not prepetition assets that were never estate property.

2.  *The Debtors Cannot Sell the Lease Assets Until the Secured Obligations Are Paid in Full and the Purchase Price Does Not Pay Off the Secured Obligations.*

The APA requires the Debtors sell the Lease Assets **before** all Secured Obligations have been paid in full.  *See* Sale Mot. ¶ 20.  But the Debtors' equity of redemption (which would need to be triggered to allow the Debtors to sell any of the Lease Assets), does not take effect **until after** the Secured Obligations are paid in full.  Hr'g Tr. at 112:1-10; 185:2-6.  The Debtors and Stalking Horse Bidders have argued that the equity of redemption will trigger at the Closing of the Sale because the Debtors will (i) receive the Purchase Price, (ii) pay off the Secured Obligations, (iii) redeem the Lease Assets, and (iv) transfer the Lease Assets all in one simultaneous act.  *See* Feb. 4, 2022 Hr'g Tr. 81:20-25, 82:1 ("[MR. ORTIZ]:  [I]t would still just be a sequencing issue. As long as they're being paid in full, everyone agrees that they—that the title then comes back to the Debtor and can be handed over to whoever our buyer is, whether it's stalking horse or a higher and better bid."); Feb. 4, 2022 Hr'g Tr. 71: 5-12 ("[MR. GREISSMAN]:  [W]e would argue that that's a distinction without much of a difference because the equity redemption can be exercised and title transferred all simultaneously.").  But this theory is fatally flawed because, *inter alia*, payment of the Purchase Price does not trigger the Debtors equity of redemption since the amount of the Purchase Price listed in the Stalking Horse Term Sheet, $207,741,763.53, is woefully insufficient to pay off the Secured Obligations.  Pursuant to the Proceeds Agreements:

> "Secured Obligations" means **any and all** moneys, **liabilities and obligations (whether actual or contingent, whether now existing or hereafter arising, whether or not for the payment of money and including, without limitation, any obligation or liability to pay damages**) from time to time owing to any of the Finance Parties by any Obligor pursuant to any Transaction Document, notwithstanding that the recourse of the Finance Parties against any person may be limited in recourse.

Gray Decl. Exs. 7, 14 (Proceeds Agreements) at App'x A (emphasis added).

The Debtors and the Stalking Horse Bidders have admitted that the amount of the Purchase Price is intended to cover *only* the principal amounts outstanding on the Loans, plus accrued but unpaid interest, and reasonable fees and costs. *See* Debtors' Statement ¶ 3. But the definition of Secured Obligations makes clear that it includes much more than the Purchase Price is intended to cover: it includes "any and all moneys, liabilities and obligations . . . owing to any of the Finance Parties by any Obligor . . . ." Gray Decl. Exs. 7, 14 (Proceeds Agreements) at App'x A.

For instance, because "Obligors" includes the Intermediate Lessors, JLPSI, and JPL Secured Obligations clearly and expressly include the swap breakage costs under the Hedging Agreement and must necessarily include the amounts these entities are liable to FWCP for breaches of the Transaction Documents as detailed in the English Proceeding. But the APA does nothing to address these amounts. Indeed, the Debtors and the Stalking Horse Bidders have made clear that that the Purchase Price *will not* cover these amounts. *See* Feb. 4, 2022 Hr'g Tr. 78:5-10; Debtors' Statement ¶ 3. The Purchase Price also does not account for the more than $20 million in unpaid rent amounts owed to the Security Agent by the Intermediate Lessors. Because the Purchase Price is woefully insufficient to satisfy the Secured Obligations, the Sale will not trigger the Debtors' equity of redemption in the Lease Assets, and the Debtors will not be able to sell the Lease Assets. *See* Hr'g Tr. at 212:23-25 ("[MR TREGEAR]: If there's been an absolute assignment to the rights, then the Debtor is not in a position to give title to those rights to a purchaser.").

