**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| JPA NO. 111 CO., LTD., and | : | Chapter 11 |
| JPA NO. 49 CO., LTD., | : | |
| | : | Case No. 21–12075 (DSJ) |
| Debtors.[1] | : | No. (Jointly Administered) |
| | : | |
| | : | |
| | : | |
| | : | |
| FITZWALTER    CAPITAL    PARTNERS | : | |
| (FINANCIAL    TRADING)    LIMITED, | : | Adv. Pro. No. _____ |
| INDIVIDUALLY AND AS SECURITY AGENT | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JPA NO. 111 CO., LTD., and | : | |
| JPA NO. 49 CO., LTD, | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

### COMPLAINT FOR DECLARATORY JUDGMENT

---

[1]  The Debtors in these Chapter 11 cases are:  JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd. The  Debtors'  corporate  address  is:    Kasumigaseki  Common  Gate  West  Tower,  3–2–1 Kasumigaseki, Chiyoda–Ku, Tokyo 100–0013.

Plaintiff, FitzWalter Capital Partners (Financial Trading) Limited, individually and as Security Agent ("**FitzWalter**" or "Plaintiff"), by and through its attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, alleges as follows:

## INTRODUCTION

1.      This action is commenced in order to determine the true owner of certain disputed assets, arising from the Debtors' unambiguous attempt, using Bankruptcy Code sections 363(b), 363(f), and 365, to sell property that they absolutely assigned and do not own, as well as contracts to which the Debtors are not parties (the "**Bankruptcy Sale**").

2.      The Debtors are single-purpose, passive investment vehicles formed under the laws of Japan for the express and sole purpose of acquiring and leasing aircraft. The Debtors' acquisition of the MSN 067 Aircraft and the MSN 173 Aircraft (the "**Aircraft**") occurred pursuant to a suite of documents (the "**Transaction Documents**") that define the rights, interests, and obligations of the parties to the transactions.

3.      The Debtors simply own the Aircraft. Every other asset that is involved in the proposed Bankruptcy Sale was either (a) absolutely assigned to the Security Agent and, under applicable English law, was (and remains) owned by the Security Agent, (b) is owned by the Intermediate Lessors (as defined below), or (c) concerns contracts to which no Debtor is a party (the "**Contracts**").

4.      The Debtors commenced these chapter 11 cases to stop a foreclosure of the Lease Assets (defined below), even though the Debtors did not own such assets. They now seek to sell the Lease Assets, and assume and assign the Contracts, even though none constitute property of the estate that can be sold under Bankruptcy Code section 363 or assumed and assigned under Bankruptcy Code section 365.

2

5.      As the Bankruptcy Code does not countenance expropriation of a third–party's property to repay a debtor's obligation, FitzWalter seeks declaratory relief confirming the extent of its rights and interests in the assets in dispute.

### THE PARTIES AND RELEVANT NON–PARTIES

6.      Plaintiff FitzWalter is a limited partnership formed under the laws of England with a principal place of business in London, United Kingdom.   FitzWalter owns the substantial majority of the Debtors' outstanding senior debt and serves as Security Agent under the Transaction Documents.

7.      Defendant JPA No. 111 Co., Ltd. is a corporation formed under the laws of Japan with a principal place of business in Tokyo, Japan.   JPA No. 111 conducts no business in the United States and has no employees in the United States.   On December 17, 2021 (the "**Petition Date**"), at the direction of its parent company, JPA No. 111 commenced its chapter 11 case in this Court by filing a voluntary petition for relief.   JPA No. 111 has alleged that it had property located in the United States as of the Petition Date, which FitzWalter has disputed.

8.      Defendant JPA No. 49 Co., Ltd. is a corporation formed under the laws of Japan with a principal place of business in Tokyo, Japan.   JPA No. 49 conducts no business in the United States and has no employees in the United States.   On the Petition Date, at the direction of its parent company, JPA No. 49 commenced its chapter 11 case in this Court by filing a voluntary petition for relief.   JPA No. 49 has alleged that it had property located in the United States as of the Petition Date, which FitzWalter has disputed.

9.      In addition to the parties, there are several entities that have interests in the Lease Assets and Contracts.  These include the "Intermediate Lessors" and the "Contract Counterparties."

10.     Non–party JLPS Leasing Draco Limited (f/k/a DAE Leasing (Ireland) 12 Limited) ("**JPLS Draco**") is a limited partnership organized under the laws of the Republic of Ireland.  At all relevant times, JLPS Draco has served as the Intermediate Lessor for JPA No. 111 in connection with the MSN 067 Aircraft.

11.     Non–party JLPS Leasing Uranus Limited (f/k/a PAAL Uranus Company Limited) ("**JPLS Uranus**") is a limited partnership organized under the laws of the Republic of Ireland.  At all relevant times, JLPS Uranus has served as the Intermediate Lessor for JPA No. 49 in connection with the MSN 173 Aircraft.

12.     Contract Counterparty Airbus SAS (a/k/a Airbus Commercial Aircraft) is a corporation organized under the laws of France with its principal place of business at 1 Rond Point Maurice Bellonte Blagnac, 31707 France.

13.     Contract Counterparty Roll–Royce Plc is a corporation organized under the laws of England and Wales with its principal place of business  62 Buckingham Gate, London, SWIE 6AT, England.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157, 1334 and 1367 because the dispute involves (a) what constitutes property of the estate of each Debtor under 11 U.S.C. § 541(a); (b) sales under 11 U.S.C. § 363 of property that is not property of the estate; and (c) assumption and assignment of purported executory contracts under 11 U.S.C. § 365.

