TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Kyle J. Ortiz
Bryan M. Kotliar
Jared C. Borriello
Eitan E. Blander

*Counsel to the Debtors*
*and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| JPA NO. 111 CO., LTD. and JPA NO. 49 CO., LTD., | Case No.: 21-12075 (DSJ) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' OMNIBUS REPLY TO THE OBJECTIONS OF
FITZWALTER CAPITAL PARTNERS (FINANCIAL TRADING) LIMITED
AND THE INTERMEDIATE LESSORS REGARDING THE PROPOSED SALE**

---

[1]  The Debtors in these Chapter 11 cases are:  JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd.  The Debtors' corporate address is Kasumigaseki Common Gate West Tower, 3-2-1 Kasumigaseki, Chiyoda-Ku, Tokyo, Japan 100-0013.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

REPLY TO OBJECTIONS ...................................................................................................3

    I.     The Debtors Can Sell the Purchased Assets Free and Clear.........................3

          A.     The Lease Assets Are Property of the Debtors' Estates ......................3

          B.     The Debtors' Rights in the Lease Assets are Property of the
                 Estate  and May Be Sold Pursuant to Section 363 of the
                 Bankruptcy Code .....................................................................7

          C.     The Debtors Can Sell the Purchased Assets, Including the
                 Lease Assets, Free and Clear Under Section 363(f) of the
                 Bankruptcy Code ....................................................................11

          D.     The Intermediate Lessors are Not Entitled to Adequate
                 Protection ...............................................................................17

    II.    All Valid Secured Obligations Will Be Satisfied By the Sale .......................18

          A.     The English Lawsuit Claims Are Not Secured Obligations .............18

          B.     The Head Lease Claims Are Duplicative ...........................................22

          C.     The Management Time Claims Are Not Secured Obligations.........22

    III.   Responses to Miscellaneous Objections .........................................................24

          A.     The Court Can Authorize the Payment of the Secured
                 Obligations Outside of a Chapter 11 Plan Pursuant to the
                 Proposed Sale Order................................................................24

          B.     The Debtors Are Entitled to Good Faith Findings............................25

          C.     Debtors Can Assume and Assign Contracts to Which They
                 Are A Party .............................................................................26

CONCLUSION....................................................................................................26

## **TABLE OF AUTHORITIES**

**Cases**

*Bank of China v. Huang (In re Huang)*,
  275 F.3d 1173 (9th Cir. 2002) ........................................................................12

*Bethesda Air Rights Ltd. P'ship*,
  117 B.R. 202 (Bankr. D. Md. 1990) .................................................................8

*Czyzewski v. Jevic Holding Corp. (In re Jevic Holding Corp.)*,
  137 S.Ct. 973 (2017) ......................................................................................24

*In re Alleghney Int'l, Inc.*,
  118 B.R. 282 (Bankr. W.D. Pa. 1990) ...........................................................2

*In re Amaravathi Ltd. P'ship*,
  416 B.R. 618 (Bankr. S.D. Tex. 2009) ...........................................................8

*In re American Safety Razor Co., LLC*,
  No. 10-12351 (MFW), 2010 WL 6982173 (Bankr. D. Del. July 28, 2010) ...........................25

*In re Aéropostale, Inc.*,
  555 B.R. 369 (Bankr. S.D.N.Y. 2016) .............................................................2

*In re Bedford Square Associates, L.P.*,
  247 B.R. 140 (Bankr. E.D. Pa. 2000) ...........................................................14

*In re BHB Enterprises, LLC*,
  Case No. 97-01975-JW, 1997 WL 33344250 (Bankr. D.S.C. Sept. 30, 1997) .....................14

*In re Bryn Athyn Invs., Ltd.*,
  69 B.R. 452 (Bankr. E.D.N.C. 1987) .............................................................10

*In re Colarusso*,
  295 B.R. 166 (B.A.P. 1st Cir. 2003) ..........................................................8, 11

*In re Contractors Equip. Supply Co.*,
  861 F.2d 241 (9th Cir. 1988) ......................................................................10

*In re DBSD N. Am. Inc.*,
  421 B.R. 133 (Bankr. S.D.N.Y. 2009) .............................................................2

*In re Ditech Holding Corporation*,
  606 B.R. 544 (Bankr. S.D.N.Y. 2019) ...........................................................15

*In re Downtown Athletic Club of New York City, Inc.*,
  Case No. M-47 (JSM), 2000 WL 744126 (S.D.N.Y. June 9, 2000) ...........................14

*In re Dundee Equity Corp.*,
    Case No. 89-B-10233, 1992 WL 53743 (Bankr. S.D.N.Y. Mar. 6, 1992)............................12

*In re Gaylord Grain L.L.C.*,
    306 B.R. 624 (B.A.P. 8th Cir. 2004) .......................................................................................13

*In re Glaser*,
    Case No. 01-10220-SSM, 01-1186, 2002 WL 32375007 (Bankr. E.D. Va. Oct. 25, 2002)..10

*In re Guardian Realty Grp., L.L.C.*,
    205 B.R. 1 (Bankr. D.D.C. 1997)..............................................................................................7

*In re Healthco Int'l, Inc.*,
    174 B.R. 174 (Bankr. D. Mass. 1994)......................................................................................16

*In re Intervention Energy Holdings, LLC*,
    553 B.R. 258 (Bankr. D. Del. 2016).........................................................................................12

*In re LATAM Airlines Grp. S.A.*,
    620 B.R. 722 (Bankr. S.D.N.Y. 2020).....................................................................................24

*In re Leckie Smokeless Coal Co.*,
    99 F.3d 573 (4th Cir. 1996)......................................................................................................15

*In re Lehman Bros. Holdings Inc.*,
    422 B.R. 407 (Bankr. S.D.N.Y. 2010)......................................................................................12

*In re LightSquared Inc.*,
    511 B.R. 253 (Bankr. S.D.N.Y. 2014)........................................................................................3

*In re May*,
    169 B.R. 462 (Bankr. S.D. Ga. 1994).........................................................................................9

*In re Megan-Racine Assocs., Inc.*,
    192 B.R. 321 (Bankr. N.D.N.Y. 1995) ...............................................................................17, 18

*In re Northport Marina Assocs.*,
    136 B.R. 911 (Bankr. E.D.N.Y. 1992) .....................................................................................10

*In re Oi Brasil Holdings Cooperatief U.A.*,
    578 B.R. 169 (Bankr. S.D.N.Y. 2017)........................................................................................4

*In re Polo Club Apartments Assocs. Ltd. P'ship*,
    150 B.R. 840 (Bankr. N.D. Ga. 1993) ........................................................................................9

*In re R.J. Dooley Realty*,
    Case No. 09-36777, 2010 WL 2076959 (Bankr. S.D.N.Y. May 21, 2010) ...........................17

*In re Residential Capital, LLC*,
    Case No. 12-12020 (MG) (Bankr. S.D.N.Y. June 13, 2013)..................................................24

*In re Rubie's Costume Co.*,
    Case No. 20-71970 (AST) (Bankr. E.D.N.Y. Sept. 25, 2020) ..............................................25

*In re S. Side House, LLC*,
    474 B.R. 391 (Bankr. E.D.N.Y. 2012) ..................................................................................10

*In re Sea Oaks Country Club, LLC*,
    No. 20-17228 (CMG), 2020 WL 6588412 (Bankr. D.N.J. Nov. 10, 2020) ..........................15

*In re Senior Hous. Alternatives, Inc.*,
    444 B.R. 386 (Bankr. E.D. Tenn. 2011) ..................................................................................9

*In re Taylor*,
    198 B.R. 142 (Bankr. D.S.C. 1996) .......................................................................................13

*In re Trans World Airlines, Inc.*,
    322 F.3d 283 (3d Cir. 2003) ...................................................................................................16

*In re WBQ P'Ship*,
    189 B.R. 97 (Bankr. E.D. Va. 1995) ......................................................................................15

*In re Worldcom*,
    304 B.R. 611 (S.D.N.Y. 2004) ...............................................................................................17

*Nicole Energy Serv., Inc.*,
    385 B.R. 201 (Bankr. S.D. Ohio 2008) ..................................................................................13

