# EXHIBIT "A"

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 |
| JPA NO. 111 CO., LTD. and JPA NO. 49 CO., LTD., | Case No.:  21-12075 (DSJ) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF FRANCIS TREGEAR QC
IN SUPPORT OF DEBTORS' OMNIBUS REPLY TO THE OBJECTIONS OF
FITZWALTER CAPITAL PARTNERS (FINANCIAL TRADING) LIMITED
AND THE INTERMEDIATE LESSORS REGARDING THE PROPOSED SALE**

I, Francis Tregear, being duly sworn, hereby depose and state:

1.     I am a Queens Counsel ("QC") located at Lincoln's Inn, London, WC2A 3UP, UK.  I am in all respects competent to make this declaration (the "Declaration") in support of the *Debtors' Omnibus Reply to the Objections Of Fitzwalter Capital Partners (Financial Trading) Limited and the Intermediate Lessors Regarding the Proposed Sale.*

*[Concludes on the Following Page.]*

---

1    The Debtors in these Chapter 11 cases are:  JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd.  The Debtors' corporate address is Kasumigaseki Common Gate West Tower, 3-2-1 Kasumigaseki, Chiyoda-Ku, Tokyo 100-0013.

2.      Attached hereto is a true and correct copy of my February 23, 2022 expert report in these cases, which represents the substance of my Declaration in connection with the Proposed Sale.

I swear under penalty of perjury pursuant to 28 U.S.C. § 1746 under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:      Spexhall in Suffolk, England
            February 23, 2022

By:   */s/ Francis Tregear*_____
Name:  FRANCIS TREGEAR

**IN THE MATTER OF JPA NO. 49 CO. LTD AND JPA NO. 111 CO. LTD (the "Debtors")**

**AND IN THE MATTER OF CHAPTER 11 PETITIONS**

**OPINION ON ENGLISH LAW (2)**

1.  I have considered the Preliminary Objections to Sale ("POS") filed by FWCP. In the Summary of Objections at page 1 the principal points on which English law has a bearing are:

    1.1. The Debtors' equitable right to redeem is *"meaningless"* because any such right does not arise until after the Secured Obligations are paid in full – (the "Right to Redeem Point"). References are made to English law that, in my view, could benefit from clarification.

    1.2. The purchase price in the APA is insufficient to pay the Secured Obligations in full because the definition in the Proceeds Agreement of Secured Obligations is not limited to the Debtors' obligations under the Senior and Junior Facility Agreements – (the "Secured Obligations Point");

    1.3. A component of the Secured Obligations relates to administration charges levied by FWCP as Security Agent which are greatly in excess of the charges levied by FWCP's predecessor, Credit Agricole Corporate and Investment Bank ("Credit Agricole") (the "Administration Costs Point").

**Qualifications**

2.  I am qualified to provide this legal opinion on principles of English law on the facts of this case and their effect to foreign courts. I have provided expert opinions in United States courts in the past in relation to company law and contract law points. I studied law at St. John's College Cambridge. I am qualified as a barrister at the bar of England & Wales. I was called to bar by the Honourable Society of the Middle Temple in 1980 and I joined Lincoln's Inn in 1990. I am a Bencher of Lincoln's Inn. I practiced in common law chambers dealing with a wide range of cases but concentrating on

1

property law. I joined XXIV – 24 Old Buildings, Lincoln's Inn in London in 1990 to concentrate my practice on primarily business-related litigation and advisory work. I have been called to the East Caribbean Bar and as well as practicing in England, I have appeared for clients in the courts of British Virgin Islands, the Cayman Islands, the Bahamas and Bermuda. I have the right to appear in all courts in England and have appeared in the High Court, the Court of Appeal and the Judicial Committee of the Privy Council. I was appointed as Queen's Counsel in 2003. I have considerable experience in property-related matters as well as commercial and insolvency law. I attach my chambers profile to this opinion.

## Scheme of this Opinion

3.   In this Opinion I consider the following points which are material to the POS:

   3.1. Issues relating to the equitable right to redeem and the equity of redemption;

   3.2. How the rules of equity under English law can affect agreements for the provision of security for the repayment of money;

   3.3. How the rules of equity can affect the recovery of costs and expenses claimed by a mortgagee[1].

## The Right to Redeem Point

4.   In the Summary of Objection at page 1 of the POS, it is stated that the Debtors' current rights are limited to their equitable right to redeem which is *"substantively meaningless unless and until the Secured Obligations owed to the secured lenders, including FWCVP, are paid **in full**"* (emphasis in original). "Substantively meaningless" is not particularly precise in its meaning. If the point that is intended to be made is that the equitable right to redeem cannot be exercised until **after**[2] payment of what is due has been made that may fail to reflect the position as I described it in my evidence to the Court on 27 January 2022. What I said (and it is accurately recorded at page 19 of the Hearing Transcript) is that *"the assignor, who has an equity of redemption only recovers the right to the chose in action **upon** payment of the secured debt"*.

---

[1] In this Opinion I use the word "mortgage" as a generic description of security agreements including mortgages and equitable charges.
[2] See page 19 of the POS.

5. I understand from what is recorded on page 29 of the POS, in answer to the proposition that *"the Debtors' equity of redemption (which would need to be triggered to allow the Debtors to sell any of the Lease Assets) does not take effect **until after the Secured Obligations are paid in full"**.* The Debtors' case in response is recorded as being that *"the equity of redemption will trigger at the Closing of the Sale because the Debtors will (i) receive the Purchase Price, (ii) pay off the Secured Obligations, (iii) redeem the Lease Assets and (iv) transfer the Lease Assets all in one simultaneous act".*

6. This is not a completely accurate reflection of the available English law evidence. The equitable right to redeem is the right of the mortgagor to recover his security by discharging his obligations under the mortgage despite the time fixed by the contract for the performance of those obligations having passed. It arises when the time fixed for performance by the terms of the contract (the legal right of redemption) has passed.

7. I understood it to be common ground between myself and Mr. Shah QC that the equitable right of redemption is a component of the mortgagor's equity of redemption which is an incident of any mortgage and comes into existence when the mortgage is executed. I am uncertain as to what is meant by either the equitable right to redeem or the equity of redemption being *"triggered"*.

8. The English law evidence before the Court at the hearing on 26 January 2022 is not completely accurately reflected in certain passages in the POS. I would make the following observations:

8.1. My answer recorded on page 19 of the POS (Hearing Transcript 185:2-6) relates to when the mortgagor can recover the chose in action. If the preceding sentence is intended to be a paraphrase of that answer it is not completely accurate as the answer quoted is not a reference to when the right of redemption could be exercised.

8.2. The statement at page 28 of the POS that the Debtors' equitable rights to redeem are *"future interests"* which do not give rise to present property interests is not easy to follow as a proposition of English law. I have set out above the distinction between the equitable right to redeem and the equity of redemption. The equitable right to redeem arises after the date of the contractual or legal right to redemption has passed. The equity of redemption arises on the creation or execution of the mortgage and it is not in any sense a future interest. It is a present property interest belonging to the mortgagor.  The Debtors possessed both—the equitable right to redeem and the equity of redemption—on the date they filed their Chapter 11 petitions.

8.3. At pages 19, 29, 31, 32 and 33 of the POS, FWCP refers to the equitable right to redeem or the equity of redemption triggering or being triggered. This is not an English law concept. The equity of redemption comes into existence on execution of the mortgage and the equitable right to redeem on the passing of the date for contractual or legal redemption. Neither can accurately be said to "trigger" or "be triggered" on full payment of the Secured Obligations.

