TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Kyle J. Ortiz
Bryan Kotliar
Jared C. Borriello
Eitan E. Blander

*Counsel to the Debtors
and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| JPA NO. 111 CO., LTD. and JPA NO. 49 CO., LTD., | Case No.:  21-12075 (DSJ) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF JARED C. BORRIELLO IN
SUPPORT OF DEBTORS' OMNIBUS REPLY TO THE OBJECTIONS OF
FITZWALTER CAPITAL PARTNERS (FINANCIAL TRADING) LIMITED
AND THE INTERMEDIATE LESSORS REGARDING THE PROPOSED SALE**

I, Jared C. Borriello, hereby declare under penalty of perjury, pursuant

to section 1746 of Title 28 of the United States Code, as follows:

1.       I am an associate at the law firm of Togut, Segal & Segal LLP, counsel to

the debtors and debtors in possession (collectively, the "Debtors") in the above-

captioned chapter 11 cases (the "Chapter 11 Cases").

2.       I respectfully submit this Declaration in support of the *Debtors' Omnibus*

*Reply to the Objection of FitzWalter Capital Partners (Financial Trading) Limited and the*

*Intermediate Lessors Regarding the Proposed Sale* filed contemporaneously herewith

(the "Reply").

---

[1] The Debtors in these Chapter 11 cases are:  JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd.  The Debtors'
corporate address is Kasumigaseki Common Gate West Tower, 3-2-1 Kasumigaseki, Chiyoda-Ku, Tokyo,
Japan 100-0013.

3.    Attached hereto are true and correct copies of the following documents:

| Exhibit | Description | Date |
|---|---|---|
| 1. | *Togut Letter to Debevoise & Plimpton LLP re Fiduciary Duties Under Applicable Irish Law.* | 2/21/22 |
| 2. | *English Lawsuit Particulars of Claim* | 2/8/22 |
| 3. | *Notification in respect of Security Agent's Management Time MSN 067* | 1/21/22 |
| 4. | *Notification in respect of Security Agent's Management Time MSN 173* | 1/21/22 |
| 5. | *Sumitomo Mitsui Trust Bank, Limited Response to Letter "Notification in Respect of Security Agent's Management Time"* | 2/17/22 |

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

foregoing is true to the best of my knowledge.

Dated:  New York, New York
        February 23, 2022

*/s/Jared C. Borriello*
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000

**EXHIBIT 1**

# TOGUT, SEGAL & SEGAL LLP

ONE PENN PLAZA
NEW YORK, NEW YORK 10119
─────
WWW.TOGUTLAWFIRM.COM
─────
(212) 594-5000
─────
KYLE J. ORTIZ
(212) 201-6582
KORTIZ@TEAMTOGUT.COM

February 21, 2022

*VIA* ELECTRONIC MAIL

Sidney P. Levinson, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022

      Re: *In re JPA No. 111 Co., Ltd. & JPA No. 49 Co., Ltd.,*
          Case No. 21-12075 (DSJ) (Bankr. S.D.N.Y.)

Dear Sid:

      As you are aware, Togut, Segal & Segal LLP represents the debtors and debtors in possession (the "Debtors") in the above-referenced chapter 11 cases (the "Chapter 11 Cases") filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). We are in receipt of the objection and reservation of rights filed by JLPS Leasing Uranus Limited and JLPS Leasing Draco Limited (together, the "Intermediate Lessors") on February 17, 2022 [Docket No. 118] (the "Objection").[1]

## I.    The Board's Fiduciary Duties

      In our discussions with you and as described in the Objection, you have indicated a desire for the Board of Directors of the Intermediate Lessors (the "Board") to eliminate all liabilities of the Intermediate Lessors. That goal should be evaluated in light of the Board's fiduciary duties.

      Under Irish law, the Board has, in the ordinary course, a number of fiduciary duties which it owes to the Intermediate Lessors. The Board must, among other things, (a) act in good faith in what the Board believes to be in the interests of the Intermediate Lessors, (b) act honestly and responsibly in relation to the conduct of the affairs of the Intermediate Lessors, and (c) not use the Intermediate Lessors' property, information, or opportunities for the Board's or anyone else's benefit.[2]

──────────────────

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Objection.

[2]    The Intermediate Lessors are continuing to incur costs and expenses. The Board should note that, if they are of the view that the Intermediate Lessors are insolvent and they continue to incur liabilities without any reasonable prospect that the companies will be able to discharge those liabilities, there is a serious risk of the

Sidney P. Levinson, Esq.
February 21, 2022
Page 2

We note from the Objection that the Intermediate Lessors refer to certain existing and/or potential liabilities owed by the Intermediate Lessors.  For the reasons outlined below, the Debtors firmly believe that the Intermediate Lessors have no such liabilities.  Without prejudice to that position, the Board should note that, if they are of the view that the Intermediate Lessors are insolvent or close to insolvency, the Board must, when managing the affairs of the Intermediate Lessors, act in the interest of all creditors as a whole and not any particular class or classes of creditor.  We note that the Debtors are owed more than $21 million on account of the Intermediate Lessors unsatisfied obligations to the Debtors under the now-terminated Head Leases—liabilities that the Debtors are in the process of resolving for the Intermediate Lessors pursuant to the Proposed Sale.[3]

The Debtors are concerned that the Board is disregarding its fiduciary duties and is solely acting at the behest of and for the sole benefit of its controlling shareholder, FitzWalter Capital Partners (Financial Trading) Limited ("FitzWalter"), which is also the Security Agent and controlling senior lender under the Transaction Documents.  As you are likely aware, prior to the Petition Date, FitzWalter sought to sell the very Lessor Assigned Property (as defined below) the Intermediate Lessors are now purporting to protect.

## II.    Overview of the Lease Assets and Sale Process

The Intermediate Lessors were formed for a single purpose—leasing the Debtors' Aircraft to the ultimate lessee (in this case, Vietnam Airlines) pursuant to the Subleases.  In connection with this purpose, the Intermediate Lessors entered into Deeds of Security for the assignment and/or charge to the Debtors of the Intermediate Lessors' rights, title, and interest under the Subleases and various other contractual arrangements (together, the "Lessor Assigned Property") as "security for the payment and discharge of the Secured Obligations."  Deed of Security § 3.1.  As you note in the Objection, the Deeds of Security are intended to secure obligations owed to the Finance Parties (i.e., the Security Agent and the Lenders) by the Debtors and the other Obligors—including the Intermediate Lessors.  Thus, effectuating a transaction that maximizes the value of the Intermediate Lessors' assets, including the Lessor Assigned Property, particularly in light of their obligations under the Transaction Documents, is critical for the Intermediate Lessors.

