VEDDER PRICE P.C.
Michael J. Edelman
Jeremiah J. Vandermark
1633 Broadway, 31st Floor
New York, New York 10019
Telephone:     (212) 407-7700

*Counsel for JP Lease Products & Services Co. Ltd.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>JPA NO. 111 CO., LTD. and<br>JPA NO. 49 CO., LTD.,<br><br>                    Debtors. | Chapter 11<br><br>Case No.: 21-12075 (DSJ)<br><br>(Jointly Administered) |

JP Lease Products & Services Co. Ltd. ("*JP Lease*"), as both the parent of the Debtors (as defined herein) and a creditor, by and through its undersigned counsel, hereby submits this statement:

(a) in support of the *Debtors' Application for Entry of Orders: (I) (A) Approving Bidding Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (B) Establishing Stalking Horse Bidders and Bid Protections; (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Authorizing Enforcement Actions; (E) Scheduling an Auction and a Sale Hearing; and (F) Approving the Form and Manner of Notice Thereof; and (II) (A) Approving the Sale of the Purchased Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances; and (B) Granting Related Relief*, filed on December 31, 2021 [Docket No. 21], to the extent related to Part II of such motion (such portion of the motion, the "*Sale Motion*")[1] that seeks authority to sell the primary assets of the JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd.. the above-referenced debtors and debtors-in-possession (collectively, the "*Debtors*"), and

(b) in support of the *Debtors' Omnibus Reply to the Objections of Fitzwalter Capital Partners (Financial Trading) Limited and the Intermediate Lessors Regarding the Proposed Sale*, filed by the Debtors on the date hereof [Docket No. 130] (the

---

[1] This Court has already approved the first part of such motion that sought approval of bidding procedures (the "*Bidding Procedures*"). *See* Order approving Bidding Procedures, entered February 4, 2022 [Docket No. 101] (the "*Bidding Procedures Order*").

"*Debtors' Omnibus Reply*")[2] that responds to both (i) the *Fitzwalter Capital Partners (Financial Trading) Limited's Preliminary Objection To Sale*, filed Fitzwalter Capital Partners (Financial Trading) Limited ("*FWC*") on February 17, 2022 [Docket No. 120] (the "*FWC Sale Objection*"), and (ii) the Objection And Reservation Of Rights Of JLPS Leasing Uranus Limited and JLPS Leasing Draco Limited to Proposed Sale of Purchased Assets, filed by JLPS Leasing Uranus Limited and JLPS Leasing Draco Limited, as the intermediate lessors one day after FWC enforced rights under the equity pledge for such entities and became the owners of such entities (the "*FWC Affiliated Objectors*", and along with FWC, the "*FWC Entities*"), which objection was filed by the FWC Affiliated Objectors on February 17, 2022 [Docket No. 118] (the "*FWC Affiliates' Sale Objection*", and along with the FWC Sale Objection, the "*FWC Entities' Sale Objections*").

In support hereof, JP Lease respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The sole bases for the FWC Entities Objections' attacks against the sale process being run by the Debtors is that English law somehow prohibits the proposed Sale because the Debtors do not retain any interest in at least some portion of the Debtors' Purchased Assets. Specifically, the FWC Entities claim that the Debtors have no rights to sell the claim assets against Vietnam Airlines and the associated rights under the Head Leases (collectively, the "*Lease Assets*") – which are the sole assets remaining under the Head Leases and the Subleases as FWC terminated those leases prepetition. Such contentions, however, have no basis in law or in fact. This Court has previously rejected such contentions. *See, e.g., Memorandum of Decision and Order Resolving Motion to Dismiss*, dated February 1, 2022 [Docket No. 97 in the Chapter 11 Cases] (the "*Dismissal Opinion*"), at 14 ("each [Debtors'] assets included lease payment and other contractual rights associated with its ownership of the aircraft . . . as well as the aircraft itself.")

2.      Not only are the FWC Entities ignoring this Court's prior rulings, they are ignoring the controlling law that governs these disputes – the Cape Town Treaty (as defined herein). The

---

[2]   Capitalized terms used herein have the meanings ascribed to such terms in the Debtors' Omnibus Reply or, if not defined therein, in the Adversary Complaint against FWC (as defined herein).

2

Cape Town Treaty governs all of the mortgages, security instruments and leases associated with the Aircraft. Under such treaty, Article 9(4) of the Cape Town Convention provides that the type of sale being proposed by the Debtors are authorized by the Cape Town Treaty – in fact, the Cape Town Treaty further provides that the parties cannot waive a debtors' rights to effect such a sale or disposition.

