# EXHIBIT 1

# Item 39

| | |
|---|---|
| **From:** | Zachary Russell |
| **Sent:** | Wednesday, January 26, 2022 7:10 AM |
| **To:** | Lynda Calderon; 'jones.chambers@nysb.uscourts.gov' |
| **Cc:** | Benjamin Finestone; Emiliano Delgado; Eric Winston; Justin Griffin; Scott Lucy; Amanda Glaubach; Brian Shaughnessy; Kyle Ortiz; Frank Oswald; Eitan Blander; mjedelman@vedderprice.com; sgreissman@whitecase.com; JVandermark@VedderPrice.com; Robert.Johnson@CliffordChance.com; christopher.giaimo@squirepb.com; nava.hazan@squirepb.com; Asher Griffin |
| **Subject:** | In re JPA No. 111 Co. Ltd. - Loechteken Deposition Designations.pdf |
| **Attachments:** | In re JPA No. 111 Co. Ltd. - Loechteken Deposition Designations.pdf |

Dear Judge Jones,

Please find attached the deposition designations for Heinrich Loechteken that the parties are submitting in lieu of a live adverse direct examination.  The green highlights constitute FitzWalter's designations, the yellow highlights are the Debtors' counter-designations, and the blue highlights are FitzWalter's rebuttal designations.  While some of the highlighted material contains objections that were lodged during the deposition, none of the parties are pressing any objections with respect to the designations.

Thank you,

**Zachary Russell**
*Associate*
**Quinn Emanuel Urquhart & Sullivan, LLP**

51 Madison Avenue, 22nd Floor
New York, NY 10010
212-849-7531 Direct
212-849-7000 Main Office Number
212-849-7100 FAX
zacharyrussell@quinnemanuel.com
www.quinnemanuel.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

1

2  UNITED STATES BANKRUPTCY COURT
   SOUTHERN DISTRICT OF NEW YORK
3

   _____
4  IN RE:                        :
                                 : CHAPTER 11
5  JPA NO. 111 CO., LTD., AND    :
   JPA NO. 49 CO., LTD.,         : CASE NO. 21-12075 (DSJ)
6                                :
                                 :
7              Debtors.          :
   _____:
8

9

10

11

12

13

14

15         VIDEOTAPED DEPOSITION OF HEINRICH LOECHTEKEN

16            AMSTERDAM, NORTH HOLLAND, NETHERLANDS

17               SUNDAY, JANUARY 23, 2022

18

19                  (Reported Remotely)

20

21

22

23  REPORTED BY:  TANYA L. VERHOVEN-PAGE,
                  CCR-B-1790
24

25  TSG JOB #:  205478

1

2                 January 23, 2022

3                     2:42 p.m.

4

5           Videotaped deposition of

6    HEINRICH LOECHTEKEN, held in Amsterdam,

7    North Holland, Netherlands before Tanya L.

8    Verhoven-Page, Certified Court Reporter

9    and Notary Public of the State of Georgia.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    APPEARANCES OF COUNSEL

3

   On behalf of the Debtors:
4
         TOGUT, SEGAL & SEGAL
5        One Penn Plaza
         New York, New York 10119
6        BY:  BRIAN SHAUGHNESSY, ESQ.
              AMANDA GLAUBACH, ESQ.
7             (Via Zoom)

8

9

10

11 On behalf of FitzWalter Capital Partners (Financial
   Trading) Limited:
12
         QUINN EMANUEL URQUHART & SULLIVAN
13       865 S. Figueroa Street
         Los Angeles, California 90017
14       BY:  JUSTIN GRIFFIN, ESQ.
              (Via Zoom)
15

16

17

18       QUINN EMANUEL URQUHART & SULLIVAN
         51 Madison Avenue
19       New York, New York 10010
         BY:  ZACHARY RUSSELL, ESQ.
20            (Via Zoom)

21

22

23

24

25

1

2                    APPEARANCES OF COUNSEL

3

4   On behalf of JP Lease:

5           VEDDER PRICE
            1633 Broadway
6           New York, New York 10019
            BY:  MICHAEL EDELMAN, ESQ.
7               (Via Zoom)

8

9

10

11   THE VIDEOGRAPHER:  Lem Lattimer

12

13                         -      -      -

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1

2                          I N D E X

3

4               WITNESS: HEINRICH LOECHTEKEN

5

6     Examination                              Page

7   BY MR. GRIFFIN                              9

8

9                        EXHIBITS:

10    Loechteken
      Deposition
11      Exhibit           Description          Page

12

13   Exhibit 1          Supplemental Loechteken
                        Declaration, Document
                        No. 78                   25
14
     Exhibit 2          Loechteken Declaration,
15                      Docket No. 44            64

16   Exhibit 3          Proceeds agreement
                        for MSN 111 and
17                      JPA No. 111 and MSN-067  126

18   Exhibit 4          Document bearing Bates
                        numbers
19                      JPA111-00000476
                        through
20                      JPA111-000000479        150

21   Exhibit 5          111 Intermediate
                        Lessor Security
22                      Assignment              154

23   Exhibit 6          Asset Purchase Agreement
                        submitted as Exhibit D,
24                      Docket No. 58-5          175

25

Page 6

1

2                              EXHIBITS:

3    Loechteken
     Deposition
4       Exhibit           Description            Page

5
     Exhibit 7           2022-1-21 QE Letter
6                        with Debtors Request
                         to Pursue                  189
7
     Exhibit 8           2021.12.31 Docket 21
8                        A-1 Bidding Procedures
                         Order                      239
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    H. LOECHTEKEN

2      AMSTERDAM, NORTH HOLLAND, NETHERLANDS;

3           SUNDAY, JANUARY 23, 2022

4                 2:42 P.M.

5

6           P R O C E E D I N G S

7

8           THE VIDEOGRAPHER:  Good morning,

9      Counselors.  My name is Lem Lattimer.  I

10     am a legal videographer in association

11     with TSG Reporting, Inc.

12           Due to the severity of COVID-19 and

13     following the practice of social

14     distancing, I will not be in the same

15     room with the witness.  Instead, I will

16     record this videotaped deposition

17     remotely.  The reporter, Tanya Page, also

18     will not be in the same room and will

19     swear the witness in remotely.

20           Do all parties stipulate to this

21     video recording and remote swearing and

22     that it will be admissible in the

23     courtroom as if it had been taken

24     following Rule 30 of the Federal Rules of

25     Civil Procedures and the state's rules

Page 8

1                    H. LOECHTEKEN

2      where this case is pending?

3            MR. GRIFFIN:  Yes.

4            THE VIDEOGRAPHER:  Thank you.  This

5      is the start of media labeled number one

6      of the video recorded deposition of

7      Heinrich Loechteken in the matter of In

8      Re: JPA No. 111 Co., LTD, et al., on

9      January 23rd, 2022 at approximately

10     3:43 p.m.

11           All appearances are noted on the

12     record.

13           Will the court reporter please

14     swear in the witness.

15

16   Thereupon --

17                 HEINRICH LOECHTEKEN,

18   called as a witness, having been first duly sworn,

19   was examined and testified as follows:

20

21           MR. GRIFFIN:  Are we ready to go or

22     are you going to take appearances or -- I

23     just want to make sure.  Ms. Court

24     Reporter?

25           (Discussion held off the record.)

1              H. LOECHTEKEN

2                EXAMINATION

3    BY MR. GRIFFIN:

4        Q    Good morning, Mr. Loechteken.  My name is

5    Justin Griffin.  I'm counsel for FitzWalter Capital

6    Partners Financial Trading Limited.

7              Are you represented by counsel here

8    today?

9        A    Yes.

10       Q    Okay.  And that's Mr. Shaughnessy; is

11   that correct?

12       A    That's correct.

13       Q    Okay.  Have you ever been deposed before?

14       A    No.

15       Q    Before we start, I want to go through

16   some ground rules just so we can all be on the same

17   page.

18              Is that okay with you?

19       A    Yeah, fine.

20       Q    First of all, can you state and spell

21   your name for the record.

22       A    My name is Heinrich Loechteken, which is

23   H-E-I-N-R-I-C-H, is the first name, and Loechteken,

24   L-O-E-C-H-T-E-K-E-N, is the last name.

25       Q    And where are you located today?

1                        H. LOECHTEKEN

2        A     I'm in Wassenaar, in the Netherlands.

3        Q     First of all, I just want you to

4    understand that you are under oath.  The oath that

5    you've taken is the same oath -- well, I guess have

6    we --

7               (Discussion held off the record.)

8    BY MR. GRIFFIN:

9        Q     First of all, I wanted you to understand

10   that you're under oath.  The oath you've taken is the

11   same oath you would take if you were in a court of

12   law and carries the same penalty of perjury.

13              Are you aware of that?

14       A     Yes.

15       Q     You notice we have a court reporter on

16   the call today.  All of my questions and all of your

17   answers and any objections that your counsel or

18   anybody else puts on the record will be transcribed

19   by the court reporter.

20              You will have an opportunity to review

21   the transcript and make corrections, but if you make

22   changes, we will be able to comment on those changes.

23              Do you understand that?

24       A     I understand.

25       Q     We need audible answers.  So a couple of

1                         H. LOECHTEKEN

2   times you've nodded, which is not unexpected in

3   normal conversations, but because we have a

4   transcript we need audible answer, yeses or nos.

5   Things like uh-huh or uh-uh is difficult for the

6   court reporter to transcribe.  So please do your best

7   to give audible answers.

8               Do you understand that?

9       A    Yes.

10      Q    Again, because there's a court reporter,

11  we should endeavor not to interrupt each other.  So

12  if you can please wait for me to finish my question

13  and I'll endeavor to wait to finish your answer so we

14  can have a clean transcript.  Does that work?

15      A    Yes.

16      Q    I don't want you answering questions if

17  you're unsure what's being asked.  So if you don't

18  understand a question, you can ask for clarification.

19              Can we agree that if you do not ask for a

20  clarification that you do, in fact, understand the

21  question?

22      A    Yes, we can, if you give me a bit of time

23  to think about it.  Because I'm not a native speaker,

24  it might take a little longer, especially if the

25  English is a bit more complex for me to comprehend.

1                           H. LOECHTEKEN

2        Q      Understood, and obviously we want you to

3    take the time to understand the question, so if you

4    need a bit, just let us know.

5        A      Okay.

6        Q      I also don't want you to speculate or

7    guess when answering, but I'm entitled to your best

8    recollection and your estimate.

9               Does that make sense?

10       A      Makes sense, yes.

11       Q      Your counsel may make some objections or

12   maybe some of the other counsel may make objections.

13   You must respond to questions even if your counsel

14   objects, unless you're instructed not to answer.

15              Do you understand that?

16       A      I understand.

17       Q      This is not an endurance test.  So if you

18   need to take break, just let me know.  The only thing

19   I ask is that if there is a question pending, that

20   you provide an answer before we take a break.

21       A      Understood.

22       Q      And I think, generally, we'll take breaks

23   around the hour to give the court reporter a chance

24   to, you know, rest her -- you know, to rest her

25   fingers.

1                         H. LOECHTEKEN

2               Is there any reason, medical or

3    otherwise, you cannot provide your most complete and

4    honest testimony today?

5         A    No.

6         Q    Before we get started, is anybody else in

7    the room with you?

8         A    No.

9         Q    Is your cell phone turned off?

10        A    Yes.

11        Q    Is there anything else up on your

12   computer other than the Zoom and the exhibit share

13   link, when we get that up and running?

14        A    No, it just has the -- I have my e-mail

15   open, obviously, because I need to watch for the

16   e-mail to come in.

17        Q    But you're not communicating with anybody

18   else --

19        A    No.

20        Q    -- during the deposition; is that

21   correct?

22        A    That's correct.

23        Q    I want to start with your preparations

24   for the deposition today.

25               Did you meet with anybody to prepare?

1                          H. LOECHTEKEN

2          A     I did.

3          Q     Okay.  Who was that?

4          A     Brian.

5          Q     Is that -- when you're saying Brian,

6    that's Mr. Shaughnessy?

7          A     Yeah, Mr. Shaughnessy.

8          Q     And when was that?

9          A     That was on two occasions last week, and

10   the last time yesterday.

11         Q     So two occasions last week and then an

12   additional one -- an additional one last week?

13         A     No.  Two occasions.

14         Q     When was the first occasion?

15         A     Friday evening.

16         Q     For about how long?

17         A     For about an hour and a half.

18         Q     Was anybody else in that meeting?

19         A     Yes.

20         Q     Who else?

21         A     Some other Togut lawyers.

22         Q     So there was Mr. Shaughnessy and some

23   additional lawyers from Togut?

24         A     Correct.

25         Q     And how many total attorneys?

1                           H. LOECHTEKEN

2        A      If I recall correctly, three.

3        Q      Do you know who the other Togut attorneys

4   were?

5        A      Kyle Ortiz, and I forgot the other name.

6        Q      Were there any non attorneys, other than

7   yourself?

8        A      No.

9        Q      And what about the other -- the second

10  occasion, when was that?

11       A      That was yesterday evening.

12       Q      About how long?

13       A      About two hours.

14       Q      And who was involved in that prep?

15       A      Again, Mr. Shaughnessy, Mr. Ortiz and one

16  lawyer from -- Mike Edelman, a lawyer from Vedder

17  Price.

18              Let me think.  There was one more lawyer

19  from Togut, but I forgot the name.  Apologies.

20       Q      Do you know whether Mr. Edelman

21  represents the debtors in this case?

22       A      Mr. Edelman represents us.

23       Q      And when you say us, who are you

24  referring to?

25       A      JP Lease.

1                         H. LOECHTEKEN

2        Q     Are you here testifying on behalf of JP

3   Lease or the debtors?

4              MR. SHAUGHNESSY:  Objection.  Calls

5        for a legal conclusion.

6   BY MR. GRIFFIN:

7        Q     You can answer.

8        A     I think I'm here to represent on behalf

9   of the debtors.

10       Q     You understand that the debtors in these

11  cases are JPA No. 111 and JPA No. 49?

12       A     I understand that.

13       Q     And JP Lease, you understand, is not a

14  debtor in this case, correct?

15       A     I understand that.

16       Q     What is JP Lease's relationship to the

17  debtors?

18       A     JP Lease has set up the debtors.  JP

19  Lease has acquired the assets and puts them into the

20  debtors.  JP Lease has financed the assets with

21  senior, as well as junior loans.  JP Lease has been

22  selling the equity in the debtors to its investors in

23  Japan, and JP Lease manages the ongoing affairs of

24  the debtors.

25       Q     The reason -- I'm going to take some

```
 1                      H. LOECHTEKEN

 2    notes.

 3              MR. SHAUGHNESSY:  Justin, do you

 4         have realtime?

 5              MR. GRIFFIN:  I do.  I got an

 6         e-mail.  Did you get that.

 7              MR. SHAUGHNESSY:  Hold on one sec.

 8         Sorry.  I didn't know I received it.

 9              THE WITNESS:  I got one, as well.

10              MR. SHAUGHNESSY:  You shouldn't

11         look at it.  It's for the lawyers.

12              THE WITNESS:  Okay.

13              MR. SHAUGHNESSY:  I'm sorry.  Just

14         give me a minute.

15              THE WITNESS:  I'm sorry.  I meant I

16         got an e-mail from TSG Reporting.

17              MR. SHAUGHNESSY:  I'm good.

18         Thanks.

19              MR. GRIFFIN:  Why don't we go off

20         the record quickly so he can potentially

21         get his password set up so when we go to

22         the exhibits, if he needs to get an

23         e-mail back.

24              MR. SHAUGHNESSY:  Yeah, let's do

25         that.
```

1                    H. LOECHTEKEN

2          THE VIDEOGRAPHER:  The time is

3    3:55 p.m.  We're off the record.

4                (Brief pause.)

5          THE VIDEOGRAPHER:  The time is

6    3:57 p.m., we're on the record.

7          MR. GRIFFIN:  And just -- before we

8    went off the record, there was a question

9    about what e-mail Mr. Loechteken

10   received, and it was an e-mail for the

11   file share.  It was not an e-mail for the

12   realtime.

13         I just want to confirm that with

14   you, Mr. Loechteken; is that correct?

15         THE WITNESS:  I got you.  Well, I

16   got two e-mails.  One is called

17   Gabriella, from Gabrielle Allegro,

18   Exhibit Link.  It just came in, as well.

19   I don't know what that means.

20         MR. GRIFFIN:  Well, we have it set

21   up.  I just didn't want -- Brian asked --

22   or Mr. Shaughnessy asked on the record --

23   off the record that we confirm that you

24   didn't have the realtime.  So I just

25   wanted to make sure that that was

1                         H. LOECHTEKEN

2          accurate.

3    BY MR. GRIFFIN:

4          Q     Okay.  So we were discussing the second

5    meeting -- prep meeting you had, which was yesterday.

6    It involved three attorneys from the Togut firm and

7    an attorney from the debtor firm, Mr. Edelman; is

8    that correct?

9          A     That's correct.

10         Q     Did you review any documents during

11   either of the meetings?

12         A     Yeah, we reviewed my declaration.

13         Q     Did you review any other documents during

14   those -- either prep session?

15         A     We briefly touched on the term sheet, the

16   stalking horse bid term sheet, but it wasn't a full

17   review.

18               MR. SHAUGHNESSY:  And let me

19         instruct the witness not to reveal any

20         details about those prep sessions.

21   BY MR. GRIFFIN:

22         Q     So you mentioned you reviewed your

23   declaration and you reviewed a term sheet.

24               Did you review any other materials during

25   that prep session that refreshed your recollection?

Page 20

1                              H. LOECHTEKEN

2        A       We reviewed the information that was

3   handed over as part of the discovery, the e-mails.

4        Q       And when you say handed over during

5   discovery, you're referencing the e-mails that were

6   produced by the debtors; is that correct?

7        A       I think so, that's correct.

8        Q       Did you review any other information that

9   refreshed your recollection?

10       A       No, not that I remember.

11       Q       You mentioned you said you reviewed the

12  declaration.  You've submitted a couple in this case

13  and did you review a specific one, all of them, you

14  know, a subset?

15       A       I reviewed two.  The first one --

16       Q       Which two -- sorry.  Which two?

17       A       The one that was very recently filed and

18  then the first declaration.

19       Q       I believe that would be -- the first

20  declaration is the one filed on January 10th?

21       A       Tenth, correct.

22       Q       And then the most recent one would be the

23  supplemental declaration filed on the 21st; is that

24  correct?

25       A       That is correct.

1                          H. LOECHTEKEN

2        Q      When you said you reviewed the term sheet

3    stalking horse, are you referring to the final or are

4    you referring to the iterations?

5        A      I'm referring to two -- it wasn't really

6    a review, as I said.  It was part of the documents

7    that were handed over by the debtors, and there was a

8    version -- there were two versions that were handed

9    over.  I think one that was the near final one and

10   one that was an earlier version, a one-day earlier

11   version.

12       Q      And did any of these documents refresh

13   your recollection about anything?

14       A      Excuse me.  Can you say again?

15       Q      Did any of the documents refresh your

16   recollection?

17       A      Not really.  A little bit, but not

18   really.  It was a fast-moving exercise where there

19   was a lot of moving pieces and it was good to review

20   this again just to kind of see chronology in order,

21   but I think I would have, by and large, understood

22   anyway.

23       Q      Beyond those two prep sessions, did you

24   do any preparation for the deposition on your own?

25       A      I read the two declaration again.

1                          H. LOECHTEKEN

2          Q     Anything else?

3          A     No.

4          Q     So you didn't review any of the

5     transaction documents relating to the -- to either of

6     the financings; is that correct?

7          A     You mean the original loan documents?

8          Q     Yes.

9          A     No.

10         Q     Did you discuss the fact you were going

11    to have a deposition with anybody outside of those

12    two prep sessions?

13         A     Just my wife.

14         Q     Not including your wife.  Any --

15         A     Not including my wife?  I discussed it --

16    I didn't discuss it.  I notified Vedder about it, but

17    they would have known anyway, and I notified Teiji

18    Ishikawa that I have the deposition today.

19         Q     With respect to Mr. Ishikawa, what did

20    you discuss with him?

21         A     I did nothing to discuss with him.  I

22    was, essentially, last week on vacation so we didn't

23    speak last week.  I sent him an e-mail and said it

24    was today.

25         Q     And why did you notify Vedder?

1                          H. LOECHTEKEN

2        A     That it was --

3              MR. SHAUGHNESSY:  Objection.

4              You can answer.

5              THE WITNESS:  Vedder was on the

6        call anyway, and I was asked by another

7        lawyer and Vedder that wasn't --

8              MR. SHAUGHNESSY:  Wait, wait.  Hold

9        on, hold on.

10   BY MR. GRIFFIN:

11       Q     I don't want your --

12             MR. SHAUGHNESSY:  I'm instructing

13       the witness not to reveal any discussions

14       with counsel.

15             THE WITNESS:  Okay.  Thank you.

16             It was just a notification.

17   BY MR. GRIFFIN:

18       Q     And just so I have -- I'm trying to

19   separate who's doing what here.

20             Is Vedder your attorney in this case or

21   is Vedder of JPL or do you not draw any distinction

22   between those two things?

23             MR. SHAUGHNESSY:  Objection.  Calls

24       for a legal conclusion.

25             THE WITNESS:  Am I still to answer?

```
 1                    H. LOECHTEKEN

 2              MR. SHAUGHNESSY:  Yes.

 3              MR. GRIFFIN:  You can.

 4              MR. SHAUGHNESSY:  You have to

 5         answer.

 6              THE WITNESS:  Vedder is the JPL

 7         lawyer.  It's not my personal lawyer.

 8    BY MR. GRIFFIN:

 9         Q    Excepting lawyers, did you have any

10    e-mail communication with anyone about this

11    deposition?  I think you mentioned the e-mail to

12    Mr. Ishikawa, but beyond that?

13         A    I don't remember.  But I certainly can --

14    I don't remember.

15         Q    All right.  Let's get started with some

16    exhibits.  Let's see if this works.

17              The two declarations you said you

18    reviewed were the January 10th and the January 21st;

19    is that correct?

20         A    That's correct.

21         Q    Let's start with the -- the January 21st.

22              MR. SHAUGHNESSY:  Mr. Griffin, just

23         a request that if we're going to be

24         jumping back and forth on documents, if

25         the documents are labeled by exhibit
```

1                          H. LOECHTEKEN

2          numbers, to refer to them as exhibit

3          numbers so the witness doesn't get

4          confused.

5                  MR. GRIFFIN:  That's fine with me.

6                  I hope I put a document in the

7          Submitted folder.  Let's see if that

8          works.

9                  (Loechteken Exhibit No. 1 was

10         marked for the record.)

11  BY MR. GRIFFIN:

12         Q     Can you go to your Submitted folder and

13  let me know if you see the document I'm marking as

14  Exhibit No. 1, which is the Supplemental Loechteken

15  Declaration, Document No. 78?

16         A     Yes, I see that.

17         Q     Can you open that document, please.

18         A     Yeah, I have it open.

19         Q     Are you familiar with this document?

20         A     Yes.

21         Q     What is this document?

22         A     It's a supplemental declaration.

23         Q     If you turn to the -- page four of the

24  document, there's an electronic signature on behalf

25  of you; is that correct?

1                        H. LOECHTEKEN

2        A      That is correct.

3        Q      Okay.  I think it says it was signed in

4   New York, New York, but you weren't in New York when

5   you signed that, were you?

6        A      No.

7        Q      And where were you when you signed it?

8        A      The 21st?  In Rome.

9        Q      Did you review this document before

10  submitting it?

11       A      Yes.

12       Q      And is it -- everything correct to your

13  knowledge?

14       A      Yes.  To my best knowledge, everything

15  correct.

16       Q      I'm going to jump into the specifics of

17  this document.

18              Can you please tell me what your

19  relationship to the debtors in this case -- and by

20  the debtors, you understand I mean JPA No. 111 and

21  JPA No. 49, correct?

22       A      Yes.

23       Q      What's your relationship to the debtors?

24              MR. SHAUGHNESSY:  Objection.

25              Vague.

1                    H. LOECHTEKEN

2              THE WITNESS:  I was specifically --

3    this might be a little longer

4    explanation.

5              I was specifically required by JP

6    Lease to be in-house asset manager.  And

7    as in-house asset manager, after a

8    ramp-up period from 2020 onwards, we were

9    responsible for origination of all new

10   business, but also to see increasing size

11   of my team.

12             So JP Lease entity in Ireland was

13   involved in every other of the JPA

14   entities that JP Lease beforehand had

15   been put together.  This includes both

16   tiers.

17             And involvement in this case means

18   we had regular calls, at least for more

19   than one year.  We had weekly calls with

20   the full team in Tokyo, where accounts

21   and airline accounts are being discussed,

22   and I had numerous discussions with

23   Mr. Ishikawa over the phone, especially

24   during the last years on the

25   fast-evolving situations with Vietnam

```
 1                    H. LOECHTEKEN

 2          Airlines.

 3    BY MR. GRIFFIN:

 4          Q     And I think you mentioned -- you said

 5    that would have involved both entities -- JP entities

 6    that were in place before you started and JP entities

 7    after you started, correct?

 8          A     So both of those entities were in place

 9    before I started.  There is a Sud Aircraft that is

10    also -- that was also in place before I started.

11                But we had regular discussion.  Because

12    this is one large airline account, we had regular

13    discussions and regular debate about what to do with

14    the airlines, over the last year at least.

15          Q     And you mentioned there's two JP entities

16    that are the debtors.  You mentioned a third JPA

17    entity that's involved with Vietnam Airlines.

18                What is that entity?

19          A     It's essentially a sister company.  It

20    does exactly the same.  It leases an 8350 to Vietnam

21    Airlines.

22          Q     So there are three planes or three JP

23    entities that are involved with Vietnam Airlines; is

24    that correct?

25          A     That's correct.
```

1                       H. LOECHTEKEN

2           Q       Do you know the MSNs for each of those

3    planes?

4           A       Yes, I do.

5           Q       What are the MSNs?

6           A       67173 for the two ones we talk about, 150

7    for the third one.

8           Q       I think you mentioned that there were

9    discussions with VNA over the last year.  What were

10   those discussions related to?

11          A       So the discussions were, by and large,

12   held by the Tokyo team and we were consulted in

13   helping them to maneuver the past year receiver

14   situation, form a view on what to do with the

15   aircraft and, more specifically, my team was asked to

16   help with the engine arrangement with Rolls-Royce,

17   try to get the engines into a Rolls-Royce or LifeKey

18   arrangement.

19          Q       If I understand, you -- I think you said

20   the Tokyo team was primarily responsible for the

21   management of the relationship and that you were

22   brought in to -- or your team was brought in to

23   address issues surrounding the engines; is that

24   correct?

25                  MR. SHAUGHNESSY:  Objection.

1                         H. LOECHTEKEN

2                    You can answer.

3                    THE WITNESS:  Yeah, the engine, but

4            also from the U.S., what to do with the

5            aircraft.  Should we try to keep the

6            aircraft here, should we go and try to

7            repossess ourselves.  Should we -- what

8            general course of action we should take?

9    BY MR. GRIFFIN:

10       Q    When did those discussions start?

11       A    At least 12 months ago.

12       Q    So in and around January of 2021?

13       A    Yes.  The engine discussions started even

14    earlier.

15       Q    What were the options you were

16    considering?

17       A    We --

18            MR. SHAUGHNESSY:  Objection.

19            THE WITNESS:  We --

20            MR. SHAUGHNESSY:  Hold on.  I

21            instruct the witness not to answer to the

22            extent it would reveal any legal advice

23            or discussions with lawyers purely about

24            legal issues.

25            THE WITNESS:  So we -- we never

```
 1                    H. LOECHTEKEN

 2          contemplated a repossession, in

 3          seriousness.  We never contemplated to

 4          sell the aircraft.  We were just trying

 5          to formulate a plan as to how to get best

 6          through the situation with Vietnam.

 7              We kept talking with Vietnam, we

 8          kept talking with other leasing

 9          companies.  We knew that other leasing

10          companies were treated the same way as

11          us, which is demonstrated by the fact

12          that a large lessors, AerCap and ALC just

13          concluded in December last year their

14          restructuring arrangements.

15              So we were looking at internal --

16          internally looking at what would be a --

17          the cost of a repossession be, but didn't

18          even go there into great details simply

19          because it's so expensive and was so

20          uncertain with regard to a releasing of

21          the aircraft in the cold environment that

22          we never really considered this.

23   BY MR. GRIFFIN:

24       Q    Just to back up for a second.

25              Why were these discussions going on at
```

```
 1                    H. LOECHTEKEN

 2   all?  Was there an issue with -- between the JPAs and

 3   Vietnam Airlines that necessitated these discussions?

 4        A      Vietnam Airlines was not paying

 5   regularly, and Vietnam Airlines had a payment plan

 6   and agreed but then they -- given that the COVID

 7   crisis was prolonged, quote, unquote, given that it

 8   took more time than they originally thought, they

 9   fell behind that.

10        Q      So when did Vietnam -- VNA stop paying

11   regularly?

12        A      If I recall correctly, beginning of last

13   year.

14        Q      And before that, had there been

15   discussions with VNM -- VNA?  I think you indicated

16   that there was a payment plan and they fell behind

17   and I'm trying to get to the beginning of the point

18   where there became issues that you got -- that the

19   JPAs needed to address with respect to VNA and their

20   payment.

21             MR. SHAUGHNESSY:  Objection.

22             THE WITNESS:  So the initial issue

23         that there was the coverage on the

24         LifeKey with Rolls-Royce, and that

25         discussion started much earlier.  So the
```

1                          H. LOECHTEKEN

2          risk, the tripartite, typically in place

3          between the lessor and the airline and

4          Rolls-Royce.  And that tripartite

5          agreement has -- gives the lessors rights

6          to utilize the maintenance on the

7          payments that Vietnam makes on the engine

8          arrangement in case there is a problem,

9          quote, unquote.

