TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Frank A. Oswald
Kyle J. Ortiz
Bryan M. Kotliar
Jared C. Borriello

*Counsel to the Debtors
and Debtors in Possession*

**HEARING DATE: 3/14/2022 AT 11:00 A.M.**
**OBJECTIONS DUE: 3/7/2022 AT 4:00 P.M.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>JPA NO. 111 CO., LTD. and<br>JPA NO. 49 CO., LTD.,<br><br>    Debtors. [1] | Chapter 11<br><br>Case No.:  21-12075 (DSJ)<br><br>(Jointly Administered) |
| JPA NO. 111 CO., LTD. and<br>JPA NO. 49 CO., LTD.,<br><br>    Plaintiffs,<br><br>v.<br><br>FITZWALTER CAPITAL PARTNERS<br>(FINANCIAL TRADING) LIMITED,<br><br>    Defendant. | Adv. Pro. No. 22-01004 (DSJ) |

**NOTICE OF HEARING ON MOTION OF THE DEBTORS
FOR ENTRY OF AN ORDER (I) DETERMINING SECURED CLAIMS
OF PREPETITION CREDIT FACILITIES OR (II) IN THE ALTERNATIVE,
ESTIMATING AMOUNT OF CLAIMS ASSERTED BY FITZWALTER CAPITAL
<u>PARTNERS (FINANCIAL TRADING) LIMITED AND ITS AFFILIATES</u>**

---

[1] The Debtors in these Chapter 11 Cases are:  JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd.  The
Debtors' corporate address is Kasumigaseki Common Gate West Tower, 3-2-1 Kasumigaseki,
Chiyoda-Ku, Tokyo 100-0013.

**PLEASE TAKE NOTICE** that on February 28, 2022, the above-captioned debtors and debtors in possession (the "Debtors") filed the *Motion for Entry of an Order (I) Determining Secured Claims of Prepetition Credit Facilities or (II) In the Alternative, Estimating Amount of Claims Asserted by FitzWalter Capital Partners (Financial Trading) Limited and its Affiliates* (the "Motion ") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

**PLEASE TAKE FURTHER NOTICE** that a hearing (the "Hearing") to consider the relief requested in the Motion will be held on **March 14, 2022 at 11:00 a.m. (prevailing Eastern Time)**, or as soon thereafter as counsel can be heard, before the Honorable David S. Jones, United States Bankruptcy Judge for the Southern District of New York, One Bowling Green, New York, New York 10004, unless otherwise ordered by the Bankruptcy Court.  In light of the COVID-19 pandemic, the Hearing shall take place via Zoom for Government.  Those wishing to appear before the Bankruptcy Court at the Hearing must register their appearance by utilizing the Electronic Appearance portal located at the Bankruptcy Court's website: https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl.  Appearances must be entered no later than March 13, 2022 at 4:00 p.m. (**Prevailing Eastern Time**).

**PLEASE TAKE FURTHER NOTICE** that responses or objections to the Motion and relief requested therein shall be filed no later than **March 7, 2022 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline") with a courtesy copy to the Chambers of the Honorable David S. Jones by email:  jones.chambers@nysbcourts.gov, United States Bankruptcy Court for the Southern District of New York, and served upon, so as to be received by the following parties by the Objection Deadline: (i) counsel to the Debtors,  Togut, Segal & Segal LLP, Frank A. Oswald, Esq. (frankoswald@teamtogut.com) and Kyle J. Ortiz, Esq. (kortiz@teamtogut.com;  and

(ii) any other parties requesting notice.

**PLEASE TAKE FURTHER NOTICE** that Gen. Ord. M-543, along with other temporary procedures implemented by the Bankruptcy Court in connection with the COVID-19 pandemic (including electronic filing procedures for *pro se* parties) can be found by visiting www.nysb.uscourts.gov (the "Bankruptcy Court's Website") and clicking on the "Coronavirus COVID-19 Protocol" banner.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion and the exhibits thereto can be viewed and/or obtained by (i) accessing the Bankruptcy Court's Website for a fee, (ii) contacting the Office of the Clerk of the United States Bankruptcy Court, Southern District of New York, or (iii) contacting the Debtors' counsel identified below.  Please note that a PACER password is required to access documents on the Bankruptcy Court's Website.

Dated:  February 28, 2022
      New York, New York

<div style="margin-left:40%">

JPA NO. 111 CO., LTD. and
JPA NO. 49 CO., LTD.
*Debtors and Debtors in Possession*
By their Counsel
TOGUT, SEGAL & SEGAL LLP
By:

*/s/ Kyle J. Ortiz*
Frank A. Oswald
Kyle J. Ortiz
Bryan M. Kotliar
Jared C. Borriello
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000

</div>

TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Frank A. Oswald
Kyle J. Ortiz
Bryan M. Kotliar
Jared C. Borriello

*Counsel to the Debtors*
*and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| JPA NO. 111 CO., LTD. and JPA NO. 49 CO., LTD., | Case No.:  21-12075 (DSJ) |
| Debtors.[1] | (Jointly Administered) |
| JPA NO. 111 CO., LTD. and JPA NO. 49 CO., LTD., | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 22-01004 (DSJ) |
| FITZWALTER CAPITAL PARTNERS (FINANCIAL TRADING) LIMITED, | |
| Defendant. | |

**MOTION OF THE DEBTORS FOR
ENTRY OF AN ORDER (I) DETERMINING SECURED CLAIMS
OF PREPETITION CREDIT FACILITIES OR (II) IN THE ALTERNATIVE,
ESTIMATING AMOUNT OF CLAIMS ASSERTED BY FITZWALTER CAPITAL
PARTNERS (FINANCIAL TRADING) LIMITED AND ITS AFFILIATES**

---

[1]    The Debtors in these Chapter 11 Cases are:  JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd.  The Debtors' corporate address is Kasumigaseki Common Gate West Tower, 3-2-1 Kasumigaseki, Chiyoda-Ku, Tokyo, Japan 100-0013.

TO THE HONORABLE DAVID S. JONES
UNITED STATES BANKRUPTCY JUDGE:

JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd., as debtors and debtors in possession (the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"), hereby make this application (the "Motion"), for entry of an order, pursuant to sections 105(a), 502(c)(1), 506(a) and 506(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) determining that the FitzWalter Alleged Fees, Costs & Charges (as defined below) do not constitute Secured Obligations (as defined below) or (ii) in the alternative, or to the extent required to expeditiously move these Chapter 11 Cases forward without undue delay, to estimate the FitzWalter Alleged Fees, Costs & Charges at $0. The Debtors are also requesting that, to the extent necessary, the Court establish the Escrow (as defined below) to provide for the payment of any disputed Secured Obligations to the extent not determined or estimated by the Court (or otherwise resolved by the parties) as of the Sale Hearing (as defined below).

In addition to certain prior filings cited herein, the Debtors submit the Declaration of Jared C. Borriello (the "Borriello Declaration") in support of the Motion. In further support of this Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION AND VENUE

1.      This United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.) (the "Amended Standing Order"). This is a core proceeding under 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant to Bankruptcy Rule

7008, to the entry of a final order by the Court in connection with the Motion to the

extent that it is later determined that the Court, absent consent of the parties, cannot

enter final orders or judgments in connection herewith consistent with Article III of the

United States Constitution.

