Sidney P. Levinson
Isabella M. Cusano
**DEBEVOISE & PLIMPTON LLP**
919 Third Avenue
New York, New York 10022
Telephone:    (212) 909-6000
Facsimile:    (212) 909-6836

*Counsel for JLPS Leasing Uranus Limited and*
*JLPS Leasing Draco Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| JPA NO. 111 CO., LTD., and JPA NO. 49 CO., LTD., | Case No. 21-12075 (DSJ) |
| Debtors.[1] | (Jointly Administered) |

**SUPPLEMENTAL DECLARATION OF SIDNEY P.**
**LEVINSON IN SUPPORT OF OBJECTION AND RESERVATION OF**
**RIGHTS OF JLPS LEASING URANUS LIMITED AND JLPS LEASING**
**DRACO LIMITED TO PROPOSED ASSUMPTION AND ASSIGNMENT OF**
**CERTAIN EXECUTORY CONTRACTS IN CONNECTION WITH PROPOSED SALE**

I, Sidney P. Levinson, an attorney duly admitted to practice in the Southern District of

New York, declare under penalty of perjury and pursuant to 28 U.S.C. § 1746:

1.    I submit this supplemental declaration in support of the *Objection and*

*Reservation of Rights of JLPS Leasing Uranus Limited And JLPS Leasing Draco Limited to*

*Proposed Assumption and Assignment of Certain Executory Contracts in Connection with*

---

[1]    The Debtors in these Chapter 11 Cases are: JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd.  The Debtors' corporate address is: Kasumigaseki Common Gate West Tower, 3-2-1 Kasumigaseki, Chiyoda-Ku, Tokyo 100-0013.

*Proposed Sale* in the above captioned cases (the "Objection"), and state that true and correct copies of the following documents are attached as exhibits hereto: [2]

2.    Attached as **Exhibit 1** is the Engine Warranty Agreement, dated as of November 21, 2018, between Rolls-Royce Plc, JLPS Draco, the Security Agent and JPA 111.

3.    Attached as **Exhibit 2** is the Airframe Warranties Agreement in Respect of One A350-900 XWB Aircraft Bearing Manufacturer's Serial Number 0067, dated as of December 26, 2016.

4.    Attached as **Exhibit 3** is a Replacement Controlling Party Notice providing for the replacement of JLPS Uranus as Controlling Party under the Uranus Airframe Warranty Agreement with the Security Agent.


Dated:   March 2, 2022
         New York, New York

/s/ Sidney P. Levinson

Sidney P. Levinson
**DEBEVOISE & PLIMPTON LLP**
919 Third Avenue
New York, New York 10022
Telephone:     (212) 909-6000
Facsimile:     (212) 909-6836
Email:         slevinson@debevoise.com

*Counsel for JLPS Leasing Uranus Limited*
*and JLPS Leasing Draco Limited*

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Objection.

**<u>Exhibit 1</u>**

**ENGINE WARRANTY AGREEMENT**
**WARRANTY DATA FORM**

Dated _____

| | |
|---|---|
| **MSN Number: 0067** | **DEG Number: 11788** |
| **Aircraft Manufacturer: Airbus** | **Engine: RB211 - Trent XWB-84 Turbofan** |
| **Aircraft: A350** | **ESN Number: 21169 and 21170** |
| **Aircraft Registration Mark: VN-A891** | (each an "**Engine**" and collectively, the "**Engines**") |

Between the following parties ("**together known as the Parties**"):

| | |
|---|---|
| **ROLLS-ROYCE plc** a company incorporated in England (company number 1003142), whose registered office is 62 Buckingham Gate, London, SW1E 6AT, England ("**Rolls-Royce**"); | **Vietnam Airlines JSC** a company incorporated in Vietnam whose registered office is at 200 Nguyen Son, Bo De Ward, Long Bien District, Hanoi City, Vietnam ("**Lessee**"); |
| Signed by **Rolls-Royce plc** by its attorney Eversheds Sutherland (International) LLP under a power of attorney dated 14 June 2018: <br><br> By: _Eversheds Sutherland LLP_ <br><br> Printed: EVERSHEDS SUTHERLAND <br> ~~Title~~ (INTERNATIONAL) LLP | Signed for and on behalf of: <br> **Vietnam Airlines JSC** <br><br><br> By: _____ <br><br> Printed: _____ <br><br> Title: _____ |
| **DAE Leasing (Ireland) 12 Limited** a private company limited by shares incorporated in Ireland whose registered office is at 29 Main Street, Cashel, Co. Tipperary E25 RF76, Ireland ("**Lessor**"); <br><br> Signed for and on behalf of: <br> **DAE Leasing (Ireland) 12 Limited** <br><br><br> By: _____ <br><br> Printed: _____ <br><br> Title: _____ | **JPA No. 111 Co., Ltd.** a company incorporated in Japan whose registered office is at 3-2-1, Kasumigaseki, Chiyoda-ku, Tokyo 100-0013, Japan ("**Head Lessor**"); <br><br> Signed for and on behalf of: <br> **JPA No. 111 Co., Ltd.** <br><br><br> By: _____ <br><br> Printed: _____ <br><br> Title: _____ |
| **Crédit Agricole Corporate and Investment Bank** a company incorporated in France whose registered office is at 12 Place des Etats Unis, CS 70052, 92547, Montrouge, Cedex, France ("**Security Trustee**"); <br><br> Signed for and on behalf of: <br> **Crédit Agricole Corporate and Investment Bank** <br><br><br> By: _____ <br><br> Printed: _____ <br><br> Title: _____ | |

Execution Version

**ENGINE WARRANTY AGREEMENT**
**WARRANTY DATA FORM**

Dated ___21 November 2018___

| | |
|---|---|
| **MSN Number: 0067** | **DEG Number: 11788** |
| **Aircraft Manufacturer: Airbus** | **Engine: RB211 - Trent XWB-84 Turbofan** |
| **Aircraft: A350** | **ESN Number: 21169 and 21170** |
| **Aircraft Registration Mark: VN-A891** | (each an **"Engine"** and collectively, the **"Engines"**) |

Between the following parties (**"together known as the Parties"**):

| | |
|---|---|
| **ROLLS-ROYCE plc** a company incorporated in England (company number 1003142), whose registered office is 62 Buckingham Gate, London, SW1E 6AT, England (**"Rolls-Royce"**); | **Vietnam Airlines JSC** a company incorporated in Vietnam whose registered office is at 200 Nguyen Son, Bo De Ward, Long Bien District, Hanoi City, Vietnam (**"Lessee"**); |
| Signed by **Rolls-Royce plc** by its attorney Eversheds Sutherland (International) LLP under a power of attorney dated 14 June 2018: | Signed for and on behalf of: Vietnam Airlines JSC |
| By: _____ | By: _____ |
| Printed: _____ | Printed:  CTCP   —   DANG NGOC HOA |
| Title: _____ | Title: _____  Vice President |
| **DAE Leasing (Ireland) 12 Limited** a private company limited by shares incorporated in Ireland whose registered office is at 29 Main Street, Cashel, Co. Tipperary E25 RF76, Ireland (**"Lessor"**); | **JPA No. 111 Co., Ltd.** a company incorporated in Japan whose registered office is at 3-2-1, Kasumigaseki, Chiyoda-ku, Tokyo 100-0013, Japan (**"Head Lessor"**); |
| Signed for and on behalf of: **DAE Leasing (Ireland) 12 Limited** | Signed for and on behalf of: **JPA No. 111 Co., Ltd.** |
| By: _____ | By: _____ |
| Printed: _____ | Printed: _____ |
| Title: _____ | Title: _____ |
| **Crédit Agricole Corporate and Investment Bank** a company incorporated in France whose registered office is at 12 Place des Etats Unis, CS 70052, 92547, Montrouge, Cedex, France (**"Security Trustee"**); | |
| Signed for and on behalf of: **Crédit Agricole Corporate and Investment Bank** | |
| By: _____ | |
| Printed: _____ | |
| Title: _____ | |

Engine Warranty Agreement (Standard Form July 2018)
800300080 v2

Execution Version

**ENGINE WARRANTY AGREEMENT
WARRANTY DATA FORM**

Dated  21 November 2018

| MSN Number: 0067 | DEG Number: 11788 |
|---|---|
| Aircraft Manufacturer: Airbus | Engine: RB211 - Trent XWB-84 Turbofan |
| Aircraft: A350 | ESN Number: 21169 and 21170 |
| Aircraft Registration Mark: VN-A891 | (each an "Engine" and collectively, the "Engines") |

Between the following parties ("together known as the Parties"):

| | |
|---|---|
| **ROLLS-ROYCE plc** a company incorporated in England (company number 1003142), whose registered office is 62 Buckingham Gate, London, SW1E 6AT, England ("**Rolls-Royce**"); | **Vietnam Airlines JSC** a company incorporated in Vietnam whose registered office is at 200 Nguyen Son, Bo De Ward, Long Bien District, Hanoi City, Vietnam ("**Lessee**"); |
| Signed by **Rolls-Royce plc** by its attorney Eversheds Sutherland (International) LLP under a power of attorney dated 14 June 2018: | Signed for and on behalf of: **Vietnam Airlines JSC** |
| By: _____ | By: _____ |
| Printed: _____ | Printed: _____ |
| Title: _____ | Title: _____ |
| **DAE Leasing (Ireland) 12 Limited** a private company limited by shares incorporated in Ireland whose registered office is at 29 Main Street, Cashel, Co. Tipperary E25 RF76, Ireland ("**Lessor**"); | **JPA No. 111 Co., Ltd.** a company incorporated in Japan whose registered office is at 3-2-1, Kasumigaseki, Chiyoda-ku, Tokyo 100-0013, Japan ("**Head Lessor**"); |
| Signed for and on behalf of: **DAE Leasing (Ireland) 12 Limited** | Signed for and on behalf of: **JPA No. 111 Co., Ltd.** |
| By: _____ | By: _____ |
| Printed: _____Frank Dowling_____ Director | Printed: _____ |
| Title: _____ | Title: _____ |
| **Crédit Agricole Corporate and Investment Bank** a company incorporated in France whose registered office is at 12 Place des Etats Unis, CS 70052, 92547, Montrouge, Cedex, France ("**Security Trustee**"); | |
| Signed for and on behalf of: **Crédit Agricole Corporate and Investment Bank** | |
| By: _____ | |
| Printed: _____ | |
| Title: _____ | |

Engine Warranty Agreement (Standard Form July 2018)
800300080.v2

Execution Version

**ENGINE WARRANTY AGREEMENT**
**WARRANTY DATA FORM**

Dated  21 November 2018

| MSN Number: 0067 | DEG Number: 11788 |
|---|---|
| Aircraft Manufacturer: Airbus | Engine: RB211 - Trent XWB-84 Turbofan |
| Aircraft: A350 | ESN Number: 21169 and 21170 |
| Aircraft Registration Mark: VN-A891 | (each an "**Engine**" and collectively, the "**Engines**") |

