**UNITED STATES BANKRUPTCY COURT**
<u>**SOUTHERN DISTRICT OF NEW YORK**</u>

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| JPA NO. 111 CO., LTD., and | : | Case No. 21-12075 (DSJ) |
| JPA NO. 49 CO., LTD., | : |  |
|  | : | (Jointly Administered) |
| Debtors.[1] | : |  |
|  | : |  |

### FITZWALTER CAPITAL PARTNERS (FINANCIAL TRADING) LIMITED'S PRELIMINARY OBJECTION TO DEBTORS' 506/502 MOTION AND RESPONSE TO DEBTORS' REPLY IN SUPPORT OF SALE MOTION AND JPL'S <u>STATEMENT IN SUPPORT OF SALE MOTION</u>

---

[1]  The Debtors in these Chapter 11 cases are: JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd.  The Debtors' corporate address is:  Kasumigaseki Common Gate West Tower, 3-2-1 Kasumigaseki, Chiyoda–Ku, Tokyo 100-0013.

# TABLE OF CONTENTS

**Page**

SUMMARY OF OBJECTION.................................................................................... 1

FACTUAL BACKGROUND .................................................................................... 4

    A.    Debtors' Obligation to Pay Secured Obligations In Full....................... 4

    B.    The Relevant Covenants In The Proceeds Agreements. ....................... 5

    C.    Retention of Airborne Capital By FWCP And Lease Asset Sale Process. ........... 7

    D.    FWCP's Claims Based On Conduct Of Debtors' Affiliates............................. 11

    E.    The Stipulation. .............................................................................. 14

OBJECTION.......................................................................................................... 15

I.     THE CLAIMS AND COSTS ASSERTED BY FWCP ARE SECURED
      OBLIGATIONS THAT SHOULD NOT BE DISALLOWED UNDER SECTION
      506(B) OR VALUED AT ZERO. .................................................................. 15

    A.    The English Claims And Head Lease Claims Are Secured Obligations
          Under The Proceeds Agreements But Are Not Subject To 506(b). .................... 16

    B.    The English Claims Are Secured Obligations Under The Proceeds
          Agreements...................................................................................... 17

    C.    The Head Lease Claims Are Secured Obligations, And FWCP Is Not
          Seeking A Double Recovery............................................................. 22

    D.    FWCP's Fees, Costs, and Charges Are Secured Obligations. ........................... 23

    E.    Section 3.1 Of The Security Assignment Agreement Is Valid. ......................... 31

II.    DEBTORS' 363(f) ARGUMENTS FAIL.......................................................... 32

    A.    Applicable Nonbankruptcy Law Does Not Allow Debtors To Sell The
          Aircraft or Lease Assets Until Secured Obligations Are Fully Satisfied............ 32

    B.    Debtors Have Not Received Adequate Consent................................. 33

    C.    Debtors' Fail To Show A Bona-Fide Dispute.................................... 33

    D.    Debtors Have Failed To Show That FWCP Could Be Compelled To
          Accept Less Than The Full Amount Of The Secured Obligations In
          Satisfaction Of Its Interest. .............................................................. 34

CONCLUSION ...................................................................................................... 35

## TABLE OF AUTHORITIES

**Page**

### Cases

*Bank of China v. Huang (In re Huang)*,
   275 F.3d 1173 (9th Cir. 2002) .......................................................................... 32

*Butner v. United States*,
   440 U. S. 48 (1979) ............................................................................................. 2

*In re C-TC 9th Avenue Partnership*,
   113 F.3d 1304 (2d Cir. 1997) ....................................................................... 9, 26

*Cheltenham and Gloucester Plc v Krausz*,
   [1997] 1 WLR 1558, at 1567–1568 .................................................................. 34

*In re DiStefano*,
   2019 WL 5616910 (Bankr. N.D.N.Y. Oct. 30, 2019) ................................. 25, 26

*In re Dow Corning Corp.*,
   211 B.R. 545 (Bankr. E.D. Mich. 1997) ........................................................... 17

*In re Eastman Kodak Co.*,
   2012 WL 2255719 (Bankr. S.D.N.Y. June 15, 2012) ....................................... 33

*Garages Ltd v Total Oil Great Britain Ltd*,
   [1983] 1 WLR 87 ............................................................................................... 31

*In re Gaylord Grain L.L.C.*,
   306 B.R. 624 (B.A.P. 8th Cir. 2004) ................................................................. 33

*In re Glazier Grp., Inc.*,
   2013 WL 1856305 (Bankr. S.D.N.Y. May 2, 2013) ............................... 25, 27, 30

*In re Grand Slam, U.S.A., Inc.*,
   178 B.R. 460 (E.D. Mich. 1995) ....................................................................... 35

*In re Hyer*,
   171 B.R. 67 (Bankr. W.D. Mo. 1994) ............................................................... 25

*In re Interiors of Yesterday, LLC*,
   2007 WL 419646 (Bankr. D. Conn. Feb. 2, 2007) ............................................ 33

*In re Intervention Energy Holdings, LLC*,
   553 B.R. 258 (Bankr. D. Del. 2016) .................................................................. 32

*In re Lehman Bros. Holdings Inc.*,
    422 B.R. 407 (Bankr. S.D.N.Y. 2010) .................................................................................. 32

*In re LightSquared Inc.*,
    2014 WL 5488413 ................................................................................................................. 16

*Manufacturers Nat'l Bank v. Auto Specialties Mfg. Co. (In re Auto Specialties Mfg. Co.)*,
    18 F.3d 358 (6th Cir. 1994) ................................................................................................... 25

*Multiservice Bookbinding Ltd v Marden*,
    [1979] Ch 84, at 110d-f ......................................................................................................... 31

*Nicole Energy Serv., Inc.*,
    385 B.R. 201 (Bankr. S.D. Ohio 2008) ................................................................................. 33

*Revel AC, Inc. v. IDEA Boardwalk LLC*,
    802 F.3d 558 (3d Cir. 2015) .................................................................................................. 34

*In re Saint Vincent's Cath. Med. Centers of New York*,
    440 B.R. 587 (Bankr. S.D.N.Y. 2010) .................................................................................. 15

*Scherer v. Federal Nat'l Mortgage Ass'n (In re Terrace Chalet Apartments, Ltd.)*,
    159 B.R. 821 (N.D. Ill. 1993) ............................................................................................... 35

*In re Taylor*,
    198 B.R. 142 (Bankr. D.S.C. 1996) ...................................................................................... 33

*Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*,
    549 U.S. 443 (2007) ................................................................................................................. 2

*In re TWA*,
    322 F.3d 283 (3d Cir. 2003) .................................................................................................. 34

### Statutory Authorities

11 U.S.C. § 363(b) .......................................................................................................................... 1

11 U.S.C. § 363(f) ............................................................................................................. 4, 26, 31, 34

11 U.S.C. § 502 ...................................................................................................................... 2, 3, 16

11 U.S.C. § 506(b) ................................................................................................................. passim

11 U.S.C. § 510(a) ................................................................................................................. 15, 26

Cape Town Convention, Article 1(m) ........................................................................................ 28

Cape Town Convention, Article 8 ..................................................................... 27, 28

Cape Town Convention, Article 9 ..................................................................... 27, 31

Cape Town Convention, Article 11 ......................................................................... 27

Cape Town Convention, Article 14 ......................................................................... 27

Cape Town Convention, Article 34 ......................................................................... 27

Cape Town Protocol, Article IX ............................................................................. 27

N.Y.U.C.C. § 9–623 ............................................................................................... 31

N.Y.U.C.C. § 9–210(b) ............................................................................................. 2

## Additional Authorities

4 *Collier on Bankruptcy* (16th ed. 2021) ................................................................ 24

FitzWalter Capital Partners (Financial Trading) Limited ("**FWCP**") respectfully submits this Preliminary Objection and Response ("**Objection and Response**") in response to (i) the *Motion of the Debtors for Entry of an Order (I) Determining Secured Claims of Prepetition Credit Facilities or (II) in the Alternative, Estimating Amounts of Claims Asserted by FitzWalter Capital Partners (Financial Trading) Limited and Its Affiliates* (Dkt. No. 136) (the "**506/502 Motion**"); (ii) Debtors' *Omnibus Reply to the Objections of FitzWalter Capital Partners (Financial Trading) Limited and the Intermediate Lessors Regarding the Proposed Sale* (Dkt. No. 130) ("**Reply**"); and (iii) JP Lease Products & Services Co. Ltd.'s ("**JPL**") *Statement in Support of Sale Motion* (Dkt. No. 132) ("**Statement**").[2]

## SUMMARY OF OBJECTION

As FWCP has forewarned throughout the pendency of these Chapter 11 Cases, Debtors' attempt to disallow (or estimate at zero) certain Secured Obligations owed to FWCP collides with fundamental principles of bankruptcy law. These fundamental problems serve as a material backdrop for the Sale Hearing. *First*, Debtors seek to sell more than their own assets—not merely the "equity of redemption" as this Court has inquired (Proposed Order ¶ 6)—notwithstanding that Bankruptcy Code section is undeniably limited to transactions involving "property of the estate" and that the "determination of property rights" is controlled here by English, not federal, law. 11

---

[2] Many of the arguments raised in the 506/502 Motion are identical or substantively similar to arguments first raised by Debtors in their Reply. Accordingly, and in the interest of efficiency, FWCP is filing single Objection and Response to address each of these related arguments and also to respond to new arguments raised by Debtors and JPL in their Reply and Statement, respectively. In accordance with a stipulation that FWCP has reached with the Debtors and others, (the "**Stipulation**"), this Objection and Response is limited to the legal issues that will be addressed by the Court at the Sale Hearing on March 14, 2022. This Objection and Response is preliminary in nature and FWCP reserves the right to file supplemental pleadings to address any and all factual issues that the Court deems necessary to the adjudication of Debtors' Sale Motion and 506/502 Motion in advance of any subsequent hearing on those issues. Capitalized terms used but not defined in this Objection and Response shall have the same meanings ascribed to them in the 506/502 Motion, Reply, or FWCP's *Preliminary Objection to Sale* (Dkt. No. 120) ("**Sale Objection**"), as applicable.

