**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| JPA NO. 111 CO., LTD., and | : | Case No. 21-12075 (DSJ) |
| JPA NO. 49 CO., LTD., | : | |
| | : | (Jointly Administered) |
| Debtors.[1] | : | |
| | : | |

**DECLARATION OF AKHIL SHAH IN SUPPORT OF FITZWALTER CAPITAL PARTNERS (FINANCIAL TRADING) LIMITED'S PRELIMINARY OBJECTION TO DEBTORS' 506/502 MOTION AND RESPONSE TO DEBTORS' REPLY IN SUPPORT OF SALE MOTION AND JPL'S STATEMENT IN SUPPORT OF SALE MOTION**

I, Akhil Shah, being duly sworn, hereby declare as follows:

1. I am a Queens Counsel ("QC") with chambers at Fountain Court Chambers, Fountain Court, Temple, London, EC4Y 9DH, UK. I am in all respects competent to make this declaration (the "Declaration") in support of Creditor FitzWalter Capital Partners (Financial Trading) Limited's Preliminary Objection To Debtors' 506/502 Motion And Response To Debtors' Reply In Support Of Sale Motion And JPL's Statement In Support Of Sale Motion ("FitzWalter's Pleadings").

2. Attached hereto is a true and correct copy of my expert Reply To Opinion On English Law By Francis Tregear QC Dated 23.02.2022, which in addition to my expert Opinion On English Law and Reply Opinion On English Law previously submitted to the Court represent the substance of my Declaration in support of FitzWalter's Pleadings.

3. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

---

[1] The Debtors in these Chapter 11 cases are: JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd. The Debtors' corporate address is: Kasumigaseki Common Gate West Tower, 3-2-1 Kasumigaseki, Chiyoda–Ku, Tokyo 100-0013.

1

2

Executed on this 9th day of March 2022, at London, United Kingdom.

*/s/ Akhil Shah*
Akhil Shah

2

**RE: FITZWALTER CAPITAL PARTNERS (FINANCIAL TRADING)**
_____

**REPLY TO OPINION ON ENGLISH LAW
BY FRANCIS TREGEAR QC DATED 23.02.2022**
_____

1. This reply opinion addresses: (a) points of English law advanced by Francis Tregear QC in his second opinion dated 23 February 2022 (***Tregear 2***) which was submitted in support of the Debtors' Omnibus Reply to the Objections Of Fitzwalter Capital Partners (Financial Trading) Limited and the Intermediate Lessors Regarding the Proposed Sale, filed on the same date (***Debtors' Reply***); and (b) English law arguments made in the Debtors' Reply.

2. I previously provided opinions on 13 January 2022 and 22 January 2022, and this Reply should be read together with those opinions.

3. Tregear 2 and the Debtors' Reply advances the following contentions (*inter alia*):

   (1) FCWP's statements that the Debtors' equitable right to redeem is "*substantively meaningless unless and until the Secured Obligations owed to the secured lenders, including FWCVP, are paid in full*" and is only "*triggered*" at that point are confused because on the date the Debtors filed the Chapter 11 petitions, the Debtors possessed both the equity of redemption and the equitable right to redeem (paragraphs 4 to 8 of Tregear 2).

   (2) The Intermediate Lessors' rights under the Intermediate Lessor Assignments will not be restored to them if the Secured Obligations are discharged by the proposed sale because those rights "*will have been realised for the purposes of satisfying the Secured Obligations which was the object of the Deeds of Security Agreement*" (paragraph 9 of Tregear 2).

   (3) A mortgagor can under English law obtain a sale of the mortgaged property by court order against the wishes of the mortgagee and where the sale price

3

does not pay all of the outstanding mortgage debt (paragraph 12 of Tregear 2).

(4) The scope of the Secured Obligations (i) exceeds the Debtors' covenants to pay under the CACIB Deeds of Security, (ii) extends not only to the Debtors' own liabilities but also liabilities of third parties, i.e. the parent company, the intermediate lessor parent company, and the intermediate lessors, and (iii) includes currently incalculable liabilities (paragraphs 25 to 29). To this extent, the Secured Obligations constitute collateral advantages which are invalid because they offend against the requirements of equity (paragraphs 30 and 35 of Tregear 2).

(5) The meaning of the anti-bankruptcy provisions in the Proceeds Agreements (Debtors' Reply paragraph 27 and the table at page 13).

(6) The administration expenses which FWCP has charged are likely to be held to be unreasonable by an English court and would be unenforceable on that basis (paragraph 43 of Tregear 2).

