TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Frank A. Oswald
Kyle J. Ortiz
Bryan M. Kotliar
Jared C. Borriello

*Counsel to the Debtors*
*and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| JPA NO. 111 CO., LTD. and JPA NO. 49 CO., LTD., | Case No.:  21-12075 (DSJ) |
| Debtors.[1] | (Jointly Administered) |
| JPA NO. 111 CO., LTD. and JPA NO. 49 CO., LTD., | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 22-01004 (DSJ) |
| FITZWALTER CAPITAL PARTNERS (FINANCIAL TRADING) LIMITED, | |
| Defendant. | |

**DEBTORS' REPLY TO FITZWALTER CAPITAL PARTNERS (FINANCIAL TRADING) LIMITED'S PRELIMINARY OBJECTION TO DEBTORS' 506/502 MOTION AND RESPONSE TO DEBTORS' REPLY IN SUPPORT OF <u>SALE MOTION AND JPL'S STATEMENT IN SUPPORT OF SALE MOTION</u>**

.

---

[1]    The Debtors in these Chapter 11 Cases are:  JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd.  The Debtors' corporate address is Kasumigaseki Common Gate West Tower, 3-2-1 Kasumigaseki, Chiyoda-Ku, Tokyo, Japan 100-0013.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

REPLY TO OBJECTION ......................................................................................................3

I.   The Claims and Costs Asserted by FitzWalter Are Not Secured
     Obligations .............................................................................................................3

     A.   The Court Can Determine the Secured Obligations ............................3

     B.   The Court Should Deny the FitzWalter Alleged Fees, Costs &
          Charges .............................................................................................................4

II.  Limited Reply to FitzWalter's Improper Sale Arguments ............................21

     A.   The Lease Assets are Property of the Debtors' Estates.....................21

     B.   Provisions of the Security Agreement Can Be Deemed
          Invalid if They Impair Redemption ....................................................23

III. Governing Law ....................................................................................................25

CONCLUSION ...................................................................................................................26

**EXHIBIT A** – Supplemental Tregear Opinion

**EXHIBIT B** – Governing Law Summary

## TABLE OF AUTHORITIES

**Cases**

*BP Exploration & Oil Co. v. Maint. Servs. Inc.*,
  313 F.3d 936 (6th Cir. 2002) ................................................................................... 16

*Butner v. United States*,
  440 U.S. 48 (1979) ..................................................................................... 20, 21

*Coastal Power Int'l, Ltd. v. Transcon. Cap. Corp.*,
  10 F. Supp. 2d 345 (S.D.N.Y. 1998) ........................................................................ 15

*Gerber v. MTC Elec. Techs. Co.*,
  329 F.3d 297 (2d Cir. 2003) ................................................................................... 16

*In re 804 Cong., L.L.C.*,
  756 F.3d 368 (5th Cir. 2014) .................................................................................... 5

*In re A&B Assocs., L.P.*,
  No. 17-40185 (EJC), 2019 WL 1470892 (Bankr. S.D. Ga. Mar. 29, 2019) ........................... 7

*In re Adelphia Bus. Solutions, Inc.*,
  341 B.R. 415 (Bankr. S.D.N.Y. 2003) ...................................................................... 14

*In re Adelphia Commc'ns Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007) ........................................................................ 6

*In re Amaravathi Ltd. P'Ship*,
  416 B.R. 618 (Bankr. S.D. Tex. 2009) ..................................................................... 21

*In re Canal Asphalt, Inc.*,
  No. 15-23094 (RDD), 2017 WL 1956849 (Bankr. S.D.N.Y. May 10, 2017) ............ 2, 5, 6, 7

*In re Carey*,
  8 B.R. 1000 (Bankr. S.D. Calif. 1981) ....................................................................... 6

*In re Continental Airlines, Inc.*,
  981 F.2d 1450 (5th Cir.1993) ................................................................................. 14

*In re Hudson Shipbuilders, Inc.*,
  794 F.2d 1051 (5th Cir. 1986) .................................................................................. 5

*In re K.H. Stephenson Supply Co.*,
  768 F.2d 580 (4th Cir.1985) .................................................................................... 5

*In re LightSquared Inc.*,
  2014 WL 5488413 (Bankr. S.D.N.Y. 2014) ............................................................... 14

*In re Masnorth Corp.,*
   36 B.R. 335 (Bankr. N.D. Ga.1984).................................................................. 8

*In re Mills,*
   77 B.R. 413 (Bankr. S.D.N.Y. 1987) ............................................................... 6

*In re Nicfur-Cruz Realty Corp.,*
   50 B.R. 162 (Bankr. S.D.N.Y. 1985) ............................................................... 5

*In re Shree Mahalaxmi, Inc.,*
   522 B.R. 899 (Bankr. W.D. Tex. 2014)............................................................ 9

*In re W.S. Sheppley & Co.,*
   62 B.R. 279 (Bankr. N.D. Iowa 1986)............................................................. 8

*In re Wonder Corp. of Am.,*
   72 B.R. 580 (Bankr. D. Conn. 1987) ....................................................... 5, 6, 8

*Matter of 268 Ltd.,*
   789 F.2d 674 (9th Cir.1986)............................................................................ 5

*Rundle v. Prudential Ins. Co. of Am.,*
   No. 18-4759-MWF (ASX), 2018 WL 6444889 (C.D. Cal. Aug. 30, 2018)........ 15

*T-Bone Rest. LLC v. Gen. Elec. Capital Corp. (In re Glazier Grp., Inc.),*
   No. 10-16099 ALG, 2013 WL 18563053 (Bankr. S.D.N.Y. May 2, 2013) ........... 5

**Statutes**

11 U.S.C. § 363(f) ............................................................................................ 20

11 U.S.C. § 502(c) ............................................................................................ 14

11 U.S.C. § 506(b)........................................................................................ 3, 9

11 U.S.C. § 510(a) ............................................................................................. 4

11 U.S.C. § 541(a)(6) ................................................................................. 21, 22

**Rules**

Bankr. S.D.N.Y. R. 9006-1(b)......................................................................... 20

The debtors and debtors in possession (the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"), hereby submit this reply (the "Reply") to the objection (the "Objection") filed by FitzWalter Capital Partners (Financial Trading) Limited ("FitzWalter") with respect to the *Motion of the Debtors for Entry of an Order (I) Determining Secured Claims of Prepetition Credit Facilities or (II) In the Alternative, Estimating Amount of Claims Asserted By FitzWalter Capital Partners (Financial Trading) Limited and Its Affiliated*, filed on February 28, 2022 [Docket No. 136, Adv. Pro. No. 22-01004, Docket No. 7] (the "Claims Motion").[2]  In support of this Reply, the Debtors, by and through their undersigned counsel, respectfully state:

## PRELIMINARY STATEMENT

In the Objection, FitzWalter (again) recycles many of the same arguments opposing the full-pay sale transaction with unsupported legal theories, incorrect explanations of the Transaction Documents, and unsupported purported Secured Obligations—all in an effort to block the sale in furtherance of its own parochial interests and ulterior motives.[3]  This time, its arguments fail, as a matter of law, to demonstrate that the FitzWalter Alleged Fees, Costs & Charges should be allowed as Secured Obligations.

