WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020-1095
212 819 8200
Scott Greissman
Richard A. Graham

111 South Wacker Drive
Suite 5100
Chicago, Illinois 60606
(312) 881-5400
Jason N. Zakia (*pro hac vice* pending)

*Counsel to Capitol Reef LLC*
*and Isle Royale LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| JPA NO. 111 CO., LTD. and JPA NO. 49 CO., LTD, | Case No. 21-12075 (DSJ) |
| Debtors.[1] | (Jointly Administered) |

**CAPITOL REEF LLC AND ISLE ROYALE LLC' S STATEMENT OF SUPPORT OF DEBTORS' MOTIONS FOR ENTRY OF ORDERS (I)(A) APPROVING THE SALE OF THE PURCHASED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES; AND (B) GRANTING RELATED RELIEF [DOCKET NO. 21]; AND (II)(A) DETERMINING SECURED CLAIMS OF PREPETITION CREDIT FACILITIES OR (B) IN THE ALTERNATIVE, ESTIMATING AMOUNT OF CLAIMS ASSERTED BY FITZWALTER CAPITAL PARTNERS (FINANCIAL TRADING) LIMITED AND ITS AFFILIATES [DOCKET NO. 136]**

Capitol Reef LLC and Isle Royale LLC (collectively, the "Stalking Horse Purchaser") submit this statement in support of the (a) *Application for Entry of Orders: (I) (A) Approving*

---

[1] The Debtors in these Chapter 11 Cases are: JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd. The Debtors' corporate address is Kasumigaseki Common Gate West Tower, 3-2-1 Kasumigaseki, Chiyoda-Ku, Tokyo, Japan 100-0013.

1

*Bidding Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (B) Establishing Stalking Horse Bidders and Bid Protections; (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Authorizing Enforcement Actions; (E) Scheduling an Auction and a Sale Hearing; and (F) Approving the Form and Manner of Notice Thereof; and (II) (A) Approving the Sale of the Purchased Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances; and (B) Granting Related Relief* [Docket No. 21] (the "Sale Motion") and (b) the *Motion of the Debtors for Entry of an Order (I) Determining Secured Claims of Prepetition Credit Facilities or (II) In the Alternative, Estimating Amount of Claims Asserted by FitzWalter Capital Partners (Financial Trading) Limited and its Affiliates* [Docket No. 136] (the "Determination Motion," and together with the Sale Motion, the "Motions" [2]), and state as follows.

## PRELIMINARY STATEMENT

1. Having determined that the Debtors filed these chapter 11 cases (the "Chapter 11 Cases") in good faith for the purpose of maximizing value recovery by its stakeholders, the Court is now offered two paths. The first is to approve the Sale Motion and allow the Debtors to quickly close a sale of substantially all of their assets for at least $210 million in cash. This path provides the most value to the most parties. The cash purchase price is sufficient to repay the senior loans, the junior loans in full and to provide a substantial recovery to equity. This path is supported by the Debtors and all of their stakeholders, except for FitzWalter Capital Partners (Financial Trading) Limited ("FitzWalter").

---

[2] Capitalized terms used but not otherwise defined herein shall carry the meanings given to such terms in, as applicable, the Motions, *Debtors' Omnibus Reply to the Objections of FitzWalter Capital Partners (Financial Trading) Limited and the Intermediate Lessors Regarding the Proposed Sale* [Docket No. 130] (the "Debtors' Omnibus Reply"), and the statement of JP Lease Products & Services Co. Ltd. ("JP Lease") in support of the Sale Motion and the Debtors' Omnibus Reply [Docket No. 132] (the "JP Lease Statement").

2

2. The second path is that offered by FitzWalter.[3] FitzWalter asks the Court to deny the Sale Motion, or effectively kill the sale by conditioning it on a purchase price that satisfies a grossly inflated amount of senior secured debt. This path would lead to FitzWalter succeeding in its strategy to take the assets without paying one dollar beyond the amounts it paid to acquire the senior loans late last year, and without providing anything to any other stakeholder. Other creditors and equityholders would receive nothing in this scenario, and the Debtors' estates would likely be left administratively insolvent. Not surprisingly, FitzWalter is the only party advocating for this path.[4]

3. The Stalking Horse Purchaser will buy the assets for the highest and best price, as confirmed by the Debtors after a comprehensive marketing process that was run in accordance with Court-approved bidding procedures. This process gave the Debtors the opportunity to identify any potential buyer that was willing to pay more than the Stalking Horse Purchaser—there was none. The process also gave FitzWalter the opportunity to credit bid. It chose not to. There can be no doubt that the Stalking Horse Purchaser is providing maximum value to the estates and stakeholders, while FitzWalter is prosecuting its own pecuniary interests to the detriment of all others.

