# EXHIBIT "B"

**Dated ~~January~~March [●], 2022**

# Asset Purchase Agreement

between

**JPA No. 111 Co., Ltd.**
as Seller

and

**~~Capitol Reef LLC,~~**
**Flicker Ltd.,**
as Buyer

This ASSET PURCHASE AGREEMENT, dated as of ~~January~~March [●], 2022 (the "Agreement Date"), is made by and among JPA No. 111 Co., Ltd., a [●] (the "Seller") and ~~Capitol Reef LLC, a limited liability company formed in the State of Delaware~~Flicker Ltd., a company organized under the laws of the Cayman Islands and having its registered office [at Mourant Ozannes Governance Services (Cayman) Limited, 94 Solaris Avenue, PO Box 1348, Camana Bay, Grand Cayman, KY1-1108, Cayman Islands] ("Buyer" and, together with the Seller, the "Parties").

## PRELIMINARY STATEMENTS

A.    The Seller is a debtor and debtor-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and has filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on December 17, 2021 (the "Petition Date") in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court" and, such cases, the "Bankruptcy Case").

B.    The Seller desires to sell to Buyer, and Buyer desires to purchase from the Seller, all of the Transferred Assets, and Buyer desires to assume the Assumed Liabilities, in each case on the terms and subject to the conditions set forth in this Agreement and the Sale Order.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth in this Agreement and the Sale Order, the Parties, intending to be legally bound, agree as follows:

## ARTICLE I

### DEFINITIONS

**Section 1.01    Certain Defined Terms**.  Capitalized terms used in this Agreement have the meanings specified in Exhibit A.

## ARTICLE II

### PURCHASE AND SALE; CLOSING

**Section 2.01    Purchase and Sale of Transferred Assets; Assumed Liabilities; Excluded Liabilities**.  (a) Transferred Assets.  On the terms and subject to the conditions set forth in this Agreement, the Sale Order, and subject to the exclusions set forth in Section 2.01(b), at the Closing, the Seller shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept from Seller, all of Seller's right, title and interest in, to and under the following listed assets, properties and rights, as the same shall exist immediately prior to the Closing, free and clear of all Liens (other than Permitted Liens) of the Seller, other than the Excluded Assets (collectively, the "Transferred Assets"), which Transferred Assets include the following:

(i)    to the maximum extent permitted by the Bankruptcy Code, other than any Excluded Assets, all rights under the Contracts set forth on Schedule 2.01(a)(i) (the "Transferred Security Documents") and any collateral granted in favor of the Seller under such Security Documents, including, without limitation, the Assigned Property;

(ii)    the Aircraft;

AMERICAS 111542653

(iii)    the Aircraft Head Lease, the Aircraft Lease, and Related Aircraft Documents and other Contracts set forth on Schedule 2.01(a)(iii) (together with the Transferred Security Documents, the "Transferred Contracts");

(iv)    all rights as an owner of the Aircraft and as an indemnitee against (i) the Aircraft Lessee and (ii) only to the extent reasonably required for Buyer to obtain all the rights, titles or interests in any other Transferred Asset to be, or purported to be, conveyed under this Agreement, including any Transferred Asset that the Seller has, or would have, as a result of enforcing any rights and/or remedies it may have under any Transferred Security Document or any other Transferred Contract, the Aircraft Head Lessee, in each case under or in connection with the Transferred Contracts;

(v)    except as set forth in Section 2.01(b)(ii), any assets, rights, claims, causes of action or defenses of the Seller obtained by the Seller in connection with, or otherwise related to, an Enforcement Action;

(vi)    to the extent transferrable or assignable, all non-Cash or Cash deposits (including security deposits) that have been paid (directly or indirectly) by the Aircraft Lessee;

(vii)    all Aircraft Related Cash;

(viii)    all rights of the Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to the Seller to the extent affecting any Transferred Asset and to the extent assignable, other than any warranties, representations and guarantees pertaining primarily to any Excluded Assets or rights and defenses pertaining primarily to any Excluded Liabilities;

(ix)    all insurance proceeds received by the Seller under any insurance policy maintained by the Seller (or any Affiliate thereof), the Aircraft Head Lessee, the Aircraft Lessee or a maintenance provider or storage facility provider, in each case, in respect of the Aircraft in respect of any damage to or loss of the Aircraft as a result of events or circumstances occurring prior to the Closing Date and regardless of whether such damage has resulted in the Aircraft being declared a total loss (to the extent such proceeds have not been applied to repair or restore such damage or loss);

(x)    all accounts receivable in connection with the Aircraft, the Aircraft Head Lease and the Aircraft Lease; and

(xi)    subject to Section 2.01(f) hereof, the Draft New Aircraft Lease and the Draft Side Letter Agreement (except with respect to the VNA Claims, which are subject to the terms of Section 2.01(e) hereof); and

(xi)(xii)    all proceeds of any of the foregoing.

(b)    Excluded Assets. Notwithstanding anything to the contrary herein, any right, title, and interest in, to and under, the following assets and properties of the Seller (the "Excluded Assets") shall be retained by the Seller:

(i)    all causes of action (including counterclaims), claims and defenses of the Seller arising under Sections 544 through 553 of the Bankruptcy Code; provided, however, that the Parties hereto acknowledge that all contractual claims of the Seller under the Transferred Contracts shall constitute a Transferred Asset;

(ii)    all claims of the Seller against Fitzwalter Capital Partners (Financial Trading) Limited (and its successors and assignees) ("Fitzwalter") in any of its capacities under the Senior Facility Agreement, the Loan Transaction Documents and the Relevant Documents and any other current or former lender under the Senior Facility Agreement, the Loan Transaction Documents and the Relevant Documents (including, without limitation, any such claims arising in any Enforcement Action), except to the extent any such claims create or result in any direct or indirect liability against Buyer or its affiliates or their respective assets (including the Transferred Assets) (in each of which case, any such claim shall not be an Excluded Asset);

(iii)    all Tax Returns;

(iv)    subject to Clause 2.02(e), the VNA Claims;

(iv)(v)    all rights and interests of the Seller under the Transaction Agreements;

(v)(vi)    all rights, title and interest in the Purchase Price;

(vi)(vii)all Cash (other than Aircraft Related Cash);

(vii)(viii)    any (x) management, director or corporate servicing agreements or (y) employment or independent consulting agreement, in each case, to which the Seller is a party;

(viii)(ix)    any real property; and

(ix)(x)    all proceeds of any of the foregoing.

(c)    Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order and subject to the exclusions set forth in Section 2.01(b), (and in the event of any conflict between the exclusions set forth in Section 2.01(d) and the provisions of this Section 2.01(d) the exclusions set forth in Section 2.01(d) shall prevail), as additional consideration for the Transferred Assets (in addition to the Purchase Price), Buyer shall, effective at the Effective Time, assume and thereafter timely pay, discharge and perform in accordance with their terms, only the following Liabilities of the Seller (the "Assumed Liabilities"):

(i)    all Liabilities arising under the Transferred Contracts to the extent that any such Liabilities under such Transferred Contract:  (A) arise at or after the Closing Date; (B) do not arise from a breach, violation or default of such Transferred Contract by the Seller prior to the Closing Date; and (C) are not required to be performed prior to the Closing Date; and

(ii)    all Liabilities relating to Buyer's ownership or operation of the Transferred Assets to the extent arising from events, facts or circumstances that occur from and after the Closing Date.

(d)    Excluded Liabilities.  Buyer is not assuming or agreeing to pay or discharge any Liabilities of the Seller (whether accruing before, on or after the Closing Date, whether known or unknown, fixed or contingent, asserted or unasserted, and not satisfied or extinguished as of the Closing Date), other than the Assumed Liabilities and the Seller shall retain and be responsible for all other Liabilities of the Seller and its Affiliates (the "Excluded Liabilities"), including:

(i)    any Debt; provided, however, it is acknowledged and agreed that while the Senior Obligations and the Junior Obligations shall be discharged in full on the Closing

Date in accordance with the terms of this Agreement, except as set forth in Section 2.01(b)(ii), any rights, claims or causes of action of the Seller in connection with the Transferred Security Documents shall be a Transferred Asset;

(ii)    all Taxes imposed or arising with respect to the Transaction;

(iii)    any Liability solely to the extent relating to any Excluded Asset;

(iv)    any Liability (A) of the Seller and its respective Affiliates for Taxes for any taxable period, (B) with respect to the Transferred Assets for any taxable period (or portion thereof) ending before the Closing Date, and (C) for Taxes imposed in respect of the Excluded Assets or the Excluded Liabilities for any taxable period;

(v)    all insurance policies owned by the Seller, including all director and officer insurance liability policies (including EPL and tail policies), and all rights of any nature with respect to any such insurance policies owned by the Seller, including any recoveries thereunder and any rights to assert claims seeking any such recoveries (other than in respect of any insurance policies held by the Aircraft Lessee under the Aircraft Lease);

(vi)    any costs and expenses subject to reimbursement to the Senior Finance Parties or the Junior Finance Parties arising out of litigation relating to any Excluded Asset;

(vii)    all Liabilities relating to amounts to be paid by the Seller hereunder;

(viii)    all Liabilities relating to (x) any management, director or corporate servicing agreements or (y) any employment or independent consulting agreement, in each case, to which the Seller is a party; and

(ix)    any Liability related to any of the Seller's right, title and/or interest in any real property.

(e)    Agreements and Allocation of Recoveries and Proceeds of the VNA Claims; Beneficial Rights in the VNA Claims and Proceeds Thereof. The Parties Agree as follows:

(i)    subject to the further provisions of this Clause 2.01(e), the Buyer shall purchase and hold legal title to the VNA Claims against the Aircraft Lessee;

(ii)    subject to the further provisions of this Clause 2.01(e), (a) the Seller shall hold a full participation interest and all beneficial interests in the VNA Claims (Seller) Portion of the VNA Claims and (b) the Buyer shall hold the beneficial interests in the VNA Claims (Buyer) Portion of the VNA Claims ;

(iv)    subject to the Seller using commercially reasonable efforts to obtain reasonable recoveries on account of the VNA Claims, and notwithstanding which Party holds legal title to the VNA Claims at any time, the Seller shall, subject to the terms of this Section 2.01(e), possess full control over the enforcement and collection of the VNA Claims, including, without limitation, retaining full and absolute discretion (i) as to what, if any, recovery, enforcement or prosecution actions should be undertaken against the Aircraft Lessee on account of the VNA Claims, which includes the right to take no enforcement, recovery or prosecution actions; (ii) with respect to the settlement authority with respect to such VNA Claims; (iii) whether to abandon any VNA Claims to the extent it determines that it is not commercially reasonable to obtain further recovery on all or any

portion of the VNA Claims; and (iv) regarding any other actions or disposition of rights with respect to the VNA Claims;

(v)      (A) the Buyer shall reimburse Seller for an amount equal to 5/12ths of the VNA Claim Recovery Costs (as defined herein); and (B) the Seller shall be entitled to deduct such reimbursement amount owed to it under the preceding subclause (A) from any recoveries, receipts or proceeds from the VNA Claims distributable to the Buyer under subclause (vi) hereof; for purposes of this Section 2.01(e), the "VNA Claim Recovery Costs" are the reasonable, documented and out-of-pocket third party costs (including, without limitations, any reasonable, documented and out-of-pocket costs or expenses of external counsel) incurred by the Seller after the date hereof in enforcing any of its rights under the Side Letters in connection with obtaining any recoveries, receipts or proceeds on account of any of the VNA Claims;

(vi)      any actual net recoveries, receipts or proceeds obtained by the Seller (after taking into account the VNA Claim Recovery Costs and the reimbursements as provided in subclause (v) above) on account of any of the VNA Claims, whether in cash or any other consideration, whether now or in the future, whether directly or indirectly, whether in whole or in part, shall be proportionately and concurrently allocated and distributed among the Seller and Buyer based upon their respective VNA Claims (Retained) Portion (for the Seller) and VNA Claims (Buyer) Portion (for the Buyer) of the VNA Claims; *provided, however,* that to the extent any of the VNA Claims recoveries, receipts or proceeds are paid in consideration other than cash, the Seller shall, promptly after the receipt thereof, transfer the economic value of the VNA Claims (Buyer) Portion of such non-cash consideration to the Buyer in U.S. dollars;

(vii)      upon request from the Buyer, the Seller shall provide a reasonably detailed accounting of any of the foregoing matters; provided, however, that if the Buyer reasonably disputes any of the accounting of any of the foregoing matters, including the valuation of any non-cash consideration, the Parties shall consult with one another in good faith for a period of thirty days to resolve such dispute, which such consultation shall not prejudice either party from exercising any rights and/or remedies it may have under contract or under applicable law to the extent such dispute is not resolved by the Parties; and

(viii)      notwithstanding the foregoing, after the date hereof, either Party may request in writing to the other Party that legal title in and to the VNA Claims be transferred from the Buyer to the Seller through a simple quit claim bill of sale, in which case the Parties shall so effect and transfer legal title to the VNA Claims within five business days after receipt of any such written request (with each Party bearing its own costs to effect the foregoing); *provided, however,* that any such change of ownership shall not affect the beneficial rights in and to the VNA Claims and the proceeds thereof, which beneficial interests, as provided above, shall be allocated with the Buyer holding all beneficial rights to the VNA Claims (Buyer) Portion (and the proceeds thereof) and the Seller holding all beneficial rights to the VNA Claims (Seller) Portion (and the proceeds thereof), in each case, subject to the foregoing provisions of this Section 2.01(e).

The Parties agree to further document, to the extent reasonably required or deemed necessary by either Party, the foregoing terms and/or further matters relating to the foregoing, all of which shall be subject to each Party acting in a commercially reasonable manner to delineate and implement the allocations and business terms reflected under this Clause 2.01(e).

(f)    New Lease Transactions.  The Parties agree that they will each use commercially reasonable and good faith efforts to have the Draft New Aircraft Lease and the Draft Side Letter Agreement (i) amended modified and revised to reflect that the Buyer is the Successful Bidder under the Sale Transactions relating to the Transferred Assets, that the Buyer is leasing the Aircraft to the Aircraft Lessee under such lease and to reflect the terms of Section 2.01(e) hereof and this Section 2.01(f) and such other terms as reasonably requested by the Seller and (ii) executed by the applicable signatories thereto, implemented and put into effect, in each case, after the revisions set forth in subclause (i) have been completed.  The Parties also agree to use commercially reasonable and good faith efforts to take such actions reasonably related to the execution of the New Aircraft Lease and the Side Letter Agreement and the implementation of any transactions related thereto.  The Buyer further agrees to reimburse the Seller for its reasonable, documented and out-of-pocket third party costs and expenses incurred by it (and its affiliates) for the period after the date hereof in connection with implementing the terms of this Section 2.01(f), including, without limitation, the reasonable, documented and out-of-pocket costs and expenses of external counsel.

**Section 2.02    Assignment of Certain Transferred Assets**.    Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Transferred Asset or any claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment or transfer thereof, without the Consent of a third party (including any Government Authority), would after giving effect to the Sale Order and the Bankruptcy Code, constitute a breach or other contravention thereof or a violation of Law or an Order of the Bankruptcy Court, or be ineffective with respect to any party to a Contract concerning such Transferred Asset, in each case that cannot be excused or rendered ineffective by operation of the Bankruptcy Code (or the Sale Order) or applicable nonbankruptcynon-bankruptcy Law; provided, that nothing in this Section 2.02 shall modify any representation or warranty of the Seller under this Agreement.  If, on the Closing Date, any such Consent has not been obtained, the Seller and Buyer will comply with **Error! Reference source not found.** and, until such Consent is obtained, cooperate in a mutually agreeable arrangement (a) under which Buyer would, in compliance with Law or an Order of the Bankruptcy Court, obtain the benefits and assume the obligations and bear the economic burdens associated with such Transferred Asset, claim, right or benefit in accordance with this Agreement, including, for example (and without limitation of other similar arrangements being employed instead and in place thereof), by subcontracting, sublicensing or subleasing such Transferred Asset to Buyer or (b) under which the Seller would enforce for the benefit (and at the expense) of Buyer any and all of the Seller's rights against a third party associated with such Transferred Asset, claim, right or benefit (collectively, "Third Party Rights"), and the Seller will promptly pay to Buyer when received all monies received by them under any such Transferred Asset, claim, right or benefit (net of the Seller's expenses incurred in connection with any assignment or other performance contemplated by this Section 2.02).  Upon obtaining any such Consent applicable to such Transferred Asset after the Closing, such Transferred Asset shall promptly be transferred and assigned to Buyer in accordance with the terms of this Agreement.

