UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>JPA NO. 111 CO., LTD. and<br>JPA NO. 49 CO., LTD.,<br><br>Debtors.[1] | Chapter 11<br><br>Case No.: 21-12075 (DSJ)<br><br>Jointly Administered |

### DECLARATION OF HEINRICH LOECHTEKEN IN SUPPORT OF ORDER (A) APPROVING THE PROPOSED SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES; AND (B) GRANTING RELATED RELIEF

I, Heinrich Loechteken, being duly sworn, hereby depose and state:

1. I am the CEO of JLPS Ireland Limited ("JLPSI"). JLPSI is responsible for aircraft trading and management for the JPL group, including JPA No. 111 Co., Ltd. and JPA No 49 Co.., Ltd., the debtors and debtors in possession (the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"). JP Lease Products & Services Co. Ltd. ("JP Lease") is the parent company of both JLPSI and the Debtors. On January 26, 2022, I was appointed as director of each of the Debtors.

2. I make this Declaration in support of the relief requested in Part II of the *Debtors' Application for Entry of Orders: (I)(A) Approving Bidding Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (B) Establishing Stalking Horse Bidders and Bid Protections; (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Authorizing Enforcement Actions; (E) Scheduling an Auction and a Sale Hearing; and (F) Approving the Form and Manner of*

---

[1] The Debtors in these Chapter 11 Cases are: JPA No. 111 Co., Ltd. and JPA No. 49 Co., Ltd. The Debtors' corporate address is: Kasumigaseki Common Gate West Tower, 3-2-1 Kasumigaseki, Chiyoda-Ku, Tokyo 100-0013.

*Notice Thereof; and (II)(A) Approving the Sale of the Purchased Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances; and (B) Granting Related Relief*, filed on December 31, 2021 [Docket No. 21] (the "Sale Motion").[2]

3.  Except where specifically noted, the statements in this Declaration are based on my personal knowledge, belief, or opinion; information that I have received from the Debtors' advisors and professionals; or from the records maintained in the ordinary course of business of the Debtors and/or their affiliates.

4.  I am not being compensated for providing this Declaration or testimony. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtors.

**Professional Background and Qualifications**

5.  I have held various executive positions in the fields of aviation and corporate finance over the last thirty years. After working at Deutsche Bank for six years, I served as Chief Credit Officer of DaimlerChrysler Financial and Chief Financial Officer of DaimlerChrysler Capital for six years. During my time at DaimlerChrysler Capital the company acquired a 900+ general aviation aircraft portfolio from the Raytheon Company. I also spent six years as Chief Financial Officer and Chief Investment Officer of AerCap, where I was responsible for all sales and purchases of aircraft, investment in aircraft, joint ventures and securitization, accounting, finance and treasury, and risk management. In 2010, I joined International Lease Finance Corporation (ILFC) as Chief Investment Officer and was responsible for ILFC's

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Sale Motion.

portfolio strategy, for aircraft investment, and for purchase and sale activities. From 2014 to 2017, I served as an executive advisor to Mitsubishi Group Companies, MCAP and Vermillion, and I have been involved in the purchase and sale activities as well as the investment activities of their various aircraft leasing portfolio companies.

6. I have been a director of several AerCap and ILFC subsidiaries. I was the Chairman of the Board of Directors of AerVenture, a joint venture between AerCap and a Kuwaiti investor, for 3 years. AerVenture over time took delivery of 70 new Airbus A320CEO family aircraft.

7. During my time at DaimlerChrysler Capital I was responsible for the sale of about $5 billion in various financial assets including, commercial real estate loans, blue and brown water commercial marine loans, pleasure marine loans, helicopter operating and finance leases, general aviation loans and leases, private jet loans and leases, commercial aircraft assets with leases attached. In my combined ten-year role as Chief Investment Officer and Chief Financial Officer of AerCap and Chief Investment Officer of ILFC, I managed teams that purchased aircraft from Original Equipment Manufacturers ("OEMs"), airlines, and leasing companies. During that timeframe I also managed teams that sold aircraft to airlines, leasing companies, and financial investors. During the aforementioned timeframe, the total volume of purchase (orders from OEMs, Sale and Leasebacks and purchases from leasing companies and investors) and sale of aircraft that I was directly responsible for exceeds $25 billion. Both AerCap and ILFC ordered large quantities of aircraft from the OEMs during my tenure – namely 70 A320 family aircraft plus 30 A330 family aircraft at AerCap and 200 A320NEO family aircraft plus 100 Embraer E2 aircraft at ILFC. Under my direction, AerCap and ILFC regularly purchased aircraft via sale and leaseback transactions from airlines. Both companies also purchased aircraft on lease from other leasing companies

and engaged in active selling of aircraft to leasing companies and financial investors. For example, between 2006 and 2008 alone, my team at AerCap purchased 139 aircraft and sold 110 aircraft. ILFC purchased its aircraft mainly through forward order contracts with the OEM. During my time as Chief Investment Officer of ILFC I oversaw the sale of 200 aircraft.