## B.    The VNA Claims Revert To The Intermediate Lessors Upon Satisfaction Of The Secured Obligations

Even if the Purchase Price were sufficient to cover the Secured Obligations (it is not), the Debtors would still not be able to sell all of the Lease Assets as required by the APA. This is because some of the Lease Assets, namely the valuable VNA Claims and other rights under the

Subleases, will revert to the Intermediate Lessors, not the Debtors, upon satisfaction of the Secured

Obligations.  *See* Gray Decl. Exs. 9, 16 (Intermediate Lessor Security Assignments) § 17.

As the Debtors' own expert explained, the transfer from the Debtors to the Security Agent

was identical to the transfer that was effectuated from the Intermediate Lessors to the Debtors

under the Intermediate Lessor Security Assignment Agreements.   Hr'g Tr. at 195:7-25

("[Question]. . . . So, with regards to one of the central questions you've been asked about whether

there is an absolute assignment or a charge, that analysis would apply equally to both deeds of

security, the deed of security between the intermediate lessor and the Debtor and the deed of

security between the Debtor and the security agent, correct?  [Answer] I agree, that follows. Yes.").

Thus, if the Debtors have an equitable right of redemption in the Lease Assets transferred to the

Security Agent, then the Intermediate Lessors must have an identical equitable right of redemption

over the VNA Claims.  And both the Debtors' rights of redemption and the Intermediate Lessors'

rights of redemption trigger simultaneously "[u]pon the expiry of the Security Period" (*i.e.*, the

date of full payment of the Secured Obligations).  *See* Gray Decl. Exs. 10, 17 (Security Assignment

Agreements) § 17; Gray Decl. Exs. 9, 16 (Intermediate Lessor Security Assignment Agreements)

§ 17; Gray Decl. Exs. 7, 14 (Proceeds Agreements) at App'x A.  Thus, upon full payment and

discharge of the Secured Obligations, certain of the Lease Assets, including the VNA Claims and

rights under the Subleases, will revert to the Intermediate Lessors—not the Debtors—and the

Debtors will not be able to sell those assets.

The Debtors have attempted to cure this fatal flaw in their Sale process by procuring the

Intermediate Lessors to execute the purported Bills of Sale, but those documents breached the

Proceeds Agreements, which require the consent of the Security Agent—which the Intermediate

Lessors did not seek or obtain from FWCP, and may be voidable by a director or insolvency officer

of either Intermediate Lessor.  *See id.* Exs. 7, 14 (Proceeds Agreements) § 11.3.4(b) ("The

Intermediate Lessor shall not without the prior written consent of the Security Agent: (i) sell,

transfer, assign its rights in respect of or otherwise dispose of any of the Collateral other than

pursuant to the Security Documents.").  In any case, the Bills of Sale do not take effect until after

the "effective date" of the Sale, *see* Bills of Sale at 2, which means that the Subleases and VNA

Claims that would revert to the Intermediate Lessors upon a hypothetical full payment of the

Secured Obligations would not transfer to the Debtors until after the Sale.

### C.    The Debtors Cannot Assume And Assign Contracts To Which They Are Not Party

Pursuant to the terms of the Notice of Assumption, the Debtors are trying to assume and

assign to the Stalking Horse Bidders certain contracts to which they are not a party and under

which they have no rights to assume as part of the Sale.  *See* APA § 2.01(i) (including among the

Transferred Assets "all rights under the Contracts set forth on Schedule 2.01(a)(i)"); APA

§ 2.01(iii) (including among the Transferred Assets "the Aircraft Head Lease, the Aircraft Lease,

and Related Aircraft Documents and other Contracts set forth on Schedule 2.01(a)(iii)").