15.     Venue is proper in this district under 28 U.S.C. § 1409 as this proceeding arises in or is related to the Debtors' cases under Title 11 of the United States Code.

16.     The Claim for declaratory relief is a core matter pursuant to 28 U.S.C. § 157.

17.     Federal Rule of Bankruptcy Procedure 7001 requires that a "proceeding to determine the validity, priority, or extent of [an] interest in property" be determined in an adversary proceeding. Fed. R. Bankr. P. 7001(2).

## BACKGROUND

18.     The Debtors' acquisition of the Aircraft occurred pursuant to the Transaction Documents, a suite of contracts and agreements that govern the rights, duties, interests, and obligations of all parties to the transaction.

19.     Pursuant to the Transaction Documents, the Debtors received financing from senior and junior lenders to fund their acquisition of the Aircraft. The Transaction Documents imposed various conditions precedent to the Debtors obtaining the financing. These conditions include, *inter alia*, that each Debtor would lease the Aircraft to a designated Intermediate Lessor that in turn would sublease each Aircraft to an operating airline. Furthermore, the Debtors and the Intermediate Lessors were required to assign their interests in the Aircraft and the Transaction Documents to a designated Security Agent that is authorized to (1) act on behalf of the senior lenders, junior lenders, and the hedging counterparty; (2) distribute proceeds from the leases to the lenders and the hedging counterparty (as well as the agent and Security Agent, all of whom are "Finance Parties"); and (3) take enforcement actions in the event of a default. *See supra*.

B.    *Formation of the Debtors*

20.    JPA No. 111 was formed in December of 2017 (after the date when JLPS Uranus was already a party to the Sublease dated August 1, 2017), and in November of 2018, it acquired the MSN 067 Aircraft.

21.    In August of 2017, JPA No. 49 was formed (after the date when JLPS Draco was already a party to the Sublease dated December 4, 2016), and, in December of 2017, it acquired the MSN 173 Aircraft.

22.    Each Debtor is wholly owned by JP Lease Products & Services Co., Ltd. ("**JPL**").  JPL appointed a representative director, who is the sole fiduciary for each Debtor.

23.    Neither Debtor has or has ever had any employees.

24.    Neither Debtor has conducted any business other than what JPL has purportedly conducted on the Debtors' behalf or incurred any debts owed to suppliers or vendors.

C.    *The Head Lease/Sublease Structure*

25.    The Debtors never intended to operate the Aircraft or conduct any business, which was material to the financing structures for each Aircraft.

26.    Instead, each Debtor was required to enter and entered into "**Head Lease**" agreements by which each Debtor leased its aircraft to JPLS Uranus or JPLS Draco (collectively the "**Intermediate Lessors**"), pursuant to sale and leaseback transactions, whereby each Intermediate Lessor could continue to lease the aircraft an operating airline, Vietnam Airlines JSC ("**VNA**") under extant sublease agreements to which the Intermediate Lessors and Vietnam Airlines JSC were already parties.

27.    JPA No. 49 leased the MSN 173 Aircraft to JLPS Uranus.

28.    JPA No. 111 leased the  MSN 067 Aircraft to JLPS Draco

29.     In turn, each Intermediate Lessor subleased the Aircraft to Vietnam Airways JSC ("**VNA**") through separate sublease agreements (the "**Subleases**").  The Subleases are detailed operating leases with VNA and were entered into by each Intermediate Lessor and VNA several months before the Debtors acquired the Aircraft.  In contrast, the Head Leases between the Debtors and Intermediate Lessors are short-form documents with limited rights and obligations.

30.     Neither Debtor is in contractual privity with VNA under the Subleases.  VNA paid amounts due under the Subleases directly to pledged and blocked accounts held with the Security Agent (as account bank) in the name of the Intermediate Lessors.  These amounts were automatically required to be applied (pursuant to clause 8.13 of the Proceeds Agreement) in accordance with the 'waterfall' for application of proceeds to the Finance Parties under clause 8 of the Proceeds Agreement.  The payments were therefore not paid by VNA to the Debtors at any point.

31.     Since the service of the Enforcement Notices (as defined below) on December 1, 2021, VNA has been obliged to pay all amounts directly to the Security Agent.  Therefore, there has never been a time when the Debtors have been entitled to receive payments from VNA.

32.     In the event that VNA breached the Subleases, neither Debtor had any right to pursue claims against VNA ("**VNA Claims**").  VNA's obligations under the Subleases were owed to the Intermediate Lessors, and, as described in greater detail below, each Intermediate Lessor assigned its right to VNA Claims to the Security Agent.

33.    The interests, rights, and powers that the Security Agent acquired pursuant to the assignments under the Head Leases and Subleases constitute the "**Lease Assets**" and include the VNA Claims. *See supra*.

### D.    *Funding Debtors' Acquisition of the Aircraft*

34.    The Debtors' acquisition of each Aircraft was funded through senior and junior debt financings. JPA No. 111 entered into senior and junior facility agreements providing for total committed loans up to $100 million and $15 million, respectively. JPA No. 49 entered into senior and junior facility agreements providing for total committed loans up to $111 million and $7.3 million, respectively.