*Revel AC, Inc. v. IDEA Boardwalk LLC*,
    802 F.3d 558 (3d Cir. 2015) ...................................................................................................14

*U.S. v. Whiting Pools, Inc.*,
    462 U.S. 198 (1983) ..................................................................................................................9

**Statutes**

11 U.S.C. § 101(37) .......................................................................................................................7

11 U.S.C. § 363 ......................................................................................................................8, 9, 12

11 U.S.C. § 363(b) .......................................................................................................................11

11 U.S.C. § 363(e) .......................................................................................................................17

11 U.S.C. § 363(f) ..........................................................................................................8, 11, 12, 15

11 U.S.C. § 363(f)(1) ...................................................................................................................11

11 U.S.C. § 363(f)(2) ...............................................................................................................11, 12

11 U.S.C. § 363(f)(3) ...............................................................................................................11, 13

11 U.S.C. § 363(f)(4) ...................................................................................................11, 13, 14

11 U.S.C. § 363(f)(5) ...................................................................................................11, 15, 16

11 U.S.C. § 363(p)(2) ......................................................................................................17

11 U.S.C. § 365 ..............................................................................................................26

11 U.S.C. § 510(a) ..........................................................................................................24

11 U.S.C. § 541 ...........................................................................................................8, 9

11 U.S.C. § 541(a)(1) ......................................................................................................8

**Other Authorities**

Cape Town Convention, Art. 9(4) ......................................................................................11

N.Y. U.C.C. § 9-617 .......................................................................................................11

N.Y. U.C.C. § 9-623 .......................................................................................................11

The debtors and debtors in possession (the "<u>Debtors</u>") in the above-captioned cases (the "<u>Chapter 11 Cases</u>"), hereby submit this reply (the "<u>Reply</u>") to the Objections[2] and in support of the Bidding Procedures and Sale Motion [Docket No. 21].[3]

## PRELIMINARY STATEMENT

The Debtors are pursuing the Sale for the purpose of paying all secured creditors in full, and they have obtained a flexible purchase price from the Stalking Horse Bidders to achieve that goal. Yet, FitzWalter, unhappy that these cases prevented it from manipulating the Transaction Documents to obtain a windfall beyond the bargained-for repayment of amounts owed, steadfastly opposes these efforts to pay them and all other Lenders what they are entitled to under the Transaction Documents.

The Objections seek to relitigate numerous issues that were already determined by the Court making the same exact—now tired—arguments, such as that the Debtors cannot sell the estates' assets. However, it is uncontroverted that the Debtors own the Aircraft, and the Court has already determined that, on the Petition Date, the Debtors held the equity of redemption in the Lease Assets. As explained below, that is all that is required for the Debtors to sell the assets pursuant to the Sale.

Knowing this, the Objectors continue FitzWalter's case-long pattern of attempting to obfuscate and distract from what is an exceptionally simple, full-pay case, by asserting spurious additional amounts that must be satisfied before the Debtors can sell their property. The Court should see FitzWalter's attempt to manufacture

---

[2]    "<u>Objections</u>" refers to the objections filed by JLPS Leasing Uranus Limited and JLPS Leasing Draco Limited (together, the "<u>Intermediate Lessors</u>") [Docket No. 118] (the "<u>Intermediate Lessor Objection</u>") and FitzWalter Capital Partners (Financial Trading) Limited ("<u>FitzWalter</u>" and, together with the Intermediate Lessors, the "<u>Objectors</u>") [Docket No. 120] (the "<u>FitzWalter Objection</u>").

[3]    Accompanying the Reply is the Declaration of Jared C. Borriello, dated February 23, 2022, with exhibits cited as "Debtor Ex. __." Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Bidding Procedures and Sale Motion.

additional "Secured Obligations" for what it is: an unabashed effort to prevent the value-maximizing Sale. Indeed, what the Objections make crystal clear is that there is no price by which the Objectors will agree to the Sale.

All this begs the question: why would a senior secured lender so passionately want to prevent a full repayment sale? The answer is in what is glaringly absent from the Objections—any alternative to the Sale that would similarly provide value to all creditors and surplus to the Debtors. The Objectors do not contest the Debtors' business judgment or dispute that the Sale will yield the maximum value for the assets. If FitzWalter believed that the Debtors' proposed Sale was not achieving a fair price, the Bankruptcy Code provides for the opportunity to credit bid, which FitzWalter has declined to do, further evidencing its ulterior motives.[4]

Instead, FitzWalter's complaint is that the proceeds will be shared with other Lenders and that a surplus will be generated for equity. This is an unbelievable position for any security agent in the face of a near-term full payment transaction. The Security Agent may be protected by its position in an administrative and non-fiduciary capacity under the Transaction Documents, but the continued disenfranchisement of the junior lenders to pursue a path of maximal resistance and at-any-cost litigation to contest a full pay transaction is ludicrous and must be brought to an end.[5]

---

[4]   *In re: Aéropostale, Inc.*, 555 B.R. 369, 414 (Bankr. S.D.N.Y. 2016) ("The ability to credit-bid helps to protect a creditor against the risk that its collateral will be sold at a depressed price.") quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 n.2 (2012)).

[5]   There are consequences when lenders act like this in chapter 11 cases. For example, a court can designate the votes cast on a plan in bad faith, when a creditor "*act[s] in aid of an interest other than an interest as a creditor.*" *See In re Alleghney Int'l, Inc.*, 118 B.R. 282, 289-90 (Bankr. W.D. Pa. 1990) (explaining that votes must be designated where "the creditor has cast his vote with an *ulterior purpose aimed at gaining some advantage to which he would not otherwise be entitled in his position.*") (citations and quotation marks omitted) (emphasis added); *see also In re DBSD N. Am. Inc.*, 421 B.R. 133, 138 (Bankr. S.D.N.Y. 2009) (bad faith can be found where "a claim holder attempts to extract or extort a personal advantage not available to other creditors in the class, or, as relevant here,

As for the Intermediate Lessors, the Court should look past the "independent" director recently appointed by FitzWalter following its exercise of remedies during these Chapter 11 Cases against the shares in those entities that were pledged as collateral for repayment of the Secured Obligations and reject his challenge to the Court-approved Enforcement Notices.[6]  Those Enforcement Notices only result in the transfer of the Lease Assets upon the closing of the Sale, which requires payment of all valid Secured Obligations.  Thus, the Intermediate Lessors will not be harmed by the Sale, whereas, absent the Sale, they could be left with substantial liabilities.

The Court should reject the Objectors' attempts to relitigate issues that were already decided and to block a transaction that maximizes value for all stakeholders. Thus, the Court should overrule the Objections and approve the Sale.

## REPLY TO OBJECTIONS

### I.   The Debtors Can Sell the Purchased Assets Free and Clear

#### A.   The Lease Assets Are Property of the Debtors' Estates

1.   FitzWalter argues that the Lease Assets cannot be included in the Sale because redemption of the "Borrower Assigned Property" (which was assigned by the Debtors to the Security Agent) would simultaneously result in the redemption of the "Intermediate Lessor Assigned Property" (which was assigned by the Intermediate

---

*where a creditor acts in furtherance of an ulterior motive unrelated to its claim or its interests as a creditor.*") (emphasis added); *see also In re LightSquared Inc.*, 511 B.R. 253, 349 (Bankr. S.D.N.Y. 2014) ("The remedy of equitable subordination must remain sufficiently flexible to deal with manifest injustice resulting from the violation of the result of fair play where ingenuity spawns unprecedented vagaries of unfairness, bankruptcy courts should not decline to recognize their marks, nor hesitate to turn the twilight for offending claimants into a new dawn for other creditors.") (quoting *In re Teltronics Servs., Inc.*, 29 B.R. 139, 172 (Bankr. E.D.N.Y. 1983)).  To this end, the Debtors have filed a complaint seeking to equitably subordinate FitzWalter's liens and/or claims.  *See JPA No. 111 Co., Ltd. & JPA No. 49 Co., Ltd. v. FitzWalter Cap. Partners (Fin. Trading) Ltd.*, Case No. 21-12075, Adv. Pro. No. 22-01004 [Docket No. 1] ("Debtors' Complaint").

[6]   On February 21, 2022, counsel for the Debtors sent counsel for the Intermediate Lessors a letter regarding fiduciary duties under applicable Irish law.  *See* Debtor Ex. 1.