9. I note that the Intermediate Lessors have also filed their own Points of Objection to Sale. The detail of that filing is outside the immediate scope of this opinion and I do not opine on it. I note that it contains similar language with respect to "triggering" of the equitable right to redeem as the POS; the comments I make in respect of that language in this opinion are equally applicable to the language in the Intermediate Lessors' Preliminary Objection to Sale. I would, however, note that the Intermediate Lessors charged/mortgaged their rights under the Sublease of the aircraft in favour of the Debtors as security for the Secured Obligations. The Debtors then charged the rights (which had been assigned to them by the Intermediate Lessors) in favour of the lenders as additional security for the Secured Obligations. The Intermediate Lessors also covenanted under clause 2 of the Deeds of Security Agreement that they would repay the Secured Obligations for which they were liable. If the proposed sale has the effect of discharging the Secured Obligations, then any liability on the part of the Intermediate Lessors in respect of the Secured Obligations will also be discharged and the purpose of the giving of security will have been fulfilled. There would be no

question of the Intermediate Lessors' rights being restored to them in some way as they will have been realised for the purposes of satisfying the Secured Obligations which was the object of the Deeds of Security Agreement.

10. It may be helpful at this point to refer to the fact that, under English law, a mortgagor can bring a redemption action. Any person who has a legal or equitable right to redeem any mortgage can seek redemption, reconveyance and delivery of possession. In a redemption action the claim is for an account and for redemption. In general, an offer to redeem out of court will have been made but there are circumstances in which a mortgagor can bring the mortgagee into court without offering to redeem, for example where:

10.1.    The mortgagor is claiming a sale instead of a redemption;

10.2.    When the proceedings are for the purposes of determining issues of construction of the mortgage deed;

10.3.    Where the mortgagee is not exercising his power of sale *bona* fide[3].

11. In relation to the circumstances where the mortgagor is claiming a sale, it is necessary to note section 91(1) of the Law of Property Act 1925 which provides, *"Any person entitled to redeem mortgaged property may have a judgment or order for sale, instead of for redemption in an action brought by him, either for redemption alone, or for sale alone, or for sale or redemption in the alternative."*

12. Section 91(2) provides that the court can direct a sale against the wishes of a mortgagee and where the sale price did not pay all of the outstanding mortgage debt[4]. The operative wording is:

*"In any action, whether for foreclosure, or for redemption, or for sale, or for the raising and payment in any manner of the mortgage money, the court on the request*

---

[3] *Cousins on Mortgages* (4th Ed.) 29-04
[4] *Cousins on Mortgages* (4th Ed.) 29-47; *Palk v Mortgage Service Funding Plc* [1993] Ch. 330

*of the mortgagee, or of any person interested, either in the mortgage money or in the right of redemption, and notwithstanding that –*

*(a) Any person dissents; or*

*(b) The mortgagee or any person does not appear in the action;*

*and without allowing any time for redemption or for payment of any mortgage money, may direct a sale of the mortgaged property on such terms as it thinks fit. Including the deposit in Court of a reasonable sum fixed by the Court to meet the expenses of sale and to secure performance of the terms."*

**The Secured Obligations Point**

13. In respect of the Secured Obligations the following points are made to develop FWCP's point that the proposed sale will not enable the security provided by the Debtors to be redeemed.

14. This can be seen in the following sections of the POS.

14.1.      Page 17 – *"The Sale Motion is only to pay the outstanding amounts of the secured loans, plus all accrued but unpaid interest, payment of indemnification and out-of-pocket expenses, and a cash payment of $5 million for JPL".*

14.2.      Page 20 – *"The Debtors clarified that the Purchase Price would not provide full and final satisfaction of the Secured Obligations...and* [did] *not include any claims that do not constitute outstanding principal, accrued interest, or reasonable fees, costs or charges owed by the Debtors under the applicable transaction documents and allowed by the Bankruptcy Code".*

14.3.      Page 24 – the claims made in the English Proceedings are described and FWCP states *"Finally, costs awarded in the English Proceedings will only be determinable at the end of those proceedings and may include amounts in respect of future elements of the English Proceedings over the coming years which are not knowable at all at present...and FWCP, as Security Agent, cannot release the property interests it holds in the Collateral <u>until these claims are addressed and the amounts owed as damages for each of the above-listed causes of action, together</u>*

<u>*with all fees and costs associated with pursuing these claims are paid in full*</u>"
[emphasis added].

14.4.       Page 31 – referring to the Debtors' argument that the equity of redemption
will *"trigger at the Closing of the Sale"* and describing it as *"fatally flawed"* because
*"the amount of the Purchase Price listed in the Stalking Horse Term Sheet,
$207,741,763.53 is woefully insufficient to pay off the Secured Obligations...the
definition of Secured Obligations makes it clear that it includes much more than the
Purchase Price is intended to cover...and must necessarily include the amounts* [the
Obligors] *are liable to FWCP for breaches of the Transaction Documents as detailed
in the English Proceedings"*.

15. In every case of a mortgage, the terms of redemption in equity are imposed on the
parties *ab extra* by the settled custom of the court which regulates every mortgager
contract. Accordingly, if property is transferred with the object of providing security
and with the intention that it should be restored to the mortgagor, it is not competent
for the parties so to frame their bargain that the mortgagee has a right under its terms
to obtain an absolute title to the property overriding the equity of redemption[5].

16. Equity, therefore, interferes directly with freedom of contract between mortgagor
and mortgagee[6].  Courts of equity had jurisdiction to relieve mortgagors against
restrictions or fetters placed in agreements on the legal and equitable rights to
redeem imposed by special covenants in mortgage deeds. The rules applied by the
courts could be summed up in the maxim "*once a mortgage, always a mortgage*"[7]. The
mortgagee is not permitted to include any term or requirement in the mortgage
transaction which prevents the mortgagor getting back that which he had
mortgaged[8].

17. However, parties are free to make what bargain they like subject to the protection
extended by the court to a mortgagor through the special equitable rules safeguarding

---

[5] *Cousins on Mortgages* (4th Ed.) 29-04
[6] *Cousins on Mortgages* (4th Ed.) 29-05
[7] *Kreglinger v New Patagonia Meat and Cold Storage Co Ltd* [1914] AC 25 at 36-7
[8] *Cousins on Mortgages* (4th Ed.) 29-07

the right to redeem[9]. A key rule is that a mortgage must be redeemable. A mortgage must not be framed so as to render the security unredeemable; the right to redeem cannot be circumvented by a provision which, while not extinguishing the equity of redemption, has the result of making the right to redeem nugatory. Accordingly, any condition in a mortgage is invalid if its effect is to vest the security absolutely in the mortgagee on any event whatsoever.

18. Equity grants relief against penalties in all kinds of contracts, but in the case of mortgages there is the added consideration that such covenants are designed or calculated to render redemption more difficult and are, therefore, clogs on the equity of redemption[10].