The Debtors have proposed a full-pay sale transaction for substantially all of their assets, including the Aircraft and Lessor Assigned Property (the "Proposed Sale").  The Proposed Sale includes an initial stalking horse bid (the "Stalking Horse Bid") that provides for an elastic purchase price to account for valid secured unliquidated amounts in addition to interest, principal, and return to the Debtors' equity.  See Stalking Horse Purchase Agreements § 3.0.  The Proposed Sale is subject to an ongoing auction and marketing process overseen by the Bankruptcy Court (the "Sale Process") pursuant to the Bidding Procedures

---

Board breaching the reckless trading provisions under Irish law.  This can give rise to serious implications for the Board and potential exposure to personal liability.

[3]    If the Proposed Sale is consummated, FitzWalter should not have any damages for purported claims against the Intermediate Lessors set forth in English Proceedings.

Sidney P. Levinson, Esq.
February 21, 2022
Page 3

Order entered on February 4, 2022 [Docket No. 101] (the "Bidding Procedures Order") that is fair, transparent, value-maximizing, and compliant with all applicable laws.

The Proposed Sale and Sale Process are designed to maximize value for the Debtors' assets, including the Aircraft and Lessor Assigned Property.[4]  At this point in the Chapter 11 Cases, the record is clear that the Sale Process will yield far superior results for all parties in interest, including the Debtors, their creditors, and the Intermediate Lessors, among others, compared with the expedited prepetition piecemeal foreclosure process employed by FitzWalter, pursuant to which FitzWalter nearly consummated a sale of the Lessor Assigned Property to an affiliate at what the Debtors believed would be a substantial discount.  Such a result would have left the Intermediate Lessors deeply insolvent without *any* material assets to repay their creditors.  Instead, the Debtors have the Proposed Sale which seeks to satisfy all valid "Secured Obligations" *in full*.  Blocking such a transaction by asserting purported rights over the Lessor Assigned Property by, among other things, contesting the Enforcement Notices—which were approved by the Bankruptcy Court—does not serve the interests of the Intermediate Lessors or their creditors.[5]

## III.    Proposal

Given the Board's fiduciary obligations, we expect the Board will be supportive of the clear path here to a near-term full-payment solution for the Intermediate Lessors, and resolution of all their claims and liabilities of as part of the Proposed Sale.  Thus, we outline the following proposal for your consideration in discharging your duties:

- The Intermediate Lessors agree to withdraw the Objection and to not raise any further or other objections to the Proposed Sale, including to the Proposed Sale to the Stalking Horse Purchaser;

- As part of the closing of the Proposed Sale to the Successful Bidder (as defined in the Bidding Procedures Order), the Debtors and the Intermediate Lessors will enter into a full mutual release of claims by and between each other; and

---

[4]     *See* Bidding Procedures Order, Recital C ("The Bidding Procedures are fair, reasonable, appropriate and are designed to maximize the value of the Purchased Assets and recoveries to the Debtors' estates and creditors.").  Moreover, the Bankruptcy Court has already found in its *Memorandum Decision and Order Resolving Motion to Dismiss*, entered on February 1, 2022 [Docket No. 97] that "the totality of the record . . . gives an overwhelming impression of a good-faith effort to use bankruptcy remedies to achieve a superior outcome for all parties-in-interest—with the possible exception of FitzWalter . . . ."  Mem. Decision at 27.

[5]     *See* Bidding Procedures Order ¶ 8 ("The Enforcement Notices are approved and shall be served on the Enforcement Notice Parties consistent with applicable law.").  The Intermediate Lessors' concerns about the transactions set forth in the Enforcement Notices harming the Intermediate Lessors is unfounded because such transactions are expressly conditioned upon, among other things, the "sale of all of the Transferred Sublease Collateral Assets to the Successful Bidder," which requires payment of all valid Secured Obligations, including amounts owed by the Intermediate Lessors under the Transaction Documents.  *See* Enforcement Notice at 2.

Sidney P. Levinson, Esq.
February 21, 2022
Page 4

- The Debtors and JP Lease will cooperate in good faith with the Intermediate Lessors, including in providing reasonable information in connection with your diligence requests provided on February 18, 2022, in confirming that there are no other material claims against the Intermediate Lessors arising out of the Transaction Documents, including on account of the Warranty Agreements and/or claims that could be asserted by Vietnam Airlines against the Intermediate Lessors.[6]

This proposal is intended to efficiently move the Sale Process towards the full-pay resolution that is in the best interests of the Debtors and the Intermediate Lessors and undoubtedly represents an appropriate exercise of the fiduciary duties of the Board. This is particularly important because every day spent in litigation with FitzWalter—and now the Intermediate Lessors as well—is additional time and expense that will serve only to drain the Debtors' estates. For the Intermediate Lessors, this should be particularly concerning, as they have no other material sources of repayment of their liabilities beyond the sale proceeds.

To the extent the Board has legitimate concerns about there being sufficient value from the Proposed Sale, including on account of the Lessor Assigned Property, to satisfy all claims against the Intermediate Lessors, either by way of the Secured Obligations or otherwise, the Sale Process, which allows other bidders to make higher and better offers, is the best way to maximize the value of the Debtors' assets, to the benefit of the Intermediate Lessors. Even if you were successful in blocking the transfer of the Lessor Assigned Property and unwinding the Enforcement Notices, this would not enable you to achieve a better result for the Intermediate Lessors than the Proposed Sale contemplated under the Bidding Procedures Order. Quite the opposite, it would irreparably harm the Intermediate Lessors and their creditors.

*[Remainder of page left blank intentionally]*

---

[6]     The Debtors firmly believe there are no such claims. The Warranty Agreements are entirely beneficial to, and are not liabilities of, the Intermediate Lessors; they entitle the Intermediate Lessors (or other beneficiaries) to assert claims *against* various third parties—not the other way around. Likewise, Vietnam Airlines, as sublessee, would not reasonably have any claims that it would assert against the lessor parties (here, the Intermediate Lessors) under a terminated lease agreement.

Sidney P. Levinson, Esq.
February 21, 2022
Page 5


       We ask that you please provide a copy of this Letter to the Boards of Directors for the Intermediate Lessors.  We are available to discuss at your convenience and look forward to hearing from you.[7]

          Very truly yours,

          TOGUT, SEGAL & SEGAL LLP
          By:

          *Kyle J. Ortiz*
          Kyle J. Ortiz, Esq.

---

[7]     Nothing herein shall be or shall be deemed to be a waiver of any claim, right, defense, objection, or privilege that the Debtors may have, and the Debtors expressly reserve all rights.

**EXHIBIT 2**

**IN THE HIGH COURT OF JUSTICE**                    Claim No. QB-2022-000199

**QUEEN'S BENCH DIVISION**

**MEDIA AND COMMUNICATIONS LIST**

**B E T W E E N :**

### FITZWALTER CAPITAL PARTNERS (FINANCIAL TRADING) LIMITED

**Claimant**

**- and -**

**(1) JP LEASE PRODUCTS & SERVICES CO., LTD.**

**(2) JLPS IRELAND LIMITED**

**(formerly JLPS Holding Ireland Limited)**

**(3) JLPS LEASING DRACO LIMITED**

**(formerly DAE Leasing (Ireland) 12 Limited)**

**(4) JLPS LEASING URANUS LIMITED**

**(formerly PAAL Uranus Company Limited)**

**(5) HEINRICH LOECHTEKEN**

**Defendants**

_____

### PARTICULARS OF CLAIM
_____

## A.    INTRODUCTION

1.    The Claimant is an investment management company incorporated under the laws of England and Wales.

2.    The First Defendant is a financial services firm incorporated under the laws of Japan. The First Defendant is the parent company of two special purpose investment vehicles (JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd.) formed under the laws of Japan and created for the express and sole purpose of acquiring and leasing Airbus 350 aircraft (each a "**Borrower**" and together the "**Borrowers**").