3. The FWC Entities' apparent efforts to mislead this Court by ignoring controlling law amounts to a further effort by FWC to aggressively push its loan-to-own strategy over the Purchased Assets. Other than pursuing FWC's loan-to-own goals, no purpose is furthered by FWC's efforts to undermine the Debtors' efforts to maximize the value of the Debtors' assets. In this regard, the FWC Entities do not contend that the sales process proposed by the Debtors will undervalue the Debtors' assets – rather, the maximization of value seems to be exactly what the FWC Entities are seeking to undermine. By publicly announcing to the world that they will pursue a scorched earth litigation strategy to promote their loan-to-own strategy and grossly inflating their asserted amount of secured obligations, FWC is pursuing a pervasive campaign to chill the bidding in the Debtors' sales process and, in violation of the stay, to assert control over the Debtors' property rights – all of which actions are causing substantial and continuing damages upon the Debtors' and their estates.[3]

4. Furthermore, as the Debtors have detailed in the Debtors' Omnibus Reply, the inflated charges and fees asserted by FWC in its supposed accounting have no basis in law or fact. FWC has asserted that lease claims (totaling over $20 million) collaterally assigned to support the

---

[3] In this regard, the hypocrisy of FWC's efforts here is further evidenced by fact that although they claim ownership of the Lease Assets (which is legally an utter fabrication) in their effort to prevent a sale, they have failed to reduce the amount of the secured indebtedness owed to account for the value of such Lease Assets. *See* Docket No. 80, Exhibit 6, Appendixes I & II (accountings filed by FWC allegedly detailed secured amounts owed by the Debtors that grossly inflate secured obligations).

3

Debtors' secured debt obligations somehow increase such secured obligations – they do not: such collateral supports the debt, it does not increase the amount of such debt obligations. Further, the supposed security trustee's management fees unilaterally imposed by FWC postpetition directly contravenes the operative documents that expressly bar a successor security agent from charging increased fees. Next, the defamation claims asserted by FWC fall outside the scope of secured obligations under the terms of the operative documents – which limits secured obligations to claims arising under the terms of the transaction documents. Finally, FWC's attempt to foist millions of dollars of expenses in furtherance of FWC's loan-to-own strategy after being guaranteed full debt repayment is unreasonable as a matter of law. *See generally* Debtors' Omnibus Reply, at ¶¶ 30-42.

5. In sum, there is no basis in law or fact supporting the FWC Entities' Sale Objections. As the Debtors have noted in the Debtors' Omnibus Reply, in similar circumstances many courts have classified the exact same type of actions as being undertaken here by FWC – where FWC purchased a majority of the senior loans on the eve of the commencement of these Chapter 11 Cases as part of a premeditated loan-to-own strategy – as an impermissible "ulterior motive" that justifies equitable relief and damages.[4] Here, this Court should not countenance FWC's obvious ulterior motive to further its loan-to-own strategy, especially where it has pursued such strategy in violation of governing laws, and should fully reject FWC's machinations to undermine the Debtors' efforts to maximize value in these Chapter 11 Cases.

---

[4] *See* Debtors' Omnibus Reply at footnotes 4 & 5 and associated text for a fuller discussion of "ulterior motive" case law.

4

## BACKGROUND FACTS

6.     JP Lease hereby references and incorporate herein the facts set forth in the Debtors' Omnibus Reply and the underlying Sale Motion and the factual declarations submitted in support thereof.

## ARGUMENT

### IN CONTRAST TO ASSERTIONS OF THE FWC ENTITIES, CONTROLLING LAW SUPPORTS THE RIGHT OF THE DEBTORS TO SELL ALL OF THE PURCHASED ASSETS THAT ARE SUBJECT TO THE SALE MOTION, INCLUDING THE LEASE ASSETS

7.     As most of the legal and factual arguments are covered in the Debtors' filings, JP Lease hereby focuses upon the applicability of the Cape Town Treaty as the governing law for these transactions – which governing law expressly contemplates and protects the Debtors' ability to conduct the transactions proposed by the Debtors under the Sale Motion. JP Lease respectfully submits that the relief sought in the Sale Motion, as such may be modified to reflect further rulings of this Court, should be approved for the following additional reasons.