10              And given that these aircraft were

11         acquired from airlines -- sorry -- from

12         the source, that Artry (phonetic) didn't

13         have a LifeKey arrangement in place, we

14         wanted to include the engines under the

15         LifeKey arrangement that my entity had

16         negotiated with Rolls-Royce, or was about

17         to negotiate.

18              And at that point in time, Rolls --

19         it took a long time.  At that point in

20         time, Rolls was not admitting any more --

21         the engines to join, simply because of

22         the fact that Vietnam had already fallen

23         behind with Rolls-Royce, as well.

24    BY MR. GRIFFIN:

25         Q    So the first thing that happened is you

1               H. LOECHTEKEN

2    were trying to get coverage on the engines and you

3    wanted to add them to a policy, but VNA was already

4    not paying Rolls-Royce and Rolls-Royce wouldn't

5    accept the coverage that you were trying to obtain;

6    is that correct?

7         A    Yes.

8              MR. SHAUGHNESSY:  Objection.

9              THE WITNESS:  That's correct.

10   BY MR. GRIFFIN:

11        Q    Were you ever able to work that issue

12   out?

13        A    No.

14        Q    What was the next issue that arose?

15        A    It was the unregular payments.

16        Q    And when you say unregular payments, they

17   just weren't paying the lease payments as required

18   under the documents; is that what you're --

19        A    That's correct.  So, on average, they

20   paid more -- if I recall correctly last year, more

21   than 500K a month, but the lease rate on the face of

22   it was higher, obviously.

23        Q    When did the unregular payments begin?

24        A    To my best recollection, beginning of

25   last year.

1                         H. LOECHTEKEN

2              Q       Prior to that, you deferred some payments

3      and worked out some agreements with VNA; is that

4      correct?

5              A       I was not involved in that one.

6              Q       Okay.  So you weren't involved with

7      respect to the relationship with VNA and the payment

8      issues until early last year; is that correct?

9              A       Correct.

10                     MR. SHAUGHNESSY:  Objection.

11     BY MR. GRIFFIN:

12             Q       So with respect to the payment issues, I

13     think you indicated that VNA was paying $500,000 a

14     month.

15                     Was that every month they were paying

16     $500,000 or they would make periodic payments that

17     aggregated to 500,000 if you -- if you do some math?

18             A       It was more periodic.  Over the year it

19     was over 500, but I don't recall exactly details as

20     to what they paid when.

21             Q       Now -- and these unregular payments began

22     in January 2021; is that correct?

23             A       If I recall correctly, yes.

24                     MR. SHAUGHNESSY:  Objection.

25                     MR. GRIFFIN:  Excuse me.  I didn't

```
 1                    H. LOECHTEKEN

 2         mean to interrupt you.  I apologize.

 3              THE WITNESS:  No, no.  I'm not a

 4         hundred percent sure.  I think the last

 5         year was the year where it really started

 6         to be unregular, that I remember.

 7   BY MR. GRIFFIN:

 8         Q      And is it your understanding that

 9   these -- failure to pay the full amount of the lease

10   would have been a breach by VNA?

11         A      Yes.

12              MR. SHAUGHNESSY:  Objection.

13   BY MR. GRIFFIN:

14         Q      Did you ever notify VNA that they were in

15   breach?

16              MR. SHAUGHNESSY:  Objection.

17              THE WITNESS:  I, quite frankly,

18         don't know, because that part was done --

19         handled by Tokyo in conjunction with the

20         arrangers that manage the direct airline

21         relationship or manage the direct airline

22         relationship until Tokyo took this by and

23         large over.

24   BY MR. GRIFFIN:

25         Q      Who would know?
```

1                     H. LOECHTEKEN

2          A     My colleagues in Tokyo.

3          Q     Including Mr. Ishikawa?

4          A     Yes.

5          Q     Anybody else?

6          A     The Tokyo account manager.

7          Q     Who was that?

8          A     Mr. Shimamura.

9          Q     You mentioned that, despite the breach by

10   VNA, you never seriously considered repossession or

11   sale of the assets; is that correct?

12               MR. SHAUGHNESSY:  Objection.

13               THE WITNESS:  That is correct.

14   BY MR. GRIFFIN:

15          Q     Why not?

16          A     Okay.  Let me start with repossession.

17   The cost of a repossession in this environment are --

18   not only in this environment.  The cost of a

19   repossession of a wide-body aircraft are quite high.

20   There's at least, I would guess, an upfront cost of a

21   minimum of 150,000 for consultants and additional

22   support as be needed to just get the aircraft.  It

23   doesn't mean that the records can be retrieved

24   completely.  The records have to be reconstructed.

25   It can easily go into the hundreds of thousands.

1                              H. LOECHTEKEN

2                        The even bigger problem is that they're

3        after all insurance, all storage, and the cost of

4        taking the aircraft out of storage would be need to

5        be born by the lessor.  These numbers can easily go

6        over and above one million dollars, because engines

7        have to go -- due to the COVID environment, it would

8        mean storage.  To take this out we'd need to have

9        Federal regulators or FAA to be -- it's a very costly

10       process.  Plus, bearing the insurance, it is very

11       expensive.

12                       Given that an aircraft then sits on the

13       ground, it doesn't earn any revenue.  It will have a

14       stigma if it comes out.  Everybody will know that the

15       aircraft has been underground, so airlines will take

16       advantage of it.

17                       And most importantly in this environment,

18       there is a weakness in the wide-body market, so any

19       re-leasing activity for a highly spec aircraft would

20       require the acceptance of power by the hour, at best,

21       maybe even zero rent initially, plus considerable

22       amount of reconfiguration for a wide body of that

23       size.

24                       This is easily $15 million, easily, per

25       aircraft, because the airline that wants to take the

1                    H. LOECHTEKEN

2    aircraft or would want to take the aircraft would

3    want to have it in its specific C configuration with

4    its galleys and so on.  That would have lead time

5    with the suppliers.  It will have lead time -- as I

6    said, lead time with the suppliers for proposed

7    galleys, toilets, whatever, inside entertainment

8    systems, seats and so on.

9                    And then, thereafter, you have to

10   probably take a very low lease rental.  And the most

11   important pieces that the airline that will take it

12   will insist upon so-called top ups.  If there are

13   maintenance conditions that need to be rectified, if

14   there are regular interval controls, the lessor would

15   typically have to contribute.  And we would not rule

16   out -- that was our other big fear -- that the return

17   conditions of the aircraft would be changed.

18                    So, who needs a wide-body aircraft today?

19   A repossession, in our view, is not a good strategy

20   because of so much value being lost on the repo and

21   so much value to be given to the airline that would

22   take the aircraft over.

23        Q    Did you have any discussion with VNA

24   about repossession?

25                    MR. SHAUGHNESSY:  Objection.  The

1                    H. LOECHTEKEN

2          witness personally or the company?

3                    MR. GRIFFIN:  Let's start with the

4          witness personally.

5                    THE WITNESS:  No.

6     BY MR. GRIFFIN:

7          Q      Did the company have -- or do you know

8     whether the company had discussions with VNA about

9     repossession?

10         A      I don't know.

11         Q      Who would know?

12         A      Mr. Ishikawa.

13         Q      So that was the repossession piece.  What

14    about sale?

15         A      That's even worse.  Where do you go today

16    to sell an A350?  That would come out of -- where

17    would he have gone?  Today is slightly better,

18    obviously, or to date is better.  But where would you

19    go and sell a naked aircraft that has no lease

20    attached?  This can only go to very distressed buyers

21    that have equity return requirements of 25,

22    30 percent, and that would diminish the value

23    immediately.

24         Q      When you say naked, what does that mean?

25         A      Just in an aircraft without a lease

1                          H. LOECHTEKEN

2    attached.  The value of an aircraft is determined by

3    two components, the metal value and the lease, and it

4    compounds.  So it adds to each other.

5            Q       Which is the more valuable aspect, the

6    aircraft or the lease?

7            A       It depends.  I can't say.  It depends on

8    the longevity of the lease, depends on the lease

9    rate.  It depends on the return conditions, but I've

10   seen wide-body leases with 25 million or $30 million

11   cash compensation at the, and I've seen wide-body

12   leases that had way in excess of a hundred million

13   dollars of lease that were collected over a period of

14   time.  So you could almost argue that all that

15   together is the value of the aircraft.

16           Q       What about for the -- the MSN 067, which

17   is the more valuable aspect, the plane or the lease?

18           A       I don't understand the question.  You

19   mean at this point in time, when the lease is

20   defaulted, or just generally speaking?

21           Q       Let's start with the lease is defaulted.

22           A       When the lease is defaulted and there is

23   no chance to get the lease reinstated and there is no

24   chance that a Vietnam Airlines would be capable of

25   entering into a new lease and retaining the aircraft,

1                    H. LOECHTEKEN

2    then very clearly, from our perspective, from my

3    personal perspective, the aircraft is more valuable

4    than the lease claim.  Because the lease claim will

5    need to be fought over in court, will need to be

6    granted by a court and would need to be then

7    collected from Vietnam Airlines, and no normal lessor

8    would do that.

9             MR. SHAUGHNESSY:  I'm going to note

10        for the record that I object to any lines

11        of questioning that are outside the scope

12        of the declarations and the sections of

13        the declarations that I have discussed

14        with counsel for FitzWalter.  I will let

15        the witness answer, but to the extent

16        it's outside the scope of the

17        declarations as noted with counsel, I

18        object to avoid constant objections.

19             MR. GRIFFIN:  I'll give you a

20        standing objection on that.  I

21        understand.

22    BY MR. GRIFFIN:

23        Q    So -- and just to clarify going back to

24    your answer, I think you said that, in the situation

25    where there is -- the lease is defaulted and the

1                              H. LOECHTEKEN

2     lease cannot be reinstated and Vietnam Airlines

3     cannot enter a new lease or retain the aircraft, then

4     the plane asset is the more valuable; is that

5     correct?

6                     MR. SHAUGHNESSY:  Objection.

7                     You can answer.

8                     THE WITNESS:  My personal view,

9             because it's very simple.  I, as a

10            lessor, as a normal lessor who wants to

11            have an ongoing relationship with

12            Vietnam, will not go and collect a claim

13            that I have to fight over.  So I will try

14            to avoid that situation.  Every last

15            lessor will do that.  It needs distressed

16            investors to force a sale.

17    BY MR. GRIFFIN:

18            Q    So your prior answer, when you were

19    trying to determine which is the more valuable aspect

20    of the -- the -- strike that.

21                 Your prior answer where you're

22    determining whether the plane asset or the lease

23    asset was more valuable was influenced by your role

24    in the industry, meaning the role of your company as

25    a lessor; is that correct?

```
 1                    H. LOECHTEKEN

 2       A     Yeah --

 3             MR. SHAUGHNESSY:  Objection.

 4             THE WITNESS:  Yes, but it's also

 5       very dynamic.

 6  BY MR. GRIFFIN:

 7       Q     Can you --

 8       A     The situation could be changing tomorrow.

 9  I mean not tomorrow, but we have a COVID crisis,

10  obviously, and wide-body aircraft are not an item

11  mark.  This is the youngest of the Airbus wide-body

12  aircraft in the family.  The 350 has been flying

13  since 2015.  It is an aircraft that has good engine

14  performance and it will be in demand for a very long

15  period of time.

16             So the aircraft values, I've seen that

17  over the last 20 years will come back.  There will be

18  demand and demand will drive value up again, because

19  it will be capable of generating cash.

20       Q     Just to get back to the issue of how the

21  role of JPL in the industry impacts valuation, I

22  think you mentioned that in -- as a lessor, you

23  wouldn't go out and repossess an aircraft; is that

24  correct?

25       A     That's not correct.  I said we would try
```

1                         H. LOECHTEKEN

2   to avoid.  We would believe that, as long as we can

3   work with an airline, we will try to lease the

4   aircraft there.

5                 I've been involved in repossessions.  If

6   it's hopeless, we'll try to get out.  But it's a

7   finite line to walk because you don't want to have

8   the aircraft ending in a total bankruptcy, but you

9   would not want to repossess early, and you certainly

10  would want to be more lenient if you have a carrier

11  like Vietnam, so -- the flag carrier of the country

12  Vietnam.

13       Q    You said you wouldn't want the aircraft

14  ending in a total bankruptcy.

15                 Do you see that?

16       A    I said that, yeah.

17       Q    What do you mean by that, a total

18  bankruptcy?

19       A    So I've been involved in a couple of

20  bankruptcies with large airlines, namely King Fisher

21  in Italy -- sorry -- in India and if -- and that was

22  a company that, in the end, was private, had no

23  whatsoever government support.  It was maybe hopeful,

24  but maybe not expected that government support would

25  be coming through, and that bankruptcy would be most

```
 1                    H. LOECHTEKEN

 2    difficult for the source.

 3              So -- I was involved and got all the

 4    aircraft back, but it was a long, protracted process.

 5         Q    Correct me if I'm wrong, but I think you

 6    mentioned in an earlier answer with respect to the

 7    lease assets that have been terminated, you wouldn't

 8    want to be involved in a litigation against VNA

 9    relating to lease asset; is that correct?

10         A    We would try to --

11              MR. SHAUGHNESSY:  Objection.

12              THE WITNESS:  We would try to

13         avoid.  I mean, if we have to we would,

14         but we would try to avoid because we view

15         Vietnam as an airline that is going to be

16         around tomorrow.  It's a flag carrier of

17         the country of Vietnam.  Vietnam is an

18         export nation, it's a tourist

19         destination, so they'll need a flag

20         carrier.

21              Vietnam is there.  To litigate

22         against Vietnam will be not helping us.

23    BY MR. GRIFFIN:

24         Q    When you say us, you're speaking about

25    JPL; is that correct?
```

1                        H. LOECHTEKEN

2           A      Correct, or any other lessor.

3           Q      There's nothing that prevents litigating

4    with VNA over the claims, and there's a potential

5    that you -- in a litigation you could recover

6    significant damages or -- as a result of that

7    litigation to offset some of the costs that you

8    identified in a repossession; is that correct?

9                  MR. SHAUGHNESSY:  Objection.

10                 THE WITNESS:  Not that easy to

11           answer.  That could be but could not be,

12           because you need to get your hands

13           physically on the asset.  I --

14   BY MR. GRIFFIN:

15           Q      Are you --

16           A      An example --

17           Q      Strike that.  Sorry.

18                  Do you have any reason to believe that

19   Vietnam -- VNA would have tried to retain the

20   aircraft if you tried to repossess it?

21                  MR. SHAUGHNESSY:  Objection.

22                  THE WITNESS:  I can't answer that.

23           I don't think we ever got to that.  I can

24           just say that I had a case once in Russia

25           where the aircraft was not leaving the

```
 1                      H. LOECHTEKEN

 2          country anymore and it was impossible to

 3          repossess.

 4   BY MR. GRIFFIN:

 5          Q     But in this circumstance you don't know

 6   one way or the other whether VNA would have willingly

 7   returned the aircraft?

 8          A     We never had that discussion.

 9          Q     So you don't know --

10          A     To my best knowledge.

11          Q     And I think we spoke over each other

12   there.  So I just want to -- for the sake of the

13   record.

14                You don't know one way or the other

15   whether Vietnam would have been willing to return the

16   aircraft, correct?

17          A     I don't know that.

18                MR. GRIFFIN:  I think we've been

19          going for about a half hour.  Do you want

20          to take a quick break -- I mean, an hour,

21          about an hour.  Do you want to take a

22          quick break?

23                THE WITNESS:  Okay.  Good idea.

24                MR. SHAUGHNESSY:  Do you want to

25          take five or ten minutes, Mr. Griffin?
```

```
 1                      H. LOECHTEKEN
 2            MR. GRIFFIN:  Five is fine.  Let's
 3       go off the record and then we'll --
 4            THE VIDEOGRAPHER:  The time is
 5       4:36 p.m.  We're off the record.
 6                  (Brief pause.)
 7            THE VIDEOGRAPHER:  The time is
 8       4:44 p.m., we're on the record.
 9  BY MR. GRIFFIN:
10       Q    Mr. Loechteken, what is the current
11  status of the VNA leases on the airplanes of the
12  debtors?
13            MR. SHAUGHNESSY:  Objection.
14            THE WITNESS:  The leases were
15       terminated by this order.
16  BY MR. GRIFFIN:
17       Q    And I think you mentioned that there was
18  another plane, the MSN 150.  What's the status of
19  that lease?
20       A    The lease is not --
21            MR. SHAUGHNESSY:  Objection.
22            THE WITNESS:  The lease is not
23       terminated.
24  BY MR. GRIFFIN:
25       Q    Is JPL in discussions with VNA in
```

1                         H. LOECHTEKEN

2    relation to the MSN 067 and MSN 173?

3         A    Not anymore.

4         Q    When did those end?

5         A    We had discussions about a new lease

6    right until we were going into the Chapter 11

7    process, if I recall correctly.  And at that point in

8    time we understood the lease was terminated anyway,

9    but we understood -- because Vietnam was in the

10   process of obtaining approval on an already

11   agreed-upon lease profile before the termination of

12   the lease, we understood we couldn't sign this

13   opportunity anymore.

14        Q    And I apologize.  You said in the process

15   of obtaining approval on an already agreed-upon lease

16   profile.  What does that mean?

17        A    So Vietnam has been going through an

18   exercise with all its lessors to restructure the

19   leases.  They have done the same with us.

20             We had a lease profile by and large

21   agreed, if I recall correctly, but obviously given

22   the Chapter 11 situation and also given the

23   termination of the lease by FitzWalter, we could not

24   and did not approve any of this anymore.

25        Q    You mentioned two things impacting moving

1                    H. LOECHTEKEN

2    forward with that lease, one was the bankruptcy, one

3    was the situation with FitzWalter.

4              Between those two, which of them, in your

5    opinion, caused the communications with VNA regarding

6    the approval of a new lease to come to an end?

7              MR. SHAUGHNESSY:  Objection.

8              THE WITNESS:  I can't really say

9         that.  I think the lease was terminated

10        and we were assuming at the point when

11        FitzWalter purchased the asset that there

12        would be value, even for FitzWalter, in a

13        new lease.  They never engaged with us on

14        this.  So when the Chapter 11 process

15        happened, then obviously that was a

16        different story.

17   BY MR. GRIFFIN:

18        Q    Did you attempt to engage with FitzWalter

19   on a lease -- a new lease with VNA?

20              MR. SHAUGHNESSY:  Objection.  Vague

21        as to the term you.

22   BY MR. GRIFFIN:

23        Q    Did you personally attempt to engage with

24   FitzWalter regarding a new lease for either of the

25   debtor aircraft?

1                          H. LOECHTEKEN

2              A       No.

3              Q       Do you know whether anybody at JPL or at

4      the debtors attempted to engage with FitzWalter

5      regarding a new lease with VNA on either of the

6      debtor aircraft?

7                      MR. SHAUGHNESSY:  Objection.

8                      THE WITNESS:  I don't know that.  I

9              doubt it, but I don't know.

10     BY MR. GRIFFIN:

11             Q       Who would know that?

12                     MR. SHAUGHNESSY:  Objection.

13                     THE WITNESS:  Well, I can't say I

14             know that, because I've been in the -- I

15             correct myself.  We did not engage.  The

16             only other person that could have engaged

17             was Teiji Ishikawa, and I was in very

18             close communication with Teiji Ishikawa.

19             I'm quite sure that he did not engage

20             with FitzWalter.  He would have told me.

21     BY MR. GRIFFIN:

22             Q       So neither you or Mr. Ishikawa engaged

23     with FitzWalter about a new VNA lease; is that

24     correct?

25                     MR. SHAUGHNESSY:  Objection.

1                    H. LOECHTEKEN

2              THE WITNESS:  That is correct.  We

3         were approached very unfriendly by

4         FitzWalter.  They terminated the lease

5         the day after they acquired the assets.

6         And they made an attempt to kind of

7         establish contact, but that was just an

8         attempt to establish a contact, nothing

9         else.

10              There was no substantive

11         discussion.  There was no reasoning as to

12         why there was no pass forward shown,

13         therefore, we felt it was not helpful to

14         engage in any discussions with them.

15    BY MR. GRIFFIN:

16         Q    After FitzWalter reached out to you, you

17    didn't think it would be helpful to move forward with

18    additional discussions with them; is that correct?

19         A    Well, I had one more additional --

20              MR. SHAUGHNESSY:  Objection.

21              You can answer.

22              THE WITNESS:  I had one more

23         discussion with them, but it was already

24         at a point where they were not only

25         threatening litigation, they were

1                    H. LOECHTEKEN

2         starting to litigate.

3    BY MR. GRIFFIN:

4         Q     You mentioned two interactions with

5    FitzWalter.  When were those?

6         A     If I remember correctly, four or five

7    days after they terminated the lease is the first

8    one, and the last one about two weeks ago.

9         Q     Did you reach out to FitzWalter on either

10   of those occasions?

11        A     No.

12        Q     When you say two weeks ago, that's

13   sometime in early January; is that correct?

14        A     I'd say January 10.

15        Q     This was, again, FitzWalter reaching out

16   to you; is that correct?

17        A     That's correct.

18        Q     Am I correct that in early December,

19   let's say around December 5th or 6th, you had your

20   first call with FitzWalter?

21             MR. SHAUGHNESSY:  Objection.

22             THE WITNESS:  I think so, I had my

23        first call with FitzWalter.

24   BY MR. GRIFFIN:

25        Q     Do you know whether that was the first

1                        H. LOECHTEKEN

2    call anybody in the JP Lease organization, including

3    the debtors and any of the other associated entities,

4    had with representatives of FitzWalter?

5        A    I don't know that.

6        Q    Who would know that?

7             MR. SHAUGHNESSY:  Objection.  Calls

8        for speculation.

9             THE WITNESS:  I don't know that.

10   BY MR. GRIFFIN:

11       Q    Do you have any reason to believe that

12   anybody else in the JP Lease organization had an

13   interaction with FitzWalter prior to the call four or

14   five days after they acquired the lease?

15            MR. SHAUGHNESSY:  Objection.

16            THE WITNESS:  Can you please repeat

17       the question?

18   BY MR. GRIFFIN:

19       Q    Do you have any reason to believe that

20   anybody in the JP Lease organization had an

21   interaction with FitzWalter prior to the call four or

22   five days after they acquired the leases?

23            I'm sorry.

24            MR. SHAUGHNESSY:  Objection.

25

1                              H. LOECHTEKEN

2     BY MR. GRIFFIN:

3          Q     I misstated.  I'm saying the leases.

4                Do you have any reason to believe that

5     anybody in the JP Lease organization had an

6     interaction with FitzWalter prior to the call four or

7     five days after they acquired their interest in the

8     debt of the JPA entities?

9                MR. SHAUGHNESSY:  Objection.

10               THE WITNESS:  It could be, but I --

11               I frankly don't know because, as I said,

12               the -- before we even knew or while we

13               knew that the debt was acquired, the

14               lease was immediately terminated.  It

15               could have been that somebody made

16               clarification calls, but I don't know

17               that.

18    BY MR. GRIFFIN:

19         Q     Would the termination of the lease have

20    prevented you from calling FitzWalter?

21               MR. SHAUGHNESSY:  Objection.

22               THE WITNESS:  It's an unfriendly

23               move, obviously.  It's not the right move

24               to start the relationship.  I'm not

25               saying it prevented, but it clearly

```
 1                         H. LOECHTEKEN

 2          created obstacles.

 3   BY MR. GRIFFIN:

 4          Q      Created obstacles between you and

 5   FitzWalter or created obstacles in some other way?

 6          A      Between us and FitzWalter.

 7          Q      What obstacles?

 8          A      If somebody acquires a piece of debt from

 9   a bank and without any consultation and without any

10   discussions terminates the lease and disrupts what

11   was ongoing in the restructuring that was very

12   publicly being commented on in the press, then that

13   creates an environment that is not friendly.

14          Q      You continued to have discussions with

15   VNA after that; isn't that correct?

16                 MR. SHAUGHNESSY:  Objection.

17                 THE WITNESS:  Yes.  We had

18          discussions with VNA.  Third we have

19          three aircraft there.

20   BY MR. GRIFFIN:

21          Q      Did you continue to have discussions with

22   VNA about the MSN 067 and MSN 173?

23                 MR. SHAUGHNESSY:  Objection.

24                 THE WITNESS:  Yes, I think so,

25          simply because it's a three-package
```

1                         H. LOECHTEKEN

2               aircraft deal.  It's three aircraft and

3               VNA entered discussion about three

4               aircraft.

5     BY MR. GRIFFIN:

6               Q     When you say a three-package aircraft

7     deal, are the leases somehow connected?

8               A     No, the leases are not connected, but VNA

9     views it as one relationship, as we do.  It's one

10    airline, three same aircraft with one airline.

11              Q     As a result, despite the termination of

12    the leases on the MSN 067, MSN 173, you continued to

13    have discussions with VNA about those leases; is that

14    correct?

15              MR. SHAUGHNESSY:  Objection.  Well,

16         we continued the discussion that standard

17         with regard to the lease profile.  And we

18         said we cannot agree to lease, but we can

19         see on whether this is something that

20         could be of interest to anyone, including

21         FitzWalter.

22              It's our firm belief that the

23         aircraft with lease attached has more

24         value than the aircraft without a lease

25         attached.  So we wanted to preserve the

1                      H. LOECHTEKEN

2           value of the restructuring that was

3           ongoing with Vietnam because we believed

4           that Vietnam will pull through and,

5           secondly, the aircraft will be worth much

6           more with the lease than without the

7           lease.

8    BY MR. GRIFFIN:

9           Q     You didn't have discussions with

10   FitzWalter to relay your ongoing discussions with

11   VNA, in your view, that continuing that VNA

12   relationship would be the best thing for the assets,

13   did you?

14                 MR. SHAUGHNESSY:  Objection.

15                 THE WITNESS:  We viewed to have an

16          asset that has a lease attached being the

17          better opportunity for anyone than an

18          asset without a lease attached.

19                 We were very clear and conscious

20          about the fact that the lease had been

21          terminated and that the -- that

22          FitzWalter controlled, through a security

23          arrangement, the debt.  So we knew that

24          we couldn't sign the lease.

25

```
 1                    H. LOECHTEKEN

 2   BY MR. GRIFFIN:

 3       Q    That didn't stop you from talking with

 4   VNA about the lease, but it did -- strike that.

 5             That didn't stop you from talking with

 6   VNA about the lease, but you did not talk with VN --

 7   with FitzWalter about those discussions with VNA,

 8   right?

 9             MR. SHAUGHNESSY:  Objection.

10             THE WITNESS:  That is correct.  We

11        kept talking or Vietnam kept talking to

12        us about this, but it was almost done

13        anyway and they were in the process of

14        doing their corporate approvals.  And we

15        did not discuss this in detail with

16        FitzWalter, that is correct.

17   BY MR. GRIFFIN:

18       Q    The discussions with VNA ended around the

19   time of the filing of the bankruptcy; is that

20   correct?

21             MR. SHAUGHNESSY:  Objection.

22             THE WITNESS:  I think the

23        discussion about the lease ended at

24        around the filing of the bankruptcy, yes.

25
```

1                    H. LOECHTEKEN

2    BY MR. GRIFFIN:

3         Q    Was there a reason those discussions with

4    VNA ended around the time of the filing of the

5    bankruptcy?

6              MR. SHAUGHNESSY:  Objection.

7              THE WITNESS:  I don't think it was

8         really related to the bankruptcy.  I

9         think it was much more related to the

10        fact that the discussion had reached its

11        conclusion anyway.

12   BY MR. GRIFFIN:

13        Q    What do you mean by that?

14        A    It was essentially agreed with Vietnam.

15   We had a lease profile that was agreed.

16        Q    Did you enter into the new lease profile

17   on the other aircraft you had with Vietnam?

18             MR. SHAUGHNESSY:  Objection.

19   BY MR. GRIFFIN:

20        Q    Why not?

21             THE REPORTER:  I'm sorry.  I didn't

22        hear an answer.

23             (Prior question read back into the

24        record.)

25             MR. GRIFFIN:  I'll ask it again so

1                          H. LOECHTEKEN

2          we can have a clear record.

3    BY MR. GRIFFIN:

4          Q      Did you enter into the new lease profile

5    on the other aircraft you had with Vietnam?

6                 MR. SHAUGHNESSY:  Objection.

7                 THE WITNESS:  No.

8    BY MR. GRIFFIN:

9          Q      Why not?

10         A      The debt was acquired or was in the

11   process of being acquired by another investor and it

12   would not have been possible for us to change the

13   lease.

14         Q      For the record, so the debt on the MSN

15   067 and MSN 173 was acquired by FitzWalter; is that

16   correct?

17                MR. SHAUGHNESSY:  Objection.

18                THE WITNESS:  Part of it.

19   BY MR. GRIFFIN:

20         Q      And then you have another plane, and the

21   debt was acquired by a separate entity; is that

22   correct?