2.      Venue of these Chapter 11 Cases and this Motion in this District is proper

under 28 U.S.C. § 1409.

3.      The predicates for the relief requested herein are sections 105, 502 and 506

of the Bankruptcy Code and Bankruptcy Rule 3012.

## **BACKGROUND**

4.      The following is a brief summary of the facts relevant to this Motion.  A

fuller recitation of the facts is set forth in the Debtors' prior submissions to this Court,

including, without limitation, the Debtors' adversary proceeding complaint[2] and the

Debtors' Omnibus Reply to the objections asserted by FitzWalter Capital Partners

(Financial Trading) Limited ("FitzWalter") and FitzWalter's affiliates, dated

February 23, 2022 [Docket No. 130] (the "Debtors' Omnibus Reply"), the Declaration of

Jared C. Borriello in support of the Debtors' Omnibus Reply, dated February 23, 2022

[Docket No. 131] ("Omnibus Reply Decl."), and in the Court's *Memorandum of Decision*

*and Order Resolving Motion to Dismiss*, dated February 1, 2022 [Docket No. 97]

(the "Memorandum Decision"), which are incorporated herein by reference.

---

[2]      *See* Complaint (the "Debtors' Complaint") filed in the Debtors' adversary proceeding against
FitzWalter in these Chapter 11 Cases.  Adv. Pro. No. 22-01004, Docket No. 1 (the "Adversary
Proceeding").  The Exhibits referenced herein are either:  (a) annexed to the *Declaration of Jared C.
Borriello in Support of Debtors' Motion for Injunctive Relief and Sanctions,* dated and filed in the
Adversary Proceeding on February 15, 2022 [Adv. Docket No. 6] (such exhibits are referenced herein
as the "Adversary Proceeding Exhibits"), or (b) submitted to this Court at the hearing regarding the
*Motion of FitzWalter Capital Partners (Financial Trading) Limited to Dismiss or Abstain From Hearing These
Chapter 11 Cases,* dated January 2, 2022 [Docket No. 22] (the "Motion to Dismiss"), which hearing
exhibits are referenced herein as the ("Hearing Exhibits").  Capitalized terms used but not otherwise
defined herein shall have the meanings ascribed to such terms in the Debtors' Complaint.

A.    **The Sale Process**

5.    On February 4, 2022, the Court entered the Bidding Procedures Order [Docket No. 101], which (a) established the bidding and auction procedures set forth in the Bidding Procedures attached thereto as Exhibit 1 and (b) approved the Stalking Horse Bids set forth in the Stalking Horse Purchase Agreement.  Pursuant to the Bidding Procedures Order, a hearing to authorize the Debtors' sale(s) of their assets pursuant to the Sale Process is currently scheduled for March 14, 2022 at 11:00 a.m. (ET) (the "Sale Hearing").

6.    The Binding Stalking Horse Term Sheet sets forth a purchase price equal to the sum of (a) all of the outstanding obligations under both Senior Facilities, *plus* (b) all of the outstanding obligations under both Junior Facilities, *plus* (c) a $5 million additional cash payment (which well exceeds the amount of the Debtors' other obligations, including any reasonable estimates of unsecured claims).[3]  Accordingly, with an elastic purchase price (to account for valid and allowed secured unliquidated amounts in addition to interest, principal, and return to equity), the proposed stalking horse bid is structured to provide for the full payment of all of the legitimate and allowed obligations owed to FitzWalter (and all other Lenders and the Security Trustee) under the Debt Facilities.[4]

7.    The Binding Stalking Horse Term Sheet specifically provides that the full satisfaction of the Debt Facilities will occur concurrently with the closing of the sales.[5]

---

[3]    *See* Bidding Procedures Motion [Docket No. 21], Ex. B (the "Binding Stalking Horse Term Sheet").

[4]    The Stalking Horse Purchase Agreement establishes this purchase price as well.  *See* Revised Exhibits to Bidding Procedures Motion [Docket No. 58], Ex. D (the "Stalking Horse Purchase Agreement"), § 3.01.

[5]    *See id.*, Ex. D, § 5.

This result was reiterated at the request of the Court in a further filing by the Debtors on January 28, 2022.[6]

**B.**    **The FitzWalter Alleged Fees, Costs & Charges**

8.    In conjunction with the Sale Process, on January 7, 2022, the Debtors requested that FitzWalter provide an accounting of the amount of the Secured Obligations (as defined in the Transaction Documents) owed by each Debtor pursuant to section 9-210 of the New York Uniform Commercial Code.[7]

9.    FitzWalter has provided accountings setting forth its view of the Debtors' respective Secured Obligations as of February 28, 2022 (which updated an original accounting sent by FitzWalter on January 21, 2022).  In addition to the claims for principal and interest on the Senior Loans and the Junior Loans and the swap break costs, neither of which is contested, FitzWalter has asserted the following additional fees, expenses and charges as constituting Secured Obligations owed by the Debtors, which the Debtors submit are not Secured Obligations (collectively, the "FitzWalter Alleged Fees, Costs & Charges"):[8]

|  | Description of FitzWalter's Alleged Fees, Costs & Charges | For The Msn 067 Aircraft Transaction | For The Msn 173 Aircraft Transaction | Aggregate Of FitzWalter's Alleged Fees, Costs & Charges |
|---|---|---|---|---|
| i. | Unpaid Rent under Head Lease | $10,429,865.50 | $10,695,530.92 | $21,125,396.42 |
| ii. | Other Alleged Breaches of Head Lease Claims | $959,291.91 | $882,856.51 | $1,842,148.42 |

---

[6]    *See Statement Responding to This Court's Inquiries Regarding Debtors' Motion to Approve Bidding Procedures [ECF No. 21]*, filed on January 28, 2022 [Docket No. 90].

[7]    *See, e.g.*, Adversary Proceeding Exs. 25 & 26.

[8]    This chart is referred to herein as the "FitzWalter Alleged Fees, Costs & Charges Chart".

| | Description of FitzWalter's Alleged Fees, Costs & Charges | For The Msn 067 Aircraft Transaction | For The Msn 173 Aircraft Transaction | Aggregate Of FitzWalter's Alleged Fees, Costs & Charges |
|---|---|---|---|---|
| iii. | Costs from Breaches of Parent Support Letters | $164,138.92 | $154,138.92 | $318,277.84 |
| iv. | Loan Transaction-Bankruptcy Breach Claims | Unliquidated | Unliquidated | Unliquidated |
| v. | Defamation/Yakuza Claims | Unliquidated | Unliquidated | Unliquidated |
| vi. | Management Time | $2,045,000.00 | $2,045,000.00 | $4,090,000.00 |
| vii. | Costs to Retain Airborne Capital as Remarketing Agent | $203,151.15 | $203,151.15 | $406,302.30 |
| viii. | FitzWalter's Legal Costs[9] | $2,314,082.45 | $2,314,082.45 | $4,628,164.90 |
| ix. | Insurance Costs | $37,510.50 | $37,510.50 | $75,021.00 |
| | **TOTALS** | **$16,153,024.91** | **$16,332,254.93** | **$32,485,310.88** |

10.     FitzWalter has asserted that the FitzWalter Alleged Fees, Costs & Charges summarized above are Secured Obligations and must be repaid or held in escrow as part of the Sale Process.  As of the February 28, 2022 accounting provided by FitzWalter, the liquidated FitzWalter Alleged Fees, Costs & Charges allege an additional $32.5 million in Secured Obligations for both Debtors plus additional unliquidated amounts.