Between the following parties ("together known as the Parties"):

| | |
|---|---|
| **ROLLS-ROYCE plc** a company incorporated in England (company number 1003142), whose registered office is 62 Buckingham Gate, London, SW1E 6AT, England ("**Rolls-Royce**"); | **Vietnam Airlines JSC** a company incorporated in Vietnam whose registered office is at 200 Nguyen Son, Bo De Ward, Long Bien District, Hanoi City, Vietnam ("**Lessee**"); |
| Signed by **Rolls-Royce plc** by its attorney Eversheds Sutherland (International) LLP under a power of attorney dated 14 June 2018: | Signed for and on behalf of: **Vietnam Airlines JSC** |
| By: _____ | By: _____ |
| Printed: _____ | Printed: _____ |
| Title: _____ | Title: _____ |
| **DAE Leasing (Ireland) 12 Limited** a private company limited by shares incorporated in Ireland whose registered office is at 29 Main Street, Cashel, Co. Tipperary E25 RF76, Ireland ("**Lessor**"); | **JPA No. 111 Co., Ltd.** a company incorporated in Japan whose registered office is at 3-2-1, Kasumigaseki, Chiyoda-ku, Tokyo 100-0013, Japan ("**Head Lessor**"); |
| Signed for and on behalf of: **DAE Leasing (Ireland) 12 Limited** | Signed for and on behalf of: **JPA No. 111 Co., Ltd.** |
| By: _____ | By: _____ |
| Printed: _____ | Printed:  CHIA HOU YU |
| Title: _____ | Title:  Attorney-in-Fact |
| | K&L Gates LLP (Singapore) |
| **Crédit Agricole Corporate and Investment Bank** a company incorporated in France whose registered office is at 12 Place des Etats Unis, CS 70052, 92547, Montrouge, Cedex, France ("**Security Trustee**"); | |
| Signed for and on behalf of: **Crédit Agricole Corporate and Investment Bank** | |
| By: _____ | |
| Printed: _____ | |
| Title: _____ | |

Engine Warranty Agreement (Standard Form July 2018)
800300080 v2

Execution Version

**ENGINE WARRANTY AGREEMENT**
**WARRANTY DATA FORM**

Dated 21 November 2018

| | |
|---|---|
| **MSN Number: 0067** | **DEG Number: 11788** |
| **Aircraft Manufacturer: Airbus** | **Engine: RB211 - Trent XWB-84 Turbofan** |
| **Aircraft: A350** | **ESN Number: 21169 and 21170** |
| **Aircraft Registration Mark: VN-A891** | (each an "**Engine**" and collectively, the "**Engines**") |

Between the following parties ("together known as the Parties"):

| | |
|---|---|
| **ROLLS-ROYCE plc** a company incorporated in England (company number 1003142), whose registered office is 62 Buckingham Gate, London, SW1E 6AT, England ("**Rolls-Royce**"); | **Vietnam Airlines JSC** a company incorporated in Vietnam whose registered office is at 200 Nguyen Son, Bo De Ward, Long Bien District, Hanoi City, Vietnam ("**Lessee**"); |
| Signed by **Rolls-Royce plc** by its attorney Eversheds Sutherland (International) LLP under a power of attorney dated 14 June 2018: | Signed for and on behalf of: **Vietnam Airlines JSC** |
| By: _____ | By: _____ |
| Printed: _____ | Printed: _____ |
| Title: _____ | Title: _____ |
| **DAE Leasing (Ireland) 12 Limited** a private company limited by shares incorporated in Ireland whose registered office is at 29 Main Street, Cashel, Co. Tipperary E25 RF76, Ireland ("**Lessor**"); | **JPA No. 111 Co., Ltd.** a company incorporated in Japan whose registered office is at 3-2-1, Kasumigaseki, Chiyoda-ku, Tokyo 100-0013, Japan ("**Head Lessor**"); |
| Signed for and on behalf of: **DAE Leasing (Ireland) 12 Limited** | Signed for and on behalf of: **JPA No. 111 Co., Ltd.** |
| By: _____ | By: _____ |
| Printed: _____ | Printed: _____ |
| Title: _____ | Title: _____ |
| **Crédit Agricole Corporate and Investment Bank** a company incorporated in France whose registered office is at 12 Place des Etats Unis, CS 70052, 92547, Montrouge, Cedex, France ("**Security Trustee**"); | |
| Signed for and on behalf of: **Crédit Agricole Corporate and Investment Bank** | |
| By: _____ | |
| Printed: Bertrand ROVETTO    Amaury DE RIVAZ | |
| Title: DIRECTOR    VICE PRESIDENT | |

Engine Warranty Agreement (Standard Form July 2018)
800300080 v2

Execution Version

| Customer Agreement: | Lease Agreement: |
|---|---|
| **Product Agreement between Rolls-Royce and Lessee dated 15 September 2014, DEG 6821 (as amended from time to time)** | **Agreement between Lessee and Lessor dated 04 December 2016 (as novated, amended, restated or supplemented from time to time)** |
| **Security Agreement:** | **Head Lease Agreement:** |
| **Agreement between Head Lessor and Security Trustee dated** 21 November 2018 | **Aircraft Head Lease Agreement between Head Lessor and Lessor dated** 21 November 2018 **(as novated, amended, restated or supplemented from time to time)** |
| **The following are the notice details for each Party.** | |
| Rolls-Royce plc<br>SINB-63<br>PO Box 31<br>Moor Lane<br>Derby<br>England<br>DE24 8BJ<br><br>Contact:  Commercial Manager Commercial Operations<br><br>E-mail Address: ewa@rolls-royce.com | For the Lessee:<br><br>200 Nguyen Son, Bo De Ward, Long Bien District, Hanoi City, Vietnam<br><br>Contact: Mr Nguyen Chien Thang |
| For the Head Lessor:<br><br>3-2-1, Kasumigaseki, Chiyoda-ku, Tokyo 100-0013, Japan<br><br>Contact:  Fund Administration | For the Security Trustee:<br><br>12 Place des Etats Unis, CS 70052, 92547, Montrouge, Cedex, France<br><br>Contact:  Structured Finance Agency & Middle Office<br>Email address: francois.barbut@ca-cib.com / mounia.bekkali@ca-cib.com / melody.lavigne@ca-cib.com |
| For the Lessor:<br><br>29 Main Street, Cashel, Co. Tipperary E25 RF76, Ireland<br><br>Contact:  Thomas Francis Dowling, Niall McNamara, Teiji Ishikawa | |

**The Engine Warranty Agreement (pages 4 to 26 inclusive of Schedules) are the terms and conditions applicable to this Engine Warranty Agreement subject to any agreed amendments between the Parties as set out here:**

1.       In clause 2.1(a) the word "it is a limited liability corporation" should be replaced with "in the case of the Lessee a joint stock company, in the case of the Lessor a private company limited by shares and in the case of the Head Lessor and Rolls-Royce a limited liability corporation".

2.       Clause 3.2(e) shall be amended by inserting "(save in respect of (a) any service credits payable or (b) any other valid claim under the Lessee Warranty arising during, or attributable to, the period prior to the service of the Trigger Event Notice (each a "Permitted Lessee Claim")) at the end of the clause.

3.       Clause 3.5(b) shall be amended by inserting the words "equivalent to a claim under the Warranties" after the words "Lessee Warranty", and also inserting ", then save in respect of any Permitted Lessee Claim," after the words "no longer the Operator".

4.       In clause 9.2, the word "Affiliate," is added between the words "employees," and "officers" in both line 2 and line 7.

5.       In schedule 1, definition of "Operator" should be deleted in its entirety and replaced with the following: ""Operator" means the Party having the right for the time being to immediate possession of the Engines".

6.       On page 18 of the Warranties ("Ultimate Life Warranty"), for point 6 "Specific conditions", the second paragraph shall be amended as follows: "Operator to provide the DACs Data to Rolls-Royce. If the DACs Data is not supplied or in

_____

2

---

**case Customer has supplied the data but the DACs system is not available then the Least Arduous Cycles will be used instead of the Ultimate Flight Cycles when calculating the Allowance Factor in Section 5 above."**

**Additional Definitions:**

**Order of Priority of Notices as referred to in clause 3.4 should be taken in the following order:** Security Trustee, Head Lessor, Lessor, Lessee;

**Beneficiaries** means the Lessor, the Security Trustee and the Head Lessor;

**Lessee Warranty:** warranties in respect of the Supplies granted by Rolls-Royce (and/or its Affiliates) to Lessee pursuant to the Customer Agreement.

---

**Background**:

**_Type 3 Sale and Leaseback Arrangement including head lessor arrangement (two leasing layers)_**

(A)     Lessee has entered into a purchase agreement with the Aircraft Manufacturer, for the purchase of the Aircraft.  The Lessee has agreed to assign to the Head Lessor its rights to purchase the Aircraft.
(B)     The Head Lessor has agreed to lease the Aircraft to the Lessor.
(C)     The Lessor has agreed to lease the Aircraft to the Lessee.
(D)     The Security Trustee and certain financial institutions have agreed to assist the Head Lessor to finance the Aircraft.
(E)     Rolls-Royce has granted certain warranties relating to the Supplies to the Lessee.
(F)     Rolls-Royce has agreed to extend to the Beneficiaries the benefit of the Warranties on the terms set out in this Agreement.

---

Engine Warranty Agreement (Standard Form July 2018)
800300080 v2

**Exhibit 2**

DATED **28 DECEMBER 2016**

**AIRBUS S.A.S.**

AS MANUFACTURER

---

**AIRFRAME WARRANTIES AGREEMENT
IN RESPECT OF ONE
A350-900 XWB AIRCRAFT BEARING
MANUFACTURER'S SERIAL NUMBER 0067**

---

**THIS AIRFRAME WARRANTIES AGREEMENT** (this "**Agreement**") is executed on ___**28 DECEMBER 2016**___ by Airbus S.A.S., *a société par actions simplifiée*, legal successor of Airbus G.I.E. and Airbus Industrie G.I.E. duly created and existing under French law, having its registered office at 1 rond-point Maurice Bellonte, 31707 Blagnac Cedex, France and includes its successors and assigns (the "**Manufacturer**"), in favour of the Relevant Parties (as defined below) from time to time.

1.   **DEFINITIONS AND INTERPRETATION**

1.1   **Definitions**

Capitalised words and expressions have the meanings set out in Schedule 1 (*Definitions and Interpretation*), except where the context otherwise requires.

1.2   **Interpretation**

Headings are to be ignored in construing this Agreement and, unless the contrary intention is stated, a reference in this Agreement or a Relevant Notice to:

1.2.1   "**Manufacturer**" or any other person includes, without prejudice to the provisions of this Agreement restricting transfer or assignment, any successor and any assignee**;**

1.2.2   words importing the plural shall include the singular and vice versa;

1.2.3   any document shall include that document as amended, novated, assigned or supplemented;

1.2.4   a Clause or a Schedule is a reference to a clause of, or a schedule to, this Agreement;

1.2.5   any law, or to any specified provision of any law, is a reference to such law or provision as amended, substituted or re-enacted;

1.2.6   a "**person**" includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust or partnership (whether or not having separate legal personality) of two or more of the foregoing; and

1.2.7   "**including**" and similar words and terms shall not be construed as limiting and shall mean "**including without limitation**".

The Schedules form part of this Agreement and shall have effect as if set out in full in the body of this Agreement. Any reference to this Agreement includes the Schedules.

For the purpose of Schedule 2 (*Warranties*) only, the term "Buyer" shall be construed as if it referred to the "Entitled Party" and the term "Seller" shall be construed as if it referred to the "Manufacturer".

2.   **EFFECTIVENESS**

2.1   **Effective Date**

This Agreement takes effect from the date hereof.

2.2   **Amendment**

Save as expressly set out in this Agreement, the prior written consent of the Manufacturer and the Controlling Party shall be required to terminate or vary this Agreement. Any such termination or variation shall then be binding on the Manufacturer and the Relevant Parties.