U.S.C. § 363(b); *Butner v. United States*, 440 U. S. 48, 54 (1979) (absent specific action by Congress, "the determination of property rights" is governed by applicable law).

*Second*, and critically, Debtors seek to determine the extent of FWCP's claims without respect for English law, which governs substantively. *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-51 (2007) ("[W]e have long recognized that the 'basic federal rule' in bankruptcy is that state law governs the substance of claims . . . ."). Debtors have apparently finally come to realize what FWCP has been repeatedly iterating throughout these Chapter 11 Cases: that Debtors cannot effectuate the Sale, as proposed in the APA, without first providing for full satisfaction of the Secured Obligations, as that term is defined in the Proceeds Agreements.

Indeed, Debtors have asked for, and FWCP as Security Agent has provided, accountings under N.Y.U.C.C. § 9–210(b) for each of the Aircraft, setting forth the amounts of the Secured Obligations, first as of January 21, 2022 (*see* Dkt. No. 80-6 (the "**First U.C.C. Statement**")), and second as of February 28, 2022 (*see* Dkt. No. 137 at 26 (the "**Second U.C.C. Statement**"). Pursuant to the Second U.C.C. Statement, the amount of outstanding Secured Obligations ($235,928,439.89,[3] plus the unliquidated amounts of damages and costs to be assessed in the English Proceeding) is significantly larger than the Purchase Price provided in the Stalking Horse Term Sheet ($207,741,763.53, *see* Sale Obj. at 31). These are not the only deficiencies with Debtors' Sale, but their fundamental nature alone establish that the Sale must not be approved.

Ostensibly in recognition of the adverse impact these issues will have on Debtors' ability to effectuate the Sale, Debtors attempt to invoke Bankruptcy Code sections 506(b) and 502 and

---

[3]  $120,087,471.51 in Secured Obligations relating to the MSN 067 Aircraft; $115,840,968.38 in Secured Obligations relating to the MSN 173 Aircraft. These amounts assume a 1:1.36 exchange rate for British Pounds Sterling and a 1:1.14 exchange rate for the Euro.

take aim at the amounts of the Secured Obligations that are over and above the Purchase Price that their Stalking Horse Bidders allegedly have agreed to pay, hoping that they can cleave off all additional amounts as "unreasonable" or valueless in order to salvage their Sale.[4]

Specifically, Debtors take issue with the following categories of Secured Obligations, each of which they argue are either (i) not actually Secured Obligations under the Transaction Documents or (ii) should be disallowed under section 506(b) or estimated at zero dollars under section 502:

- Amounts for damages suffered by FWCP as a result of breaches of the Transaction Documents;

- Unpaid rent owed to FWCP by the Intermediate Lessors;

- FWCP's fees and costs, including costs for management time, legal fees, remarketing costs, and insurance costs.

But each of these items fall squarely within the definition of Secured Obligations, and Debtors' arguments to the contrary are nothing less than an attempt to rewrite the clear terms of the Proceeds Agreements and other Transaction Documents. And Debtors' circular argument that these amounts should be valued at zero because the Secured Obligations will be paid in full (an assertion that FWCP disputes) has no basis in law or logic.

Similarly, Debtors' argument that whole swaths of fees and costs should be disallowed in their entirety as a matter of law under section 506(b), or valued at zero under section 502, not only misapplies the law, but attempts to transform Debtors (and JPL's) conclusory allegations regarding FWCP's intent and whether the Purchase Price will fully satisfy the Secured Obligations, into

---

[4]    In other words, even though there was no prepetition right to disallow or estimate such Secured Obligations, Debtors have used specific provisions of the Bankruptcy Code in order to consummate a sale that benefits their equity owner, despite the fact that their equity owner contracted to not cause or support a bankruptcy for either Debtor.

established facts, which is clearly improper, and which all parties have agreed cannot be considered at the Sale Hearing in any case pursuant to the limitations contained in the Stipulation.

Finally, the Reply's section 363(f) arguments fail to show that Debtors are entitled to sell the Purchased Assets free and clear absent full pay off of all Secured Obligations. *First,* section 363(f)(1) does not allow Debtors to sell free and clear absent full pay off as the referenced sections of the Cape Town Convention and N.Y.U.C.C. only contemplate a redemption and sale of the Collateral upon full satisfaction of the Secured Obligations.[5] *Second*, a dispute concerning *Debtors'* interest in property they seek to sell does not qualify as a bona fide dispute under section 363(f)(4)—to the contrary, the case law is clear that Debtors' interest in property must be determined before the Sale. *Third,* Debtors cannot show that under these circumstances an English court would compel FWCP to accept money satisfaction and order a release of its interests in the Aircraft and Lease Assets absent full payoff of the Secured Obligations.

## FACTUAL BACKGROUND

FWCP incorporates by reference the factual background set forth in its Sale Objection, and highlights the following facts specific to the 506/502 Motion and the new arguments raised in the Reply and Statement.

### A.    Debtors' Obligation to Pay Secured Obligations In Full.

As part of the Transaction, Debtors granted the Security Agent liens in the Aircraft and executed an absolute assignment of the Lease Assets in favor of the Security Agent. *See* Sale Obj. 7–12. Pursuant to the terms of the Transaction Documents, the Security Agent has the sole right to dispose of any Lease Asset unless and until there has been "full, final and indefeasible payment

---

[5]    The N.Y.U.C.C. is only applicable to the Aircraft as they are governed by the New York Mortgages. The N.Y.U.C.C. does not apply to the Lease Assets as they are governed by English law.

and discharge in full of all amounts of the Secured Obligations." *Declaration of Andrew Gray in Support of Motion to Dismiss* (Dkt. No. 23) (the "**Gray Decl.**") Exs. 10, 17 (Security Assignment Agreements) § 17; Exs. 9, 16 (Intermediate Lessor Security Assignments). This is not disputed by Debtors.

Similarly, the Security Agent has the right to enforce its liens in the Aircraft should Debtors default on the Loans, and is required to release its liens only upon full payment of the Secured Obligations. *See id.* Exs. 7, 14 (Proceeds Agreements) § 7.1. The Transaction Documents define "Secured Obligations" to mean "any and all moneys, liabilities and obligations (whether actual or contingent, whether now existing or hereafter arising, whether or not for the payment of money and including, without limitation, any obligation or liability to pay damages) from time to time owing to any of the Finance Parties by any Obligor pursuant to any Transaction Document." *Id.* at App'x A. This too is not disputed by Debtors.

The term "Obligors" is defined to include Debtors, Debtors' Parent (JPL), the Intermediate Lessors, and the Intermediate Lessors' Parent, JLPS Holding Ireland Limited ("**JLPSI**"). *Id.* And "Transaction Documents" includes the Security Documents, the Proceeds Agreements, the Hedging Agreements, the Subleases, the Head Leases, the Borrower Parent Letters, the Intermediate Lessor Parent Letters, the Security Assignment Agreements, and the Intermediate Lessor Assignment Agreements, the Senior Facility Agreements, and the Junior Facility Agreements. *Id.* Finally, FWCP is a "Finance Party" as both a Senior Lender and the Security Agent. *Id.* Again, this is not disputed by Debtors.

B.     **The Relevant Covenants In The Proceeds Agreements.**

The Transaction Documents also contain numerous covenants that expressly prohibit Debtors and their affiliates from engaging in certain conduct. The relevant covenants are described below.

The Proceeds Agreements forbid JPL and the Intermediate Lessors from causing Debtors to file these Chapter 11 Cases, or from joining in or supporting these cases, or any bankruptcy or insolvency proceeding, unless JPL has obtained the Security Agent's consent to do so. *Id.* § 3.1.3 (providing that JPL agrees "it shall not . . . file or join in any petition to commence any winding-up proceedings by or against the Borrower or the Intermediate Lessor or any other action or proceedings for the winding-up, dissolution, administration or examinership of the Borrower or the Intermediate Lessor or take, or acquiesce in, any other action which might reasonably be expected to lead to the bankruptcy or insolvency of the Borrower or the Intermediate Lessor, save as required by applicable law or with the consent of the Security Agent.");[6] *id.* § 3.2.3 ("The Intermediate Lessor hereby agrees . . . it shall not . . . (and shall procure that its Affiliates will not) . . . take, or acquiesce in, any other action which might reasonably be expected to lead to the bankruptcy or insolvency of the Borrower, save as required by applicable law or with the consent of the Security Agent.").

Each of the Borrower Parent Letters require JPL ensure Debtors remain solvent, avoid reorganization, and "duly and punctually perform and comply with [their] obligations." *See Decl. of Zachary Russell in Support of Obj.* (Dkt. No. 121) ("**Russell Decl.**") at Exs. 1, 2 (Borrower Parent Letters) ¶¶ 1(b), (d). The Intermediate Lessor Parent Letters require JLPSI to ensure the Intermediate Lessors "duly and punctually perform and comply with [their] obligations." *Id.* Exs. 3, 4. (Intermediate Lessor Parent Letters) ¶ 1(d).

---

[6]   *See also id.* § 10.2.3(c) (providing that JPL "shall not . . . (and shall procure that its Affiliates will not) . . . take, or acquiesce in, any other action which might reasonably be expected to lead to the bankruptcy or insolvency of the Borrower or the Intermediate Lessor, save as required by applicable law or with the consent of the Security Agent.").