4. These points are addressed in turn.

**1. The nature of the mortgagor's interest prior to redemption**

5. I do not disagree with the statement of the law in paragraphs 6 to 7 of Tregear 2. As there explained, the equity of redemption comes into existence when the mortgage is executed and the equitable right to redeem arises when the time fixed for performance of the mortgagor's obligations by the terms of the contract has passed.

6. However, this issue is distinct from the issue of the extent to which the mortgagor may deal with the mortgaged property before the mortgagor exercises the right to redeem by discharging the Secured Obligations. Prior to redemption, the mortgagor's ownership of the mortgaged property is subject to the mortgage, and while he may dispose of the equity of redemption he may not dispose of the property in its entirety. See *Snell's Equity*, 34th ed., 38-001 and 38-003, and see also Mr Tregear's testimony,

4

which is quoted at p. 19 of the Objection ("*[Question]…a party, in this instance, the assignor, who has an equity of redemption only recovers the right to the chose in action upon payment of the secured debt, correct? [Answer] The—correct as far as it goes.*").

**2. The effect of the discharge of the Secured Obligations on the Intermediate Lessors' rights**

7. Tregear 2 notes that this matter is strictly outside the scope of his opinion (paragraph 9), and as such it is not considered in detail.

8. However, I do not agree with the suggestion that the Intermediate Lessors' rights disappear upon discharge of the Secured Obligations. As explained in *Fisher and Lightwood's Law of Mortgage*, 15th ed., at 47.51, "*[u]pon the debt being paid off the mortgagor is entitled to have the mortgaged property restored to him free from the mortgagee's security.*"

9. It follows that upon discharge of the Secured Obligations:

    9.1 the Debtors' rights under the Head Leases will be restored to them free of the security interests held by the Security Agent of behalf of the Lenders.

    9.2 the Intermediate Lessors' rights under the VNA Leases are restored to the Intermediate Lessors free of the Debtors' security interests.

    9.3 The Debtors will be able to sell or otherwise deal with the Head Leases, but not with the VNA Leases.

    9.4 The Intermediate Lessors will be able to sell or otherwise deal with the VNA Leases.

    9.5 The Debtors would not have any legal right to sell or otherwise deal with the VNA Leases.

5

**3. The sale of mortgaged property in a redemption action**

10. The provisions of s. 91 of the Law of Property Act 1925 are accurately cited at paragraphs 11 to 12 of Tregear 2.

11. Mr Tregear is correct to say that the court "*can direct a sale against the wishes of a mortgagee and where the sale price did not pay all of the outstanding mortgage debt.*" It is relevant to add that this power is rarely exercised as a matter of fact. It is exceptional for a court to exercise this power against the wishes of a mortgagee and where there would be a shortfall in the mortgage debt.[2]

12. Based on the instructions I have been provided, it is my understanding that in this case the Debtors may well have negative equity. But Mr Tregear does not point to any exceptional circumstances which would justify a court-ordered sale in such circumstances.

**4. The scope of the Secured Obligations and collateral advantages**

13. The law on collateral advantages, i.e. rights of the mortgagee which are additional to the mortgagor's covenant to repay together with interest, is accurately summarised in *Fisher and Lightwood's Law of Mortgage*, 15th ed., at 47.11 (omitting footnotes):

    "…the rule is that such a [collateral advantage] will not be enforceable if it is either: (a) unfair and unconscionable, or (b) in the nature of a penalty clogging the equity of redemption, or (c) inconsistent with or repugnant to the contractual and equitable right to redeem."[3]

14. These three categories are considered in turn.

---

[2] *Cheltenham and Gloucester Plc v Krausz* [1997] 1 WLR 1558, at 1567-1568, per Millett LJ, who clarified that a court would not order the sale of mortgaged property where (i) the mortgagee is taking active steps to obtain possession and enforce its security by sale; and (ii) there is negative equity, so that the mortgagee is likely to have the greater incentive to obtain the best price and the quickest sale.

[3] See also the *Kreglinger* case cited in paragraph 19 of Tregear 2.

6

*(a) Unfair and unconscionable*

15. It is important to note that the correct test in relation to (a) is whether the advantage is unfair and unconscionable, and not whether it is "unreasonable".

16. Mr Tregear appears to suggest that "unreasonable" is equivalent to "unfair and unconscionable" (paragraph 21), apparently in reliance on Goff J's judgment in *Cityland and Property (Holdings) Ltd v Dabrah* [1968] Ch 166 and *Halsbury's Laws of England*.