The Objection continues to assert additional, manufactured claims, nearly all of which were first asserted against the Debtors and non-debtor affiliates after the commencement of these Chapter 11 Cases, including eye-popping amounts for

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Claims Motion.

[3]  FitzWalter admitted that it was seeking to obtain ownership of the Debtors' assets through an affiliate. *See, e.g., Declaration of Jared C. Borriello in Support of Debtors' Motion for Injunctive Relief and Sanctions,* dated February 15, 2022 [Adv. Pro. No. 22-01004, Docket No. 6]) Ex. 30 (Quinn Emanuel letter dated January 11, 2022) ¶ 6(B).

professional fees and management time in the many millions of dollars.  Furthermore, based on its threats in the Objection, FitzWalter apparently intends to prosecute its claims for amounts disallowed by this Court in other jurisdictions and exercise self-help remedies by withholding amounts from the other Lenders pursuant to its position of dominance over the priority waterfall under the Proceeds Agreement and pursue further litigation in the form of turnover actions against any Finance Party (which includes the other Lenders) if they receive a distribution prior to payment of FitzWalter's extortionate claims.

This is an untenable position for a security agent to take in the face of a full pay transaction, when its only arguments relate to challenging the Debtors' ability to use what is indisputably property of their estates (and/or arose from what are indisputably their assets—the Aircraft) to repay the very same Security Agent in full in cash pursuant to a sale process overseen by the Court.  In such circumstances, Second Circuit courts have consistently reduced creditor's fees and expenses, "question[ing] why [the creditor's] counsel would need to be so active in [a] case [where the creditor] was largely assured of a full recovery."  *In re Canal Asphalt, Inc.*, No. 15-23094 (RDD), 2017 WL 1956849, at *8 (Bankr. S.D.N.Y. May 10, 2017).

Incongruently, FitzWalter, on the one hand, asserts entitlement to substantial unjustified fees and expenses that are only appropriate for ***oversecured creditors***, and on the other hand, ***challenges their very own position as an oversecured creditor*** by asserting that the proposed sale will not in fact pay them in full (because of the unsupported FitzWalter Alleged Fees, Costs & Charges).  Ironically, if FitzWalter were to succeed in blocking the sale or asserting additional amounts that the purchaser does not pay as Secured Obligations, FitzWalter would render itself undersecured and many of the FitzWalter Alleged Fees, Costs & Charges would be disallowable on that basis.

- 2 -

As explained by the Objection, the Debtors, FitzWalter, and other parties-in-interest are negotiating a Stipulation narrowing the issues and limiting the presentation of certain evidence at the Sale Hearing with respect to the Secured Obligations. As explained in the Claims Motion and this Reply, the Court can and should rule as a matter of law and based upon the record of the Sale Hearing, that the FitzWalter Alleged Fees, Costs & Charges are not Secured Obligations payable at the closing of the proposed sale. To the extent that the Court does not make this determination as of the Sale Hearing, as set forth in the Claims Motion, the Court should establish an Escrow in a reasonable amount over which any remaining liens can attach (with the other collateral being released from such liens) and, if needed, the Court can schedule a further hearing regarding any remaining issues, if any, relating to FitzWalter's claims and escrowed amounts.[4]

## REPLY TO OBJECTION

### I.    The Claims and Costs Asserted by FitzWalter Are Not Secured Obligations

#### A.    The Court Can Determine the Secured Obligations

1.    In a footnote, FitzWalter asserts that should this Court disallow its claims (in that instance, for legal fees) against the Debtors, FitzWalter may nevertheless recover such amounts against non-debtors as section 506(b) of the Bankruptcy Code only applies to claims against a debtor's estate. Obj. at 26 n. 17.

2.    By the Debtors' Complaint and the Claims Motion, the Debtors have requested that the Court determine the "Secured Obligations" for purposes of the Transaction Documents in connection with the proposed sale, which provides for

---

[4]    The foregoing Escrow construct has been proposed by the Debtors and, while negotiations are ongoing, has not been agreed to with the Stalking Horse Purchasers.

payment in full of all valid Secured Obligations.  Those findings will be binding on

FitzWalter regardless of which obligors it asserts those claims against.  *See e.g., Katchen*

*v. Landy*, 382 U.S. 323, 334-35 (1966) ("The normal rules of res judicata and collateral

estoppel apply to the decision of bankruptcy courts."); *EDP Medical Computer Sys., Inc.*

*v. U.S.*, 480 F.3d 621, 625 (2d Cir. 2007) (stating that *res judicata* principles "appl[y] will

full force to matters decided by the bankruptcy courts.") (internal citations and

quotations omitted).  As such, FitzWalter cannot then turn around and assert amounts

this Court has determined are not Secured Obligations against non-debtors in other

fora.

3.    FitzWalter is effectively stating that it will disregard the Court's orders.

FitzWalter argues that it is entitled to payment of its fees under section 8.3 of the

Proceeds Agreement before any other creditor may recover payments, and that the

waterfall is an enforceable subordination agreement under section 510(a) of the

Bankruptcy Code.  But this argument assumes that the Court's findings will not be

binding on it outside of these Chapter 11 Cases and is particularly damaging to the

other Lenders since FitzWalter's threatened course of conduct would directly impair

other Lenders' recoveries from the full-pay sale.  *See* Obj. at 26 n.17 (stating "FWCP

would be entitled to recover such fees from non-debtors" and threatening to "seek

turnover under section 4.1 of the Proceeds Agreements should Debtors, JPL, or any

Finance Party receive a distribution prior to full payment of FWCP's Expenses (as

defined in the Proceeds Agreements), including its legal fees and costs.").

**B.    The Court Should Deny the FitzWalter Alleged Fees, Costs & Charges**

(1)    *FitzWalter's Legal Fees and Expenses Are Patently Unreasonable*

4.    FitzWalter asserts that, as of February 28, 2022, its legal counsel alone has

incurred more than $4.6 million—a staggering amount that continues to accrue each

day that FitzWalter continues its all-out multi-prong litigation assault against the

Debtors and non-debtor entities across the globe.[5]  For reasons set forth below and in

the Claims Motion, FitzWalter's fees and expenses cannot possibly be reasonable under

the circumstances here.

5.       As courts in the Second Circuit (and elsewhere) have held, the

reasonableness of a secured creditor's legal fees is governed by federal law, including

the policies and purposes of the Bankruptcy Code, and not the non-bankruptcy law

applicable to the underlying contract.  *In re Wonder Corp. of Am.*, 72 B.R. 580, 588 (Bankr.