---

[3] On February 17, 2022, FitzWalter filed an objection to the sale memorialized in the Stalking Horse Purchase Agreement [Docket No. 120] (the "FitzWalter Sale Objection"). On that same date, JLPS Leasing Uranus Limited and JLPS Leasing Draco Limited (collectively, the "Intermediate Lessors") also filed an objection to the sale [Docket No. 118] (the "Intermediate Lessors Sale Objection"). On March 9, 2022, FitzWalter filed an objection to the Determination Motion and Response to the Debtors' Omnibus Reply [Docket No. 152] (the "FitzWalter Response" and, together with the FitzWalter Sale Objection and the Intermediate Lessors Sale Objection, the "Objections").

[4] At least one other entity holds an amount of senior loans, and that party supports the proposed transaction with the Stalking Horse Purchaser. See Statement of Sumitomo Mitsui Trust Bank, Limited, Regarding the Bidding Procedures Motion and the Dismissal Motion, filed January 13, 2022 [Docket No. 51], at ¶ 7 (expressing support for "allowing the Debtors to proceed with a sale process that will maximize the value of the Aircraft for the benefit of all parties in interest, including the MSN 173 Senior Secured Parties.").

4. The Stalking Horse Purchaser has been patient. It continues to commit considerable capital to the proposed transaction and support to a process that has been lengthier and far more litigious than it anticipated. Recent disruption in the capital markets, particularly in the aircraft finance industry, has only increased the risks of this transaction. While the Stalking Horse Purchaser has been a constructive participant in the Debtors' sale process, the time has come for that process to end. The sale should be approved and the Court should determine that the Secured Obligations (which must be paid for the sale to close) should be limited to the amount of the senior loans, the junior loans, break costs, and a reasonable but limited amount of FitzWalter's attorney's fees and other limited costs.

## THE SALE SHOULD BE APPROVED

5. For the Court to approve the Sale Motion, it must determine that the Bankruptcy Code authorizes and empowers the Debtors to sell all the Purchased Assets free and clear of interests, particularly the liens held by FitzWalter as Security Agent. Part I below outlines the path for doing so. Given the structure of the proposed sale, the Court must also determine that the amount of sale proceeds payable to FitzWalter suffices to satisfy the Secured Obligations, and Part II below outlines the for the Court why this is the case. Finally in Part III below, we explain why the Court need not allow FitzWalter and its newly installed "fiduciary" to utilize the pass-through Intermediate Lessor entities to intercept for FitzWalter's benefit the value that would otherwise flow to all stakeholders as a result of the proposed sale.

**I.   The Bankruptcy Code Allows for Sale of the Lease Assets Free and Clear of Interests**

6. The Lease Assets are property of the estate. To the extent any of the objecting parties has an interest in the Purchased Assets (including the Lease Assets), the Bankruptcy Code authorizes the Debtors to sell the Purchased Assets free and clear of those interests.

4

**A.      The Bankruptcy Code Gives the Debtors the Power to Sell the Lease Assets**

7.      This Court has already determined that the Debtors' equity of redemption in the Lease Assets is a property interest in the Lease Assets.  Memorandum of Decision and Order Resolving Motion to Dismiss, dated February 1, 2022 [Docket No. 97] (the "Memorandum Decision") at 20.

8.      Section 363 of the Bankruptcy Code empowers the Debtors, as debtors in possession, to sell all the Purchased Assets, including the Lease Assets, free and clear of all interests, including liens.  11 U.S.C. § 363(f) (empowering sales free and clear of interests and including liens as interests by its terms:  "(3) such interest is a lien and . . . ."); *see also Austein v. Schwartz (In re Gerwer)*, 898 F.2d 730 (9th Cir. 1990) (holding pledged notes held by pledgor were properly turned over to the estate and sold by the trustee, with lien attaching to sale proceeds); *cf. In re Weber*, 719 F.3d 72, 78 (2d Cir. 2013) ("*Whiting Pools* teaches that, upon Weber's filing of his bankruptcy petition, Weber's equitable interest under state law gave the bankruptcy estate a possessory right in the secured property, as property that the trustee could use under section 363."), *abrogated on other grounds by City of Chicago v. Fulton*, 141 S. Ct. 585, 208 L. Ed. 2d 384 (2021).