**Section 2.03    Additional and Eliminated Transferred Contracts**.  Notwithstanding anything in this Agreement to the contrary, Buyer may, from time to time prior to a date which is five (5) Business Days prior to the Closing Date, and in its sole discretion, upon written notice to the Seller, amend or revise Schedule 2.01(a)(i) or Schedule 2.01(a)(iii) to eliminate any Contract therefrom or to add any Contract thereto, so long as, in each case, the Seller (x) is a party or Third Party Beneficiary to such Contract and (y) each such Contract relates to the Aircraft and/or the owning, financing, leasing, storage, maintenance and/or transit thereof.  Automatically upon such addition of any Contract by Buyer in accordance with the previous sentence, such Contract shall be a Transferred Contract for all purposes of this Agreement.  Automatically upon any such deletion of any Contract by Buyer in accordance with the first sentence of this Section 2.03, such Contract shall be an Excluded Asset for all purposes of this Agreement, and no Liabilities arising thereunder or relating thereto shall be assumed by Buyer or be the obligation, Liability or responsibility of

Buyer, in each case, until and unless such time, if any, as Buyer restores such eliminated Contract to Schedule 2.0201(a)(i)(A) or Schedule 2.01(a)(iii) in accordance with the first sentence of this Section 2.03. If any Contract is added to the list of Transferred Contracts, then the Seller shall take such steps as are reasonably necessary to cause such Contract to be assumed and assigned to Buyer as promptly as possible at or following the Closing.

Section 2.04    **Closing**.  The closing of the sale and purchase of the Transferred Assets and the assumption of the Assumed Liabilities (the "Closing") shall take place by telephone conference and electronic exchange of documents, at 9:00 a.m. (New York City time) on the second Business Day following the date upon which all Closing Conditions are satisfied or waived in writing (to the extent permitted by applicable Law) in accordance with ARTICLE X (other than those Closing Conditions that by their nature can only be satisfied at the Closing, but subject to the satisfaction or waiver of those Closing Conditions at such time), or on such other date or at such other time or place as the Parties may agree in writing.  The date on which the Closing occurs is referred to in this Agreement as the "Closing Date."  For all purposes under this Agreement and each other Transaction Agreement, (a) except as otherwise provided in this Agreement or such other Transaction Agreements, all matters at the Closing will be considered to take place simultaneously and (b) the Closing shall be deemed effective as of the Effective Time.

Section 2.05    **Withholding**.  Buyer and its respective Affiliates shall be entitled to deduct and withhold from any amount otherwise payable under this Agreement such amounts as Buyer or any of its Affiliates are required to deduct and withhold with respect to the making of such payment under applicable Law.  To the extent that amounts are so deducted, withheld and timely paid over to the applicable Taxing Authority, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding were made.  At least five (5) days prior to the Closing, Buyer shall provide the Seller with a written notice of its intent to withhold, the estimated amount to be withheld, the legal basis therefor and a reasonable opportunity to furnish forms, certificates or other items that would reduce or eliminate such withholding, and shall cooperate with the Seller using commercially reasonable efforts to reduce or eliminate any such withholding that otherwise would be required.

# ARTICLE III

## PURCHASE PRICE AND CERTAIN CLOSING MATTERS

Section 3.01    **Purchase Price**.  The aggregate consideration to be paid by Buyer for the sale of all of the Transferred Assets and the obligations of the Seller set forth in this Agreement (the "Purchase Price") shall be an amount in Cash equal to the sum of (a) $2,500,000 (the "Additional Cash Payment"), plus (b) the Senior Obligations, plus (c) the Junior Obligations, plus (d) any Cure Costs.  The payment of the Purchase Price shall be deemed the "Closing Payment".  For the avoidance of doubt, the portion of the Purchase Price identified in clauses (b) or (c) above may be set-off by the Buyer in an amount equal to the Total Set Off Amounts (if any).  [The Seller and the Buyer understand the foregoing Purchase Price (other than the Additional Cash Payment) to be the equivalent of all outstanding principal and accrued interest on the Senior Loans and the Junior Loans together with all fees, costs or charges allowed by the Bankruptcy Code, which reflects all of the allowed secured claims owed by the Seller to the Senior Finance Parties and the Junior Finance Parties under the applicable Loan Transaction Documents.  Based on the pleadings, testimony, and letters to affiliates of the Seller, FitzWalter has asserted additional claims that do not qualify as Senior Obligations.  For avoidance of doubt, the Purchase Price does not include amounts on account of (w) defamation and similar claims, whether sounding in contract, tort, or otherwise; (x) trustee and agent fees significantly in excess of amounts normally charged by Credit Agricole Corporate and Investment Bank and other reputable and customary agents and security agents acting in such capacities; (y) duplicative claims; and (z) any claims that do not constitute outstanding principal, accrued interest, or reasonable fees,

costs, or charges owed by the Seller under the applicable Loan Transaction Documents and allowed by the Bankruptcy Code.][1]

**Section 3.02    Certain Closing Deliverables.**  At the Closing:

(a)    The Seller shall deliver or cause to be delivered to Buyer the following:

(i)    a counterpart of the Bill of Sale, Assignment and Assumption Agreement for Transferred Assets (other than the Aircraft), in the form attached hereto as Exhibit B-1 (the "Bill of Sale, Assignment and Assumption Agreement"), duly executed by the Seller to Buyer at the Closing and the Bill of Sale (Aircraft) in the form attached hereto as Exhibit B-2 (the "Aircraft Bill of Sale") for the Aircraft, duly executed by the Seller;

(ii)    the officer's certificate required to be delivered pursuant to Section 10.01(a)(iii);

(iii)    in escrow with authorization to release at or after the Closing (in the Buyer's sole discretion), all documents necessary or advisable under the Laws of Vietnam to deregister and export the Aircraft from Vietnam, including, without limitation, any documents necessary or advisable to revoke any IDERA issued by the Aircraft Lessee and any Vietnamese mortgage in respect of the Aircraft, in form and substance reasonably satisfactory to the Buyer;

(iv)    evidence reasonably satisfactory to the Buyer that suitable arrangements have been made to permit, following the Closing, the discharge of any international interests (as defined in the Cape Town Convention) granted in favor of the Seller, the Senior Finance Parties, the Junior Finance Parties or any other Person in respect of the Aircraft Head Lease, the Aircraft Lease or the Aircraft and to register the Aircraft Bill of Sale as a contract of sale on the International Registry (as defined in the Cape Town Convention) in favor of the Buyer;

(v)    to the extent that any Engine or the APU is not attached to the Airframe, a written confirmation from the Seller as to (a) the Person in physical possession of such Engine or APU (as the case may be); (b) the jurisdiction in which such Engine or APU (as the case may be) is located; and (c) any amounts due and owing to such Person to release any Lien on such Engine or APU (as the case may be); and

(vi)    all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Buyer, as may be necessary to convey the Transferred Assets to Buyer.

(b)    Buyer shall deliver or cause to be delivered to the Seller (or with respect to Section 10.02, as directed by the Seller) the following:

(i)    the Closing Payment (less the Total Set Off Amounts), by wire transfer of immediately available funds to an account or accounts as directed by the Seller, in the Estimated Closing Statement;

---

[1] NTD: Such language remains subject to further review and agreement (with each Party required to act reasonably) depending on Court's determinations at the Sale Hearing.

(ii)     a counterpart of the Bill of Sale, Assignment and Assumption Agreement, duly executed by Buyer;

(iii)     the officer's certificate required to be delivered to the Seller pursuant to Section 10.01(a)(iii);

(iv)     such other instruments of conveyance and transfer in form and substance reasonably acceptable to the Seller as necessary to convey the Transferred Assets and Assumed Liabilities to Buyer.

**Section 3.03**    **Estimated Closing Statement; Closing Payment**.  (a)  No fewer than three (3) Business Days before the Closing Date, the Seller shall prepare and deliver to Buyer a written statement (the "Estimated Closing Statement") setting forth the aggregate Purchase Price, including the Senior Obligations, the Junior Obligations, and the Total Set-Off Amounts (if applicable).

(b)     The Seller shall, during normal business hours, make available their respective Representatives responsible for and knowledgeable about the information used in, and the preparation of the  Estimated Closing Statement, to respond to the reasonable inquiries of, or requests for information by, Buyer or its Representatives.

(c)     The Closing Payment and any other payments to be made to the Seller under this Agreement shall be paid to the Seller for its account; provided, however, that (i) the Senior Obligations shall be paid directly by the Buyer to the Senior Finance Parties and (ii) the Junior Obligations shall be paid directly by the Buyer to the Junior Finance Parties; provided, further, that to the extent that there is a dispute as to the amount of the pay-off required to be made to the Senior Finance Parties or the Junior Finance Parties, as the case may be, and/or the persons or entities to whom such payments should be made, then any such disputed amount shall be held (unless otherwise ordered by the Bankruptcy Court) in escrow by the Seller pending the resolution of any such dispute by the Bankruptcy Court).

**Section 3.04**    **Certain Calculation Principles**.  The Estimated Closing Statement (and each of the components and defined terms from this Agreement reflected therein) shall be:  (a) prepared and determined in accordance with GAAP, and (b) consistent with the provisions of this Agreement.

**Section 3.05**    **Buyer Nominee**.  Buyer shall have the right, by notice in writing to the Seller Parties as soon as reasonably practicable, and in no event later than ten (10) days, prior to the Closing, to nominate a trust, the beneficiary of which is the Seller (a "Buyer Nominee") to purchase and take title to any Transferred Asset pursuant to the provisions of this Agreement, and provided that such Buyer Nominee meets the following requirements, the Seller shall sell the relevant Transferred Asset to such Buyer Nominee pursuant to the provisions of this Agreement:  (a) such Buyer Nominee complies with the Know Your Customers requirements of the Seller; and (b) such Buyer Nominee has the capacity and financial wherewithal to complete the purchase of such Transferred Asset.  Notwithstanding any such nomination, (i) Buyer shall remain fully and primarily liable for the performance of all of its obligations under this Agreement and (ii) none of the liabilities or obligations of the Seller shall be increased as a result thereof and none of the Seller's rights or benefits under this Agreement shall be reduced, diminished or extinguished as a result thereof.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER

The Seller hereby represents and warrants on behalf of itself to Buyer that, except as set forth in the Disclosure Schedules:

**Section 4.01    Formation and Authority of the Seller; Enforceability**.    The Seller is a corporation or other entity duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization. Except for such authorizations required by the Bankruptcy Court, the Seller has the requisite corporate or other appropriate power to execute, deliver, and perform its obligations under the Seller Transaction Agreements (including the consummation of the Transactions) to which it is a party.    The Seller has the requisite corporate or other appropriate power to operate its business with respect to the Transferred Assets that it owns as now conducted and is duly qualified as a foreign corporation or other organization to do business, and to the extent legally applicable, is in good standing, with respect to the Business, in each jurisdiction in which the character of its owned, operated or leased properties or the nature of its activities makes such qualification necessary, except for jurisdictions where the failure to be so qualified or in good standing has not had a material adverse effect on the Seller or the Transferred Assets.    The execution, delivery and performance by the Seller of the Transaction Agreements (including the consummation of the Transactions) to which it is a party have been (or will be prior to the Closing) duly authorized by all requisite corporate or similar action on the part of the Seller.    Upon entry of the Sale Order and the Sale Procedures Order (as applicable), (a) this Agreement has been duly executed and delivered by the Seller, and upon execution and delivery thereof, the other Transaction Agreements will be duly executed and delivered by the Seller party thereto, and (b) this Agreement constitutes, and upon execution and delivery thereof, the other Transaction Agreements will constitute, legal, valid and binding obligations of the Seller party thereto, enforceable against the Seller thereto in accordance with their respective terms, subject to the Bankruptcy and Equity Exception.

**Section 4.02    No Conflict**.    Provided that all Consents listed on Schedules 4.03 have been obtained, except as may result from any facts or circumstances relating to Buyer or its Affiliates (as opposed to any other third party or its Affiliates), the execution, delivery, and performance by the Seller of the Transaction Agreements do not and will not:

(a)    violate or conflict with in any material respect the certificate or articles of incorporation or bylaws or similar organizational documents of the Seller; or

(b)    violate, conflict with, result in a breach of or constitute a violation or default (or any event that, with notice or lapse of time or both would constitute a default) under or give rise to any right of termination, cancellation, modification or acceleration of, or loss of a material benefit under, any Transferred Contract; or

(c)    violate in any material respect any Law or Order applicable to the Seller.

**Section 4.03    Consents and Approvals**.    Except for the entry of the Sale Order and the Sale Procedures Order by the Bankruptcy Court and the matters determined and/or effected under the terms of such Orders, the execution, delivery and performance by the Seller of the Transaction Agreements do not and will not require any material Consent, waiver, or other action by, or any material filing with or notification to, any Government Authority or any other party by the Seller ,except the filing, or receipt of, any Consents or notices listed on [Schedule 4.03].

**Section 4.04    Absence of Litigation**.    Except for (a) Actions by Fitzwalter or its Affiliates in connection with the Senior Facility Agreement, the Loan Transaction Documents and the Relevant Documents and (b) the Bankruptcy Case, as of the Agreement Date, no Actions are pending or, to the knowledge of Seller, threatened against the Seller (i) that would prevent or materially impair or delay the ability of the Seller to consummate the Transaction or (ii) with respect to the Aircraft or the Transferred Assets.

AMERICAS 111542653

**Section 4.05    Compliance with Laws; Permits**. (a) The Seller has not been, in violation in any material respect of any Laws or Orders applicable to it or in connection with the Business.  The Seller has not received any written notice of or been charged with the violation of any Laws.

**Section 4.06    Transferred Contracts**. (a) Schedule 2.01(a)(i) contains a complete, true and accurate list of all the Security Documents that are in effect on the Agreement Date;

(b)    Schedule 2.01(a)(iii) contains a complete, true and accurate list of all the Related Aircraft Documents that are in effect on the Agreement Date;

(c)    Other than as set forth on Schedule 4.06(c), the Seller has made available to Buyer true and complete copies of each Transferred Contract, together with all amendments, waivers, or other changes thereto, and any and all notices issued in connection therewith.

(d)    Each Transferred Contract is a legal, valid and binding obligation of the Seller and each other party to such Transferred Contract, and is enforceable against the Seller and each other Party to such Transferred Contract, in accordance with its terms, subject, in each case, to the Bankruptcy and Equity Exception.

(e)    Other than as set forth on Schedule 4.06(e).) or defaults cured by operation of the Bankruptcy Code, the Seller has not delivered any notice of any default or event that with notice or lapse of time or both would constitute a default by a third party under any Transferred Contract.

(f)    Other than the Transferred Contracts or as set forth on Schedule 2.01(a)(i), Schedule 2.01(a)(iii) and Schedule 4.06(e), the Seller is not a party to any other contract or agreement with any other person (including its affiliates).

**Section 4.07    Other Assets; Liabilities**. Except as set forth on Schedule 4.07, (i) the Seller does not own or have any interest in any assets or contracts other than the Transferred Assets or the Excluded Assets or (ii) have any Liabilities other than the Assumed Liabilities or the Excluded Liabilities or any indebtedness in connection with the Loan Transaction Documents.

**Section 4.08    Employment Matters**.  The Seller does not have any employees or independent contractors.

**Section 4.09    Taxes**. (a) The Seller has timely filed (or have had filed on their behalf) all material Tax Returns required to be filed (taking into account any extensions of time to file such Tax Returns) and all such material Tax Returns were complete and accurate in all material respects.  All material amounts of Taxes shown as due on such Tax Returns by the Seller have been fully and timely paid, other than with respect to any Taxes the payment of which was precluded by reason of the Bankruptcy Case (which are set forth on Schedule 4.09 hereof).