8. I was also responsible for the sale of debis AirFinance to Cerberus Capital in 2005 and the subsequent IPO of AerCap (ex debis AirFinance) in a deal valued at $2.8 billion, the acquisition of AeroTurbine in 2006 in a deal valued at $0.3 billion, the sale of a 50% equity interest in AerCap Partners 1 Holding Limited in 2006 in a deal valued at $0.7 billion, and the acquisition of AeroTurbine into ILFC in 2011 in a deal valued at $0.2 billion. As part of the ILFC management team I participated in the sale of ILFC in a deal valued at $28.1 billion.

9. During my time at JP Lease, JP Lease has purchased 10 A350s and has sold 9 A350s. In my role at JLPSI, I was responsible for and directly involved in the purchase of 4 A350s and the sale of 3 A350s.

## Sale and Marketing Efforts

10. I am personally involved in the Debtors' sale process (the "Sale Process") and am leading the team (the "Sale Team") responsible for marketing and selling the Debtors' assets in accordance with the Bankruptcy Court's order approving, among other things, the bidding and auction procedures [Docket No. 102] (the "Bidding Procedures Order"). The Sale Team consists of myself and other individuals at JPLSI with experience in the marketing and sale of aircraft and related assets as well as negotiations with potential bidders.

11. Following the entry of the Bidding Procedures Order, I oversaw what I believe was a fulsome and thorough marketing process for the Purchased Assets

- 4 -

in accordance with the Bidding Procedures Order.  Specifically, the Sale Team (a) contacted a broad range of both strategic and financial investors that may have had an interest in bidding for the Purchased Assets and (b) provided to potential bidders who had signed a customary non-disclosure agreement (the "NDAs") access to a data room containing confidential information about the Purchased Assets, including key diligence information relating to the operations and condition of the Aircraft, the respective engines, and other ancillary equipment, and other miscellaneous matters.  In total, I or other individuals at JPLSI working at my direction contacted total of more than 50 potential bidders.  Approximately 24 potential bidders signed NDAs and accessed the data room.  The Sale Team engaged in extensive discussions with such parties regarding the foregoing.  There is a relatively small pool of buyers who regularly participate in aircraft sales, and we were able to market the Purchased Assets through the typical channels pursuant to which such buyers would consider these types of assets.

12.     I believe that the Debtors, through the Sale Team, conducted a fulsome and thorough marketing process for the Purchased Assets in accordance with the Bidding Procedures Order.  In my view, the Sale Process was fair, open, and competitive.

### The Sale Process Timeline

13.     I believe that the timeline for the Sale Process was reasonable and allowed for market-testing of the Purchased Assets.  Throughout the Sale Process, the Debtors encouraged bidders to participate in the Sale Process and Auction in an effort to facilitate a competitive bidding atmosphere.  However, I understand based on conversations that I and other members of the Sale Team had with potential bidders, that many potential bidders were deterred from participating in the sale process

because of the aggressive and ongoing litigation efforts undertaken by FitzWalter during the Chapter 11 Cases.

14. Following entry of the Bidding Procedures Order, the Sale Team undertook extensive efforts (as described in more detail above) to identify and engage with potential bidders about the formal process set forth in the Bidding Procedures. I believe that from the time the Debtors began their sale efforts until the deadline for submission of Qualified Bids under the Bidding Procedures Order, potential bidders had sufficient time to formulate a bid, obtain diligence information, engage in discussions with the Debtors and the Sale Team, and to submit a bid.

15. While there was substantial interest in the Purchased Assets certain world events that occurred during the bidding period—chiefly, the escalation of conflict in Ukraine—created substantial exposure and uncertainty in the Asian and European markets for many of the potential bidders who were actively conducting diligence. Less than two weeks prior to the bid deadline, on February 24, 2022, Russia began its invasion of Ukraine, which continued and intensified through the bid deadline and remains ongoing, with no end in sight.

16. The deadline for the submission of Qualified Bids under the Bidding Procedures Order was March 7, 2022 at noon (ET) and the Auction was scheduled for March 8, 2022 at 10:00 a.m. (ET). In total, the Debtors marketed the Purchased Assets for 31 days from entry of the initial order approving the Bidding Procedures on February 4, 2022 [Docket No. 101] (which was then amended by the Bidding Procedures Order dated February 7, 2022) to the Bid Deadline on March 7, 2022. I believe that this duration was sufficient to maximize the value of the Purchased Assets.

17.     Shortly before the 12:00 p.m. (ET) bid deadline on March 7, 2022, the Debtors received one offer (the "Non-Qualified Bid") in addition to the Stalking Horse Bid.  While the Non-Qualified Bid did not conform with many of the requirements to be a "Qualified Bid" pursuant to the Bidding Procedures Order, such offer provided a potentially attractive structure with improved economics compared to that set forth in the Stalking Horse Bid.