For instance, the Notice of Assumption lists the Airframe Warranty Agreement for

Aircraft.  However, ***the Debtors are not parties to these contracts*** and have no rights under them

to assume and assign—these rights belong to the Intermediate Lessors.  This is also true of the

Engine Warranty Agreement for the MSN 173 Aircraft.  The Debtors cannot sell these rights under

Bankruptcy Code section 365.  *See* 11 U.S.C. § 365(a) (allowing the trustee to assume or reject

only "any executory contract or unexpired lease ***of the debtor***") (emphasis added); *Orion Pictures

Corp. v. Showtime Networks (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993)

("[Section] 365 permits the trustee or debtor-in-possession, subject to the approval of the

bankruptcy court, to go through the inventory of executory contracts ***of the debtor*** and decide

which ones it would be beneficial to adhere to and which ones it would be beneficial to reject.")
(emphasis added). The Debtors cannot assign contracts to which they are not a party.

Additionally, the Debtors are seeking to assume and assign their purported rights under the
Intermediate Lessor Security Assignment Agreements. But the Debtors have already assigned
these rights to the Security Agents pursuant to the Security Assignment Agreements. *See* Gray
Decl. Exs. 10, 17 (Security Assignment Agreements) § 1.1 (defining "Assigned Property" to
include the "Intermediate Lessor Assignment Property"); Gray Decl. Exs. 7, 14 (Proceeds
Agreements) at App'x A (defining "Lessor Assigned Property" to include "all of the right, title,
benefit, claims and interests (present and future, actual and contingent) of the Borrower in, to,
under and in respect of the Intermediate Lessor Assignment."). These rights belong to the Security
Agent until the Secured Obligations are paid in full. *See supra* Section I.A. And once the Secured
Obligations are paid in full, the VNA Claims and other rights under the Subleases will revert to
the Intermediate Lessors, not the Debtors. *See supra* Section I.B; Gray Decl. Exs. 9, 16
(Intermediate Lessor Security Assignment Agreements). Thus, under no circumstance can the
Debtors assume and assign rights under the Subleases, as the Notice of Assumption purports to do.

## II.    THE DEBTORS CANNOT SELL THE COLLATERAL FREE AND CLEAR OF THE SECURITY AGENT'S PROPERTY INTERESTS.

The Debtors seek to sell the Transferred Assets free and clear of the Security Agent's
property interests in the Collateral. *See* Sale Mot. ¶ 32 ("All of the Purchased Assets shall be sold
as a single lot (free and clear of all liens, claims and encumbrances) . . . ."); Proposed Sale Order
(Dkt. No. 58-4) ¶ K ("Pursuant to the Stalking Horse Purchase Agreement . . . upon Closing, the
sale of the Purchased Assets to the Purchasers, including all Purchased Assets that were subject to
the Enforcement Actions, shall be free and clear (other than those items expressly permitted to
remain under the terms of the Stalking Horse Purchase Agreement) of liens, claims (including any

35

competing claims to legal or beneficial title or adverse ownership claims), defenses and interests . . . .").  But the Debtors cannot sell, and this Court cannot approve, the Sale free and clear of the Security Agent's property interests because the Debtors have not satisfied the requirements of section 363(f) of the Bankruptcy Code.

### A.    The Extent Of The Debtors' Interest In The Lease Assets Must Be Determined By Adversary Proceeding Prior To A 363(f) Sale.