### E.    *The Security Agent's Interests In The Aircraft and Lease Assets*

35.    The Transaction Documents impose a set of conditions precedent that had to be satisfied in order for the Debtors to receive the senior and junior loans.

36.    *First*, on December 29, 2017, JPA No. 49 executed an aircraft mortgage granting a lien on the MSN 173 Aircraft in favor of the Security Agent ("**MSN 173 Aircraft Mortgage**"). JPA No. 49 pledged the MSN 173 Aircraft as collateral by granting a first priority security interest in the Aircraft to the Security Agent. The MSN 173 Aircraft Mortgage is governed by New York law. It gives the Security Agent broad enforcement powers over the Aircraft when an event of default occurs, including the authority to effectuate a foreclosure sale of the Aircraft. The Security Agent is authorized to exercise enforcement powers at its absolute discretion.

37.    *Second*, also on December 29, 2017, JLPS Uranus—the MSN 173 Intermediate Lessor—"assign[ed] absolutely by way of security with full title guarantee . . . as security for the payment of the discharge of the Secured Obligations, all of its right, title and interest, present and future, in and to the Assigned Property" to JPA No. 49 ("**MSN 173 Intermediate**

**Lessor Security Assignment Agreement**"). "Assigned Property" is defined to include

"(a) the Lease Agreement Property, (b) the Intermediate Lessor Insurance Property, (c) the

Requisition Proceeds Property, (d) the Final Disposition Proceeds Property, relating to the

[MSN 173] Aircraft. . . ." The applicable Proceeds Agreement defines these terms:

<ol type="a">
<li>

"'**Lease Agreement Property**' means all of the right, title and interest, present and future, of the Intermediate Lessor under the Lease Agreement and the other Relevant Documents including, without limitation . . . (b) claims of the Intermediate Lessor for damages arising out of a breach of or default under the Lease Agreement and the other Relevant Documents, and (c) all the rights of the Intermediate Lessor to compel performance and otherwise exercise all rights and remedies under the Lease Agreement and the other Relevant Documents . . . ."</li>

<li>

"'**Intermediate Lessor Insurance Property**' means all of the right, title and interest (present and future, actual and contingent) of the Intermediate Lessor in and to the Insurances (excluding third party liability insurance and including any Insurance Proceeds) . . . ."</li>

<li>

"'**Requisition Proceeds Property**' means all of the right, title and interest (present and future, actual and contingent) of the Borrower and the Intermediate Lessor in and to any Requisition Proceeds."</li>

<li>

"'**Final Disposition Proceeds Property**' means all of the right, title and interest (present and future, actual and contingent) of the Borrower in and to any Final Disposition Proceeds."</li>
</ol>

38.     ***Third***, also on December 29, 2017, JPA No. 49 "assign[ed] absolutely by way

of security with full title guarantee . . . as security for the payment of the discharge of the

Secured Obligations, all of its right, title and interest, present and future, in and to the Assigned

Property" to the Security Agent ("**MSN 173 Security Assignment Agreement**"). "Assigned

Property" is defined to include (a) the Head Lease Agreement Property, (b) the Aircraft

Purchase Agreement Property, (c) the Borrower Insurance Property, (d) the Requisition

Proceeds Property, (e) the Final Disposition Proceeds Property, (f) the Lease Management

Agreement Property, (g) the Hedging Agreement Property and (h) the Intermediate Lessor

Assignment Property relating to the Aircraft . . . ."   The applicable Proceeds Agreement

defines these terms:

a)     "'**Head Lease Agreement Property**' means all of the right, title and
interest, present and future, of the Borrower under the Head Lease
Agreement . . . including, without limitation, all of its right, title and interest
in and to (a) any amounts payable under the Head Lease Agreement,
(b) claims of the Borrower for damages arising out of a breach of or default
under the Head Lease Agreement and the Acceptance Certificate (as defined
in the Head Lease Agreement), and (c) all the rights of the Borrower to
compel performance and otherwise exercise all rights and remedies under
the Head Lease Agreement. . . ."

b)     "'**Aircraft Purchase Agreement Property**' means all of the right, title and
interest (present and future, actual and contingent) of the Borrower in, to
and under any representations, warranties and indemnities given to it by the
Seller under the Aircraft Purchase Agreement and the Bill of Sale, such
rights excluding, for the avoidance of doubt, the right of the Borrower to
purchase and take title to the Aircraft and the Intermediate Lessor Shares
under the Aircraft Purchase Agreement and the Bill of Sale."

c)     "'**Borrower Insurance Property**' means all of the right, title and interest
(present and future, actual and contingent) of the Borrower in and to the
Insurances (excluding third party liability insurance and including any
Insurance Proceeds) . . . ."

d)     "'**Requisition Proceeds Property**' means all of the right, title and interest
(present and future, actual and contingent) of the Borrower and the
Intermediate Lessor in and to any Requisition Proceeds."

e)     "'**Final Disposition Proceeds Property**' means all of the right, title and
interest (present and future, actual and contingent) of the Borrower in and
to any Final Disposition Proceeds."

f)     "'**Lease Agreement Property**' means all of the right, title and interest,
present and future, of the Intermediate Lessor under the Lease Agreement
and the other Relevant Documents including . . . (b) claims of the
Intermediate Lessor for damages arising out of a breach of or default under
the Lease Agreement and the other Relevant Documents, and (c) all the
rights of the Intermediate Lessor to compel performance and otherwise
exercise all rights and remedies under the Lease Agreement and the other
Relevant Documents . . . ."

g)     "'**Hedging Agreement Property**' means all of the right, title and interest,
present and future, of the Borrower under the Hedging Agreement including,
without limitation, all of its right, title and interest in and to (a) any amounts

payable under the Hedging Agreement, (b) claims of the Borrower for damages arising out of a breach of or default under the Hedging Agreement, and (c) all the rights of the Borrower to compel performance and otherwise exercise all rights and remedies under the Hedging Agreement . . . ."

h)      "'**Intermediate Lessor Assignment Property**' means all of the right, title, benefit, claims and interests (present and future, actual and contingent) of the Borrower in, to, under and in respect of the Intermediate Lessor Assignment."