- 3 -

Lessors to the Debtors).  *See* FitzWalter Obj. at 32-33.  This argument is incorrect for at least two overarching reasons.

> *(1)    The Enforcement Notices are Valid and Enforceable*

2.      During these Chapter 11 Cases, each Intermediate Lessor executed the Enforcement Notices, which initiated certain actions (the "Enforcement Actions") to facilitate the Debtors' enforcement on, and transfer of, the Intermediate Lessor Assigned Property, which transfer is effective only upon consummation of the Sale or by further order of the Court.[7]  The Enforcement Notices and the Debtors' effectuation of the Enforcement Actions has already been approved by the Bankruptcy Court in connection with the Sale Process.[8]  Furthermore, the Enforcement Notices were validly executed by the authorized representatives of the Intermediate Lessors in conformity with applicable law, including the Cape Town Convention, and served on the applicable notice parties.[9]

3.      While FitzWalter objected to the Bidding Procedures and Sale Motion, and even provided the Court directly with comments on the form of the Bidding Procedures Order, FitzWalter did not object to or seek to modify the provisions regarding approval of the Enforcement Notices and Enforcement Actions.  The Court should disregard any challenges from FitzWalter now.[10]  Similarly, the Court should disregard the complaints

---

[7]     *See (A) Notice of Enforcement Sale and (B) General Conveyance and Bill of Sale* [Docket No. 77, Ex. A] (the "Enforcement Notices"), at 2 (setting forth six conditions to the effectiveness of the Notice and Bill of Sale effectuating the foregoing transfer).

[8]     *See* Bidding Procedures Order ¶¶ 7-8 ("The Debtors are authorized to take the necessary steps under applicable law to effectuate the Enforcement Actions.  The Enforcement Notices are approved and shall be served on the Enforcement Notice Parties consistent with applicable law.").

[9]     *See Affidavit of Service*, filed on February 11, 2022 [Docket No. 109].

[10]    This type of gamesmanship has been rejected by this Court before.  *See, e.g., In re Oi Brasil Holdings Cooperatief U.A.*, 578 B.R. 169, 220-21 (Bankr. S.D.N.Y. 2017) (explaining the Court's reservations to revisit a prior order where the creditor attended the prior hearing and its "failure to object . . . was a

of the Intermediate Lessors' new director that was appointed by FitzWalter because it is clearly acting on FitzWalter's behalf to interfere with the Sale for FitzWalter's benefit.[11]

4.      The Intermediate Lessors' challenges to the Enforcement Notices are also without merit.  The Intermediate Lessors argue that they received nothing in exchange for the consensual Enforcement Actions other than a "worthless release" of their obligations under the Head Leases.[12]  This description is a severe misunderstanding of the relative assets and liabilities of the Intermediate Lessors.  The Intermediate Lessors owe more than $20 million in unpaid rent to the Debtors pursuant to the Head Leases— making the Debtors some of the Intermediate Lessors largest creditors.  Additionally, the Intermediate Lessors are "Obligors" under the Transaction Documents and the Sale will result in the satisfaction of all claims under the Transaction Documents.

5.      The alternative to the consensual Enforcement Actions is not freedom to pursue claims against Vietnam Airlines.  Rather, without a waiver from the Debtors, the Intermediate Lessors will owe substantial sums to the Debtors, and any proceeds collected from Vietnam Airlines would inevitably be passed along to the Debtors.

### (2)      *The Sale of the Borrower Assigned Property Does Not Cause Redemption of the Intermediate Lessor Assigned Property*

6.      For separate and independent reasons, FitzWalter's assertions that the Debtors will not be able to sell the Lease Assets because the Intermediate Lessors' equitable rights of redemption will be triggered simultaneously with the Debtors' rights

---

strategic decision, not one based on a lack of information or some fundamental misunderstanding of the facts" and emphasizing actions taken by the creditor after the hearing with the intention of returning to the Court).

[11]   The Debtors have asserted that these actions violate the automatic stay and are void.  *See* Debtors' Compl. ¶ 63; *Opening Brief in Support of Debtors' Motion for Injunctive Relief and Sanctions*, filed on February 15, 2022 [Adv. Pro. No. 22-01004, Docket No. 4] (the "Stay Violation Brief") ¶¶ 20-21.

[12]   *See* Intermediate Lessor Obj. ¶ 4.

to redeem, causing the transfer to the Intermediate Lessors of all of the rights to the Lease Assets are wrong.[13]  FitzWalter confuses several concepts—most importantly, the existence of an "equity of redemption," which causes assigned collateral to become property of the Debtors' estates, and the actual exercise of a right of redemption through the discharge of the Secured Obligations in a non-bankruptcy context.

7.      The Borrower Assigned Property (which contains the Intermediate Lessor Assigned Property) automatically became property of the Debtors' estates on the Petition Date (by virtue of the equity of redemption, which is an interest created at the time of entering into the security agreements) and, following Court approval, the interests will be transferred to the Successful Bidder free and clear of both the Security Agent's and Intermediate Lessors' interests pursuant to section 363(f) of the Bankruptcy Code.  As explained in Part I.C below, the Debtors are required to show—which they do—that the Security Agent "could be compelled" to release the Borrower Assigned Property in a nonbankruptcy forum but need not actually obtain such a release.

8.      Therefore, it does not follow, as FitzWalter suggests, that approval of the sale of the Purchased Assets free and clear of the Security Agent's interests will simultaneously and automatically also provide for the redemption of the Intermediate Lessor Assigned Property to the Lessors.  To the contrary, the Bidding Procedures expressly provide that the transfer of the Purchased Assets constitutes a foreclosure sale and enforcement action of the Debtors' interests in such assets.  Approval of the Sale will extinguish any equitable rights of redemption held by the Intermediate Lessor.[14]

---

[13]    FitzWalter Obj. at 29-30 n.12; *see also id.* at 33 ("[I]f the Debtors have an equitable right of redemption in the Lease Assets transferred to the Security Agent, then the Intermediate Lessors must have an identical equitable right of redemption over the VNA Claims.").

[14]    *See* Bidding Procedures ¶ IX(G) [Docket No. 102, Ex. 1].

**B.    The Debtors' Rights in the Lease Assets are Property of the Estate and May Be Sold Pursuant to Section 363 of the Bankruptcy Code**

9.      FitzWalter recycles its argument that because the assignment of the Lease Assets was absolute, the Debtors therefore have no interest in the property to include in the Sale.[15]  The Court has already determined, following extensive briefing, expert testimony, and an evidentiary hearing, that the Lease Assets were assigned merely as security for the Secured Obligations.  Therefore, "at a minimum, [the Debtors] possess[] an 'equity of redemption,' meaning roughly speaking an equitable right to redeem and recover the pledged or assigned property upon repayment of the secured debt."[16]

10.     FitzWalter appears to argue that the assignment of the Lease Assets as security somehow renders a different outcome than if the assets were encumbered by a charge.[17]  But this is incorrect.  It is merely an artifact of how common law developed in different jurisdictions that some security instruments operate under "lien theory" (like the Aircraft Mortgages), and others, under a "title theory" (like the Security Agreements).  However, despite these superficial differences, bankruptcy courts recognize that a security agreement—regardless of "lien theory" or "title theory"— gives rise to the same principles of ownership and equity.  11 U.S.C. § 101(37) ("The term 'lien' means charge against *or interest in* property to secure payment of a debt or performance of an obligation"); *see also In re Guardian Realty Grp., L.L.C.*, 205 B.R. 1, 4 (Bankr. D.D.C. 1997) ("The majority of cases to consider language in a security agreement granting a mortgagee an alleged absolute assignment of rents have found

---

[15]  *See* FitzWalter Obj. at 27 ("[The Transaction Documents] evidence a clear intent to effectuate an absolute transfer.").

[16]  *Memorandum Decision and Order Resolving Motion to Dismiss*, filed on February 1, 2022 [Docket No. 97] (the "Memorandum Decision"), at 20.