19. A stipulation which is a term of a mortgage and secures to the mortgagee an advantage outside his principal, interest and costs is invalid if it (i) defeats or renders illusory the right to redeem, (ii) clogs or fetters the equity of redemption[11]. After the last repeal of the laws against usury in 1854, the approach of courts of equity modified somewhat transactions which provided for a collateral advantage. In my first opinion I referred to the important case of *Kreglinger* at pages 86-7.  The head note of that case states:

> *"There is now no rule in equity that a mortgagee cannot stipulate in the mortgage deed for a collateral advantage to endure beyond redemption, provided that such collateral advantage is not either (1) unfair and unconscionable, or (2) in the nature of a penalty clogging the equity of redemption or (3) inconsistent with or repugnant to the contractual or equitable right to redeem".*

20. The position under English law post-repeal of laws against usury is set out in the following cases:

---

[9] *Cousins on Mortgages* (4th Ed.) 29-08
[10] *Cousins on Mortgages* (4th Ed.) 29-18
[11] *Cousins on Mortgages* (4th Ed.) 29-21

20.1.     *"I think, as I ventured to say in <u>Noakes v Rice</u> that equity will not permit any device or contrivance designed or calculated to prevent or impede redemption."* Per Lord Macnaghten *Bradley v Carritt* [1903] AC 253.

20.2.     *"Laying aside the usury laws and all rules to prevent their evasion, and laying also aside all considerations of fraud, undue influence, oppression, and illegality on other grounds, I am not aware of any authority which invalidates a contract between a mortgagor and a mortgagee unless it affects or purports to affect the property mortgaged, or the right to redeem it. Any contract which does that has always been held invalid in equity, and must now be treated as invalid by all Courts. The restoration of the mortgaged property to the mortgagor on performance of the obligation to secure which it was mortgaged is the grand object which Courts of Equity have always steadily kept in view and insisted on, all agreements to the contrary notwithstanding. ...But beyond that I am not prepared to go. I cannot bring myself to believe that it is part of the law of this country that mortgagors and mortgagees cannot make what bargains they like with each other so long as such bargains are not inconsistent with the right of the mortgagor to redeem the property mortgaged by discharging the debt or obligation to secure which the mortgage was effected."* Lord Lindley *Bradley v Carritt* [1903] AC 253 at 278.

20.3.     *"The position of a mortgagee of land whether freehold or leasehold is well established. In equity the right of the mortgagee is limited to the money secured and he holds the land only as security for his money, therefore although he has the legal estate in the land, yet in equity he has a mere charge for the amount due to him. In equity the mortgagor is regarded as the owner of the mortgaged land subject only to the mortgagee's charge, and the mortgagor's equity of redemption is treated as an equitable estate in the land of the same nature as other equitable estates. Moreover no agreement between the parties that the mortgage should not be redeemable has any effect in equity, and any attempt to fetter the equity of redemption with any other condition than the payment of the money secured is null and void."* <u>Re Sir Thomas Spencer Wells, Swinburne-Hanham v Howard</u> [1932] Ch 29.

20.4.    In *Cityland and Property (Holdings) Ltd v Dabrah* [1968] Ch 166, the above principles were considered in the context of a loan of £4,553 to enable the defendant to pay £2,900 to complete the purchase of a house. The loan was secured by mortgage. The premium over and above the sum necessary to complete the purchase was £1,653. The judge held that the mere fact the premium was a collateral advantage would not enable the defendant to avoid the term. He held that the defendant could succeed if the collateral advantage in that case was *"'unfair or unconscionable' or, to use the language used in Halsbury's Laws of England 'unreasonable'; and I therefore have to determine whether it was or not"* – see page 180. The Judge considered that the effective interest rate over the loan constituted by the premium was excessive. He also considered that the premium relative the value of the actual loan and the value of the house was such that it *"forthwith destroyed the whole equity and made it a completely deficient security. If default were made, and all that had been secured was the principal and interest, it was likely that on any exercise of the plaintiff's powers as mortgagees, there would be a surplus for the mortgagor, but this premium destroyed any possibility of that, and it also made the security which was offered deficient. For these reasons, in my judgment this was reasonable, and, on the equity as now defined in* [*Kreglinger*], *I can and ought to interfere."* – see page 181. The mortgagee could only enforce payment of the principal sum advanced, with interest, after bringing into account the instalments already paid.

21. It is in the light of these principles that the terms of the Security Assignments and FWCP's contentions as to how they apply have to be considered. If it can be argued that those terms are either (1) unfair and unconscionable or to use the language used in Halsbury's Laws of England "*unreasonable*", or (2) in the nature of a penalty clogging the equity of redemption, or (3) inconsistent or repugnant to the contractual or equitable right to redeem, then they will be held to be invalid and of no effect.

22. The Debtors were the borrowers under the Senior and Junior Facility Agreements (together, the "Facility Agreements") pursuant to which funds were advanced to enable them each to buy an Airbus A350.  Pursuant to the terms of the facility

agreements, the Debtors promised to repay the loans in instalments on each Repayment Date.

23. To secure the debt, the Debtors entered into, among other agreements, Deeds of Security Agreement (the "Security Agreements") with Credit Agricole as the Security Agent. Clause 2 of the Security Agreements contained a covenant by each Debtor to pay *"the Secured Obligations for which it is liable in accordance with their respective terms"*. This promise was subject to the limitation of recourse provisions in the Facility Agreements. Clause 3 of the Security Agreements assigned the Assigned Property (as defined) *"by way of security with full title guarantee...to the Security Agent...as security for the payment and discharge of the Secured Obligations"*.

24. The Secured Obligations are defined as *"all and any moneys, liabilities and obligations (whether actual or contingent, whether now existing or hereafter arising, whether or not for the payment of money and including without any limitation, any obligation or liability to pay damages) from time to time owing to any of the Finance Parties by any Obligor pursuant to any Transaction Document notwithstanding that the recourse of the Finance Parties against any person may be limited"*. Finance Parties are defined as "the Lenders, the Security Agent, the Senior Agent, the Mandated Lead Arranger, the Hedging Counterparty and the Account Bank". The Obligors are defined as "the Borrower, the Borrower Parent, the Intermediate Lessor and the Intermediate Lessor Parent. The Transaction Documents are defined widely and include the following documents:

24.1.    The Senior and Junior Facility Agreements;

24.2.    The Proceeds Agreement;

24.3.    The Security Documents;

24.4.    Each Fee Letter;

24.5.    The Funding Indemnity Letter;

24.6.    the Lease Agreement;

24.7.    the Head Lease Agreement;

24.8.    the Aircraft Purchase Agreement;

24.9.    the Bill of Sale;

24.10.    the Service Agreement;

24.11.      the Hedging Agreement;

24.12.      the Lease Management Agreement'

24.13.      the Borrower Parent Letter;

24.14.      the Intermediate Lessor Parent Letter;

24.15.      the Borrower Security Assignment;

24.16.      the Intermediate Lessor Assignment.

25. The range of documents, Obligors and Finance Parties makes it clear that the financial obligations purportedly secured by clause 3.1 of the Security Agreements are significantly more extensive than each Debtor's covenant to pay in clause 2 of the same document. In clause 2 the promise of each Debtor is confined to the Secured Obligations for which each of the Debtors was liable.

26. Additionally, the effect of clause 3.1 is that the mortgage or charge of each Debtor's assets purportedly secures liabilities for which the Debtors are not, themselves, liable because they are liabilities of (i) the parent company, (ii) the intermediate lessor parent company, (iii) the intermediate lessors.

27. The effect of clause 3.1 is, on FWCP's case, that before the Debtors can redeem the Security Agreements and recover the property assets in which they have their equity of redemption, they must pay off liabilities of third parties as if they were guarantors.