1

3.      The Second to Fourth Defendants are subsidiaries of the First Defendant.

4.      The Fifth Defendant is the Chief Executive Officer ("**CEO**") of the Second Defendant.

## B.      TRANSACTION DOCUMENTS

5.      The Claimant and the First to Fourth Defendants are, amongst others, parties to various transaction documents relating to the financing of two Airbus A350 aircraft (with manufacturer's serial numbers ("**MSN**") 67 and 173) (together, the "**Aircraft**"). The relevant Borrower in relation to MSN 67 is JPA No. 111 Co., Ltd. and the Borrower in relation to MSN 173 is JPA No. 49 Co., Ltd.

6.      The transaction documents include:

    6.1      two Proceeds Agreements dated 22 December 2017 and 6 November 2018, the terms of which are mostly identical (the "**Proceeds Agreements**");

    6.2      two Head Lease Agreements dated 19 November 2018 and 29 December 2017 (each a "**Head Lease**");

    6.3      two Sub-Lease Agreements with Vietnam Airlines JSC (the "**Sub-Lessee**" and the "**Sub-Leases**") dated 4 December 2016 and 1 August 2017; and

    6.4      two Borrower Security Assignments dated 21 November 2018 and 29 December 2017, pursuant to which the Borrowers' rights under, inter alia, the Head Leases and Sub Leases were assigned to the Security Agent.

7.      The Claimant makes the following claims in its capacity as Security Agent under the relevant transaction documents. The Claimant will rely on the transaction documents as necessary at trial for their full terms, true meaning and effect. Without prejudice to that position, the material provisions of the transaction documents relevant to this claim are set out below.

## (1)      Transaction documents relating to MSN 173

8.      Pursuant to the Proceeds Agreement in respect of the financing of one Airbus A350-941 aircraft with MSN 173 dated 22 December 2017 ("**the MSN 173 Proceeds Agreement**"), the First Defendant (as "Borrower Parent") and the Fourth

2

Defendant (as "Intermediate Lessor") (by way of the Proceeds Agreement
Accession Undertaking dated 29 December 2017) agreed (amongst others) as
follows:

8.1     Clause 3 provided, under the heading "NON-PETITIONING", as follows:

    3.1     **The Borrower Parent hereby agrees in favour of each of the
Finance Parties that until the Secured Obligations Discharge Date
it shall not:**

       …

    3.1.3   (and shall procure that its Affiliates will not) file or join in any
petition to commence any winding-up proceedings by or
against the Borrower or the Intermediate Lessor or any other
action or proceedings for the winding-up, dissolution,
administration or examinership of the Borrower or the
Intermediate Lessor or take, or acquiesce in, any other action
which might reasonably be expected to lead to the bankruptcy
or insolvency of the Borrower or the Intermediate Lessor, save
as required by applicable law or with the consent of the
Security Agent.

    3.2     **The Intermediate Lessor hereby agrees in favour of each of the
Finance Parties that until the Secured Obligations Discharge Date
it shall not:**

       …

    3.2.3   (and shall procure that its Affiliates will not) file or join in any
petition to commence any winding-up proceedings by or
against the Borrower or any other action or proceedings for
the winding-up, dissolution, administration or examinership
of the Borrower or take, or acquiesce in, any other action
which might reasonably be expected to lead to the bankruptcy
or insolvency of the Borrower, save as required by applicable
law or with the consent of the Security Agent.

8.2     Clause 10 provided, under the heading "BORROWER PARENT
UNDERTAKINGS", as follows:

    10.2    **Service Agreement and Lease Management Agreement**

…

    10.2.3  The Borrower Parent hereby unconditionally and irrevocably
agrees with the Finances Parties that the it [*sic*] shall not,
during the Security Period:

       …

3

(c)    (and shall procure that its Affiliates will not) file or join in any petition to commence any winding-up proceedings by or against the Borrower or the Intermediate Lessor or any other action or proceedings for the winding-up, dissolution, administration or examinership of the Borrower or the Intermediate Lessor or take, or acquiesce in, any other action which might reasonably be expected to lead to the bankruptcy or insolvency of the Borrower or the Intermediate Lessor, save as required by applicable law or with the consent of the Security Agent.

8.3    Clause 11 provided, under the heading "INTERMEDIATE LESSOR", as follows:

### 11.3.23 *Anti-Social Forces, Relationship and Conduct*

(a)    The Intermediate Lessor shall ensure that no Obligor shall (x) have any relationship with any Anti-Social Forces or any person under the control of any Anti-Social Forces, (y) have any Anti-Social Relationship or (z) engage in any Anti-Social Conduct, whether directly or indirectly through a third party.

(b)    The Intermediate Lessor shall promptly provide to the Security Agent such documents or information pertaining to it and within its possession (including, without limitation, registered or principal office, residential address, formal name, birth date) as the Security Agent shall reasonably request for the purposes of screening to identify Anti-Social Conduct, Anti-Social Forces and Anti-Social Relationship by the Security Agent.

(c)    The Intermediate Lessor shall not engage, directly or indirectly, in (i) any demand or claim under the threat of violence; (ii) any unreasonable demand or claim under the threat of actions that are not legally permissible; (iii) any blackmail or assault, physically or verbally; (iv) any obstructive activities, including, but not limited to, disseminating information or fraudulent activities for the purpose of falsely harming a Lender's creditworthiness or impeding a Lender's business; or (v) other actions similar or analogous to any of the foregoing.

(d)    Upon receiving information which provides to a reasonable certainty that a violation of this Clause 11.3.23 has occurred, the Intermediate Lessor shall immediately advise the Security Agent of the occurrence and take all actions reasonably necessary to mitigate, correct and report such occurrence, under

4

law or otherwise (such steps may include termination or severance of the individual(s) involved).

8.4    Appendix A contained the following definitions:

"**Affiliate**" means, in relation to any person, any other person which, directly or indirectly, controls or is controlled by or is under common control with such person and for the purposes of this definition, "control" when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise and the terms "**controlling**" and "**controlled**" shall be construed accordingly.

…

"**Anti-Social Conduct**" means:

    (a)    a demand and conduct with force and arms;

    (b)    an unreasonable demand and conduct having no legal cause;

    (c)    threatening or committing violent behaviour relating to its business transactions;

    (d)    an action to defame the reputation or interfere with the business of any Finance Party by spreading rumour, using fraudulent means or resorting to force; or

    (e)    other actions similar or analogous to any of the foregoing in any jurisdiction.