8.     As FWC has conceded several times, it purchased its majority stake of the senior loans under the Secured Obligations and self-appointed itself as the security agent thereunder for the sole purpose of effecting a loan-to-own strategy with respect to the Debtors' assets. Then, as detailed in the Debtor's adversary proceeding complaint,[5] FWC orchestrated an immediate enforcement sale procedure that violated numerous requirements under governing laws and the operative documents. Specifically, FWC acted unlawfully by violating governing legal requirements mandated under the Cape Town Treaty and the U.C.C., as well as the statutory mandates for acting in a commercially reasonable manner. These breaches have caused the

---

[5] *See* Complaint filed in Debtors' adversary proceeding against FWC in these Chapter 11 Cases. Adversary Proceeding No. 22-01004, Docket No. 1 (the "*Adversary Complaint against FWC*").

5

Debtors and all parties in interest substantial damages and forced the Debtors to initiate these Bankruptcy Cases is response to FWC breaches. These matters are detailed more fully in the Debtors' Adversary Complaint against FWC.

9. Thereafter, after the Debtors commenced these Chapter 11 Cases that thwarted FWC's original loan-to-own strategies and proposed to pay-off FWC in full through the proposed Sale, FWC has commenced an all-out assault on established laws and legal norms to force its loan-to-own strategy.

10. Indeed, within days after the Debtors filed the Sale Motion that guaranteed the full pay-off of all secured obligations, FWC filed a motion to dismiss these cases by arguing that it was the owner of all of the Debtors' assets. As this Court knows, FWC then submitted a legal opinion stating that under English "law", the Debtors retain no interest in the Purchased Assets – which original opinion disingenuously omitted all equity considerations and avoided any reference to the Debtors' rights to redeem from the scope of such original opinion. *See* Docket 57, Exhibit 1 (Original Opinion of Akhil Shah) (limiting opinion to issues of "law" and "legal effect" of assignment). Only after the Debtors expressly called out such omissions did FWC acknowledge the Debtors' property rights and interests.

11. Now, the FWC Entities are raising the same rehashed arguments that this Court considered and rejected previously. FWC, however, is again seeking to mislead this Court by ignoring controlling law that specifically recognizes the Debtors ability to effect the proposed Sale being pursued by the Debtors. In this regard, the FWC Entities are ignoring governing and controlling law that allows the Debtors to sell all of Purchased Assets, including the Lease Assets,

6

free and clear of all liens, claims and interest. Specifically, the FWC Entities have fully ignored that these transactions are *all* governed and controlled by the Cape Town Treaty.[6]

12. The Cape Town Treaty has been ratified and in effect in each of (w) the United States (as of Mar. 1, 2006), (x) Ireland (as of Mar. 1, 2006), (y) Vietnam (as of Jan. 1, 2015) and (z) the United Kingdom (as of Jan. 11, 2015) – in each case well before the underlying transactions were executed.[7] With respect to England, after ratification by the United Kingdom, the Cape Town Convention was implemented into English law by The International Interests in Aircraft Equipment (Cape Town Convention) Regulations 2015.[8]

13. Having been ratified and made a part of English law, the FWC Entities' complete failure to address the ramifications of the Cape Town Treaty raises serious issues here. And the reason for this omission is clear – the Cape Town Treaty wholly undermines FWC's loan-to-own strategy and their current objections to the Sale Motion.

14. The Cape Town Treaty governs the rights of the parties with respect to the Lease Assets and the Aircraft. Specifically, the Cape Town Treaty covers the leases and security agreements at issue here, as they constitute "international interests" over "aircraft objects." *See* Cape Town Convention, Articles 1(p) (definition of international interests), 2 (coverage over leases and security agreements of airframes and aircraft engines). Additionally, the rights and claims under the Head Leases and the Subleases – *i.e.*, the "*Lease Assets*" – are also governed by the Cape as "associated rights" relating to the Aircraft. *See* Cape Town Convention, Article 2(1)

---

[6] The "Cape Town Treaty" is comprised of, collectively, (a) that certain Convention on International Interests in Mobile Equipment (the "Cape Town Convention"), and (b) that certain Protocol to the Convention on International Interests on Matters Specific to Aircraft Equipment (the "Cape Town Protocol"), each as adopted on November 16, 2001 at a diplomatic conference in Cape Town, South Africa. Collectively, the Cape Town Protocol and the Cape Town Convention are referred to as the "Cape Town Treaty".
[7] *See* https://www.unidroit.org/instruments/securityinterests/aircraft-protocol/status.
[8] *See* https://www.legislation.gov.uk/uksi/2015/912/contents.