23                MR. SHAUGHNESSY:  Objection.

24                THE WITNESS:  On the -- yes, that's

25         correct.  If it was --

Page 63

```
 1                    H. LOECHTEKEN

 2  BY MR. GRIFFIN:

 3        Q    What entity acquired that debt?

 4        A    But FitzWalter only acquired part of the

 5  debt.  FitzWalter acquired just a slim majority in

 6  one aircraft as a senior portion, and I think, if I

 7  recall correctly, about 70 percent value or

 8  70 percent in the other aircraft, and there was also

 9  junior debt outstanding.

10        Q    Thank you for that.

11             With respect to the other aircraft, the

12  MSN 150 I believe, who acquired that debt?

13             MR. SHAUGHNESSY:  Objection.

14             THE WITNESS:  SVPGlobal.

15  BY MR. GRIFFIN:

16        Q    Did that acquisition prevent you from

17  entering this agreed-upon lease with VNA?

18             MR. SHAUGHNESSY:  Objection.

19             THE WITNESS:  Yes.  Yes.

20  BY MR. GRIFFIN:

21        Q    Is the lease on the MSN 150 still in

22  place?

23             MR. SHAUGHNESSY:  Objection.

24             THE WITNESS:  Yes.

25
```

1                            H. LOECHTEKEN

2    BY MR. GRIFFIN:

3         Q    We can finally get to these declarations.

4    I'm going to put in your other declaration because I

5    think that's where more of your background is.  So

6    give me a moment.

7                    (Loechteken Exhibit No. 2 was

8              marked for the record.)

9    BY MR. GRIFFIN:

10        Q    Do you see an -- what's been marked as

11   Exhibit No. 2 in your folder, the Loechteken

12   Declaration, Docket No. 44?

13        A    I see that.

14        Q    Do you recognize this document?

15        A    Well, it's -- yes, I do.

16        Q    Did you prepare this document?

17        A    Yes, I do -- I did.  I did this with the

18   help of my attorneys.  I gathered the facts.  I

19   handed over the facts and consulted with my

20   attorneys.  They did the actual write-up, but I

21   reviewed.

22        Q    Is the information in this declaration

23   accurate to the best of your knowledge?

24        A    It's accurate to the best of my

25   knowledge.

```
 1                        H. LOECHTEKEN

 2         Q     Is there anything about this declaration

 3   that, sitting here today, you would want to modify?

 4         A     I don't think so.

 5         Q     If you turn to Section 2 of this

 6   declaration, it's on page five.  Please let me know

 7   when you get there.

 8         A     One moment, please, sir.  Yes, I have it.

 9         Q     And before I ask you any questions there,

10   you note in here that you're the CEO of JLPS Ireland,

11   Limited; is that correct?

12         A     That is correct.

13         Q     You're not an officer, employee or

14   authorized representative of the debtors, are you?

15              MR. SHAUGHNESSY:  Objection.

16              THE WITNESS:  No, but I'm involved

17         with the debtor on a day-to-day basis.

18         As I said earlier, we have continuous

19         calls to Tokyo frequently on a weekly

20         basis, and given than Vietnam has been --

21         the airline was -- lease went into

22         arrears, I had numerous calls with Teiji

23         Ishikawa about this.

24   BY MR. GRIFFIN:

25         Q     But to answer my question, you're not an
```

Page 66

```
 1                      H. LOECHTEKEN
 2    authorized, employee or authorized representative of
 3    the debtors; is that correct?
 4                  MR. SHAUGHNESSY:  Objection.
 5                  THE WITNESS:  That's correct.
 6    BY MR. GRIFFIN:
 7         Q     You were not directly involved in the
 8    purchase of either the MSN 173 or MSN 067; is that
 9    correct?
10         A     Correct.  Predates me joining JP Lease.
11         Q     When did you join JP Lease?
12         A     On the first of January 2019.  Well, I
13    should say I've been involved for the better part of
14    six months beforehand as a consultant.
15         Q     In your role as a consultant, you were
16    not involved in the purchase of either of the
17    aircraft at issue here; is that correct?
18         A     That is correct.
19         Q     Who handled those transactions?
20         A     The aircraft was purchased with the help
21    of two arrangers, one is Austrados and one is Clover.
22         Q     Who within the JP Lease organization was
23    responsible for the purchase of the MSN 067 and MSN
24    173?
25                  MR. SHAUGHNESSY:  Objection.
```

1                    H. LOECHTEKEN

2              THE WITNESS:  I can't tell.  There

3         was one employee that in the interim has

4         left who was leading the acquisition

5         team.

6    BY MR. GRIFFIN:

7         Q    Do you know if Mr. Ishikawa would have

8    had any role in these acquisitions?

9         A    He would have been involved from an

10   approval perspective, that's for sure.

11        Q    Are you testifying here in -- with

12   respect to the declaration on January 10th as an

13   expert or a fact witness?

14             MR. SHAUGHNESSY:  Objection.

15             THE WITNESS:  I don't know the

16        difference.  That's a legal question.  I

17        can't answer.

18   BY MR. GRIFFIN:

19        Q    Are you testifying from your personal

20   knowledge?

21        A    From my personal knowledge, yes, correct.

22        Q    So you're not offering opinions; is that

23   correct?

24             MR. SHAUGHNESSY:  Objection.

25             THE WITNESS:  I don't understand

1                         H. LOECHTEKEN

2          what opinion in this context means.

3    BY MR. GRIFFIN:

4              Q      If you turn to page five of the

5    declaration, the Sales and Marketing Efforts,

6    Paragraph 11 says:  The debtors are pursuing in an

7    orderly marketing and auction process for the sale of

8    the debtors' hundred percent ownership in the

9    purchased assets.

10             Do you see that?

11        A      I see that, yeah.

12        Q      What are the purchased assets?

13        A      These are the two aircraft, MSN 67 and

14   MSN 173.

15        Q      Anything else?

16        A      Plus the lease/lease claims that would be

17   associated.

18        Q      Anything else?

19        A      Is there anything else?  I don't think

20   so.

21        Q    I don't know.  I'm just asking you.  This

22   is discovery, so we're trying to determine what

23   you're identifying here when you're discussing the

24   interests.

25             A      So it's lease -- lease, lease claims and

1                              H. LOECHTEKEN

2      the assets, and everything that's associated with the

3      assets, obviously engines, APUs, records, everything

4      that goes with it.

5              Q       And when you say lease claims, what does

6      that mean?

7              A       That means that there has been a lease

8      that has been defaulted, obviously, and if it

9      defaulted -- if there was a defaulted lease, there

10     could be claims.  So anything that has to do with

11     those leases that a potential buyer could value.

12             Q       To clarify, you're not selling an active

13     lease, you're selling a terminated lease and whatever

14     claims are associated with a terminated lease; is

15     that correct?

16                 MR. SHAUGHNESSY:  Objection.

17                 THE WITNESS:  That is correct, but

18         what we can also offer to buyers is a

19         lease profile of what Vietnam would agree

20         to, and then it's up to the buyers to

21         consider on whether this is something

22         that they can value.

23     BY MR. GRIFFIN:

24             Q       To clarify, so it's the aircraft, the

25     lease claims, and within the claims there's a lease

```
 1                    H. LOECHTEKEN

 2   profile?

 3       A    No.  The claims are related to the

 4   terminated lease, but there is obviously a discussion

 5   a commercial discussion that had run its course where

 6   Vietnam has agreed to a cash flow profile and certain

 7   return conditions for the aircraft in the future, and

 8   that is something that a potential buyer can value.

 9       Q    And the lease profile, is that something

10   that you have in writing from VNA and can accept?

11            MR. SHAUGHNESSY:  Objection.

12            THE WITNESS:  Yes, I think we'll

13            have enough communication on that.  It is

14            in writing, to my best knowledge.  I need

15            to clarify this with Tokyo, as to what

16            exactly is the status now.

17   BY MR. GRIFFIN:

18       Q    For clarification, is there a written

19   document that's been signed by VNA offering a new

20   cash flow profile on the -- on the terminated leases?

21            MR. SHAUGHNESSY:  Objection.

22            THE WITNESS:  I don't think so, but

23            I don't know precisely.  I don't think it

24            is there.  You mean signed, really signed

25            by them as this is corporate approved
```

1                              H. LOECHTEKEN

2            from Vietnam?

3     BY MR. GRIFFIN:

4            Q       Correct.

5            A       They were -- I would need to discuss this

6     directly with Tokyo, what was the relationship.  They

7     were in the process of approving, but I don't this

8     so, because obviously we told them we can't approve.

9     I don't understand.  I don't know exactly where that

10    process is within Vietnam.

11           Q       Thank you for that.  I'm just trying to

12    get to the bottom of what you're marketing and

13    auctioning in the -- in the purchased assets.

14                   So we have the aircraft and the

15    associated documentation and engines and things like

16    that, and we have lease claims on the terminated

17    lease.  Is there anything beyond that that you're

18    actually offering for sale?

19                   MR. SHAUGHNESSY:  Objection.  The

20           term sheet speaks for itself.

21    BY MR. GRIFFIN:

22           Q       You can answer.

23           A       We'll offer them what's in the term

24    sheet.

25           Q       Have you had any discussions with any

Page 72

1                        H. LOECHTEKEN

2   potential buyers of what goes into the purchased

3   assets?

4        A     We obviously had discussions with the

5   stalking horse bidder.  We did not have detailed

6   discussions yet with any other potential buyer.

7        Q     When you say the stalking horse bidder,

8   you're referring to Strategic Value Partners?

9        A     Correct.

10       Q     And you haven't had any detailed

11   discussions with anyone beyond SVP?

12       A     No, not detailed enough to exactly spell

13   out these are the assets, including potential claims

14   and including a potential new lease profile.

15       Q     In the discussions with SVP, did you make

16   any representations about what would be included in

17   the purchased assets?

18             MR. SHAUGHNESSY:  Objection.

19             THE WITNESS:  I think the SVP term

20        sheet spells it out.

21   BY MR. GRIFFIN:

22       Q     I understand that there are words in the

23   SVP term sheet.  Were there any other -- any other

24   discussions between you and SVP about those terms?

25       A     No, not to my knowledge.  Not in my role.

1                         H. LOECHTEKEN

2            Q      You didn't have any calls with anyone

3    from SVP about the term sheet?

4            A      I did.

5                   MR. SHAUGHNESSY:  Objection.

6    BY MR. GRIFFIN:

7            Q      How many calls did you have with SVP

8    about the term sheet?

9            A      I would say maybe -- maybe one or two.

10   Difficult to distinguish because we have always --

11   also the MSN 150 situation.

12                  But the term sheet negotiations, by and

13   large, were handled by our counsel with input from

14   our side, but the face-to-face or the direct

15   negotiations was handled by our counsel.

16           Q      When you say our counsel, who are you

17   referring to?

18           A      Vedder Price.

19           Q      That's counsel to JPL, correct?

20           A      Correct.

21           Q      Not counsel for the debtors?

22           A      Correct.

23           Q      You mentioned that it's hard to

24   distinguish the discussions about the purchased

25   assets described in your declaration with those of

```
 1                    H. LOECHTEKEN
 2   the -- relating to the one -- MSN 150 situation.
 3              Were the discussions about those two
 4   transactions part of a single discussion?
 5              MR. SHAUGHNESSY:  Objection.
 6              THE WITNESS:  I think initially,
 7         yes.
 8   BY MR. GRIFFIN:
 9         Q     And what do you mean by that?
10         A     That SVP made a proposal for all three
11   aircraft.
12         Q     When SVP made that proposal, did SVP
13   already own the debt in one of the aircraft?
14         A     At least parts of the debt.
15         Q     At some point did the discussions shift
16   to only include the 067 and 173?
17              MR. SHAUGHNESSY:  Objection.
18              THE WITNESS:  Yes.  According to my
19         recollection, it shifted, because we
20         wanted to do separate leases.
21   BY MR. GRIFFIN:
22         Q     When you say we, you're referring to JPL?
23         A     JPL, because it was our counsel.
24         Q     And again, our counsel -- I'm sorry to be
25   pedantic but there's a lot of different players here.
```

1                         H. LOECHTEKEN

2    And there's the counsel sitting at the table

3    defending this deposition and there's the counsel on

4    the phone.

5              So I just want to make sure, when you say

6    our counsel, again, you're referring to the counsel

7    from Vedder; is that correct?

8         A    No, I think --

9              MR. SHAUGHNESSY:  Objection.

10             THE WITNESS:  I think this was also

11        a matter of involvement from Togut,

12        because we have two assets that are owned

13        by -- I'm sorry -- the two assets under

14        the Chapter 11 process where FitzWalter

15        acquired that, and then we have another

16        asset that is not in a Chapter 11 process

17        and we would not want to put into a

18        Chapter 11 process because it is a

19        totally different discussion.

20             That is being -- essentially, that

21        debt has been acquired by SVPGlobal, so

22        we wanted to keep this separate.

23   BY MR. GRIFFIN:

24        Q    The one or two calls you had with SVP,

25   when were those?

```
 1                    H. LOECHTEKEN

 2       A      They were before -- one was before -- one

 3  was in the week of -- starting December 10th, if I

 4  remember correctly, and the other one was around

 5  Christmastime.  The second one was very short.

 6       Q      With respect to the first call, what was

 7  that -- the December 10th -- strike that.

 8                  The first call was in the week of

 9  December 10th.  Can you tell me who participated in

10  that call?

11       A      I don't remember whether -- anymore who

12  participated on their side, and I cannot -- no, I

13  don't remember.

14                  I think it was one gentleman called Greg

15  Braylovskiy, but I don't -- yeah, he participated,

16  but I don't know who else.

17       Q      What was the substance of that call?

18       A      The call was about SVP having made a

19  proposal to us, in -- in effectively buying the

20  aircraft from us, with some recovery for our

21  investors.

22       Q      This is before the filing of the

23  bankruptcy, correct?

24       A      Correct.

25       Q      Did that proposal relate to the plane
```

```
 1                      H. LOECHTEKEN
 2      that they had an interest in, the 150, or did it
 3      relate to something else?
 4           A      It related to all three planes.
 5           Q      You mentioned that there would be some
 6      recovery for our investors.  What do you mean by
 7      that?
 8           A      There was a proposal where they would pay
 9      upfront something to the equity, plus a participation
10      in proceeds, if and when a certain hurdle rate would
11      have been surpassed.
12           Q      Was the proposal to pay off all the debt
13      holders and then pay off equity?
14           A      Correct.  It was a hundred percent payoff
15      to the debt holders and then equity.  And this is
16      something that is of extreme importance to us.  We
17      don't want to be seen in the market of inviting debt
18      holders and banks into structures where money has
19      been lost, especially if it's unnecessary.
20           Q      What do you mean by that?
21           A      So SVPGlobal made a proposal that would
22      have paid all debt, which is better than what we see
23      a proposal that was offered by FitzWalter or the
24      process we saw from FitzWalter.  So, for us, it is
25      important to not only be seen, but to actively work
```

```
 1                         H. LOECHTEKEN

 2    with other creditors to secure that a hundred percent

 3    of the debt in a structure that we have implemented,

 4    invite the banks into finance and managing ongoingly

 5    for all creditors, as well as investors.  We don't

 6    want to see unnecessary losses created.

 7         Q     You mentioned a process -- or strike

 8    that.

 9               You mentioned the proposal that was

10    offered by FitzWalter.

11               What are you referring to there?

12         A     If I recall correctly, it was a term

13    sheet, a draft term sheet proposal.

14         Q     And you received a draft term sheet from

15    FitzWalter?

16         A     I think so.  I'm not sure whether they

17    called it a term sheet, but it was -- it had some

18    terms.

19         Q     When did you receive the term sheet?

20         A     I don't recall precisely.  I think it was

21    in the week before December 17th.

22         Q     What were the terms, if you remember?

23         A     It was pay out all the debt, give a

24    recovery of two and a half million per aircraft, and

25    then have a 20 percent participation in the residual
```

1                          H. LOECHTEKEN

2    proceeds.

3         Q     I think we're crossing signals here.

4               Was that a proposal from FitzWalter or

5    the proposal from SVP?

6         A     No, that was an SVP proposal.  FitzWalter

7    never made a proposal, to my best knowledge.

8         Q     So I think we need to back up then a

9    couple of questions there.

10              I asked you -- you mentioned a proposal

11   from FitzWalter or a process from FitzWalter that you

12   thought was less advantageous than what you were

13   getting from SVP; is that correct?

14        A     Certainly.

15        Q     Okay.  What is the proposal or process

16   relating to FitzWalter that you're referencing?

17        A     There was no process.  I mean, FitzWalter

18   terminated the leases, made what I call, on the face

19   of it, attempt to establish contact, never followed

20   up with any substantive proposal or anything.

21              It -- the next conversation happened when

22   we were already deep in Chapter 11, and then there

23   was a proposal made to me, which I am not sure

24   whether I could value at all that they wanted to

25   match the stalking horse bidder, and in exchange,

1                          H. LOECHTEKEN

2    waive litigation.

3         Q     Thank you for that.

4               There was just some confusion because I

5    think you mentioned that there was a proposal by

6    FitzWalter.

7         A     No, I'm sorry, then I misspoke if I said

8    FitzWalter.  It was SVP.

9         Q     You mentioned earlier that FitzWalter was

10   the security agent; is that correct?

11        A     CACIB was the security agent, but

12   FitzWalter stepped into that position.

13        Q     As of early December, correct?

14        A     As of December 1.

15        Q     As a security agent, they had the rights

16   and obligations to sell the collateral; is that

17   correct?

18              MR. SHAUGHNESSY:  Objection.  Calls

19        for a legal conclusion.

20              THE WITNESS:  I don't want to

21        speculate on that, but I know that it's

22        not the norm in the industry that this

23        goes in such a rushed and rapid process.

24   BY MR. GRIFFIN:

25        Q     My question was, as the security agent,

```
 1                    H. LOECHTEKEN
 2    they had the ability to sell the underlying
 3    collateral because of the -- the associated defaults;
 4    is that correct?
 5              MR. SHAUGHNESSY:  Objection.
 6              THE WITNESS:  That is correct, but
 7         I can't comment on timelines.  I think
 8         the timeline was super aggressive and
 9         outside the norms and potentially outside
10         of the legal framework.
11    BY MR. GRIFFIN:
12         Q     What are you referring to when you say
13    the timelines?
14         A     The start of the auction of the claims.
15    So within the first day of acquiring, termination of
16    the lease, and then essentially a few days later the
17    auctioning of the claims.
18         Q     Is the -- or strike that.
19              Are you suggesting the timeline between
20    when they acquired the claims and when they started
21    the auction impacts the -- whether the auction was
22    appropriate?
23              MR. EDELMAN:  Objection.  That
24         calls for -- a lot of your questions call
25         for a legal conclusion, and this witness
```

```
 1                        H. LOECHTEKEN

 2            is not a lawyer.  So could you refrain

 3            from asking -- I think the last five

 4            questions were all legal conclusions, so

 5            I object.

 6                  MR. SHAUGHNESSY:  Same objection.

 7    BY MR. GRIFFIN:

 8            Q    You can answer the question.

 9            A    Can you ask the question again?  Sorry, I

10    was distracted.

11            Q    Are you suggesting that the timeline

12    between when FitzWalter acquired the claims and when

13    they started the auction impacts whether the auction

14    was appropriate?

15                  MR. SHAUGHNESSY:  Objection.

16                  THE WITNESS:  Commercially, yes;

17            legally, I can't answer.

18    BY MR. GRIFFIN:

19            Q    So you have no opinion about whether what

20    FitzWalter did with respect to the auction was legal

21    under the contracts?

22                  MR. SHAUGHNESSY:  Objection.

23                  THE WITNESS:  I don't want to

24            speculate.

25
```

 1                        H. LOECHTEKEN

 2    BY MR. GRIFFIN:

 3         Q     So you have no opinion about whether

 4    what -- strike that.

 5               You have no opinion about what FitzWalter

 6    did with respect to the auctions was legal under the

 7    contracts?

 8               MR. SHAUGHNESSY:  Objection.

 9               THE WITNESS:  I don't want to

10          speculate on legal matters.

11    BY MR. GRIFFIN:

12         Q     Whether you want to speculate or not, are

13    you going to be offering testimony about whether what

14    FitzWalter did with respect to the auction was legal

15    under the contracts?

16               MR. SHAUGHNESSY:  Objection.

17               THE WITNESS:  Frankly speaking, I

18          can't answer that.  Therefore, I would

19          need to know the contracts in a lot of

20          detail.

21    BY MR. GRIFFIN:

22         Q     Because you don't know the contracts and

23    you're not offering an opinion on the law, you are

24    not going to be able to offer any testimony in this

25    proceeding about whether what FitzWalter did with

1              H. LOECHTEKEN

2    respect to the auctions was legal under the

3    contracts; is that correct?

4              MR. SHAUGHNESSY:  Objection.

5         Mischaracterizes testimony, calls for a

6         legal conclusion.

7              THE WITNESS:  I can't -- I can't

8         really answer that question.

9    BY MR. GRIFFIN:

10        Q    You can't answer whether you're going to

11   give testimony or not?

12             MR. SHAUGHNESSY:  Objection.  His

13        declarations speak for themselves, his

14        testimony for the hearing is already in

15        the record.

16   BY MR. GRIFFIN:

17        Q    You've made reference to their auction

18   procedures throughout multiple of your declarations

19   and here today.

20             My question is, are you going to testify

21   about whether what FitzWalter did with respect to the

22   auctions of the lease assets was legal under the

23   terms of the contract?

24             MR. SHAUGHNESSY:  Objection.  Let

25        me note for the record that the portions

```
 1                    H. LOECHTEKEN

 2        of the declarations that are being

 3        submitted for next Wednesday's hearing do

 4        not address this topic.  This is outside

 5        the scope, as my standing objection noted

 6        earlier.

 7             Mr. Loechteken, you can answer.

 8        I'm not instructing you not to answer.

 9             THE WITNESS:  Can you point me to

10        the part of the term sheets that you're

11        referring to, please?  Sorry, part of my

12        declaration.  My apologies.

13   BY MR. GRIFFIN:

14        Q    Can you answer my question?

15             Are you going to be offering any

16   testimony about whether FitzWalter's actions

17   regarding the sale of the lease assets was

18   inconsistent with their rights under the contracts?

19             MR. SHAUGHNESSY:  Same objection.

20             THE WITNESS:  I can't judge the

21        situation, so I can't offer testimony.

22   BY MR. GRIFFIN:

23        Q    Is that a no?

24        A    That was a no.

25        Q    Turning back to your declaration, to
```

```
 1                    H. LOECHTEKEN
 2    Docket No. 44, which is Exhibit 2, under Paragraph
 3    12, with respect to the sales and marketing efforts,
 4    you talk about you will contact a broad range of both
 5    strategic and financial investors.
 6              MR. EDELMAN:  Can we hold on for
 7         one second?  I think Brian lost his
 8         connection and he's trying to --
 9              MR. GRIFFIN:  Yeah, let's go off
10         the record.  I'm sorry.  I was looking
11         down, I didn't see Brian disappear.
12         Let's go off the record.
13              THE VIDEOGRAPHER:  The time is
14         5:34 p.m.  We're off the record.
15                   (Brief pause.)
16              THE VIDEOGRAPHER:  The time is
17         5:47 p.m., we're on the record.
18    BY MR. GRIFFIN:
19         Q    Mr. Loechteken, with respect to each of
20    these JPAs, they were created to acquire these
21    aircraft; is that correct?
22              MR. SHAUGHNESSY:  Objection.
23              THE WITNESS:  That is correct,
24         yeah.
25
```

```
 1                    H. LOECHTEKEN

 2    BY MR. GRIFFIN:

 3         Q     And the aircraft is their only asset,

 4    correct?

 5                    MR. SHAUGHNESSY:  Objection.

 6                    THE WITNESS:  Correct.

 7    BY MR. GRIFFIN:

 8         Q     They're not -- neither of the debtors

 9    here was formed under U.S. law?

10                    MR. SHAUGHNESSY:  Objection.

11                    THE WITNESS:  Correct.

12    BY MR. GRIFFIN:

13         Q     They're Japanese entities?

14                    MR. SHAUGHNESSY:  Objection.

15                    THE WITNESS:  Correct.

16    BY MR. GRIFFIN:

17         Q     Do you know what a single-purpose vehicle

18    is?

19         A     Yes.

20         Q     That's what each of the debtors is,

21    correct?

22         A     Yes.

23         Q     And they cannot engage in any business

24    other than owning these aircraft, correct?

25                    MR. SHAUGHNESSY:  Objection.
```

1                    H. LOECHTEKEN

2              THE WITNESS:  They're designed to

3         own one aircraft each.

4    BY MR. GRIFFIN:

5         Q     Thank you for clarifying.

6               So the JPA No. 111 debtor is created to

7    own the MSN 067, correct?

8         A     That is correct.

9         Q     And it can't engage in any business other

10   than that?

11              MR. SHAUGHNESSY:  Objection.  Calls

12        for a legal conclusion.

13              THE WITNESS:  I don't know the

14        charter in detail of those JPA entities,

15        so I don't know what is in either the

16        charter allowed and/or what is allowed

17        under Japanese law.

18   BY MR. GRIFFIN:

19        Q     In your experience in this industry, you

20   understand that, in these transactions, entities in

21   the form of the debtors are created to basically own

22   the aircraft and don't do anything else, right?

23              MR. SHAUGHNESSY:  Objection.

24              THE WITNESS:  That is correct.

25

```
 1                        H. LOECHTEKEN

 2   BY MR. GRIFFIN:

 3        Q     In fact, they don't even conduct any of

 4   their own operations, right?

 5             MR. SHAUGHNESSY:  Objection.

 6             THE WITNESS:  Mostly not.

 7   BY MR. GRIFFIN:

 8        Q     They don't have any employees?

 9             MR. SHAUGHNESSY:  Objection.

10             THE WITNESS:  They have directors.

11   BY MR. GRIFFIN:

12        Q     But they don't have employees, correct?

13        A     They don't have employees.

14             MR. SHAUGHNESSY:  Objection.

15   BY MR. GRIFFIN:

16        Q     And I think you're testifying here as the

17   representative of an affiliated entity, correct?

18             MR. SHAUGHNESSY:  Objection.

19             THE WITNESS:  I have been involved

20        with my team in Ireland in the day-to-day

21        operations of the entities because, as I

22        said earlier, we have discussed the

23        Vietnam situation very frequently.  We

24        have weekly calls where Vietnam, as an

25        airline carrier is discussed, and I had
```

```
 1                    H. LOECHTEKEN

 2        numerous discussions with Teiji Ishikawa

 3        about that.

 4   BY MR. GRIFFIN:

 5        Q     I understand that, but my simple question

 6   was, the debtors don't conduct their own operations.

 7   They conduct operations by engaging with entities

 8   such as your entity that you're the CEO of, right?

 9                    MR. SHAUGHNESSY:  Objection.

10                    THE WITNESS:  Correct.  Sorry.

11                    That is correct.

12   BY MR. GRIFFIN:

13        Q     They're managed by JPL, essentially, and

14   then JPL will engage other of its subsidiaries to do

15   the specific tasks?

16                    MR. SHAUGHNESSY:  Objection.

17                    THE WITNESS:  That is correct.

18   BY MR. GRIFFIN:

19        Q     Those entities then bill JPL, and then

20   JPL will bill the debtor; is that correct?

21                    MR. SHAUGHNESSY:  Objection.

22                    THE WITNESS:  That is correct.

23   BY MR. GRIFFIN:

24        Q     Is that the basis of the unsecured claims

25   that JPL is submitting here?
```

```
 1                     H. LOECHTEKEN

 2              MR. SHAUGHNESSY:  Objection.

 3              THE WITNESS:  That is a legal

 4         question that, again, I'm not qualified

 5         to answer.

 6   BY MR. GRIFFIN:

 7         Q    So you don't know one way or the other

 8   what the basis of the claims that JPL is submitting

 9   in this case?

10              MR. SHAUGHNESSY:  Objection.

11              THE WITNESS:  It's a legal claim in

12         bankruptcy that I have no knowledge

13         about.  I can't judge that.

14   BY MR. GRIFFIN:

15         Q    Again, it's not a trick question.  I'm

16   just trying to verify that you're not going to be

17   testifying about the claims that JPL has made in this

18   bankruptcy.

19              MR. SHAUGHNESSY:  Objection.

20              THE WITNESS:  No, I'm not

21         testifying about that.

22   BY MR. GRIFFIN:

23         Q    The debtors don't have any offices in the

24   United States, correct?

25         A    That is correct.
```

1                    H. LOECHTEKEN

2          Q        In fact, they have no offices anywhere in

3     the world, right?

4                    MR. SHAUGHNESSY:  Objection.

5                    THE WITNESS:  That is correct.

6     BY MR. GRIFFIN:

7          Q        Do you know whether either aircrafts

8     owned by either of the -- strike that.

9                    Do you know whether the aircraft owned by

10    JPA No. 111 has ever touched down in the United

11    States?

12         A        I don't know.

13         Q        What about the other aircraft, the one

14    owned by JPA, No. 49?

15         A        I don't know the flight schedules, the

16    past flight schedules of those aircraft.  I don't

17    know.

18         Q        Who would know that answer to those

19    questions?

20         A        Vietnam.

21         Q        Who at the debtors would know the answer

22    to those questions?

23                    MR. SHAUGHNESSY:  Objection.  Asked

24          and answered.

25                    THE WITNESS:  I honestly don't

1                         H. LOECHTEKEN

2              think that there would, because the

3              aircraft would not acquire the FRAT from

4              the manufacturer, that the debtor would

5              know and what the past flight schedules

6              were.  It is not a matter that

7              particularly has been diligenced.

8    BY MR. GRIFFIN:

9         Q    With respect to the time frame during

10   which the aircrafts were owned by the debtors, would

11   anyone at the debtor know whether those aircraft have

12   touched down in the United States?