11.     As described in prior pleadings, including the Debtors' Complaint and the Debtors' Omnibus Reply, the Debtors believe that FitzWalter has asserted inflated and unsubstantiated amounts that have no basis under the Transaction Documents or at law as Secured Obligations.  Contrary to FitzWalter's allegations, as will be

---

[9]     The Debtors applied (i) a Euro/US exchange rate of 1.12, and (ii) Pound/USD exchange rate of 1.34.

demonstrated by the Debtors, none of these costs (or, at most, less than $500,000 of these costs) should be allowed claims.

## **RELIEF REQUESTED**

12.      The Debtors respectfully request entry of an order (i) determining that the FitzWalter Alleged Fees, Costs & Charges do not constitute Secured Obligations, as a matter of law and/or are not reasonable as required by section 506(b) of the Bankruptcy Code or (ii) in the alternative, or to the extent required to expeditiously move these Chapter 11 Cases forward without undue delay, to estimate the FitzWalter Alleged Fees, Costs & Charges at $0.  In addition, to the extent that any alleged Secured Obligations remain disputed and unresolved by the Court or the parties as of the Sale Hearing, the Debtors request that the Court establish the Escrow (*see* Part C below).

13.      As part of the Sale Process, based on the Stalking Horse Bids, the amount of the Secured Obligations owed under the Transaction Documents will need to be determined to ascertain the amount of the final purchase price.  The Debtors believe that these issues have been sufficiently procedurally noticed and presented to the Court as part of the Sale Motion as well as the Debtors' Complaint,[10] but out of an abundance of caution, the Debtors file this Motion to ensure (a) proper notice that a determination (or estimation) of the validity of the Secured Obligations and/or secured claims under sections 502(c) and 506(b) of the Bankruptcy Code, as applicable, will occur is given, and (b) compliance with the terms of Bankruptcy Rule 3012 such that the Court may determine the validity of the Secured Obligations at the Sale Hearing (or such later date as agreed by the parties) or establish an appropriate Escrow.

---

[10]    *See* Debtors' Compl. ¶¶ 106-109.

14.     The Debtors submit that approval of this Motion was part of the order approving the Sale is proper.  The Debtors intend to file a revised proposed form of order approving the Sale (the "Revised Proposed Sale Order") following the conclusion of the Auction but prior to the Sale Hearing.  To the extent that the Court requires a further order, the Debtors are happy to submit a proposed form of such further order in such scenario.

## BASIS FOR RELIEF REQUESTED

### A.     The Court Can Determine the Secured Obligations Under Section 506 of the Bankruptcy Code

15.     Pursuant to section 506(a) of the Bankruptcy Code and Bankruptcy Rule 3012, in connection with the Sale Process, the Debtors request that the Court determine the validity of the Secured Obligations, that the FitzWalter Alleged Fees, Costs & Charges do not constitute Secured Obligations, and that the FitzWalter Alleged Fees, Costs & Charges represent claims that should be disallowed.

16.     Bankruptcy Rule 3012(a) provides, in pertinent part, as follows:

> **Determination of Amount of Secured . . . Claims.**
> On request by a party in interest and after notice—to the holder of the claim and any other entity the court designates—and a hearing, the court may determine:
> (1)     the amount of a secured claim under § 506(a) of the [Bankruptcy] Code[.]

Fed. R. Bankr. P. 3012.  Subsection (b) provides that "a request to determine the amount of a secured claim may be made by motion." *Id.*

17.     Section 506(a) of the Bankruptcy Code sets forth two requirements for finding that a claim is a secured obligation:  the existence of a "lien" and the "allow[ance]" of the underlying claim.  11 U.S.C. § 506(a) ("An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest

in such property . . . an is an unsecured claim to the extent that the value of such

creditor's interest . . . is less than the amount of such allowed claim.").  As succinctly

stated by Collier on Bankruptcy:

> In addition to the threshold requirement that there be a lien or right
> of setoff to establish the existence of a secured claim, section 506(a)
> also requires that the underlying "claim" must be "allowed."

4 COLLIER ON BANKRUPTCY ¶506.03[2] (Richard Levin & Henry J. Sommer eds. 16th Ed.

2021).

18.     The determination in respect of the allowance of the FitzWalter Alleged

Fees, Costs & Charges is governed by section 506(b) of the Bankruptcy Code.  11 U.S.C.

§ 506(b).  Section 506(b) provides, in pertinent part, that an oversecured creditor is

entitled to "any ***reasonable fees, costs, or charges provided for under the agreement*** or

State statute under which such claim arose."  *Id.* (emphasis added).  Bankruptcy Courts

are charged with determining the reasonableness of "fees, costs and charges" under

section 506(b) of the Bankruptcy Code.

19.     Courts in the Second Circuit follow the overwhelming majority of courts,

which have held that the reasonableness determination is a matter of federal law rather

than non-bankruptcy law.  *See In re Elmwood Farm, Inc.*, 19 B.R. 338, 341 (Bankr.

S.D.N.Y. 1982);  *Chase Manhattan Bank, N.A. v. Wonder Corp. of Am. (In re Wonder Corp. of

Am.)*, 82 B.R. 186, 189 (D. Conn. Ct. 1988); *see also* 4 COLLIER ON BANKRUPTCY

¶506.04[3](b) (noting that almost all courts, including all circuit courts that have

adjudicated such matters (the Fourth, Fifth, Eighth, Ninth and D.C. Circuits) have

determined that section 506(b)'s reasonableness standard constitutes a federal law

standard).  "The issue of the validity of [a] contractual provision allowing attorney's

fees is not the same as the issue of reasonableness of the fees allowed. . . .

[I]mportantly, inherent in the inquiry into reasonableness is a consideration of the

- 9 -

necessity of the action from the perspective of the time at which it was taken." *Wonder Corp.*, 82 B.R. at 191.

20.     Applying these standards to the FitzWalter Alleged Fees, Costs & Charges reveals that they are not only not "Secured Obligations" as a matter of law, but that they do not constitute claims that satisfy the federal reasonableness standards within the meaning of section 506(b) of the Bankruptcy Code for the reasons set forth below and in the Debtors' Complaint and Debtors' Omnibus Reply.

21.     The following demonstrates that none of the additional "fees, costs and charges" being claimed by FitzWalter constitutes an allowed secured claim.

(1)    Unpaid Rent and Other Breach Damages Under Head Leases[11]

22.     FitzWalter has asserted that lease claims (totaling approximately $23 million as of February 28, 2022) (categories (i) and (ii) of the FitzWalter Alleged Fees, Costs & Charges Chart), which lease claims were assigned as collateral to support the Debtors' secured debt obligations somehow increase the amount of the outstanding secured obligations—they do not.