3.    **BENEFIT OF WARRANTIES**

3.1    **General**

3.1.1    Pursuant to the terms of this Agreement, the Manufacturer agrees to make available to the Entitled Party (from time to time) the Warranties. The entitlement of any Entitled Party to make a claim under the Warranties shall be only as specified in this Agreement or as otherwise agreed in accordance with Clause 3.2 (*Relevant Parties*) (and any agreement otherwise between any or all of the Relevant Parties and/or any other person shall have no effect and shall not bind the Manufacturer).

3.1.2    The terms and conditions of the Warranties shall be binding upon the Entitled Party and shall apply to all claims made in respect of the Warranties (including the release waiver and renunciation in clause 12.5 of the Warranties). Only one Entitled Party shall be entitled to benefit from and to make a claim under the Warranties at any one time.

3.2    **Relevant Parties**

3.2.1    The Entitled Party on the Delivery Date shall be the Initial Entitled Party. Such person shall remain the Entitled Party unless and until a different Eligible Person is specified as the new Entitled Party in a Replacement Entitled Party Notice delivered in accordance with Clause 4.1.1 (*Termination of Entitled Party's Rights*).

3.2.2    The Controlling Party on the Delivery Date shall be the Initial Controlling Party. Such person shall remain the Controlling Party unless and until a different Eligible Person is specified as the new Controlling Party in a Replacement Controlling Party Notice delivered in accordance with Clause 4.2.1 (*Termination of Controlling Party's Rights*).

3.2.3    The Entitled Party and the Controlling Party may (but are not required to) be the same person.

3.3    **Record of Relevant Parties**

The Manufacturer will, as soon as practicable following receipt by it of a Relevant Notice, countersign such Relevant Notice and return it to the Controlling Party.

4.    **TERMINATION OF WARRANTY RIGHTS**

4.1    **Termination of Entitled Party's Rights**

4.1.1    With immediate and automatic effect at the time of the receipt by the Manufacturer of a Replacement Entitled Party Notice (the "**Relevant Time**"):

(a)    the Outgoing Entitled Party shall cease to be the Entitled Party;

(b)    the New Entitled Party shall be the Entitled Party; and

(c)    save to the extent of any claim or right to claim against the Manufacturer, in each case which prior to the Relevant Time (A) exists and (B) has been notified in writing to the Manufacturer in accordance with this Agreement:

(i)    all rights of the Outgoing Entitled Party under this Agreement shall terminate; and

(ii)    the Manufacturer shall have no liability whatsoever to the Outgoing Entitled Party in any respect under this Agreement.

For the avoidance of doubt, the benefit of any other claim or right to claim against the Manufacturer shall accrue to the New Entitled Party.

4.1.2   Without prejudice to Clause 4.1.1 (*Termination of Entitled Party's Rights*), a copy of a Replacement Entitled Party Notice shall be sent by the Controlling Party to the Outgoing Entitled Party for information, but the receipt or non-receipt of such copy by the Outgoing Entitled Party shall not affect the rights or obligations of any person under this Agreement.

4.1.3   For the purposes of this Clause 4.1 (*Termination of Entitled Party's Rights*), the "Outgoing Entitled Party" means the person specified as such in the relevant Replacement Entitled Party Notice (being the person who, immediately prior to service thereof, was the Entitled Party) and the "New Entitled Party" means the person specified as such in the relevant Replacement Entitled Party Notice.

4.2   **Termination of Controlling Party's Rights**

4.2.1   With immediate and automatic effect upon the receipt by the Manufacturer of a Replacement Controlling Party Notice:

(a)   the Outgoing Controlling Party shall cease to be the Controlling Party;

(b)   the New Controlling Party shall be the Controlling Party;

(c)   all rights of the Outgoing Controlling Party under this Agreement shall terminate; and

(d)   the Manufacturer shall have no further liability whatsoever to the Outgoing Controlling Party in any respect under this Agreement.

4.2.2   Without prejudice to Clause 4.2.1 (*Termination of Controlling Party's Rights*), a copy of a Replacement Controlling Party Notice shall be sent by the New Controlling Party to the Entitled Party for information, but the receipt or non-receipt of such copy by the Entitled Party shall not affect the rights or obligations of any person under this Agreement.

4.2.3   For the purposes of this Clause 4.2 (*Termination of Controlling Party's Rights*), the "Outgoing Controlling Party" means the person specified as such in the relevant Replacement Controlling Party Notice (being the person who, immediately prior to service thereof, was the Controlling Party) and the "New Controlling Party" means the person specified as such in the relevant Replacement Controlling Party Notice.

4.3   **Other Warranty Agreements**

This Agreement shall not interfere with or limit the terms of any separate warranty arrangements with respect to the Aircraft that the Manufacturer may, from time to time, have made with any person, provided that nothing in such arrangements shall limit the rights of any Relevant Party in respect of the Warranties unless and to the extent it has expressly agreed the same in writing with the Manufacturer.

4.4   **Lapse of Warranties**

4.4.1   The entitlement of any Relevant Party to enforce the rights under any Warranty shall automatically lapse on the date on which that Warranty expires in accordance with this Agreement.

4.4.2   Following the date on which all Warranties have expired in accordance with this Agreement:

(a)     no change to the identity of the Controlling Party or the Entitled Party may be made hereunder; and

(b)     the Manufacturer shall cease to be under any obligation to maintain the record of the Relevant Parties pursuant to Clause 3.3 (*Record of Relevant Parties*).

5.      **MANUFACTURER LIMIT OF LIABILITY**

By execution of any Relevant Notice, each party thereto agrees that:

5.1     the Manufacturer shall not incur any Liability under this Agreement by reason of the Transaction Documents;

5.2     any performance by the Manufacturer that discharges its obligation in respect of any of the Warranties in favour of any Relevant Party in accordance with this Agreement will satisfy the respective interests of each Relevant Party from time to time, and nothing in this Agreement shall give rise to or impose upon the Manufacturer any several or duplicate liability with respect to such Warranties;

5.3     the Manufacturer shall (i) be entitled to rely conclusively on the information contained in any Relevant Notice, without enquiring as to the accuracy and validity of such Relevant Notice or to the entitlement of the party serving such Relevant Notice to serve it, (ii) have no duty so to enquire and (iii) not be liable for acting in accordance with such Relevant Notice;

5.4     in the event that a Relevant Party commences or has commenced against it any bankruptcy, insolvency, reorganization, receivership, suspension of payments, dissolution, liquidation, assignment for the benefit of creditors, moratorium, or other similar proceeding under debtor relief laws of the United States or any other applicable jurisdiction or the Manufacturer otherwise believes in good faith that it is or could be the subject of conflicting claims or another dispute hereunder as to the relative rights and interests of the Relevant Parties, the Manufacturer shall have the right to refrain from acting in accordance with any Relevant Notice until either (i) the Relevant Parties obtain a final and non-appealable order from a court of appropriate jurisdiction (which may be a bankruptcy court) setting forth the relative rights of the Relevant Parties or (ii) an assurance from the administrator, receiver, liquidator, bankruptcy trustee or other applicable insolvency officer, in each case confirming the relative rights of the Relevant Parties in respect of the Warranties and until such order is obtained, the Manufacturer shall be permitted to perform hereunder to and on the instruction of the person that is the then Entitled Party designated prior to such proceeding, conflicting claim or other dispute having arisen and the Manufacturer shall have no liability to any other Relevant Party in connection therewith. The Entitled Party shall indemnify, defend and hold harmless the Manufacturer from all Liabilities (including legal fees and expenses, including legal fees and expenses incurred in connection with the enforcement of this indemnity) incurred, imposed on, asserted against or suffered by the Manufacturer and arising out  or related to any such proceeding, conflicting claim, dispute or court order;

5.5     without limiting the foregoing, the Manufacturer may refrain from doing anything and shall not be required to take any action that, in its good faith opinion, is contrary to any applicable law or regulation, may be otherwise actionable in any legal proceeding by any person or otherwise expose the Manufacturer to liability, and may do anything which, in its good faith opinion, is necessary or desirable to comply with any applicable law or regulation; and

5.6     the Manufacturer shall not be deemed to have knowledge of any change in the authority of any Relevant Party to exercise the rights established under this Agreement until the Manufacturer has received written notice thereof in accordance with this Agreement.

6. **PARTIAL INVALIDITY**

If, at any time, any provision hereof is or becomes illegal, invalid or unenforceable in any respect under the law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions hereof nor the legality, validity or enforceability of such provision under the law of any other jurisdiction shall in any way be affected or impaired thereby.

7. **REMEDIES AND WAIVERS**

No failure by the Manufacturer or any Relevant Party to exercise, nor any delay in exercising, any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise thereof or the exercise of any other right or remedy.

8. **NOTICES**

8.1 **Form of Communication**

Any notice or other communication given or to be made under this Agreement shall be in writing in the English language and shall be addressed to the recipient as set out below. In the absence of evidence of earlier receipt, any notice or other communication shall be deemed to have been duly given:

8.1.1    if sent by post, five (5) Business Days after posting; and

8.1.2    if sent by fax, when confirmation of its clear transmission has been recorded on the sender's fax machine.

Any notice or other communication delivered to the Manufacturer outside 9am to 5pm (Toulouse time) on a Business Day shall only be deemed effective at 9am (Toulouse time) on the next Business Day.

8.2 **Relevant Parties' Addresses**

The contact details for any Relevant Party shall be set out in a Relevant Notice or shall be such other address as such Relevant Party may notify to the Manufacturer from time to time in writing.

8.3 **Manufacturer's Address**

The contact details for the Manufacturer are as set out below as at the date of this Agreement:

Address:    Airbus S.A.S.
1, rond-point Maurice Bellonte
31707 Blagnac Cedex - France

Fax:    +33 (0)5 61 93 46 10
Attention:    Head of Contracts - Customer Services

The Manufacturer may amend the contact details specified above by sending written notice to the Controlling Party.

8.4 **Electronic Mail**

Any notice or other communication given or to be made under this Agreement to the Manufacturer shall also be sent by electronic mail to the following address (provided that the receipt or non-receipt of such electronic mail by the Manufacturer shall not affect the rights or obligations of any person under this Agreement): AWA.notification@airbus.com.

9.    **BENEFIT OF AGREEMENT**

No Relevant Party may assign or otherwise transfer (in whole or in part) any rights that it may have under this Agreement or the Warranties (including any rights to proceeds of any claim in respect of the Warranties) other than pursuant to the delivery of a Relevant Notice to the Manufacturer in strict compliance with the express provisions of this Agreement and any such transfer shall only be effective as to the Manufacturer upon its receipt of the applicable Relevant Notice as provided herein. Any purported assignment or other transfer by a Relevant Party of rights hereunder or the Warranties that does not comply with the requirements of this Agreement shall be null and void and of no force or effect.

10.    **LAW AND JURISDICTION**

10.1    **Governing Law**

This Agreement shall be governed by and construed in accordance with the laws of France.

10.2    **Exclusive Jurisdiction**

10.2.1   The Tribunal de commerce de Paris has exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute regarding the existence, validity or termination of this Agreement or the consequences of its nullity) (a "**Dispute**").

10.2.2   Each of the Manufacturer and (by their signature of Relevant Notice(s)) the Relevant Parties agrees that the French courts are the most appropriate and convenient courts to settle Disputes and accordingly it will not argue to the contrary.

10.3    **Election of Domicile**

Without prejudice to any other mode of service allowed under any relevant law, the Manufacturer hereby elects domicile at its registered office address as provided in Clause 8.3 (*Manufacturer's Address*) for the purpose of serving any judicial or extra-judicial documents in relation to any action or proceedings.