The Intermediate Lessors are required by their respective Head Leases to make lease payments during the lease period and use reasonable endeavors to procure that VNA complies with its obligations under the Subleases. Finestone Decl. Exs. 2, 3 (Head Leases) §§ 3.1, 3.6. The Intermediate Lessors must pay rent directly to accounts which are pledged in favor of the Security Agent (or as otherwise directed by the Security Agent), and such payment must flow through the waterfall. First Day Decl. ¶ 14; *Declaration of Benjamin I. Finestone* (Dkt. No. 57) ("**Finestone Decl.**") Exs. 4, 5 (Subleases) §§ 9, 12. However, the Intermediate Lessors have failed to make the necessary rent payments owed to the Security Agent. *See Supplemental Declaration of Andrew Gray* (Dkt. No. 80) ("**Supp. Gray Decl.**") Ex. 6 (First U.C.C. Response).

Finally, each of the Proceeds Agreements contains a covenant that prohibits Debtors or any of their affiliates from engaging, directly or indirectly, in Anti-Social conduct, which includes, but is not limited to, "an action to defame the reputation or interfere with the business of any Finance Party by spreading rumour . . . or other actions similar or analogous to any of the foregoing in any jurisdiction." Gray Decl. Exs. 7, 14 (Proceeds Agreements) § 11.3.23.

###    C.    Retention of Airborne Capital By FWCP And Lease Asset Sale Process.

In early 2021, VNA defaulted on its lease payments under the Subleases, which in turn caused the Intermediate Lessors to default under the Head Leases and Debtors to default on the Loans. *See* First Day Decl ¶¶ 26–27.

On December 1, 2021, CACIB, as (then) Security Agent (i) notified Debtors, the Intermediate Lessors, and VNA that events of default had occurred and were continuing under the Head Leases and the Subleases, (ii) terminated the leasing of the Aircraft under the Head Leases and Subleases; and (iii) provided notice confirming the automatic acceleration of the Senior Loans. Gray Decl. ¶ 69, Exs. 31, 32 (Head Lease and Sublease Termination Notices). Debtors do not dispute that the Head Leases and Subleases were terminated prior to the Petition Date.

On December 1, 2021, CACIB also sent Enforcement Notices to Debtors, the Intermediate Lessors, and VNA pursuant to the Notice and Acknowledgement of Security Assignments. *See* Supp. Gray Decl. Exs. 1, 2 (Enforcement Notices). These Enforcement Notices triggered the Security Agent's power of sale pursuant to section 6.1 of the Security Assignment Agreements and also constituted notice that the power of sale had arisen. The Enforcement Notices directed VNA and the Intermediate Lessors to (i) "pay all amounts that may be payable" under the Subleases and Head Leases directly to the Security Agent, and (ii) "perform all obligations" under the Subleases and Head Leases "in favour of the Security Agent as if the Security Agent were named therein as lessor," as contractually required pursuant to paragraph 13 of the Notice & Acknowledgements of Assignment. *Id.* at 3–4.

Also on December 1, 2021, FWCP acquired $128,227,903.53 in outstanding senior obligations issued by Debtors. Gray Decl. ¶ 76. On December 2, 2021, FWCP assumed CACIB's role as Security Agent. *Id.* Consistent with its rights as Security Agent, on December 10, 2021, FWCP, engaged Airborne Capital ("**Airborne**") to conduct an auction of the Lease Assets, with the auction to close on December 17, 2021 ("**Lease Assets Auction**"). Gray Decl. ¶ 81. As part of the auction process, Airborne posted notices not only on the Wall Street Journal, but also Aersyn (a trade website), and its own website. Gray Decl. ¶ 82. Airborne specifically arranged for the WSJ advertisement to run nationally. *See Declaration of Andrew Gray* in Support *of Objection and Response* filed concurrently herewith, (the "**Third Gray Declaration**") ¶ 6. News of the pending sale was also picked up by Cirium, a prominent member of the aviation industry, who then published their own article on December 13, 2022 explaining the terms of the sale. *Id.*

Debtors knew of the auction by no later than December 13, 2021, and had received the Enforcement Notices on December 1, 2021, which provided express notice of the events of default

and triggered the Security Agent's power of sale pursuant to section 6.1 of the Security Assignment Agreements. Debtors have not disputed that the Security Agent has the power to sell the Lease Assets; they have only disputed the process which the Security Agent, through Airborne, used to market the Lease Assets.

On December 17, 2021, Debtors, at the direction of their parent, JPL, and with the support of JLPSI filed these cases (the "**Chapter 11 Cases**") to prevent FWCP exercising the parties' agreed upon remedies over the Lease Assets, assets that do not belong to Debtors. First Day Decl. ¶ 37; Hr'g Tr. 155:9–13. Debtors did not file the Chapter 11 Cases to, for example, save any relationship with VNA or to attempt to reorganize through a plan of reorganization.

On December 24, 2021, Debtors and two subsidiaries of Strategic Value Partners, LLC ("**SVP**"), Capital Reef LLC and Isle Royale LLC (together the "**Stalking Horse Bidders**") executed a term sheet pursuant to which the Stalking Horse Bidders committed to purchase, and Debtors agreed to sell, the Aircraft and all of the Lease Assets (the "**Stalking Horse Bid**"), (*see Stalking Horse Term Sheet* (Dkt. 21-3) at 1), despite the fact that the Lease Assets were not and are not Debtors' property.

On December 31, 2021, Debtors filed the Sale Motion, seeking approval of the Sale and the proposed Bid Procedures. The Sale Motion states that the total consideration is $207,741,763.53 (the "**Purchase Price**"). Sale Mot. ¶ 20. This amount is only to pay the outstanding amounts of the secured loans, plus all accrued but unpaid interest, payment of indemnification and out-of-pocket expenses (including attorneys' fees and costs), and a cash payment of $5 million, which is intended to paid to JPL. *Id.*

Consistent with its representations made at the first day hearing, on January 2, 2022, FWCP filed a motion to dismiss these Chapter 11 Cases (the "**Motion to Dismiss**") (Dkt No. 22). The

Motion to Dismiss sought to dismiss these cases under Bankruptcy Code section 1112 as commenced in bad faith due in part to the presence of many of the factors identified in *In re C-TC 9th Avenue Partnership*, 113 F.3d 1304 (2d Cir. 1997). The Motion to Dismiss also sought abstention under bankruptcy Code section 305, and further sought dismissal because, based on the evidence available to FWCP at the time, Debtors did not qualify for protection under Bankruptcy section 109(a) as Debtors were not domiciled in, had no operations in, and had no property in, the United States.[7]

On January 13, 2022, FitzWalter objected to the Bid Procedures proposed in the Sale Motion. *See Prelim. Obj. to the Sale Mot.* (Dkt. No. 56) (the "**Bid Proc. Obj.**"). Among other reasons for the relief requested in the Bid Procedures Objection, FWCP reiterated its concern that Debtors were seeking to sell the Lease Assets, which they did not own. *See* Bid Proc. Obj. § I.

On January 13, 2022, Debtors filed the APA. The APA contains a Purchase Price that is not tied to Secured Obligations. *See* Sale Obj. 17–18; APA § 3.01. The APA also indicates that the Sale is contingent on Debtors ability to sell the Lease Assets, which belong to FWCP. Sale Obj. 16–18.

Also on January 13, 2022, Debtors filed the Bills of Sale.[8] The Bills of Sale purport to transfer to Debtors all of the Intermediate Lessors' "right, title and interest, . . . in and to the Assigned Property," including the rights under the Subleases and the VNA Claims. Bills of Sale at 2–3. While the Court approved the *form* of the Bills of Sale, the Court specifically stated that "[f]or the avoidance of doubts, notwithstanding any language included in this order, ***no substantive***

---

[7]   This Court denied the Motion to Dismiss, concluding that Debtors had commenced the cases in good faith and, because of a retainer funded by JPL to Debtors' counsel two days before the filing, had property located in the United States.

[8]   Revised versions of the Bills of Sale were filed on January 21, 2022. *See* Dkt. No. 77.

*rights* of any parties are deemed to have been determined by this Order." Bidding Procedures

Order ¶ 21 (emphasis added).

### D.    FWCP's Claims Based On Conduct Of Debtors' Affiliates.

In the time leading up to the Petition Date and through the pendency of these Chapter 11

Cases, Debtors' affiliates have engaged in unlawful conduct, namely breaches of the Transaction

Documents, for which they are liable to FWCP, in its capacity as Security Agent and Senior

Lender.

On January 20, 2022, FitzWalter filed suit against JPL, the Intermediate Lessors, JLPSI,

and JLPSI's CEO, Heinrich Loechteken, in the High Court of Justice, Queen's Bench Division

Royal Courts of Justice in London, England (the "**English Proceeding**"). *See* Supp. Gray Decl.

Ex. 5 (English Proceeding Claim Form). The English Proceeding Claim Form details the

following claims that arise out of the filing of these Chapter 11 Cases (the "**Bankruptcy Filing**

**Claims**"):

- Breach of sections 3.1.3 and 10.2.3(c) of the Proceeds Agreements against JPL for supporting and joining in these Chapter 11 Cases;

- Breach of section 3.2.3 of the Proceeds Agreements against the Intermediate Lessors and JLPSI for supporting these Chapter 11 Cases;

- Breach of clause 1(b) of each of the Borrower Parent Letters JPL for failing to ensure Debtors would remain solvent and not be reorganized;

- Breach of clause 1(d) of each of the Borrower Parent Letters against JPL for failing to ensure the Borrowers would "duly and punctually perform and comply with [their] obligations";

- Breach of clause 1(d) of each of the Intermediate Lessor Parent Letters against JPLSI for failing to ensure the Intermediate Lessors would "duly and punctually perform and comply with [their] obligations";

The English Proceeding Claim Form details additional claims against the Intermediate

Lessors that arise out of breaches of the Head Leases (the "**Head Lease Claims**"):

- Breach of clause 3.6 of the Head Lease Agreements by the Intermediate Lessors, for failure to use reasonable endeavors to procure that VNA compliance with its obligations under the Subleases;

- Breach of the Head Leases against each of the Intermediate Lessors for failure to pay rent under the Head Leases.