17. However, that is not correct, as explained by Browne-Wilkinson J in the subsequent case of *Multiservice Bookbinding Ltd v Marden* [1979] Ch 84, at 110d-f:

> "…There are other passages in the judgment where Goff J. seems to treat the words "unreasonable" and "unconscionable" as being interchangeable. But in that case it was unnecessary for him to distinguish between the two concepts, since on either test the premium was unenforceable. I do not think that Goff J. intended to cut down the obvious effect of the *Kreglinger* case [1914] A.C. 25 in any way. Moreover, the decision of the Court of Appeal in *Knightsbride Estates Trust Ltd. v. Byrne* [1939] Ch. 441 was not cited to him.
>
> I therefore approach the second point on the basis that, in order to be freed from the necessity to comply with all the terms of the mortgage, the plaintiffs must show that the bargain, or some of its terms, was unfair and unconscionable: it is not enough to show that, in the eyes of the court, it was unreasonable. In my judgment a bargain cannot be unfair and unconscionable unless one of the parties to it has imposed the objectionable terms in a morally reprehensible manner, that is to say, in a way which affects his conscience."

18. As explained in the second paragraph cited above, the English courts are very wary of invalidating a contractual term on the basis that it is unfair and unconscionable. A court will interfere with the parties' bargain on this ground only where: (i) one party was at a serious disadvantage to the other, whether through poverty, ignorance, or lack of advice, such that an unfair advantage could be taken; (ii) this weakness was exploited by the other in some morally culpable manner; and (iii) the resulting transaction is not merely hard or improvident but overreaching or oppressive: *Alec Lobb (Garages Ltd v Total Oil Great Britain Ltd* [1983] 1 WLR 87, 94-95 (Peter Millett QC).

7

19. Relevant considerations as to whether a collateral advantage is unfair and unconscionable include: (i) the character and bargaining power of the parties– company or individual; (ii) the circumstances of the loan - commercial transaction or private loan; (iii) the quantum of consideration, (iv) the benefits to the mortgagor, (v) the nature of the security, (vi) the nature and duration of the restriction (if any) on the mortgagor's right to deal freely with the mortgaged property and other property of the mortgagor, (vii) whether the borrower was advised by solicitors; and (viii) the terms of the collateral advantage.[4]

*(b) Clog on the equity of redemption*

20. The rule against clogs on the equity of redemption precludes the mortgagor from stipulating for an advantage which affects the property such that the mortgagor is prevented from getting back on redemption exactly what he mortgaged: *Fisher and Lightwood's Law of Mortgage*, 15th ed., at 47.11.

21. Accordingly, the rule does not preclude the mortgagor from stipulating for an advantage which does not affect the property or which affects the property but ceases on redemption: ibid.[5]

*(c) Inconsistent with the right to redeem*

22. The classic example of a collateral advantage falling foul of this rule is an option on the part of the mortgagee to purchase the mortgaged property which is given to the mortgagee at the time of the loan and as part of the same transaction. Such an option is objectionable because the mortgagee can prevent redemption by the mortgagor by exercising the option: *Snell's Equity*, 34th ed., 38-013.

---

[4] *Fisher and Lightwood's Law of Mortgage*, 15th ed., at 47.11.
[5] See also *Cousins on Mortgages*, 4th ed., 29-25: "it is equally evident that a collateral advantage is no clog if it ceases to affect both the security and the mortgagor at the moment the legal or the equitable right to redeem is exercised."

8

23. Another example is the case of *Fairclough v Swan Brewery Co Ltd* [1912] AC 562, where the security was a lease with 201 months still to run and the mortgage was made redeemable only by 209 monthly payments. In substance, that stipulation was held to have made the security irredeemable.

24. By contrast, it is not inconsistent with the right to redeem for redemption to be postponed because the obligation secured is not capable at present of immediate pecuniary valuation, e.g. where a mortgage secures a life annuity or the payment of a contingent charge: *Snell's Equity*, 34th ed., at 38-004 and *Cousins on Mortgages*, 4th ed., 29-17.

*Application of these principles*

25. Although Tregear 2 refers to the three rules discussed above, it is not entirely clear which rule Mr Tregear considers the broad definition of the Secured Obligations to fall afoul of. In paragraph 31 of Tregear 2, he states that the broad scope of the Secured Obligations arguably "*impedes and restricts the Debtors' ability to redeem the Security Agreements and to exercise the right to redeem which is a component part of their equity of redemption.*" In paragraph 32, he adds that FWCP's Objection is (in his view) calculated to frustrate the Debtors' right to redeem.