D. Conn. 1987) ("While it is clear that courts must look to the underlying contract as the

initial focal point, it is equally clear that after bankruptcy, it is § 506(b), not state law,

through which that look is focused, and that examination must view not only the

contours of § 506(b) but also the broader penumbra of bankruptcy law."); *T-Bone Rest.*

*LLC v. Gen. Elec. Capital Corp. (In re Glazier Grp., Inc.)*, No. 10-16099 ALG, 2013 WL

1856305, at *3 (Bankr. S.D.N.Y. May 2, 2013) ("The underlying contract serves as the

initial focal point . . . but courts must also consider reasonableness within the general

policies and provisions of the Bankruptcy Code, and bankruptcy courts have inherent

discretion to review fee claims for potential abuse."); *In re Nicfur-Cruz Realty Corp.*, 50

B.R. 162, 167 (Bankr. S.D.N.Y. 1985) ("this reasonableness requirement mandates that

---

[5]    This figure is particularly egregious in light of the Debtors' counsel having incurred just a fraction of
       that amount consisting of approximately $1.1 million from the Petition Date through January 31,
       2022.  *See First Fee Statement of Togut, Segal & Segal LLP for Compensation for Services Rendered and*
       *Reimbursement of Expenses Incurred as Counsel to the Debtors for the Period from December 17, 2022*
       *("Petition Date") Through December 31, 2021*, filed on March 8, 2022 [Docket No. 150]; *Second Fee*
       *Statement of Togut, Segal & Segal LLP for Compensation for Services Rendered and Reimbursement of*
       *Expenses Incurred as Counsel to the Debtors for the Period from January 1, 2022 Through January 31, 2022*,
       filed on March 8, 2022 [Docket No. 151].  For sake of comparison, in its prior accounting letters to the
       Debtors, FitzWalter asserted more than $1.5 million in legal fees incurred just through January 21,
       2022—further demonstrating the skyrocketing costs being incurred by FitzWalter.

the bankruptcy court consider, among other things, both the policies, purposes and provisions of the Bankruptcy Code").[6]

6.      Under section 506(b) of the Bankruptcy Code, an oversecured creditor's claim for attorney's fees and expenses must be "reasonable."  In the Second Circuit, bankruptcy courts have broad discretion in determining the reasonableness of claims for professional fees—such an analysis is based on "whether the attorney's fees and costs were incurred in an action reasonably calculated to protect the creditors' rights." *In re Mills*, 77 B.R. 413, 419 (Bankr. S.D.N.Y. 1987) (quoting *In re Carey*, 8 B.R. 1000, 1004 (Bankr. S.D. Calif. 1981).  Reasonableness of a secured creditor's fees "may depend on the extent to which the creditor's secured position is jeopardized . . . *[w]hen there is only minimal risk, circumstances will generally require that counsel respond only to issues of material concern.*"  *See Canal Asphalt*, 2017 WL 1956849 at *8, quoting *Glazier Grp.*, 2013 WL 1856305 at *9-10 (emphasis added) .[7]

---

[6]     Further to this point, multiple Courts of Appeals have rebutted the application of *Butner* in the section 506(b) context because "when Congress enacted § 506(b), 'it intended that federal law should govern the enforcement of attorney's fees provision, notwithstanding contrary state law.'" *In re 804 Cong., L.L.C.*, 756 F.3d 368, 374 (5th Cir. 2014) (citing *In re Hudson Shipbuilders, Inc.*, 794 F.2d 1051, 1056, 1058 (5th Cir. 1986) ("[f]ederal law should be the measure of 'reasonableness' called for by 11 U.S.C. § 506(b)" because "Congress has clearly chosen to exercise its broad power to establish a uniform rule respecting the existence of a right by enacting § 506(b). Accordingly, the holding in *Butner* is not applicable."); *see also Matter of 268 Ltd.*, 789 F.2d 674 (9th Cir.1986) (bankruptcy court properly conducts an independent inquiry into the reasonableness of attorney's fees under § 506(b) which preempts state law governing the availability of such fees as part of a secured claim); *cf. In re K.H. Stephenson Supply Co.*, 768 F.2d 580 (4th Cir.1985) (Congress intended that attorney fee provisions may be awarded under § 506(b) notwithstanding contrary state law); *Canal Asphalt*, 2017 WL 1956849 at *7-9 (explaining the "significant bankruptcy gloss" to reasonableness considerations under the Bankruptcy Code separate and apart from the underlying contract and applicable state law).

[7]     The cases cited by FitzWalter for the proposition that reasonableness under section 506(b) of the Bankruptcy Code looks to whether the creditor reasonably believed the services were necessary to protect its interests in the debtor's property is misguided.  *See* Obj. at 24-26.  The bankruptcy court has discretion in determining whether a creditor's fees and expenses are reasonable, and the creditor has the burden of demonstrating its entitlement to them.  *See e.g.*, *Canal Asphalt*, 2017 WL 1956849 at *7-8.

7.     While creditors are "entitled to engage counsel" for "aggressive representation," a court may disallow or reduce such fees "because of an attorney's . . . overzealous advocacy." *Wonder Corp. of Am.*, 72 B.R. at 591; *Canal Asphalt*, 2017 WL 1956849 at *8 (same) .  Further, courts have questioned and reduced fees for creditors who are "largely assured of a full recovery," who are overly litigious, and whose fees relate to a focus of "implementing [an] acquisition strategy" of a debtor's assets." *Canal Asphalt*, 2017 WL 1956849 at *9-10; *see also In re Adelphia Commc'ns Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2007); *Wonder Corp. of Am.*, 72 B.R. at 590-94; *In re A&B Assocs., L.P.*, No. 17-40185 (EJC), 2019 WL 1470892, at *43-44 (Bankr. S.D. Ga. Mar. 29, 2019) (disallowing 25% of the fees and expenses of creditor's counsel, where the creditor had an equity cushion yet "repeatedly raised an unusually large number of issues in various contested matters in [the] case . . . which seemed repetitious and unnecessary" because such actions were "disproportionate to its risk and . . .  not those that would be incurred by a typical creditor in its position.").