9.      As both English law experts testified, whether FitzWalter's interests are absolute assignments by way of security or assignments by way of charges, they are fundamentally devices to secure payment of a debt or performance of an obligation, and in both cases the assignor retains the right to redeem the assigned property upon payment.  *See, e.g.*, Reply Opinion of Akhil Shah QC, dated 22 January 2022 [Docket No. 79], at ¶¶ 6, 9 (agreeing "that the Deeds of Security were security for payment of all liabilities falling within the defined term of Secured Obligations, and as such would be considered as a mortgage" in the form of an absolute assignment); Opinion of

5

Francis Tregear QC, dated 18 January 2022,[5] at ¶ 8.6 ("This is because the assignment was 'by way of security' and was clearly intended as security for the sums owed to the secured creditors. As such there was plainly no intention to do anything other than create a security interest. In those circumstances, the effect of English law is that there is an equity to redeem. As is stated below, if the assignment was absolute, the transaction was entered into by the parties with a view to creating security for repayment of the funds advanced to the Debtors so that they were entitled to the equity of redemption in the assigned assets."). FitzWalter's interests in the Lease Assets are therefore "liens" as a matter of bankruptcy law for the purpose of sales under Section 363, irrespective of how they are styled under English law. 11 U.S.C. § 101(17) ("The term 'lien' means charge against or interest in property to secure payment of a debt or performance of an obligation.").[6]

10. Furthermore, the section 363 power to sell does not require a trustee or debtor in possession to first redeem the property to be sold. *See, e.g.*, *In re Gerwer*, 898 F.2d at 734 ("Austein argues that California law does not permit the sale of pledged notes unless they are redeemed. But the power exercised by the bankruptcy court depends on the federal law embodied in section 363."). The full payment protection a secured creditor obtains under applicable non-bankruptcy law before it must release a lien (or re-reassign property subject to a security assignment) as part of a redemption is replaced in bankruptcy with the remedy of adequate

---

[5] Attached to *Debtors' Reply to the Objection of FitzWalter in Further Support of Their Application for Entry of Orders, Inter Aila, Approving Bidding Procedures Relating to the Sale of Substantially all of the Debtors' Assets*, filed January 18, 2022 [Docket No. 68], Exhibit A (*Declaration of Francis Tregear in Support of Debtors' Reply to the Objection of FitzWalter in Further Support of Their Application for Entry of Orders, Inter Aila, Approving Bidding Procedures Relating to the Sale of Substantially all of the Debtors' Assets*).

[6] *E.g.*, *In re Guardian Realty Grp., L.L.C.*, 205 B.R. 1, 4 (Bankr. D.D.C. 1997) ("The majority of cases to consider language in a security agreement granting a mortgagee an alleged absolute assignment of rents have found the true nature of the mortgagee's interest to be no more than security even in those states following the 'title theory' of mortgages."); *In re Amaravithi Ltd. P'ship*, 416 B.R. 618, 630 (Bankr. S.D. Tex. 2009); *In re Foundry of Barrington P'ship*, 129 B.R. 550, 557 (Bankr. N.D. Ill. 1991). Note that the court in *Guardian Realty* observed that, while state law creates the relevant property interest, federal courts must look to the substance of the transaction under state law and not accept what are only state law labels as controlling on substance. *In re Guardian Realty*, 206 B.R. at 4 (synthesizing *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 727 (1985) with *Butner v. United States*, 440 U.S. 48, 55 (1979)).

6

protection. 11 U.S.C. § 363(e). Cash payment is only one of many forms of adequate protection for lienholders available in a bankruptcy sale scenario, none of which require redemption. *See* 11 U.S.C. § 361 (setting forth examples of adequate protection that may be provided "when required under section . . . 363," including replacement liens (attached, for example to proceeds of sale)). Accordingly, bankruptcy law does not require that all secured obligations be paid in order for collateral to be sold, regardless of non-bankruptcy law requirements. The Security Agent's interests in the Lease Assets are liens, and the Lease Assets may be sold free and clear of such interests so long as the requirements of section 363(e) and (f) are satisfied.