(b)    There are no (i) material deficiencies for any Taxes that have been proposed, asserted or assessed in writing by a Taxing Authority against the Seller that are still pending, (ii) audits or examinations outstanding by a Taxing Authority against the Seller with respect to Taxes or (iii) written notices received by the Seller from any Taxing Authority indicating an intent to open an audit, examination or other review with respect to a Taxes or a request for information related to Taxes, with respect to the Seller, as to each of clause (i), clause (ii) and clause (iii) above, to the extent such deficiency, audit or examination could give rise to a Lien on the Transferred Assets.

(c)    There are no Liens for Taxes on the Transferred Assets, other than Permitted Liens.

(e)    The Aircraft is registered in Vietnam and not in any other country.

**Section 4.10** **Brokers**.  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from the Seller or any of its respective Affiliates in connection with any Transaction.

**Section 4.11** **Title**.  Except for Permitted Liens, upon the Closing Date, the Transferred Assets are owned by the Seller.  Upon Closing, subject to Section 2.02, and **Error! Reference source not found.**, requisite Bankruptcy Court approvals and the terms of the Sale Order, and assumption by the Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs), Buyer will acquire from the Seller good and valid title to or, as applicable, a valid leasehold interest in the Transferred Assets, free and clear of all Liens (other than Permitted Liens).

**Section 4.12** **Aircraft Owned and Related Leases; Expected Purchases**.  (a) Schedule 4.12(a) lists:

       (i)  the Aircraft, together with its related Engine and APU (each, by its model number and manufacturer, and related serial number), as of the Agreement Date legally and/or beneficially owned by the Seller free and clear of all Liens (except Permitted Liens) and the country in which the Aircraft is registered and, a description of Aircraft Head Lease and the Aircraft Lease), including the following details: (A) the Aircraft Lease commencement date, (B) the Aircraft Head Lease and the Aircraft Lease maturity date, (C) the applicable lease rentals payable by the Aircraft Head Lessee and the Aircraft Lessee on the relevant payment dates, (D) any early termination option thereunder, (E) any purchase option thereunder, (F) any security deposit applicable thereto or letter of credit in lieu thereof and (G) any pending, ongoing or completed insurance claim made by or on behalf of Seller in connection with the Aircraft; and

       (ii)  to the extent the Aircraft is not subject to the Aircraft Head Lease or the Aircraft Lease as of the Agreement Date, the Aircraft's storage location and storage provider and any amounts due and owing (invoiced or otherwise accrued) to such storage provider.

(b)  The foregoing information relating to the Aircraft Head Lease and the Aircraft Lease is true and correct in all material respects.  Except as otherwise noted in Schedule 4.12(b), (i) the Aircraft (x) is in operating condition, (y) has not suffered a Total Loss (as defined under the Aircraft Lease) or material damage and (z) is in the same condition and configuration as it was on December 11, 2021 (ordinary wear and tear excepted)[;); and (ii) to the best of the Seller's knowledge, the Aircraft Head Lease and the Aircraft Lease have been validly terminated[2] and there are no agreements or ongoing negotiations (other than those have been previously notified by the Seller to Buyer in writing) between the Seller and any other Person with respect to the leasing, charter or other operation of the Aircraft.

(c)  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE SELLER SPECIFICALLY DISCLAIMS, AND EXCLUDES HEREFROM, WITH RESPECT TO EACH AIRCRAFT (I) ANY WARRANTY AS TO THE AIRWORTHINESS, VALUE, DESIGN, QUALITY, MANUFACTURE, OR OPERATION OF THE AIRCRAFT, (II) ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY OF MERCHANTABILITY OR FITNESS FOR USE OR FOR A PARTICULAR PURPOSE, (III) ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY OF FREEDOM FROM ANY RIGHTFUL CLAIM BY WAY OF INFRINGEMENT OF ANY PATENT, TRADEMARK, COPYRIGHT, OR PROPRIETARY RIGHTS OR THE LIKE, (IV) ANY IMPLIED REPRESENTATION OR WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE

---

[2]  Subject to further factual review by Parties..

OF DEALING OR USAGE OF TRADE, (V) ANY EXPRESS OR IMPLIED WARRANTY REGARDING THE CONDITION OF THE AIRCRAFT AND (VI) ANY OBLIGATION OR LIABILITY ON ITS PART ARISING IN CONTRACT OR IN TORT (INCLUDING STRICT LIABILITY OR SUCH AS MAY ARISE BY REASON OF ITS NEGLIGENCE) ACTUAL OR IMPUTED, OR IN STRICT LIABILITY, INCLUDING ANY OBLIGATION OR LIABILITY FOR LOSS OF USE, REVENUE OR PROFIT WITH RESPECT TO SUCH AIRCRAFT OR FOR ANY LIABILITY OF THE SELLER PARTIES TO ANY THIRD PARTY OR ANY OTHER DIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGE WHATSOEVER.

(d)    Nothing in this Section 4.12 shall limit Buyer's ability to rely on the express representations and warranties in ARTICLE IV (as modified by the Disclosure Schedules).

(e)    Other than with respect to enforcing the Head Lessee's claims against the Aircraft Lessee and/or in connection with the transfer of the collateral over the claims and leasehold rights arising under the Aircraft Lease so that such collateral is transferred to the Seller (and which forms have been filed with the Bankruptcy Court), neither the Seller nor its affiliates have engaged in any acts or conduct or made any omissions or had any relationships with the Aircraft Head Lessee, the Aircraft Lessee, or any of their affiliates, that will result in Buyer receiving (i) less in payments or damages with respect to claims under or related to the Aircraft Head Lease, the Aircraft Lease, the Related Aircraft Documents, the Security Documents and any other claims against the Aircraft Head Lessee or the Aircraft Lessee than the amount that it would otherwise be entitled to receive, or (ii) less in payments or distributions with respect to, or less favorable treatment (including the timing or type of payments or distributions) for its claims under or in relation to the Aircraft Head Lease, the Aircraft Lease, the Related Aircraft Documents, the Security Documents or otherwise against the Aircraft Head Lessee or the Aircraft Lessee than is received by holders of allowed general secured and unsecured claims against the Aircraft Head Lessee or Aircraft Lessee generally.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to the Seller Parties that, except as set forth in the Disclosure Schedule:

**Section 5.01    Formation and Authority of Buyer; Enforceability**.  Buyer is a corporation or other entity duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization and has the requisite corporate or other appropriate power and authority to execute, deliver and perform its obligations under the Transaction Agreements (including the consummation of the Transactions).  The execution, delivery and performance of the Transaction Agreements by Buyer (including the consummation of the Transactions) have been duly authorized by all requisite corporate or organizational action on the part of Buyer, and no shareholder or other similar approval is required in connection with Buyer's execution, delivery and performance of the Transaction Agreements.  This Agreement has been, and upon execution and delivery thereof, the other Transaction Agreements will be, duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and upon execution and delivery thereof, the other Transaction Agreements will constitute, legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms, subject to the Bankruptcy and Equity Exception.

**Section 5.02    No Conflict**.  Provided that all Consents and other actions described in Section 5.03 have been obtained, except as may result from any facts or circumstances relating to the Seller (as

opposed to any other third party or its Affiliates or its respective Affiliates), the execution, delivery and performance by Buyer of the Transaction Agreements do not and will not:

(a)    violate or conflict with in any material respect the certificate or articles of incorporation or bylaws or similar organizational documents of Buyer;

(b)    conflict with or violate in any material respect any Law or Order applicable to Buyer; or

(c)    result in any breach of, or constitute a default (with or without notice or lapse of time, or both) under, or give to any Person any right to terminate, amend, accelerate or cancel, or result in the creation of any Lien (other than a Permitted Lien) on any assets or properties of Buyer pursuant to, any Contract to which Buyer or any of its subsidiaries or Affiliates is a party or by which any of such assets or properties is bound, except for any such conflicts, violations, terminations, cancellations, breaches, defaults, rights or Liens as would not materially impair or delay the ability of Buyer to consummate the Transactions or otherwise perform its obligations under the Transaction Agreements.

Section 5.03    **Consents and Approvals**.  The execution, delivery and performance by Buyer of the Transaction Agreements do not and will not require any Consent, waiver or other Action by, or any filing with or notification to, any Government Authority, except where the failure to obtain such Consent or waiver, to take such action, or to make such filing or notification, would not materially impair or delay the ability of Buyer to consummate the Transactions or otherwise perform its obligations under the Transaction Agreements.  Buyer is not aware of any reason why any necessary Consent, waiver or other action by any Government Authority will not be received or obtained in order to permit consummation of the Transactions on a timely basis or to permit Buyer to otherwise perform its obligations under the Transaction Agreements.

Section 5.04    **Absence of Restraints; Compliance with Laws**.  (a) To the knowledge of Buyer, no facts or circumstances exist that would reasonably be expected to impair or delay the ability of Buyer to consummate the Transactions or otherwise perform its obligations under the Transaction Agreements.

(b)    Buyer is not in violation of any Laws or Orders applicable to the conduct of its business, except for violations the existence of which would not reasonably be expected to impair or delay the ability of Buyer to consummate the Transactions or otherwise perform its obligations under the Transaction Agreements.

(c)    As of the Agreement Date, there are no Actions pending or, to the knowledge of Buyer, threatened, that would affect in any material respect Buyer's ability to perform its obligations under the Transaction Agreements or to consummate the Transactions contemplated by the Buyer Transaction Agreements.

Section 5.05    **Financial Ability**.  Buyer will have at the Closing, (a) sufficient immediately available funds and the financial ability to pay the Purchase Price and any expenses incurred by Buyer in connection therewith and (b) the resources and capabilities (financial and otherwise) to perform its obligations under the Transaction Agreements and in each case to pay any expenses incurred by Buyer in connection therewith.  Buyer has not incurred, and is not contemplating or aware of, any obligation, commitment, restriction, or other Liability of any kind, in each case that would impair or adversely affect such resources, funds or capabilities.

Section 5.06    **Brokers**.  No broker, finder, or investment banker is entitled to any brokerage, finder's or other fee or commission from Buyer or any of Buyer's Affiliates in connection with any Transaction.

## ARTICLE VIADDITIONAL AGREEMENTS

**Section 6.01**    **Conduct of Business Before the Closing**.  Buyer acknowledges that the Seller is operating the Business in the context of the Bankruptcy Case.  Subject to the foregoing, (i) the Seller shall use and maintain the Transferred Assets in their current condition (subject to ordinary wear and tear), (ii) the Seller shall consult with and apprise Buyer regarding all matters concurrently in connection with any discussions and negotiations regarding any (x) Enforcement Action or (y) amendment, modification or [reinstatement]³ of the Aircraft Head Lease with the Aircraft Head Lessee or the Aircraft Lease with the Aircraft Lessee, as the case may be; (iii) at the direction and the expense of the Buyer, the Seller shall take all reasonable steps to preserve and/or maximize the value of any claims of any nature under or in connection with the Aircraft Lease, against the Aircraft Lessee or, to the extent reasonably required for Buyer to obtain  all the rights, titles or interests in any other Transferred Asset to be, or purported to be, conveyed under this Agreement, including any Transferred Asset that the Seller has, or would have, as a result of enforcing any rights and/or remedies it may have under any Transferred Security Document or any other Transferred Contract, the Aircraft Head Lessee, or otherwise in respect of the Aircraft; [(iv) the Seller shall not seek to reinstate or have reinstated any of the Aircraft Head Lease and/or the Aircraft Lease or claim that the Aircraft Head Lease or Aircraft Lease have been or will be reinstated or were not otherwise validly terminated;]⁴; and (v) except (A) as required by applicable Law or by Order of the Bankruptcy Court, or as otherwise expressly contemplated by the Transaction Agreements or (B)  during the Pre-Closing Period unless Buyer otherwise consents in writing (which Consent shall not be unreasonably withheld, conditioned or delayed), the Seller will (I) conduct the Business in the ordinary course of business, (II) provide to Buyer copies of all notices and reports required to be delivered by the Aircraft Head Lessee under the Aircraft Head Lease and/or the Aircraft Lessee under the Aircraft Leases, as the case may be, and received by the Seller and (III) notify Buyer immediately upon becoming aware of any Total Loss (as defined under the Aircraft Lease) or any incident that results in damage to the Aircraft. Except as permitted under Section 8.02, the Seller agrees not to do any of the following:

(a)    grant any Lien on any Transferred Asset (in each case, whether tangible or intangible), other than a Permitted Lien;

(b)    incur or issue any Debt (unless such Debt is in an amount sufficient, and the proceeds are immediately used, to (i) refinance and repay in Cash in full the Senior Obligations and the Junior Obligations and (ii) pay in Cash and in full the Break-up Fee and the Expense Reimbursement);

(c)    sell, transfer or otherwise dispose of any Transferred Asset;

(d)    enter into any settlement or release with respect to any Action relating to the Transferred Assets or the Assumed Liabilities, or initiate any material Action relating to the Transferred Assets or the Assumed Liabilities;

(e)    amend, vary, modify, supplement, restate, novate, waive, replace, cancel, terminate, or agree to any amendment, variation, modification, supplement, restatement, novation, waiver, replacement, cancellation or termination of (i) any Transferred Contract, or any Contract that would be a Transferred Contract if entered into prior to the Agreement Date or (ii) any Relevant Document or Loan Transaction Document (including, for the avoidance of doubt, any Security Document);

(f)    solely with respect to the Transferred Assets, (i) settle any claim with respect to material Taxes, (ii) surrender any right to claim a refund of material Taxes, (iii) consent to any extension or waiver of the limitation period applicable to any claim or assessment with respect to Taxes (other than

---

³  Subject to further factual review by Parties.

⁴  Subject to further factual review by Parties.

in the ordinary course of business), (iv) fail to pay material Taxes that were due and payable (including estimated Tax payments), (v) incur any liability for Taxes outside the ordinary course of business or (vi) enter into any closing agreement in respect of any Taxes;

(g)        grant any consent, waiver or approval under any insurances relating to the Aircraft;

(h)        waive any event of default under any Aircraft Head Lease or Aircraft Lease without first obtaining the consent of the Buyer;

(i)        not engage in any acts or conduct or made any omissions or had any relationships with the Aircraft Head Lessee or the Aircraft Lessee or its affiliates that will result in Buyer receiving (i) less in payments or damages with respect to claims under or related to the Aircraft Head Lease, the Aircraft Lease, the Related Aircraft Documents and the Security Documents and any other claims against the Aircraft Lessee than the amount that it would otherwise be entitled to receive, or (ii) less in payments or distributions with respect to, or less favorable treatment (including the timing or type of payments or distributions) for its claims under or in relation to the Aircraft Head Lease, the Aircraft Lease, the Related Aircraft Documents, the Security Documents or otherwise against the Aircraft Head Lessee or the Aircraft Lessee than is received by holders of allowed general secured and unsecured claims against the Aircraft Head Lessee or the Aircraft Lessee generally;

(j)        not enter into any lease, sublease, charter agreement or other similar agreement, or any agreement having the effect of the foregoing, in respect of the Aircraft; or

(k)        enter into any legally binding commitment with respect to any of the foregoing.

**Section 6.02    Access to Information.**  (a) During the Pre-Closing Period, upon reasonable prior notice, the Seller shall furnish to the Representatives of Buyer such additional financial and operating data and other information regarding the Transferred Assets as Buyer or its Representatives may from time to time reasonably request for purposes of consummating the Transactions, in each case, at the sole cost and expense of Buyer.