18.     Following receipt of the Non-Qualified Bid, the Debtors and their professionals worked with the bidder to confirm certain aspects of the offer as well as remedy the defects required to designate such offer as a "Qualified Bid."  In conjunction with these discussions, the Debtors also engaged with the Stalking Horse Bidder to seek to increase the value of the Stalking Horse Bid in light of the structure proposed by the Non-Qualified Bid.

19.     Ultimately, the Debtors reached an agreement with the Stalking Horse Bidder to improve the terms of the Stalking Horse Bid (the "Revised Stalking Horse Bid") on the morning of March 8, 2022, prior to scheduled start time of the Auction.  Because the other bidder did not remedy the defects set forth in the Non-Qualified Bid, in accordance with the Bidding Procedures Order, the Debtors cancelled the Auction, selected the Revised Stalking Horse Bid as the highest and best bid, and designated the Stalking Horse Bidder as the "Successful Bidder" (as defined by the Bidding Procedures Order).  *See Notice of Cancellation of Auction and Designation of Stalking Horse Bidder as Successful Bidder Pursuant to Revised Stalking Horse Bid* [Docket No. 149].

20.     Following the selection of the Stalking Horse Bidder as the Successful Bidder, the Debtors and its advisors continued to negotiate the form of purchase agreement (the "Revised Stalking Horse Purchase Agreement") for the Sale

- 7 -

(the "Proposed Sale") to affiliates of the Stalking Horse Bidder (the "Proposed Purchasers"), the substantially final form of which is attached as Exhibit A to the *Notice of Filing of (I) Revised Stalking Horse Purchase Agreement and (II) Revised Proposed Sale Order In Connection with the Debtors' Proposed Sale*, filed substantially contemporaneously herewith (the "Sale Notice"). The Debtors intend to seek approval of, and thereafter consummate the Proposed Sale with the Successful Bidder, subject to the entry of the revised Sale Order, a copy of which is attached as Exhibit E to the Sale Notice. A hearing to consider approval of the Sale is currently scheduled for March 14, 2022 (the "Sale Hearing").

**The Proposed Sale is Fair, Reasonable,
and In the Best Interests of the Debtors' Estates**

21. The Proposed Sale pursuant to the Revised Stalking Horse Purchase Agreements represents a positive outcome for the Debtors. The Proposed Sale provides for, among other things, payment in full of the Debt Facilities and a cash payment to the Debtors' estates of $5,000,000 (the "Cash Component").

22. I understand that FitzWalter Capital Partners (Financial Trading) Limited and its affiliates ("FitzWalter") have asserted that additional amounts constitute "Secured Obligations" under the Transaction Documents, which the Debtors dispute.[3] To the extent that any alleged Secured Obligations remain unresolved by the Bankruptcy Court or disputed by the parties as of the Sale Hearing, I understand that

---

[3] I understand the Intermediate Lessors have asserted ownership of the Lease Assets which the Debtors dispute. The Intermediate Lessors, which are incorporated under Irish law, were formed solely for the purpose of acting as an Irish intermediary between Vietnam Airlines (in Vietnam) and the Debtors (in Japan), and have no other business. There is currently no tax treaty in effect between the countries of Vietnam and Japan, while Ireland has standing tax treaty with both countries. The Intermediate Lessors were formed so that rent payments could be made from Vietnam Airlines to an Irish entity, which could then be passed to the Japanese Debtors without deducting any withholding taxes from the payments.

the Debtors have requested that the Bankruptcy Court establish an escrow to be used to satisfy such amounts that the Bankruptcy Court (or the parties) determine are valid Secured Obligations.  I understand that the Cash Component is anticipated to be sufficient for the Debtors' estates to pay all administrative expenses and unsecured claims in the Chapter 11 Cases, with any remainder distributed to equity, pursuant to a chapter 11 plan of liquidation to be submitted by the Debtors at a later date.

23. The Revised Stalking Horse Purchase Agreements represent an unambiguously positive outcome for all parties, particularly the prepetition Lenders, which are to be paid in full at the closing of the Proposed Sale.  I believe the terms of the Proposed Sale, which result from the extensive marketing process described above, constitute a sound exercise of the Debtors' business judgment and are fair, reasonable, and in the best interests of the Debtors and their estates and should be approved.

### The Proposed Purchasers Are Good Faith Purchasers

24. The Proposed Purchasers should be determined to be a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and should be entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code, and any other applicable or similar bankruptcy and non-bankruptcy law.

### Conclusion

25. In conclusion, I believe that the terms of the Proposed Sale are fair, reasonable, and market-tested.  Debtors have determined, in the exercise of their reasonable business judgment, that moving forward with the Proposed Sale would be in the best interest of the Debtors and their estates and is the best way to maximize value to all creditors and all other parties in interest.  Thus, I believe that the Proposed Sale should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct to the best of my knowledge.

Dated: Shannon, Ireland
March 11, 2022

By: /s/ *Heinrich Loechteken*
Name: Heinrich Loechteken
Title: Director