As the Court is well aware, the parties dispute the extent of the Debtors' property interests in the Lease Assets.  *See supra* Section I; Mot. to Dismiss at 21; Hr'g Tr. 41: 3-9.  It is well settled in this Circuit that a sale under section 363(f) cannot resolve questions of ownership .  *See, e.g.*, *In re Eastman Kodak Co.*, No. 12-10202 ALG, 2012 WL 2255719, at *2 (Bankr. S.D.N.Y. June 15, 2012) (denying debtors' motion under 105(a) to aid proposed 363 sale because creditors claimed interest in collateral that had to be resolved in an adversary proceeding); *In re Interiors of Yesterday, LLC*, No. 02-30563LMW, 2007 WL 419646, at *6 (Bankr. D. Conn. Feb. 2, 2007) ("[A] Section 363(f)(4) sale cannot be had when there is an unresolved issue of whether the subject property is 'property of the estate:' that issue must be resolved prior to sale. . . .  Moreover, the Trustee might have to commence adversary proceedings (perhaps as many as twenty) to determine the 'property of the estate' issue because the issue likely may not be amenable to resolution in the context of a Section 363 motion."); *Darby v. Zimmerman (In re Popp*), 323 B.R. 260 (B.A.P. 9th Cir. 2005) (requiring the extent of debtor's ownership rights to be determined before 363 sale to avoid piecemeal litigation); *accord Collier on Bankruptcy* ¶ 363.06 (16th ed. 2021) ("[T]he court may not authorize a sale free and clear of property that is not property of the estate.  Thus, if the estate's ownership of the property is disputed, the court must determine who owns the property before it may authorize a sale free and clear.").  An adversary proceeding is the proper vehicle for the determination of an interest in property.  *See* Fed. R. Bankr. P. 7001(2).  FWCP has initiated a

proceeding to determine the extent of their interests in the Lease Assets—property the Debtors

purport to sell pursuant to the terms of the APA. Until these interests are determined, no sale under

section 363(f) may occur.

**B.      The Debtors Have Not Established That Any Of The Requirements Of Section 363(f) Apply.**

Section 363(f) of the Bankruptcy Code states that "[t]he trustee may sell property under

subsection (b) or (c) of this section free and clear of any interest in such property of an entity other

than the estate, only if—

> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> (2)     such entity consents;
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4)     such interest is in bona fide dispute; or
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."

11 U.S.C. § 363(f). The Debtors have not shown (and indeed cannot show) that any of these five

requirements apply here.

> 1.      *Applicable Nonbankruptcy Law Does Not Permit the Debtors to Sell the Collateral Free and Clear of the Security Agent's Interests.*

The first prong of 363(f) is only satisfied where a debtor could have sold the assets in

question outside of bankruptcy, pursuant to nonbankruptcy law. *See, e.g.*, *Dishi & Sons v. Bay

Condos LLC*, 510 B.R. 696, 710 (S.D.N.Y. 2014) ("[T]he Court holds that paragraph

(1) refers . . . 'only to situations where the owner of the asset may, under nonbankruptcy law, sell

an asset free and clear of an interest in such asset.'" (quoting *In re Jaussi*, 488 B.R. 456, 458

(Bankr. D. Colo. 2013)). As explained above, under English law, the Debtors do not have any

interests in the Lease Assets beyond their equitable right of redemption (which does not reach the

Subleases and VNA Claims in any case), and thus cannot sell the Lease Assets so long as the

Secured Obligations remain outstanding. *See supra* Section I.A; Hr'g Tr. 112: 4-10. This is also true of the Aircraft, which are subject to the Security Agent's lien. *See* Gray Decl. Exs. 11, 18 (Mortgage Agreements) § 3(b) ("The security interests created hereunder shall not be released or discharged by any intermediate payment, performance, discharge or satisfaction of any part of the Secured Obligations or by reason of any matter (other than due payment, performance or discharge in full of the Secured Obligations)."); *id.* § 5.1 ("[T]he Mortgagor shall not part with possession of the Aircraft other than in accordance with the provisions of the Lease Agreement or the other Transaction Documents to which it is a party.").

Indeed, until the Secured Obligations are paid in full, the Security Agent is the only party authorized to dispose of the Collateral. *See* Gray Decl. Exs. 7, 14 (Proceeds Agreements) § 6; *id.* Exs. 10, 17 (Security Assignment Agreements) § 7.1; *id.* Exs. 10, 17 (Security Assignment Agreements) § 6.    And pursuant to section 13 of the Notice and Acknowledgements of Assignment, the Debtors relinquished all rights under the Head Leases and the Subleases to the Security Agent when the Enforcement Notices were sent by CACIB. Supp. Gray Decl. Exs. 3, 4 (Notice and Acknowledgements of Security Assignment) § 13. Nonbankruptcy law does not allow the Debtors to sell the Collateral until all the Secured Obligations are paid in full, and the Debtors do not dispute this. *See In re Dundee Equity Corp.*, No. 89-B-10233, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) (sale of real property free of and clear of covenants was not authorized under section 363(f) because under New York law the debtor would not have been authorized to sell the property free of the covenant).