39.     The effect of this transaction is that JPA No. 49 assigned all property interests it possessed in the Lease Assets applicable to MSN 173, including (a) its rights arising from the Head Lease with JPLS Uranus and (b) the rights JPLS Uranus assigned to JPA No. 49 under the Sublease, to Crédit Agricole Corporate and Investment Bank ("**CACIB**") (in its capacity as Security Agent), effective as of December 29, 2017.

40.     On December 29, 2017, JPA No. 49, JPLS Uranus, VNA, and CACIB executed a Notice and Acknowledgement of Security Assignments referencing assignments discussed in paragraphs 36 through 38 above ("**MSN 173 Notice and Acknowledgement**"). In the MSN 173 Notice and Acknowledgement:

a)      The parties acknowledged that JPLS Uranus "assigned absolutely by way of security and has charged by way of first to [JPA No. 49] all of its right, title and interest, present and future, actual or contingent and whether contractual, proprietary or of any other kind, in and to the Lessors Assigned Property. . . ."

b)      The parties also acknowledged that JPA No. 49 "has assigned absolutely by way of security and has charged by way of first fixed charge to the Security Agent all of its rights, title and interest, present and future, actual or contingent and whether contractual or proprietary or of any other kind, in and to, the Borrower Assigned Property. . . ."

41.     Through the MSN 173 Notice and Acknowledgement, JPA No. 49, JPLS Uranus, VNA, and the Security Agent received notice of and acknowledged the simultaneous chain of absolute assignments giving the Security Agent ownership and full control over all property interests in the Lease Assets.

11

42.     An identical set of conditions precedents existed, and an identical transaction occurred *mutatis mutandis* with respect to the MSN 067 Aircraft. ***First***, on November 21, 2018, JPA No. 111 executed an aircraft mortgage granting a lien on the MSN 067 Aircraft in favor of the Security Agent ("**MSN 067 Aircraft Mortgage**"). JPA No. 111 pledged the MSN 067 Aircraft as collateral by granting a first priority security interest in the Aircraft to the Security Agent. The MSN 067 Aircraft Mortgage is governed by New York law. It gives the Security Agent broad enforcement powers over the Aircraft when an event of default occurs, including the authority to effectuate a foreclosure sale of the Aircraft. The Security Agent is authorized to exercise enforcement powers in its absolute discretion.

43.     ***Second***, also on November 21, 2018, JLPS Draco—the MSN 067 Intermediate Lessor—"assign[ed] absolutely by way of security with full title guarantee . . . as security for the payment of the discharge of the Secured Obligations, all of its right, title and interest, present and future, in and to the Assigned Property" to JPA No. 111 ("**MSN 067 Intermediate Lessor Security Assignment Agreement**"). Again, "Assigned Property" is defined as "(a) the Lease Agreement Property, (b) the Intermediate Lessor Insurance Property, (c) the Requisition Proceeds Property, (d) the Final Disposition Proceeds Property, relating to the [MSN 067] Aircraft. . . ." These terms are defined by the applicable Proceeds Agreement and given the same meanings as those quoted above.

44.     ***Third***, also on November 21, 2018, JPA No. 111 "assign[ed] and agree[d] to assign absolutely by way of security with full title guarantee (subject to any Permitted Security Interest) to the Security Agent . . . as security for payment and discharge of the Secured Obligations, all of its right, title and interest, present and future, in and to the Assigned Property" ("**MSN 067 Security Assignment Agreement**"). "Assigned Property" is defined as "(a) the

Head Lease Agreement Property, (b) the Aircraft Purchase Agreement Property, (c) the

Borrower Insurance Property, (d) the Requisition Proceeds Property, (e) the Final Disposition

Proceeds Property, (f) the Lease Management Agreement Property, (g) the Hedging

Agreement Property and (h) the Intermediate Lessor Assignment Property relating to the

Aircraft [MSN 067]. . . ."  These terms are defined by the applicable Proceeds Agreement and

given the same meanings as those quoted above.

45.      The effect of this transaction is that JPA No. 111 assigned all property interests

it possessed in the Lease Assets applicable to MSN 067, including (a) its rights arising from

the Head Lease with JPLS Draco and (b) the rights JPLS Draco assigned to JPA No. 111 under

the Sublease, to CACIB (in its capacity as Security Agent), effective as of November 21, 2018.

46.      On November 21, 2018, JPA No. 111, JPLS Draco, VNA, and CACIB executed

a Notice and Acknowledgement of Security Assignments referencing assignments discussed

in paragraphs 42 through 44 above ("**MSN 067 Notice and Acknowledgement**").  In the MSN

067 Notice and Acknowledgement:

> **a)**      The parties acknowledged that JPLS Draco "assigned absolutely by way of
> security and has charged by way of first to [JPA No. 111] all of its right,
> title and interest, present and future, actual or contingent and whether
> contractual, proprietary or of any other kind, in and to the Lessors Assigned
> Property. . . ."