[17]  *See* FitzWalter Obj. at 27, 31.

the true nature of the mortgagee's interest to be no more than security even in those states following the 'title theory' of mortgages."). Cases analyzing instruments like the Security Agreements, which appear on their face to transfer title, emphasize that the parties' intention to create a security agreement will govern over any language that the collateral assignment was a "true" or "absolute" transfer, like a sale. *See, e.g., In re Amaravathi Ltd. P'ship*, 416 B.R. 618, 630 (Bankr. S.D. Tex. 2009) ("[The lender] can call this arrangement an 'absolute assignment' or, more appropriate, 'Mickey Mouse.' It's still a lien.") (quoting *In re Foundry of Barrington P'ship*, 129 B.R. 550, 557 (Bankr. N.D. Ill. 1991)) ("That the mortgage purports to give the lender absolute title to the rents or that state law may label the assignment as giving the mortgagee title (as is often the case in states following the 'title theory' of mortgages) does not control the court's decision.").

11.    All property of the estate can be used, sold, or leased by a debtor pursuant to section 363, including the ability to sell any property of the estate free and clear of all interests, subject to the requirements of section 363(f) of the Bankruptcy Code. *See, e.g., In re Colarusso*, 295 B.R. 166, 173 (B.A.P. 1st Cir. 2003) ("If the Debtors had an interest in the subject property upon the commencement of the case, that interest would have become property of the estate to be sold by the Chapter 7 Trustee."). Under section 541 of the Bankruptcy Code, all collateral subject to the equitable right of redemption automatically becomes property of the estate, so long as the equitable right was not extinguished prepetition, for example, through consummation of a sale.[18] As one court has aptly noted:

---

[18]    *See* 11 U.S.C. § 541(a)(1) (stating that a debtor's estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."); *see, e.g., Bethesda Air Rights Ltd. P'ship*, 117 B.R. 202, 206 (Bankr. D. Md. 1990) (title theory instrument) ("The Property was not foreclosed prior to the petition. As the Debtor retained an equitable interests in the Property as of the commencement of the case, the Property is property of the estate."); *In re Polo Club Apartments Assocs. Ltd. P'ship*, 150 B.R.

> [A]n assignment, which is characterized as 'absolute', is not absolute in
> the sense that it totally divests a grantor of any and all interest in the rents.
> The grantor retains an equitable interest in the rents, and whether the
> interest is depicted as a 'reversionary interest', a 'right of redemption' or
> the like, it is an interest which becomes property of the bankruptcy estate.
> [It is] sufficient to give the bankruptcy estate an interest in the rents and
> allow a debtor-in-possession to use such rents in the operation of its
> business.

*In re May*, 169 B.R. 462, 471 (Bankr. S.D. Ga. 1994).

12.    Here, the Debtors' estates include ownership of the Lease Assets,

notwithstanding that title had been assigned by way of security to the Security Agent,

because the Debtors retained an equitable right of redemption that existed as of the

Petition Date.[19]  The Bankruptcy Code recognizes the secured party's interest in the

collateral, but in the context of sections 363 and 541 of the Bankruptcy Code, the estate's

interest in the collateral is superior.  *See In re Senior Hous. Alternatives, Inc.*, 444 B.R. 386,

399-400 (Bankr. E.D. Tenn. 2011) ("Outside of bankruptcy, Bernard, having taken all

action required by the assignment document, would be entitled to obtain or retain

possession of the rents.  The result is different in bankruptcy, because the Code

recognizes the need of the debtor in possession to use property of the estate for the

benefit of all creditors, while at the same time protecting the creditor's interest.").

13.    The Supreme Court's decision in *U.S. v. Whiting Pools, Inc.* provided the

foundational principle that the Bankruptcy Code "grants to the estate a possessory

interest in certain property of the debtor that was not held by the debtor at the

commencement of the reorganization proceedings."  462 U.S. 198, 207 (1983).  If the

---

840, 850 (Bankr. N.D. Ga. 1993) (title theory instrument) ("Even if a grantor in possession could
convey an absolute right to rents, the assignment would not extinguish his equitable estate in the
rents.").

[19]    Additionally, as explained in more detail below and in the Opinion of Francis Tregear QC, a copy of
which is attached hereto as **Exhibit A** (the "<u>Tregear Opinion</u>"), under English Law, any provision of a
security agreement that defeats or renders illusory the right to redeem, or clogs or fetters the equity
of redemption, will be deemed invalid.

debtor retained some legal or equitable interest in property as of the petition date, the rights of the estate supersede all interests in the property, including those of a lender in possession of collateral. *See In re S. Side House, LLC*, 474 B.R. 391, 411-12 (Bankr. E.D.N.Y. 2012) ("This Court likewise finds that although the Lender has an enforceable interest in the Rents, the Debtor retains a prepetition interest in the Rents sufficient to bring them into the estate."); *In re Northport Marina Assocs.*, 136 B.R. 911, 921 (Bankr. E.D.N.Y. 1992) ("Viewing rents as cash collateral in which a secured creditor has an interest even though the debtor's title is superior is more compatible with the overall structure of the Code . . .").

14.     In one case with similar facts, a lender refused to turn over property that had been assigned as security prepetition. *In re Bryn Athyn Invs., Ltd.*, 69 B.R. 452 (Bankr. E.D.N.C. 1987). The bankruptcy court wrote the following:

> R.P.I. concedes that Bryn Athyn retains its equity of redemption, but apparently contends that, by virtue of the Assignment and subsequent revocation of the conditional license, Bryn Athyn's redemption rights no longer extend to the right to possess the property and the right to collect rents. ***Such a construction would render the debtor's redemption rights worthless, if not incomprehensible.*** It would also be inconsistent with the provision in the Assignment that the Assignment is to become void upon satisfaction of the mortgage debt. . . . Since Bryn Athyn still has its full redemption rights, under Whiting Pools it is entitled to turnover of the apartment complex as long as R.P.I's interests are adequately protected.

*Id.* at 457-58 (emphasis added).[20]

15.     Therefore, even to the extent the Debtors assigned the Lease Assets to the Security Agent, because the Lease Assets are collateral subject to the equity of

---

[20]   *See also In re Contractors Equip. Supply Co.*, 861 F.2d 241, 244 (9th Cir. 1988) (holding that a debtor's assignment of accounts receivable, which was intended as security, was sufficient to bring the accounts receivable into the debtor's estate without any redemption proceeding); *In re Glaser*, Case No. 01-10220-SSM, 01-1186, 2002 WL 32375007, at *14 (Bankr. E.D. Va. Oct. 25, 2002) ("Indeed, even without first redeeming, the trustee would arguably be entitled to turnover of the pawned goods for the purpose of selling them (with the pawnbroker's lien attaching to the proceeds of the sale, and with the pawnbroker having the right to credit bid at the sale.").

redemption, the underlying collateral—here, the Lease Assets—becomes property of the
estate and can be included in a sale pursuant to section 363(b).  As such, the Debtors
maintain the right to sell property of their estates, including the Lease Assets, free and
clear, subject to the requirements of section 363(f) of the Bankruptcy Code.

> **C.    The Debtors Can Sell the Purchased Assets, Including the Lease Assets,
> Free and Clear Under Section 363(f) of the Bankruptcy Code**

16.     The Objectors challenge the Debtors' ability to sell the Purchased Assets
free and clear of their interests under section 363(f) of the Bankruptcy Code.  Section
363(f) is written in the disjunctive and is satisfied if any one of the five conditions is met.
*See* 11 U.S.C. § 363(f)(1) – (5).   Notably, section 363(f) allows a debtor to sell free and
clear of all competing interests, not strictly liens. *See In re Colarusso*, 295 B.R. 166, 175
(B.A.P. 1st Cir. 2003), *aff'd*, 382 F.3d 51 (1st Cir. 2004) ("Only one of these conditions,
§ 363(f)(3), relates specifically to liens.  The other four treat all interests in property,
including liens.").  As set forth below and in the Sale Motion, there are multiple bases to
authorize the Sale free and clear.

17.     Section 363(f)(1)  – Both the Cape Town Convention and the Uniform
Commercial Code permit the Sale of the Purchased Assets free and clear of all liens,
claims and interests.[21]  Thus, section 363(f)(1) of the Bankruptcy Code is satisfied.