28. The effect of clause 3.1 is that FWCP obtains a collateral advantage by the mortgage pursuant to which it can refuse to reconvey the mortgaged property until the Debtors have paid not only their own debts but also the debts of third parties.  Those are debts of which the Debtors may have no knowledge and over the existence or amount of which the Debtors have no control. They are very widely defined and cover obligations which did not exist as at the date of execution of the Security Agreements.

29. In my opinion, it is arguable that the terms of clause 3.1 of the Security Agreements are such to provide a collateral advantage over and above security for the sums advanced to the Debtors. They also, on the basis of the contentions in the POS, provide for a substantial and currently incalculable additional payment by the Debtors as mortgagors before they can seek a reconveyance of their assets pursuant to clause 7

of the Proceeds Agreement. This is graphically illustrated by the reference in the POS at page 32 to the fact that the Purchase Price payable in respect of the proposed sale of $207,741,763.53 which is calculated by reference to outstanding amounts of the secured loans, all accrued but unpaid interest, indemnification and out-of-pocket expenses is *"woefully[12] insufficient to satisfy the Secured Obligations"*.  I understand that the deficiency referred to by FWCP is principally the product of (i) claims made in proceedings brought by FWCP before the English High Court and (ii) substantial increases in administration charges levied by FWCP (by a notice dated 21 January 2022 claiming to have retrospective effect) in its capacity as the Security Agent in succession to Credit Agricole. As to (i) at this stage these are no more than claims asserted by FWCP against parties other than the Debtors.

30. The question is whether the collateral advantage or extra payment demanded for redemption can be said to be "reasonable" or in other ways to offend against the requirements of equity set out above.

31. It is, in my opinion, well arguable that the effect of clause 3.1 of the Security Agreements is, purportedly, to require (i) a collateral advantage in the form of a secured guarantee of third party liabilities and (ii) additional payments in respect of those liabilities. In my opinion, it is also arguable that this impedes and restricts the Debtors' ability to redeem the Security Agreements and to exercise the right to redeem which is a component part of their equity of redemption.

32. It appears that the whole basis of FWCP's objection is designed and calculated to impede/frustrate the Debtors' right to redeem and to assert a case on the basis that any equity that there may be in the Debtors' assets can be destroyed by the additional and as yet unquantified payments which FWCP maintains are due.

33. FWCP has commenced proceedings in London for unliquidated damages:

33.1.     Breaches of clauses 3.1.3 and 10.2.3 of the Proceeds Agreement and clauses 1(b) and 1(d) of the Borrower Parent Letter which relate to the initiation of the Chapter 11 proceedings;

---

[12] The adverb "woefully" is used in other parts of the POS – e.g. page 31

33.2.    Breaches of clause 11.3.23(a) of the Proceeds Agreement relating to allegedly defamatory statements constituting anti-social conduct which are said to be covered by that clause;

33.3.    Conspiracy and unlawful interference with FWCP's business;

33.4.    Costs to be assessed at the end of the proceedings at some unspecified future date.

My understanding is that these claims were commenced on 20 January 2022.

34. The commencement of proceedings against parties other than the Debtors in which unliquidated losses and future costs liabilities which are impossible to calculate or provide is, if FWCP is correct about the effect of the Security Agreements, a strategy which has as its object to prevent the Debtors from redeeming for an indefinite period of time. Further, it appears to amount to a refusal to accept payment of the sums which the mortgage was intended to secure at the date of its execution.

35. On the basis that the scope of the Secured Obligations and the provision that their payment is a pre-condition for redemption is liable to be considered invalid and of no effect. In that case, there would be no obstacle to redemption on the basis of the payment of (i) principal, (ii) interest and (iii) reasonable costs reasonably incurred.

36. I have not, for the purposes of this opinion, considered the substance of the London claims and whether the claim based on allegedly defamatory statements can properly be said to constitute a breach of clause 11.3.23(a) of the Proceeds Agreement or can properly be considered defamatory.

**The Administration Charges Point**

37. FWCP took over from Credit Agricole as Security Agent in December 2021. In January 2022, after the Debtors commenced the Chapter 11 proceedings, FWCP gave notice of its intention to charge administration expenses, including of Management time, which is purportedly being charged at daily rates announced in letters (sent on 21 January

2022 rather than the date when FW succeeded as Security Agent) of $50,000 for co-founders, $20,000 for partners and $10,000 for non-partners.

38. FWCP contends that the amount necessary to redeem the Security Agreements is being increased at this new burn rate, in addition to its argument in the POS based on the excess of the Secured Obligations over the Purchase Price.

39. No attempt is made to justify this cost which is significantly more than what I understand was previously charged by Credit Agricole when it was Security Agent (equal to $10,000 per annum for JPA No. 111 and $15,000 per annum for JPA No. 49). Mr Shah QC observed in his Reply Opinion that the Transaction Documents do not qualify FWCPs administration costs as having to be reasonable.

40. In my view, it is highly unlikely that an English Court would permit costs which are considered to be unreasonable in amount or unreasonably incurred to be added to a security.

41. In *Gomba Holdings v Minories Finance* [1993] Ch 171, the Court of Appeal stated that the principle that a mortgagee can recover and add to the secured debt costs, charges and expenses properly incurred is embedded in the law (page 184-5).  The question was whether charges or expenses which have been unreasonably incurred or which are unreasonable in amount could be recovered by a mortgagee. As a matter of construction the court held that the particular instruments did not entitle the mortgagees to such charges and expenses.

42. The Court stated at page 187 *"It is difficult to contemplate that a mortgage deed would ever be construed as entitling a mortgagee to charge against the mortgaged property, or to require the mortgagor to pay all costs, charges and expenses even if improperly or unreasonably incurred or improper and unreasonable in amount unless the mortgage deed expressly in terms so provided. But if a mortgage deed did expressly so provide, the enforceability of such a provision would, in our opinion, be open to serious question on public policy grounds"*.

43. This statement is *obiter* as the Court held that on their true construction, the relevant agreements did not provide for the mortgagor having to pay costs which had been unreasonably incurred or which were unreasonable in amount. However, it indicates that where, as here, management fees have been unilaterally fixed and imposed on the Debtors to increase the amounts payable before redemption can take place, an English Court will be minded to avoid any provision which appears to permit this to be done. The FWCP Security Agent charges appear unreasonable on their face and in comparison with those charged by Credit Agricole. In the circumstances of FWCP's unwillingness to allow the Debtors to redeem the Security Agreements, the level of charges appears calculated to increase the amounts to be paid on redemption unreasonably. If the terms of the Transaction Documents allow this, those terms would, in my opinion, be at risk of being considered unreasonable and as an impediment or clog to redemption.

**FRANCIS TREGEAR QC**
XXIV – 24 Old Buildings,
Lincoln's Inn
London
23 February 2022

**LONDON**
Lincoln's Inn
London WC2A 3UP, UK
**Tel:** +44 (0)20 7691 2424
**Fax:** +44 (0)870 460 2178
teama@xxiv.co.uk

**GENEVA**
16, rue de Candolle
1205, Geneva
Switzerland
**Tel:** +41 (0)22 328 1313
**Fax:** +41 (0)22 320 4109



*"Insightful, user-friendly and very astute." "Solid and unflappable."*
— Chambers & Partners 2021 (UK and Global)

# Francis Tregear QC

## Call: 1980 | Silk: 2003

francis.tregear@xxiv.co.uk

Francis is a very experienced silk regarded as a **"Intellectually adept, a pleasure to deal with, prompt with advice, navigates complexity and is very user friendly"** in relation to his expertise in a number of areas.