…

"**Finance Parties**" means, together, the Lenders, the Security Agent, the Senior Agent, the Junior Agent, the Mandated Lead Arranger,[1] the Hedging Counterparty and the Account Bank.

…

"**Obligors**" means, collectively, the Borrower, the Intermediate Lessor, the Intermediate Lessor Parent and the Borrower Parent (each an "**Obligor**").

…

"**Secured Obligations Discharge Date**" means the date on which the Security Interests constituted by the Security Documents are required to be released, discharged and/or re-assigned pursuant to Clause 7 (*Release of Security*) of the

---

[1] The MSN 67 Proceeds Agreement, as defined below, does not include reference to the Mandated Lead Arranger.

5

Proceeds Agreement.

…

"**Security Period**" means the period commencing on the first Utilisation Date and expiring on the Secured Obligations Discharge Date.

…

"**Utilisation Date**" means the date of a Utilisation, being the date on which the Senior Loan or the Junior Loan (as applicable) is, or is to be, made.

…

9.      On 22 December 2017, the First Defendant executed a Parent Letter in favour of the Security Agent in respect of the Borrower's obligations ("**the MSN 173 Borrower Parent Letter**") by which it agreed (amongst other things) as follows (references to the "Company" being references to the "Borrower"):

1.      In consideration of the foregoing, the Parent hereby agrees with the Security Agent (acting for and on behalf of the Lenders) that, unless and until the Company shall have performed and discharged in full its obligations to the Transaction Documents to which the Company is a party (the "**Lessor Documents**"):

(a)      except with the prior written consent of the Security Agent, the Parent will continue to control the Company and directly hold the legal and beneficial ownership of the entire issued share capital in the Company;

(b)      the Parent will ensure that the Company will be properly and diligently managed, will remain solvent and will not be liquidated or dissolved or merged or reorganised in any other manner;

…

(d)      the Parent will ensure that the Company shall duly and punctually perform and comply with its obligations, covenants and agreements under the Lessor Documents pursuant to the terms and conditions thereof and contained therein (including, without limitation, the personal liability of the Borrower pursuant to and in accordance with clause 6.2 (*Personal Liability*) of the Senior Facility Agreement) and clause 6.2 (*Personal Liability*) of the Junior Facility Agreement) …

…

**provided that** the Parent shall not be liable or responsible for any breach in respect of paragraph (b) above if such breach is caused solely and directly by any Lease Event of Default or an event which with the lapse of time or giving of notice could become a Lease Event of

6

Default.

2.    In further consideration of the Finance Parties entering into the Transaction Documents to which they are a party, we hereby undertake to you that, for so long as the Company shall have any undischarged obligations to the Finance Parties under the Lessor Documents, whether jointly or severally incurred: (1) we shall indemnify each of the Finance Parties and keep them indemnified against any and all costs, losses and expenses that they may suffer or incur (i) arising out of the Parent failing to perform its undertakings in this Letter; …

…

5.    This Letter shall be governed by and construed in accordance with the laws of Japan.

10.    On 22 December 2017, the Second Defendant executed a Parent Letter in favour of the Security Agent ("**the MSN 173 Intermediate Lessor Parent Letter**") on terms materially the same as those set out in paragraph 9 above albeit in respect of the obligations of the Fourth Defendant as "Intermediate Lessor". Therefore, references to "the Company" in the MSN 173 Intermediate Lessor Parent Letter are to the Fourth Defendant as Intermediate Lessor.

**(2)    Transaction documents relating to MSN 67**

11.    Pursuant to a Proceeds Agreement in respect of the financing of one Airbus A350-900 aircraft with MSN 67 dated 6 November 2018 ("**the MSN 67 Proceeds Agreement**"), the First Defendant (as "Borrower Parent") and the Third Defendant (as "Intermediate Lessor") (by way of the Proceeds Agreement Accession Undertaking dated 21 November 2018) agreed (amongst others) materially the same terms as set out in paragraph 8 above.

12.    On 6 November 2018, the First Defendant executed a Parent Letter in favour of the Security Agent in respect of the Borrower's Obligations ("**the MSN 67 Borrower Parent Letter**") on terms materially the same as those set out in paragraph 9 above.

13.    On 6 November 2018, the Second Defendant executed a Parent Letter in favour of the Security Agent ("**the MSN 67 Intermediate Lessor Parent Letter**") on terms materially the same as those set out in paragraph 9 above albeit in respect of the obligations of the Third Defendant as "Intermediate Lessor". Therefore, references to "the Company" in the MSN 67 Intermediate Lessor Parent Letter are to the Third

7

Defendant as Intermediate Lessor.

**(3)    The Claimant as Lender and Security Agent**

14.    In December 2021, the Claimant became a party to the MSN 173 and MSN 67
Proceeds Agreements when it (a) succeeded Credit Agricole Corporate &
Investment Bank as Security Agent pursuant to two Resignation and Appointment
Agreements dated 2 December 2021, and (b) became a Lender under those
agreements by acquiring approximately US $128 million in outstanding obligations
issued by the Borrowers.

15.    On 1 December 2021, following the occurrence of certain events of default under
the transaction documents, the leasing of each Aircraft was terminated and the Sub-
Lessee was required immediately to cease operating the Aircraft. In this connection,
the Borrowers were in breach of (amongst other obligations) clauses 19.23 and
19.26 of two Senior Facility Agreements dated 22 December 2017 and 6 November
2018 respectively. As a result, the First Defendant is in breach of its obligation
under Clause 1(d) of the Borrower Parent Letters. The Claimant reserves the right
to claim damages for the aforesaid breaches in due course.

16.    The Sub-Lessee has breached its obligations pursuant to each Sub-Lease, including
inter alia, by continuing to operate the Aircraft. Contrary to their obligations under
clause 3.6 of each of the Head Lease Agreements, dated 19 November 2018 and 29
December 2017 the Third and Fourth Defendants have failed to use their reasonable
endeavours to procure that the Sub-Lessee complies with its obligations under the
relevant Sub-Lease. Furthermore, the Second Defendant is in breach of its
obligations under Clause 1(d) of the MSN 67 Intermediate Lessor Parent Letter and
the MSN 173 Intermediate Lessor Parent Letter by failing to ensure that the Third
Defendant and/or Fourth Defendant would duly and punctually perform and
comply with their obligations. The Claimant reserves the right to claim damages
for the aforesaid breaches in due course.

17.    On 10 December 2021, the Claimant (in its capacity as Security Agent) appointed
Airborne Capital Limited ("**Airborne**") to conduct a sale of its lease-related rights
(the "**Sales Process**"). Airborne advertised the pending sale and offered detailed

8

bidding procedures to any parties who expressed interest in the sale. However, for the reasons set out below, the Sales Process has been frustrated by the unlawful actions of the Defendants.

## C.   LIABILITY

**(1)   Chapter 11 bankruptcy in the United States**

(a)   <u>Breach of contract: Chapter 11 Filing</u>

18.   On 17 December 2021, the Borrowers filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code (the "**Chapter 11 Filing**").