7

("This Convention provides for the constitution and effects of an international interest in aircraft objects and associated rights"). "Associated rights" include all "rights to payment or other performance by a debtor under an agreement which are secured by or associated with the aircraft object." *See* Cape Town Convention, Article 1(c) (definition of "associated rights").

15. Based upon its terms, the Cape Town Treaty is the governing law over the New York Mortgages, the English Security Agreements, the Intermediate Assignments, the Head Leases, the Subleases – as the Aircraft are registered in Vietnam (which ratified the Cape Town Treaty years before the parties entered into the Transaction Documents) – thereby triggering the Cape Town Treaty's coverage over all of those agreements and the associated Aircraft and Lease Assets.[9]

16. In addition to restricting and providing how enforcement actions may be undertaken – which legal requirements were violated by FWC as detailed in the Adversary Complaint against FWC, the Cape Town Treaty expressly allows for the dispositions proposed by the Debtors under the Sale Motion. Specifically, Section 9(4) of the Cape Town Convention specifically provides:

> At any time after default as provided in Article 11 and before sale of the charged object or the making of an order under paragraph 2, the chargor or any interested person may discharge the security interest by paying in full the amount secured, subject to any lease granted by the chargee under Article 8(1)(b) or ordered under Article 8(2). Where, after such default, the payment of the amount secured is made in full by an interested person other than the debtor, that person is subrogated to the rights of the chargee.

---

[9] As an additional ground for the mandated application of the Cape Town Treaty, such treaty also governs the Head Leases and the Subleases as the lessees under each of those leases were situated in a country that had ratified the Cape Town Treaty at the time that such documents were executed. *See* Cape Town Convention, Art. 2, 3 & 4. Each of the Intermediate Lessors are situated in Ireland. Vietnam Airlines, in turn, is situated in Vietnam. As each of Ireland and Vietnam were subject to the Cape Town Treaty at the time that the Head Leases and Subleases were executed, the Cape Town Treaty also governs Head Leases and the Subleases.

*See* Cape Town Treaty, Article 9(4). Such provision under the Cape Town Treaty specifically provides that the proposed Sale by the Debtor is the exact type of transaction protected and specifically authorized under the Cape Town Treaty. Indeed, such provision not only states that the Successful Bidder would obtain the rights to the Purchased Assets free and clear of all liens, rights and interests held by the holders of the existing secured debt, but the Successful Bidders is subrogated and will itself hold all such liens, claims and rights upon the satisfaction of existing secured debt. Such right of the Debtors to control the disposition of their assets upon the satisfaction of the secured obligations was deemed so important that this provision under the Cape Town Treaty cannot be waived by the parties.[10]

17. Similarly, the New York Mortgage that governs both the Aircraft Lease and the Lease Assets that are being sold by the Debtors also recognizes the rights of the Debtors to sell its assets free and clear of all liens, claims and interests. *See, e.g.,* N.Y. U.C.C. §§ 9-617 (Rights of Transferee of Collateral); 9-623 (Right to Redeem Collateral).

18. Accordingly, the laws governing these transactions and the Debtors' Purchased Property expressly allow for the Sale being proposed by the Debtors to proceed and be free and clear of all liens, claims and interests. Accordingly, the Debtor's proposed Sale is expressly the type of sale protected under the Cape Town Treaty and other governing law and satisfies the requirements under, *inter alia,* Section 363(f)(1) and (5) of the Bankruptcy Code.

---

[10] *See* Cape Town Convention, Art. 15 ( Article 9(4) of the Cape Town Convention cannot be waived by the parties).

## **CONCLUSION**

For the reasons set forth herein, and in the Sale Motion, the Debtors' Omnibus Reply Debtor's Reply and the evidence to be adduced at the hearing, JP Lease submits that the Court should overrule the FWC Entities' Sale Objections in their entirety upon the conclusion of the auction, approve the Sale Motion and approve the Successful Bidders thereunder.

Dated: New York, New York
       February 23, 2022

VEDDER PRICE P.C.

/s/ *Michael J. Edelman*
Michael J. Edelman
Jeremiah Vandermark
1633 Broadway, 31st Floor
New York, New York 10019
Telephone:  (212) 407-7700
E-Mail:     MJEdelman@VedderPrice.com
E-Mail:     JVandermark@VedderPrice.com

*Counsel for JP Lease Products & Services Co. Ltd.*