13                  MR. SHAUGHNESSY:  Objection.

14                  THE WITNESS:  I can't answer.

15   BY MR. GRIFFIN:

16        Q    So there will be nobody providing any

17   testimony on behalf of the debtors regarding whether

18   the aircraft have ever touched down in the U.S.; is

19   that correct?

20                  MR. SHAUGHNESSY:  Objection.  He

21              doesn't -- he's not the debtor's counsel.

22   BY MR. GRIFFIN:

23        Q    Let me ask a different question.

24              You won't be providing any testimony that

25   the aircrafts have ever touched down in the United

```
 1                       H. LOECHTEKEN

 2    States; is that correct?

 3         A     That is correct.

 4         Q     Are you aware that all of the creditors

 5    associated with the respective debtor are parties to

 6    a proceeds agreement?

 7               MR. SHAUGHNESSY:  Objection.

 8               THE WITNESS:  Yes, I think so.

 9    BY MR. GRIFFIN:

10         Q     Is it your understanding that every

11    secured creditor is a party -- strike that.

12               Is it your understanding that every

13    secured creditor of each of the debtors is a party to

14    that agreement?

15               MR. SHAUGHNESSY:  Objection.

16               THE WITNESS:  I am not a hundred

17         percent certain.  I assume so, but I'm

18         not a hundred percent certain.

19    BY MR. GRIFFIN:

20         Q     Is it correct that JPL filed these --

21    strike that.

22               Is it correct that JPL had the debtors

23    file these cases to stop FitzWalter from selling the

24    lease assets?

25         A     Yes, that is correct.  We saw this as an
```

```
 1                    H. LOECHTEKEN
 2    attempt to diminish the value.
 3         Q       Were you personally involved in that
 4    decision?
 5         A       Yes.
 6         Q       Who else was involved in that decision?
 7         A       Several people on my team, Teiji Ishikawa
 8    in Tokyo and several people on his team in Tokyo.
 9    Also, our counsel, and we have been filing based on
10    the recommendation -- based on the legal analysis.
11         Q       Yeah, I'm not -- I don't want you to get
12    into discussions with counsel.  I'm not trying to get
13    into that.
14              MR. SHAUGHNESSY:  Thank you,
15         Mr. Griffin.
16              MR. GRIFFIN:  I just want to
17         understand --
18              MR. SHAUGHNESSY:  I'll offer the
19         same instruction.
20    BY MR. GRIFFIN:
21         Q    I want to understand, at the outset, who
22    was involved.
23              So we have you were involved and people
24    on your team, and would that be the team within
25    JLPSI?
```

1                          H. LOECHTEKEN

2          A      Correct.

3          Q      And then there's Mr. Ishikawa; is that

4    correct?

5          A      That's correct, and members in his team.

6          Q      And when you say members in his team, is

7    that a team at JPL?

8          A      That's the team in Tokyo, yes, in JPL.

9          Q      Who on your team was involved in this

10   process?

11         A      Our head of legal.

12         Q      Who is that?

13         A      The name is Shane Carroll.

14         Q      Who else?

15         A      And our chief operating officer.  The

16   name is Mike Butler.

17         Q      Anybody else?

18         A      No.

19         Q      Mr. Ishikawa was directly involved in

20   this decision to file bankruptcy, as well?

21         A      Correct.

22         Q      Who else from his team was involved?

23         A      I don't remember.  I don't recall

24   precisely.  There was a group of people that was

25   there that included our lawyer and several others,

```
 1                        H. LOECHTEKEN

 2     but I don't remember.

 3                  I think the final decision, obviously, in

 4     this is between -- it was a collective decision, but

 5     it's between myself and Mr. Ishikawa.

 6          Q      You and Mr. Ishikawa were the final

 7     decision makers about whether to institute a

 8     bankruptcy in this case?

 9          A      Yeah.

10          Q      When you say Mr. Ishikawa's lawyer, would

11     that have been an in-house lawyer or external

12     counsel?

13          A      That would have been an in-house lawyer.

14          Q      You don't remember the name of that

15     individual?

16          A      I remember it's Buda-san, Mr. Buda.

17          Q      In Paragraph 4 of your supplemental

18     declaration, Doc 78, which is Exhibit 1, you mention

19     that there were extensive internal discussions --

20                  MR. SHAUGHNESSY:  Hold on.  Let's

21              make sure the witness is looking at the

22              document, please.

23                  MR. GRIFFIN:  Yeah, I'm fine.

24              Okay.

25                  MR. SHAUGHNESSY:  Thank you.
```

1                    H. LOECHTEKEN

2               THE WITNESS:  Okay.

3    BY MR. GRIFFIN:

4         Q     Do you see Paragraph 4 on page two of

5    Exhibit No. 1, you reference that there are extensive

6    internal discussion.

7               Do you see that?

8         A     Correct.

9         Q     When you're referencing debtors' counsel

10   there, are you referencing the Togut firm or another

11   firm?  And I don't want your communications.  I just

12   want you to identify which firm.

13        A     So we spoke with the Togut firm, but we

14   also spoke with our counsel.

15        Q     When you say our counsel, you're talking

16   about JPL's counsel, correct?

17        A     In-house as well as, yeah, the Vedder

18   firm, Vedder Price.

19        Q     You mentioned other debtor

20   representatives.  Is that a reference to the people

21   that we just -- we just identified?

22        A     That's a reference to the people, yeah,

23   we identified, correct.

24        Q     Were there any discussions regarding

25   instituting the bankruptcy had outside the presence

1                     H. LOECHTEKEN

2    of counsel?

3         A    I remember one or two longer phone calls

4    with Teiji Ishikawa about this, but the vast majority

5    of the discussions were with counsel.

6         Q    When was the first discussion you had

7    with Mr. Ishikawa with -- outside the presence of

8    counsel, about the issue of whether to file a

9    bankruptcy?

10        A    I don't remember precisely, but I think

11   we started that discussion around Wednesday that

12   week, when we filed on Friday.  It could have been

13   Tuesday.

14        Q    You filed on the 17th of December.

15        A    Correct.

16        Q    So the conversation would have occurred

17   either the 15th or the 14th of December; is that

18   correct?

19        A    That is correct.  I think on the 14th --

20   on the 14th we found out about the FitzWalter sale,

21   and only after that happened did we even seriously

22   consider.

23             We had engaged with counsel before, but

24   we were not considering filing for bankruptcy, but

25   when we saw the process that was started, then we

```
 1                        H. LOECHTEKEN

 2   started to have the discussion about -- first with

 3   counsel and then internally, about whether or not we

 4   should.

 5        Q      And just to clarify, I'm not trying to

 6   get into discussions with counsel.

 7               But your testimony is that the thing that

 8   triggered JPL's consideration of bankruptcy was

 9   discovering the auction that SVP had instituted with

10   respect to the sale of the lease assets; is that

11   correct?

12               MR. SHAUGHNESSY:  Objection.

13               THE WITNESS:  No, it's FitzWalter,

14        not SVP.

15   BY MR. GRIFFIN:

16        Q      Sorry.  Thank you for the clarification.

17   Let me try that again.

18               Your testimony is that the thing that

19   triggered JPL's consideration of bankruptcy was

20   discovering the auction that FitzWalter had

21   instituted with respect to the sale of the lease

22   assets; is that correct?

23        A      That is correct.  And let me clarify it.

24               At that point in time, we lost belief

25   that there would be a process that would pay back
```

```
 1                      H. LOECHTEKEN

 2    every creditor.  And paying back every creditor is of

 3    utmost importance to us, if we can help this.  So it

 4    was a drastic measure that was meant to secure that

 5    every creditor is being paid back.

 6         Q    Did you consider submitting a bid?

 7         A    We didn't have the cash to do so.

 8         Q    Did you consider approaching someone to

 9    obtain the cash?

10         A    We relatively quickly and even before

11    that had started doing that, but so fast, with such a

12    short notice period, it's not possible to raise money

13    against an asset that is on lease to Vietnam.

14         Q    The asset you would have been purchasing

15    in the sale would have been the lease asset, not the

16    planes, right?

17              MR. SHAUGHNESSY:  Objection.

18              THE WITNESS:  Had we -- had we

19         taken -- had we -- had we had faith in

20         the process of this being a fair auction,

21         it might have been different.  We didn't

22         have that.

23    BY MR. GRIFFIN:

24         Q    Why not?

25         A    Because in terms of the auctions and the
```

1                        H. LOECHTEKEN

2    way that it was announced, the speed of the action

3    taken after the termination of the lease.  First, the

4    speed of the termination of the lease; second, the

5    speed of the auction itself shortly thereafter, and

6    then the very restrictive terms around

7    confidentiality agreements, no warranties, no reps,

8    the security deposits, the wire transfer instructions

9    and the ability of FitzWalter to step in itself

10   didn't make us believe that we could -- that this was

11   a process that we should participate in.

12          Q     Who was running the auction?

13                MR. SHAUGHNESSY:  Objection.

14                THE WITNESS:  A company called

15          Airborne Capital.

16   BY MR. GRIFFIN:

17          Q     Had you ever heard of Airborne Capital

18   before?

19          A     Yes.

20          Q     What -- what is Airborne Capital?

21          A     Airborne Capital is our nextdoor neighbor

22   in Shannon.  They're sitting in the same office

23   building we are sitting in.  And I personally know of

24   the management of Airborne Capital for a minimum of

25   15 years.  I've sold him aircraft in various jobs

```
 1                    H. LOECHTEKEN

 2    beforehand.

 3         Q      So they're an established entity,

 4    correct?

 5         A      Well, I would say they're a rather small

 6    platform at this stage that has a couple of

 7    individuals that have experience.  There's no

 8    question.  But I don't think that they are comparable

 9    to a large leasing company, or even a mid-sized

10    leasing company, my personal belief.

11         Q      It's not a company that just started

12    auctioning planes yesterday, right?  They've been

13    around for a long time?

14         A      The company, such not.  The company as

15    such is a relatively new creation.  The two

16    individuals involved have been in the industry for a

17    long -- two of the individuals that I know are -- the

18    two top guys, have been in the industry for a long

19    period of time.

20         Q      So the people running the auction, you

21    knew them and you know that they've been in the

22    industry for quite some time, correct?

23         A      That is correct.

24         Q      What specifically about the terms of the

25    auction did you take issue with?
```

1                           H. LOECHTEKEN

2        A     The tight confidentiality agreement.  The

3   timeline of the deposit, the no reps and warranties

4   clauses, and then the decision making with the

5   ability of FitzWalter to step in.  Plus the wire

6   instructions as to when the transaction -- the money

7   had to be wired, and then the ability of first

8   FitzWalter in that.

9        Q     Did you believe the lease assets would

10   sell for a significant price in this auction?

11        A     No.

12        Q     What did you expect the lease assets to

13   sell for?

14        A     I had not gone through the analysis.  I

15   think it requires a very specific type of investor to

16   come in, because it requires somebody to be willing

17   to go after Vietnam Airlines and force Vietnam

18   Airlines to pay, under uncertainty.  So I don't

19   think --

20        Q     Did you --

21        A     I don't think it's a marketable product.

22        Q     Could you have bought the lease assets

23   and just re-negotiated them with Vietnam Airlines?

24             MR. SHAUGHNESSY:  Objection.  Calls

25        for speculation.

1                        H. LOECHTEKEN

2              THE WITNESS:  I, frankly speaking,

3         don't know on whether we -- I don't know.

4         It could have happened, but I don't

5         think -- we had not the -- we had not the

6         belief it would be successful.

7    BY MR. GRIFFIN:

8         Q    You decided not to submit a bid because

9    you didn't think it would be successful; is that

10   correct?

11             MR. SHAUGHNESSY:  Objection.

12             THE WITNESS:  Correct.  That's

13        correct.

14   BY MR. GRIFFIN:

15        Q    Did you not think it would be successful

16   because you couldn't submit a bid that was high

17   enough or some other reason?

18             MR. SHAUGHNESSY:  Objection.

19             THE WITNESS:  I would have not even

20        known how to price this.

21   BY MR. GRIFFIN:

22        Q    What do you think the lease assets are

23   worth?

24             MR. SHAUGHNESSY:  Objection.

25             THE WITNESS:  I can't price this.

1                    H. LOECHTEKEN

2        It's pure speculation.  It's not a

3        transparent process.  It's not a

4        bankruptcy process.  A bankruptcy

5        process, well, in the U.S., I have been

6        involved, I've seen these assets being

7        sold.  I know you get cents on the

8        dollars and you can try to price this.

9             This was out of sight, and is

10       Vietnam, in a country like Vietnam.  So I

11       had no handle, we had no handle the

12       prices, nor would --

13   BY MR. GRIFFIN:

14       Q    Your --

15       A    -- indeed, anybody would have.

16       Q    Sorry for talking over you.  Is it your

17   testimony that JPL -- strike that.

18            Is it your testimony that, despite JPL's

19   knowledge of the status of the lease with VNA and the

20   relationship with VNA, it's still unable to value the

21   lease assets?

22            MR. SHAUGHNESSY:  Objection.

23            THE WITNESS:  Can you repeat the

24       question, please?

25

```
 1                    H. LOECHTEKEN
 2   BY MR. GRIFFIN:
 3         Q     Is it your testimony that, despite --
 4   despite JPL's knowledge of the leases with VNA and
 5   the relationship with VNA, it is still unable to
 6   value the lease assets?
 7              MR. SHAUGHNESSY:  Objection.
 8              THE WITNESS:  I would have valued
 9         the lease assets with zero.  I had to,
10         because we had essentially a lease that
11         was about to get agreed with V -- or was
12         about agreed with VNA, and I could have
13         not gone to VNA and asked them to pay for
14         this.  I would have not wanted, one.
15   BY MR. GRIFFIN:
16         Q     You valued the lease assets that were
17   being sold by FitzWalter as zero; is that correct?
18         A     And I would assume the vast majority
19   of -- yes, or close to zero.  And I would assume that
20   the vast majority of market participants would do the
21   same.
22         Q     So any amount paid for the lease would
23   have been more than what they were worth; is that
24   correct?
25              MR. SHAUGHNESSY:  Objection.
```

1                    H. LOECHTEKEN

2           THE WITNESS:  It might be worth

3       something to somebody else.  I can't

4       speculate on that.  It was certainly

5       worth something to FitzWalter, and they

6       would have won the auction.  That was our

7       belief.  They would have paid essentially

8       any price to win this.

9  BY MR. GRIFFIN:

10      Q    Whatever price the person who won the

11  auction paid, those funds would be used by the

12  security agent to pay off a portion of the debt of

13  the debtors; is that correct?

14          MR. SHAUGHNESSY:  Objection.

15          THE WITNESS:  I think so, but it

16      would go according to seniority,

17      obviously.

18  BY MR. GRIFFIN:

19      Q    It would go down the waterfall provided

20  in the proceeds agreement, right?

21          MR. SHAUGHNESSY:  Objection.

22          THE WITNESS:  Yeah.

23          THE REPORTER:  That answer was

24      covered up.  Sorry.

25

```
 1                    H. LOECHTEKEN

 2           MR. GRIFFIN:  I'll just ask it

 3      again.

 4  BY MR. GRIFFIN:

 5      Q    It would go -- strike that.

 6           Whatever price the person who won the

 7  auction paid, that amount would be used to pay back a

 8  portion of the debtors' debts by going through the

 9  waterfall in the proceeds agreement; is that correct?

10           MR. SHAUGHNESSY:  Objection.

11           THE WITNESS:  That is my

12      understanding.  Had that --

13  BY MR. GRIFFIN:

14      Q    You didn't think that -- I'm sorry.  I

15  didn't mean to interrupt you.

16      A    No, no.  I wanted to say, had that amount

17  been a small amount, which I would assume, then it

18  would have done relatively little to the debt

19  outstanding and, with that, the asset would have been

20  disenfranchised from the debt.

21           So I would value that asset at 30 to

22  40 million if there's no lease attached.  That would

23  have led to a massive -- massive loss for every debt

24  investor.

25      Q    Your testimony is that the planes without
```

```
 1                    H. LOECHTEKEN

 2    the associated VNA lease are each only worth 30 to

 3    $40 million?

 4         A    Would be my best guesstimate.

 5                    MR. SHAUGHNESSY:  Objection.

 6                    THE WITNESS:  Would be my best

 7         guesstimate.  I would not pay more for it

 8         personally.

 9    BY MR. GRIFFIN:

10         Q    Why are the planes only worth 30 to

11    $40 million without the associated lease asset?

12                    MR. SHAUGHNESSY:  Objection.

13                    THE WITNESS:  Because you would

14         need to go to Vietnam and would need to

15         kind of do a deal with Vietnam as,

16         essentially, the new owner of the

17         aircraft, or you need to repossess.  If

18         you have to repossess, the cost of the

19         repossession, to have a reconfiguration,

20         is easily something around 15 to

21         $20 million in total.  So subtract that

22         out of, let's say, a soft value, market

23         value.

24                    Then you would need to go and find

25         a new lessee.  You have marketing costs,
```

```
 1                    H. LOECHTEKEN

 2     you have down time.  You have in the

 3     meantime costs of ensuring and storing.

 4     You have a workman's lien, likely, on

 5     the -- on one of the engines because one

 6     of the engines was in or is in a shop

 7     called N3, which is a joint venture

 8     between Rolls and Lufthansa.  So there

 9     would be a workman lien that has to be

10     paid off.

11            You need to collect your engines.

12     All the engines are -- which is very

13     typical in large airlines -- are being

14     moved around to various aircraft types.

15     Without the help of Vietnam, that would

16     have never been possible easily.  The

17     APUs are a different aircraft.  That is a

18     logistical nightmare.  And then you need

19     to get the records.  You need to get the

20     records out of Vietnam.  And if you don't

21     have an airline cooperating, eventually

22     you can't use that.

23            But it's a very long and costly

24     exercise.

25            Once you have the aircraft, you
```

```
 1                    H. LOECHTEKEN

 2    need then to market the aircraft in an

 3    environment that is soft.

 4          So I have heard -- this is hearsay,

 5    but I've heard about lease rates that are

 6    300K, 400K for a new aircraft, and some

 7    of them are just power by the hour and

 8    nothing, for relatively short leases.

 9          But with an A350, you don't want to

10    do a short lease.  You need to put so

11    much money into the aircraft upfront that

12    you want to do a long lease, at a good

13    and high lease rental.  Otherwise, the

14    value is diminished.  It's a perishable

15    asset.  It losses value over time.

16          So my 30 to 40 million, that's my

17    personal view.  That's what I -- that

18    might be conservative.  That's what I

19    would pay for an aircraft asset without a

20    lease attached.  But I would believe,

21    given that I -- since I know how large

22    leasing companies would look at this, I

23    would believe that others would not look

24    very different.

25
```

1                    H. LOECHTEKEN

2   BY MR. GRIFFIN:

3        Q    There's a lot in there.  I'm going to

4   break that apart a bit.

5             You mentioned that it was a -- the lease

6   assets are a perishable asset.  What does that mean?

7             MR. SHAUGHNESSY:  Objection.

8             THE WITNESS:  Leasing companies

9        depreciate assets over 25 years, down to

10       15 percent or down to 10 percent.  So

11       there's something like a 3.4 to 3.6 per

12       annum depreciation.

13            And then you have market

14       fluctuations in rates, and that is

15       obviously depending on whether the market

16       is strong or whether the market is soft.

17       So years '17, '18, '19, saw a very strong

18       aviation leasing market, very strong

19       aircraft values.  The years '20, '21 have

20       seen those values drop significantly.

21            And on wide-bodies, the drop in

22       value has exceeded the drop -- has

23       exceeded the depreciation that leasing

24       companies normally would apply.

25       Therefore, to take an aircraft at this

1                        H. LOECHTEKEN

2          stage, repossess and then try to sell it

3          will face a soft market.

4    BY MR. GRIFFIN:

5          Q     You said you -- strike that.

6                How much does the use of the asset by the

7    airline impact the value of the asset over time?

8                    MR. EDELMAN:  Objection.  Isn't

9          this very far afield from the scope of

10         this deposition?

11                   MR. GRIFFIN:  His declaration says

12         that the value of the assets decreases --

13         the value of the plane decreases by

14         $300,000 a month, so it's not far afield

15         of anything.  Thank you.

16                   MR. EDELMAN:  Your question was

17         much broader.  If you limit to what's

18         stated in the declaration, that might be

19         helpful.

20   BY MR. GRIFFIN:

21         Q     How much does the use of the air -- of

22   the asset by the airline impact the value of the

23   asset over time?

24                   MR. SHAUGHNESSY:  Objection.

25                   THE WITNESS:  So it all depends in

1                    H. LOECHTEKEN

2    the end on whether the airline will pay

3    for it or not.  If you're obviously

4    repossessing the aircraft, then the

5    aircraft will not pay any more for it,

6    except if you then have claims that you

7    can force through the system.

8            The 300,000 per month mentioned is

9    on -- based on utilization, and based on

10   cost of utilization is our relatively --

11   it's our estimate as to what the value

12   decreases.

13           Vietnam has paid 500K rental a

14   month, so they have paid more at this

15   point in time than what they would have

16   utilized.  If and when the lease would

17   get extended to Vietnam, or reinstated to

18   Vietnam -- that's a better word, strike

19   extended -- then obviously we would get

20   return conditions in which Vietnam would

21   make up for that shortfall.

22           If you don't, then you get a

23   fraction of the dollar, which is your

24   claim amount, and that you have to

25   extract out of Vietnam.

1                    H. LOECHTEKEN

2    BY MR. GRIFFIN:

3         Q    When you mentioned claim amount.  It's

4    not like you don't have any ability to get these -- a

5    return for this.  You just need to go after Vietnam,

6    right, and force them to give it back to you, right?

7                    MR. SHAUGHNESSY:  Objection.

8                    THE WITNESS:  Yes, you would need

9         to force them to give it back to you.

10        You would need them to force them, then,

11        to do something about this.

12   BY MR. GRIFFIN:

13        Q    And there's rights under the respective

14   agreements that give you the ability, whoever owns

15   those assets, to go after Vietnam and get those

16   recoveries; is that correct?

17                    MR. SHAUGHNESSY:  Objection.

18                    THE WITNESS:  That is correct.  But

19        you would need to kind of still collect

20        it, and you need to force it through the

21        system with Vietnam.

22   BY MR. GRIFFIN:

23        Q    The ability to go after those claims is

24   not something you're interested in JPL because of

25   your relationship with VNA?  You weren't going to sue

```
 1                    H. LOECHTEKEN

 2    them, right?

 3              MR. SHAUGHNESSY:  Objection.

 4              THE WITNESS:  I mean, that is to a

 5         certain extent speculation I'm doing, but

 6         the general thinking would be, suing an

 7         airline is the last resort.  If there's

 8         nothing else that is possible, then on

 9         behalf of our investors we would have a

10         duty to do so, as well, but we would

11         rather avoid.

12    BY MR. GRIFFIN:

13         Q    You mentioned that there were other

14    entities that might be willing to do that, for

15    example, hedge funds, right?

16              MR. SHAUGHNESSY:  Objection.

17              THE WITNESS:  Correct.

18    BY MR. GRIFFIN:

19         Q    A hedge fund might place a value on these

20    lease asset, separate from the plane, above zero,

21    correct?

22              MR. SHAUGHNESSY:  Objection.

23              THE WITNESS:  That's speculation on

24         my part, but I think that could be the

25         case.
```

```
 1                    H. LOECHTEKEN
 2   BY MR. GRIFFIN:
 3         Q     Do you know whether VNA paid any money to
 4   the debtors since termination?
 5               MR. SHAUGHNESSY:  Objection.
 6               THE WITNESS:  I don't think they
 7         did.
 8   BY MR. GRIFFIN:
 9         Q     Do the debtors have any source of cash
10   flows other than the payments on these VNA leases?
11               MR. SHAUGHNESSY:  Objection.
12               THE WITNESS:  No, they don't.
13   BY MR. GRIFFIN:
14         Q     If the lease assets were sold away from
15   the -- strike that.
16               If the lease assets were sold in the
17   auction, the debtors would still own the aircraft; is
18   that correct?
19         A     That is correct.
20               MR. SHAUGHNESSY:  Objection.
21   BY MR. GRIFFIN:
22         Q     It would have the ability to re-lease
23   those airplanes, correct?
24               MR. SHAUGHNESSY:  Objection.
25               THE WITNESS:  Theoretically, yes,
```

```
 1                    H. LOECHTEKEN

 2          but there is a glut of wide-body aircraft

 3          that's available in the market.  So this

 4          is a very long, drawn out process that

 5          can take -- it's not months.  This is

 6          years before you get another lessee.

 7              Or you go to certain -- what I

 8          would call -- less credible lease

 9          entities, and they need to make that

10          analysis on whether am I willing to put

11          as much money as needed into it to get it

12          there, and can I collect this.

13  BY MR. GRIFFIN:

14      Q    If JPL wanted to continue operating these

15  planes with VNA, it could have submitted a bid in the

16  auction, bought the leases and just agreed to

17  re-negotiate the leases, instead of pursuing the

18  termination claims, correct?

19              MR. SHAUGHNESSY:  Objection.  Calls

20          for speculation.

21              THE WITNESS:  Yeah, I -- it's

22          speculative.  I mean, it could -- the

23          loans were in arrears, so the next step

24          could have been default on the loans.  We

25          simply don't -- didn't see that as a
```

```
 1                      H. LOECHTEKEN

 2          viable option, but it's speculation.

 3   BY MR. GRIFFIN:

 4          Q     Did you object to the auction?

 5                MR. SHAUGHNESSY:  Objection.  Who

 6          are you talking about?

 7   BY MR. GRIFFIN:

 8          Q     Did the debtors submit a formal objection

 9   to the auction?

10          A     No, not that I remember.

11          Q     Did the debtors go --

12          A     I mean --

13          Q     -- and try to get -- strike that.  I

14   didn't mean to interrupt.  If you had other things to

15   say, please.

16          A     I wanted to make one more comment.

17                We had sent a letter to FitzWalter when

18   they were becoming the security agent, and that

19   letter got unanswered -- got not an answer.  We

20   debated on whether they could become a security agent

21   because there were certain provisions with regard to

22   the requirement of becoming a security agent, and we

23   never got an answer on this, and the next action was

24   the auction.

25                So we simply did not have the belief that
```

```
 1                        H. LOECHTEKEN
 2    this would be a fair process.
 3         Q      When did you send this letter to
 4    FitzWalter?
 5         A      Shortly after the -- shortly after the
 6    termination of the leases and shortly after they
 7    became the security agent.
 8         Q      You mentioned that, in this letter, you
 9    questioned whether FitzWalter could be the security
10    agent; is that correct?
11         A      Yes --
12         Q      What's your --
13         A      -- as far as I recall.
14         Q      -- basis -- sorry.
15                Sitting here today, do you think
16    FitzWalter can serve as the security agent?
17                MR. SHAUGHNESSY:  Objection.  Calls
18           for a legal conclusion.
19                THE WITNESS:  Yeah, I can't say
20           that.  This letter was drafted by our
21           legal counsel.
22    BY MR. GRIFFIN:
23         Q      Did you review the letter?
24         A      No, I did not.
25         Q      Do you know the content of the letter?
```

```
 1                    H. LOECHTEKEN

 2         A      That letter was sent when I had a private

 3    emergency and I was not available.

 4         Q      All you know about the letter is there

 5    were -- it raised issues about FitzWalter's ability

 6    to serve as a security agent; is that correct?

 7              MR. SHAUGHNESSY:   Objection.

 8              THE WITNESS:   That is my

 9         understanding.

10    BY MR. GRIFFIN:

11         Q      Turning back to your declaration, which

12    is Document No. 78, Exhibit 1.

13              MR. SHAUGHNESSY:   This is the

14         supplemental declaration, Mr. Griffin?

15              MR. GRIFFIN:   Yes, the supplemental

16         declaration.

17    BY MR. GRIFFIN:

18         Q      In the end of Paragraph 4, it talks about

19    extensive internal discussions about the filing of

20    the bankruptcy.   And at the end it says:   And the

21    consequences for filing bankruptcy relief.

22              Do you see that?

23         A      I see that, yeah.

24         Q      Without disclosing discussions with

25    counsel, what consequences are you referring to here?
```

```
 1                  H. LOECHTEKEN

 2          MR. SHAUGHNESSY:  And I'll just

 3   supplement that with instructing the

 4   witness not to answer if he believes that

 5   his knowledge of the consequences derived

 6   solely from discussions with counsel.

 7          You can otherwise answer.

 8          THE WITNESS:  So I'll give a --

 9   then I can't say everything, obviously.

10   I'll give an answer that is dealing with

11   our general concerns that we had with

12   regards to consequence of filing for

13   bankruptcy.

14          So we're an entity that buys

15   annually about three to 4 billion-dollars

16   worth of assets.  These assets are being

17   purchased, partially warehoused, in the

18   joint venture partially with Airbus,

19   partially with also our own financial

20   means, and then they are sold to our

21   Japanese investors.  We have about two

22   and a half thousand Japanese investors

23   that regularly invest with us.

24          Every of those assets that have

25   been sold to Japanese investors goes into
```

1                         H. LOECHTEKEN

2              a special purpose vehicle.  We sometimes

3              bundle this into -- more than one asset

4              into one SPC.  That can also happen.  It

5              goes into those vehicles and then we need

6              to raise nonrecourse debt.

7                   So we perfectly understand that

8              there was a clause in the contract that

9              effectively prohibits us from filing for

10             Chapter 11.  So we discussed the

11             consequences of filing for bankruptcy

12             relief with that clause in mind, but also

13             with regard to what and how are we going

14             to raise in the future nonrecourse debt

15             in case we are being seen as defending

16             what we deemed to be all creditors and

17             not one creditor.