23.     The lease payments by Vietnam Airlines on account of the Subleases were used to make lease payments to the Debtors under the Head Leases, and by the Debtors to repay the outstanding debt under the Debt Facilities.  Thus, the Debtors' prepetition debt is serviced by the rental income under the Head Leases (the Debtors' sole source of revenue) and the Subleases.  It would be illogical that any Finance Party would be entitled to both the debt repayments and the rental income.  This understanding is reflected in Clause 11.2 of the Proceeds Agreements, which addresses any double recovery issue by providing that the Intermediate Lessors have a direct

---

[11]    *See* Debtors' Omnibus Reply ¶ 38.

obligation to the Security Agent—in addition to the Intermediate Lessors' obligations

to the Debtors under the Head Leases—in respect of any amounts owing to the Debtors

under the Transaction Documents.[12]  This obligation is separate and independent from

the Intermediate Lessors' obligations to the Debtors, but is reduced by any amount

which the Intermediate Lessors pay directly to the Debtors and vice versa—*i.e.*, the

amount owing to the Debtors is reduced by any amount paid directly by the

Intermediate Lessors to the Security Agent.

24.    This result is further reflected in the waterfall set forth in the Proceeds

Agreements.  The payment obligations in respect of the unpaid Head Lease rental

claims (whether under the Proceeds Agreements or under the Enforcement Notices)

are owing to the Security Agent rather than directly to the Senior Agent or the

Lenders.[13]  It would be illogical for the Security Agent to argue that it is entitled to

retain the full amount of such unpaid Head Lease rental amounts for its own benefit

under the first priority position of the waterfall in the Proceeds Agreements, which is

designed to address the Security Agent's costs and expenses.[14]  Since the proceeds of

---

[12]  *See* Hr'g Ex. 8 & 15 (Proceeds Agreements), Cl. 11.2.1(a) ("[T]he Intermediate Lessor hereby irrevocably and unconditionally undertakes to pay, subject always to the operation of any limited recourse provisions therein or applicable thereto, *to the Security Agent all amounts whatsoever, without any limitation, owing by the Intermediate Lessor to the Borrower . . . .*") (emphasis added); *see id.* Cl. 11.2.1(b) ("[E]ach of the Intermediate Lessor and the Security Agent acknowledges that the Intermediate Lessor Obligations are obligations and liabilities of the Intermediate Lessor to the Security Agent under this Agreement, *separate and independent from,* and without prejudice to, *the identical obligations which the Intermediate Lessor has to the Borrower under the Transaction Documents*, provided that the total amount due and payable under or in respect of the Intermediate Lessor Obligations shall be decreased to the extent that the Intermediate Lessor pays any amounts to the Borrower under and in the manner required under the Transaction Documents and vice versa . . . .") (emphasis added).

[13]  *See id.* Cl. 8.3.1-8.3.10).

[14]  *See id.* Cl. 8.3.1 ("**firstly**, on each Repayment Date and on the date on which any other amount may be due and payable pursuant to the Senior Facility Agreement or any other Transaction Document . . . in payment to the Senior Agent and the Security Agent in discharging Expenses . . . and other amounts (other than principal and interest under the Senior Facility Agreement) owing by any Obligor to the Senior Agent, the Security Agent . . . under the Transaction Documents.").

the Sale are designed to satisfy all valid Secured Obligations, any amounts received from the Intermediate Lessors by way of rent should filter through the waterfall and be paid back to the Debtors.[15]

25.    Thus, for the foregoing reasons set forth above, the Court should value at $0 the FitzWalter Alleged Fees, Costs & Charges relating to the unpaid rent and other damages claims under the Head Leases.

(2)    Costs from Breaches of Parent Support Letters &
        Loan Transaction-Bankruptcy Breach Claims

26.    The English Lawsuit (as that term is defined in the Debtors' Omnibus Reply) was filed after the commencement of these Chapter 11 Cases in a transparent attempt to manufacture additional claims and interfere with the Sale Process. Claims arising under the English Lawsuit fall into the three categories delineated in rows (iii), (iv) and (v) of the FitzWalter Alleged Fees, Costs & Charges Chart. This subsection (A)(2) addresses rows (iii) and (iv) of the FitzWalter Alleged Fees, Costs & Charges Chart, whereas the next subsection (A)(3) of this Motion addresses the Defamation/Yakuza Claims (which includes the supposed defamation claims asserted by FitzWalter).

27.    FitzWalter has asserted several breaches of the Proceeds Agreement, the Parent Direction Letters and the Intermediate Parent Direction Letters, including each of the following, which as noted, have no basis:[16]

---

[15]   *See id.* Cl. 8.3.10 ("**lastly**, on the Final Repaayment Date, subject to Clause 8.11 (*Retention of surplus*), any surplus in payment to the Borrower (or to the Borrower's order) to such account as the Borrower may notify the Account Bank.")

[16]   *See* Borriello Decl., Ex. 1 (Parent Support Letter, MSN 067), Ex. 2 (Parent Support Letter, MSN 173), Ex. 3 (Intermediate Lessor Support Letter, MSN 067), Ex. 4 (Intermediate Lessor Support Letter, MSN 173).

| SUBJECT AGREEMENT OR CLAUSE | ALLEGED BREACH | REASONS WHY SUCH CLAIMS HAVE NO BASIS/NO DAMAGES |
|---|---|---|
| • Proceeds Agreements, Clause 3.1.3 | • JP Lease, as parent of Debtors, alleged to have breached commitment to avoid taking action that "lead[s] to bankruptcy or insolvency of the [each Debtor] . . . ." | • Clause not applicable to current Chapter 11 Cases as these cases are not a "bankruptcy or insolvency" under English law, which, under English law, means an insolvency or dissolution. In contrast, these Chapter 11 Cases are not insolvencies or dissolutions and, in fact, constitute the sole means to effect the full payoff of all claims and indeed result in a surplus.<br>• Clause expressly excludes actions "as required by applicable law". As set forth in the Debtors' Complaint and the Debtors' Omnibus Reply, these Chapter 11 Cases were commenced both (i) to stop FitzWalter's actions in furtherance of its ulterior motives that sought to benefit itself and leave all other creditors at material risk and (ii) to fairly administer the Chapter 11 Cases so as to ensure that all creditors are paid in full. In such situation, applicable law required that the Debtors take actions to protect the interests of *all* creditors and parties in interest.<br>• Even if it is breached, Clause 3.1.3 solely protects the full payoff of the Secured Obligations. Upon the payoff or satisfaction of the Secured Obligations, as provided under the Sale Process, there are no damages. |
| Proceeds Agreements, Cl. 3.2.3 | • Intermediate Lessors alleged to have breached commitment to avoid taking action that "lead[s] to bankruptcy or insolvency of the Borrower . . . ." | • Same as set forth above with respect to Clause 3.1.3 of the Proceeds Agreement |
| Proceeds Agreements, Cl. 10.2.3 | • JP Lease, as parent of Debtors, alleged to have breached undertaking to avoid | • Same as set forth above with respect to Clause 3.1.3 of the Proceeds Agreement |

| SUBJECT AGREEMENT OR CLAUSE | ALLEGED BREACH | REASONS WHY SUCH CLAIMS HAVE NO BASIS/NO DAMAGES |
|---|---|---|
| | taking action that "lead[s] to bankruptcy or insolvency of the [each Debtor] . . . ." | |
| Parent Support Letters, Cl. 1(b) | • JP Lease, as parent of Debtors, alleged to breach keeping the Debtors "solvent" and that Debtors will not be "reorganized". | • Borrower's Chapter 11 Cases were commenced to protect the solvency of the Debtors. <br> • Such provision of the Parent Support Letters expressly provides that JP Lease "shall not be liable or responsible for any [such] breach . . . if such breach is caused solely and directly by any Lease Event of Default . . . ." Here, the current Chapter 11 Cases and the financial condition of the Debtors were directly caused by the payment Leases Events of Default under the Vietnam Airlines' Subleases arising due to the COVID 19 pandemic. <br> • Even if breached, such provision of the Parent Support Letter solely protects the full payoff of the Secured Obligations. Upon the payoff or satisfaction of the Secured Obligations, as provided under the Sale Process, there are no damages. |
| Intermediate Lessor Support Letters, Cl. 1(d) | • Intermediate Lessor Parent alleged to breach obligation to ensure that Intermediate Lessors performed and complied with their obligations under Transaction Documents. | • In addition to the reasons outlined above, even if breached, such provision of the Intermediate Lessor Support Letters solely protect the full payoff of the Secured Obligations. Upon the payoff or satisfaction of the Secured Obligations, as provided under the Sale Process, there are no damages. |