## SCHEDULE 1
## DEFINITIONS AND INTERPRETATION

### PART A - SPECIFIC DEFINITIONS

"**Airframe**" means the A350-900 XWB airframe with manufacturer's serial number 0067 (excluding the Propulsion Systems installed thereon) together with all parts incorporated in, installed on or attached to such airframe on the Delivery Date.

"**Buyer**" means MSN 0067 Leasing Limited, being the person named as "*Buyer*" in the bill of sale in respect of the Aircraft issued by the Manufacturer on the Delivery Date.

"**Initial Controlling Party**" means National Australia Bank Limited.

"**Initial Entitled Party**" means Vietnam Airlines JSC.

### PART B - GENERAL DEFINITIONS

"**Aircraft**" means, collectively, the Airframe and the Propulsion Systems installed thereon.

"**Aircraft Purchase Agreement**" means the purchase agreement pursuant to which, inter alia, the Manufacturer has agreed to sell the Aircraft.

"**Aviation Authorities**" means when used in respect of any jurisdiction the government entity which, under the laws of such jurisdiction, has control over civil aviation or the registration, airworthiness or operation of aircraft in such jurisdiction.

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in Toulouse, France.

"**Buyer Furnished Equipment**" means the items described in the list attached to the BFE bill of sale delivered to the Manufacturer on the Delivery Date.

"**Controlling Party**" means, at any time, the person who is the controlling party for the purposes of this Agreement, being the Initial Controlling Party or the person named as the New Controlling Party in any Replacement Controlling Party Notice delivered to the Manufacturer in accordance with this Agreement.

"**Delivery**" means the transfer of title to the Aircraft by the Manufacturer to the Buyer.

"**Delivery Date**" means the date on which Delivery occurs.

"**Eligible Person**" means:

(i)     in the case of the Entitled Party: the person that has the present right to possession of the Airframe, whether (a) as owner, mortgagee or pledgee or under a lease or other bailment of the Airframe or any analogous instrument or (b) as a duly appointed nominee of any such person;

(ii)    in the case of the Controlling Party: a person that either (a) has the present right to possession of the Airframe whether (x) as owner, mortgagee or pledgee or under a lease or other bailment of the Airframe or any analogous instrument or (y) as a duly appointed nominee of any such person; or (b) may have such right subject only to the enforcement of rights under the Transaction Documents; and

(iii)   in all cases, a person that is neither (a) subject to any sanctions or similar instruments such as would result in the Manufacturer being in breach of any laws or sanctions of the United States of America, France, the European Union or the United Nations by having a legal relationship under this Agreement with such person in respect of the Warranties and the

Airframe nor (b) an aircraft manufacturer or a person owned or controlled by an aircraft manufacturer.

"**Entitled Party**" means, at any time, the person who is entitled at such time to make claims under the Warranties under and in accordance with this Agreement, being the Initial Entitled Party or the person named as the new Entitled Party in any Replacement Entitled Party Notice delivered to the Manufacturer in accordance with this Agreement.

"**Initial Notice**" means a notice signed by the Initial Entitled Party and the Initial Controlling Party in the form of Schedule 3 (*Initial Notice*).

"**Liabilities**" means losses, liabilities, actions, claims, proceedings, penalties, fines, judgments, damages, fees, costs and expenses and "**Liability**" means any such thing.

"**New Controlling Party**" has the meaning given to that term in Clause 4.2.3 (*Termination of Controlling Party's Rights*).

"**New Entitled Party**" has the meaning given to that term in Clause 4.1.3 (*Termination of Entitled Party's Rights*).

"**Outgoing Controlling Party**" has the meaning given to that term in Clause 4.2.3 (*Termination of Controlling Party's Rights*).

"**Outgoing Entitled Party**" has the meaning given to that term in Clause 4.1.3 (*Termination of Entitled Party's Rights*).

"**Propulsion Systems**" means the engines and, if provided by the engine manufacturer, the nacelles and thrust reversers installed on the Aircraft at Delivery.

"**Propulsions Systems Manufacturer**" means the manufacturer of the Propulsion Systems.

"**Relevant Notice**" means an Initial Notice, a Replacement Entitled Party Notice or a Replacement Controlling Party Notice.

"**Relevant Party**" means, at any time, each of the Entitled Party and the Controlling Party at such time.

"**Replacement Controlling Party Notice**" means a notice, executed by the Outgoing Controlling Party and the New Controlling Party named therein, in the form of Schedule 5 (*Replacement Controlling Party Notice*).

"**Replacement Entitled Party Notice**" means a notice, executed by the Controlling Party and the New Entitled Party named therein, in the form of Schedule 4 (*Replacement Entitled Party Notice*).

"**Seller's Representatives**" means a customer support representative of the Manufacturer.

"**Service Bulletin**" means the document used to notify officially an airline of the technical data governing embodiment of modifications (or the accomplishment of inspections to be performed) on in-service aircraft.

"**Service Life Policy**" has the meaning set out in clause 12.2 of Schedule 2 (*Warranties*).

"**Specification**" means the aircraft specification as further detailed in the Technical Data available to the Buyer at Delivery.

"**Technical Data**" means the technical data and software services provided by the Manufacturer to the Buyer in respect of the Aircraft at Delivery.

"**Transaction Documents**" means all documents (excluding this Agreement and any Relevant Notice and the Aircraft Purchase Agreement) entered into between the Relevant Parties and other persons in connection with the acquisition, leasing, bailment and/or financing of the Aircraft.

"**Warranties**" means, insofar as they relate to the Airframe, such warranties, rights and provisions as are set out in Schedule 2 (*Warranties*).

**SCHEDULE 2**
**WARRANTIES**

**12          WARRANTIES AND SERVICE LIFE POLICY**

This Clause covers the terms and conditions of the warranty and service life policy.

**12.1          Standard Warranty**

12.1.1          **Nature of Warranty**

For the purpose of this Clause 12, the term "**Warranted Part**" shall mean any Seller proprietary component, equipment, accessory or part, which is installed on the Aircraft at Delivery thereof and

(a)    which is manufactured to the detailed design of the Seller or a subcontractor of the Seller and

(b)    which bears a part number of the Seller at the time of such Delivery.

Subject to the conditions and limitations as hereinafter provided for and except as provided for in Clause 12.1.2, the Seller warrants to the Buyer that the Aircraft and each Warranted Part shall at Delivery to the Buyer be free from defects:

(i)     in material;

(ii)    in workmanship, including without limitation processes of manufacture;

(iii)   in design (including without limitation the selection of materials) having regard to the state of the art at the date of such design; and

(iv)   arising from failure to conform to the Specification, except to those portions of the Specification relating to performance or where it is expressly stated that they are estimates, approximations or design aims.

12.1.2          **Exclusions**

The warranties set forth in Clause 12.1.1 shall not apply to Buyer Furnished Equipment, nor to the Propulsion Systems, nor to any component, equipment, accessory or part installed on the Aircraft at Delivery that is not a Warranted Part except that:

(i)     any defect in the Seller's workmanship in respect of the installation of such items in the Aircraft, including any failure by the Seller to conform to the installation instructions of the manufacturers of such items, that invalidates any applicable warranty from such manufacturers, shall constitute a defect in workmanship for the purpose of this Clause 12.1 and be covered by the warranty set forth in Clause 12.1.1 (ii); and

(ii)    any defect inherent in the Seller's design of the installation, in consideration of the state of the art at the date of such design, which impairs the use of such items, shall constitute a defect in design for the purpose of this Clause 12.1 and be covered by the warranty set forth in Clause 12.1.1 (iii).

Clause 12 - A350XWB

12.1.3          **Warranty Period**

The warranties set forth in Clauses 12.1.1 and 12.1.2 shall be limited to those defects that become apparent within forty eight (48) months after Delivery of the Aircraft (the "**Warranty Period**").

12.1.4          **Buyer's Remedy and Seller's Obligation**

12.1.4.1        The Buyer's remedy and the Seller's obligation and liability under Clauses 12.1.1 and 12.1.2 are limited to, at the Seller's expense and option, the repair, replacement or correction of any Warranted Part which is defective (or to the supply of modification kits rectifying the defect), together with a credit to the Buyer's account with the Seller of an amount equal to the mutually agreed direct labour costs expended in performing the removal and the reinstallation thereof on the Aircraft at the labour rate defined in Clause 12.1.7.5.

The Seller may alternatively furnish to the Buyer's account with the Seller a credit equal to the price at which the Buyer is entitled to purchase a replacement for the defective Warranted Part.

12.1.4.2        In the event of a defect covered by Clauses 12.1.1 (iii), 12.1.1 (iv) and 12.1.2 (ii) having become apparent on an aircraft that was delivered to the Buyer (as initial operator thereof) less than forty eight (48) months prior to the Delivery of the Aircraft (such aircraft to be of the same type and built to the same Specification as the Aircraft), the Seller shall, if so requested by the Buyer in writing, correct such defect in the Aircraft not yet delivered to the Buyer, provided however,

(i)     that the Seller shall not be responsible, nor deemed to be in default on account of any delay in Delivery of the Aircraft or otherwise in respect of the performance of the Aircraft Purchase Agreement or this Clause 12, due to the Seller's undertaking to make such correction and provided further

(ii)    that, rather than accept a delay in the Delivery of the Aircraft, the Buyer and the Seller may agree to deliver the Aircraft with subsequent correction of the defect by the Buyer at the Seller's expense, or the Buyer may elect to accept Delivery and thereafter file a Warranty Claim as though the defect had become apparent immediately after Delivery of the Aircraft.

12.1.4.3        <u>Cost of inspection</u>

In addition to the remedies set forth in Clauses 12.1.4.1 and 12.1.4.2, the Seller shall reimburse the direct labour costs incurred by the Buyer in performing inspections of the Aircraft to determine whether or not a defect exists in any Warranted Part within the Warranty Period subject to the following conditions:

(i)     such inspections are recommended by a Seller Service Bulletin to be performed within the Warranty Period;

(ii)    the reimbursement shall not apply for any inspections performed as an alternative to accomplishing corrective action as recommended by the Seller when such corrective action has been made available to the Buyer and such corrective action could have reasonably been accomplished by the Buyer at the time such inspections are performed or earlier,

Clause 12 - A350XWB

(iii)   the labour rate for the reimbursement shall be the labour rate defined in Clause 12.1.7.5, and

(iv)   the manhours used to determine such reimbursement shall not exceed the Seller's estimate of the manhours required for such inspections.

12.1.5   **Warranty Claim Requirements**

The Buyer's remedy and the Seller's obligation and liability under this Clause 12.1, with respect to any warranty claim submitted by the Buyer (each a "**Warranty Claim**") are subject to the following conditions:

(i)   the defect having become apparent within the Warranty Period;

(ii)   the Buyer having filed a warranty claim within 90 days of discovering the defect;

(iii)   the Buyer having submitted to the Seller evidence reasonably satisfactory to the Seller that the claimed defect is due to a matter embraced within this Clause 12.1 and that such defect has not resulted from any act or omission of the Buyer including, but not limited to, any failure to operate and maintain the Aircraft or part thereof in accordance with the standards set forth in Clause 12.1.9 or from any act or omission of any third party;

(iv)   the Seller having received a Warranty Claim complying with the provisions of Clause 12.1.6 below.