Finally, the English Proceeding Claim Form details claims against the Intermediate Lessors that arise out of breaches of the Anti-Social Conduct provisions of the Proceeds Agreements (the "**Anti-Social Conduct Claims**"):

- Breach of clause 11.3.23(a) of the Proceeds Agreements, which requires the Intermediate Lessors to ensure that no Obligor engages in any Anti-Social Conduct, against any Finance Party, including the Security Agent and the Senior Lenders , based on false, defamatory, and damaging statements made about FWCP by Heinrich Loechteken, the CEO of JLPSI to members of the airline financing industry that have had a material impact on FWCP's ability to conduct business.

English Proceeding Claim Form ¶¶ 9-20.

The damages associated with the Anti-Social Conduct Claims are unquantified. Given the widespread campaign to defame FWCP and interfere with its business, the full extent of FWCP's damages remains unknown. The clear breaches of the Proceeds Agreements detailed in the Bankruptcy Filing Claims, Head Lease Claims, and the Anti-Social Conduct Claims are prima facie evidence of FWCP's claims and are apparent from the improper nature of the actions taken, including Mr. Loechteken's statements to industry professionals that FWCP is a "financial terrorist."

The breaches of the Anti-Social Conduct covenants have directly impaired FWCP's business. The following instances are just those currently known to FitzWalter, without the benefit of discovery, and the full extent of the breaches and the harm caused will only become apparent at a later stage:

- In conversations with Airborne, FWCP's Marketing Agent, Mr. Loechteken referred to FWCP as a "Financial Terrorist" and made both verbal and written threats (including text messages on or around December 19, 2021) to harm

Airborne if it did not resign immediately from the engagement with FWCP. Mr. Loechteken also stated in this text that he and his cohorts had already spoken to senior management at Airbus and Boeing and the President of the International Society of Transport Aircraft Trading ("**ISTAT**"), an international organization of leading aviation professionals;

- The defamatory comments have been directed at Airbus, one of the two key aircraft manufactures with whom FWCP has historically had a constructive relationship, include disparaging FWCP as a "predatory fund";

- FWCP's preferred service provider in Ireland has declined to work with FWCP as a result of this campaign;

- Disparaging statements about FWCP and the Lease Assets Auction process on the public record in these Chapter 11 Cases by JPL and/or its counsel;

- Statements including "improper," "hyper-aggressive," and "wholly inappropriate" have been reported in at least four global publications, with inevitable and intentional harm to FWCP's reputation;

- FWCP's financing partner, with whom FWCP has partially complete transactions, on Feb. 17, 2022 requested a call to discuss the "Japanese lessor situation" which it had seen in the press and wanted to "make sure on FitzWalter's side its not a major issue;"

- As further discovery will show, the breaches have had additional adverse effects on third parties' willingness to deal with FWCP and the value to FWCP's business and standing in the marketplace;

- Finally, costs awarded in the English Proceeding will only be determinable at the end of those proceedings and may include amounts in respect of future elements of the English Proceeding (which are not knowable at present).

Each of the Bankruptcy Filing Claims, Head Lease Claims, and the Anti-Social Conduct Claims

constitute a Secured Obligation of Debtors, as they are all contingent liabilities of the Obligors,

and FWCP, as Security Agent, has no obligation under the Transaction Documents to release the

property interests it holds in the Aircraft or the Lease Assets until these claims are addressed and

the amounts owed as damages for each of the above-listed causes of action, together with all fees

and costs associated with pursuing these claims, are paid in full. *See Reply to the Tregear Opinion*

*2,* submitted by Akhil Shah concurrently with this Objection (the "**Shah Reply**") ¶¶ 7–9; *Decl. of Akhil Shah* (Dkt. No. 79) Ex. 2 ¶¶ 38–46.

On January 21, 2022, FWCP provided Debtors the First UCC Statement, setting forth the amounts of the Secured Obligations then known to FWCP. *See* Supp. Gray Decl. Ex. 6 (UCC Statement) at App'x 1, 2. According to the UCC Statement, the outstanding Secured Obligations totaled more than $232,707,465.59, on January 21, 2022, plus the unliquidated amounts of damages and costs to be assessed in the English Proceeding. Debtors did not respond.

On February 28, 2022, after Debtors made a second request, FWCP provided to Debtors the Second UCC Statement, setting forth updated amounts of the Secured Obligations. *See Declaration of Jared Borriello in Support of 506/502 Motion* (Dkt. No. 137) ("**Borriello Decl.**") Ex. 6 (Second UCC Statement) at App'x 1, 2. As of February 28, 2022, the Secured Obligations totaled $235,928,439.89 plus the unliquidated amounts of damages and costs to be assessed in the English Proceeding. *Id.* And the amounts of the legal and professional fees and costs of the Security Agent have increased and will continue to increase as Debtors continue to pursue the Sale in breach of the express terms of the Transaction Documents.

### E. The Stipulation.

FWCP, Debtors, the Intermediate Lessors and JPL have agreed to certain terms embodied in the Stipulation, which, *inter alia*, an agreement to (i) forego the presentation or admission of evidence at the March 14, 2022 Sale Hearing concerning the Unliquidated Claims (as that term is defined in the Stipulation), including the claims being pursued in the English Proceeding; (ii) limit the facts to be considered by the Court in determining the reasonableness of FWCP's fees to the following: (a) the fact that Debtors filed these Chapter 11 Cases; (b) the terms of the Stalking Horse Term Sheet and APA; (c) the fact that Debtors have alleged that all Secured Obligations (as provided for, or not, by the term sheet) will be paid in full; (d) the Transaction Documents and

the rights and obligations related thereto, including enforcement thereof; and (e) the commencement by FWCP of the English Proceeding and the existence of the Japanese Dispute and the Irish Dispute; (iii) limit the issues presented to the Court concerning the Unliquidated Claims to (x) whether the Unliquidated Claims constitute claims, as defined in the Bankruptcy Code, or Secured Obligations as that term is defined in the Proceeds Agreements, and (y) whether the Unliquidated Claims, as alleged, are sufficient as a matter of law under the Transaction Documents and the Bankruptcy Code; and (iv) forego, or postpone for a later hearing, discovery concerning the merits of the Unliquidated Claims. *See* Stipulation ¶¶ 4–9.

## **OBJECTION**

### I.    **THE CLAIMS AND COSTS ASSERTED BY FWCP ARE SECURED OBLIGATIONS THAT SHOULD NOT BE DISALLOWED UNDER SECTION 506(B) OR VALUED AT ZERO.**

Debtors seek to rewrite the terms of the Transaction Documents by asking this Court to take an insupportably broad view of Bankruptcy Code section 506(b) so that they may limit the definition of Secured Obligations in a manner that (improperly) allows them to sell the Collateral and the Lease Assets to Stalking Horse Bidder at the preordained Purchase Price. In so doing, Debtors again advance an "ends justify the means" position. But they provide no factual or legal basis for the Court to disregard the clear contractual provisions in the Transaction Documents. Nor do Debtors set forth any legitimate basis for the disallowance of any of the Secured Obligations. Indeed, some of the Secured Obligations they seek to disallow under section 506(b) are not "fees, costs, or charges" as defined by that section, and Debtors have failed to show the fees and costs that are properly subject to section 506(b) can be disallowed as "unreasonable." 11 U.S.C. § 506(b).[9]

---

[9]    Section 506(b) will only apply in the event that the Lenders are oversecured, which remains to be seen. In any event, the fees and costs of the Security Agent sit at the top of the waterfall in section 8.3 of the

**A.    The English Claims And Head Lease Claims Are Secured Obligations Under The Proceeds Agreements But Are Not Subject To 506(b).**

Debtors do not argue that the claims against the Obligors for damages arising out of breaches of the Transaction Documents (the "**Breach Claims**") should be disallowed under section 506(b).  This is unsurprising.  By its own terms, section 506(b) only applies to "fees, costs, or charges."[10]  *Id.*  Section 506(b) does not apply to claims for damages.  *Cf. In re Saint Vincent's Cath. Med. Centers of New York*, 440 B.R. 587, 598 (Bankr. S.D.N.Y. 2010) ("The Court will not use the benefit of hindsight under the guise of § 506 (b) to disturb a liquidated damages clause in a contract negotiated by sophisticated parties").  Accordingly, FWCP's various claims for breaches of the Transaction Documents may not be disallowed pursuant to section 506(b).  Debtors have not cited any authority suggesting the contrary.

Thus, the only basis for the requested relief is estimation under section 502(c).  As discussed below, estimation cannot be resolved here because Debtors have agreed they will not challenge that factual basis for such claims at the March 14, 2022 hearing, and, in exchange, FWCP has agreed to stay discovery relating to the merits of such claims.  *See* Stipulation ¶¶ 4–7. Accordingly, as the parties have agreed to avoid developing the record necessary for the Court to make factual determinations regarding the merits and quantum of the claims, Debtors' factual arguments should not inform the Court's analysis.

Moreover, Debtors' request for estimation should be denied on its face, as estimation is not absolutely necessary to avoid undue delay of administration of Debtors' cases, which is what is

---

Proceeds Agreement, and must be paid first out of any distribution, regardless of whether the Lenders are oversecured or not.  *See* 11 U.S.C. § 510(a).