26. This note proceeds on the basis that Mr Tregear's criticism is that the advantages which he identifies are inconsistent with the Debtors' right to redeem. The specific aspects criticised by Mr Tregear are, as stated above, that the Secured Obligations (i) exceed the Debtors' covenants to pay under the CACIB Deeds of Security, (ii) extend not only to the Debtors' own liabilities but also to liabilities of third parties, i.e. the parent company, the intermediate lessor parent company, and the intermediate lessors, and (iii) include currently incalculable liabilities.

27. However, in my view, none of these criticisms is well-founded:

9

(1) As to (i), this is the case for any collateral advantage and the law at present is that such an advantage is permissible unless if falls afoul of the rules set out above.

(2) As to (ii), this criticism is not supported by any case law, and it appears to ignore the commercial reality of the agreements entered into in relation to the aircraft. The 'third parties' identified by Mr Tregear were, at the time the agreements were concluded, all part of the same corporate group. Further, the Debtors were single purpose companies with no assets other than the aircraft and the Head Leases, and the right to recourse against them was limited.

(3) As to (iii), this does not mean that the mortgages are irredeemable. As explained above, it is consistent with the right to redeem for redemption to be postponed because the obligation secured is not capable at present of immediate pecuniary valuation.

28. For the avoidance of doubt, I do not consider that the other rules have any application in this case. There is no evidence that the provisions identified by Mr Tregear are unfair and unconscionable in the sense described above. The relevant assignments were agreements reached between commercial parties with the benefit of legal advice, and the courts are slow to interfere with agreements in those circumstances. Further, there is no question of a clog on redemption in circumstances in which the relevant obligations cease on redemption.

**5. The Proceeds Agreements' Anti-Bankruptcy provisions**

29. I have reviewed the provisions in the Proceeds Agreement regarding the Obligors' duty to refrain from supporting or participating in any bankruptcy or insolvency proceeding initiated on behalf of the Debtors and in my view, the intention of the parties was that these provisions were intended to apply broadly to all manner of actions initiated by or on behalf of the Debtors to address their inability to pay their outstanding debts and collectively bind the Debtors' creditors to a court-ordered alteration of their entitlements under the senior and/or junior loan agreements.

10

30. Specifically, clauses 3.1.3, 3.2.3, and 10.2.3 of the Proceeds Agreement were all drafted with the same broad language, prohibiting involvement not only in "*any petition to commence any winding-up proceedings*" of the Debtors, but also "*any other action or proceedings for the winding-up, dissolution, administration or examinership*" of the Debtors, and "*any other action which might reasonably be expected to lead to the bankruptcy or insolvency*".

31. This language was clearly drafted to extend to all possible proceedings for the administration of Debtors, including these Chapter 11 proceedings.[6] That is evident specifically in each of the above cited clauses from: (a) the broad reference to "*any other action*"; and (b) the type of proceedings referred to, each of which involves a collective process that brings the assets/property of the Debtors under the control or supervision of a court, (in this case the New York bankruptcy court). Within that proceeding the supervising court is able to impose an outcome that binds all the creditors of the petitioning Debtors.

32. Similarly, I believe the Debtors' argument that the Obligors' involvement in these Chapter 11 cases was "*required by applicable law*" is incorrect. The Debtors state that the filings were required to "*stop FitzWalter's actions in furtherance of its ulterior motives that sought to benefit itself and leave all other creditors at material risk*," but I have reviewed the Transaction Documents and have found no provision explicitly requiring the Obligors to file or support the Debtors' bankruptcy petitions to prevent the Security Agent from enforcing its rights under the Transaction Documents. Indeed, the Transaction Documents contain no provision requiring the filing of a chapter 11 case on behalf of either Debtor in any circumstance. And I am aware of no other legal requirement under English law that would require the Obligors to file or support a Chapter 11 petition filed on behalf of the Debtors in the United States of America. On the contrary, any complaint which the Debtors may have against the Security Agent or any of the Obligors or vice versa, should have been

---

[6] which I understand to be debtor in possession bankruptcy proceedings, under which the Debtors proceed under the supervision of the court.

11

brought in the English courts in accordance with the exclusive jurisdiction agreement between all parties at clause 21.1 of the Proceeds Agreement.

### 6. Whether the administration expenses are unreasonable and unenforceable

33. I agree that an English court is unlikely to allow the mortgagee to recover costs which the court assesses from the facts to have been improperly or unreasonably incurred. However, legal costs incurred in litigation properly or reasonably brought, or in properly or reasonably defending legal proceedings will be permitted by an English court.

**AKHIL SHAH QC**

7 March 2022

Fountain Court Chambers
Temple
London, EC4Y 9DH