8.     The *Canal Asphalt* decision is particularly relevant as the court disallowed attorney's fees of a creditor who (1) asserted substantial attorney's fees to acquire a debtor's property in a sale for a low value, (2) was assured of a full recovery in the proceeding, and (3) was overly litigious.  In that case, the debtor commenced a section 363 sale process to sell substantially all of its assets, and obtained a stalking horse bid valued at $11.2 million, which would have been sufficient to pay all creditors, including the secured creditor, in full.  *In re Canal Asphalt, Inc.*, Case No. 15-23094 (RDD) (Bankr. S.D.N.Y. Apr. 29, 2016) [Docket No. 275].  In reducing the creditor's claim for attorney's fees from approximately $130,000 to $13,000, the court questioned the creditor's aggressive litigation strategy, stating that "one seriously questions why [the creditor's] counsel would need to be so active in [a] case [where the creditor] was largely assured

of a full recovery," finding that the creditor had over a 100% equity cushion.  *Canal Asphalt*, 2017 WL 1956849 at *9.  The court noted that it was clear that the creditor's fees and expenses related "not to obtaining a full recovery on the claim, or work that counsel would normally undertake to ensure that result, but, rather, (a) acquiring the claim from [another creditor], (b) pursuing a third-party guaranty by the Debtor's principal in state court, and (c) primarily, implementing [an] acquisition strategy, which . . . was [the creditor's] main, if not exclusive, focus in this case."  *Id.*  Ultimately, the court found that even if the creditor did not act in bad faith, it was not reasonable for the debtor to "pay its acquirer's legal fees in implementing such a result."  *Id.*

9.      Similar to *Canal Asphalt*, other cases have limited secured creditor's claims for legal fees and expenses where they have had an equity cushion and pursued an overzealous litigation strategy.  For example, in *Wonder Corporation*, the bankruptcy court reduced a secured creditor's claim for legal fees and expenses from $350,000—an amount that totaled over double the debtor's attorney's costs—to $90,000.  *Wonder Corp of Am.*, 72 B.R. at 591-94.  The court noted that the creditor "generat[ed] unreasonable fees and expenses" in connection with a "blatant and totally unproductive obstruction" of the debtor's reorganization, which resulted in "a considerable and largely unnecessary administrative expense." *Id.* at 592, 594.  Furthermore, the court queried whether the creditor's "real motive . . . [was] to manage, orchestrate, and control [the debtor's] reorganization . . . ." *Id.* at 594.  Relevant here, the *Wonder Corporation* court noted that while "the secured creditor had the right to assert all bona fide claims, it was not entitled to 'saddle the debtor with all the attorney's fees and expenses incurred so as

to impede the debtor's ability to reorganize.'"  *Id.* at 591-92 (quoting *In re Masnorth Corp.*, 36 B.R. 335 (Bankr. N.D. Ga.1984)).[8]

10.     Based on the foregoing case law, the Court can find, as a matter of law, that FitzWalter's legal fees and expenses are unreasonable.[9]  The Debtors entered into a binding full-pay sale agreement within one week of the Petition Date and filed a motion for such full-pay sale transaction on December 31, 2021, within two weeks after the Petition Date.  And the Court entered the Bidding Procedures Order for a value-maximizing sale process with the benefit of the full pay Stalking Horse Bid on February 4, 2022 (which was corrected on February 7, 2022).  There is simply no legal basis for FitzWalter's exorbitant counsel fees and expenses in light of the non-existent risk to FitzWalter for obtaining a full recovery.[10]

### (2)    *The Management Time Claims Are Not Reasonable*

11.     For the same reasons set forth above with respect to FitzWalter's legal fees and expenses, the Court should disallow the Management Time Claims.  The Management Time Claims have been asserted in the amount of $4,090,000 as of February 28, 2022 and continue to accrue each day thereafter.[11]  The reasonableness

---

[8]    The court also analogized this case to another in which the actions of a secured creditor that was "*determined to embark upon an 'all-out-war' to oppose every effort or attempt by the debtor to proceed with its reorganization*, notwithstanding the substantial equity cushion that protected [its] secured debt and assured its ultimate payment" justified "a substantial discount from [the secured creditor's] hourly rate fees."  *Id.* at 592 (quoting *In re W.S. Sheppley & Co.*, 62 B.R. 279, 282 (Bankr. N.D. Iowa 1986)) (emphasis added).

[9]    To the extent that the Court requires a further hearing to determine precisely which invoices and time entries are unreasonable, the Debtors reserve the right to request and take discovery of FitzWalter in this regard.

[10]    FitzWalter's statement that it is "vindicating its legitimate legal rights by bringing the Unliquidated Claims against the Obligors" demonstrates that it is asserting amounts personal to it and not Secured Obligations.  These are not costs that the Obligors should have to pay.

[11]    Together, FitzWalter's legal fees and expenses and the Management Time Claims have been asserted in the outrageous amount of $8,718,164.90 (as of February 28, 2022) or nearly 4.25% of the

limitations under section 506(b) of the Bankruptcy Code apply to any "fees, costs or charges" and are not limited to counsel fees. 11 U.S.C. § 506(b); *c.f. In re Shree Mahalaxmi, Inc.*, 522 B.R. 899, 912-13 (Bankr. W.D. Tex. 2014) (disallowing appraisal fees as unreasonable because the appraisal "did not serve any useful purpose to protect the creditor's interest or otherwise aid the bankruptcy case.").

12.    More fundamentally, section 506(b) limits a secured creditor's entitlement to reasonable postpetition fees and expenses to those "***provided for under the agreement . . . under which such claim arose***." 11 U.S.C. § 506(b) (emphasis added). FitzWalter has not provided any response to the Debtors' arguments in the Claims Motion that the Management Time Claims are not supported by—and are expressly prohibited by—the terms of the Transaction Documents. *See* Claims Mot. ¶¶ 37-42.

13.    Instead, FitzWalter attempts to justify its substantial and unreasonable Management Time Claims, which it effectuated pursuant to notices served on the Debtors ***after the commencement of these Chapter 11 Cases*** and which resulted in a substantial increase in the amounts that the Debtors were previously obligated to pay the Security Agent as of the Petition Date had no such notice been sent, by purporting to equate the Management Time Claims to the 3.5% Break-Up Fee for the Stalking Horse Bidder (of approximately $7.5 million). These arguments are wholly irrelevant to the reasonableness of the Management Time Claims.

14.    Contrary to FitzWalter's arguments, the Break-Up Fee was not simply to "compensate the Stalking Horse Bidders for the time spent pursuing the Sale." Obj. at 30-31. Rather, the Break-Up Fee induced the Stalking Horse Bidder to make a binding

---

outstanding principal, interest and non-FitzWalter fees and expenses under the Transaction Documents. The Management Time Claims alone exceed the amount of fees and expenses incurred by the Debtors' counsel for these Chapter 11 Cases. *See supra* n.5.

commitment to purchase the Debtors' assets, established the floor price for the auction, guaranteed a sale of the Debtors' assets at a level to satisfy all valid Secured Obligations, and compensated the Stalking Horse Bidder (if paid) for the time spent, diligence undertaken, and exposure for having capital committed during the marketing period in the Sale Process that the Debtors would use its offer to pursue a higher bid from another party. *See e.g.*, Sale Mot. ¶¶ 50-53. That is unlike the Management Time Claims which are entirely unnecessary for FitzWalter given the full pay transaction, and which provide no benefit to the Debtors' estates (or any of their creditors other than FitzWalter for that matter).[12]

15.     Rather than the Break-Up Fee, which is not substantively comparable to the Management Time Claims, FitzWalter should provide actual comparable rates charged by security agents in similar circumstances. As explained in the Claims Motion, the Court need look no further than the fees charged by the prior security agent. That prior security agent only charged $10,000 per year for Debtor MSN 067 Owner and $15,000 per year for Debtor MSN 173 Owner, and ***never charged additional management time*** despite the prepetition Debt Facilities being in default for nearly two years prior to FitzWalter's purported succession.