**B.     The Purchased Assets can be Sold Free and Clear of FitzWalter's Liens or Interests**

11.     Section 363(f) of the Bankruptcy Code allows a debtor to sell assets free and clear of all competing interests if any one of five criteria are met. 11 U.S.C. § 363(f). As set forth in the Debtors' Omnibus Reply, several of those criteria are met here. Debtors' Omnibus Reply ¶¶ 16-26. First, applicable non-bankruptcy law (the Uniform Commercial Code and the Cape Town Convention) permits the Sale of the Purchased Assets free and clear of all liens, claims and interests. Debtors' Omnibus Reply ¶¶ 17-18; JP Lease Statement ¶¶ 12-18. Second, under section 363(f)(3), the purchase price is sufficient to satisfy the full amount of the value of any lien properly asserted by FitzWalter. Debtors' Omnibus Reply ¶ 20. Third, under section 363(f)(4), there is a bona fide dispute over the validity and extent of FitzWalter's and the Intermediate Lessors' asserted interests.[7] *E.g.*, Debtors' Omnibus Reply ¶ 22; Motion to Dismiss at 21; *see generally* FitzWalter Complaint; Debtors' Complaint. Finally, under section 363(f)(5), to the extent either

---

[7]     Although FitzWalter attempts to confuse the issue by asserting that the extent of the Debtors' ownership rights in the Lease Assets must be determined prior to consummation of the Sale, FitzWalter Objection at 36, in doing so it ignores this Court's determination that the Lease Assets are property of the estate. Memorandum Decision at 20.

7

FitzWalter or the Intermediate Lessors has interests in the Purchased Assets, the Debtors would be entitled to seek an accounting of such assets in the English Court, and that court could direct a sale of the property in exchange for payment of less than the face amount of the asserted claims. *E.g.*, Debtors' Omnibus Reply ¶ 26; Tregear Opinion ¶ 10.

### II. The FitzWalter Alleged Fees, Costs & Charges Do Not Constitute Secured Obligations and Are Not Entitled to Allowance as Secured Claims

12. The Stalking Horse Purchaser has committed to a purchase price of $5 million, in addition to an amount sufficient to cover the Senior Loans and the Junior Loans (and certain swap breakage costs). This totals approximately $210 million. The Stalking Horse Purchaser acknowledges that the Secured Obligations also include a reasonable but limited amount of the legal fees of FitzWalter's counsel. But paying fees to FitzWalter's counsel is not required or agreed to the extent those fees were mainly incurred in contesting these Chapter 11 Cases and the proposed sale in the face of the Debtors' repeated affirmation that the Senior Loans, Junior Loans and swap breakage costs would be fully repaid, and also because FitzWalter repeatedly argued they were undersecured (which would mean they are NOT entitled to payment of any fees).

13. Finally, the other FitzWalter Alleged Fees, Costs & Charges (or similar charges) outlined below are neither Secured Obligations as a matter of applicable non-bankruptcy law, nor allowable secured claims under section 506(b) of the Bankruptcy Code because they are also manifestly unreasonable.

### A. Breach Damages Under Head Leases Are Not Additive

14. Unpaid rent and breach damages claims under the Head Leases are collateral for, and not part of, the Secured Obligations. FitzWalter construes provisions providing that rent be paid directly to the Security Agent as additive to their claims in an amount totaling approximately $21 million. But these payments are merely proceeds of the collaterally assigned Head Lease and

8

cannot be double-counted as also part of FitzWalter's claim. This is made clear by the requirements that the payments be applied to the Secured Obligations through the payment priority waterfall in Proceeds Agreements (as FitzWalter itself has insisted upon), which excludes any double payment obligation.[8] The Stalking Horse Purchaser has been clear that it will not double pay these amounts.

### B. No Claim is Cognizable for Commencement of Chapter 11 Cases

15. For the reasons set forth in the Determination Motion,[9] the Stalking Horse Purchaser agrees that the commencement of these Chapter 11 Cases did not violate the Transaction Documents, because no Obligor took action leading to either Debtor becoming "bankrupt" or "insolvent." To the contrary, it is now apparent that commencing these Chapter 11 Cases preserved the solvency of each Debtor by seeking the aid of this Court to effect a properly marketed sale or refinancing, so that the Debtors' assets could be used to fully satisfy the Secured Obligations and other debts, leaving a surplus to fund a distribution to equityholders. Even if there were a technical violation of the Transaction Documents, full payment of the Secured Obligations leaves no basis for a claim for damages. The Stalking Horse Purchaser will not include in the purchase price any amounts on account of the supposedly contingent and unliquidated "claims."