(b)        Notwithstanding anything in this Agreement to the contrary,

(i)        (A) in no event shall the Seller or its respective Affiliates be obligated to provide any (1) access or information in violation of any applicable Law, (2) information the disclosure of which could reasonably be expected to jeopardize any applicable privilege (including the attorney-client privilege) available to any of the Seller or any of their respective Affiliates relating to such information, or (3) information the disclosure of which would cause the Seller to breach a confidentiality obligation to which it is bound; provided, that, in the event that the Seller withholds access or information in reliance on the foregoing clause (A), the Seller shall provide (to the extent possible without waiving or violating the applicable legal privilege or Law) notice to Buyer that such access or information is being so withheld and shall use commercially reasonable efforts to provide such access or information in a way that would not risk waiver of such legal privilege or applicable Law (including, as applicable, as contemplated by Section 6.02(c), and (B) any access or investigation contemplated by Section 6.02(a) shall not unreasonably interfere with any of the businesses, personnel or operations of any of the Seller or any of its Affiliates;

(c)        If so requested by the Seller or Buyer, the Parties shall enter into a customary joint defense agreement or common interest agreement with one or more of the Seller, or any of its respective Affiliates with respect to any information provided to Buyer, or to which Buyer gains access, pursuant to this Section 6.02(c) or otherwise.

**Section 6.03    Confidentiality.**  (a) For the period from the date hereof until Closing, Buyer shall not directly or indirectly disclose to the public or to any third party any material non-public information concerning or related to the Seller, other than with the express prior written consent of the Seller, except as

may be required by applicable Law or the Bankruptcy Court, in which event the Buyer shall provide prior written notice to the Seller of the content, form, timing and manner of any proposed disclosure; provided, however, that notwithstanding anything to the contrary contained in this Agreement, the Buyer may disclose such information (a) to any of its stockholders, members, Affiliates, agents, Representatives and existing and potential financing sources who need to know such information for the sole purpose of evaluating, negotiating or implementing the Transactions or (b) where such disclosure is required under any applicable Law. For the avoidance of doubt, as of the Closing, material non-public information with respect to the Transferred Assets and the Assumed Liabilities shall be deemed the confidential information of the Buyer, and the Seller shall maintain the confidentiality thereof in accordance with this Section 6.03 from and after the Closing Date.

(b)    For the period from the date hereof until Closing, the Seller shall not directly or indirectly disclose to the public or to any third party any material non-public information concerning or relating to the Buyer, except as may be required by applicable Law or the Bankruptcy Court, in which event the Seller shall to the extent practicable and permissible by Law, provide prior written notice to the Buyer of the content, form, timing and manner of any proposed disclosure; provided, however, that notwithstanding anything to the contrary contained in this Agreement, the Seller may disclose such information (a) to any of its stockholders, members, Affiliates, agents, Representatives and existing and potential financing sources who need to know such information for the sole purpose of evaluating, negotiating or implementing the Transactions or (b) where such disclosure is required under any applicable Law or is required pursuant to the Sale Procedures Order or is required by an Order of the Bankruptcy Court.

**Section 6.04    Third Party Consents**.  (a) Each of Buyer and the Seller shall take any and all steps to make all required filings and promptly obtain all Consents, Permits and Orders of all Government Authorities (other than any required approvals or action of the Bankruptcy Court, which are governed exclusively by ARTICLE VIII) that may be, or become, necessary for the execution and delivery of, and performance of its obligations pursuant to, the Transaction Agreements (including the consummation of the Transactions) (collectively, the "Government Approvals").

(b)    Each Party shall promptly notify the other Party of any material oral or written communication it or any of its Representatives receives from any Government Authority relating to the matters that are the subject of this **Error! Reference source not found.**, permit the other Party and its respective Representatives to review in advance any material communication relating to the matters that are the subject of this **Error! Reference source not found.** proposed to be made by such Party to any Government Authority and provide the other Parties with copies of all material substantive correspondence, filings or other communications between them or any of their Representatives, on the one hand, and any Government Authority or members of its staff, on the other hand, relating to the matters that are the subject of this **Error! Reference source not found.**, provided, however, that materials proposed to be submitted in response to any such Government Authority communication may be redacted:  (i) to remove references concerning the valuation of the Business; (ii) as necessary to comply with Contractual arrangements, applicable Law or by Order of the Bankruptcy Court; and (iii) as necessary to address reasonable attorney-client or other privilege or confidentiality concerns to the extent not governed by a common interest privilege or doctrine.  No Party shall agree to participate in any meeting or discussion with any Government Authority in respect of any such filings, investigation or other inquiry unless it consults with the other Party in advance and, to the extent permitted by such Government Authority, gives the other Party the opportunity to attend and participate at such meeting.  Subject to Section 6.03, the Parties will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other Party may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods.  The Parties shall share the right to control and direct the process by which the Parties seek to avoid or eliminate impediments under any antitrust, competition, trade regulation or foreign investment regulation Law, including by directing the strategy and making final determinations related to the review

or investigation of the Transactions by any Government Authority and attending all meetings, discussions, and communications with any Government Authority except to the extent that such Government Authority may request to communicate exclusively with one Party.  Nothing in this <u>Section 6.04(b)</u> shall be applicable to Tax matters.

(c)    Each Party agrees to cooperate to obtain any other Consents from any third person other than a Government Authority that may be required in connection with the Transactions, including any Consents contemplated by <u>Section 2.02</u> (the "<u>Third Party Consents</u>").  Notwithstanding anything in this Agreement to the contrary, neither the Seller nor any of its Affiliates shall be required to compensate any third party, commence or participate in any Action or offer or grant any accommodation (financial or otherwise, including any accommodation or arrangement to remain primarily, secondarily or contingently liable for any Assumed Liability) to any third party to obtain any such Third Party Consent.

**Section 6.05    <u>Matters Relating to the Senior Loan Obligations and Junior Loan Obligations</u>**.

(a)    <u>Consent</u>.  The Seller hereby consents to the Buyer (or any of its affiliates) purchasing (i) any Senior Loan or other Senior Loan Obligation from any Senior Finance Party and/or (ii) any Junior Loan or other Junior Loan Obligations from any Junior Finance Party.

(b)    <u>Pay-off Amount</u>.  To the extent that the Senior Finance Parties and the Junior Finance Parties fail to provide payoff amounts to the Seller as of the Closing Date, the Seller agrees to use commercially reasonable efforts to obtain an order from the Bankruptcy Court (a) directing such Senior Finance Parties and Junior Finance Parties to specify the amounts owed to such Senior Finance Parties and Junior Finance Parties under the Loan Transaction Documents and/or (b) fixing the amounts owed to the Senior Finance Parties and the Junior Finance Parties under the Loan Transaction Documents.  To the extent not otherwise provided in an Order from the Bankruptcy Court, the Seller hereby agrees to deliver, in accordance with the terms and conditions of the relevant Loan Transaction Documents, irrevocable notices to the Senior Finance Parties and the Junior Finance Parties (with a copy to Buyer) that the Seller will complete a full prepayment of the Senior Obligations to the Senior Finance Parties and the Junior Obligations, in each case, on or before the Closing Date.

(c)    <u>Enforcement Action</u>.  The Seller hereby agrees to deliver to Buyer any copies of any notices, letters or agreements with any third party relating to any Enforcement Action.

**Section 6.06    <u>Cooperation</u>**.  During the Pre-Closing Period, (a) the Seller and Buyer shall, and shall cause their respective Affiliates to, (i) refrain from taking any Actions that would reasonably be expected to impair, delay or impede the Closing and (ii) without limiting the foregoing, use reasonable best efforts to cause all Closing Conditions of the other Party to be met as promptly as practicable and in any event on or before the Outside Date and (b) each Party shall keep the other Party reasonably apprised of the status of the matters relating to the completion of the Transactions, including with respect to the negotiations relating to the satisfaction of the Closing Conditions of the other Party.

**Section 6.07    <u>Bulk Transfer Laws</u>**.  The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Transferred Assets shall be free and clear of any security interests in the Transferred Assets, including any Liens or claims arising out of the bulk transfer Laws, and the Parties shall take such steps as may be reasonably necessary or appropriate to so provide in the Sale Order.  In furtherance of the foregoing, each Party hereby waives, to the fullest extent permitted by applicable Law, compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws in all applicable jurisdictions in respect of the Transactions.  This <u>Section 6.07</u> shall not affect any obligation of the Seller with respect to Excluded Liabilities or Excluded Assets.

**Section 6.08    Aircraft Matters**. (a) Risk of Loss. As between the Seller, on the one hand, and Buyer, on the other hand, all risk of Loss of or damage to the Aircraft shall pass from the Seller to Buyer or the applicable Buyer Nominee upon the execution and delivery of the Aircraft Bill of Sale.

(b)    No Physical Delivery. Buyer acknowledges that following the transfer of title to the Aircraft, such Aircraft will remain in the possession of the Aircraft Lessee and the Seller is not required to effect physical delivery of such Aircraft to Buyer.

(c)    Cape Town Convention Filings; Etc. To the extent applicable, the Seller and Buyer agree that they shall register the sale of the Aircraft to Buyer or the applicable Buyer Nominee as a sale (as defined in the Cape Town Convention) at the International Registry established pursuant to the Cape Town Convention (the "International Registry"). In addition, the Seller and Buyer agree that they shall register the sale of the Aircraft to Buyer or the applicable Buyer Nominee with any Government Authority as is reasonably necessary in order to effect such sale (subject to the cooperation of the Aircraft Lessee or other third party where such cooperation is required). All such registrations shall be initiated by counsel (such counsel to be agreed in advance of the Closing Date by the Seller and Buyer) on the Closing Date immediately following the Closing.

(d)    Letters of Credit. If any letter of credit has been provided by the Aircraft Lessee to or for the benefit of the Seller or in connection with the Aircraft or the leasing thereof, and such letter of credit has not expired or otherwise been terminated or revoked, the Seller shall at Closing either (i) cause a replacement letter of credit in form and substance reasonably satisfactory to the Buyer to be issued in favor of the Buyer or the Buyer Nominee (as directed by the Buyer in writing) or (ii) pay to the Buyer, by way of set-off against the Purchase Price, an amount equal to the stated amount of such letter of credit.

**Section 6.09    Protections for Payment of Buyer Protections**. The Sale Procedures Order will provide that the Break-Up Fee and the Expense Reimbursement will be paid by the Seller and its bankruptcy estates when due and, as applicable, the Break-Up Fee and the Expense Reimbursement will be paid from the sources (i.e., the Break-Up Fee and the Expense Reimbursement are payable as the initial uses of the proceeds obtained from any consummated sale transaction) and at the times specified in this Agreement. The exact wording of such provisions must be reasonably acceptable to both the Seller and Buyer.

**Section 6.10    Seller to Use Commercially Reasonable and Good Faith Efforts to Limit and Expunge Certain Costs**. The Seller is obligated to use commercially reasonable and good faith efforts to seek to limit the Senior Out-of-Pocket Amounts and the Junior Out-of-Pocket Amounts to reasonable amounts, including, without limitation, by obtaining Order(s) from the Bankruptcy Court determining that the amounts payable by the Buyer (or, in certain circumstances, by the Seller) to the to any other person or entity are limited to delineated reasonable amounts as determined by the Bankruptcy Court or under procedures approved by the Bankruptcy Court. Each of the Parties agrees to assist each other in any such actions before the Bankruptcy Court.  [The Seller shall retain authority to settle any determination of the Senior Out-of-Pocket Amounts and the Junior Out-of-Pocket Amounts, *provided, however*, that any such settlement shall be subject to the consent of the Buyer, which consent may not be unreasonably withheld or delayed.][5]

**Section 6.11    Matters Relating to the Other Agreement**. The Seller hereby agrees to deliver to Buyer a copy of any notice, letter or agreement issued and/or received by it (or any affiliate thereof) relating to any breach and/or termination of the Other Agreement.

---

[5] NTD: Such language remains subject to further review and agreement (with each Party required to act reasonably) depending on Court's determinations at the Sale Hearing.

## ARTICLE VII

## POST-CLOSING COVENANTS

**Section 7.01    Further Assurances**.  (a) From time to time following the Closing, the Parties shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all reasonable further conveyances, notices, assumptions, releases and acquittances and such instruments, and shall take such reasonable Actions as may be necessary or appropriate to make effective the Transactions as may be reasonably requested by the other Party (including (a) transferring back to the Seller or its designees each Excluded Asset and any asset or Liability not contemplated by this Agreement to be a Transferred Asset or an Assumed Liability, respectively, which asset or Liability was transferred to Buyer at the Closing and (b) transferring to Buyer (and having Buyer assume) any asset or Liability contemplated by this Agreement to be a Transferred Asset or an Assumed Liability, respectively, which was not transferred to Buyer at the Closing); provided, however, that except for Buyer's obligations to discharge an Assumed Liability, nothing in this Section 7.01 shall require any Party or its Affiliates to pay money to, commence or participate in any Action with respect to, or offer or grant any accommodation (financial or otherwise) to, any third party following the Closing. To the extent that the Buyer requests that the Seller undertake any actions under this Section 7.01, then the Buyer shall, within thirty (30) days after receipt of an invoice from the Seller for the same, pay for the reasonable, documented out-of-pocket costs and expenses of the Seller (including, without limitation, reasonable legal fees and expenses) incurred in connection therewith.

(b)    In furtherance of the foregoing, if the Seller receives any payment related to any Transferred Asset after the Closing, including, without limitation, any hull insurance proceeds (and in the case of any payment related to hull insurance proceeds, such Seller shall also provide to the Buyer copies of all written communication with the insurance broker (and reinsurance broker, as applicable)), the Seller agrees to promptly remit (or cause to be promptly remitted) such funds to Buyer to the extent related to such Transferred Asset, and Buyer shall reimburse the Seller for its reasonable expenses incurred in connection therewith.  If Buyer or any Affiliate of Buyer receives any payment related to any Excluded Asset after the Closing, Buyer agrees to promptly remit (or cause to be promptly remitted) such funds to the Seller to the extent related to such Excluded Asset, and the Seller shall reimburse Buyer for its reasonable expenses incurred in connection therewith.

## ARTICLE VIII

## BANKRUPTCY PROVISIONS

**Section 8.01    Break-Up Fee and Expense Reimbursement**.  (a) Break Up Fees and Expense Reimbursement.  To the extent approved under the Sale Procedures Order, in consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of the Seller, the Seller shall pay Buyer, in accordance with the terms hereof, (a) a break-up fee in an amount equal to four per cent (4%) of the Purchase Price (the "Break-Up Fee"), plus (b) without duplication in respect of the Other Agreement, an aggregate amount of up to $1,000,000 for all of the actual, documented and reasonable out of pocket costs, fees and expenses (as delineated in invoice(s) sent by Buyer to the Seller in accordance with Section 12.03) that are incurred or to be incurred by Buyer or its Affiliates, including all reasonable out of pocket travel expenses and all fees, costs and expenses of any professionals (including financial advisors, outside legal counsel, accountants, experts and consultants) retained by Buyer or its Affiliates, in connection with or related to the authorization, preparation, investigation, negotiation, enforcement, execution, implementation and performance of this Agreement, the Other Agreement, the Transactions, the Other Transactions and the Bankruptcy Case and other judicial, extra-judicial and regulatory proceedings related

to such Transactions and Other Transactions, (such costs, fees and expenses, the "Expense Reimbursement").  Each of the Parties acknowledges and agrees that the agreements contained in this Section 8.01 are an integral part of the Transactions and this Agreement and that the Break-Up Fee and the Expense Reimbursement are not a penalty, but rather are liquidated damages in a reasonable amount that will reasonably compensate Buyer in the circumstances in which such Break-Up Fee and/or Expense Reimbursement are payable for the efforts and resources expended and opportunities foregone by Buyer while negotiating and pursuing the Transactions and this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.  Claims of Buyer and its Affiliates in respect of the Break-Up Fee and the Expense Reimbursement hereunder are and constitute allowed administrative expense claims against the Seller under Sections 503(b) and 507(a)(2) of the Bankruptcy Code in the Bankruptcy Case.

(b)    Timing of Payments of Break-Up Fee and Expense Reimbursement and Related Matters.