2.      *The Security Agent Has Not Consented to the 363(f) Sale.*

The Debtors' Proposed Sale Order purports to impose a "consent-via-silence" requirement on any party holding a property interest in the Transferred Assets. *See* Proposed Sale Order ¶ M ("Those holders of Encumbrances who did not object, or who withdrew their objections, to the

Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code."). This requirement is inappropriate under applicable precedent.  *See In re Flour City Bagels, LLC*, 557 B.R. 53, 85 (Bankr. W.D.N.Y. 2016) (finding that creditor did not consent to sale, and rejecting debtor's argument that failure to specifically object under 363(f)(2) constitutes implied consent); *accord In re Smith*, No. BR 13-61627-TMR7, 2014 WL 738784, at *1 (requiring "actual consent" to satisfy 363(f)(2)).  In any case, and for the avoidance of any doubt, FWCP hereby specifically announces that it does not consent to the Sale of any of the Collateral free and clear of its property interests therein.

3.    *The Purchase Price is not Greater than the Value of the Security Agent's Liens on the Collateral.*

As explained above, the Security Agent may only release its interests in the Collateral, including the liens in the Aircraft, once the Secured Obligations are paid in full.  *See* Gray Decl. Exs. 7, 14 (Proceeds Agreements) § 7.1.  Thus, the value of the liens is equal to the full outstanding amount of the Secured Obligations (valued at $232,707,465.59 plus unliquidated amounts of damages, fees, and costs associated with the claims being pursued in the English Proceeding), which is larger than the Purchase Price, which the Debtors estimate will be $207,741,763.53. *See In re Flour City Bagels, LLC*, 557 B.R. at 88 (denying proposed sale under 363(f)(3) where sale would realize $5 million for liens that had face amount exceeding $11 million); *accord In re Smith*, 2014 WL 738784, at *2 (applying face-amount view and finding that proposed sale netting $80,000 could not proceed under Section 363(f)(3) where liens totaled approximately $180,000).

4.    *The Security Agent's Property Interests Are Not the Subject of a Bona Fide Dispute.*

The Debtors do not dispute that FWCP, as Security Agent, has a valid property interest in the Collateral that is subject of the Sale.  While the parties disagree about whether the Security Assignment Agreements effectuated an absolute transfer of the Lease Assets or simply granted the

Security Agent a security interest (*i.e.*, a charge), the parties are in agreement that, at the very least, the Security Agent has valid liens in those assets. *Debtors' Reply to Bid Proc. Obj.* (Dkt. No. 68) ("[E]ven if the Lease Assets were assigned 'absolutely,' they nonetheless constitute a security under English law."). And no one contests the Security Agent's liens on the Aircraft. Because there is no dispute that the Security Agent holds *some* property interest in the Collateral, section 363(f)(4) does not apply. *See Revel AC, Inc. v. IDEA Boardwalk LLC*, 802 F.3d 558, 573 (3d Cir. 2015) ("'Bona fide dispute' in the § 363(f)(4) context means that there is an objective basis— either in law or fact—to cast doubt on the validity of [the existence of a property interest]. To satisfy that provision, Revel needed to show there was some factual or legal basis to deny that IDEA held a 'true lease.'"); *Barnes v. Barnes (In re Barnes)*, 615 B.R. 514, 526 (Bankr. D. Conn. 2020) (applying § 363(f)(4) because "the nature, validity, extent, priority, and enforceability" of liens at issue were subject to a bona fine dispute).