> **b)**      The parties also acknowledged that JPA No. 111 "has assigned absolutely
> by way of security and has charged by way of first fixed charge to the
> Security Agent all of its rights, title and interest, present and future, actual
> or contingent and whether contractual or proprietary or of any other kind,
> in and to, the Borrower Assigned Property. . . ."

47.      Through the MSN 067 Notice and Acknowledgement, JPA No. 111, JPLS

Draco, VNA, and the Security Agent received notice of and acknowledged the simultaneous

chain of absolute assignments giving the Security Agent ownership and full control over all

property interests in the Lease Assets.

48.     Thus, by no later than December 29, 2017 (in the case of JPA No. 49) and November 21, 2018 (in the case of JPA No. 111), each Debtor lacked any property interest in the Lease Assets pursuant to valid, absolute assignments of their interests to the Security Agent (at that time CACIB).  Pursuant to these conveyances, the entirety of the Debtors' interests in the Lease Assets passed to the Security Agent.  The Security Assignment Agreements were entered into on the same date as the Intermediate Lessor Security Assignments, and therefore there was not one single day when either Debtor owned the Subleases or the VNA Claims.

49.     The legal effect of these conveyances is clear.  As of December 29, 2017, the Debtors ceased to possess any "*title and interest, present and future*" under the Head Lease and Sublease governing the MSN 173 Aircraft.  And, as of November 21, 2018, the Debtors ceased to possess any "*title and interest, present and future*" under the Head Lease and Sublease related to the MSN 067 Aircraft.

50.     As a result of these conveyances, the entirety of the Debtors' interests in the Lease Assets passed to the then–Security Agent, CACIB.  Pursuant to the Transaction Documents, only the Security Agent owns, and has the right to dispose of, any Lease Asset unless and until there has been "full, final and indefeasible payment and discharge in full of all amounts of the Secured Obligations."  The Security Assignment Agreements were entered into on the same date as the Intermediate Lessor Security Assignments, and therefore there was not one single day when either Debtor possessed an interest in the Subleases or the VNA Claims.

51.     The Proceeds Agreements define "Secured Obligations" to mean "any and all moneys, liabilities, and obligations (whether actual or contingent, whether now existing or hereafter arising, whether or not for the payment of money and including, without limitation,

any obligation or liability to pay damages) from time to time owing to any of the Finance

Parties by any Obligor pursuant to any Transaction Document. . . ."

52.     Secured Obligations under the Transaction Document include but are not

limited to the outstanding principal of and accrued interest on the Senior and Junior Loans,

along with all fees, costs, and charges.

53.     The Security Agreements are a standard part of the transaction structure that is

typical in the commercial aircraft financing and leasing industry.

54.     Commercial aircraft financings are carefully negotiated and designed to ensure

that the entities owning the aircraft (which form part of the security for the loan) cannot

interfere with the rights of financing parties if there is a subsequent default.  None of the

provisions in the financings for the MSN 173 or MSN 067 were "off-market," *sui generis*, or

bespoke.

55.     Pursuant to the Transaction Documents, the Security Agent enjoys broad

enforcement rights over the Lease Assets and Aircraft that secure the Secured Obligations.

Specifically, the Proceeds Agreements, which bind all the parties to both transactions,

empowered the Majority Senior Secured Parties to direct the Security Agent to undertake

enforcement actions against the collateral, including, "but not limited to the disposal, collection,

or realization of assets subject to the Collateral."  The Debtors, Intermediate Lessors, and JPL

"waive[d] all rights . . . to require that the Collateral be enforced in any particular order or

manner or at any particular time" provided, however, that the proceeds realized from an

enforcement action be distributed to according to the waterfall distribution scheme set forth in

the Proceeds Agreements.

56.     The Proceeds Agreement contains a "waterfall" for distribution of the Collateral and, in this regard, is a subordination agreement enforceable under 11 U.S.C. § 510(a).

57.     The Proceeds Agreements further empower the Junior Lenders, as defined in the Transaction Documents, to purchase all, but not less than all, of the outstanding Secured Obligations at any time while an event of default is continuing (the "**Buy-Out Right**").  No Junior Lender has ever exercised a Buy-Out Right.

58.     The Senior Facility Agreements also empower the Debtors to exercise a right to make a cure payment in respect of a default caused by a non–payment by VNA (the "**Cure Right**").  No Debtor ever exercised such a cure right.

59.     Finally, the Proceeds Agreements prohibit the Debtors' parent, JPL, from causing the Debtors to file for bankruptcy or join in any bankruptcy proceeding unless JPL has obtained the Security Agent's consent.

**F.**     ***The Debtors' Equity of Redemption Under English law and Secured Obligations***

60.     The legal effects of the Intermediate Lessors' conveyance to the Debtors and the Debtors' conveyance to the Security Agent (collectively the "**Absolute Assignments**") are determined by English law.

61.     The operative language in the two sets of chains of assignments comprising the Absolute Assignments is identical:  the applicable grantor "assigns and agrees to assign absolutely by way of security with full title guarantee (subject to any Permitted Security Interest) to the" grantee "as security for the payment and discharge of the Secured Obligations, all of its right, title and interest, present and future, in and to the Assigned Property."