18.     FitzWalter is incorrect in its argument that because the Security Agent is
the only authorized party to dispose of the Collateral under the Transaction Documents,
then the Debtors are prohibited from selling the Collateral *at all* until all of the Secured

---

[21]    *See* Cape Town Convention, Art. 9(4) (Vesting of object in satisfaction; redemption); N.Y. U.C.C. §§ 9-
617 (Rights of Transferee of Collateral), 9-623 (Right to Redeem Collateral).

Obligations are paid in full.[22]  Just because the Debtors are proposing to satisfy all valid

Secured Obligations in connection with the Sale does not mean that the Debtors cannot

sell their assets absent satisfaction of the Secured Obligations.  Such a position would

eviscerate all of section 363 of the Bankruptcy Code (not just the free and clear

provisions) and prevent nearly any debtor with defaulted prepetition financing from

selling its assets in bankruptcy.[23]

19.    <u>Section 363(f)(2)</u> – The Debtors agree that FitzWalter, as Security Agent, is

not consenting to the Sale on the Non-Lease Assets and, thus, section 363(f)(2) does not

apply to the Sale with respect to FitzWalter.[24]  The Intermediate Lessors, however, have

already consented to the Sale of the Lease Assets by the Debtors pursuant to the

Enforcement Notices as described in greater detail above.  Furthermore, the

Intermediate Lessors will not have any interest in the Lease Assets when they transfer

pursuant to the Enforcement Notices because that transfer will only occur upon

---

[22]    *See* FitzWalter Obj. at 38.  In support, FitzWalter cites a single case on completely different facts, *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992), which involved successor liability in a real property sale.  There, a chapter 7 trustee sought to sell an apartment complex free and clear of certain settlement stipulations entered into between the debtor and its tenants that resolved repair, rent, and other disputes.  *Id.* at *1-2. Because the court held that none of the section 363(f) prongs applied to such stipulation, which contained a covenant that ran with the land, the court denied the sale.  *Id.* at *4.

[23]    Courts routinely disregard prepetition contract terms that would effectuate an end-run around the provisions of the Bankruptcy Code.  *See In re Lehman Bros. Holdings Inc.*, 422 B.R. 407, 415 (Bankr. S.D.N.Y. 2010) ("It is now axiomatic that ipso facto clauses are, as a general matter, unenforceable."); *In re Intervention Energy Holdings, LLC*, 553 B.R. 258, 265-66 (Bankr. D. Del. 2016) (concluding that waiver of right to file bankruptcy petition was void as contrary to federal public policy); *Bank of China v. Huang (In re Huang)*, 275 F.3d 1173, 1177 (9th Cir. 2002) ("It is against public policy for a debtor to waive the prepetition protection of the Bankruptcy Code.  This prohibition of prepetition waiver has to be the law; otherwise, astute creditors would routinely require their debtors to waive") (citations omitted).

[24]    The other Lenders have not objected to the sale and are deemed to consent with respect to their interests in the Purchased Assets.

payment in full of all valid Secured Obligations.[25]

20.    Section 363(f)(3) – The Debtors clearly satisfy section 363(f)(3) of the Bankruptcy Code because the Stalking Horse Purchase Agreement's provision of a price floor consisting of all valid Secured Obligations plus $5 million is by its designed to satisfy "the aggregate value of all liens on such property."

21.    Section 363(f)(4) – The Debtors' interests in the Lease Assets are clearly in bona fide dispute for purposes of section 363(f)(4) of the Bankruptcy Code.  A debtor is required to demonstrate an objective basis for either a factual or legal dispute as to the validity of the interest.  *See, e.g., Nicole Energy Serv., Inc.*, 385 B.R. 201, 229-30 (Bankr. S.D. Ohio 2008) ("A 'bona fide dispute' exists under § 363(f)(4) when there is an objective basis for either factual or legal dispute as to the validity of an interest in property.") (citations omitted); *In re Taylor*, 198 B.R. 142, 162 (Bankr. D.S.C. 1996) (same). The Court is not required to resolve the underlying dispute, assess the probable outcome, or determine whether the allegations are true; rather, the Court only has to find that a dispute exists.  *See Nicole Energy*, 385 B.R. at 229; *In re Gaylord Grain L.L.C.*, 306 B.R. 624, 627 (B.A.P. 8th Cir. 2004).

22.    Here there is clearly an objective basis for a legal dispute regarding the Security Agent's interests:  FitzWalter disputed ownership of the Lease Assets in its Motion to Dismiss;[26] FitzWalter admitted there is a dispute as to the validity and extent

---

[25]    As for the Intermediate Lessors' arguments about all types of other "interests," such purported interests (a) do not exist at the time the Court authorizes the transaction, and (b) are worthless because there will be no liabilities arising from the *transfer* of the Lease Assets because the valid Secured Obligations will be paid in full in connection therewith.

[26]    *See* Motion to Dismiss at 21 (describing disagreement with the Debtors' position regarding ownership of the Lease Assets and interests of the Security Agent).

of the Debtors' rights in the Lease Assets in its recently filed complaint;[27] and the

Debtors have sought equitable subordination of FitzWalter's liens, claims and security

interests.[28]  Contrary to FitzWalter's argument, the Court can determine the Debtors'

interests in the Lease Assets pursuant to the Sale Motion as part of the Sale Hearing.[29]

      23.    FitzWalter argues that section 363(f)(4) does not apply because "there is

no dispute that the Security Agent holds *some* property interest in the Collateral"—*i.e.,*

such as with respect to the Aircraft.[30]  That is incorrect.  If there is a bona fide dispute as

to some interest in the property, a debtor can sell the entire property free and clear.  For

example, in *In re Bedford Square Associates, L.P.*, 247 B.R. 140 (Bankr. E.D. Pa. 2000), the

court allowed a sale, pursuant to section 363(f)(4), of land and a related ground lease

free and clear of an unrecorded restrictive covenant in an objector's lease affecting the

land, despite no disagreement on the validity of the lease itself.[31]

---

[27] *See FitzWalter Cap. Partners (Fin. Trading) Ltd. v. JPA No. 111 Co., Ltd. & JPA No. 111 Co., Ltd. (In re JPA No. 111 Co., Ltd. & JPA No. 111 Co., Ltd.)*, Case No. 21-12075 (DSJ), Adv. Pro. No. 22-01006 (DSJ) (Bankr. S.D.N.Y. Feb. 17, 2022) [Docket No. 124; Adv. Docket No. 1] at p. 23 ¶ 2 ("An actual controversy has arisen and now exists between FitzWalter and each Debtor concerning the ownership of certain or all of the Lease Assets.").

[28] *See generally* Debtors' Complaint.

[29] *See, e.g.*, *In re BHB Enterprises, LLC*, No. 97-01975-JW, 1997 WL 33344250, at *2 (Bankr. D.S.C. Sept. 30, 1997) (finding that assets to be sold in connection with a sale motion were property of the estate based on testimony proffered and evidence submitted in support of the motion).

[30] FitzWalter Obj. ¶ 40 (emphasis in original).  FitzWalter cites *Revel AC, Inc. v. IDEA Boardwalk LLC*, 802 F.3d 558, 573 (3d Cir. 2015), where the Third Circuit rejected a flat line rule that the filing of a declaratory judgment action itself creates a *bona fide* dispute for purposes of section 363(f)(4) .  In that case, a creditor filed a declaratory judgment action to exercise its rights under section 365(h)  of the Bankruptcy Code rather than litigate the nature of its interest.  The court on appeal refers to their dispute as being "fanciful if not disingenuous."  *Id.* at 574.  The court was also clearly concerned with the implications of the debtors' argument, i.e., that any complaint filed by a nonresidential tenant seeking declaratory relief pursuant section 365(h) affirmatively alleges, subject to Fed. R. Civ. P. 11, that a dispute exists because a declaratory judgment action requires an actual case or controversy.  *Id.* at 575.  This is not a concern present here.

[31] *See also In re Downtown Athletic Club of New York City, Inc.*, No. M-47 (JSM), 2000 WL 744126, at *5 (S.D.N.Y. June 9, 2000) (in *post hoc* analysis, sale of real property was free and clear of tenants' asserted rights to obtain leases pursuant to local rent stabilization laws, over which there was a bona fide dispute);  *In re Sea Oaks Country Club, LLC*, No. 20-17228 (CMG), 2020 WL 6588412, at *10 (Bankr.