He is valued for his comprehensive and detailed understanding of the commercial and financial issues and realities affecting his clients. He is acknowledged as an extremely effective advocate in court as well as on paper. This has made him a popular choice for all types of business disputes and civil fraud claims involving complex issues of fact, law and forensic accountancy.

A very significant proportion of his work is international in nature and he has a sterling reputation for his international expertise. He has acted and advised in many offshore jurisdictions including the Cayman Islands, BVI, the Bahamas, Bermuda, Guernsey, Gibraltar, Cyprus and the Isle of Man. He is called to the Bar of the Eastern Caribbean. His pre-eminence in multi-jurisdictional disputes involves him in strategy, interim remedies including freezing injunctions, conflicts of law, asset tracing and recovery.

Notable cases include;

- The Public Institution for Social Security v Al Rajaan and others (2021)
- St John Trust Company (PVT) Limited v Medlands & Others (Bermuda) (2021)
- JSC Aeroflot v Berezovsky and others
- Mezhdunarodniy Promyshlenniy Bank v Pugachev
- Herald Fund SPC (Cayman) and Privy Council
- BTU Power Co (Cayman) and Privy Council
- Janus Capital Management v Safeguard World International
- North Shore Ventures v Anstead Holdings & Ors
- Spreadex v Sekhon
- Spreadex v Kemsley
- Byblos International Fund LLC v IFX Markets
- Camerata Property Inc v Credit Suisse
- Torre Asset Funding v Royal Bank of Scotland
- Valiance Fund v Cheyne New Europe Fund (Cayman)
- Lemos v Coutts Cayman (Cayman)
- Bank of Butterfield Bermuda v Murphy (Bermuda)

# Arbitration

Francis is frequently involved as advocate on arbitrations administered by arbitral institutions including the ICC and contractual and ad hoc contractual agreements. Arbitration work is by its nature confidential but the following details give an indication of the types of arbitration in which he becomes involved:

**ICC arbitration between major telecommunication multi-national and US equity fund:** The claim related to a guarantee liability in relation to the construction and fitting out of an office development in Moscow (Seat London, Russian law).

**Arbitration for the Coal Authority:** (Seat London, English law) A substantial arbitration which related to the compensation obligations in respect of land with development potential which had been the subject of opencast mining and post-opencast restoration.

**Various arbitrations for British Coal:** (Seats London, English law) including a dispute as to the valuation formula in an overage contract. The case involves a complicated series of issues relating to the calculation of open market value.

**Arbitration concerning major housing developer:** (Seat London, English law). The dispute concerned the degree to which the developer had to inform a seller about the advisability of the seller securing a right of way over the land being sold.

## Banking and Financial Services

The Legal 500 2020 describes Francis as **'Very strong and very easy to work with from a client perspective'**. Chambers & Partners says "Francis is a very smart man and a real pleasure to work with. He is confident at all levels of the court system and a very effective advocate." He also has very considerable experience of work involving capital markets and derivative products, as recognized in the licensing section of Legal 500 (see the "hedge fund and structured investment vehicle" section in his profile).

His work is mostly contentious but does include non-contentious advisory work. Contentious work has included disputes over structured products, contracts for differences, spread bets, options and other derivatives relating to financial, foreign exchange(and, to a lesser extent, sporting) markets.

Notable and recent cases have included the following:

**Torre Asset Funding v Royal Bank of Scotland:** The Claim arose out of structured lending to a property company and was brought against RBS as the Agent, lender, equity participant and Security Trustee as well as being responsible for creating the structure. The claim was for negligent advice provided by Credit Suisse in respect of the Issuer.

**Camerata Property Inc v Credit Suisse [2011] EWHC 479 (Comm):** The claim arose out of a US$12m 5 hear auto-redemption note issued by Lehmann Brothers. This case involved a claim of negligent advice provided by Credit Suisse in relation to a structured credit product and the terms of the contract.

**Spreadex v. Barnes:** a £2.4m claim by a spread betting company against a debtor in which there were issues as to the debtor's liability for an account that was not in his own name.

**Spreadex v Kemsley:** claim by a spread betting company for payment of c. £6.5m under a number of spread bets. The defendant took numerous points of contractual construction as well as relying on UCTA.

**Spreadex v Sekhon:** important case dealing with FSA rules and the scope and effect of section 150 of FSMA 2000 – [2008] EWHC 1136. The claim raised issues relating to breach by Spreadex of Regulatory obligations and contributory negligence by the spread better.

**Byblos International v IFX Markets Ltd EWHC 346:** Claim by a foreign exchange broker against IFX Markets which the broker alleged had underpaid it in relation to transactions by customers introduced under the brokerage. The claim involved detailed consideration of forex transactions and interpretation of the brokerage contract.

**Various film financing schemes:** Francis has been involved in a number of cases involving group litigation relating to tax-driven film financing schemes that failed to deliver the promised tax breaks. The schemes included **Evolution**, **Take** and **Tower**.

## Civil Fraud, Asset Tracing & Recovery

Francis has very broad experience relating to the tracing and recovery of assets fraudulently obtained. He has acted for liquidators and individuals seeking to recover assets from directors in a number of different contexts, generally involving fraud. He also acts for defendants and has successfully defended claims of fraud made against clients both on the merits and on the basis of challenges to the court's jurisdiction.

For example:

**The Public Institution for Social Security v Al Rajaan and others** – this is a massive multi-defendant (c 40) fraud claim arising from bribes which are alleged to have been paid by various UK, Swiss and Liechtenstein financial institutions and intermediaries. The claims total US$900,000,000. Francis acts for Banque Mirabaud & Cie SA. At first instance, Francis successfully challenged the jurisdiction of the English court – [2020] EWHC 2979 (Comm). The case has just been heard in the Court of Appeal and judgment is awaited.

**Aeroflot Claim:** In this claim Aeroflot alleged that it had been defrauded of over US$200m in overflight payments paid by international airlines. Aeroflot alleged that a complex network of companies had been used to take control of Aeroflot's central treasury function and enable overflight payments to be misappropriated through bogus lending. Francis acted for companies ncorporated in Luxembourg, Switzerland, Cyprus and the BVI which had been formed by Boris Berezovsky and Nikolai Glushkov. Francis successfully challenged the claims against the Swiss and the Cyprus companies. Aeroflot's appeal was dismissed [[2013] EWCA Civ 784.

The claims against the Luxembourg and the BVI company proceeded in London. Forensic accountancy evidence showed that the claims by Aeroflot were political and baseless. Aeroflot discontinued its claims on the first day of the trial. Francis' clients were awarded indemnity costs [2018] EWHC 1735 (Ch).

**Mezhdunarodniy Promyshlenniy Bank v Pugachev [2015] EWCA Civ 139** – Francis acted for Sergei Pugachev who was a politically exposed Russian oligarch then living in London. The state-appointed liquidator of the Russian bank claimed the deficiency in the liquidation pursuant to Russian insolvency law. The claim exceeded US$1Bn. Over two years Francis acted in hard-fought proceedings in relation to extensive WFOs obtained by the Claimant A very important point of law as to the scope of a worldwide freezing order in relation to interests under a discretionary trust was considered by the Court of Appeal.

**MG Fabrications:** Francis acted for Lloyds Register in relation to major (and ambitious) fraudulent trading claim made against Lloyds Register by the liquidators of a ship-building company. The liquidators alleged that fraudulent certificates had been issued. After a hard-fought pre-trial defence, the claimant liquidators abandoned the claim.