19.   As a result of the Chapter 11 Filing, the First Defendant (as Borrower Parent) is breach of its obligations under Clause 3.1.3 and 10.2.3(c) of the Proceeds Agreements (see paragraphs 8.1, 8.2 and 11 above) and Clause 1(b) of the Parent Letters (see paragraphs 9 and 12 above).

PARTICULARS OF BREACH

19.1   The First Defendant failed to procure that the Borrowers (being one of the First Defendant's Affiliates as defined) would not file or join in the Chapter 11 Filing. In this connection, the First Defendant held the entire share capital of the Borrowers and thereby retained control over the Borrowers (and expressly agreed it would continue to do so under Clause 1(a) of the Parent Letters: see paragraphs 9 and 12 above).

19.2   The Chapter 11 Filing was and continues to be supported by a declaration given by Mr Teiji Ishikawa (President and Chief Executive Officer of First Defendant), such that the First Defendant has joined in and/or acquiesced and/or engaged in action which might reasonably be expected to lead to the bankruptcy or insolvency of the Borrowers.

19.3   Mr Ishikawa acts as the Representative Director for each of the Borrowers in the Chapter 11 Filing.

19.4   The First Defendant paid money into a retainer account in the United States seemingly for the sole purpose of allowing the Borrowers to assert that the US Bankruptcy Court has jurisdiction over the bankruptcy.

9

19.5   The First Defendant also failed to procure that the Second Defendant (being one of the First Defendant's Affiliates as defined) would not file or join in the Chapter 11 Filing. In this connection, the Chapter 11 Filing is supported by a declaration by the Fifth Defendant (as CEO of the Second Defendant).

19.6   Further, as stated in the deposition evidence of the Fifth Defendant taken on 23 January 2022, the decision to make the Chapter 11 Filing was taken by the First Defendant and the Second Defendant.

20.   The Fourth Defendant (as Intermediate Lessor) is in breach of its obligations under Clause 3.2.3 of the MSN 173 Proceeds Agreement (see paragraphs 8.1 and 11 above) by failing to procure that the Borrower and/or the First Defendant and/or the Second Defendant and/or the Third Defendant (each being one of the Fourth Defendant's Affiliates as defined) would not file or join in the Chapter 11 Filing. The Claimant relies on and repeats the matters set out in paragraph 19 above.

21.   The Third Defendant (as Intermediate Lessor) is in breach of its obligations under Clause 3.2.3 of the MSN 67 Proceeds Agreement (see paragraphs 8.1 and 11 above) by failing to procure that the Borrower and/or the First Defendant and/or the Second Defendant and/or the Fourth Defendant (each being one of the Third Defendant's Affiliates as defined) would not file or join in the Chapter 11 Filing. The Claimant relies on and repeats the matters set out in paragraphs 19 and 20 above.

22.   The Second Defendant is in breach of its obligations under Clause 1(d) of the MSN 67 Intermediate Lessor Parent Letter and the MSN 173 Intermediate Lessor Parent Letter (see paragraphs 10 and 13 above) by failing to ensure that the Third Defendant and/or Fourth Defendant would duly and punctually perform and comply with their obligations (as to which the Claimant relies on and repeats paragraphs 20 and 21 above).

(b)   Breach of contract: the Purported Enforcement Sale

23.   On 21 January 2022, the Borrowers filed a Notice of Enforcement Sale and General Conveyance and Bill of Sale, which purported to assign certain property said to be the property of the Third and Fourth Defendants (the "**Purported Enforcement Sale**"). The notice of the Purported Enforcement Sale was signed by Niall McNamara as director of the Third and Fourth Defendants.

10

24.     By purporting to assign property as part of the Purported Enforcement Sale, the Fourth Defendant breached clause 11.3.4(b) of the Proceeds Agreement, which provides that the Fourth Defendant "*shall not without the prior written consent of the Security Agent* [i.e. the Claimant]: *[...] (i) sell, transfer, assign its rights in respect of or otherwise dispose of any of the collateral other than pursuant to the Security Documents*", in circumstances where the Fourth Defendant had not in fact obtained such consent from the Claimant, and where the Purported Enforcement Sale was not carried out "pursuant to the Security Documents".

(c)     <u>Inducing or procuring a breach of contract</u>

25.     By reason the matters set out in paragraphs 18 to 24 above, the First Defendant and/or Second Defendant and/or the Fifth Defendant are liable for the tort of inducing or procuring a breach of contract in that the First Defendant, Second Defendant and Fifth Defendant (each and all of them) were aware that the Chapter 11 Filing would constitute a breach of contract as set out above and took active steps to support the Chapter 11 Filing. Indeed, as the Fifth Defendant stated during his deposition evidence of the Fifth Defendant taken on 23 January 2022, "*we perfectly understand that there was a clause in the contract that effectively prohibits us from filing for Chapter 11. So we discussed the consequences of filing for bankruptcy relief with that clause in mind*" ("*we*" meaning, at the least, the First Defendant, Second Defendant and the Fifth Defendant).

(d)     <u>Conspiracy</u>

26.     The Defendants (and each of them) were party to a conspiracy to injure the Claimant by unlawful means. The unlawful means consist of the breaches of contract identified in paragraphs 18 to 24 above. Pending disclosure, the existence of a joint enterprise falls to be inferred from the matters set out in paragraph 19 above. As is evident from the Fifth Defendant's deposition taken on 23 January 2022, the Defendants (and each of them) made and/or supported and/or acquiesced in the Chapter 11 Filing for the sole purpose of frustrating the Sales Process and thereby to interfere with Claimant's contractual rights under the transaction documents.

**(2)     Statements and threats to damage the Claimant's business**

27.     On or around 21 December 2021, the Fifth Defendant described the Claimant as a

11

*"financial terrorist"* during a telephone conversation with the CEO of Airborne, Mr Ramki Sundaram, in connection with the Claimant's business dealings with the First Defendant (the "**Offending Statements**"). These statements are false and defamatory of the Claimant.

28.   During the same conversation, the Fifth Defendant also threatened to take (and impliedly that the First and Second Defendants would take) steps to harm the reputation of Airborne if Airborne did not resign immediately from its engagement by the Claimant. The Fifth Defendant had previously made similar threats to Airborne in a text message sent to Cian Dooley (an Executive Director at Airborne) on or around 19 December 021 stating that, if Airborne did not resign immediately from its engagement by the Claimant, the Fifth Defendant (and impliedly the First and Second Defendants) would take steps to cause reputational harm to Airborne in the view of participants in the aviation sector. The Fifth Defendant also stated that he already spoken to senior management at Airbus and Boeing and the President of the International Society of Transport Aircraft Trading (ISTAT) (the "**Further Threats**").

29.   The Offending Statements and/or the Further Threats were made with the authorisation and/or acquiescence of the First Defendant and/or the Second Defendant and which are thereby to be attributed to the First Defendant and/or the Second Defendant.