18                   And then comes the legal counsel

19             process through that, consultation

20             process, we came to the conclusion that

21             Chapter 11 is the only viable process.

22   BY MR. GRIFFIN:

23             Q     You mentioned in that answer that there

24   was a clause preventing the filing of the bankruptcy.

25                   What are you referring to there?

1                    H. LOECHTEKEN

2              MR. EDELMAN:  Objection.  I'm going

3         to just ask the witness not to delve into

4         legal matters that were discussed with

5         counsel.  The witness can answer to the

6         extent it dealt with matters that were

7         not covered by legal discussions.

8              THE WITNESS:  So my understanding

9         is it's an SPC.  My understanding is that

10        there is a clause in the contract that

11        prohibits the debtors to file for Chapter

12        11 -- or for bankruptcy, not for Chapter

13        11.

14              But we saw this as the only

15        sensible alternative, especially given

16        that we had more than hopes at that point

17        in time that we would be capable of

18        paying everybody back.  And this was, to

19        us, more important than the contract of

20        or this specific clause in the contract.

21   BY MR. GRIFFIN:

22        Q    I think you're referring to the proceeds

23   agreement when you're referring to the contract.

24   Let's get it up so we have everybody on the same page

25   here.

1                         H. LOECHTEKEN

2              And we can go through this with each

3    plane if we want, but it's my understanding the

4    proceeds agreement for the -- each of the debtors is

5    essentially identical.  Is that generally your

6    understanding?

7              MR. SHAUGHNESSY:  Objection.

8              THE WITNESS:  I would think so, but

9         I can't be sure.

10   BY MR. GRIFFIN:

11        Q    If we need to go through it with both

12   planes, we'll do it.  I'm marking as Exhibit No. 3

13   the proceeds agreement for MSN 111 and JPA number --

14   JPA No. 111 and MSN-067.

15             (Loechteken Exhibit No. 3 was

16        marked for the record.)

17   BY MR. GRIFFIN:

18        Q    Please let me know when you see that.

19             MR. SHAUGHNESSY:  Mr. Loechteken,

20        take your time if you want to review the

21        document.

22             THE WITNESS:  I have it open.  Let

23        me -- this is a 120-page document.

24   BY MR. GRIFFIN:

25        Q    I understand that.  You mentioned a

```
 1                      H. LOECHTEKEN

 2   particular provision in the contract and you said

 3   that there was something that prevented the entities

 4   from filing for bankruptcy.

 5              I think I know what you're talking about,

 6   but I wanted to verify with you so there was no

 7   ambiguity about what -- what the provision of the

 8   agreement is.

 9              MR. SHAUGHNESSY:  And again,

10        Mr. Loechteken, only answer to the extent

11        you knew about whatever provision is

12        going to be shown to you without the

13        advice of counsel or discussions with

14        counsel.

15              MR. EDELMAN:  And I would like to

16        reiterate that I'd actually like to

17        instruct the witness not to answer to the

18        extent it delves into matters that were

19        discussed with legal calls or any fruits

20        of those legal calls.  That's an

21        instruction not to -- not to disclose

22        privileged matters.

23   BY MR. GRIFFIN:

24        Q      If you turn to Section 3.1 of the

25   proceeds agreement for JPA No. 111, it's on page five
```

```
 1                    H. LOECHTEKEN
 2   of Exhibit No. 3.  Let me know when you're there.
 3                MR. SHAUGHNESSY:  I'm sorry,
 4        Mr. Griffin.  You said page five, and
 5        what section are we on?
 6                MR. GRIFFIN:  Page five, Section
 7        3.1 or Paragraph 3.1.  It's in the
 8        Non-Petitioning Section.
 9                MR. SHAUGHNESSY:  Hold on.  Let's
10        go by pages on the document, because that
11        would be page three.
12                MR. GRIFFIN:  I'm sorry.
13                MR. SHAUGHNESSY:  Just so nobody is
14        confused.
15                MR. GRIFFIN:  Okay.  That makes
16        sense.
17                MR. SHAUGHNESSY:  Thank you.
18   BY MR. GRIFFIN:
19        Q     Are you there?
20        A     I'm there.
21        Q     If you see this section, Section 3, it's
22   called Non-Petitioning.
23              And Section 3.1 says:  The borrower
24   parent hereby agrees in favor of each of the financed
25   parties that until the secured obligation's discharge
```

Page 129

1                        H. LOECHTEKEN

2    date, it shall not -- and if you skip down to Section

3    3.1.3 it says -- and shall procure that its

4    affiliates will not file or join in any petition to

5    commence any winding-up proceedings by or against the

6    borrower or the intermediate lessor or any other

7    action or proceedings for the winding up,

8    dissolution, administration or examinership of the

9    borrower or the intermediate lessor, or take or

10   acquiesce in any other action which might reasonably

11   be expected to lead to the bankruptcy or insolvency

12   of the borrower or the intermediate lessor, stayed as

13   required by applicable law or with the consent of the

14   security agent.

15                Do you see that?

16        A      I see that.

17        Q      And JPL, in fact, supported the filing of

18   this bankruptcy; is that correct?

19        A      That is correct.

20        Q      Okay.  With knowledge that it would

21   breach this provision of the agreement, correct?

22                MR. EDELMAN:  Objection.

23                MR. SHAUGHNESSY:  Objection.

24        That's an objection.

25                MR. EDELMAN:  Objection.  Calls for

```
 1                    H. LOECHTEKEN

 2    a legal conclusion and speculation.  Go

 3    ahead.

 4          MR. SHAUGHNESSY:  Yeah, no,

 5    objection to the same thing.  Calls for a

 6    legal conclusion.  This paragraph is a

 7    legal document.  Its govern -- has many,

 8    you know, terms of art like bankruptcy,

 9    insolvency.  And your question goes into

10    matters that are -- I believe, are

11    privileged.

12          I'm instructing the witness not to

13    answer anything about privileged matters,

14    an express instruction not to discuss

15    privileged discussions.

16          MR. GRIFFIN:  Are you instructing

17    the witness not to answer?

18          MR. SHAUGHNESSY:  If the witness

19    can reveal anything that does not reflect

20    legal advice or discussions with counsel,

21    he may answer, subject to my objections

22    that it calls for speculation and also

23    calls for a legal conclusion.

24          MR. EDELMAN:  And I'd like to

25    reiterate that objection, and I think
```

```
 1                    H. LOECHTEKEN

 2          your question, by its terms, asks for

 3          legally privileged matters.  But to the

 4          extent it doesn't, that's not an

 5          instruction, but I am instructing him not

 6          to answer any privileged matters.

 7                 MR. SHAUGHNESSY:  You may answer,

 8          Mr. Loechteken, subject to what we just

 9          said.

10                 THE WITNESS:  So what I can say

11          without disclosing the counsel -- advice

12          of counsel discussion is that this was a

13          clause that concerned us.

14   BY MR. GRIFFIN:

15          Q    And you testified that you knew the

16   clause prevented filing bankruptcy, but needed to be

17   seen to be defending your business model; is that

18   correct?

19                 MR. SHAUGHNESSY:  Objection.

20                 THE WITNESS:  That's not correct.

21          It's not our business model.  It's

22          defending the creditors.

23   BY MR. GRIFFIN:

24          Q    Defending which creditor?

25          A    All creditors.
```

1                           H. LOECHTEKEN

2        Q      So you were defending FitzWalter?

3        A      Yeah, FitzWalter, plus all the other

4    senior creditors and the juniors.

5        Q      In this specific transaction?

6        A      We were of the belief that, in this

7    specific transaction, we were -- be capable of

8    generating enough cash to pay back everyone,

9    including some recovery -- small recovery, but some

10   recovery for our investors.

11              So we saw this as a win-win.  Everybody

12   would get paid off.  It would lead to a situation

13   where we would be seen as doing the right thing and

14   the good thing and there would be, essentially, no

15   outstanding debt that would by any means be impaired

16   or lost loss on other party's behalf.  And that is an

17   important topic for us, as I said.

18              So it's not primarily our investors.  Our

19   investors would have lost the vast majority of the

20   money.  And there's no question, in market terms, as

21   of today, our investors are not whole.  That's clear.

22   But the structure that we were contemplating and the

23   process would pay back every creditor.

24       Q      You made a --

25              MR. SHAUGHNESSY:  All I was going

```
 1                        H. LOECHTEKEN

 2           to say, Mr. Griffin, we've been going for

 3           another hour.  We should take a break

 4           soon.  If you want to ask a couple more

 5           questions, that's fine, but we should

 6           take a break soon.

 7   BY MR. GRIFFIN:

 8           Q      You made a decision to breach this

 9   agreement because you thought you could put together

10   a better deal, correct?

11               MR. SHAUGHNESSY:  Objection.

12               MR. EDELMAN:  Objection.  Calls for

13           a legal conclusion.  The witness never

14           testified that he -- there was a breach

15           of this agreement.  That's you putting

16           words in his mouth.  Objection.  Also --

17               MR. GRIFFIN:  You're coaching your

18           witness.

19               MR. EDELMAN:  I'm not coaching the

20           witness.

21               MR. GRIFFIN:  Your --

22               MR. EDELMAN:  You are badgering the

23           witness.  You are badgering the witness

24           and you're asking about legally

25           privileged matters.
```

1                    H. LOECHTEKEN

2          MR. SHAUGHNESSY:  Okay.  Ask the

3     question.

4          MR. GRIFFIN:  He's testified about

5     this already.  If you want to say he's

6     testified about legally privileged

7     matters, then he has waived that

8     privilege.  I'm asking him questions, you

9     are giving your instructions and he's

10    answering the questions.  I would prefer

11    you stop coaching the witness.

12         MR. EDELMAN:  And I would prefer

13    that you stop asking the witness about

14    legally privileged matters that we have

15    to object to every single time.

16         MR. GRIFFIN:  Reading a document is

17    not privileged.

18         MR. EDELMAN:  And reading a

19    document, the document states for itself.

20    You're badgering the witness.

21         MR. SHAUGHNESSY:  Do you want to

22    re-ask the question or do you want him

23    to --

24         MR. GRIFFIN:  I'll ask it.

25

```
1                          H. LOECHTEKEN

2    BY MR. GRIFFIN:

3         Q     You made a decision to breach this

4    agreement because you thought you could put together

5    a better deal, correct?

6                    MR. SHAUGHNESSY:  Same objection.

7                    MR. EDELMAN:  Same objection.

8                    THE WITNESS:  We were of the belief

9         it would pay back every creditor.

10   BY MR. GRIFFIN:

11        Q     You believed you could pay back every

12   creditor if you went into bankruptcy, so you ignored

13   this provision; is that correct?

14                   MR. SHAUGHNESSY:  Objection.

15                   MR. EDELMAN:  Objection.  Same

16        objection as before.

17   BY MR. GRIFFIN:

18        Q     You can answer.

19        A     Oh, I can answer?  Okay.

20                   MR. SHAUGHNESSY:  Why don't you

21        read back the question again since there

22        was a long lapse of time.

23   BY MR. GRIFFIN:

24        Q     You believed you could pay back every

25   creditor if you went into bankruptcy, so you ignored
```

1                         H. LOECHTEKEN

2    this provision, specifically provision 3.1.3 of the

3    proceeds agreement?

4              MR. SHAUGHNESSY:  Same objection.

5              MR. EDELMAN:  Same objection.

6         There's an assumption in your question

7         which he did not testify to.

8              MR. SHAUGHNESSY:  You may answer.

9              THE WITNESS:  We believed we could

10        pay back every creditor.

11   BY MR. GRIFFIN:

12        Q    I guess we'll keep going.

13             You believed you could pay back every

14   creditor if you went into bankruptcy so you ignored

15   this provision, specifically provision 3.1.3 of the

16   proceeds agreement; is that correct?

17             MR. SHAUGHNESSY:  Objection.

18             MR. EDELMAN:  Objection.  Again,

19        you're putting an assumption in the

20        witness's mouth.

21             MR. GRIFFIN:  Stop coaching the

22        witness.

23             MR. EDELMAN:  Stop this restating

24        and putting words in the witness's mouth.

25        You're staying that he breached, you're

1                    H. LOECHTEKEN

2          saying that he ignored, and he testified

3          that goes against what he said.

4                I mean, this is unethical conduct

5          by you.  You cannot put words and

6          assumptions that directly contradict what

7          he said.

8     BY MR. GRIFFIN:

9          Q    You testified earlier that you knew there

10    was a clause that prevented filing bankruptcy,

11    correct?

12               MR. SHAUGHNESSY:  Objection.

13               MR. EDELMAN:  Objection.

14               THE WITNESS:  I testified there was

15          a clause that could cause potential

16          issues.

17               MR. GRIFFIN:  I'm going to go off

18          the record.  We're going to go back and

19          find your prior testimony and then we'll

20          keep going.  So let's go off the record.

21               THE VIDEOGRAPHER:  The time is

22          6:45 p.m.  We're off the record.

23                    (Brief pause.)

24               THE VIDEOGRAPHER:  The time is

25          6:57 p.m.  We're on the record.

1          H. LOECHTEKEN

2   BY MR. GRIFFIN:

3          Q     Mr. Loechteken, you testified that you

4   made the decision to file bankruptcy in conjunction

5   with Mr. Ishikawa; is that correct?

6          A     That is correct.

7          Q     You two were the decision makers for JPL,

8   correct?

9          A     Correct.  There were others that were

10  weighing in, but we decided.

11         Q     And just so it's clear for the record,

12  you testified earlier that you perfectly understood

13  that there was a clause in the contract that

14  effectively prohibited us from filing for Chapter 11,

15  correct?

16              MR. SHAUGHNESSY:  Objection.  Calls

17         for a legal conclusion.

18              MR. EDELMAN:  And it's a

19         misstatement.

20              THE WITNESS:  We had a general

21         understanding that there might be a

22         clause in the contract, but none of us is

23         a lawyer, so we can't interpret a legal

24         situation.

25              Our concern was more on the

```
 1                    H. LOECHTEKEN

 2          commercial side.  What is it doing to all

 3          lenders vis-a-vis us and our investors if

 4          we do this or we do the alternative.

 5   BY MR. GRIFFIN:

 6          Q      Did you ask for the securities agent

 7   permission before filing for bankruptcy?

 8               MR. SHAUGHNESSY:  Objection.

 9               THE WITNESS:  No.

10   BY MR. GRIFFIN:

11          Q      When you decided to file for bankruptcy,

12   was the plan to do a reorganization?

13          A      I don't know what that means.

14               MR. SHAUGHNESSY:  Objection.

15          Sorry.  Go ahead.

16               THE WITNESS:  Sorry.  I don't know

17          what that means.

18   BY MR. GRIFFIN:

19          Q      Okay.  Were you planning on just going

20   into bankruptcy and then selling the assets in the

21   bankruptcy?

22               MR. SHAUGHNESSY:  Objection.

23               THE WITNESS:  We were planning to

24          go into bankruptcy to give us the time

25          necessary to repay all creditors.
```

1                    H. LOECHTEKEN

2  BY MR. GRIFFIN:

3      Q     With respect to repaying all creditors,

4  did you have anything in mind about how you could

5  accomplish that?

6      A     We had, at that point in time,

7  discussions with SVPGlobal about a stalking horse

8  bid.

9      Q     Was there ever any consideration of

10  obtaining funds yourselves so you could repurchase

11  the assets?

12              MR. SHAUGHNESSY:  Objection.

13              THE WITNESS:  You mean repurchase

14      on behalf of our investors?

15  BY MR. GRIFFIN:

16      Q     Yes.  So that the debtors could

17  essentially buy out the loans and get the assets for

18  themselves.

19      A     Certainly that we have these

20  considerations as well.  But given the time frame,

21  raising of money against an asset, against a lease,

22  that was not -- at that point in time it was

23  terminated, that would have taken a lot longer time.

24              So, yes, we would certainly want to do

25  that if we would be given the time and the ability to

1                          H. LOECHTEKEN

2    raise the money.

3          Q     Did you expect that to happen during the

4    bankruptcy?

5                MR. SHAUGHNESSY:  Objection.

6                THE WITNESS:  I can't speculate on

7          that, but I believe it would be a

8          possibility.

9    BY MR. GRIFFIN:

10         Q     Would that type of restructuring have

11   been an important consideration for your business --

12               MR. SHAUGHNESSY:  Objection.

13   BY MR. GRIFFIN:

14         Q     -- the ability to do that?

15         A     So any restructuring that we would do,

16   whether that was a lease or loans, and we have

17   been part -- any restructuring we would do, we have

18   been agreeing to lease restructurings.  We would do,

19   obviously, with the idea in mind to protect our

20   equity investors.

21               We perfectly accept seniority of debt

22   over equity.  There's no question about that.  We

23   just thought that -- we just think we need to do

24   something to be active to assure that there's a fair

25   and transparent process that pays back everyone.

1                        H. LOECHTEKEN

2        Q     Was the transaction you were discussing

3    with SVP an asset purchase or was it refinancing of

4    your debt?

5        A     The SVP discussions were an asset

6    purchase.

7        Q     At the time you decided to go into

8    bankruptcy, was the intention to accept the SVP

9    proposal of an asset purchase through an option

10   process?

11       A     It was gate one for us to go through.

12   Essentially, yes, because it gives us the time and it

13   gave us the consideration that would allow repayment

14   of every creditor, and there was very small recovery

15   to our investors.

16       Q     And you said gate one, is that --

17       A     Yeah.  We -- we have in bankruptcy a bit

18   nor time to see on whether something else can happen,

19   either through an auction process, where there was

20   more being offered by third parties, which we

21   believed there's a good and fair chance to do so, or

22   through a refinancing.

23       Q     Subsequent to the filing of the

24   bankruptcy but before you submitted the stalking

25   horse bid, were there negotiations with people other

1                         H. LOECHTEKEN

2    than SVP?

3         A    No real negotiations.

4         Q    Were there any negotiations with anyone

5    between December 17th and when you agreed to the

6    asset purchase agreement and term sheet?

7         A    There was some discussions, yes.

8         Q    With who?

9         A    So I personally had discussions with

10   Blackstone about financing, potentially in

11   combination with a stalking horse bid, and I had

12   discussions with Airbus, personally, about same.

13        Q    Anyone else?

14        A    I reached out to Deutsche, but I didn't

15   get any response.

16        Q    Anyone else?

17        A    Not that I had discussions with.

18        Q    These discussions were all after the

19   filing of the bankruptcy, correct?

20        A    These discussions, given that there

21   was -- these discussions evolved.  Given that there

22   was a situation that we had with both FitzWalter and

23   with SVP, I started these discussions on the

24   financing basis that -- what you, yourself, suggested

25   a little earlier, I think in the first week of

1                              H. LOECHTEKEN

2    December.

3         Q     For the moment, can you consider the time

4    frame from the filing the bankruptcy on

5    December 17th.

6               Did you have any of these discussions

7    with a potential stalking horse other than SVP post

8    the filing of the bankruptcy?

9         A     Yes, I think so, we did.  So the same

10   parties.  The parties I talked to was -- not Deutsche

11   at that point, but Blackstone and Airbus.

12        Q     Blackstone and Airbus; is that correct?

13        A     Yes.  Very little hopes, I should also

14   say, because this is a pre-Christmas period and very

15   large organizations have books closed, and it was not

16   going well.

17        Q     The discussions you had both prior and

18   post bankruptcy filing were not going well, except

19   with respect to SVP; is that correct?

20              MR. SHAUGHNESSY:  Objection.

21              THE WITNESS:  I think we could have

22        not gotten this in time.

23   BY MR. GRIFFIN:

24        Q     But when you say not going well, what did

25   you mean?

1                        H. LOECHTEKEN

2        A      Timing wise.  It is -- it is a process

3    that requires time for large organizations.

4        Q      Did any of the people you contacted have

5    concerns with the amount you were requesting in terms

6    of the deal?

7                MR. SHAUGHNESSY:  Objection.

8                THE WITNESS:  That's a -- on the

9            other side, not really the amounts.  It's

10           more like can we get this approved, yes

11           or no.

12               MR. GRIFFIN:  Hold on.  I think

13           somebody is off mute but talking in the

14           background.  Is that --

15               MR. SHAUGHNESSY:  Mr. Edelman.

16               MR. GRIFFIN:  We'll just keep

17           going.

18    BY MR. GRIFFIN:

19        Q      So I think you said, with respect to

20    Airbus, it wasn't the amount but the time frame; is

21    that correct?

22        A      Correct.

23        Q      What about Blackstone?

24        A      It was a matter of product and it was a

25    matter of price and time frame.

1                         H. LOECHTEKEN

2          Q      What do you mean by product?

3          A      Equity, debt, combination of equity or

4     debt, and then price to it.

5          Q      What was the issue with the price?

6          A      The initial discussions were under

7     long-term financing, and the long-term financing

8     would have been too expensive, way too expensive to

9     kind of preserve value over time.

10         Q      What do you mean by long-term in this

11    context?

12         A      Eight years.

13         Q      You didn't want eight years or you did

14    want eight years?  I'm just --

15         A      No, I did not want -- I did not want

16    eight years.

17         Q      What time frame were you looking for?

18         A      One to two years.

19         Q      What would have happened after one to two

20    years?

21         A      Re --

22                MR. SHAUGHNESSY:  Objection.

23                THE WITNESS:  I mean, it's

24         speculation, but if I would speculate,

25         it's a refi, as a stabilized figure.

1                        H. LOECHTEKEN

2    BY MR. GRIFFIN:

3         Q      The Blackstone deal was for them to re --

4    for you to refinance the assets, not to sell the

5    assets; is that correct?

6         A      Correct.

7         Q      Was that the same thing you were

8    discussing with Airbus?

9         A      Correct.

10        Q      With respect to all of the discussions

11   you were having, were you attempting to refi in all

12   of them except for the SVP deal?

13                MR. SHAUGHNESSY:  Objection.

14                THE WITNESS:  I think our

15            preference would have been to try to refi

16            everything, logically, because that

17            would -- if the lease with Vietnam would

18            come into place, and if there's a little

19            bit of time passing, the market heals,

20            then we could raise longer term money at

21            better conditions.

22   BY MR. GRIFFIN:

23        Q      None of those attempted refinances came

24   to fruition; is that correct?

25                MR. SHAUGHNESSY:  Objection.

```
 1                    H. LOECHTEKEN

 2            THE WITNESS:  Not in the time frame

 3       for the stalking horse bid.

 4  BY MR. GRIFFIN:

 5       Q    Do you expect to have refinance offers

 6  during the bid procedures process, if we ever get

 7  there?

 8            MR. SHAUGHNESSY:  Objection.  Calls

 9       for speculation.

10            THE WITNESS:  Yeah, I can't

11       speculate on that.  There's discussions

12       but I don't know about the outcome.

13            MR. EDELMAN:  By the way, I

14       apologize for the interruption, but the

15       heat went out in my house and the oil

16       company was just calling me, so I

17       apologize for that noise.

18            MR. GRIFFIN:  No worries.  You have

19       to deal with stuff in your life.  It's

20       all right.

21  BY MR. GRIFFIN:

22       Q    With respect to your discussions with

23  SVP, did you discuss obtaining financing from them?

24            MR. SHAUGHNESSY:  Objection.

25            THE WITNESS:  There wasn't an
```

1                          H. LOECHTEKEN

2          offer.

3     BY MR. GRIFFIN:

4          Q     That was an asset purchase, right?

5          A     That was an asset purchase.

6          Q     With respect to the asset -- the

7     negotiations of the asset purchase term sheet, there

8     is a reference in there to the potential for a -- a

9     DIP financing or a debtor in possession financing.

10    Are you aware of that?

11         A     I think I saw that, yeah.

12         Q     Was that important to you?

13         A     That was inserted by all lawyers.

14         Q     Was that done at your instruction?

15         A     No.  I took it when it came, but I didn't

16    instruct.

17         Q     That wasn't something that was being used

18    to tell the investors that the structure may still be

19    left intact?

20              MR. SHAUGHNESSY:  Objection.

21              THE WITNESS:  Not to my knowledge.

22         I'm quite certain that our Tokyo

23         colleagues couldn't even have explained

24         it.

25

1                          H. LOECHTEKEN

2              MR. GRIFFIN:  I'm going to put in a

3       document -- sorry, I'm trying.

4                  (Loechteken Exhibit No. 4 was

5       marked for the record.)

6    BY MR. GRIFFIN:

7        Q    I've marked as Exhibit 4 what's going to

8    appear in your Submitted folder as Tab 4,

9    JPA111-00000476.

10              Do you see that?

11              MR. SHAUGHNESSY:  I don't have it.

12       Oh, okay.  The 476?

13              MR. GRIFFIN:  Yes.

14              MR. SHAUGHNESSY:  I see it.

15       Thanks.

16    BY MR. GRIFFIN:

17       Q    Do you see this document?

18       A    I see the document, yeah.

19       Q    If you look at the last sentence of the

20    third paragraph, it says:  The clause regarding a

21    replacement DIP is needed as that is what's being

22    used to tell the investors that the structure may

23    still be left intact.  This has no substantive impact

24    upon SVP and is needed to get approval from our

25    client.

1                    H. LOECHTEKEN

2             Do you see that?

3      A      I see that, yeah.

4      Q      Is this an accurate statement?

5             MR. SHAUGHNESSY:  Objection.

6             THE WITNESS:  I can't comment on

7      that.  Was I copied on this e-mail?

8   BY MR. GRIFFIN:

9      Q      No.

10     A      I can't comment.

11     Q      The client being referred to here is JPL,

12  correct?

13            MR. SHAUGHNESSY:  Objection.

14            THE WITNESS:  I assume so.

15  BY MR. GRIFFIN:

16     Q      It's sent by the attorneys from Vedder

17  Price, correct?

18     A      That is correct.

19     Q      And those are JPL's lawyers?

20     A      That is correct.

21     Q      Do you understand that one of the issues

22  in this case is who has a right to the lease assets

23  related to the Vietnam Airlines?

24            MR. SHAUGHNESSY:  Objection.

25            THE WITNESS:  I understand it's an

```
 1                    H. LOECHTEKEN

 2        issue.

 3   BY MR. GRIFFIN:

 4        Q    The leases between VNA are not actually

 5   convenient the debtors and Vietnam Airlines, correct?

 6             MR. SHAUGHNESSY:  Objection.  Calls

 7        for a legal conclusion.

 8             THE WITNESS:  Sorry.  Can you say

 9        it again?

10   BY MR. GRIFFIN:

11        Q    I didn't think this was a trick question.

12             I'm saying, VNA has airplane leases and

13   those leases aren't between the debtors and VNA.

14   There's someone else in the middle, right?

15        A    That's correct.

16             MR. SHAUGHNESSY:  Objection.

17   BY MR. GRIFFIN:

18        Q    VNA's leases are, in fact, with what's

19   called the intermediate lessors?

20             MR. SHAUGHNESSY:  Objection.

21             THE WITNESS:  It is correct, Draco

22        and Uranus.

23   BY MR. GRIFFIN:

24        Q    Yeah, I was going to ask that.  So on

25   the -- the JPA No. 111, the intermediate lessor is
```

Page 153

```
 1                      H. LOECHTEKEN
 2    Draco, correct?
 3          A      Correct.
 4          Q      And on JPA No. 49, the intermediate
 5    lessor it is Uranus; is that correct?
 6          A      Yes.  Uranus.  It's a star, I believe.
 7          Q      The debtors have no direct contractual
 8    relationship with VNA?
 9                 MR. SHAUGHNESSY:  Objection.
10                 THE WITNESS:  It's a head lease,
11          sublease arrangement.
12    BY MR. GRIFFIN:
13          Q      And just to clarify, the head lease is
14    the debtor has a head lease with the intermediate
15    lessor, and that would be either Draco or Uranus,
16    correct?
17                 MR. SHAUGHNESSY:  Objection.
18                 THE WITNESS:  That is correct.
19    BY MR. GRIFFIN:
20          Q      And then the intermediate lessor actually
21    leases the -- actually has the arrangement with VNA,
22    correct?
23                 MR. SHAUGHNESSY:  Objection.
24                 THE WITNESS:  Correct.
25
```

 1                     H. LOECHTEKEN

 2   BY MR. GRIFFIN:

 3        Q     The intermediate lessors entered into

 4   deed of security agreements with the debtors and

 5   assigned the property defined as the assigned

 6   property to the debtors; is that correct?  And that

 7   would be --

 8             MR. EDELMAN:  Objection as to form.

 9             THE WITNESS:  It's a legal

10        question.  I think so, but I'm not a

11        hundred percent certain.

12             MR. GRIFFIN:  Let's look at the

13        documents then.  Are you aware that

14        the -- strike that.  I'm unfortunately

15        having some document issues.  I

16        apologize.  Okay.

17             I'm marking Exhibit No. 5.

18             (Loechteken Exhibit No. 5 was

19        marked for the record.)

20   BY MR. GRIFFIN:

21        Q     Let me know when you see Exhibit 5.

22             MR. SHAUGHNESSY:  They're not

23        labeled as exhibits, Justin.  You've got

24        to describe the document.

25

1                            H. LOECHTEKEN

2    BY MR. GRIFFIN:

3         Q    I apologize.  If you go in the Submitted

4    folder, it's -- the document Exhibit No. 5 is going

5    to be named 111 Intermediate Lessor Security

6    Assignment.

7              Do you see that?

8         A    Yeah, I see that.

9              MR. SHAUGHNESSY:  Mr. Loechteken,

10        if you want to review the document, you

11        can review the document.