28.    Thus, the claims set forth in rows (iii) and (iv) of the FitzWalter Alleged Fees, Costs & Charges Chart do not constitute Secured Obligations and, even if such amounts were Secured Obligations, they should be valued at $0.

- 14 -

(3)    <u>Defamation/Yakuza Claims</u>[17]

29.    The other English Lawsuit related claims that FitzWalter has alleged to be Secured Obligations are the Defamation/Yakuza Claims (which includes the supposed defamation claims asserted by FitzWalter).  The Defamation Claims, on their face, are not "Secured Obligations" as defined in the Proceeds Agreements because they do not arise "pursuant to any Transaction Document."[18]

30.    In support of the Defamation Claims, FitzWalter cites Clause 11.3.23 of the Proceeds Agreements, which covers only the Intermediate Lessors and relates to "Anti-Social Forces, Relationship and Conduct."  The Defamation Claims fail to allege facts that give rise to any claims arising under, or for breach of, these provisions or the Transaction Documents.[19]

31.    *First*, none of the prohibited conduct set forth in the Proceeds Agreements occurred here.  Clause 11.3.23(a) of the Proceeds Agreements provide that "[t]he Intermediate Lessors shall ensure that no Obligor shall (x) have any relationship with Anti-Social Forces, (y) have any Anti-Social Relationship, or (z) engage in any Anti-Social Conduct, whether directly or indirectly through a third party" (the "<u>Anti-Yakuza Provisions</u>").[20]  The terms "Anti-Social Forces," "Anti-Social Relationship," and "Anti-Social Conduct" contained within the Anti-Yakuza Provisions each clearly refer,

---

[17]    Debtors' Omnibus Reply ¶¶ 31-37.

[18]    Hr'g Ex. 8 & 15 (Proceeds Agreements), Sch. 2 ("Secured Obligations" definition); *see also* Exhibit A hereto.

[19]    *See* Adversary Proceeding Ex. 37 (Particulars of Claim) ¶¶ 27-34.

[20]    *See* Hr'g Exs. 8, 15 (Proceeds Agreements) § 11.3.23.

by their terms, to various types of organized crime and other fraudulent and criminal

enterprises not applicable here.[21]

32.     The English Lawsuit does not allege any connection between the

defendants and organized crime groups.  In addition, the allegations in the English

Lawsuit does not meet the "Anti-Social Conduct" provisions—the only conceivable

basis for a potential claim—because the Defamation Claims do not allege that Mr.

Loechteken "spread[] rumour, us[ed] fraudulent means or resort[ed] to force."[22]

33.     *Second*, the other provisions of Clause 11.3.23 of the Proceeds Agreements

do not provide a basis for establishing any liability in the English Lawsuit as "Secured

Obligations."  Unlike Clause 11.3.23(a) of the Proceeds Agreements, which requires

that the "Intermediate Lessor ***shall ensure that no Obligor shall***,"[23] Clause 11.3.23(c) of

the Proceeds Agreements only covers the Intermediate Lessor directly and not any of

the other Obligors.  Mr. Loechteken was not a director, employee, agent, or other

person acting on behalf of the Intermediate Lessors.  And again, these provisions

clearly relate to conduct that is outside the scope of what has been alleged in the

English Lawsuit.

---

[21]    These "anti-social" provisions are from a wider domestic public policy implemented in Japan to
suppress criminal activities that had been historically carried out in Japan by a number of
organizations.  For example, there was a notification from the Japan Bankers Association to its
member banks regarding sample anti-social provisions in 2008, which recommended the inclusion of
certain provisions in lending contracts that appear to be similar to the Anti-Yakuza Provisions in the
Proceeds Agreements.  *See Draft Model Clause For Eliminating Racketeering to be Inserted into the
Agreement on Bank Transactions Finalized,* available at
https://www.zenginkyo.or.jp/en/news/2008/n230/(last visited February 23, 2022).

[22]    Ex. A (definition of Anti-Social Conduct) (emphasis added).  FitzWalter has alleged that Mr.
Loechteken made various defamatory statements, including characterizing FitzWalter as a "financial
terrorist[]" and/or a "predatory fund" using "predatory tactics."  On their face, none of these
allegations implicate rumor, fraud, or force.

[23]    FitzWalter does not articulate, and the Debtors will not speculate, how the Intermediate Lessors
could ensure that none of the other Obligors engaged in the conduct covered by the Anti-Yakuza
Provisions as the Intermediate Lessors do not control, exercise any corporate governance with respect
to, serve as the agents for, or otherwise have authorization to bind, the other Obligors.

34.    FitzWalter also claims that the Intermediate Lessors are somehow liable
on account of the alleged Defamation/Yakuza Claims under the generic performance
undertaking under Clause 1(d) of the Intermediate Lessor Support Letters based upon
their unsupported claims that the Proceeds Agreement were violated by such alleged
conduct.  As the alleged Defamation/Yakuza Claims do not violate the terms of the
Proceeds Agreement, there is likewise no basis to allege that such matters constitute
allowed claims under the Intermediate Lessor Support Letters.

35.    *Finally*, upon payoff or satisfaction of the Secured Obligations, as provided
under the Sale, there will be no damages in connection with the alleged
Defamation/Yakuza Claims.

36.    Based upon the foregoing, the alleged Defamation/Yakuza Claims set
forth in row (v) of the FitzWalter Alleged Fees, Costs & Charges Chart do not
constitute Secured Obligations and, even if such amounts were Secured Obligations,
they should be valued at $0.  be valued at $0.

(4)    <u>Management Time</u>[24]

37.    FitzWalter has also sought to increase the amount of the Security Agent's
management fees by about 70,000% (calculated by comparing the amounts charged by
FitzWalter over 50 days as compared to the annual fees charged by the prior Security
Agent) and allege that such increased management fees should be considered as
Secured Obligations.  Such contentions are baseless for two independent reasons
(a) such charges contravene the express terms of the Transactions Documents and
(b) such claims are not reasonable under the federal law standards that govern Section
506(b) of the Bankruptcy Code.

---

[24]    Debtors' Omnibus Reply ¶¶ 39-42.