12.1.6   **Warranty Administration**

The warranties set forth in Clause 12.1 shall be administered as hereinafter provided for:

12.1.6.1   Claim Determination

Determination as to whether any claimed defect in any Warranted Part is a valid Warranty Claim shall be made by the Seller and shall be based upon the claim details, reports from the Seller's Representatives, historical data logs, inspections, tests, findings during repair, defect analysis and other relevant documents.

12.1.6.2   Transportation Costs

The cost of transporting a Warranted Part claimed to be defective to the facilities designated by the Seller and for the return therefrom of a repaired or replaced Warranted Part shall be borne by the Buyer.

12.1.6.3   Return of the Aircraft

If the Buyer and the Seller mutually agree, prior to such return, that it is necessary to return the Aircraft to the Seller for consideration of a Warranty Claim, the Seller shall bear the direct costs of fuel and landing fees to and from the Seller's facilities for such return of the Aircraft. The Buyer shall make its reasonable efforts to minimize the duration of the corresponding flights.

Clause 12 - A350XWB

12.1.6.4   <u>On Aircraft Work by the Seller</u>

If the Seller determines that a defect subject to this Clause 12.1 justifies the dispatch by the Seller of a working team to repair or correct such defect through the embodiment of one or several Seller's Service Bulletins at the Buyer's facilities, or if the Seller accepts the return of the Aircraft to perform or have performed such repair or correction, then the labour costs for such on-Aircraft work shall be borne by the Seller.

The condition which has to be fulfilled for on-Aircraft work by the Seller is that, in the opinion of the Seller, the work necessitates the technical expertise of the Seller as manufacturer of the Aircraft.

If said condition is fulfilled and if the Seller is requested to perform the work, the Seller and the Buyer shall agree on a schedule and place for the work to be performed.

12.1.6.5   <u>Warranty Claim Substantiation</u>

Each Warranty Claim filed by the Buyer under this Clause 12.1 shall contain at least the following data:

(a)   description of defect and action taken, if any,
(b)   date of incident and/or removal date,
(c)   description of Warranted Part claimed to be defective,
(d)   part number,
(e)   serial number (if applicable),
(f)   position on Aircraft,
(g)   total flying hours or calendar time, as applicable, at the date of defect appearance,
(h)   time since last shop visit at the date of defect appearance,
(i)   Manufacturer Serial Number of the Aircraft and/or its registration,
(j)   Aircraft total flying hours and/or number of landings at the date of defect appearance,
(k)   Warranty Claim number,
(l)   date of Warranty Claim,
(m)   Delivery Date of Aircraft or Warranted Part to the Buyer,

Warranty Claims are to be addressed as follows:

AIRBUS
CUSTOMER SERVICES DIRECTORATE
WARRANTY ADMINISTRATION
ROND POINT MAURICE BELLONTE
B.P. 33
F 31707 BLAGNAC CEDEX
FRANCE

12.1.6.6   <u>Replacements</u>

Title to and risk of loss of the Aircraft or any component, accessory, equipment or part returned by the Buyer to the Seller shall at all times remain with the Buyer, except that:

Clause 12 - A350XWB

(i)    risk of loss (limited to cost of replacement and excluding in particular loss of use) shall be with the Seller for as long as such Aircraft, component, accessory, equipment or part shall be under the care, custody and control of the Seller and;

(ii)   title to and risk of loss of a returned component, accessory, equipment or part shall pass to the Seller upon shipment by the Seller to the Buyer of any item furnished by the Seller to the Buyer as a replacement therefor.

Upon the Seller's shipment to the Buyer of any replacement component, accessory, equipment or part provided by the Seller pursuant to this Clause 12.1, title to and risk of loss of such replacement component, accessory, equipment or part shall pass to the Buyer.

## 12.1.6.7    Rejection

The Seller shall provide reasonable written substantiation in case of rejection of a Warranty Claim. In such event the Buyer shall refund to the Seller reasonable inspection and test charges incurred in connection therewith.

## 12.1.6.8    Inspection

The Seller shall have the right to inspect the Aircraft, documents and other records relating thereto in the event of any Warranty Claim under this Clause 12.1.

## 12.1.7    Inhouse Warranty

## 12.1.7.1    Seller's Authorization

The Seller hereby authorizes the Buyer to repair Warranted Parts ("**Inhouse Warranty**") subject to the terms of this Clause 12.1.7.

## 12.1.7.2    Conditions for Seller's Authorization

The Buyer shall be entitled to repair such Warranted Parts:

- provided the Buyer notifies the Seller Representative of its intention to perform Inhouse Warranty repairs before any such repairs are started where the estimated cost of such repair is in excess of US Dollars Fifteen Thousand (US$ 15,000). The Buyer's notification shall include sufficient detail regarding the defect, estimated labour hours and material to allow the Seller to ascertain the reasonableness of the estimate. The Seller agrees to use all reasonable efforts to ensure a prompt response and shall not unreasonably withhold authorization;

- provided adequate facilities and qualified personnel are available to the Buyer;

- provided repairs are performed in accordance with the Seller's Technical Data or written instructions; and

- only to the extent specified by the Seller, or, in the absence of such specification, to the extent reasonably necessary to correct the defect, in accordance with the standards set forth in Clause 12.1.9.

Clause 12 - A350XWB

12.1.7.3     Seller's Rights

The Seller shall have the right to require the return of any Warranted Part, or any part removed therefrom, which is claimed to be defective if, in the judgment of the Seller, the nature of the claimed defect requires technical investigation. Such return shall be subject to the provisions of Clause 12.1.6.2. Furthermore, the Seller shall have the right to have a Seller Representative present during the disassembly, inspection and testing of any Warranted Part claimed to be defective, subject to such presence being practical and not unduly delaying the repair.

12.1.7.4     Inhouse Warranty Claim Substantiation

Claims for Inhouse Warranty credit shall be filed within the time period set forth in 12.1.5 (ii) and shall contain the same information as that required for Warranty Claims under Clause 12.1.6.5 and in addition shall include:

(a)     a report of technical findings with respect to the defect,

(b)     for parts required to remedy the defect:
                    - part numbers,
                    - serial numbers (if applicable),
                    - parts description,
                    - quantity of parts,
                    - unit price of parts,
                    - related Seller's or third party's invoices (if applicable),
                    - total price of parts,

(c)     detailed number of labour hours,

(d)     Inhouse Warranty Labour Rate,

(e)     total claim value.

12.1.7.5     Credit

The Buyer's sole remedy and the Seller's sole obligation and liability with respect to Inhouse Warranty Claims shall be the credit to the Buyer's account of an amount equal to the mutually agreed direct labour costs expended in performing the repair of a Warranted Part and to the direct costs of materials incorporated in said repair, determined as set forth below:

(a)     to determine direct labour costs, only manhours spent on removal from the Aircraft, disassembly, inspection, repair, reassembly, final inspection and test of the Warranted Part and reinstallation thereof on the Aircraft shall be counted. Any manhours required for maintenance work concurrently being carried out on the Aircraft or the Warranted Part shall not be included.

(b)     The manhours counted as set forth above shall be multiplied by an agreed labour rate ("Inhouse Warranty Labour Rate") of either:

         i.     the Inhouse Warranty Labour Rate applicable pursuant to any existing agreement between the Seller and the Buyer, or

      ii.  a labour rate to be agreed between the Buyer and the Seller and corresponding to the Inhouse Warranty Labour Rate generally applicable to operators of Airbus aircraft in the region, in the event that the Buyer is not already an Airbus aircraft operator.

(c)   Direct material costs are determined by the prices at which the Buyer acquired such material, excluding any parts and materials used for overhaul and as may be furnished by the Seller at no charge.

12.1.7.6    <u>Limitation</u>

The Buyer shall in no event be credited for repair costs (including labour and material) for any Warranted Part in excess of sixty-five per cent (65%) of the Seller's current catalogue price for a replacement of such defective Warranted Part.

12.1.7.7    <u>Scrapped Material</u>

The Buyer shall retain any defective Warranted Part beyond economic repair and any defective part removed from a Warranted Part during repair for a period of either one hundred and twenty (120) days after the date of completion of the repair or sixty (60) days after submission of a claim for Inhouse Warranty credit relating thereto, whichever is longer. Such parts shall be returned to the Seller within thirty (30) days of receipt of the Seller's request to that effect.

Notwithstanding the foregoing, the Buyer may scrap any such defective parts, which are beyond economic repair and not required for technical evaluation locally, with the agreement of the Seller Representative(s).

Scrapped Warranted Parts shall be evidenced by a record of scrapped material certified by an authorized representative of the Buyer and shall be kept in the Buyer's file for a least the duration of the applicable Warranty Period.

12.1.8    **Warranty for Corrected, Replaced or Repaired Warranted Parts**

Whenever any Warranted Part, which contains a defect for which the Seller is liable under Clause 12.1, has been corrected, replaced or repaired pursuant to the terms of this Clause 12.1, the period of the Seller's warranty with respect to such corrected, repaired or replacement Warranted Part, whichever the case may be, shall be the remaining portion of the original warranty or twelve (12) months, whichever is longer.

If a defect is attributable to a defective repair or replacement by the Buyer, a Warranty Claim with respect to such defect shall be rejected, notwithstanding any subsequent correction or repair, and shall immediately terminate the remaining warranties under this Clause 12.1 in respect of the affected Warranted Part.

12.1.9    **Accepted Industry Standard Practices   Normal Wear and Tear**

The Buyer's rights under this Clause 12.1 are subject to the Aircraft and each component, equipment, accessory and part thereof being maintained, overhauled, repaired and operated in accordance with accepted industry standard practices, all Technical Data and any other instructions issued by the Seller, the Suppliers and

the Propulsion Systems Manufacturer and all applicable rules, regulations and directives of the relevant Aviation Authorities.

The Seller's liability under this Clause 12.1 shall not extend to normal wear and tear nor to:

(i)     the Aircraft or any component, equipment, accessory or part thereof, which has been repaired, altered or modified after Delivery, except by the Seller or in a manner approved by the Seller;

(ii)    the Aircraft or any component, equipment, accessory or part thereof, which has been operated in a damaged state;

(iii)   any component, equipment, accessory and part from which the trademark, name, part or serial number or other identification marks have been removed.

## 12.1.10    Limitation of liability

THE SELLER SHALL NOT BE LIABLE FOR, AND THE BUYER SHALL INDEMNIFY THE SELLER AGAINST, ANY CLAIMS FROM ANY THIRD PARTIES FOR LOSSES DUE TO ANY DEFECT OR NON-CONFORMITY OF ANY KIND, ARISING OUT OF OR IN CONNECTION WITH ANY REPAIR OF ANY WARRANTED PART UNDERTAKEN BY THE BUYER UNDER THIS CLAUSE 12.1 OR ANY OTHER ACTIONS UNDERTAKEN BY THE BUYER UNDER THIS CLAUSE 12, WHETHER SUCH CLAIM IS ASSERTED IN CONTRACT OR IN TORT, OR IS PREMISED ON ALLEGED, ACTUAL, IMPUTED, ORDINARY OR INTENTIONAL ACTS OR OMISSIONS OF THE BUYER.

## 12.2    Seller Service Life Policy

12.2.1    In addition to the warranties set forth in Clause 12.1, the Seller further agrees that should a Failure occur in any Item (as these terms are defined herebelow) that has not suffered from an extrinsic force, then, subject to the general conditions and limitations set forth in Clause 12.2.4, the provisions of this Clause 12.2 shall apply.

For the purposes of this Clause 12.2:

(i)     "**Item**" means any item listed in Exhibit "F";

(ii)    "**Failure**" means a breakage or defect that can reasonably be expected to occur on a fleetwide basis and which materially impairs the utility of the Item.