[10]    While Debtors include FWCP's breach claims within its defined term "FitzWalter Alleged Fees, Costs & Charges," they make no substantive effort to argue that the Breach Claims should be disallowed under section 506(b).

required under the caselaw.  The fact that Debtors may want estimation in order to effectuate a

sale that, by contract, includes a purchase price requiring payment in full of all Secured Obligations

is not a basis to claim "undue delay."  *See In re LightSquared Inc.*, 2014 WL 5488413 at *5–6

("[T]he cause of this so–called delay is really the inability, in the absence of estimation at zero or

expungement of the Guaranty Claim, to confirm a plan . . .  In other words, 'if the Court expunges

this claim, we can confirm the . . . Plan.' . . .  While the Court recognizes and shares the desire of

all parties in interest to bring these cases to a successful conclusion as soon as possible, it declines

to consider the failure to meet the parties' self–imposed deadlines and conditions to confirmation

of the Inc. Plan as an appropriate factor to be considered in an undue delay analysis. Delay, undue

or otherwise, is not a justification for ignoring applicable law or undermining the settled

expectations of parties who transact every day in reliance on the belief, for example, that credit

documents such as guarantees mean what they say."); *In re Dow Corning Corp.*, 211 B.R. 545,

563 (Bankr. E.D. Mich. 1997) (noting a delay is "undue" if it is "unjustifiable").

     **B.**     **The English Claims Are Secured Obligations Under The Proceeds Agreements.**

Debtors argue that the Breach Claims are not Secured Obligations for various legal and

factual reasons.  However, each argument fails on its face.

     1.     *The Anti-Social Conduct Claims are Secured Obligations that this Court Should Not Erase.*

Debtors incorrectly argue that claims arising from the non-Debtors' violation of the Anti-

Social covenants are not Secured Obligations.  There is no dispute that the Transaction Documents

define that Secured Obligations to include "all moneys, liabilities and obligations (whether actual

or contingent, whether now existing or hereafter arising, whether or not for the payment of money

and including, without limitation, any obligation or liability to pay damages," (*see* Gray Decl. Exs.

7, 14 (Proceeds Agreements) at App'x A), or that these claims have been asserted against the

Intermediate Lessors, parties that are defined as Obligors under the Transaction Documents that are bound to "ensure that no Obligor shall . . . engage in any Anti-Social Conduct," and to refrain from engaging in "any obstructive activities, including, but not limited to, disseminating information or fraudulent activities for the purpose of falsely harming a Lender's creditworthiness or impeding a Lender's business." *Id.* §§ 11.3.23(a); 11.3.23(c).

Instead, Debtors argue Heinrich Loechteken's statements do not implicate the Anti-Social covenant because FWCP did not allege that Mr. Loechteken "spread[] rumour, us[ed] fraudulent means or resort[ed] to force." 506/502 Mot. ¶ 32; Reply ¶ 34. This argument is incorrect.

To begin, the allegations asserted in the English Proceeding, (Supp. Gray Decl. Ex. 5), and the Sale Objection (at 22–24), were made without the benefit of discovery, as Debtors and JPL have refused to produce any documents relating to these claims.[11] But even without discovery, FWCP has reasonably alleged that Mr. Loechteken has engaged "action[s] to defame the reputation or interfere with the business of" FWC through "rumor" or "other actions similar or analogous"—namely by calling FWCP a "financial terrorist" and "predatory" and threatening Airborne if it continued to work with FWC—and that he has harmed FWCP's business by doing so. *See* Sale Obj 22–24. These allegations, and the reasonable inferences they support, adequately state a prima facie claim for a violation of the Anti-Social covenants. Debtors' attempt to summarily dismiss FWCP's concerns is unpersuasive: Mr. Loechteken's statements that FWCP is a "financial terrorist" and a "predatory fund" and his efforts to interfere with FWC's business relationships are clearly the type of conduct that the Transaction Documents prohibit.[12]

---

[11]  And Debtors have agreed to refrain from making arguments regarding the merits of the claims asserted in the English Proceeding. *See* Stipulation ¶¶ 4–5.

[12]  For this reason, Debtors' argument that the Intermediate Lessors did not breach Clause 1(d) of the Intermediate Lessor Support Letters (506/502 Mot. ¶ 34) must also fail.

Similarly, Debtors' argument that Mr. Loechteken is not "a director, employee, agent, or other person acting on behalf of the Intermediate Lessors" (506/502 Mot. ¶ 33)—and therefore that 11.3.23(c) is inapplicable—is without merit. Debtors have not provided any evidence to support this factual assertion, notwithstanding FWCP's repeated requests for discovery about who is authorized to speak on behalf of Debtors and their affiliates, and the provision in question makes the Intermediate Lessors responsible for Anti-Social Conduct "whether directly or indirectly."[13] In any case, Debtors have stipulated that such a factual determination should not be addressed at the March 14, 2022 hearing. *See* Stipulation ¶¶ 4–5.

In another attempt to rewrite the Transaction Documents, Debtors attempt to smuggle past this Court a contrived reading of the Anti-Social covenants, reasoning that the relevant provisions are only concerned about organized crime. Debtors argue that the Proceeds Agreement clearly implies such a limitation, yet they cannot cite anything that supports this strained construction. It is well-settled that contractual interpretation should effectuate the parties' intent as manifested by the terms and language of their bargain; the Proceeds Agreements do not expressly or impliedly contemplate Debtors' proposed limitation. This Court should not be misguided by Debtors' specious reading.

Finally, Debtors' bald assertion that "there will be no damages" resulting from the Anti–Social Claims because there will be "payoff or satisfaction of the Secured Obligations" (506/502 Mot. ¶ 34) is circular, illogical, and should be rejected. FWCP has reasonably alleged significant,

---

[13]    Both sets of Requests For Production served by FWCP requested "documents and communications concerning the formation and corporate governance of the Debtor." These documents were requests for the specific purpose of understanding Mr. Loechteken's role within the various JP–related entities, as has been explained to Debtors on multiple meet and confers. Debtors have summarily refused to produce such documents. It would be patently unfair to now allow Debtors to make assertions regarding Mr. Loechteken's roles while simultaneously when they have unjustifiably refused to produce discovery into these very same issues.

intentional damages to its business as a result of a clear breach of contract. The full extent of the FWCP's injury cannot be known or estimated before discovery has occurred. In addition, Debtors and the Stalking-Horse Bidder have specifically represented to the Court that the proposed transaction will not include payment of the Unliquidated Claims. As such, Debtors' argument is baseless.

Accordingly, this Court cannot rationally conclude that FWCP's claims are absolutely worthless at the Sale Hearing as Debtors' request. The Court must allow the parties to develop a reliable record that can support such a finding.

2.    *The Bankruptcy Filing Claims Are Secured Obligations and Should Not be Valued at Zero*

Debtors argue, incorrectly, that the Bankruptcy Filing Claims are not Secured Obligations and should be valued at zero dollars because they "have no basis." 506/502 Mot. 27 ¶ 27; Reply ¶ 36. In support, Debtors provide a chart of "legal" arguments, all of which are defective. *See* 506/502 Mot. ¶ 27.

*First*, Debtors apparently believe that the filing of these Chapter 11 Cases did not violate sections 3.1.3, 3.2.3, and 10.2.3 of the Proceeds Agreements because a chapter 11 filing is not a "bankruptcy or insolvency" as that term is used in those provisions. *See* 506/502 Mot. ¶ 27. This argument is frivolous. *See* Shah Reply ¶¶ 29–31. These provisions do not set forth a narrow prohibition of support of or participation in any specific "bankruptcy or insolvency" proceeding— these provisions are broader and cover "***any*** petition to commence ***any*** winding-up proceedings" of Debtors, along with "***any*** other action or proceedings for the ***winding-up, dissolution, administration*** or examinership" of Debtors, and "***any other action*** which might reasonably be expected to lead to the bankruptcy or insolvency." Gray Decl. Exs. 7, 14 (Proceeds Agreements) §§ 3.1.3; 3.2.3; 10.2.3 (emphases added). These provisions were broadly drafted, reflecting the

20

parties' unambiguous intent to prohibit *any* type of conduct that would bind the creditors to a court-ordered alteration of their entitlements under the loan documents.  Shah Reply ¶¶ 30–31.  These Chapter 11 Cases unquestionably violate the natural and plain meeting of the parties' agreement.[14]

*Second,* Debtors argument that they did not breach these provisions because the filings were "required by applicable law" to stop FWCP from exercising its rights under the Transaction Documents (*see* 506/502 Mot. ¶ 27) is similarly baseless.  Debtors point to no "applicable law," under either the Transaction Documents or English law, that could have "required" the Obligors to support Debtors' chapter 11 filings in the United States *in any circumstance*, much less to prevent the Security Agent from exercising its rights over the Collateral pursuant to its authority under the Transaction Documents.  *See* Shah Reply ¶ 32; Sale Obj. 7–8.

*Third,* Debtors' argument that they did not breach the Borrower Parent Letters or Intermediate Lessor Parent Letters because they filed these Chapter 11 Cases to "protect the solvency of Debtors" (*see* 506/502 Mot. ¶ 27) is undermined by Debtors' own admission that the purpose of these filings was to prevent FWCP from selling the Lease Assets.  *See e.g.*, *Debtors' Obj. to Mot. to Dismiss* (Dkt. 53) ¶ 19.  In any case, Debtors have indicated from the outset that these filings were initiated to effectuate a section 363 sale of substantially all of Debtors assets, not to reorganize into a solvent operating entity that would emerge and continue as a going concern post-bankruptcy.  *See id.*

*Fourth,* Debtors claim their breaches were caused "solely and directly by" VNA's payment defaults.  *See* 506/502 Mot. ¶ 27.  That is inconsistent with their prior representations.  As Debtors told this Court, even though VNA stopped meeting its payment obligations at the beginning of

---

[14]  Of course, the Proceeds Agreements do not specifically mention chapter 11, or the Bankruptcy Code, because *no one* believed Debtors would ever run thousands of miles to the United States to commence an insolvency proceeding.  Debtors have not produced any evidence to the contrary.