16.     As set forth in prior pleadings, as the purported successor Security Agent, the Proceeds Agreements expressly bar such increased costs. Section 2.15.7 of Schedule 2 of the Proceeds Agreement expressly provides that:

---

[12]    In addition, the Break-Up Fee is a fixed, finite amount, and is not being paid under the circumstances here. Contrast that with the Management Time Claims, which FitzWalter asserts relate to time incurred by its personnel related to pursuing its rights in a distressed situation. If FitzWalter has its way and the Debtors do not consummate the sale, FitzWalter's Management Time Claims could easily exceed the Break-Up Fee if these Chapter 11 Cases continue for a few more months. Indeed, based on these rates, FitzWalter would charge nearly $17 million in a year.

> A change in the identity of the Security Agent ***shall not result in an
> Obligor*** or the Lessee ***having to make any increased payment or
> perform any increased obligations*** or have any reduced rights
> under the Transaction Documents."[13]

In sum, not only are such asserted management fees facially unreasonable, FitzWalter is

barred by the terms from the operative documents from asserting such claims.

17.     Furthermore, FitzWalter's attempt to justify the Management Time Claims

based on the facts and circumstances presently known is inconsistent with FitzWalter's

assertion that the Management Time Fees imposed by notice sent to the Debtors on

January 21, 2022 are retroactively active to December 2, 2021—*i.e.*, prior to the Debtors

having filed these Chapter 11 Cases.

### (3)     *Anti-Social Conduct Claims Are Not Secured Obligations*

18.     For the reasons set forth in the Claims Motion, the purported breaches of

the Anti-Yakuza Claims are not Secured Obligations.  *See* Claims Mot. ¶¶ 29-36.

FitzWalter engages in mental gymnastics to claim that it has adequately alleged that the

English Lawsuit claims, on their face, violate the Anti-Yakuza provisions of the

Proceeds Agreement.  Obj. at 17-20.  In doing so, FitzWalter asserts that

Mr. Loechteken's actions are "clearly the type of conduct that the Transaction

Documents prohibit."  Obj. at 18.  This is not so.

19.     FitzWalter asserts, without citation, that it is "well-settled that contractual

interpretation should effectuate the parties' intent as manifested by the terms and

language of their bargain."  Obj. at 19.  However, under English law, which applies to

the Proceeds Agreement, the Court must "construe the relevant instrument taken as a

whole" (*see* Shah Initial Op. ¶ 36) and "give more or less weight to elements of the

---

[13]  *Declaration of Andrew Gray in Support of Motion to Dismiss*, dated January 2, 2022 [Docket No. 23] (the
"Gray Decl."), Ex. 7, 14 (Proceeds Agreements).

wider context in reaching its view as to the objective meaning of the language used" (*see* Tregear Op. ¶ 54).[14]  When correctly read in the context of the overall provisions, it is clear that the allegations in the English Lawsuit are not the type of actions that the Proceeds Agreement is designed to prohibit which is limited to "Anti-Social Conduct," "Anti-Social Relationship," and "Anti-Social Forces."  A plain reading of these defined terms demonstrates that, taking the allegations in the English Lawsuit as true, this is not the type of covered conduct, which is focused on things like "conduct with force and arms" and "threatening or committing violent behavior relating to . . . business transactions."  Gray Decl., Exs. 7, 14 (Proceeds Agreements), Sch. 4 (definition of Anti-Social Conduct).  Indeed, every prong of the definition of "Anti-Social Forces" references "organised crime."[15]

20.    Furthermore, even within the isolated provision on which FitzWalter focuses its arguments, FitzWalter's reading of the Anti-Yakuza Provisions ignores half of the definition on which it relies to assert that its claims against the English Lawsuit Defendants are Secured Obligations.  The definition of "Anti-Social Conduct" does not say "an action to defame the reputation or interfere with the business of any Finance Party" but rather "an action to defame the reputation or interfere with the business of

---

[14]    FitzWalter's own foreign law expert agreed with Tregear's "summary of the approach taken under English law" as it relates to interpretation of contracts.  *See* Shah Reply ¶ 11.  In fact, in prior briefing, FitzWalter's expert took issue with the Debtors' expert for "effectively ignor[ing] the language used by the parties" within the Deeds of Security.  *See id.* ¶ 12.

[15]    Prong (a) of the definition of "Anti-Social Forces" refers to an "organized crime group (*boryukudan*) (as defined in the law relating to Prevention of Unjustifiable Acts by Organized Crime Group Members of Japan (Law No. 77 of 1991, as amended)."  Law No. 77 of 1991 was enacted specifically to address Yakuza-related gang activity in business activities and transactions in Japan.  *See* Edward F. Reilly Jr., *Criminalizing Yakuza Membership: A Comparative Study of the Anti-Boryokudan Law*, 13 Wash. U. Global Stud. L. Rev. 801, 824-829 (2014), *available at* https://openscholarship.wustl.edu/cgi/viewcontent.cgi?article=1511&context=law_globalstudies (last visited March 10, 2022) (explaining similarities between anti-Yakuza law reform in Japan and U.S. federal RICOH statute).

any Finance Party *by spreading rumour, using fraudulent means or resorting to force . . .*

*.*" *Id.*, Sch. 4. The English Lawsuit does not allege that the defendants "spread[] rumour,

us[ed] fraudulent means or resort[ed] to force." *See* Omnibus Reply Decl, Ex. 2. As

such, these claims fail as a matter of law to become Secured Obligations for this reason.

21.    Furthermore, such terms under the Proceeds Agreement are included to

ensure repayment of the Secured Obligations—not to claim additional amounts. Here,

where the Secured Obligations are being paid in full, there is no basis to assert such

additional claims as damages owed by the Debtors.

22.    Finally, FitzWalter asserts that these claims entitle FitzWalter to "costs"

that are "only . . . determinable at the end of those [English Proceedings] and may

include amounts in respect of future elements of the English Proceeding (which are not

knowable at present)." Obj. at 13. To the extent necessary, the Court can estimate such

costs at $0.00 pursuant to section 502(c) of the Bankruptcy Code. This type of

unknowable damages that takes time to liquidate in foreign jurisdictions is precisely the

reason for section 502(c) of the Bankruptcy Code. 11 U.S.C. § 502(c) ("There shall be

estimated . . . any contingent or unliquidated claim, the fixing or liquidation of which,

as the case may be, *would unduly delay the administration of the case* . . . .") (emphasis

added); *see e.g.*, *In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 422 (Bankr. S.D.N.Y. 2003)

(citing *In re Continental Airlines, Inc.*, 981 F.2d 1450, 1461 (5th Cir.1993) ("Bankruptcy

Courts may estimate claims under § 502(c)(1) in order to (i) 'avoid the need to await the

resolution of outside lawsuits to determine issues of liability or amount owed by means

of anticipating and estimating the likely outcome of these actions,' and (ii) 'promote a

fair distribution to creditors through a realistic assessment of uncertain claims'").[16]

**(4)** *There Are No Damages for the Bankruptcy Filing Claims*

23.    FitzWalter misconstrues the Debtors' arguments regarding the Bankruptcy Filing Claims. *See* Obj. at 20-22. There are colorable arguments that the provisions asserted by FitzWalter have not been breached. *See* Claims Mot. ¶¶ 26-28. Again, such terms under the Proceeds Agreement are included to ensure repayment of the Secured Obligations—not to claim additional amounts. And again, where the Secured Obligations are being paid in full, there is no basis to assert such additional claims as damages owed by the Debtors.