### C. Defamation/Yakuza Claims Are Not Secured Obligations

16. The Stalking Horse Purchaser agrees that the Debtors are also correct that there has been no breach of Clause 11.3.23 of the Proceeds Agreements relating to "Anti-Social Forces, Relationship and Conduct." There are no allegations implicating "Anti-Social Forces" or "Anti-Social Relations." Those terms, which deal with criminal organizations, use and threats of

---

[8] *See* Proceeds Agreement, Cls. 11.2.1 (providing for decrease in payment obligations to extent of satisfaction of identical obligations paid to Borrower) and 8.3.1-8.3.10 (payment waterfall providing for payment of surplus to Borrower).
[9] Determination Motion at ¶ 27.

9

violence, racketeering and blackmail, serve to provide clarifying context for any vague, imprecise or open-ended language in the definition of "Anti-Social Conduct."

17.  A full read of Clause 11.3.23 makes clear that it deals with issues of organized crime as opposed to "threats" to call out an industry player for continuing its involvement in an irregular and inequitable sales process after having been apprised of the facts. The purpose of these claims, which are vague, fact-intensive and unliquidated, is to derail the sale by inflating to the purchase price beyond what the Stalking Horse Purchaser will pay. They should be disregarded.

### D. Excessive Management Time Claims Are Not Secured Obligations

18.  For the reasons set forth in the Determination Motion, the Management Time Claims are not Secured Obligations (or allowed secured claims) and should be reduced to at most the rates charged by the former Security Agent and prorated to cover at most only the time from FitzWalter's appointment until the closing. The amounts charged by FitzWalter for the 3 months it owned Senior Loans and served as self-appointed security agent, totaling approximately $4.1 million as of February 28, 2022, are exponentially more that the annual amounts ($25,000) charged by the original security agent and their suggestion that such amounts should be included in FitzWalter's claim is abusive.

### E. Costs to Retain Airborne Capital as Remarketing Agent, FitzWalter's Legal Fees and the Insurance Costs Are Not Secured Obligations

19.  As explained in the Determination Motion,[10] the costs to retain Airborne, FitzWalter's legal costs and the insurance costs are not Secured Obligations and should be disallowed. It should be noted that, in addition to the reasonableness that applies under section

---

[10] Determination Motion ¶¶ 43-52.

10

506(b) of the Bankruptcy Code, FitzWalter had similar duties to act reasonably under English law,[11] the Cape Town Treaty,[12] and the New York Uniform Commercial Code ("UCC").[13]

### III. Intermediate Lessor Assigned Property May Be Sold As Purchased Assets

20. The Court may ignore any supposed impediment to the proposed sale suggested by or on account of the Intermediate Lessors. Intermediate lessors in aircraft financing lease structures are pass-through entities that are put in place for withholding tax considerations. This common tax-advantaged structure is designed to attract investors, and the Intermediate Lessors' sole purpose is to facilitate the leasing of the asset from the owner to the operator. It is not to impede or clog the ability of stakeholders to realize the full value of their investment. Any ruling by the Court that does cause the intermediate lessor structure intermediate lessor structure to impede the ability of stakeholders to realize the value of their investment could disrupt the market for these structures and raise financing costs.

21. Moreover, notwithstanding FitzWalter's prepetition foreclosure on the equity interests in the Intermediate Lessors, the Intermediate Lessors remained under the same management as the Debtors and executed the conditional assignment in the Enforcement Notices described below for the express purpose of facilitating a value-maximizing transaction. It is only

---

[11] A mortgagee properly enforcing a mortgage over lease rights is bound by English law duties to take reasonable steps to obtain a proper price for the asset, *Cuckmere Brick Company Ltd. v. Mutual Finance Ltd [1971]* 22 P & CR 624, 2 WLR 1207, EWCA Civ 9, 2 All ER 633, Ch 949 at 978 (25 February 1971) (or, per Salmon LJ at 966, "the true market value"), to act fairly towards the borrower, and to not act in a way that unfairly prejudices the mortgagor, *Palk v. Mortgage Services Funding plc [1993]*, 2 All ER 481, 2 WLR 415, Ch 330 at 337 (31 July 1992).
[12] Cape Town Treaty, Arts. 8(3) (sale and other remedies "shall be exercised in a commercially reasonable manner"), (4) ("A chargee proposing to sell or grant a lease of an object under paragraph 1 shall give reasonable prior notice in writing of the proposed sale.").
[13] N.Y. U.C.C. §§ 9-610 (McKinney) ("Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable."). The UCC applies, because the Lease Assets constitute proceeds of the Aircraft and related collateral subject to the mortgages governed by the New York law. N.Y. Mortgages § 1.1(b) (including proceeds of the other "Mortgaged Property," including proceeds from sale or other disposition (i.e. leasing) as "Mortgaged Property"); N.Y. U.C.C. §§ 9-102(64) (McKinney 2001) (defining "proceeds" to include "[w]hatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral; . . .whatever is collected on, or distributed on account of, collateral; [and] rights arising out of collateral").