The Break-Up Fee and Expense Reimbursement shall be payable by the Seller upon the occurrence of a Trigger Event.  The Break-Up Fee and Expense Reimbursement shall be paid by the Seller by wire transfer of immediately available funds to an account designated by Buyer as follows (1) in the event of a Trigger Event under clauses (ii), (iii), or (iv) of the definition of Trigger Event (or the definition of "Trigger Event" under the Other Agreement), from the first proceeds of any sale or other disposition, or of any financing (and no other lender claims will attach thereto), within (Y) two (2) Business Days following the date of consummation of a Competing Bid, other transfer, or financing in the case of the Break-Up Fee, and (Z) in the case of the Expense Reimbursement, two (2) Business Days after Buyer submits to the Seller invoice(s) detailing the Expense Reimbursement amounts, which invoice(s) shall solely summarize the work incurred to enable the ~~Debtor~~Seller to review such invoice(s) for reasonableness, and shall not be subject to application or allowance by the Bankruptcy Court, or (2) in the event of any other Trigger Event, within two (2) Business Days after Buyer submits to the Seller invoice(s) detailing the Expense Reimbursement amounts, which invoice(s) shall solely summarize the work incurred to enable the ~~Debtor~~Seller to review such invoice(s) for reasonableness, and shall not be subject to application or allowance by the Bankruptcy Court.  The obligations set forth in this Section 8.01 with respect to the Break-Up Fee and Expense Reimbursement shall survive any termination of this Agreement.

**Section 8.02    Competing Bid; Transfer of Intermediate Collateral**.  (a) This Agreement is subject to approval by the Bankruptcy Court and, other than in respect to the provisions related to the Break-Up Fee and Expense Reimbursement, the consideration by the Seller of higher and better competing bids in respect of all the Transferred Assets (and the "Transferred Assets" as defined in the Other Agreement) in accordance with the Sale Procedures Order (each a "Competing Bid").  From the Agreement Date (and any prior time) and until entry of the Sale Order, to the extent provided in the Sale Procedures Order, the Seller is permitted to, and to cause their Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with a Competing Bid.  In addition, the Seller shall have the responsibility and obligation to respond to any inquiries or offers for a Competing Bid and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Sale Procedures Order or other applicable Law, including supplying information relating to the Business and the assets of the Seller to prospective purchasers.

(b)    The Seller may consensually effect an enforcement sale of the collateral granted to it by the Aircraft Head Lessee in accordance with the notice and bill of sale (the "Enforcement Notice and Bill of Sale") in the form as filed with the Bankruptcy Court on or about January 13, 2022, and take all actions contemplated as required to implement and effectuate such Enforcement Notice and Bill of Sale. Notwithstanding anything herein to the contrary, all of the representations, warranties, covenants,

obligations and agreements of the Seller contained herein shall carve out the terms and transactions provided for under the Enforcement Notice and Bill of Sale.

**Section 8.03    Bankruptcy Court Filings**.  (a) The Seller and Buyer acknowledge that this Agreement and the Transactions are subject to entry of, as applicable, the Sale Procedures Order and, except to the extent provided in the Sale Procedures Order, the Sale Order.  In the event of any discrepancy between this Agreement and the Sale Procedures Order and the Sale Order, the Sale Procedures Order and the Sale Order shall govern.

(b)    The Seller shall give notice under the Bankruptcy Code of the request for the relief specified in the Debtors' Application for Entry of Orders: (I)(A) Approving Bidding Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (B) Establishing Stalking Horse Bidders and Bid Protections; (C) Approving Procedures of the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Authorizing Enforcement Actions; (E) Scheduling an Auction and a Sale Hearing; and (F) Approving the Form and Manner of Notice Thereof; and (II)(A) Approving the Sale of the Purchased Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances; and (B) Granting Related Relief [ECF No 21] (the "Sale Motion") to all Persons entitled to such notice, including all Persons that have asserted Liens in the Transferred Assets and all non-debtor parties to the Transferred Contracts, and other appropriate notice as required by the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, including such additional notice as the Bankruptcy Court shall direct or as Buyer may request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, Orders, hearings, or other proceedings in the Bankruptcy Court relating to this Agreement, the Other Agreement, the Transactions, or the Other Transactions.

(c)    The Seller shall use commercially reasonable efforts to ensure that the proposed Sale Procedures Order and Sale Order state that, the provisions of this Agreement and the Other Agreement, including (in each case) ARTICLE VIII, are reasonable, were a material inducement to Buyer, and were reasonably relied upon by Buyer in deciding, to enter into this Agreement and the Other Agreement, and are designed to achieve the highest or otherwise best price for the Transferred Assets.

(d)    Subject to the Seller exercising its rights pursuant to Section 11.02, the Seller shall not, and shall cause its Affiliates not to, take any Action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Sale Procedures Order or, if applicable, if Buyer is the prevailing bidder at the Auction, the Sale Order. The Seller shall, and shall cause its Affiliates to, comply with the Sale Procedures Order and the Sale Order.

(e)    Buyer agrees that it will promptly take such Actions as are reasonably requested by the Seller to assist in obtaining entry of the Sale Procedures Order and the Sale Order and a finding of adequate assurance of future performance by Buyer, including furnishing witnesses, affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(f)    The Seller shall be responsible for making all necessary filings with the Bankruptcy Court, which material filings, including any amendments, supplements, or modifications thereto, shall be in form and substance reasonably acceptable to Buyer.  The Seller and Buyer shall consult with one another regarding substantive pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval or modification of, as applicable, the Sale Procedures Order or the Sale Order.  The Seller shall provide (or shall cause their Representatives to provide) Buyer with advance drafts of, and a reasonable opportunity to review and comment upon, the Sale Motion, the Sale Procedures Order, the Sale Order, and any substantive pleadings, motions, applications, petitions, schedules and supporting papers prepared by the Seller to be filed with the

Bankruptcy Court (or, in each case, any amendments thereto) in furtherance of the Transaction as soon as reasonably practicable prior to the date the Seller Parties intend to file such motion, pleading or Bankruptcy Court filing, and the Seller shall make any reasonable modifications of such documents requested by Buyer. In the event the entry of the Sale Procedures Order and the Sale Order or any other Order of the Bankruptcy Court relating to this Agreement or the Transactions shall be appealed (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Procedures Order, the Sale Order or other such Order), the Seller shall use its respective commercially reasonable efforts to defend such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

(g)    In accordance with the Sale Procedures Order or other Order of the Bankruptcy Court (or, if required by the Bankruptcy Court, a motion to assume and assign the Transferred Contracts), the Seller shall file with the Bankruptcy Court send a cure notice in respect of each Transferred Contract with sufficient detail to provide adequate notice to the non-debtor parties to such Contracts, and shall set forth the applicable Cure Cost, if any, for each Transferred Contract as reasonably estimated in good faith by the Seller.   Upon removal by Buyer of any Contract from <u>Schedule 2.02(a)(i)</u> and <u>Schedule 2.02(a)(iii)</u> in accordance with <u>Section 2.03</u>, the Seller shall promptly remove such Transferred Contract from the cure notice and notify the non-debtor parties to such Contracts of such removal.[6]

**Section 8.04    <u>Back-up Bidder</u>**.  If Buyer is not the winning bidder at either an auction held in accordance with the Sale Procedures Order (the "<u>Auction</u>"), and if and only if (a) this Agreement together with the Other Agreement (or any further bid submitted by Buyer together with the Other Buyer at the Auction) is the second highest or second best bid, and (b) the Seller gives notice to Buyer on or before the Back-up Termination Date, stating that the Seller (i) failed to consummate the sale with the winning bidder, and (ii) terminated the purchase agreement with the winning bidder, Buyer shall promptly consummate the Transaction upon the terms and conditions as set forth herein, including the Purchase Price, as the same may be increased by Buyer at the Auction, if applicable.

**Section 8.05    <u>Bankruptcy Milestones</u>**.  Without prejudice to any of the Seller's obligations hereunder, the Seller shall use their reasonable best efforts to satisfy the milestones set forth in the Sale Procedures Order.

# ARTICLE IX

## TAX MATTERS

**Section 9.01    <u>Taxes</u>**.

(a)    Each Party shall be liable for its own Taxes, including Transfer Taxes, and shall timely prepare and file, or cause to be timely prepared and filed, the relevant Tax Returns; <u>provided</u>, <u>however</u>, that the parties hereto acknowledge and agree that Seller shall not charge Buyer for any value added sales, consumption, or similar Taxes ("<u>VAT Transfer Tax</u>") in connection with the Transaction and to the extent that the Seller or any Taxing Authority determines that VAT Transfer Tax should be payable, Seller shall be responsible for the payment of such Tax.

(b)    The Seller shall timely remit to the Seller's local agent for payment to the appropriate Taxing Authority or directly to the applicable Taxing Authority, all Transfer Taxes imposed or arising with respect to the Transactions.

---

[6]    NTD:  Cure costs to be discussed.

(c)     The Parties shall use their commercially reasonable and good faith efforts to ensure that the Aircraft is located in a tax-efficient jurisdiction at the time of the Closing.

(d)     For the avoidance of doubt, the Seller shall not be responsible, and shall not indemnify Buyer, for any of the Seller's Transfer Taxes which are:

(i)     Taxes arising in respect of events occurring after, but not including, the Closing Date, and Taxes that are not contemplated by the Transaction Agreements;

(ii)     Taxes imposed on Buyer that are not Transfer Taxes and are based on or measured by net income or profits of Buyer (including interest, additions to Tax, penalties, or other charges in respect thereof); or

(iii)     Taxes resulting from the gross negligence or willful misconduct of Buyer.

(e)     Buyer shall provide to the Seller, and the Seller shall provide to Buyer, any written notices or correspondence received from the applicable Taxing Authority with respect to the payment of any of the Seller's Transfer Taxes with respect to the Transaction.

**Section 9.02     Survival**.  The obligations set forth in this ARTICLE IX with respect to Taxes shall survive until the date that is thirty (30) days following the expiration of the applicable statute of limitations with respect to the Tax Returns and Tax obligations, as applicable, contemplated hereby.

## ARTICLE X

## CONDITIONS TO CLOSING

**Section 10.01     Conditions to Obligations of the Seller**.  The obligation of the Seller to consummate the Closing shall be subject to the satisfaction or waiver by the Seller in its sole discretion, at or before the Closing, of each of the following conditions:

(a)     Representations and Warranties; Covenants.

(i)     all representations and warranties of Buyer contained in this Agreement shall be true and correct as of the Agreement Date and the Closing Date as if made on the Closing Date (other than representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such date), except for breaches or inaccuracies, as the case may be, that, individually or in the aggregate, would not reasonably be expected to have a material adverse effect on Buyer's ability to perform its obligations under this Agreement and consummate the Transactions; provided, however, that for purposes of determining the satisfaction of the condition in this clause (i), no effect shall be given to the exceptions of "material" in such representations and warranties;

(ii)     the covenants contained in this Agreement required to be complied with by Buyer on or before the Closing shall have been complied with in all material respects, and

(iii)     the Seller shall have received a certificate signed by an authorized officer of Buyer, dated as of the Closing Date, with respect to the matters set forth in the foregoing clauses (i) and (ii).

(b)      <u>Governmental Approvals</u>.  All Required Approvals shall have been obtained or, if applicable, shall have expired, shall have been waived by the applicable Government Authority or shall have been terminated.

(c)      <u>No Order</u>.  There shall be no Order in a court of competent jurisdiction with respect to the subject matter of such Order in existence that enjoins or otherwise prohibits the sale of the Transferred Assets pursuant to this Agreement or the other Transactions.

(d)      <u>Transaction Agreements</u>.  Buyer shall have executed and delivered to the Seller Parties all Transaction Agreements to be executed by it and the other deliverables contemplated by <u>Section 3.02(b)</u>.

(e)      <u>Closing Location</u>.  Confirmation satisfactory to the Seller that the Aircraft is in the Closing Location.

**Section 10.02    <u>Conditions to Obligations of Buyer</u>**.  The obligations of Buyer to consummate the Closing shall be subject to the satisfaction or waiver by Buyer in its sole discretion, at or before the Closing, of each of the following conditions:[7]

(a)      <u>Representations and Warranties; Covenants</u>.

(i)      all representations and warranties of the Seller contained in this Agreement shall be true and correct as of the Closing as if made on the Closing Date (other than representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such date);

(ii)      the covenants contained in this Agreement required to be complied with by the Seller on or before the Closing shall have been complied with in all material respects; and

(iii)      Buyer shall have received a certificate signed by an authorized officer of the Seller (on behalf of itself and the other Seller Parties), dated as of the Closing Date, with respect to the matters set forth in the foregoing <u>clauses (i)</u> and <u>(ii)</u>.

(b)      <u>Governmental Approvals</u>.  All Required Approvals shall have been obtained or, if applicable, shall have expired or been waived by the applicable Government Authority, or have been terminated.

(c)      <u>No Order</u>.  There shall be no Order in existence that enjoins or otherwise prohibits the sale of the Transferred Assets pursuant to this Agreement or the other Transactions.

(d)      <u>Transaction Agreements</u>.  The Seller shall have executed and delivered, or caused to be executed and delivered, to Buyer all Transaction Agreements to be executed by it and the other deliverables contemplated by <u>Section 3.02(a)</u>.

(e)      <u>Other Agreements</u>.  The Other Seller shall have executed and delivered, or caused to be executed and delivered, the Other Agreements to be executed by it and the other deliverables contemplated thereunder to consummate the Other Transactions and no default or termination event (howsoever defined) has occurred and is continuing in respect of such Other Agreements.

(f)      <u>Sale Procedures Order</u>.  The Bankruptcy Court shall have entered the Sale Procedures Order on or before (x) ~~January~~<u>February</u> 7, 2022 and (y) the earliest date available on the

---

[7] NTD: Such language remains subject to further review and agreement (with each Party required to act reasonably) depending on Court's determinations at the Sale Hearing.

Bankruptcy Court's calendar (or such later date as agreed upon by the Seller and the Buyer), such Sale Procedures Order shall not be subject to any stay and shall not have been vacated, and the Seller shall not have breached any applicable provision of the Sale Procedures Order in any respect.

(g)    Sale Order.  The Bankruptcy Court shall have entered the Sale Order on or before ~~February 25, 2022~~Outside Date and the Sale Order shall not be subject to any stay, shall not have been vacated and shall become effective immediately upon its entry by the Bankruptcy Court, and the Seller shall not have breached any applicable provision of the Sale Order in any respect.

(h)    Closing Location.  Confirmation satisfactory to the Buyer that the Aircraft is in the Closing Location.

(i)    Aircraft Matters.  Confirmation satisfactory to the Buyer that (i) the Engines and the APU are attached to the Aircraft; (ii) the Aircraft has not suffered any Total Loss (as defined under the Aircraft Lease) or material damage since the Agreement Date that has not been otherwise repaired to the reasonable satisfaction of Buyer; (iii) the Aircraft is in the same condition (subject to ordinary wear and tear)  as at the earlier to occur of (x) the Petition Date and (y) the date on which any Senior Finance Party took any enforcement action against the Seller or in respect of any collateral provided under the Loan Transaction Documents; and (iv) after payment of the Closing Payment and the transfer of the Seller's title to the Transferred Assets, the Transferred Assets shall be free and clear of all Liens (other than Permitted Liens).

**Section 10.03    Frustration of Closing Conditions**.  Neither the Seller nor Buyer may rely on the failure of any condition set forth in this ARTICLE X to be satisfied if such failure was caused by such Party's failure to act in good faith or to use reasonable best efforts to cause the Closing Conditions of each such other Party to be satisfied, including as required by **Error! Reference source not found.**.

**Section 10.04    Waiver of Closing Conditions**.  Upon the occurrence of the Closing, any condition set forth in this ARTICLE X that was not satisfied as of the Closing shall be deemed to have been waived as of and from the Closing.