> 5.    *The Debtors Have No Right to Bring a Proceeding Against FWCP to Compel it to Accept Money and Extinguish its Interests.*

Section 363(f)(5) only applies where the creditor may, under nonbankruptcy law, be compelled to accept a payment in exchange for its interest. *See Dishi,* 510 B.R. at (holding that § 363(f)(5) "should be read to reach only those legal or equitable proceedings that could be brought by the trustee as owner of the property" and rejecting argument that possible foreclosure action could satisfy section 363(f)(5)). As explained above, under English law, the Security Agent is only required to release its interests in the Collateral upon full payment of the Secured Obligations, which will not happen as a result of the Sale. *See supra* Section I.A. But even then the requirement to release the Collateral is not absolute, as the Security Agent is explicitly permitted to retain its interests in the Collateral in certain instances. *See, e.g.*, Gray Decl. Exs. 7, 14 (Proceeds Agreements) § 7.2 ("No Finance Party shall be required to release any part of the Collateral if the

Security Agent has been advised by appropriate and reputable legal counsel that, by reason of the application of any bankruptcy, insolvency or other applicable laws affecting creditors' rights and the discharge of obligations, the Security Agent will or will become likely to be obliged to pay to or account to any Obligor or any liquidator or trustee in bankruptcy of any Obligor any amount corresponding to all or any part of the amount paid in or towards such discharge.").  And the Security Agent is not the object of any other obligation or proceeding, such as subordination or cramdown, through which the Debtors could seek to compel FWCP to extinguish its property interests in the Collateral for an amount less than that required to fully satisfy the Secured Obligations.

The Debtors bear the burden of establishing entitlement under section 363(f).  Their failure to show that FWCP could be compelled to accept monetary relief in exchange for releasing its property interest in the Collateral takes this case out of the ambit of section 363(f)(5).

### C.    The Debtors May Not Sell The Collateral Free And Clear Of FWCP's Claims For Wrongful Conduct That Occurred Post-Petition

Section 363(f) does not apply to claims that arise out of wrongful conduct that occurred postpetition.  *See Elliott v. GM LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 157 (2d Cir. 2016) ("These sorts of claims are based on New GM's *post*-petition conduct, and are not claims that are based on a right to payment that arose before the filing of petition or that are based on pre-petition conduct.  Thus, these claims are outside the scope of the Sale Order's 'free and clear' provision."); *Maury v. Ventura in Manhattan, Inc.*, 544 F. Supp. 3d 396, 402 (S.D.N.Y. 2021) (holding that the a sale under § 363(f) did not extinguish the plaintiff's tort claims arising from the purchaser's post sale conduct).  Thus, the Debtors cannot sell the Collateral free and clear of FWCP's claims against the Debtors' affiliates for post-petition breaches, including those based on FWCP's claims for defamation, malicious falsehoods, unlawful interference with business, and

conspiracy under Section 11.3.23 of the Proceeds Agreements. *See* Supp. Gray Decl. Ex. 5 (Claim Form) ¶ 19.