62.     The Absolute Assignments further provide:  the applicable grantor "charges with full title guarantee (subject to any Permitted Security Interest) in favour of the" grantee

"(to the extent not validly and effectively assigned pursuant to Clause 3.1 (*Assignment*)) as security for the payment and discharge of the Secured Obligations, by way of first fixed charge, all of its right, title and interest, present and future, in and to the Assigned Property."

63.     Section 136 of the Law of Property Act of 1925 enacted in England governs the legal effects of a conveyance whereby the grantor conveys a right arising under a contract (a chose in action), the extent and nature of a grantee's property interests therein under English law.

64.     The plain language of the Absolute Assignments and the Notices and Acknowledgements of Assignment makes clear that the Lease Assets have been transferred to the Security Agent and are not vested with the Debtors.

65.     Regardless of whether an absolute assignment or charge is effectuated, the experts on English law agree that the grantee possesses an equity of redemption. Under English law, the equity of redemption is a legal right of a defaulting mortgagor to redeem mortgaged property that only arises once the obligation in respect of which the mortgage is given has been fully discharged, *i.e.,* the Secured Obligations.   Thus, the equity of redemption is not a freestanding right that can be exercised or enforced; it is a "theoretical interest" that does not arise unless and until the Secured Obligations are fully discharged, at which point the mortgagor may then exercise the equity of redemption to redeem the mortgaged property.

66.     Under English law, the Debtors' equity of redemption does not confer any power with respect to the Collateral.   In fact, it is only when there is a "full, final and indefeasible payment and discharge in full of all amounts of the Secured Obligations" that the Security Agent is required to reassign the rights under the Absolute Assignments to the Obligor

(and this is subject to the additional protection for the Security Agent under clause 7.2 of the Proceeds Agreement).

67.    Unless and until full satisfaction of the Secured Obligations occurs, and subject (in any event) to the further provisions of clause 7.2 of the Proceeds Agreement the Security Agent possesses all of the Debtors and Intermediate Lessors' "right, title and interest, present and future, in and to the Assigned Property," including but not limited to each Debtor's original interest in the Head Leases and each Intermediate Lessor's original interest in the Subleases pursuant to the Absolute Assignments.

68.    Finally, as the experts for both FWCP and the Debtors agree, the Debtors' equitable rights to redeem the Lease Assets are future interests, which does not give rise to present property interests in the Lease Assets. *See* Tr. of Jan. 26, 2022 Hr'g 112:1–10, *In re JPA No. 111 Co., Ltd.*, 21-12075-dsj (Dkt. No. 94[2])(testimony from Mr. Shah explaining the Debtors are unable to exercise their equity of redemption or equitable right to redeem the Lease Assets until they "pay off the entirety of the secured obligations" and that "until that time, all the Debtors can sell is their . . . interest. Effectively whatever their right of redemption is worth."); *id.* at 185:2–6 ("[Question]. . . . a party, in this instance, the assignor, who has an equity of redemption only recovers the right to the chose in action upon payment of the secured debt, correct?  [Answer]The—correct as far as it goes.").

69.    It is clear that the Debtors' right of redemption in respect of the Sublease and the VNA Claims can only ever be worth zero, as the Secured Obligations under both the

---

[2]    All citations to docket entries refer to *In re JPA No. 111 Co., Ltd.*, 21-12075-dsj (Jointly Administered).  FitzWalter respectfully asks the Court to take judicial notice of all filings in the Chapter 11 cases that are cited herein.

Intermediate Lessor Security Assignment and the Security Assignment Agreement are exactly the same, so both documents must be released (reassigned) simultaneously.  With respect to the Subleases and VNA Claims, the Intermediate Lessor who has the ultimate right of redemption and the right of the Debtor is a nullity.

G.    *The Commencement of these Case and the Proposed Sale Including the Lease Assets*

70.    There is no dispute that the Head Leases and Subleases were not performing and that on December 1, 2021, CACIB, then–Security Agent under the Transaction Documents, terminated the leasing under the Head Leases and the Subleases and provided notice thereof to each Debtor, each Intermediate Lessor, and VNA (the "**Enforcement Notices**.").

71.    The Enforcement Notices expressly stated that events of default had occurred under the terms of the Transaction Documents.  Pursuant to Section 6.1 of the Security Assignment Agreements, the occurrence of a default empowers the Security Agent to dispose of the assigned Lease Assets in its absolute direction "with or without notice to the Borrower or prior authorization from any court."

72.    On December 2, 2021, FitzWalter assumed CACIB's role as Security Agent.

73.    Thus, as of December 2, 2021, FitzWalter possessed the entirety of the property interests in the Lease Assets that the Debtors conveyed through the Absolute Assignments, including the right to dispose of such assets in its absolute discretion.

74.    Consistent with its rights, on or around December 10, 2021, FitzWalter, as Security Agent, appointed a third party (the "**Auctioneer**") to conduct an auction of the Lease Assets, with the auction to close on December 17, 2021 ("**Lease Assets Auction**").

75.    The Auctioneer posted notices in the Wall Street Journal, Aersyn (a trade website), and on its own website.  This is standard practice in the market for litigation claims.

The Debtors knew of the auction by no later than December 13, 2021, although they had (in any event) received the Enforcement Notices on 1st December, which gave notice of the event and circumstances which expressly give rise to the power of sale under clause 6.1 of each Security Assignment Agreement. Clause 6.1 of each Security Assignment Agreement provides that the Security Agent's rights (including the power to dispose of or transfer the assigned Lease Assets in its absolute discretion) are immediately enforceable "with or without notice to the Borrower or prior authorization from any court."