24.     Finally, the Intermediate Lessors state that no parties have challenged their "claims for rescission, equity of redemption, fraudulent transfer and other rights relating to the Lessor Assets."[32]  All of these (other than the equity of redemption), are not present interests and will never become interests pursuant to the Enforcement Notices.  As such the Court should ignore these red herrings.

25.     Section 363(f)(5) – FitzWalter and the Intermediate Lessors appear to take an overly narrow view of section 363(f)(5) of the Bankruptcy Code.[33]  The Intermediate Lessors do a great job of explaining just how broad interests are defined for purposes of section 363(f) of the Bankruptcy Code.[34]  As long as the holder of the interest could be "compelled, in a legal or equitable proceeding, to accept a money satisfaction of [its] interest," then section 363(f)(5) applies irrespective of whether the debtor has commenced such a proceeding.  *In re WBQ P'Ship*, 189 B.R. 97, 106 (Bankr. E.D. Va. 1995); *see also In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 585 (4th Cir. 1996) (agreeing that Coal Act successor liability claims related to benefit plan funding could be required to accept money satisfaction).  Courts often look to bankruptcy for examples of circumstances where a creditor could be compelled to accept a monetary satisfaction of

---

D.N.J. Nov. 10, 2020) (sale of golf course could proceed free and clear of membership interests entitling objectors to lifetime use of golf course, which were avoidable pursuant to section 544(a)(3) of the Bankruptcy Code and therefore subject to bona fide dispute).

[32]   Intermediate Lessor Obj. ¶ 55.  The Intermediate Lessors assert that the Enforcement Notices acknowledge the Intermediate Lessors' rights, title, claims, and interests presently held by such entities.  *Id.* ¶ 55.  That is not the case.  The Enforcement Notices expressly state that the Intermediate Lessors, as sellers, are transferring their rights to the Debtors, as buyers, on an "as-is, where is' basis, without any recourse, representation or warranty whatsoever [.]"  Enforcement Notices at 2.

[33]   *See* Intermediate Lessors Obj. ¶ 53; FitzWalter Obj. at 40.

[34]   Intermediate Lessor Obj. ¶ 51 & n.12 (collecting cases).  On this point, the Intermediate Lessors argue for an expansive reading of section 363(f) of the Bankruptcy Code that includes both "claims" and "interests" even though section 363(f) refers only to "interests."  In general, the Debtors agree with the decisions cited by the Intermediate Lessors on this point, which was summarized in *In re Ditech Holding Corporation*, 606 B.R. 544, 581-82 (Bankr. S.D.N.Y. 2019) (explaining decisions holding that "interests" also includes "claims" where they "flow from a debtor's ownership of the transferred assets.").

- 15 -

its claims or interests, such as a chapter 7 liquidation or pursuant to a chapter 11 plan.

*See In re Trans World Airlines, Inc.*, 322 F.3d 283, 290-91 (3d Cir. 2003) (holding that

discrimination claims and rights under a travel voucher program were interests

property that could be extinguished under section 363(f)(5) of the Bankruptcy Code

because both were "subject to monetary valuation" and would have been converted to

dollar amounts in a hypothetical chapter 7 liquidation); *In re Healthco Int'l, Inc.*, 174 B.R.

174, 175-77 (Bankr. D. Mass. 1994) (because secured creditor with lien could be

compelled to accept less than the full amount of its debt over its objection in the context

of confirmation of a chapter 11 plan, it could be compelled in a sale free and clear of its

interest to accept less than the full amount of its debt under section 363(f)(5)).

26.     Likewise, as explained in the Tregear Opinion, the Debtors would be able

to commence a redemption action in the English Court that would provide a forum to

establish the reasonable costs and entitlements under the Transaction Documents to

facilitate redemption or a direct sale to a third party.[35]  In that context, the Court would

take an account which would determine the correct amount of the secured indebtedness

together with interest and costs.  In determining the correct amount of the secured

indebtedness, the English court would include in the account only those collateral or

additional liabilities that are deemed to be equitably permissible.[36]  Moreover, the

---

[35]   *See* Tregear Op. ¶ 10.

[36]   *Id.* (if a contractual provision requires any payments beyond principal, interest, and costs, to exercise
such redemption, such "collateral advantage" will be deemed invalid if it is "in the nature of a
penalty clogging the equity of redemption" or "inconsistent with or repugnant to the contractual or
equitable right to redeem") (quoting *Kreglinger v. New Patagonia Meat & Cold Storage Co. Ltd.* [1914]
AC, at 86-87).

English court would be able to order redemption and/or sale with the Debtors paying less than the face amount of the Security Agent's claims.[37]

### D.    The Intermediate Lessors are Not Entitled to Adequate Protection

27.    The Court should deny the Intermediate Lessors' request for adequate protection under section 363(e) of the Bankruptcy Code.[38]

28.    In the Second Circuit, only secured creditors and lessors of personal property are entitled to adequate protection under section 363(e) of the Bankruptcy Code.  *In re R.J. Dooley Realty*, No. 09-36777, 2010 WL 2076959, at *8 (Bankr. S.D.N.Y. May 21, 2010) ("Cases construing § 363(e) fall into two groups: 1. only secured creditors may demand adequate protection pursuant to § 363(e); and 2. secured creditors and lessors may demand adequate protection.") (citing *In re Megan-Racine Assocs., Inc.*, 192 B.R. 321, 326-27 (Bankr. N.D.N.Y. 1995)).  Adequate protection is limited to ensuring that the "secured creditor receives the value for which the creditor bargained for prior to the debtor's bankruptcy."  *In re Worldcom*, 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004) ("However, neither the legislative history nor the Bankruptcy Code require the Court to protect a creditor beyond what was bargained for by the parties.").  The party seeking adequate protection has the burden of demonstrating the validity, priority, or extent of such an interest in property that they allege is entitled to adequate protection.  *See* 11 U.S.C. § 363(p)(2); *see also Worldcom*, 304 B.R. at 618 (explaining that the "party asserting an interest in property . . . prove 'the validity, priority, or extent of such interest.'").

---

[37]    *See id.* ¶ 12 ("[T]he court can direct a sale against the wishes of a mortgagee and where the sale price did not pay all of the outstanding mortgage debt"); Law of Property Act 1925, Section 91 ("In any action, whether for foreclosure, or for redemption, or for sale . . . notwithstanding that (a) any person dissents . . . [the court] may direct a sale of the mortgaged property, on such terms as it thinks fit.").

[38]    Intermediate Lessor Obj. ¶ 56.

29.     The Intermediate Lessors cannot meet this burden.  As explained in greater detail above, the Intermediate Lessors already authorized the transfer of the Lease Assets pursuant to the Enforcement Notices.  Furthermore, there is no basis for providing adequate protection of the litany of contingent claims identified by the Intermediate Lessors "that are tied to the Lessor Assets" such as recission and fraudulent transfer.  *Megan-Racine*, 192 B.R. at 327 ("This Court cannot find that Code § 363(e) was implemented to provide adequate protection for those holding a contingent interest.").  As for the equity of redemption, the Debtors are providing the Intermediate Lessors with exactly what they bargained for because of the full satisfaction of the valid Secured Obligations.

## II.     All Valid Secured Obligations Will Be Satisfied By the Sale

30.     The Debtors' position throughout the Sale Process is that the Sale is intended to pay all outstanding principal, interest, and allowed fees and expenses under the applicable Transaction Documents.[39]  FitzWalter has asserted that certain disputed amounts constitute additional "Secured Obligations."[40]  For the reasons set forth below, the English Lawsuit Claims, the Head Lease Claims, and the Management Time Claims (each as defined below) are not Secured Obligations.[41]

### A.     The English Lawsuit Claims Are Not Secured Obligations

31.     On January 20, 2022, FitzWalter commenced a lawsuit in England (the "English Lawsuit") against each of non-Debtors (a) JPL, (b) JLPS Ireland, the direct

---

[39]   *Statement Responding to This Court's Inquiries Regarding Debtors' Motion to Approve Bidding Procedures [ECF No. 21]*, filed on January 28, 2022 [Docket No. 90] § 3.  The allowed Secured Obligations are limited to "***reasonable*** fees, costs or charges provided for under the agreement or State statute under which such claim arose."  11 U.S.C. § 506(b) (emphasis added).