**BTA Bank:** Francis acted for various BVI companies who were alleged to have been used as conduits to move money stolen from the claimants.

# Commercial Litigation

Francis has extensive commercial litigation experience covering a wide range of areas including:

- Fund and banking litigation
- Company and business disputes
- Forex and other derivatives
- Trust disputes
- Conflicts of law disputes
- Sports disputes

He is recommended for commercial dispute resolution by Chambers & Partners who have referred to him as a **"quick thinking silk on the rise"**.

Some of his recent cases include:

**Public Institution for Social Services v Al Rajan** – see above

**Janus Capital Management v Safeguard World International** – this case raised complex issues of contractual interpretation in the context of forex accounting.

**North Shore Ventures v Anstead Holdings & Ors:** This was a claim made by a company which had been incorporated by Boris Berezovsky for the purpose of a loan transaction to a Russian associate. The case raised an important points in relation to frustration of contracts and the duties of disclosure in guarantee contracts. It also dealt with issues relating to certification of indebtedness in guarantee contracts. These issues were considered by the Court of Appeal and that judgment remains major authority in this area. (Francis wrote an article on a significant new authority which cited North Shore in the Journal of International Banking and Financial Law in October 2018.)In the process of execution there was also an important judgment on whether cross-examination of judgment debtors on assets should be heard in private. A further issue arose as to the disclosure obligations of beneficiaries of discretionary trusts which was dealt with by the Court of Appeal.

**Camerata Property Inc v Credit Suisse:** This case concerned complex structured credit products and the terms of the contracts on the basis of which advice was given by Credit Suisse.

**Aeroflot v Forus Holdings and others (2018):** This is dealt with in more detail above. Aeroflot sued the Forus group of companies for over US$120,000,000 which was allegedly misappropriated in the course of providing finance for Aeroflot. The claims were resisted on the basis that the English Court did not have jurisdiction over some of the defendants which succeeded for some of the defendants. In 2018, when the matter came on for trial in 2018 Aeroflot discontinued its case at trial.

**Hedge fund disputes:** Francis has acted in contentious and non-contentious clients in relation to hedge funds including **CPIM SCF**, **Weavering**, **La Fayette**, **Bear Stearns**, **Matador**, **Torre Asset Funding** and **Valiance** amongst others.

**Lehman Bros:** Francis acted for equity funds seeking information from the administrators of Lehman Bros which held US$400m of assets as collateral for prime brokerage in the immediate aftermath of the collapse of the bank.

**Film financing scheme disputes:** Francis has been involved in a number of claims resulting from supposedly tax efficient film finance schemes such as Evolution, Tower and Take. These are complex group actions involving claims based on breach of trust, breach of contract, misrepresentation, professional negligence, faulty tax advice and execution of schemes, breach of schemes as well as regulatory aspects.

**Bermudian trust dispute – Butterfield Bank:** Francis acted in relation to a large number of valuable discretionary trusts which had been established in the 1960s and in relation to which major issues arose as to the validity of the appointment of the trustees. This had particular significance as the trustees had restructured the trusts to make them more tax efficient before the issue as to their authority to act arose. Francis advised the trustees over many years and a number of hearings in Bermuda in the course of which the constitutional issues were all resolved.

**AMG Global v Africa Resources:** This was high profile trial between representatives of Mugabe's regime and a Zimbabwean businessman concerning the rights over bearer share warrants for two English companies which owned very substantial Zimbabwean asbestos mines. The case is important in relation to issues relating to unlawful assistance for purchase of shares under the former s151 Companies Act which was considered by the Court of Appeal on the other side's unsuccessful appeal.

**Spreadex:** various high value cases for a spread betting company called Spreadex including the **Sekhon** case– the client was held 85% contributorily liable as the decision to keep positions open was driven by him and he was not inexperienced) and its claim against the Icelandic **Landesbank**.

**Formula 1 disputes:** Francis has dealt with a number of cases for Jordan Grand Prix such as their claim against Vodafone and against Tiger Telematics. He has also dealt with a number of disputes relating to the Force India Formula 1 team including **Force India v Etihad** [2010 CA], **Van der Garde v Force India [2010] EWHC 2373** – an important case on termination by repudiatory breach and remediability of breaches of contract.

**BTA Bank:** Francis acted in relation to claims against various BVI companies which were alleged to have been used as conduits for significant sums of money.

**Savannah Consulting v Mintley:** This was a derivative claim brought for a company in relation to the sale of an asset at an undervalue. Francis obtained a freezing order in Gibraltar and successfully resisted an attempt to strike out the claim.

---

# Company

Francis is recommended in this area in Legal 500 2020 **'Intellectually adept, a pleasure to deal with, prompt with advice, navigates complexity and is very user friendly.'** High profile disputes relating to shareholder disputes and share valuations form a major part of his practice. He also has considerable experience of hedge fund related company work (see the "Hedge fund and structured investment vehicles" section of his profile).

Francis has in addition been involved in company proceedings in Cyprus and the Channel Islands and a complex restructuring of the assets of various international companies in order to permit distribution through a trust structure in the Cayman Islands.

Francis is and has been involved in a large number of hedge fund related disputes such as:

**Herald Fund SPC:** This was a very long-running and complex liquidation in Cayman. Herald Fund was one of the biggest investors in Bernard L Madoff Investment Services BLMIS. It involved complex and novel issues under the Cayman Companies Law as well as significant liaison with lawyers in New York acting in the Madoff bankruptcy. Francis acted for the Additional Liquidators of Herald Fund which was one of the largest Madoff feeder funds. The case raised issues as to the effect of provisions of the Cayman Companies law relating to

redemptions and rectification of the share register in the exceptional circumstances of the liquidation of BLMIS in New York. The case involved hearings in the Grand Court and the Cayman Islands Court of Appeal and the Privy Council.

**Kathrein v Camulos:** this case was heard in the Cayman Islands Court of Appeal and concerned the interpretation of the articles and whether it was open to investors to petition to wind up the fund on the just and equitable basis.

He has also acted in funds cases involving **Valiance**, **Torre Asset Funding**, **Matador**, **CPIM SCF**, **Weavering** and **La Fayette**, further details of which can be found in the "Hedge funds and structured investment products" section of his profile.

Some other recent examples of his cases are set out below:

**North Shore Ventures v Anstead:** Although the principal matter in this case related to the disclosure obligations owed by a creditor to a guarantor it also involved issues relating to bearer shares and new legislation immobilising bearer shares in the BVI.

**Camber 3 PLC:** This was a claim for US$24m. There was alleged breach of collateral management agreement. CPIM was said to have bought securities which were not eligible for a particular fund.

**AMG v ARL:** Francis acted for ARL (a BVI company owned by a high profile Zimbabwean/South African businessman) in a dispute with AMG (which was a nominee for the government of Zimbabwe) as to the rights over bearer share warrants for two English companies which owned very substantial Zimbabwean asbestos mines. The case turned on the true construction of the US$60,000,000 purchase agreement for the bearer shares and related security documentation. The Government of Zimbabwe also unsuccessfully argued that the purchase agreement was void pursuant to section 151 Companies Act 1985 on the grounds of unlawful financial assistance. Evans- Lombe J held that section 151 was not breached because any financial assistance was given by an offshore subsidiary in accordance with local law. This finding was upheld by the Court of Appeal.