(a)   <u>Breach of contract: Anti-Social Conduct</u>

30.   The Offending Statements and/or Further Threats amount to a breach by the Third Defendant (as Intermediate Lessor) and/or the Fourth Defendant (as Intermediate Lessor) of Clause 11.3.23(a) of the MSN 173 Proceeds Agreement and the MSN 67 Proceeds Agreement respectively (see paragraphs 8.3 to 11 above). In particular:

30.1   The Third Defendant and/or the Fourth Defendant failed to ensure that the First Defendant and/or the Second Defendant (both of which fall within the definition of an Obligor) did not engage in any Anti-Social Conduct, whether directly or indirectly through a third party (including via the Fifth Defendant).

30.2   The Offending Statements amounted to Anti-Social Conduct as being (a)

12

conduct having no legal cause and/or (b) an action to defame the reputation or interfere with the business of the Claimant by spreading rumour and/or (c) was a similar or analogous action.

30.3   The Further Threats amounted to Anti-Social Conduct as being (a) an unreasonable demand and conduct having no legal cause and/or (b) was a similar or analogous action.

31.   Furthermore, the Second Defendant is in breach of its obligations under Clause 1(d) of the MSN 67 Intermediate Lessor Parent Letter and the MSN 173 Intermediate Lessor Parent Letter by failing to ensure that the Third Defendant and/or Fourth Defendant would duly and punctually perform and comply with their obligations.

(b)   <u>Conspiracy to injure</u>

32.   The Defendants (and each of them) were party to a conspiracy to injure the Claimant by unlawful means. The unlawful means consist of the breaches of contract identified in paragraph 30 above and/or the defamation pleaded at paragraph 33 below and/or the malicious falsehood pleaded at paragraph 34 below. Pending disclosure, the existence of a joint enterprise falls to be inferred from the common control between the Defendants and the fact that the Offending Statements and the Further Threats were part of a wider campaign of interfering with the Claimant's contractual rights and/or the Claimant's business more generally, which included the Chapter 11 Filing.

(c)   <u>Defamation</u>

33.   The Offending Statements were defamatory. In particular:

33.1   In their natural and ordinary meaning and in context, the words complained of meant and were understood to mean that the Claimant had been and would continue to be engaged in unlawful conduct, alternatively disreputable conduct, alternatively commercially or morally unacceptable conduct, in respect of its business and its dealings with the Defendants.

33.2   The Offending Statements have caused and/or are likely to cause serious financial harm to the Claimant. The serious harm arises from the fact that the Offending Statements were published to significant individuals and/or

13

entities in the aviation sector and who are (collectively and individually) highly influential to the Claimant's prospects of engaging in further business in the aviation finance sector.

(d)     Malicious falsehood

34.     The Defendants are liable for the tort of malicious falsehood by virtue of the following:

34.1    The Offending Statements were false. Claimant is not a "*financial terrorist*" and had not engaged in any of the conduct described in paragraph 33 above.

34.2    The Offending Statements were made maliciously. The Fifth Defendant (and through him the First to Fourth Defendants) intended to damage the reputation of the Claimant and interfere with the exercise of its contractual rights, including the Sales Process.


**D.      LOSS AND DAMAGE**

35.     By reason of the above breaches of duty, the Claimant has suffered loss and damage. The precise extent of that loss and damage is yet to be ascertained and the Claimant reserves the right to further particularise its claim for damages when the position becomes clear.

36.     Without prejudice to the foregoing, the Claimant claims:

36.1    The losses sustained in respect of the Chapter 11 Filing, which will include the legal and management costs of the Chapter 11 Filing, the losses associated with the Claimant's inability to exercise its contractual rights under the transaction documents and/or the wasted costs of the Sales Process and/or the additional costs associated with any further Sales Process.

36.2    The losses sustained as a result of the Offending Statements and/or Further Threats, which will include damages for loss of reputation and/or loss of profits as a result of the interference with the Claimant's business.

37.     Further, the Claimant is entitled to and claims interest pursuant to Section 35A of

the Senior Courts Act 1981 for such period and in such amount as the Court thinks fit.

AND the Claimant claims:

(1) Damages

(2) Interest as aforesaid

(3) Costs

**CHRISTOPHER LANGLEY**

15

**EXHIBIT 3**

**NOTIFICATION IN RESPECT OF SECURITY AGENT'S MANAGEMENT TIME MSN 67**

<u>  21 </u> January 2022

**SENT BY EMAIL TO: JLPS-NOTICES@JLPS.CO.JP**

**Attention: Fund Administration**
JPA No. 111 Co., Ltd.
c/o JP Lease Products & Services Co., Ltd
Kasumigaseki Common Gate West Tower 34F
3-2-1, Kasumigaseki
Chiyoda-ku
Tokyo 100-0013
Japan
Fax: + 81 3 6206 1395
Email: jlps-notices@jlps.co.jp

**COPY BY EMAIL TO: ROBERT.MELSON@KLGATES.COM /**
**TAKAHIRO.KAWAGUCHI@KLGATES.COM**

**Attention: Robert E. Melson/ Takahiro Kawaguchi**

K&L Gates Gaikokuho Joint Enterprise
Toranomon Hills Mori Tower 28F
1-23-1 Toranomon, Minato-ku
Tokyo, 105-6328
Japan
Fax: +81 3 3597 6421
Email: Robert.Melson@klgates.com / Takahiro.Kawaguchi@klgates.com

**COPY TO LENDERS VIA SENIOR AGENT BY EMAIL TO: FRANCOIS.BARBUT@CA-CIB.COM /**
**MOUNIA.BEKKALI@CA-CIB.COM          /          MELODY.LAVIGNE@CA-CIB.COM          /**
**MARCAURELE.LERNO@CA-CIB.COM   /   PIERRE-ANTOINE.LEVAYER@CA-CIB.COM   /**
**AMIR.BELAID@CA-CIB.COM**

**Attention: Structured Finance Agency & Middle Office**
Crédit Agricole Corporate and Investment Bank (Senior Agent)
12 place des Etats-Unis, CS 70052 92547
Montrouge Cedex, France
Fax: +33 1 41 89 85 75
Email:  francois.barbut@ca-cib.com  /  mounia.bekkali@ca-cib.com  /  melody.lavigne@ca-cib.com  /
marcaurele.lerno@ca-cib.com / Pierre-Antoine.LEVAYER@ca-cib.com / amir.belaid@ca-cib.com

Dear All

**SECURITY AGENT'S MANAGEMENT TIME IN RELATION TO ONE AIRBUS A350-900 AIRCRAFT
WITH MANUFACTURER'S SERIAL NUMBER 67 (THE AIRCRAFT)**

We refer to:

    a)   the Senior Facility Agreement dated 6 November 2018 between the Lenders, Crédit Agricole
            Corporate and Investment Bank (**CACIB**), as security agent, and JPA No. 111 Co., Ltd as
            Borrower (amongst others) as amended, restated or supplemented from time to time (the
            **Senior Facility Agreement**);

    b)   the Junior Facility Agreement dated 6 November 2018 between the Lenders, **CACIB**, as security
            agent, and JPA No. 111 Co., Ltd as Borrower (amongst others) as amended, restated or
            supplemented from time to time (the **Junior Facility Agreement**);

c)  the Proceeds Agreement dated 6 November 2018 between the Lenders, CACIB, as security agent, and the Borrower (amongst others) as amended, restated or supplemented from time to time (the **Proceeds Agreement**);

d)  the Enforcement Event Notice which was sent to you on 1 December 2021; and

e)  the Resignation and Appointment Agreement dated 2 December 2021 made between FitzWalter Capital Partners (Financial Trading) Limited (**FitzWalter**) and CACIB whereby CACIB resigned as security agent and FitzWalter was appointed as security agent in respect of the financing of the Aircraft.