12   BY MR. GRIFFIN:

13        Q    Take your time.

14        A    This is a document that I'm not familiar

15   with.  I know it exists, but I am not familiar with

16   it, but please go ahead.

17        Q    This is a document titled Deed of

18   Security Agreement, and it's with respect to JPA No.

19   111 as borrower.

20             Do you see that on the first page?

21        A    I see that, yeah.

22        Q    And this is the agreement whereby the

23   intermediate lessors assign their properties in the

24   VNA leases to the debtors, correct?

25             MR. SHAUGHNESSY:  Objection.

1                          H. LOECHTEKEN

2                 THE WITNESS:  I assume so.  I said

3           I'm not familiar.  It says so, so I

4           assume that it will be the content.

5      BY MR. GRIFFIN:

6           Q      If you look at page two of the document,

7      Section 3.1.  Are you there?

8           A      Yes, I'm there.

9           Q      It states, The Lessor, and for the

10     purposes of this agreement, that's the intermediate

11     lessor, right?

12                 MR. SHAUGHNESSY:  Objection.

13                 MR. EDELMAN:  Objection.  I think

14           the witness testified he wasn't familiar

15           with this document, so why are you

16           badgering the witness with questions?

17     BY MR. GRIFFIN:

18           Q      For the purpose of this agreement, the

19     lessor is the intermediate lessor, correct?

20                 MR. SHAUGHNESSY:  Objection.

21                 THE WITNESS:  I'm not familiar with

22           the document.  I can only speculate.  I

23           assume you're right.  I don't know.

24     BY MR. GRIFFIN:

25           Q      You won't be offering any testimony about

1                    H. LOECHTEKEN

2  the assignments between the intermediate lessor and

3  the debtor; is that correct?

4                    MR. SHAUGHNESSY:  Objection.

5           Vague.  If you can restate it more

6           clearly, please.

7  BY MR. GRIFFIN:

8      Q     Do you intend to offer any testimony

9  about the assignments between any of the entities and

10 the debtor?

11                   MR. SHAUGHNESSY:  Same objection.

12                   THE WITNESS:  I'm not familiar with

13          those documents and I'm not a lawyer.

14 BY MR. GRIFFIN:

15     Q     Okay.  That's not my question.

16           Do you, in this proceeding, plan to offer

17 any testimony about the document Exhibit No. 5?

18     A     No, I don't plan to do so.

19     Q     Do you plan to offer any testimony about

20 any of the deal documents at issue in this dispute?

21                   MR. SHAUGHNESSY:  Objection.

22                   THE WITNESS:  What are the other

23          deal documents?

24 BY MR. GRIFFIN:

25     Q     There are hundreds.  We can go through

Page 158

1                    H. LOECHTEKEN

2  every one of them and find out whether you've seen it

3  and plan on testifying about it.

4           But you said you didn't see this one.

5  This is one that -- you know there's an issue in this

6  case about the assignment, correct?

7           MR. SHAUGHNESSY:  Mr. Griffin,

8           maybe I can help with this.  Are you

9           asking if he's going to offer an opinion

10          or testimony that could be any way

11          related to any of these documents?

12          I think if you're looking for an

13          opinion, it could be a -- you know, an

14          easier question and avoid further

15          follow-up questions.

16          MR. GRIFFIN:  He's the only witness

17          who I think is going to give fact

18          testimony at the hearing, and to the

19          extent that there's any fact testimony

20          about how these documents work together

21          and what rights lie in what place and who

22          has them, then that's testimony that we

23          want to understand before the hearing.

24          MR. SHAUGHNESSY:  Oh, that's a fair

25          question, I think.  You can restate it.

1                          H. LOECHTEKEN

2    BY MR. GRIFFIN:

3        Q    I'm going to -- so we can go through the

4    document.  If you look at the first page of the

5    document on the definition of lessor -- or sorry -- I

6    guess the first page after the Table of Contents.  So

7    the page number one, internal page of the document

8    number one.

9             It defines the lessor as DEA Leasing

10   Ireland 12, Limited.

11            Do you see that?

12       A    I see that, yeah.

13       Q    Is that the intermediate lessor here?

14            MR. SHAUGHNESSY:  Objection.

15            THE WITNESS:  I don't know,

16       frankly.  This was put together before I

17       joined the company.

18   BY MR. GRIFFIN:

19       Q    You don't know whether JP Leasing Draco

20   Limited is the entity that was formerly known as DEA

21   Leasing Ireland 12 Limited?

22       A    No, I don't.

23            MR. SHAUGHNESSY:  Objection.

24            THE WITNESS:  I don't.

25

```
 1                    H. LOECHTEKEN

 2    BY MR. GRIFFIN:

 3            Q     Are you going to be giving any testimony

 4    about the assignment between Draco Limited and the

 5    debtor --

 6                  MR. SHAUGHNESSY:  Objection.

 7    BY MR. GRIFFIN:

 8            Q     -- of the VNA lease?

 9            A     I am not qualified to do so and I don't

10    know the documents well enough.

11                  MR. SHAUGHNESSY:  Mr. Griffin, I'm

12            happy to stipulate on the record

13            regarding what his direct testimony will

14            be about.  We've discussed this before.

15            If you'd like me, I can say on the record

16            what his testimony is confined to for the

17            hearing next Wednesday, if that would

18            help move this along.

19                  MR. GRIFFIN:  Sure.

20                  MR. SHAUGHNESSY:  Mr. Loechteken's

21            direct testimony is limited to his

22            declaration, in its entirety, dated

23            January 21st, 2022, as well as his

24            declaration from January 10th, 2022, with

25            the exception of Section 3, the term
```

1              H. LOECHTEKEN

2    sheet in that declaration.

3         MR. GRIFFIN:  If we look at --

4    sorry, I didn't mean to interrupt.

5         If you look at the declaration from

6    January 1st -- January 21st, 2022, which

7    is Exhibit 1, in Paragraph 5 of that, the

8    second half of that paragraph says:  The

9    bankruptcy was filed because the debtors

10   determined -- and this is a part in

11   quote -- debtors determined posed a

12   threat of irreparably diminishing the

13   value of their assets.

14        And I think the question of what

15   assets are at issue here and what the

16   debtor's assets are is something that is

17   going to be discussed at the hearing.

18        So if the witness isn't going to

19   testify that the lease assets are the

20   debtor's assets, then we don't need to go

21   through this discussion, but if he's

22   going to testify that the lease assets

23   are the assets of the debtor, then I

24   think, one, we need to have this

25   discussion and, two, there seems to be a

1                        H. LOECHTEKEN

2        problem because this witness doesn't have

3        personal knowledge of the relevant

4        documents.

5            MR. SHAUGHNESSY:  I'm happy to talk

6        about this off the record so we don't

7        have to have a colloquy.

8            MR. GRIFFIN:  Let's do that.

9            MR. SHAUGHNESSY:  I want to go off

10       the record for a minute.

11           THE VIDEOGRAPHER:  The time is

12       7:30 p.m.  We're off the record.

13                   (Brief pause.)

14           THE VIDEOGRAPHER:  The time is

15       7:52 p.m., we're on the record.

16  BY MR. GRIFFIN:

17       Q    Mr. Loechteken, Exhibit No. 1 is your

18  supplemental declaration.  Can you please pull that

19  back up on the screen when you have a moment.

20       A    Yes, I have it open.

21       Q    In this document you discuss on Paragraph

22  5, you say:  There was a threat of irreparably

23  diminishing the value of their assets.

24            Do you see that?

25       A    Yes, I see that.

1                        H. LOECHTEKEN

2        Q     What assets were you referring to here?

3        A     The two aircraft.

4        Q     You're not referring to the lease assets;

5   is that correct?

6        A     I think the question on who owns the

7   assets, including the lease assets, is not one I'm

8   qualified to answer.

9        Q     And just to clarify, when you're saying

10  there is a threat to irreparably diminishing the

11  value of their assets, you're only referring to the

12  airplanes; is that correct?

13             MR. SHAUGHNESSY:  Objection to

14             form.

15             THE WITNESS:  So I'm referring to

16             the aircraft assets.  We have a lease

17             that is essentially quasi agreed with or

18             can be implemented with Vietnam, so I

19             would view this commercially as the

20             aircraft as well as the leases.

21  BY MR. GRIFFIN:

22        Q     And when you're talking about the

23  leases -- that's what we were doing before the break.

24             So there's the aircraft and then there's

25  the leases with VNA, correct?

1                    H. LOECHTEKEN

2        A     Correct.

3        Q     The leases with VNA are between the

4   intermediate lessor and the VNA -- and VNA, correct?

5        A     Correct.

6              MR. SHAUGHNESSY:  Objection.

7   BY MR. GRIFFIN:

8        Q     And they're assigned from the

9   intermediate lessor -- absolutely assigned from the

10  intermediate lessor to the debtor, correct?

11             MR. SHAUGHNESSY:  Objection.  Calls

12        for a legal conclusion.

13             MR. EDELMAN:  Objection as to form.

14             MR. SHAUGHNESSY:  Go ahead and

15        answer.

16             THE WITNESS:  Sorry, Brian, I

17        didn't get that.

18             MR. SHAUGHNESSY:  You can answer.

19             THE WITNESS:  Yeah.  So this is all

20        legal analysis where we were advising our

21        lawyers on, and all lawyers advised that

22        the risk --

23             MR. SHAUGHNESSY:  Wait, wait.

24        Don't reveal the legal advice.  You

25        cannot reveal legal advice.

1                    H. LOECHTEKEN

2           THE WITNESS:  All right.

3    BY MR. GRIFFIN:

4       Q    All I want -- for the purpose of this

5    question, I just want to know what you're referring

6    to when you say the value of their assets.  What are

7    we referring to in Paragraph 5 of Exhibit 1?

8              MR. SHAUGHNESSY:  Objection.  Asked

9         and answered.

10             But answer -- you can answer.

11             THE WITNESS:  Aircraft asset as

12        well as leases.

13   BY MR. GRIFFIN:

14      Q    Are you going to testify here about --

15   when you say their assets, are you stating as a

16   matter of fact that the debtors have a current

17   property interest in the lease assets?

18             MR. SHAUGHNESSY:  Objection.

19             THE WITNESS:  That is a legal

20        question.  I think that's the whole

21        dispute.

22   BY MR. GRIFFIN:

23      Q    So you're not going to testify as a

24   matter of fact that the debtors have a current

25   possessory interest in the lease assets?

```
 1                      H. LOECHTEKEN

 2                MR. SHAUGHNESSY:  Objection.  Asked

 3        and answered.

 4                THE WITNESS:  It's a legal

 5        question, and I think that that's exactly

 6        the dispute we're having.

 7   BY MR. GRIFFIN:

 8        Q    It's a dispute we're having and it's a

 9   legal question, so you, as a fact witness, aren't

10   going to testify that the debtors have a current

11   possessory interest in those lease assets, correct?

12                MR. SHAUGHNESSY:  Objection.

13                THE WITNESS:  I rely on my lawyers.

14        It's -- I have no firm own opinion on

15        this.  It is on legal advice that we're

16        acting.

17   BY MR. GRIFFIN:

18        Q    You can't testify as a matter of fact

19   that there's a current possessory interest in the

20   lease assets of the debtor's, correct?

21                MR. SHAUGHNESSY:  Objection.

22   BY MR. GRIFFIN:

23        Q    You're relying on your lawyers, correct?

24                MR. SHAUGHNESSY:  Objection.

25                THE WITNESS:  We're relying on our
```

1                    H. LOECHTEKEN

2        lawyers.

3   BY MR. GRIFFIN:

4        Q     And whether it's a current possessory

5   interest is going to be determined based upon legal

6   arguments, but you as a fact witness aren't going to

7   say, yes, those are our leased assets as a matter of

8   fact?

9             MR. SHAUGHNESSY:  Objection.

10            THE WITNESS:  As I said, we rely on

11        our lawyers.  It's a legal dispute.

12   BY MR. GRIFFIN:

13        Q     Did you ever represent to anyone that you

14   could sell the lease assets to?

15            MR. SHAUGHNESSY:  Objection.

16            THE WITNESS:  Not to my knowledge.

17   BY MR. GRIFFIN:

18        Q     So you never discussed with SVP, for

19   example that the debtor could sell both the planes

20   and the lease assets?

21            MR. SHAUGHNESSY:  Objection.

22            THE WITNESS:  I -- I personally did

23        not discuss this possessory, no.

24   BY MR. GRIFFIN:

25        Q     Do you know whether anybody from JPL or

1            H. LOECHTEKEN

2   the debtors did discuss this with SVP?

3        A    The only person who had real discussions,

4   and there was limited, with SVP was myself, to my

5   best knowledge.

6        Q    Have you had any discussions with anyone

7   about whether the debtors can sell the lease assets?

8            MR. SHAUGHNESSY:  Are you asking

9        aside from counsel, Mr. Griffin, or

10       anyone?

11           MR. GRIFFIN:  Thank you for the

12       clarification.

13  BY MR. GRIFFIN:

14       Q    Have you had any discussions with anyone

15  other than counsel about whether the debtors can sell

16  the lease assets?

17       A    No.  We did not -- I mean -- no, we did

18  not.

19       Q    If you turn to -- in your initial

20  declaration, which is Exhibit No. 2.  It's Docket 44.

21           Do you see that?

22       A    Yes.

23       Q    If you turn to page five of your

24  declaration, it's discussing sales and marketing

25  efforts, correct?

```
 1                      H. LOECHTEKEN

 2        A      Correct.

 3        Q      And it talks about the sale of debtor's

 4   hundred percent ownership interest in the purchase

 5   assets.

 6               Do you see that?

 7        A      Yes, I see that.

 8        Q      What is debtor selling?

 9               MR. SHAUGHNESSY:  Objection.  Asked

10        and answered.

11               THE WITNESS:  Based on the legal

12        advice we were getting, the debtor is

13        selling the -- I can't review, but it's

14        selling all the assets.

15   BY MR. GRIFFIN:

16        Q      You can't testify about whether the

17   purchase assets -- about what's included in the

18   purchase assets?

19               MR. SHAUGHNESSY:  Objection.

20               THE WITNESS:  My commercial

21        assumption is that the purchase assets

22        will include the aircraft, as well as the

23        claims.

24   BY MR. GRIFFIN:

25        Q      By claims, you're talking about the lease
```

1                          H. LOECHTEKEN

2      claims?

3            A      I am talking about the lease claims.

4            Q      When you say that -- in the next

5      paragraph, Under the proposed bidding procedures, the

6      debtors and their advisors will market the purchase

7      assets, are you going to market the sale of both the

8      planes and the lease claim?

9            A      We will market -- yes, we will market the

10     assets, including the lease claims, and we would also

11     potentially indicate to buyers that there might be a

12     new lease that they could themselves enter into.

13           Q      Are you going to represent -- planning to

14     represent to the buyers that the assets, in fact,

15     include ownership of the lease claims?

16                  MR. SHAUGHNESSY:  Objection.

17                  THE WITNESS:  Commercially, yes, we

18           will.

19     BY MR. GRIFFIN:

20           Q      What does commercially yes mean?

21           A      Subject to the legal dispute because

22     FitzWalter is claiming that they own the lease assets

23     and, according to advice we're getting, there's a

24     dispute.  That's for the court to decide.

25           Q      With respect to the stalking horse bid

```
 1                    H. LOECHTEKEN

 2     you currently have, does that include both the planes

 3     and the leased assets?

 4          A     Yes, it does.

 5          Q     If the leased assets are determined not

 6     to be part of the debtor's assets, does the stalking

 7     horse still have to proceed?

 8                MR. SHAUGHNESSY:  Objection.

 9                THE WITNESS:  This is something

10          that goes beyond my area of expertise.

11          We make the assumption based on counsel

12          that this is a question that is being

13          decided by the court and, based on that,

14          we believe it will stand.

15     BY MR. GRIFFIN:

16          Q     It will stand that you're right, correct?

17          A     Correct.

18          Q     If we're right, meaning if FitzWalter

19     Capital is right, and the lease assets are not part

20     of the debtor's estate, does the stalking horse bid

21     you have continue in effect, meaning they have to

22     purchase just the claims for the amount currently

23     stated?

24                MR. SHAUGHNESSY:  Objection.  Calls

25          for a legal conclusion.
```

1                    H. LOECHTEKEN

2              THE WITNESS:  I can't comment on

3        that.  I think this is a question that

4        needs to be decided by the court.

5   BY MR. GRIFFIN:

6        Q     When negotiating the stalking horse bid,

7   did you make any representations about whether the

8   lease assets were part of what is going to be sold in

9   the stalking horse process?

10       A     I didn't make those representations.

11       Q     Did anybody make any representations on

12  behalf of the debtors regarding the lease assets?

13       A     The details of the term sheet were

14  negotiated by our counsel.

15       Q     So if we wanted to understand the details

16  of the negotiations and get factual testimony, we

17  would need to depose your lawyers?

18              MR. SHAUGHNESSY:  Objection.

19              THE WITNESS:  I think I can't -- I

20       can't comment on those legal discussions.

21  BY MR. GRIFFIN:

22       Q     Is there anybody other than one of your

23  lawyers who has any knowledge about whether

24  representations regarding the purchased assets,

25  including the lease assets, were made to SVP?

1                          H. LOECHTEKEN

2                  MR. SHAUGHNESSY:  Objection.

3                  THE WITNESS:  Not to my knowledge.

4          You should --

5     BY MR. GRIFFIN:

6          Q    Do you know if SVP thinks it's buying the

7     leased assets?

8                  MR. SHAUGHNESSY:  Objection.

9                  THE WITNESS:  I can't speculate.

10    BY MR. GRIFFIN:

11         Q    In Paragraph 21 of Exhibit 2, if you turn

12    to that, specifically page nine.

13                 MR. SHAUGHNESSY:  Are we on the

14         original declaration, Mr. Griffin?

15                 MR. GRIFFIN:  Yes.

16                 MR. SHAUGHNESSY:  I'm sorry.  Can

17         you repeat where we're going?  I'm sorry.

18                 MR. GRIFFIN:  Page nine, Paragraph

19         21.

20                 MR. SHAUGHNESSY:  Thank you.

21    BY MR. GRIFFIN:

22         Q    This is the section discussing the

23    bidding procedures and timeline.

24                 Do you see that?

25         A    I see that, yeah.

1                          H. LOECHTEKEN

2          Q     And if you look on page nine, you said:

3    Moreover, I believe that the proposed sale timeline,

4    including the period of over one month from approval

5    of the bid procedures to the bid submission deadline,

6    will benefit all parties as it will provide stability

7    in the near term regarding the go-forward operation

8    and utilization of the purchased assets.

9                Do you see that?

10         A     I see that, yeah.

11         Q     And again, here you're referring to both

12   the lease assets and the airplane assets, right?

13         A     Yes.

14         Q     And you don't know what happens if the

15   lease assets are not part of the purchased assets?

16               MR. SHAUGHNESSY:  Objection.

17               THE WITNESS:  I can only speculate

18         on what that would be.

19   BY MR. GRIFFIN:

20         Q     What was that?

21         A     I would need to speculate on what that

22   would be, but as I explained earlier, I think the

23   value would be greatly diminished.

24         Q     I understand the value would be greatly

25   diminished.  I'm just trying to determine if -- with

1                           H. LOECHTEKEN

2   respect to these -- the stalking horse bid and the

3   bidding procedures, if there is, in fact, going to be

4   someone there to buy the assets, if -- the plane

5   assets, if the lease assets aren't there.

6               So do you have any understanding one way

7   or the other, if the lease assets are determined not

8   to be property of the estate, do you, in fact, have a

9   stalking horse bidder?

10              MR. SHAUGHNESSY:  Objection.

11              THE WITNESS:  That's a legal

12          question.  I can't comment on that.

13  BY MR. GRIFFIN:

14          Q    Have you read the APA?

15          A    Sorry.  What is the APA?

16          Q    Have you read the asset purchase

17  agreement?

18          A    Can you show me the document?

19          Q    Sure.

20              (Loechteken Exhibit No. 6 was

21          marked for the record.)

22  BY MR. GRIFFIN:

23          Q    I'm marking as Exhibit No. 6 the Asset

24  Purchase Agreement submitted as Exhibit D, Doc 585 --

25  Docket No. 58-5.

```
 1                    H. LOECHTEKEN

 2              MR. SHAUGHNESSY:  I don't see it

 3       yet.

 4              MR. GRIFFIN:  It says Stalking

 5       Horse APA.

 6              MR. SHAUGHNESSY:  Oh, yeah.  I see

 7       it.  Got it.

 8  BY MR. GRIFFIN:

 9       Q    Are you familiar with this document?

10       A    I've read it.

11       Q    Do you know what assets are being

12  included in the transaction contemplated by this

13  document?

14       A    Yes.

15       Q    What assets are those?

16       A    It is listed under the Roman 1 through to

17  Roman 11.

18       Q    Roman 1 through what?  Sorry.

19       A    Roman 11.

20              MR. SHAUGHNESSY:  Mr. Loechteken,

21       why don't you refer to a page number so

22       we can make sure we're looking at the

23       same thing.

24              THE WITNESS:  So --

25              MR. SHAUGHNESSY:  Are we looking at
```

1                    H. LOECHTEKEN

2           page three or page four?  There are page

3           notations at the very top where it says

4           page 2 of 47, page 3 of 47.  I just want

5           to make sure we're all looking at the

6           same page.

7                MR. GRIFFIN:  Thank you.  Right.

8                THE WITNESS:  I think the start to

9           look at, as my understanding of this

10          document on -- what's the page number?

11               MR. SHAUGHNESSY:  It's at the very

12          top of the page, where it says PG.

13               THE WITNESS:  Oh, PG.  If we start

14          at PG -- PG 3, the Purchase and Sale,

15          Article 2.

16   BY MR. GRIFFIN:

17        Q     So you're saying Article 2 defines what's

18   being sold; is that correct?

19               MR. SHAUGHNESSY:  Objection.

20               THE WITNESS:  I think so.

21   BY MR. GRIFFIN:

22        Q     Is it your testimony that the debtors

23   have the ability to sell each of the things listed in

24   Section 2?

25               MR. SHAUGHNESSY:  Objection.

1                          H. LOECHTEKEN

2                  THE WITNESS:  Based on the legal

3          advice, yes.

4    BY MR. GRIFFIN:

5          Q    So your only basis to testify about the

6    ability to sell these -- strike that.

7                  If you look at Article 2 of Exhibit 6,

8    Section 2.01.

9                  Do you see that?

10         A    Yes.

11         Q    Okay.  And it talks about the purchase

12   and sale of transferred assets, assumed liabilities

13   and excluded liabilities, as a heading there.

14                 Do you see that?

15         A    Yes.

16         Q    If you go down to the first romanette,

17   are these the -- in the romanettes describing what

18   debtor is selling to SVP?

19                 MR. SHAUGHNESSY:  Objection.

20                 THE WITNESS:  This is my

21         understanding based on legal input.

22   BY MR. GRIFFIN:

23         Q    What happens to this agreement if any of

24   these things are determined not to be assets of the

25   debtor?

1                        H. LOECHTEKEN

2                   MR. SHAUGHNESSY:  Objection.

3                   THE WITNESS:  That's a legal

4          question that I can't comment on.

5    BY MR. GRIFFIN:

6          Q     Is it not --

7          A     It's for the court to decide.

8          Q     I'm sorry.  I didn't mean to interrupt.

9    I'm not trying to talk over you.

10                  Is there any provision of this agreement

11   that states what happens if any of the assets

12   identified in Section 2.01 are determined not to be

13   part of the debtor's estate?

14                  MR. SHAUGHNESSY:  Objection.

15                  THE WITNESS:  The question of the

16         legal interpretation of an agreement, I'm

17         not qualified to do so.

18   BY MR. GRIFFIN:

19         Q     Do the debtors make any representations

20   in this agreement about whether they have the ability

21   to sell the assets listed in Section 2.01?

22                  MR. SHAUGHNESSY:  Objection.

23                  THE WITNESS:  Again, that is a

24         question of legal interpretation that I

25         can't comment on.

```
 1                    H. LOECHTEKEN

 2   BY MR. GRIFFIN:

 3        Q    If you look at Section 4.01 of this

 4   agreement, Exhibit No. 6, page 9 of 47, if you're

 5   looking at the top --

 6        A    Yes.

 7        Q    -- are these the representations and

 8   warranties of the seller?

 9              Do you see that?

10              MR. SHAUGHNESSY:  Objection.

11              THE WITNESS:  That's a legal matter

12        I'm not qualified to comment on.

13   BY MR. GRIFFIN:

14        Q    So you don't know one way or the other

15   what's being sold, what happens if the things aren't

16   actually assets to the debtor or anything along those

17   lines?

18              MR. SHAUGHNESSY:  Objection.

19              THE WITNESS:  It's a matter of

20         legal dispute.  It would be solved by the

21         by the court.  I have a commercial

22         understanding of what is to be sold, but

23         on where they fall out is a matter for

24         the court to decide on.

25
```

```
 1                    H. LOECHTEKEN

 2   BY MR. GRIFFIN:

 3       Q       The dispute isn't what happens -- I'm

 4   asking -- this is a matter of fact -- what are --

 5           Is SVP buying the lease assets, and if

 6   they're not part of your estate, do you have a deal?

 7           MR. SHAUGHNESSY:   Objection.

 8           MR. EDELMAN:   Objection to form.

 9       The document speaks --

10           MR. SHAUGHNESSY:   Asked and

11       answered.

12           MR. EDELMAN:   The document speaks

13       for itself.   Why are you harassing the

14       witness?   That's what you're really

15       doing.   The document is legal document

16       and it says what it says.

17           MR. SHAUGHNESSY:   You can answer.

18           THE WITNESS:   It's a legal matter.

19       I would refer to the lawyers.

20   BY MR. GRIFFIN:

21       Q       So you don't know?

22       A       I don't know.

23       Q       Would anybody from JPL know what happens

24   to this deal if it doesn't know -- if it doesn't own

25   the lease assets?
```

1                        H. LOECHTEKEN

2              MR. SHAUGHNESSY:  Objection.

3              THE WITNESS:  We're relying on

4         advice from our lawyers.

5    BY MR. GRIFFIN:

6         Q    That wasn't my question.

7              Do you know whether anybody at JPL or the

8    debtors is aware of what happens if the lease assets

9    aren't part of this transaction?

10             MR. SHAUGHNESSY:  Objection.

11             THE WITNESS:  I don't think so.  I

12        don't think that anybody has a better

13        understanding at this point other than

14        me.

15   BY MR. GRIFFIN:

16        Q    As a matter of fact, is it your

17   expectation that the purchase price reflected in the

18   asset purchase agreement will be sufficient to pay

19   off all of the secured obligations?

20        A    That is my expectation, yes.

21        Q    What are the secured obligations?

22        A    The senior loan, the junior loan, plus

23   associated accrued interests and the cost.

24        Q    What's that understanding based on?

25             MR. SHAUGHNESSY:  Objection.

```
 1                      H. LOECHTEKEN

 2              THE WITNESS:  Excuse me.  I didn't

 3         get the question.

 4    BY MR. GRIFFIN:

 5         Q    Sorry about that.  Let me back up.

 6              Is that everything that is within the

 7    secured obligations?

 8         A    That's my understanding.

 9         Q    What's that understanding based on?

10         A    Advice from our lawyers.

11         Q    So you have no basis to testify about

12    what the secured obligations are other than what's

13    been told to you by your lawyers?

14              MR. SHAUGHNESSY:  Objection.

15              MR. EDELMAN:  Objection.  Also,

16         I'll ask the witness not to testify about

17         the documents or any of the legal

18         discussions.

19              THE WITNESS:  Yeah, based -- it's

20         based on advice of our lawyers.

21    BY MR. GRIFFIN:

22         Q    So, given that, you won't be testifying

23    as a matter of fact that the proposed bid from SVP

24    will, in fact, pay off the secured obligations; is

25    that correct?
```

1                    H. LOECHTEKEN

2              MR. SHAUGHNESSY:  Objection.

3         Mischaracterizes testimony.

4              THE WITNESS:  My understanding is

5         it will, and it will create a recovery, a

6         small recovery, for our investors.

7    BY MR. GRIFFIN:

8         Q     You have no factual basis to make that

9    statement, do you?

10             MR. SHAUGHNESSY:  Objection.

11             THE WITNESS:  It's based on legal

12        analysis and legal calculations.

13   BY MR. GRIFFIN:

14        Q     Are you going to be testifying about what

15   your lawyers told you?

16             MR. SHAUGHNESSY:  Objection.

17             THE WITNESS:  I think I can't

18        testify about what my lawyers told me.

19   BY MR. GRIFFIN:

20        Q     I don't think you can, either, unless you

21   want to waive the privilege.

22             So I'm saying, as a matter of fact,

23   excluding what your lawyers told you, do you have any

24   basis to testify that the amounts reflected in the

25   asset purchase agreement will, in fact, pay off the

1                   H. LOECHTEKEN

2    secured obligations?

3              MR. SHAUGHNESSY:  Objection.

4              THE WITNESS:  It is my assumption

5         it will be based on the senior debt

6         outstanding, the junior debt outstanding

7         and the interest costs.

8    BY MR. GRIFFIN:

9         Q    But those aren't all the secured

10   obligations under the agreements, are they?

11             MR. SHAUGHNESSY:  Objection.

12             THE WITNESS:  Sorry.  Was it a

13        question or was it a statement?

14             MR. SHAUGHNESSY:  Why don't you

15        repeat the question.

16   BY MR. GRIFFIN:

17        Q    You testified that it's your assumption

18   that all the -- strike that.  You testified -- let me

19   just ask the question.