38.     As set forth both in the Debtors' Complaint and the Debtors' Omnibus

Reply, on January 21, 2022, FitzWalter sent each of the Debtors notices styled as

"Notification in Respect of Security Agent's Management Time" (the "Management

Time Notices").[25]  By the Management Time Notices, FitzWalter sought to unilaterally

and retroactively impose an unconscionable and manifestly unreasonable increase in

the amount of the Security Agent's management fees for each of the Debtors from what

the Debtors were obligated to pay as of the Petition Date nearly two months after

FitzWalter's appointment as the successor Security Agent.  Such amounts purportedly

include daily rates for the Security Agent's management time charged to *each* Debtor

of $50,000, $25,000, and $10,000 for each of FitzWalter's Co-Founders, Partners, and

Non-Partners, respectively.[26]  On February 28, 2022, in response to the Debtors' request

for an updated accounting, FitzWalter provided an updated accounting that included

updated fees for such management time.[27]  FitzWalter has asserted that such amounts

incurred between December 2, 2021 and February 28, 2022 are approximately

$4,090,000 and continue to accrue each day thereafter (the "Management Time

Claims").[28]

39.     The Debtors have asserted that the Management Time Notices are void ab

initio as violations of the automatic stay.[29]  In addition, the Management Time Claims

are not "reasonable" as required by Section 2.19 of Schedule 2 of the Proceeds

---

[25]   *See* Adversary Proceeding Exs. 21 & 22 (Management Time Notices) at 1.

[26]   *See id.* at 2.

[27]   *See* Borriello Decl., Ex. 6 (February 28, 2022 Accounting Letter).

[28]   *See* Adversary Hearing Ex. 27 (FitzWalter's response to the Debtors' request for accounting) at App'x. 1-2.

[29]   *See* Debtors' Omnibus Reply ¶ 40.

Agreement on which such notices are based.[30]  This view is shared by other Lenders who have objected to such amounts.[31]

40.    In contrast, the prior Security Agent charged an annual "fee" for acting as the Security Agent of (a) $10,000 per annum for MSN 067 Owner and (b) $15,000 per annum for the MSN 173 Owner.[32]  In the almost two years that the Secured Obligations were in default prior to FitzWalter installing itself as the Security Agent, the prior Security Agent (CACIB) never charged any additional amounts for "management time" pursuant to Section 2.19 of Schedule 2 of the Proceeds Agreement.[33]  As the purported successor Security Agent, the Proceeds Agreements also expressly bar such increased costs.  Section 2.15.7 of Schedule 2 of the Proceeds Agreement expressly provides that:

> A change in the identity of the Security Agent **shall not result in an Obligor** or the Lessee **having to make any increased payment or perform any increased obligations** or have any reduced rights under the Transaction Documents."[34]

41.    Further, such unilaterally imposed hyper-inflated management fees do not satisfy the requirements for constituting Secured Obligations as such fees are

---

[30]    Section 2.19 of Schedule 2 of the Proceeds Agreements provides that such rates must be "reasonable." Hr'g Exs. 8 & 15 (Proceeds Agreements), Sch. 2, § 2.19.

[31]    *See* Omnibus Reply Decl. Ex. 5 (Sumitomo Mitsui Trust Bank's Limited Response to Management Time Notices).

[32]    Even if FitzWalter had imposed reasonable daily rates for its management time (it did not), any Management Time Claims incurred after the Debtors filed the Sale Motion are patently unreasonable. The Debtors proposed a full pay transaction, and as such, FitzWalter should not be incurring Management Time related to enforcing or preserving security or as part of any restructuring or rescheduling of the Secured Obligations.

[33]    In addition, CACIB and FitzWalter failed to comply with the terms and procedures that must be undertaken for the appointment of a successor Security Agent, rendering FitzWalter's status as Security Agent dubious. *See, e.g.,* Hr'g Exs. 8 & 15 (Proceeds Agreements), Sch. 2, § 2.15.2 (the "Instructing Party" must "consult[] with the Borrower" before the "[appoint]ment of a successor Security Agent").

[34]    *Id.,* Sch. 2, § 2.15.17 (emphasis added).

prohibited by the operative agreements. Such fees also do not satisfy the reasonableness requirements under section 506(b) of the Bankruptcy Code.

42.    Thus, the exorbitant Management Time Claims, as set forth in row (v) of the FitzWalter Alleged Fees, Costs & Charges Chart, should be disallowed as inconsistent with the Transaction Documents and the requirements under section 506 of the Bankruptcy Code.

(5)    Costs to Retain Airborne Capital as Remarketing Agent

43.    FitzWalter has also sought to charge in excess of $400,000 of costs asserted for FitzWalter's remarketing agent—Airborne Capital ("Airborne")—as Secured Obligations. Airborne Capital is the remarketing and sales agent hired by FitzWalter on December 10, 2021 to "conduct an auction of the Lease Assets, with the auction to close on December 17, 2021."[35]

44.    The Debtors believe that Airborne Capital's fees are unreasonable as it conducted an enforcement sale of the Lease Assets that violated the law and was patently commercially unreasonable. As set forth both in the Debtors' Complaint and the Debtors' Omnibus Reply, Airborne Capital, as FitzWalter's agent, conducted an enforcement sales process that:

- was pursued on an expedited basis and was scheduled to select a winning bidder within seven calendar days (from start to finish)—by December 17, 2021;

- was pursuant to a bifurcated enforcement process that separated the Lease Assets away from the Aircraft;

- was pursued by FitzWalter and Airborne Capital despite their failure to provide any notice of such sale to the Debtors, Vietnam Airlines and/or any other interested party;

---

[35]    Docket No. 120 (FitzWalter's preliminary objection to Sale Motion, the "FitzWalter Sale Response")); *see also* Adversary Proceeding Ex. 43 (Jan. 26, 2022 Hr'g Tr.) at 271; Adversary Proceeding Ex. 45 (Procedures for enforcement sale of Lease Assets).

- was unlawful as violating requirements of the Cape Town Treaty and other applicable laws, including the requirement to provide ten working days' advance notice of any enforcement sale;

- failed to comply with the advance notice requirements of the contractual agreements to which FitzWalter was bound, including under the New York Mortgages;

- set up bidding procedures that were designed to prevent potential bidders (other than FitzWalter and its affiliates) from bidding on the Lease Assets, which bidding procedures (a) provided that FitzWalter, as the Security Agent, would select the successful bid at 5:00 p.m. (New York time) on Friday evening, December 17, 2021, and (b) then required that the successful bidder to "fund the Purchase Price" by "midnight"—seven hours after the Friday evening selection of the winning bidder—when banks were closed; and

- was conducted in furtherance of FitzWalter's ulterior motives to obtain ownership of the Debtors' assets.[36]

45.     In a filing earlier this month, FitzWalter stated that "Airborne posted notices in the Wall Street Journal"—implying that Airborne Capital placed commercially reasonable advertisements of the enforcement sale regarding the Lease Assets.[37]  Yet the notice, which ran only once in the Wall Street Journal, confirms that Airborne Capital ran a facially defective sales process that was designed to ensure that FitzWalter (or its affiliates) was the winning bidder.[38]  The WSJ Notice was contained in the print edition of the Wall Street Journal distributed in the Eastern portion of the United States (and not elsewhere) on December 14, 2021 (three days before the scheduled auction).  Not only was the WSJ Notice published only in the Eastern United States edition, such notice did not even appear in the Wall Street Journal's online editions.