## 12.2.2    Periods and Seller's Undertakings

The Seller agrees that if a Failure occurs in an Item within fifteen (15) years after the Delivery of the Aircraft in which such Item was originally installed, the Seller shall, at its discretion and as promptly as practicable and with the Seller's financial participation as hereinafter provided, either:

- design and furnish to the Buyer a correction for such Item with a Failure and provide any parts required for such correction (including Seller designed standard parts but excluding industry standard parts), or

- replace such Item.

Clause 12 - A350XWB

12.2.3       **Seller's Participation in the Costs**

Subject to the general conditions and limitations set forth in Clause 12.2.4, any part or Item that the Seller is required to furnish to the Buyer under this Service Life Policy in connection with the correction or replacement of an Item shall be furnished to the Buyer at the Seller's then current sales price therefore, less the Seller's financial participation determined in accordance with the following formula:

$$P = C (N - T) / N$$

where :

P :          financial participation of the Seller,

C :          Seller's then current sales prices for the required Item or
             Seller designed parts,

T :          total time in months since Delivery of the Aircraft in which the Item
             subject to a Failure was originally installed,

and,

N :          one hundred and eighty (180) months,

12.2.4       **General Conditions and Limitations**

12.2.4.1     The undertakings set forth in this Clause 12.2 shall be valid after the period of the Seller's warranty applicable to an Item under Clause 12.1.

12.2.4.2     The Buyer's remedies and the Seller's obligations and liabilities under this Service Life Policy are subject to the prior compliance by the Buyer with the following conditions:

(i)      the Buyer shall maintain log books and other historical records with respect to each Item, adequate to enable the Seller to determine whether the alleged Failure is covered by this Service Life Policy and, if so, to define the portion of the costs to be borne by the Seller in accordance with Clause 12.2.3;

(ii)     the Buyer shall keep the Seller informed of any significant incidents relating to the Aircraft, howsoever occurring or recorded;

(iii)    the Buyer shall comply with the conditions of Clause 12.1.9;

(iv)     the Buyer shall implement specific structural inspection programs for monitoring purposes as may be established from time to time by the Seller. Such programs shall be as compatible as possible with the Buyer's operational requirements and shall be carried out at the Buyer's expense. Reports relating thereto shall be regularly furnished to the Seller;

(v)      the Buyer shall report any breakage or defect in a Item in writing to the Seller within sixty (60) days after such breakage or defect becomes apparent, whether or not said breakage or defect can reasonably be expected to occur in

Clause 12 - A350XWB

any other aircraft, and the Buyer shall have provided to the Seller sufficient detail on the breakage or defect to enable the Seller to determine whether said breakage or defect is subject to this Service Life Policy.

12.2.4.3   Except as otherwise provided for in this Clause 12.2, any claim under this Service Life Policy shall be administered as provided for in, and shall be subject to the terms and conditions of, Clause 12.1.6.

12.2.4.4   In the event of the Seller having issued a modification applicable to the Aircraft, the purpose of which is to avoid a Failure, the Seller may elect to supply the necessary modification kit free of charge or under a pro rata formula. If such a kit is so offered to the Buyer, then, to the extent of such Failure and any Failures that could ensue therefrom, the validity of the Seller's commitment under this Clause 12.2 shall be subject to the Buyer incorporating such modification in the Aircraft, as promulgated by the Seller and in accordance with the Seller's instructions, within a reasonable time.

12.2.4.5   This Service Life Policy is neither a warranty, performance guarantee, nor an agreement to modify the Aircraft or any Airframe components to conform to new developments occurring in the state of airframe design and manufacturing art.

The Seller's obligation hereunder is to furnish only those corrections to the Items or provide replacements therefor as provided for in this Clause 12.2.

The Buyer's sole remedy and relief for the non-performance of any obligation or liability of the Seller arising under or by virtue of this Service Life Policy shall be in the form of a credit, limited to the amount the Buyer reasonably expends in procuring a correction or replacement for any Item that is the subject of a Failure covered by this Service Life Policy and to which such non-performance is related.

The Buyer hereby waives, releases and renounces all claims to any further damages, direct, incidental or consequential, including loss of profits and all other rights, claims and remedies, arising under or by virtue of this Service Life Policy.

## 12.3   Supplier and ACS Supplier Warranties and Service Life Policies

At Delivery of the Aircraft, the Seller shall provide the Buyer, in accordance with the provisions of the Aircraft Purchase Agreement, with:

a)   the warranties and, where applicable, service life policies that the Seller has obtained for Supplier Parts pursuant to the Supplier Product Support Agreements, and

b)   the warranties that the Seller has obtained for ACS Equipment pursuant to the Airbus Contracted Suppliers Support Agreements.

### 12.3.1   Supplier Warranties and Service Life Policies

12.3.1.1   **Definitions**

12.3.1.1.1   "**Supplier**" means any supplier of Supplier Parts.

Clause 12 - A350XWB

12.3.1.1.2 "**Supplier Part**" means any component, equipment, accessory or part installed in the Aircraft at the time of Delivery thereof and for which there exists a Supplier Product Support Agreement. For the sake of clarity, Propulsion Systems, ACS Equipment, Buyer Furnished Equipment and other equipment selected by the Buyer to be supplied by suppliers with whom the Seller has no existing enforceable warranty agreements are not Supplier Parts.

12.3.1.1.3 "**Supplier Product Support Agreements**" means agreements between the Seller and Suppliers, as described in the Aircraft Purchase Agreement, containing enforceable and transferable warranties and, in the case of landing gear suppliers, service life policies for selected structural landing gear elements.

12.3.1.2 **Supplier's Default**

12.3.1.2.1 In the event of any Supplier, under any standard warranty obtained by the Seller pursuant to Clause 12.3.1, defaulting in the performance of any material obligation with respect thereto and the Buyer submitting in reasonable time to the Seller reasonable proof that such default has occurred, then Clause 12.1 shall apply to the extent the same would have been applicable had such Supplier Part been a Warranted Part, except that the Supplier's warranty period as indicated in the Supplier Product Support Agreement shall apply.

12.3.1.2.2 In the event of any Supplier, under any Supplier Service Life Policy obtained by the Seller pursuant to Clause 12.3.1, defaulting in the performance of any material obligation with respect thereto and the Buyer submitting in reasonable time to the Seller reasonable proof that such default has occurred, then Clause 12.2 shall apply to the extent the same would have been applicable had such Supplier Item been listed in Exhibit F, Seller Service Life Policy, except that the Supplier's Service Life Policy period as indicated in the Supplier Product Support Agreement shall apply.

12.3.1.2.3 At the Seller's request, the Buyer shall assign to the Seller, and the Seller shall be subrogated to, all of the Buyer's rights against the relevant Supplier with respect to and arising by reason of such default and shall provide reasonable assistance to enable the Seller to enforce the rights so assigned.

12.3.2 **ACS Supplier Warranties**

12.3.2.1 **Definitions**

12.3.2.1.1 "**ACS Supplier**" means any supplier of ACS Equipment.

12.3.2.1.2 "**ACS Equipment**" means any component, equipment, accessory or part installed in the Aircraft at the time of Delivery thereof and for which there exists an Airbus Contracted Suppliers Support Agreement. For the sake of clarity, Propulsion Systems, Supplier Parts, Buyer Furnished Equipment and other equipment selected by the Buyer to be supplied by suppliers with whom the Seller has no existing enforceable warranty agreements are not ACS Equipment.

12.3.2.1.3 "**Airbus Contracted Suppliers Support Agreements**" means agreements between the Seller and ACS Suppliers, as described in the Aircraft Purchase Agreement, containing enforceable and transferable warranties.

Clause 12 - A350XWB

12.3.2.2    **ACS Supplier's Default**

The Buyer hereby:

a)    agrees and acknowledges that it shall have no right of recourse against the Seller with respect to any default by an ACS Supplier; and

b)    waives to the fullest extent permitted by applicable law any right of recourse against the Seller (in contract and/or at law) with respect to any default by an ACS Supplier,

in each case, following transfer by the Seller to the Buyer of warranties that the Seller has obtained for ACS Equipment pursuant to Airbus Contracted Suppliers Support Agreements.

## 12.4    Interface Commitment

12.4.1    **Interface Problem**

If the Buyer experiences any technical problem in the operation of the Aircraft or its systems due to a malfunction, the cause of which, after due and reasonable investigation, is not readily identifiable by the Buyer but which the Buyer reasonably believes to be attributable to the design characteristics of one or more components of the Aircraft ("**Interface Problem**"), the Seller shall, if so requested by the Buyer, and without additional charge to the Buyer except for transportation of the Seller's personnel to the Buyer's facilities, promptly conduct or have conducted an investigation and analysis of such problem to determine, if possible, the cause or causes of the problem and to recommend such corrective action as may be feasible. The Buyer shall furnish to the Seller all data and information in the Buyer's possession relevant to the Interface Problem and shall cooperate with the Seller in the conduct of the Seller's investigations and such tests as may be required.

At the conclusion of such investigation, the Seller shall promptly advise the Buyer in writing of the Seller's opinion as to the cause or causes of the Interface Problem and the Seller's recommendations as to corrective action.

12.4.2    **Seller's Responsibility**

If the Seller determines that the Interface Problem is primarily attributable to the design of a Warranted Part, the Seller shall, if so requested by the Buyer and pursuant to the terms and conditions of Clause 12.1, correct the design of such Warranted Part to the extent of the Seller's obligation as defined in Clause 12.1.

12.4.3    **Supplier's Responsibility**

If the Seller determines that the Interface Problem is primarily attributable to the design of any Supplier Part, the Seller shall, if so requested by the Buyer, reasonably assist the Buyer in processing any warranty claim the Buyer may have against the Supplier.

12.4.4    **Joint Responsibility**

If the Seller determines that the Interface Problem is attributable partially to the design of a Warranted Part and partially to the design of any Supplier Part, the

Clause 12 - A350XWB

Seller shall, if so requested by the Buyer, seek a solution to the Interface Problem through cooperative efforts of the Seller and any Supplier involved.

The Seller shall promptly advise the Buyer of such corrective action as may be proposed by the Seller and any such Supplier. Such proposal shall be consistent with any then existing obligations of the Seller hereunder and of any such Supplier towards the Buyer. Such corrective action, when accepted by the Buyer, shall constitute full satisfaction of any claim the Buyer may have against either the Seller or any such Supplier with respect to such Interface Problem.

12.4.5     **General**

12.4.5.1    All requests under this Clause 12.4 shall be directed to both the Seller and the Supplier.

12.4.5.2    Except as specifically set forth in this Clause 12.4, this Clause shall not be deemed to impose on the Seller any obligations not expressly set forth elsewhere in this Clause 12.

12.4.5.3    All reports, recommendations, data and other documents furnished by the Seller to the Buyer pursuant to this Clause 12.4 shall be deemed to be delivered under the Aircraft Purchase Agreement and shall be subject to the terms, covenants and conditions set forth in this Clause 12.