2020, the bankruptcy filings did not occur until December 17, 2021, on the eve of FWCP's auction of the Lease Assets. The timing was not coincidental. Debtors did not invoke the protections of the Bankruptcy Code because of VNA's default; their filings were a tactical decision of the Obligors explicitly intended to prevent FWCP from exercising its contractual rights as Security Agent. Debtors have admitted as much, and like the Transaction Documents, Debtors cannot rewrite the narrative to serve their present purposes. *Id.*

*Finally*, Debtors again emphasize that full repayment of the Secured Obligations is dispositive. *See* 506/502 Mot. ¶ 27. Debtors have agreed that FWCP's damages are not at issue for the March 14, 2022 hearing. *See* Stipulation ¶¶ 4–5. And this argument is particularly cynical given that FWCP's damages will include the costs and fees it has incurred as a result of these Chapter 11 Cases, amounts Debtors are specifically requesting the Court disallow. Debtors' promise of full payment only comes true if the Court rewrites the Transaction Documents to erase FWCP's Secured Obligations.

### C.    The Head Lease Claims Are Secured Obligations, And FWCP Is Not Seeking A Double Recovery.

Debtors admit that they have failed to pay the amounts owed by the Intermediate Lessors under the Head Leases. *See* Reply ¶ 4 ("The Intermediate Lessors owe more than $20 million in unpaid rent to Debtors pursuant to the Head Leases."). And Debtors admit that these amounts must be paid directly to the Security Agent, FWCP. 506/502 Mot. ¶ 23 ("Clause 11.2 of the Proceeds Agreements . . . provid[es] that the Intermediate Lessors have a direct obligation to the Security Agent—in addition to the Intermediate Lessors' obligations to Debtors under the Head Leases—in respect of any amounts owing to Debtors under the Transaction Documents."). Independently, the Intermediate Lessors are separately obligated to pay these amounts to FWCP, which will distribute the amounts according to the waterfall contained in section 8.3 of the

Proceeds Agreements. This distribution will result in a commensurate decrease in the outstanding amount of principal and interest, as well as costs and expenses payable to the Security Agent, as applicable.

As a practical matter, paying one-tier of the lease obligations will flow through the distribution scheme, and its cascade will extinguish the second-tier obligations, so there is no prospect of double recovery. However, the waterfall distribution is the precise structure for which the parties bargained, and the process must be respected to extinguish the Secured Obligations. To accept Debtors' argument would write out of the Transaction Documents bargained-for protections, treating these provisions as mere surplusage, in violation of contract principles recognized under English law and every state.

### D.    FWCP's Fees, Costs, and Charges Are Secured Obligations.

1.    *FWCP Is Entitled To Legal Fees Under The Transaction Documents And Debtors Have Not Shown The Fees Are Unreasonable.*

Debtors do not argue that FWCP's legal fees are not Secured Obligations, and indeed they, and—all other fees and costs included in the Security Agent's calculation of Secured Obligations—are specifically provided for in the Proceeds Agreement and Senior Facility Agreements. *See* Gray Decl. Exs. 5, 12 (Senior Facility Agreements) § 15.5 (providing that the Debtors shall indemnify the Security Agent for any "Loss"[15] suffered, "including any Remarketing and Recovery Expenses"); *id.* § 16.1.2 ("The Borrower shall promptly on-demand pay to each Senior Finance Party the amount of all reasonable costs and documented expenses (including, but not limited to, legal fees) incurred by that Senior Finance Party in connection with the preservation

---

[15]    Loss is defined broadly to include "any losses (including Taxes), costs, charges, documented and properly incurred expenses, interest (including default interest), fees (including, without limitation, legal fees and VAT thereon), payments, demands, liabilities, claims, actions, proceedings, penalties, damages, adverse judgments, orders or other sanctions." *Id.* Exs. 7, 14 (Proceeds Agreements), at App'x A.

of any rights under any Security Document requested as a result of an Event of Default, Acceleration Event or Change in Law."); *id.* § 16.3 ("The Borrower shall, on demand, pay to each Senior Finance Party the amount of all costs and expenses (including, but not limited to, legal fees) incurred by that Senior Finance Party in connection with the enforcement of, any Security Document in circumstances where an Event of Default or Acceleration Event is continuing."); *Id.* Exs. 7, 14 (Proceeds Agreements) § 8.3.1 & App'x A (including the Security Agent's Expenses among the first payments to be made under the waterfall, and defining "Expenses" to include "the costs and expenses referred to in clause 16 (*Costs and Expenses*) of the Senior Facility Agreement); There is no question that FWCP's legal fees are Secured Obligations, nor is there any dispute there is no "prevailing party" provision.

Debtors instead argue that FWCP's legal fees should not count in the calculation of Secured Obligations because they should be disallowed under section 506(b). *See* 506/502 Mot. ¶ 50. Usually, a determination of the reasonableness of legal fees requires the parties to provide to the Court "a detailed description of the services rendered, supporting documentation, or other evidence . . . ." 4 Collier on Bankruptcy ¶ 506.04 (16th ed. 2021) (gathering cases). But Debtors do not attempt to provide detailed descriptions for the fees, explain which categories of fees they believe are unreasonable, or point to any line item entries in the invoices sent to FWCP by its counsel. Instead, Debtors proffer three blanket justifications that, they argue, require disallowance of FWCP's legal fees *in toto*. *See* 506/502 Mot. ¶ 50. Each of these arguments fail.

*First,* Debtors argue that all of FWCP's legal fees should be disallowed because "FitzWalter commenced an unlawful and commercially unreasonable sales process for the Lease Assets." *Id.* FWCP disputes this characterization of the process it used to market and sell the Lease Assets. Any determination on the "commercial reasonableness" of the sale process is

necessarily factual and would require discovery. In any case, Debtors utterly fail to explain how FWCP's sale process has any bearing on the determination of the reasonableness of all of the legal fees Debtors now seek to disallow.

*Second,* Debtors allege that the litigations instituted by FWCP against Debtors' affiliates were commenced with the "ulterior motive of wresting Debtors' property away from Debtors." Again, Debtors present no evidence to support this baseless claim. Nor could they because, again, there has been no discovery into this issue. And Debtors have explicitly agreed to forego arguments concerning the merits of the litigations instituted by FWCP in other fora. *See* Stipulation ¶¶ 4–5. Moreover, Debtors' claims regarding any supposed "ulterior motive" by FWCP are nonsense: FWCP is vindicating its legitimate legal rights by bringing the Unliquidated Claims against the Obligors. *In re DiStefano*, 2019 WL 5616910, at *2 (Bankr. N.D.N.Y. Oct. 30, 2019) (fees were reasonable where (i) "[c]reditor counsel has vigorously represented its client against multiple defendants and debtors in various locations in state and federal court involving numerous hearings, briefings, and appeals" and "the Debtor did not establish bad faith"); *In re Hyer*, 171 B.R. 67, 71 (Bankr. W.D. Mo. 1994) (fees incurred to "enforce any rights" of the secured lender were reasonable, even those expended in litigation against a guarantor); *Manufacturers Nat'l Bank v. Auto Specialties Mfg. Co. (In re Auto Specialties Mfg. Co.)*, 18 F.3d 358, 360 (6th Cir. 1994) (costs incurred by creditor as defendant in action brought by debtor in possession for equitable subordination were reasonable).

*Finally*, Debtors allege that because the "Sales Process guarantees the full repayment of all Secured Obligations, no legitimate purpose is being served by the expenditure of any legal fees" by FWCP beyond "typical monitoring costs." *See* 506/502 Mot. ¶ 50. But as this Court is well aware, whether the Sale will result in full payment of the Secured Obligations is in dispute. Indeed,

it is FWCP's position that the sale is illegitimate for the precise reason that it will **not** result in full payment of the Secured Obligations, and that Debtors are improperly seeking to sell assets that they do own (*i.e.*, the Lease Assets).  *See* Sale Obj. 26–34.  The vast majority of FWCP's legal fees were expended in these Chapter 11 Cases to protect its rights, including its property interests in the Lease Assets, and to ensure that the Lenders are not improperly stripped of their rights to the Collateral,[16] all of which are reasonable costs under section 506(b).  *See In re Glazier Grp., Inc.*, 2013 WL 1856305, at *3 (Bankr. S.D.N.Y. May 2, 2013) (the court's primary goal in assessing the reasonableness of fees is to "determine whether the creditor reasonably believed the services were necessary to protect its interest in the debtor's property."); *DiStefano*, 2019 WL 5616910, at *2.[17]

        2.    *Airborne's Fees Are Reasonable.*

Debtors argue in summary fashion that the fees Airborne charged as remarketing and sales agent for FWCP should be disallowed under section 506(b) because Airborne's Lease Asset Auction allegedly "violat[ed] requirements of the Cape Town Treaty and other applicable laws"

---

[16]  *See FWCP's Objection to Debtors Motion for Entry of an Order (I) Enforcing the Protections of Sections 105(A), 362, 365, 525, and 541 of the Bankruptcy Code, Restating Automatic Stay and Ipso Facto Provisions; and (II) Granting Related Relief* (Dkt. No. 12) (filed to ensure automatic stay was not improperly extended to protect non-debtors); Motion to Dismiss (seeking to dismiss these Chapter 11 Cases because Debtors had no connection to the United States and multiple *C-TC* factors were present); Objection to Bid Procedures (raising concerns over Debtors' plan to sell assets they do not own, improper limitations on credit bidding, and out-of-market break-up fees); Sale Objection (explaining Sale cannot go forward because Debtors will not own Lease Assets at time of sale and failed to comply with section 363(f)); *Adversary Complaint*, Case No. 22-01004 (Dkt. No. 1) (teeing up Lease Asset ownership issue for determination).