24.    This Court can conclude, as a matter of law at the Sale Hearing, that FitzWalter has suffered no damages if the Court approves the Sale and determines the Secured Obligations that will be paid in full. FitzWalter's argument that its damages "will include the costs and fees it has incurred as a result of these Chapter 11 Cases" is circular and baseless because such costs and fees will be paid as Secured Obligations as part of the Sale to the extent that the Court determines that such costs and fees are allowable as Secured Obligations. In other words, if these costs are deemed to be Secured Obligations, they will be paid; and if they are not Secured Obligations, FitzWalter is not entitled to recover them anyway. As such, there can be no basis for any other purported damages for these claims. *Coastal Power Int'l, Ltd. v. Transcon. Cap.*

---

[16]    FitzWalter's reliance on *In re LightSquared Inc.*, 2014 WL 5488413, at *5-6 (Bankr. S.D.N.Y. 2014) for the proposition that estimation must be "absolutely necessary" to avoid undue delay in administration of the cases (a requirement not set forth in the statute) and not of the debtor's own making is misplaced. In that case, the debtors sought to estimate a guaranty claim that was neither contingent nor unliquidated and did not argue, as required by section 502(c) of the Bankruptcy Code, that estimation was necessary to avoid undue delay. Instead, the debtors argued that estimation would "help 'avoid future gamesmanship and provide clarity to the parties that will ease the path to exit." *Id.* at *6. Here, the Debtors have satisfied their burden to demonstrate estimation is proper to the extent that the Court determines additional time is needed to liquidate the English Lawsuit Claims, such liquidation is necessary as part of the proposed sale.

*Corp.*, 10 F. Supp. 2d 345, 364 (S.D.N.Y. 1998) ("The rules governing damages are easily

stated: 'Although any breach of contract entitles the injured party at least to nominal

damages, he cannot recover more without establishing a basis for an inference of fact

that he has been actually damaged.'"), *aff'd*, 182 F.3d 163 (2d Cir. 1999); *Rundle v.*

*Prudential Ins. Co. of Am.*, No. 18-4759-MWF (ASX), 2018 WL 6444889, at *5-6 (C.D. Cal.

Aug. 30, 2018) ("Defendant contends that there can be no breach of contract claim under

the Conversion Policy because there is no dispute that Defendant paid the full amount

of disability benefits to which Plaintiff was entitled on June 2017, and Plaintiff does not

allege she is entitled to any additional disability benefits under the Conversion Policy.

There are therefore no damages . . . [p]laintiff has simply not pointed to any benefits

due under the Conversion Policy that she has not received in full, and therefore has not

stated a claim for breach of contract.").

### (5)    *The Head Lease Claims Seek Double Recovery*

25.    Rather than addressing the fact that assignment of the Head Lease Claims

to the Security Agent serves as collateral and security for the repayment of the Secured

Obligations, FitzWalter argues that the Debtors and the Intermediate Lessors are

nevertheless obligated to pay the Head Lease Claims to the Security Agent.  Obj. at 22.

26.    FitzWalter ignores that under the express terms of each of the security

documents, the Lease Assets were assigned as security to support the Secured

Obligations—not as Secured Obligations.  *See* New York Mortgages § 1.1 (collateral,

including the Lease Assets (*i.e.*, the claims under the various leases), were granted "as

security" for the Secured Obligations); English Security Agreements, Cl. 3.1 (Lease

Assets granted "as security for the payment and discharge of the Secured Obligations");

Intermediate lessor Security Assignments (Lease Assets granted "as security for the payment and discharge of the Secured obligations").

27.    FitzWalter's arguments also side steps the fact that, as long as the Secured Obligations are paid in full, payment of the Head Lease Claims separately is duplicative and improper. *See e.g., BP Exploration & Oil Co. v. Maint. Servs. Inc.*, 313 F.3d 936, 942 (6th Cir. 2002) (stating that it is a well settled rule of common law that "[a]n injured party is entitled to only one satisfaction for his injuries."); *see also Gerber v. MTC Elec. Techs. Co.*, 329 F.3d 297, 303 (2d Cir. 2003) (prohibiting plaintiff from recovering more than once for each injury).

28.    FitzWalter's only counter argument is that the Head Lease Claims will nevertheless filter through the waterfall priority scheme in section 8.3 of the Proceeds Agreement and "its cascade will extinguish the second-tier obligations, so there is no prospect of double recovery." Obj. at 23. But this argument is nonsensical and impractical. As long as the Secured Obligations are paid in full, which is provided for under the proposed sale, no further amounts should be paid through the waterfall as all of the Secured Obligations would have been paid in full. There is no requirement under law or contract for the Stalking Horse Bidder to pay these amounts through the waterfall and back to the Debtors. *See id.* at 22-23 (recognizing that "[t]his distribution will result in a commensurate decrease in the outstanding amount of principal and interest, as well as costs and expenses payable to the Security Agent, as applicable."). This result further illustrates the point that these amounts are for security purposes only and not independent obligations owed by the Debtors or the Intermediate Lessors to FitzWalter above and beyond repayment in full of the Secured Obligations.

29.    Incredibly, FitzWalter's arguments that the Debtors ***and the Intermediate Lessors*** are directly obligated to pay the Head Lease Claims is directly at odds with the

FitzWalter-owned Intermediate Lessors' arguments that the Intermediate Lessors are somehow entitled to keep such claims for themselves, and that the Intermediate Lessors are not obligated to the Security Agent to pay anything under the Transaction Documents because of the limitations on liability and non-recourse provisions of the Proceeds Agreement. *Compare* Obj. at 22 ("[T]he Intermediate Lessors are separately obligated to pay these amounts to FWCP.") *with* Intermediate Lessors Sale Obj. ¶ 32 (arguing that the Intermediate Lessors are "protected by 'limitation of recourse' provisions in the Proceeds Agreement which limit their liability under any 'Transaction Document' to amounts equivalent to monies received under the VNA Leases . . . .").