after FitzWalter failed to credit bid in the Court-approved sale process and instead installed its own manager that the Intermediate Lessors adopted FitzWalter's positions for the sole purpose of assisting FitzWalter in acquiring the Debtors assets without payment to any other stakeholders. Having concluded that the Debtors' Chapter 11 Cases were properly filed, the Court should not allow FitzWalter to manipulate the Intermediate Lessors in order to prevent stakeholders from recovering full value for the Debtors' assets.

22. The Court may also reject the Objectors' arguments, because the *(A) Notice of Enforcement Sale and (B) General Conveyance and Bill of Sale [MSN 067 Sublease Claims and Other Sub-Leasehold Assets]* and the *(A) Notice of Enforcement Sale and (B) General Conveyance and Bill of Sale [MSN 173 Sublease Claims and Other Sub-Leasehold Assets]* [each filed at Docket No. 77] (the "Enforcement Notices") effect a transfer of the Intermediate Lessor Assigned Property to the Debtors (for on-sale to the Stalking Horse Purchaser) either (or both) by (i) valid written consent to enforcement under the Cape Town Treaty (*see* JP Lease Statement ¶¶ 12-16) and the UCC, or (ii) a valid contract and bill of sale.

23. Consent to transfer by enforcement occurred via the Enforcement Notices.[14] Each Intermediate Lessor granted the applicable Debtor, among other things, "all of [Intermediate Lessor's] right, title and interest, as the enforcing secured party (including, the right, estate, title and interest of the [Intermediate Lessor]), in and to the Assigned Property (as defined under the

---

[14] This was a "use" of the Sublease Security Assignment under section 363 of the Bankruptcy Code that was authorized by this Court. *See* Corrected Order (A) Approving Bidding Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (B) Establishing Stalking Horse Bidders and Approving Bid Protections; (C) Approving Procedures of the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Authorizing Enforcement Actions; (E) Scheduling an Auction and a Sale Hearing; and (F) Approving the Form and Manner of Notice Thereof, entered Feb. 7, 2022 [Docket No. 102] (the "Bidding Procedures Order"), at ¶ 7 ("The Debtors are authorized to take the necessary steps under applicable law to effectuate the Enforcement Actions."); *see also In re Weber*, 719 F.3d at 78 ("*Whiting Pools* teaches that, upon Weber's filing of his bankruptcy petition, Weber's equitable interest under state law gave the bankruptcy estate a possessory right in the secured property, as property that the trustee could use under section 363.").

Sublease Security Assignment) granted under the Sublease Security Assignment . . . ." Enforcement Notices at 2. Both the Cape Town Treaty and New York law authorize this procedure. Cape Town Treaty, Arts. 9(1) (providing that a "chargee and all the interested persons may agree that ownership of (*or any other interest of the chargor in*) any object covered by the security interest shall vest in the chargee in or towards satisfaction of the secured obligations" (emphasis added)) & 9(5) ("Ownership or any other interest of the chargor passing on a sale under Article 8(1)(b) or passing under paragraph 1 or 2 of this Article is free from any other interest over which the chargee's security interest has priority under the provisions of Article 29");[15] N.Y. U.C.C. §§ 9-620-9-622 (McKinney 2001) (providing for transfer to and acceptance by the "secured party" of "all of a debtor's rights in the collateral" in full or partial satisfaction of secured obligations by consent).[16] Under both authorities, the Debtors (as "chargees" under the Cape Town Treaty and "secured parties" under the UCC), not FitzWalter, are entitled to accept the Intermediate Lessor Assigned Property.