## ARTICLE XI

## TERMINATION

**Section 11.01    Termination**.  Notwithstanding anything in this Agreement to the contrary, this Agreement may be terminated before the Closing:

(a)    by the mutual written consent of the Seller and Buyer;

(b)    by the Seller, if Buyer shall have breached any representation or warranty or failed to comply with any covenant or agreement applicable to Buyer that would cause any Closing Condition set forth in Section 10.01 not to be satisfied, and (i) such breach is not waived by the Seller or (ii) if such breach has not been waived by the Seller but is curable and is not cured by Buyer prior to the earlier to occur of (A) ten (10) Business Days after receipt of the Seller's notice of its intent to terminate and (B) the Outside Date (or such later date as agreed between the Seller and Buyer); provided, however, that the Seller is not then in material breach of this Agreement;

(c)    by Buyer, if the Seller shall have breached any representation or warranty or failed to comply with any covenant or agreement applicable to the Seller that would cause any Closing Condition set forth in Section 10.02 not to be satisfied, and (i) such breach is not waived by Buyer or, (ii) if such breach has not been waived by Buyer but is curable and is not cured by the Seller prior to the earlier to occur of (A) ten (10) Business Days after receipt of Buyer's notice of its intent to terminate and (B) the

Outside Date (or such later date as agreed between the Seller and Buyer); provided, however, that Buyer is not then in material breach of this Agreement;

(d)    by Buyer, if the Closing shall not have occurred by ~~February 28~~March 15, 2022 (or such later date as agreed by the Parties, which agreement shall not be unreasonably withheld, the "Outside Date"); provided, however, that if the Closing shall not have occurred on or before the Outside Date, due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer, then Buyer may not terminate this Agreement pursuant to this Section 11.01(d).

(e)    by either the Seller or Buyer, in the event that any Government Authority of competent jurisdiction shall have issued an Order that permanently enjoins the consummation of the purchase of the Transferred Assets contemplated by this Agreement and such Order shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 11.01(e) shall not be available to the Seller or Buyer whose Action or failure to fulfill any obligation under this Agreement has been the cause of the issuance of such Order or other Action;

(f)    by either the Seller or Buyer (subject in the case of Buyer to Buyer's obligation to be the Backup Bidder pursuant to Section 8.04), if the Seller enters into a definitive agreement with respect to a Competing Bid, upon entry by the Bankruptcy Court of an Order approving such agreement; and

(g)    by the Seller, if the Seller is entitled to terminate, or has terminated, the Other Agreement.

Section 11.02    **Notice of Termination**.  If either the Seller or Buyer desires to terminate this Agreement pursuant to Section 11.01, such Party shall give written notice of such termination to the other Party.

Section 11.03    **Effect of Termination**.  (a) If this Agreement is terminated pursuant to Section 11.01, this Agreement shall thereupon become null and void and of no further force and effect, except for the provisions of (i) Section 6.03, (ii) Section 8.01, (iii) Section 11.01, (iv) this Section 11.03 and (v) ARTICLE XII. Nothing in this Section 11.03 shall be deemed to release any Party from any Liability for any breach by such Party of any term of this Agreement or impair the right of any Party to compel specific performance by any other Party of its obligations under this Agreement; provided, however, that, if this Agreement is validly terminated pursuant to this ARTICLE XI, no Party shall have any remedy or right to recover for any Liabilities resulting from any breach of this Agreement (other than breaches of (i) Section 6.03, (ii) Section 8.01 and (iii) Section 11.01), unless the breaching Party willfully and knowingly committed fraud against the non-breaching Party with the specific intent to deceive and mislead the non-breaching Party regarding the representations and warranties made in this Agreement; provided further, that a failure of Buyer to consummate the Closing when required pursuant to the terms of this Agreement shall be deemed to be a knowing and intentional breach or violation, whether or not Buyer had sufficient funds available.

## ARTICLE XII

## MISCELLANEOUS

Section 12.01    **Rules of Construction**.  The following rules of construction shall govern the interpretation of this Agreement:

(a)    references to "applicable" Law or Laws with respect to a particular Person, thing or matter means only such Law or Laws as to which the Government Authority that enacted or promulgated such Law or Laws has jurisdiction over such Person, thing or matter as determined under the Laws of the State of New York as required to be applied thereunder by the Bankruptcy Court; references to any statute,

rule, regulation or form (including in the definition thereof) shall be deemed to include references to such statute, rule, regulation or form as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, include any rules and regulations promulgated under such statute), and all references to any section of any statute, rule, regulation or form include any successor to such section;

(b)    when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is referenced in beginning the calculation of such period will be excluded (for example, if an action is to be taken within two (2) days after a Triggering Event and such event occurs on a Tuesday, then the action must be taken by Thursday); if the last day of such period is a non-Business Day, the period in question will end on the next succeeding Business Day;

(c)    whenever context requires, words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender;

(d)    (i) the provision of a table of contents, the division into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement and (ii) references to the terms "Article," "Section," "subsection," "subclause," "clause," "Schedule" and "Exhibit" are references to the Articles, Sections, subsections, subclauses, clauses, Schedules and Exhibits to this Agreement unless otherwise specified;

(e)    (i) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits thereto, (ii) the terms "thereof," "therein," "thereby," "thereto" and derivative or similar words refer to this Agreement to which the context refers, including the Schedules and Exhibits thereto, (iii) the terms "include," "includes," "including" and words of similar import when used in this Agreement mean "including, without limitation" unless otherwise specified, (iv) the term "any" means "any and all" and (v) where the context permits, the term "or" shall not be exclusive and shall mean "and/or";

(f)    (i) references to "days" means calendar days unless Business Days are expressly specified, (ii) references to "written" or "in writing" include in electronic form (including by e-mail transmission or electronic communication by portable document format (.pdf)) and (iii) references to "$" mean U.S. dollars;

(g)    accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP.  To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control;

(h)    references to any Person includes such Person's successors and permitted assigns;

(i)    whenever this Agreement requires any Seller Party or Buyer, as applicable, to take any action, such requirement shall be deemed to involve an undertaking on the part of the Seller Party or Buyer, as applicable, to take such action or to cause the Seller Parties or Buyer, as applicable, to take such action;

(j)    unless the context otherwise requires, the word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if"; and

(k)    each Party has participated in the negotiation and drafting of this Agreement, and if an ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any provision in this Agreement; the language used in this Agreement will be

deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Party.  Further, prior drafts of this Agreement or any ancillary agreements, schedules or Exhibits thereto or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement or any ancillary agreements, schedules or exhibits hereto shall not be used as an aide of construction or otherwise constitute evidence of the intent of the Parties; and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of such prior drafts.

Section 12.02   **Expenses**.  Each Party will pay its own costs and expenses, including legal, consulting, financial advisor and accounting fees and expenses, incurred in connection with the Transaction Agreements and the Transactions, irrespective of when incurred or whether or not the Closing occurs.

Section 12.03   **Notices**.   All notices and other communications under or by reason of this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when personally delivered, (b) when delivered by e-mail transmission with receipt confirmed, or (c) upon delivery by overnight courier service, in each case, to the addresses and attention Parties indicated below (or such other address, e-mail address or attention Party as the recipient Party has specified by prior notice given to the sending Party in accordance with this Section 12.03):

If to the Seller, to:    [●]

with a copy (which will not constitute notice) to:    [●]

If to Buyer, to:    Strategic Value Partners, LLC
375 Park Avenue, 27th Floor
New York, NY 10152
Email: legalnotices@svpcorp.com

with a copy (which will not constitute notice) to:    White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
Email: sgreissman@whitecase.com;
WCSVP_VA@whitecase.com

Section 12.04   **Survival**.   Except to the extent that any covenant that by its terms is to be performed (in whole or in part) by any Party following the Closing, none of the representations, warranties, or covenants of any Party set forth in this Agreement shall survive, and each of the same shall terminate and be of no further force or effect as of, the Effective Time.

Section 12.05   **Severability**.  If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of this Agreement will not in any way be affected or impaired.  If the final judgment of a court of competent jurisdiction or other Government Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

Section 12.06   **Assignment**.  This Agreement will be binding upon and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the Parties.  No Party may assign (whether by operation of Law or otherwise) this Agreement or any rights, interests or obligations provided

by this Agreement without the prior written consent of the other Parties. Any attempted assignment in violation of this Section 12.06 shall be void ab initio.

Section 12.07   **No Third-Party Beneficiaries**.  This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns, and, except as expressly set forth in this Agreement, nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person not a party hereto, including any Affiliates of any Party (other than any Affiliates of the Buyer in connection with Section 8.01).

Section 12.08   **Entire Agreement**.  This Agreement (including the Disclosure Schedules) and the other Transaction Agreements (and all exhibits and schedules hereto and thereto), and the Other Agreement (including its Disclosure Schedules (as defined in the Other Agreement)) and the other Transaction Agreements (as defined in the Other Agreement) (and all exhibits and schedules under the Other Agreement and its Transaction Documents (as defined in the Other Agreement) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior negotiations, correspondence, understandings, agreements and Contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof. To the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of any other Transaction Agreement (which, for the avoidance of doubt, excludes the Sale Procedures Order, the Sale Order and any other Order of the Bankruptcy Court), this Agreement will govern and control.

Section 12.09   **Amendments**.  This Agreement (including all exhibits and schedules hereto) may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each Party.

Section 12.10   **Waiver**.  At any time before the Closing, either the Seller or Buyer may (a) extend the time for the performance of any obligation or other acts of the other Party, (b) waive any breaches or inaccuracies in the representations and warranties of the other Party contained in this Agreement or in any document delivered pursuant to this Agreement or (c) waive compliance with any covenant, agreement or condition contained in this Agreement but such waiver of compliance with any such covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure. Any such waiver shall be in a written instrument duly executed by the waiving Party. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 12.11   **Governing Law**.  This Agreement, and any Action that may be based upon, arise out of or relate or be incidental to any Transaction, this Agreement, the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into the foregoing, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising (each, a "Transaction Dispute"), will be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of New York, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of New York to be applied.

Section 12.12   **Dispute Resolution; Consent to Jurisdiction**.  (a) Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Transaction Dispute which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby Consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 12.03; provided, however, upon the

closing of the Bankruptcy Case, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the U.S. District Court for the Southern District of New York sitting in New York County or the Commercial Division of the Courts of the State of New York sitting in the County of New York and any appellate court from any thereof, for the resolution of any such Transaction Dispute.  In that context, and without limiting the generality of the foregoing, each Party irrevocably and unconditionally:

(i)        submits for itself and its property to the exclusive jurisdiction of such courts with respect to any Transaction Dispute and for recognition and enforcement of any judgment in respect thereof, and agrees that all claims in respect of any Transaction Dispute shall be heard and determined in such courts;

(ii)        agrees that venue would be proper in such courts, and waives any objection that it may now or hereafter have that any such court is an improper or inconvenient forum for the resolution of any Transaction Dispute; and

(iii)        agrees that the mailing by certified or registered mail, return receipt requested, to the Persons listed in Section 12.03 of any process required by any such court, will be effective service of process; provided, however, that nothing herein will be deemed to prevent a Party from making service of process by any means authorized by the Laws of the State of New York.

(b)        The foregoing consent to jurisdiction will not constitute submission to jurisdiction or general consent to service of process in the State of New York for any purpose except with respect to any Transaction Dispute.

Section 12.13    **Waiver of Jury Trial**.  To the maximum extent permitted by Law, each Party irrevocably and unconditionally waives any right to trial by jury in any forum in respect of any Transaction Dispute and covenants that neither it nor any of its Affiliates will assert (whether as plaintiff, defendant or otherwise) any right to such trial by jury.  Each Party certifies and acknowledges that (a) such Party has considered the implications of this waiver, (b) such Party makes this waiver voluntarily and (c) such waiver constitutes a material inducement upon which such Party is relying and will rely in entering into the this Agreement.  Each Party may file an original counterpart or a copy of this Section 12.13 with any court as written evidence of the consent of each Party to the waiver of its right to trial by jury.

Section 12.14    **Admissibility into Evidence**.  All offers of compromise or settlement among the Parties or their Representatives in connection with the attempted resolution of any Transaction Dispute, (a) shall be deemed to have been delivered in furtherance of a Transaction Dispute settlement, (b) shall be exempt from discovery and production and (c) shall not be admissible into evidence (whether as an admission or otherwise) in any proceeding for the resolution of the Transaction Dispute.

Section 12.15    **Remedies; Specific Performance**.  (a) Except to the extent set forth otherwise in this Agreement, all remedies under this Agreement expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by Law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.

(b)        Each Party agrees that irreparable damage would occur and the Parties would not have an adequate remedy at law if any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached.  Accordingly, each Party agrees that the other Party will be entitled to injunctive relief from time to time to prevent breaches of the provisions of this Agreement and to enforce specifically the terms and provisions of this Agreement, in each case (i) without the requirement of posting any bond or other indemnity and (ii) in addition to any other remedy to which it may be entitled, at law or in equity.  Furthermore, each Party agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement, and to specifically

enforce the terms of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of such Party under this Agreement.  Each Party expressly disclaims that it is owed any duty not expressly set forth in this Agreement, and waives and releases all tort claims and tort causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement.

**Section 12.16    Target Closing Timeline**.    Acknowledging that effecting the Closing in accordance with the terms of this Agreement on or before ~~February 28~~March 15, 2022 is of material economic import for each of the Parties, subject to each Party's obligations hereunder (including Section 2.04), each of the Parties agrees to undertake good-faith, commercially reasonable steps to consummate the Closing as provided herein on or before ~~February 28~~March 15, 2022, subject in all respects to the satisfaction (or waiver) of the Closing Conditions and the other terms and provisions of this Agreement.

**Section 12.17    Disclosure Schedules and Exhibits**.  The Disclosure Schedules, schedules and Exhibits attached to this Agreement shall be construed with and as an integral part of this Agreement to the same extent as if the same had been set forth verbatim herein.  Any capitalized terms used in any Exhibit or Schedule or in the Disclosure Schedules but not otherwise defined therein shall be defined as set forth in this Agreement.  The representations and warranties of the Seller set forth in this Agreement are made and given subject to the disclosures contained in the Disclosure Schedules.  Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Disclosure Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement or item.  Any matter, information or item disclosed in the Disclosure Schedules, under any specific representation or warranty or schedule or section thereof shall be deemed to be disclosed and incorporated by reference in any other schedule or section of the Disclosure Schedules to the extent it is reasonably apparent from the face of such disclosure that such disclosure is applicable to such other schedule(s) or section(s).  The inclusion of any matter, information or item in the Disclosure Schedules as an exception to a representation or warranty shall not be deemed to constitute (i) an admission of any Liability by the Seller Parties to any third party, (ii) an admission that any breach or violation of applicable Laws or any contract or agreement to which the Seller is a party exists or has actually occurred, (iii) an admission that such item is outside the ordinary course of business or not consistent with past practice, or (iv) otherwise imply an admission that such item represents a material exception or material fact, event, circumstance or that such item has had, or would reasonably be expected to have a material adverse effect.  The Disclosure Schedules have been arranged for purposes of convenience in separately titled schedules corresponding to the sections of this Agreement.

**Section 12.18    Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.  Facsimiles, e-mail transmission of .pdf signatures or other electronic copies of signatures shall be deemed to be originals.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;<br>SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Seller and Buyer have caused this Agreement to be executed on the date first written above by their respective duly authorized officers.

**BUYER:**

~~CAPITOL REEF LLC~~

FLICKER LTD.

By:
Name:
Title:

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**SELLER:**

JPA No. 111 Co., Ltd.


By:
Name:
Title:

AMERICAS 111542653

Exhibit A

<u>DEFINITIONS</u>

"<u>Action</u>" means any action, suit, arbitration, audit, investigation or proceeding by or before any Government Authority.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person that, at the time of determination, directly or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with such specified Person; <u>provided</u>, <u>however</u>, that for the purposes of this Agreement (a) no Seller Party shall be deemed an Affiliate of Buyer, nor, after the Closing, of any Transferred Entity which is transferred to Buyer pursuant to this Agreement and (b) after the Closing, Buyer shall be deemed an Affiliate of each of the Transferred Entities.

"<u>Agreement</u>" means this Asset Purchase Agreement, dated as of ~~January~~March [●], 2022, by and among the Seller and Buyer, including the Disclosure Schedules and the Schedules, Exhibits, and all amendments to such agreement made in accordance with <u>Section 12.10</u>.

"<u>Aircraft</u>" means the one (1) Airbus A350-900 XWB aircraft with manufacturer serial number 067, (including the Airframe, the Engines, the APU, each Part and the Aircraft Documents) or, if applicable, any part of it.

"<u>Aircraft Documents</u>" has the meaning given to such term in the Aircraft Lease.

"<u>Aircraft Head Lease</u>" means the Aircraft Lease Agreement dated November 19, 2018 (as amended form time to time) between the Seller, as lessor, and the Aircraft Head Lessee, as lessee.