## III.    THE DEBTORS CANNOT PAY THE JUNIOR LENDERS DIRECTLY IN VIOLATION OF SECTION 510(A) AND THE PROCEEDS AGREEMENT

The APA provides that, as part of the Sale, the Stalking Horse Bidders will pay the Junior Lenders directly. APA § 3.03(c) ("[T]he Senior Obligations shall be paid directly by the Buyer to the Senior Finance Parties and . . . the Junior Obligations shall be paid directly by the Buyer to the Junior Finance Parties."). First, this is an improper request to dictate the putative terms of a chapter 11 plan while evading confirmation requirements. *See In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 816, (Bankr. S.D.N.Y. Sept. 10, 2020); *cf. Czyzewski v. Jevic Holding Corp. (In re Jevic Holding Corp.)*, 137 S. Ct. 973, 987 (2017) (prohibiting "nonconsensual priority-violating structured dismissals"). Second, the Proceeds Agreements, which are enforceable subordination agreements under section 510(a) of the Bankruptcy Code, prohibit the Junior Lenders from receiving any payments until the amounts owed to the Senior Lenders are fully satisfied. Gray Decl. Exs. 7, 14 (Proceeds Agreements) § 8.3; *see U.S. Bank Nat'l Ass'n v. T.D. Bank, N.A.*, 569 B.R. 12, 20 (S.D.N.Y. 2017) ("The Bankruptcy Code provides that subordination agreements are enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law.") (internal quotations omitted). Under no circumstances should this Court impair FWCP's rights to seek immediate turnover under section 4.2 of the Proceeds Agreements should any payments be made to any Junior Lender or equity interest holder (or any other party) prior to the full payment of amounts owed to FWCP, both in its capacity as Security Agent and as Senior Lender. *See In re Purdue Pharma, L.P.*, 2021 WL 5979108, at *70 (S.D.N.Y. Dec. 16, 2021), *certificate of appealability granted,* 2022 WL 121393 (S.D.N.Y. Jan. 7, 2022)

(holding "the Bankruptcy Code confers no such authority" to approve non-consensual third party releases).

## IV.    THE DEBTORS ARE NOT ENTITLED TO A FINDING OF GOOD FAITH.

The Debtors have requested a finding from this Court that "[e]ach of the Parties to the Stalking Horse Purchase Agreement acted in good faith in negotiating the Stalking Horse Purchase Agreement and related agreements." Proposed Sale Order ¶ M.  FWCP submits that the Debtors are not entitled to this finding for the reasons set forth in its Motion to Dismiss,[14] and for the additional reason that JPL, who has controlled the Debtors throughout these Chapter 11 Cases, has engaged in numerous acts of questionable conduct throughout this case.  For instance, JPL willfully breached sections 3.1.3 and 10.2.3(c) of the Proceeds Agreements by causing the Debtors to file these Chapter 11 Cases.  Further, JPL's CEO, Teiji Ishikawa has admitted, under oath, that JPL would not have caused the Debtors to file these Chapter 11 Cases unless doing so provided a return to JPL.  *See* Russell Decl. Ex. 8 (Transcript of Section 341 Meeting) 42:20-44:19.  Finally, it is FWCP's belief that JPL and SVP have entered into an undisclosed side-deal regarding a third aircraft, MSN 150, owned by another JPL subsidiary, JPA No. 134 Co. Ltd.  While FWCP does not currently know the particulars of this side-deal, FWCP has requested discovery on the matter and reserves the right supplement this Objection should it obtain any information relevant to this issue, or any other raised in this Objection.  Given JPL's complete control over Debtors, these actions, and the intent exhibited by JPL, should be imputed upon the Debtors and the Court should not find that they have acted in good faith.

---

[14]  FWCP has filed a *Notice of Appeal* regarding the Court's Order denying the Motion to Dismiss. *See* Dkt. No. 115.

## **CONCLUSION**

Based on the foregoing, FWCP respectfully requests that this Court deny the Sale Motion.

Dated: February 17, 2022

Respectfully submitted,

/s/ *Benjamin I. Finestone*

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Benjamin I. Finestone
Zachary Russell
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
benjaminfinestone@quinnemanuel.com
zacharyrussell@quinnemanuel.com

Justin C. Griffin (pro hac vice admitted)
Eric Winston (pro hac vice admitted)
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
justingriffin@quinnemanuel.com
ericwinston@quinnemanuel.com

Asher B. Griffin (pro hac vice admitted)
300 West 6th Street, Suite 2010
Austin, TX 78710
Telephone: (737) 667-6100
Facsimile: (737) 667-6110
ashergriffin@quinnemanuel.com

*Counsel to FitzWalter Capital Partners (Financial Trading) Limited*