76.     On December 13, 2021, FitzWalter provided notice of the Lease Assets Auction to all Lenders party to the Transaction Documents.

77.     On information and belief, no Lender protested, objected to, or otherwise raised to FitzWalter or the Auctioneer any concerns with the form, timing, or manner of the Lease Assets Auction.  No Junior Lender exercised the Buy-Out Right.   No Debtor exercised the Cure Right.  In spite of having received Enforcement Notices and notices of acceleration of the loans, neither Debtor discharged the Secured Obligations nor made any payment at all to redeem the assigned and secured property.

78.     On December 17, 2021, the Debtors, at the direction of their parent JPL and with the support of JLPS Holding Ireland Limited ("**JLPSI**"), filed these cases (the "**Chapter 11 Cases**") to obtain the benefit of the automatic stay, which the Debtors contend applies to the Lease Assets and to prevent FitzWalter exercising the parties' agreed upon remedies over the Lease Assets, assets that do not belong to the Debtors.

79.     The Debtors were directed to file for bankruptcy protection by JPL in violation of the Proceeds Agreement.

80.     On December 24, 2021, the Debtors and Capital Reef LLC and Isle Royale LLC ( collectively the "**Stalking Horse Bidders**") executed a term sheet pursuant to which the Stalking Horse Bidders committed to purchase, and the Debtors agreed to sell the Aircraft and all of the Lease Assets (the "**Stalking Horse Bid**").   A week later, the Debtors filed a motion seeking approval of the Stalking Bid and bid procedures.

81.     Among other things, the Stalking Horse Bid prohibits the Debtors from seeking to reinstate either the Head Leases or the Subleases or communicating with VNA.

82.     On January 2, 2022, FitzWalter moved to dismiss the chapter 11 cases pursuant to 11 U.S.C. §§ 109(a) and 1112(b) and for this Court to abstain pursuant to 11 U.S.C. § 305 (the "**Motion to Dismiss**").   (Dkt. No. 22)   Among other reasons for the requested relief, FitzWalter asserted that the Debtors were seeking to sell the Lease Assets, which they did not own.   *See id.* at 1.

83.     The Debtors opposed the Motion to Dismiss.   (Dkt. No. 53).

84.     On January 28, 2022, the Debtors and the Stalking Horse Bidders confirmed that the Stalking Horse Bidders intended to proceed with the Stalking Horse Bid only if they acquired title the Lease Assets.   (Dkt. No. 90).

85.     On February 1, 2022, this Court issued its *Memorandum Decision and Order Resolving the Motion to Dismiss*.   (Dkt. No. 97).   The Court did not determine in its ruling whether the Debtors owned the Lease Assets or whether the Debtors could sell the Lease Assets. *See id.* at 20.   ("The Court declines to find whether an absolute assignment or a mere 'charge' was effected under the governing agreements, because no such finding is necessary to resolve the dispute before the Court.").   It is quite correct that it is not necessary to determine the English law question of whether an absolute assignment or a charge was effected, because

logically—under either analysis—the result is the same: the Debtors do not own or have the right to dispose of the rights to the Subleases or the VNA Claims.

86.    During the hearing on the approval of bidding procedures on February 4, 2022, both the Debtors and the Stalking Horse Bidders confirmed that the Stalking Horse Bidders intended to proceed with the Stalking Horse Bid only if they acquired title to the Lease Assets. *See* Tr. Feb. 4, 2022 Hr'g 70:5–17 (Dkt. No. 103).

87.    On February 4, 2022, this Court approved the request for bidding procedures and granted, as an administrative expense priority, the Stalking Horse Bidders a breakup fee, equal to 3.5% of the Stalking Horse Bidders' proposed purchase price, plus up to $1,500,000 in expense reimbursements, to be payable even if the Debtors do not receive any overbids and the proposed sale to the Stalking Horse Bidders is not consummated (other than because of a breach by the Stalking Horse Bidders). (Dkt. Nos. 101, 102).

88.    Because the Stalking Horse Bidders will not proceed unless they acquire title to all of the Lease Assets, and because the Debtors can only sell property of the Debtors' estates, the Debtors will not be able to deliver title to the Lease Assets because the Debtors do not presently own, and may never own, the Lease Assets.

89.    On February 9, 2022, the Debtors filed two notices of executory contracts the Debtors seeks to assume and assign to the Stalking Horse Bidders (Dkt Nos. 104 and 104–1). Among the purported executory contracts are the "**Contracts**," which are:

- An "*Airframe Warranties Agreement in Respect of One A350–900 XWB Aircraft Bearing Manufacturer's Serial Number 0067*" with Airbus SAS as counterparty;

- An "*Airframe Warranties Agreement in Respect of One A350–900 XWB Aircraft Bearing Manufacturer's Serial Number 173*" with Airbus SAS as counterparty; and

- Three "*Engine Warranty Agreements*" related to the MSN 173 Aircraft with CACIB, the Intermediate Lessors, Roll–Royce Plc, and VNA as contract counterparties.

90.    The Debtors were not parties to any of the Contracts as of the Petition Date.

## CLAIMS FOR RELIEF

## COUNT 1: DECLARATORY RELIEF REGARDING LEASE ASSETS

1.    FitzWalter incorporates by reference and re-alleges each and every allegation set forth above in paragraphs A.1 through G.90 as if fully set forth herein.