[40]   *See id*; *see also* FitzWalter Obj. at 22-25.

[41]   A schedule of the relevant definitions from the Transaction Documents discussed in this Part II is attached hereto as **Exhibit B**.

parent of the Intermediate Lessors, (c) the Intermediate Lessors, and (d) Heinrich

Loechteken (the "English Lawsuit Defendants").  The English Lawsuit seeks damages,

interest, and costs, in unliquidated amounts, for (a) various tort, breach of contract, and

conspiracy claims, based on purportedly "false, defamatory, and damaging statements"

made about FitzWalter by Mr. Loechteken, while he was the President of JLPS Ireland,

to members of the airline financing industry, and the other defendants purported

failure to prevent this conduct (the "Defamation Claims"), and (b) various tort, breach

of contract, and conspiracy claims against the English Lawsuit Defendants for their

purported actions to facilitate and/or failure to prevent the Debtors' filing of these

Chapter 11 Cases (the "Chapter 11 Filing Claims", together with the Defamation

Claims, the "English Lawsuit Claims").[42]  The English Lawsuit was filed after the

commencement of these Chapter 11 Cases in a clear attempt to manufacture additional

claims and interfere with the Sale Process.[43]

32.    The Defamation Claims, on their face, are not "Secured Obligations . . .

pursuant to any Transaction Document."  In support of the Defamation Claims,

FitzWalter cites Clause 11.3.23 of the Proceeds Agreements, which cover only the

Intermediate Lessors and relates to "Anti-Social Forces, Relationship and Conduct."

The Defamation Claims fail to allege facts that give rise to any claims arising under, or

for breach of, these provisions.[44]

---

[42]    *See* FitzWalter Obj. at 23-25; *Supplemental Declaration of Andrew Gray*, filed January 23, 2022 [Docket
No. 80] ("<u>Suppl. Gray Decl.</u>") Ex. 5 (English Claim Form); Debtor Ex. 2 (Particulars of Claim) ¶¶ 18-
37.

[43]    As explained in the Debtors' Complaint and the Stay Violation Brief, the Debtors have asserted that
FitzWalter's filing of the English Lawsuit violates the automatic stay.  In the alternative, the Debtors have
requested that the Court enjoin FitzWalter's prosecution of the English Lawsuit pursuant to
sections 105 and/or 362 of the Bankruptcy Code.

[44]    *See* FitzWalter Obj. at 23-25; *see generally,* Suppl. Gray Decl. Ex. 5 (English Claim Form); Debtor Ex. 2
(Particulars of Claim) ¶¶ 18-37.

33.     *First*, none of the prohibited conduct set forth in the Proceeds Agreements occurred here.  Clause 11.3.23(a) of the Proceeds Agreements provide that "The Intermediate Lessors shall ensure that no Obligor shall (x) have any relationship with Anti-Social Forces, (y) have any Anti-Social Relationship, or (z) engage in any Anti-Social Conduct, whether directly or indirectly through a third party" (the "Anti-Yakuza Provisions").[45]  The terms "Anti-Social Forces," "Anti-Social Relationship," and "Anti-Social Conduct" contained within the Anti-Yakuza Provisions each clearly refer, by their terms, to various types of organized crime and other fraudulent and criminal enterprises not applicable here.[46]

34.     The English Lawsuit does not allege any connection between the defendants and organized crime groups.  In addition, the allegations in the English Lawsuit do not meet the "Anti-Social Conduct" provisions—the only conceivable basis for a potential claim—because the Defamation Claims do not allege that Mr. Loechteken "spread[] rumour, us[ed] fraudulent means or resort[ed] to force."[47]

35.     *Second*, the other provisions of Clause 11.3.23 of the Proceeds Agreements do not provide a basis for establishing any liability in the English Lawsuit as "Secured

---

[45]  *See Declaration of Andrew Gray*, filed January 2, 2022 [Docket No. 23] (the "Gray Decl.") Ex. 7, 14 (Proceeds Agreements) § 11.3.23.

[46]  These "anti-social" provisions are from a wider domestic public policy implemented in Japan to suppress criminal activities that had been historically carried out in Japan by a number of organizations.  For example, there was a notification from the Japan Bankers Association to its member banks regarding sample anti-social provisions in 2008, which recommended the inclusion of certain provisions in lending contracts that appear to be similar to the Anti-Yakuza Provisions in the Proceeds Agreements.  *See Draft Model Clause For Eliminating Racketeering to be Inserted into the Agreement on Bank Transactions Finalized*, available at https://www.zenginkyo.or.jp/en/news/2008/n230/ (last visited February 23, 2022).

[47]  Ex. B (definition of Anti-Social Conduct) (emphasis added).  FitzWalter has alleged that Mr. Loechteken made various defamatory statements, including characterizing FitzWalter as a "financial terrorist[]" and/or a "predatory fund" using "predatory tactics."  On their face, none of these allegations implicate rumor, fraud, or force.

Obligations."  Unlike Clause 11.3.23(a) of the Proceeds Agreements, which require the

"Intermediate Lessor *shall ensure that no Obligor shall*,"[48] Clause 11.3.23(c) of the

Proceeds Agreements only cover the Intermediate Lessor directly and not any of the

other Obligors.  Mr. Loechteken was not a director, employee, agent, or other person

acting on behalf of the Intermediate Lessors.  And again, these provisions clearly relate

to conduct that is outside the scope of what has been alleged in the English Lawsuit.

36.     The Chapter 11 Filing Claims seek to recover "losses sustained in respect

of the Chapter 11 Filing, which will include the legal and management costs of the

Chapter 11 Filing, the losses associated with [FitzWalter's] inability to exercise its

contractual rights under the transaction documents and/or the wasted costs of the Sales

Process."[49]  The Debtors do not concede that such amounts constitute Secured

Obligations, but submit that should the Sale be consummated, FitzWalter will be paid

the amounts it is entitled to under the Transaction Documents in full.  Accordingly,

there will be no cognizable losses associated with these purported Conspiracy Claims

37.     Thus, because the English Lawsuit Claims are not Secured Obligations

pursuant to the Transaction Documents and are not supported by allegations of any

conduct that meets the requirements for a breach of the Proceeds Agreements, such

claims are not Secured Obligations.

---

[48]   FitzWalter does not articulate, and the Debtors will not speculate, how the Intermediate Lessors
could ensure that none of the other Obligors engage in the conduct covered by the Anti-Yakuza
Provisions as the Intermediate Lessors do not control, exercise any corporate governance with respect
to, serve as the agents for, or otherwise have authorization to bind, the other Obligors.

[49]   *See* FitzWalter Obj. at 23; Suppl. Gray Decl. Ex. 5 (English Claim Form) ¶ 20(a); Debtor Ex. 2
(Particulars of Claim) ¶¶ 18-26, 36.1.  The Debtors do not concede that such amounts constitute
Secured Obligations, but submit that there will be no cognizable losses associated with these
purported breaches because FitzWalter will be paid in full all valid Secured Obligations.

**B.    The Head Lease Claims Are Duplicative**

38.    In addition to all of the principal and accrued unpaid interest due under the Transaction Documents, FitzWalter claimed that the Secured Obligations include more than $21 million on account of the unpaid rent under the terminated Head Leases between the Debtors and the Intermediate Lessors (the "Head Lease Claims").  Under the Transaction Documents, the rental payments under the Head Leases constitute collateral that secures the Secured Obligations and not amounts that constitute additional secured obligations.[50]  Because the Debtors are proposing to pay all valid Secured Obligations in full, the Head Lease Claims should be disallowed as improper double counting.

**C.    The Management Time Claims Are Not Secured Obligations**

39.    As explained in greater detail in the Debtors' Complaint, on January 21, 2022, FitzWalter sent each of the Debtors notices styled as "Notification in Respect of Security Agent's Management Time" (the "Management Time Notices").[51]  By the Management Time Notices, FitzWalter seeks to unilaterally and retroactively impose an unconscionable and manifestly unreasonable increase in the amount of the Security Agent's management fees for each of the Debtors from what the Debtors were obligated to pay as of the Petition Date nearly two months after FitzWalter's appointment as the successor Security Agent.  Such amounts purportedly include daily rates for the Security Agent's management time charged to *each* Debtor of $50,000, $25,000, and $10,000 for each of FitzWalter's Co-Founders, Partners, and Non-Partners,

---

[50]    *See* Gray Decl. Exs. 10, 17 (Borrower Security Assignments).