**Davenport v Cream Holdings:** Francis acted successfully for an outgoing shareholder in relation to the company's compulsory share-transfer provisions.

**Savannah Consulting v Mintley Investments Ltd:** A derivative action brought by a shareholder in the Gibraltar courts for Canadian $12.5m.

---

# Hedge Funds & Structured Investment Vehicles

Francis's practice in relation to hedge funds and structured investment vehicles ensured his involvement in major disputes when the current global financial crisis first arose in 2007 and 2008. This means that he has advised on and been involved in litigation relating to a range of issues which have affected funds and their managers as the crisis has developed and worsened.

In 2007 he was advising funds in relation to the power to manage redemptions generally either consensually by agreed lock-ups and variation of class rights or by imposing gates. The objective was to use the articles of association to ensure that a balance was struck between redeeming and non- redeeming investors. This involved advising on restructuring and litigation in the Grand Court in Cayman on the imposition of gates.

After the crisis in 2007 and 2008, Francis became involved in litigation in Cayman relating to the liquidation of **Bear Stearns** funds and conflicts of interest in service providers to funds.

From 2008 onwards, Francis has been involved in advising funds on questions relating to powers of suspension, orderly wind-downs and powers to redeem compulsorily during suspension. He has also been involved in litigation relating to the scope of the Court's power to wind up funds on the just and equitable basis – e.g. **Camulos Partners Offshore Ltd (Court of Appeal Cayman 2010)** in which he successfully appealed an order and got a winding up petition struck out and more recently Herald Fund SPC in Cayman which is dealt with in more detail above.

Other cases he has dealt with include:

**Torre Asset Funding:** A hedge fund invested in a property portfolio by way of syndicated loan. RBS had the top US$500m layer which was securitized and protected by a credit default swap. However, RBS also acted in a number of different capacities including as agent for the lenders. It is alleged that RBS should have told other lenders of indications that the underlying borrower was running out of cash and needed restructuring.

**Valiance:** A hedge fund (A) invested in another hedge fund (B). The case relates to the terms of the offer memorandum and whether it failed to disclose a structural and serious conflict of interest. The claim relates to the losses caused to (A) by the failure to make proper disclosure

of conflict in relation to a key asset held by (B).

**Camerata Properties** – see above

**Matador:** This dispute concerns whether there was a valid gate on redemption as a result of an investor being bound by the articles after being enticed into investing on the basis of some particular representations.

---

# Insolvency

Praised in Legal 500 for his "excellent advice", Francis Tregear has a long-established insolvency practice. His time has very largely been devoted to acting for the Additional Liquidators of Herald Fund SPC. This was one of the largest Madoff feeder funds. The case raised particular issues relating to the priority of redeemers in a fund investing in a Ponzi scheme. It also raised issues relating to the liquidator's power to rectify the share register where a fund's NAV has been fraudulently misstated. This was a power which had not previously been considered by the Cayman Islands courts. Francis was involved in this litigation which went to the Privy Council in relation to redeemers for many years until it concluded in 2018.

Other recent cases include:

**BTU Power Company** – Francis acted for the Joint Official Liquidators of this Cayman liquidation. His involvement included cross examining a director in the USA, acting in relation to over US$40,000,000 of proofs submitted by various entitles connected with the director and a claim that the orders made in the liquidation should be set aside because of the apparent bias of the Judge hearing the case in Cayman. This issue went to the Privy Council and judgment was handed down in early 2018.

**Camulos Partners LLP:** winding up petition in the Cayman Islands. Leading case as to the correct approach to redemption in specie and the limits of just and equitable petitions in Cayman law after the Strategic Turnaround Master Partnership case.

**Matador:** liquidation of a multi-million dollar fund in the Cayman Islands. This dispute concerned the validity of a gate imposed on redemptions and whether the gated redeemers could validly seek to wind up the company on the just and equitable ground.

**Emirates International Investment:** A fraud concerning a sovereign investment fund. The central allegation is that consultancy charged to EIIC were fraudulently charged (and paid). The principal legal issue is whether the liquidation of the company which was commenced as a voluntary liquidation by its owners and directors (and which was continued as an insolvent liquidation) should be terminated under BVI insolvency law.

**Polygon Opportunities Global Fund:** Just and equitable winding up petition which was discontinued following a settlement.

**North Shore Ventures v Anstead Holdings & Ors:** law relating to bearer shares, migration from the BVI to Nevis and St Kitt's and the nature of the dissolution of a Nevis Trust Foundation.

**In re Lehman Brothers (Europe) (in administration) v. Four Private Equity Funds [2008] EWHC 269**

**Take film investment scheme:** This multi-party litigation has been complicated by the fact that the promoters of the Take scheme (Teather and Greenwood) were owned by Landsbanki whose insolvency delayed claims which had to be met by insurers.

---

# International & Offshore

Francis Tregear is a member of the Bar of the Eastern Caribbean Supreme Court. He has conducted litigation in The British Virgin Islands and The Cayman Islands and has also been involved in an advisory capacity in proceedings in Guernsey, Jersey, The Isle of Man, Cyprus and Gibraltar . Chambers and Partners rank Francis in the Offshore section for 2020. In 2020 and 2021 he has appeared in the courts of the BVI ( Court of Appeal), Bermuda (Supreme Court and Court of Appeal), the Bahamas (High Court)

2021 – Francis appeared on behalf of Kobre & Kim in successfully discharging a gagging injunction in relation to a judgment given in Norwich Pharmacal proceedings in the BVI. The injunction was made personally against the target company's lawyers

St John Trust Company (PVT) Limited v Medlands – Francis acted for a discretionary of a multi-billion trust. He appeared at the hearing of the appeal which was successful. Further, the Court of Appeal appointed a new trustee on the basis of the argument advanced by Francis on behalf of his client. The appointment of the new trustee was subsequently formalised by the Supreme Court. The appeal involved complex trust law which were made more complex by reason of the fact that one of the other beneficiaries had been indicted in the US for tax fraud and the US Department of Justice sought to intervene.

Bahamas – trust matter involving a Chinese settlor of a very wealthy charitable trust which raised complex issues under the terms of the trust arising from an inter-family dispute as to the capacity of the Settlor to appoint trust officers. The matter was dealt with at a hearing in the Bahamas in 2021.

Francis is actively involved in advising in relation to trusts and insolvency matters in Cayman and Bermuda.

Francis was involved for many years in the Herald Fund SPC insolvency litigation in Cayman and the Privy Council.

Francis was also involved in the liquidation of BTU Power in Cayman and the Privy Council.

From 2008 onwards Francis was actively involved in hedge fund litigation in Cayman involving a number of different hedge funds and concerning issues of redemption, gating of redemptions and liquidations.

Francis has also been actively involved in trust litigation in Cayman involving *Lemos v Coutts Cayman* and other trusts in respect of which confidentiality orders and obligations preclude disclosure.

More information on his international/offshore work appears under his other specialism.

## Real Estate Litigation

Francis has done a considerable amount of work for coal and gypsum mining companies and/or land subject to the grant of mineral rights. Recent cases have involved detailed consideration of mining leases and working rights agreements.

His cases include:

Acting for **British Coal** in relation to the formula contained in a transfer of a strategic development site outside Leeds. The contract contained an overage clause. The developers failed to develop the land blaming the economic crisis and the question turns on development value and the proper interpretation of the contract.

Acting for **Persimmon Homes** in an Arbitration seeking rectification for unilateral and mutual mistake of a contract for a development site to provide for a right of way to part of the retained land.