Capitalised terms not otherwise defined herein shall have the meaning ascribed to such terms in the Proceeds Agreement.

Pursuant to paragraph 2.19 of Schedule 2 of the Proceeds Agreement we hereby notify you that in respect of the enforcement and/or preservation of security any amount payable to the Security Agent for its management time or other resources pursuant to:

(a)  Paragraph 2.14 (*Lenders' indemnity*) of Schedule 2 to the Proceeds Agreement;
(b)  Clause 16 (*Costs and Expenses*) of the Senior Facility Agreement; and/or
(c)  Clause 16 (*Costs and Expenses*) of the Junior Facility Agreement

will be calculated on the basis of the following daily rates:

| Co-Founder | $50,000.00 |
| Partner | $25,000.00 |
| Non-Partner | $10,000.00 |

We hereby expressly reserve all the rights, powers and remedies whether arising under the Transaction Documents, the Relevant Documents, the Security Documents applicable law and/or however arising that we may have now and/or which may arise subsequently. In particular, we expressly reserve our right to make demands for the costs payable to the Security Agent for its management time or other resources.

Nothing in this Notice constitutes a waiver of any rights or remedies which we have or may have now or subsequently.  Nothing in this notice waives or varies any of the terms of the Relevant Documents.

The terms of this notice and all non-contractual obligations arising out of or in connection with it shall be governed by and construed in accordance with English law.

Yours faithfully,

**FitzWalter Capital Partners (Financial Trading) Limited (not in its individual capacity but solely as Security Agent**

2

**EXHIBIT 4**

**NOTIFICATION IN RESPECT OF SECURITY AGENT'S MANAGEMENT TIME MSN 173**

‎ 21 ‎ January 2022

**SENT BY EMAIL TO: JLPS-NOTICES@JLPS.CO.JP**

**Attention: Fund Administration**
JPA No. 49 Co., Ltd.
c/o JP Lease Products & Services Co., Ltd
Kasumigaseki Common Gate 34F
3-2-1, Kasumigaseki
Chiyoda-ku
Tokyo 100-0013
Japan
Fax: + 81 3 6206 1395
Email: jlps-notices@jlps.co.jp

**COPY BY EMAIL TO: ROBERT.MELSON@KLGATES.COM /
TAKAHIRO.KAWAGUCHI@KLGATES.COM**

**Attention: Robert E. Melson/ Takahiro Kawaguchi**

K&L Gates Gaikokuho Joint Enterprise
Toranomon Hills Mori Tower 28F
1-23-1 Toranomon, Minato-ku
Tokyo, 105-6328
Japan
Fax: +81 3 3597 6421
Email: Robert.Melson@klgates.com / Takahiro.Kawaguchi@klgates.com

**COPY TO LENDERS VIA SENIOR AGENT BY EMAIL TO: FRANCOIS.BARBUT@CA-CIB.COM /
ALEXANDRA.DELAUNE@CA-CIB.COM      /      MOUNIA.BEKKALI@CA-CIB.COM      /
NATHALIE.ELKADY@CA-CIB.COM / RONALD.GALVISACEBEDO@CA-CIB.COM**

**Attention: Structured Finance Agency & Middle Office**
Crédit Agricole Corporate and Investment Bank (as Senior Agent)
12 place des Etats-Unis, CS 70052
92547 Montrouge Cedex, France
Fax: +33 1 41 89 85 75
Email: francois.barbut@ca-cib.com / alexandra.delaune@ca-cib.com / mounia.bekkali@ca-cib.com /
nathalie.elkady@ca-cib.com / ronald.galvisacebedo@ca-cib.com

Dear All

**SECURITY AGENT'S MANAGEMENT TIME IN RELATION TO ONE AIRBUS A350-941 AIRCRAFT
WITH MANUFACTURER'S SERIAL NUMBER 173 (THE AIRCRAFT)**

We refer to:

a) the Senior Facility Agreement dated 22 December 2017 between the Lenders, Crédit Agricole
Corporate and Investment Bank (**CACIB**), as security agent, and JPA No.49 Co., Ltd as
Borrower (amongst others) as amended, restated or supplemented from time to time (the
**Senior Facility Agreement**);

b) the Junior Facility Agreement dated 22 December 2017 between the Lenders, **CACIB**, as security agent, and JPA No. 49 Co., Ltd as Borrower (amongst others) as amended, restated or supplemented from time to time (the **Junior Facility Agreement**);

c) the Proceeds Agreement dated 22 December 2017 between the Lenders, CACIB, as security agent, and the Borrower (amongst others) as amended, restated or supplemented from time to time (the **Proceeds Agreement**);

d) the Enforcement Event Notice which was sent to you on 1 December 2021; and

e) the Resignation and Appointment Agreement dated 2 December 2021 made between FitzWalter Capital Partners (Financial Trading) Limited (**FitzWalter**) and CACIB whereby CACIB resigned as security agent and FitzWalter was appointed as security agent in respect of the financing of the Aircraft.

Capitalised terms not otherwise defined herein shall have the meaning ascribed to such terms in the Proceeds Agreement.

Pursuant to paragraph 2.19 of Schedule 2 of the Proceeds Agreement we hereby notify you that in respect of the enforcement and/or preservation of security any amount payable to the Security Agent for its management time or other resources pursuant to:

(a) Paragraph 2.14 (*Lenders' indemnity*) of Schedule 2 to the Proceeds Agreement;
(b) Clause 16 (*Costs and Expenses*) of the Senior Facility Agreement; and/or
(c) Clause 16 (*Costs and Expenses*) of the Junior Facility Agreement

will be calculated on the basis of the following daily rates:

| | |
|---|---|
| Co-Founder | $50,000.00 |
| Partner | $25,000.00 |
| Non-Partner | $10,000.00 |

We hereby expressly reserve all the rights, powers and remedies whether arising under the Transaction Documents, the Relevant Documents, the Security Documents applicable law and/or however arising that we may have now and/or which may arise subsequently. In particular, we expressly reserve our right to make demands for the costs payable to the Security Agent for its management time or other resources.

Nothing in this Notice constitutes a waiver of any rights or remedies which we have or may have now or subsequently.  Nothing in this notice waives or varies any of the terms of the Relevant Documents.