20             Do you have any basis to testify that the

21   amounts reflected in the asset purchase agreement

22   will, in fact, pay off the secured obligations?

23             MR. SHAUGHNESSY:  Objection.

24             THE WITNESS:  It is my assumption

25        it will based on -- based on the legal

1                    H. LOECHTEKEN

2         advice we got.

3    BY MR. GRIFFIN:

4         Q    Again, you're not going to be testifying

5    about the statements from your counsel, are you?

6         A    No.

7         Q    So excluding the statements from your

8    counsel, do you have any factual basis to testify

9    that the amount reflected in the asset purchase

10   agreement will, in fact, pay off all of the secured

11   obligation?

12              MR. SHAUGHNESSY:  Objection.  Asked

13        and answered.

14              THE WITNESS:  I can only repeat

15        what I've been saying.  This has been

16        based on our legal advice and the

17        calculations and the analysis that's been

18        done by our legal experts.

19   BY MR. GRIFFIN:

20        Q    And I -- it's my job to close you out

21   about what you can testify about.  So I'm just trying

22   to say, you're not going to testify about your legal

23   advice, right?

24        A    No, I'm not.

25              MR. SHAUGHNESSY:  Objection.

1                         H. LOECHTEKEN

2    BY MR. GRIFFIN:

3         Q    Okay.  And without that legal advice,

4    there is no factual basis that you can testify to

5    that the amounts in the asset purchase agreement

6    will, in fact, pay off all of the secured

7    obligations?

8                   MR. EDELMAN:  Objection as to form.

9                   MR. SHAUGHNESSY:  Objection.

10                  MR. EDELMAN:  Objection to form.

11              The document speaks for itself.  I think

12              the documents actually state that it

13              will, but the document -- you don't need

14              to harass the witness about what the

15              document says.  The document says what it

16              says, and you're just asking the same

17              question 15 times.

18                  MR. GRIFFIN:  Do you want to get on

19              the stand?  I can ask you questions.  We

20              can do this.

21                  MR. EDELMAN:  We're harassing the

22              witness.  He's answered the --

23                  MR. GRIFFIN:  If the witness would

24              just answer the question no, we could

25              move on.  How about you tell your witness

1                    H. LOECHTEKEN

2          to answer the question.

3               MR. EDELMAN:  Objection as to form

4          and, you know, again harassing.  The

5          document speaks for itself.

6               MR. GRIFFIN:  Anything else?

7               MR. SHAUGHNESSY:  Why don't you

8          re-ask the question, Mr. Griffin.

9     BY MR. GRIFFIN:

10         Q    Without referring to legal advice, you

11    have no factual basis to testify that the amounts in

12    the asset purchase agreement will, in fact, pay off

13    all the secured obligations in the transaction

14    documents?

15              MR. SHAUGHNESSY:  Objection.

16              MR. EDELMAN:  Same objection.

17              THE WITNESS:  This has been

18         analyzed by our lawyers and we rely on

19         the legal advice, and I can add now the

20         document speaks for itself.

21              MR. GRIFFIN:  Zach, do we have the

22         UCC payoff notice in our documents?

23              MR. RUSSELL:  It's not uploaded.

24              MR. GRIFFIN:  Can you get that and

25         then we can come back to that.

```
 1                    H. LOECHTEKEN

 2              MR. RUSSELL:  The document should

 3         be in the Submitted folder.

 4              MR. SHAUGHNESSY:  What's the name

 5         of the document?

 6              MR. RUSSELL:  It starts 2022-1-21

 7         QE Letter with Debtors Request to Pursue.

 8              MR. SHAUGHNESSY:  Okay.

 9              MR. GRIFFIN:  Thank you.

10              (Loechteken Exhibit No. 7 was

11         marked for the record.)

12    BY MR. GRIFFIN:

13         Q    This has been marked -- what's been

14    marked as Exhibit 6 -- 7 -- sorry.  A letter dated

15    January 21st, 2022 from Quinn Emanuel to the debtors.

16              Do you see that?

17         A    I see that, yes.

18         Q    And if you go to the second to last page

19    of this document, Appendix 1.

20         A    Yes.  Okay.

21         Q    This is the information related to MSN

22    67, which is for JPA No. 111; is that correct?

23              No, I'm representing to you that this is

24    the -- is information for MSN 67 for JPA No. 111.  Do

25    you have that in mind?
```

1                    H. LOECHTEKEN

2        A     Yeah, I see that here.

3        Q     Do you have any basis to testify that

4   these -- that any of these amounts are not a secured

5   obligation of JPA 111?

6             MR. SHAUGHNESSY:  Objection.

7             THE WITNESS:  There's elements in

8        here that are clearly outside my area of

9        expertise and I can't comment on that.

10  BY MR. GRIFFIN:

11       Q     So you can't testify one way or the other

12  whether any of the elements listed in Appendix 1 of

13  Exhibit 7 are not secured obligation of debtor JPA

14  No. 111?

15            MR. SHAUGHNESSY:  Objection.

16       Mischaracterizes testimony.

17            THE WITNESS:  I -- this would

18       require legal input and requires legal

19       analysis.  I cannot -- I cannot comment

20       on this.

21  BY MR. GRIFFIN:

22       Q     So to clarify, you can't testify

23  factually whether any of these ele -- these things

24  are not secured obligations of the debtor, JPA 111?

25            MR. SHAUGHNESSY:  Objection.

Page 191

1              H. LOECHTEKEN

2              MR. EDELMAN:  Objection as to form,

3         calls for a legal conclusion.

4              THE WITNESS:  I need to rely on the

5         lawyers for this.  This is outside my

6         area of expertise.

7    BY MR. GRIFFIN:

8         Q    I understand that you're saying that this

9    is outside your area of expertise.

10             What I'm trying to confirm is, because

11   it's outside your area of expertise, you,

12   Mr. Loechteken, are not going to testify factually

13   about these items in Appendix 1 relating to JPA 111?

14             MR. SHAUGHNESSY:  Objection.  Asked

15        and answered.

16             MR. EDELMAN:  Objection to form.

17             THE WITNESS:  Yes, as I said

18        already, I need to rely on the legal

19        analysis.  This is outside of what I want

20        to comment and can comment on.

21   BY MR. GRIFFIN:

22        Q    Is the senior principal 87 million

23   dollars 870 -- sorry.

24             Is the senior principal on the JPA No.

25   111, $87,087,569?

1                    H. LOECHTEKEN

2              MR. SHAUGHNESSY:  Objection.

3              THE WITNESS:  The number sounds

4         right, but I don't have that at hand and

5         I can't comment on whether it's right or

6         wrong.  The magnitude sounds right.

7    BY MR. GRIFFIN:

8         Q     So you can't dispute the specific number

9    based upon --

10             MR. SHAUGHNESSY:  Objection.

11             MR. EDELMAN:  Objection.  You know

12        also you're asking the witness about a

13        document that you sent after the start of

14        the weekend.  All -- this whole line of

15        questioning is just harassing the

16        witness.

17             It's beyond the scope of the

18        deposition.  You know, it's a document

19        that was just produced by the --

20        FitzWalter over the weekend.  Everything

21        here is just harassing the witness.

22             MR. GRIFFIN:  So do you want to

23        kick the hearing and do the deposition in

24        a week or two so we can look at the

25        documents and testify to the facts, or do

1                       H. LOECHTEKEN

2          you want him to say he's not going to

3          testify to the facts.  That's all that

4          I'm asking him to do, so he can say no or

5          we can keep going.

6                  MR. SHAUGHNESSY:  Let's keep going.

7    BY MR. GRIFFIN:

8          Q    Do you dispute that the senior principal,

9    as of today, is $87,870,569.

10                 MR. SHAUGHNESSY:  Objection.

11                 MR. EDELMAN:  Objection.

12                 THE WITNESS:  I need more time to

13         analyze this and I need time to discuss

14         it with my lawyers.  I can't make

15         statements this way or the other.

16   BY MR. GRIFFIN:

17         Q    Okay.  So are you going to testify about

18   what the amount of the senior principal is at the

19   upcoming hearing?

20                 MR. SHAUGHNESSY:  Objection.  His

21         declarations speak for themselves.

22                 MR. EDELMAN:  Objection.  It's also

23         beyond the scope of the deposition.

24                 MR. GRIFFIN:  There's no beyond the

25         scope of a personal deposition.  This is

1              H. LOECHTEKEN

2         not a 30(b)(6).  If you wanted to put up

3         a 30(b)(6) witness, you had the

4         opportunity and you chose not to.

5              MR. EDELMAN:  No, but this has to

6         do with relevancy.  It's an objection as

7         to relevancy.  I'm not instructing him

8         not to answer, but it's an objectionable

9         question.

10              MR. SHAUGHNESSY:  All right.  Well,

11         let's keep on going, Justin, please.

12    BY MR. GRIFFIN:

13         Q    Do the debtors contend that the amount of

14    the APA -- the amount reflected in the APA is going

15    to pay off all the secured obligation?

16         A    It is my assumption from my commercial

17    understanding that it will pay off all the secured

18    obligations.

19         Q    Are the debtors going to offer -- are you

20    going to offer evidence that the amount of the APA is

21    going to pay off all the secured obligations?

22              MR. SHAUGHNESSY:  Objection.

23              MR. EDELMAN:  Objection.  The

24         document -- we've gone through this

25         before.  The document itself speaks for

1                    H. LOECHTEKEN

2          itself, and the document is in the

3          record.

4                    MR. SHAUGHNESSY:  You may answer.

5                    THE WITNESS:  I will not -- I

6          cannot comment on this.  This is a legal

7          question.  There's a document that speaks

8          for itself and it will need to be

9          interpreted by the lawyers.

10   BY MR. GRIFFIN:

11         Q    Do the secured obligations of these

12   transaction documents include the breach of the

13   non-petitioning clause by filing this bankruptcy?

14                   MR. SHAUGHNESSY:  Objection.

15                   THE WITNESS:  It's outside the

16         scope of my knowledge.  I can't comment.

17         I would need to have the lawyers to

18         comment on this.

19   BY MR. GRIFFIN:

20         Q    So confirm you're not going to testify

21   about that fact, correct?

22                   MR. SHAUGHNESSY:  Objection.

23                   THE WITNESS:  It's outside the

24         scope of my knowledge.  It will be --

25

```
 1                        H. LOECHTEKEN

 2   BY MR. GRIFFIN:

 3        Q     Why can't you just say no?  Does no not

 4   knot exist in your vocabulary?

 5             MR. SHAUGHNESSY:  Objection.

 6   BY MR. GRIFFIN:

 7        Q     Are you going to testify that -- strike

 8   that.

 9             So, to confirm, you're not going to

10   testify that the breach of the non-petitioning clause

11   of the proceeds agreement --

12             MR. GRIFFIN:  Let's take a break.

13        Are you okay with taking a break, Brian?

14             MR. SHAUGHNESSY:  Yeah, five

15        minutes good?

16             MR. GRIFFIN:  Sure.

17             THE WITNESS:

18             THE VIDEOGRAPHER:  The time is

19        8:37 p.m.  We're off the record.

20                     (Brief pause.)

21

22             THE VIDEOGRAPHER:  The time is

23        8:45 p.m., we're on the record.

24   BY MR. GRIFFIN:

25        Q     Do you know what the secured obligations
```

1                    H. LOECHTEKEN

2  are under the transaction documents?

3              MR. SHAUGHNESSY:  Objection.

4              THE WITNESS:  Broadly speaking,

5         yes.

6  BY MR. GRIFFIN:

7         Q    What are the secured obligations?

8              MR. SHAUGHNESSY:  Objection.

9              THE WITNESS:  The ones that I know,

10        but the rest would need to be analyzed by

11        my legal counselors.

12             The senior principal, the interest,

13        the default, the junior principal

14        interest default and the swap rate cost

15        and the interest related.

16  BY MR. GRIFFIN:

17        Q    Are you aware that the secured

18  obligations means any and all monies, liabilities and

19  obligations, whether they're actual or contingent,

20  whether now existing or hereafter arising, whether or

21  not for the payment of money and including without

22  limitation any obligation or liability to pay damages

23  from time to time owing to any of the finance parties

24  by any obligor pursuant to any transaction document,

25  notwithstanding that the recourse of the finance

1                          H. LOECHTEKEN

2    parties -- strike that -- notwithstanding the

3    recourse of the finance parties against any person

4    may be limited in recourse.

5                Does that --

6                MR. SHAUGHNESSY:  Objection.

7    BY MR. GRIFFIN:

8        Q    Have you ever heard that definition of

9    secured obligations?

10               MR. EDELMAN:  Objection.  Justin,

11          you're just reading the document.

12               THE WITNESS:  This is something I

13          would need to rely on my lawyers on.  I

14          have not seen that document.

15   BY MR. GRIFFIN:

16       Q    So you don't have any basis to testify

17   whether the secured obligations include more than the

18   things that you just testified about, right?

19               MR. SHAUGHNESSY:  Objection.

20               You can answer.

21               THE WITNESS:  I would need to rely

22          on my lawyers for that.

23   BY MR. GRIFFIN:

24       Q    And you're not going to dispute whether

25   the secured obligations include unpaid rents under

1                    H. LOECHTEKEN

2    the head lease, for example?

3              MR. SHAUGHNESSY:  Objection.

4              THE WITNESS:  I have not said that.

5         I would need to rely on my lawyers on

6         this.

7    BY MR. GRIFFIN:

8         Q    When you say you would need to rely on

9    your lawyers, what do you mean?

10        A    I would want them to analyze this against

11   the -- against the contracts, and I would like the

12   court then to decide on this.

13        Q    Okay.  But that's not my question.

14             My question is are you going to testify

15   about this question?  Your lawyers might make

16   arguments.  You're supposed to give evidence and I'm

17   trying to understand the evidence that you're going

18   to provide to support the arguments that your lawyers

19   might make.  That's all I'm trying to do in this

20   deposition.

21             So are you going to provide evidence that

22   the secured obligations do not include unpaid rent?

23             MR. SHAUGHNESSY:  If I can just say

24        one thing, Mr. Griffin, if you don't

25        mind.

1              H. LOECHTEKEN

2         MR. GRIFFIN:  Yeah.

3         MR. SHAUGHNESSY:  It is not the

4    witness, but the debtor's counsel who

5    will be proffering the evidence.  The

6    evidence has already been proffered.  The

7    declarations speak for themselves.

8         If you want to move to exclude

9    portions of it, that's fine, but you're

10   asking the witness if he's planning on

11   providing testimony.  He's not testifying

12   live on direct, and his redirect will be

13   in the scope of your cross.

14        MR. GRIFFIN:  Yeah, but if I call

15   him in my case and I want to ask him

16   these questions, I need to know what the

17   answers are going to be, right?

18        MR. SHAUGHNESSY:  You mean if you

19   want to do an adverse direct?

20        MR. GRIFFIN:  Yes.

21        MR. SHAUGHNESSY:  I will note for

22   the record that while Mr. Griffin is

23   correct that he could call an adverse

24   witness, but in front of the judge we

25   agreed that the deposition would be

1              H. LOECHTEKEN

2         limited to the topics we identified in

3         his declarations, and that counsel for

4         FitzWalter agreed to that, but

5         technically you're correct, you can call

6         an adverse direct.

7              MR. GRIFFIN:  And for the record,

8         we did discuss that we each would reserve

9         our rights to call each other's witness

10        in our own case; is that not correct?

11             MR. SHAUGHNESSY:  That's correct.

12        If we're going to do more colloquy, we

13        can go off the record.

14             MR. GRIFFIN:  Yeah, again, we're

15        just preserving stuff for the record.

16             MR. SHAUGHNESSY:  Oh, I get it.

17        Fair enough.

18   BY MR. GRIFFIN:

19        Q    So is unpaid rent under the head lease

20   agreement a secured obligation?

21             MR. EDELMAN:  Objection.

22             THE WITNESS:  I cannot comment on

23        that.  My understanding is that the

24        stalking horse bids that we would -- that

25        we have provided is going to pay off

1                         H. LOECHTEKEN

2          everything that is due to the creditors

3          and there will be some small recovery for

4          investors.  That is my understanding.

5   BY MR. GRIFFIN:

6          Q     And is it going to go down the waterfall

7   provided in the proceeds agreement?

8          A     That is my understanding.

9          Q     And what's your understanding of how

10  things get down the waterfall in the proceeds

11  agreement?

12         A     I can't comment on that.  I don't know.

13  I would need to kind of go -- I don't know those

14  documents in detail.  This is done by in-house

15  lawyers and by our legal advisors.

16         Q     So you can't testify about that because

17  you don't know?

18              MR. SHAUGHNESSY:  Objection.

19              THE WITNESS:  It is a matter --

20          it's a legal matter.  I'm relying on

21          lawyers.

22  BY MR. GRIFFIN:

23         Q     You don't know?

24              MR. SHAUGHNESSY:  Can we go off the

25          record for a minute, please?

1              H. LOECHTEKEN

2              MR. GRIFFIN:  Yeah.

3              THE VIDEOGRAPHER:  The time is

4      8:51 p.m.  We're off the record.

5                    (Brief pause.)

6              THE VIDEOGRAPHER:  The time is

7      9:05 p.m. we're on the record.

8  BY MR. GRIFFIN:

9      Q     Mr. Loechteken, if we turn to your

10 supplemental declaration, Exhibit No. 1, Paragraph

11 No. 8.  Please let me know when you're there.

12     A     I'm there.

13     Q     Did you see debtors also -- strike that.

14           Paragraph 8 says:  The debtors also

15 decided to file these Chapter 11 cases so that the

16 debtor's assets could be marketed and sold so that

17 all of the debtor's creditors could be paid in full,

18 not just FitzWalter.

19           Do you see that?

20     A     I see that, yes.

21     Q     Are you going to testify that the APA

22 that you agreed to is going to, in fact, pay all the

23 debtors in full?

24           MR. SHAUGHNESSY:  Objection.

25           THE WITNESS:  It is my

1                          H. LOECHTEKEN

2          understanding that -- and this is based

3          on legal input -- that the APA will be

4          sufficient to pay back all the senior, as

5          well as the junior, and still have some

6          recovery for the equity.

7   BY MR. GRIFFIN:

8          Q     Your only basis for that testimony is

9   information from your lawyers, right?

10         A     Basis that it is, yes.  It's my

11  commercial understanding, but the legal implications

12  are from our lawyers, from my lawyers, yes.

13         Q     And then when you say your commercial

14  understanding, what are you referring to?

15         A     Senior principal outstanding, the junior

16  principal outstanding, the swap breakage cost and the

17  interest related.

18         Q     Is it your understanding -- is it your

19  testimony that, under the transaction documents,

20  those are all of the obligations?

21               MR. SHAUGHNESSY:  Objection.

22               MR. EDELMAN:  Objection.

23               THE WITNESS:  Based on the input of

24         my lawyers, it's a legal question that I

25         can't answer, but it is the legal advice.

1                          H. LOECHTEKEN

2          I can't say.  So, it's my understanding

3          based on legal advice.

4    BY MR. GRIFFIN:

5          Q     Excepting the legal advice, you don't

6    know whether the -- those things you mentioned are

7    all of the secured obligations under the transaction

8    documents; is that correct?

9                    MR. EDELMAN:  Objection.  Could

10         the court -- could you repeat what --

11         what was stated before, because I don't

12         remember what was stated.

13                   (The prior answer was read back

14         into the record.)

15                   MR. EDELMAN:  Justin, your question

16         was asking for a recitation of a list.  I

17         just don't remember the list.

18                   MR. GRIFFIN:  I'll re-ask with the

19         list, how about that?  Would that be good

20         for you?

21                   MR. EDELMAN:  That would be

22         perfect.  Thank you.

23   BY MR. GRIFFIN:

24         Q     So outside of legal advice, you don't

25   know whether anything other than senior principal

```
1                    H. LOECHTEKEN

2    outstanding, junior principal outstanding, the swap

3    rate cost and related interest are secured

4    obligations?

5              MR. SHAUGHNESSY:  Objection.

6              THE WITNESS:  It is my assumption,

7         my commercial assumption, that this is

8         sufficient to pay back senior, junior

9         and, as I said, some recovery on the

10        Japanese investors' behalf.

11   BY MR. GRIFFIN:

12        Q    Setting aside your assumptions, now

13   facts, I want facts.  And you said you can't testify

14   about what your lawyers told you and I'm not asking

15   you to testify about what your lawyers told you.

16             What I'm asking is, other than the items

17   you mentioned, you don't have any testimony about --

18   strike that.  Sorry.

19             Outside of legal advice, you don't know

20   whether anything other than senior principal

21   outstanding, junior principal outstanding, the swap

22   rate cost and related interest are secured

23   obligations, correct?

24             MR. SHAUGHNESSY:  Objection.

25             THE WITNESS:  It's a legal matter,
```

1               H. LOECHTEKEN

2         again, that I need to kind of consult

3         with my lawyers on and I cannot give an

4         answer on that one.

5               It doesn't -- I'll offer a bit

6         more.  It doesn't sound -- it doesn't

7         sound commercially right that a senior

8         lender is going to get repaid way over

9         and above what's the principal

10        outstanding and the interest is, plus the

11        swap breakage cost and maybe some

12        reasonable cost.  That's my commercial

13        understanding.

14              And reasonable in this context

15        would need to be determined with the

16        input of our lawyers.

17   BY MR. GRIFFIN:

18        Q    What the parties agreed to is in the

19   documents, right?

20        A    Right, but I'm not a lawyer.  I can't

21   interpret -- I can't interpret legal documents.

22        Q    I'm not asking you to interpret legal

23   documents.  I'm asking to answer the questions I ask

24   you.

25              What the parties agreed to is set forth

1                          H. LOECHTEKEN

2    in the documents, correct?

3         A     That is my assumption.

4         Q     Is it your testimony that the documents

5    defines senior secured -- or strike that.

6              Is it your testimony that the documents

7    define secured obligations to only include the

8    limited things that you mentioned?

9              MR. SHAUGHNESSY:  Objection.  Calls

10             for a legal conclusion.

11             THE WITNESS:  I think we have --

12             I've said that before.  I'm not familiar

13             in the detail that you are asking about

14             the original documents and I will need to

15             rely on legal advice.

16   BY MR. GRIFFIN:

17        Q     So then the answer to my question is

18   either no or I don't know, not a big stream of words,

19   so.

20             Is committing antisocial conduct a breach

21   of the proceeds agreement?

22             MR. SHAUGHNESSY:  Objection.  Calls

23             for a legal conclusion.

24             THE WITNESS:  I can't comment on

25             this.  That's really a legal question.

1                    H. LOECHTEKEN

2          So can we go back to that document,

3          because I'm -- I was in a different

4          document.  Are you back to the letter you

5          sent?

6   BY MR. GRIFFIN:

7          Q    We are back to Exhibit No. 3, the 111

8    proceeds agreement.

9          A    Okay.

10         Q    Please let me know when you get there.

11         A    I'm there.

12         Q    If you go to Section 11.3.23 of the

13   document.

14              MR. SHAUGHNESSY:  What page is

15         that?

16              MR. GRIFFIN:  I'm trying to get

17         there.  Hold on.  It's on the internal

18         page number 24.

19              MR. SHAUGHNESSY:  And that's the

20         number at the very bottom of the page in

21         the center.

22              THE WITNESS:  Sorry.  11.3.19.

23         Okay.

24   BY MR. GRIFFIN:

25         Q    If you look at the section, the title is

```
 1                          H. LOECHTEKEN

 2     Antisocial Forces, Relationship and Conduct.

 3                    Do you see that?

 4          A     I see that.

 5          Q     And it says:  Intermediate lessor shall

 6     ensure that no obligor shall have any relationship

 7     with any antisocial forces or any person under the

 8     control of any antisocial forces, of any antisocial

 9     relationship or engage in any antisocial conduct.

10                    Do you see that?

11          A     I see that.

12          Q     Do you know what antisocial conduct is --

13          A     No.

14          Q     -- as provided by this statement?

15          A     No.

16          Q     If you go to page 78 of this document,

17     just let me know when you're there.  It's page 80 of

18     119 if you look at the bottom on the exhibit share.

19          A     Okay.

20          Q     Do you see there's a definition for

21     antisocial conduct?

22          A     Uh-huh.

23          Q     And it says -- that's Subsection D, is

24     what I'm referring to here.  It says, Antisocial

25     conduct means.  And Subsection D says:  An action to
```

```
 1                    H. LOECHTEKEN
 2    defame the reputation or interfere with the business
 3    of any finance party by spreading rumor, using
 4    fraudulent means or resorting to force.
 5              Do you see that?
 6       A    I see that.
 7       Q    Have you committed any antisocial conduct
 8    as it relates to FitzWalter Capital?
 9              MR. SHAUGHNESSY:  Objection.
10              THE WITNESS:  I'm not sure what
11         you're referring to.
12    BY MR. GRIFFIN:
13       Q    I'm asking you a question.
14              Have you committed any antisocial conduct
15    as it relates to FitzWalter Capital?
16              MR. SHAUGHNESSY:  Objection.  Calls
17         for a legal conclusion.
18              THE WITNESS:  I have no means to
19         interpret that.  This is a document --
20         and I think we have discussed this --
21         that I'm not familiar with.  I have not
22         read this document in its entirety.  I
23         see that for the first time and I would
24         need to -- in order to be capable of
25         answering your question I need to have
```

1                     H. LOECHTEKEN

2          legal device.

3    BY MR. GRIFFIN:

4          Q     Have you made any disparaging statements

5    about FitzWalter Capital?

6          A     I'm not -- I cannot comment.  Can you

7    show me documents?

8          Q     I'm asking you a question.

9                Can you tell me whether you've issued any

10   disparaging statements about FitzWalter Capital?

11               MR. SHAUGHNESSY:  Objection.

12               THE WITNESS:  I do not think it is

13         disparaging.  I had conversations with

14         one party -- or maybe it was a second

15         party, but I think that's one that

16         belongs to FitzWalter Capital.  It's the

17         same group.  I had discussions with one

18         party, but I do not think it was

19         disparaging.