---

[36]   *See, e.g.*, Debtors' Compl. ¶¶ 37- 41, 51-53; Debtors' Omnibus Reply at 3-4.

[37]   *See* FitzWalter Sale Resp. at 16

[38]   The notice published in the Wall Street Journal on December 14, 2021 (the "<u>WSJ Notice</u>") is attached to the Borriello Declaration as Exhibit 5.

46.     The full WSJ Notice provides:

**Airborne Capital Mandated to Sell Certain Rights and Claims**

Airborne Capital Limited (www.airbornecapital.aero) has been exclusively mandated to offer for sale certain rights and claims under, amongst other things, certain head lease agreements with JLPS Leasing Draco Limited (formerly DAE Leasing (Ireland) 12 Limited) and JLPS Leasing Uranus Limited (formerly known as PAAL Uranus Company Limited) respectively, and certain lease agreements with Vietnam Airlines JSC.

These rights and claims are to be sold on an 'as is, where is' basis, and may be sold individually, via a sale process that will be conducted in accordance with certain procedures beginning on 10 December 2021.

For further information on the sale, expressions of interest, bid deadlines and procedures, please contact Airborne Capital by emailing remarketing@airbornecapital.aero with "JLPS Claims" in the subject line.[39]

47.     Noticeably, the WSJ Notice:

(a)     failed to provide any notice that the assets being involved aircraft leases;

(b)     failed to provide any notice that the sale involved claims associated with large jet (A350) aircraft;

(c)     other than a generic statement that lease assets and claims were involved, failed to provide any notice regarding the type of transactions involved;

(d)     failed to identify the collateral involved;

(e)     failed to provide notice that an enforcement sale or the type of sale that was the subject of such notice;

(f)     failed to give any indication of the magnitude of the sale; and

(g)     most importantly, failed to give notice that expedited action was required.

48.     Based on these deficiencies, it is clear that the WSJ Notice was not a

legitimate effort to engage potential bidders to participation in the auction.  Further,

given that Airborne Capital in its sales procedures was requiring that potential bidders

execute confidentiality agreements *within one day* after the publication date of the WSJ

---

[39]   *Id*. Ex. 5.

Notice, the failure to state the urgency of the forthcoming deadline makes it nearly impossible for a party to make a legitimate bid based on the notice. Rather than providing effective and legally sufficient notice, the WSJ Notice further confirms that Airborne Capital was running an enforcement sale process that was patently commercially unreasonable and violated the notice requirements under applicable law.

49.    Given the manifestly unreasonable and sales process run by Airborne Capital, as FitzWalter's agent, the Debtors believe that any fees incurred by Airborne Capital (as set forth in row (vii) of the FitzWalter Alleged Fees, Costs & Charges Chart) do not satisfy the reasonableness requirements for section 506(b) of the Bankruptcy Code and should be disallowed in their entirety. This is particularly warranted where, as here, such fees would potentially reduce the recoveries of other parties in interest.

(6)    <u>FitzWalter's Legal Costs</u>

50.    FitzWalter also is seeking reimbursement of millions of dollars of legal fees over and above reasonable monitoring costs. Given that (a) FitzWalter commenced a unlawful and commercially unreasonable sales process for the Lease Assets; (b) FitzWalter has been undertaking a worldwide litigation barrage to further its ulterior motive of wresting the Debtors' property away from the Debtors and (c) the Sales Process guarantees the full repayment of all Secured Obligations, no legitimate purpose is being served by the expenditure of any legal fees and expenses by FitzWalter beyond the typical monitoring costs incurred by a secured lender in a full-pay scenario. As such, FitzWalter does not satisfy the reasonableness requirements, as determined by reference to U.S. federal law, for allowance of such fees under section 506 of the Bankruptcy Code.

51.    Accordingly, the Debtors request that all such fees (as set forth in row (viii) of the FitzWalter Alleged Fees, Costs & Charges Chart) be disallowed under sections 506(a) of the Bankruptcy Code and expunged in their entirety.

(7)    <u>Insurance Costs</u>

52.    Even the insurance costs claimed by FitzWalter are unreasonable.  The aircraft are the subject of an insurance policy that covers the Aircraft and includes FitzWalter as a beneficiary under such policy.  The current insurance policies require that the Security Agent be given notice before any cancellation of such policies can be effected.  Upon information and belief, no such notice of cancellation was ever delivered on the current insurance policies.  Accordingly, FitzWalter obtaining additional and duplicative insurance for the Aircraft serves no purpose, and is wasteful and unreasonable.  Accordingly, the Debtors request that FitzWalter's insurance charges (as set forth in row (ix) of the FitzWalter Alleged Fees, Costs & Charges Chart) be disallowed under section 506 of the Bankruptcy Code.

**B.    In the Alternative, the Court Can Estimate the FitzWalter Alleged Fees, Costs & Charges Under Section 502(c)(1) of the Bankruptcy Code**

53.    To the extent any of the foregoing claims are not disallowed, estimation of the FitzWalter Alleged Fees, Costs & Charges is mandatory under section 502(c) of the Bankruptcy Code because a full-blown trial of the FitzWalter Alleged Fees, Costs & Charges would unduly delay the administration of the Chapter 11 Cases.

54.    Section 502(c)(1) provides:

> There shall be estimated for purposes of allowance under this section [] any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case.

11 U.S.C. § 502(c)(1).  As set forth in Collier on Bankruptcy:

> Section 502(c) requires the court to estimate any claim the liquidation of which in the ordinary course would unduly delay the administration if the estate.

4 COLLIER ON BANKRUPTCY ¶ 502.04[2]; *see also A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1011-12 (4th Cir. 1986) ("[The] duty of estimation in a proper case under section 502(c) is not a permissive one; it is a mandatory obligation of the bankruptcy court.").

55.    Estimation helps the court "avoid the need to await the resolution of outside lawsuits to determine issues of liability." *First City Beaumont v. Durkay (In re Ford)*, 967 F.2d 1047, 1053 (5th Cir. 1992); *see e.g., In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 422-23 (Bankr. S.D.N.Y. 2003) ("Estimation is effective . . . for enabling bankruptcy cases . . . to move forward and to get recoveries into the pockets of creditors without delaying the whole process as a consequence of a limited number of very complex claims").

56.    Estimation is an essential tool for a debtor seeking to reorganize because estimation avoids forcing a debtor to await the outcome of a potentially protracted legal proceeding. *See In re Lionel L.L.C.*, No. 04-17324, 2007 WL 2261539, at *4 (Bankr. S.D.N.Y. Aug. 3, 2007) (ordering estimation in part where "neither the likelihood of an adverse judgment, nor the timing and amount of such a judgment, can be predicted with any certainty"). Estimation has been used in a variety of contexts in chapter 11 cases, including for determining voting rights, evaluating plan feasibility, setting claims distribution reserves, and allowing claims, among other things. *In re AMR Corp.*, No. 11-15463 (SHL), 2021 WL 2954824, at *3 (Bankr. S.D.N.Y. July 14, 2021), *reconsideration denied*, No. 11-15463 (SHL), 2021 WL 5016606 (Bankr. S.D.N.Y. Oct. 28, 2021).