**12.5**        **Waiver, Release and Renunciation**

THE WARRANTIES, OBLIGATIONS AND LIABILITIES OF THE SELLER (AS DEFINED BELOW FOR THE PURPOSES OF THIS CLAUSE) AND REMEDIES OF THE BUYER SET FORTH IN THIS CLAUSE 12 ARE EXCLUSIVE AND IN SUBSTITUTION FOR, AND THE BUYER HEREBY WAIVES, RELEASES AND RENOUNCES ALL OTHER WARRANTIES, OBLIGATIONS AND LIABILITIES OF THE SELLER AND RIGHTS, CLAIMS AND REMEDIES OF THE BUYER AGAINST THE SELLER, EXPRESS OR IMPLIED, ARISING BY LAW, CONTRACT OR OTHERWISE, WITH RESPECT TO ANY NON CONFORMITY OR DEFECT OF ANY KIND, IN THE AIRCRAFT OR ANY IN COMPONENT, EQUIPMENT, ACCESSORY, PART, SOFTWARE, DATA, SERVICES DELIVERED UNDER THE AIRCRAFT PURCHASE AGREEMENT, INCLUDING BUT NOT LIMITED TO:

A.     ANY WARRANTY AGAINST HIDDEN DEFECTS;

B.     ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS;

C.     ANY IMPLIED WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OR TRADE;

D.     ANY OBLIGATION, LIABILITY, RIGHT, CLAIM OR REMEDY, WHETHER IN CONTRACT OR IN TORT, WHETHER OR NOT ARISING FROM THE SELLER'S NEGLIGENCE, ACTUAL OR IMPUTED; AND

E.     ANY OBLIGATION, LIABILITY, RIGHT, CLAIM, OR REMEDY FOR LOSS OF OR DAMAGE TO THE AIRCRAFT OR TO ANY COMPONENT, EQUIPMENT, ACCESSORY, PART, SOFTWARE, DATA, SERVICES DELIVERED UNDER THE AIRCRAFT PURCHASE AGREEMENT, FOR LOSS OF USE, REVENUE

Clause 12 - A350XWB

OR PROFIT, OR FOR ANY OTHER DIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES,

PROVIDED THAT IN THE EVENT THAT ANY OF THE AFORESAID PROVISIONS SHOULD FOR ANY REASON BE HELD UNLAWFUL OR OTHERWISE INEFFECTIVE THE REMAINDER OF THIS CLAUSE AND THE AIRCRAFT PURCHASE AGREEMENT SHALL REMAIN IN FULL FORCE AND EFFECT.

FOR THE PURPOSES OF THIS CLAUSE 12.5, THE "SELLER" SHALL BE UNDERSTOOD TO INCLUDE THE SELLER, ANY OF ITS SUPPLIERS AND SUBCONTRACTORS, ITS AFFILIATES AND ANY OF THEIR RESPECTIVE INSURERS.

## 12.6    Duplicate Remedies

The Seller shall not be obliged to provide any remedy that duplicates any other remedy available to the Buyer in respect of the same defect under Clauses 12.1 and 12.2 as such Clauses may be amended, complemented or supplemented by other contractual agreements or by other clauses of the Aircraft Purchase Agreement.

## 12.7    Negotiated Agreement

It is hereby agreed that:

(i)     the Specification has been agreed upon after careful consideration by the purchaser under the Aircraft Purchase Agreement using its judgment as a professional operator of aircraft used in public transportation and as such is a professional within the same industry as the Seller;

(ii)    this Clause 12, has been the subject of discussion between the Buyer and the Seller and is fully understood by the Buyer and any other entity having the right to enforce any of the rights contained in this Clause 12; and

(iii)   the price of the Aircraft and the other mutual agreements of the purchaser and the Seller under the Aircraft Purchase Agreement were arrived at in consideration of, inter alia, the provisions of Clause 12, specifically including the waiver, release and renunciation set forth in Clause 12.5.

## 12.8    Disclosure to Third Party Entity

Should the Buyer intends to designate a third party entity to administrate this Clause 12, the Buyer shall promptly notify the Seller of such intention.

**13**        **PATENT AND COPYRIGHT INDEMNITY**

**13.1**      **Indemnity**

13.1.1      Subject to the provisions of Clause 13.2.3, the Seller shall indemnify the Buyer from
and against any damages, costs and/or expenses including legal costs (excluding
damages, costs, expenses, loss of profits and other liabilities in respect of or
resulting from loss of use of the Aircraft) resulting from any infringement or claim of
infringement by the Airframe (or any part or software installed therein at Delivery) of:

(i)     any British, French, German, Spanish or U.S. patent;

and

(ii)    any patent issued under the laws of any other country in which the Buyer may
lawfully operate the Aircraft, provided that :

(1)     from the time of design of such Airframe, accessory, equipment and/or
part and until infringement claims are resolved, such country and the flag
country of the Aircraft are each a party to the Chicago Convention on
International Civil Aviation of December 7, 1944, and are each fully
entitled to all benefits of Article 27 thereof,

or in the alternative,

(2)     from such time of design and until infringement claims are resolved, such
country and the flag country of the Aircraft are each a party to the
International Convention for the Protection of Industrial Property of
March 20, 1883 ("Paris Convention");

and

(iii)   in respect of computer software installed on the Aircraft, any copyright,
provided that the Seller's obligation to indemnify shall be limited to
infringements in countries which, at the time of infringement, are members of
The Berne Union and recognize computer software as a "work" under the
Berne Convention.

13.1.2      Clause 13.1.1 shall not apply to

(i)     Buyer Furnished Equipment or Propulsion Systems; or

(ii)    software not developed or created by the Seller.

13.1.3      In the event that the Buyer, due to circumstances contemplated in Clause 13.1.1, is
prevented from using the Aircraft (whether by a valid judgment of a court of
competent jurisdiction or by a settlement arrived at between claimant, Seller and
Buyer), the Seller shall at its discretion and expense either:

(i)     procure for the Buyer the right to use the Aircraft free of charge to the Buyer;
or

(ii)    replace the infringing part of the Aircraft as soon as possible with a non-
infringing substitute complying in all other respects with the requirements of
the Aircraft Purchase Agreement.

**13.2**     **Administration of Patent and Copyright Indemnity Claims**

13.2.1     If the Buyer receives a written claim or a suit is threatened or commenced against the Buyer for infringement of a patent or copyright referred to in Clause 13.1, the Buyer shall:

(i)     forthwith notify the Seller giving particulars thereof;

(ii)    furnish to the Seller all data, papers and records within the Buyer's control or possession relating to such patent or claim;

(iii)   refrain from admitting any liability or making any payment or assuming any expenses, damages, costs or royalties or otherwise acting in a manner prejudicial to the defense or denial of such suit or claim provided always that nothing in this sub-Clause (iii) shall prevent the Buyer from paying such sums as may be required in order to obtain the release of the Aircraft, provided such payment is accompanied by a denial of liability and is made without prejudice;

(iv)    fully co-operate with, and render all such assistance to, the Seller as may be pertinent to the defense or denial of the suit or claim;

(v)     act in such a way as to mitigate damages, costs and expenses and/or reduce the amount of royalties which may be payable.

13.2.2     The Seller shall be entitled either in its own name or on behalf of the Buyer to conduct negotiations with the party or parties alleging infringement and may assume and conduct the defense or settlement of any suit or claim in the manner which, in the Seller's opinion, it deems proper.

13.2.3     The Seller's liability hereunder shall be conditional upon the strict and timely compliance by the Buyer with the terms of this Clause and is in lieu of any other liability to the Buyer express or implied which the Seller might incur at law as a result of any infringement or claim of infringement of any patent or copyright.

THE INDEMNITY PROVIDED IN THIS CLAUSE 13 AND THE OBLIGATIONS AND LIABILITIES OF THE SELLER UNDER THIS CLAUSE 13 ARE EXCLUSIVE AND IN SUBSTITUTION FOR, AND THE BUYER HEREBY WAIVES, RELEASES AND RENOUNCES ALL OTHER INDEMNITIES, WARRANTIES, OBLIGATIONS, GUARANTEES AND LIABILITIES ON THE PART OF THE SELLER AND RIGHTS, CLAIMS AND REMEDIES OF THE BUYER AGAINST THE SELLER, EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE (INCLUDING WITHOUT LIMITATION ANY OBLIGATION, LIABILITY, RIGHT, CLAIM OR REMEDY ARISING FROM OR WITH RESPECT TO LOSS OF USE OR REVENUE OR CONSEQUENTIAL DAMAGES), WITH RESPECT TO ANY ACTUAL OR ALLEGED PATENT INFRINGEMENT OR THE LIKE BY ANY AIRFRAME, PART OR SOFTWARE INSTALLED THEREIN AT DELIVERY, OR THE USE OR SALE THEREOF, PROVIDED THAT, IN THE EVENT THAT ANY OF THE AFORESAID PROVISIONS SHOULD FOR ANY REASON BE HELD UNLAWFUL OR OTHERWISE INEFFECTIVE, THE REMAINDER OF THIS CLAUSE SHALL REMAIN IN FULL FORCE AND EFFECT. THIS INDEMNITY AGAINST PATENT AND COPYRIGHT INFRINGEMENTS SHALL NOT BE EXTENDED, ALTERED OR VARIED EXCEPT BY A WRITTEN INSTRUMENT SIGNED BY THE SELLER AND THE BUYER.

**EXHIBIT F**

**<u>EXHIBIT F</u>**

# S E R V I C E   L I F E   P O L I C Y

## L I S T   O F   I T E M S

**EXHIBIT F**

## SELLER SERVICE LIFE POLICY

1       The Items covered by the Service Life Policy pursuant to Clause 12.2 are those Seller Items of primary and auxiliary structure described hereunder.

2       **WINGS - CENTER AND OUTER WING BOX (LEFT AND RIGHT)**

2.1     **Wing Structure**

2.1.1   Spars

2.1.2   Ribs and stringers inside the wing box

2.1.3   Upper and lower wing skin panels of the wing box

2.2     **Fittings**

2.2.1   Support structure and attachment fittings for the flap structure

2.2.2   Support structure and attachment fitting for the engine pylons

2.2.3   Support structure and attachment fitting for the main landing gear

2.2.4   Support structure and attachment fitting for the center wing box

2.3     **Auxiliary Support Structure**

2.3.1   For the slats:

2.3.1.1 Ribs supporting the track rollers on wing box structure

2.3.1.2 Ribs supporting the actuators on wing box structure

2.3.2   For the ailerons:

2.3.2.1 Hinge brackets and ribs on wing box rear spar or shroud box

2.3.2.2 Actuator fittings on wing box rear spar or shroud box

2.3.3   For airbrakes, spoilers, lift dumpers:

2.3.3.1 Hinge brackets and ribs on wing box rear spar or shroud box

2.3.3.2 Actuator fittings on wing box rear spar or shroud box

Exhibit F

**EXHIBIT F**

**2.4**      **Pylon**

2.4.1      For the Pylon Main Structural Box

2.4.1.1      Spars

2.4.1.2      Ribs

2.4.1.3      Skin, doublers and stiffeners

2.4.1.4      Support structure and attachment fitting for engine supports

**3**        **FUSELAGE**

**3.1**      **Fuselage structure**

3.1.1      Fore and aft bulkheads

3.1.2      Pressurized floors and bulkheads surrounding the main and nose gear wheel well and center wing box

3.1.3      Skins with doublers, stringers and frames from the forward pressure bulkheads to the frame supporting the rear attachment of horizontal stabilizer

3.1.4      Window and windscreen attachment structure but excluding transparencies

3.1.5      Passenger and cargo doors internal structure

3.1.6      Sills, excluding scuff plates, and upper beams surrounding passenger and cargo door apertures

3.1.7      Cockpit floor structure and passenger cabin floor beams excluding floor panels and seat rails

3.1.8      Keel beam structure

**3.2**      **Fittings**

3.2.1      Landing gear support structure and attachment fitting

3.2.2      Support structure and attachment fittings for the vertical and horizontal stabilizers

3.2.3      Support structure and attachment fitting for the APU

**4**　　　　**STABILIZERS**

**4.1**　　　　**Horizontal Stabilizer Main Structural Box**

4.1.1　　　Spars

4.1.2　　　Ribs

4.1.3　　　Upper and lower skins and stringers

4.1.4　　　Support structure and attachment fitting to fuselage and trim screw actuator

4.1.5　　　Elevator support structure

4.1.5.1　　Hinge bracket

4.1.5.2　　Servocontrol attachment brackets

**4.2**　　　　**Vertical Stabilizer Main Structural Box**

4.2.1　　　Spars

4.2.2　　　Ribs

4.2.3　　　Skins and stringers

4.2.4　　　Support structure and attachment fitting to fuselage

4.2.5　　　Rudder support structure

4.2.5.1　　Hinge brackets

4.2.5.2　　Servocontrol attachment brackets

**5**　　　　**EXCLUSIONS**

Bearing and roller assemblies, bearing surfaces, bushings, fittings other than those listed above, access and inspection doors, including manhole doors, latching mechanisms, all system components, commercial interior parts, insulation and related installation and connecting devices are excluded from this Seller Service Life Policy.