[17]  Even if FWCP's legal fees are disallowed as a secured claim against Debtors, FWCP is still entitled to full payment of those fees before any other creditor may receive payment under the waterfall contained in section 8.3 of the Proceeds Agreements, which is an intercreditor agreement enforceable under the Bankruptcy Code.  *See* 11 U.S.C. § 510(a).  Further, FWCP would be entitled to recover such fees from non-debtors; Bankruptcy Code section 506(b) only applies to claims against a debtor's estate.  FWCP reserves its rights to seek turnover under section 4.1 of the Proceeds Agreements should Debtors, JPL, or any Finance Party receive a distribution prior to full payment of FWCP's Expenses (as defined in the Proceeds Agreements), including its legal fees and costs.

and was "commercial unreasonable."[18]  506/502 Mot. ¶ 44.  These arguments are unfounded.

Debtors point to no caselaw establishing that the purported violation of a ten-day notice requirement in an international treaty is sufficient to disallow the entirety of remarketing costs. Indeed the caselaw is clear that costs are unreasonable where the expenses were not "necessary to protect [the secured creditor's] interest in the debtor's property." *Glazier Grp.*, 2013 WL 1856305, at *3.  Debtors do nothing to address that requirement here.

In any case, Debtors' claim that the auction violated the Cape Town Treaty is wrong. Debtors are apparently arguing that Article IX(4) of the Cape Town Protocol—which states "A chargee giving ten or more working days' notice of a proposed sale or lease to interested persons shall be deemed to satisfy the requirement of providing 'reasonable prior notice' specified in Article 8(4) of the Convention"—imposed a ten-day notice requirement on FWCP and Airborne. But Article 34 of the Convention (which relates to default remedies in respect of security assignments) specifies only that Articles 8, 9, and 11 to 14 of the Convention apply to the sale of the Lease Assets (as opposed to a sale of the Aircraft itself).  Article 34 does not refer to or apply Article IX of the Protocol, or specify any way in which Article IX(4) should be interpreted in relation to security assignments.  This makes sense, as there is a clear difference between selling the Aircraft (which belongs to someone else) and selling the Lease Assets, which FWCP already owns.  Additionally, applying a ten-day notice period to assignments would be improper because it is much more important to act quickly against contractual rights against a defaulting party than against the asset, because the there is a far greater risk that the former will severely devalue in the

---

[18]  Debtors do not argue that costs associated with the retention of Airborne are not Secured Obligations under the Transaction Documents, as they are explicitly provided for the Proceeds Agreements.  Gray Decl. Exs. 7, 14 (Proceeds Agreements) § 8.3.1 (specifically providing for repayment of Security Agent's Remarketing and Recovery Expenses).

short term, if not disappear entirely.  Furthermore, the plain English wording of Article IX(4) only

refers to a "chargee" not an assignee.  Article IX(4) of the Protocol, therefore, does not, on its own

terms, contemplate a sale of the Lease Assets, and the ten-day notice requirement does not apply.

Instead, the only arguably applicable requirement imposed upon FWCP and Airborne is

the general requirement to provide reasonable notice under Article 8(4) of the Cape Town

Convention,[19] which FWCP clearly fulfilled.  *First*, the only entities that qualify as "interested

persons" under the Cape Town Convention (*i.e.*, Debtors and Intermediate Lessors, *see* Cape Town

Convention art. 1(m)), were given Enforcement Notices on December 1, 2022, notifying them that

an Enforcement Event had occurred, which triggered the power of sale.  *Second*, Debtors concede

that they received notice of the sale on December 13, 2022, (*see* Jan. 26, 2022 Hr'g Tr. 125:3-14),

which provided ample time to take action, including by filing of these Chapter 11 Cases.

Presumably, they could easily have participated in the Lease Assets Auction had they wished to

do so.  *See id.* 128:10-16.  In any case, it is difficult to see how the auction violated any applicable

laws, as it is undisputed that the sale never transpired.

As to commercially reasonableness, Article 8(3) of the Cape Town Convention simply

states, "[a]ny remedy . . . shall be exercised in a commercially reasonable manner" and that "[a]

remedy shall be deemed to be exercised in a commercially reasonable manner where it is exercised

in conformity with a provision of the security agreement [the security assignment] except where

---

[19]    Article 8(4) specifies that:

"A chargee [which includes an assignee] proposing to sell … [assigned lease rights, following a default under a security assignment] shall give reasonable prior notice in writing of the proposed sale or lease to:

(a)    interested persons specified in Article 1(m)(i) and (ii); and

(b)    interested person specified in Article 1(m)(iii) who have given notice of their rights to the charge within a reasonable time prior to the sale or lease. "

such a provision is manifestly unreasonable." Here, the Security Assignment Agreements state that remedies are "immediately enforceable," and that the Security Agent can act "with or without notice to the Borrower or prior authorisation from any court, in its absolute discretion," and can "dispose of . . . or transfer all or any part of the Assigned Property . . . at the times, in the manner and on the terms it thinks fit." Gray Decl. Exs. 10, 17 (Security Assignment Agreements) § 6.1. Moreover, section 9.2 of the Proceeds Agreement contains a waiver by Debtors of all rights to require that Collateral be enforced in any particular manner or at any particular time. *Id.* § 9.2; Sale Obj. at 12. These are standard provisions in security assignments, and Debtors do not argue otherwise.

Instead, Debtors spill much ink taking issue with the form of the notice printed in the Wall Street Journal. *See* 506/502 Mot. ¶¶ 45–47. But Debtors intentionally omit the fact that Airborne posted notice in multiple locations, including Aersyn, and its own website. Gray Decl. ¶ 82. And Debtors' assertion that the WSJ advertisement was limited to only the "Eastern portion of the United States," (506/502 Mot. ¶ 45), is incorrect, as Airborne specifically arranged for the WSJ advertisement to run nationally. Third Gray Decl. ¶ 6. And any argument that Airborne's efforts to effectuate notice is undermined by the fact that the advertisements were sufficient to alert Cirium of the pending sale, who then published their own article detailing the sale on December 13, 2022. *Id.* Clearly, Airborne's advertising efforts were sufficiently broad if the industry press picked it up and reported on it. And it goes without saying that Cirium's own publishing drew even more attention to the sale. Debtors' cherry-picked attack on the WSJ's posted notice is insufficient to establish that the entirety of the costs to retain Airborne as FWCP's remarketing agent were unreasonable, thus the Court should not disallow these fees under section 506(b).

29

In addition, the fees FWC paid Airborne are reasonable for the work that Airborne was hired to do. Mr. Loechteken has admitted that Airborne's principals have decades of experience in the industry and are knowledgeable and qualified to conduct the sale process. *See* Jan. 26, 2022 Hr'g Tr. 126:1-24. In addition, FWCP negotiated a flat-fee with Airborne of $400,000 ($200,000 for each of the sales processes) that would cover both the sale of the Lease Assets and a subsequent sale of the aircraft. This fee is far below the standard percentage based fees structure that normally compensates the broker with 1-3 % of the sale price. *See* Third Gray Decl. ¶ 5. Given the assets is question, FWC's negotiations with and retention of Airborne saved millions of dollars in fees. *Id.*

3.    *FWCP's Insurance Costs Are Reasonable.*

Debtors do not identify the specific insurance policy they seek to challenge. But considering the conditions that existed immediately prior to the filing of the Chapter 11 Cases, where the Subleases and Head Leases had been terminated, and VNA was no longer entitled to possession of the Aircraft but has not yet returned them to the lessor, it was not necessarily clear existing insurance policies would remain valid. *Id.* ¶¶ 7–9. Therefore, faced with those circumstances, FWCP believed it was necessary and prudent to obtain insurance for the Aircraft. *Id.* ¶ 10; *Glazier Grp.*, 2013 WL 1856305, at *3. Given that VNA was continuing to improperly operate the Aircraft even after the termination of the lease, FWCP needed to protect the collateral prior to FWCP securing possession of the Aircraft. *Id.* FWCP's actions to secure the insurance and these costs are reasonable. *Id.* ¶ 11.

4.    *FWCP's Fees for Management Time Are Reasonable.*

Considering the substantial effort required by the auction, the Chapter 11 Cases, and the English Proceeding, there is a distinction between the annual fees previously charged and those which would have been incurred during the time FWCP was Security Agent, such that the quantum

of the CACIB fees is irrelevant to a determination of reasonableness under section 506(b).  Further,

FWCP's management fees pale in size to the break-up fee that Debtors agreed to, which break-up

fee is supposed to compensate the Stalking Horse Bidders for the time spent pursuing the sale,

which is a significantly narrower set of issues as compared to what a security agent for nine-figure

secured loans must address.

      **E.**      **Section 3.1 Of The Security Assignment Agreement Is Valid.**

      While not explicitly argued in Debtors' pleadings, Mr. Tregear, in his opinion submitted

with the Reply, posits that section 3.1 is an invalid "collateral advantage" because it impermissibly

circumvents Debtors right to redeem.  *See Declaration of Francis Tregear QC in Support of Reply*

(Dkt. 130-1) at Ex. A (the "**Tregear Opinion 2**") ¶¶ 15–35 ("On the basis that the scope of the

Secured Obligations and the provision that their payment is a precondition for redemption is liable

to be considered invalid and of no effect.").  This opinion misconstrues English law.  As set forth

in more detail in the Shah Reply, section 3.1 is valid and enforceable because (i) it is not "unfair

and unconscionable;"[20] (ii) it is not a "clog in the equity of redemption" because it does not "affects

the property such that the mortgagor is prevented from getting back on redemption exactly what

he mortgaged;" and (iii) it is not inconsistent with the right to redeem simply because "redemption

[must] be postponed because the obligation secured is not capable at present of immediate

pecuniary valuation."  Shah Reply ¶¶ 13–27.