### (6)    *AirBorne's Fees Are Not Reasonable*

30.    FitzWalter incorrectly asserts that Airborne's fees are reasonable merely because it negotiated a flat, fixed fee of $400,000—instead of the "standard percentage-based fee structure" that would have compensated Airborne at 1-3% of the sale price. Gray Decl. ¶ 5. FitzWalter conveniently omits that, under the terms of the agreement, Airborne was entitled to this flat fee regardless of whether any marketing services were actually provided. If FitzWalter had engaged Airborne on a commission basis, no fees would be owed to Airborne until the assets were sold, which they were not. Moreover, the $400,000 fee is patently unreasonable for the service actually provide by Airborne, which was limited to placing "advertisements in the WSJ, Aersyn, and Airborne's own website" and most significantly "arrang[ing] for the WSJ advertisement to run nationally . . ." *Id.*

31.    In addition, for the reasons set forth in the Debtors' Complaint and the Claims Motion, the Airborne's marketing process was improper and did not comply with applicable law, including the notice requirements of both the N.Y. U.C.C. and the Cape Town Treaty. Article 8 of the Cape Town Convention provides minimum

standards for how a chargee (assignee/lessor) must treat interested parties (mortgagor/lessee) after default when enforcement actions are taken. Here, the international interests are the Leases and the Security Agreements that relate to "aircraft objects" that are registered in a Contracting State (*i.e.*, Vietnam). Article 34 then provides that these same rules from Cape Town Convention Article 8 must apply to associated rights, such as lease claims. Where the Cape Town Protocol applies with respect to aircraft objects, Aircraft Protocol Article IX modifies Convention Article VIII with respect to all matters covered by the Cape Town Treaty as governing the relation between the chargee and the interested party subject to the enforcement action. *See* Aircraft Protocol, Article IX(4).

32.    Under the Aircraft Protocol:

> A chargee giving ten or more working days' prior written notice to interested parties of a proposed sale or lease is deemed to satisfy the requirement of "reasonable prior notice" specified in Article 8(4) (Article IX(4)).

*See* Official Commentary on the Cape Town Treaty, Comment 3.47. Such provision of the Aircraft Protocol is not just limited to "aircraft objects," but such advance notice requirement covers the relationship between any chargee and interested parties regarding enforcement after a default that are covered by the Aircraft Protocol, including associated rights. The Official Commentary of Cape Town (4th Edition) expressly recognizes the application of Article IX of the Aircraft Protocol as governing any enforcement action brought by the charge (the assignee/mortgagee) against interested parties with respect to assigned associated rights (as opposed to enforcement actions under the lease itself). In discussing the scope of Article IX of the Aircraft Protocol, the Official Commentary noted that:

> The duty imposed on a chargee to exercise remedies in a commercially reasonable manner is extended to cover all remedies in relation to aircraft objects and thus to embrace not only remedies of the creditor under the security agreement but those conferred on the assignee of associated rights qua transferee of the international interest under Article 34 but not remedies in relation to the associated rights themselves.

Official Commentary on the Cape Town Treaty, Comment 3.47 (discussing "Aircraft Protocol modifies the Convention in various respects to give greater certainty for the parties").

33.     Furthermore, FitzWalter's argument that it complied with the "reasonable prior notice in writing of the proposed sale" through the December 1, 2021 default notice is also wholly without merit.  Such notice is a default notice—it does not mention a "proposed sale," or, for that matter, any disposition of assets.  Such notice does not meet the facial thresholds for providing "reasonable prior notice in writing of the proposed sale," as required under the Cape Town Treaty.  As set forth in prior pleadings, FitzWalter, and its agent in charge of the remarketing of the Lease Claim Assets (Airborne) were commercially unreasonable in their attempted prepetition enforcement sale of the Lease Assets.[17]

*                          *                          *

34.     Accordingly, FitzWalter should not be compensated by the Debtors (or any of the Obligors) for the amounts it has agreed to pay Airborne, and any such fees do not satisfy the reasonableness requirements under section 506(b) of the Bankruptcy Code.

---

[17]   Pursuant to the Debtors' Complaint, the Debtors are seeking to recover damages for FitzWalter's prepetition enforcement efforts.

## II.    Limited Reply to FitzWalter's Improper Sale Arguments

35.    The Objection contains additional arguments opposing the proposed sale regarding the Debtors' ability to sell their property free and clear pursuant to section 363(f) of the Bankruptcy Code.  Obj. ¶¶ 32-34.  Such arguments are improperly asserted in the Objection and untimely raised because the objection deadline established by the Court passed on February 17, 2022 at 4:00 p.m. (ET).  *See* Bidding Procedures at II.  FitzWalter filed a 43-page objection at that time, including in which it addressed section 363(f) of the Bankruptcy Code.  *See* Docket No. 120 (the "FitzWalter Sale Objection").  FitzWalter has not sought the Court's permission to file a sur-reply to further brief its opposition to the proposed sale, and as such, its arguments in the Objection in that regard should be rejected as untimely.  *See* Local Rule 9006-1(b) ("Untimely papers may be rejected.").

36.    Nevertheless, the Debtors do address two arguments argument raised in the Objection below.

### A.    The Lease Assets are Property of the Debtors' Estates

37.    FitzWalter continues to push its unsupported argument that the Debtors do not own the Lease Assets and, as such, cannot sell them as part of the proposed sale. *See e.g.*, Obj. at 32-33.  In support of this argument, FitzWalter asserts that "the determination of property rights is controlled here by English, not federal, law."  Obj. at 1 (citing *Butner v. United States*, 440 U.S. 48, 54 (1979)).  That is not the case.

38.    As FitzWalter correctly quotes from *Butner*: "***absent specific action by Congress***, the determination of property rights is governed by applicable law."  *Id.* at 1-2 (emphasis added).  Indeed, there are two exceptions to the general rule in *Butner*. "First, there is an exception if Congress modifies state law through legislation enacted under Congress's 'authority . . . to establish uniform laws on the subject of Bankruptcies

- 21 -

throughout the United States . . . . Second, state property law must relent 'if some

federal interest requires a different result." *In re Amaravathi Ltd. P'Ship*, 416 B.R. 618,

622 (Bankr. S.D. Tex. 2009) (internal quotations omitted).[18]

39.    Here, there is a specific action by Congress—section 541(a)(6) of the

Bankruptcy Code, which provides that property of the Debtors' estates include, among

other things, "[p]roceeds, product, offspring, rents, or profits of or from property of the

estate . . . ." 11 U.S.C. § 541(a)(6).  As explained by the bankruptcy court in *Amaravathi*,

Congress enacted section 541(a)(6) of the Bankruptcy Code **after** the Supreme Court

decided *Butner*.  In doing so, Congress abrogated *Butner* to the extent it determined that

ownership of the rights to rents collected from a bankruptcy estate was determined by

non-bankruptcy law.  *Amaravathi*, 416 B.R. at 622-23.  Thus, section 541(a)(6) of the

Bankruptcy Code controls the question as to whether "interests in the rents and profits

earned by property in a bankruptcy estate." *Id.* at 623-24.