24. Further, there is no right of redemption in respect of the Intermediate Lessors, as that would require that *they* pay the Secured Obligations.[17] Instead, they are simply transferring to the Debtors their equities of redemption, together with any other rights they may have in the

---

[15] Enforcement on the Lease Assets is covered by the Cape Town Treaty. *See* JP Lease Statement ¶¶ 11-15 (detailing scope and state parties relevant here).

[16] As noted above, the Lease Assets are subject to enforcement under the UCC, because they constitute proceeds of the Aircraft and related collateral subject to the mortgages governed by the New York law.

[17] To the extent the Intermediate Lessor Assigned Property could be said to be "redeemed" by satisfaction of the Secured Obligations by the Debtors, then (but for the transfers and releases effected by Enforcement Notices), the Debtors would still be the secured party – by way of subrogation – in respect of debt owed by the Intermediate Lessors under the Transaction Documents (e.g., rent and other amounts owed to the Debtors under the Head Leases). *See* Cape Town Treaty, Art. 9(4) ("Where, after such default, the payment of the amount secured is made in full by an interested person other than the debtor, that person is subrogated to the rights of the chargee.").

Intermediate Lessor Assigned Property and any other Assigned Property, in exchange for a release.[18]

25. The Enforcement Notices functioned alternatively as enforceable contracts. To the extent consideration was necessary to support the Enforcement Notices,[19] the release the Debtors granted to the Intermediate Lessors of obligations under the Transaction Documents,[20] together with the requirement that the Debtors sell the Purchased Assets, are more than adequate consideration to support a contract. *Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F. Supp. 2d 228, 252 (S.D.N.Y. 1999) ("Sufficient consideration, however, may be provided either by a benefit to a promisor or a detriment to the promisee[.]") (citing *Weiner v. McGraw–Hill, Inc.,* 57 N.Y.2d 458, 464, 457 N.Y.S.2d 193, 196–97, 443 N.E.2d 441, 444 (1982) ("It is enough that something is promised, done, forborne, or suffered by the party to whom the promise is made as consideration for the promise made to him.")).

26. FitzWalter's position regarding the Intermediate Lessors is without merit and should be disregarded.

---

[18] It follows that the Intermediate Lessors' argument that they are entitled to adequate protection also fails. The Sale under section 363 of the Bankruptcy Code will not be of property in which the Intermediate Lessors still have an interest, so there is nothing to protect.

[19] The Debtors are also entitled to rely upon detrimental reliance as a consideration substitute. *See, e.g.*, *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000) ("A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance."). The Debtors obtained Court approval of the Stalking Horse Term Sheet (making it binding upon them) based on the Enforcement Notices, this fact was known to the Intermediate Lessors, and the Debtors would be injured if they were unable to close the sale to the Stalking Horse Purchaser (in that they would lose the highest and best offer obtained and become liable for the Break-Up Fee and Expense Reimbursement (each as defined in the Bidding Procedures Order), etc.).

[20] Each Intermediate Lessor has a contractual obligation to the applicable Debtor (as head lessor) to assist, or not interfere with, the Debtor, or the asset manager (JP Lease), in collecting rent from Vietnam Airlines. *See* Intermediate Lessor Security Agreement, Cl 5. (further assurance clause requiring the Intermediate Lessors to, among other things, maintain the security). Further, each had an Aircraft redelivery obligation, which was non-contingent given the termination of the leasing. Head Lease, Cl. 7 (redelivery obligation requiring the [Intermediate Lessor] to redeliver the Aircraft to the [Debtor]). Contrary to the Intermediate Lessors' arguments, the limited recourse provisions are not intended to relieve the Intermediate Lessor from performance but rather provide that each Intermediate Lessor could not be personally sued for their performance other than as permitted in such provisions. Proceeds Agreements, Cl. 22.

## CONCLUSION

WHEREFORE, the Stalking Horse Purchaser respectfully requests that the Court overrule the Objections with prejudice and grant the Motions.

*[Remainder of Page Intentionally Left Blank]*

Dated: March 11, 2022

Respectfully submitted,

/s/ *Scott Greissman*

Scott Greissman
Richard A. Graham
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020-1095
212 819 8200
sgreissman@whitecase.com
rgraham@whitecase.com

and

Jason N. Zakia
WHITE & CASE LLP
111 South Wacker Drive
Suite 5100
Chicago, Illinois 60606
(312) 881-5400
jzakia@whitecase.com

*Counsel to Capitol Reef LLC
and Isle Royale LLC*