"<u>Aircraft Head Lessee</u>" means JLPS Leasing Draco Limited (formerly known as DAE Leasing (Ireland) 12 Limited).

"<u>Aircraft Lease</u>" means the Aircraft Lease Agreement dated November 19, 2018 (as amended from time to time) between the Aircraft Head Lessee, as lessor, and the Aircraft Lessee, as lessee.

"<u>Aircraft Lease Security Assignment</u>" means the Deed of Security Assignment dated November 21, 2018 between the Aircraft Head Lessee, assignor, and the Seller, as assignee.

"<u>Aircraft Lessee</u>" means Vietnam Airlines JSC, as lessee, under the Aircraft Lease.

"<u>Aircraft Related Cash</u>" means all Cash held by or on behalf of the Seller in connection with the Aircraft Head Lease, the Aircraft Lease, any Related Aircraft Document or the Aircraft.

"<u>Airframe</u>" means the Aircraft together with all Parts related to it, but excluding the Engines (or any engines from time to time installed thereon) and the Aircraft Document.

"<u>APU</u>" means (i) the auxiliary power unit of the Aircraft as identified in Schedule ~~1 of the Aircraft Lease~~4.12(a) hereof and having the manufacturer's serial number set out in the Acceptance Certificate; or (ii) any auxiliary power unit substituted for that auxiliary power unit in accordance with this Agreement, title to which has transferred to the Seller.

"<u>Assigned Property</u>" has the meaning given to such term in the Aircraft Lease Security Assignment.

"<u>Back-up Termination Date</u>" means the first to occur of (i) ~~February 28, 2022,~~the Outside Date (if applicable, as extended pursuant to the terms hereof), (ii) consummation of the sale transaction under a Competing Bid, and (iii) the termination of this Agreement pursuant to Section 11.01(f) or (iv) Buyer's receipt of notice from the Seller of the release by the Seller of Buyer's obligations under <u>Section 8.03</u>.

Exhibit A-1

"Bankruptcy and Equity Exception" means the effect on enforceability of (a) any applicable Law relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Law relating to or affecting creditors' rights generally and (b) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

"Bidding Procedures" means the bidding procedures annexed as Exhibit 1 to the Sale Procedures Order.

"Business" means the ownership and leasing of the Aircraft by the Seller.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which commercial banks in the Cities of (i) New York, New York, or (ii) Tokyo, Japan are required or authorized by Law to be closed.

"Buyer Affiliate Loan Obligation" means any Senior Obligation or Junior Obligation, as the case maybe, due and owing to the Buyer, Strategic Value Partners, LLC., or any affiliate thereof, including, without limitation, any managed funds and accounts of such person, in its capacity as a Senior Loan Party or a Junior Loan Party.

"Cape Town Convention" means, together, the Convention on International Interests in Mobile Equipment and its Protocol on Matters Specific to Aircraft Equipment.

"Cash" means all cash and cash equivalents, including (i) checks, commercial paper, treasury bills, certificates of deposit and other bank deposits, securities, derivative securities, securities entitlements, instruments and other investments and all bank accounts and securities accounts, and (ii) all cash deposits (e.g., customer, security and maintenance deposits arising under any Transferred Contract or Excluded Contract or other cash deposits for rent, electricity, telephone or otherwise) and restricted cash, in each case, calculated in accordance with GAAP and the Seller's books and records.

"Closing" has the meaning ascribed to such term in Section 2.04 hereof.

"Closing Conditions" means conditions to the respective obligations of the Parties to consummate the Transactions, as set forth in ARTICLE X.

"Closing Date" has the meaning ascribed to such term in Section 2.04 hereof.

"Closing Location" means a location over international waters or such other location as may be agreed between the Parties.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Consent" means any consent, approval, signature, novation, waiver of rights or authorization.

"Contract" means any written contract, agreement, undertaking, indenture, note, bond, mortgage, lease, sublease, license, sublicense, sales order, purchase order or other instrument or commitment that purports to be binding on any Person or any part of its property (or subjects any such assets or property to a Lien).

"Control" means, as to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise. The terms "Controlled by," "Controlled," "under common Control with" and "Controlling" shall have correlative meanings.

"Cure Costs" means any and all amounts, costs or expenses (including, for the avoidance of doubt, accrued and invoiced accounts payable with respect to Transferred Contracts) that must be paid or actions

AMERICAS 111542653

or obligations that must be performed or satisfied pursuant to the Bankruptcy Code to effectuate the assumption by the Seller, and the assignment to Buyer, of the Transferred Contracts to which the Seller is party, as determined by the Bankruptcy Court or agreed to by the Seller and the non-Seller counterparty to the applicable Transferred Contract.

"Data Room" has the meaning ascribed to such term in the Bidding Procedures.

"Debt" means, without duplication, (i) indebtedness or other obligations for borrowed money or in respect of loans or advances or issued in substitution for or exchange of indebtedness for borrowed money or loans or advances, whether short-term or long-term, secured or unsecured, (ii) any indebtedness or other obligations evidenced by any note, bond, debenture or other debt security, (iii) all obligations to pay the deferred purchase price of property or services, contingent or otherwise (including all "earn-out" obligations), (iv) all obligations under interest rate and currency hedging agreements, including swap breakage or associated fees, (v) all obligations arising from bankers' acceptances, letters of credit (to the extent drawn) and cash/book overdrafts or similar facilities, (vi) any indebtedness or other obligations guaranteed, including guarantees in the form of an agreement to repurchase or reimburse or that assures a creditor against loss, (vii) any obligations under leases that have been or are required to be, in accordance with GAAP, recorded as capital leases, (viii) any indebtedness or other obligations secured by a Lien on any Seller Party's or Transferred Entity's interest in any assets (including any Aircraft), and (ix) all accrued interest, premiums, penalties (including any prepayment penalties or premiums) and other obligations related to any of the foregoing; *provided*, *however*, that the term "Debt" excludes all obligations arising under any Transferred Contracts to the extent relating to any period after the Closing Date.

"Disclosure Schedules" means the disclosure schedules dated as of the Agreement Date delivered by the Seller to Buyer, which form a part of this Agreement.

"Draft New Aircraft Lease" means the draft of the Aircraft Lease Agreement, between the New Aircraft Head Lessee, as lessor, and the Aircraft Lessee, as lessee, in the form as executed by the Aircraft Lessee and contained in the Data Room.

"Draft Side Letter Agreement" means the draft of the Side Letter Agreement (MSN 0067) among the New Aircraft Head Lessee, as the lessor under the Draft New Aircraft Lease, the Aircraft Lessee, as the lessee under the Draft New Aircraft Lease, Seller, as the current owner of the Aircraft, and JP Lease Products & Services Co., Ltd., as the owner of the Seller, in the form as executed by the Aircraft Lessee and contained in the Data Room.

"Effective Time" means 11:59 p.m. (local time) on the last calendar day immediately preceding the Closing Date.

"Enforcement Action" means any exercise of any rights or remedies of the Seller under and in connection with the Loan Transaction Documents, the Aircraft Head Lease, the Aircraft Lease or any Relevant Document; provided, however, that with respect to the Aircraft Head Lease, the exercise of such rights or remedies of the Seller shall be subject to the Enforcement Notice and Bill of Sale.

"Enforcement Notice and Bill of Sale" shall have the meaning ascribed to such term in Section 8.02(b).

"Engine" means the Rolls Royce Trent XWB84 engine with engine serial numbers [●] and [●], , together with all Parts installed in or on such engine at Delivery (as defined in the Aircraft Lease) or (ii) any Replacement Engine which has replaced an engine referred to in clause (i) above or this clause (ii) in accordance with the Aircraft Lease, title to which has vested in the Seller, and shall include all Replacement Parts at any time installed in or on any such engine in accordance with the Aircraft Lease.

Exhibit A-3

"<u>Exhibits</u>" means the exhibits dated as of the Agreement Date (and as may be amended from time to time) which form a part of this Agreement.

"<u>GAAP</u>" means U.S. generally accepted accounting principles.

"<u>Government Authority</u>" means any U.S. federal, state or local or any supra-national or non-U.S. government, political subdivision, governmental, regulatory or administrative authority, instrumentality, agency, body or commission, self-regulatory organization or any court, tribunal, or judicial or arbitral body.

"<u>Hazardous Materials</u>" means any substance, material or waste that is defined or regulated as "hazardous," "toxic," a "pollutant," a "contaminant" or words of similar meaning and regulatory effect under any applicable Environmental Law, including petroleum products or byproducts, asbestos, polychlorinated biphenyls or radiation.

"<u>IDERA</u>" means an Irrevocable De-Registration and Export Request Authorization as required by the Cape Town Convention authorizing the Buyer, as lessor, to deregister and export the Aircraft from the State of Registration in the form approved by the applicable Governmental Authority.

"<u>IRS</u>" means the U.S.  Internal Revenue Service.

"<u>Junior Facility Agreements</u>" has the meaning given to such term in the Proceeds Agreement.

"<u>Junior Finance Parties</u>" has the meaning given to such term in the Proceeds Agreement.

"<u>Junior Interest Amount</u>" means all accrued interest on the Junior Loans to the extent accrued under the Junior Facility Agreements and unpaid.

"<u>Junior Loans</u>" has the meaning given to such term in the Proceeds Agreement.

"<u>Junior Obligations</u>" means the Outstanding Junior Principal Amount, plus the Junior Interest Amount, plus the Junior Out-of-Pocket Amounts.

"<u>Junior Out-of-Pocket Amounts</u>" means (a) any indemnification and other out of pocket expenses owing to the Junior Finance Parties under the Junior Facility Agreements and the other Loan Transaction Documents, <u>plus</u> (b) any breakage costs attributable to the pay-off as such breakage costs are determined as of the Closing Date to the extent that such breakage costs are reimbursable or subject to indemnification under the Junior Facility Agreements and the other related Loan Transaction Documents.

"<u>Law</u>" means any U.S. federal, state, local or non-U.S. statute, law, ordinance, regulation, rule, code, Order or other requirement or rule of law (including common law) promulgated by a Government Authority.

"<u>Liabilities</u>" means any liability, Debt, guarantee, claim, demand, expense, commitment or obligation (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or known or unknown, due or to become due) of any kind, nature or and description, including all costs and expenses related thereto, regardless of whether or not required to be disclosed on a balance sheet prepared in accordance with GAAP and regardless of whether or not immediately due and payable.

"<u>Lien</u>" means any mortgage, deed of trust, pledge, hypothecation, security interest, encumbrance, claim, lien (as defined in Section 101(37) of the Bankruptcy Code) or charge of any kind.

"<u>Loan Transaction Documents</u>" has the meaning given to Transaction Documents in the Proceeds Agreement.

AMERICAS 111542653

"Losses" means all losses, damages, costs, expenses, and Liabilities actually suffered or incurred (including reasonable attorneys' fees).

"New Aircraft Head Lessee" means Bowie Aircraft Leasing Limited.

"New Aircraft Lease" means the Aircraft Lease Agreement, between the Buyer, as lessor, and the Aircraft Lessee, as lessee, in the form of the Draft New Aircraft Lease and amended, modified and revised in accordance with the terms of this Agreement.

"Other Agreement" means the Asset Purchase Agreement dated ~~January~~March [●], 2022 between JPA No. 49 Co., Ltd., as seller, and Isle Royal LLC, as buyer.

"Other Seller" means JPA No. 49 Co., Ltd.

"Other Transactions" means the "Transactions" as defined under the Other Agreement.

"Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Government Authority.

"Outstanding Junior Principal Amount" means the outstanding principal amount of the Junior Loans.

"Outstanding Senior Principal Amount" means the outstanding principal amount of the Senior Loans.

"Part" means, with respect to an Airframe, Engine, any APU, avionics, appliance, part, instrument, appurtenance, accessory, furnishing or other item of equipment of whatever nature (other than an Engine) which may from time to time be incorporated or installed in or attached to the relevant Airframe or Engine and to which the Seller that owns such Airframe or Engine has title or, after removal therefrom, so long as title thereto shall remain vested in the Seller.

"Permits" means all permits, licenses, registrations (other than Aircraft registrations), concessions, grants, franchises, certificates (other than aviation-related certificates) and waivers issued or required by any Government Authority under applicable Law.

"Permitted Liens" means the following Liens:  (a)  statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen, workmen, repairmen and other Liens imposed or permitted by Law, in the ordinary course of business for amounts that are not delinquent, or that are being contested in good faith by appropriate proceedings that do not involve any reasonable likelihood of the sale, seizure, forfeiture or loss of any Aircraft or title thereto, (c) Liens for fees or charges of any airport or air navigation authority that are not delinquent or which are being contested in good faith by appropriate proceedings that do not involve any imminent likelihood of the sale, seizure, forfeiture or loss of any Aircraft, Engine or title thereto, (d) salvage or similar rights of insurers under insurance policies maintained by the Seller, the Aircraft Lessee or any sublessee thereof, (e) the Aircraft Head Lease, the Aircraft Lease and the Related Aircraft Documents and any subleases or sub-subleases under the Aircraft Leases and all Liens arising by or through the Aircraft Head Lessee, the Aircraft Lessee, sublessee or sub-sublessees (whether or not such Lien is in breach of the Aircraft Head Lease or Aircraft Lease), (f) deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance or other types of social security and (g) defects or imperfections of title (except with respect to any Aircraft), exceptions, easements, covenants, rights of way, restrictions and other similar charges, defects or encumbrances not materially interfering with the leasing of the Aircraft and that do not materially detract from the value of the Aircraft and the Transferred Assets.

AMERICAS 111542653

"<u>Person</u>" means any natural person, general or limited partnership, corporation, company, trust, limited liability company, limited liability partnership, firm, association or organization or other legal entity.

"<u>Pledged Amounts</u>" means any amount (whether Cash or non-Cash) held by or on behalf of the Senior Finance Parties or the Junior Finance Parties, as the case may be, in connection with the Senior Facility Agreements or the Junior Facility Agreements, as the case may be, and that, in each case, is pledged as security for the Senior Obligations and/or the Junior Obligations, as the case may be, and such Senior Finance Parties or Junior Finance Parties, as the case may be, are entitled to retain and apply against any Senior Obligation or Junior Obligation, as the case may be.

"<u>Pre-Closing Period</u>" means the period beginning on the Agreement Date and ending on the earlier of the Closing Date and the date this Agreement is terminated in accordance with its terms.

"<u>Proceeds Agreement</u>" means the Proceeds Agreement dated November 6, 2018 (along with exhibits, schedules and appendices thereto and as modified and in effect from time to time) originally between, among others, Seller, as borrower and Credit Agricole Corporate and Investment Bank, as security agent.

"<u>Related Aircraft Documents</u>" means, with respect to the Aircraft Head Lease and the Aircraft Lease, the agreements and instruments relating to such Aircraft Head Lease or Aircraft Lease, as the case may be, to which the Seller is a party, has an interest and/or which benefit the Seller.

"<u>Release</u>" means the presence, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, migration, movement or disposing into or through the environment.

"<u>Relevant Documents</u>" has the meaning given such term in the Aircraft Lease.

"<u>Replacement Engine</u>" has the meaning given to such term in the Aircraft Lease.

"<u>Replacement Part</u>" has the meaning given to such term in the Aircraft Lease.

"<u>Representative</u>" of a Person means the directors, officers, employees, advisors, agents, consultants, attorneys, accountants, investment bankers or other representatives of such Person.

"<u>Required Approvals</u>" means the approvals of the Government Authorities set forth on <u>Schedules 10.01(b) and 10.02(b).</u>

"<u>Sale Order</u>" shall be an Order or Orders of the Bankruptcy Court in the form of Exhibit C to the Sale Motion and conforming to the terms hereof, or otherwise in form and substance reasonably acceptable both to Buyer and the Seller, approving this Agreement and the Other Agreement, and the terms and conditions hereof and thereof, approving and authorizing the Seller Parties to consummate the Transactions, and the Other Seller Parties to consummate the Other Transactions, determining that each of Buyer and Other Buyer is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code.