2.    An actual controversy has arisen and now exists between FitzWalter and each Debtor concerning the ownership of certain or all of the Lease Assets.

3.    Each Absolute Assignment is a valid, enforceable contract.

4.    FitzWalter contends that by virtue of the Transaction Documents, including the Absolute Assignments, the Lease Assets were not the property of either Debtor as of the Petition Date and never became property of the estate under English law or for purposes of 11 U.S.C. § 541(a).  Specifically:

a.    Full and final satisfaction and discharge of the Secured Obligations is a condition precedent to the Debtors' exercise of the equity of redemption;

b.    To date, the Secured Obligations have not been fully and finally satisfied and discharged;

c.    To the extent that the Absolute Assignment did not absolutely convey all right, title, and interest in and to the Lease Assets to the Security Agent, the Intermediate Lessors own the Subleases and VNA Claims, not the Debtors; and

      d.      To the extent that the Absolute Assignment did not absolutely convey all right, title, and interest in and to the VNA Claims to the Security Agent, the Debtors' do not have an equity of redemption in or power over any of the VNA Claims.

5.      Each Debtor has asserted that the Debtors have the right to sell, and this Court can authorize such sale of, all of the Lease Assets to the Stalking Horse Bidders, even if the Secured Obligations have not been paid in full or if the Proposed Sale does not result in payment in full of all Secured Obligations.

6.      Federal Rule of Bankruptcy Rule 7001(2) states that a proceeding to determine the validity, priority, extent of a lien or other interest in property, but not a proceeding under Rule 3012 or Rule 4003(d), is an adversary proceeding.  Determining the ownership of some or all of the Lease Assets is an adversary proceeding under Bankruptcy Rule 7001(2).

7.      Federal Rule of Bankruptcy Rule 7001(9) states that an adversary proceeding is required in any proceeding to obtain a declaratory judgment relating to any of the foregoing provisions of Bankruptcy Rule 7001.

8.      A judicial determination is necessary and appropriate at this time and under these circumstances for the parties to ascertain ownership to some or all of the Lease Assets.

## COUNT 2: DECLARATORY RELIEF REGARDING CONTRACTS

9.      FitzWalter incorporates by reference and realleges each and every allegation set forth above in paragraphs A.1 through G.90 as if fully set forth herein.

10.      An actual controversy has arisen and now exists between FitzWalter and each Debtor concerning the Debtors' interests, if any, in the Contracts.

11.      FitzWalter contends that the Debtors were not parties to any of the Contracts as of the Petition Date and thus cannot assume and assign the Contracts to the Stalking Horse Bidders.

12.     Each Debtor has asserted that the Debtors have the right to assume and assign, and this Court can authorize such assumption and assignment of, all of the Contracts to the Stalking Horse Bidders.

13.     Federal Rule of Bankruptcy Rule 7001(2) states that a proceeding to determine the validity, priority, extent of a lien or other interest in property, but not a proceeding under Rule 3012 or Rule 4003(d), is an adversary proceeding.  Determining the ownership of some or all of the Lease Assets is an adversary proceeding under Bankruptcy Rule 7001(2).

14.     Federal Rule of Bankruptcy Rule 7001(9) states that an adversary proceeding is required in any proceeding to obtain a declaratory judgment relating to any of the foregoing provisions of Bankruptcy Rule 7001.

15.     A judicial determination is necessary and appropriate at this time and under these circumstances for the parties to ascertain ownership to some or all of the Lease Assets.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FitzWalter, prays for relief as follows:

A.     On Count I, enter a declaratory judgment for FitzWalter and against the Debtors that the Lease Assets were not property of the Debtors as of the Petition Date, never became property of the Debtors' estates by virtue of the Absolute Assignments, and that FitzWalter, as Security Agent, owns such Lease Assets;

B.     In the alternative, on Count I, enter a declaratory judgment for FitzWalter and against the Debtors that to the extent that FitzWalter, as Security Agent, does not own all of the Lease Assets, the Debtors only have an interest in the Head Leases and that all other Lease Assets are legally and beneficially owned by the Intermediate Lessors;

C.    On Count II, enter a declaratory judgment for FitzWalter and against the Debtors that the Debtors had no interests in the Contracts as of the Petition Date and thus cannot assume and assign the Contracts pursuant to 11 U.S.C. § 365; and

D.    Grant FitzWalter any such other and further relief as the Court deems just and proper.

Dated:   New York, New York
         February 17, 2022

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

*/s/ Benjamin I. Finestone*

Benjamin I. Finestone
Zachary R. Russell
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849–7000
Facsimile: (212) 849–7100
benjaminfinestone@quinnemanuel.com
zacharyrussell@quinnemanuel.com

Justin C. Griffin (admitted *pro hac vice*)
Eric Winston (admitted *pro hac vice*)
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443–3000
Facsimile: (213) 443–3100
justingriffin@quinnemanuel.com
ericwinston@quinnemanuel.com

Asher B. Griffin (admitted *pro hac vice*)
300 West 6th Street, Suite 2010
Austin, TX 78710
Telephone: (737) 667–6100
Facsimile: (737) 667–6110
ashergriffin@quinnemanuel.com

*Attorneys for Plaintiff FitzWalter Capital*
*Partners (Financial Trading) Limited*