[51]    *See* Debtor Exs. 3, 4 (Management Time Notices) at 2.

respectively.[52]  FitzWalter has asserted that such amounts are approximately $2,442,500

incurred between December 2, 2021 and January 21, 2022, and continue to accrue each

day thereafter (the "Management Time Claims").[53]

40.    The Debtors have asserted that the Management Time Notices are void ab

initio as violations of the automatic stay.  In addition, the Management Time Claims are

not "reasonable" as required by Section 2.19 of Schedule 2 of the Proceeds Agreement

on which such notices are based.[54]  This view is shared by other Lenders who have

objected to such amounts.[55]

41.    In contrast, the prior Security Agent charged an annual "fee" for acting as

the Security Agent of (a) $10,000 per annum for MSN 067 Owner and (b) $15,000 per

annum for the MSN 173 Owner.[56]  In the almost two years that the Secured Obligations

were in default prior to FitzWalter installing itself as the Security Agent, the prior

Security Agent (CACIB) never charged any additional amounts for "management time"

pursuant to Section 2.19 of Schedule 2 of the Proceeds Agreement.[57]  As the purported

---

[52]    *See id.*

[53]    *See* Suppl. Gray Decl., Ex. 6 (Quinn Emanuel Resp. to Togut Demands for Accounting) at App'x. 1-2.

[54]    Section 2.19 of Schedule 2 of the Proceeds Agreements provides that such rates must be "reasonable."

[55]    *See* Debtor Ex. 5 (Sumitomo Mitsui Trust Bank's Limited Response to Management Time Notices).

[56]    Even if FitzWalter had imposed reasonable daily rates for its management time (it did not), any
Management Time Claims incurred after the Debtors filed the Sale Motion are patently unreasonable.
The Debtors proposed a full pay transaction, and as such, FitzWalter should not be incurring
Management Time related to enforcing or preserving security or as part of any restructuring or
rescheduling of the Secured Obligations.

[57]    In addition, CACIB and FitzWalter failed to comply with the terms and procedures that must be
undertaken for the appointment of a successor Security Agent, rendering FitzWalter's status as
Security Agent dubious. *See, e.g.,* Gray Decl. Exs. 7, 14 (Proceeds Agreements), Sch. 2, § 2.15.2 (the
"Instructing Party" must "consult[] with the Borrower" before the "[appoint]ment of a successor
Security Agent").

successor Security Agent, the Proceeds Agreement bars such increased costs.[58]

42.      Thus, the exorbitant Management Time Claims should be disallowed as inconsistent with the Transaction Documents.

## III.    Responses to Miscellaneous Objections

### A.    The Court Can Authorize the Payment of the Secured Obligations Outside of a Chapter 11 Plan Pursuant to the Proposed Sale Order

43.      FitzWalter complains that the Stalking Horse Bidder will pay the Junior Lenders directly in violation of section 510(a) of the Bankruptcy Code and the Proceeds Agreements.[59]  Section 3.03(c) of the Stalking Horse Purchase Agreement provides that the Senior Obligations and Junior Obligations (as defined therein) will be paid "directly by the Buyer" to the Senior Finance Parties and the Junior Finance Parties, respectively. The definitions of "Senior Finance Party" and "Junior Finance Party" include the Security Agent and the relevant senior or junior lenders, as applicable.  Given that all allowed Secured Obligations are being paid in full, there is no basis for FitzWalter to complain, unless it is seeking to divert amounts to pay claims disallowed by this Court.

44.      Furthermore, this payment mechanism is not an "improper request to dictate the putative terms of a chapter 11 plan while evading confirmation requirements."[60]  Rather, the Sale effectuates a routine paydown of secured debt, which

---

[58]    Relevant here, Section 2.15.7 of Schedule 2 of the Proceeds Agreement expressly provides that "A change in the identity of the Security Agent *shall not result in an Obligor* or the Lessee *having to make any increased payment or perform any increased obligations* or have any reduced rights under the Transaction Documents." *Id.*, Sch. 2 § 2.15.17 (emphasis added).

[59]    *See* FitzWalter Obj. at 42.

[60]    *Id.*  The two cases cited by the FitzWalter Objection are inapposite.  In *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 730-31 (Bankr. S.D.N.Y. 2020), the court declined to approve a proposed DIP financing that contained a provision authorizing the conversion of the DIP financing claims into stock in the reorganized debtors at a pre-determined discount to plan value under a to-be-filed chapter 11 plan. In *Czyzewski v. Jevic Holding Corp. (In re Jevic Holding Corp.)*, 137 S.Ct. 973, 987 (2017), the Supreme Court held that a bankruptcy court could not authorize a structured dismissal of a chapter 11 case in a manner that violated the priority scheme in the Bankruptcy Code.  Moreover, the Court did not

is regularly approved by courts in this and other districts. *See, e.g., In re Res. Cap., LLC*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. June 13, 2013) [Docket No. 3967] (approving full payoff of secured revolving credit facility and partial paydown of junior secured notes); *see also In re Rubie's Costume Co.*, No. 20-71970 (AST) (Bankr. E.D.N.Y. Sept. 25, 2020) [Docket No. 408], at ¶ 12 (approving section 363 sale and authorizing payoff of certain prepetition secured obligations and DIP financing from the proceeds of the sale); *In re American Safety Razor Co., LLC*, No. 10-12351 (MFW), 2010 WL 6982173, at *8–9 (Bankr. D. Del. July 28, 2010) (approving section 363 sale and authorizing repayment of prepetition first lien and second lien debt).

### B.    The Debtors Are Entitled to Good Faith Findings

45.    FitzWalter half-heartedly argues that the Debtors are not entitled to customary good faith findings "for the reasons set forth in its Motion to Dismiss" and because of their allegations of wrongful conduct against JPL for breaches of the Transaction Documents, including for having caused the Debtors to file these Chapter 11 Cases.[61]  These arguments have already been rejected—the Court has denied that motion and found that the Debtors acted in good faith in filing these Chapter 11 Cases.  Furthermore, in the Bidding Procedures Order, the Court already found that the Sale Process is likely to maximize value.[62]  The evidence at the Sale Hearing will show that throughout the Sale Process, the Debtors acted in good faith, consistent with the Bidding Procedures Order, to maximize the value of their assets.

---

decide whether pre-plan distributions must always comply with the absolute priority rule. *Id.* at 983. Neither of the concerns from *LATAM* and *Jevic* are present here, as the Debtors are not establishing the terms of any future chapter 11 plan, nor are the Debtors effectuating a structured dismissal.

[61]    FitzWalter Obj. at 43.

[62]    *See* Bidding Procedures Order, Recital C.

- 25 -

C.    **Debtors Can Assume and Assign Contracts to Which They Are A Party**

46.    The Objections argue that the Debtors are impermissibly seeking to assume and assign contracts to which the Debtors are not a party.[63]  The Debtors are only proposing to assume and assign contracts pursuant to which the Debtors are a party and have the ability to do so under section 365 of the Bankruptcy Code.  In addition, it is disingenuous for FitzWalter and the Intermediate Lessors to object to the Debtors' proposed assumption and assignment of contracts by asserting the rights of counterparties that have, to date, not contested the Debtors' ability to do so.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (a) overrule the Objections; (b) enter the Sale Order; and (c) grant such other and further relief as may be just and proper.

Dated:  February 23, 2022          JPA NO. 111 CO., LTD. and
        New York, New York         JPA NO. 49 CO., LTD.
                                   *Debtors and Debtors in Possession*
                                   By their Counsel
                                   TOGUT, SEGAL & SEGAL LLP
                                   By:


                                   /s/ Kyle J. Ortiz
                                   Kyle J. Ortiz
                                   Bryan M. Kotliar
                                   Jared C. Borriello
                                   Eitan E. Blander
                                   One Penn Plaza, Suite 3335
                                   New York, New York 10119
                                   Telephone: (212) 594-5000

---

[63]    FitzWalter Obj. at 34; Intermediate Lessor Obj. at 40.