Acted successfully for the **Coal Authority** in an arbitration relating to a terminal payment compensation clause following opencast coal operations on land with very valuable development potential.

Successfully represented **UK Coal** in litigation relating to development land swap agreement following opencast coaling operations in which the issues were estoppels, rectification, mutual and unilateral mistake.

Advising the **Coal Authority** in relation to the validity of a restrictive covenant limiting density of development of land for housing under which there were former mine workings.

Advising the Coal Authority in relation to liability for damage caused by former mine workings in Wales.

**Hallam Land Management Ltd -v- RJB Mining (UK) Ltd** A condition of an option agreement for the acquisition of some 45 acres of developable land that provided that the option was exercisable on the submission of a planning application for development of "the property" was not satisfied where the application as submitted.

Advised **Manchester City Council** in relation to restrictive covenants relating to development land in respect of which there had been historic mining operations.

## Trusts, Probate & Estates

Francis is a very experienced chancery practitioner. Recommended by Chambers & Partners and Legal 500 2020 for his traditional chancery practice, his work is largely international in nature.

Recent cases include:

ST John Trust Company (PVT) Limited v Medlands – see above

Chinese Trust in the Bahamas.Various trust matters which have been or are litigating in Cayman.

Onshore he also regularly advises in relation to trust matters.

**Bermuda Trust Litigation:** This case involves a large group of high value Bermuda Trusts and important questions relating to appointment of trustees and protectors. The allegation that the trustees and/or protectors were invalidly appointed has led to major problems in the administration and constitution of the Trust and the effectiveness of steps taken within the Trust.

**Guernsey trust dispute:** The dispute in this case revolves around whether an employee benefit trust which was capable of being set aside on the basis of mistakes made in its establishment.

**Film finance tax shelter schemes:** Francis is involved for large groups of investors in litigation involving film finance tax shelter schemes in which a critical issue is whether investors' money was held by the scheme promoters on the basis of a purpose trust giving rise to obligations to account in addition to liability for misstatement and negligence. A judgment is awaited in relation to certain preliminary issues in this case.

**Hutcheson:** Guernsey trust involved in a dispute over diversification of investments.

**Draper Family settlements:** dispute over diversification of Guernsey trust assets.

---

# Recommendations

**Company & Partnership**

**Chambers & Partners**

Francis Tregear QC is regularly instructed by well-known City and offshore firms for both litigation and advisory work. He has a specialism in hedge fund and structured investment vehicle-related matters, as well as those concerning cross-border insolvency. His company offering is complemented by his experience in fraud, asset recovery and professional negligence work. **Strengths:** "A shrewd operator who is underestimated by the opposition at their peril." (2022)

**Strengths:** "His ability to forensically analyse complicated matters and to get to the core of the issue is just outstanding. He's a great advocate who is highly responsive." (2021)

**Legal 500**

'Cool under pressure, exceedingly pleasant to deal with regardless of the demands of the case, thoughtful and measured in his advocacy and highly responsive.' (2022)

'His advocacy is superb and his drafting and insight into the intricacies of a case is exceptional.' (2021)

**Chancery: Commercial**

**Chambers & Partners**

"Absolutely divine. He is a delight to work with as he is so incredibly user-friendly." (2022)

"His ability to forensically analyse complicated matters and to get to the core of the issue is just outstanding. He is an excellent advocate and very responsive." (2021 – UK and Global)

**Chancery: Traditional**

**Chambers & Partners**

Francis Tregear QC is a respected silk with a well-established traditional chancery practice. He is a recognised authority on offshore and overseas matters, and has been called to the Bar of the Eastern Caribbean. He has an impressive depth of experience in trust and estate matters, and is particularly noted for his expertise in contentious proceedings. **Strengths:** "His legal work is fantastic and he has this very light touch with clients." "He's really nice to work with, he's charming and he has a nice way about him." (2022 – UK and High Net Worth)

**Strengths:** "Tremendously careful and elegant in court." (2021)

Francis Tregear QC is described as "the unspoken hero of the Bar" by a fellow barrister, who also states that he is "tremendously careful and elegant in court." He has a strong traditional chancery practice but is also notable for handling major commercial disputes, particularly those involving offshore jurisdictions. (2021 – High Net Worth)

**Offshore**

**Chambers & Partners**

Francis Tregear QC is well known for his liquidation work, and he has acted for clients in Bermuda, the BVI and the Cayman Islands. He offers additional expertise in trust disputes and has recently been active in Jersey. Tregear regularly acts for shareholders and liquidators. **Strengths:** "He's good on the technical side and he's someone you like to have as part of your team." "He is brilliant. He's very strategic, very calm with excitable clients, measured and a team player." (2022)

**Strengths:** "Insightful, user-friendly and very astute." "Solid and unflappable." (2021 – UK and Global)

**Legal 500**

'A great intellect and he brings a sense of calm, control and careful thought.' (2022)

'He commands respect with his experience and is very impressive in court.' (2021)

**Insolvency**

**Legal 500**

'Cool under pressure and his advice and strategy for matters is sound.' (2022)

'Excellent value and very user friendly.' (2021)

**Professional Negligence**

**Legal 500**

'He is experienced in professional negligence disputes.' (2021)

**Banking & Finance**

**Legal 500**

'A consummate gentleman; cool under pressure, exceedingly pleasant to deal with regardless of the demands of the case, thoughtful and measured in his advocacy and highly responsive.' (2022)

'Always prepared and available, and very impressive ability to deal with and solve complex issues.' (2021)

**Commercial Litigation**

**Legal 500**

'A consummate gentleman, cool under pressure and exceedingly pleasant to deal with regardless of the demands of the case. Francis is thoughtful and measured in his advocacy and highly responsive.' (2022)

'A pleasure to deal with and an excellent advocate.' (2021)

**Private Client: Trusts and Probate**

**Legal 500**

'For a senior silk Francis is easy to deal with and is down to earth. His advice and strategy for matters is sound.' (2022)

'He commands respect with his experience and was very impressive in court.' (2021)

**Fraud: Civil**

**Legal 500**

'Clients love him – good common sense while alive to their priorities.' (2022)

'Very focused on the strategy, has a clear and reasonable way to explain the choices, and is always available.' (2021)

Chambers Global 2020 recommends Francis for his offshore practice, describing him as ' **A very smart man and a very effective advocate who is good at dealing with difficult questions'.** Solicitors mentioned that he is **"Extremely hard-working, user-friendly and responsive. He gets to grip with extremely complicated contractual issues and statutory matters of interpretation in a practical and incisive manner."**

## Academic history

BA (Cantab) (St John's College)

## Appointments

- Recorder
- Accredited Mediator

## Professional memberships

- Member of the Bar of the Eastern Caribbean Supreme Court
- Chancery Bar Association [Member of the Committee]
- COMBAR
- Professional Negligence Bar Association
- European Circuit

## Business details

**VAT number:** 245949228
**Registered name:** Francis Benedict William Tregear

## Practice Managers

**Perry Brown**
Senior Practice Manager
+44 (0)20 7419 6206
perry.brown@xxiv.co.uk

**Tommie Drury**
Practice Manager
+44 (0)20 7419 6203
tommie.drury@xxiv.co.uk
**Matthew Evans**
Assistant Practice Manager
+44 (0)20 7691 2424
matthew.evans@xxiv.co.uk

## Events

XXIV Fifth Annual Caribbean Conference 2015