The terms of this notice and all non-contractual obligations arising out of or in connection with it shall be governed by and construed in accordance with English law.

Yours faithfully,

_____

**FitzWalter Capital Partners (Financial Trading) Limited (not in its individual capacity but solely as Security Agent)**

**EXHIBIT 5**

**To:** FitzWalter Capital Partners (Financial Trading) Limited (not in its individual capacity but solely as security agent) (the "**Security Agent**")

|            |                          |
|------------|--------------------------|
| Attention: | Joe Brough               |
| Address:   | 21 Bruton Street, London W1J 6QD |
| Fax:       | N/A                      |
| Email:     | joe.brough@fwcap.com     |
|            | legalnotices@fwcap.com   |
|            | VNA-A350@fwcap.com       |

## BY EMAIL

**From:** Sumitomo Mitsui Trust Bank, Limited, acting on behalf of itself and acting in its capacity as trustee for Trust No. 00011436 for the benefit of the beneficiaries of the trust, each in its capacity as a senior lender (collectively, "**SMTB**")

**Copy to:** JPA No. 49 Co., Ltd.

|            |                          |
|------------|--------------------------|
| Attention: | Fund Administration      |
| Address:   | c/o JP Lease Products & Services Co., Ltd. |
|            | Kasumigaseki Common Gate 34F |
|            | 3-2-1, Kasumigaseki, Chiyoda-ku |
|            | Tokyo 100-0013           |
|            | Japan                    |
| Fax:       | +81 3 6206 1395          |
| Email:     | jlps-notices@jlps.co.jp  |

with a copy to K&L Gates Gaikokuho Joint Enterprise

|            |                          |
|------------|--------------------------|
| Attention: | Robert E. Melson / Takahiro Kawaguchi |
| Address:   | Toranomon Hills Mori Tower 28F |
|            | 1-23-1, Toranomon, Minato-ku |
|            | Tokyo 105-6328           |
|            | Japan                    |
| Fax:       | +81 3 3597 6421          |
| Email:     | Robert.Melson@klgates.com |
|            | Takahiro.Kawaguchi@klgates.com |

**Copy to:** Senior Lenders via Crédit Agricole Corporate and Investment Bank (as Senior Agent)

|            |                          |
|------------|--------------------------|
| Attention: | Structured Finance Agency & Middle Office |
| Address:   | 12 place des Etats-Unis, CS 70052 |
|            | 92547 Montrouge Cedex, France |
| Fax:       | +33 1 41 89 85 75        |
| Email:     | francois.barbut@ca-cib.com |
|            | alexandra.delaune@ca-cib.com |
|            | mounia.bekkali@ca-cib.com |
|            | nathalie.elkady@ca-cib.com |
|            | ronald.galvisacebedo@ca-cib.com |

17 February 2022

**RESPONSE LETTER TO "NOTIFICATION IN RESPECT OF SECURITY AGENT'S MANAGEMENT TIME MSN 173"**

**Re: One (1) Airbus A350-941 aircraft with manufacturer's serial number 173 (the "Aircraft")**

1.    We refer to the proceeds agreement dated 22 December 2017 between, among others, JPA No. 49 Co., Ltd. as borrower, JP Lease Products & Services Co., Ltd. as borrower parent, Crédit Agricole Corporate and Investment Bank as senior agent and junior agent and the lenders named therein as lenders in respect of the Aircraft (the "**Proceeds Agreement**").

2.    Capitalised terms used in this letter and not otherwise defined shall have the meanings given to them in the Proceeds Agreement.

3.    We are in receipt of the "Notification in respect of Security Agent's Management Time MSN 173" dated 21 January 2022 issued by the Security Agent in respect of the Aircraft (the "**Management Time Notice**"). The Management Time Notice purports to notify the recipients thereof that amounts payable to the Security Agent for its management time or other resources pursuant to paragraph 2.14 of Schedule 2 of the Proceeds Agreement, clause 16 of the Senior Facility Agreement, and clause 16 of the Junior Facility Agreement will be calculated on the basis of daily rates of: (i) $50,000.00 for a Co-Founder, (ii) $25,000.00 for a Partner, and (iii) $10,000.00 for a Non-Partner (collectively, the "**Purported Daily Rates**").

4.    Paragraph 2.19 of Schedule 2 of the Proceeds Agreement provides:

> Any amount payable to the Security Agent under paragraph 2.14 (*Lenders' indemnity to the Security Agent*) above, clause 16 (*Costs and Expenses*) of the Senior Facility Agreement and clause 16 (*Costs and Expenses*) of the Junior Facility Agreement shall include the cost of utilising the Security Agent's management time or other resources, but only to the extent that this applies to enforcement or preservation of security or as part of any restructuring or rescheduling of the Secured Obligations, and will be calculated on the basis of such **reasonable** daily or hourly rates as the Security Agent may notify to the Borrower and the relevant Lenders, and is in addition to any fee paid or payable to the Security Agent.

(emphasis added).

5.    The Purported Daily Rates set out in the Management Time Notice are not reasonable and are significantly in excess of similar rates charged by third party security agents in comparable transactions. Accordingly, SMTB objects to the Purported Daily Rates as a basis for calculating amounts payable to the Security Agent pursuant to paragraph 2.19 of Schedule 2 of the Proceeds Agreement.

6.    This letter is without prejudice to any of SMTB's rights or remedies under the Proceeds Agreement, under any other Transaction Document and/or under applicable law or otherwise, and SMTB may at its option exercise any such rights or remedies at any time.

7.    SMTB reserves all of its rights and remedies under the Proceeds Agreement, under any other Transaction Document and/or under applicable law (including, without limitation, the right to object to any amounts claimed by the Security Agent pursuant to paragraph 2.19 of Schedule 2 of the Proceeds Agreement calculated based on the Purported Daily Rates set out in the Management Time Notice).

8.    Any delay (whether past, present or future) in the exercise or any non-exercise of any of those rights and remedies by SMTB shall not constitute a waiver of the same.

9.    All of SMTB's rights under the Proceeds Agreement and the other Transaction Documents remain in full force and effect.  No action taken or not taken by SMTB is intended as, and shall not be construed as, a waiver of, or consent or amendment to, any terms of the Proceeds Agreement and any other Transaction Document.

10.    This letter and all non-contractual obligations arising from or in connection with it are governed by and shall be construed in accordance with English law.

[SIGNATURE PAGE FOLLOWS]

For and on behalf of

**SUMITOMO MITSUI TRUST BANK, LIMITED**, acting on behalf of itself, in its capacity as a senior lender

By:

Name:        Nobuo Murakami

Title:        Executive Officer and General Manager of Structured Finance Department

For and on behalf of

**SUMITOMO MITSUI TRUST BANK, LIMITED**, acting in its capacity as trustee for Trust No. 00011436 for the benefit of the beneficiaries of the trust, in its capacity as a senior lender

By:

Name:        Hirohito Niji

Title:        General Manager of Structured Trust Products Department