20   BY MR. GRIFFIN:

21         Q     What discussions are you thinking of?

22               MR. SHAUGHNESSY:  Objection.

23               THE WITNESS:  I was -- I don't --

24         it could be -- but I would like to see

25         evidence and documentation.  It could be

```
 1                    H. LOECHTEKEN

 2        something that had to do with my Airbus

 3        discussions.

 4  BY MR. GRIFFIN:

 5        Q    I'm not talking -- asking you about a

 6  specific document.  I'm asking you about the facts

 7  that you recall.

 8             So when you're thinking about these two

 9  conversations, what conversations are you thinking

10  about?

11             MR. SHAUGHNESSY:  Objection.

12             THE WITNESS:  I think this is a

13        matter of questions that I would like --

14        this is a question I would like to get

15        some legal advice on.

16  BY MR. GRIFFIN:

17        Q    Is it a privileged conversation?

18        A    No, it's not a privileged conversation.

19        Q    So what is your basis for needing legal

20  advice?  Is it you're worried about criminal

21  liability?

22        A    I'm worrying about -- I don't even

23  understand precisely what disparaging means.  I see

24  this antisocial conduct means and definitions for the

25  first time.
```

```
 1                    H. LOECHTEKEN
 2              MR. SHAUGHNESSY:  Mr. Griffin, why
 3         don't you use a different word than
 4         disparaging, a synonym that he might
 5         understand.
 6    BY MR. GRIFFIN:
 7         Q    At this point I just want to know about
 8    these two conversations.  I'm separated from this
 9    term right now.
10              You said you're thinking about two
11    conversations that came to your mind as a result of
12    my question.  I'm just asking you about those two
13    conversations right now.
14         A    Okay.  Good.  Then let me be precise.
15              I had a conversation with the CEO of
16    Airborne Capital, but I am not entirely sure on
17    whether that could ever fall under disparaging
18    because I know this gentleman for 15 years and I
19    asked him to consider on whether and what he is doing
20    in working with FitzWalter.
21         Q    How did you ask him to do that?
22         A    I don't remember.
23         Q    You don't remember what words you used?
24         A    No.  It is a long time ago and it was in
25    the heat of the situation.  We were just kind of
```

```
 1                    H. LOECHTEKEN

 2   getting aware that things were really moving very

 3   fast.  I've known the gentleman for a long time.

 4   I've sold him assets.  I think that helped him to

 5   kind of get stuff done at the company where he was in

 6   the past.  He's our direct neighbor in the same

 7   office building in Shannon.

 8              And I believe that what is -- my personal

 9   opinion, what is going on here is outside the norms

10   of what is typical in aviation.  So I had a call with

11   him, which I thought is more a friendly call, a call

12   from a business partner to another business partner

13   to understand what he's doing and to consider.

14              So that's one conversation, basically.

15        Q     Before we get off that conversation,

16   what's the gentleman's name?

17        A     Ramki Sundaram.  He's the CEO of -- the

18   CEO of Airborne Capital.

19        Q     Airborne Capital is the entity that was

20   marketing the auction, correct?

21        A     Correct.  Airborne Capital has

22   supposedly, as you've just been showing me, a

23   marketing contract with FitzWalter.

24        Q     And you knew that Airborne Capital had a

25   marketing contract with FitzWalter when you made this
```

```
 1                    H. LOECHTEKEN
 2    call, correct?
 3         A    I did, yes.
 4         Q    Around what date -- sorry.
 5              Around what date was the call?
 6         A    It was -- I think it was around the
 7    tenth, around --
 8         Q    Tenth of what?  Sorry.
 9         A    December, 10th or 11th of December,
10    around the time that we became aware of the Airborne
11    Capital selling of the claims without even talking to
12    us.
13         Q    So you weren't pleased with Airborne
14    Capital, correct?
15         A    Well, I was disappointed.
16         Q    And you called to express -- you called
17    to express your disappointment?
18         A    I called him to -- yes.  I called to ask
19    on whether he is considering what he's doing.
20         Q    Do you remember any of the words you used
21    in those discussions?
22         A    No.
23         Q    Did you send any text messages or e-mails
24    relating to those discussions?
25         A    I had one text message that I had sent to
```

```
 1                       H. LOECHTEKEN
 2    another gentleman at Airborne before.
 3         Q      Who is the other gentleman?
 4         A      His name is Cian Dooley.
 5         Q      What was that text message about?
 6         A      That was about that I am respecting him,
 7    if I remember correctly, as a person.  I have worked
 8    with him also in -- over 15 years.  I negotiated a
 9    large joint venture with him ages ago, and I
10    expressed my disappointment about the behavior.
11         Q      Did you pressure him not to work with
12    FitzWalter?
13                MR. SHAUGHNESSY:  Objection.
14                THE WITNESS:  I don't precisely
15         remember, but that could be.
16    BY MR. GRIFFIN:
17         Q      Do you remember any of the words that you
18    used in your text messages?
19         A      Can you show me the text message?
20                MR. SHAUGHNESSY:  Objection.
21    BY MR. GRIFFIN:
22         Q      I wish we had them but you didn't produce
23    them, so I'm just trying to --
24                Do you remember any of the words you used
25    in your text --
```

```
 1                        H. LOECHTEKEN

 2         A     No, no.

 3         Q     And you didn't turn over those text

 4   messages to your counsel; is that correct?

 5               MR. SHAUGHNESSY:  Objection.

 6               THE WITNESS:  I don't remember.

 7   BY MR. GRIFFIN:

 8         Q     Does the phrase nail him to the mast ring

 9   any bells?

10               MR. SHAUGHNESSY:  Objection.

11               THE WITNESS:  I would need to

12         review.  Is that the text message you're

13         referring to?

14   BY MR. GRIFFIN:

15         Q     I'm asking you questions.

16               Do you remember telling Mr. Dooley that

17   you would nail him to the mast if he continued to

18   work with FitzWalter?

19               MR. SHAUGHNESSY:  Objection.

20               THE WITNESS:  I don't remember.

21   BY MR. GRIFFIN:

22         Q     So you don't remember a conversation -- a

23   text conversation that happened in the last month

24   with Mr. Dooley?

25               MR. SHAUGHNESSY:  Objection.
```

```
 1                        H. LOECHTEKEN

 2              THE WITNESS:  No, not in detail.  I

 3          don't remember.  As I told you, I had a

 4          private emergency.  My mother was in

 5          hospital or still in hospital.  So I was

 6          quite a bit distracted with other things,

 7          as well, so I don't remember.

 8   BY MR. GRIFFIN:

 9         Q    I didn't know that about your mother and

10   I hope she's doing well.

11              Do you have any reason to dispute that

12   you told Mr. Dooley that you would nail him to the

13   mast if he continued to work with FitzWalter Capital?

14              MR. SHAUGHNESSY:  Objection.

15              THE WITNESS:  I would need to

16          review the text message and understand

17          better, and I would also want the kind of

18          same context.

19              And, frankly speaking, I don't --

20          do not understand what that means about

21          disparaging, but okay.  That's a

22          different matter.

23   BY MR. GRIFFIN:

24         Q    Did you call FitzWalter Capital a

25   financial terrorist during a call with Airborne in or
```

```
 1                     H. LOECHTEKEN

 2     around December 20th?

 3               MR. SHAUGHNESSY:  Objection.

 4               THE WITNESS:  So I had only one

 5          call with FitzWalter -- sorry -- with --

 6          this was a call with Airborne, you said,

 7          right?  So this is a call with Ramki.  I

 8          don't remember.

 9     BY MR. GRIFFIN:

10          Q     Do you have any reason to deny that you

11     called FitzWalter a financial terrorist?

12               MR. SHAUGHNESSY:  Objection.

13               THE WITNESS:  I don't remember.

14     BY MR. GRIFFIN:

15          Q     Did you tell Airborne to resign from

16     working with FitzWalter immediately or face the

17     consequences?

18               MR. SHAUGHNESSY:  Objection.

19               THE WITNESS:  I don't remember.

20     BY MR. GRIFFIN:

21          Q     Do you have any reason to deny that you

22     said that?

23               MR. SHAUGHNESSY:  Objection.

24               THE WITNESS:  I don't remember.

25
```

```
 1                     H. LOECHTEKEN

 2   BY MR. GRIFFIN:

 3        Q    Do you believe that's something you might

 4   have said?

 5             MR. SHAUGHNESSY:  Objection.

 6             THE WITNESS:  I don't want to

 7        speculate.

 8             MR. GRIFFIN:  We would like the

 9        communications between Mr. Loechteken and

10        Airborne to be produced, as consistent

11        with the discussion we had about

12        discovery.  But we can talk about that

13        off the record or you can respond now,

14        it's up to you?

15             MR. SHAUGHNESSY:  No, no, we'll

16        consider the request and we're happy to

17        talk off the record.

18   BY MR. GRIFFIN:

19        Q    You mentioned two conversations, one was

20   with the CEO of Airborne.  What was the other

21   conversation that you were thinking of?

22        A    I had --

23             MR. SHAUGHNESSY:  Objection.

24             THE WITNESS:  As I said, I had a --

25        I have ongoing, permanent conversations
```

1                   H. LOECHTEKEN

2          with Airbus.  So I have, I'd say, at

3          least twice a week a call with Airbus

4          because we have a large joint venture

5          with Airbus.

6                   And it is very clear that Airbus

7          is, as a company, concerned about the

8          valuations of their assets, and they're

9          concerned about -- that's the whole

10         purpose we have the joint venture.

11         They're concerned about the Japanese

12         market.  And I'm quite sure that I

13         updated Airbus about the attempt of

14         FitzWalter to -- not only attempt, about

15         FitzWalter's action in terminating the

16         lease and then going through the auction

17         process.

18    BY MR. GRIFFIN:

19         Q     How many conversations have you had with

20    Airbus about FitzWalter?

21         A     I don't remember.

22         Q     More than one?

23         A     I think it has been a topic that has gone

24    through more than one conversations, not because I

25    triggered this.  Simply because they asked,

```
 1                    H. LOECHTEKEN

 2   especially after the Chapter 11 filing.

 3        Q    Your conversations with Airbus about

 4   FitzWalter have been an ongoing, regular thing?

 5        A    I think so, yeah, because it is something

 6   that is of grave concern to the manufacturer.

 7        Q    Did you call FitzWalter a predatory fund?

 8             MR. SHAUGHNESSY:  Objection.

 9             THE WITNESS:  I think I did,

10        because that's in the documents I think

11        we produced, yeah, but you should show me

12        the document again.

13   BY MR. GRIFFIN:

14        Q    What do you mean by predatory fund?

15        A    I can't even define that.  I think I've

16   been working with distressed funds for quite some

17   time.  A distressed fund looks for weakness and looks

18   for opportunity, and that is essentially somebody who

19   then jumps on an opportunity when there is weakness.

20   That's what I mean by this.

21        Q    Were you suggesting that FitzWalter was

22   doing anything illegal?

23        A    No, I have no basis to claim that.

24        Q    Was doing anything improper?

25        A    Outside the norm of typical aviation
```

```
 1                    H. LOECHTEKEN

 2   finance behavior, not improper.  I can't say

 3   improper.

 4        Q    So not improper under the transaction

 5   documents, correct?

 6              MR. SHAUGHNESSY:  Objection.  Calls

 7        for a legal conclusion.

 8              THE WITNESS:  Yeah, I'm not

 9        familiar enough with the other

10        transaction documents and I'm not -- I

11        can't comment on the legal implications

12        of this.

13   BY MR. GRIFFIN:

14        Q    So you're not saying they were doing

15   anything illegal, correct?

16        A    No, I didn't say that.

17        Q    Did you and Airbus discuss any ways to

18   address the concerns that you had about FitzWalter?

19              MR. SHAUGHNESSY:  Objection.

20              THE WITNESS:  So I asked Airbus on

21        whether they could be a stalking horse

22        bid.

23   BY MR. GRIFFIN:

24        Q    Anything else?

25        A    Not that I remember, no.
```

1                          H. LOECHTEKEN

2          Q      Did you discuss approaching AWG?

3          A      I'm not a member of AWG.

4          Q      Did you discuss Airbus raising the issue

5    with AWG?

6          A      They raised it.

7          Q      What issue did they raise with AWG?

8          A      That I don't know.  I'm not a member of

9    AWG.

10         Q      Did you have any discussions with Airbus

11   about discussing FitzWalter with AWG?

12                MR. SHAUGHNESSY:  Objection.

13                THE WITNESS:  I don't remember.

14         I --

15   BY MR. GRIFFIN:

16         Q      What is AWG?

17         A      The Aviation Working Group.  It's all

18   banks, the OEMs and it's large leasing companies.

19         Q      Are they import -- sorry.  Go ahead.

20         A      And they're essentially setting, so to

21   speak, the standards and principles of our behavior.

22         Q      Are they an important player in this

23   industry?

24                MR. SHAUGHNESSY:  Objection.

25                THE WITNESS:  I would need to

```
 1                        H. LOECHTEKEN

 2           speculate.  I would think -- we're not a

 3           member, but a lot of other leasing

 4           companies and the OEMs are and the banks

 5           are.

 6    BY MR. GRIFFIN:

 7           Q     Did Airbus tell you what they raised with

 8    AWG?

 9           A     No.

10           Q     Did you discuss a more proactive plan to

11    counter FitzWalter's predatory attacks?

12                 MR. SHAUGHNESSY:  Objection.

13                 THE WITNESS:  I don't remember, but

14           I don't think so.  The situation is that

15           we have single-aircraft owning SPCs, that

16           if the lessee doesn't pay are vulnerable.

17           And we did not -- I did not discuss any

18           plan there because it would require

19           something on a much larger scale, and

20           there's not simply time enough.  So it

21           had -- no, I did not.  It hasn't

22           happened.

23    BY MR. GRIFFIN:

24           Q     Did you approach Tim Myers?

25                 MR. SHAUGHNESSY:  Objection.
```

1                        H. LOECHTEKEN

2                THE WITNESS:  No.

3    BY MR. GRIFFIN:

4        Q    Did you say you intend to approach Tim

5    Myers?

6                MR. SHAUGHNESSY:  Objection.

7                THE WITNESS:  I think I might have

8         said that in an e-mail, but I did not

9         talk to Tim Myers.

10   BY MR. GRIFFIN:

11       Q    Why not?

12       A    And I did not approach him.

13       Q    Is there a reason why you decided not to

14   approach Mr. Myers?

15               MR. SHAUGHNESSY:  Objection.

16               THE WITNESS:  Not that I remember.

17   BY MR. GRIFFIN:

18       Q    Who is Tim Myers?

19       A    The president of Boeing Capital, the

20   president and CEO of Boeing Capital.

21       Q    With respect to the bid procedures in

22   this case, are the -- whatever assets the debtors

23   own, are they being sold in one package?

24       A    Yes, they are.

25       Q    Why is that?

```
 1                        H. LOECHTEKEN

 2       A     It is a deal we could get and it pays

 3  everybody --

 4       Q     Would you --

 5       A     Sorry.

 6       Q     Go ahead.

 7       A     And it pays everybody in full, my

 8  assumption.

 9       Q     Would you prefer to be able to sell them

10  in pieces?

11       A     Not necessarily.  So I would not want to

12  sell them -- no, I would not sell -- commercially

13  speaking, I would not want to sell the assets without

14  the leases.  And whether we sell one now and then one

15  five months later, it doesn't make a difference.  The

16  market right now is not bad for assets, more than

17  technology aircraft.

18                  I've participated on the buy side in ten,

19  15, 20 RFPs, at least, in the last two years and they

20  all were overbid by five times.  So there's a lot of

21  demand out there for new technology assets.

22       Q     Did SVP want you to sell them in one

23  package?

24             MR. SHAUGHNESSY:  Objection.

25             THE WITNESS:  The term sheet speaks
```

```
 1                    H. LOECHTEKEN

 2           for itself.  It is a deal we could get.

 3    BY MR. GRIFFIN:

 4           Q       Do you know who decided to have the

 5    assets -- the requirement the assets be sold in one

 6    package?

 7                    MR. SHAUGHNESSY:  Objection.

 8                    THE WITNESS:  In the end, it was a

 9           decision between Teiji and myself, Teiji

10           Ishikawa.

11    BY MR. GRIFFIN:

12           Q       Was it your preference initially to allow

13    the assets to be sold in whole or in lots?

14           A       We had no -- we had no real preference.

15    It would have been nice to have -- potentially, to

16    have the assets have more time.  That is a more

17    important figure.  But it is not -- but it's not even

18    necessary.

19                    But it was not our preference to have the

20    assets in lots with the one caveat that we do not

21    want the leases, the lease claims, separated from the

22    assets.

23           Q       You would have been happy to have the

24    assets for the JPA 111 sold together, and then to

25    also have the potential to have whatever assets there
```

1                    H. LOECHTEKEN

2    are for JPA No. 49 sold together, but not require

3    them to be sold in one bucket; is that correct?

4         A    So JPA 111, together 67, MSN, and the

5    other JPA in one bucket, but it doesn't matter on

6    whether it's in one go or not.  We're confident it

7    will go.

8         Q    And it's correct, isn't it, that SVP

9    wanted them all to be in one bucket, to be sold

10   together, correct?

11        A    It's what the term sheets reflects.

12             MR. SHAUGHNESSY:  Objection.

13   BY MR. GRIFFIN:

14        Q    Did you negotiate the break-up fee?

15        A    I was involved in one conversation on the

16   break-up fee with SVP.

17        Q    What occurred during that conversation?

18        A    I tried to lower it.

19        Q    Why is that?

20        A    Because based on the advice I got from

21   our lawyers.

22             MR. SHAUGHNESSY:  Wait.  Don't say

23        anything that reflects legal advice.

24             THE WITNESS:  So based -- we felt

25        that the -- initially, the 5 percent fee

```
 1                        H. LOECHTEKEN

 2           was too high.  We wanted to push it down

 3           and we could get it down to a 4 percent

 4           break-up fee.

 5    BY MR. GRIFFIN:

 6           Q     At that time, you weren't speaking with

 7    any other potential stalking horse bidders, correct?

 8           A     Not on that detailed level.

 9           Q     Did you ever ask FitzWalter what they

10    would be willing to purchase the assets for?

11                 MR. SHAUGHNESSY:  Objection.

12                 THE WITNESS:  No, I did not.

13    BY MR. GRIFFIN:

14           Q     Before it was --

15           A     For the reasons explained before.  We

16    felt that FitzWalter was not a friendly party, as

17    they started this process without notifying us, so

18    they didn't speak to us.  Why would we turn around

19    and then ask them, after they started this process,

20    what they would pay for the assets.

21                 That only happened when I was called by

22    FitzWalter way later when they offered to match the

23    stalking horse bid.

24           Q     So you never talked with FitzWalter

25    before or after filing bankruptcy until they reached
```

```
 1                    H. LOECHTEKEN
 2    out to you about what FitzWalter would be able --
 3    willing to do with respect to these assets?
 4              MR. SHAUGHNESSY:  Objection.
 5              THE WITNESS:  I think that is
 6         correct.
 7    BY MR. GRIFFIN:
 8         Q    There's a process in the transaction
 9    documents for selling the assets, correct?
10         A    What exactly are you referring to?
11         Q    Say in the event of a default, there's a
12    process that everybody agreed to about how to resolve
13    the assets, correct?
14              MR. SHAUGHNESSY:  Objection.  What
15         documents are you talking about?
16    BY MR. GRIFFIN:
17         Q    The proceeds agreement that appoints
18    FitzWalter Capital as a security agent, correct?
19              MR. SHAUGHNESSY:  Objection.  Calls
20         for a legal conclusion.
21              THE WITNESS:  I'm not familiar with
22         this -- I'm not -- and I can't interpret
23         the legal situation.
24              MR. SHAUGHNESSY:  Mr. Griffin, how
25         much more time do you think you guys --
```

1                    H. LOECHTEKEN

2            MR. GRIFFIN:  I'm going to go

3        through my outline and cross off

4        everything.  I think we're almost done

5        here.

6            MR. SHAUGHNESSY:  All right.  Thank

7        you.  Are we going to take five minutes,

8        ten minutes?

9            MR. GRIFFIN:  Let's take five.  I

10       know it's getting late for Mr. Loechteken

11       over there, so let's take five.

12           MR. SHAUGHNESSY:  Okay.  Great.

13           THE VIDEOGRAPHER:  The time is 9:40

14       p.m.  We're off the record.

15                   (Brief pause.)

16           THE VIDEOGRAPHER:  The time is

17       9:47 p.m., we're on the record.

18           MR. GRIFFIN:  A few more questions.

19   BY MR. GRIFFIN:

20       Q    What experience do you have with U.S.

21   bankruptcy?

22       A    I've been on the receiving end of U.S.

23   bankruptcy in a couple of U.S. airlines bankruptcy

24   processes and a couple of firm bankruptcy processes.

25   I, myself, was not in bankruptcy.

1                        H. LOECHTEKEN

2        Q     Understood.  So with respect to the

3   businesses you were associated with, you said a

4   couple of those have been in bankruptcy themselves or

5   creditors in bankruptcy?  What are you discussing

6   there?

7        A     Exposure that I, as an executive of

8   various entities, had with U.S. airlines, mostly, or

9   foreign airlines that went into Chapter 11 processes

10  and bankruptcy.

11       Q     In those circumstances, were you in a

12  situation where you owned an asset and a company went

13  into bankruptcy?

14       A     Correct.

15       Q     Have you ever been in a situation where

16  your company has gone into bankruptcy?

17       A     No, but I had a couple of near bankruptcy

18  experiences with companies that were in financial

19  difficulties where we were -- had to restructure debt

20  and convert unsecured debt into senior secured debt

21  and were living off three months waivers, and we had

22  to institutionalize an asset sales program in

23  between.

24       Q     Earlier, we discussed the long-term lease

25  renegotiations that you were going -- engaged in with

1                         H. LOECHTEKEN

2    VNA around the, you know, fall of 2020, correct?

3         A      Correct.

4                    MR. SHAUGHNESSY:  Objection.

5                    THE WITNESS:  I should clarify, I

6         was not personally engaged.  My Tokyo

7         colleagues were engaged.

8    BY MR. GRIFFIN:

9         Q      Thank you for the clarification.

10               So people from JPL were engaged in

11   renegotiation discussions with VNA, right?

12        A      Correct.

13        Q      Did you expect the bankruptcy to assist

14   in those discussions?

15                   MR. SHAUGHNESSY:  Objection.

16                   THE WITNESS:  I have no legal view

17        on it.  I think we were essentially done

18        before.  I don't know whether the

19        bankruptcy will assist with this or not.

20   BY MR. GRIFFIN:

21        Q      In this bankruptcy -- strike that.

22               During the bankruptcy, there's been no

23   real additional discussions with VNA during the --

24   relating to the lease negotiations, right?

25                   MR. SHAUGHNESSY:  Objection.

1                        H. LOECHTEKEN

2                THE WITNESS:  Not that I know of.

3    BY MR. GRIFFIN:

4            Q      Do you know whether SVP is interested in

5    having JPL re-engage with VNA about the lease

6    negotiations?

7                MR. SHAUGHNESSY:  Objection.

8                THE WITNESS:  It is clear that SVP

9            does not want us to enter into a lease,

10           either, on MSN 150, and therefore the

11           rest can't be entered into with, to begin

12           with.

13   BY MR. GRIFFIN:

14           Q      SVP is not interested in renegotiating a

15   lease on the plane that's not in bankruptcy, correct?

16           A      Correct.

17               MR. SHAUGHNESSY:  Objection.

18   BY MR. GRIFFIN:

19           Q      The plane that it purchased from the

20   bank, correct?

21               MR. SHAUGHNESSY:  Objection.

22               THE WITNESS:  I don't really know

23           what SVP, in the end, is interested in.

24           They have asked us to stop negotiating

25           with Vietnam.

```
 1                      H. LOECHTEKEN

 2   BY MR. GRIFFIN:

 3            Q      So the bankruptcy wouldn't have assisted

 4   in the process of getting leases back in place,

 5   right?

 6                   MR. SHAUGHNESSY:  Objection.

 7                   THE WITNESS:  I don't think so

 8           because I -- I believe, and I've seen

 9           that with other leasing companies, that

10           Vietnam was in the process of agreeing

11           lease restructurings with other leasing

12           companies, as well, in the same way they

13           were discussing with us.

14                   So I think this is one process

15           where Vietnam is effectively

16           restructuring its leases, because other

17           leases have been signed already, as would

18           have been signed by now if not the

19           Chapter 11 and SVP situation happened.

20   BY MR. GRIFFIN:

21           Q      And it wasn't just FitzWalter's conduct

22   that stopped the new leases from being signed,

23   because there's a separate plane that FitzWalter

24   doesn't have any relationship with, and the lease on

25   that plane, the 150, also hasn't been resigned; is
```

1                       H. LOECHTEKEN

2    that correct?

3                  MR. GRIFFIN:  Objection.

4                  THE WITNESS:  That lease has not

5          been signed either, yet.

6    BY MR. GRIFFIN:

7          Q     And, in fact, SVP does not want you to

8    renegotiate the leases on either the 067173 or the

9    510, right?

10                 MR. SHAUGHNESSY:  Objection.

11                 THE WITNESS:  That I can't really

12         say because we have not had any

13         discussions beyond this until we are

14         effectively clear with what happens in

15         the bankruptcy process.

16   BY MR. GRIFFIN:

17         Q     In fact, the APA prevents you from

18   talking to VNA about the leases, right?

19                 MR. SHAUGHNESSY:  Objection.

20                 THE WITNESS:  Yes.

21   BY MR. GRIFFIN:

22         Q     And we had cross talk, so let's do that

23   again.

24                 The APA prevents you from talking to VNA

25   about the leases, correct?

```
 1                    H. LOECHTEKEN
 2                MR. SHAUGHNESSY:  Objection.
 3                THE WITNESS:  The APA says what it
 4         says.
 5    BY MR. GRIFFIN:
 6         Q     You said yes last time.  Is that -- are
 7    you able to talk to VNA about the leases?
 8                MR. SHAUGHNESSY:  Objection.
 9                THE WITNESS:  From my
10         understanding, we are not, at this stage.
11    BY MR. GRIFFIN:
12         Q     With respect to the -- strike that.
13                Earlier we discussed the break-up fee,
14    correct?
15         A     Uh-huh.
16                (Loechteken Exhibit No. 8 was
17         marked for the record.)
18    BY MR. GRIFFIN:
19         Q     I added Exhibit No. 8 to the folder, and
20    it's the Bidding Procedures Order.  It's 2021.12.31,
21    if you look in the file name there.
22                MR. SHAUGHNESSY:  What's the title?
23                MR. GRIFFIN:  It should be
24         2021.21.12.31-Docket 21.  It should be
25         the very top document in the folder.
```

1                H. LOECHTEKEN

2          MR. SHAUGHNESSY:  I apologize.  My

3     computer -- this part of the website is

4     freezing on me.  I've got to sign back

5     in.  I don't know why.

6          MR. GRIFFIN:  This is going to be

7     the last question.

8          MR. SHAUGHNESSY:  Bad timing,

9     sorry.

10         MR. GRIFFIN:  No worries.

11         THE WITNESS:  It's really slow for

12    me, as well.

13         MR. SHAUGHNESSY:  I'm sorry, Mr.

14    Griffin.  What's the title of the

15    document?

16         MR. GRIFFIN:  It should be the very

17    first document in the folder.  It's

18    2021.12.31 DKT 21 Bidding Procedures

19    Order.

20         Do you see that?

21         MR. SHAUGHNESSY:  I got it.  It was

22    number three on my list, so --

23         MR. GRIFFIN:  Oh, sorry.

24         MR. SHAUGHNESSY:  Whether it was

25    alphabetical or not.

1                        H. LOECHTEKEN

2                   MR. GRIFFIN:  The sorting must be

3         different in our respective folders.

4                   MR. SHAUGHNESSY:  Mr. Loechteken,

5         do you have it?

6                   THE WITNESS:  I have it, yeah.

7    BY MR. GRIFFIN:

8         Q    Can you go down to the page that -- if

9    you look at the numbers on top, it's going to be page

10   18 of 29.

11                  MR. SHAUGHNESSY:  Take your time to

12        review the document, if you'd like to.

13                  MR. GRIFFIN:  Of course, yes.

14                  THE WITNESS:  My computer is very

15        slow on that page.  Page 14.  Okay.

16        Eighteen of 29.

17   BY MR. GRIFFIN:

18        Q    Actually, if you scroll back up to the

19   prior page, I just want to put it in context.  It's

20   Section 5, Stalking Horse Bidders' Protection is what

21   this section is.

22                  And if you go down to, again, page 18 of

23   29, the first full paragraph, you see that it's

24   beginning with, The break-up fee.

25                  Do you see that?

1                    H. LOECHTEKEN

2        A      Uh-huh, yeah.

3        Q      And, obviously, take your -- why don't

4    you take your time to read this paragraph and I'll

5    ask you a question about it.

6               Have you got it?

7        A      Yeah.  I'm not sure I understand it, but

8    I've gone through it.

9        Q      Let's find out.

10               So if you read this paragraph, it says:

11   The break-up fee and expense reimbursement shall be

12   due and payable upon --

13               And there's a bunch of subsections here.

14   I want to go to the third romanette, small I, small

15   I, small I.

16               Do you see that.  It's a -- it's six

17   lines down?

18       A      Yeah.

19       Q      Okay.  So it says:  The break-up fee and

20   expense reimbursement shall be due and payable

21   upon -- and you go to romanette 3 -- the debtors

22   breaching their obligations under the stalking horse

23   purchase agreement, including without limitation, A,

24   by withdrawing from the transaction -- and then I'm

25   going to skip over the parenthetical -- B, by failing

```
 1                    H. LOECHTEKEN

 2    to meet their time of the essence obligations under

 3    the stalking horse purchase agreement, it being

 4    understood that the timing provisions of these

 5    bidding procedures shall constitute an agreement by

 6    the debtor and the stalking horse bidders of the

 7    dates provided for herein.

 8              And then it says:  Or, C, changes having

 9    being made to the bidding procedures or other terms

10    agreed by the parties as part of the bidding

11    procedures order, except for changes agreed upon in

12    writing by the buyer, which consent shall not be

13    unreasonably withheld.

14              Do you see that?

15      A    I'm a bit slow at reading.  Yes, I see

16    that.

17      Q    So the stalking horse break-up fee is

18    payable even if there's not a sale to another entity;

19    is that correct?

20              MR. SHAUGHNESSY:  Objection.

21              THE WITNESS:  As of a breach of the

22              obligation, I think, yes.

23    BY MR. GRIFFIN:

24      Q    If you don't sell the assets to someone

25    else, where does the money come to pay -- come from
```

```
 1                    H. LOECHTEKEN
 2  to pay the break-up fee?
 3               MR. SHAUGHNESSY:  Objection.
 4               THE WITNESS:  So I -- I've been
 5         advised that this --
 6               MR. SHAUGHNESSY:  Stop.
 7               THE WITNESS:  No, stop.
 8               MR. SHAUGHNESSY:  You can't reveal
 9         any advice from legal counsel.  If your
10         understanding is based on the advice of
11         legal counsel, I instruct you not to
12         answer.
13  BY MR. GRIFFIN:
14         Q    Are you accepting your counsel's
15  instruction.
16         A    I accept it.
17         Q    So you don't know where the money would
18  come from without divulging your counsel's
19  information, correct?
20         A    Correct.
21               MR. GRIFFIN:  I have no further
22         questions.
23               MR. SHAUGHNESSY:  Okay.  Justin, do
24         you want me to give you a call quickly
25         about outstanding matters?
```

Page 245

1                      H. LOECHTEKEN

2              MR. GRIFFIN:  Sure.

3              MR. SHAUGHNESSY:  We're off the

4        record, right?

5              MR. GRIFFIN:  Yeah, let's go off

6        the record.

7              THE VIDEOGRAPHER:  The time is

8        10:01 p.m.  We're off the record.

9

10             (Thereupon, the deposition was

11       concluded at approximately 10:01 p.m.)

12

13

14

15

16
                    _____
17                  HEINRICH LOECHTEKEN

18

19

20  Subscribed and sworn to before me

21  this_____ day of_____, 2022.

22  _____

23

24

25

1

2                 C E R T I F I C A T E

3

4    STATE OF GEORGIA:

5    FULTON COUNTY:

6

7              I hereby certify that the foregoing

8         deposition was reported, as stated in the

9         caption, and the questions and answers

10        thereto were reduced to written page

11        under my direction, that the preceding

12        pages represent a true and correct

13        transcript of the evidence given by said

14        witness.

15             I further certify that I am not of

16        kin or counsel to the parties in the

17        case, am not in the regular employ of

18        counsel for any of said parties, nor am I

19        in any way financially interested in the

20        result of said case.

21             Dated this 24th day of January,

22        2022.

23

24        _____
          Tanya L. Verhoven-Page,
25        Certified Court Reporter,
          B-1790.

Page 247

1    NAME OF CASE:

2    DATE OF DEPOSITION:

3    NAME OF WITNESS:

4    Reason Codes:

5           1.   To clarify the record.

6           2.   To conform to the facts.

7           3.   To correct transcription errors.

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                        _____