57.    An estimate does not need to be certain—rather, courts should make a "speedy and rough estimation of [the] claims for purposes of determining [claimant's]

- 25 -

voice in the Chapter 11 proceedings." *See Chateaugay Corp. v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1006 (2d Cir. 1991); *In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503, 421 (Bankr. E.D.N.Y. 1991) ("[A]n estimate necessarily implies no certainty; it is not a finding or a fixing of an exact amount. It is merely the court's best estimate for the purpose of permitting the case to go forward and thus not unduly delaying the matter.") (citations omitted).

58.     Courts have discretion with respect to the methods they employ in estimating claims. *In re Chemtura Corp.*, 448 B.R. 635, 648 (Bankr. S.D.N.Y. 2011); *In re Adelphia*, 341 B.R. at 422-23; *Windsor*, 170 B.R. at 520. The methods courts have employed range from a review of pleadings to summary trials to full evidentiary hearings (*AMR*, 2021 WL 2954824, at *4), but courts have often recognized the value of a truncated proceeding, as a time-consuming process would defeat the purpose of section 502(c) in avoiding undue delay (*Adelphia*, 341 B.R. at 423). Estimation solely requires "sufficient evidence on which to base a reasonable estimate of the claim." *AMR*, 2021 WL 2954824, at *4 (quoting *Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134, 135 (3d Cir. 1982)). Disputed legal issues must be evaluated "not for the probability that they have merit, but rather for their correctness as a matter of governing law." *Chemtura*, 448 B.R. 635 at 651 (quoting *In re Ralph Lauren Womenswear*, 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996)).

59.     In the instant case, given that the approved Bidding Procedures provide that the purchase price of any bid must repay the Secured Obligations in full, it is imperative the amount of the Secured Obligations be determined as part of the Sale Process under the timing required by the Stalking Horse Bid. Accordingly, if this Court does not fully adjudicate the amount of the Secured Obligations under section 506(a) and 506(b) of the Bankruptcy Code, the Debtors hereby request that the Court

- 26 -

estimate the FitzWalter Alleged Fees, Costs & Charges in the amount of $0 for the reasons set forth in Part A above.

**C.    The Court Should Establish an Escrow for Amounts That**
**       Remain Unresolved and Disputed as of the Sale Hearing**

60.    To the extent that any alleged Secured Obligations remain disputed and unresolved by the Court or the parties as of the Sale Hearing, the Debtors submit that the Court can establish an escrow account with sufficient proceeds from the Sale to be used to satisfy any such claims to the extent later determined (or estimated) by the Court to be allowed as Secured Obligations (the "Escrow").  To this end, the Debtors intend to submit the Revised Proposed Sale Order following the Auction but prior to the Sale Hearing.  The Revised Proposed Sale Order will provide (a) for the establishment of such Escrow  in an amount as determined by this Court (to cover the maximum reasonable amount of such claims (to be included as part of the payment of the purchase price under the Sale)) and (b) that the prepetition liens and security interests under the Debt Facilities will attach to the Escrow to the same extent and with the same priority as existing as of the Petition Date (and otherwise be released from the prepetition collateral upon the payment of the undisputed amounts and the establishment of such Escrow).[40]

61.    To the extent that the Court determines that any disputed Secured Obligations are less than the amount held in the Escrow, the differential shall be returned to the buyer or as otherwise provided in the Sale Order.  And to the extent that the Court determines that the purchase price must include amounts held in the Escrow, such additional amounts will be taken from the Escrow to pay such allowed

_____

[40]    The Debtors estimate that the amount of the Escrow pursuant to the Revised Proposed Sale Order should be approximately $500,000.

secured claims.  The terms of the Escrow will be set forth in the Revised Proposed Sale Order.

## **NOTICE**

62.     Notice of this Motion shall be given to:  (a) the United States Trustee for the Southern District of New York; (b) the parties listed in the list of thirty (30) largest unsecured creditors filed by the Debtors in these Chapter 11 Cases; (c) the parties listed in the list of the holders of the Debtors' five (5) largest secured claims; (d) the Internal Revenue Service;  (e) FitzWalter; and (f) any such other party entitled to notice pursuant to Local Bankruptcy Rule for the United States Bankruptcy Court for the Southern District of New York 9013-1(b).  The Debtors submit that no other or further notice need be provided.

WHEREFORE, the Debtors respectfully request the Court grant the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: February 28, 2022
    New York, New York

JPA NO. 111 CO., LTD. and
JPA NO. 49 CO., LTD.
*Debtors and Debtors in Possession*
By their Counsel
TOGUT, SEGAL & SEGAL LLP
By:

*/s/ Kyle J. Ortiz*
Frank A. Oswald
Kyle J. Ortiz
Bryan M. Kotliar
Jared C. Borriello
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000

- 28 -

# EXHIBIT "A"

## Exhibit A

### Excerpts of Relevant Definitions from Schedule 4 of the Proceeds Agreements[41]

"**Secured Obligations**" means any and all moneys, liabilities and obligations (whether actual or contingent, whether now existing or hereafter arising, whether or not for the payment of money, and including, without limitation, any obligation or liability to pay damages) from time to time owing to any of the Finance Parties by any Obligor pursuant to any Transaction Document, notwithstanding that the recourse of the Finance Parties against any person may be limited in recourse.

"**Anti-Social Forces**" means:

(a)  an organised crime group (*boryokudan*) (as defined in the law relating to Prevention of Unjustifiable Acts by Organized Crime Group Members of Japan (Law No. 77 of 1991, as amended);

(b)  a member of an organised crime group (*boryokudan in*);

(c)  a person who used to be a member of an organised crime group but has only ceased to be a member of an organised crime group for a period of less than 5 years;

(d)  a quasi-member of an organised crime group (*bouryokudan jun-kosei-in*) including individuals who are not members of an organised crime group and who may (x) imply its influence to engage in violent and unlawful activity, or (y) cooperate in the maintenance and operation of an organised crime group; (v) a related or associated company of an organised crime group (*bouryokudan kankei kigyo*);

(e)  a related or associated company of an organised crime group (*bouryokudan kankei kigyo*);

(f)  a corporate racketeer (*sokaiya*) or blackmailer advocating social cause (*shakaiundo tou hyoubou goro*) or a special intelligence organised crime group; or

(g)  a member of any other criminal force similar or analogous to any of the foregoing in any jurisdiction.

"**Anti-Social Relationship**" means in relation to a person:

(a)  an Anti-Social Forces controls its management;

(b)  an Anti-Social Forces is substantively involved in its management;

---

[41]  *See* Hr'g Exs. 8 & 15 (Proceeds Agreement), Sch. 4 (Master Definitions Schedule).

(c)    it has entered into arrangements with an Anti-Social Forces for the purpose of, or which have the effect of, unfairly benefiting itself or a third party or prejudicing a third party;

(d)    it is involved in the provision of funds or other benefits to an Anti-Social Forces; or

(e)    any of its directors or any other person who is substantively involved in its management has a socially objectionable relationship with an Anti-Social Forces.

"**Anti-Social Conduct**" means:

(a)    a demand and conduct with force and arms;

(b)    an unreasonable demand and conduct having no legal cause;

(c)    threatening or committing violent behavior relating to its business transactions;

(d)    an action to defame the reputation or interfere with the business of any Finance Party by spreading rumour, using fraudulent means or resorting to force; or

(e)    other actions similar or analogous to the foregoing in any jurisdiction