Exhibit F

**SCHEDULE 3**
**INITIAL NOTICE**

To:  **Airbus S.A.S.**
Attention:  Head of Contracts – Customer Services

CC:  MSN 0067 Leasing Limited

*[Date of the Agreement]*

**One A350-900XWB airframe with MSN 0067 (the "Airframe")**

1.  Unless otherwise defined, terms used in this notice bear the same meanings as those set forth in the airframe warranties agreement dated [•] entered into by Airbus S.A.S. in relation to the Airframe (the "**Airframe Warranties Agreement**").

2.  We hereby give notice that: (a) Vietnam Airlines JSC is the Initial Entitled Party; and (b) National Australia Bank Limited is the Initial Controlling Party.

3.  The contact details of the Initial Entitled Party for the purposes of clause 8.2 (*Relevant Parties' Addresses*) of the Airframe Warranties Agreement are as follows:

**Vietnam Airlines JSC**
200 Nguyen Son
Bo De Ward
Long Bien District
Hanoi City
Vietnam

Fax:  +84 4 38722254
Attention:  Director of Technical Department and Director of Supply & Material Management Department
E-mail:  thangnguyenchien@vietnamairlines.com and hoaitranquoc@vietnamairlines.com

4.  The contact details of the Initial Controlling Party for the purposes of clause 8.2 (*Relevant Parties' Addresses*) of the Airframe Warranties Agreement are as follows:

**National Australia Bank Limited**

National Australia Bank Limited
Specialised Transaction Management
Level 29, 500 Bourke Street
Melbourne VIC 3000
Australia

Fax :  +61 3 8641 3590 / 1300 652 199
Email:  wholesale.banking.transaction.management.group@nab.com.au
Christopher.Evans@nab.com.au
Attention:  Christopher Evans

with a copy to Dubai Aerospace Enterprise (DAE) Ltd. at:

**Dubai Aerospace Enterprise (DAE) Ltd.**
Level 3, Building 4
Dubai International Financial Centre
PO Box 506592
Dubai, United Arab Emirates

Email:        daecapitalnotices@dubaiaerospace.com
Attention:    General Counsel

5.    This is the Initial Notice.

6.    By its signature below and in consideration of the Manufacturer making available to it the rights specified under the Airframe Warranties Agreement and for other good and valuable consideration, receipt of which is hereby acknowledged, the Initial Entitled Party hereby: (i) represents and warrants that it is an Eligible Person; and (ii) joins as party to, and agrees to be bound by and perform its obligations under (as, and for so long as it remains, the Entitled Party) the terms and conditions of, the Airframe Warranties Agreement.

7.    By its signature below and in consideration of the Manufacturer making available to it the rights specified under the Airframe Warranties Agreement and for other good and valuable consideration, receipt of which is hereby acknowledged, the Initial Controlling Party hereby: (i) represents and warrants that it is an Eligible Person; and (ii) joins as party to, and agrees to be bound by and perform its obligations under (as, and for so long as it remains, the Controlling Party) the terms and conditions of, the Airframe Warranties Agreement.

8.    This notice shall be governed by and construed in accordance with the laws of France.

**NATIONAL AUSTRALIA BANK LIMITED**

By: _____

Title: _____


**VIETNAM AIRLINES JSC**

By: _____

Title: _____


Accepted and agreed for and on behalf of:

**AIRBUS S.A.S.**

By: _____

Title: _____

## SCHEDULE 4
## REPLACEMENT ENTITLED PARTY NOTICE

To:         **Airbus S.A.S.**
Attention:  Head of Contracts - Customer Services

CC:         **[Outgoing Entitled Party]**
Attention:  [•]

*[Date]*

**One 350-900XWB airframe with MSN 0067 (the "Airframe")**

1.    Unless otherwise defined, terms used in this notice bear the same meanings as those set forth in the airframe warranties agreement dated [•] entered into by Airbus S.A.S. in relation to the Airframe (the "**Airframe Warranties Agreement**").

2.    [•] (the "**Controlling Party**") hereby gives notice that, as from today's date: (a) [•] (being the "Outgoing Entitled Party" for the purposes of the Airframe Warranties Agreement) has ceased to be the Entitled Party; and (b) [•] (the "**New Entitled Party**") is the new Entitled Party

3.    The contact details of the New Entitled Party for the purposes of clause 8.2 (*Relevant Parties' Addresses*) of the Airframe Warranties Agreement are as follows:

      [•]

4.    This is a Replacement Entitled Party Notice.

5.    By its signature below and in consideration of the Manufacturer making available to it the rights specified under the Airframe Warranties Agreement and for other good and valuable consideration, receipt of which is hereby acknowledged, the New Entitled Party hereby: (i) represents and warrants that it is an Eligible Person; and (ii) joins as party to, and agrees to be bound by and perform its obligations under (as, and for so long as it remains, the Entitled Party) the terms and conditions of, the Airframe Warranties Agreement.

6.    This notice shall be governed by and construed in accordance with the laws of France.

**[NAME OF CONTROLLING PARTY]**

By:      _____

Title:    _____


**[NAME OF NEW ENTITLED PARTY]**

By:      _____

Title:    _____


Accepted and agreed for and on behalf of:

**AIRBUS S.A.S.**

By:      _____

Title:    _____

## SCHEDULE 5
## REPLACEMENT CONTROLLING PARTY NOTICE

To:        **Airbus S.A.S.**
Attention:   Head of Contracts - Customer Services

CC:        **[Entitled Party]**
Attention:   [•]

<em>[Date]</em>

**One A350-900XWB airframe with MSN 0067 (the "Airframe")**

1.      Unless otherwise defined, terms used in this notice bear the same meanings as those set forth in the airframe warranties agreement dated [•] entered into by Airbus S.A.S. in relation to the Airframe (the "**Airframe Warranties Agreement**").

2.      We hereby give notice that, as from today's date: [•] (the "**Outgoing Controlling Party**") has ceased to be the Controlling Party; and [•] (the "**New Controlling Party**") is the new Controlling Party.

3.      The contact details of the New Controlling Party for the purposes of clause 8.2 (*Relevant Parties' Addresses*) of the Airframe Warranties Agreement are as follows:

      [•]

4.      This is a Replacement Controlling Party Notice.

5.      By its signature below and in consideration of the Manufacturer making available to it the rights specified under the Airframe Warranties Agreement and for other good and valuable consideration, receipt of which is hereby acknowledged, the New Controlling Party hereby: (i) represents and warrants that it is an Eligible Person; and (ii) joins as party to, and agrees to be bound by and perform its obligations under (as, and for so long as it remains, the Controlling Party) the terms and conditions of, the Airframe Warranties Agreement.

6.      This notice shall be governed by and construed in accordance with the laws of France.

**[NAME OF RETIRING CONTROLLING PARTY]**

By: _____

Title: _____

**[NAME OF NEW CONTROLLING PARTY]**

By: _____

Title: _____

Accepted and agreed for and on behalf of:

**AIRBUS S.A.S.**

By: _____

Title: _____

**EXECUTION PAGE**

**AIRBUS S.A.S.**

By:

Title:

~~Marion THOYER~~
Sales Contracts Manager
Attorney-in-fact

**Exhibit 3**

## REPLACEMENT CONTROLLING PARTY NOTICE

To:         **Airbus S.A.S.**
Attention:   Head of Contracts - Customer Services

CC:         **Vietnam Airlines JSC**
Attention:   Director of Technical Department and
             Director of Supply & Material Management Department

_____ 2018

**One A350-941 airframe with MSN 0173 (the "Airframe")**

1.    Unless otherwise defined, terms used in this notice bear the same meanings as those set forth in the airframe warranties agreement dated 29 December 2017 entered into by Airbus S.A.S. in relation to the Airframe (the "**Airframe Warranties Agreement**").

2.    We hereby give notice that, as from today's date: PAAL URANUS COMPANY LIMITED (the "**Outgoing Controlling Party**") has ceased to be the Controlling Party; and Crédit Agricole Corporate and Investment Bank (the "**New Controlling Party**") is the new Controlling Party.

3.    The contact details of the New Controlling Party for the purposes of clause 8.2 (*Relevant Parties' Addresses*) of the Airframe Warranties Agreement are as follows:

**Crédit Agricole Corporate and Investment Bank ("CACIB")**

Address:     12 place des États-Unis, CS 70052
             92547, Montrouge CEDEX
             France

Fax:         +33 1 41 89 85 75
Attention:   Structured Finance Agency & Middle Office
Email:       francois.barbut@ca-cib.com / alexandra.delaune@ca-cib.com / mounia.bekkali@ca-cib.com

4.    This is a Replacement Controlling Party Notice.

5.    By its signature below and in consideration of the Manufacturer making available to it the rights specified under the Airframe Warranties Agreement and for other good and valuable consideration, receipt of which is hereby acknowledged, the New Controlling Party hereby: (i) represents and warrants that it is an Eligible Person; and (ii) joins as party to, and agrees to be bound by and perform its obligations under (as, and for so long as it remains, the Controlling Party) the terms and conditions of, the Airframe Warranties Agreement.

6.    This notice shall be governed by and construed in accordance with the laws of France.

**PAAL URANUS COMPANY LIMITED**

By: _____Niall McNamara_____

Title: _____Director_____

**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**

By: _____    By: _____

Title: _____    Title: _____

Accepted and agreed for and on behalf of:

**AIRBUS S.A.S.**

By: _____

Title: _____

MSN 173 - REPLACEMENT CONTROLLING PARTY NOTICE

**PAAL URANUS COMPANY LIMITED**

By: _____

Title: _____


**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**

By: _____    By: _____
    Bertrand ROVETTO                              Amaury DE RIVAZ

Title: _____    Title: _____
    DIRECTOR                                          ASSOCIATE


Accepted and agreed for and on behalf of:

**AIRBUS S.A.S.**

By: _____

Title: _____

**PAAL URANUS COMPANY LIMITED**

By: _____

Title: _____


**CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK**

By: _____     By: _____

Title: _____     Title: _____


Accepted and agreed for and on behalf of:

**AIRBUS S.A.S.**

By: _____

Title: _____

Stéphanie ARCHIMBAUD
Head of Warranties
Services and Customer Support

MSN 173 - REPLACEMENT CONTROLLING PARTY NOTICE