---

[20]    Mr. Tregear seems to argue that the standard for determining whether a provision is "unfair and unconscionable" is whether the provision is "unreasonable."  Tregear Op. ¶ 21.  But this is not correct. *See* Shah Reply ¶ 17–18 (explaining that "English courts are very wary of invalidating a contractual term on the basis that it is unfair and unconscionable" and that "[a] court will interfere with the parties' bargain on this ground only where: (i) one party was at a serious disadvantage to the other, whether through poverty, ignorance, or lack of advice, such that an unfair advantage could be taken; (ii) this weakness was exploited by the other in some morally culpable manner; and (iii) the resulting transaction is not merely hard or improvident but overreaching or oppressive") (citing *Multiservice Bookbinding Ltd v Marden* [1979] Ch 84, at 110d-f & *Garages Ltd v Total Oil Great Britain Ltd* [1983] 1 WLR 87, 94–95).

## II.    DEBTORS' 363(f) ARGUMENTS FAIL.

In response to FWCP's Sale Objection, Debtors advance spurious arguments that they meet each of the requirements of 363(f)(1)-(f)(5).  But, as explained below, each of these arguments is fundamentally flawed.

### A.    Applicable Nonbankruptcy Law Does Not Allow Debtors To Sell The Aircraft or Lease Assets Until Secured Obligations Are Fully Satisfied.

Debtors point to Article 9(4) of the Cape Town Convention to support their argument that they can sell the Purchased Assets free and clear.   *See* Reply ¶ 17; Statement ¶ 16.  But that provision simply states that, before the sale of a charged object, the charger "may discharge the security interest by paying in full the amount secured."  Debtors also point to Section 9-623 of the N.Y.U.C.C., which similarly allows a debtor to redeem collateral and sell it upon "fulfillment of all obligations secured by the collateral."[21]  Thus, even applicable nonbankruptcy law recognizes Debtors' obligation to pay the Secured Obligations in full.   Effectively, Debtors are simply rehashing their argument that they will pay Secured Obligations in full, a position that FWCP disputes.

Debtors' halfhearted argument to avoid the strictures of the Transaction Documents—that the provisions within the Transaction Documents that allow only the Security Agent to dispose of collateral should be disregarded because to uphold those provisions would "eviscerate" section 363 (*see* Reply ¶ 18)—also fails.  None of the cases cited by Debtors support this position.  Indeed those cases are wholly inapposite, as they all deal with *ipso facto* clauses that are not at issue here.  *See In re Lehman Bros. Holdings Inc.*, 422 B.R. 407, 415 (Bankr. S.D.N.Y. 2010); *In re Intervention Energy Holdings, LLC*, 553 B.R. 258, 265–66 (Bankr. D. Del. 2016); *Bank of China*

---

[21]   As noted above, the N.Y.U.C.C. not applicable to the Lease Assets.

*v. Huang (In re Huang)*, 275 F.3d 1173, 1177 (9th Cir. 2002). And it is not the Security Agent's broad enforcement rights under the Transaction Documents that is preventing Debtors from selling the Purchased Assets; it is the fact that Debtors insist on selling assets that they do not own (the Lease Assets), and doing so without providing adequate compensation to the Lenders to satisfy their Secured Obligations, which must be paid before Debtors can redeem any of the Lease Assets.

### B.   Debtors Have Not Received Adequate Consent.

Debtors admit that FWCP has not consented to the sale free and clear under section 363(f)(2). Rather, they argue that the Intermediate Lessors consented to the sale via the Bills of Sale. *See* Reply ¶ 19. While the Intermediate Lessors expressly dispute that adequate consent was given for multiple reasons, Debtors' argument that the Bills of Sale "already been approved by the Bankruptcy Court in connection with the Sale Process" misconstrues this Court's order. *Id.* ¶ 2. At the February 4, 2022 hearing, FWCP specifically asked for, and Debtors expressly agreed to include, language stating that no substantive rights were being determined by the Court's approval of the Bid Procedures. *See* Feb 4, 2022 Hr'g Tr 93:10–12 ([DEBTORS' COUNSEL]: "[A]nd we'll add in a clause that no substantive rights of the parties are determined in this order to address Mr. Griffin's concerns."). This language was consciously reflected in the Court's order. *See* Bidding Procedures Order ¶ 21 ("For the avoidance of doubts, notwithstanding any language included in this order, no substantive rights of any parties are deemed to have been determined by this Order."). This Court should not endorse Debtors' attempt to infect the Order approving procedural matters with substantive outcomes, a tactic which is especially appalling given the record's clarity on this point.

### C.   Debtors' Fail To Show A Bona-Fide Dispute.

Debtors argue that FWCP has "admitted" that Debtors' rights in the Lease Assets are in dispute, and the disputed nature of Debtors' interest in the Lease Assets is sufficient for 363(f)(4)

to apply. *See* Reply ¶ 22 ("FitzWalter admitted there is a dispute as to the validity and extent of Debtors' rights in the Lease Assets in its recently filed complaint.") But the fact that there is a dispute concerning the extent of the Debtors' interests is a red herring (which, if anything, precludes a sale); there is no dispute that FWCP has—at a minimum—a valid security interest in all of the Collateral, which is what the statute focuses on. *See Nicole Energy Serv., Inc.*, 385 B.R. 201, 229-30 (Bankr. S.D. Ohio 2008) (objecting affiliate's interest); *In re Taylor*, 198 B.R. 142, 162 (Bankr. D.S.C. 1996) (holding *no bona fide dispute* existed); *In re Gaylord Grain L.L.C.*, 306 B.R. 624, 627 (B.A.P. 8th Cir. 2004) (dispute concerning secured creditors' liens). And Debtors wholly ignore FWCP's cases that *clearly hold* that a seller's interest must be determined prior to the Sale. *In re Eastman Kodak Co.*, 2012 WL 2255719, at *2 (Bankr. S.D.N.Y. June 15, 2012); *In re Interiors of Yesterday, LLC*, 2007 WL 419646, at *6 (Bankr. D. Conn. Feb. 2, 2007).

Debtors also argue that FWCP's interests in the Collateral are subject to dispute because Debtors have requested equitable subordination of FWCP's liens. Reply ¶ 22. They cite no case to support this proposition. Nor could they, as the caselaw is clear that filing an adversary proceeding *does not* itself creates a bona fide dispute. *Revel AC, Inc. v. IDEA Boardwalk LLC*, 802 F.3d 558, 573 (3d Cir. 2015).

**D.    Debtors Have Failed To Show That FWCP Could Be Compelled To Accept Less Than The Full Amount Of The Secured Obligations In Satisfaction Of Its Interest.**

Debtors argue 363(f)(5) applies because they could have commenced a redemption action in English Court, where the court could establish the correct amount of the Secured Obligations, and could order redemption or sale even if Debtors pay less than the "the face amount of the Security Agent's claims." Reply ¶¶ 25–26. This clever wording attempts to obfuscate what Debtors are really arguing, which is that an English Court could determine the amount of Secured Obligations, and order redemption upon payment of that amount. In any case, as Mr. Tregear

notes, a redemption action is not available unless "the mortgagee is not exercising his power of sale" which is indisputably what FWCP was doing.  Tregear Op. 2 ¶ 10.3; Shah. Reply ¶ 11 & n.1 (noting that "a court would not order the sale of mortgaged property where (i) the mortgagee is taking active steps to obtain possession and enforce its security by sale; and (ii) there is negative equity") (citing *Cheltenham and Gloucester Plc v Krausz* [1997] 1 WLR 1558, at 1567–68).

For the purposes of section 363(f)(5), it is not enough to point out completely unrelated situations where other creditors have accepted money satisfaction upon compulsion.  Instead, the debtor must ***show*** that the particular creditor could be compelled to take money satisfaction, taking into account the particular circumstances of the specific creditor in that particular instance, *i.e.*, by showing the creditor could be crammed down or would necessarily receive less than one hundred cents in a liquidation.  See *In re TWA*, 322 F.3d 283, 290–91 (3d Cir. 2003) (holding that section 363(f)(5) applied in a liquidation because the interests were subject to monetary valuation and distribution); *In re Grand Slam, U.S.A., Inc.*, 178 B.R. 460 (E.D. Mich. 1995) (holding section 363(f)(5) applied where creditor could be crammed down); *Scherer v. Federal Nat'l Mortgage Ass'n (In re Terrace Chalet Apartments, Ltd.)*, 159 B.R. 821 (N.D. Ill. 1993) (same).  Debtors have not shown that here.  Therefore, section 365(f)(5) cannot save their Sale.

## CONCLUSION

Based on the foregoing, FWCP respectfully requests that this Court deny the 502/506 Motion and deny Debtors' request to approve the Sale.

Dated: March 9, 2022

Respectfully submitted,

/s/ *Benjamin I. Finestone*

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

Benjamin I. Finestone
Zachary Russell
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
benjaminfinestone@quinnemanuel.com
zacharyrussell@quinnemanuel.com

Justin C. Griffin (pro hac vice admitted)
Eric Winston (pro hac vice admitted)
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
justingriffin@quinnemanuel.com
ericwinston@quinnemanuel.com

Asher B. Griffin (pro hac vice admitted)
300 West 6th Street, Suite 2010
Austin, TX 78710
Telephone: (737) 667-6100
Facsimile: (737) 667-6110
ashergriffin@quinnemanuel.com

*Counsel to FitzWalter Capital Partners (Financial
Trading) Limited*