40.    In *Avaranthi*, the bankruptcy court concluded that, notwithstanding an

absolute assignment of rents granted by the debtors to a security trustee prior to the

petition date, the associated rents were property of the estate under section 541(a)(6) of

the Bankruptcy Code.  In that case, there was no dispute that the underlying properties

giving rise to the rents belonged to the debtors.  Here, no party has disputed—nor could

they—that the Debtors own the Aircraft.  The Lease Assets are clearly "proceeds,

product, offspring, rents, or profits" derived from the Aircraft.  As such, the Lease

---

[18]    The other case cited by FitzWalter on this point, *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-51 (2007), also recognized the exceptions from *Butner* that bankruptcy courts look to applicable non-bankruptcy law "unless some federal interest requires a different result."

Assets are property of the Debtors' estates under section 541(a)(6) of the Bankruptcy Code, and the Debtors have the right to sell them as part of the proposed sale.[19]

**B.    Provisions of the Security Agreement Can Be Deemed Invalid if They Impair Redemption**

41.    In its improper and untimely sur-reply, FitzWalter misrepresents the Debtors' arguments and the opinion of Francis Tregear regarding the treatment under English law of contractual provisions that have the effect of interfering with a borrower's equity of redemption.  *See* Obj. at 31 ("While not explicitly argued in Debtors' pleadings, Mr. Tregear, in his opinion submitted with the [Debtors' Sale] Reply, posits that section 3.1 is an invalid 'collateral advantage' because it impermissibly circumvents the Debtors' right to redeem.").

42.    This is a straw-man argument.  Mr. Tregear does not state in his opinion that Section 3.1 is conclusively invalid on its face and unenforceable in any context; rather, he states that such a provision is "***liable*** to be considered invalid and have no effect," if it has the effect of entitling FitzWalter to augment the amount of the Secured Obligations unilaterally by a guarantee-type claim (as distinct from a liability) that is unconnected to the obligation which was secured at the time of the execution of the Security Agreements. This is what is being argued by FitzWalter, that the terms of Section 3.1 can be manipulated and employed by a lender in such a way where the effect is to make redemption impossible.  By this interpretation, such a provision is arguably violative of public policy surrounding the equity of redemption or the right to redeem.

---

[19]    In addition, for the reasons set forth in the Debtors' Sale Reply and the Tregear Opinion attached thereto as Exhibit A, the Debtors can sell the Lease Assets under English law.  *See* Debtors' Sale Reply ¶ 26 & Ex. A.

43.     In support of its argument that Section 3.1 validly incorporates a broad scope of unrelated liabilities, FitzWalter relies on the *Reply to the Tregear Opinion* submitted by Akhil Shah, a copy of which is attached to the Objection (the "Shah Reply"), which attempts to poke holes in Mr. Tregear's prior opinion in support of the Debtors' Omnibus Sale Reply [Docket No. 130] that provided three bases for a security provision to be deemed invalid.  However, as described in more detail in the Tregear Opinion attached hereto as **Exhibit A** (the "Supplemental Tregear Opinion"), the English cases referenced in the Shah Reply are distinguishable or inapplicable to the Debtors' cases.  Among other things, the Supplemental Tregear Opinion reiterates that Section 3.1 is liable to be considered invalid and of no effect not because its terms are "unfair and unconscionable" on their face, as the Objection suggests, but because they are purported to have the effect of impairing the Debtors' equity of redemption and right to redeem.  *See* Suppl. Tregear Op. ¶¶ 13-25.

44.     The Supplemental Tregear Opinion also addresses an argument made by FitzWalter that the claims and assets assigned by the Intermediate Lessors to the Debtors (the "Lessor Assets") would automatically revert to the Intermediate Lessors following consummation of the proposed sale.  *See* FitzWalter Sale Obj. at 32-33. According to FitzWalter, "upon full payment and discharge of the Secured Obligations, certain of the Lease Assets, including the VNA Claims and rights under the Subleases, will revert to the Intermediate Lessors—not the Debtors—and the Debtors will not be able to sell those assets."  *Id.* at 33.

45.     This argument confuses the effect of redemption by payment by the borrower and the effect of redemption by sale of the underlying collateral to a third party.  As explained in the Supplemental Tregear Opinion, the effect of a redemption sale to a third party is that the securing party "would cease to be the legal owner" of the

collateral, since it has been sold to pay off the secured obligations.  *See* Suppl. Tregear

Op. ¶ 6.  FitzWalter's argument—that a sale of collateral, if the proceeds satisfy the

underlying debt, causes the collateral to revert to the borrower—is nonsensical.  "In

those circumstances, there is no prospect of the Secured Rights returning to either the

Debtors or the Intermediate Lessors because they will have been sold to the purchaser."

*Id.* ¶ 4.

### III.    <u>Governing Law</u>

46.    FitzWalter has repeatedly alleged that English law should apply to the

instant disputes.  While the Debtors have shown that the relief requested by the Debtors

in the Claims Motion and Sale Motion are supported by applicable law, FitzWalter's

predominant reliance upon English law is misplaced—both in terms of governing law

and substance.  The Bankruptcy Code governs the analysis of secured claims under

section 506(b) of the Bankruptcy Code and the Cape Town Treaty and New York law

arguably govern ahead of English Law in the following order of priority:

    (i)    **<u>Federal Law / Bankruptcy Law</u>**:  governing matters arising under sections 363(b) & (f) and 506(b) of the Bankruptcy Code;

    (ii)    **<u>The Cape Town Treaty</u>**:  governing the enforcement actions and the right to sell;

    (iii)    **<u>New York Law</u>**:  governing the New York Mortgage, which governs all of the collateral being sold and defines "Secured Obligations" under the Transaction Documents; and

    (iv)    **<u>English Law</u>**:  governing the Proceeds Agreements and the English law security documents.

47.    As set forth in greater detail in the summary of governing law in

**<u>Exhibit B</u>** hereto and in the Debtors' prior filings, no matter which law is applied, the

relief by the Debtors under the Sale Motion and Claims Motion is appropriate and

supported by applicable law.

- 25 -

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that the Court (a) overrule the Objection and grant the Claims Motion, and (b) grant such other and further relief as may be just and proper.

Dated:  March 11, 2022          JPA NO. 111 CO., LTD. and
        New York, New York      JPA NO. 49 CO., LTD.
                                    *Debtors and Debtors in Possession*
                                    By their Counsel
                                    TOGUT, SEGAL & SEGAL LLP
                                    By:

                                    */s/ Kyle J. Ortiz*
                                    Frank A. Oswald
                                    Kyle J. Ortiz
                                    Bryan M. Kotliar
                                    Jared C. Borriello
                                    One Penn Plaza, Suite 3335
                                    New York, New York 10119
                                    Telephone: (212) 594-5000