"<u>Sale Procedures Order</u>" means that certain Order of the Bankruptcy Court in the form of Exhibit A to the Sale Motion and conforming to the terms hereof, or otherwise in form and substance reasonably acceptable both to Buyer and the Seller Parties.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended.

"<u>Senior Facility Agreements</u>" has the meaning given to such term in the Proceeds Agreement.

"<u>Senior Finance Parties</u>" has the meaning given to such term in the Proceeds Agreement.

AMERICAS 111542653

"Senior Interest Amount" means all accrued interest on the Senior Loans to the extent accrued under the Junior Facility Agreements and unpaid.

"Senior Loans" has the meaning given to such term in the Proceeds Agreement.

"Senior Obligations" means the Outstanding Senior Principal Amount, plus the Senior Interest Amount, plus the Senior Out-of-Pocket Amounts.

"Senior Out-of-Pocket Amounts" means (a) any indemnification and other reasonable and documented out of pocket expenses owing to the Senior Finance Parties under the Senior Facility Agreements and the other Loan Transaction Documents, plus (b) any breakage costs attributable to the pay-off as such breakage costs are determined as of the Closing Date to the extent that such breakage costs are reimbursable or subject to indemnification under the Senior Facility Agreements and the other related Loan Transaction Documents.[8]

"Side Letter Agreement" means the Side Letter Agreement (MSN 0067) among the Buyer, as the lessor under the New Aircraft Lease, the Aircraft Lessee, as the lessee under the New Aircraft Lease, Seller, as the former owner of the Aircraft, and JP Lease Products & Services Co., Ltd., as the owner of the Seller, in the form of the Draft Side Letter Agreement and amended, modified and revised in accordance with the terms of this Agreement.

"State of Registration" means, as of the date hereof, Vietnam.

"Tax" or "Taxes" means all federal, state, local, foreign and other income, excise, gross receipts, ad valorem, value-added (including VAT), sales, use, production, employment, unemployment, severance, franchise, profits, registration, license, lease, service, service use, environmental, recording, documentary, filing, permit or authorization, stamp, business and occupation, gains, property, leasing, transfer, payroll, intangibles or other taxes, duties, levies or charges of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax or additional amounts imposed by any Taxing Authority with respect thereto.

"Tax Returns" means all returns, reports and other filings (including elections, declarations, disclaimers, notices, disclosures, schedules, estimates, claims (including claims for refunds) and information returns) supplied or required to be supplied to a Taxing Authority relating to Taxes or otherwise appropriate, including any amendments thereof.

"Taxing Authority" means any federal, state, local or non-U.S. jurisdiction (including any subdivision and any revenue agency of a jurisdiction) imposing Taxes and the agencies, if any, charged with the collection, administration or enforcement of such Taxes for such jurisdiction.

"Total Set Off Amount" means the aggregate amount of any Pledged Amount and any Buyer Affiliate Loan Obligations.

---

[8] Each of the Parties agrees that if the Buyer so elects during the period between (i) the date the Court rules on the *Motion of the Debtors for Entry of an Order (I) Determining Secured Claims of Prepetition Credit Facilities or (II) in The Alternative, Estimating Amount of Claims Asserted by Fitzwalter Capital Partners (Financial Trading) Limited and its Affiliates*, dated February 28, 2022 [Docket No. 136], and (ii) the Closing, then the Parties will utilize commercially reasonable efforts to establish a cap (which cap shall be based upon the reasonableness requirements provided under Section 506 of the Bankruptcy Code) on the Senior Out-of-Pocket Amounts and, if such cap is not so agreed upon by the Parties, that such cap can be fixed by the Bankruptcy Court upon application by either Party (which the Parties hereby agree may be determined on an expedited basis by the Court). [NTD: Such language remains subject to further review and agreement (with each Party required to act reasonably) depending on Court's determinations at the Sale Hearing.]

Exhibit A-7

"<u>Transaction Agreements</u>" means this Agreement, the Bill of Sale, Assignment and Assumption Agreement, the Aircraft Bill of Sale, the Sale Order and any other agreements, instruments or documents required to be delivered at the Closing, in each case including all exhibits and schedules thereto and all amendments thereto made in accordance with the respective terms thereof.

"<u>Transactions</u>" means the transactions contemplated by this Agreement and the other Transaction Agreements.

"<u>Transfer Taxes</u>" means all sales, use, excise, <u>ad valorem</u>, direct or indirect real property, transfer, intangible, stamp, business and occupation, value added (including VAT), recording, documentary, filing, permit or authorization, leasing, license, lease, service, service use, severance, import, export and consumption Taxes together with any interest and any penalties, additions to tax or additional amounts imposed by any Taxing Authority with respect thereto.

"<u>Trigger Event</u>" means the occurrence of any of the following events: (i) any material breach of this Agreement by Seller; (ii) any material breach of the Other Agreement by the Other Seller; (iii) a Competing Bid approved by the Bankruptcy Court is consummated; (iv) the consummation of a debtor-in-possession or other financing (whether in or outside of the Bankruptcy Case) sufficient to (y) repay all of the Senior Obligations and the Junior Obligations and (z) pay the Expense Reimbursement and the Break-up Fee to the Buyer; (v) the Seller transfers any part of the Transferred Assets other than to the Buyer (whether in or outside of Bankruptcy Case); (vi) a "Trigger Event" occurs under the Other Agreement; or (vii) the Seller fails to consummate the Transaction on or before the Outside Date other than as a result of any delay caused by Buyer (other than in connection with the Seller failing to satisfy a Closing Condition and/or being in breach of this Agreement); or (viii) the Seller makes or allows changes to be made to the Sale Procedures Order, except for changes agreed in writing by the Buyer (which consent shall not unreasonably withheld).

"<u>U.S.</u>" means the United States of America.

"<u>VNA Claims</u>" means the claims against the Aircraft Lessee (in the amount of up to $6,000,000) provided for under Clause 2.3 of the Draft Side Letter Agreement.

"<u>VNA Claims (Retained) Portion</u>" means a seventh-twelfth (7/12) portion (58.3333333%) of the proceeds of the VNA Claims that are being retained by the Seller.

"<u>VNA Claims (Buyer) Portion</u>" means a five-twelfth (5/12) portion (41.6666667%) of the proceeds of the VNA Claims that are being beneficially sold to the Buyer through a full participation.

AMERICAS 111542653

Exhibit B-1

FORM OF BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

**BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "Agreement"), dated as of [●], 2022 by and among JPA No. 111 Co., Ltd. (the "Assignor") and ~~Capitol Reef LLC, a limited liability company formed in the State of Delaware~~Flicker Ltd. ("Assignee") (each of the Assignor and Assignee, a "Party" and, together, the "Parties").

Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in that certain Asset Purchase Agreement (as amended, supplemented or otherwise modified, the "Purchase Agreement"), dated as of ~~January~~March [●], 2022, by and among Assignee, as buyer, and Assignor, as seller.

**WHEREAS**, Assignor and Assignee have entered into the Purchase Agreement pursuant to which Assignee has agreed to purchase the Transferred Assets and to assume the Assumed Liabilities, in each case on the terms and subject to the conditions set forth in the Purchase Agreement; and

**WHEREAS**, pursuant to this Agreement, the Assignor shall sell, convey, assign, transfer and deliver to Assignee, and Assignee shall purchase, acquire, accept and assume from the Assignor, all of the Assignor's right, title and interest in, to, and under the Transferred Assets and the Assumed Liabilities, in each case on the terms and subject to the conditions set forth in the Purchase Agreement (including Section 2.02 thereof).

**NOW, THEREFORE**, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      Assignment of Transferred Assets.  Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement (including Section 2.02 thereof), the Assignor hereby sells, conveys, assigns, transfers and delivers to Assignee, and Assignee hereby purchases, acquires and accepts from the Assignor, all of such Assignor's right, title and interest in, to, and under the Transferred Assets, other than the Aircraft.

2.      Assumption of Assumed Liabilities.  Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement (including Section 2.02 thereof), Assignee hereby assumes and agrees to pay, discharge and perform in accordance with their terms, all of each Assignor's obligations and liabilities under the Assumed Liabilities; provided, that Assignee is not assuming or agreeing to pay, discharge or perform any Excluded Liabilities.

3.      Binding Agreement.  This Agreement is binding upon and inures to the benefit of the Parties and be enforceable by the legal representatives, respective successors and permitted assigns of the Parties.

4.      Conflict.  The respective rights of Assignor and Assignee with respect to the Transferred Assets sold, conveyed, assigned, transferred and delivered hereby and the Assumed Liabilities assumed hereby shall be governed exclusively by the Purchase Agreement and nothing in this Agreement shall alter any liability or obligation arising under the Purchase Agreement, which shall (without limiting the generality of the foregoing) govern, and shall contain the sole and exclusive representations, warranties and obligations of the Parties with respect to such Transferred Assets and such Assumed Liabilities.  If there is any conflict or inconsistency between the provisions of the Purchase Agreement and this Agreement, the provisions of the Purchase Agreement shall govern.

Exhibit B-1-1

5.      <u>Sole Remedy</u>.  The sole and exclusive remedy of the Assignee and Assignor with respect to a breach of this Agreement shall be as set forth in the Purchase Agreement.

6.      <u>Notices</u>.  All notices and other communications under or by reason of this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when personally delivered, (b) when delivered by e-mail transmission with receipt confirmed (followed by delivery of an original by another delivery method provided for in this <u>Section 6(b)</u> or <u>Section 12.02</u> upon delivery by overnight courier service, in each case to the addresses and attention parties indicated below (or such other address, e-mail address or attention party as the recipient party has specified by prior notice given to the sending party in accordance with this <u>Section 6</u>):

| | |
|---|---|
| If to Assignor, to: | [●] |
| With a copy (which will not constitute notice) to: | [●] |
| If to Assignee, to: | [●] |

7.      <u>Severability</u>.  If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of this Agreement will not in any way be affected or impaired.  If the final judgment of a court of competent jurisdiction or other Government Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

8.      <u>Amendments</u>.  This Agreement may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each of Assignor and Assignee.

9.      <u>Further Assurances</u>.  Each of the Parties shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all reasonable further documents, and shall take such reasonable actions as may be necessary or appropriate to make effective the transactions contemplated hereby as may be reasonably requested by the other Party.

10.      <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument. Facsimiles, e-mail transmission of .pdf signatures or other electronic copies of signatures shall be deemed to be originals.

11.      <u>Governing Law</u>.  This Agreement, and any Action that may be based upon, arise out of or relate or be incidental to this Agreement, the negotiation, execution, performance or consummation of the transactions contemplated by this Agreement or the inducement of either Party to enter into this Agreement, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising, will be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of New York, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of New York to be applied.

12.      <u>No Third-Party Beneficiaries</u>.  This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person not a Party hereto, including any Affiliates of any such Party.

AMERICAS 111542653

13.    <u>Entire Agreement</u>.  This Agreement, and the Purchase Agreement (and all exhibits and schedules thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and supersede all prior negotiations, correspondence, understandings, agreements and Contracts, whether written or oral, among the Parties respecting the subject matter hereof.

[Signature page follows]

AMERICAS 111542653

IN WITNESS WHEREOF, Assignee and Assignors have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

ASSIGNORS

By:
Name:
Title:

By:
Name:
Title:

ASSIGNEE

By:
Name:
Title:

By:
Name:
Title:

By:
Name:
Title:

<u>EXHIBIT B-2</u>

<u>FORM OF AIRCRAFT BILL OF SALE</u>

**AIRCRAFT BILL OF SALE** (this "<u>Aircraft Bill of Sale</u>"), dated ~~January~~March [●], 2022 by JPA No. 111 Co., Ltd. ("<u>Seller</u>").  For valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller, owner of the full legal and beneficial title to the aircraft, engines, equipment and documents described below (the "<u>Aircraft</u>"):

      1.      one [●] (Generic Model [●]) Aircraft bearing manufacturer's serial number [●];

      2.      two [●] (Generic Model [●]) Engines bearing manufacturer's serial numbers [●] and [●]; and

      3.      all equipment, accessories and parts belonging to, installed in or appurtenant to such aircraft or engines,

does hereby sell, grant, transfer and deliver all of its right, title and interest in and to the Aircraft, to ~~Capitol Reef LLC~~Flicker Ltd. ("<u>Buyer</u>") under and in accordance with the terms of the Asset Purchase Agreement (as amended, supplemented or otherwise modified, (the "<u>Purchase Agreement</u>"), dated ~~January~~March [●], 2022, by and among Buyer and JPA No. 111 Co., Ltd., to have and to hold the Aircraft forever.  Seller hereby warrants to Buyer, and its successors and assigns, that there is hereby conveyed to Buyer good title to the Aircraft, free and clear of any Liens other than Permitted Liens, and that the Seller shall defend such title forever.

The terms "Liens" and "Permitted Liens" shall have the same meanings in this Aircraft Bill of Sale as in the Purchase Agreement.

Except as otherwise specifically provided in the Purchase Agreement, the Aircraft is sold "AS-IS" and "WHERE-IS" and such sale is subject to the disclaimers in [<u>Section 4.14</u>] of the Purchase Agreement.

This Aircraft Bill of Sale, and any Action that may be based upon, arise out of or relate or be incidental to this Aircraft Bill of Sale, the negotiation, execution, performance or consummation of the transaction contemplated by this Aircraft Bill of Sale or the inducement of either party to enter into this Aircraft Bill of Sale, whether for breach of Contract (as defined in the Purchase Agreement), tortious conduct or otherwise, and whether now existing or hereafter arising, will be exclusively governed by and construed and enforced in accordance with the internal laws of the State of New York, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of New York, United States to be applied.

[*Signature page follows*]

AMERICAS 111542653

IN WITNESS WHEREOF, Seller has caused this Aircraft Bill of Sale to be duly executed as of this date first above written.

**JPA NO. 111 CO., LTD.**

By:
Name:
Title:
Date:

[SIGNATURE PAGE TO BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT]

**DISCLOSURE SCHEDULES**

**SCHEDULE 2.01(a)(i):         TRANSFERRED SECURITY DOCUMENTS**

The Security Documents (as defined under the Loan Transaction Documents)

**SCHEDULE 2.01(a)(iii):         TRANSFERRED CONTRACTS**

**None**

**SCHEDULES 4.03:     REQUIRED CONSENTS**

**None**

**SCHEDULE 4.06(c):   TRANSFERRED CONTRACTS NOT DELIVERED**

**None**

**SCHEDULE 4.06(e):   DEFAULTS UNDER TRANSFERRED DOCUMENTS**
                        **(other than defaults cured upon assignment under the Bankruptcy Code)**

**None**

**SCHEDULE  4.07:      OTHER ASSETS**
                        **(not included within Transferred Assets or Excluded Assets)**

None

**SCHEDULE  4.09:      OPEN TAXES**

None

## SCHEDULE 4.12(A):  DESCRIPTION OF AIRCRAFT

1.    AIRFRAME

        Manufacturer:                    Airbus

        Type and model:              A350-900 XWB

        Serial number:            MSN 0067

2.    ENGINES

        Engine Manufacturer          Rolls Royce

        Type and model:              Trent XWB84

        Serial numbers:              Engine No 1: 21169 / Engine No 2: 21170

3.    APU

        Manufacturer:                    Honeywell

        Type and model:              HGT1700

        Serial number:            APU SN: 70720014-00 / SN: P-00194

4.    LANDING GEAR

        Manufacturer:              Main Landing Gear (MLG): MESSIER-BUGATTI-DOWTY

                            Nose Landing Gear (NLG):        Liebherr

        Serial number:            LH MLG PN: 10-356503-000 / SN: 16MDG13882

                            RH MLG PN: 10-356603-000 / SN: 16MDG13895

                            NLG PN: 4816A0000-06 / SN: 4816A00LI000169

5.    Aircraft Storage Location; Storage Provider; Amounts Due

        Location:

        Provider:

        Amounts Due:                Subject to entry into of new lease, no amounts due

Exhibit B-2-2

Exhibit B-2-3

AMERICAS 111542653

**Schedule 4.12(b):**        **OPERATING CONDITION EXCEPTIONS**

_____[_____]

Exhibit B-2-4